UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
:
CYPRESS HOLDINGS, III, L.P., individually and :
derivatively on behalf of SPORT-BLX, INC., :
: Case No. 22-cv-01243 (LGS)
Plaintiff, :
:
-against- :
: **DECLARATION OF**
GEORGE HALL, JOSEPH DEPERIO, SPORT- : **JOSEPH DE PERIO IN SUPPORT**
BLX, INC. and GLASSBRIDGE ENTERPRISES, : **OF DEFENDANTS' MOTION TO**
INC., : **DISQUALIFY**
:
Defendants. :
:
------------------------------------------------------------- X

I, Joseph De Perio, declare and state as follows:

1. I am a Director at GlassBridge Enterprises, Inc. ("GlassBridge"). I am also an individual defendant in this action. I offer this declaration in support of my (along with George Hall's, and Sport-BLX Inc.'s) motion to disqualify Fox Rothschild — our former corporate lawyers — from representing a party suing us.

2. Unless otherwise indicated, I have personal knowledge of the facts contained herein and, if called as a witness, I could and would testify competently thereto.

3. In its Amended Complaint, Cypress Holdings, III, L.P. ("Cypress") appears to allege that GlassBridge purchased shares of Sport-BLX in some round about effort to deprive Cypress of a purported contractual right to a seat on the Sport-BLX Board of Directors, and that GlassBridge was somehow unjustly enriched through its business relationship with Cypress and Sport-BLX. Despite the allegations in the Complaint that make it appear as though GlassBridge simply purchased shares of Sport-BLX in December 2019 and then sold its shares in December 2021, GlassBridge's Sport-BLX asset purchases and investments were continuous throughout the

time period it was represented by Fox Rothschild on the Pension Benefit Guaranty Corporation ("PBGC") matter, and were based on GlassBridge's investment strategy during that time.

4. Thus, Fox Rothschild was privy to all manner of information traditionally kept within the bounds of attorney/client confidences.

5. Beyond that, and perhaps more personally upsetting, a Fox Rothschild partner — Pamela Thein — when I raised these concerns at the time, made repeated personal assurances that the firm understood it was improper to be adverse to us, and would take swift and definitive action to correct it. That the firm has apparently attempted to walk back those commitments is particularly troubling.

6. And finally, Ms. Thein was privy to discussions about what Plaintiff's current counsel, Marc Gross, complained of at that time, by virtue of working with GlassBridge on the whole affair *and* speaking to Mr. Gross about it. Her testimony on that subject, therefore, will ultimately show that Plaintiff's federal claims are stale.

## BACKGROUND ON GLASSBRIDGE AND RELATED EVENTS

7. GlassBridge is a publicly traded corporation incorporated in Delaware, with its principal place of business in New York, New York. GlassBridge owns and operates an asset management business through various subsidiaries. GlassBridge has less than ten employees, most of whom work on GlassBridge's various investment strategies and projects.

8. GlassBridge was formerly known as Imation Corp. ("Imation"). Upon information and belief, GlassBridge was formed in 1996 as a spinoff of 3M Co. At that time, I understand and believe Imation Enterprises Corp. ("IEC"), was a subsidiary of Imation/GlassBridge.

9. I am informed and believe that Imation manufactured and IEC marketed a wide variety of products and services for the information processing industry, specializing in data storage and imaging applications through several different units. Imation's business units

included: (1) data storage; (2) printing and publishing systems; (3) medical imaging systems and photo color products; (4) customer service technology; and (5) document imaging. Upon information and belief, Imation developed and manufactured the products for the various business lines and then sold them to the Adara Enterprises Corp. ("Adara") at cost, which Adara, in turn, marketed and sold through commercial and retail channels.

10. From the beginning, however, I am informed and believe that Imation and its subsidiaries, including Adara, struggled to be profitable. As a result, upon information and belief, Imation began to divest itself of various business lines in 1998 until it became focused solely on data storage by 2005.

