**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------- X
   :
CYPRESS HOLDINGS, III, L.P., individually and  :
derivatively on behalf of SPORT-BLX, INC.,  :
   :  Case No. 22-cv-01243 (LGS)
   Plaintiff,  :
   :
   -against-  :
   :  **DECLARATION OF**
GEORGE HALL, JOSEPH DEPERIO, SPORT-  :  **GEORGE HALL IN SUPPORT OF**
BLX, INC. and GLASSBRIDGE ENTERPRISES,  :  **DEFENDANTS' MOTION TO**
INC.,  :  **DISQUALIFY**
   :
   Defendants.  :

-------------------------------------------------------------- X

I, George Hall, declare and state as follows:

1.    I am the CEO of Sport-BLX.  I am also an individual defendant in this action.  I offer this declaration in support of my (along with Joseph De Perio's, and Sport-BLX Inc.'s) motion to disqualify Fox Rothschild — the former corporate lawyers of GlassBridge Inc. and by extension Sport-BLX — from representing a party suing us.

2.    Unless otherwise indicated, I have personal knowledge of the facts contained herein and, if called as a witness, I could and would testify competently thereto.

3.    The document attached to Mr. De Perio's Declaration as Exhibit 2 is a true and accurate copy of a letter sent to me by Marc Gross, threatening to pursue legal action against me (and seemingly, by implication, Mr. De Perio and Sport-BLX).

4.    For brevity, I can say the background in the Strauss and De Perio declarations is accurate, and I will also use the same abbreviations and terms defined therein.

### PBGC AND THE RISK TO GLASSBRIDGE'S PENSIONS

5.      In late 2018, I learned that the PBGC — a U.S. Government agency that protects retirement incomes in private sector defined benefit pension plans — was considering forcing a liquidation and seizure of GlassBridge assets to partially satisfy pension liability.

6.      Thus, in November 2018, I traveled to Washington to visit the office of PBGC and do what I could to seek a better solution.  I did this as I was largest shareholder and consultant to GlassBridge.  At that time, I owned 30 percent of GlassBridge, and my other company — Clinton Group — was serving as a consultant to GlassBridge.

7.      I was able to arrange a meeting with Cynthia Wong at the PBGC.

8.      During that meeting, I discussed some of the positive things going on at GlassBridge and respectfully requested some time to offer alternative proposals to a liquidation.

9.      One of the opportunities that GlassBridge had was its significant position in SportBLX a promising start up which I thought had significant value and could be collateral for a settlement that might be more valuable than whatever the PBGC could get in a bankruptcy — as well as (obviously) being better for GlassBridge shareholders.

10.     In my estimation SportBLX could be very valuable and given time, would allow PBGC to get a better recovery while still preserving some value for GlassBridge shareholders.

11.     That approach was ultimately successful as the PBGC delayed the foreclosure and negotiated a settlement.   The pension plan was terminated in April 2019 and final settlement was entered in September of 2019

12.     This came about in large part because of the work of Pamela Thein and her colleagues at Fox Rothschild.      Fox Rothschild and Ms. Thein represented GlassBridge in the final transactions with PBGC — and was aware of the potential value of SportBLX.

13.     While I did not personally attend meetings and was not involved in the direct communication Ms. Thein had with the PBGC, based on what information that she had access to— and as an email I am happy to submit in camera, with emails between GlassBridge, PBGC, and Fox Rothschild representatives dating from between March 5, 2019 and March 15, 2019 would demonstrate — she was aware of the significant value that GlassBridge and the PBGC put on the potential enterprise value of Sport-BLX's business model.

14.     That is, as counsel to GlassBridge, and given the importance of Sport-BLX as collateral for the settlement, Fox Rothschild, as Glassbridge's counsel, had unfettered access to information about Sport-BLX.  Based on that access, Fox Rothschild and GlassBridge principals negotiated a favorable deal based significantly on the Sport-BLX value.

