# EXHIBIT A

Message

| | |
|---|---|
| **From:** | Michael Salerno [msalerno@nppg.com] |
| **on behalf of** | Michael Salerno <msalerno@nppg.com> [msalerno@nppg.com] |
| **Sent:** | 2/19/2019 4:52:38 PM |
| **To:** | Joseph De Perio [joseph.deperio@clinton.com] |
| **Subject:** | FW: Sport-BLX |
| **Attachments:** | SPORTBLX - SPA_Salerno Pre-Series A-3620213-v1.DOCX; SPORTBLX - SPA_$95 per share-3619612-v1.DOCX; Sport-BLX - Side Letter_revised-3620607-v1.DOCX |

Hi joe,

See attached.  Let me know if you would like to discuss... ttyl


Cordially,

Michael M. Salerno
**NPPG** Fiduciary Services

**N**ORTHEAST **P**ROFESSIONAL **P**LANNING **G**ROUP, Inc.
**NPPG** Investment Services, LLC
**NPPG** Fiduciary Services, LLC
- *Employee Benefits & Retirement Planning*
- *Actuarial & Retirement Plan Administration*
- *Registered Investment Advisory Services*
- *Fiduciary Consulting Services*

121 Monmouth Street
Red Bank, NJ 07701
Phone: (732) 758-1577 ext. 239  |  Fax: (732) 758-1582

www.nppgfs.com




You are hereby advised that any tax **or other professional guidance** contained in this communication or any attachments is not intended or written to be used, nor can it be used for the purpose of (i) avoiding any tax-related penalties under the internal revenue code or (ii) supporting, marketing or recommending any tax-related matters contained in this communication. **You are further advised that any e-mail communications from Northeast Professional Planning Group, Inc. ("NPPG") or its affiliates may originate from an electronic mailing address associated with any of NPPG or its affiliates, and the electronic mailing address used for any specific communication is not indicative of the entity whose services have been retained.** Confidentiality notice: the document accompanying this communication contains information from NPPG, including its members and affiliates, which is confidential and/or legally privileged. If you are not the intended recipient named above, you are hereby notified that any disclosure, copying, or distribution of the information is strictly prohibited, and the documents should be returned to this firm immediately. If you have received this communication in error, please notify us by telephone immediately **and before accessing or distributing this communication or any accompanying documents or attachments.**

SPORTBLX0148243

**From:** Philip D. Forlenza <PForlenza@ghclaw.com>
**Sent:** Tuesday, February 19, 2019 4:33 PM
**To:** Michael Salerno <msalerno@nppg.com>
**Subject:** Sport-BLX

Michael:

Please see redlined copies of the Stock Purchase Agreements and side letter showing suggested changes.

| **Giordano Halleran & Ciesla**<br>Attorneys at Law | Philip D. Forlenza, Esq.<br>Shareholder<br>www.ghclaw.com<br>www.njcorporatelaw.com<br>Direct Dial: (732) 219-5483 · F: (732) 224-6599<br>125 Half Mile Road · Suite 300 · Red Bank, NJ 07701-6777 | **website | biography | vcard** |
| --- | --- | --- |

**From:** Michael Salerno [mailto:msalerno@nppg.com]
**Sent:** Tuesday, February 12, 2019 6:39 PM
**To:** Philip D. Forlenza <PForlenza@ghclaw.com>
**Subject:** RE: DOCS

Phil I will call u tomorrow around 1030ish… thanks   see below caps

**From:** Philip D. Forlenza <PForlenza@ghclaw.com>
**Sent:** Tuesday, February 12, 2019 10:41 AM
**To:** Michael Salerno <msalerno@nppg.com>
**Subject:** RE: DOCS

Michael:
I have reviewed the documents.  The following are the issues I would like to discuss with you:

1.   Why are there two Stock Purchase Agreements with different pricing?
I AM INVESTING 500K AT 9.5MM AND 500K AT 25MM WITH DOWNSIDE PROTECTION IN THE EVENT THEY DO NOT DO NEXT ROUND ABOVE OR AT 25MM
2.   Consideration should be given to expanding the representations being made by Sport –BLX, Inc. (e.g., capitalization, financial statements, no litigation, intellectual property).
AGREED
3.   the right of first refusal you are being asked to grant should terminate when the company goes public.
WE CAN DISCUSS BUT SOUNDS RESONABLE
4.   Do you want to request tag-along rights so that you can participate in a sale if the Founders decide to sell their shares?
YES
5.   Why does anti-dilution protection only apply to the shares purchased under the second stock purchase agreement?
IT SHOULD APPLY TO BOTH
6.   Is the ant-dilution protection trigger of $1,500,000 too high?
LETS DISCUSS

Let me know when you would like to speak.

| **Giordano** | Philip D. Forlenza, Esq.<br>Shareholder | **website | biography | vcard** |
| --- | --- | --- |

**Halleran &
Ciesla**
Attorneys at Law

www.ghclaw.com
www.njcorporatelaw.com
Direct Dial: (732) 219-5483 · F: (732) 224-6599
125 Half Mile Road · Suite 300 · Red Bank, NJ 07701-6777

**From:** Michael Salerno [mailto:msalerno@nppg.com]
**Sent:** Thursday, February 07, 2019 4:50 PM
**To:** Philip D. Forlenza <PForlenza@ghclaw.com>
**Subject:** Re: DOCS

Ty

Cordially,

Michael M. Salerno
President

**N**ORTHEAST **P**ROFESSIONAL **P**LANNING **G**ROUP, Inc.
**NPPG** Fiduciary Services, LLC
**NPPG** Investment Services, LLC

•Fiduciary Consulting Services
•*Registered Investment Advisory*
•*Employee Benefits & Retirement Planning*
•*Actuarial & Retirement Plan Administration*

121 Monmouth Street
Red Bank, NJ 07701
(732) 758-1577 ext. 239
www.nppg.com

On Feb 7, 2019, at 3:08 PM, Philip D. Forlenza <PForlenza@ghclaw.com> wrote:

Michael: I will review and get back to you.

**Giordano
Halleran &
Ciesla**
Attorneys at Law

Philip D. Forlenza, Esq.     **website | biography | vcard**
Shareholder
www.ghclaw.com
www.njcorporatelaw.com
Direct Dial: (732) 219-5483 · F: (732) 224-6599
125 Half Mile Road · Suite 300 · Red Bank, NJ 07701-6777

**From:** Michael Salerno [mailto:msalerno@nppg.com]
**Sent:** Wednesday, February 06, 2019 7:12 PM
**To:** Philip D. Forlenza <PForlenza@ghclaw.com>
**Subject:** FW: DOCS

Confidential – Subject to Protective Order

SPORTBLX0148245

Phil,
I believe paul sent you my docs... also, See revised docs for review per below...

Lmk when u want to discuss...

