# EXHIBIT D

Page 1

1            UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF NEW YORK

3          CIVIL ACTION NO. 1:22-CV-8111-LGS

4                        and

5          CIVIL ACTION NO. 1:22-CV-01243

6

7

8    SPORT-BLX, INC., individually and derivatively

9    on behalf of its shareholders,

10                  Plaintiff,

11              vs.

12   MICHAEL M. SALERNO and CYPRESS

13   HOLDINGS, III, LP,

14                  Defendants.

15   ------------------------------------------------

16   CYPRESS HOLDINGS, III, LP,

17                  Plaintiffs,

18              vs.

19   GEORGE HALL,

20                  Defendants.

21   ------------------------------------------------

22            DEPOSITION OF JOSEPH DEPERIO

23            THURSDAY, JULY 6, 2023

24

25

Page 2

1        Deposition of JOSEPH DEPERIO in the

2   above-mentioned matter before Jomanna DeRosa, a

3   Certified Court Reporter (License No. 30XI00188500),

4   and Notary Public of the State of New Jersey, taken

5   in person at 105 Eisenhower Parkway, Roseland, New

6   Jersey 07068 on Thursday, July 6, 2023, commencing at

7   9:55 a.m.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1    A P P E A R A N C E S

2

3    CHIESA SHAHINIAN & GIANTOMASI PC

4    BY:  ROSS PEARLSON, ESQ.

5         and

6         KELLY KORTES, ESQ.

7    105 Eisenhower Parkway

8    Roseland, New Jersey 07068

9

10

11   COLE SCHOTZ

12   BY:  DAVID GOLD, ESQ.

13   25 Main Street

14   Court Plaza North

15   Hackensack, New Jersey 07601

16   (201) 525-6305

17   Dgold@coleschotz.com

18

19

20   MORVILLO ABRAMOWITZ GRAND IASON & ANELLO PC

21   BY:  JONATHAN SACK, ESQ.

22   565 5th Avenue

23   New York, New York 10017

24   (212) 856-9600

25   Jsack@maglaw.com

Page 4

1       LOEB & LOEB LLP

2       BY:  CHRISTIAN CARBONE, ESQ.

3       345 Park Avenue

4       New York, New York 10154

5

6

7       ALSO PRESENT:

8       FRANCIS RUCHALSKI (via Zoom)

9       VERITEXT VIDEOGRAPHER - HOWARD BRODSKY

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 27

1        Q.      What specifically were your duties and

2    responsibilities at Millennium Group?

3        A.      Originating, making investments, and

4    then monitoring those investments.

5        Q.      Why did you leave the Millennium Group?

6        A.      I decided that I wanted to go back to

7    Clinton Group.

8        Q.      Was there any particular reason why?

9        A.      No.

10        Q.      First of all, who hired you the first

11    time around to be part of the Clinton Group?

12        A.      It was technically two people, Conrad

13    Bringsjord and George Hall.

14        Q.      In 2005 through 2007, where was the

15    Clinton Group located?

16        A.      9 West 57th Street.

17        Q.      When you came back in 2010, who hired

18    you to come back to the Clinton Group at that time?

19        A.      George Hall.

20        Q.      And what is your understanding of

21    Mr. Hall's relationship to the Clinton Group?

22        A.      He's the CEO.

23        Q.      Is he also the owner?

24        A.      That's correct.

25        Q.      Is he 100 percent owner of the Clinton

Page 191

```
 1                    MR. SACK:  When?

 2                    MR. GOLD:  When?

 3                    MR. PEARLSON:  The night before this

 4     e-mail.

 5                    MR. GOLD:  Objection to form.

 6                    THE WITNESS:  I don't know what Article

 7     VII, Section 1 is.  I'm not sure what he's referring

 8     to there.

 9

10     BY MR. PEARLSON:

11          Q.    Do you recall what your discussion was

12     with Mr. Salerno about the Sport-BLX fund that night?

13                    MR. GOLD:  Objection to form.

14                    THE WITNESS:  I don't remember.

15                    THE VIDEOGRAPHER:  Time is 14:37.  We

16     are off the record.

17

18                    (Whereupon, a brief recess was taken.)

19

20                    THE VIDEOGRAPHER:  The time is 14:55.

21     We are on the record.

22

23     BY MR. PEARLSON:

24          Q.    Mr. DePerio, when did Sport-BLX first

25     begin to use the space at 510 Madison Avenue?
```

1           A.      Since its inception.

2           Q.      Did it use it throughout 2019?

3           A.      Yes.

4           Q.      Were there any occupants of the space at

5      that time?