11. I am informed and believe that between 2005 and 2015, Adara made certain strategic acquisitions and attempted to pivot its business to meet rapidly changing data storage market needs and trends. Despite these efforts, I understand that Adara still failed to be profitable.

12. In the third quarter of 2015, Imation adopted a restructuring plan to begin the termination of all of its data storage business operations, and Adara wound down its distribution business for those products. During this time, Adara sought to ensure that all of its known creditors from its legacy business were paid in full. By the first quarter of 2016, Imation's data storage business was effectively wound-down and all but a handful of small vendor claims had been repaid. The remaining vendors were paid in the following months, leaving Adara with no known unsecured creditors, other than, from time to time, trade payables incurred in the operation of Adara's business that were paid in the ordinary course.

13. Having completed the wind-down of its data storage business, in 2017 GlassBridge and Adara acquired new management to help pivot its business to asset management. That new

management team included Daniel Strauss, as President of Adara. At or about that time, Imation announced its name change to GlassBridge and its new focus on asset management.

14. As part of the Adara and GlassBridge pivot, Daniel Strauss along with the new management team sought to resolve certain outstanding debts owed by GlassBridge. Prior to this restructuring, GlassBridge had become delinquent on its pension obligations. The PBGC, a U.S. Government agency that protects retirement incomes in private sector defined benefit pension plans, threatened to foreclose on GlassBridge to recoup the monies owed to GlassBridge's pension plan.

15. GlassBridge's new management team worked to resolve GlassBridge's prior pension liabilities with the PBGC. GlassBridge's pension plan was terminated on April 30, 2019, when GlassBridge's application for termination of the GlassBridge Enterprises Cash Balance Pension Plan was approved by the PBGC. Following the termination of GlassBridge's pension plan, GlassBridge worked and negotiated with the PBGC to resolve its outstanding pension liabilities.

**GLASSBRIDGE'S DECISION TO PURCHASE AND SELL SPORT-BLX COMMON STOCK WHILE REPRESENTED BY FOX ROTHSCHILD**

16. Beginning in early 2019, when Fox Rothschild was GlassBridge's — along with, as set out in the accompanying declaration of George Hall, a company called Clinton Group's — counsel, we began acquiring shares of Sport-BLX. Through a variety of transfers beginning in January 2019 through December 2019, GlassBridge owned approximately 50% of the outstanding shares of Sport-BLX.

17. On January 4, 2019, GlassBridge was issued 10,526 common shares of Sport-BLX, and made a commitment to invest $1,000,000 in Sport-BLX. This commitment allowed

GlassBridge to acquire an estimated 10% of Sport-BLX, and GlassBridge funded its $1,000,000 investment in installments over the course of 2019.

18. In addition to GlassBridge's initial stock purchase and $1,000,000 investment, GlassBridge made additional purchases and investments in Sport-BLX stock throughout 2019.

19. On September 16, 2019, GlassBridge purchased 679 shares of Sport-BLX common stock, for $178,854.

20. October 18, 2019, Adara Enterprises Corporation (a subsidiary of GlassBridge) purchased 2,314 shares of Sport-BLX common stock for $609,524.72. These investments were publicly disclosed in GlassBridge's 10-Q filing, dated November 8, 2019.

21. On December 12, 2019, GlassBridge purchased from me, 17,076 shares of Sport-BLX common stock in exchange for $606,198 in cash and a $5,455,782 principal amount promissory note.

22. On December 12, 2019, GlassBridge purchased from George Hall, 37,924 shares of Sport-BLX common stock in exchange for $1,346,302 in cash and a $12,116,718 principal amount promissory note.

23. Given these stock purchases in 2019, as of December 31, 2019, GlassBridge owned 50.67% of Sport-BLX.

24. GlassBridge also made loans to Sport-BLX, and on October 1, 2019, GlassBridge made a loan to Sport-BLX for $1,750,000. This loan publicly was disclosed in GlassBridge's 10-Q filing, dated November 8, 2019.