**SALERNO AND CYPRESS'S CONDUCT, AND FOX ROTHSCHILD'S WITHDRAWAL**

15.     On February 28, 2019, after much negotiation and due diligence Sport-BLX and Salerno came to a meeting of the minds and an agreement was executed that he would invest in the company and be given a board seat.

16.     Rather than fund his commitment immediately, he waited.  In our estimation it was an inappropriate length of time.

17.     Thus, on March 8th Mr. De Perio informed Mr. Salerno via email that we no longer wished to have him as an investor.  A true and correct copy of that email is attached as **Exhibit 1**.

18.     I followed up with a call and discussion explaining that we did not want him to invest, and we should agree to void the agreement.

19.     However, based upon information and belief, a fear of "missing out," set in and  on March 12, Mr. Salerno ignored our request and wired money pursuant to the agreement.

20.     While I cannot draw any firm conclusions, that Fox Rothschild shared something about the privileged valuation of the firm does seem to be a possible conclusion from the following facts:

(a)     On March 8, we asked Mr. Salerno not to invest;

(b)     On March 12, despite that request — and apparently despite serious misgivings about things he now claims are so suspicious as to be fraudulent, like the rent — he wired money;

(c)     We provided Fox Rothschild with substantial information showing the value of Sport-BLX in and around early March — and Fox Rothschild used that information in discussions with the PGBC between March 5 and March 14; and

(d)     As set out below, not so long after this (June 10), Mr. Salerno used Fox Rothschild to threaten to sue Sport-BLX, myself, and GlassBridge.

21.     Ultimately, given that our agreement did not specify a deadline for the wiring of money, we decided we were bound to accept Mr. Salerno's the money pursuant to the terms of the offer.

22.     Over the next several months, as the business plan was executed, it became apparent that Sport-BLX would need to disclose all the beneficial owners of the company including the beneficial owners of Cypress.

23.     Sport-BLX hired a consultant to make application for various regulatory approvals. Those approvals were an essential step in Sport-BLX's business plan.

24.     Plaintiff is an LLC and an investment vehicle, managed by Michael M. Salerno.

25.     Salerno refused to disclose the full ownership of Cypress. *See, e.g.,* De Perio Ex. 1 at 8 ("I am willing to provide FINRA [itself] with ownership information that they want however I am not willing to provide it to you or any other sport-blx directors" (typography preserved)); *see also, id.* at 7 (noting Plaintiff's "refusal to cooperate in ordinary course is damaging to advancing our process"). What is quoted in De Perio Exhibit 1 was his best attempt at cooperation — before

this, he had stonewalled any requests for these required disclosures, and, ultimately, he rejected the request to disclose ownership information out of hand, saying it was "no one's business."

26.     So, in sum, at the same time Fox Rothschild was representing GlassBridge in its transactions with the PBGC, Plaintiff was refusing to disclose the ownership group of the entity (Cypress III LLC) — and that disclosure was a regulatory requirement and essential to pursuing the Sport-BLX business.

27.     Also at that time, Plaintiff was a member of the Sport-BLX Board — and thus had applicable fiduciary duties to the company.

28.     De Perio, Sport-BLX, and I made extensive efforts to get Salerno to disclose the required details of Cypress's ownership and investor structure, explaining at length that his refusal was going to make the business plan untenable.

29.     But, despite his obligation as a fiduciary to the company, Salerno refused to make the required disclosures.

30.     That is, Salerno would not disclose who investors of Cypress were, despite repeated requests and evidence that this would cripple the business plan as this disclosure was necessary to meet regulatory requirements.

31.     In an attempt to remedy the situation — and faced with the prospect of having to abandon the initial business plan — we offered to buy out Salerno for a massive profit:  he invested $1,000,000.00, and we offered to buy him out at a 170% ($1,700,000.00) return after a mere ***three months***.

32.     But Mr. Salerno demanded more (specifically, $2,000,000.00).[1]

---

[1] By this time Salerno was aware of everything he alleges in the suit was not disclosed to him (i.e., the cost of rent, rent and number of employees, and the firm's need for space).  Putting aside that prior to investing he had ample access and reviewed and discussed this information with

33.     When the company could not capitulate to his attempted shakedown, 12 days later, we received a letter from Marc Gross, threatening to sue us (De Perio Ex. 2).