Michael

**From:** Joseph De Perio <joseph.deperio@sportblx.com>
**Sent:** Wednesday, February 06, 2019 6:41 PM
**To:** Michael Salerno <msalerno@nppg.com>
**Cc:** geh@clinton.com; Henry Sullivan <hws@clinton.com>
**Subject:** RE: DOCS

Mike – As per the email exchange, please see a revised set of docs enclosed.  I added the redlines of what changed.  Looking forward to our meeting tomorrow.,

Best regards, Joe




Joseph A. De Perio
Sport-BLX, Inc.
510 Madison Avenue, 9th Floor
New York, NY 10022
jad@sportblx.com
(212) 377-4252




**From:** Joseph De Perio <joseph.deperio@clinton.com>
**Sent:** Friday, February 01, 2019 2:36 PM
**To:** Michael Salerno <msalerno@nppg.com>
**Cc:** geh@clinton.com; Henry Sullivan <hws@clinton.com>
**Subject:** DOCS

Mike – Thanks for the patience here.  Enclosed please find  two purchase agreements and a shareholder agreement as per our discussions and email traffic below.  Please feel free to email me or contact me at my office or cell (below) with any questions.  Countersignatures will follow immediately; share certificates will take a few weeks.

Set forth also below is a link to our data room for your diligence records and wiring instructions.    Best regards, Joe



**Data room:**

https://www.dropbox.com/sh/vl5secfhvyfkkww/AAA1hrydo0UkUOHpEg4GAy96a?dl=0



**Wiring:**

SPORTBLX0148246

**Account Name:**
SPORT-BLX, Inc.

**Address:**
510 MADISON AVENUE FL 9
NEW YORK NY, 10022

**Account Number:**
1503337610 money market

**ABA:**
026013576

Joseph A. De Perio
Sport-BLX, Inc.
510 Madison Avenue, 9th Floor
New York, NY 10022
jad@clinton.com
(212) 377-4252
(917) 539-5027 (CELL)

On Tue, Jan 29, 2019 at 17:53 Michael Salerno <msalerno@nppg.com> wrote:

This message was sent securely using Zix®

Joe, yes we are in agreement.  Lookin forward to working with you, George and your team.


     Cordially,


     Michael M. Salerno
     President

     **NORTHEAST PROFESSIONAL PLANNING GROUP, Inc.**
     **NPPG** Fiduciary Services, LLC
     **NPPG** Investment Services, LLC


     •Fiduciary Consulting Services
     •*Registered Investment Advisory*
     •*Employee Benefits & Retirement Planning*
     •*Actuarial & Retirement Plan Administration*


     121 Monmouth Street
     Red Bank, NJ 07701
     (732) 758-1577 ext. 239

Confidential – Subject to Protective Order

www.nppg.com

On Jan 29, 2019, at 5:52 PM, Joseph De Perio <joseph.deperio@clinton.com> wrote:

Mike – We are good with what we discussed.

1.   $500k funded at closing at the founders round  $9.5 mm pre-money valuation

2.   $500k funded at closing at the pre-series A round of $25 mm pre-money valuation

      a.   Price protection in the event the pre series A round comes in inside of $25 mm (in the form of additional shares issued)

3.   Non-transferrable pro rata rights for subsequent investment

4.   Board appointment at closing

If you can respond in the positive to this email, I can have our lawyers prepare a revised purchase agreement.  And, Henry will get you a data room link for diligence files for your records.

Thanks, Joe

Joseph A. De Perio

Clinton Group, Inc.

510 Madison Avenue, 9th Floor

New York, NY 10022

jad@clinton.com

(212) 377-4252

Confidential – Subject to Protective Order

Disclaimer

Clinton Group makes every effort to use reliable information, but cannot make any representation to the accuracy or completeness of the information in this email or items attached to this email. The recipient should note that any disclaimers presented in the attachments are construed to be part of the content transmitted in the body of the email.  Do not expect us to inform you if the information contained herein changes or is updated. We do not accept any liability relating to this information, its completeness or timeliness. This email and the information contained in it and attached to it is not an offer to buy or sell (nor a solicitation of a proposal to buy or sell) securities, funds or any financial instrument. Any such offer or solicitation may be made only by delivery of a private placement memorandum and other offering documents.  Clinton Group and/or its employees may have an investment in, and may effect transactions in, securities and derivatives of securities of companies mentioned in this email. We do not provide tax, legal, regulatory or other advice; we recommend that investors seek advice from independent advisers. Past performance is not necessarily indicative of future performance. The information herein may not be redistributed without the prior written consent of Clinton Group and is not intended for non-professional investors.

This message was secured by Zix&#174.

Disclaimer

Clinton Group makes every effort to use reliable information, but cannot make any representation to the accuracy or completeness of the information in this email or items attached to this email. The recipient should note that any disclaimers presented in the attachments are construed to be part of the content transmitted in the body of the email.  Do not expect us to inform you if the information contained herein changes or is updated. We do not accept any liability relating to this information, its completeness or timeliness. This email and the information contained in it and attached to it is not an offer to buy or sell (nor a solicitation of a proposal to buy or sell) securities, funds or any financial instrument. Any such offer or solicitation may be made only by delivery of a private placement memorandum and other offering documents.  Clinton Group and/or its employees may have an investment in, and may effect transactions in, securities and derivatives of securities of companies mentioned in this email. We do not provide tax, legal, regulatory or other advice; we recommend that investors seek advice from independent advisers. Past performance is not necessarily indicative of future performance. The information herein may not be redistributed without the prior written consent of Clinton Group and is not intended for non-professional investors.

Disclaimer

Clinton Group makes every effort to use reliable information, but cannot make any representation to the accuracy or completeness of the information in this email or items attached to this email. The recipient should note that any disclaimers presented in the attachments are construed to be part of the content transmitted in the body of the email.  Do not expect us to inform you if the information contained herein changes or is updated. We do not accept any liability relating to this information, its completeness or timeliness. This email and the information contained in it and attached to it is not an offer to buy or sell (nor a solicitation of a proposal to buy or sell) securities, funds or any financial instrument. Any such offer or solicitation may be made only by delivery of a private placement memorandum and other offering documents.  Clinton Group and/or its employees may have an investment in, and may effect transactions in, securities and derivatives of securities of companies mentioned in this email. We do not provide tax, legal, regulatory or other advice; we recommend that investors seek advice from independent advisers. Past performance is not necessarily indicative of future performance. The information herein may not be redistributed without the prior written consent of Clinton Group and is not intended for non-professional investors.

This message was secured by Zix®.

This message was secured by Zix®.

Confidential – Subject to Protective Order

SPORTBLX0148249

*Execution Version*

# SPORTBLX, INC.

## COMMON STOCK PURCHASE AGREEMENT

This Common Stock Purchase Agreement (the "***Agreement***") is made as of February 1, 2019, by and among Sport-BLX, Inc., a Delaware corporation (the "***Company***"), Michael M. Salerno (the "***Purchaser***") and, solely for the purposes of Section 4(F), the other shareholders of the Company set forth on <u>Schedule A</u> (the "***Founders***").