6           A.      Clinton Group.

7           Q.      What about GlassBridge, did it also use

8      the space in 2019?

9           A.      Yes.

10          Q.      When did GlassBridge begin making

11     payments for its use of the space at 510 Madison

12     Avenue?

13          A.      I don't remember.

14          Q.      Do you recall to whom it made those

15     payments?

16          A.      I don't.

17          Q.      Who would know that from Sport-BLX?

18          MR. GOLD:  Objection to form.

19          THE WITNESS:  You asked me GlassBridge;

20     didn't you?

21          MR. GOLD:  You were saying GlassBridge.

22

23     BY MR. PEARLSON:

24          Q.      When did Sport-BLX begin paying for its

25     use of space at 510 Madison Avenue?

Page 193

```
 1        A.      Sometime in Q1 2019.

 2        Q.      To whom did it make those payments?

 3        A.      To Clinton Group.

 4        Q.      Did Clinton Group then forward those

 5   payments to the landlord?

 6        A.      I don't know.

 7                THE VIDEOGRAPHER:  Time is 14:56.  We

 8   are off record.

 9

10                (Whereupon, a brief recess was taken off

11   the record.)

12

13                THE VIDEOGRAPHER:  The time is 14:57.

14   We are on the record.

15

16   BY MR. PEARLSON:

17        Q.      Did the Clinton Group then forward those

18   payments to the landlord?

19        A.      I don't know.

20        Q.      Who from the Clinton Group would have

21   been handling the rent payments?

22        A.      I don't know.

23        Q.      Do you know when Sport-BLX last made a

24   rental payment for its use of the space at 510

25   Madison?
```

1          A.     Probably around Q4 2019.

2          Q.     Can you look at the document in front of

3     you?  Its been marked as DePerio-24 for

4     identification.  I'd like you to turn to what's

5     Bates-stamped Clinton00034109 and let me know when

6     you're there.

7          A.     Okay.  I'm there.

8          Q.     And it says this is a sublease between

9     World Gold Trust Services LLC and the Clinton Group

10    dated August 31st, 2015?

11         A.     I see that.

12         Q.     Were you aware that the Clinton Group

13    had a sublease with World Gold Trust Services LLC?

14         A.     Yes, I was aware.

15         Q.     When did you become aware of that

16    relationship?

17         A.     When I saw this in discovery.

18         Q.     Before that, you didn't know who the

19    landlord was?

20         A.     I didn't know the details.

21         Q.     If you could turn to page 2 of the

22    document.

23                MR. GOLD:  Of the consent to sublease?

24                MR. PEARLSON:  If you look at paragraph

25    2 of the agreement where it says, "rent amount."

1            MR. GOLD:  There's a consent to sublease

2       and a sublease.

3            MR. PEARLSON:  We're on the sublease,

4       34119.

5            MR. GOLD:  Okay.

6

7       BY MR. PEARLSON:

8            Q.    Mr. DePerio, were you aware of the

9       amount of rent that Clinton Group was paying for the

10      space at 510 Madison Avenue?

11           A.    I knew directionally how much it was.

12           Q.    When you say, "directionally," what was

13      your knowledge?

14           A.    I knew it was somewhere around a million

15      to 1,300,000.

16           Q.    And you knew that in 2019?

17           A.    That's correct.

18           Q.    If you could turn to -- actually, if you

19      look under paragraph 2, item D, does that reflect

20      that there was a monthly rent of $88,986.72 per month

21      from January of 2019 through December 31st, 2019?

22           A.    I see that.

23           Q.    And was that -- did that comport with

24      your recollection of approximately what Clinton Group

25      was paying in rent for the entire space?