25. In mid-July 2021, GlassBridge wanted to divest itself of its investment in Sport-BLX. On July 31, 2021, GlassBridge assigned obligations owed to it from Sport-BLX, totaling $4,176,102, to Fintech Debt Corporation ("FDC"), for $400,000, and on December 30, 2021,

GlassBridge sold its remaining 68,519 shares of Sport-BLX common stock to FDC for $137,038. GlassBridge's sales of its interests in Sport-BLX common stock was at a significant loss.

26. Fox Rothschild was counsel starting in, at the latest, March 2016, and was our llegal counsel for almost the entirety of the viable life of investment in Sport-BLX,[1] with the exclusion of GlassBridge's final December 30, 2021 share sale to FDC. During this time Fox Rothschild had confidential and sensitive information pertaining to our intentions to make additional investments in Sport-BLX.

27. Additionally, given the allegations in the Complaint, I have deep concerns about the legal advice we received from Fox Rothschild.

28. Fox Rothschild was responsible for evaluating the value of Sport-BLX as an investment.

29. As set out above, Fox Rothschild's work in representing GlassBridge to the PBGC involved a detailed evaluation of the Sport-BLX investment, its business model — along with having access to the data room used for various diligence — and ultimately represented successfully to the PBGC that the investment was so valuable that essentially standing alone, it outweighed significant liabilities.

30. If there was some kind of fraud involved in that process (and there was not), particularly when it comes to personal liability, I was largely listening to the advice of my counsel — Fox Rothschild.

31. That also means that, should I need to defend my decisions during this period, I intend to call Ms. Thein and have her explain exactly what she explained to me at the time. I

---

[1] After the filing of this lawsuit, the value of Sport-BLX has plummeted essentially to nothing.

expect she will testify that she did not see anything untoward about any of the things the Complaint identifies — because she evaluated all of them at the time, and used those same facts to convince the PBGC that Sport-BLX was extraordinarily valuable.

### FOX ROTHSCHILD'S ASSURANCES THAT THEY WOULD CEASE ADVERSE REPRESENTATIONS

32. With the exception of GlassBridge's initial Sport-BLX investment, all of GlassBridge's investments and loans to Sport-BLX during 2019 occurred after GlassBridge was assured by Fox Rothschild, on September 3, 2019, that it would not represent Cypress in bringing claims adverse to GlassBridge related Sport-BLX.

33. Attached as **Exhibit 1** is a true and correct copy of an email thread, with the most recent email dated September 3, 2019.

34. Attached as **Exhibit 2** is a true and correct copy of a letter,[2] dated June 10, 2019, addressed to George Hall, from Marc Gross (a partner at Fox Rothschild), which is the document that was attached to the first email in Exhibit 1. *See* Ex. 1 at 13 ("It was distressing to receive the enclosed correspondence from one of your partners on behalf of Cypress Holdings III, LP").

35. During the period I was exchanging the emails in Exhibit 1, I also had frequent phone conversations with Ms. Thein.

36. Exhibit 1 is, and I understood it to be, a threat to sue us (that is, myself, George Hall, Clinton Group, and Sport-BLX), sent to us by our own lawyers.

37. Obviously, that was distressing. At this time, GlassBridge was an investor in Sport-BLX – a fact that Fox Rothschild was clearly aware of because of its existing representation of

---

[2] The letter appears to follow Fox Rothschild formatting and document numbering — both of which I am familiar with from my time as their client — but omits the letterhead itself, listing Mr. Gross as a partner in an unknown firm.

GlassBridge. Given all of our investment in Sport-BLX and the effect any potential lawsuit would have on all of us, I reached out to Ms. Thein, expressing that, "It was distressing to receive the enclosed correspondence from one of your partners on behalf of Cypress Holdings III, LP. As background, Cypress, a 4% shareholder of SportBLX, has made a number of unsubstantiated statements and has communicated 'potential claims' to be asserted under law. Further, Cypress has suggested a buyout of his shares at 2x the purchase price from this past February. It is frustrating since all the matters in the letter were also diligenced and discussed in advance of the investment and recorded in our data room." Ex. 1 at 12-13.