34.     Mr. Gross requested I get counsel for him to speak directly to — at the same time Fox Rothschild was representing GlassBridge, a large stakeholder in the very entity Gross was threatening to sue.

35.     I forwarded the letter to Joe De Perio, who reached out to our primary attorney on these matters, Pamela Thein.

36.     Shortly thereafter, Ms. Thein sent an email to all of us, assuring us that Mr. Gross would no longer be involved in any way.

37.     Given the assurances offered by Ms. Thein — in an email cc'd to me — GlassBridge and Sport-BLX (and its employees) believed that Fox Rothschild would not be adverse to us.

38.     The details of that exchange are set out in more detail in the De Perio Declaration, but in short, by the end, we were assured that Fox Rothschild and Mr. Gross were "NOT representing Michael Salerno on this matter and referred Mr. Salerno to other legal counsel" — and that Mr. Gross "should not be copied on any future e-mails" or otherwise involved.  De Perio Ex. 1 at 1.

39.     Based on that, GlassBridge continued using Fox Rothschild's services — and continued to make confidences in them.

---

management, by his own admission in the suit, he had all this information at the time he was offered $1.7 million, yet he rejected the offer and asked for $2 million. Yet, now Salerno claims that if not for that supposed "misinformation" he would not have invested the initial $1,000,000. An email thread showing these demands and offers is attached as **Exhibit 2**.  All of that suggests very strongly that this entire suit is brought in bad faith.

40.     I understood Ms. Thein's communication to be a binding agreement.   Ms. Thein represented what happened to be a breach of Fox Rothschild's ordinary ethics process that was "disappoint[ing]" to all concerned — and so that GlassBridge continued to use Fox Rothschild's services, the firm agreed specifically that it would stop representing Cypress and Salerno, refer them "to other legal counsel," and that Mr. Gross "should not be copied on any future e-mails you receive from Mr. Salerno on this matter."  De Period Ex. 1 at 1-2.

41.     That is, I understood Ms. Thein and Fox Rothschild would cease representing Salerno and Cypress in any future conflict — especially the suit threatened in the June 10th letter.

## THIS SUIT IS THE SAME SUIT MR. GROSS THREATENED, AND CALLS INTO QUESTION FOX ROTHSCHILD'S REPRESENTATIONS

42.     There is no question in my mind that the present suit is the same one that Mr. Gross threatened back in 2019, and that Ms. Thein and Fox Rothschild's general counsel promised they were not pursuing.

43.     In fact, some of the initial complaint appears to be copied and pasted from that letter:

(a)   "…apparently Sport-BLX had entered into a lease for certain commercial office space, expending approximately $500,000 per annum for occupancy for less than five employees."  Complaint (ECF No. 2-1 ¶ 23);

(b)   "…apparently Sport-BLX has entered into a lease for certain commercial office space, expending approximately $500,000 per annum for an occupancy for less than five **(5)** employees."  De Perio Ex. 2 at 1 (difference bolded).

44.     Indeed, this particular complaint is troubling because it seems that Plaintiff is alleging that the company was worthless because it was required to pay a large rent.  But as Ms. Thein would testify, the business plan — which included that rent — was so promising, the PBGC was willing to accept it as collateral to forestall foreclosure.  And Mr Salerno rejected a generous

buyout, instead demanding an even more inflated buyout.  Yet, he claims now that if not for some

alleged misinformation he would not have invested in the first place.

45.     In short, Fox Rothschild, in opposing this motion — through Marc Gross — is

reversing a firm and "sincere" apology and promise (Ex. 1 at 4),  and suing its own client

(GlassBridge) and largest shareholder of that client (me) the chairman of the board of its client

(Joe De Perio), and the company which was the largest asset of its client (SportBLX).

I declare under penalty of perjury that the foregoing is true and correct.  Executed this

31st day of May 2022.

GEORGE HALL