In consideration of the mutual covenants and representations set forth below, the Company and the Purchaser agree as follows:

1.      **Purchase and Sale of the Shares.**  Subject to the terms and conditions of this Agreement, the Company hereby issues and sells to the Purchaser and the Purchaser hereby purchases from the Company 2,497 shares of the Company's Common Stock, par value $0.001 per share (the "***Shares***"), at a price of $200.18 per share.  No fractional shares will be issued. The Company will issue, as promptly as practicable, a stock certificate, registered in the name of the Purchaser, evidencing the Shares.

2.      **Representations of Company.**   The Company hereby makes the following representations:

A.  ***Authorization.***  The execution, delivery and performance by the Company of the this Agreement and the consummation of the transactions contemplated hereby (a) are within the power of the Company and (b) have been duly authorized by all necessary actions on the part of the Company.  This Agreement constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms.  The Shares, upon issuance will be duly authorized, validly issued, fully paid and nonassessable.

B.  ***No Conflicts.***  The execution, delivery and performance of this Agreement by the Company, and the consummation of the transactions contemplated hereby and thereby, will not (a) result in any material violation of or be in material conflict with or constitute, with or without the passage of time and giving of notice, a material default under or breach of the Certificate of Incorporation or bylaws of the Company or any material provision of any instrument, judgment, order, writ, decree or contract to which the Company is a party or by which it is bound, or (b) result in any material violation of any provision of federal or state statute, rule or regulation applicable to the Company.

C. ***Capitalization.***  Exhibit A hereto sets forth the authorized and the issued and outstanding capital stock of the Company as of the date hereof.  Except  as set forth on Exhibit A there are no subscription rights, options, warrants, conversion rights, purchase rights or other agreements that may or would require the Company to issue, sell, transfer or otherwise cause to become outstanding any capital stock of the Company.

NY: 915746-4

**D.  Financial Statements.**  The Company has heretofore delivered to Purchaser a copy of the unaudited balance sheet of the Company as of December 31, 2018 (the "**Most Recent Balance Sheet**"), together with the unaudited statement of operations for the Company for the twelve months ended December 31, 2018 (the "**Financial Statements**").  The Financial Statements are in accordance with the books and records of the Company, have been prepared in accordance with U.S. Generally Accepted Accounting Principles consistently applied, and fairly present the financial position of the Company in all material respects as of the date thereof, and the income or loss for the period then ended.

**E.  Absence of Undisclosed Liabilities.**  Except as (1) reflected or reserved against on the Most Recent Balance Sheet or (2) incurred since the date of the Most Recent Balance Sheet in the ordinary course of business and consistent with past practice, the Company has no liability in excess of $10,000.

**F.  Litigation and Claims.**  There is no (i) claim or (ii) legal, administrative, arbitration or other proceeding, suit or action, or governmental investigation or enforcement action (**"Proceeding"**), pending, or to the Company's knowledge, threatened against the Company, its employees to the extent involving or relating to the Company, the Company's assets or securities of the Company.

**G.  Compliance with Law.**  The business of the Company is being conducted, and has been conducted, in compliance with all applicable laws and regulations in all material respects. The Company possesses all authorizations, permits and licenses necessary to permit it to operate its business in the manner in which it presently is conducted.

H.  **No Infringement.**  The intellectual property used by the Company in its business does not infringe upon the rights of any third party.

3.    **Representations of Purchaser.**  The Purchaser hereby makes the following representations:

A.  **Authorization.**  The execution, delivery and performance by the Purchaser of the this Agreement and the consummation of the transactions contemplated hereby (a) are within the power of the Purchaser and (b) have been duly authorized by all necessary actions on the part of the Company.  This Agreement constitutes a legal, valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms.

B.  **Purchase for Own Account.**  Purchaser is purchasing the Shares solely for investment purposes for its own account, and not with a view to the resale or distribution of any part thereof. Purchaser is not a party to, and does not presently intend to enter into, any contract or other arrangement with any other person or entity involving the resale, transfer, grant or participation with respect to or other distribution of any of the shares.

C.  **Access to Information.**  Purchaser has had opportunity to discuss the plans, operations and financial condition of the Company with its officers, directors or controlling persons, and has received all information Purchaser deems appropriate for assessing the risk of an investment in the Shares.

Confidential – Subject to Protective Order

SPORTBLX0148251

D. *Restricted Securities.*  Purchaser understands that the shares are "restricted securities" under applicable US federal and state securities laws and that  Purchaser must hold the shares indefinitely, unless any subsequent proposed resale by Purchaser is registered under the Securities Act or an exemption from registration is otherwise available, and that the Company is under no obligation to register any subsequent proposed resale of the Shares.

E. *No Public Market*. The Purchaser understands that no public market now exists for the Shares, and that the Company has made no assurances that a public market will ever exist for the Shares.

F. *Accredited Investor.* The Purchaser is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

G. *Foreign Investors.* If the Purchaser is not a United States person (as defined by Section 7701(a)(30) of the Code) (a "*Foreign Investor*"), the Purchaser hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Shares or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the Shares, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained, and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the Shares. The Purchaser's subscription and payment for and continued beneficial ownership of the Shares will not violate any applicable securities or other laws of the Purchaser's jurisdiction.

4.      **Restrictions on Transfer.**

A. *Investment Representations and Legend Requirements.*  The Purchaser understands and agrees that the Company shall cause the legends set forth below, or substantially equivalent legends, to be placed upon any certificate(s) evidencing ownership of the Shares, together with any other legends that may be required by the Company or by applicable state or federal securities laws:

> THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "*ACT*") AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER THE ACT OR, IN THE OPINION OF COUNSEL SATISFACTORY TO THE ISSUER OF THESE SECURITIES, SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE ACT.

> THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LOCK-UP PERIOD IN THE EVENT OF A PUBLIC OFFERING AS SET FORTH IN THE COMMON STOCK PURCHASE AGREEMENT BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE

-3-

SPORTBLX0148252

ISSUER. SUCH TRANSFER RESTRICTIONS, RIGHT OF FIRST REFUSAL AND LOCK-UP PERIOD ARE BINDING ON TRANSFEREES OF THESE SHARES.

B. **_Stop-Transfer Notices._** The Purchaser agrees that to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

C. **_Refusal to Transfer._** The Company shall not be required (i) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or (ii) to treat as owner of such Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Shares shall have been so transferred.

D. **_Lock-Up Period._** The Purchaser hereby agrees that the Purchaser shall not sell, offer, pledge, contract to sell, grant any option or contract to purchase, purchase any option or contract to sell, grant any right or warrant to purchase, lend or otherwise transfer or encumber, directly or indirectly, any Shares or other securities of the Company, nor shall the Purchaser enter into any swap, hedging or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any Shares or other securities of the Company, during the period from the filing of the first registration statement of the Company filed under the Securities Act of 1933, as amended (the "Securities Act"), that includes securities to be sold on behalf of the Company to the public in an underwritten public offering under the Securities Act through the end of the 180-day period following the effective date of such registration statement (or such other period as may be requested by the Company or the underwriters to accommodate regulatory restrictions on (i) the publication or other distribution of research reports and (ii) analyst recommendations and opinions, including, but not limited to, the restrictions contained in NASD Rule 2711(f)(4) or NYSE Rule 472(f)(4), or any successor provisions or amendments thereto). The Purchaser further agrees, if so requested by the Company or any representative of its underwriters, to enter into such underwriter's standard form of "lockup" or "market standoff" agreement in a form satisfactory to the Company and such underwriter. The Company may impose stop-transfer instructions with respect to securities subject to the foregoing restrictions until the end of any such restriction period.