Page 196

1          A.      Yes, it does.

2          Q.      And as per the sublease, it was the

3    Clinton Group's obligation to pay that rent.

4    Correct?

5                  MR. GOLD:  Objection to form.

6                  THE WITNESS:  Correct.

7

8    BY MR. PEARLSON:

9          Q.      If you could turn to Clinton0034123,

10   paragraph 7.  Before we get there, can you tell me,

11   whose idea was it that Sport-BLX would operate out of

12   the 510 Madison Avenue space?

13         A.      It was always the business plan of the

14   company when it first incepted.

15         Q.      And that was a decision that you and

16   Mr. Hall made as management of the company?

17         A.      Correct.

18         Q.      If you look at paragraph 7, it's

19   entitled "No Assignment/Sublet."  Do you see that?

20         A.      I see that section seven, yes.

21         Q.      I believe you indicated that you never

22   saw this sublease until discovery.  Is that correct?

23         A.      Correct.

24         Q.      Were you ever made aware that there was

25   a provision or a prohibition against Clinton Group

Page 197

1    subleasing out space to any other occupants of the
2    property?
3                   MR. SACK:  Objection to form.
4                   MR. GOLD:  Objection to form.
5                   THE WITNESS:  I take issue with that
6    question because I also reviewed the overlease in
7    discovery, and I believe there is a proviso that
8    allows them to do that.
9
10   BY MR. PEARLSON:
11        Q.     And when you say, "the overlease," the
12   overlease between whom?
13        A.     World Gold and the ultimate lender.
14        Q.     In looking at paragraph 7, did you
15   understand that the -- let me ask you, at the time,
16   did you have any knowledge as to whether Sport-BLX
17   could legally sublet the premise from Clinton Group
18   without permission of the landlord?
19                   MR. SACK:  Objection to form.
20                   MR. GOLD:  Objection to form.
21                   MR. SACK:  Also calls for a legal
22   opinion.
23                   THE WITNESS:  I have not seen these
24   documents in 2019, so I wouldn't have known.
25

Page 198

1    BY MR. PEARLSON:

2         Q.    Did anyone make you aware that there was

3    an issue with Sport-BLX occupying the space without

4    permission from the landlord?

5                   MR. SACK:  Objection to form.

6                   THE WITNESS:  No.

7

8    BY MR. PEARLSON:

9         Q.    Did Sport-BLX ever seek the permission

10   of the landlord to occupy the premises of 610 Madison

11   Avenue?

12        A.    I think that's the wrong number.

13        Q.    510 Madison Avenue.

14        A.    I'm not aware of that.

15                  MR. PEARLSON:  Can we show him

16   DePerio-25?

17

18   BY MR. PEARLSON:

19        Q.    Before we look at 25, Mr. DePerio, were

20   you ever aware at any time whether Sport-BLX could be

21   held responsible for the entire rent of the premises

22   by the landlord?

23                  MR. SACK:  Objection to form.

24                  THE WITNESS:  I'm not aware of anything

25   like that.

1

2      BY MR. PEARLSON:

3           Q.     If we could look at DePerio-25.  Can you

4      tell us what that document is?

5           A.     It looks like financial statements for

6      Sport-BLX.

7                  MR. GOLD:  I ask you to page through the

8      whole thing.

9                  THE WITNESS:  I did.

10

11     BY MR. PEARLSON:

12          Q.     Do you know who prepared -- the first

13     two pages are a balance sheet and income statement

14     for Sport-BLX.  Do you know who prepared that?

15          A.     I believe Francis Ruchalski did.

16          Q.     And these are reflecting -- it's a

17     balance sheet and income statement for the year

18     ending December 31st, 2019?

19          A.     Correct.

20          Q.     If you could look at the balance sheet.

21     My first question is:  It says, "other assets," and

22     then it says, "investments-racehorses," and there's

23     $220,000 for that item.  What does that item reflect,

24     to your knowledge?

25                 MR. GOLD:  Objection to form.

1            THE WITNESS:  I think my recollection

2      was that to assist in our proof of concept, we

3      acquired certain interest in racehorses with the idea

4      that we would syndicate them and sell them on the

5      Sport-BLX platform.

6

7      BY MR. PEARLSON:

8            Q.    And those were purchases made by

9      Sport-BLX, those assets?

10           A.    Correct.

11           Q.    Does Sport-BLX still hold those assets?

12           A.    I don't know.

13           Q.    In terms of long-term liabilities, it

14     says, "notes payable," and it has $2 million.  Do you

15     know what that's referencing?