38. Ms. Thein apparently shared my shock: after an immediate response saying she would look into it, she said she was "pleased to report that our law firm is withdrawing from representation of Cypress in the Sports-BLX matter" and "sorry you were put in the position of having to contact us, but sincerely appreciate your thoughtfulness in doing so," concluding that "GlassBridge and the Clinton Group are important to us and we value our relationship." Ex. 1 at 10.

39. However, that did not stop the matter. Just a month later, Marc Gross's name appeared again on correspondence from Plaintiff, in which he was being unnecessarily antagonistic on routine matters. *See, id.,* at 7-8. So, once again, I reached out to Ms. Thein — and once again she shared my shock.

40. Her response was apologetic: "I'm sorry to read this message. As I wrote to you earlier, I was told Marc withdrew. I have asked about Marc's name on that e-mail. The person I need to speak with is apparently out of the office today (he is in our Philadelphia office), but please know I am asking and will get back to you as soon as I confirm why Marc was copied on that message to you. Again, my apologies you had to contact us about this matter. Thank you for your

patience, it is greatly appreciated." *Id.* at 6.  She followed up in kind: "I am as confused as you must be, Joe. I am sorry and will forward your message to our firm's general counsel. Thank you. I really do appreciate your patience. And my apology is sincere." *Id.* at 4.

41. In short, her messaging left no ambiguity that (1) she understood that Fox Rothschild could not ethically be adverse to us relative to the Sport-BLX investment and (2) she found it hard to understand how Mr. Gross could think such a representation was appropriate.

42. Even then, however, Plaintiff continued to receive advice from Mr. Gross — and Plaintiff continued to include Mr. Gross on adversarial communications.  *See, id.* at 3.  I once again raised this with Ms. Thein.  *Id.*  Her response again reiterated that Mr. Gross's role — if it involved giving advice to Plaintiff — was completely inappropriate.  *Id.* at 2 ("I am as disappointed and surprised by all this as you are and I just called our firm's general counsel office to ask – again - why Marc is being copied on these e-mails to you. (Our general counsel is out of the office this week but I spoke with another attorney in our general counsel's office who said she would handle this right away.)").

43. That final instance appeared to end the affair.  Ms. Thein assured us (capitalization in original): "Marc Gross confirmed this afternoon that he is NOT representing Michael Salerno on this matter and referred Mr. Salerno to other legal counsel." *Id.* at 1.

44. Throughout this period, I spoke with some frequency on the phone with Ms. Thein as well.  The sum and substance of those calls was that she assured us, without using these words, that Mr. Gross's behavior here was him "going rogue" and he was on a frolic of his own.  Thus, I understood Ms. Thein's references in the emails to the firm's general counsel's office to be about controlling and undoing unauthorized behavior by Mr. Gross.

45. She and I also spoke about Fox Rothchild's conflict check process — essentially trying to figure out how Mr. Gross could have believed it was okay to represent Plaintiff against GlassBridge, Clinton Group, Sport-BLX, George Hall, and myself — given our status as current Fox Rothschild clients.  Necessarily implicit in that conversation was an obvious assumption: there *was* a conflict of interest.

46. Finally, Ms. Thein's representations at the end of the that email chain induced us to continue to use Fox Rothschild's services.  That is, it was the clarity and definitiveness of her action faced with Mr. Gross's behavior that allowed us to feel comfortable spending a significant amount more money on the firm's services.  Had we known that the firm intended to fire us as a client and sue us, we would have likely sought some remedy for the inappropriate, conflicted conduct back in 2019 — but would have never paid the firm anything more.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 31st day of May 2022.

_____
JOSEPH DE PERIO