E. **_Company ROFR._**  If the Purchaser proposes any assignment, sale, offer to sell, pledge, mortgage, hypothecation, encumbrance, disposition of or any other like transfer or encumbering ("**_Transfer_**") of any Shares, then the Purchaser shall promptly give written notice (the "**_Notice_**") simultaneously to the Company at least thirty (30) days prior to the closing of such Transfer.  The Notice shall describe in reasonable detail the proposed Transfer including, without limitation, the number of Shares to be transferred, the nature of such Transfer, the consideration to be paid, and the name and address of each prospective purchaser or transferee. If such prospective purchaser or transferee is a Foreign Investor, the Purchaser shall notify the Company of Purchaser's intent to transfer or sell to such Foreign Investor.  For a period of fifteen (15) days (the "**_Company ROFR Period_**") following receipt of any Notice, the Company shall have the right to purchase all or a portion of the Shares subject to such Notice on the same terms and conditions as set forth therein.  The Company's purchase right shall be exercised by written notice signed by an officer of the Company (the "**_Company Notice_**") and delivered to the Purchaser within the

-4-

SPORTBLX0148253

Company ROFR Period.  The Company shall effect the purchase of the Shares, including payment of the purchase price, not more than ten (10) business days after delivery of the Company Notice, and at such time the Purchaser shall deliver to the Company the certificate(s) representing the Shares to be purchased by the Company, each certificate to be properly endorsed for transfer.  The Shares so purchased shall thereupon be cancelled and cease to be issued and outstanding shares.

   F. ***Founder ROFR.*** In the event that the Company does not elect to purchase all of the Shares available pursuant to its rights under Section 4(E) within the Company ROFR Period, the Purchaser shall give written notice within twenty (20) days following the earlier to occur of (i) any waiver by the Company of its rights under Section 4(E) or (ii) the expiration of Company ROFR Period (the "***Second Notice***") to each of the Founders, which shall set forth the number of Shares not purchased by the Company and which shall include the terms of Notice set forth in Section 4(E). Each Founder shall then have the right, exercisable upon written notice to the Purchaser (the "***Founder Notice***") within fifteen (15) days after the receipt of the Second Notice (the "***Founder ROFR Period***"), to purchase its pro rata share of the Shares subject to the Second Notice and on the same terms and conditions as set forth therein.  Except as set forth in this section, the Founders who so exercise their rights (the "***P****articipating Founders***") shall effect the purchase of the Shares, including payment of the purchase price, not more than five (5) days after delivery of the Founder Notice, and at such time the Purchaser shall deliver to the Participating Founders the certificate(s) representing the Shares to be purchased by the Participating Founders, each certificate to be properly endorsed for transfer. Each Founder's pro rata share shall be equal to the product obtained by multiplying (i) the aggregate number of Shares covered by the Second Notice and (ii) a fraction, the numerator of which is the number of Shares held by the Participating Founder at the time of the First Notice, and the denominator of which is the total number of shares of Shares issued or issuable or other rights to acquire Shares at the time of the First Notice held by all Founders.  In the event that not all of the Founders elect to purchase their pro rata share of the Shares available pursuant to their rights under this Section within the Founder ROFR Period, then the Purchaser shall give written notice to each of the Participating Founders within twenty (20) days following the expiration of the Founder ROFR Period, which shall set forth the number of Shares not purchased by the other Founders, and shall offer such Participating Founders the right to acquire such unsubscribed shares (the "***Unsubscribed Share Notice***").  Each Participating Founder shall have five (5) days after receipt of the Unsubscribed Share Notice to deliver a written notice to the Purchaser (the "***Participating Founders Additional Subscription Notice***") indicating the number of unsubscribed shares that such Participating Founder desires to purchase, and each such Participating Founder shall be entitled to purchase such number of unsubscribed shares on the same terms and conditions as set forth in the Second Notice. In the event that the Participating Founders desire, in the aggregate, to purchase in excess of the total number of available unsubscribed shares, then the number of unsubscribed shares that each Participating Founder may purchase shall be reduced on a pro rata basis.  The Participating Founders shall then effect the purchase of the Shares, including payment of the purchase price, not more than five (5) days after delivery of the Participating Founders Additional Subscription Notice, and at such time, the Purchaser shall deliver to the Founders the certificates representing the Shares to be purchased by the Participating Founders, each certificate to be properly endorsed for transfer.

   G. ***Termination of ROFRS***.  The rights of first refusal granted by Purchaser pursuant to Section 4.E and 4.F above shall terminate at such time as a registration statement filed with

Confidential – Subject to Protective Order                  SPORTBLX0148254

respect to securities of the Company with the Securities and Exchange Commission becomes effective under the Securities Act of 1933, as amended.

H. ***Tag-Along Rights***.   In the event that the Founders elect to sell shares of the Company's common stock that represent more than fifty percent (50%) of the aggregate number of shares then outstanding to a third party purchaser, the Founders shall give notice (a "Tag-Along Notice") to the Purchaser not less than fifteen (15) days prior to the consummation of the proposed sale.   The notice shall identify the consideration per share and the other material terms of the proposed transfer. The Purchaser shall have the right to transfer to the third party the percentage of the Shares then owned by such Shareholder that is equal to the percentage of the total outstanding shares of the Company desired to be acquired by such third party purchaser.   The rights of the Founder under this Section 4.G may be exercised by giving notice to the Founders within ten (10) days of the delivery to such Shareholder of the Tag-Along Notice.   The failure by the Purchaser to so notify the Founders within such ten (10) day period shall be deemed an election by the Purchaser not to exercise his rights under this Section 4.G.

5.   **General Provisions.**

A. ***Choice of Law.*** This Agreement shall be governed by the internal substantive laws, but not the choice of law rules, of Delaware.

B. ***Integration.*** This Agreement, including all exhibits hereto, represents the entire agreement between the parties with respect to the purchase of the Shares by the Purchaser and supersedes and replaces any and all prior written or oral agreements regarding the subject matter of this Agreement including, but not limited to, any representations made during any interviews, relocation discussions or negotiations whether written or oral.

C. ***Notices.*** Any notice, demand, offer, request or other communication required or permitted to be given by either the Company or the Purchaser pursuant to the terms of this Agreement shall be in writing and shall be deemed effectively given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one business day after being deposited with an overnight courier service or (v) four days after being deposited in the U.S. mail, First Class with postage prepaid and return receipt requested, and addressed to the parties at the addresses provided to the Company (which the Company agrees to disclose to the other parties upon request) or such other address as a party may request by notifying the other in writing.