16           A.    If memory serves, that's probably the

17     demand note to the benefit of GlassBridge.

18           Q.    And then under "net income," it has a

19     negative number.  Do you see that?

20           A.    Net income, yes.

21           Q.    And that reflects the negative net

22     income that Sport-BLX had at the end of December

23     2019.  Correct?

24           A.    I don't know because this is a balance

25     sheet and not an income statement.  It could have

Page 201

1    been an accrual.  But looking at the second page, I

2    could confirm that it was a net income.

3         Q.    So that was a negative net income that

4    Sport-BLX had at the end of December 31st, 2019?

5         A.    Correct.

6         Q.    Do you see that in the balance sheet

7    there's an item for salaries and benefits?  Do you

8    see that?

9         A.    On the balance sheet?

10        Q.    On the income statement, 000518.

11        A.    I do.

12        Q.    Does that reflect the amount that was

13   spent in 2019 on salaries and benefits for Sport-BLX

14   employees?

15        A.    Yes.

16        Q.    And then it has another item, travel and

17   entertainment, $349,302.78?

18        A.    I do see that.

19        Q.    And that's T&E expenses for the year?

20        A.    The acronym, that's correct.

21        Q.    And then for rent taxes, it has

22   $560,035.41.  Do you see that?

23        A.    I do see that.

24        Q.    And is that what Sport-BLX paid in rent

25   for the year December 31st, 2019?

Page 202

1        A.    Well, when I see rent and rent taxes, I
2    say it's a facility expense, so yes, it was for the
3    facility.
4        Q.    And how many employees did Sport-BLX
5    have in total, full-time employees in 2019?
6        A.    At the end of 2019, I don't remember.
7        Q.    Do you know how many full-time employees
8    came into the office every day?
9             MR. SACK:  At any time during the year?
10             MR. PEARLSON:  During 2019.
11             MR. GOLD:  Objection to form.
12             THE WITNESS:  Directionally, I'd be
13    guessing, so I don't remember.
14
15    BY MR. PEARLSON:
16        Q.    How about in terms -- was the facility
17    also used by Sport-BLX for visits from agents?
18        A.    Yes.  So the facility that we use was
19    used for a number of things, which I think I've
20    answered already, one of which was for ConsenSys's
21    build.  At any point, they would have ten to 15
22    engineers on premise all during their engagement.  We
23    also used the meeting area space to meet with
24    potential investors, potential agents, wealth
25    managers of athletes.  We had a number of interns

Page 203

1    that were working out of our office.  We had a number

2    of consultants working out of our office as well.

3            Q.     My question is just in terms of agents.

4    How many agents came and visited Sport-BLX's office

5    in 2019?

6            A.     I don't remember.

7            Q.     How many athletes came to visit

8    Sport-BLX in those offices?

9            A.     I don't remember.

10           Q.     Did those visits result in any signed

11   contract with athletes?

12           A.     We had a signed deal with Peter

13   Washington.

14           Q.     Was that in 2019?

15           A.     I don't remember when we signed that

16   deal.

17           Q.     I believe I asked this question.  If I

18   did, I apologize.  Do you know who at the Clinton

19   Group was responsible for paying the rent to the

20   landlord?

21                  MR. GOLD:  Objection to form.

22                  THE WITNESS:  I don't.  You did ask it

23   already, but I don't know the answer.

24

25   BY MR. PEARLSON:

1          Q.    Do you recall becoming aware at some

2     time in 2019 that the Clinton Group had fallen behind

3     in its rent obligations to the landlord?

4               MR. SACK:  Objection to form.

5               THE WITNESS:  Ask that again.

6

7     BY MR. PEARLSON:

8          Q.    Did you become aware at some point in

9     2019 that the Clinton Group had fallen behind in its

10    rent obligations to the landlord?

11         A.    I don't think I was aware of that in

12    2019.

13         Q.    Did you ever hear that the Clinton Group

14    was being evicted for failure to pay rent?

15              MR. SACK:  Objection to form.

16              THE WITNESS:  So I heard that Clinton

17    decided to leave in December of 2019, but I didn't

18    know the circumstances behind that.