D. ***Successors.*** Any successor to the Company (whether direct or indirect and whether by purchase, merger, consolidation, liquidation or otherwise) to all or substantially all of the Company's business and/or assets shall assume the obligations under this Agreement and agree expressly to perform the obligations under this Agreement in the same manner and to the same extent as the Company would be required to perform such obligations in the absence of a succession. For all purposes under this Agreement, the term "Company" shall include any successor to the Company's business and/or assets which executes and delivers the assumption agreement described in this section or which becomes bound by the terms of this Agreement by operation of law. Subject to the restrictions on transfer set forth in this Agreement, this Agreement

-6-

SPORTBLX0148255

shall be binding upon the Purchaser and his or her heirs, executors, administrators, successors and assigns.

E. **Assignment; Transfers.** Except as set forth in this Agreement, this Agreement, and any and all rights, duties and obligations hereunder, shall not be assigned, transferred, delegated or sublicensed by either party without the prior written consent of the other party. Any attempt without such consent to assign, transfer, delegate or sublicense any rights, duties or obligations that arise under this Agreement shall be void. Except as set forth in this Agreement, any transfers in violation of any restriction upon transfer contained in any section of this Agreement shall be void, unless such restriction is waived in accordance with the terms of this Agreement.

F. **Waiver.** Either party's failure to enforce any provision of this Agreement shall not in any way be construed as a waiver of any such provision, nor prevent that party from thereafter enforcing any other provision of this Agreement. The rights granted both parties hereunder are cumulative and shall not constitute a waiver of either party's right to assert any other legal remedy available to it.

G. **Severability.** Should any provision of this Agreement be found to be illegal or unenforceable, the other provisions shall nevertheless remain effective and shall remain enforceable to the greatest extent permitted by law.

H. **Reliance on Counsel and Advisors.** The Purchaser acknowledges that he or she has had the opportunity to review this Agreement, including all attachments hereto, and the transactions contemplated by this Agreement with his or her own legal counsel, tax advisors and other advisors. The Purchaser is relying solely on his or her own counsel and advisors and not on any statements or representations of the Company or its agents for legal or other advice with respect to this investment or the transactions contemplated by this Agreement.

I. **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

*(signature page follows)*

-7-

In Witness Whereof, the parties have executed this Agreement as of the date first written above.

**Company:**                                                          **Purchaser:**


**SPORT-BLX, INC.**

By:     _____          _____
Name:    George E. Hall                                  Michael M. Salerno
Title:     Executive Chairman




**Founders:**




**GEORGE E. HALL**                                  **JOSEPH A. DE PERIO**

By:     _____          By:     _____




*[Signature Page to Common Stock Purchase Agreement]*

Confidential – Subject to Protective Order                                    SPORTBLX0148257

## Schedule A
Founders

George E. Hall
Joseph A. De Perio

Docs #3620213-v1

SPORTBLX0148258

*Execution Version*

# SPORTBLX, INC.

## COMMON STOCK PURCHASE AGREEMENT

This Common Stock Purchase Agreement (the "***Agreement***") is made as of February __, 2019, by and among Sport-BLX, Inc., a Delaware corporation (the "***Company***"), Michael M. Salerno (the "***Purchaser***") and, solely for the purposes of Section 4(F), the other shareholders of the Company set forth on <u>Schedule A</u> (the "***Founders***").

In consideration of the mutual covenants and representations set forth below, the Company and the Purchaser agree as follows:

1.      **Purchase and Sale of the Shares.** Subject to the terms and conditions of this Agreement, the Company hereby issues and sells to the Purchaser and the Purchaser hereby purchases from the Company 5,263 shares of the Company's Common Stock, par value $0.001 per share (the "***Shares***"), at a price of $95.00 per share.  No fractional shares will be issued. The Company will issue, as promptly as practicable, a stock certificate, registered in the name of the Purchaser, evidencing the Shares.

2.      **Representations of Company.**   The Company hereby makes the following representations:

A. ***Authorization.***  The execution, delivery and performance by the Company of the this Agreement and the consummation of the transactions contemplated hereby (a) are within the power of the Company and (b) have been duly authorized by all necessary actions on the part of the Company.  This Agreement constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms. The Shares, upon issuance will be duly authorized, validly issued, fully paid and nonassessable.

B. ***No Conflicts.***  The execution, delivery and performance of this Agreement by the Company, and the consummation of the transactions contemplated hereby and thereby, will not (a) result in any material violation of or be in material conflict with or constitute, with or without the passage of time and giving of notice, a material default under or breach of the Certificate of Incorporation or bylaws of the Company or any material provision of any instrument, judgment, order, writ, decree or contract to which the Company is a party or by which it is bound, or (b) result in any material violation of any provision of federal or state statute, rule or regulation applicable to the Company.

C. ***Capitalization.***  Exhibit A hereto sets forth the authorized and the issued and outstanding capital stock of the Company as of the date hereof.  Except  as set forth on Exhibit A there are no subscription rights, options, warrants, conversion rights, purchase rights or other agreements that may or would require the Company to issue, sell, transfer or otherwise cause to become outstanding any capital stock of the Company.

Confidential – Subject to Protective Order

D.  *Financial Statements.*  The Company has heretofore delivered to Purchaser a copy of the unaudited balance sheet of the Company as of December 31, 2018 (the "**Most Recent Balance Sheet**"), together with the unaudited statement of operations for the Company for the twelve months ended December 31, 2018 (the "**Financial Statements**").  The Financial Statements are in accordance with the books and records of the Company, have been prepared in accordance with U.S. Generally Accepted Accounting Principles consistently applied, and fairly present the financial position of the Company in all material respects as of the date thereof, and the income or loss for the period then ended.

E.  *Absence of Undisclosed Liabilities.*  Except as (1) reflected or reserved against on the Most Recent Balance Sheet or (2) incurred since the date of the Most Recent Balance Sheet in the ordinary course of business and consistent with past practice, the Company has no liability in excess of $10,000.

F.  *Litigation and Claims.*  There is no (i) claim or (ii) legal, administrative, arbitration or other proceeding, suit or action, or governmental investigation or enforcement action (**"Proceeding"**), pending, or to the Company's knowledge, threatened against the Company, its employees to the extent involving or relating to the Company, the Company's assets or securities of the Company.

G.  *Compliance with Law.*  The business of the Company is being conducted, and has been conducted, in compliance with all applicable laws and regulations in all material respects. The Company possesses all authorizations, permits and licenses necessary to permit it to operate its business in the manner in which it presently is conducted.

H.  *No Infringement.*  The intellectual property used by the Company in its business does not infringe upon the rights of any third party.

3.      **Representations of Purchaser.**  The Purchaser hereby makes the following representations:

A.  *Authorization.*  The execution, delivery and performance by the Purchaser of the this Agreement and the consummation of the transactions contemplated hereby (a) are within the power of the Purchaser and (b) have been duly authorized by all necessary actions on the part of the Company.  This Agreement constitutes a legal, valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms.

B.  *Purchase for Own Account.*  Purchaser is purchasing the Shares solely for investment purposes for its own account, and not with a view to the resale or distribution of any part thereof. Purchaser is not a party to, and does not presently intend to enter into, any contract or other arrangement with any other person or entity involving the resale, transfer, grant of participation with respect to or other distribution of any of the shares.