19

20    BY MR. PEARLSON:

21         Q.    Did Mr. Hall ever advise you that the

22    Clinton Group had stopped paying rent to the

23    landlord?

24              MR. GOLD:  Objection to form.

25              MR. SACK:  Objection to form.

1          THE WITNESS:  I don't remember.

2

3     BY MR. PEARLSON:

4          Q.    Do you know if the rent that Sport-BLX

5     was paying to the Clinton Group, whether that was, in

6     turn, being paid to the landlord?

7               MR. SACK:  Objection to form.

8               THE WITNESS:  I believe you asked it

9     already, and I said I don't know.

10

11    BY MR. PEARLSON:

12         Q.    Is it fair to say that Sport-BLX paid

13    approximately half of the rent for the entire year of

14    2019 for the premises at 510 Madison Avenue?

15              MR. SACK:  Objection to form.

16              MR. GOLD:  Objection to form.

17              THE WITNESS:  I would have to do the

18    math, but directionally, that's correct, which is

19    consistent with our financial model.

20              MR. PEARLSON:  If we could show him

21    DePerio-26.

22

23    BY MR. PEARLSON:

24         Q.    Mr. DePerio, I'm showing you what has

25    been marked as DePerio-26 for identification.  It's

1      board minutes of Sport-BLX dated August 19th, 2019.

2      It shows that you were in attendance.  Do you see

3      that?

4              A.      I do see it.

5              Q.      If you could turn to the second page of

6      the document, sir.

7              A.      Yes, I'm there, yes.

8              Q.      First of all, there's a paragraph under

9      "company's offices space requirements and hiring

10     projections."  Do you see that?

11             A.      I've read it.

12             Q.      Did anyone mention in that board meeting

13     that the Clinton Group had stopped making rent

14     payments to the landlord months before?

15                     MR. SACK:  Objection to form.

16                     MR. GOLD:  Objection to form.

17                     THE WITNESS:  I don't recall it.

18

19     BY MR. PEARLSON:

20             Q.      Do you recall at that meeting

21     Mr. Salerno asking, "Where is the lease?"

22             A.      I know he asked for a lease multiple

23     times, but I don't know of the specifics of this

24     meeting.

25             Q.      At some point, did someone tell him that

Page 207

1    there was no lease for the premises?

2         A.    I think we told them a number of times

3    that there was no lease.

4         Q.    Did anyone ever give him the lease

5    between the Clinton Group and World Trust for the

6    premises?

7         A.    World Gold.  I don't know.  I did not

8    because I didn't have it.

9         Q.    Did anyone advise him that the $500,000

10   was half of the rent for the space?

11              MR. GOLD:  Objection to form.

12              THE WITNESS:  I believe I mentioned that

13   on two occasions, once in our diligence meeting where

14   he brought our entire data room with him, and

15   secondly at Char Steakhouse on the 28th when I told

16   him if he had any discomfort with the lease and who

17   it was being paid to, that he should not fund.

18

19   BY MR. PEARLSON:

20        Q.    Do you recall telling him --

21        A.    Yeah.  We went through that on two

22   occasions because we talked about how much space we

23   were using and the formulation of the amount was

24   roughly half the space, and to be frank, the

25   conference room space has a premium to it.  I

Page 208

1    believed we were getting a good deal.

2         Q.    And did you ever look for any other

3    space for use by Sport-BLX?

4              MR. GOLD:  Objection to form.  Him

5    personally?

6

7    BY MR. PEARLSON:

8         Q.    Or Sport-BLX.  Are you aware of

9    Sport-BLX looking for any other space?

10        A.    It was never a part of the business

11   plan.  Let me tell you why --

12        Q.    Mr. DePerio, can you please answer my

13   question?  My question is:  Did Sport-BLX look for

14   any other space, other than 510 Madison Avenue, to

15   operate out of?

16        A.    No.

17             MR. PEARLSON:  Can we show him 27?

18

19   BY MR. PEARLSON:

20        Q.    Mr. DePerio, I'm showing you what has

21   been marked as DePerio-27 for identification.  This

22   is an e-mail from Michael Salerno to George Hall

23   entitled "Attachments: Request For Information."

24   You're not on the cover e-mail.  Correct?

25        A.    Correct, I'm not on the cover e-mail.