C.  *Access to Information.*  Purchaser has had opportunity to discuss the plans, operations and financial condition of the Company with its officers, directors or controlling

Confidential – Subject to Protective Order

persons, and has received all information Purchaser deems appropriate for assessing the risk of an investment in the Shares.

D. **_Restricted Securities._**   Purchaser understands that the shares are "restricted securities" under applicable US federal and state securities laws and that Purchaser must hold the shares indefinitely, unless any subsequent proposed resale by Purchaser is registered under the Securities Act or an exemption from registration is otherwise available, and that the Company is under no obligation to register any subsequent proposed resale of the Shares.

E. **_No Public Market_**. The Purchaser understands that no public market now exists for the Shares, and that the Company has made no assurances that a public market will ever exist for the Shares.

F. **_Accredited Investor._** The Purchaser is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

G. **_Foreign Investors._** If the Purchaser is not a United States person (as defined by Section 7701(a)(30) of the Code) (a "**_Foreign Investor_**"), the Purchaser hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Shares or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the Shares, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained, and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the Shares. The Purchaser's subscription and payment for and continued beneficial ownership of the Shares will not violate any applicable securities or other laws of the Purchaser's jurisdiction.

4. **Restrictions on Transfer.**

A. **_Investment Representations and Legend Requirements._**   The Purchaser understands and agrees that the Company shall cause the legends set forth below, or substantially equivalent legends, to be placed upon any certificate(s) evidencing ownership of the Shares, together with any other legends that may be required by the Company or by applicable state or federal securities laws:

> THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "**_ACT_**") AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER THE ACT OR, IN THE OPINION OF COUNSEL SATISFACTORY TO THE ISSUER OF THESE SECURITIES, SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE ACT.

> THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LOCK-UP PERIOD IN THE EVENT OF A PUBLIC OFFERING AS SET FORTH IN THE COMMON STOCK PURCHASE AGREEMENT BETWEEN THE ISSUER AND THE

-3-

SPORTBLX0148261

ORIGINAL HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER. SUCH TRANSFER RESTRICTIONS, RIGHT OF FIRST REFUSAL AND LOCK-UP PERIOD ARE BINDING ON TRANSFEREES OF THESE SHARES.

B.  ***Stop-Transfer Notices.*** The Purchaser agrees that to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

C.  ***Refusal to Transfer.*** The Company shall not be required (i) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or (ii) to treat as owner of such Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Shares shall have been so transferred.

D.  ***Lock-Up Period.*** The Purchaser hereby agrees that the Purchaser shall not sell, offer, pledge, contract to sell, grant any option or contract to purchase, purchase any option or contract to sell, grant any right or warrant to purchase, lend or otherwise transfer or encumber, directly or indirectly, any Shares or other securities of the Company, nor shall the Purchaser enter into any swap, hedging or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any Shares or other securities of the Company, during the period from the filing of the first registration statement of the Company filed under the Securities Act of 1933, as amended (the "Securities Act"), that includes securities to be sold on behalf of the Company to the public in an underwritten public offering under the Securities Act through the end of the 180-day period following the effective date of such registration statement (or such other period as may be requested by the Company or the underwriters to accommodate regulatory restrictions on (i) the publication or other distribution of research reports and (ii) analyst recommendations and opinions, including, but not limited to, the restrictions contained in NASD Rule 2711(f)(4) or NYSE Rule 472(f)(4), or any successor provisions or amendments thereto). The Purchaser further agrees, if so requested by the Company or any representative of its underwriters, to enter into such underwriter's standard form of "lockup" or "market standoff" agreement in a form satisfactory to the Company and such underwriter. The Company may impose stop-transfer instructions with respect to securities subject to the foregoing restrictions until the end of any such restriction period.

E.  ***Company ROFR.*** If the Purchaser proposes any assignment, sale, offer to sell, pledge, mortgage, hypothecation, encumbrance, disposition of or any other like transfer or encumbering ("***Transfer***") of any Shares, then the Purchaser shall promptly give written notice (the "***Notice***") simultaneously to the Company at least thirty (30) days prior to the closing of such Transfer.  The Notice shall describe in reasonable detail the proposed Transfer including, without limitation, the number of Shares to be transferred, the nature of such Transfer, the consideration to be paid, and the name and address of each prospective purchaser or transferee. If such prospective purchaser or transferee is a Foreign Investor, the Purchaser shall notify the Company of Purchaser's intent to transfer or sell to such Foreign Investor.  For a period of fifteen (15) days (the "***Company ROFR Period***") following receipt of any Notice, the Company shall have the right to purchase all or a portion of the Shares subject to such Notice on the same terms and conditions

-4-

SPORTBLX0148262

as set forth therein.  The Company's purchase right shall be exercised by written notice signed by an officer of the Company (the "***Company Notice***") and delivered to the Purchaser within the Company ROFR Period.  The Company shall effect the purchase of the Shares, including payment of the purchase price, not more than ten (10) business days after delivery of the Company Notice, and at such time the Purchaser shall deliver to the Company the certificate(s) representing the Shares to be purchased by the Company, each certificate to be properly endorsed for transfer.  The Shares so purchased shall thereupon be cancelled and cease to be issued and outstanding shares.

      F.   ***Founder ROFR.***  In the event that the Company does not elect to purchase all of the Shares available pursuant to its rights under Section 4(E) within the Company ROFR Period, the Purchaser shall give written notice within twenty (20) days following the earlier to occur of (i) any waiver by the Company of its rights under Section 4(E) or (ii) the expiration of Company ROFR Period (the "***Second Notice***") to each of the Founders, which shall set forth the number of Shares not purchased by the Company and which shall include the terms of Notice set forth in Section 4(E). Each Founder shall then have the right, exercisable upon written notice to the Purchaser (the "***Founder Notice***") within fifteen (15) days after the receipt of the Second Notice (the "***Founder ROFR Period***"), to purchase its pro rata share of the Shares subject to the Second Notice and on the same terms and conditions as set forth therein.  Except as set forth in this section, the Founders who so exercise their rights (the "***Participating Founders***") shall effect the purchase of the Shares, including payment of the purchase price, not more than five (5) days after delivery of the Founder Notice, and at such time the Purchaser shall deliver to the Participating Founders the certificate(s) representing the Shares to be purchased by the Participating Founders, each certificate to be properly endorsed for transfer. Each Founder's pro rata share shall be equal to the product obtained by multiplying (i) the aggregate number of Shares covered by the Second Notice and (ii) a fraction, the numerator of which is the number of Shares held by the Participating Founder at the time of the First Notice, and the denominator of which is the total number of shares of Shares issued or issuable or other rights to acquire Shares at the time of the First Notice held by all Founders.  In the event that not all of the Founders elect to purchase their pro rata share of the Shares available pursuant to their rights under this Section within the Founder ROFR Period, then the Purchaser shall give written notice to each of the Participating Founders within twenty (20) days following the expiration of the Founder ROFR Period, which shall set forth the number of Shares not purchased by the other Founders, and shall offer such Participating Founders the right to acquire such unsubscribed shares (the "***Unsubscribed Share Notice***").  Each Participating Founder shall have five (5) days after receipt of the Unsubscribed Share Notice to deliver a written notice to the Purchaser (the "***Participating Founders Additional Subscription Notice***") indicating the number of unsubscribed shares that such Participating Founder desires to purchase, and each such Participating Founder shall be entitled to purchase such number of unsubscribed shares on the same terms and conditions as set forth in the Second Notice. In the event that the Participating Founders desire, in the aggregate, to purchase in excess of the total number of available unsubscribed shares, then the number of unsubscribed shares that each Participating Founder may purchase shall be reduced on a pro rata basis.  The Participating Founders shall then effect the purchase of the Shares, including payment of the purchase price, not more than five (5) days after delivery of the Participating Founders Additional Subscription Notice, and at such time, the Purchaser shall deliver to the Founders the certificates representing the Shares to be purchased by the Participating Founders, each certificate to be properly endorsed for transfer.

Confidential – Subject to Protective Order

SPORTBLX0148263

G. ***Termination of ROFRS***. The rights of first refusal granted by Purchaser pursuant to Section 4.E and 4.F above shall terminate at such time as a registration statement filed with respect to securities of the Company with the Securities and Exchange Commission becomes effective under the Securities Act.

H. ***Tag-Along Rights***. In the event that the Founders elect to sell shares of the Company's common stock that represent more than fifty percent (50%) of the aggregate number of shares then outstanding to a third party purchaser, the Founders shall give notice (a "Tag-Along Notice") to the Purchaser not less than fifteen (15) days prior to the consummation of the proposed sale. The notice shall identify the consideration per share and the other material terms of the proposed transfer. The Purchaser shall have the right to transfer to the third party the percentage of the Shares then owned by such Shareholder that is equal to the percentage of the total outstanding shares of the Company desired to be acquired by such third party purchaser. The rights of the Purchaser under this Section 4.G may be exercised by giving notice to the Founders within ten (10) days of the delivery to Purchaser of the Tag-Along Notice. The failure by the Purchaser to so notify the Founders within such ten (10) day period shall be deemed an election by the Purchaser not to exercise his rights under this Section 4.H.

## 5.   General Provisions.

A. ***Choice of Law.*** This Agreement shall be governed by the internal substantive laws, but not the choice of law rules, of Delaware.

B. ***Integration.*** This Agreement, including all exhibits hereto, represents the entire agreement between the parties with respect to the purchase of the Shares by the Purchaser and supersedes and replaces any and all prior written or oral agreements regarding the subject matter of this Agreement including, but not limited to, any representations made during any interviews, relocation discussions or negotiations whether written or oral.

C. ***Notices.*** Any notice, demand, offer, request or other communication required or permitted to be given by either the Company or the Purchaser pursuant to the terms of this Agreement shall be in writing and shall be deemed effectively given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one business day after being deposited with an overnight courier service or (v) four days after being deposited in the U.S. mail, First Class with postage prepaid and return receipt requested, and addressed to the parties at the addresses provided to the Company (which the Company agrees to disclose to the other parties upon request) or such other address as a party may request by notifying the other in writing.

D. ***Successors.*** Any successor to the Company (whether direct or indirect and whether by purchase, merger, consolidation, liquidation or otherwise) to all or substantially all of the Company's business and/or assets shall assume the obligations under this Agreement and agree expressly to perform the obligations under this Agreement in the same manner and to the same extent as the Company would be required to perform such obligations in the absence of a succession. For all purposes under this Agreement, the term "Company" shall include any successor to the Company's business and/or assets which executes and delivers the assumption agreement described in this section or which becomes bound by the terms of this Agreement by

-6-

Confidential – Subject to Protective Order

SPORTBLX0148264

operation of law. Subject to the restrictions on transfer set forth in this Agreement, this Agreement shall be binding upon the Purchaser and his or her heirs, executors, administrators, successors and assigns.

E. **Assignment; Transfers.** Except as set forth in this Agreement, this Agreement, and any and all rights, duties and obligations hereunder, shall not be assigned, transferred, delegated or sublicensed by either party without the prior written consent of the other party. Any attempt without such consent to assign, transfer, delegate or sublicense any rights, duties or obligations that arise under this Agreement shall be void. Except as set forth in this Agreement, any transfers in violation of any restriction upon transfer contained in any section of this Agreement shall be void, unless such restriction is waived in accordance with the terms of this Agreement.

F. **Waiver.** Either party's failure to enforce any provision of this Agreement shall not in any way be construed as a waiver of any such provision, nor prevent that party from thereafter enforcing any other provision of this Agreement. The rights granted both parties hereunder are cumulative and shall not constitute a waiver of either party's right to assert any other legal remedy available to it.

G. **Severability.** Should any provision of this Agreement be found to be illegal or unenforceable, the other provisions shall nevertheless remain effective and shall remain enforceable to the greatest extent permitted by law.

H. **Reliance on Counsel and Advisors.** The Purchaser acknowledges that he or she has had the opportunity to review this Agreement, including all attachments hereto, and the transactions contemplated by this Agreement with his or her own legal counsel, tax advisors and other advisors. The Purchaser is relying solely on his or her own counsel and advisors and not on any statements or representations of the Company or its agents for legal or other advice with respect to this investment or the transactions contemplated by this Agreement.

I. **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

*(signature page follows)*

-7-

In Witness Whereof, the parties have executed this Agreement as of the date first written above.

**Company:**                                    **Purchaser:**

**SPORT-BLX, INC.**

By: _____     _____
Name:    George E. Hall                        Michael M. Salerno
Title:    Executive Chairman

**Founders:**

**GEORGE E. HALL**                        **JOSEPH A. DE PERIO**

By: _____     By: _____

*[Signature Page to Common Stock Purchase Agreement]*

Confidential – Subject to Protective Order                              SPORTBLX0148266

## Schedule A
Founders

George E. Hall
Joseph A. De Perio

Docs #3619612-v1

Confidential – Subject to Protective Order

SPORTBLX0148267

**Sport-BLX, Inc.**
510 Madison Avenue, 9th Floor
New York, NY 10022

February [6], 2019

Michael M. Salerno
[ADDRESS]

Re:     Stockholder Agreement

Reference is hereby made in this letter agreement (the "*Agreement*") to that certain (A) Common Stock Purchase Agreement (the "*Founder Agreement*") dated as of February [6], 2019 by and among Sport-BLX, Inc., a Delaware corporation (the "*Company*"), Michael M. Salerno ("*Salerno*"), and, solely for the purposes specified therein, George E. Hall ("*Hall*") and Joseph A. De Perio ("*De Perio*" and, together with Hall, the "*Founders*") and (B) Common Stock Purchase Agreement (the "*Second Agreement*" and, together with the Agreement, the "*Stock Purchase Agreements*") dated as of February [6], 2019 by and among the Company, Salerno and, solely for the purposes specified therein, the Founders.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Stock Purchase Agreements.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company, Salerno and the Founders hereby agree as follows:

1. **Salerno Right of First Offer**.

A. ***General.***  Salerno shall have a right of first offer to purchase his Pro Rata Share (as defined below) of New Securities (as defined below) that the Company may, from time to time following the date of this Agreement, propose to sell and issue. If the Company proposes any offering to sell and issue any shares of New Securities (an "*Offering*"), then the Company shall promptly give written notice (the "*Offering Notice*") simultaneously to Salerno at least 15 days prior to the Offering. The Offering Notice shall describe in reasonable detail the proposed Offering including, without limitation, the number of New Securities to be offered, the nature of such Offering and the price and terms upon which the Offering is to be made.  For a period of 10 days (the "*ROFO Period*") following receipt of any Offering Notice, Salerno shall have the right to purchase up to his Pro Rata Share of the New Securities subject to such Offering Notice on the same terms and conditions as set forth therein. Salerno's right of first offer shall be exercised by written notice delivered to the Company within the ROFO Period stating its election to purchase New Securities and the quantity of New Securities Salerno elects to purchase (the "*ROFO Notice*"). Salerno shall effect the purchase of the New Securities, including payment of the purchase price, not more than five business days after delivery of the ROFO Notice, and at such time the Company shall deliver to Salerno the certificate(s) representing the New Securities to be purchased by Salerno.  In the event that Salerno fails to exercise in full its right of first offer under this Section 1 within the time period required as set forth above, then the Company shall have the right, for 120 days thereafter, to sell the New

NY: 1163503-6

Confidential – Subject to Protective Order                                          SPORTBLX0148268

Securities at a price and upon general terms no more favorable to the purchasers thereof than specified in the Offering Notice. In the event that the Company has not sold the New Securities within such 120 day period, the Company shall not thereafter issue or sell any New Securities without again first offering such New Securities pursuant to this Section 1.

B. ***Pro Rata Share.***  For purposes of this Section 1, Purchaser's "***Pro Rata Share***" shall be calculated as of the date of the Offering Notice and shall be the ratio of (1) the total number of shares of Common Stock held by Salerno plus the number of shares of Common Stock issuable upon conversion of all shares of any other class or series of capital stock held by Salerno, *over* (2) the total number of shares of Common Stock then outstanding plus the number of shares of Common Stock issuable upon exercise or conversion of all then outstanding shares of any other class or series of capital stock or other securities exercisable for or convertible into, directly or indirectly, Common Stock.

C. ***New Securities***.  For purposes of this Section 1, "***New Securities***" shall mean any shares of capital stock of the Company, including Common Stock and any other series or class of capital stock, whether now authorized or not, and rights, options or warrants to purchase said shares of capital stock, and securities of any type whatsoever that are, or may become, convertible into or exchangeable for said shares of capital stock.  Notwithstanding the foregoing, "New Securities" does not include: (i) securities issued and issuable upon conversion of shares of capital stock; (ii) securities issued and issuable to employees, consultants, or directors pursuant to stock option, stock grant, stock purchase, or similar plans and arrangements approved by the Company's board of directors (the "**Board**"), including without limitation securities issuable upon the exercise of such securities; (iii) securities issued and issuable to equipment lessors, banks, financial institutions or similar entities in a debt financing or commercial transaction approved by the Board, the principle purpose of which is other than the raising of capital; (iv) securities issued and issuable as a dividend or other distribution; (v) securities issued in connection with an underwritten public offering under the Securities Act, (vi) securities issued and issuable in a merger or acquisition that is approved by the Board; (vii) securities issued and issuable pursuant to any transactions approved by the Board primarily for the purpose of (A) joint ventures, technology licensing or development, marketing or other commercial activities or (B) any other transactions involving corporate partners that are primarily for purposes other than raising capital; (viii) securities issued and issuable pursuant to a registration statement filed under the Securities Act; and (ix) securities issued or issuable upon the exercise or conversion of rights, options or warrants to subscribe for, purchase or otherwise acquire either Common Stock or securities convertible, either directly or indirectly, into or exchangeable for Common Stock outstanding as of the date hereof.

D. ***Termination.***  The provisions of this Section 1 will terminate and be of no further force or effect (i) with respect to any Shares Transferred to another person by Salerno, (ii) upon a change of control of the Company, (iii) upon the closing of an underwritten public offering under the Securities Act or (iv) if, and for so long as, Salerno (A) is deemed to be a Covered Person under Rule 506(d)(1) of the Securities Act and (B) is subject to any Bad Actor Disqualification (except as set forth in Rule 506(d)(2)(ii) or (iii) or (d)(3) under the Securities Act).  The term "***Bad Actor Disqualification***" means any "bad actor" disqualification described in Rule 506(d)(1)(i) through (viii) under the Securities Act.

**2. Board Composition.**

**A. *Salerno Board Seat*.**  For so long as Salerno continues to hold, in the aggregate, a number of shares of the capital stock of the Company that is not less than the number of shares acquired pursuant to the Stock Purchase Agreements (the "**Ownership Threshold**") (which Ownership Threshold may be waived by the Board in its sole discretion and shall be subject to equitable adjustment in the event of a stock dividend, stock split, reverse stock split or similar event), each Founder agrees, from time to time and at all times, at each annual or special meeting of stockholders at which an election of directors is held or pursuant to any written consent of the stockholders, to vote, or cause to be voted, all shares of the Company's capital stock owned by such Founder, or over which such Founder has voting control, in favor of Salerno being elected to the Board.

**B. *Founder Board Seats*.**  Salerno agrees, from time to time and at all times, at each annual or special meeting of stockholders at which an election of directors is held or pursuant to any written consent of the stockholders, to vote, or cause to be voted, all shares of the Company's capital stock owned by Salerno, or over which Salerno has voting control, in favor of each of the Founders being elected to the Board.

**3. Anti-Dilution Protection.**  If the Company shall at any time during the Anti-Dilution Period (as defined below) issue shares of Common Stock or preferred stock of the Company to an investor(s) (excluding the transactions between the Company and Salerno contemplated by the Second Agreement) (a "***Subsequent Financing***") and the price per share at which shares of Common Stock or preferred stock of the Company are sold in such Subsequent Financing is less than the Per Share Price, then, concurrently with the consummation of such Subsequent Financing, the Company shall issue to Salerno, for no additional consideration, an additional number of shares of Common Stock such that the aggregate number of shares of Common Stock issued to Salerno pursuant to this Section 3 and the Second Agreement shall equal the quotient of (a) $499,849.46, divided by (b) lowest price per share paid by an investor participating in such Subsequent Financing.  The "***Anti-Dilution Period***" means the period commencing on the date hereof and ending on the earlier of (i) May 15, 2019 and (ii) immediately following the consummation of the first Subsequent Financing consummated by the Company after the date hereof.

SPORTBLX0148270

In witness whereof, the parties have executed this Agreement as of the date first written above.

**SPORT-BLX, INC.**

By: _____
Name:   George E. Hall
Title:   Executive Chairman

_____

Michael M. Salerno

**Founders:**

_____

George E. Hall

_____

Joseph De Perio

Docs #3620607-v1