Page 1

UNITED STATES DISTRICT COURT?
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
CYPRESS HOLDINGS, III, L.P., individually
and derivatively on behalf of SPORT-BLX,
INC.,

                    Plaintiff,

     -V-              Civil Action No.:
                      1:22-cv-1243-LGS
GEORGE HALL, JOSEPH DE PERIO, DANIEL
STRAUSS, FRANCIS RUCHALSKI, CESAR BAEZ,
CHRISTOPHER JOHNSON, SPORT-BLX INC.,
SPORT-BLX SECURITIES, INC., CLINTON GROUP
INC., AND GLASSBRIDGE ENTERPRISES INC.,
                      Defendants.
-----------------------------------------X
SPORT-BLX, INC., individually and
derivatively on behalf of its shareholders,

                    Plaintiff,

     -V-              Case No.:
                      1:22-cv-8111-LGS
MICHAEL M. SALERNO, CYPRESS HOLDINGS, III,
L.P.,

                    Defendants.
-----------------------------------------X
                DATE: May 1, 2023
                TIME: 9:43  A.M.


          EXAMINATION BEFORE TRIAL of the
Defendant, Michael Salerno, taken by Mr.
Sack, pursuant to Order, held at the
offices of Hindy Freilich, a Notary Public
of the State of New York.



Page 2

```
 1
 2   A P P E A R A N C E S:
 3
 4
     MORVILLO ABRAMOWITZ GRAND IASON & ANELLO
 5   ATTORNEYS FOR SPORT-BLX AND GEORGE HALL
        565 Fifth Avenue
 6      New York, NY 10017
        BY: JONATHAN S. SACK, ESQ.
 7          EDWARD M. SPIRO, ESQ
            JOSEPH STERN, ESQ
 8          ALEXANDER MALETIS - paralegal
 9
     CHIESA SHAHINIAN & GIANTOMASI PC
10      ATTORNEYS FOR CYPRESS HOLDINGS, III, L.P.,
        MICHAEL M. SALERNO
11      11 Times Square - 34th Floor
        New York, NY 10036
12      BY: ROSS PEARLSON, ESQ.
            KELLY KORTES, ESQ
13          DANIEL TYRRELL - (virtually)
     Rpearlson@csglaw.com
14
15   LOEB AND LOEB LLP
        ATTORNEYS FOR GLASSBRIDGE ENTERPRISES INC., AND
16      DANIEL STRAUSS AND FRANCIS RUCHALSKI
        345 Park Avenue
17      New York, New York 10154
        BY: CHRISTIAN D. CARBONE, ESQ.
18
19   COLE SCHOTZ P.C.
        ATTORNEYS FOR JOSEPH DE PERIO
20      1325 6th Avenue - 19th floor
        New York, NY 10019
21      BY: DAVID GOLD, ESQ
     Dgold@coleschotz.com
22
23
      ALSO PRESENT:
24      Videographer - Peter Van der Vlugt
      (virtually)
25      Joseph De Perio
```



```
 1
 2              221. UNIFORM RULES FOR THE
                CONDUCT OF DEPOSITIONS
 3              221.1 Objections at Depositions
    (a) Objections in general.  No objections
 4  shall be made at a deposition except those
    which, pursuant to subdivision (b), (c) or
 5  (d) of Rule 3115 of the Civil Practice Law
    and Rules, would be waived if not
 6  interposed, and except in compliance with
    subdivision (e) of such rule.  All
 7  objections made at a deposition shall be
    noted by the officer before whom the
 8  deposition is taken, and the answer shall
    be given and the deposition shall proceed
 9  subject to the objections and to the right
    of a person to apply for appropriate relief
10  pursuant to Article 31 of the CPLR.
    (b) Speaking objections restricted.  Every
11  objection raised during a deposition shall
    be stated succinctly and framed so as not
12  to suggest an answer to the deponent, and
    at the request of the questioning attorney,
13  shall include a clear statement as to any
    defect in form or other basis of error or
14  irregularity.  Except to the extent
    permitted by CPLR Rule 3115 or by this
15  rule, during the course of the examination,
    persons in attendance shall not make
16  statements or comments that interfere with
    the questioning.
17  221.2 Refusal to answer when objection is
    made.  A deponent shall answer all
18  questions at a deposition, except (i) to
    preserve a privilege or right of
19  confidentiality, (ii) to enforce a
    limitation set forth in an order of the
20  court, or (iii) when the question is
    plainly improper and would, if answered,
21  cause significant prejudice to any person.
    An attorney shall not direct a deponent not
22  to answer except as provided in CPLR Rule
    3115 or this subdivision.  Any refusal to
23  answer or direction not to answer shall be
    accompanied by a succinct and clear
24  statement of the basis therefor.  If the
    deponent does not answer a question, the
25  examining party shall have the right to
```



```
 1
 2            221. UNIFORM RULES FOR THE
                CONDUCT OF DEPOSITIONS
 3
            221.3 Communication with the
 4   Deponent.  An attorney shall not interrupt
     the deposition for the purpose of
 5   communicating with the deponent unless all
     parties consent or the communication is
 6   made for the purpose of determining whether
     the question should not be answered on the
 7   grounds set forth in section 221.2 of these
     rules, and in such event, the reason for
 8   the communication shall be stated for the
     record succinctly and clearly.
 9
10          IT IS FURTHER STIPULATED AND AGREED
     that the transcript may be signed before
11   any Notary Public with the same force and
     effect as if signed before a clerk or a
12   judge of the court.
13
            IT IS FURTHER STIPULATED AND AGREED
14   that the examination before trial may be
     utilized for all purposes as provided by
15   the CPLR.
16
            IT IS FURTHER STIPULATED AND AGREED
17   that all rights provided to all parties by
     the CPLR cannot be deemed waived and the
18   appropriate sections of the CPLR shall be
     controlling with respect hereto.
19
20          IT IS FURTHER STIPULATED AND AGREED
     by and between the attorneys for the
21   respective parties hereto that a copy of
     this examination shall be furnished,
22   without charge, to the attorneys
     representing the witness testifying herein.
23
24
25
```



Page 5

```
 1

 2

 3          VIDEOGRAPHER:  We are now on

 4      the record.  This begins videotape

 5      number 1 in the deposition of Michael

 6      M Salerno in the matter of Cypress

 7      Holdings, III, L.P. versus Sport-BLX,

 8      Inc.  Today is Monday, May 1, 2023,

 9      and the time is 9:43 a.m.  This

10      deposition is being taken virtually

11      at the request of Morvillo Abramowitz

12      Grand Iason & Anello.

13          The videographer is Peter Van

14      der Vlugt of Magna Legal Services,

15      and the court reporter is Hindy

16      Freilich of Magna Legal Services.

17          Will counsel and all parties

18      present state their appearances and

19      whom they represent.

20          MR. SACK:  I'm Jonathan Sack,

21      and along with colleagues who will

22      introduce themselves, we represent

23      Sport-BLX and individuals associated

24      with Sport-BLX.

25          MR. SPIRO:  Ed Spiro, also from
```



Page 6

```
 1
 2          Morvillo Abramowitz, representing
 3          Sport-BLX and the individuals
 4          associated with them.
 5              MR. STERN:  Joseph Stern, also
 6          with Morvillo Abramowitz, and also
 7          representing Sport-BLX and associated
 8          individuals.
 9              MR. SACK:  And we have
10          Alexander Maletis, who is a legal
11          assistant in our office, with us as
12          well.
13              MR. PEARLSON:  Ross Pearlson,
14          P-E-A-R-L-S-O-N, of Chiesa Shahinian
15          & Giantomasi, representing Cypress
16          and the witness, Michael Salerno.
17          Appearing with me is Kelly Kortes,
18          one of our associates.  And appearing
19          by video is -- and by Zoom, I should
20          say, is Dan Tyrrell.
21              MR. GOLD:  David Gold, Cole
22          Schotz PC, on behalf of Joseph De
23          Perio, and I'm joined with
24          Mr. De Perio.
25              MR. CARBONE:  Chris Carbone,
```



MAGNA ▸
LEGAL SERVICES

Page 7

```
 1
 2          Loeb and Loeb, here for Glassbridge
 3          and the individual defendants, Daniel
 4          Strauss and Frank Ruchalski.
 5              VIDEOGRAPHER:  Will the court
 6          reporter please swear in the witness.
 7
 8   M I C H A E L   S A L E R N O, called as a
 9   witness, having been first duly sworn by a
10   Notary Public of the State of New York, was
11   examined and testified as follows:
12   EXAMINATION BY
13   MR. SACK:
14       Q.    Mr. Salerno, as you heard, my
15   colleagues and I represent Sport-BLX,
16   George Hall and other individuals
17   associated with Sport-BLX in the
18   consolidated litigations in this case.
19              For this deposition, your
20   counsel is permitted to object to a
21   question, but generally, you must answer
22   the question even if there's an objection.
23   If there's a concern with respect to
24   attorney/client privilege, you may
25   reasonably consult with your attorney on
```



Page 8

 1
 2    that.
 3              I will try to ask clear
 4    questions.  If anything is not clear,
 5    please let me know and I'll seek to clarify
 6    it.  If you don't say anything, if you
 7    don't ask to clarify a question, then I'll
 8    just operate on the premise that my
 9    question is clear.
10              Do you understand that?
11         A.   Yes.
12         Q.   I'll just confirm for all of us
13    here that the deposition is subject to a
14    protective order that's been entered into
15    and agreed to by all the parties to this
16    case.  That protective order provides for
17    various confidentiality protections.  Do
18    you understand that, Mr. Salerno?
19         A.   Yes.
20              MR. PEARLSON:  John, I would
21         ask that the entire deposition be
22         designated confidential until we can
23         review it and give you specific
24         confidentiality designations.
25              MR. SACK:  That's agreeable.



Page 9

1
2                And any objections to that?
3                MR. CARBONE:  No.
4                MR. SPIRO:  I think the
5          protective order already provides for
6          that.
7          Q.    Okay.  Mr. Salerno, is there
8    anything prohibiting you from giving
9    accurate and truthful testimony today?
10         A.    No.
11         Q.    Are you on any medication, for
12   example, that might affect your testimony?
13         A.    No.
14         Q.    What have you done to prepare
15   for today's deposition?
16         A.    I met with counsel, and I
17   looked over some documents that they
18   provided to me.
19         Q.    When did you meet with counsel?
20         A.    Last week.
21         Q.    For how long?
22         A.    About two hours.
23         Q.    And how many documents did you
24   look at?
25         A.    I'm not sure.



Page 10

```
 1
 2        Q.    Did they refresh your
 3   recollection about the events in this
 4   litigation?
 5        A.    Yes, particular to the document
 6   I looked at.
 7        Q.    What was that document?
 8        A.    There were a bunch.  I'm not
 9   sure.
10        Q.    What is NPPG plan
11   professionals?
12        A.    That is my company.
13        Q.    You own the company?
14        A.    I do.
15        Q.    You control the company?
16        A.    I do.
17        Q.    What does it do?
18        A.    It performs employee benefit
19   services, as well as retirement plan
20   services.
21        Q.    Works on estate plans for
22   people?
23        A.    I'm sorry?
24        Q.    It works on estate plans for
25   people?
```



```
 1
 2        A.    Can you clarify estate or a
 3   state?
 4        Q.    Estate?
 5        A.    As in -- can you clarify?
 6        Q.    Yeah.  Does the NPPG plan
 7   professionals work on estate planning?
 8        A.    No.
 9        Q.    So when you say it handles
10   retirement plans, can you expand on that a
11   little bit?
12        A.    We handle compliance work.  We
13   perform testing.  We do compliance 5500
14   preparation.  And we help design and manage
15   the plan document.
16        Q.    It's administration of plans,
17   is that right?
18        A.    That's correct.  We also do
19   some investment advisory work.
20        Q.    And so you are a registered --
21   NPPG plan professionals is a registered
22   investment advisor?
23        A.    It is.
24        Q.    And what sort of investment
25   advisory work does it do?
```



```
 1
 2        A.     It does institutional fiduciary
 3    oversight.
 4        Q.     What does that mean?
 5        A.     It oversees investments that
 6    would be appropriate for a retirement plan.
 7        Q.     And what is NPPG Investment
 8    Services, LLC?
 9        A.     That was a state registered
10    investment advisory firm.
11        Q.     What kind of investment
12    advisory work does NPPG Investment Services
13    do?
14        A.     It oversees the investments
15    that would be inside of a retirement plan.
16        Q.     You said before investments
17    appropriate for a retirement plan.  What
18    does that mean, investments appropriate for
19    a retirement plan?
20        A.     It means that it would be an
21    investment that would be considered
22    appropriate for a retirement plan.
23        Q.     Could you give some examples of
24    what would be an appropriate investment for
25    a retirement plan and what would be an
```



1

2    inappropriate investment?

3        A.    An appropriate investment would

4    be an index stock fund.

5        Q.    And what would an inappropriate

6    investment be?

7        A.    An example could be -- I'm not

8    really sure.  Well, that's not true.  A

9    private placement into a horse.  If you

10   buy, you know, a speculative investment

11   into a horse, that would not be appropriate

12   to put in your retirement plan for

13   employees to select from.

14       Q.    How about a speculative private

15   investment not in a horse, would that be

16   inappropriate for a retirement plan?

17       A.    No.  That may be appropriate.

18       Q.    So it would depend on what the

19   investment was, is that right?

20       A.    Not just that.  It also depends

21   on the investment policy statement that the

22   plan sponsor provides.

23       Q.    You picked the example of a

24   horse for an inappropriate private

25   investment.  Could you think of some other



Page 14

```
 1
 2    examples of what would be an inappropriate
 3    private investment for a retirement plan?
 4         A.    No.
 5         Q.    None, not as -- you're an
 6    investment advisor and you can't think of
 7    any other --
 8              MR. PEARLSON:  Objection.
 9              MR. SACK:  Let me finish my
10        question.
11         Q.    You're an investment advisor
12    and you can't think of any other example,
13    other than a horse, for an inappropriate
14    investment?
15         A.    If you provided me an
16    investment policy statement, I would be
17    able to.  But you're not doing that.
18         Q.    What was your position with
19    NPPG Investment Services?
20         A.    I'm the owner.
21         Q.    And you controlled its
22    activities, as well?
23         A.    Yes.
24         Q.    And that was a registered
25    investment advisor, as well?
```



```
 1
 2        A.      State.  Yes.  State of New
 3   Jersey.
 4        Q.      And are they both registered
 5   investment advisors?  Are they both,
 6   meaning plan professionals and investment
 7   services?
 8        A.      I don't understand the
 9   question.
10        Q.      Did you file a form ADV for
11   each of those entities?
12        A.      I did not, but our counsel did.
13        Q.      What's a form ADV?
14        A.      In my opinion, it's a
15   disclosure form.
16        Q.      To whom?
17        A.      The public.
18        Q.      And to the SEC?
19        A.      Not necessarily.
20        Q.      Who filed the forms -- in other
21   words, possibly to the SEC, you're not
22   sure, is that what you're saying?
23        A.      No.  I'm saying in estate
24   registration, we wouldn't file with the
25   SEC.
```



Page 16

1

2        Q.    But in a -- if it's more than a

3   state registration, you would file with the

4   SEC?

5              MR. PEARLSON:  Objection to

6        form.

7        A.    What do you mean, "more"?

8        Q.    Why don't we break it down.

9              For NPPG plan professionals,

10  was a form ADV filed?

11       A.    Yes.

12       Q.    With whom?

13       A.    The SEC.

14       Q.    Why with the SEC?

15       A.    Because it was a registration

16  application with the SEC.

17       Q.    And with investment services,

18  who is the form ADV filed with?

19       A.    The state of New Jersey.

20       Q.    And who filed those forms?

21       A.    I don't recall who filed NPPG

22  Investment Services.  RIA Lawyers filed it

23  for NPPG plan professionals.

24       Q.    And who are they?

25       A.    Our counsel.



Page 17

```
 1
 2       Q.     Who?
 3       A.     Gentleman's name is Ryan, Ryan
 4  Walker -- Walter.
 5       Q.     At what firm?
 6       A.     RIA Lawyers.
 7       Q.     I'm going to show you a form
 8  NPPG Investment Services, form ADV.  We'll
 9  have them distribute it.
10            MR. PEARLSON:  What are you
11         going to mark this as, John?
12            MR. SACK:  We'll call it
13         Exhibit 1.  Salerno Exhibit --
14         Salerno Deposition Exhibit 1.
15       Q.     Feel free to look through the
16  document, Mr. Salerno, but I'm going to
17  direct you initially to the last two pages.
18  It's a 24-page document, and we'll navigate
19  through the document as well as we can.
20  Please take a look at the last two pages,
21  initially.  And then I'm going to direct
22  you to --
23       A.     Do you have a pair of reading
24  glasses by any chance?  I don't have them.
25       Q.     I don't.  You didn't bring
```



Page 18

1

2  reading glasses to a deposition,

3  Mr. Salerno?

4       A.    No.  I forgot them.

5            MR. CARBONE:  These are

6         prescription, but they're reading

7         glasses, if you want to try them out.

8         I'll share.  You can try them on.

9       Q.    Well, let's do the best we can.

10 If we have to take a break, we'll just take

11 a break for you to get some.

12           On page 23, under -- in the box

13 that's headed domestic investment advisors

14 execution page, do you see your name

15 indicated there with your CRD number and

16 the date of March 31, 2023?

17      A.    I don't see a page number.

18      Q.    I understand.  It's the next to

19 last page of the document.

20      A.    Okay.  I'm here.

21      Q.    Yes.

22           MR. PEARLSON:  At the bottom of

23        the box.

24      A.    Yes.  I see my name.

25      Q.    And were you involved in any



Page 19

```
 1
 2   way with the preparation and filing of this
 3   document?
 4        A.    I'm sure I was.
 5        Q.    How so?  How were you involved?
 6        A.    Counsel, at the time, would
 7   have probably asked me questions.  I don't
 8   recall them.
 9        Q.    Well, at the time, this was
10   filed on or about March 31, 2023.  That was
11   just about one month ago.
12        A.    Oh.  This was an update.  Okay.
13   I'm sorry.  I thought this was the initial,
14   you said.
15        Q.    This was the one filed with the
16   SEC on March 31, 2023.  Were you involved
17   in the preparation of this document?
18        A.    Not much.  No.
19        Q.    Well, at all, were you -- did
20   you speak with your lawyer?
21        A.    Yes.
22        Q.    Did you provide your lawyer
23   information that went into this document?
24        A.    I did not.
25        Q.    Did he ask you questions about
```



Page 20

 1
 2  the document?
 3       A.    He did not.
 4       Q.    Did you review the document
 5  before it went to the SEC?
 6       A.    This did not go to the SEC.
 7       Q.    It was filed with the SEC.  We
 8  got it off of the SEC website.
 9       A.    This is a state registration.
10       Q.    Well, we can argue about that
11  separately.  But this was filed with a
12  public authority.  Did you review it before
13  it was -- it went to that authority?
14       A.    Briefly, yes.
15       Q.    And did you review it for
16  accuracy?
17       A.    I relied on counsel for the
18  accuracy.
19       Q.    So what did you review it for?
20       A.    Completeness.
21       Q.    Let me direct you to -- and you
22  see also -- do you see, Mr. Salerno, on the
23  page you're on, it's for a domestic
24  investment advisor execution page.  Under
25  the signature it says, "I, undersigned,



Page 21

 1

 2  sign this form ADV on behalf of and with

 3  the authority of the investment advisor.

 4  The investment advisor and I both certify

 5  under penalty of perjury under the laws of

 6  the United States of America that the

 7  information and statements made in the ADV,

 8  including exhibits and any other

 9  information submitted, are true and

10  correct."

11          So do you see that statements

12  are being made here to the United States of

13  America?  Do you see that?

14      A.    I see that it's -- I wouldn't

15  phrase it that way.

16          MR. PEARLSON:  Yeah, I would

17      object to that.  That isn't what it

18      says.

19      A.    That's not what it says.  I see

20  the paragraph.

21      Q.    There's a box there on 23 for

22  domestic investment advisor execution page.

23  Turn to the last page, Mr. Salerno.  Do you

24  see there's also a separate box like that

25  for state registered investment advisor



 1

 2  execution page, and you have a separate set

 3  of certifications of accuracy there, as

 4  well, is that right?

 5       A.    Yes.

 6       Q.    Also on March 31, 2023?

 7       A.    Yes.

 8       Q.    If you could go to the second

 9  page from the back.

10            MR. PEARLSON:  The one we were

11       just on?

12            MR. SACK:  We're still on the

13       same document.  The one before the

14       two pages we just looked at.

15            MR. PEARLSON:  Which page?

16       Second to last page or the third to

17       last page?

18            MR. SACK:  Third to last page.

19       Thank you.

20       Q.    Do you see an answer -- do you

21  see a question and a set of answers there

22  under custody, and it says number 2, pooled

23  investment vehicles and trusts.  Do you --

24  at A 1, "Do you or a related person act as

25  a general partner, managing member or



Page 23

1

2    person serving in a similar capacity for

3    any pooled investment vehicle for which you

4    are the advisor to the pooled investment

5    vehicle or for which you are the advisor to

6    one or more of the investors in the pooled

7    investment vehicle."

8              And do you see the response to

9    that question is yes?

10         A.    I do see that.

11         Q.    What's a pooled investment

12   vehicle?

13         A.    In this context, I would have

14   to ask our counsel, who completed it.

15         Q.    But you're responsible for the

16   accuracy of the information.  You don't

17   know what a pooled investment vehicle is?

18         A.    In this context, I would have

19   to ask him.

20         Q.    Well, in any context, as a

21   registered investment advisor, what's your

22   understanding of what a pooled investment

23   vehicle is?

24         A.    As a registered investment

25   advisor, my understanding of a pooled



Page 24

```
 1
 2    investment would be the grouping of
 3    multiple investments under one omnibus
 4    account.
 5         Q.    And would it also be a grouping
 6    of multiple investors in one vehicle or one
 7    partnership or one investment agreement?
 8         A.    In general or in this context?
 9         Q.    In any context?  Is that an
10    accurate -- if multiple investors invest in
11    a partnership, would that be a pooled
12    investment vehicle?
13         A.    I'm not sure if it would be in
14    this context.  It might be.  But I don't --
15    in this context, I would have to rely on
16    counsel, which I did.
17         Q.    Well, counsel said yes.  So
18    what did counsel -- counsel had to have
19    some basis -- withdrawn.
20               You said yes, because this was
21    your statement in this form, wasn't it?
22    Didn't you say yes?
23         A.    No.  I signed the form.  I'm
24    responsible for what's in it.  But I relied
25    on counsel.
```



Page 25

```
 1
 2       Q.    So what was your understanding
 3   when you certified the accuracy of the
 4   information that you did act as a general
 5   partner, managing member, et cetera, of a
 6   pooled investment vehicle?  What was your
 7   understanding?
 8            MR. PEARLSON:  I'm just going
 9        to caution the witness, to the extent
10        you're revealing impressions or
11        communications that you received from
12        counsel, I'm going to instruct you
13        not to answer.
14            If you have an independent
15        understanding outside of your
16        counsel, you can testify to that.
17       A.    No.  I've relied on my counsel.
18       Q.    I have to -- this is your
19   statement.  You've certified the accuracy
20   of it.  You can testify as to when you
21   certified the accuracy of yes to that
22   answer, you had to have some understanding
23   of what a pooled investment vehicle was,
24   and that's what I'm asking for.  What was
25   your understanding of what a pooled
```



Page 26

```
 1
 2   investment vehicle was?
 3             MR. PEARLSON:  And again --
 4         hold on a sec.  Again, I'll repeat my
 5         objection and direct you not to
 6         answer to the extent that
 7         understanding came from conversations
 8         based with you and your counsel.
 9     Q.    I'm not asking for what your
10   counsel said to you.  I'm asking you when
11   you certified the accuracy of yes, what --
12   when you said yes to managing a pooled
13   investment vehicle, what did you mean?
14             MR. PEARLSON:  Same objection,
15         to the extent that if your only
16         understanding came from counsel, I'll
17         direct you not to answer.
18             If you have an independent
19         understanding outside of your
20         communications with counsel, that's
21         fine, you can answer.  But if it's
22         only from talking to counsel, don't
23         answer the question.
24     Q.    Will you answer the question,
25   Mr. Salerno?
```



 1
 2      A.    No.
 3            MR. SACK:  I take issue with
 4      the assertion of counsel.  So we'll
 5      reserve that issue --
 6            MR. PEARLSON:  Okay.
 7            MR. SACK:  -- for a separate
 8      time.
 9      Q.    Let me show you an SEC
10 definition of what a pooled investment
11 vehicle is and see if you agree with that.
12            MR. SACK:  Can we have that,
13      Joe?
14            MR. PEARLSON:  Are you marking
15      that as an exhibit?
16            MR. SACK:  Yes, we will.  This
17      will be Salerno Exhibit 2.
18      Q.    Turn to page 15 of the
19 document, please, Mr. Salerno.  There's a
20 definition published by the SEC of a pooled
21 investment vehicle.  The first sentence
22 reads, "A pooled investment vehicle is an
23 entity often referred to as a fund that an
24 advisor creates to pool money from multiple
25 investors."



Page 28

 1
 2          Would you agree with that
 3  definition of a pooled investment vehicle?
 4      A.    Can I read the whole paragraph?
 5      Q.    Go ahead.
 6      A.    This, to me, is more of an
 7  example versus a definition.
 8      Q.    I think it's both, Mr. Salerno.
 9  It defines it as "A pooled investment
10  vehicle is an entity often referred to as a
11  fund that an advisor creates to pool money
12  from multiple investors."  And then it
13  provides various examples of a pooled
14  investment vehicle.
15          So my question is, under the
16  SEC's definition of a pooled investment
17  vehicle, are you a general partner or
18  managing member of any pooled investment
19  vehicles?
20      A.    Based on --
21          MR. PEARLSON:  Can we be clear
22      about this?  You're asking whether he
23      personally is, or whether NPPG is?
24      Q.    Whether NPPG Investment
25  Services or a related person.  And a



Page 29

1

2  related person includes, would you agree,

3  Mr. Salerno, that you are a related person

4  to the NPPG Investment Services, or that

5  your entities you control would be a

6  related person?

7       A.    I'm getting confused.  Okay.

8  What is the question?

9       Q.    My question is, do you -- are

10  you or an entity you control a general

11  partner or managing member of a pooled

12  investment vehicle, as defined by the SEC?

13       A.    I don't see this as being the

14  definition from the SEC.  This is a jargon

15  A to Z definition.  I don't know what this

16  is.

17       Q.    Mr. Salerno, you can argue with

18  it all you want.  This is a definition put

19  out by the SEC.  My question is based on

20  what the SEC says is a pooled investment

21  vehicle.

22            MR. PEARLSON:  As --

23       Q.    As stated there --

24            MR. SPIRO:  Don't interrupt.

25       Q.    As stated there, are you a



Page 30

1

2    managing member or a general partner of a

3    pooled investment vehicle, as described on

4    that page in that definition?

5            MR. PEARLSON:  Okay.  I believe

6        his objection was a fair one.  You've

7        put a document in front of him he's

8        never seen before that just says the

9        jargon from A to Z, and you're

10        characterizing it as an SEC

11        definition.

12            MR. SACK:  Ross, that's an

13        improper speaking objection.  You're

14        coaching the witness.  You can object

15        as to form.  That went way beyond the

16        line of form objections.

17    Q.    Mr. Salerno, you can argue all

18    you want with what the SEC writes.  The

19    SEC's written here what a pooled investment

20    vehicle is.  Were you or a company you

21    control a general partner or managing

22    member -- withdrawn.

23            Are you or a company you

24    control a managing member or general

25    partner of a pooled investment vehicle as



Page 31

```
 1
 2   described in this SEC document?
 3        A.    With all due respect, sir, if I
 4   look at the last page here, this is not
 5   from the SEC.  This says the glossary
 6   represents the views of the staff of the
 7   office of advocate for small business
 8   capital formation.  It is not a rule,
 9   regulation or statement of the SEC.
10        Q.    Mr. Salerno, I'm going to --
11             MR. SACK:  Can I have the
12        question read back.
13             (Whereupon, a portion of the
14        testimony was read back.)
15             MR. PEARLSON:  Again, I join in
16        the objection.  Same objection with
17        characterization of this document.
18        Q.    Mr. Salerno, are you or a
19   company you control a general partner or
20   managing member of a pooled investment
21   vehicle as defined in this document?
22             MR. PEARLSON:  Same objection.
23        A.    And let us just establish the
24   definition.  You're saying a pooled
25   investment is an entity or a fund, so
```


MAGNA
LEGAL SERVICES

Page 32

```
 1
 2   you're saying the entity is a fund?
 3        Q.    No.   I'm just reading the first
 4   sentence.   "A pooled investment vehicle is
 5   an entity often referred to as a fund that
 6   an advisor creates to pool money from
 7   multiple investors."
 8        A.    No.   I do not have a fund.
 9        Q.    That's not my question.
10              Are you a manager or general
11   partner of a pooled investment vehicle, a
12   fund being an example or a way of referring
13   to it.   It doesn't say a definition of a
14   fund.   It's a definition of a pooled
15   investment vehicle.
16        A.    Again, based on my
17   interpretation of what this document says
18   that you've put in front of me, it's saying
19   it's a fund.   I do not run a fund.
20        Q.    Mr. Salerno, are you the
21   general partner or managing member of an --
22              Mr. Salerno, are you or an
23   entity you control a general partner or
24   managing member of any entity that pools
25   money from multiple investors?
```



Page 33

```
 1
 2              THE WITNESS:  Can you read it
 3        back, please.
 4              (Whereupon, a portion of the
 5        testimony was read back.)
 6       A.     Yes.
 7       Q.     What are those?  Please name
 8  them.
 9       A.     Name what?
10       Q.     Name the -- are you the
11  managing member of any entity or general
12  partner, please name those entities?
13       A.     Oh.  The entities.  Cypress
14  III.
15       Q.     Any others?
16       A.     I don't think so.
17       Q.     And by Cypress III, you mean
18  Cypress Holdings, III, L.P.?
19       A.     Yes.
20       Q.     Do you have a problem if we
21  just refer to it as Cypress III for
22  shorthand during the deposition?
23       A.     I think that works.
24       Q.     Did you -- were you the general
25  partner or managing member of any entities
```



Page 34

```
 1
 2   that pool money from multiple investors
 3   before Cypress III?
 4        A.    I'm concerned with the context
 5   that you're asking me this, because
 6   Cypress III is not a pooled investment.
 7   Cypress III is a limited partnership that I
 8   set up for investments for myself, which I
 9   have let some friends into.  You're
10   characterizing it as a pooled investment,
11   which I don't think is accurate.
12        Q.    Well, the friends are not part
13   of your family and they're investing in the
14   fund alongside you, correct?  They're --
15   correct?
16        A.    Some of them are family.
17        Q.    But it doesn't matter --
18   withdrawn.
19              So what would you call
20   Cypress III?
21        A.    A limited partnership.
22        Q.    That you manage, correct?
23        A.    Correct.
24        Q.    And that you manage it on
25   behalf of yourself and other investors?
```



Page 35

```
 1
 2         A.     Correct.
 3         Q.     And you and your wife actually
 4   had a minority interest in this limited
 5   partnership as of February 2019, isn't that
 6   right?
 7         A.     I'm not sure.  We may have had
 8   a majority interest at that time.  I would
 9   have to look.
10         Q.     All right.  We will look at it.
11                As of now, it's a minority
12   interest, correct?
13         A.     As we sit here today, yes.
14         Q.     It's 25 percent or less of the
15   partnership, would you say?
16         A.     No.
17         Q.     How much -- what's the
18   percentage today?
19         A.     I'm not sure.  I think it's
20   somewhere around 40 percent.
21         Q.     So this is a limited
22   partnership that you manage for yourself
23   and for others in which you are a minority
24   owner?  Is that an accurate description?
25         A.     Today, yes.
```



Page 36

```
 1
 2        Q.    And it holds the assets of
 3   multiple investors?
 4        A.    I'm concerned -- assets of
 5   investors or assets of investments?
 6        Q.    Does it hold the assets of
 7   multiple investors?
 8        A.    It accepted cash from multiple
 9   investors and today holds assets of
10   investments.
11        Q.    And it holds the financial
12   interests of multiple investors, correct?
13        A.    What's the definition of
14   financial interest?
15        Q.    Does it hold -- do the LPs have
16   separate interests from your own,
17   Mr. Salerno, in this limited partnership?
18        A.    What LPs?  I'm sorry.
19        Q.    Are there limited partners in
20   Cypress III?
21        A.    Limited partners, yes.
22        Q.    The limited partners of
23   Cypress III have rights to the money in
24   that fund that are separate and apart from
25   whatever rights you have to the money in
```



Page 37

1
2  the fund, correct?
3          MR. PEARLSON:  Objection to
4      form.
5      A.    Yeah.  I'm not following that
6  question.
7      Q.    Okay.  They have interests in
8  the Cypress III limited partnership,
9  separate and apart from yours, correct?
10     A.    Yes.  The seven people have a
11 separate interest.  Everyone has their own
12 allocation.
13     Q.    And they have -- they put in
14 their own money?
15     A.    Correct.
16     Q.    You and your wife put in money,
17 correct?
18     A.    Correct.
19     Q.    And these other individuals in
20 a number of different entities put in money
21 into the limited partnership, correct?
22     A.    Those seven or eight people,
23 correct.
24     Q.    And you manage the interest of
25 yourself, your wife, and those seven or



Page 38

1
2    eight people, correct?
3        A.    Correct.
4        Q.    And so is it fair to say that
5    this Cypress III holds the assets of those
6    multiple investors?
7        A.    Yes.
8        Q.    In the same -- let's take this
9    -- I'll set this aside, Mr. Salerno.
10   Please go back to this document that is
11   Exhibit 1.  And I'm going to direct you now
12   to, if you wouldn't mind counting eight
13   pages from the back, and I think we'll be
14   able to find --
15       A.    From the back?
16       Q.    From the back.
17       A.    Sure.
18       Q.    Excuse me.  My mistake.  It's
19   seven pages from the back.  Excuse me.  And
20   then we'll make sure we're on the same
21   page.
22              Do you see a box in the middle
23   of the page?  I think -- I'm sorry,
24   Mr. Salerno, if I could take this document,
25   I'll direct you to the page.



Page 39

```
 1
 2        A.     Thank you.
 3               MR. PEARLSON:  I think I was on
 4          the same page as him.  If you could
 5          tell us.
 6               MR. SACK:  I think it's one
 7          more.
 8               MR. PEARLSON:  That has the box
 9          on the bottom that says schedule A?
10               MR. SACK:  Correct, Ross.
11        Q.     So in that box, under schedule
12   A, it says direct owners and executive
13   officers.  And then at the bottom, it lists
14   in a box under full legal name, Ice
15   Holdings, LLC.  Was that a direct owner of
16   NPPG Investment Services, LLC?
17        A.     I would have to check with our
18   counsel.  I relied on them.
19        Q.     Was it an owner?
20        A.     Yes.
21        Q.     It was an owner?
22        A.     Yes.
23        Q.     And you own Ice Holdings, is
24   that correct?  You're the sole member of
25   Ice Holdings, LLC?
```



Page 40

 1
 2          A.    Ice Holdings, I'm the managing
 3    member, I believe.
 4          Q.    There are other members of Ice
 5    Holdings, LLC?
 6          A.    Yes.
 7          Q.    What does Ice Holdings hold?
 8          A.    It holds my family's assets.
 9          Q.    It's your holding company?
10          A.    Yes.
11          Q.    What assets are those that it
12    holds?
13          A.    Numerous.
14          Q.    What are they?
15          A.    Real estate, private holdings,
16    public stock.
17          Q.    Any other examples?  Horses?
18          A.    Not at this time.
19          Q.    Who are the other members of
20    Ice Holdings, LLC, besides yourself --
21    withdrawn.
22                Who were the individual members
23    of Ice Holdings, LLC, or entity members of
24    Ice Holdings, LLC?
25          A.    I would have to ask my estate



Page 41

```
 1
 2    attorney.  It's a part of my estate.
 3         Q.    Are they immediate family
 4    members?
 5         A.    Immediate family members are
 6    included, yes.
 7         Q.    And that would be your wife and
 8    children?
 9         A.    They are in -- yes, they would
10    be beneficiaries.
11         Q.    Anyone else?
12         A.    Yes.
13         Q.    Who else?
14         A.    People I find dear to me.
15         Q.    Other family members?
16         A.    Can you define "family"?
17         Q.    Are you related -- other people
18    you're related to by blood?
19         A.    Yes, at different levels.  Not
20    immediate.  Some not blood.
21         Q.    Could you give us the
22    percentage ownership interest of each
23    member of Ice?
24         A.    I don't know.
25               MR. PEARLSON:  I'm going to
```


MAGNA
LEGAL SERVICES

Page 42

 1

 2          object to this line of questioning.

 3          I don't see the relevance of it.

 4                  But go ahead, if you know.

 5     A.     I don't know.

 6     Q.     Were you the majority owner?

 7     A.     I don't think so.

 8     Q.     Ice was part of your estate

 9   plan structure, Mr. Salerno?

10     A.     Yes.

11     Q.     Please turn to the immediately

12   prior page, and then we'll just make sure

13   we're on the same one.  There is at the

14   bottom, it is --

15     A.     Item 12, small business?

16     Q.     If you don't mind, let me just

17   make sure we're on the right page.  Yes.

18   This is the right page.

19             MR. SACK:  And Ross, at the

20          very bottom in the box, there's a

21          section H.  You have that?

22             MR. PEARLSON:  Yes.

23     Q.     So I'm going to read excerpts

24   of H, Mr. Salerno, just to try to focus us,

25   but you can read that fully.



Page 43

1

2              Actually, before I do, I take

3   it you thought it was important to be

4   accurate in this form ADV filed with the

5   government, correct?

6         A.    I relied on my counsel, I'm

7   sure.

8         Q.    Did you think it was important

9   to be accurate?

10        A.    Of course.

11        Q.    H asks, "Has any domestic or

12   foreign court, sub B, ever found that you

13   or any advisory affiliate were involved in

14   a violation of investment related statutes

15   or regulations?"  It's a question, and the

16   answer is no.

17             And then subparagraph 2 says,

18   "Are you or any advisory affiliate now the

19   subject of any civil proceeding that could

20   result in a yes answer to any part of a

21   light item 11 H 1?"  And the answer is no.

22             Isn't that a false answer,

23   Mr. Salerno?  Isn't that a false statement

24   being made to the government?

25        A.    I don't think so.



Page 44

1

2        Q.    Really?   You don't think you're

3   now the subject of a civil proceeding that

4   involves a violation of investment related

5   statutes or regulations?

6        A.    I don't.

7        Q.    You've been sued for a

8   violation of section 10 B of the Securities

9   Exchange Act of 1934.   There's a lawsuit

10   against you that claims you violated the

11   securities laws.   Are you aware of that?

12        A.    I frankly was not aware that it

13   was a securities fraud claim, which is

14   absolutely ridiculous.

15        Q.    Mr. Salerno, an amended

16   complaint was filed against you and Cypress

17   over a month ago, two months ago, early

18   March 2023, that alleged that you and

19   Cypress violated the securities laws of the

20   United States.   Were you aware that suit

21   was filed against you?

22        A.    As far as the time -- I rely on

23   my counsel.   I know there was an amended

24   complaint.   Yes, I know there was an

25   amended complaint.



Page 45

```
 1
 2        Q.    And did you know that an
 3   amended complaint accused you of violating
 4   the securities laws of the United States?
 5        A.    No.
 6        Q.    Did you look at the amended
 7   complaint?
 8        A.    I did.
 9              MR. SACK:  Let's pull out the
10        first amended complaint, please.
11              MR. PEARLSON:  This is being
12        marked as Exhibit 3?
13              MR. SACK:  Yes.
14        Q.    I'm going to direct you to
15   paragraphs 88 to 96 of that first amended
16   complaint.  Paragraph 88.
17              I'll just direct you first to
18   the caption.  First cause of action,
19   violation of section 10 B of the Securities
20   Exchange Act of 1934, and rule 10 B 5
21   against Salerno and Cypress.
22              And then you see that the
23   paragraphs after, if you'd like to look,
24   please do, 88 to 96 detail the securities
25   laws and regulations at issue and your
```



Page 46

```
 1
 2    personal alleged violation of those laws
 3    and regulations.
 4              Did you tell your lawyer that
 5    you were the subject of a civil proceeding
 6    alleging a violation of investment related
 7    statutes and regulations?
 8              MR. PEARLSON:  I'm going to
 9         direct him not to answer about what
10         he told his lawyer.
11         Q.    Were you aware that you were
12    the subject of a lawsuit --
13         A.    Yes.
14         Q.    -- involving --
15         A.    I'm sorry.  I didn't -- were
16    you done with your question?
17         Q.    I was not.
18         A.    Sorry.
19         Q.    On March 31, 2023, when this
20    document was filed with the government,
21    were you aware that you were the subject of
22    a civil case that involved an alleged
23    violation of investment related statutes or
24    regulations?
25         A.    No.
```



Page 47

```
 1
 2       Q.    If the suit had been filed a
 3   month earlier, can you explain why you were
 4   not aware of that?
 5       A.    I was not aware that it was an
 6   SEC claim.  You're putting in front of me,
 7   I see it now, but I was not aware at the
 8   time.
 9       Q.    You read the document, correct?
10       A.    I really don't look at the
11   causes of action.  Typically, when I read
12   these, I read the facts and I rely on my
13   attorneys for the legalese.
14       Q.    Now that you're aware of the
15   error, do you plan to amend?
16       A.    I'd have to discuss it with our
17   counsel.
18       Q.    Well, why don't you just take a
19   look at it here while we're here.  Look at
20   the same box we were at.  The question is,
21   H 1 B, "Has any domestic or foreign court
22   ever found that you or an advisory
23   affiliate were involved in a violation of
24   investment related statutes or
25   regulations?"
```



Page 48

1

2          And subparagraph 2 says, "Are
3   you or an advisory affiliate now the
4   subject of a civil proceeding that could
5   result in a yes answer relating to
6   violation of investment related statutes or
7   regulations."
8          Based on that, do you think you
9   need to amend this form?
10      A.    I would rely on my counsel to
11  advise me.
12      Q.    So you can't answer that
13  question?
14      A.    That's right.
15      Q.    You can't say whether that's --
16  you're obligated to say yes to that
17  question?
18      A.    I don't know if there's any
19  dispensations that I would be afforded or
20  if this is applicable to this.  So I would
21  rely on my counsel.
22      Q.    Let's turn to the NPPG plan
23  professionals form ADV.  We'll get that to
24  you in a moment.
25          So this form ADV was filed in



Page 49

1

2    the -- based on the upper left, on April

3    10, 2023, and it was reported to be an

4    other than annual amendment.  Do you know

5    what that is, an other than annual

6    amendment, Mr. Salerno?

7        A.    I do not.

8        Q.    If you would turn to the next

9    to last page, I would appreciate it.

10            MR. PEARLSON:  For the record,

11        this is Exhibit 4, John?

12            MR. SACK:  Yes.  Thank you,

13        Ross.

14        Q.    Who's Greg Woods?

15        A.    Greg Woods is an employee of

16    NPPG plan professionals.

17        Q.    And he's listed here as the

18    signatory on April 10, 2023.  What's his

19    position with NPPG plan professionals?

20        A.    He's the head of investment

21    fiduciary institutional services.

22        Q.    He's listed on this document --

23    I'm going to give you how he's described

24    and just ask you whether that's accurate.

25    He's listed as chief compliance officer,



Page 50

1
2  director of investments and fiduciary
3  services.  That's on the prior page.
4            MR. PEARLSON:  I'm sorry.  Your
5       question, John?
6       Q.    Is that his position with NPPG
7  plan professionals?
8       A.    I'm not a title guy.  So what
9  he does is he runs the investment fiduciary
10 institutional services department.
11      Q.    Do you have a compliance
12 officer in your company, Mr. Salerno?  You
13 don't know that?
14      A.    I'm sorry?
15      Q.    Do you have a chief compliance
16 officer for your company?
17      A.    For NPPG plan professionals?
18      Q.    Yes.
19      A.    It's saying here that that's
20 Greg.
21      Q.    I understand it says it there,
22 but you run the company.  Is it true?  Do
23 you have a chief compliance officer?
24      A.    I would say it's Greg.
25      Q.    It is true.  So you're



Page 51

```
 1
 2    saying --
 3         A.    Yes.
 4         Q.    You run the company, do you
 5    have a chief compliance officer?
 6              MR. PEARLSON:  I believe he
 7          asked and answered -- that was asked
 8          and answered.
 9         Q.    It's Greg?
10         A.    It's Greg.
11         Q.    What are his responsibilities
12    as chief compliance officer?
13         A.    To oversee the fiduciary
14    institutional services.
15         Q.    And is it your responsibility,
16    as the person who's running the company, to
17    get Gregory Woods the information he needs
18    to fulfill his compliance officer duties?
19         A.    Me, alone?  Or I own the
20    company, so I'm accountable?
21         Q.    So one of your responsibilities
22    is to get him information he needs to
23    fulfill his compliance role, correct?
24         A.    Correct.
25         Q.    Now, look, please, at the fifth
```



Page 52

```
 1
 2   page in from the back, and then we'll make
 3   sure we're on the same page.  Give me one
 4   second.
 5            So it has that box H at the
 6   top.  Are you there, Ross?
 7            MR. PEARLSON:  I can't see
 8         whether it's an H because of the
 9         staple.
10            MR. SACK:  It says, "For yes
11         answer to the following questions,
12         complete a civil judicial action
13         DRP."  Do you have that?
14            MR. PEARLSON:  I was on the one
15         that says --
16            MR. SACK:  Sorry.  Fourth in
17         from the back.  There's a box
18         schedule A at the bottom of the page.
19            MR. PEARLSON:  I'm there.
20      Q.    So Mr. Salerno, this has the
21   same questions and answers that we went
22   over with the investment services document.
23   And it asks, "Has any domestic or foreign
24   court ever found that you or an advisory
25   affiliate were involved in a violation of
```



Page 53

1
2  investment related statutes or regulations?
3  Answer, no."
4          And then number 2, "Are you or
5  any advisory affiliate now the subject of
6  any civil proceeding that could result in a
7  yes answer?  Answer, no."
8          Is this something -- is this a
9  document that Greg Woods prepared and
10 submitted?
11     A.    You would have to ask Greg.
12     Q.    You don't know who does it for
13 your business, who submits this document?
14     A.    We would have to ask Greg.
15     Q.    You don't know who prepares it
16 and submits it?
17     A.    Our counsel prepared it, I'm
18 sure.
19     Q.    Have you told Greg Woods about
20 this securities litigation that you're
21 involved in?
22     A.    I didn't even know it was a
23 securities litigation.
24     Q.    Have you told him about this
25 litigation that you're involved in?



Page 54

1

2          A.      I don't recall.

3          Q.      So you may not have, is what

4     you're saying?

5          A.      That's very possible.

6          Q.      So if you didn't, then really

7     what you did was you deprived him of

8     information that he needed to fill out this

9     questionnaire accurately, isn't that right?

10              MR. PEARLSON:   Objection to

11          form.

12         A.      That's your opinion, it sounds.

13     Not mine.

14         Q.      But isn't it -- do you agree

15     that it's relevant to know whether you're

16     the subject of a securities related action

17     against you?  Is that relevant to

18     completing this document?

19         A.      Only if it's applicable to this

20     document in the context of the definition

21     of advisory affiliate or you, and I need to

22     speak to our counsel to see whether or not

23     that that's germane here.

24         Q.      So what you really need to do

25     is bring the information to the people --



Page 55

```
 1
 2   bring the information about this lawsuit to
 3   the people who were involved in submitting
 4   these documents to the government, isn't
 5   that right?  You have to bring them the
 6   information?
 7        A.    That sounds right.
 8        Q.    And you didn't do that?
 9        A.    I don't recall if I did or
10   didn't.
11        Q.    Oh, you think you did?  You
12   think you did tell them about this
13   litigation?
14        A.    With all due respect, that's
15   not what I said.
16        Q.    Did you tell them -- did you
17   tell your counsel and Mr. Woods, who were
18   involved in submitting these documents,
19   about this litigation?
20             MR. PEARLSON:  Objection.  Hold
21        on.  I direct you not to answer to
22        the extent it's with counsel.  You
23        can answer it with respect to
24        Mr. Woods.
25        A.    I don't recall.
```



Page 56

 1

 2        Q.    Let's stay on this document for

 3    a moment.  And do you intend to amend this

 4    form for your business, as well as the

 5    other form, Mr. Salerno?

 6        A.    This is something that Greg

 7    signed.  I would bring this up to counsel.

 8        Q.    And you'll bring it up to him,

 9    as well?

10        A.    I will.

11        Q.    On the third page in on this

12    document, we're on the same document,

13    there's a schedule B of indirect owners.

14             MR. PEARLSON:  I'm sorry, John.

15         Third page from the back or third

16         page into the document?

17             MR. SACK:  From the back.

18         Thank you.

19        Q.    Do you see a box that lists

20    indirect owners of NPPG plan professionals?

21        A.    Which one is that?

22        Q.    It's the box there at the

23    bottom (indicating).

24        A.    Yes.  Thank you.

25        Q.    I'll have a question for you in



Page 57

 1
 2   a moment.
 3            There's an entity listed there,
 4   Ice Investment Holdings, LLC.  What's that
 5   entity?
 6        A.    Ice Holdings.
 7        Q.    Is it the same as the Ice
 8   Holdings entity that I asked you about in
 9   the other ADV?
10        A.    I believe so.
11        Q.    You think that's just a -- an
12   error in the way it's referred to there?
13        A.    Yeah.  I believe so.
14        Q.    So all of your answers that you
15   gave earlier about what Ice Holdings is
16   would apply to this Ice Investment Holdings
17   here, correct?
18        A.    Correct.
19        Q.    What's the Salerno family
20   trust?
21        A.    It's a trust.
22        Q.    And who are the trustees of the
23   trust?
24            MR. PEARLSON:  I'm going to
25         object to the relevance.



Page 58

```
 1
 2              Go ahead, you can answer.
 3      A.      I don't recall who's the
 4  trustee of that one.  It may have been my
 5  mother.
 6      Q.      Excuse me.
 7      A.      Oh, I'm sorry.
 8      Q.      You're saying it may have been
 9  your mother, but you're not sure?
10      A.      Right.
11      Q.      Who are the beneficiaries of
12  the trust?
13              MR. PEARLSON:  Same objection.
14      A.      There are multiple.
15      Q.      How many, approximately?
16      A.      I don't recall this particular
17  trust, who the beneficiaries are.
18      Q.      Is that family trust part of
19  your estate plan, as well?
20      A.      It is.
21      Q.      And who is Salerno -- Leonora
22  -- well, I'm just going to read it as
23  written and then ask you who they are.
24  Salerno Bossie Leonora Carmela, so who is
25  that person, no disrespect intended?
```



Page 59

 1

 2          A.    Understood.  Thank you.  That's

 3     my mother.

 4          Q.    Her first name is Leonora?

 5          A.    Yes.  Her birthday was

 6     Thursday.

 7          Q.    Very nice.

 8                And this means your mother was

 9     one of the indirect owners of NPPG plan

10     professionals, correct?

11          A.    I don't think so.  This -- and

12     again, I have to rely on counsel, but I'm

13     trying to help and answer my questions

14     directly.  I think this says that she's the

15     trustee of Salerno family trust.

16          Q.    Understood.  But you're not

17     entirely sure why she's listed on this

18     document, is that right?

19          A.    That's correct.

20          Q.    Mr. Salerno, this document

21     indicates that --

22          A.    Are we at the same spot?  I'm

23     sorry.

24          Q.    You are.  We are.  Thank you.

25                This document states that the



Page 60

```
 1
 2   interest of Ice Holdings, the Salerno
 3   family trust and Leonora Salerno Bossie
 4   were acquired in December 2022, is that
 5   correct?
 6             MR. PEARLSON:  I'm going to
 7        object.  Again, it refers to her as
 8        the trustee.  But --
 9             MR. SACK:  Well, I'll just
10        rephrase it.
11        Q.    This document indicates that
12   the reported status of these individuals
13   was acquired in December 2022.  Do you know
14   what that's referring to, what was acquired
15   or what they're status was then, as opposed
16   to different time periods?
17        A.    I don't.
18        Q.    To your knowledge, have they
19   had the relationships here for many years,
20   reported here for many years?
21        A.    More than one year.
22        Q.    What's NPPG Holdings, LLC?
23        A.    It's a limited liability
24   corporation.
25        Q.    What does it hold?
```



Page 61

```
 1
 2       A.    NPPG holds -- Holdings owns
 3  interest in NPPG plan professionals, NPPG
 4  record keeping services, Pinnacle Financial
 5  Services.   I think that's it.   I'm not
 6  sure.
 7       Q.    These are all your assets, the
 8  ones that it holds?
 9       A.    Yes, NPPG Holdings.
10       Q.    So this is another of your
11  holding companies?
12       A.    Correct.
13       Q.    Mr. Salerno, in June 2019, did
14  you authorize Marc Gross to send a letter
15  to George Hall?
16       A.    I don't remember the date.
17       Q.    Why don't you take a look at
18  it, then I'll have a few questions about
19  that, Mr. Salerno.
20       A.    Sure.
21            MR. PEARLSON:  This is Exhibit
22       5?
23            MR. SACK:  Yes.
24       Q.    Let me know when you're ready,
25  but I'm not rushing you, Mr. Salerno.
```



Page 62

```
 1
 2        A.      Okay.
 3        Q.      In the second paragraph -- I'm
 4   going to ask some questions about the
 5   second paragraph.
 6              Did you retain Mr. Gross before
 7   he sent that letter as your counsel?
 8        A.      I would think so.
 9        Q.      You don't know?
10        A.      I don't want to get caught up
11   on the word "retain."  Mr. Gross was
12   working for me.  I don't know.  But I think
13   so.
14        Q.      Was he working for Cypress
15   Holdings, as well?
16        A.      Yes.  He was working for
17   Cypress Holdings, rather than me.  That
18   would be correct.
19        Q.      And you authorized him to send
20   this letter, correct?
21        A.      I did.
22        Q.      And you gave him information
23   that went into this letter, correct?
24        A.      I did.
25        Q.      This letter says, "Sport-BLX
```



Page 63

1
2   has entered into a lease for certain
3   commercial office space, expending
4   approximately $500,000 per annum for an
5   occupancy for less than five employees."
6           Do you see that?
7       A.      Yes.
8       Q.      What was your basis for saying
9   that Sport-BLX had less than five
10  employees?
11      A.      That was my understanding.
12      Q.      From what?
13      A.      From Mr. De Perio, Mr. Hall,
14  from my -- going to the office.
15      Q.      When did you go to the office?
16      A.      I don't recall.  But it was two
17  or three times.
18      Q.      It was in early 2019, correct?
19      A.      I'm sorry.  I don't recall
20  exactly.
21      Q.      Well, was it in May or June of
22  2019, shortly before the letter?
23      A.      Again, I don't recall.
24      Q.      Okay.  So you say the assertion
25  that there were less than five employees



Page 64

 1

 2   was based on your visits to the office?

 3   How many visits?

 4        A.    Probably two or three.

 5        Q.    And then what else was it based

 6   on?

 7        A.    It would have been much easier

 8   if they actually gave me the W-2s that I

 9   asked for and the financial records, I

10   could have easily seen exactly how many

11   employees it had.  But I was not provided

12   that information.

13        Q.    What was your assertion based

14   on, Mr. Salerno?

15        A.    As I said, Mr. De Perio's

16   comments, my own visual and understanding,

17   and Mr. Hall's.

18        Q.    What did Mr. De Perio say to

19   you?

20        A.    He was telling me we had a few

21   people working there.

22        Q.    When did he say that?

23        A.    I don't recall exactly.  But it

24   was obviously prior to this letter.

25        Q.    And what did George Hall, he



Page 65

 1
 2    just said, the best that you can remember
 3    now, is that we had a few people working
 4    there?
 5         A.    In that context.
 6         Q.    What do you mean "in that
 7    context"?
 8         A.    Yes, it was my understanding we
 9    had less than five employees.
10         Q.    And when did he say that to you
11    in relation to this letter?
12         A.    Prior to it.
13         Q.    But you can't say whether that
14    was in January or in June, is that right?
15         A.    I cannot.
16         Q.    So it may very well have been
17    before you invested in January?
18         A.    That's possible.
19         Q.    What did George -- you said you
20    also relied on statements by George Hall?
21         A.    Correct.
22         Q.    What did he say to you?
23         A.    Basically my understanding was
24    that we had less than five employees.  I
25    don't remember the exact wording.



Page 66

 1

 2        Q.    And again, can you give any

 3   timeframe on that statement at all?

 4        A.    Prior to this letter, I cannot.

 5        Q.    And let me be clear, did

 6   Mr. De Perio and Mr. Hall say less than

 7   five people working or less than five

 8   employees?  What was it?

 9        A.    I don't recall.

10        Q.    Because didn't they tell you

11   there were numerous people who worked for

12   Clinton Group, and unpaid interns who also

13   worked on behalf of Sport-BLX?

14             MR. PEARLSON:  Objection to

15          form.

16             You can answer.

17        A.    Why would people from Clinton

18   Group be working for Sport-BLX?

19        Q.    Because weren't you told,

20   Mr. Salerno, that Clinton Group was

21   supporting the development of Sport-BLX

22   during the founders' round fundraising, and

23   that people at Clinton Group were helping

24   the development of the company?

25        A.    I'm sorry.  I'm confused.



Page 67

```
 1
 2         Q.     Yes.
 3         A.     Because the address and the
 4   location for Sport-BLX was Clinton Group's
 5   office.   So the employees of Clinton Group
 6   were already working there.   So how would
 7   that impact us at all?
 8         Q.     Because they were working on
 9   Sport-BLX.
10         A.     In the office that they were
11   working in for years prior.
12         Q.     Yeah, but people come and go
13   from a company.  People -- there are many
14   people who work for entities who join as
15   the business develops, isn't that right?
16   It's not a static thing, Mr. Salerno.
17         A.     I don't think that's what
18   you're saying, and that's not what this is
19   saying.   You're saying that people should
20   be added to this number of five, at least
21   that's what I'm understanding you to say,
22   that worked for Clinton Group.   They had to
23   go to that office 9:00 to 5:00 every day to
24   work at Clinton Group, regardless of the
25   Sport-BLX project.
```



Page 68

1

2          Q.    But did you know how many

3    people were working on Sport-BLX when this

4    letter was sent?

5                MR. PEARLSON:  Objection to

6          form.

7          A.    Specifically how many people

8    worked for Sport-BLX or on the program?  On

9    the project?

10         Q.    Both.  Weren't both relevant,

11   Mr. Salerno?

12         A.    Well, what's relevant is where

13   they worked, not if they worked on it.  If

14   they were to report to that office from

15   9:00 to 5:00, that would be relevant to me.

16         Q.    And did you ask George Hall and

17   Joe De Perio shortly before directing

18   Mr. Gross to send the letter, how many

19   people were using the space to work on the

20   Sport-BLX's business?

21         A.    I don't recall.

22         Q.    So the only due diligence you

23   did was to, at some point, speak with

24   George Hall and Joe De Perio, and at some

25   point visit the office?



Page 69

 1
 2          MR. PEARLSON:  Objection.
 3     Q.    That's what you did before
 4  directing Mr. Gross to send that letter?
 5          MR. PEARLSON:  Objection to
 6      form and the characterization of due
 7      diligence.
 8          Go ahead.
 9     A.    Can you repeat the question?
10     Q.    You've referred to
11  conversations with George Hall and Joe De
12  Perio and visits to the office before
13  having this letter sent, is that right?
14     A.    Correct.
15     Q.    Did you do anything else to
16  verify the accuracy of that information
17  before sending the letter?
18     A.    I asked for financial
19  information, which included details on
20  payroll, which I did not receive.
21     Q.    I'm going to show you an e-mail
22  in a moment.  Why don't we pull it out, and
23  then I'll say it for the record.
24          MR. SACK:  Are we up to Exhibit
25      6, Hindy?



Page 70

```
 1
 2              COURT REPORTER:  Yes.
 3       A.     Before we get into this, can we
 4  take a quick bathroom break?
 5              MR. SACK:  Yeah.  Why don't we
 6         say -- it's 11:00 now.  Can we come
 7         back 10 after 11:00?
 8              THE WITNESS:  Sure.
 9              VIDEOGRAPHER:  Off the record,
10         10:58.
11              (Whereupon, an off-the-record
12         discussion was held.)
13              VIDEOGRAPHER:  On the record,
14         11:12.
15       Q.     Mr. Salerno, how were you
16  introduced to Marc Gross?
17       A.     Through my accountant.
18       Q.     Who is that?
19       A.     Dave Roth.
20       Q.     Ross or Roth?
21       A.     Roth, R-O-T-H.  Sorry.
22       Q.     When was that, approximately,
23  that you were introduced to Mr. Gross?
24       A.     Five, six years ago maybe.  I'm
25  not really sure.
```



Page 71

```
 1
 2         Q.    So we're in 2023 now.  So that
 3    would be roughly 2018, 2017, 2018?
 4         A.    Something like that.  Maybe a
 5    little earlier.
 6         Q.    And your wife's an attorney
 7    too, correct?
 8         A.    Correct.
 9         Q.    Does she have professional
10    dealings with Mr. Gross, as well?
11         A.    Can you clarify "professional
12    dealings"?
13         Q.    Working with him in a legal
14    capacity, such as on cases on the same
15    side, opposite side, deals, just some kind
16    of professional working relationship with
17    him?
18              MR. PEARLSON:  Not as a client,
19         you're talking about working with --
20              MR. SACK:  As an attorney.
21         A.    As an attorney, I would say no,
22    I don't think so.
23         Q.    As a client, has she been a
24    client of Mr. Gross?
25         A.    Not that I recall.
```



Page 72

```
 1
 2        Q.    And have you used Mr. Gross for
 3   matters other than Sport-BLX related
 4   matters?
 5        A.    Yes.
 6        Q.    Matters related to investments?
 7              MR. PEARLSON:  I just want to
 8         caution the witness.  I think we're
 9         getting into attorney/client
10         privilege.
11              MR. SACK:  Yeah, I'm just
12         asking at the level of subject
13         matter.  I'm not asking for beyond
14         subject matter.
15              MR. PEARLSON:  You can answer.
16        A.    I'm concerned about your
17   definition of investments.  I would say
18   that all of them had to do with money.
19        Q.    Please take a look at what's
20   been marked as Exhibit 6.  It's an e-mail,
21   the cover, it's Cypress Bates number 1215
22   to 1217, an e-mail and a two-page
23   attachment.  And it's from you,
24   Mr. Salerno, to George Hall with a CC to
25   Marc Gross.  "See attached request for
```



Page 73

```
 1
 2   information as we discussed," and it's
 3   dated May 21, 2019.
 4              And this comes, Mr. Salerno,
 5   about three weeks, approximately, before
 6   the June 10 letter that you -- that
 7   Mr. Gross sent that we were just
 8   discussing, is that right?
 9       A.    Yes.
10       Q.    And this list has 25 items of
11   specific information that you -- that
12   you're seeking.  And do you seek in any way
13   here W-2 information or the number of
14   employees of the company or the number of
15   people using the space on behalf of
16   Sport-BLX?
17       A.    I believe that would be covered
18   under number 1, current financial
19   statements year-to-date through April 30,
20   including but not limited to general
21   ledger, profit and loss statement, balance
22   sheet, cash flow statements, et cetera.
23       Q.    How would financial statements
24   show the number of people who were employed
25   or using the space on behalf of Sport-BLX?
```



Page 74

```
 1
 2      A.     In the profit and loss
 3  statement, typically there would be a line
 4  item for payroll and then a detail
 5  supporting that line item.
 6      Q.     You're saying the detail would
 7  include the number of employees, not just
 8  the amount of compensation paid out?
 9      A.     Typically, when I do a
10  financial statement, I have supporting
11  documentation and you have payroll reports
12  conclusive of that.
13      Q.     Didn't you see those very
14  projections during the due diligence phase
15  in meetings with Mr. De Perio and others,
16  where they -- where Sport-BLX laid out the
17  number of employees it anticipated being on
18  site working in the business?
19          MR. PEARLSON:  Objection.
20      Q.     Can you answer the question?
21  Didn't you see the very projected
22  financials and statements about the number
23  of employees during the due diligence
24  phase?
25          MR. PEARLSON:  Objection to
```



Page 75

1

2          form.

3                  You can answer.

4          A.    I saw projection.  Projections

5      had certain details --

6          Q.    And the projections were in

7      excess of five employees, weren't they?

8          A.    Well, those projections also

9      showed $50 million of revenue just --

10         Q.    Well, my question is how many

11     employees --

12                MR. PEARLSON:  John, could you

13          let him finish his answer?

14                MR. SACK:  Well, he was giving

15          an unresponsive answer.  I didn't ask

16          about revenue.  I said projected

17          employees.

18         Q.    What was the number of

19     projected employees?

20         A.    I don't recall --

21         Q.    Was it in excess of five?

22                MR. PEARLSON:  John, can you

23          please let him finish when you ask a

24          question?

25         Q.    Was the number in excess of



 1
 2   five?

 3        A.     The number of what?

 4        Q.     Employees that you saw in the

 5   materials reviewed during due diligence?

 6        A.     I would have to look at it to

 7   recall specifically.  At what point in

 8   time?

 9        Q.     But you did look at projections

10   of employees in due diligence, correct?

11        A.     I believe, not specifically,

12   because at the time, my concern was not

13   specific to the number of employees.  I

14   looked at the projections in its whole.

15        Q.     Other than number 1, current

16   financial statements year-to-date, is there

17   any place here where you ask the number of

18   people using the space to work for

19   Sport-BLX?  Take your time.  Look through

20   the list.

21        A.     Understanding your question to

22   only be with respect to this document, the

23   answer would be yes.

24             MR. SACK:  Okay, let's hear the

25         question back, please, Hindy.



Page 77

```
 1
 2                (Whereupon, a portion of the
 3          testimony was read back.)
 4      Q.    You're saying yes?  Other than
 5   number 1, is there anything on this 25-item
 6   list that asks for -- withdrawn.
 7                So you claim that number 1,
 8   current financial statements, would provide
 9   the number of people using the space to
10   work for Sport-BLX, is that what your claim
11   is?  What would number 1 tell you?
12      A.    Number 1 would include detailed
13   reports, which would allow us to see how
14   many employees there are.
15                MR. PEARLSON:  John, are you
16          withdrawing your other question about
17          whether there was anything else?
18                MR. SACK:  I -- I withdrew
19          that, but I'll get back to it.
20      Q.    Is there anything else in your
21   view, Mr. Salerno, other than number 1,
22   relevant to the number of employees using
23   the space?
24      A.    Yes.
25      Q.    What's that?
```



Page 78

```
 1
 2          A.      Number 21.
 3          Q.      And that says, "Provide a copy
 4   of employment agreements currently in place
 5   for all employees," is that the one you're
 6   referring to?
 7          A.      Yes.
 8          Q.      And you understand that
 9   employees routinely act as employees
10   without employment agreements, is that
11   right?
12               MR. PEARLSON:  Objection to
13          form.
14          A.      I don't act that way.
15          Q.      Well, you're in a business.  Do
16   all of your employees have employment
17   agreements?
18          A.      Yes.
19          Q.      And are you aware -- is that
20   your view, that all businesses have
21   employees with employment agreements?
22               MR. PEARLSON:  Objection to
23          form.
24               You can answer.  Go ahead.
25               THE WITNESS:  I'm sorry.
```



Page 79

 1
 2              MR. PEARLSON:  Go ahead.
 3      A.     That's what I consider to be
 4  best practices, yes.
 5      Q.     Well, that's not my question.
 6              My question is, is it your view
 7  that all employers use employment
 8  agreements with their employees?
 9              MR. PEARLSON:  Objection.
10      A.     I can't speak -- sorry.
11              MR. PEARLSON:  Go ahead.
12      A.     I can't speak to other
13  employers.
14      Q.     But you have experience with
15  other employers who don't use employment
16  agreements, don't you?
17      A.     I don't have those
18  conversations.
19      Q.     Have you ever heard of the
20  concept of an at will employee?
21      A.     I've heard of that.
22      Q.     What does that term mean to
23  you?
24      A.     That an employee can be hired
25  or fired.



Page 80

1

2      Q.    Does it also mean to you that
3   an employee can be hired and fired and
4   doesn't have an employment agreement?
5      A.    No.  Why would they not have an
6   employment agreement?
7      Q.    So you're not familiar with, in
8   21, you thought the request for employment
9   agreements was a request for all employee
10  information, is that what you're saying?
11           MR. PEARLSON:  Objection.
12       Mischaracterizes what he said.
13           Go ahead.
14      A.    What I'm saying is, I'm asking
15  for an employment agreement for each
16  employee, that's going to tell me how many
17  people are there.
18      Q.    It's going -- isn't it true,
19  Mr. Salerno, it's just going to tell you
20  who has an employment agreement, not how
21  many employees there are, isn't that right?
22      A.    No.  That's not my intent here.
23      Q.    Did you ask for W-2 information
24  here?
25      A.    Not on this document, no.



Page 81

1

2      Q.    And 25 items, three weeks

3  before you sent that letter, you didn't ask

4  for W-2 information, correct?

5            MR. PEARLSON:  Asked and

6       answered.

7      A.    That's right.  I think I also

8  said that my intent was to obtain the

9  number of employees by number 21, which

10  says provide a copy of the employment

11  agreements.

12     Q.    Mr. Salerno, was the subject of

13  usage of space addressed at a board meeting

14  that took place approximately one month

15  after -- approximately one month after this

16  letter that Mr. Gross sent?

17     A.    I don't recall timing.  I do

18  know that I brought it up on a number of

19  occasions, which there are recordings that

20  can depict what happened accurately.

21     Q.    Recordings of the meetings?

22     A.    Correct.

23     Q.    That you took secretly?

24     A.    I wouldn't say secretly.  I

25  took.



Page 82

```
 1
 2         Q.     What would you say -- secretly,
 3    did you tell anyone else at the meeting
 4    that you were recording it?
 5         A.     No.
 6         Q.     You didn't tell anyone else.
 7    You wouldn't call that a secret?
 8         A.     You're calling it a secret.
 9         Q.     Well, what would you call it?
10    Would you call it transparent, Mr. Salerno?
11             MR. PEARLSON:  Objection to
12          form.
13             Go ahead.
14         A.     I would call it protecting my
15    interest to people I don't trust.
16         Q.     Secretly?
17         A.     Okay.
18         Q.     Of course it was secret, wasn't
19    it?  You have to fight on that, that it was
20    secretly recording a meeting?
21             MR. PEARLSON:  He agreed with
22          you.
23             MR. SACK:  After three
24          questions.
25             MR. PEARLSON:  Okay.  So why
```



Page 83

```
 1
 2        are you arguing with him?  He agreed
 3        with your answer -- with your
 4        question.
 5        Q.    Mr. Salerno, we'll call this --
 6  this will be marked as Salerno Exhibit 7, I
 7  think.  And these are -- it's Sport-BLX
 8  Bates 21294 to 95.
 9            Take a look at it, Mr. Salerno,
10  then I'll ask you some questions.
11        A.    Okay.
12        Q.    These are minutes of a meeting
13  held on July 13, 2019.  It records here
14  that you were unable to attend the meeting,
15  Mr. Salerno, is that right?
16        A.    That's what it says.
17        Q.    And did you see minutes of this
18  meeting after, sometime after July 13,
19  2019?
20        A.    I don't recall.
21        Q.    You see here at the meeting,
22  Mr. Hall and Mr. De Perio address the issue
23  of usage of space, and they said, "The
24  monthly rent expense was consistent with
25  the financial model presented to
```



Page 84

 1
 2    investors," would you agree with that?
 3        A.    That's what it says.
 4        Q.    Yeah.  Would you agree with
 5    that?  Would you agree with the substance
 6    of that statement?
 7        A.    That's what it says, yes, I
 8    agree with that.
 9        Q.    No, the -- so you agree that
10    the monthly rent expense was consistent
11    with the financial model presented to
12    investors, would you agree with that?
13        A.    I would have to look at the
14    performance and compare it.
15        Q.    Okay.  But the $500,000 per
16    annum expense for usage of space, that was
17    consistent with what you had been -- what
18    you and others had been told in the due
19    diligence period, correct?
20        A.    We were also told it was
21    generating 50 million dollars a year.
22        Q.    Well, you were told that it was
23    generating 50 million dollars a year or the
24    hope was to generate 50 million dollars a
25    year?



Page 85

1

2      A.    With all due respect, the

3  entire pro forma was a hope.

4      Q.    Including --

5      A.    The number of employees.

6      Q.    And including the anticipated

7  rent expense, too?

8      A.    Correct.

9      Q.    So it also says here that

10  Mr. De Perio also noted the current head

11  count in the New York City office was at

12  present 13 paid employees and six unpaid

13  interns.  Did you have any contrary

14  information to that in July 2019,

15  Mr. Salerno?

16      A.    I don't believe this to be

17  accurate.

18      Q.    What's your basis for that?

19      A.    When I was there.

20      Q.    Which was when?

21      A.    Prior to the June letter.

22      Q.    When?

23      A.    I don't recall exactly.

24      Q.    So you don't know whether it

25  was January, February, March, April, May or



Page 86

1

2  June, is that right?

3      A.    I don't recall specifically the

4  date.

5      Q.    Okay.  So again, what's your

6  basis for saying it was inaccurate that in

7  July of 2019 there were 13 paid employees

8  and six unpaid interns?

9      A.    That was my understanding.

10     Q.    Based on a visit to the office

11 that you cannot date, as we sit here?

12     A.    As well as conversations with

13 De Perio, Hall, and also Henry Sullivan.

14     Q.    And those were conversations

15 you previously told us you could not date

16 those either, correct?

17     A.    That's correct.

18     Q.    So they may very well have been

19 in early 2019, correct?

20     A.    They may have been early '19 or

21 they may have been right before this

22 letter, I don't recall.

23     Q.    But you're saying you knew

24 Mr. De Perio was lying in that meeting?

25     A.    I didn't say that.



Page 87

1

2          Q.    You said you knew he was not

3     telling the truth?

4          A.    I did not say that.

5          Q.    What are you saying?

6          A.    I don't believe this to be

7     accurate.

8          Q.    What do you believe to be

9     accurate?

10          A.    Whatever the payroll records

11     would say.  We can get them, you can look

12     at them and we can determine what is

13     accurate or not.

14          Q.    But in regard to what was said

15     at this meeting, you have a belief it was

16     inaccurate, based on what you were told and

17     observed at undated times, and that's all?

18               MR. PEARLSON:  Objection.

19           Asked and answered.

20          A.    I'm sorry?

21               MR. SACK:  Please, let's have

22           the question back.

23               (Whereupon, a portion of the

24           testimony was read back.)

25               MR. PEARLSON:  I objected.



Page 88

```
 1
 2            You can answer, though.  Go
 3       ahead.
 4       A.    So I don't believe this to be
 5  accurate because there are other
 6  inaccuracies here.  It also states that
 7  Mr. Hall would provide a proposal to the
 8  board in the near term and the shareholders
 9  of the corporation for their approval,
10  which never occurred.
11            I think this is something that
12  was done for a, kind of cover themselves.
13  It was done at a meeting that I could not
14  attend.  This meeting probably was one of
15  many that was called literally in 24 hours
16  or less in advance, and I think this is a
17  set up.
18            MR. SACK:  We'll move to strike
19       as unresponsive.
20       Q.    You're saying you had better
21  information than Mr. De Perio and Mr. Hall
22  about who worked on Sport-BLX in July 2019,
23  is that right?
24       A.    That's not what I said.
25       Q.    Okay.  So you believe they were
```



Page 89

1

2  not telling you the truth, is that right?

3      A.    That's correct.

4      Q.    Weren't Mr. Hall and

5  Mr. De Perio in a better position to

6  determine the number of employees needed

7  for the business and the proper use of the

8  space, Mr. Salerno?

9      A.    Better position than what?

10     Q.    Than you.

11     A.    I wouldn't necessarily say

12 that, no.

13     Q.    Well, it was their business

14 judgment, as the management of the company,

15 as to the number of people needed and the

16 space needed to run the business

17 productively.  Isn't that what managers are

18 supposed to do, exercise their business

19 judgment?

20     A.    That is my -- that's my

21 concern, is their business judgment,

22 because they've had -- they had conflicts

23 of interest where the rents were going to

24 them.  So therefore, their business

25 judgment was questionable.



Page 90

1

2      Q.      They told you that the rent --
3  the payment for the space would go to
4  Clinton Group.   That wasn't a surprise to
5  you.
6      A.      Yes, it was.
7      Q.      You knew that going in, didn't
8  you?
9      A.      No.
10      Q.      You didn't know the business
11  was housed in Clinton Group?
12              MR. PEARLSON:   Objection.
13       Which question are you asking him to
14       answer?
15      Q.      So you didn't know when you
16  invested that the business was going to be
17  paying for use of space at Clinton Group?
18      A.      No.
19      Q.      So the offices you visited
20  where Sport-BLX was was the Clinton Group,
21  correct?
22      A.      They were the Clinton Group's
23  offices.
24      Q.      And the space, the rental
25  expense projected was $500,000 and --



1

2    correct, that was the annual rental expense

3    projected before you invested.  You knew

4    that, correct?

5        A.    I recall that was on the pro

6    forma.

7        Q.    Did anyone ever tell you the

8    business was going to move from the Clinton

9    Group to somewhere else?

10       A.    No one ever told me it was

11   going to be in the Clinton Group.

12       Q.    Where did you think it was

13   going to be?

14       A.    At some location.

15       Q.    Excuse me.  You thought George

16   Hall and Joe De Perio --

17            MR. PEARLSON:  Can you let him

18        finish his answer, please.

19       Q.    Sure.  At some location, are

20   you finished?

21       A.    Yes.

22       Q.    At what location?

23       A.    To be determined.

24       Q.    So you thought George Hall and

25   Joe De Perio were going to be shuttling



Page 92

1

2  back and forth from the Clinton Group

3  office to somewhere else to work on

4  Sport-BLX?

5      A.    So are you saying -- I'm not

6  understanding your question because --

7      Q.    Go ahead.

8      A.    Because they were employees of

9  Clinton Group, so they would be in Clinton

10 Group's office.  They also had a

11 Glassbridge company that, I believe, had a

12 different office.  They also had other

13 entities that had different offices.

14         So there was nothing ever told

15 to me that they were going to be paying

16 George Hall $500,000, because I would have

17 objected to that.

18      Q.    When did you -- well, no one

19 ever told you they were paying George Hall

20 $500,000, did they?

21      A.    The Clinton Group, I'm sorry,

22 which is solely owned and is George Hall's

23 entity.

24      Q.    When did you find out that it

25 was the Clinton Group that was receiving



Page 93

1
2    funds for the use of space?
3          A.    It was before July and it was
4    somewhere around when we got the first
5    financials, and -- actually, the only
6    financials that I was ever given.
7          Q.    So would that have been the
8    June 30 financials, the mid-year financials
9    that came out, I believe, in July or August
10   of 2019?  Is that when you found out about
11   the Clinton Group receiving the funds?
12         A.    I don't recall it being June
13   30.  I don't recall the dates exactly.  I
14   remember seeing the P&L and the financial
15   statements and asking questions on it,
16   being in the board room at the Clinton
17   Group.  And there's a recording of it, so
18   that's an accurate depiction of it.
19         Q.    It was at a board meeting for
20   -- was it at a Sport-BLX board meeting that
21   you learned that?
22         A.    I'm not sure if it was an
23   actual board meeting or just a meeting that
24   we had at Clinton Group.
25         Q.    Was this one of the secret



Page 94

1

2  recordings you referred to earlier or is

3  this a new one?

4        A.    This is one of those

5  recordings.

6        Q.    You're saying it was -- it may

7  have been a board meeting of Clinton Group?

8        A.    I don't recall if it was an

9  official board meeting.

10             MR. PEARLSON:  Objection.  I

11        think you misstated it.

12             MR. SACK:  Sorry.

13        Q.    It may have been a board

14  meeting of Sport-BLX?

15        A.    It may have.

16        Q.    And what else might it have

17  been?

18        A.    Just a meeting.

19        Q.    With whom?

20        A.    George Hall, Mr. De Perio,

21  Mr. Strauss and Mr. Ruchalski.

22        Q.    And it was to go over

23  financials -- reported financials for

24  Sport-BLX, was that the purpose of the

25  meeting?



Page 95

```
 1
 2        A.    I don't recall the purpose of
 3   the meeting, specifically.  I do recall
 4   getting financial statements.
 5        Q.    Let me ask you, when was that
 6   meeting that you're referring to --
 7        A.    I don't recall.
 8        Q.    Excuse me.  Let me finish.
 9        A.    Sorry.
10        Q.    That you're referring to, the
11   one that you learned about the Clinton
12   Group getting rent money?  Was it after or
13   before this July 13 meeting where Hall and
14   De Perio reported on space usage?
15        A.    I don't recall exactly.
16        Q.    If it was before, could you
17   give an approximate date?
18        A.    Again, I don't recall.  Sorry.
19        Q.    Excuse me one moment.
20              (Whereupon, an off-the-record
21        discussion was held.)
22        Q.    This meeting that you're
23   referring to, it was at the Clinton Group
24   office?
25        A.    Yes.
```



1

2      Q.    And this was Sport-BLX related

3  business that you were talking about?

4      A.    Yes.

5      Q.    And all the people --

6  withdrawn.

7           And so you were going to the

8  Clinton Group office for Sport-BLX

9  business, correct?

10      A.    Yes.

11      Q.    And did you think there was a

12  separate Sport-BLX office at the time?

13      A.    I didn't think we had an office

14  at the time.

15      Q.    So you knew Sport-BLX was

16  operating out of the Clinton Group,

17  correct?

18      A.    I believe that Sport-BLX --

19  Clinton Group employees were officers of

20  Sport-BLX, as well.  And I understood that

21  they were performing Sport-BLX functions

22  while working in their normal capacity at

23  Clinton Group.

24      Q.    What do you mean their normal

25  capacity?  This was all in addition to



Page 97

```
 1
 2    whatever they were doing for the Clinton
 3    Group, correct?
 4         A.    That's what I meant.
 5         Q.    But the work for Sport-BLX that
 6    you've described was all happening at the
 7    Clinton Group offices, correct?
 8         A.    No.
 9         Q.    Where else was it happening?
10         A.    Well, you said all.  I mean --
11         Q.    Were you aware of any work
12    being done for Sport-BLX at any place other
13    than the Clinton Group?
14         A.    Yes.
15         Q.    Where?
16         A.    I don't know the location.  The
17    Consensus employees had their own location.
18    This was also during the time of the
19    pandemic.  Sport-BLX was working remotely,
20    right, during the pandemic.  Sport-BLX
21    worked remotely prior to the pandemic.  So
22    in my opinion, the Sport-BLX was -- I was
23    never provided a specific location up front
24    where they were going to work out of.
25         Q.    When you say "up front," you
```



Page 98

1
2    were never provided a specific --
3        A.    Prior to the investment.
4        Q.    -- up front?
5              Prior to the investment.
6    A.    Yes.
7        Q.    And wasn't it a fact that
8    Consensus employees were working at the
9    Clinton Group on the Sport-BLX project?
10        A.    I don't know that.
11        Q.    Well, if it's true,
12    Mr. Salerno, then your allegation's false,
13    isn't it?  Then your allegation about the
14    space needs and the number of people
15    working there is false?
16              MR. PEARLSON:  Objection.
17         Argumentative.
18        Q.    Mr. Salerno, do you know
19    whether Consensus staff was working at the
20    Clinton Group on the Sport-BLX project?
21        A.    I do not know that.
22        Q.    If it's true, would it not
23    undermine your claim that they only needed
24    space for five or fewer employees?
25        A.    No.  Because Consensus



Page 99

1

2    employees would not need to work at

3    Sport-BLX.  They have their own office.

4         Q.    Well, you can't imagine any

5    efficiencies or synergies that would come

6    from having the Consensus employees with

7    the Sport-BLX employees in one location?

8              MR. PEARLSON:  Objection.  Let

9         me get my objection.  Objection to

10        form.

11             Go ahead.

12        A.    I'm sorry.

13             That could be done in a space

14   that's much less expensive than $45,000 a

15   month.

16        Q.    Isn't that all a matter of

17   business judgement, Mr. Salerno?  This is

18   not for a director to determine?

19             MR. PEARLSON:  Objection.

20        Q.    Isn't that right?

21        A.    No, it's not.

22        Q.    Is it for a 6 percent

23   shareholder to decide, what the appropriate

24   space needs and appropriate offices are for

25   a business?



1

2      A.     I think that my investment

3 comes with certain rights.    My board seat

4 comes with certain rights.    And to voice

5 those opinions when there's $50,000 a month

6 being syphoned to a self-interested party,

7 I don't think that's appropriate.    And I

8 think it's my obligation to the

9 shareholders to voice it.

10      Q.     It's the business judgement of

11 the management on the space needs.    That's

12 not for a director to determine, is it?

13           MR. PEARLSON:    Asked and

14      answered.

15      Q.     Mr. Salerno, you were aware

16 that investors and athletes and their

17 families were coming to Sport-BLX, is that

18 right, in this period of the first half of

19 2019?

20      A.     I was told as a defense to the

21 office space that that was occurring, yes.

22      Q.     Do you believe that was

23 happening?

24      A.     To some extent.

25      Q.     What did you think was



1

2  happening?

3      A.    That Mr. De Perio and Mr. Hall

4  and Mr. Staisil were going out to meet

5  different athletes and their families.

6  They were traveling to see them.  They

7  could take them to dinner.  They could meet

8  them at their homes.  And when I say "their

9  homes," I mean at the athletes' homes, at

10  other locations.

11          Do I think that the conference

12  room of Clinton Group was important to get

13  people to invest or do business with

14  Sport-BLX?  No.

15      Q.    How do you know that?  How do

16  you know more than Hall, De Perio, and

17  everybody else connected with the business?

18  You weren't in the sports business.  How do

19  you know what's important for people to

20  come when they visit an office?  How do you

21  know that?

22          MR. PEARLSON:  Which question

23       do you want him to answer?

24      Q.    How do you know whether it's

25  important to have an appropriate conference



1

2    room and office space for potential

3    investors and athletes and their families?

4    What is your basis to know that?

5             MR. PEARLSON:  Objection.

6             You can answer.

7         A.    My basis to that?

8         Q.    Yes.

9         A.    Is the result that none of

10   those athletes moved forward with

11   Sport-BLX.  So it was not beneficial.

12        Q.    But when you told them, when

13   you said they were using space

14   inappropriately, you didn't know what the

15   outcome was going to be.  You're just

16   talking with the benefit of hindsight,

17   Mr. Salerno.  We're talking about in May,

18   June, July of 2019, when this business was

19   courting investors, athletes, families,

20   significant people in the sports world, and

21   you knew better than Hall and De Perio and

22   everyone else connected with the business,

23   what type of space was appropriate?

24            MR. PEARLSON:  Objection to

25        form.



Page 103

1

2          A.    I'm sorry.  I don't understand

3     the question.  What's the question?

4          Q.    Okay.  In May, June and July of

5     2019, did you know more than Hall and

6     De Perio about what the appropriate use of

7     space was for visitors and employees and

8     unpaid interns of the company?

9          A.    In my opinion, given the

10    outcome, the answer would be yes.

11         Q.    Not given the outcome.  At that

12    time, what did you know better and more

13    than they did in May, June, July of 2019?

14              MR. PEARLSON:  I'm going to

15         object to the form.

16              Go ahead.

17         A.    I believe my judgment was

18    better, especially given the outcome.

19         Q.    You're familiar with the PJ

20    Washington deal that was done with

21    Sport-BLX in 2019, so there was a

22    significant deal done with a significant

23    athlete?

24         A.    A single athlete, yes.

25         Q.    A significant deal for the



Page 104

1
2    company, wasn't it?
3        A.    Define "significant."
4        Q.    It was a star player that would
5    have been a great proof of concept,
6    wouldn't it, for the business?
7        A.    I don't believe there was
8    revenues generated.
9        Q.    That was not my question.
10   You're not responding to my question.
11             Wasn't that a significant
12   development for the business to sign a
13   significant young athlete in pro
14   basketball?
15       A.    There was no proof that signing
16   PJ Washington had anything to do with the
17   conference room of Clinton Group.
18       Q.    That's the standard, is
19   management has to prove to you that a
20   particular conference room resulted in a
21   particular deal, or else it's not
22   appropriate to have the conference room,
23   Mr. Salerno?  Is that the test you applied
24   as director?
25             MR. PEARLSON:  Objection.



 1
 2        Argumentative.  We've been through
 3        this.
 4            MR. SACK:  The answer was
 5        argumentative.
 6        Q.    You can answer.  You're
 7   arguing, Mr. Salerno.
 8            Are you saying that unless you
 9   can prove a connection between a conference
10   room and a deal, management isn't
11   authorized to have a conference room that's
12   clean, appropriate, professional?
13        A.    What I'm saying is that a
14   business decision to do -- a decision by PJ
15   Washington and his father was probably more
16   aligned with Sport-BLX hiring his father
17   than where they met.
18        Q.    How do you know that?
19        A.    I think it's common sense.
20        Q.    Other than your subjective
21   view, what basis do you have for the
22   comment you just made?
23        A.    I've been doing business for
24   over 25 years.  Relationships count more
25   than where you meet.



1

2      Q.    Just based on your experience,

3  that's all you're relying on, that's all,

4  just your subjective adjustment,

5  Mr. Salerno, for the comment you just made

6  about what caused the PJ Washington deal to

7  be done, is that it?

8      A.    I'm sorry.  Can you ask the

9  question?  Because I think you're asking my

10  opinion, right?

11      Q.    No.  I'm saying you made a

12  statement as to why you think that deal was

13  done.  And I'm asking what your evidence is

14  for it.  You made a statement as to how a

15  deal was done, and I'm asking you what your

16  evidence was for that statement?

17      A.    My belief -- my belief of

18  making that statement is that we --

19  Sport-BLX did one athlete deal.  It's also

20  the only father that Sport-BLX hired.  No

21  other athletes did a deal with Sport-BLX.

22  No other fathers or family members were

23  hired by Sport-BLX.  I don't believe the

24  conference room and the location generated

25  any additional benefit to get athletes.



1

2       Q.    Mr. Salerno, you, before,

3   referred to the pandemic as affecting the

4   use of the space.  Was there a pandemic in

5   2019?

6       A.    No.  I'm sorry.  What I was

7   trying to explain was that as done in the

8   pandemic, people work remotely.  People

9   also work remotely at Sport-BLX.

10      Q.    How do you know that?  How do

11  you know where people were working for

12  Sport-BLX?

13      A.    Because that's what was told to

14  me.

15      Q.    But you were also told -- so

16  you believed you -- when you were told they

17  were working remotely, but you didn't

18  believe when they had 13 paid employees and

19  six unpaid interns and needed the space for

20  professionals to come to the office?

21      A.    Yes.

22      Q.    So you believed that, but you

23  didn't believe the other facts I just read?

24      A.    I'm sorry.  What's the

25  question?



Page 108

```
 1
 2        Q.    Okay.  You believed when you
 3   were told that people were working for
 4   Sport-BLX off the premises of the Clinton
 5   Group, is that correct?
 6        A.    Yes.
 7        Q.    Did you disbelieve what you
 8   were told about the number of employees and
 9   interns working at the offices of Clinton
10   Group?
11        A.    Yes.
12        Q.    Who told you about the people
13   working off premises?
14        A.    Mr. De Perio, Mr. Hall,
15   Mr. Strauss, Mr. Ruchalski, Mr. Sullivan.
16        Q.    So you believed them when they
17   told you about the people working off
18   premises, but you didn't believe them when
19   they told you about the people working on
20   premises, is that your testimony?
21              MR. PEARLSON:  Again, asked and
22        answered.
23              Go ahead.
24        A.    My testimony is yes, because
25   when I was in the office and there was no
```



Page 109

```
 1
 2    one there, they would say they're working
 3    from home or somewhere else.
 4         Q.    And when you visited the office
 5    and were told that, you can't give us even
 6    an approximate date of when that visit
 7    happened, correct?
 8         A.    Sometime in 2019, before July
 9    or August.
10         Q.    Okay.  Even before you
11    invested, it could have been?
12         A.    No.
13         Q.    I'm going to show you two
14    exhibits now.  It's a long thread of
15    e-mails, Mr. Salerno, but I'll point you to
16    a particular one.
17              MR. PEARLSON:  I'm sorry.  This
18         is Exhibit 8 that we're looking at
19         now?
20              MR. SACK:  This is Exhibit 8.
21              MR. PEARLSON:  And this is the
22         one that's Wednesday, April 17, 2019,
23         at the top?
24              MR. SACK:  At the top, yes.
25         Q.    Mr. Salerno, the e-mail I'm
```



Page 110

1

2    going to be focusing on in the next few

3    questions is on Cypress 1028 in the lower

4    right-hand corner, and then I'm going to

5    show you another document.

6              (Whereupon, an off-the-record

7         discussion was held.)

8              MR. SACK:  Let's mark the long

9         thread 9 and the one-pager 8.  Thank

10        you.

11       Q.    So take a look at the one-page

12   document, Mr. Salerno, call it Exhibit 8.

13             This is an invitation for you

14   to visit the office of Clinton Group at 510

15   Madison Avenue on January 10th.  Was this

16   one of the visits you were referring to

17   earlier, as when you saw the Clinton Group

18   office and saw who was and was not working

19   there?

20       A.    This could have been one of

21   them.

22       Q.    But are you sure there were --

23   there was more than this one?

24       A.    Yes.

25       Q.    And was it before or after this



 1
 2  one?
 3      A.    I would think it's after.
 4      Q.    But you don't know?
 5      A.    I'm not a hundred percent
 6  certain.
 7      Q.    Let's take a look at --
 8      A.    It would be after.  Because
 9  this is showing Mike Staisil also being
10  involved.
11      Q.    Yes.  How does that lead you to
12  think one thing or another about timing?
13      A.    Because I was at the office
14  with Mike Staisil, and then I was at the
15  office after that without Mike Staisil.
16      Q.    How long after?
17      A.    I don't recall.
18      Q.    In that Exhibit 9, the longer
19  chain, there is an e-mail dated April 11 at
20  9:33 a.m. from you to Joe De Perio and
21  George Hall.  It's the Bates 1028 at the
22  bottom.
23          Why don't you let me know when
24  you're there.  I could direct you to it, if
25  you prefer.



Page 112

1

2        A.    I got it.

3        Q.    This is an e-mail where you

4   talk about exercising your right to

5   purchase pro rata shares.  And then in the

6   second paragraph, you talk about

7   communicating about other matters and you

8   list a set of bullet points there.  And

9   fifth bullet down is rental agreement,

10  market rent and address issue of self

11  dealing.  Do you see that?

12       A.    Yes.

13       Q.    So what were you referring to

14  there?

15       A.    The market rent being above --

16  the market rent being -- excuse me.  Strike

17  that.

18             This is the rental agreement

19  with respect to Sport-BLX and the Clinton

20  Group.

21       Q.    So you believe the rent being

22  paid to the Clinton Group was above market?

23       A.    Yes.

24       Q.    And what do you mean by

25  "address issue of self dealing"?



Page 113

1

2      A.   That the Clinton Group, being

3  owned by George Hall, there was a self

4  interest there for George Hall to overpay

5  himself.

6      Q.   So you knew as of April 11 that

7  the Clinton Group was getting money for the

8  use of space, is that fair to say?

9      A.   That would be fair to say.

10     Q.   How did you find that out?

11     A.   I don't recall, as I sit here

12  today.

13     Q.   Well, it must have been from

14  either George Hall or Joe De Perio or

15  someone else connected to Sport-BLX,

16  correct?

17     A.   That would make sense to me.

18          MR. PEARLSON:  Objection.

19      Don't speculate.  If you know, you

20       know.

21     Q.   That makes sense, is that what

22  you answered?

23     A.   I don't know for a fact.  It

24  seems reasonable.

25     Q.   And so if it were not George



Page 114

1

2  Hall or Joe De Perio, could you think of

3  anyone else you would have learned that

4  from?

5      A.    Mike Staisil, Henry Sullivan,

6  Francis Ruchalski, Daniel Strauss, anyone

7  else that was involved with Sport-BLX.

8      Q.    And that was something you

9  learned -- how long before April 11 did you

10 learn that?

11     A.    I don't recall.

12     Q.    As of July -- as of the time of

13 this July board meeting, Mr. Salerno, did

14 you know how many people were working for

15 Sport-BLX and at Sport-BLX's offices?

16     A.    I don't recall.

17     Q.    So you don't know whether what

18 De Perio and Hall said to you was true or

19 not, is that fair to say?

20          MR. PEARLSON:  About what?

21          MR. SACK:  About the number of

22       employees working for and at

23       Sport-BLX offices.

24     A.    I did not receive the payroll

25 reports and records.  So I cannot determine



Page 115

1

2    a hundred percent if this is accurate or

3    inaccurate.

4         Q.    You didn't know?

5         A.    I didn't know.

6         Q.    Did you do anything -- did you

7    find out additional information after July

8    2019 about who was and was not working for

9    and at Sport-BLX?

10        A.    I asked for payroll records.

11        Q.    Did you ask for anything else?

12        A.    I don't recall that.  I recall

13   asking for payroll records.

14        Q.    Did you get them?

15        A.    No.

16        Q.    Did you look at the financial

17   statements as of June 30, 2019 and as of

18   September 30, 2019?

19        A.    I don't recall the dates of the

20   financial statements.  I believe, although

21   I did ask for financial statements, I only

22   received one set.

23        Q.    We'll talk more about financial

24   statements in a bit.  But I mean, did

25   George Hall and Joe De Perio continue to



Page 116

1
2  say to you they had a lot more people
3  working for and at Sport-BLX than you were
4  claiming, is that a fair statement?
5      A.    I don't recall.
6      Q.    Well, did they -- to your
7  knowledge, were they giving you information
8  materially different from what they shared
9  with you and others in the July board
10 meeting?
11         MR. PEARLSON:  Objection to
12      form.  He testified he wasn't at this
13      board meeting.
14         MR. SACK:  I'll rephrase.
15     Q.    Did Hall and De Perio give you
16 materially different information about the
17 number of employees and interns and others
18 using the space, materially different
19 information about those things from the
20 information reflected in the July 13, 2019
21 board minutes?
22     A.    They never gave me any
23 information.
24     Q.    They gave you information here,
25 right, in that meeting, and you saw the



Page 117

1

2  minutes about the number of paid employees

3  and unpaid interns and others using the

4  space, didn't they?  They gave it to the

5  board, and you got these minutes, didn't

6  you?

7       A.    This was a statement.  When you

8  say "information," I take that as giving me

9  supporting documentation to a statement.

10 This is a statement made that I was not

11 there, that I believe they did to cover

12 their tracks.  And no, I was not given

13 information.

14      Q.    Well, you have a funny

15 definition of information, Mr. Salerno.

16 You were given specific numbers and

17 information.  You just didn't know whether

18 it was true or not, isn't that right?

19           MR. PEARLSON:  Objection.

20      We've been over this three times now.

21      Q.    So your view is when De Perio

22 and Hall gave you -- made these statements

23 reflected in a board meeting, that was not

24 information, according to your definition

25 of the word?



Page 118

```
 1
 2        A.    This is a statement that did
 3   not have any supporting information.
 4        Q.    Did you know whether this
 5   statement was true or false?
 6        A.    I believed it to be false.
 7        Q.    Did you know whether it was
 8   true or false?
 9        A.    Again, I will say, I believe it
10   was false.
11        Q.    You're commenting on your
12   subjective belief.  Did you have evidence
13   that it was false?
14             MR. PEARLSON:  I believe he's
15         asked -- this has been asked and
16         answered at least three times.
17             MR. SACK:  Because he's not
18         answering.
19             MR. PEARLSON:  I believe he
20         did.
21        Q.    Did you have evidence that it
22   was false?
23        A.    No.  I asked for the evidence,
24   and they wouldn't give it to me.
25        Q.    Mr. Salerno, what we marked as
```



MAGNA
LEGAL SERVICES

Page 119

1

2    Exhibit 10 is the complaint you had filed

3    against Sport-BLX and others on February

4    2022.  And I'm going to direct you to a

5    particular paragraph -- I'm sorry.  January

6    2022, my mistake.  And I'm going to direct

7    you to paragraph 23 of this document.

8              You can take your time to look

9    at it.  I'll ask you a few general

10   questions about the document, and then hone

11   in on 23.  But if you want more time to

12   look at it, I don't have a problem with

13   that.

14             You retained Marc Gross to file

15   this complaint, is that right?

16        A.    Cypress did, yes.

17        Q.    You, individually, caused that

18   to happen, correct?

19        A.    Yes.

20        Q.    You made the decision for

21   Cypress, correct?

22        A.    Correct.

23        Q.    And so you made the decision to

24   retain Marc Gross to file the complaint?

25        A.    Yes.



Page 120

1

2          Q.      And you reviewed the complaint

3     before it went in, before it was filed?

4          A.      Yes.

5          Q.      And I'm not asking you about

6     specific communications with Mr. Gross, but

7     it would be fair to say that this complaint

8     relies significantly on information from

9     your own connection to Sport-BLX and

10    involvement with Sport-BLX?

11         A.      I believe, yes.

12         Q.      So let me direct you to

13    paragraph 23.   Paragraph 23 states, "In

14    this regard, apparently Sport-BLX had

15    entered into a lease for certain commercial

16    office space, expending $500,000 per annum

17    for occupancy for less than five

18    employees."

19                 Do you see that?

20         A.      I do.

21         Q.      You didn't know whether that

22    statement was true or false when that was

23    put in this complaint, isn't that correct?

24         A.      I believed it to be true.

25         Q.      Yes, but you didn't know



Page 121

1

2   whether it was true or false, correct?

3           MR. PEARLSON:  John, how many

4        times are you going to ask this

5        question?

6       Q.    Well, this is in the context of

7   a complaint filed in court.  So my question

8   is, did you know whether the statement made

9   in paragraph 23 was true or false?

10      A.    Again, to the best of my

11  knowledge, yes, I believed it to be true.

12      Q.    Based on the conversations and

13  meetings at the office that you've

14  described, is that right?

15          MR. PEARLSON:  Asked and

16       answered numerous times.  Can we move

17       on, please.

18      A.    I believe this to be an

19  accurate statement, yes.  And even if it

20  wasn't five employees, even if this is

21  true, 13 plus 6 is 19, $500,000 a year for

22  19 people is still extremely out of market

23  and excessive.

24      Q.    You're an expert on the

25  Manhattan real estate market, Mr. Salerno?


MAGNA
LEGAL SERVICES

Page 122

```
 1
 2          A.     I don't have to be an expert,
 3   but the research I did, and I showed
 4   Sport-BLX an opportunity that would have
 5   saved $30,000 a month.
 6          Q.     A WeWork space?
 7          A.     Yes.
 8          Q.     An open bullpen area, is that
 9   right?
10          A.     No.   No.
11          Q.     Mr. Salerno, what would be the
12   advantage to Sport-BLX of having a lease
13   versus no lease?
14          A.     It would have a full
15   understanding of its obligations.
16          Q.     Including having to pay
17   security deposit, correct?
18          A.     That's a negotiable term.
19          Q.     You think you can do a
20   commercial lease in Manhattan without
21   paying a security deposit?   You have
22   information to that effect?
23          A.     I know that that's a negotiable
24   term.
25          Q.     You think that can be
```



Page 123

```
 1
 2   negotiated out of a lease, is that right?
 3        A.     Every lease has negotiable
 4   terms.
 5        Q.     Right.  So you don't know --
 6   you don't know what the terms of a suitable
 7   space would be in Manhattan when -- in
 8   2019, during the relevant period, isn't
 9   that right?
10        A.     The research that I did showed
11   a $30,000 savings to Sport-BLX available to
12   us.
13        Q.     Based on your personal judgment
14   of what a suitable space was for Sport-BLX,
15   is that right?
16        A.     Based upon research and -- yes.
17        Q.     Based on --
18        A.     I'm sorry.  Finish, please.
19        Q.     Based on substituting your
20   judgment for the judgment of the management
21   of the company, correct?
22             MR. PEARLSON:  Objection.
23             You can answer.
24        A.     That was based upon my
25   experience, my research and what I believe
```



1
2  to be true.
3      Q.    What experience did you have in
4  Midtown Manhattan real estate, Mr. Salerno,
5  in mid-2019?
6      A.    I did the research and I was
7  getting information and that was the
8  experience that I used to help me come up
9  with a solution.
10     Q.    The experience was online
11 research for WeWork space, is that what
12 you're referring to?
13     A.    I spoke to people at that
14 office.  I spoke to other people in the
15 real estate industry.  And for a small
16 space, which was necessary, $500,000 a year
17 was excessive.
18     Q.    Based on your belief that only
19 a small space was necessary, is that right?
20     A.    Small being a relative term,
21 but yes.
22     Q.    Did you know how many agents or
23 athletes and potential investors and
24 athletes' family members were coming to the
25 office?



Page 125

1

2     A.    Regardless, it didn't need an

3  entire floor.

4     Q.    Did you know --

5        MR. SACK:  Can I have the

6     question read back, please, Hindy.

7        (Whereupon, a portion of the

8     testimony was read back.)

9        MR. PEARLSON:  John, can we

10    take a break after this, please.

11       (Whereupon, a portion of the

12    testimony was read back.)

13    Q.    And I'm going to add in

14  mid-2019?

15    A.    Specifically, I did not get a

16  list of all the people.

17    Q.    Did you know?  I didn't ask you

18  whether you got a list.

19       MR. SACK:  Can I have the

20    question again, Hindy.

21       (Whereupon, a portion of the

22    testimony was read back.)

23    A.    Over what period of time?

24    Q.    Approximately mid-2019?

25    A.    In a single day or a single



1

2  week, single month?

3      Q.    How often -- you answer it any

4  way you want.  You just say how many people

5  were coming in on a weekly, monthly basis.

6  Did you know?  Do you know?

7      A.    I'm sorry.  What's the

8  question?

9          MR. SACK:  Let's have it again,

10      Hindy.

11      A.    There's a bunch of different

12  questions flying around.

13          (Whereupon, a portion of the

14      testimony was read back.)

15      Q.    In mid-2019?

16      A.    So the question is how many

17  athletes and agents came to the office in

18  mid-2019?

19      Q.    It was a broader category.

20          MR. SACK:  Please, Hindy, I'm

21      sorry to do this to you, could you

22      reread the question.

23          (Whereupon, a portion of the

24      testimony was read back.)

25      A.    My interpolation of that was



Page 127

1

2    less than ten.

3        Q.    Per what period of time?

4        A.    Over a month or so period.

5        Q.    And what's your basis to say

6    less than ten of people in that broad

7    category per month?

8        A.    From when I was in the board

9    meetings, and the recordings -- and I'm

10   going by memory, but the recordings will

11   give us an accurate depiction of what

12   happened, what was said, but it was said

13   that -- George Hall had gave me some names

14   of who had been there in the past month.

15   And that is what I'm basing my answer on.

16       Q.    So you're basing your answer on

17   information that we will be able to hear in

18   these recordings, is that what you're

19   saying?

20       A.    That's what I'm trying to

21   recall, yes.

22       Q.    And you think your recollection

23   now is that George Hall told you the number

24   of people, agents, athletes, investors, and

25   family members of athletes who were



Page 128

1
2  visiting the Sport-BLX office per month,
3  that's what you think George Hall told you
4  in these meetings?
5       A.    I think you just added
6  investors to the list.
7       Q.    No, investors was there all
8  along.
9       A.    Okay.  So I didn't hear that
10  prior.  And he did not say here's a number
11  of people who were here.  He provided names
12  of people who he had met with.
13       Q.    As examples?
14       A.    He provided names of people who
15  he had met with.
16       Q.    And you understood that to be a
17  complete list of every person he met with
18  at the offices connected to Sport-BLX?
19       A.    I didn't think of it in that
20  context at the time.
21            MR. SACK:  Ross, would you like
22       to take a short break?
23            MR. PEARLSON:  Short break.
24            VIDEOGRAPHER:  Off the record,
25       12:17.



Page 129

```
 1
 2              (Whereupon, a short break was
 3          taken at this time.)
 4              VIDEOGRAPHER:  On the record,
 5          12:29.
 6      Q.    Mr. Salerno, I asked you
 7  earlier today about some form ADV for NPPG
 8  Investment Services, and I would like to
 9  show you an additional document, which
10  we're up to 11.  We'll call this Salerno
11  Exhibit 11.
12              And I'm going to represent to
13  you what this is.  You can look through it
14  and then I will direct you to a particular
15  statement.
16              It is the NPPG Investment
17  Services, LLC form ADV part 2 A brochure,
18  which is an attachment to the document that
19  we showed you and was publically filed.
20  And I'm going to refer you specifically to
21  the top of page 4.
22              MR. PEARLSON:  John, this was
23          an attachment to Exhibit 1?
24              MR. SACK:  It's an attachment
25          to Exhibit 1.
```



Page 130

1

2      Q.    And in the first paragraph
3  under item 4, it refers to various entities
4  and it says that -- in the fourth line down
5  under item 4, "Ice Holdings, LLC, and
6  Michael M. Salerno are our principal
7  owners."  And then it says, "Mr. Salerno is
8  the sole member of Ice Holdings, LLC."
9           And my question is, do you have
10  any reason to doubt the accuracy of that
11  statement?
12      A.    I do.
13      Q.    You do.  What do you believe is
14  the case?
15      A.    I believe that there was a typo
16  and maybe taken from a previous -- this
17  would have to be amended.  This may be
18  referring to -- I should take that back.
19  This may be referring to the sole managing
20  member.
21      Q.    It's untrue as written, is that
22  your belief?
23      A.    No.  You know what -- I'm not
24  RIA counsel and I would need to talk to
25  them about it.



1

2          Q.    You don't know whether that

3    statement is true or not?

4              MR. PEARLSON:  Which one, that

5          he's the sole member of Ice Holdings?

6              MR. SACK:  There's a sentence

7          there, yes, that Mr. Salerno is the

8          sole member of Ice Holdings, LLC.

9          A.    It all depends, if it's the

10   sole managing member if it's referencing, I

11   am.  If it's sole member, then I'm not.

12         Q.    Were you ever the sole member

13   of Ice Holdings, LLC?

14         A.    Yes.

15         Q.    When was that?

16         A.    I don't know.  I don't recall.

17         Q.    When did it change?

18         A.    I don't recall.

19         Q.    Do you have any approximate

20   timeframe as to when you created Ice

21   Holdings, LLC?

22         A.    Ten years ago.  Fifteen years

23   ago.  Ten years ago.  Eight.

24         Q.    Let's just say -- I hear you

25   saying you don't remember.  Let's just say



1

2  approximately ten years ago, and I

3  understand you said you don't have a

4  crystal clear memory.

5          When do you believe additional

6  members were added to Ice Holdings, LLC, in

7  relation to its creation?

8      A.    I don't recall.

9      Q.    As of 2018 and 2019, do you

10  have a belief as to whether you were the

11  sole member or there were other members?

12      A.    On those dates, I don't recall

13  on those dates, no.

14      Q.    You're going to see that this

15  is corrected and clarified if it's

16  incorrect, Mr. Salerno?

17      A.    If it's incorrect, of course it

18  will be corrected.  But if this is correct,

19  then no, it won't be.

20      Q.    Mr. Salerno, in February of

21  2019, before you signed the stock purchase

22  agreement, did you have a meeting at

23  Clinton Group with Joe De Perio and George

24  Hall and possibly others to go over the

25  investment?



1

2      A.    I don't know the specific date.

3      Q.    Specific date in February or

4  the specific date at all?

5      A.    At all.

6      Q.    Okay.  So you do believe the

7  meeting -- a meeting took place at the

8  Clinton Group offices in January or

9  February 2019, before you signed the stock

10  purchase agreements?

11      A.    I don't remember the month.

12      Q.    Was it before your investment?

13      A.    Yes.

14      Q.    Did you have a meeting with

15  Clinton Group before your investment?

16      A.    Yes.

17      Q.    And do you believe it was

18  before February 28, 2019?

19      A.    I don't recall.

20      Q.    So you think it may have been

21  after the 28th, but before March 12th, when

22  funding happened?

23      A.    I don't recall the date.

24      Q.    Okay.  But it was -- so when I

25  say -- was it before you signed the stock



1

2  purchase agreements on February 28, 2019?

3      A.    It was before I signed the

4  stock purchase agreements, yes.

5      Q.    Do you recall a meeting with

6  George Hall and Joe De Perio at the Clinton

7  offices before you signed the stock

8  purchase agreement?

9      A.    I recall, yes, the first time I

10  was there, I was brought there by Michael

11  Staisil and I met with De Perio and

12  Mr. Hall.

13      Q.    And Staisil, did he stay?

14      A.    He did.

15      Q.    And how about Henry Sullivan,

16  was he present for all or part of the

17  meeting?

18      A.    I think he was.  But I don't

19  recall if he was -- if that was before or

20  after.  He was in -- Henry was in some

21  meetings, not all.

22      Q.    Did you bring a binder to that

23  meeting of material that you gathered about

24  Sport-BLX?

25      A.    I don't recall.



Page 135

1

2      Q.    You may have, you just don't
3  know one way or the other?
4      A.    I don't recall.  I don't recall
5  a binder.
6      Q.    At this meeting, did you go
7  over the projected financials of Sport-BLX?
8      A.    I don't recall what we went
9  specifically over in the meeting.
10     Q.    Did you go over projected
11 expenses and revenues for the business?
12     A.    At that meeting, I don't recall
13 what we went over.
14     Q.    Did you ever have a meeting
15 before signing the stock purchase
16 agreements where you went over with Joe De
17 Perio and/or George Hall, the projected
18 financials of the company?
19     A.    If you define a meeting by
20 telephone conversation, as well as in
21 person, I'm confident that the answer is
22 yes.
23     Q.    Let me break it down.  Do you
24 recall a physical meeting, an in-person
25 meeting where you and Joe and/or George



1

2    Hall went over the financial projections

3    for the company before February 28th?

4         A.    Again, when I was there in

5    person, I don't recall specifically what we

6    went over.  But I know before the -- I

7    signed, I did discuss with them the pro

8    forma.

9         Q.    And it was either, you're

10   saying, by phone or in person, you don't

11   remember which now?

12        A.    I don't recall.

13        Q.    How long was this meeting --

14   withdrawn.

15              How long was this discussion

16   that you're referring to, where you were

17   discussing the pro formas?

18        A.    I don't recall.

19        Q.    Was it longer than 30 minutes?

20        A.    I don't recall.

21        Q.    You have no recollection

22   whether it was a brief five or ten-minute

23   call or more like an hour or more

24   discussion?

25        A.    I'm speculating, but it's more



Page 137

1
2  than five minutes.
3       Q.      In this discussion with Joe and
4  George, did the subject of rent payments
5  come up?
6       A.      I don't believe so.
7       Q.      Did the subject of payments to
8  Clinton Group come up?
9       A.      No.
10      Q.      Definitely not?
11      A.      I say no, because I didn't know
12 prior to me signing that Clinton Group was
13 getting paid.
14      Q.      When you said -- did you know
15 when you signed up that Clinton Group would
16 be paid?
17      A.      I'm sorry.  Ask the question
18 again.
19      Q.      Your answer was --
20           MR. SACK:  If you can read back
21        Mr. Salerno's prior answer, I would
22        appreciate it.
23           (Whereupon, a portion of the
24        testimony was read back.)
25      Q.      So my question was, would be



```
 1
 2   paid, not was getting paid.  Did you know
 3   prior to signing that Clinton Group would
 4   be paid sometime in the future?
 5              MR. PEARLSON:  Objection to
 6        form.  Paid what?
 7        Q.    Would be paid money?
 8        A.    For what?
 9        Q.    Anything.
10        A.    No.  I want to add to that.
11   There was something with regard to -- there
12   was something in the FAQ that said George
13   Hall -- and I'm trying to go from memory --
14   George Hall was not to get paid anything
15   until there was an agreement -- I'm
16   paraphrasing -- memorializing such.
17   Something to that effect.
18        Q.    So you were told in the FAQs,
19   that a time would come when the Clinton
20   Group would be compensated for various
21   things, is that right?
22        A.    You're paraphrase -- I can
23   agree with that in the context of
24   paraphrasing.
25        Q.    We'll look at it in a moment,
```



```
 1
 2    Mr. Salerno.  But I want to go back to this
 3    either phone call or physical meeting.  I
 4    want to go back to this phone call or
 5    physical meeting you're referring to.  You
 6    said you may have discussed rent payments,
 7    you're not sure, is that right?
 8              MR. PEARLSON:  Objection.  I
 9         don't think that's what he said.
10              But you can answer.
11         A.    Can we read back the --
12         Q.    I think the answer was "I don't
13    believe so," but I just want to understand,
14    you're not saying it -- you said -- I'm
15    just going to be right up front,
16    Mr. Salerno.  I'm sure nobody said anything
17    about money to the Clinton Group, but then
18    when I asked about rent, you said, "I
19    believe we didn't talk about rent, but I
20    don't know."
21              MR. SACK:  So why don't we hear
22         Mr. Salerno's answer.
23              (Whereupon, a portion of the
24         testimony was read back.)
25         Q.    So when you say "I don't
```



Page 140

```
 1
 2   believe so," are you saying it didn't come
 3   up?  Or you're saying it may have or may
 4   not have, you just don't remember?
 5        A.     The latter.
 6        Q.     In this meeting, did the
 7   subject of payments for space to Clinton
 8   Group come up?
 9        A.     No.
10        Q.     Did the subject in this meeting
11   come up of the number of employees
12   projected in the course of 2019 come up?
13        A.     I don't believe so.
14        Q.     Okay.  And again, does "I don't
15   believe so" mean it may have come up or it
16   might not have come up, you just don't
17   know?
18        A.     I don't know.
19        Q.     In conversation with Mr. Hall
20   or De Perio or both, did one or both of
21   them say to you, if you don't agree with
22   the amount of money for rent, then don't
23   invest?
24        A.     I don't believe so.
25        Q.     They may have said that to you,
```



Page 141

```
 1
 2   they may not have, you just don't remember
 3   one way or the other, is that right?
 4       A.    I would say if it was in a
 5   board meeting that they said that, there's
 6   a recording of it and I don't recall
 7   specifically.
 8       Q.    I'm not asking you about a
 9   board meeting.  I'm not asking you about a
10   secret recording.  I'm asking you in a
11   meeting, before you signed the stock
12   purchase agreement -- agreements, did Joe
13   De Perio or George Hall say to you in
14   substance, if you don't like the amount of
15   the rent, then don't invest?
16       A.    No.
17       Q.    Definitely, they didn't say
18   that to you?
19       A.    They did not.
20       Q.    Did they say in a meeting or
21   conversation before February 28, 2019 that
22   if you don't like the fact that Clinton
23   Group would be getting money for rent or
24   otherwise, don't invest?
25       A.    No.
```



Page 142

1

2          Q.     Did you -- did you have a

3    meeting or conversation with Mr. De Perio

4    at or about the time you had dinner with

5    him at a steakhouse in New Jersey?

6          A.     I had dinner with him, yes.

7          Q.     You had dinner with him in New

8    Jersey?

9          A.     Right.

10         Q.     And did you have a meeting with

11   him to discuss the financials of the

12   company, either the same day or within a

13   few days of that dinner meeting with him?

14         A.     I'm sorry.  What are you

15   asking?

16         Q.     I'm asking you, did you have a

17   meeting with Mr. De Perio where you

18   discussed the financial projections of the

19   company on the day of your dinner meeting

20   or within a few days of the dinner meeting

21   with Mr. De Perio?

22         A.     I'm concerned about you saying

23   the word "meeting."  Does that mean in

24   person?  Because I don't believe so.

25         Q.     Did you have a conversation



1

2    with Mr. De Perio about the projected

3    financials of the company on the same day

4    that you had dinner with him in New Jersey

5    or within a few days of that dinner?

6         A.    I don't recall specifically.

7    But I remember having a conversation with

8    Mr. De Perio on financials, somewhere

9    around that dinner date.

10         Q.    Did the subject of projected

11    rent come up in that conversation with

12    Mr. De Perio?

13         A.    No.

14         Q.    Did the subject of payments to

15    Clinton Group come up in that conversation

16    with Mr. De Perio?

17         A.    No.

18         Q.    Did the subject of the number

19    of employees in 2019 at Sport-BLX or

20    working for Sport-BLX come up in that

21    conversation?

22         A.    Can you repeat that question?

23         Q.    Yeah.  In that conversation

24    you're now referring to with Mr. De Perio,

25    did the projected number of employees for



1
2    2019 come up in conversation?

3         A.    I don't believe so.

4         Q.    But it may have.  You just

5    don't remember one way or the other,

6    correct?

7         A.    I don't recall that, yes.

8         Q.    And did Mr. De Perio, either at

9    dinner or in this conversation we're

10   talking about, say if you don't agree with

11   the amount of rent or payments to Clinton

12   Group, then don't invest?

13        A.    He never said that.

14        Q.    Mr. Salerno, did Sport-BLX, in

15   the material you looked at in due

16   diligence, did it project revenue in the

17   first year, in 2019, or only in out years?

18        A.    I don't know what calendar year

19   it projected.  It gave projections on an

20   annual basis.

21        Q.    It would be in the due

22   diligence materials that would be provided

23   to you, correct?

24        A.    It would.  I just don't know if

25   it was saying it was from May 2019 to April



Page 145

1
2    2020, et cetera.  I remember there was
3    three columns, and there was multiple years
4    of revenue.
5         Q.    In the first year of the
6    company, was there projected revenue?
7         A.    I don't recall.  Have to look
8    it up.
9         Q.    Mr. Salerno, after this letter
10   that Marc Gross sent on June 10, 2019, the
11   one I asked you about earlier, did you
12   learn about a conflict of interest that
13   Mr. Gross had -- that Mr. Gross and his
14   firm had in representing you and Cypress?
15        A.    Yes.
16        Q.    How did you learn that?
17        A.    Mr. Gross told me.
18             MR. PEARLSON:  All right.  I'm
19          going to caution you not to go into
20          what Marc Gross told you as your
21          attorney.
22             MR. SACK:  Even on the
23          existence of a conflict?  That's not
24          seeking or giving legal advice, is
25          it?  I don't see the basis for the



Page 146

 1

 2          privilege assertion, Ross.

 3               MR. PEARLSON:  Okay.  If you

 4          want to move on that, I'm going to

 5          direct him not to answer any advice

 6          he was given on the conflict issue by

 7          Mr. Gross.

 8               MR. SACK:  I'm not going to ask

 9          him about advice.  Let's take it

10          question by question and see where we

11          go.

12     Q.    Did there come a time when you

13  learned about a conflict?

14               MR. PEARLSON:  You can answer

15          that.

16     A.    Yes.

17     Q.    And did the -- in your

18  understanding, did the conflict relate to

19  Fox Rothschild's representation of

20  Glassbridge, a significant Sport-BLX

21  shareholder?

22               MR. PEARLSON:  Again, to the

23          extent that that was based on your

24          discussions with Mr. Gross, I'm going

25          to direct you not to answer that.


MAGNA
LEGAL SERVICES

1

2          Q.    Can you answer the question,

3     Mr. Salerno?

4          A.    I cannot.

5          Q.    When did you learn about a

6     conflict in relation to this June 10th

7     letter?

8          A.    Oh.  In relation to the June

9     10th letter?

10         Q.    Yeah.

11         A.    I don't recall a conflict in

12    relation to that.

13         Q.    By "in relation," I mean when

14    in time in relation to that.  Did you learn

15    about a conflict before the June 10th

16    letter or after the June 10th letter?

17         A.    Much after.

18         Q.    How long after?

19         A.    After he filed a complaint --

20    no.  That's not true.  I don't -- I don't

21    recall.  I don't want to speculate.

22         Q.    Okay.  I'm going to show you an

23    e-mail chain and I'll ask you a few

24    questions about that.

25         A.    Can I write a note?  I just



Page 148

```
 1
 2   want to remember something for myself
 3   later.
 4              MR. PEARLSON:  No, no, no.  Sit
 5        down.
 6              MR. CARBONE:  Only if you share
 7        it with all of us.
 8              THE WITNESS:  I'll share it
 9        with everyone.  I just wanted to
10        write to not forget to talk to
11        counsel about ADV.  Can you write it
12        down?
13              MR. PEARLSON:  We'll take care
14        of it.
15        Q.    Okay.  Let me just describe
16   these, Mr. Salerno, and then I'll direct
17   you to particular communications.  This is
18   an e-mail chain.
19              MR. PEARLSON:  This is Salerno
20        12?
21              COURT REPORTER:  Yeah.
22        Q.    And it's marked -- it's a chain
23   that begins GBE 11250 to GBE 11261.  And
24   this is a set of e-mails you're not on, but
25   I want to see if it refreshes your
```



MAGNA
LEGAL SERVICES

1

2 recollection, Mr. Salerno.  And so why

3 don't we begin on Bates 11259.

4                There's an e-mail at the bottom

5 of the page.  It's from Joe De Perio to

6 others, July 10, 2:20 p.m.  So this is

7 about one month after that June 10th

8 letter.  "I write to you" -- this is to a

9 number of people connected to Fox

10 Rothschild, copying George Hall and Daniel

11 Strauss.

12                "I write to you as chairman of

13 Glassbridge Enterprises.  You may or may

14 not recall that George Hall and I own 26

15 percent and 2 and a half percent of

16 Glassbridge stock, respectively.  And then

17 I'm also the president of Sport-BLX, Inc.,

18 and George Hall is executive chairman.  He

19 and I are founders and own 75 percent of

20 the stock of Sport-BLX.  It was distressing

21 to receive the enclosed correspondence from

22 one of your partners on behalf of Cypress

23 Holdings, III, L.P." -- and I'll represent

24 that it was this June 10th letter.

25                And then I will go ahead to



Page 150

```
 1
 2   August 16th in this chain.  And it's at GBE
 3   11255.  It's another e-mail from Joseph De
 4   Perio to a number of people.  It's Fox
 5   Rothschild copying Hall and Strauss.  "Pam,
 6   Marc Gross's name has again resurfaced in
 7   correspondence antagonistic to our
 8   company."
 9            And then I'm going to skip the
10   next paragraph and then read, "I thought
11   this was resolved in our last e-mail
12   exchange, but it appears he continues to
13   get advice."  "He" being -- "he continues
14   to gets advice from Fox Rothschild to our
15   detriment."
16            So Mr. Salerno, this is
17   referring to yet another e-mail that you
18   sent to George Hall and others, copying
19   Marc Gross in August.  So what I'm asking
20   you is, did you find out --
21            MR. PEARLSON:  I'm sorry.  Who
22       sent it?  Did you say he sent it?  I
23       think you misstated something in your
24       question.
25            MR. SACK:  No, no.  Okay.
```



Page 151

```
 1
 2          Let's get this -- can I get that
 3          August e-mail?
 4               MR. PEARLSON:  John, my only
 5          question was in the August e-mail, I
 6          thought you said in the question that
 7          he sent it.
 8               MR. SACK:  He did.  Mr. Salerno
 9          did.  So go back one -- go to 11256.
10          This forwards an e-mail from Michael
11          Salerno to George Hall, copying Marc
12          Gross on August 16, 2019.
13          Q.    The discussion here is about
14   providing information to FINRA, that's
15   forwarded, and then Joe De Perio says to
16   others at -- at then Fox Rothschild in the
17   next e-mail, August 16 at 11:10 a.m., "Pam,
18   Marc Gross's name has again resurfaced in
19   correspondence antagonistic to our
20   company."
21               And then skipping the next
22   paragraph, the third paragraph says, "I
23   thought this was resolved in our last
24   e-mail exchange, but it appears he
25   continues to get advice from Fox Rothschild
```



1

2    to our detriment."

3              And I believe, Mr. Salerno, the

4    reference to "he" is to you.  And so my

5    question is, did you learn in July 2019, in

6    June or July 2019 that there was a conflict

7    in Mr. Gross representing you and Cypress

8    and that Fox Rothschild had directed

9    Mr. Gross no longer to do work for -- for

10   Cypress or you in relation to Sport-BLX?

11             MR. PEARLSON:  I'll object to

12        the form.

13             You can answer.

14        A.    I don't recall when Marc told

15   me there was a conflict.

16        Q.    When you copied him on your

17   August 16th e-mail that is on 11256, was he

18   continuing to represent you in relation to

19   Sport-BLX matters?

20        A.    I don't recall.

21        Q.    Would you have copied him on

22   the e-mail if he wasn't representing you on

23   Sport-BLX matters?

24        A.    I may have done it just out of

25   -- he was on other e-mails to George Hall,



Page 153

 1

 2    and this was another one.

 3            MR. PEARLSON:  I want you not

 4       to guess.

 5        A.    No, then I can't answer.  I'm

 6    sorry.

 7        Q.    So what you're saying is he may

 8    have been representing you then or he may

 9    not have been representing you then, you

10    just don't know?

11        A.    I don't recall.

12        Q.    Do you recall learning before

13    August 16th of a conflict or potential

14    conflict that would preclude him from

15    representing you and Cypress?

16        A.    I don't recall when he told me.

17        Q.    Mr. Salerno, staying with this

18    August -- 11254, there's an e-mail at 2:23

19    from Pamela Thein to Joe De Perio and

20    others.  It says, "Joe, I'm sorry to read

21    this message.  As I wrote to you earlier, I

22    was told Marc withdrew.  I have asked about

23    Marc's names on that e-mail."

24            Does this refresh your

25    recollection as to whether in or about



1

2    August of 2019, Mr. Gross had withdrawn

3    from doing work for you and Cypress in

4    relation to Sport-BLX?

5        A.    It does not.

6        Q.    And you just don't know whether

7    that's true or not that Marc withdrew?

8        A.    Marc did withdraw.  I do not

9    recall the date.

10       Q.    Do you believe it was sometime

11   after August 16, 2019?

12       A.    I don't recall.  I'm sure

13   there's documentation.

14       Q.    Would you have included his

15   name on an e-mail as a CC, had he withdrawn

16   as counsel?

17       A.    As I said before, it may have

18   been just because he was on previous

19   e-mails to George Hall.

20       Q.    So let's go now to 11251,

21   Mr. Salerno.

22       A.    Sure.

23       Q.    It begins at the very bottom of

24   the page, from Michael Salerno, September

25   3, 2019, to Joe De Perio and others,



Page 155

```
 1
 2   copying Marc Gross.
 3             "Joe, the minutes you attached
 4   are a gross misrepresentation of what
 5   actually occurred," et cetera.  Why did you
 6   copy Marc Gross about board meeting
 7   minutes?
 8             MR. PEARLSON:  You're on 11252,
 9        Jonathan, right?
10             MR. SACK:  11251 is the very
11        beginning, and it carries over to
12        11252.  But it shows that Mr. Salerno
13        copied Marc Gross on an e-mail to Joe
14        De Perio about board minutes.
15        Q.    Why was he copied?
16        A.    I don't recall.
17        Q.    Was he still your lawyer then?
18        A.    Again, I don't recall when they
19   sent me the -- gave correspondence to the
20   conflict.
21        Q.    Did you get correspondence
22   about the conflict?
23        A.    Yeah.  Marc called me.  There
24   may have been a letter.  I forget.  Marc
25   definitely called me.  There may have been
```



Page 156

 1
 2    a follow-up letter.
 3        Q.    Can you go to the very first
 4    page in the e-mail chain, Bates GBE 11250
 5    on September 3rd from Pam Thein to Joe De
 6    Perio and others.
 7            "Joe, Marc Gross confirmed this
 8    afternoon that he is not representing
 9    Michael Salerno in this matter and referred
10    Mr. Salerno to other legal counsel."
11    Skipping a paragraph, "Marc should not be
12    copied on any future e-mails you receive
13    from Mr. Salerno on this matter."
14            Were you advised in or about
15    early September 2019 that Mr. Gross is not
16    representing Michael Salerno in this
17    matter?
18        A.    I don't recall the timeline.
19    Marc Gross did call me --
20            MR. PEARLSON:  I don't want you
21         to go into what Marc Gross said.  The
22         question was the timing.
23        A.    Yeah.  I don't recall the
24    timeline.
25        Q.    Did he refer you to other legal



1

2    counsel?

3        A.    Yes.

4        Q.    And was that in the fall of

5    2019?

6        A.    I don't recall the timeline.

7        Q.    Did it precede the books and

8    records demand that counsel sent in

9    November 2019 on your behalf?

10       A.    Can you say that again.

11       Q.    Yes.  Mr. Salerno, a lawyer by

12   the name of Ed Kole sent a books and

13   records demand to Sport-BLX in November

14   2019.  Was he the lawyer you were referred

15   to by Mr. Gross?

16       A.    Yes.

17       Q.    Did Mr. Gross tell you -- did

18   you learn of the conflict that Mr. Gross

19   and his firm had before November 2019?

20       A.    I don't recall the timeline.  I

21   hired Mr. Kole after being introduced to

22   him by Mr. Gross.

23       Q.    And you were introduced to him

24   because Mr. Gross told you, in substance,

25   that he could not represent you any longer



1
2    vis-à-vis Sport-BLX, correct?
3              MR. PEARLSON:  I'm going to
4         object.
5              And direct you not to answer
6         that one.
7         Q.    Did you begin working with
8    Mr. Kole as your counsel because Mr. Gross
9    could no longer represent you in regard to
10   Sport-BLX?
11             MR. PEARLSON:  You can answer
12        that.
13        A.    Yes.
14        Q.    And that -- and that would have
15   been before the books and records demand,
16   correct?
17        A.    What's the timeline?
18        Q.    I've told you, the books and
19   records demand was in November 2019.
20        A.    With Mr. Kole.
21        Q.    That Mr. Kole sent, correct.
22        A.    Yes.  Mr. Kole sent a demand
23   for records.
24        Q.    And he sent it -- I'm going to
25   represent to you, he sent it to Sport-BLX



1

2    in November 2019.  So Mr. Gross -- just

3    representing that.  Did Mr. Gross's

4    representation of you stop before the books

5    and records demand letter was sent?

6         A.    Yes.

7         Q.    How is it, then, that Mr. Gross

8    filed a complaint against Sport-BLX in

9    February of -- in January of 2022 if his

10   representation ceased?

11             THE WITNESS:  Can I answer

12       that?

13             MR. PEARLSON:  If it's based on

14       your discussions with him --

15             THE WITNESS:  Yeah, it is.

16             MR. PEARLSON:  -- then no.

17        Q.    Did you see any problem at all

18   in using a law firm that represented

19   Glassbridge to sue Sport-BLX?  Did you see

20   any problem at all with that?

21        A.    I'm not an attorney.  Why would

22   I see a problem with that?

23        Q.    Because his representation had

24   ceased due to a conflict, correct?

25        A.    I don't think I should answer



Page 160

1

2    because it's -- my actions were based upon

3    conversations with Marc.

4          Q.    Following conversations with

5    Marc, did you determine it was appropriate

6    for him to represent Cypress in a suit

7    against Sport-BLX?

8          A.    Yes.  He filed a complaint with

9    Cypress.

10          Q.    And after your conversations

11    with Marc Gross, did you determine that it

12    was appropriate for Fox Rothschild and

13    Mr. Gross to sue Glassbridge Enterprises?

14          A.    Again, that's all based upon

15    conversations with --

16             MR. PEARLSON:  No, no.  He's

17          not asking for the substance.  He

18          wants to know just after talking to

19          him -- that was the question, without

20          getting into the substance of your

21          conversation.

22             MR. SACK:  Let's do the

23          question again.

24             Hindy, could you read back the

25          last question, please -- Okay.  Let



 1
 2          me try it.
 3          Q.     Following your conversations
 4   with Marc Gross in 2019, did you determine
 5   it was appropriate for Marc Gross and Fox
 6   Rothschild to sue Glassbridge Enterprises?
 7          A.     My determination was based upon
 8   conversations with Marc, which that's my
 9   trepidation of answering.
10          Q.     Did you believe it was
11   appropriate?
12          A.     Again, my belief of why it was
13   appropriate goes to the conversations I had
14   with Mr. Gross.
15          Q.     You wouldn't have authorized
16   that lawsuit unless you believed it was
17   appropriate, correct?
18          A.     Again, it's all based upon my
19   conversations with Mr. Gross.
20          Q.     Did you go against the advice
21   you got from Mr. Gross?
22          MR. PEARLSON:  I'm going to
23          object.
24          You can go ahead, if you can
25          answer that without revealing the



Page 162

```
 1
 2        contents of your conversations with
 3        Mr. Gross.
 4        A.    No.  That's -- my actions were
 5   based upon my conversations with Mr. Gross.
 6        Q.    And those actions include
 7   authorizing the filing of a suit against
 8   Sport-BLX and Glassbridge and George Hall
 9   and Joe De Perio, correct?
10        A.    Those were my actions.
11              MR. SACK:  I think why don't we
12        break for lunch.
13              MR. PEARLSON:  Off the record.
14              VIDEOGRAPHER:  Off the record,
15        1:09.
16              (Whereupon, a short break was
17        taken at this time.)
18              VIDEOGRAPHER:  On the record,
19        2:03.
20        Q.    Mr. Salerno, when did you first
21   hear about Sport-BLX?
22        A.    In Birravino restaurant.
23        Q.    When was that?
24        A.    I don't recall the date.
25        Q.    Where is that?
```



1

2          A.    In Red Bank, New Jersey.

3          Q.    Who did you hear about

4   Sport-BLX from?

5          A.    Mike Staisil.

6          Q.    What was your relationship with

7   Mike Staisil?

8          A.    He was a friendly acquaintance.

9          Q.    Do you think that was in late

10  2018 or early 2019?

11         A.    That sounds about right.

12         Q.    What do you remember about that

13  conversation relating to Sport-BLX?

14         A.    Mike said it was a very

15  interesting and good investment.   He

16  introduced me to Henry Sullivan.   They told

17  me the concept about basically

18  fractionalizing assets, particularly sports

19  assets, that would then be sold onto --

20  sold from an exchange, a platform, which

21  Sport-BLX would create.   That was really

22  about it.   It was a concept there that

23  Sport-BLX would be a fund, would raise

24  money.   The fund will buy the assets, the

25  assets could appreciate in value to


MAGNA
LEGAL SERVICES

1
2    generate profit for Sport-BLX.
3              The -- they would also charge a
4    fee, a management fee, and then basically
5    create a market by selling those assets to
6    the public through the Sport-BLX exchange,
7    and then hopefully creating a buzz and
8    those people who would originally buy the
9    asset would then sell the asset on
10   Sport-BLX exchange.
11        Q.    So you're talking about two
12   conversations you had, one with Mike
13   Staisil at a restaurant in Red Bank and
14   then a follow-up conversation with Staisil
15   and Sullivan?
16        A.    Yes.  And both of them were at
17   Birravino.
18        Q.    So we're talking about two
19   conversations now in roughly late 2018,
20   early 2019, is that right?
21        A.    That sounds about right.
22        Q.    And what you're saying is they
23   told you about Sport-BLX would create a
24   platform for trading these fractionalized
25   sports assets, is that part of it?



Page 165

```
 1
 2         A.    That's part of it, yes.
 3         Q.    And that was the -- that was
 4    the technology part of the company, that
 5    technologically they were going to build
 6    out this trading platform for these assets?
 7         A.    I would agree.
 8         Q.    And they also told you about a
 9    fund, is that right?
10         A.    Correct.
11         Q.    And did they tell you the fund
12    was in existence or that that was the fund
13    that was a hope or a prospect down the
14    road?
15               MR. PEARLSON:    Objection to
16          form.
17         A.    No.   They didn't context it as
18    being -- they didn't compartmentalize it.
19    They said the Sport-BLX investment was a
20    part of this investment that would raise
21    capital, would manage it, which was the
22    fund, and then it would monetize those
23    assets on the Sport-BLX's exchange, the
24    technology.
25         Q.    So in your understanding, based
```



1

2  on these conversations with Staisil and

3  Sullivan, you thought Sport-BLX could both

4  be an investment fund and the exchange on

5  which these investments were traded?

6        A.    Sport-BLX, yes, would have an

7  interest or own it directly, yes.

8        Q.    You didn't think that would be

9  a conflict for Sport-BLX to both invest in

10  these fractional athlete units and be the

11  trading platform for these fractional

12  units?

13        A.    No.

14        Q.    You thought that would pass

15  muster with the SEC for it to be both the

16  fund that owned and traded the assets and

17  be the platform on which these assets were

18  traded?

19        A.    I was relying on what they were

20  saying as being accurate.  I didn't foresee

21  an issue with it.  And then they followed

22  up with a deck that showed exactly that.

23  So no, I didn't.

24        Q.    What deck are you referring to?

25        A.    There were a few different



Page 167

1

2   investment decks that were provided to me.

3           (Whereupon, an off-the-record

4       discussion was held.)

5       Q.    I'm going to show you some

6   materials and I'll ask you a few questions

7   about those.

8           We'll call it Salerno

9   Deposition Exhibit 13, Cypress Bates stamp

10  1607 to 1610.

11          Are these the set of frequently

12  asked questions that you saw in early 2019,

13  Mr. Salerno?

14      A.    They appear to be.

15      Q.    And you saw a document like

16  this in the data room, correct?

17      A.    I don't know how I got it, but

18  yes, this was what I refer to as the

19  frequent -- the FAQ, frequently asked

20  questions.

21      Q.    Please take a look at the third

22  page of the document, 1609 and item 10.    It

23  lists three ways, three responses to the

24  question how does Sport-BLX make money.    It

25  says, number 1, "We will charge initial



Page 168

1

2    tokenization fees to horse owners and

3    athletes seeking to create trade tokens.

4    We may choose to wave the initial

5    tokenization fees for initial product."

6              Number 2, "At the time of the

7    initial sale of tokens to the public, we

8    will charge fees for the sale of the

9    initial trade tokens when proceeds are

10   realized by the seller."

11             3, "For every subsequent trade

12   of the tokens, we will charge transaction

13   fees to both buyers and sellers."

14             Where does it say there,

15   Mr. Salerno, that the fund would earn

16   management fees -- excuse me.  That

17   Sport-BLX would earn management fees or

18   would manage a fund?

19        A.    This is not all encompassing of

20   what was told to me.

21        Q.    My question was, where did it

22   say there --

23             MR. PEARLSON:  Easy.  Easy.

24             MR. SACK:  No.  He's not

25        answering questions.



Page 169

```
 1
 2       Q.     Where does it say there that
 3  Sport-BLX --
 4            MR. PEARLSON:  There's still
 5        now -- Jonathan, there's still no
 6        need to raise your voice.  Okay?
 7       Q.    Where does it say there that
 8  Sport-BLX would be earning management fees
 9  from managing a fund?
10       A.    Again, this is not all
11  encompassing and it does not say that here.
12       Q.    Look at number 11, Mr. Salerno.
13  "Given our background as financial
14  investors, we try to model the revenue and
15  earnings of business" --
16       A.    I'm not seeing.
17       Q.    Number 11.
18       A.    On top, okay.
19       Q.    "Given our background as
20  financial investors, we try to model the
21  revenue and earnings of the business.  The
22  realty is, we do not have enough variables
23  sorted out at this point to get any
24  semblance of accuracy."
25            Did they -- they were telling
```



Page 170

1

2  you there they couldn't model any revenues

3  at that point, whether from a fund or

4  otherwise, correct?

5       A.    Can I read this whole thing,

6  please?

7       Q.    Please.  Go ahead.

8       A.    Okay.

9       Q.    Does this document say anything

10 about management of a fund or revenue for

11 management of fund go into Sport-BLX?

12      A.    This document says at this

13 point in this document, it does not speak

14 to revenues.

15      Q.    And does it speak to fund?

16      A.    It does not speak to -- it does

17 not use the word "fund" here.

18      Q.    Does it speak to the concept of

19 the fund?  Can you see anything here that

20 reflects what you just described about the

21 existence of a fund, the management of a

22 fund or fees from a fund?

23      A.    Yes.

24      Q.    Where?

25      A.    Also on the --



1

2      Q.    What section is it?

3      A.    The second -- I'm just looking

4   at number 11.  I have not reviewed the

5   other document -- the whole document with

6   regard to your question.  Only with number

7   11.

8      Q.    I asked you to look at the

9   whole document.  You said you were going to

10  look at the whole document.  I'm asking you

11  about the whole document.

12            Does that document anywhere say

13  that Sport-BLX had a fund -- excuse me.

14  That Sport-BLX anticipated revenue from

15  managing a fund in any way?

16      A.    I'll answer the question with

17  number 11 first, and then if you give me

18  time, I'll look at the rest of the

19  document, because I don't recall the

20  document in its entirety.

21            "Also, it is worth emphasizing

22  that our current conception of our revenue

23  model is to charge fees for initial

24  offerings and trades -- and all trades."

25            Initial offerings would come



Page 172

1
2  from a fund, because the fund would own the
3  athlete and the other sport assets.   So
4  that would be a reference to the fund.
5      Q.    It could also be a reference to
6  a platform, correct, for acting as the
7  executing trades on initial offerings,
8  correct?
9      A.    It doesn't say executing, sir.
10     Q.    Well, charge fees for initial
11  offerings.
12     A.    Right.
13     Q.    It's very different from
14  management fees, isn't it?
15     A.    It doesn't say executing.   I
16  don't think management fees would be
17  far-fetched to be germane with initial
18  offerings in all trades.
19     Q.    So you think number 11 is
20  referring to fees to a -- for a fund that
21  Sport-BLX was to manage?
22     A.    I think that number 11 is
23  giving an example of the process, which
24  includes a fund, which will purchase an
25  asset, which will then have an initial



Page 173

1

2  offering and then have multiple trades.

3       Q.     Look at number 12, please.

4       A.     Can I look at the rest of the

5  document?

6       Q.     You may.

7       A.     So from the first page --

8  excuse me.  From the first page, number 1

9  also implies that a fund will be a part of

10 Sport-BLX in the creating of factual

11 interests representing revenue shared

12 interests in the future earnings of an

13 athlete or equity ownership in racehorses

14 and teams.

15      Q.     You're saying -- please go

16 ahead.

17      A.     In my opinion, when I read

18 this, you cannot create fractional

19 interests unless you own it.  So Sport-BLX

20 needed to own the asset in which it's

21 speaking to here that's fractionalized.

22      Q.     What's the basis for your

23 opinion?  You don't know anything about

24 this business, do you?  What's the basis

25 for your opinion of what creating



Page 174

1

2    fractional interest means?

3        A.    From what was told to me prior

4    to investing.

5        Q.    So what you were told was one

6    of the primary expected revenue sources

7    from Sport-BLX was the management of a

8    fund, but the words "managing a fund" never

9    appears in the FAQs.  Do you agree with

10    that statement?

11        A.    No.  I don't agree.

12        Q.    Show me the words "managing a

13    fund" --

14        A.    You said FAQs.  I can only

15    speak to the one in front of me.

16        Q.    That's the one I'm talking

17    about.  Do the words "managing a fund,"

18    creating or managing a fund appear in this

19    document?

20        A.    So far going down page 1.

21            MR. PEARLSON:  Jonathan,

22        perhaps to move things along, we can

23        stipulate the document says what it

24        says, and the words "managing a fund"

25        do not appear in the document.



1

2          Q.    Do you agree with that,

3    Mr. Salerno --

4              THE WITNESS:  I'm going to read

5          it.  You want me to read it or you

6          don't?

7              MR. PEARLSON:  We can stipulate

8          the document says what it says and

9          doesn't use the words "managing a

10         fund" anywhere in the document.

11             THE WITNESS:  If the document

12         doesn't say that, then we can

13         stipulate to that.  Okay.

14         Q.    Turn to number 12 on 1610.

15   "Given Clinton Group's longstanding

16   position as an SEC registered investment

17   advisor, we have taken a rigorous approach

18   to SEC compliance.  At present, their

19   strategy relies on the following findings,

20   that these tokens in our system are, in

21   fact, securities, and that we will access

22   certain exemptions for registration and

23   resale under SEC regulations."

24             So is it fair to say,

25   Mr. Salerno, that you understood when you



Page 176

```
 1
 2    invested that the intention was for
 3    Sport-BLX to be totally compliant with
 4    applicable SEC regulations and laws?
 5        A.    I think it's fair to say that I
 6    believe that Sport-BLX would be compliant
 7    with all laws, including SEC, yes.
 8        Q.    And do you think -- did you
 9    think that the SEC would allow a large
10    investment fund that took positions in
11    assets to also own the trading platform
12    where those assets would be traded?
13        A.    I didn't contemplate it to that
14    extent.  I relied on what was represented
15    to me that they would.
16        Q.    But you were a registered
17    investment advisor.  You had some basic
18    understanding of conflicts of interest in
19    the securities markets, didn't you?
20        A.    I am a registered investment
21    advisor.  For technical things, such as
22    that, I rely on counsel.
23        Q.    You thought -- can you think of
24    a single example where an investment fund
25    owns the trading platform where the assets
```



Page 177

1

2    it owns trades?

3         A.     Yes.

4         Q.     What's that?

5         A.     What's the investment?

6         Q.     What's the fund -- what fund

7    owns what trading platform?

8         A.     Principal.

9         Q.     What's Principal?

10         A.     Principal Financial.

11         Q.     What exchange does it own?

12         A.     They own a recordkeeping

13    platform which allows exchanges and trades

14    to take place, and they also have

15    proprietary funds that trade on it.

16         Q.     Do you know of any other?

17         A.     Transamerica.

18         Q.     Is that -- what assets trade

19    there?  What assets -- what's --

20         A.     I'm not following.

21         Q.     What's Transamerica?

22         A.     Transamerica is another

23    financial institution that owns a

24    recordkeeping and trading platform that

25    have proprietary funds that are allowed to



1

2  trade on their platform.

3      Q.     Allowed to trade by the SEC?

4      A.     Yes.

5      Q.     And --

6      A.     Numerous others.

7      Q.     And you thought that's what

8  Henry Sullivan and Mike Staisil were saying

9  to you, that they were going to be -- that

10 Sport-BLX would be creating and managing a

11 fund and trading on its own platform?

12     A.     Not just Michael Staisil and

13 Henry Sullivan, but Mr. De Perio and

14 Mr. Hall, and that was the whole business

15 model until all of a sudden George Hall

16 changed his mind and Joe De Perio changed

17 his mind and it wasn't.

18         MR. SACK:  Let's take a look at

19      -- we'll go to the January 14th one,

20      Joe.

21     Q.     It's an e-mail from Henry

22 Sullivan to you, dated January 14th.  It's

23 at Sport-BLX-147207 is the e-mail, and then

24 the attachment is 147208 through 229.  This

25 is a deck for Sport-BLX that you received



1

2    on or about January 14, 2019.  Was this one

3    of the decks you were referring to a few

4    moments ago about receiving Sport-BLX's

5    decks?

6         A.    I would assume it's one of

7    them, yes.

8         Q.    Does it look familiar to you?

9         A.    It does.

10        Q.    Please take a look through it,

11   but I'll direct you to certain pages.

12        A.    Okay.

13        Q.    Take a look at page 12, which

14   is at 147220.

15        A.    Yes.

16        Q.    The top of the page says,

17   "Sport-BLX will take a small fee for each

18   tokenization and each trade transaction."

19   And then there's a diagram and a discussion

20   of percentages of on boarded product and

21   percentage of every trade.  Is there any

22   reference there to having a fund or

23   managing a fund?

24        A.    Not on this page.

25        Q.    In fact it talked about small



Page 180

 1
 2  fees for each transaction, not substantial
 3  fees, correct?
 4      A.    It does say the word "small
 5  fee," yes.
 6      Q.    Take a look at the next page,
 7  page 13, 147221.  The caption is creating
 8  an ecosystem.  In the block on the
 9  right-hand side it says, "Sport-BLX will
10  build connections to companies with diverse
11  competencies."
12           Could you read the page, tell
13  us whether there's any reference there to
14  owning or managing or making money from a
15  fund?
16           MR. PEARLSON:  John, I'm going
17       to object.  The page says what it
18       says.  You're entitled to do your
19       deposition any way you want, but
20       there are a lot of pages that don't
21       say things too.
22      Q.    Do you see anything in this
23  document, Mr. Salerno, that confirms what
24  you said earlier, that Sport-BLX would own
25  or manage or make fees from a fund?



```
 1
 2         A.    This document --
 3         Q.    You referred to documents,
 4    that's why I'm asking.
 5              MR. SACK:  He's referred to
 6         documents he received.  I'm trying to
 7         understand.
 8              MR. PEARLSON:  I understand.
 9    My point was just you don't have to
10         go through every single page and say
11         does it say this anywhere.
12         A.    So can you repeat the question
13    now so I can answer you directly.
14              MR. SACK:  Can I have that
15         back, Hindy.
16              (Whereupon, a portion of the
17         testimony was read back.)
18         A.    So in this particular document
19    that you just handed to me -- and I'm
20    trying to go through it, I have not had a
21    chance to go through the whole thing.
22    However, in a brief review of it, I do see
23    a reference to the fund on page 15.  The
24    top of it says institutional investor
25    relationship, and it references proprietary
```



1

2    sources.   "A third-party can have a pool of

3    risk capital aggregated from proprietary

4    sources."

5                    When it says "proprietary

6    sources," that, to me, means Sport-BLX.

7         Q.    Really?  It says a third-party

8    can have a pool of risk from proprietary

9    sources.  So it's really talking about a

10   third-party would have these assets, isn't

11   it?

12        A.    No.  And again, this is -- you

13   put it in front of me, I'm reading it.  I

14   -- when it says "from proprietary sources,"

15   I believe it's referencing back to the

16   first bullet, where it says Sport-BLX.

17        Q.    You're inferring that

18   proprietary sources or investors means

19   Sport-BLX?  Is that what you're saying?

20        A.    I'm inferring that when it says

21   proprietary sources, it's referring to

22   Sport-BLX.

23        Q.    It doesn't say it, but that's

24   your inference?

25        A.    That is what I believe it says,



Page 183

 1
 2  yes.
 3       Q.    So thus far, Mr. Salerno,
 4  you've referred to meetings with Mike
 5  Staisil, Henry Sullivan, George Hall and
 6  Joe De Perio, is that right?
 7       A.    Yes.
 8       Q.    And did you discuss the
 9  financial projections for the company,
10  including projected revenues if the
11  business succeeded and projected expenses
12  with any of the people that we just
13  identified?
14       A.    I'm sure I did.
15       Q.    And could you pinpoint any
16  meetings or conversations before February
17  28th, where you talked about the financial
18  -- the financials of the company?
19       A.    I don't recall timeline.
20       Q.    And who did you have
21  conversations with the financial -- about
22  the financials with?
23       A.    I spoke to George Hall about
24  financials.  I spoke to Joe De Perio on
25  financials.  I spoke to Henry Sullivan


MAGNA ▶
LEGAL SERVICES

Page 184

1
2  about financials, I spoke to Francis
3  Ruchalski about financials.
4        Q.    Who?
5        A.    Francis Ruchalski, the CFO, and
6  Michael Staisil.
7        Q.    Can you tell us, what did you
8  learn about the financials in those
9  meetings?
10       A.    That they were modeled out
11 after a great deal of due diligence by
12 Mr. Hall and Mr. De Perio and that they
13 were the basis for the business to go
14 forward.
15       Q.    And they modeled out expenses,
16 as well?
17       A.    They did.
18       Q.    Did you have questions about
19 the financials?
20       A.    I'm sure I did.
21       Q.    Did you have concerns about
22 them?
23       A.    I asked questions.  If a
24 question is also a concern, then same
25 definition, then yes.



Page 185

```
 1
 2        Q.    What questions did you ask?
 3        A.    I don't recall.
 4        Q.    Do you recall any questions you
 5   asked about any aspect of the financial
 6   projection of the company?
 7        A.    I don't recall specifically,
 8   no.
 9        Q.    No subject comes to mind that
10   came to your attention and stood out from
11   any other?
12        A.    Yes.
13        Q.    What?
14        A.    Whether or not it was
15   reasonable estimates that they were making.
16        Q.    Reasonable estimates of what?
17        A.    Of the overall pro forma.  The
18   overall revenues relative to the overall
19   expenses.
20        Q.    Who did you ask that of?  Were
21   these -- withdrawn.
22              So what you were asking was did
23   these individuals believe -- believe they
24   were reasonable projections, is that the
25   substance of what you were asking?
```



```
 1
 2          A.      I would agree with that.
 3          Q.      And who did you ask that
 4     question of?
 5          A.      I remember having that
 6     conversation with Mr. De Perio mostly.
 7          Q.      His name is De Perio, by the
 8     way.  Can you do a little -- his name is De
 9     Perio, you've seen it in many documents.
10          A.      Okay.  No disrespect.
11          Q.      You had those conversations
12     with Mr. De Perio.  Who else?
13          A.      Mr. Hall.
14          Q.      And what did they tell you?
15          A.      They told me that they believed
16     in the pro forma numbers.
17          Q.      You understood this was an
18     extremely high risk venture?
19          A.      Yes.
20          Q.      A high risk of failure?
21          A.      High risk of failure and
22     reward, yes.
23          Q.      It was a startup company that
24     might reasonably completely fail, correct?
25          A.      That was a possibility.
```



Page 187

 1

 2    Q.    So this was just the best

 3    educated guesses that Mr. De Perio and

 4    Mr. Hall could give at a given point in

 5    time, correct?

 6              MR. PEARLSON:  I'm sorry.

 7        Objection to form.

 8              Go ahead.

 9    Q.    Did you understand their

10    responses to be their best educated guesses

11    that they could give in this early 2019

12    period, is that a fair statement?

13    A.    The statement I would make is I

14    trusted what they put on paper was

15    accurate.

16    Q.    And you trusted when they put

17    on paper, that given our background as

18    financial investors, we tried to model the

19    revenue and earnings of the business.  The

20    realty is that we don't have enough

21    variables sorted out at this point to get

22    any semblance of accuracy.  Was that one of

23    the statements they made to you in

24    substance?  This is from the FAQs -- that

25    you relied upon?



Page 188

```
 1
 2        A.    However, that FAQ was prior to
 3   the pro forma being provided.
 4        Q.    Well, you said you relied on
 5   the FAQ when you invested, isn't that
 6   right?  That was all before February 28th.
 7   It was part of the mix of information that
 8   you had when you invested, correct?
 9        A.    It was a part of the
10   information, yes.
11        Q.    This pro forma, you reviewed it
12   in the data room?
13        A.    I'm sorry.  Rephrase the
14   question.
15        Q.    Did you review data in the data
16   room that you were given access to?
17        A.    No.
18        Q.    You didn't go into the data
19   room and look at any of the data?
20        A.    Yes.
21        Q.    You did go into the data room,
22   correct?
23        A.    I went into the data room, I
24   downloaded the information and I reviewed
25   it in my office.
```



Page 189

1

2      Q.    Did you look at, to the best of

3  your knowledge, all of the information in

4  the data room?

5      A.    I don't think I looked at all

6  of the information, no.

7      Q.    But you had access to all of

8  the information in the data room, correct?

9      A.    I had access to whatever was in

10  the data room, yes.

11      Q.    And you printed out a

12  substantial volume of material, correct?

13      A.    Yes.

14      Q.    And included in that material

15  were the projected financials of the

16  company, budgeted forecast revenue,

17  expenses, capital expenses and the like?

18      A.    Yes.

19      Q.    Did you talk with anyone, other

20  than individuals with Sport-BLX, about the

21  information you were receiving and

22  reviewing?

23      A.    Yes.

24      Q.    With whom?

25      A.    My counsel.



Page 190

```
 1
 2        Q.    Who is that?
 3        A.    That was Giordano Halleran.
 4        Q.    Philip Forlenza, that firm?
 5        A.    Yes, I believe so.
 6        Q.    With whom else?
 7        A.    That's it.
 8        Q.    Did you talk to David Roth
 9   about the information?
10        A.    I don't think so.
11        Q.    Did you talk with David Roth
12   about the decision of whether to invest in
13   Sport-BLX?
14        A.    No.
15        Q.    So your attorneys wrote to the
16   Court saying that you spoke with one of the
17   LPs of Cypress about the decision to invest
18   in Sport-BLX.  Is that statement incorrect?
19        A.    I'm not sure that they said
20   that.
21        Q.    Let's look for it.
22              MR. SACK:  Okay.  So I guess
23         we're up to 15, Exhibit 15.
24        Q.    I'll point you to the right
25   place.
```



Page 191

```
 1
 2            I'm going to direct you to page
 3    5 of this letter, Mr. Salerno, and I'm just
 4    going to explain to you, procedurally, what
 5    it is.
 6            MR. SACK:  This is Exhibit 15,
 7         Hindy.
 8        Q.   So I'm going to explain to you,
 9    procedurally, what it is.  It's a letter
10    that is submitted on the letterhead of my
11    firm, but it combines information provided
12    both by my firm and your counsel, and it
13    presented an issue to the Court regarding
14    getting discovery about the LPs.  Do you
15    recall that issue came up in this case?
16        A.   Yes.
17        Q.   And you were opposed to
18    providing any information about Cypress's
19    limited partners?
20        A.   Yes.
21        Q.   So at the top of page 5, the
22    last sentence of the carryover paragraph
23    begins, "Based on Mr. Salerno's
24    representation that he only discussed a
25    potential Sport-BLX investment with one of
```



1

2    Cypress's limited partners, his accountant,

3    the Cypress parties are willing to disclose

4    the identity of that limited partner."

5              Is that an incorrect statement?

6        A.    No.  That's correct.

7        Q.    Okay.  So you did speak with

8    potential Sport-BLX investment with one of

9    Cypress's limited partners, your

10   accountant, is that accurate?

11       A.    Right.

12       Q.    Who is that?

13       A.    Dave Roth.

14       Q.    So what did you speak with

15   Mr. Roth -- first of all, when did you

16   speak with Mr. Roth about your investment

17   in Sport-BLX?

18       A.    Mr. Roth is Cypress's

19   accountant.  He knew about the investment

20   after I made the investment.  I'm trying to

21   think if there was any particular detail of

22   the Sport-BLX investment that was

23   communicated to Mr. Roth prior to, other

24   than the dollar amount and name that we

25   made the investment into.



1

2          Q.    You didn't speak with him about

3     any of the financial information you've

4     reviewed in connection with the investment,

5     is that right?

6          A.    I did not -- no.

7          Q.    Anything else about the

8     company?  Did you speak with him before

9     making the investment?

10         A.    No.

11         Q.    Is he your accountant, as well?

12         A.    He is.

13         Q.    I think -- I asked you a few

14    moments ago whether any questions or issues

15    stood out from the financial information

16    you were reviewing before you made the

17    investment, and I'm just trying to

18    paraphrase here.  I believe you said the

19    one that stood out was whether George and

20    Joe believed in the projections that were

21    being conveyed to you.

22                Did I get that accurately,

23    Mr. Salerno?

24         A.    My concern was whether or not

25    they were reasonable projections, and they



Page 194

1

2    -- and they were reasonable and truthful,

3    yes.

4        Q.    And they told you, in

5    substance, they believed they were

6    reasonable projections?

7        A.    Yes.

8        Q.    And you understood they could

9    not make any predictions or guarantees

10   because this was an extremely high risk

11   venture.  Is that a fair statement?

12       A.    That's a fair statement.

13       Q.    Is there any other subject

14   matter or concern or issue that you recall

15   from reviewing those financial statements

16   that you talked about before making your

17   investment?

18       A.    No.  Not as I sit here today.

19       Q.    Did you convey to Sport-BLX

20   that you would be the investor in

21   Sport-BLX?

22       A.    Me, as a person?  Or me, as an

23   investor?  I made it clear to them that I

24   was investing in Sport-BLX.

25       Q.    As -- so that Michael Salerno


MAGNA
LEGAL SERVICES

Page 195

1

2  would be the investor in Sport-BLX, is that

3  what you made clear to them?

4      A.    I also told them that I would

5  be doing it through Cypress.

6      Q.    When did you tell -- who did

7  you tell that to?

8      A.    George Hall, Joe De Perio, Mike

9  Staisil, Henry Sullivan.

10      Q.    When did you tell them that?

11      A.    The first reference was at

12  George Hall's house, when I told him that I

13  had a company that I invest through, which

14  is Cypress.

15      Q.    Were you asked any questions

16  about what Cypress was and who else

17  invested in Cypress?

18      A.    No.

19      Q.    Any other times you can recall

20  saying that you were going to invest

21  through Cypress?

22      A.    It was in regular conversation,

23  communication, if it came up.  It wasn't an

24  agenda item.

25          MR. SACK:  Let's go to February



1

2          1 e-mail, Joe.

3          Q.    Mr. Salerno, this is an e-mail

4     from Joe De Perio to you, CCing others, on

5     February 1, 2019.  You can take a look at

6     it.  And there are several attachments.

7     They're the two stock purchase agreements

8     and a side letter and a cover e-mail, as I

9     mentioned.

10               I'm really only going to ask a

11    few questions about this.  If you really --

12    if you need to look at the documents, I'm

13    not going to deprive you of that

14    opportunity.  But I really only have a few

15    questions.

16               If you take a look at the two

17    stock purchase agreements and the side

18    letter, I think you could see in the very

19    first paragraph they identify the purchaser

20    as Michael M. Salerno, and then in the side

21    letter, it also identifies -- it's an

22    agreement among you and others.  You're not

23    referred to as purchaser, but it's a

24    stockholder agreement among you and others.

25    You, being Michael M Salerno.



1

2          So when you got this agreement,

3    did you see that it was mistaken, that it

4    should say Cypress?

5          A.    At some point I noticed it and

6    I let everyone know.

7          Q.    So as of February 1, you knew

8    you were investing through Cypress, is that

9    right?

10         A.    Yes.

11         Q.    Did you -- was Cypress an

12   accredited investor as of February 1?

13         A.    Yes, to my knowledge.

14         Q.    How much money is needed to be

15   an accredited investor for an entity like

16   Cypress?

17         A.    I think there's multiple ways

18   for it to be an accredited investor.

19         Q.    There are.  Can you name any of

20   them?

21         A.    I'll rely on my counsel to

22   guide me here, our RIA counsel.

23         Q.    You don't know what any of the

24   requirements are, as you're sitting here

25   now, for an entity to invest as an



Page 198

1

2    accredited investor?

3        A.    I believe I remember reading

4    that one of the many ways to be an

5    accredited investor is to have more than 5

6    million dollars -- I'm sorry.  No.  That's

7    wrong.  5 million dollars of assets.

8        Q.    So I'm going to represent to

9    you, based on the Cypress document that was

10   produced by your counsel, that as of

11   February 4, Cypress had 4.355 million

12   dollars.  So was it an accredited investor

13   at that time?

14       A.    Yes.

15       Q.    Why?

16       A.    From -- one of the other

17   reasons -- and also -- what are you looking

18   at?  Are you looking at the cash holdings

19   or are you looking also at the balance

20   sheet?

21       Q.    Why don't I show you.  This was

22   produced by your counsel.  Let's take a

23   look at that document.

24            MR. SACK:  This will be now

25       Cypress Exhibit 15 -- 17, Salerno.



Page 199

1

2         A.     I'm sorry.  I can't read this.
3    Look at the size of that -- I don't know if
4    you can read that.  Can you read that?
5         Q.     If I look at it very closely, I
6    can?
7         A.     Can I see yours instead?
8         Q.     Sure.  We can share this one.
9                MR. PEARLSON:  Can the rest of
10          us get the exhibit first.
11               THE WITNESS:  Good luck.
12        Q.     So what this document shows,
13   Mr. Salerno, is --
14               MR. PEARLSON:  What page are
15          you on, John?  We have two pages.
16               MR. SACK:  It's combined.  It's
17          3456 to 57.
18               MR. PEARLSON:  It's on one
19          sheet in the exhibit you're showing
20          him?
21               MR. SACK:  Yes.  I pasted them
22          together.
23               MR. SPIRO:  This is how you
24          produced it.  So don't look at us.
25               MR. PEARLSON:  I'm not saying



Page 200

```
 1
 2          anything, other than I just want to
 3          be clear that we're all on the same
 4          page.
 5     Q.    I will represent to you that I
 6  did the math and checked the math and that
 7  as of February 4th, the reported
 8  investments in this document were 4.35
 9  million dollars, and as of February 19, it
10  became 5.4 million dollars.
11          So I'll just simply ask if you
12  know, was Cypress an accredited investor as
13  of February 1, when you were getting these
14  draft documents from Mr. De Perio?
15     A.    Yes, I believe it was.
16     Q.    Based on what?  What made it an
17  accredited investor?
18          MR. PEARLSON:  Objection.
19       Calls for a legal conclusion.
20          You can answer.
21     Q.    I'm asking for your
22  understanding, Mr. Salerno, as the general
23  partner of this fund.
24     A.    Can we start with, first, this
25  is a deposit log.  This is not a balance
```



```
 1
 2    sheet.   This only shows the cash that has
 3    been received.   It does not show the
 4    accounts receivable of the investors that
 5    monies came in afterwards.   So the balance
 6    sheet would have -- if you're looking for
 7    them to be over 5 million, if you added the
 8    accounts receivable, then it would be over
 9    5 million.   This is only a deposit log.
10         Q.    You had people -- there were
11    accounts receivable because investors had
12    committed to investing by then?
13         A.    That's correct.
14         Q.    So your best understanding is
15    that as of February 1, Cypress was
16    accredited, fully qualified to invest in
17    Sport-BLX, and that you had made the
18    decision that it would invest in Sport-BLX,
19    is that correct?
20         A.    That it would?
21         Q.    Yes.
22         A.    Yes.
23         Q.    And so when you got these
24    documents from Mr. De Perio, did you notice
25    the mistake, that it said Michael Salerno,
```



Page 202

1

2  purchaser, in both stock purchase

3  agreements and referred to Michael Salerno

4  in the side letter?

5         MR. PEARLSON:  Objection to

6      form.

7      A.    At some point I did.  When I

8  first got the documents, I just flipped

9  them over to counsel.  And candidly, I

10 really never read the first paragraph

11 because that's stuff that's not that

12 important.  It's the terms, to me, that I

13 need to make sure is right.  And the names

14 and the Delaware and the New Jersey, those

15 things, that's easily always corrected.

16     Q.    Were you involved in

17 negotiating -- withdrawn.

18         Were you involved in reviewing

19 the terms of these agreements and proposing

20 changes and additions?

21     A.    With counsel, yes.

22     Q.    What was your -- how would you

23 characterize your involvement?

24     A.    Counsel reviewed it, counsel

25 made recommendations.  I would take those



Page 203

```
 1
 2   recommendations, and then I would forward
 3   them on to Mr. De Perio -- how do I say it?
 4   De Perio.  Mr. De Perio.
 5        Q.    And there was a series of
 6   iterations of this document, is that right?
 7   Of these documents, excuse me.
 8        A.    Yes.
 9        Q.    So you, after receiving the
10   document on February 1, did you convey to
11   Mr. De Perio or anyone else, or did your
12   lawyer convey to Mr. De Perio or anyone
13   else, that the identity of the purchaser
14   should be different?
15        A.    Yes, I'm sure we did at some
16   point, because the documents were
17   corrected.
18        Q.    Let's look at another version
19   of these documents, February 6.  By the
20   way, did your lawyer know who the investor
21   was going to be?
22        A.    Sure.
23        Q.    Through this period, as of
24   February 1, correct?
25        A.    I don't --
```



Page 204

```
 1
 2            MR. PEARLSON:  Objection.  I
 3        don't want you going into what your
 4        lawyer knew and didn't know based on
 5        conversations you had with your
 6        lawyer.
 7        Q.    Let me ask you this, and I'm
 8   not asking for the substance.  Did you give
 9   your lawyer all material information about
10   this investment so that he could propose
11   changes or additions to the agreements?
12            MR. PEARLSON:  Objection to
13        form.
14        A.    My concern is what you define
15   as "material."
16        Q.    Do you think the owner, the
17   purchaser of the stock, and the party to
18   the side letter is a material term?
19        A.    No.  Not really.
20        Q.    Why not?
21        A.    Because multiple -- that's
22   really not a very relevant point, whether
23   it be Michael Salerno or Cypress or NPPG
24   Holdings or XYZ.  To me, that's really
25   irrelevant.
```



Page 205

1

2      Q.    Wouldn't it be material to

3   Sport-BLX?

4      A.    If it was, they should have

5   asked me.

6      Q.    Well, the document said Michael

7   Salerno, and you didn't correct it until

8   the very last minute.  Weren't you

9   conveying to them that you were the

10  individual investor?

11           MR. PEARLSON:    Objection to

12      form.  Argumentative.

13      A.    No.  No.  I had already told

14  them that it was Cypress.  And even -- when

15  they knew it, they never asked me once.

16      Q.    Let's take a look at the

17  February 6 documents.  These are documents

18  that Joe De Perio sent to you after a round

19  of edits suggested by you and your lawyer.

20  And do you see here that the documents

21  still list you as the purchaser and the

22  party to the side agreement?

23      A.    This looks like the same

24  document, the same e-mail.

25      Q.    Maybe we're mixing these up.



1

2          MR. SACK:  Joe, could you come

3      around for a second?  Just make sure

4      Mr. Salerno only has the February --

5      A.    What I'm saying is it's --

6  yeah, it's the same e-mail, it's just one

7  more string of it.

8      Q.    Correct.  It's just the top

9  e-mail indicates that the document's been

10  turned, based on edits, that you and your

11  attorney have given to others, to Mr. De

12  Perio, do you see that?

13     A.    No.

14     Q.    This is a top e-mail from Joe

15  to you.  "Mike, as per the e-mail exchange,

16  please see a revised set of docks enclosed.

17  I added the red lines of what changed.

18  Looking forward to our meeting tomorrow."

19          Do you know, why didn't -- any

20  understanding of why neither you nor your

21  lawyer conveyed in this first turn of the

22  document why the purchaser should be

23  Cypress Holdings versus Mike Salerno?

24          MR. PEARLSON:  Again, I just

25      want to caution the witness not to



Page 207

 1
 2          reveal conversations with counsel.
 3               If you can answer it other than
 4          that, go ahead.
 5      A.    I don't recall.  It wasn't
 6  important to us.  It wasn't important to
 7  Sport-BLX, Joe De Perio or George Hall.
 8      Q.    Mr. Salerno, the documents
 9  ended up getting signed and finalized on
10  February 28th.  So between February 6th,
11  the version and the e-mail you just saw,
12  and February 28th, did you have
13  conversations and e-mails about the
14  versions of the document with your lawyer
15  and with Mr. De Perio?
16      A.    Yes.
17      Q.    And what did these
18  conversations concern?
19      A.    Changes to the terms.
20      Q.    Any terms come to mind that
21  were of significance to you?
22      A.    No, I don't recall any that pop
23  out.
24      Q.    I'm going to show you a set of
25  e-mails.  The set of e-mails that you



Page 208

 1

 2   forwarded to Joe De Perio on February 19

 3   has a back and forth between you and your

 4   lawyer, Mr. Forlenza, and I want to direct

 5   your attention to an exchange there.

 6              Take a look at the chain, but I

 7   really want to direct you to -- let me

 8   identify, Exhibit 19 is Sport-BLX 148275 to

 9   148285.  And I'm going to direct you to an

10   e-mail 148277.  It's an e-mail from Philip

11   Forlenza to Mike Salerno, February 12th at

12   10:41 a.m.

13              MR. SACK:  We have this, Ross,

14         because it was forwarded during the

15         negotiations to Mr. De Perio.

16         Q.    Do you see there, Mr. Salerno,

17   where your lawyer asks, number 1, why are

18   there two stock purchase agreements with

19   different pricing?  Do you see that?

20         A.    Yeah.

21         Q.    And you write, "I am investing

22   500K at 9.5 million and 500K at 25 million

23   with downside protection, et cetera."  You

24   write to your own lawyer that, "I am

25   investing."  You don't say anything about



Page 209

```
 1
 2    Cypress there, do you?
 3         A.    When, in this context, I am
 4    synonymous with Cypress.
 5         Q.    Really?
 6         A.    Really.
 7         Q.    That's what Dennis Nathan
 8    thinks, "I" is synonymous with Cypress?
 9         A.    I'm sorry.  What about Dennis
10    Nathan?
11         Q.    He's one of the limited
12    partners.  Do the limited partners think,
13    "I, Michael Salerno," is synonymous with
14    Cypress?
15         A.    This is an e-mail with respect
16    to my conversation with Philip Forlenza.
17    He is who I'm talking to, not Dennis
18    Nathan.
19         Q.    I understand.  But you said "I
20    am synonymous with Cypress"?
21         A.    I believe I said -- can you
22    read it back?  I think I said in the
23    context of this e-mail.
24         Q.    Whatever.
25               You didn't say Cypress is
```



Page 210

```
 1
 2    investing.  You said here "I am investing,"
 3    correct?
 4              MR. PEARLSON:  Objection.  The
 5        document says what it says.
 6        Q.    You're saying Mr. Forlenza knew
 7    it was Cypress by this time?
 8        A.    I don't exactly know the
 9    timeline, but I would believe, yes.
10        Q.    Next page.
11        A.    Forward or back?
12        Q.    Forward.  It's 148278.  There's
13    a question number 4, "Do you want to
14    request tagalong rights -- do you want to
15    request tagalong rights so that you can
16    participate in a sale if the founders
17    decide to sell their shares," and you wrote
18    "Yes," correct?
19        A.    Yeah.  That's what it says.
20        Q.    And so you asked -- it was at
21    your lawyer's request -- at your lawyer's
22    suggestion and your agreement that a
23    tagalong rights provision was put into the
24    stock purchase agreements, is that correct?
25        A.    From my understanding, tagalong
```



Page 211

1

2    rights are in the stock purchase agreement,

3    yes.

4        Q.    And what was the initiative for

5    putting tagalong rights into the stock

6    purchase agreement?

7            MR. PEARLSON:  I just want to

8        caution the witness again, to the

9        extent you're getting into legal

10        advice with your counsel, if there's

11        another reason independent of that,

12        you can go ahead and answer.

13            MR. SACK:  The e-mail is right

14        here.  To that extent, there's been a

15        waiver by sending it to Mr. De Perio.

16        I'm just asking about these

17        communications.

18            MR. PEARLSON:  No.  No.  That's

19        not a waiver of attorney/client

20        privilege by him, just generally

21        saying do you want to request it.

22        The substance of the advice is

23        privileged.

24            MR. SACK:  I'll try to rephrase

25        the question.


MAGNA
LEGAL SERVICES

1

2      Q.    Did you, Mr. -- what were

3   tagalong rights in the versions of the

4   agreement that had been provided to you,

5   Mr. Salerno?

6      A.    I don't recall.  The tagalong

7   rights are in the agreement.

8      Q.    And were they at your request

9   that they were added to the agreement?

10     A.    I don't recall.

11     Q.    Do you recall whether it was

12  you or your lawyer who suggested the

13  language for the tagalong rights that went

14  into the agreement?

15     A.    I don't.

16     Q.    You were comfortable with the

17  tagalong rights that made their way into

18  the agreement?

19     A.    In retrospect, no.

20     Q.    I didn't -- no, I didn't ask

21  you in retrospect, Mr. Salerno.  In -- when

22  the agreement was signed on February 28th,

23  were you comfortable with the tagalong

24  rights that were in the stock purchase

25  agreement?


MAGNA
LEGAL SERVICES

1

2      A.    When I signed it, I was

3   comfortable with the documents, that that

4   would include everything in it, including

5   the tagalong rights, yes.

6      Q.    And did the tagalong rights

7   come into the document at your request?

8            MR. PEARLSON:  Asked and

9       answered.

10      A.    I don't recall.

11      Q.    Did you have the opportunity to

12   revise and edit the tagalong rights

13   provision?

14      A.    That would have been subject to

15   negotiation, I guess.

16      Q.    Was it negotiated or did you

17   get the language you wanted in the

18   agreement?

19      A.    I don't recall how we ended up

20   with the final language.

21      Q.    Did George or Joe suggest that

22   you have tagalong rights?

23      A.    I don't recall.

24      Q.    They may have, you're saying?

25   You're saying it may have been at their



Page 214

1
2    suggestion that you have tagalong rights?
3         A.    Actually, let me back up.  At
4    what point in time?  Because George
5    actually did specifically state that I
6    would have tagalong rights and every other
7    shareholder would, as well.
8         Q.    We're talking about this
9    agreement in February of 2019.
10        A.    Okay.
11        Q.    We're talking about the
12   negotiation of the agreement leading up to
13   February 28th.  Did George and Joe make the
14   suggestion that you have tagalong rights?
15        A.    I don't recall in February, in
16   this agreement, who initiated the tagalong
17   right clause.
18        Q.    It may have been George and
19   Joe, is what you're saying?
20        A.    It may have been.
21        Q.    Let's go to the February 28th
22   e-mail.  So I'm going to ask you questions
23   about the top e-mail.  And that's dated
24   February 28, 2019 at 11:09 a.m. from Joe De
25   Perio to Michael Salerno, copy George Hall.



1

2    And that e-mail says, "Mike, enclosed

3    reflects the red lines and what should be

4    execution versions based on an acceptance

5    of your two outstanding points below."  And

6    then these e-mails talk about certain

7    points that you've raised.

8              What I'd like to do is turn

9    your attention to one of the stock purchase

10    agreements.  You would agree, Mr. Salerno,

11    that the stock purchase agreements are

12    identical except for the number of shares

13    and the share price?

14        A.      They should be.  Number of

15    shares, share price, yes.

16        Q.      And I'll direct you to -- let's

17    look at Sport-BLX 16300, tagalong rights,

18    that is the bottom of the page, paragraph

19    4, subpart H.

20        A.      What page?  I'm sorry.

21        Q.      16300.  Before we go there,

22    let's go to the front of the document.  And

23    again, at 11:09 a.m., the version of the

24    document still has Michael M. Salerno as

25    the purchaser, and the side agreement still



Page 216

1

2    lists Michael M. Salerno as one of the

3    parties to the agreement.

4              And so now I'll have you turn

5    to the tagalong rights at 16 -- 16300.

6              And were those the tagalong

7    rights -- take a look at that.  Is that

8    what you negotiated and agreed upon with

9    Sport-BLX?

10             MR. PEARLSON:  John, you're

11        asking whether this is what appeared

12        in the execution version?

13             MR. SACK:  I'm just asking for

14        the substance.  Is this what

15        Mr. Salerno negotiated -- it did, it

16        didn't change.  I'm just asking for

17        whether this was what he agreed to in

18        the stock purchase agreements.

19        A.    It looks like it is.  I'm not a

20    hundred percent certain, but if you're

21    saying this is the same language that's in

22    the execution agreement, then it is.

23        Q.    And so you would agree that on

24    this tagalong rights provision, that if the

25    founders, George Hall and Joe De Perio,



```
 1
 2   sold common stock, it represented less than
 3   50 percent of the aggregate number of
 4   shares outstanding, then you would not have
 5   these tagalong rights, correct?
 6        A.    Sorry.  Say that one more time.
 7              MR. SACK:  Why don't we read
 8         that back, Hindy.
 9              (Whereupon, a portion of the
10         testimony was read back.)
11        A.    I would agree in this
12   agreement, in this context, that's the
13   definition that's used here, yes.
14        Q.    Well, it's not just the
15   definition, it defines the rights of the
16   parties, correct?  And that based on what I
17   said, that you would not have tagalong
18   rights -- based on the circumstances I just
19   said in the question, you would not have
20   tagalong rights, correct?
21        A.    Only at this time.
22        Q.    Under this contract that you
23   signed, correct?
24        A.    But it was superseded after the
25   contract was signed.
```



Page 218

1

2          Q.      It was superseded when?

3          A.      In, I believe it was December

4    2019.

5          Q.      How was it superseded?

6          A.      George Hall specifically stated

7    that I would get tagalong rights, along

8    with the other shareholders, if he sold any

9    stock.  And it's on the recording, which --

10         Q.      And he said you would have

11   tagalong rights without any conditions,

12   without any percentage or other conditions?

13         A.      He did not stipulate any

14   conditions would be relevant.

15         Q.      I'm asking you now under this

16   agreement.  We'll deal with that,

17   Mr. Salerno, at another time.  But I'm

18   asking you under this agreement.

19         A.      Yes, I agree.  In this

20   definition, at this point in time, I would

21   agree with that.

22         Q.      So now, as of -- you've now

23   received -- I've shown you, and you've

24   received, a series of iterations of these

25   stock purchase agreements and side letters



Page 219

1

2  from Mr. De Perio that continue to list

3  Michael Salerno as the purchaser and

4  Michael Salerno as the party to the side

5  agreement.

6              Is it fair to say that up

7  through 11:09 a.m. on February 28th,

8  neither you nor your attorney have done

9  anything to reflect in these agreements

10  that you, individually, were not the

11  purchaser, but that Cypress Holdings was,

12  is that a fair statement?

13      A.    That would be fair to these

14  agreements only, yes.

15      Q.    Now, in our complaint against

16  you and Cypress, our complaint had the

17  following allegation, "Initial drafts and

18  Salerno's markups of the investment

19  agreements consistently reflected and

20  reiterated that fact identifying the

21  purchaser as Michael Salerno."

22              And your answer said,

23  "Defendants deny the allegations contained

24  in paragraph 28 of the amended complaint."

25              What was your basis for denying



Page 220

1
2    the allegation that I read to you?
3        A.    I would have to speak to
4    counsel regarding that.
5        Q.    Did you look at the answer
6    before it went in?
7        A.    I relied on my counsel.
8        Q.    Let me show you the documents.
9              So this is Exhibit 3, the
10    Sport-BLX first amended complaint.
11    Paragraph 28, look at 28, and please read
12    paragraph 28.
13        A.    "Defendants deny the
14    allegations contained in paragraph 28" --
15        Q.    No, no.  I'm sorry.  Wrong
16    document.  I'm sorry.  I want you to look
17    at what our allegation is first.
18              MR. SPIRO:  It's Exhibit 3 in
19        the pile.
20        Q.    Amended complaint.  Here we go.
21    Keep that open, Mr. Salerno.  And then it's
22    that one.  28, Salerno received draft.
23    I'll read it aloud.
24              "Salerno received drafts of the
25    investment agreements in early February



Page 221

```
 1
 2    2019, all of which included his name in the
 3    heading, the body of the agreements and the
 4    signature line.  He then extensively
 5    negotiated these agreements with Sport-BLX.
 6    Throughout over four weeks of negotiations,
 7    Salerno repeatedly represented that he
 8    would be investing in Sport-BLX
 9    individually.  Initial drafts and Salerno's
10    markups of the investment agreements
11    consistently reflected and reiterated that
12    fact, identifying the purchaser as Michael
13    M. Salerno."
14              What's incorrect about that
15    statement, that paragraph?
16        A.    When -- when this statement
17    says, "throughout over four weeks of
18    negotiations, Salerno repeatedly
19    represented that he would be investing in
20    Sport-BLX individually," that is not
21    accurate.  I did not represent at any time
22    I was going to be making an investment
23    individually.
24        Q.    But when you were getting
25    documents that had you as the individual
```



Page 222

```
 1
 2   investor, and you didn't change that
 3   through multiple iterations, weren't you
 4   indicating to Joe De Perio and Sport-BLX
 5   and George Hall that you were going to be
 6   the investor?
 7              MR. PEARLSON:  Objection to
 8        form.
 9              Go ahead.  You can answer.
10        A.    I agree with the next sentence,
11   "The initial drafts and Salerno's markups
12   of the investment agreements consistently
13   reflected and reiterated the fact,
14   identifying the purchaser as Michael M.
15   Salerno."  But I do not agree with the
16   sentence prior to that.
17        Q.    Okay.  So let's look at the
18   first sentence of paragraph 28.  "Salerno
19   received drafts of the investment
20   agreements in early February 2019, all of
21   which included his name in the heading, the
22   body of the agreements, and the signature
23   line."  Do you agree with that fact?
24        A.    I know it was in the heading.
25   I don't know if it was in the signature
```



Page 223

1

2    line, as well.

3        Q.    I'll represent to you that it

4    was consistently Michael M. Salerno in the

5    signature line.

6        A.    Okay.

7        Q.    So you agree with -- based on

8    my representing what the document says, you

9    agree the first sentence is accurate?

10       A.    Yes.

11       Q.    Second sentence, "He then

12   extensively negotiated these agreements

13   with Sport-BLX."

14       A.    I wouldn't use the word

15   "extensively."   There was negotiations,

16   yes.

17       Q.    And then the third sentence you

18   disagree with, and the fourth sentence you

19   agree with?

20       A.    Correct.

21       Q.    So do you know how it came to

22   be that the answer filed in this case says,

23   "Defendants deny the allegations contained

24   in paragraph 28 of the amended complaint"?

25           MR. PEARLSON:  Again, I would



Page 224

1

2      caution the witness just on

3      reflecting conversations or repeating

4      conversations with counsel.

5      A.    It would be based upon my

6  conversations with counsel.  But clearly,

7  it has something to do with the fact that

8  the fourth sentence is incorrect.

9      Q.    Did you review the answers

10  before they were filed?

11      A.    Not thoroughly.

12          MR. SACK:  Why don't we take a

13      break.

14          VIDEOGRAPHER:  Off the record,

15      3:57.

16          (Whereupon, a short break was

17      taken at this time.)

18          VIDEOGRAPHER:  On the record,

19      3:44.

20      Q.    So Mr. Salerno, the last

21  document we looked at was Mr. De Perio

22  sending you the latest version of the

23  document at 11:09 a.m. on February 28th.

24  And at 12:27, less than an hour and a half

25  later, you wrote to Mr. De Perio saying



Page 225

1
2      that you "saw my attorney didn't update
3      agreements with my holding company name."
4              Do you recall making that
5      change in the documents within an hour and
6      a half of the version that Mr. De Perio
7      sent at 11:09?
8          A.    I don't recall particularly
9      making that change.  I know the change did
10     get done.
11         Q.    Do you recall that the change
12     was made at the last minute?
13         A.    No.
14             MR. PEARLSON:  Objection to
15          form.  You got to let me get my
16          objection.
17             THE WITNESS:  Sorry.
18         Q.    So why don't we look at what
19     you did and what you wrote.
20             MR. SACK:  Thank you, Joe.
21         Q.    And I'm directing you to the
22     top e-mail.  Why don't we -- why don't we
23     go back into the document some so you can
24     see the chain, Mr. Salerno.
25             Salerno Exhibit 22 is



```
 1
 2   Sport-BLX's document 18535 to 18539.  And
 3   the -- on the third page, at 537, there's
 4   Mr. De Perio's e-mail of 11:09.  "Mike,
 5   enclosed reflects the red lines and what
 6   should be execution versions based on
 7   acceptance of your two outstanding points
 8   below."  Do you see that?
 9        A.    I do.
10        Q.    And then you respond at 12:10,
11   this is at 536, where you ask some
12   clarifying questions about the
13   capitalization chart.  Do you see that?
14        A.    I do.
15        Q.    And then at 12:25, Mr. De Perio
16   provides information in response to your
17   questions about the capitalization chart.
18   Do you see that?
19        A.    Yes.
20        Q.    So now if we look at the front
21   page, 18535, we have your e-mail at 12:27,
22   which is basically the last e-mail before
23   these documents are executed you wrote, "I
24   saw my attorney didn't update agreements
25   with my holding company name.  I will do
```



1

2    that and send over signed documents now."

3              Is it your position,

4    Mr. Salerno, that it's a complete

5    coincidence that you talked about updating

6    the agreement with your holding company

7    after what Mr. De Perio sent you at 11:09

8    as the execution version?  Is that a

9    complete coincidence?

10       A.    A coincidence with what?

11       Q.    That it came then, after he

12   sent you the final version of the document?

13       A.    I don't know if it was a

14   coincidence.  It was now being ready to be

15   signed and it needed to be a hundred

16   percent accurate.

17       Q.    And so it's just an accident

18   that you corrected that aspect of the

19   document an hour or so after he -- Mr. De

20   Perio sent you the final negotiated version

21   of the document?

22              MR. PEARLSON:  Objection.

23       A.    I don't see the context as

24   being coincidental or correcting errors.

25   Within an hour, like you said, we had final



```
 1
 2   documentation and I saw that it wasn't a
 3   right name of the purchasing entity, so it
 4   was corrected.
 5        Q.    Mr. Salerno, you just said a
 6   few moments ago you never look at the
 7   opening paragraph of these agreements
 8   because they're not important to you.  So
 9   now you looked at the opening paragraph of
10   the agreement and saw the wrong party?
11        A.    Yeah.  Because I was signing
12   it.
13        Q.    But you said never before.  You
14   said I never look at the opening paragraph
15   of an agreement?
16        A.    I don't recall me saying
17   exactly never.  If I said never, what I
18   intended to say was that it's not
19   important.  So never before I have to
20   actually sign it, would I look at that
21   paragraph.
22        Q.    You're saying it wasn't
23   important to you, Mr. Salerno?
24        A.    That's correct.
25        Q.    And are you also saying it
```



Page 229

```
 1
 2   wasn't important to Sport-BLX to know who
 3   was actually investing in the company?
 4              MR. PEARLSON:  Objection.
 5       A.     In my opinion, it wasn't,
 6   because they didn't ask me for any
 7   information after this.   They could have
 8   said, hold on, wait a second, who's
 9   Cypress.   They never did because they
10   already knew because I had told them prior.
11       Q.     I see.   It wasn't because you
12   had led them to think you were investing
13   individually and then just called it my
14   holding company?   You don't think that had
15   anything to do with their understanding of
16   who was investing in the company?
17       A.     No.
18       Q.     You blaming this on your
19   attorney for not updating the document,
20   Mr. Salerno?
21       A.     I'm not blaming anyone.   I'm
22   just stating that the document needs to be
23   updated.
24       Q.     Well, you wrote "My attorney
25   didn't update the agreements."   Would it be
```



Page 230

```
 1
 2   fair to say you didn't update the
 3   agreements either?
 4        A.    It would be fair to say that,
 5   yes, the agreements needed to be updated,
 6   that both my attorney and I both -- I'm
 7   sorry.  What happened?
 8             MR. PEARLSON:  Nothing.  You
 9        can keep going.
10        A.   Can you repeat the question.
11             MR. SACK:  Yes.  Can we have
12        that back, Hindy.
13             (Whereupon, a portion of the
14        testimony was read back.)
15             THE WITNESS:  Thank you.
16        A.   The agreement needed to be
17   updated.  At this point, neither my
18   attorney nor I updated it.
19        Q.    You could have updated this --
20   the draft beginning as early as February 1,
21   correct?
22        A.    Yes, that's possible.
23        Q.    And the document went through
24   -- documents went through multiple
25   iterations and negotiations between
```



Page 231

```
 1
 2   February 1 and February 28, correct?
 3        A.    Correct.
 4        Q.    And you chose to insert Cypress
 5   as the owner at the very last minute of
 6   this negotiation, isn't that correct?
 7              MR. PEARLSON:  Objection.
 8        A.    I would disagree with that.
 9        Q.    You didn't choose to insert
10   Cypress within an hour and a half of
11   getting the final version of the document,
12   isn't that a simple fact?  That's when you
13   chose to correct Cypress --
14              MR. PEARLSON:  Objection.
15        Q.    -- as the investor?
16              MR. PEARLSON:  Objection.
17              You can answer.
18        A.    No.  There were multiple
19   execution versions.  I think, when you look
20   back at everything you gave me going back
21   to February 1, it also says it's an
22   execution version.  So --
23        Q.    Let's hear my question -- let
24   me rephrase my question.
25              My question was, you could have
```



Page 232

1

2    changed Michael Salerno to Cypress on any

3    day between February 1 and February 28

4    through multiple negotiations of this

5    document, and you chose to do it an hour

6    and a half after you got the last version

7    of the document, is that correct?

8                  MR. PEARLSON:  Objection.

9                  Go ahead.

10        A.    I updated it prior to me

11   signing it.  In the same context, that

12   never did they say to me, hey, Michael,

13   shouldn't this be Cypress?  Because they

14   knew about Cypress prior.

15        Q.    In what sense was Cypress "my

16   company"?  When you say "my holding

17   company," in what sense was it "mine"?

18        A.    I'm the managing partner.  I

19   was the first dollars in.  This -- from

20   going back to history, Cypress was my

21   company.  I let some of my buddies in, so

22   it started out at a barbecue, that they

23   wanted to be in an investment that I was

24   in, and I said the only way I'll do it is

25   if I control the decisions on it, and you



Page 233

```
 1
 2    guys can, you know, share in the goods and
 3    the bads of it.   So it was my Cypress.   And
 4    the same way that the Clinton opportunity
 5    fund is George Hall's fund.
 6         Q.    When you -- on February 28th,
 7    were you the majority owner of Cypress?
 8         A.    On February 28th?
 9         Q.    Of 2019.
10         A.    Probably not.
11         Q.    So you said it was yours, even
12    though you didn't own a majority of
13    Cypress?
14         A.    From an ownership standpoint,
15    what you're saying is correct.   I
16    controlled Cypress and I still do.
17         Q.    But "my holding company"
18    doesn't talk about who manages or controls
19    the company, does it?   It talks about
20    ownership.   "My holding company"?
21         A.    It doesn't say anything about
22    ownership.
23         Q.    What does "my" refer to there?
24         A.    My holding company.   It's where
25    I hold assets.
```



1

2        Q.    But it's where other people

3   hold assets, as well, correct?

4        A.    Yes.  In the same context that

5   Clinton Group has the opportunity fund,

6   which it is George Hall's.

7        Q.    We're not talking about the

8   Clinton opportunity fund.  We're talking

9   about Cypress.  Do you own stock in IBM,

10  Mr. Salerno, or a public company?

11       A.    IBM, no.

12       Q.    Do you own stock in a public

13  company?

14       A.    Yes.

15       Q.    Do you call it your holding

16  company because you have assets in that

17  company?

18       A.    I don't control that, no.  I

19  think the controlling aspect of this is

20  germane to why I consider that my holding

21  company.  I also think that from day one,

22  this was my company and I let my friends

23  join in it with me.

24       Q.    Then the accurate way to

25  describe this company is that it's an



Page 235

```
 1
 2    investment partnership that I manage and
 3    control.  Isn't that a far more accurate
 4    way of describing it to someone like
 5    Sport-BLX than "my holding company"?
 6         A.    In your opinion, that may be
 7    true.  In my opinion, I think I described
 8    it accurately.  Sport-BLX, George Hall, Joe
 9    De Perio, they all knew Cypress was my
10    holding company.
11         Q.    What did you tell them about
12    Cypress, specifically?
13              MR. PEARLSON:  Can we have a
14        timeframe, John?
15         Q.    I'm referring to -- the
16    timeframe is before February 28, 2019, what
17    did you tell Joe De Perio and George Hall
18    about what Cypress was?
19         A.    That I have an investment
20    company, a holding company.  Mike Staisil
21    knew it, as well, actually, because he
22    brought mutual investment opportunities to
23    me for Cypress.  That's what I told them.
24         Q.    And you told them you had
25    multiple limited partners in Cypress?
```



Page 236

1

2          A.      I don't recall I told them
3    there was partners or not.
4          Q.      Wasn't that relevant, whether
5    Sport-BLX was taking a million dollar
6    investment from you or whether it was
7    taking it from multiple individuals besides
8    yourself?
9          A.      I don't think so.
10         Q.      Why not?
11         A.      Because I don't think it's
12   relevant.
13         Q.      But what position -- why isn't
14   it relevant to a high risk startup company
15   to know who its investors are?
16         A.      Because they didn't ask the
17   question.
18         Q.      No, no.    I'm asking you why
19   isn't it relevant.    Not whether they asked
20   the question or not.    Why wasn't it
21   relevant?
22         A.      Relevant to Sport-BLX?
23         Q.      Correct.
24         A.      Because they didn't ask the
25   question.    If it was relevant, they would



Page 237

1

2  have asked.

3      Q.     That's the only reason you

4  could give, while you're sitting here, that

5  if they didn't ask the question, it must

6  not have been relevant to them?

7      A.     That's what comes to mind right

8  now.  If you give me more time to think

9  about it --

10      Q.     But you didn't tell them you

11  had other investors other than yourself,

12  correct?

13      A.     The topic didn't come up.

14      Q.     Well, so then how would they

15  know to ask about other investors if you

16  represented it as your company and your

17  holding company?

18      A.     In the same context, again, as

19  when George Hall says, "I have the

20  opportunity fund," if I want to know who's

21  in it, I would ask him for it.  With

22  Cypress, it's a matter of if he wanted to

23  know if there were investors, I would have

24  been happy to tell him there were

25  investors.


MAGNA
LEGAL SERVICES

```
 1
 2       Q.    So you withheld from Mr. Hall
 3  and Mr. De Perio the fact that you had
 4  investors other than yourself, correct?
 5             MR. PEARLSON:  Objection.
 6       A.    No.
 7       Q.    Did you tell them you had
 8  investors other than yourself --
 9       A.    They did not ask.
10       Q.    -- in your company?
11             Did you tell them whether you
12  had investors, other than yourself, in
13  Cypress?
14       A.    At February, I do not recall if
15  I told them yes or no with regard to having
16  additional investors in Cypress.
17       Q.    You may have or you may not
18  have, is that what you're saying, or you're
19  saying you don't believe you told them that
20  you had investors, other than yourself, in
21  Cypress?
22       A.    I believe that if they asked me
23  the question if I had other investors, I
24  would have answered it, yes, I do.
25       Q.    Okay.  Did you tell them that
```



1

2   you had other investors, other than

3   yourself, in Cypress?

4        A.    On February --

5        Q.    On February 28th or earlier?

6        A.    I don't recall exactly.  If

7   they would have asked me, I would've

8   definitely told them.

9        Q.    When you say "I don't recall

10  exactly," are you saying you may have told

11  them you had other investors or may not

12  have told them, and you just don't

13  remember?

14       A.    Yes.  I may have told them.

15  Michael Staisil may have told them.

16  Michael Staisil definitely knew I had other

17  investors in it.  He had met them.  And I

18  don't recall if they asked me specifically

19  or not.

20       Q.    You don't know what Michael

21  Staisil told to George Hall and Joe De

22  Perio, is that correct?

23       A.    I don't know if he told them

24  that or not.

25       Q.    You don't know whether he told



Page 240

1

2    them at all, correct?

3         A.    I don't.

4         Q.    So if you didn't tell George

5    Hall and Joe De Perio -- withdrawn.

6              Did you tell George Hall and

7    Joe De Perio that Cypress was your holding

8    company?

9         A.    Yes.

10        Q.    If you didn't tell them that

11   this company had investors other than

12   yourself, how were George Hall and Joe De

13   Perio supposed to know to ask?

14        A.    In my opinion, if it's an

15   important question, there would be a

16   questionnaire with regard to the ownership

17   of the investors.  There was no investor

18   questionnaire here, which is quite common

19   with investments like this.  So I don't

20   believe that it was important to them.

21        Q.    So you're saying if there was

22   no questionnaire, you thought it was

23   acceptable to withhold from them that there

24   were investors other than yourself?

25              MR. PEARLSON:  Objection to



Page 241

1
2    form.
3         A.    I did not withhold anything
4    because I was not asked anything.
5         Q.    Withhold means not saying,
6    Mr. Salerno.  Did you not say to them "I
7    have investors other than myself in my
8    holding company"?
9              MR. PEARLSON:  I'm just going
10             to object to the beginning of the
11             question.  You're getting very
12             argumentative.  Withhold means what
13             it means.
14             Go ahead, you can answer.
15        A.    I did not withhold anything
16    from them.
17        Q.    Did you tell them that you had
18    investors, other than yourself, in Cypress?
19             MR. PEARLSON:  Again, asked and
20             answered.
21        A.    I don't -- I don't recall.  I
22    know Michael Staisil knew.  I believe that
23    he would have told them.  And I also know
24    if they asked me directly, I would have
25    answered affirmatively, yes, there are



Page 242

```
 1
 2    investors.  If they gave me a
 3    questionnaire, I would have filled it out,
 4    yes, I have other investors.
 5         Q.    So Mr. Salerno, when they asked
 6    you in August for the limited partners, why
 7    did you refuse -- if you were willing to
 8    say it in February, why did you refuse to
 9    say it in August?
10              MR. PEARLSON:  Objection to
11       form.
12       Q.    Why?
13       A.    You're not --
14              MR. PEARLSON:  Wait.  Wait.
15       Wait.  Wait.  Hold on a second.
16       First of all, no need to yell.
17       Second of all, I object.
18              You can answer the question if
19       you understand it.
20       Q.    You said you were willing to
21    say it in February, had you been asked who
22    the investors in Cypress were.  You were
23    asked in August who were the investors in
24    Cypress, and you refused.
25       A.    That is not what I said.
```



Page 243

```
 1
 2      Q.    You refused to provide it to
 3   Sport-BLX --
 4      A.    No.  What I said is that I
 5   would tell them there were investors.  I
 6   would not have told them who they are.
 7      Q.    You would have withheld from
 8   Sport-BLX who its beneficial owners were?
 9   A.     I didn't --
10           MR. PEARLSON:  Hold on.  Let me
11      get in my objection.
12           Objection to form.
13           Go ahead, you can answer.
14      A.    I would not have withheld
15   information and I did not withhold
16   information.
17      Q.    Did you just say that had you
18   been asked in February who the investors in
19   Cypress were, you would not have said who
20   they were?
21      A.    That's not what was said.  You
22   asked me -- and read it back, please,
23   because I believe what you said was would
24   you have told them there were investors.  I
25   would have told them there were investors.
```



 1
 2    I would not have given the names of the
 3    investors.
 4        Q.    So had you been asked in
 5    February were there other investors in
 6    Cypress, you would have said yes, correct?
 7        A.    Yes.
 8        Q.    And if they then said who are
 9    the other investors, what would your answer
10    have been?
11        A.    It's none of their business.
12        Q.    And don't you think it was the
13    business of Sport-BLX to know who was
14    signing onto a high risk business with a
15    complete risk of loss?
16        A.    No.    Because they had no
17    discretion over the investment decision to
18    do it or not do it.
19        Q.    Sport-BLX had complete
20    discretion to decide who its investors
21    were, correct?
22        A.    Any private entity has that --
23        Q.    Correct.  So wouldn't a company
24    like Sport-BLX want to know who is
25    investing in the company, and a founders



1

2   round?

3        A.    I can't speak to what Sport-BLX

4   would have thought was important, other

5   than that if it was important, they would

6   have asked me.  They would have had a

7   questionnaire for shareholders.

8        Q.    Don't you know it was important

9   because George Hall and Joe De Perio met

10  with you many times to get to know you and

11  make sure you understood the investment and

12  make sure you got to ask all the questions

13  you had?  Didn't they make it clear to you

14  they wanted to know who their investors

15  were?

16             MR. PEARLSON:  Objection to

17       form.

18             Go ahead.

19       A.    They did not know.  They did

20  not ask me who the investors of Cypress

21  were.

22       Q.    No, no.  Sport-BLX wanted to

23  know who the investors were in Sport-BLX,

24  isn't that right, didn't they convey that

25  to you based on all of the time they spent



Page 246

```
 1
 2   with you, personally?
 3        A.    No.
 4        Q.    Why did you think they spent so
 5   much time with you, personally?
 6        A.    They wanted to understand what
 7   I could bring to the table as a director
 8   and of benefit to Sport-BLX.
 9        Q.    And what could you bring to the
10   table of benefit to Sport-BLX?
11        A.    Experience in business, a
12   successful business for over 25 years,
13   money, relationships.
14        Q.    One of your limited partners in
15   Cypress is a felon, Dennis Nathan, correct?
16        A.    That's what's recently been
17   said, yes.
18        Q.    Did you know that in February
19   2019?
20        A.    No.
21        Q.    Don't you think it would have
22   been relevant to Sport-BLX to know if one
23   of its investors was a felon?
24        A.    I didn't know he was a felon.
25        Q.    And that's something Sport-BLX
```



1
2    couldn't know because you didn't tell them
3    about your limited partners, correct?
4              MR. PEARLSON:  Objection.
5         A.    What couldn't they have known?
6         Q.    They could have done due
7    diligence and research on the limited
8    partners?
9              MR. PEARLSON:  Objection to
10        form.
11             Go ahead.
12        A.    If they could have asked me a
13   question of who the investors were, then I
14   would have -- they would have had the
15   opportunity to know that I would not have
16   given them the names there, and they could
17   have said no, we're not going to take your
18   investment.  But they didn't do that
19   because it was not important to them.
20        Q.    It may also be, Mr. Salerno,
21   they didn't do that because you led them to
22   believe it was your money that was
23   investing in Cypress -- it was your money
24   in Cypress only, correct, Mr. Salerno?
25        A.    I can't speculate on that.



Page 248

```
 1
 2      Q.    Well, you're doing a lot of
 3   speculating about what was important or not
 4   important.
 5            MR. PEARLSON:  John -- John,
 6        can you ask a question?  Is that a
 7        question?
 8      Q.    Mr. Salerno, in January of 2019
 9   you filed a lawsuit along with other
10   limited partners in Cypress, is that right?
11      A.    No.
12      Q.    Against the Ebury fund, didn't
13   you and other limited partners in Cypress
14   file a lawsuit against the Ebury fund?
15      A.    I'm sorry.  I thought you asked
16   me if Cypress filed a lawsuit.  Sorry.
17   There was a lawsuit against Ebury funds.
18   Ebury funds, me and some of my friends
19   invested into a -- what would you call it?
20   A tax lien fund.  The tax lien fund started
21   having problems paying distributions.
22   We've looked into it.  There was
23   malfeasance, so we filed a lawsuit and it
24   was quickly settled and they paid us what
25   we were supposed to receive.
```



1

2      Q.    Were eight of the limited

3    partners in Cypress plaintiffs in that

4    litigation against the Ebury fund?

5              MR. PEARLSON:  Are you

6         including him?

7              MR. SACK:  I'm including Ice

8         Holdings.

9      A.    I don't recall exactly who they

10   were, if all of them were.  But --

11     Q.    But many of them?

12     A.    There's some overlap,

13   definitely.

14     Q.    Yeah.  And isn't that something

15   Sport-BLX would want to know, if it's

16   admitting investors into a fund who were

17   involved in a litigation over a private

18   investment?

19     A.    I don't see why.

20     Q.    You don't think they would want

21   to know whether they have litigious

22   investors in their high risk company?  You

23   cannot think of a reason why a small

24   private company would want to know of

25   litigations involving its new investors?



Page 250

1

2          MR. PEARLSON:  Hold on a

3     second.  What question do you want

4     him to answer there?  There was

5     multiple parts.

6          MR. SACK:  Well, let me

7     rephrase it.

8     Q.    Wouldn't a small private

9  company wish to know whether its new

10 investors were engaged in litigation over

11 another private investment at the very time

12 they're making that investment in

13 Sport-BLX?

14     A.    I won't speculate on what they

15 would want to know because they didn't ask

16 me questions such of that, so I don't

17 believe that it was important to them.  If

18 it was, they would have asked me questions

19 of it.

20     Q.    Mr. Salerno, you know in

21 securities law there's the concept of a

22 reasonable investor and what would a

23 reasonable investor want to know before

24 entering into a securities transaction.

25 Are you familiar with that?



Page 251

1

2     A.    I understand -- if that's what
3  you're telling me.  I'm not familiar with
4  that law.  I'm not a lawyer.
5     Q.    But you've taken multiple
6  series security licenses, haven't you?
7  You've been a series 7, series 63 and many
8  others.  You've studied a lot about the
9  basic elements of securities markets and
10  securities law?
11     A.    I have a good understanding to
12  pass the test.
13     Q.    Yeah.  Don't you think a
14  reasonable investor or a reasonable private
15  company would want to know whether its new
16  investors in the founders round were
17  engaged at the same time in litigation over
18  another private investment?
19     A.    In my opinion, a reasonable
20  investor and a reasonable company that is
21  starting up, if it was important to them,
22  they would put a questionnaire together so
23  that they could address any items that they
24  find important.  So that would be a
25  reasonable action.



1

2          Q.      And so your view is if a small

3    start up company didn't have a

4    questionnaire, that conveyed to you they

5    didn't care who their investors were?  Is

6    that your position?

7               MR. PEARLSON:  Objection.

8               Go ahead, you can answer.

9          A.      My position is, this can't be

10   described as a small investment company

11   when you have the founders touting that

12   they've got 20, 30 years experience with

13   billions of dollars in the market, who are

14   very sophisticated, who have multiple

15   holding companies, who buy and sell

16   entities all the time, and are very well

17   versed of identifying what should be

18   important and should not be important to

19   them.

20               MR. SACK:  Can I have that

21          answer read back, please, Hindy.

22               (Whereupon, a portion of the

23          testimony was read back.)

24          Q.      Sport-BLX was a small company

25   that was looking for strategic investors,



1

2    correct, Mr. Salerno?

3        A.    Yes.

4        Q.    That's what they conveyed to

5    you, they were looking for strategic

6    investors, correct?

7        A.    Yes.

8        Q.    And by "strategic," that meant

9    people who understood the business and

10   people who were going to contribute to this

11   high risk business, correct?

12       A.    I won't speculate on what they

13   define strategic as.

14       Q.    But if they conveyed to you

15   they wanted strategic investors, didn't you

16   realize they wanted to know who these

17   investors were, who the people were who

18   were putting up money into their company?

19       A.    I was the investor.  I made the

20   sole decision.  No one else.

21       Q.    You made the decisions, but the

22   others were the investors.  It was their

23   money.  Wouldn't you call them the

24   investors because it was their money?  Most

25   of the million dollars that went into this



Page 254

1

2  company came from other investors, correct?

3       A.    I made the decision to invest

4  in Sport-BLX.   The other seven or eight

5  people didn't even know Sport-BLX at all

6  until this lawsuit and they were recently

7  contacted.   So, no.

8       Q.    Would it be accurate to call

9  Cypress a pooled investment vehicle,

10  Mr. Salerno?

11            MR. PEARLSON:  I'm going to

12       object to the extent it calls for a

13       legal conclusion.

14            You can answer.

15       A.    Under what definition?  If it's

16  what you showed me earlier, no.

17       Q.    Why isn't it a pooled

18  investment vehicle?

19       A.    Because it's not a fund.

20       Q.    Well, we'll disagree.   It's not

21  limited to fund.   That was an example.

22            But it is a pooled investment

23  vehicle if we define it as pooling money

24  from multiple investors in one investment

25  vehicle, correct?   If it's defined as



Page 255

```
 1
 2    pooling money from multiple investors in
 3    one investment vehicle, would it be fairly
 4    called a pool investment vehicle?
 5         A.    I'm not certain.  It could be
 6    considered a partnership.
 7         Q.    It was a partnership that you
 8    managed, correct?
 9         A.    Yes.  But I was saying a
10    partnership in context of a partnership of
11    monies coming together.
12         Q.    Yeah.  You could have called,
13    in that e-mail where you called it "my
14    holding company," you could have called it
15    many other things accurately, correct?
16         A.    I think I did call it
17    accurately.
18         Q.    No.  My question is, you could
19    have called it other things accurately,
20    such as this is the investment partnership
21    that I manage, or I want to update the
22    agreements with the investment partnership
23    I have with my other LPs.  You could have
24    called it other things, other than "my
25    holding company," correct?
```



Page 256

```
 1
 2            MR. PEARLSON:  Objection.
 3       Calls for speculation.  Lack of
 4       foundation.
 5            You can answer.
 6       A.    I don't think I needed to,
 7  because they already knew of Cypress.
 8       Q.    And they already -- but they
 9  didn't know -- they didn't already know
10  that Cypress had investors other than
11  yourself, isn't that right, Mr. Salerno?
12       A.    That's speculation because I
13  don't know if Michael Staisil told them
14  that or if they would have asked me a
15  question of it, I would have told them
16  that.
17       Q.    But you can't say, as you're
18  sitting here, that you told them that
19  Cypress had investors other than yourself,
20  correct?
21       A.    Again, I shared, I don't recall
22  a hundred percent, because if they would
23  have asked me, I would have told them.
24       Q.    You can't say, as you're
25  sitting here, that you told them that
```



```
 1
 2   Cypress had investors other than yourself,
 3   correct?
 4              MR. PEARLSON:  I think we've
 5         been over this.
 6              MR. SACK:  No, no.  He's not
 7         answering the question.
 8         Q.    As you're sitting here, you
 9   cannot say that you told George Hall and
10   Joe De Perio that Cypress had investors
11   other than yourself, correct?
12              MR. PEARLSON:  I think he did
13         answer this specific question.  He
14         said he couldn't recall either way.
15              But go ahead, you can answer.
16              MR. SACK:  Please, don't answer
17         for the witness, Ross.  You really
18         crossed the line.
19              MR. PEARLSON:  John, we've been
20         over this like five times now.
21              If you understand the question,
22         you can answer it.
23         A.    You used like three different
24   double negatives there.  Can you ask me the
25   question differently.
```



Page 258

1

2          MR. SACK:  Hindy, can you read

3      the question back.

4          (Whereupon, a portion of the

5      testimony was read back.)

6          MR. PEARLSON:  Objection.

7      Asked and answered.

8          Go ahead.

9      A.    Again, I don't recall.

10     Q.    Mr. Salerno, after you told Joe

11  De Perio -- after you told Joe De Perio you

12  were -- let me get the exact language.

13          After you told Joe De Perio

14  that "my attorney didn't update agreements

15  with my holding company name," you said

16  that you would actually make the edits in

17  the agreement, correct?  Take a look at it.

18     A.    What I wrote was, "I will do

19  that and send over signed documents."  So

20  yes, that would be correct.

21     Q.    So you actually made the change

22  at that point in the documents?

23     A.    I don't recall doing it, but

24  this is what I'm saying, so I believe it to

25  be accurate.



1

2           MR. PEARLSON:  This is 23?

3           COURT REPORTER:  Yeah.

4      Q.    I'm just going to show you,

5  take a look at one of the stock purchase

6  agreements, Mr. Salerno.  And you see that

7  you changed in the first paragraph, Cypress

8  Holdings, you inserted Cypress Holdings for

9  the abbreviated term purchaser?

10     A.    Yes.

11     Q.    And then in the side agreement,

12  Mr. Salerno, you see where you inserted in

13  the first paragraph Cypress Holdings III,

14  but then you kept that abbreviated term

15  Salerno in bold in the one, two, three,

16  fourth line down?

17     A.    I see that I put in Cypress

18  Holdings.  I didn't change anything else.

19     Q.    And then you kept where

20  number 1 it says Salerno, right of first

21  offer in the caption for paragraph 1?

22     A.    Are you asking me a question?

23     Q.    Yeah.  You kept it as Salerno,

24  right of first offer?

25     A.    I didn't change anything in the



Page 260

1

2    document other than that line.   So anything

3    referencing Salerno as -- what do you call

4    it -- defining Cypress Holdings was not

5    changed.   Nothing was changed.

6         Q.     Why was that?   Why didn't you

7    make that change?

8         A.     I'm not an attorney.   I think

9    it's valid.

10        Q.     And is it -- did you want to

11   keep these rights for yourself,

12   individually, and not Cypress?

13        A.     No.

14               MR. PEARLSON:   Objection to

15      form.

16               THE WITNESS:   I'm sorry.   You

17      finished?

18               MR. PEARLSON:   Yeah.  Go ahead.

19               THE WITNESS:   I'm sorry.

20        A.     No.

21        Q.     There would be a conflict with

22   the Cypress limited partners for you to get

23   a benefit for yourself, personally, that

24   didn't apply to Cypress Holdings III,

25   correct?



Page 261

1

2          MR. PEARLSON:  Objection.

3      That's not what this agreement says.

4      You know better, John.

5      A.      I don't understand the

6  question.

7      Q.      You're not looking for

8  something for yourself, individually, even

9  though it says Cypress here.  The rights

10  here, you're saying, aren't to you,

11  personally, even though it says Salerno

12  right of first offer?

13      A.      Absolutely not.  I was not

14  looking for anything for me, personally,

15  because this is the definition of Cypress

16  Holdings.

17      Q.      Let's take a look at -- now I

18  have to find an exhibit number, the April

19  11th e-mail.

20          MR. PEARLSON:  Something that's

21      been previously marked?

22          MR. SACK:  It has been

23      previously marked, yeah.  It's

24      Exhibit 9.  Let's see if we can find

25      it here.



Page 262

1

2        Q.    What I would like you to do is

3   turn to page 1028 of that document and I'd

4   like to go back to the e-mail I asked you

5   about earlier.

6        A.    1028, you said, right?

7        Q.    1028 in the lower right.

8        A.    Okay.

9        Q.    You sent an e-mail on April 11

10  at 9:33 a.m. to Joe De Perio and George

11  Hall.    You say, "I would like to exercise

12  my right to purchase my pro rata share of

13  the new securities per paragraph 1 A of the

14  side letter."

15             Why did you refer to your right

16  to purchase the pro rata share there and

17  not Cypress's right, Mr. Salerno?

18        A.    As I believe I said prior, when

19  I speak, you or I, it's synonymous with

20  Cypress.

21        Q.    And you know that that's clear

22  to everyone else who gets e-mails like

23  this, that you and Cypress are synonymous?

24        A.    It absolutely should be because

25  the agreement is between Cypress and



Page 263

```
 1
 2    Sport-BLX, not me.  I would have no
 3    standing.
 4         Q.     Mr. Salerno, as we talked about
 5    earlier today, in the next paragraph you
 6    include some bullet points, and one of them
 7    talked about -- it's a whole series of
 8    issues and the fifth bullet refers to
 9    rental agreement, market rent and address
10    issues of self dealing.  You recall we
11    talked about that earlier?
12         A.     Yes.
13         Q.     And just to summarize -- I'm
14    not trying to mischaracterize -- you said
15    that was a reference to your concerns that
16    Sport-BLX was paying over above market rent
17    to Clinton Group, and that constituted self
18    dealing, is that what you were conveying
19    there?
20         A.     Clinton Group, George Hall,
21    again, they're -- just like I, you, and
22    Cypress is synonymous, George Hall and
23    Clinton Group are synonymous.
24         Q.     So let me try that again.  Your
25    reference to the rental agreement there and
```



Page 264

```
 1
 2   the reference to market rent and address
 3   issues of self dealing, that reflected your
 4   concerns that Sport-BLX was paying above
 5   market rent to individuals or entities with
 6   -- who were both acting for Sport-BLX and
 7   for related parties, is that right?
 8              MR. PEARLSON:  I'm going to
 9         object.  This was asked and answered
10         hours ago.
11         A.    It was related to my concern of
12   Sport-BLX paying above market rents to
13   Clinton Group, which Clinton Group is a
14   hundred percent owned by George Hall, which
15   that's the self dealing that I was
16   referring.
17         Q.    Was that a serious concern that
18   you had at the time?
19         A.    Yes.
20         Q.    Why would -- why did you want
21   to exercise your right to purchase your pro
22   rata share of stock in a company that you
23   had that serious concern about,
24   Mr. Salerno?
25         A.    Because at that point in time,
```



1
2    I believed, based upon communications, that
3    we would have gotten it resolved.
4         Q.    But you didn't -- but you knew
5    by then Sport-BLX and George Hall and
6    Clinton Group and Joe De Perio had a
7    different position, didn't you, about the
8    validity of that rent and the validity of
9    that relationship?
10        A.    I believed that we would've got
11   it resolved amicably.
12        Q.    Let me ask you, did you know
13   when you wrote that e-mail that Hall and
14   De Perio had a different position from you
15   on those issues?
16        A.    We had a difference of opinion,
17   and I thought that we would wind up
18   somewhere in between, rather than them
19   drawing a line in the sand and syphoning
20   money from Sport-BLX.
21        Q.    What was the difference of
22   opinion that you just referred to that Hall
23   and De Perio and Sport-BLX had from yours?
24        A.    That the rents, in their
25   opinion, were appropriate, and in my



Page 266

 1
 2    opinion, they were inappropriate.
 3         Q.    And I take it they also thought
 4    it was appropriate for Sport-BLX to be
 5    paying that money to Clinton Group and you
 6    thought it was not appropriate for them to
 7    be paying it to Clinton Group?
 8         A.    The Clinton Group issue comes
 9    into play as who the benefit of the
10    overpayment was.
11         Q.    So there are two issues, the
12    overpayment and to whom it went, correct?
13         A.    Yes.
14         Q.    And they disagreed with you on
15    both, George, Joe, and Sport-BLX disagreed
16    with you on both of those issues, correct?
17         A.    Yes.
18         Q.    Did they indicate they would
19    change their position as of April 11 when
20    you wrote that e-mail?
21         A.    The timeline, I'm not a hundred
22    percent certain on, but there are numerous
23    communications where George Hall and I
24    would speak and then he spoke to, I'm glad
25    we had this conversation, even Mr. De



Page 267

1

2     Perio, with regard to how we would move

3     forward, we would find a path to work

4     together and resolve this.  So that's what

5     I was relying on.

6          Q.    You had no idea that it would

7     be resolved at this point, correct?

8          A.    There was no conclusion at this

9     point.

10         Q.    And one of the things that

11    George and Joe were saying to you on or

12    about April 11th was that this had all been

13    disclosed to you, the amount of the rent,

14    and the Clinton Group relationship when you

15    invested, correct?

16         A.    I don't see that here.

17         Q.    No.  I didn't ask you about

18    this e-mail.  I said in this time period,

19    was one of the things George and Joe were

20    saying to you was you knew the rent when

21    you invested, you knew the Clinton Group

22    was housing Sport-BLX, and that was not

23    something they were prepared to change,

24    isn't that what they told you on or about

25    April 11th?



Page 268

```
 1
 2        A.     No.
 3        Q.     They never conveyed that to
 4   you?
 5        A.     As what you said, no.
 6               MR. SACK:  Off the record for a
 7          minute.
 8               (Whereupon, an off-the-record
 9          discussion was held.)
10               VIDEOGRAPHER:  Off the record,
11          4:30.
12               (Whereupon, a short break was
13          taken at this time.)
14               VIDEOGRAPHER:  On the record,
15          4:34.
16        Q.     Mr. Salerno, this top e-mail,
17   this February 28, 11:09 a.m.  It's one
18   where Mr. De Perio sends you documents
19   which reflect the red lines and what should
20   be execution versions of the agreements.  I
21   had asked you a number of questions about
22   subsequent changes and e-mails.  I would
23   like you to look at earlier e-mails here,
24   please.
25               There's an e-mail on the second
```


MAGNA
LEGAL SERVICES

Page 269

1

2    page, Sport-BLX 16290, from Joe De Perio to

3    you copying George Hall.  It says, "Mike we

4    worked through your comments.  Here is

5    where we are.  Please let me know if there

6    is anything left open pending your review.

7    Regards, Joe."

8              And then under purchase

9    agreement, on the fourth line down, there's

10   a sentence that begins -- actually, let me

11   read that whole section beginning it with,

12   "We are unable to produce 12/31 financials

13   and thus can't rest either the financials

14   and undisclosed liabilities.  And frankly,

15   they won't be instructive, given our

16   operations and their inception date.  We

17   hope you get comfortable with the materials

18   in the data room.  There is no opex since

19   Clinton is bearing the cost prior to the

20   closing of the preseries A ground and the

21   liabilities are tied to the consensus

22   agreement in the data room and our legal

23   counsel."

24             And there's a response from you

25   a short time later.  And I'm just going to


MAGNA
LEGAL SERVICES

Page 270

```
 1
 2   read paragraph 2 in your e-mail at
 3   10:25 a.m.  "At -- that there is no
 4   material outstanding debt, other than that
 5   which is incurred in the ordinary course of
 6   business and to Consensus."  Do you see
 7   that?
 8       A.    Yes.
 9       Q.    And the Consensus debt was for
10   the build out of the technology platform,
11   correct?
12       A.    I believe so, yes.
13       Q.    And so you were familiar with
14   this debt that was owed to Consensus,
15   correct, before you signed the agreement?
16       A.    The amount, I don't recall.  I
17   know that there were -- there was a
18   contract that they had with Consensus, that
19   Sport-BLX had with Consensus.  Consensus
20   was paid cash and stock.  The unpaid cash
21   for any outstanding invoices should be
22   reflected as debt in its normal and
23   ordinary course.
24       Q.    And you looked at that issue
25   before you signed the stock purchase
```



Page 271

1
2    agreement.  You looked to see what the
3    relationship was with Consensus, and what
4    the obligation was that the company had to
5    Consensus, correct?
6         A.    I don't want to agree the way
7    you said it.  I looked at the data room,
8    got a Consensus agreement.  I don't recall
9    if it was an executed agreement or not, and
10   I understood that census -- Consensus
11   received stock and they would be owed
12   money, cash for services rendered based
13   upon different, and I think it was based
14   upon different stages of completion.
15        Q.    And you understood that that
16   was a significant obligation of Sport-BLX.
17   Before you signed this agreement, you knew
18   Sport-BLX had a significant obligation to
19   Consensus for the build out of the
20   technology platform, correct?
21        A.    Yes.
22             MR. PEARLSON:  Objection.
23             THE WITNESS:  Sorry.  Sorry.
24        Q.    Mr. Salerno, after you signed
25   this agreement on February 28th, did you



 1
 2    wire the funds promptly thereafter?
 3         A.    No.  I needed to get the wire
 4    instructions, which I did not receive for
 5    two weeks.
 6         Q.    You didn't have the wire
 7    instructions as of February 28th?
 8         A.    No.  I don't believe so.
 9         Q.    You're sure?
10         A.    I don't believe so.  And there
11    was a big thing about this, because I had
12    an argument with Mr. Joe De Perio about it
13    and the conclusion was that they found,
14    which I saw somewhere in discovery, that
15    they realized they did not send it to me,
16    they actually only -- they asked Henry to
17    send it to me.  And Henry only sent it to
18    Mr. Joe De Perio, not to me.
19         Q.    So how did you get to wire the
20    money if Henry didn't send you the wire
21    instructions?
22         A.    After the argument that I had,
23    he then sent me the wiring instructions and
24    I promptly sent them.  And there's also a
25    recording to that, as well.



1

2      Q.    That's another conversation you

3   secretly recorded?

4      A.    That I recorded of Joe De Perio

5   and I talking about the wiring

6   instructions.

7      Q.    When did you do that?

8      A.    Before the wire was sent.

9      Q.    So you started recording Joe De

10  Perio within a week of your investing in

11  the company, you started recording?

12     A.    I think there is one, yes.

13     Q.    No, no.  Not I think there is

14  one.  Did you secretly -- did you start to

15  secretly record conversations within

16  approximately a week of making your

17  investment in this company?

18     A.    Yes, it's very possible.

19     Q.    Why?

20     A.    Because at that point, I was

21  already concerned about the investment

22  being made.  And if I didn't do it, that

23  they were going to hold me up with a

24  contract dispute.

25     Q.    Within one week you were



 1

 2   secretly recording your new business

 3   partners, that's what you're saying?

 4                MR. PEARLSON:  Objection to

 5         form.

 6        Q.     You already distrusted them?

 7        A.     I had a concern.

 8        Q.     What was your concern?

 9        A.     That they were -- if I didn't

10   make the investment, they would come after

11   me for breach of contract.

12        Q.     Didn't Mr. De Perio e-mail you

13   one week after your investment and say we

14   don't want your money, Mr. Salerno.  We

15   don't want your money.  Didn't he e-mail

16   that to you?

17        A.     Paraphrasing it.  But after my

18   conversation with Mr. Hall, I understood it

19   as they were using that as a tactic to come

20   after me.

21        Q.     What?  What tactic?  They said

22   they don't want your money.  These are the

23   people you're accusing of fraudulently

24   inducing you, who said don't invest,

25   Mr. Salerno.  That's what they said, don't



Page 275

```
 1
 2   invest?
 3       A.    If they didn't want the money,
 4   they could have sent it back.
 5       Q.    You didn't send it.  Mr. De
 6   Perio e-mailed you before March 12 and said
 7   don't send your money, deal's off.  That's
 8   what he wrote to you.
 9       A.    I don't remember the timeline.
10       Q.    Okay.  Let's do it.
11             MR. SACK:  March 8th.
12             What exhibit is this, Hindy?
13             COURT REPORTER:  24.
14       Q.    Please take a look at the
15   e-mail from Joe De Perio to you on March
16   8th at 5:19 p.m.  "Mike, I tried your line
17   this morning and also sent a text.  I also
18   just spoke to our CFO and learned the funds
19   haven't come in.  At this point, too much
20   time -- too much has changed since our
21   closing dinner and exchange of executed
22   documents last Thursday.  I would not be a
23   proper fiduciary to our founders/investors
24   and preseries A investors who have funded
25   simultaneously with the execution of docks
```



Page 276

```
 1
 2   as stated if we accepted the investment on
 3   Monday or thereafter.  Obviously I don't
 4   know your intent.  I hope we can find a way
 5   to cooperate at another endeavor in the
 6   future.  Best regards, Joe."
 7              So now do you see that Joe De
 8   Perio, on behalf of Sport-BLX, said don't
 9   send us your money, we don't want it?
10        A.    I see the e-mail.  There was
11   already a signed agreement, and I was
12   concerned that they would come after me for
13   breach of that agreement.
14        Q.    Nothing here talks about -- did
15   you ask them, can we just part ways
16   amicably?
17        A.    I spoke to Mr. Hall after I
18   received this e-mail.  I was in Florida, I
19   remember.  And I spoke to Mr. Hall about
20   it, and we said that we would talk over the
21   following week.  He made comments that made
22   me scared he was going to take legal action
23   if I didn't, and that is why I moved
24   forward and promptly sent the money.
25        Q.    What did he say to you that
```



Page 277

```
 1
 2   made you scared, using your words?
 3        A.    That we already signed an
 4   agreement and that the agreement was
 5   enforced.
 6        Q.    And did he say -- did he say
 7   what the harm was to Sport-BLX at that
 8   point if you didn't send the money and you
 9   parted ways?  Did he indicate what he could
10   sue you for?
11        A.    I don't recall.
12        Q.    What did you think you could be
13   sued for?
14        A.    With Mr. Hall, it doesn't take
15   much.  Look where I am.
16        Q.    Who initiated this suit,
17   Mr. Salerno?  You did.
18        A.    With regard to the securities
19   claim that I realize you guys now filed, as
20   well.
21        Q.    Did you speak with your
22   attorney because of this so called fear of
23   a litigation, Mr. Salerno?
24             MR. PEARLSON:  I just want you,
25        again, to be careful about revealing
```



Page 278

```
 1
 2        the contents of any discussions with
 3         your counsel.
 4        A.    I don't recall.  I did speak to
 5   counsel.  But I don't recall when it was.
 6        Q.    What about Mr. De Perio's
 7   e-mail made you concerned about a
 8   litigation?  And I draw your attention to
 9   the line, "I hope we can find a way to
10   cooperate on another endeavor in the
11   future."
12            What about this e-mail made you
13   concerned about a litigation?
14        A.    It was Mr. Hall's conversation
15   with me.
16        Q.    Did he say -- did he say to
17   you, if you don't want to invest, Michael,
18   let's part ways, or in substance?
19            MR. PEARLSON:  Who are you
20         saying the "he" is now, John?
21            MR. SACK:  Withdrawn.
22        Q.    What's your best recollection
23   of what George Hall said to you?
24        A.    That they were expecting the
25   money earlier.  I expressed to him that, as
```



Page 279

1

2    I said to Joe that night when we had

3    dinner, send me the wire instructions.  Joe

4    said he would.  The wire instructions never

5    came over.  And at that point he said,

6    well, we have a signed contract with you,

7    and, you know, we don't know what your

8    intent is.

9              And there was other context,

10   and I'm paraphrasing, and I don't recall

11   exactly.  But he used some terminology that

12   when we got off the phone, I felt that he

13   was setting me up for a lawsuit.

14        Q.    What terminology did he use

15   that you say is now a set up for a lawsuit?

16        A.    I don't recall a hundred

17   percent.  I don't recall.

18        Q.    Did you just ask him -- let me

19   just ask you, did you want to invest in the

20   company at that time, on March 8th?

21        A.    Yes.

22        Q.    And did you say may I -- I want

23   to invest?  Did you tell George Hall you

24   did want to invest?

25        A.    I told him I would meet my



Page 280

1

2    obligations, as the signed agreement -- and

3    again, I'm going by memory.  And he said

4    something like that's what we all expect,

5    is to do what was obligated, or something

6    to that effect.

7        Q.    But he didn't say he would file

8    a lawsuit or was considering filing a

9    lawsuit against you, correct?

10       A.    Not directly, no.

11       Q.    How did he do it indirectly?

12       A.    It was the innuendo about the

13   contract and the obligations, and I thought

14   that the best position for me was to send

15   him the money so I wouldn't have any -- he

16   wouldn't have any claim breach and we would

17   work it out from there.

18       Q.    So speaking to you about your

19   contracts and your obligations, to you,

20   that's a threat of litigation?

21       A.    I'm sorry?

22       Q.    You said he spoke to you about

23   your contract and your obligations.  You

24   took that as a threat of litigation?

25       A.    In the way he spoke to it, yes.



 1

 2      Q.    But you can't tell us the words

 3   that Mr. Hall used that you took that way,

 4   is that right?

 5            MR. PEARLSON:  Objection.

 6       Asked and answered.

 7      A.    That's right.

 8      Q.    Did you record the call with

 9   George Hall?

10      A.    No.

11      Q.    Why not?

12      A.    I was in Florida.

13      Q.    You had already recorded your

14   call with Mr. De Perio, is that right?

15      A.    I think I did.

16      Q.    Yeah, was that the first call

17   you recorded in early March?

18      A.    I'm not sure.

19      Q.    Did you record any calls before

20   February 28th, when you signed the stock

21   purchase agreements?

22      A.    I don't think so.  But I don't

23   want to say something that I'm not a

24   hundred percent sure of.

25      Q.    Have you produced in this



Page 282

 1

 2    litigation every recording that you made?

 3        A.    Yes.

 4        Q.    Was the reason you didn't fund

 5    the investment promptly was because you

 6    were waiting for some information about the

 7    investment that you thought was promising?

 8        A.    No.

 9        Q.    And there was no other

10    information that you were either waiting

11    for or counting on before funding, is that

12    right?

13        A.    No.

14        Q.    I would like to look at one

15    more exhibit.  You're saying that you

16    invested only after you were sent the wire

17    instructions again?

18            MR. SACK:  The February 1st

19        e-mail, please.

20            MR. STERN:  Number 16.

21        Q.    I'm showing you an e-mail on

22    February 1 from Joe De Perio to you where

23    he encloses the first version of these

24    agreements, and he attaches a link to the

25    data room and he gives you the wiring



Page 283

 1

 2    instructions.  Do you see that,

 3    Mr. Salerno?

 4        A.    Yes, I do, actually.

 5        Q.    So he gave you the wiring

 6    instructions on February 1st.  You had them

 7    all along?

 8        A.    I did not realize that, which

 9    is why when we had dinner, I made it

10    specifically clear to him, Joe, give me the

11    wire instructions, send them to me, and

12    I'll get you the wire.  He did not do that,

13    and I did not realize these were here.

14        Q.    Did you check?

15        A.    Yes, I looked to see if he sent

16    me something recently, and I did not see

17    this, which is -- I think is also relevant

18    to their own e-mail where Joe De Perio

19    says, "George, I think I found the problem.

20    Henry didn't send the wire instructions to

21    Michael, he only sent them to me."

22        Q.    Mr. Salerno, you started

23    recording conversations with Mr. De Perio

24    and Mr. Hall within approximately one week

25    of your February 28th investment, correct?



Page 284

1

2          A.      I think so.

3          Q.      You early -- just a short time

4    ago told us that roughly one month later,

5    on April 11th, you said you wanted to buy

6    more stock in Sport-BLX and you believed

7    you could work out your disputes with

8    Mr. Hall and Sport-BLX over rent and

9    Clinton Group, correct?

10         A.      Yes.

11         Q.      If you had that level of

12   distrust of Hall and De Perio, how on earth

13   could you think you would be working out

14   these disputes with them?

15         A.      I took them on their word that

16   we could work it out.

17         Q.      You didn't take them on their

18   word because you started recording

19   conversations in March.

20         A.      Just because I was recording

21   the conversations doesn't mean that I take

22   them on their word to take future actions

23   to come up with a solution.

24         Q.      But don't you record in order

25   to prove something to somebody who you



```
 1
 2   think doesn't do what they say?  Isn't that
 3   the purpose of recording, to have evidence
 4   you can hold up to them and say you told me
 5   X and now you're doing Y?  Isn't that the
 6   basic reason to secretly record
 7   conversations?
 8        A.    The reason to record the
 9   conversation was to protect my interest.
10        Q.    And you thought your interests
11   were so vulnerable they needed secret
12   recordings after a week of investing in
13   this company?
14             MR. PEARLSON:  Objection.
15         Asked and answered.
16        A.    I don't think taking a
17   recording changes whether or not someone is
18   speaking the truth on that conversation.
19             MR. SACK:  Why don't we take a
20         break.
21             VIDEOGRAPHER:  Off the record,
22         4:53.
23             (Whereupon, a short break was
24         taken at this time.)
25             VIDEOGRAPHER:  On the record,
```



Page 286

 1
 2          5:11.
 3          Q.    Mr. Salerno, I'm showing you a
 4    list of Cypress Holdings, III, L.P.,
 5    limited partners, that you produced in this
 6    case.  It's Salerno Exhibit 25, and the
 7    Bates numbers are Cypress 1614 to 1616.
 8                I'm going to go through these
 9    limited partners with you and ask a series
10    of questions.
11                What's the Elizabeth R Walsh
12    2016 irrevocable trust?
13          A.    It's an irrevocable trust.
14          Q.    And who is Elizabeth R Walsh?
15          A.    My cousin.
16          Q.    And what's your relationship
17    with this trust?  Do you manage it?  Do you
18    have any particular relationship with the
19    trust?
20          A.    This is a part of my family's
21    estate plan.  I'm the trustee.
22          Q.    Are you the only trustee?
23          A.    Yes, I am.
24          Q.    Who are the beneficiaries?
25          A.    My nephew.



Page 287

1

2      Q.    She's your first cousin?

3      A.    Second cousin.  Second or third

4  cousin.

5      Q.    And you managed the funds in

6  the trust?

7      A.    I do.

8      Q.    And Ice Holdings, LLC, that's

9  the company we previously discussed in

10 connection with your form ADV filings, is

11 that right?

12     A.    Yes, that's correct.

13     Q.    Tiffany Salerno with Eagan in

14 parentheses, that's your wife?

15     A.    It is.

16     Q.    What's number 5, Millennium

17 Trust Company, LLC, custodian, FBO Merrick

18 Construction, 401K?

19     A.    It's the custodian account for

20 Mr. Tim Cross through his 401K plan.

21     Q.    And what's your relationship

22 with Tim Cross?

23     A.    He's a friend.

24     Q.    And is he a client of your

25 firm?



Page 288

1

2         A.     He is not.

3         Q.     Is his company a client of your

4    firm?

5         A.     His company is.

6         Q.     So that's Merrick Construction

7    is a client of NPPG plan professionals?

8         A.     No.

9         Q.     What's it a client of?

10        A.     NPPG.

11        Q.     What services does NPPG provide

12   for Merrick Construction?

13        A.     TPA and compliance.

14        Q.     What does TPA stand for?

15        A.     Third-party administration.

16        Q.     Does NPPG manage the funds in

17   the 401K plan?

18        A.     I don't think NPPG manages the

19   funds in his 401K plan.

20        Q.     So how did it come to be that

21   Merrick Construction 401K was invested in

22   Cypress?

23        A.     NPPG Investment Services may

24   manage some 401K plans for Merrick, for the

25   record, but I'm not sure a hundred percent.



```
 1
 2              MR. PEARLSON:  I'm going to ask
 3        you to keep your voice up.
 4              THE WITNESS:  I'm sorry.
 5        A.    When Tim Cross invested in
 6   previous Cypresses, at one point he asked
 7   if he could use his 401K dollars to do
 8   that.  I don't recall if he did that, if
 9   this is the first time he did that or not,
10   but that's him.
11        Q.    There were prior Cypresses?
12        A.    Yes.
13        Q.    Cypress I and Cypress II?
14        A.    Yes.
15        Q.    Were those limited
16   partnerships, as well?
17        A.    I don't recall.
18        Q.    Were you managing those?
19        A.    Yes.
20        Q.    And who were the investors in
21   those?
22        A.    Mostly the same people here.
23        Q.    When did they exist?
24        A.    "They" meaning who?  I'm sorry.
25        Q.    When did Cypress I and II
```



Page 290

1

2    exist?

3         A.    Cypress I, somewhere around --

4    somewhere 2003, 2004, 2005, 2006, somewhere

5    around that, 2007 maybe, before the crash.

6         Q.    Excuse me?

7         A.    Before the crash.

8         Q.    And how about Cypress II?

9         A.    Cypress II was after the crash.

10        Q.    And Mr. Cross was invested in

11   Cypress I and II?

12        A.    I believe so, yes.

13        Q.    And is it accurate to say that

14   Mr. Cross invested individually in Cypress

15   III and his 401K invested in Cypress III?

16        A.    No.

17        Q.    What's inaccurate about what I

18   said?

19        A.    The number five here,

20   Millennium Trust, custodian FBO Merrick

21   Construction 401K XXX 47461 is Mr. Cross's

22   personal account in the 401K plan.

23        Q.    So it would be fair to say that

24   Mr. Cross invested in Cypress III and

25   Mr. Cross's personal 401K account invested



Page 291

1

2    in Cypress III?

3          A.    Yes.

4          Q.    And did you discuss with

5    Mr. Cross investing his personal 401K

6    account in Sport-BLX?

7          A.    No.

8          Q.    Why not?

9          A.    I have full discretion over

10   Cypress.

11         Q.    And was that a suitable

12   investment for a 401K account?

13         A.    For Mr. Cross, yes, I believe

14   so.

15         Q.    Do you have investment

16   guidelines for Mr. Cross's 401K account?

17         A.    I don't know.  Probably -- I

18   don't know.

19         Q.    Okay.  You said earlier that it

20   might be a suitable -- a high risk start up

21   might be a suitable investment depending on

22   the investment guidelines.  So you're

23   saying -- do you have investment guidelines

24   for Mr. Cross's 401K account?

25         A.    You're asking two different



Page 292

1

2    questions.

3        Q.    Do you have investment

4    guidelines for Mr. Cross's 401K account?

5        A.    For Mr. Cross's 401K account,

6    no.

7        Q.    You don't.  For Mr. Cross, do

8    you have investment guidelines?

9        A.    No.

10        Q.    Do you have investment

11    guidelines for the entity listed at number

12    five on this list?

13        A.    Yes.

14        Q.    You do.  Well, I asked --

15    number five refers to Merrick -- a Merrick

16    Construction 401K account, correct?

17        A.    Merrick Construction 401K, we

18    have guidelines for.  Merrick -- Tim Cross

19    is different than Merrick Construction

20    401K.

21        Q.    But who is referred to in

22    number five, a 401K account for everyone at

23    Merrick Construction or just for Mr. Cross?

24        A.    This is just for Mr. Cross.

25        Q.    So you have investment



Page 293

1

2    guidelines for the Merrick 401K account,

3    but not for Mr. Cross's specific 401K

4    account, is that what you're saying?

5         A.    No.

6         Q.    Explain.  You're -- you earlier

7    corrected me when I talked about the

8    Merrick Construction 401K, you said that

9    refers to Mr. Cross's specific 401K

10   account, correct?

11        A.    This particular dollars do,

12   yes.

13        Q.    Okay.  These dollars, were they

14   invested pursuant to investment guidelines?

15        A.    Investment guidelines --

16   Merrick Construction 401K is a retirement

17   plan.  A retirement plan has an investment

18   policy statement.  An individual does not

19   have an investment policy statement.

20        Q.    So what you're saying is this

21   investment on behalf of Mr. Cross's 401K

22   account was pursuant to the Merrick

23   Construction's 401K investment policy

24   statement?

25        A.    No.  The contrary.  This



1

2    investment is made by Mr. Cross and

3    Mr. Cross's decision to invest his personal

4    dollars that he's holding through his 401K.

5        Q.    He made this decision, correct?

6        A.    Correct.

7        Q.    And what information did you

8    give him for him to make that decision?

9        A.    Which decision?

10       Q.    To invest his dollars in

11   Cypress III?

12       A.    I gave him an executive

13   summary.

14       Q.    Of what?

15       A.    A description of what Cypress

16   III would invest in.

17       Q.    What's -- I'm sorry.  What's an

18   executive summary in this context, please?

19       A.    I believe it was a two-page

20   document summarizing the type of

21   investments that I would be investing money

22   in.

23       Q.    And what did you say in that

24   page, in that two-page document?

25       A.    I don't recall exactly.  We can



Page 295

1
2   get a copy of it.
3        Q.    Well, it hasn't been produced.
4             MR. SACK:  Has it been
5        produced, Ross, this two-page
6        document?
7             THE WITNESS:  It has.
8             MR. PEARLSON:  I'm not sure.
9        As I sit here right now, I can't tell
10       you.
11       Q.    How did you send it to
12  Mr. Cross?
13       A.    Tim, it would either have been
14  he picked it up or e-mail, one or the
15  other.
16       Q.    Did you e-mail with the LPs of
17  Cypress Holdings?
18       A.    At what period of time?
19       Q.    Since the beginning of Cypress
20  Holdings in 2018, have you e-mailed with
21  the limited partners about the activities
22  of Cypress III?
23       A.    No.
24       Q.    At any time have you e-mailed
25  with the limited partners of Cypress III



1

2  about Cypress III?

3       A.    Not outside of giving them

4  annual accounting, K-1s.

5       Q.    I didn't ask about outside of

6  anything.  I'm saying did you e-mail with

7  them -- did you e-mail with the limited

8  partners of Cypress Holdings III?

9       A.    With regard to Cypress Holdings

10  activities, no.

11       Q.    How did you communicate with

12  the limited partners of Cypress Holdings

13  III?

14       A.    I'm sorry.  Regarding what?

15       Q.    Regarding the activities of

16  Cypress Holdings III.  How did you

17  communicate with them?

18       A.    That's what I'm telling you.  I

19  don't.

20       Q.    Do you send them annual reports

21  about the activities and investments in

22  Cypress III?

23       A.    No.

24       Q.    Aren't you obligated to do that

25  under your partnership agreement?



Page 297

```
 1
 2          A.    I don't believe so.
 3          Q.    You're sure?
 4          A.    Again, I'm not sure.  None of
 5   these seven friends of mine have ever
 6   questioned how I run Cypress III or asked
 7   for information that we did not give them.
 8          Q.    What did you give them -- what
 9   did you say in this executive summary
10   document you referred to about Sport-BLX?
11          A.    Nothing.  The executive summary
12   was provided when -- prior to them
13   investing in Cypress III.
14          Q.    So what did you say to them
15   about -- did you talk about any specific
16   investments in Cypress III that you
17   contemplated?
18          A.    Specifics, no.
19          Q.    Any generalities about what you
20   contemplated investing in?
21          A.    Yes.
22          Q.    What were the generalities?
23          A.    Real estate, tax liens, I think
24   he even said private placements, maybe
25   startups, things of that nature.
```



Page 298

1
2    Paraphrasing, not to hold me to the exact
3    wording.
4         Q.    Did you tell Mr. Cross that you
5    were planning to do an investment in a real
6    estate in Asbury Park?
7         A.    What context?
8         Q.    In connection with Cypress III?
9         A.    No.  Cypres II did Asbury Park.
10        Q.    What does Cypress III hold now,
11   what assets?
12        A.    Cash, real estate, private
13   companies, public companies.
14        Q.    What private companies does it
15   hold?
16        A.    Sport-BLX, a Canadian gaming
17   company.  I don't recall the rest of them.
18        Q.    What real estate does it hold?
19        A.    Real estate project in Long
20   Branch.
21        Q.    What's the present valuation of
22   Sport-BLX within your portfolio?
23        A.    I don't know.  I don't recall.
24        Q.    Have you written any of it down
25   below the one million dollar cost?



Page 299

1

2        A.    I don't recall.  I would have

3   to look at the accounting.

4        Q.    Number 7 lists Millennium Trust

5   Company, LLC, custodian FBO Marsden Medical

6   Defined Benefit Plan.  What's that?

7        A.    That is a custodian account for

8   the Marsden Medical Defined Benefit Plan,

9   yes.

10       Q.    And what's you or your

11  company's relationship with Marsden

12  Medical?

13       A.    We are the TPA, third-party

14  administrator.  We handle compliance work.

15  I think that's it.

16       Q.    And who did you deal with there

17  to get their investment in Cypress III?

18       A.    Dr. Marsden.

19       Q.    What's your relationship with

20  Dr. Marsden?

21       A.    Just a friend.  An

22  acquaintance.

23       Q.    Is it a friend or an

24  acquaintance?

25       A.    I would consider him a friend.



Page 300

```
 1
 2        Q.     Who's Sam Christopher?
 3        A.     Sam is an individual I know for
 4   many years.  He's family.  He's like
 5   family.
 6        Q.     Does he work for you?
 7        A.     He does.
 8        Q.     And you also have an investment
 9   from his -- from an IRA account for him?
10        A.     Yes.
11        Q.     And have you spoken with him
12   about this investment in Sport-BLX?
13        A.     No.
14        Q.     And do you provide -- did you
15   provide Sam or any of these other LPs any
16   updates on the Sport-BLX investment at all?
17        A.     No.
18        Q.     Did you talk to them before you
19   filed a lawsuit?
20        A.     No.
21        Q.     Did you use Cypress funds to
22   fund the lawsuit?
23        A.     Yes.
24        Q.     You didn't tell them that you
25   were using their money to litigate the
```



1

2  case?

3       A.    No.

4       Q.    Is that right?

5       A.    Not their money, it's Cypress's

6  money they invested in.

7       Q.    Yeah, partly their money,

8  correct?

9       A.    They have interest in it, yes.

10       Q.    They have, in fact, the

11  majority interest in it, correct?  As of

12  2022, your interest and your wife's

13  interest went down to about 25 percent,

14  isn't that right?

15       A.    I don't know.  I would have to

16  look at the numbers.

17       Q.    But well below half?

18       A.    It doesn't sound right, but...

19       Q.    But below half, correct?

20       A.    That sounds right.

21       Q.    So you were mostly using your

22  limited partner's money to fund the

23  litigation, correct?

24       A.    In the context of Cypress's

25  money and their investment in it, yes.



Page 302

1

2      Q.    And have you told them that you

3   and Cypress have been sued in a countersuit

4   for fraud and securities fraud and related

5   violations of law?

6      A.    No, I did not.

7      Q.    And have you told them that

8   you're using, to a large extent, their

9   money to fund your defense of that

10  litigation?

11     A.    No.

12     Q.    In no time did you think it was

13  relevant for them to know that their money

14  was being used to fight a litigation that

15  you started and where you and Cypress have

16  been sued in a countersuit?

17     A.    I don't believe that the money

18  is being used to defend me, as much as

19  prosecute their bad acts.

20     Q.    But it is being used to defend

21  you, isn't that right, Mr. Salerno?

22     A.    I don't agree with that.

23     Q.    You don't agree that it's being

24  used to defend the litigation against you?

25     A.    I, again, in my opinion, I



Page 303

1
2    believe that the money for Cypress is being
3    used for legal fees to prosecute their bad
4    acts.
5        Q.    You saw no reason to tell your
6    investors you're using their money for your
7    litigations?
8                MR. PEARLSON:    Objection to
9        form.
10       A.    These aren't my litigations.
11   These are Cypress's litigations.
12       Q.    But you make all the decisions,
13   correct, Mr. Salerno?
14       A.    I do.
15       Q.    Without any accountability to
16   anyone, correct?
17               MR. PEARLSON:    Objection to
18       form.
19       A.    I don't understand the
20   question.
21       Q.    You solely make decisions,
22   correct, with regard to litigation and
23   every decision Cypress makes, is that
24   correct?
25       A.    Yes.



Page 304

1

2     Q.    Do you consult anyone, anyone,

3  any one of the limited partners about

4  decisions for Cypress?

5     A.    No.

6     Q.    So these are your acts and your

7  decisions, correct, so far as Cypress is

8  acting?

9     A.    These are the acts of Cypress.

10  Me on behalf of Cypress.

11     Q.    Without any consultation

12  whatsoever with people whose money is at

13  stake, correct?

14          MR. PEARLSON:  Objection.

15      Asked and answered.

16          You can still answer.  You can

17       answer it again.

18     A.    I'm sorry.  What was the

19  question again?

20          (Whereupon, a portion of the

21       testimony was read back.)

22     A.    I make the decisions on behalf

23  of Cypress.

24     Q.    Have you told any of the

25  limited partners that the countersuit



Page 305

1

2    against Cypress and you is seeking a

3    judgment that may be very much larger than

4    the million dollar investment?

5         A.    I have not spoken to them about

6    it.

7         Q.    Don't you think that would be

8    important for the limited partners to know?

9         A.    Not based upon the frauds that

10   they made.

11        Q.    No, no.  My question is, is it

12   true, Mr. Salerno, that Cypress and you

13   have been sued for an amount of money that

14   may exceed the one million dollar invested,

15   is that accurate?

16        A.    That's what the claims are,

17   yes.

18        Q.    Don't you think it's relevant

19   -- do you think it's relevant for the

20   limited partners to know that there could

21   be a judgment against them greatly in

22   excess of a million dollars?

23        A.    I'm sorry.  I don't believe

24   that to be accurate.

25        Q.    I didn't say there would be a



Page 306

1
2    judgment.  I said there could be a judgment
3    against Cypress and you for greater than a
4    million dollars.  You don't think that
5    could happen?
6                MR. PEARLSON:  I'm going to
7           object to the relevance and to the
8           speculation.
9                Go ahead.
10       A.    You said that -- asked me if I
11   thought it was relevant to speak to them
12   about a potential judgment against them,
13   and I don't think that's possible.
14       Q.    You think it's impossible for
15   there to be a potential judgment against --
16   well, withdrawn.
17                When you say "against them," do
18   you mean them individually?
19       A.    That's what you said.
20       Q.    Okay.  Do you think there could
21   be a potential judgment against Cypress?
22                MR. PEARLSON:  Objection.
23                Again, you can answer it.
24       A.    No.  I don't see how the law
25   could ever see that as to occur, no.


MAGNA
LEGAL SERVICES

1

2       Q.    You know there can't be a

3   judgment against Cypress?

4       A.    Based upon the facts, I don't

5   see that happening.

6       Q.    And you believe that's your

7   decision to make and not to let the limited

8   partners know that they do face that risk?

9           MR. PEARLSON:  Objection.

10      Asked and answered.

11      A.    Again, they don't face that

12  risk, Cypress does.

13      Q.    And their money invested in

14  Cypress is at risk for that reason,

15  correct?

16      A.    Cypress's assets are involved

17  in the lawsuit, if there was a judgment,

18  which I don't believe will occur.

19      Q.    Who is Jeffrey Kuc?

20      A.    He's another friend.

21      Q.    And you invest money for his

22  IRA?

23      A.    No.

24      Q.    Well, you invest it through

25  Cypress III, don't you?  Look at number 10.



1
2    You invest his -- Jeffery Kuc IRA money in
3    Cypress III, correct?
4        A.    No.  I invested this particular
5    portion.  I do not manage his accounts.
6        Q.    I didn't ask you whether you
7    manage them.  I said did you invest money
8    for his 401K.  You're saying you do to the
9    extent it's in Cypress III, correct?
10       A.    No.  It's not a 401K.
11       Q.    Excuse me.  Jeffery Kuc IRA,
12   you invest a portion of his IRA money
13   through Cypress III, correct?
14       A.    I invest a portion of this
15   particular IRA through Cypress III.
16       Q.    And you invest money for the
17   Kuc Korp LLC?
18       A.    Yes, they're an investor.
19       Q.    What is that?
20       A.    It's a limited liability
21   corporation.
22       Q.    Who are the members of that?
23       A.    I believe it's just Jeff.
24       Q.    But you don't know?
25       A.    I don't know if there's any



1
2    others.  I know it is Jeff.
3        Q.    You have a limited partner
4    here, Aspire Capital Finance, LLC.  What's
5    that?
6        A.    That's a limited liability
7    corporation.
8        Q.    Who are the members of that?
9        A.    I believe it's just John
10   Harris.
11       Q.    You don't know, though, there
12   may be other members?
13       A.    There could be.  I don't think
14   so.  I think it's just John.
15       Q.    What's your relationship with
16   John Harris?
17       A.    He's another friend.
18       Q.    Now, there are a number of
19   limited partner interests associated with
20   Dennis Nathan, would you agree with that?
21       A.    Yes, there's more than one.
22       Q.    Who is Dennis Nathan?
23       A.    He's a friend and client.
24       Q.    A client in what respect?  Just
25   explain that.



Page 310

1

2          A.      Actually, no, I'm sorry.

3    Dennis Nathan is not a client.   His company

4    is a client.   We handle their employee

5    benefits and 401K plan compliance.

6          Q.      What's your relationship with

7    him?

8          A.      I consider him a friend.

9          Q.      How long have you known him?

10         A.      I think we started doing

11   business in 2001 maybe, 2002.   2000

12   somewhere.   Somewhere around 2000, give or

13   take.

14         Q.      How did you learn that he's a

15   felon?

16         A.      Through this lawsuit.

17         Q.      Did you speak -- did you do KYC

18   on Mr. Nathan as a client or his company

19   for your firm?

20         A.      I've known Mr. Nathan, Dennis,

21   for some 20 years.   I've been associated

22   with numerous broker dealers.   At one time

23   even managed some of his personal money.

24   All the broker dealers through the years

25   had information that when we opened up the



Page 311

```
 1
 2    account, they did the know-your-client
 3    review.  Never once did any objection,
 4    question, or any inquiry or comment about
 5    him having this felon background come up.
 6        Q.    Have you spoken with him since
 7    you learned about this, his felony record?
 8        A.    Yes.
 9        Q.    Did you speak about this case?
10        A.    With counsel.
11        Q.    Who was there at the meeting?
12        A.    There was no meeting.
13        Q.    Who was there during the
14    conversation?
15        A.    Dan, myself, and Dennis.
16        Q.    Tell us what was said.
17            MR. SACK:  Do you represent
18        Dennis Nathan?
19            MR. PEARLSON:  No.
20        Q.    Tell us what was said during
21    the conversation?
22        A.    Dan asked if --
23            THE WITNESS:  Actually, I think
24        Ross, you were on the call, too --
25        A.    -- asked if Dennis knew about
```



1

2    Sport-BLX.  He said no.  Then they asked

3    him about his felony.  If I recall

4    correctly, Dennis said it had something to

5    do with him selling his products and trade.

6        Q.    Did you talk about what was --

7    anything more about the litigation?

8        A.    Which?  The felony litigation

9    or --

10        Q.    No.  The litigations that bring

11    us here today.

12        A.    No.

13        Q.    Mr. Nathan didn't ask anything

14    about that?

15        A.    No.

16        Q.    And you didn't tell him?

17        A.    No.

18        Q.    Have you spoken with Mr. Nathan

19    about a possible deposition in this case?

20        A.    No.

21        Q.    Did you speak with him about

22    efforts to serve him with a Subpoena?

23        A.    No.

24        Q.    Are you aware of any efforts

25    that have been undertaken to serve him with



Page 313

```
 1
 2    a Subpoena?
 3         A.    I understand that you're going
 4    to be deposing him.
 5         Q.    Where is he located now?
 6         A.    I don't know.
 7         Q.    Where does he live?
 8         A.    I'm not sure.
 9         Q.    The address here is 89 Leuning
10    Street in South Hackensack, New Jersey.
11    That's a place of employment, I take it?
12         A.    That's his business, yes.  I
13    would assume he still lives in New Jersey.
14    But he travels a lot, so that's why I'm not
15    sure.
16         Q.    There's an address for numbers
17    -- associated with a family trust of 7
18    Charlden Drive, Saddle River.  Is that his
19    home?
20         A.    I don't know.
21         Q.    Does he go to his business to
22    work there?
23         A.    I would assume, yes.  When I
24    meet with him, it's at his place of
25    business.
```



Page 314

```
 1
 2         Q.      What's the Brinker-Cohen family
 3   trust?
 4         A.      It's a trust.
 5         Q.      Who are the trustees?
 6         A.      On the Brinker-Cohen -- I'm not
 7   sure, I think Dennis is the trustee of the
 8   Brinker-Cohen trust.
 9         Q.      Dennis Nathan?
10         A.      Yes.
11         Q.      And who are the beneficiaries?
12         A.      I don't know.
13         Q.      What's the relationship between
14   Brinker-Cohen and Nathan?
15         A.      I'm sorry?
16         Q.      What's the relationship between
17   Allen Cohen and Dennis Nathan?
18         A.      They're brothers.
19         Q.      They work together, as well?
20         A.      They do.
21         Q.      And what's MJR Cypress number
22   19?
23         A.      That's a limited liability
24   corporation.
25         Q.      Who are the members?
```



Page 315

1

2          A.      Dave Roth.

3          Q.      That's your accountant?

4          A.      Yes.

5          Q.      And that's Cypress's

6     accountant?

7          A.      Yes.

8          Q.      What work does he do for

9     Cypress?

10         A.      Tax filing.

11         Q.      Does he provide K-1s to the

12    limited partners?

13         A.      He does.

14         Q.      Any other work?

15         A.      General accounting.

16         Q.      What does that involve here for

17    Cypress?

18         A.      I don't know.  That's his --

19    that's what he does.  He does the tax

20    return at year end.

21         Q.      Have you spoken with him about

22    his deposition?

23         A.      Yes.

24         Q.      Tell us about -- when was that?

25         A.      A week or two ago.  Maybe three



Page 316

1

2    weeks ago.  Maybe a month ago.

3        Q.    Tell us what you remember about

4    the conversation?

5        A.    I told him that I was pretty

6    sure you guys were going to depose him.

7        Q.    Did you talk about the case or

8    the issues in the case?

9        A.    No.  He simply said, they can

10    ask me whatever they want, I don't know

11    anything about it other than doing tax

12    returns at year end.

13        Q.    Did any of the limited partners

14    ever convey to you --

15        A.    Can you give me a minute.  Yes.

16    I'm sorry.

17        Q.    Did any of the limited partners

18    convey to you that that they didn't want

19    their names disclosed in connection with

20    Sport-BLX or this litigation?

21        A.    No.

22        Q.    Did you have any agreement with

23    them not to disclose their names?

24        A.    No.

25        Q.    So as far as they were



```
 1
 2   concerned, you could have disclosed their
 3   names in connection with the broker dealer
 4   application in August 2019?
 5            MR. PEARLSON:  Objection.
 6            Go ahead, you can answer.  I
 7       just objected.
 8       A.    I don't believe so.  I don't
 9   believe that I would have been doing the
10   right thing by disclosing their names as
11   partners of Cypress.
12       Q.    Okay.
13            MR. SACK:  Hindy, could you
14       please read my question back and
15       let's see if Mr. Salerno can answer
16       it.
17            (Whereupon, a portion of the
18       testimony was read back.)
19       Q.    The question was could you have
20   done that?
21       A.    Your question was -- that's not
22   what your question was.
23       Q.    The question was, as far as
24   your limited partners were concerned, you,
25   as general partner, could have disclosed
```



Page 318

```
 1
 2   their names to Sport-BLX?
 3              MR. PEARLSON:  I'm going to
 4        object to that.
 5              Go ahead.
 6        A.    Did I have discretion to
 7   disclose their name?  I would think yes.
 8   If you're -- your question was would they
 9   have allowed it, and I'm paraphrasing.  I
10   don't think I can make that determination.
11        Q.    You didn't ask them, did you?
12        A.    No.
13        Q.    So you don't even know whether
14   -- what they would decide about whether to
15   disclose their names, correct?
16        A.    I did not ask them that.
17        Q.    You made the decision solely on
18   your own?
19        A.    That's correct.  Well, no.  I
20   made the decision with speaking to counsel
21   with regard to whether or not it was really
22   necessary, as well.  But at the end of the
23   day, it was my discretion as a Cypress III
24   manager.
25              MR. SACK:  Let's show the
```



Page 319

1

2          limited partnership agreement,

3          please.

4          Q.    I'm going to show you a couple

5    of portions of this limited partnership

6    agreement.  It's Exhibit 26, it's Cypress

7    3118 through 3152.  And I'm going to direct

8    you to some specific places.  So is this

9    the limited partnership agreement between

10   you and the limited partners of Cypress,

11   Exhibit 26?

12         A.    It looks like it, yes.

13         Q.    Do you see that in section

14   3.01, the general part of it says in the

15   first line, "The general partner shall have

16   the sole discretion of making investments

17   on behalf of the partnership"?

18         A.    Yes.

19         Q.    And you see in 3.02, on the

20   next page, "The general partner shall have

21   the following powers on behalf of the

22   partnership"?

23         A.    Yes, I see that section.

24         Q.    And then included in there,

25   includes to make investments.  And then in



Page 320

1
2  subparagraph J, to act for the partnership
3  in all other matters?
4       A.    I see that section.
5       Q.    Do you see in section 303 B --
6  B, which carries over to page 4, you
7  actually have the authority to indemnify
8  yourself for legal fees?
9       A.    I don't see that.  But if
10  you're saying it's here.  Where is it?
11       Q.    It says, "The partnership
12  shall, in the discretion of the general
13  partner, advance" --
14       A.    What page are you on?
15       Q.    Page 4 of the document.  It
16  says -- it's in the middle of the paragraph
17  of B.  It says, "The partnership shall, in
18  the discretion of the general partner,
19  advance amounts and/or pay expenses as
20  incurred in connection with the
21  indemnification obligations herein."
22            In other words, you can
23  indemnify yourself for fees and expenses
24  under this partnership agreement, correct?
25       A.    I don't see it yet, but okay.



Page 321

```
 1
 2        Q.    Do you have -- do you have to
 3   consult with anyone about any of the
 4   decisions you make as general partner?
 5        A.    Do I have to?   No.
 6        Q.    Take a look at 1105 of this
 7   agreement, Mr. Salerno, bottom of page 15.
 8   It says, "Reports to partners.  The
 9   partnership shall furnish to the partners
10   annual unaudited reports of the performance
11   of the partnership and the unaudited
12   financial statements of the partnership
13   prepared by the general partner within 90
14   days of the end of each fiscal year, or as
15   soon as practicable thereafter, using gap
16   as a guideline."  Do you do that?
17        A.    I believe we satisfy this by
18   giving them their K-1 and we would have to
19   -- and the tax return.
20        Q.    That's your personal opinion --
21   what's the basis for that opinion,
22   Mr. Salerno?
23        A.    A tax return is a financial
24   statement.  It is the official financial
25   statement of every entity, including a
```



Page 322

```
 1
 2    partnership.  And I think that that
 3    satisfies this section.
 4         Q.    But you don't send -- how do
 5    you send that to them?  How do you send the
 6    materials you just referred to to them?
 7         A.    I don't send it to them.
 8         Q.    Mr. Roth does?
 9         A.    Yes.
10         Q.    But you don't provide any
11    statement of any kind annually or
12    periodically to the limited partners about
13    how their investments are doing?
14         A.    That is correct.
15         Q.    I'm showing you now Exhibit 27.
16    It's entitled partnership resolution of
17    Cypress Holdings, III, L.P.
18              What's this document,
19    Mr. Salerno?
20         A.    I'm not familiar with it.
21         Q.    Your counsel produced it to us
22    in the litigation and it has your
23    signature, correct?
24         A.    Yes.  This is a partnership
25    resolution for Cypress Holdings III.
```



1

2        Q.    And so you're talking to

3   yourself here, correct?

4        A.    I'm sorry?  I was answering

5   your question.

6        Q.    Yeah.  No, no.  It's a

7   partnership resolution, meaning you're

8   signing it as Michael Salerno, manager, and

9   you're giving yourself the authority set

10  forth in the resolution?

11       A.    That's a legal determination.

12  I don't know.

13       Q.    Well, did you consult with

14  anyone about this resolution?

15       A.    Cypress's attorneys prepared it

16  and suggested it to be appropriate.

17       Q.    When?

18            MR. PEARLSON:  I just want to,

19        again, caution you, don't reveal what

20        your attorneys told you.  But go

21        ahead.

22       A.    I don't recall when this was

23  signed.

24       Q.    Okay.  Let's go through what it

25  says in the first paragraph.  Who were the



Page 324

```
1
2    attorneys who you consulted in regard to
3    this exhibit?
4         A.     This would -- well, I'm not --
5    can I read this?
6         Q.     Please.  Go ahead.
7         A.     Okay.
8         Q.     Which attorneys did you consult
9    with?  I'm not asking for the substance of
10   your consultation, but which attorneys did
11   you consult with about this?
12        A.     I don't recall.  I don't
13   actually recall signing this document.
14        Q.     Okay.  What attorneys have you
15   used in regard to Cypress Holdings matters?
16        A.     Giordano Halleran, Fox
17   Rothschild, Wilentz and then, you know,
18   Ross.
19        Q.     Did you consult with
20   Mr. Pearlson's firm in regard to this
21   document, the preparation of this document?
22        A.     I don't recall this document.
23        Q.     Where is Ed Kole, what's his
24   firm?
25        A.     Wilentz.
```



Page 325

1

2          Q.    Take a look at the second

3   paragraph.   "Be it further resolved that

4   all of the actions of Michael Salerno in

5   his capacity as manager of Cypress LLC, as

6   general partner of Cypress L.P., taken in

7   good faith from the inception of Cypress

8   L.P. to the present are hereby ratified and

9   affirmed by Cypress L.P."

10            Do you have any recollection of

11  seeking or needing some sort of

12  ratification and affirmance of your

13  actions?

14         A.    No.

15         Q.    Do you recall anyone suggesting

16  that you hadn't acted in good faith?

17         A.    Absolutely not.

18         Q.    So what's the point of that

19  paragraph, if you're signing it and

20  ratifying and affirming your own actions?

21            MR. PEARLSON:  I just want to,

22         again, counsel, you -- to the extent

23         that you were doing it at the

24         direction of counsel and the

25         reasoning is going to reveal the



 1
 2          thoughts of your counsel, you're not
 3          going to disclose it, okay?
 4                 THE WITNESS:  Sure.
 5     A.     I don't recall which one of my
 6  attorneys prepared this.  So I would need
 7  to speak to them with respect to why it was
 8  prepared in the first place.
 9     Q.     You had complete discretion
10  over everything that Cypress III did,
11  correct?
12     A.     Yes.
13                 MR. PEARLSON:  Asked and
14          answered.
15     Q.     You had complete discretion.
16  And so you can't think of any reason why
17  you signed a resolution ratifying and
18  affirming your own acts?
19                 MR. PEARLSON:  Again, asked and
20          answered.
21     A.     Again, I would have to speak to
22  whichever attorney prepared this and look
23  into it.
24     Q.     Okay.  The first paragraph
25  says, in the third line, that you, Michael



Page 327

```
 1
 2     Salerno, "is hereby authorized, empowered
 3     and directed for and on behalf of Cypress
 4     L.P. and in its name to act on behalf of
 5     Cypress L.P., and specifically, and without
 6     limitation, is authorized and directed to
 7     request such documents in connection with
 8     Cypress L.P.'s stockholder interest in
 9     Sport-BLX."
10              Does that refresh your
11     recollection at all as to the origins of
12     this document?
13          A.    No.
14          Q.    Were you, separate and apart
15     from this resolution, authorized,
16     empowered, and directed for and on behalf
17     of Cypress L.P. in its name and on its
18     behalf to request documents in connection
19     with the investment in Sport-BLX?
20              MR. PEARLSON:  Objection.
21          Calls for a legal conclusion.
22              MR. SACK:  No, it doesn't.
23          Q.    This is your partnership
24     agreement.  You signed it.  Doesn't this
25     partnership agreement give you the very
```



Page 328

```
 1
 2   authority that's referred to in the first
 3   paragraph?
 4        A.    In my layman opinion, I would
 5   think so.
 6        Q.    So you have no idea why this
 7   resolution was prepared or why you signed
 8   it?
 9             MR. PEARLSON:  Again, why don't
10        you ask him one more time, maybe
11        you'll get a different answer.
12        A.    No.   I don't recall who
13   prepared this or why.
14             MR. SACK:   Let's take a
15        five-minute break and see if we want
16        to do anything more today.
17             VIDEOGRAPHER:  Off the record,
18        6:00.
19             (Whereupon, a short break was
20        taken at this time.)
21             VIDEOGRAPHER:  On the record,
22        6:09.
23        Q.    Mr. Salerno, you recently
24   referred -- just a few moments ago referred
25   to a real estate investment that you're
```



```
 1
 2   involved with in Red Bank, New Jersey?
 3        A.    No.
 4        Q.    Long Branch, excuse me.
 5        A.    Yes.
 6        Q.    Long Branch, New Jersey?
 7        A.    Yes.
 8        Q.    When did you begin that
 9   investment?
10        A.    2019.
11        Q.    And do you have partners in
12   that investment?
13        A.    I do.
14        Q.    Are any of them the Cypress
15   limited partners that I've been asking you
16   questions about?
17        A.    No.  You're asking if any of
18   the limited partners that are in Cypress
19   are also involved in the real estate
20   separately?
21        Q.    Correct.
22        A.    There are none.
23        Q.    And how about any of the 401K
24   or benefit plans or LLCs, not just
25   individually, but any of these entities
```



Page 330

 1
 2    that are Cypress limited partners, are they
 3    involved in the Long Branch real estate
 4    project?  We can pull out that list again
 5    if you want to check.
 6         A.    My only -- Ice Holdings has a
 7    position in it, as well.  But I consider
 8    that meaning me.
 9         Q.    And your wife, is she invested
10    in this Long Branch project, as well?
11         A.    I don't think so, no.  I don't
12    think she's in that one.
13         Q.    Are you also involved in a Red
14    Bank development, as well?
15         A.    Me, yes.  Me.
16         Q.    You, personally, or one of the
17    entities you control?
18         A.    One of the entities I control.
19         Q.    And are any of the Cypress III
20    limited partners involved in the Red Bank
21    real estate project?
22         A.    Only Ice.  Again, none of the
23    -- no one outside of me.
24              MR. SACK:  I think we're
25         finished for today.



Page 331

1

2          MR. PEARLSON:  Can we have the

3     time check?

4          VIDEOGRAPHER:  Would you like

5     to go off the record, first?

6          MR. SACK:  Yes, please.

7          VIDEOGRAPHER:  Off the record,

8     6:12.

9

10              o          o          o          o

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 332

```
1
2              D E C L A R A T I O N
3
4        I hereby certify that having been
5   first duly sworn to testify to the truth, I
6   gave the above testimony.
7
8        I FURTHER CERTIFY that the foregoing
9   transcript is a true and correct transcript
10  of the testimony given by me at the time
11  and place specified hereinbefore.
12
13
14
                   _____
15                      MICHAEL SALERNO
16
17
18  Subscribed and sworn to before me
19  this _____ day of _____ 2023.
20
21
     _____
22      NOTARY PUBLIC
23
24
25
```



Page 333

```
 1
 2                I N D E X
 3    EXAMINATION BY                        PAGE
 4    Mr. Sack
 5
 6                E X H I B I T S
 7
      NO.        DESCRIPTION              PAGE
 8
      1 through 27 - retained by counsel
 9
10
      INFORMATION/ DOCUMENTS REQUESTED   PAGE
11
      (None)
12
13        QUESTIONS MARKED FOR RULINGS
      PAGE LINE QUESTION
14
      (None)
15
16
17
18
19
20
21
22
23
24
25
```



1
2              C E R T I F I C A T E
3

   STATE OF NEW YORK        )
4                            :  SS.:
   COUNTY OF NEW YORK        )

5

6       I, HINDY FREILICH, a Notary Public
7  for and within the State of New York, do
8  hereby certify:
9       That the witness whose examination is
10 hereinbefore set forth was duly sworn and
11 that such examination is a true record of
12 the testimony given by that witness.
13      I further certify that I am not
14 related to any of the parties to this
15 action by blood or by marriage and that I
16 am in no way interested in the outcome of
17 this matter.
18      IN WITNESS WHEREOF, I have hereunto
19 set my hand this 1st day of May 2023.
20
21
22

              _____ *Hindy Freilich* _____
23                HINDY FREILICH
24
25



```
 1
 2
                    ERRATA SHEET
 3
     PAGE/LINE CORRECTION
 4
     _____ _____
 5
     _____ _____
     _____ _____
 6
     _____ _____
 7
     _____ _____
     _____ _____
 8
     _____ _____
 9
     _____ _____
     _____ _____
10
     _____ _____
11
     _____ _____
12
     _____ _____
13
     _____ _____
14
     _____ _____
15
     _____ _____
16
     _____ _____
17
     _____ _____
18
     _____ _____
19
     _____ _____
20
     _____ _____
21
     _____ _____
22
     _____ _____
23
     _____ _____
24
     _____ _____
25
     _____ _____
```



## A

**a.m**
1:19 5:9 111:20
151:17 208:12
214:24 215:23
219:7 224:23
262:10 268:17
270:3
**abbreviated**
259:9,14
**able**
14:17 38:14 127:17
**Abramowitz**
2:4 5:11 6:2,6
**absolutely**
44:14 261:13 262:24
325:17
**acceptable**
240:23
**acceptance**
215:4 226:7
**accepted**
36:8 276:2
**access**
175:21 188:16 189:7
189:9
**accident**
227:17
**accompanied**
3:23
**account**
24:4 287:19 290:22
290:25 291:6,12,16
291:24 292:4,5,16
292:22 293:2,4,10
293:22 299:7 300:9
311:2
**accountability**
303:15
**accountable**
51:20
**accountant**
70:17 192:2,10,19
193:11 315:3,6
**accounting**
296:4 299:3 315:15
**accounts**
201:4,8,11 308:5
**accredited**
197:12,15,18 198:2,5
198:12 200:12,17
201:16
**accuracy**
20:16,18 22:3 23:16
25:3,19,21 26:11
69:16 130:10
169:24 187:22
**accurate**
9:9 24:10 34:11
35:24 43:4,9 49:24
85:17 87:7,9,13
88:5 93:18 115:2
121:19 127:11
166:20 187:15
192:10 221:21
223:9 227:16
234:24 235:3 254:8
258:25 290:13
305:15,24
**accurately**
54:9 81:20 193:22
235:8 255:15,17,19
**accused**
45:3
**accusing**
274:23
**acquaintance**
163:8 299:22,24
**acquired**
60:4,13,14
**act**
22:24 25:4 44:9
45:20 78:9,14 320:2
327:4
**acted**
325:16
**acting**
172:6 264:6 304:8
**action**
1:6 45:18 47:11
52:12 54:16 251:25

**actions**
160:2 162:4,6,10
284:22 325:4,13,20
**activities**
14:22 295:21 296:10
296:15,21
**acts**
302:19 303:4 304:6,9
326:18
**actual**
93:23
**add**
125:13 138:10
**added**
67:20 128:5 132:6
201:7 206:17 212:9
**addition**
96:25
**additional**
106:25 115:7 129:9
132:5 238:16
**additions**
202:20 204:11
**address**
67:3 83:22 112:10,25
251:23 263:9 264:2
313:9,16
**addressed**
81:13
**adjustment**
106:4
**administration**
11:16 288:15
**administrator**
299:14
**admitting**
249:16
**ADV**
15:10,13 16:10,18
17:8 21:2,7 43:4
48:23,25 57:9 129:7
129:17 148:11
287:10
**advance**
88:16 320:13,19

**advantage**
122:12
**advice**
145:24 146:5,9
150:13,14 151:25
161:20 211:10,22
**advise**
48:11
**advised**
156:14
**advisor**
11:22 14:6,11,25
20:24 21:3,4,22,25
23:4,5,21,25 27:24
28:11 32:6 175:17
176:17,21
**advisors**
15:5 18:13
**advisory**
11:19,25 12:10,12
43:13,18 47:22 48:3
52:24 53:5 54:21
**advocate**
31:7
**affect**
9:12
**affiliate**
43:13,18 47:23 48:3
52:25 53:5 54:21
**affirmance**
325:12
**affirmatively**
241:25
**affirmed**
325:9
**affirming**
325:20 326:18
**afforded**
48:19
**afternoon**
156:8
**agenda**
195:24
**agents**
124:22 126:17
127:24



**aggregate**
217:3
**aggregated**
182:3
**ago**
19:11 44:17,17 70:24
   131:22,23,23 132:2
   179:4 193:14 228:6
   264:10 284:4
   315:25 316:2,2
   328:24
**agree**
27:11 28:2 29:2
   54:14 84:2,4,5,8,9
   84:12 138:23
   140:21 144:10
   165:7 174:9,11
   175:2 186:2 215:10
   216:23 217:11
   218:19,21 222:10
   222:15,23 223:7,9
   223:19 271:6
   302:22,23 309:20
**agreeable**
8:25
**agreed**
4:10,13,16,20 8:15
   82:21 83:2 216:8,17
**agreement**
24:7 80:4,6,15,20
   112:9,18 132:22
   134:8 138:15
   141:12 196:22,24
   197:2 205:22
   210:22 211:2,6
   212:4,7,9,14,18,22
   212:25 213:18
   214:9,12,16 215:25
   216:3,22 217:12
   218:16,18 219:5
   227:6 228:10,15
   230:16 258:17
   259:11 261:3
   262:25 263:9,25
   269:9,22 270:15
   271:2,8,9,17,25

276:11,13 277:4,4
   280:2 296:25
   316:22 319:2,6,9
   320:24 321:7
   327:24,25
**agreements**
78:4,10,17,21 79:8
   79:16 80:9 81:11
   133:10 134:2,4
   135:16 141:12
   196:7,17 202:3,19
   204:11 208:18
   210:24 215:10,11
   216:18 218:25
   219:9,14,19 220:25
   221:3,5,10 222:12
   222:20,22 223:12
   225:3 226:24 228:7
   229:25 230:3,5
   255:22 258:14
   259:6 268:20
   281:21 282:24
**ahead**
28:5 42:4 58:2 69:8
   78:24 79:2,11 80:13
   82:13 88:3 92:7
   99:11 103:16
   108:23 149:25
   161:24 170:7
   173:16 187:8 207:4
   211:12 222:9 232:9
   241:14 243:13
   245:18 247:11
   252:8 257:15 258:8
   260:18 306:9 317:6
   318:5 323:21 324:6
**Alexander**
2:8 6:10
**aligned**
105:16
**allegation**
98:13 219:17 220:2
   220:17
**allegation's**
98:12
**allegations**

219:23 220:14
   223:23
**alleged**
44:18 46:2,22
**alleging**
46:6
**Allen**
314:17
**allocation**
37:12
**allow**
77:13 176:9
**allowed**
177:25 178:3 318:9
**allows**
177:13
**alongside**
34:14
**aloud**
220:23
**amend**
47:15 48:9 56:3
**amended**
44:15,23,25 45:3,6
   45:10,15 130:17
   219:24 220:10,20
   223:24
**amendment**
49:4,6
**America**
21:6,13
**amicably**
265:11 276:16
**amount**
74:8 140:22 141:14
   144:11 192:24
   267:13 270:16
   305:13
**amounts**
320:19
**and/or**
135:17,25 320:19
**Anello**
2:4 5:12
**annual**
49:4,5 91:2 144:20

296:4,20 321:10
**annually**
322:11
**annum**
63:4 84:16 120:16
**answer**
3:8,12,17,17,22,23
   3:23,24 7:21 22:20
   25:13,22 26:6,17,21
   26:23,24 43:16,20
   43:21,22 46:9 48:5
   48:12 52:11 53:3,7
   53:7 55:21,23 58:2
   59:13 66:16 72:15
   74:20 75:3,13,15
   76:23 78:24 83:3
   88:2 90:14 91:18
   101:23 102:6
   103:10 105:4,6
   123:23 126:3
   127:15,16 135:21
   137:19,21 139:10
   139:12,22 146:5,14
   146:25 147:2
   152:13 153:5 158:5
   158:11 159:11,25
   161:25 171:16
   181:13 200:20
   207:3 211:12
   219:22 220:5 222:9
   223:22 231:17
   241:14 242:18
   243:13 244:9 250:4
   252:8,21 254:14
   256:5 257:13,15,16
   257:22 304:16,17
   306:23 317:6,15
   328:11
**answered**
3:20 4:6 51:7,8 81:6
   87:19 100:14
   108:22 113:22
   118:16 121:16
   213:9 238:24
   241:20,25 258:7
   264:9 281:6 285:15



304:15 307:10
326:14,20
**answering**
118:18 161:9 168:25
257:7 323:4
**answers**
22:21 52:21 57:14
224:9
**antagonistic**
150:7 151:19
**anticipated**
74:17 85:6 171:14
**apart**
36:24 37:9 327:14
**apparently**
120:14
**appear**
167:14 174:18,25
**appearances**
5:18
**appeared**
216:11
**appearing**
6:17,18
**appears**
150:12 151:24 174:9
**applicable**
48:20 54:19 176:4
**application**
16:16 317:4
**applied**
104:23
**apply**
3:9 57:16 260:24
**appreciate**
49:9 137:22 163:25
**approach**
175:17
**appropriate**
3:9 4:18 12:6,17,18
12:22,24 13:3,11,17
99:23,24 100:7
101:25 102:23
103:6 104:22
105:12 160:5,12
161:5,11,13,17

265:25 266:4,6
323:16
**approval**
88:9
**approximate**
95:17 109:6 131:19
**approximately**
58:15 63:4 70:22
73:5 81:14,15
125:24 132:2
273:16 283:24
**April**
49:2,18 73:19 85:25
109:22 111:19
113:6 114:9 144:25
261:18 262:9
266:19 267:12,25
284:5
**area**
122:8
**argue**
20:10 29:17 30:17
**arguing**
83:2 105:7
**argument**
272:12,22
**argumentative**
98:17 105:2,5 205:12
241:12
**Article**
3:10
**Asbury**
298:6,9
**aside**
38:9
**asked**
19:7 51:7,7 57:8 64:9
69:18 81:5 87:19
100:13 108:21
115:10 118:15,15
118:23 121:15
129:6 139:18
145:11 153:22
167:12,19 171:8
184:23 185:5
193:13 195:15

205:5,15 210:20
213:8 236:19 237:2
238:22 239:7,18
241:4,19,24 242:5
242:21,23 243:18
243:22 244:4 245:6
247:12 248:15
250:18 256:14,23
258:7 262:4 264:9
268:21 272:16
281:6 285:15 289:6
292:14 297:6
304:15 306:10
307:10 311:22,25
312:2 326:13,19
**asking**
25:24 26:9,10 28:22
34:5 72:12,13 80:14
90:13 93:15 106:9
106:13,15 115:13
120:5 141:8,9,10
142:15,16 150:19
160:17 171:10
181:4 185:22,25
200:21 204:8
211:16 216:11,13
216:16 218:15,18
236:18 259:22
291:25 324:9
329:15,17
**asks**
43:11 52:23 77:6
208:17
**aspect**
185:5 227:18 234:19
**Aspire**
309:4
**assertion**
27:4 63:24 64:13
146:2
**asset**
164:9,9 172:25
173:20
**assets**
36:2,4,5,6,9 38:5
40:8,11 61:7 163:18

163:19,24,25 164:5
164:25 165:6,23
166:16,17 172:3
176:11,12,25
177:18,19 182:10
198:7 233:25 234:3
234:16 298:11
307:16
**assistant**
6:11
**associated**
5:23 6:4,7 7:17
309:19 310:21
313:17
**associates**
6:18
**assume**
179:6 313:13,23
**athlete**
103:23,24 104:13
106:19 166:10
172:3 173:13
**athletes**
100:16 101:5 102:3
102:10,19 106:21
106:25 124:23
126:17 127:24,25
168:3
**athletes'**
101:9 124:24
**attached**
72:25 155:3
**attaches**
282:24
**attachment**
72:23 129:18,23,24
178:24
**attachments**
196:6
**attend**
83:14 88:14
**attendance**
3:15
**attention**
185:10 208:5 215:9
278:8



**attorney**
3:12,21 4:4 7:25 41:2
71:6,20,21 145:21
159:21 206:11
219:8 225:2 226:24
229:19,24 230:6,18
258:14 260:8
277:22 326:22
**attorney/client**
7:24 72:9 211:19
**attorneys**
2:5,10,15,19 4:20,22
47:13 190:15
323:15,20 324:2,8
324:10,14 326:6
**August**
93:9 109:9 150:2,19
151:3,5,12,17
152:17 153:13,18
154:2,11 242:6,9,23
317:4
**authority**
20:12,13 21:3 320:7
323:9 328:2
**authorize**
61:14
**authorized**
62:19 105:11 161:15
327:2,6,15
**authorizing**
162:7
**available**
123:11
**Avenue**
2:5,16,20 110:15
**aware**
44:11,12,20 46:11,21
47:4,5,7,14 78:19
97:11 100:15
312:24

**B**

**b**
3:4,10 43:12 44:8
45:19,20 47:21
56:13 320:5,6,17

333:6
**back**
22:9 31:12,14 33:3,5
38:10,13,15,16,19
52:2,17 56:15,17
70:7 76:25 77:3,19
87:22,24 92:2 125:6
125:8,12,22 126:14
126:24 130:18
137:20,24 139:2,4
139:11,24 151:9
160:24 181:15,17
182:15 208:3
209:22 210:11
214:3 217:8,10
225:23 230:12,14
231:20,20 232:20
243:22 252:21,23
258:3,5 262:4 275:4
304:21 317:14,18
**background**
169:13,19 187:17
311:5
**bad**
302:19 303:3
**bads**
233:3
**BAEZ**
1:8
**balance**
73:21 198:19 200:25
201:5
**Bank**
163:2 164:13 329:2
330:14,20
**barbecue**
232:22
**based**
26:8 28:20 29:19
32:16 48:8 49:2
64:2,5,13 86:10
87:16 106:2 121:12
123:13,16,17,19,24
124:18 146:23
159:13 160:2,14
161:7,18 162:5

165:25 191:23
198:9 200:16 204:4
206:10 215:4
217:16,18 223:7
224:5 226:6 245:25
265:2 271:12,13
305:9 307:4
**basic**
176:17 251:9 285:6
**basically**
65:23 163:17 164:4
226:22
**basing**
127:15,16
**basis**
3:13,24 24:19 63:8
85:18 86:6 102:4,7
105:21 126:5 127:5
144:20 145:25
173:22,24 184:13
219:25 321:21
**basketball**
104:14
**Bates**
72:21 83:8 111:21
149:3 156:4 167:9
286:7
**bathroom**
70:4
**bearing**
269:19
**beginning**
155:11 230:20
241:10 269:11
295:19
**begins**
5:4 148:23 154:23
191:23 269:10
**behalf**
1:4,12 6:22 21:2
34:25 66:13 73:15
73:25 149:22 157:9
276:8 293:21
304:10,22 319:17
319:21 327:3,4,16
327:18

**belief**
87:15 106:17,17
118:12 124:18
130:22 132:10
161:12
**believe**
30:5 40:3 51:6 57:10
57:13 73:17 76:11
85:16 87:6,8 88:4
88:25 92:11 93:9
96:18 100:22
103:17 104:7
106:23 107:18,23
108:18 112:21
115:20 117:11
118:9,14,19 120:11
121:18 123:25
130:13,15 132:5
133:6,17 137:6
139:13,19 140:2,13
140:15,24 142:24
144:3 152:3 154:10
161:10 176:6
182:15,25 185:23
185:23 190:5
193:18 198:3
200:15 209:21
210:9 218:3 238:19
238:22 240:20
241:22 243:23
247:22 250:17
258:24 262:18
270:12 272:8,10
290:12 291:13
294:19 297:2
302:17 303:2
305:23 307:6,18
308:23 309:9 317:8
317:9 321:17
**believed**
107:16,22 108:2,16
118:6 120:24
121:11 161:16
186:15 193:20
194:5 265:2,10
284:6



**beneficial**
102:11 243:8
**beneficiaries**
41:10 58:11,17
286:24 314:11
**benefit**
10:18 102:16 106:25
246:8,10 260:23
266:9 299:6,8
329:24
**benefits**
310:5
**best**
18:9 65:2 79:4
121:10 187:2,10
189:2 201:14 276:6
278:22 280:14
**better**
88:20 89:5,9 102:21
103:12,18 261:4
**beyond**
30:15 72:13
**big**
272:11
**billions**
252:13
**binder**
134:22 135:5
**Birravino**
162:22 164:17
**birthday**
59:5
**bit**
11:11 115:24
**blaming**
229:18,21
**block**
180:8
**blood**
41:18,20 334:15
**board**
81:13 88:8 93:16,19
93:20,23 94:7,9,13
100:3 114:13 116:9
116:13,21 117:5,23
127:8 141:5,9 155:6

155:14
**boarded**
179:20
**body**
221:3 222:22
**bold**
259:15
**books**
157:7,12 158:15,18
159:4
**Bossie**
58:24 60:3
**bottom**
18:22 39:9,13 42:14
42:20 52:18 56:23
111:22 149:4
154:23 215:18
321:7
**box**
18:12,23 21:21,24
38:22 39:8,11,14
42:20 47:20 52:5,17
56:19,22
**Branch**
298:20 329:4,6 330:3
330:10
**breach**
274:11 276:13
280:16
**break**
16:8 18:10,11 70:4
125:10 128:22,23
129:2 135:23
162:12,16 224:13
224:16 268:12
285:20,23 328:15
328:19
**brief**
136:22 181:22
**Briefly**
20:14
**bring**
17:25 54:25 55:2,5
56:7,8 134:22 246:7
246:9 312:10
**Brinker-Cohen**

314:2,6,8,14
**broad**
127:6
**broader**
126:19
**brochure**
129:17
**broker**
310:22,24 317:3
**brothers**
314:18
**brought**
81:18 134:10 235:22
**buddies**
232:21
**budgeted**
189:16
**build**
165:5 180:10 270:10
271:19
**bullet**
112:8,9 182:16 263:6
263:8
**bullpen**
122:8
**bunch**
10:8 126:11
**business**
31:7 42:15 53:13
56:4 67:15 68:20
74:18 78:15 89:7,13
89:16,18,21,24
90:10,16 91:8 96:3
96:9 99:17,25
100:10 101:13,17
101:18 102:18,22
104:6,12 105:14,23
135:11 169:15,21
173:24 178:14
183:11 184:13
187:19 244:11,13
244:14 246:11,12
253:9,11 270:6
274:2 310:11
313:12,21,25
**businesses**

78:20
**buy**
13:10 163:24 164:8
252:15 284:5
**buyers**
168:13
**buzz**
164:7

---

**C**

**c**
2:2 3:4 7:8 332:2
334:2,2
**calendar**
144:18
**call**
17:12 34:19 82:7,9
82:10,14 83:5
110:12 129:10
136:23 139:3,4
156:19 167:8
234:15 248:19
253:23 254:8
255:16 260:3 281:8
281:14,16 311:24
**called**
7:8 88:15 155:23,25
229:13 255:4,12,13
255:14,19,24
277:22
**calling**
82:8
**calls**
200:19 254:12 256:3
281:19 327:21
**Canadian**
298:16
**candidly**
202:9
**capacity**
23:2 71:14 96:22,25
325:5
**capital**
31:8 165:21 182:3
189:17 309:4
**capitalization**



226:13,17
**caption**
45:18 180:7 259:21
**Carbone**
2:17 6:25,25 9:3 18:5
148:6
**care**
148:13 252:5
**careful**
277:25
**Carmela**
58:24
**carries**
155:11 320:6
**carryover**
191:22
**case**
1:14 7:18 8:16 46:22
130:14 191:15
223:22 286:6 301:2
311:9 312:19 316:7
316:8
**cases**
71:14
**cash**
36:8 73:22 198:18
201:2 270:20,20
271:12 298:12
**category**
126:19 127:7
**caught**
62:10
**cause**
3:21 45:18
**caused**
106:6 119:17
**causes**
47:11
**caution**
25:9 72:8 145:19
206:25 211:8 224:2
323:19
**CC**
72:24 154:15
**CCing**
196:4

**ceased**
159:10,24
**census**
271:10
**certain**
63:2 75:5 100:3,4
111:6 120:15
175:22 179:11
215:6 216:20 255:5
266:22
**certifications**
22:3
**certified**
25:3,19,21 26:11
**certify**
21:4 332:4,8 334:8
334:13
**CESAR**
1:8
**cetera**
25:5 73:22 145:2
155:5 208:23
**CFO**
184:5 275:18
**chain**
111:19 147:23
148:18,22 150:2
156:4 208:6 225:24
**chairman**
149:12,18
**chance**
17:24 181:21
**change**
131:17 216:16 222:2
225:5,9,9,11 258:21
259:18,25 260:7
266:19 267:23
**changed**
178:16,16 206:17
232:2 259:7 260:5,5
275:20
**changes**
202:20 204:11
207:19 268:22
285:17
**characterization**

31:17 69:6
**characterize**
202:23
**characterizing**
30:10 34:10
**charge**
4:22 164:3 167:25
168:8,12 171:23
172:10
**Charlden**
313:18
**chart**
226:13,17
**check**
39:17 283:14 330:5
331:3
**checked**
200:6
**chief**
49:25 50:15,23 51:5
51:12
**Chiesa**
2:9 6:14
**children**
41:8
**choose**
168:4 231:9
**chose**
231:4,13 232:5
**Chris**
6:25
**CHRISTIAN**
2:17
**Christopher**
1:9 300:2
**circumstances**
217:18
**City**
85:11
**civil**
1:6 3:5 43:19 44:3
46:5,22 48:4 52:12
53:6
**claim**
44:13 47:6 77:7,10
98:23 277:19

280:16
**claiming**
116:4
**claims**
44:10 305:16
**clarified**
132:15
**clarify**
8:5,7 11:2,5 71:11
**clarifying**
226:12
**clause**
214:17
**clean**
105:12
**clear**
3:13,23 8:3,4,9 28:21
66:5 132:4 194:23
195:3 200:3 245:13
262:21 283:10
**clearly**
4:8 224:6
**clerk**
4:11
**client**
71:18,23,24 287:24
288:3,7,9 309:23,24
310:3,4,18
**Clinton**
1:9 66:12,17,20,23
67:4,5,22,24 90:4
90:11,17,20,22 91:8
91:11 92:2,9,9,21
92:25 93:11,16,24
94:7 95:11,23 96:8
96:16,19,23 97:2,7
97:13 98:9,20
101:12 104:17
108:4,9 110:14,17
112:19,22 113:2,7
132:23 133:8,15
134:6 137:8,12,15
138:3,19 139:17
140:7 141:22
143:15 144:11
175:15 233:4 234:5



234:8 263:17,20,23
264:13,13 265:6
266:5,7,8 267:14,21
269:19 284:9
**closely**
199:5
**closing**
269:20 275:21
**coaching**
30:14
**Cohen**
314:17
**coincidence**
227:5,9,10,14
**coincidental**
227:24
**Cole**
2:19 6:21
**colleagues**
5:21 7:15
**columns**
145:3
**combined**
199:16
**combines**
191:11
**come**
67:12 70:6 99:5
101:20 107:20
124:8 137:5,8
138:19 140:2,8,11
140:12,15,16
143:11,15,20 144:2
146:12 171:25
206:2 207:20 213:7
237:13 274:10,19
275:19 276:12
284:23 288:20
311:5
**comes**
73:4 100:3,4 185:9
237:7 266:8
**comfortable**
212:16,23 213:3
269:17
**coming**

100:17 124:24 126:5
255:11
**comment**
105:22 106:5 311:4
**commenting**
118:11
**comments**
3:16 64:16 269:4
276:21
**commercial**
63:3 120:15 122:20
**committed**
201:12
**common**
105:19 217:2 240:18
**communicate**
296:11,17
**communicated**
192:23
**communicating**
4:5 112:7
**communication**
4:3,5,8 195:23
**communications**
25:11 26:20 120:6
148:17 211:17
265:2 266:23
**companies**
61:11 180:10 252:15
298:13,13,14
**company**
10:12,13,15 30:20,23
31:19 40:9 50:12,16
50:22 51:4,16,20
66:24 67:13 73:14
89:14 92:11 103:8
104:2 123:21
135:18 136:3
142:12,19 143:3
145:6 150:8 151:20
165:4 183:9,18
185:6 186:23
189:16 193:8
195:13 225:3
226:25 227:6 229:3
229:14,16 232:16

232:17,21 233:17
233:19,20,24
234:10,13,16,17,21
234:22,25 235:5,10
235:20,20 236:14
237:16,17 238:10
240:8,11 241:8
244:23,25 249:22
249:24 250:9
251:15,20 252:3,10
252:24 253:18
254:2 255:14,25
258:15 264:22
271:4 273:11,17
279:20 285:13
287:9,17 288:3,5
298:17 299:5 310:3
310:18
**company's**
299:11
**compare**
84:14
**compartmentalize**
165:18
**compensated**
138:20
**compensation**
74:8
**competencies**
180:11
**complaint**
44:16,24,25 45:3,7
45:10,16 119:2,15
119:24 120:2,7,23
121:7 147:19 159:8
160:8 219:15,16,24
220:10,20 223:24
**complete**
52:12 128:17 227:4,9
244:15,19 326:9,15
**completed**
23:14
**completely**
186:24
**Completeness**
20:20

**completing**
54:18
**completion**
271:14
**compliance**
3:6 11:12,13 49:25
50:11,15,23 51:5,12
51:18,23 175:18
288:13 299:14
310:5
**compliant**
176:3,6
**concept**
79:20 104:5 163:17
163:22 170:18
250:21
**conception**
171:22
**concern**
7:23 76:12 89:21
184:24 193:24
194:14 204:14
207:18 264:11,17
264:23 274:7,8
**concerned**
34:4 36:4 72:16
142:22 273:21
276:12 278:7,13
317:2,24
**concerns**
184:21 263:15 264:4
**conclusion**
200:19 254:13 267:8
272:13 327:21
**conclusive**
74:12
**conditions**
218:11,12,14
**CONDUCT**
3:2 4:2
**conference**
101:11,25 104:17,20
104:22 105:9,11
106:24
**confident**
135:21



**confidential**
8:22
**confidentiality**
3:19 8:17,24
**confirm**
8:12
**confirmed**
156:7
**confirms**
180:23
**conflict**
145:12,23 146:6,13
  146:18 147:6,11,15
  152:6,15 153:13,14
  155:20,22 157:18
  159:24 166:9
  260:21
**conflicts**
89:22 176:18
**confused**
29:7 66:25
**connected**
101:17 102:22
  113:15 128:18
  149:9
**connection**
105:9 120:9 193:4
  287:10 298:8
  316:19 317:3
  320:20 327:7,18
**connections**
180:10
**consensus**
97:17 98:8,19,25
  99:6 269:21 270:6,9
  270:14,18,19,19
  271:3,5,8,10,19
**consent**
4:5
**consider**
79:3 234:20 299:25
  310:8 330:7
**considered**
12:21 255:6
**considering**
280:8

**consistent**
83:24 84:10,17
**consistently**
219:19 221:11
  222:12 223:4
**consolidated**
7:18
**constituted**
263:17
**Construction**
287:18 288:6,12,21
  290:21 292:16,17
  292:19,23 293:8,16
**Construction's**
293:23
**consult**
7:25 304:2 321:3
  323:13 324:8,11,19
**consultation**
304:11 324:10
**consulted**
324:2
**contacted**
254:7
**contained**
219:23 220:14
  223:23
**contemplate**
176:13
**contemplated**
297:17,20
**contents**
162:2 278:2
**context**
23:13,18,20 24:8,9
  24:14,15 34:4 54:20
  65:5,7 121:6 128:20
  138:23 165:17
  209:3,23 217:12
  227:23 232:11
  234:4 237:18
  255:10 279:9
  294:18 298:7
  301:24
**continue**
115:25 219:2

**continues**
150:12,13 151:25
**continuing**
152:18
**contract**
217:22,25 270:18
  273:24 274:11
  279:6 280:13,23
**contracts**
280:19
**contrary**
85:13 293:25
**contribute**
253:10
**control**
10:15 29:5,10 30:21
  30:24 31:19 32:23
  232:25 234:18
  235:3 330:17,18
**controlled**
14:21 233:16
**controlling**
4:18 234:19
**controls**
233:18
**conversation**
135:20 140:19
  141:21 142:3,25
  143:7,11,15,21,23
  144:2,9 160:21
  163:13 164:14
  186:6 195:22
  209:16 266:25
  273:2 274:18
  278:14 285:9,18
  311:14,21 316:4
**conversations**
26:7 69:11 79:18
  86:12,14 121:12
  160:3,4,10,15 161:3
  161:8,13,19 162:2,5
  164:12,19 166:2
  183:16,21 186:11
  204:5 207:2,13,18
  224:3,4,6 273:15
  283:23 284:19,21

285:7
**convey**
194:19 203:10,12
  245:24 316:14,18
**conveyed**
193:21 206:21 252:4
  253:4,14 268:3
**conveying**
205:9 263:18
**cooperate**
276:5 278:10
**copied**
152:16,21 155:13,15
  156:12
**copy**
4:21 78:3 81:10
  155:6 214:25 295:2
**copying**
149:10 150:5,18
  151:11 155:2 269:3
**corner**
110:4
**corporation**
60:24 88:9 308:21
  309:7 314:24
**correct**
11:18 21:10 34:14,15
  34:22,23 35:2,12
  36:12 37:2,9,15,17
  37:18,21,23 38:2,3
  39:10,24 43:5 47:9
  51:23,24 57:17,18
  59:10,19 60:5 61:12
  62:18,20,23 63:18
  65:21 69:14 71:7,8
  76:10 81:4,22 84:19
  85:8 86:16,17,19
  89:3 90:21 91:2,4
  96:9,17 97:3,7
  108:5 109:7 113:16
  119:18,21,22
  120:23 121:2
  122:17 123:21
  132:18 144:6,23
  158:2,16,21 159:24
  161:17 162:9



165:10 167:16
170:4 172:6,8 180:3
186:24 187:5 188:8
188:22 189:8,12
192:6 201:13,19
203:24 205:7 206:8
210:3,18,24 217:5
217:16,20,23
223:20 228:24
230:21 231:2,3,6,13
232:7 233:15 234:3
236:23 237:12
238:4 239:22 240:2
244:6,21,23 246:15
247:3,24 253:2,6,11
254:2,25 255:8,15
255:25 256:20
257:3,11 258:17,20
260:25 266:12,16
267:7,15 270:11,15
271:5,20 280:9
283:25 284:9
287:12 292:16
293:10 294:5,6
301:8,11,19,23
303:13,16,22,24
304:7,13 307:15
308:3,9,13 318:15
318:19 320:24
322:14,23 323:3
326:11 329:21
332:9
**corrected**
132:15,18 202:15
203:17 227:18
228:4 293:7
**correcting**
227:24
**CORRECTION**
335:3
**correctly**
312:4
**correspondence**
149:21 150:7 151:19
155:19,21
**cost**

269:19 298:25
**counsel**
5:17 7:20 9:16,19
15:12 16:25 19:6
20:17 23:14 24:16
24:17,18,18,25
25:12,16,17 26:8,10
26:16,20,22 27:4
39:18 43:6 44:23
47:17 48:10,21
53:17 54:22 55:17
55:22 56:7 59:12
62:7 130:24 148:11
154:16 156:10
157:2,8 158:8
176:22 189:25
191:12 197:21,22
198:10,22 202:9,21
202:24,24 207:2
211:10 220:4,7
224:4,6 269:23
278:3,5 311:10
318:20 322:21
325:22,24 326:2
333:8
**count**
85:11 105:24
**countersuit**
302:3,16 304:25
**counting**
38:12 282:11
**COUNTY**
334:4
**couple**
319:4
**course**
3:15 43:10 82:18
132:17 140:12
270:5,23
**court**
1:2 3:20 4:12 5:15
7:5 43:12 47:21
52:24 70:2 121:7
148:21 190:16
191:13 259:3
275:13

**courting**
102:19
**cousin**
286:15 287:2,3,4
**cover**
72:21 88:12 117:11
196:8
**covered**
73:17
**CPLR**
3:10,14,22 4:15,17
4:18
**crash**
290:5,7,9
**CRD**
18:15
**create**
163:21 164:5,23
168:3 173:18
**created**
131:20
**creates**
27:24 28:11 32:6
**creating**
164:7 173:10,25
174:18 178:10
180:7
**creation**
132:7
**Cross**
287:20,22 289:5
290:10,14,24 291:5
291:13 292:7,18,23
292:24 294:2
295:12 298:4
**Cross's**
290:21,25 291:16,24
292:4,5 293:3,9,21
294:3
**crossed**
257:18
**crystal**
132:4
**current**
73:18 76:15 77:8
85:10 171:22

**currently**
78:4
**custodian**
287:17,19 290:20
299:5,7
**custody**
22:22
**Cypres**
298:9
**Cypress**
1:3,16 2:10 5:6 6:15
33:13,17,18,21 34:3
34:6,7,20 36:20,23
37:8 38:5 44:16,19
45:21 62:14,17
72:21 110:3 119:16
119:21 145:14
149:22 152:7,10
153:15 154:3 160:6
160:9 167:9 190:17
192:3 195:5,14,16
195:17,21 197:4,8
197:11,16 198:9,11
198:25 200:12
201:15 204:23
205:14 206:23
209:2,4,8,14,20,25
210:7 219:11,16
229:9 231:4,10,13
232:2,13,14,15,20
233:3,7,13,16 234:9
235:9,12,18,23,25
237:22 238:13,16
238:21 239:3 240:7
241:18 242:22,24
243:19 244:6
245:20 246:15
247:23,24 248:10
248:13,16 249:3
254:9 256:7,10,19
257:2,10 259:7,8,13
259:17 260:4,12,22
260:24 261:9,15
262:20,23,25
263:22 286:4,7
288:22 289:13,13



289:25 290:3,8,9,11
290:14,15,24 291:2
291:10 294:11,15
295:17,19,22,25
296:2,8,9,12,16,22
297:6,13,16 298:8
298:10 299:17
300:21 302:3,15
303:2,23 304:4,7,9
304:10,23 305:2,12
306:3,21 307:3,12
307:14,25 308:3,9
308:13,15 314:21
315:9,17 317:11
318:23 319:6,10
322:17,25 324:15
325:5,6,7,9 326:10
327:3,5,8,17 329:14
329:18 330:2,19
**Cypress's**
191:18 192:2,9,18
262:17 301:5,24
303:11 307:16
315:5 323:15
**Cypresses**
289:6,11

---

**D**

**d**
2:17 3:5 332:2 333:2
**Dan**
6:20 311:15,22
**Daniel**
1:8 2:13,16 7:3 114:6
149:10
**data**
167:16 188:12,15,15
188:18,19,21,23
189:4,8,10 269:18
269:22 271:7
282:25
**date**
1:19 18:16 61:16
86:4,11,15 95:17
109:6 133:2,3,4,23
143:9 154:9 162:24

269:16
**dated**
73:3 111:19 178:22
214:23
**dates**
93:13 115:19 132:12
132:13
**Dave**
70:19 192:13 315:2
**David**
2:21 6:21 190:8,11
**day**
67:23 125:25 142:12
142:19 143:3 232:3
234:21 318:23
332:19 334:19
**days**
142:13,20 143:5
321:14
**De**
1:8 2:19,25 6:22,24
63:13 64:15,18 66:6
68:17,24 69:11
74:15 83:22 85:10
86:13,24 88:21 89:5
91:16,25 94:20
95:14 101:3,16
102:21 103:6
108:14 111:20
113:14 114:2,18
115:25 116:15
117:21 132:23
134:6,11 135:16
140:20 141:13
142:3,17,21 143:2,8
143:12,16,24 144:8
149:5 150:3 151:15
153:19 154:25
155:14 156:5 162:9
178:13,16 183:6,24
184:12 186:6,7,8,12
187:3 195:8 196:4
200:14 201:24
203:3,4,4,11,12
205:18 206:11
207:7,15 208:2,15

211:15 214:24
216:25 219:2 222:4
224:21,25 225:6
226:4,15 227:7,19
235:9,17 238:3
239:21 240:5,7,12
245:9 257:10
258:11,11,13
262:10 265:6,14,23
266:25 268:18
269:2 272:12,18
273:4,9 274:12
275:5,15 276:7
278:6 281:14
282:22 283:18,23
284:12
**deal**
103:20,22,25 104:21
105:10 106:6,12,15
106:19,21 184:11
218:16 299:16
**deal's**
275:7
**dealer**
317:3
**dealers**
310:22,24
**dealing**
112:11,25 263:10,18
264:3,15
**dealings**
71:10,12
**deals**
71:15
**dear**
41:14
**debt**
270:4,9,14,22
**December**
60:4,13 218:3
**decide**
99:23 210:17 244:20
318:14
**decision**
105:14,14 119:20,23
190:12,17 201:18

244:17 253:20
254:3 294:3,5,8,9
303:23 307:7
318:17,20
**decisions**
232:25 253:21
303:12,21 304:4,7
304:22 321:4
**deck**
166:22,24 178:25
**decks**
167:2 179:3,5
**deemed**
4:17
**defect**
3:13
**defend**
302:18,20,24
**Defendant**
1:22
**defendants**
1:11,17 7:3 219:23
220:13 223:23
**defense**
100:20 302:9
**define**
41:16 104:3 135:19
204:14 253:13
254:23
**defined**
29:12 31:21 254:25
299:6,8
**defines**
28:9 217:15
**defining**
260:4
**definitely**
137:10 141:17
155:25 239:8,16
249:13
**definition**
27:10,20 28:3,7,16
29:14,15,18 30:4,11
31:24 32:13,14
36:13 54:20 72:17
117:15,24 184:25


MAGNA
LEGAL SERVICES

217:13,15 218:20
254:15 261:15
**Delaware**
202:14
**demand**
157:8,13 158:15,19
158:22 159:5
**Dennis**
209:7,9,17 246:15
309:20,22 310:3,20
311:15,18,25 312:4
314:7,9,17
**deny**
219:23 220:13
223:23
**denying**
219:25
**department**
50:10
**depend**
13:18
**depending**
291:21
**depends**
13:20 131:9
**depict**
81:20
**depiction**
93:18 127:11
**deponent**
3:12,17,21,24 4:4,5
**depose**
316:6
**deposing**
313:4
**deposit**
122:17,21 200:25
201:9
**deposition**
3:4,7,8,8,11,18 4:4
5:5,10 7:19 8:13,21
9:15 17:14 18:2
33:22 167:9 180:19
312:19 315:22
**Depositions**
3:2,3 4:2

**deprive**
196:13
**deprived**
54:7
**der**
2:24 5:14
**derivatively**
1:4,12
**describe**
148:15 234:25
**described**
30:3 31:2 49:23 97:6
121:14 170:20
235:7 252:10
**describing**
235:4
**description**
35:24 294:15 333:7
**design**
11:14
**designated**
8:22
**designations**
8:24
**detail**
45:24 74:4,6 192:21
**detailed**
77:12
**details**
69:19 75:5
**determination**
161:7 318:10 323:11
**determine**
87:12 89:6 99:18
100:12 114:25
160:5,11 161:4
**determined**
91:23
**determining**
4:6
**detriment**
150:15 152:2
**development**
66:21,24 104:12
330:14
**develops**

67:15
**Dgold@coleschotz....**
2:21
**diagram**
179:19
**difference**
265:16,21
**different**
37:20 41:19 60:16
92:12,13 101:5
116:8,16,18 126:11
166:25 172:13
203:14 208:19
257:23 265:7,14
271:13,14 291:25
292:19 328:11
**differently**
257:25
**diligence**
68:22 69:7 74:14,23
76:5,10 84:19
144:16,22 184:11
247:7
**dinner**
101:7 142:4,6,7,13
142:19,20 143:4,5,9
144:9 275:21 279:3
283:9
**direct**
3:21 17:17,21 20:21
26:5,17 38:11,25
39:12,15 45:14,17
46:9 55:21 111:24
119:4,6 120:12
129:14 146:5,25
148:16 158:5
179:11 191:2 208:4
208:7,9 215:16
319:7
**directed**
152:8 327:3,6,16
**directing**
68:17 69:4 225:21
**direction**
3:23 325:24
**directly**

59:14 166:7 181:13
241:24 280:10
**director**
50:2 99:18 100:12
104:24 246:7
**disagree**
223:18 231:8 254:20
**disagreed**
266:14,15
**disbelieve**
108:7
**disclose**
192:3 316:23 318:7
318:15 326:3
**disclosed**
267:13 316:19 317:2
317:25
**disclosing**
317:10
**disclosure**
15:15
**discovery**
191:14 272:14
**discretion**
244:17,20 291:9
318:6,23 319:16
320:12,18 326:9,15
**discuss**
47:16 136:7 142:11
183:8 291:4
**discussed**
73:2 139:6 142:18
191:24 287:9
**discussing**
73:8 136:17
**discussion**
70:12 95:21 110:7
136:15,24 137:3
151:13 167:4
179:19 268:9
**discussions**
146:24 159:14 278:2
**dispensations**
48:19
**dispute**
273:24



disputes
284:7,14
disrespect
58:25 186:10
distressing
149:20
distribute
17:9
distributions
248:21
DISTRICT
1:2,2
distrust
284:12
distrusted
274:6
diverse
180:10
docks
206:16 275:25
document
10:5,7 11:15 17:16
   17:18,19 18:19 19:3
   19:17,23 20:2,4
   22:13 27:19 30:7
   31:2,17,21 32:17
   38:10,24 46:20 47:9
   49:22 52:22 53:9,13
   54:18,20 56:2,12,12
   56:16 59:18,20,25
   60:11 76:22 80:25
   110:5,12 119:7,10
   129:9,18 167:15,22
   170:9,12,13 171:5,5
   171:9,10,11,12,19
   171:20 173:5
   174:19,23,25 175:8
   175:10,11 180:23
   181:2,18 198:9,23
   199:12 200:8 203:6
   203:10 205:6,24
   206:22 207:14
   210:5 213:7 215:22
   215:24 220:16
   223:8 224:21,23
   225:23 226:2

227:12,19,21
229:19,22 230:23
231:11 232:5,7
260:2 262:3 294:20
294:24 295:6
297:10 320:15
322:18 324:13,21
324:21,22 327:12
document's
206:9
documentation
74:11 117:9 154:13
   228:2
documents
9:17,23 55:4,18
   181:3,6 186:9
   196:12 200:14
   201:24 202:8 203:7
   203:16,19 205:17
   205:17,20 207:8
   213:3 220:8 221:25
   225:5 226:23 227:2
   230:24 258:19,22
   268:18 275:22
   327:7,18 333:10
doing
14:17 97:2 105:23
   154:3 195:5 248:2
   258:23 285:5
   310:10 316:11
   317:9 322:13
   325:23
dollar
192:24 236:5 298:25
   305:4,14
dollars
84:21,23,24 198:6,7
   198:12 200:9,10
   232:19 252:13
   253:25 289:7
   293:11,13 294:4,10
   305:22 306:4
domestic
18:13 20:23 21:22
   43:11 47:21 52:23
double

257:24
doubt
130:10
downloaded
188:24
downside
208:23
Dr
299:18,20
draft
200:14 220:22
   230:20
drafts
219:17 220:24 221:9
   222:11,19
draw
278:8
drawing
265:19
Drive
313:18
DRP
52:13
due
31:3 55:14 68:22
   69:6 74:14,23 76:5
   76:10 84:18 85:2
   144:15,21 159:24
   184:11 247:6
duly
7:9 332:5 334:10
duties
51:18

_____
         E
_____
e
2:2,2 3:6 7:8,8 332:2
   333:2,6 334:2,2
e-mail
69:21 72:20,22
   109:25 111:19
   112:3 147:23
   148:18 149:4 150:3
   150:11,17 151:3,5
   151:10,17,24
   152:17,22 153:18

153:23 154:15
155:13 156:4
178:21,23 196:2,3,8
205:24 206:6,9,14
206:15 207:11
208:10,10 209:15
209:23 211:13
214:22,23 215:2
225:22 226:4,21,22
255:13 261:19
262:4,9 265:13
266:20 267:18
268:16,25 270:2
274:12,15 275:15
276:10,18 278:7,12
282:19,21 283:18
295:14,19 296:6,7
e-mailed
275:6 295:20,24
e-mails
109:15 148:24
152:25 154:19
156:12 207:13,25
207:25 215:6
262:22 268:22,23
Eagan
287:13
earlier
47:3 57:15 71:5 94:2
110:17 129:7
145:11 153:21
180:24 239:5
254:16 262:5 263:5
263:11 268:23
278:25 291:19
293:6
early
44:17 63:18 86:19,20
156:15 163:10
164:20 167:12
187:11 220:25
222:20 230:20
281:17 284:3
earn
168:15,17
earning



169:8
**earnings**
169:15,21 173:12
  187:19
**earth**
284:12
**easier**
64:7
**easily**
64:10 202:15
**Easy**
168:23,23
**Ebury**
248:12,14,17,18
  249:4
**ecosystem**
180:8
**Ed**
5:25 157:12 324:23
**edit**
213:12
**edits**
205:19 206:10
  258:16
**educated**
187:3,10
**EDWARD**
2:7
**effect**
4:11 122:22 138:17
  280:6
**efficiencies**
99:5
**efforts**
312:22,24
**eight**
37:22 38:2,12 131:23
  249:2 254:4
**either**
86:16 113:14 136:9
  139:3 142:12 144:8
  230:3 257:14
  269:13 282:10
  295:13
**elements**
251:9

**Elizabeth**
286:11,14
**emphasizing**
171:21
**employed**
73:24
**employee**
10:18 49:15 79:20,24
  80:3,9,16 310:4
**employees**
13:13 63:5,10,25
  64:11 65:9,24 66:8
  67:5 73:14 74:7,17
  74:23 75:7,11,17,19
  76:4,10,13 77:14,22
  78:5,9,9,16,21 79:8
  80:21 81:9 85:5,12
  86:7 89:6 92:8
  96:19 97:17 98:8,24
  99:2,6,7 103:7
  107:18 108:8
  114:22 116:17
  117:2 120:18
  121:20 140:11
  143:19,25
**employers**
79:7,13,15
**employment**
78:4,10,16,21 79:7
  79:15 80:4,6,8,15
  80:20 81:10 313:11
**empowered**
327:2,16
**enclosed**
149:21 206:16 215:2
  226:5
**encloses**
282:23
**encompassing**
168:19 169:11
**endeavor**
276:5 278:10
**ended**
207:9 213:19
**enforce**
3:19

**enforced**
277:5
**engaged**
250:10 251:17
**entered**
8:14 63:2 120:15
**entering**
250:24
**Enterprises**
1:10 2:15 149:13
  160:13 161:6
**entire**
8:21 85:3 125:3
**entirely**
59:17
**entirety**
171:20
**entities**
15:11 29:5 33:12,13
  33:25 37:20 67:14
  92:13 130:3 252:16
  264:5 329:25
  330:17,18
**entitled**
180:18 322:16
**entity**
27:23 28:10 29:10
  31:25 32:2,5,23,24
  33:11 40:23 57:3,5
  57:8 92:23 197:15
  197:25 228:3
  244:22 292:11
  321:25
**equity**
173:13
**ERRATA**
335:2
**error**
3:13 47:15 57:12
**errors**
227:24
**especially**
103:18
**ESQ**
2:6,7,7,12,12,17,21
**establish**

31:23
**estate**
10:21,24 11:2,4,7
  15:23 40:15,25 41:2
  42:8 58:19 121:25
  124:4,15 286:21
  297:23 298:6,12,18
  298:19 328:25
  329:19 330:3,21
**estimates**
185:15,16
**et**
25:5 73:22 145:2
  155:5 208:23
**event**
4:7
**events**
10:3
**everybody**
101:17
**evidence**
106:13,16 118:12,21
  118:23 285:3
**exact**
65:25 258:12 298:2
**exactly**
63:20 64:10,23 85:23
  93:13 95:15 166:22
  210:8 228:17 239:6
  239:10 249:9
  279:11 294:25
**examination**
1:21 3:15 4:14,21
  7:12 333:3 334:9,11
**examined**
7:11
**examining**
3:25
**example**
9:12 13:7,23 14:12
  28:7 32:12 172:23
  176:24 254:21
**examples**
12:23 14:2 28:13
  40:17 128:13
**exceed**



305:14

**excerpts**
42:23

**excess**
75:7,21,25 305:22

**excessive**
121:23 124:17

**exchange**
44:9 45:20 150:12
151:24 163:20
164:6,10 165:23
166:4 177:11
206:15 208:5
275:21

**exchanges**
177:13

**excuse**
38:18,19 58:6 91:15
95:8,19 112:16
168:16 171:13
173:8 203:7 290:6
308:11 329:4

**executed**
226:23 271:9 275:21

**executing**
172:7,9,15

**execution**
18:14 20:24 21:22
22:2 215:4 216:12
216:22 226:6 227:8
231:19,22 268:20
275:25

**executive**
39:12 149:18 294:12
294:18 297:9,11

**exemptions**
175:22

**exercise**
89:18 262:11 264:21

**exercising**
112:4

**exhibit**
17:13,13,14 27:15,17
38:11 45:12 49:11
61:21 69:24 72:20
83:6 109:18,20

110:12 111:18
119:2 129:11,23,25
167:9 190:23 191:6
198:25 199:10,19
208:8 220:9,18
225:25 261:18,24
275:12 282:15
286:6 319:6,11
322:15 324:3

**exhibits**
21:8 109:14

**exist**
289:23 290:2

**existence**
145:23 165:12
170:21

**expand**
11:10

**expect**
280:4

**expected**
174:6

**expecting**
278:24

**expending**
63:3 120:16

**expense**
83:24 84:10,16 85:7
90:25 91:2

**expenses**
135:11 183:11
184:15 185:19
189:17,17 320:19
320:23

**expensive**
99:14

**experience**
79:14 106:2 123:25
124:3,8,10 246:11
252:12

**expert**
121:24 122:2

**explain**
47:3 107:7 191:4,8
293:6 309:25

**expressed**

278:25

**extensively**
221:4 223:12,15

**extent**
3:14 25:9 26:6,15
55:22 100:24
146:23 176:14
211:9,14 254:12
302:8 308:9 325:22

**extremely**
121:22 186:18
194:10

---

**F**

**F**
334:2

**face**
307:8,11

**fact**
98:7 113:23 141:22
175:21 179:25
219:20 221:12
222:13,23 224:7
231:12 238:3
301:10

**facts**
47:12 107:23 307:4

**factual**
173:10

**fail**
186:24

**failure**
186:20,21

**fair**
30:6 38:4 113:8,9
114:19 116:4 120:7
175:24 176:5
187:12 194:11,12
219:6,12,13 230:2,4
290:23

**fairly**
255:3

**faith**
325:7,16

**fall**
157:4

**false**
43:22,23 98:12,15
118:5,6,8,10,13,22
120:22 121:2,9

**familiar**
80:7 103:19 179:8
250:25 251:3
270:13 322:20

**families**
100:17 101:5 102:3
102:19

**family**
34:13,16 41:3,5,15
41:16 57:19 58:18
59:15 60:3 106:22
124:24 127:25
300:4,5 313:17
314:2

**family's**
40:8 286:20

**FAQ**
138:12 167:19 188:2
188:5

**FAQs**
138:18 174:9,14
187:24

**far**
44:22 174:20 183:3
235:3 304:7 316:25
317:23

**far-fetched**
172:17

**father**
105:15,16 106:20

**fathers**
106:22

**FBO**
287:17 290:20 299:5

**fear**
277:22

**February**
35:5 85:25 119:3
132:20 133:3,9,18
134:2 136:3 141:21
159:9 183:16 188:6
195:25 196:5 197:7



197:12 198:11
200:7,9,13 201:15
203:10,19,24
205:17 206:4
207:10,10,12 208:2
208:11 212:22
214:9,13,15,21,24
219:7 220:25
222:20 224:23
230:20 231:2,2,21
232:3,3 233:6,8
235:16 238:14
239:4,5 242:8,21
243:18 244:5
246:18 268:17
271:25 272:7
281:20 282:18,22
283:6,25
**fee**
164:4,4 179:17 180:5
**Feel**
17:15
**fees**
168:2,5,8,13,16,17
169:8 170:22
171:23 172:10,14
172:16,20 180:2,3
180:25 303:3 320:8
320:23
**felon**
246:15,23,24 310:15
311:5
**felony**
311:7 312:3,8
**felt**
279:12
**fewer**
98:24
**fiduciary**
12:2 49:21 50:2,9
51:13 275:23
**Fifteen**
131:22
**fifth**
2:5 51:25 112:9
263:8

**fight**
82:19 302:14
**file**
15:10,24 16:3 119:14
119:24 248:14
280:7
**filed**
15:20 16:10,18,20,21
16:22 19:10,15 20:7
20:11 43:4 44:16,21
46:20 47:2 48:25
119:2 120:3 121:7
129:19 147:19
159:8 160:8 223:22
224:10 248:9,16,23
277:19 300:19
**filing**
19:2 162:7 280:8
315:10
**filings**
287:10
**fill**
54:8
**filled**
242:3
**final**
213:20 227:12,20,25
231:11
**finalized**
207:9
**Finance**
309:4
**financial**
36:11,14 61:4 64:9
69:18 73:18,23
74:10 76:16 77:8
83:25 84:11 93:14
95:4 115:16,20,21
115:23 136:2
142:18 169:13,20
177:10,23 183:9,17
183:21 185:5
187:18 193:3,15
194:15 321:12,23
321:24
**financials**

74:22 93:5,6,8,8
94:23,23 135:7,18
142:11 143:3,8
183:18,22,24,25
184:2,3,8,19 189:15
269:12,13
**find**
38:14 41:14 92:24
113:10 115:7
150:20 251:24
261:18,24 267:3
276:4 278:9
**findings**
175:19
**fine**
26:21
**finish**
14:9 75:13,23 91:18
95:8 123:18
**finished**
91:20 260:17 330:25
**FINRA**
151:14
**fired**
79:25 80:3
**firm**
12:10 17:5 145:14
157:19 159:18
190:4 191:11,12
287:25 288:4
310:19 324:20,24
**first**
7:9 27:21 32:3 45:10
45:15,17,18 59:4
93:4 100:18 130:2
134:9 144:17 145:5
156:3 162:20
171:17 173:7,8
182:16 192:15
195:11 196:19
199:10 200:24
202:8,10 206:21
220:10,17 222:18
223:9 232:19
242:16 259:7,13,20
259:24 261:12

281:16 282:23
287:2 289:9 319:15
323:25 326:8,24
328:2 331:5 332:5
**fiscal**
321:14
**five**
63:5,9,25 65:9,24
66:7,7 67:20 70:24
75:7,21 76:2 98:24
120:17 121:20
136:22 137:2
257:20 290:19
292:12,15,22
**five-minute**
328:15
**flipped**
202:8
**floor**
2:11,20 125:3
**Florida**
276:18 281:12
**flow**
73:22
**flying**
126:12
**focus**
42:24
**focusing**
110:2
**follow-up**
156:2 164:14
**followed**
166:21
**following**
37:5 52:11 160:4
161:3 175:19
177:20 219:17
276:21 319:21
**follows**
7:11
**force**
4:11
**forecast**
189:16
**foregoing**



332:8
**foreign**
43:12 47:21 52:23
**foresee**
166:20
**forget**
148:10 155:24
**forgot**
18:4
**Forlenza**
190:4 208:4,11
209:16 210:6
**form**
3:13 15:10,13,15
16:6,10,18 17:7,8
21:2 24:21,23 30:15
30:16 37:4 43:4
48:9,23,25 54:11
56:4,5 66:15 68:6
69:6 75:2 78:13,23
82:12 99:10 102:25
103:15 116:12
129:7,17 138:6
152:12 165:16
187:7 202:6 204:13
205:12 222:8
225:15 241:2
242:11 243:12
245:17 247:10
260:15 274:5
287:10 303:9,18
**forma**
85:3 91:6 136:8
185:17 186:16
188:3,11
**formas**
136:17
**formation**
31:8
**forms**
15:20 16:20
**forth**
3:19 4:7 92:2 208:3
323:10 334:10
**forward**
102:10 184:14 203:2

206:18 210:11,12
267:3 276:24
**forwarded**
151:15 208:2,14
**forwards**
151:10
**found**
43:12 47:22 52:24
93:10 272:13
283:19
**foundation**
256:4
**founders**
149:19 210:16
216:25 244:25
251:16 252:11
**founders'**
66:22
**founders/investors**
275:23
**four**
221:6,17
**fourth**
52:16 130:4 223:18
224:8 259:16 269:9
**Fox**
146:19 149:9 150:4
150:14 151:16,25
152:8 160:12 161:5
324:16
**fractional**
166:10,11 173:18
174:2
**fractionalized**
164:24 173:21
**fractionalizing**
163:18
**framed**
3:11
**Francis**
1:8 2:16 114:6 184:2
184:5
**Frank**
7:4
**frankly**
44:12 269:14

**fraud**
44:13 302:4,4
**frauds**
305:9
**fraudulently**
274:23
**free**
17:15
**Freilich**
1:24 5:16 334:6,23
**frequent**
167:19
**frequently**
167:11,19
**friend**
287:23 299:21,23,25
307:20 309:17,23
310:8
**friendly**
163:8
**friends**
34:9,12 234:22
248:18 297:5
**front**
30:7 32:18 47:6
97:23,25 98:4
139:15 174:15
182:13 215:22
226:20
**fulfill**
51:18,23
**full**
39:14 122:14 291:9
**fully**
42:25 201:16
**functions**
96:21
**fund**
13:4 27:23 28:11
31:25 32:2,5,8,12
32:14,19,19 34:14
36:24 37:2 163:23
163:24 165:9,11,12
165:22 166:4,16
168:15,18 169:9
170:3,10,11,15,17

170:19,21,22,22
171:13,15 172:2,2,4
172:20,24 173:9
174:8,8,13,17,18,24
175:10 176:10,24
177:6,6 178:11
179:22,23 180:15
180:25 181:23
200:23 233:5,5
234:5,8 237:20
248:12,14,20,20
249:4,16 254:19,21
282:4 300:22
301:22 302:9
**funded**
275:24
**funding**
133:22 282:11
**fundraising**
66:22
**funds**
93:2,11 177:15,25
248:17,18 272:2
275:18 287:5
288:16,19 300:21
**funny**
117:14
**furnish**
321:9
**furnished**
4:21
**further**
4:10,13,16,20 325:3
332:8 334:13
**future**
138:4 156:12 173:12
276:6 278:11
284:22

---

G

**gaming**
298:16
**gap**
321:15
**gathered**
134:23



**GBE**
148:23,23 150:2
  156:4
**general**
3:3 22:25 24:8 25:4
  28:17 29:10 30:2,21
  30:24 31:19 32:10
  32:21,23 33:11,24
  73:20 119:9 200:22
  315:15 317:25
  319:14,15,20
  320:12,18 321:4,13
  325:6
**generalities**
297:19,22
**generally**
7:21 211:20
**generate**
84:24 164:2
**generated**
104:8 106:24
**generating**
84:21,23
**Gentleman's**
17:3
**George**
1:8 2:5 7:16 61:15
  64:25 65:19,20
  68:16,24 69:11
  72:24 91:15,24
  92:16,19,22 94:20
  111:21 113:3,4,14
  113:25 115:25
  127:13,23 128:3
  132:23 134:6
  135:17,25 137:4
  138:12,14 141:13
  149:10,14,18
  150:18 151:11
  152:25 154:19
  162:8 178:15 183:5
  183:23 193:19
  195:8,12 207:7
  213:21 214:4,13,18
  214:25 216:25
  218:6 222:5 233:5

234:6 235:8,17
  237:19 239:21
  240:4,6,12 245:9
  257:9 262:10
  263:20,22 264:14
  265:5 266:15,23
  267:11,19 269:3
  278:23 279:23
  281:9 283:19
**germane**
54:23 172:17 234:20
**getting**
29:7 72:9 95:4,12
  113:7 124:7 137:13
  138:2 141:23
  160:20 191:14
  200:13 207:9 211:9
  221:24 231:11
  241:11
**Giantomasi**
2:9 6:15
**Giordano**
190:3 324:16
**give**
8:23 12:23 41:21
  49:23 52:3 66:2
  95:17 109:5 116:15
  118:24 127:11
  171:17 187:4,11
  204:8 237:4,8
  283:10 294:8 297:7
  297:8 310:12
  316:15 327:25
**given**
3:8 93:6 103:9,11,18
  117:12,16 146:6
  169:13,19 175:15
  187:4,17 188:16
  206:11 244:2
  247:16 269:15
  332:10 334:12
**gives**
282:25
**giving**
9:8 75:14 116:7
  117:8 145:24

172:23 296:3
  321:18 323:9
**glad**
266:24
**Glassbridge**
1:10 2:15 7:2 92:11
  146:20 149:13,16
  159:19 160:13
  161:6 162:8
**glasses**
17:24 18:2,7
**glossary**
31:5
**go**
20:6 22:8 28:5 38:10
  42:4 58:2 63:15
  67:12,23 69:8 78:24
  79:2,11 80:13 82:13
  88:2 90:3 92:7
  94:22 99:11 103:16
  108:23 132:24
  135:6,10 138:13
  139:2,4 145:19
  146:11 149:25
  151:9,9 154:20
  156:3,21 161:20,24
  170:7,11 173:15
  178:19 181:10,20
  181:21 184:13
  187:8 188:18,21
  195:25 207:4
  211:12 214:21
  215:21,22 220:20
  222:9 225:23 232:9
  241:14 243:13
  245:18 247:11
  252:8 257:15 258:8
  260:18 262:4 286:8
  306:9 313:21 317:6
  318:5 323:20,24
  324:6 331:5
**goes**
161:13
**going**
17:7,11,16,21 25:8
  25:12 31:10 38:11

41:25 42:23 45:14
  46:8 49:23 57:24
  58:22 60:6 62:4
  63:14 69:21 80:16
  80:18,19 89:23 90:7
  90:16 91:8,11,13,25
  92:15 96:7 97:24
  101:4 102:15
  103:14 109:13
  110:2,4 119:4,6
  121:4 125:13
  127:10 129:12,20
  132:14 139:15
  145:19 146:4,8,24
  147:22 150:9 158:3
  158:24 161:22
  165:5 167:5 171:9
  174:20 175:4 178:9
  180:16 191:2,4,8
  195:20 196:10,13
  198:8 203:21 204:3
  207:24 208:9
  214:22 221:22
  222:5 230:9 231:20
  232:20 241:9
  247:17 253:10
  254:11 259:4 264:8
  269:25 273:23
  276:22 280:3 286:8
  289:2 306:6 313:3
  316:6 318:3 319:4,7
  325:25 326:3
**Gold**
2:21 6:21,21
**good**
163:15 199:11
  251:11 325:7,16
**goods**
233:2
**gotten**
265:3
**government**
43:5,24 46:20 55:4
**Grand**
2:4 5:12
**great**



104:5 184:11
**greater**
306:3
**greatly**
305:21
**Greg**
49:14,15 50:20,24
  51:9,10 53:9,11,14
  53:19 56:6
**Gregory**
51:17
**gross**
61:14 62:6,11 68:18
  69:4 70:16,23 71:10
  71:24 72:2,25 73:7
  81:16 119:14,24
  120:6 145:10,13,13
  145:17,20 146:7,24
  150:19 151:12
  152:7,9 154:2 155:2
  155:4,6,13 156:7,15
  156:19,21 157:15
  157:17,18,22,24
  158:8 159:2,7
  160:11,13 161:4,5
  161:14,19,21 162:3
  162:5
**Gross's**
150:6 151:18 159:3
**ground**
269:20
**grounds**
4:7
**Group**
1:9 66:12,18,20,23
  67:5,22,24 90:4,11
  90:17,20 91:9,11
  92:2,9,21,25 93:11
  93:17,24 94:7 95:12
  95:23 96:8,16,19,23
  97:3,7,13 98:9,20
  101:12 104:17
  108:5,10 110:14,17
  112:20,22 113:2,7
  132:23 133:8,15
  137:8,12,15 138:3

138:20 139:17
140:8 141:23
143:15 144:12
234:5 263:17,20,23
264:13,13 265:6
266:5,7,8 267:14,21
284:9
**Group's**
67:4 90:22 92:10
  175:15
**grouping**
24:2,5
**guarantees**
194:9
**guess**
153:4 190:22 213:15
**guesses**
187:3,10
**guide**
197:22
**guideline**
321:16
**guidelines**
291:16,22,23 292:4,8
  292:11,18 293:2,14
  293:15
**guy**
50:8
**guys**
233:2 277:19 316:6

_____

**H**

**H**
7:8 42:21,24 43:11
  43:21 47:21 52:5,8
  215:19 333:6
**Hackensack**
313:10
**half**
100:18 149:15
  224:24 225:6
  231:10 232:6
  301:17,19
**Hall**
1:8 2:5 7:16 61:15
  63:13 64:25 65:20

66:6 68:16,24 69:11
72:24 83:22 86:13
88:7,21 89:4 91:16
91:24 92:16,19
94:20 95:13 101:3
101:16 102:21
103:5 108:14
111:21 113:3,4,14
114:2,18 115:25
116:15 117:22
127:13,23 128:3
132:24 134:6,12
135:17 136:2
138:13,14 140:19
141:13 149:10,14
149:18 150:5,18
151:11 152:25
154:19 162:8
178:14,15 183:5,23
184:12 186:13
187:4 195:8 207:7
214:25 216:25
218:6 222:5 235:8
235:17 237:19
238:2 239:21 240:5
240:6,12 245:9
257:9 262:11
263:20,22 264:14
265:5,13,22 266:23
269:3 274:18
276:17,19 277:14
278:23 279:23
281:3,9 283:24
284:8,12
**Hall's**
64:17 92:22 195:12
  233:5 234:6 278:14
**Halleran**
190:3 324:16
**hand**
334:19
**handed**
181:19
**handle**
11:12 299:14 310:4
**handles**

11:9
**happen**
119:18 306:5
**happened**
81:20 109:7 127:12
  133:22 230:7
**happening**
97:6,9 100:23 101:2
  307:5
**happy**
237:24
**harm**
277:7
**Harris**
309:10,16
**head**
49:20 85:10
**headed**
18:13
**heading**
221:3 222:21,24
**hear**
76:24 127:17 128:9
  131:24 139:21
  162:21 163:3
  231:23
**heard**
7:14 79:19,21
**held**
1:23 70:12 83:13
  95:21 110:7 167:4
  268:9
**help**
11:14 59:13 124:8
**helping**
66:23
**Henry**
86:13 114:5 134:15
  134:20 163:16
  178:8,13,21 183:5
  183:25 195:9
  272:16,17,20
  283:20
**hereinbefore**
332:11 334:10
**hereto**



4:18,21
**hereunto**
334:18
**hey**
232:12
**high**
186:18,20,21 194:10
236:14 244:14
249:22 253:11
291:20
**hindsight**
102:16
**Hindy**
1:24 5:15 69:25
76:25 125:6,20
126:10,20 160:24
181:15 191:7 217:8
230:12 252:21
258:2 275:12
317:13 334:6,23
**hired**
79:24 80:3 106:20,23
157:21
**hiring**
105:16
**history**
232:20
**hold**
26:4 36:6,15 40:7
55:20 60:25 229:8
233:25 234:3
242:15 243:10
250:2 273:23 285:4
298:2,10,15,18
**holding**
40:9 61:11 225:3
226:25 227:6
229:14 232:16
233:17,20,24
234:15,20 235:5,10
235:20 237:17
240:7 241:8 252:15
255:14,25 258:15
294:4
**holdings**
1:3,16 2:10 5:7 33:18

39:15,23,25 40:2,5
40:7,15,20,23,24
57:4,6,8,15,16 60:2
60:22 61:2,9 62:15
62:17 130:5,8 131:5
131:8,13,21 132:6
149:23 198:18
204:24 206:23
219:11 249:8 259:8
259:8,13,18 260:4
260:24 261:16
286:4 287:8 295:17
295:20 296:8,9,12
296:16 322:17,25
324:15 330:6
**holds**
36:2,9,11 38:5 40:8
40:12 61:2,8
**home**
109:3 313:19
**homes**
101:8,9,9
**hone**
119:10
**hope**
84:24 85:3 165:13
269:17 276:4 278:9
**hopefully**
164:7
**horse**
13:9,11,15,24 14:13
168:2
**Horses**
40:17
**hour**
136:23 224:24 225:5
227:19,25 231:10
232:5
**hours**
9:22 88:15 264:10
**house**
195:12
**housed**
90:11
**housing**
267:22

**hundred**
111:5 115:2 216:20
227:15 256:22
264:14 266:21
279:16 281:24
288:25

---
**I**
---

**Iason**
2:4 5:12
**IBM**
234:9,11
**Ice**
39:14,23,25 40:2,4,7
40:20,23,24 41:23
42:8 57:4,6,7,15,16
60:2 130:5,8 131:5
131:8,13,20 132:6
249:7 287:8 330:6
330:22
**idea**
267:6 328:6
**identical**
215:12
**identified**
183:13
**identifies**
196:21
**identify**
196:19 208:8
**identifying**
219:20 221:12
222:14 252:17
**identity**
192:4 203:13
**ii**
3:19 289:13,25 290:8
290:9,11 298:9
**iii**
1:3,16 2:10 3:20 5:7
33:14,17,18,21 34:3
34:6,7,20 36:20,23
37:8 38:5 149:23
259:13 260:24
286:4 290:15,15,24
291:2 294:11,16

295:22,25 296:2,8
296:13,16,22 297:6
297:13,16 298:8,10
299:17 307:25
308:3,9,13,15
318:23 322:17,25
326:10 330:19
**imagine**
99:4
**immediate**
41:3,5,20
**immediately**
42:11
**impact**
67:7
**implies**
173:9
**important**
43:3,8 101:12,19,25
202:12 207:6,6
228:8,19,23 229:2
240:15,20 245:4,5,8
247:19 248:3,4
250:17 251:21,24
252:18,18 305:8
**impossible**
306:14
**impressions**
25:10
**improper**
3:20 30:13
**in-person**
135:24
**inaccuracies**
88:6
**inaccurate**
86:6 87:16 115:3
290:17
**inappropriate**
13:2,5,16,24 14:2,13
266:2
**inappropriately**
102:14
**inception**
269:16 325:7
**include**



3:13 74:7 77:12
162:6 213:4 263:6
**included**
41:6 69:19 154:14
189:14 221:2
222:21 319:24
**includes**
29:2 172:24 319:25
**including**
21:8 73:20 85:4,6
122:16 176:7
183:10 213:4 249:6
249:7 321:25
**incorrect**
132:16,17 190:18
192:5 221:14 224:8
**incurred**
270:5 320:20
**indemnification**
320:21
**indemnify**
320:7,23
**independent**
25:14 26:18 211:11
**index**
13:4
**indicate**
266:18 277:9
**indicated**
18:15
**indicates**
59:21 60:11 206:9
**indicating**
56:23 222:4
**indirect**
56:13,20 59:9
**indirectly**
280:11
**individual**
7:3 40:22 205:10
221:25 293:18
300:3
**individually**
1:3,12 119:17 219:10
221:9,20,23 229:13
260:12 261:8

290:14 306:18
329:25
**individuals**
5:23 6:3,8 7:16 37:19
60:12 185:23
189:20 236:7 264:5
**inducing**
274:24
**industry**
124:15
**inference**
182:24
**inferring**
182:17,20
**information**
19:23 21:7,9 23:16
25:4 51:17,22 54:8
54:25 55:2,6 62:22
64:12 69:16,19 73:2
73:11,13 80:10,23
81:4 85:14 88:21
115:7 116:7,16,19
116:20,23,24 117:8
117:13,15,17,24
118:3 120:8 122:22
124:7 127:17
151:14 188:7,10,24
189:3,6,8,21 190:9
191:11,18 193:3,15
204:9 226:16 229:7
243:15,16 282:6,10
294:7 297:7 310:25
**INFORMATION/**
333:10
**initial**
19:13 167:25 168:4,5
168:7,9 171:23,25
172:7,10,17,25
219:17 221:9
222:11
**initially**
17:17,21
**initiated**
214:16 277:16
**initiative**
211:4

**innuendo**
280:12
**inquiry**
311:4
**insert**
231:4,9
**inserted**
259:8,12
**inside**
12:15
**institution**
177:23
**institutional**
12:2 49:21 50:10
51:14 181:24
**instruct**
25:12
**instructions**
272:4,7,21,23 273:6
279:3,4 282:17
283:2,6,11,20
**instructive**
269:15
**intend**
56:3
**intended**
58:25 228:18
**intent**
80:22 81:8 276:4
279:8
**intention**
176:2
**interest**
35:4,8,12 36:14
37:11,24 41:22 60:2
61:3 82:15 89:23
113:4 145:12 166:7
174:2 176:18 285:9
301:9,11,12,13
327:8
**interested**
334:16
**interesting**
163:15
**interests**
36:12,16 37:7 173:11

173:12,19 285:10
309:19
**interfere**
3:16
**interns**
66:12 85:13 86:8
103:8 107:19 108:9
116:17 117:3
**interpolation**
126:25
**interposed**
3:6
**interpretation**
32:17
**interrupt**
4:4 29:24
**introduce**
5:22
**introduced**
70:16,23 157:21,23
163:16
**invest**
24:10 101:13 140:23
141:15,24 144:12
166:9 190:12,17
195:13,20 197:25
201:16,18 254:3
274:24 275:2
278:17 279:19,23
279:24 294:3,10,16
307:21,24 308:2,7
308:12,14,16
**invested**
65:17 90:16 91:3
109:11 176:2 188:5
188:8 195:17
248:19 267:15,21
282:16 288:21
289:5 290:10,14,15
290:24,25 293:14
301:6 305:14
307:13 308:4 330:9
**investing**
34:13 174:4 194:24
197:8 201:12
208:21,25 210:2,2



221:8,19 229:3,12
229:16 244:25
247:23 273:10
285:12 291:5
294:21 297:13,20
**investment**
11:19,22,24 12:7,10
12:11,12,21,24 13:2
13:3,6,10,15,19,21
13:25 14:3,6,11,14
14:16,19,25 15:5,6
16:17,22 17:8 18:13
20:24 21:3,4,22,25
22:23 23:3,4,7,11
23:17,21,22,24 24:2
24:7,12 25:6,23
26:2,13 27:10,21,22
28:3,9,14,16,18,24
29:4,12,20 30:3,19
30:25 31:20,25 32:4
32:11,15 34:6,10
39:16 43:14 44:4
46:6,23 47:24 48:6
49:20 50:9 52:22
53:2 57:4,16 98:3,5
100:2 129:8,16
132:25 133:12,15
163:15 165:19,20
166:4 167:2 175:16
176:10,17,20,24
177:5 191:25 192:8
192:16,19,20,22,25
193:4,9,17 194:17
204:10 219:18
220:25 221:10,22
222:12,19 232:23
235:2,19,22 236:6
244:17 245:11
247:18 249:18
250:11,12 251:18
252:10 254:9,18,22
254:24 255:3,4,20
255:22 273:17,21
274:10,13 276:2
282:5,7 283:25
288:23 291:12,15

291:21,22,23 292:3
292:8,10,25 293:14
293:15,17,19,21,23
294:2 298:5 299:17
300:8,12,16 301:25
305:4 327:19
328:25 329:9,12
**investments**
12:5,14,16,18 24:3
34:8 36:5,10 50:2
72:6,17 166:5 200:8
240:19 294:21
296:21 297:16
319:16,25 322:13
**investor**
181:24 194:20,23
195:2 197:12,15,18
198:2,5,12 200:12
200:17 203:20
205:10 222:2,6
231:15 240:17
250:22,23 251:14
251:20 253:19
308:18
**investors**
23:6 24:6,10 27:25
28:12 32:7,25 34:2
34:5 36:3,5,7,9,12
38:6 84:2,12 100:16
102:3,19 124:23
127:24 128:6,7
169:14,20 182:18
187:18 201:4,11
236:15 237:11,15
237:23,25 238:4,8
238:12,16,20,23
239:2,11,17 240:11
240:17,24 241:7,18
242:2,4,22,23 243:5
243:18,24,25 244:3
244:5,9,20 245:14
245:20,23 246:23
247:13 249:16,22
249:25 250:10
251:16 252:5,25
253:6,15,17,22,24

254:2,24 255:2
256:10,19 257:2,10
275:24 289:20
303:6
**invitation**
110:13
**invoices**
270:21
**involve**
315:16
**involved**
18:25 19:5,16 43:13
46:22 47:23 52:25
53:21,25 55:3,18
111:10 114:7
202:16,18 249:17
307:16 329:2,19
330:3,13,20
**involvement**
120:10 202:23
**involves**
44:4
**involving**
46:14 249:25
**IRA**
300:9 307:22 308:2
308:11,12,15
**irregularity**
3:14
**irrelevant**
204:25
**irrevocable**
286:12,13
**issue**
27:3,5 45:25 83:22
112:10,25 146:6
166:21 191:13,15
194:14 266:8
270:24
**issues**
193:14 263:8,10
264:3 265:15
266:11,16 316:8
**item**
42:15 43:21 74:4,5
130:3,5 167:22

195:24
**items**
73:10 81:2 251:23
**iterations**
203:6 218:24 222:3
230:25

---

**J**

**J**
320:2
**January**
65:14,17 85:25
110:15 119:5 133:8
159:9 178:19,22
179:2 248:8
**jargon**
29:14 30:9
**Jeff**
308:23 309:2
**Jeffery**
308:2,11
**Jeffrey**
307:19
**Jersey**
15:3 16:19 142:5,8
143:4 163:2 202:14
313:10,13 329:2,6
**Joe**
27:13 68:17,24 69:11
91:16,25 111:20
113:14 114:2
115:25 132:23
134:6 135:16,25
137:3 141:12 149:5
151:15 153:19,20
154:25 155:3,13
156:5,7 162:9
178:16,20 183:6,24
193:20 195:8 196:2
196:4 205:18 206:2
206:14 207:7 208:2
213:21 214:13,19
214:24 216:25
222:4 225:20 235:8
235:17 239:21
240:5,7,12 245:9



257:10 258:10,11
258:13 262:10
265:6 266:15
267:11,19 269:2,7
272:12,18 273:4,9
275:15 276:6,7
279:2,3 282:22
283:10,18
**John**
8:20 17:11 49:11
50:5 56:14 75:12,22
77:15 121:3 125:9
129:22 151:4
180:16 199:15
216:10 235:14
248:5,5 257:19
261:4 278:20 309:9
309:14,16
**JOHNSON**
1:9
**join**
31:15 67:14 234:23
**joined**
6:23
**Jonathan**
2:6 5:20 155:9 169:5
174:21
**Joseph**
1:8 2:7,19,25 6:5,22
150:3
**judge**
4:12
**judgement**
99:17 100:10
**judgment**
89:14,19,21,25
103:17 123:13,20
123:20 305:3,21
306:2,2,12,15,21
307:3,17
**judicial**
52:12
**July**
83:13,18 85:14 86:7
88:22 93:3,9 95:13
102:18 103:4,13

109:8 114:12,13
115:7 116:9,20
149:6 152:5,6
**June**
61:13 63:21 65:14
73:6 85:21 86:2
93:8,12 102:18
103:4,13 115:17
145:10 147:6,8,15
147:16 149:7,24
152:6

**K**

**K-1**
321:18
**K-1s**
296:4 315:11
**keep**
220:21 230:9 260:11
289:3
**keeping**
61:4
**Kelly**
2:12 6:17
**kept**
259:14,19,23
**kind**
12:11 71:15 88:12
322:11
**knew**
86:23 87:2 90:7 91:3
96:15 102:21 113:6
192:19 197:7 204:4
205:15 210:6
229:10 232:14
235:9,21 239:16
241:22 256:7 265:4
267:20,21 271:17
311:25
**know**
8:5 13:10 23:17
29:15 41:24 42:4,5
44:23,24 45:2 48:18
49:4 50:13 53:12,15
53:22 54:15 60:13
61:24 62:9,12 68:2

81:18 85:24 90:10
90:15 97:16 98:10
98:18,21 101:15,16
101:19,21,24 102:4
102:14 103:5,12
105:18 107:10,11
111:4,23 113:19,20
113:23 114:14,17
115:4,5 117:17
118:4,7 120:21,25
121:8 122:23 123:5
123:6 124:22 125:4
125:17 126:6,6
130:23 131:2,16
133:2 135:3 136:6
137:11,14 138:2
139:20 140:17,18
144:18,24 153:10
154:6 160:18
167:17 173:23
177:16 197:6,23
199:3 200:12
203:20 204:4
206:19 210:8
222:24,25 223:21
225:9 227:13 229:2
233:2 236:15
237:15,20,23
239:20,23,25
240:13 241:22,23
244:13,24 245:8,10
245:14,19,23
246:18,22,24 247:2
247:15 249:15,21
249:24 250:9,15,20
250:23 251:15
253:16 254:5 256:9
256:9,13 261:4
262:21 265:12
269:5 270:17 276:4
279:7,7 291:17,18
298:23 300:3
301:15 302:13
305:8,20 307:2,8
308:24,25 309:2,11
313:6,20 314:12

315:18 316:10
318:13 323:12
324:17
**know-your-client**
311:2
**knowledge**
60:18 116:7 121:11
189:3 197:13
**known**
247:5 310:9,20
**Kole**
157:12,21 158:8,20
158:21,22 324:23
**Korp**
308:17
**Kortes**
2:12 6:17
**Kuc**
307:19 308:2,11,17
**KYC**
310:17

**L**

**L**
7:8,8 332:2
**L.P**
1:3,16 2:10 5:7 33:18
149:23 286:4
322:17 325:6,8,9
327:4,5,17
**L.P.'s**
327:8
**Lack**
256:3
**laid**
74:16
**language**
212:13 213:17,20
216:21 258:12
**large**
176:9 302:8
**larger**
305:3
**late**
163:9 164:19
**latest**



224:22
**law**
3:5 159:18 250:21
251:4,10 302:5
306:24
**laws**
21:5 44:11,19 45:4
45:25 46:2 176:4,7
**lawsuit**
44:9 46:12 55:2
161:16 248:9,14,16
248:17,23 254:6
279:13,15 280:8,9
300:19,22 307:17
310:16
**lawyer**
19:20,22 46:4,10
155:17 157:11,14
203:12,20 204:4,6,9
205:19 206:21
207:14 208:4,17,24
212:12 251:4
**lawyer's**
210:21,21
**Lawyers**
16:22 17:6
**layman**
328:4
**lead**
111:11
**leading**
214:12
**learn**
114:10 145:12,16
147:5,14 152:5
157:18 184:8
310:14
**learned**
93:21 95:11 114:3,9
146:13 275:18
311:7
**learning**
153:12
**lease**
63:2 120:15 122:12
122:13,20 123:2,3

**led**
229:12 247:21
**ledger**
73:21
**left**
49:2 269:6
**legal**
5:14,16 6:10 39:14
71:13 145:24
156:10,25 200:19
211:9 254:13
269:22 276:22
303:3 320:8 323:11
327:21
**legalese**
47:13
**Leonora**
58:21,24 59:4 60:3
**let's**
18:9 38:8 45:9 48:22
56:2 76:24 87:21
110:8 111:7 126:9
131:24,25 146:9
151:2 154:20
160:22 178:18
190:21 195:25
198:22 203:18
205:16 214:21
215:16,22 222:17
231:23 261:17,24
275:10 278:18
317:15 318:25
323:24 328:14
**letter**
61:14 62:7,20,23,25
63:22 64:24 65:11
66:4 68:4,18 69:4
69:13,17 73:6 81:3
81:16 85:21 86:22
145:9 147:7,9,16,16
149:8,24 155:24
156:2 159:5 191:3,9
196:8,18,21 202:4
204:18 262:14
**letterhead**
191:10

**letters**
218:25
**Leuning**
313:9
**level**
72:12 284:11
**levels**
41:19
**liabilities**
269:14,21
**liability**
60:23 308:20 309:6
314:23
**licenses**
251:6
**lien**
248:20,20
**liens**
297:23
**light**
43:21
**limitation**
3:19 327:6
**limited**
34:7,21 35:4,21
36:17,19,21,22 37:8
37:21 60:23 73:20
191:19 192:2,4,9
209:11,12 235:25
242:6 246:14 247:3
247:7 248:10,13
249:2 254:21
260:22 286:5,9
289:15 295:21,25
296:7,12 301:22
304:3,25 305:8,20
307:7 308:20 309:3
309:6,19 314:23
315:12 316:13,17
317:24 319:2,5,9,10
322:12 329:15,18
330:2,20
**line**
30:16 42:2 74:3,5
130:4 221:4 222:23
223:2,5 257:18

259:16 260:2
265:19 269:9
275:16 278:9
319:15 326:25
333:13
**lines**
206:17 215:3 226:5
268:19
**link**
282:24
**list**
73:10 76:20 77:6
112:8 125:16,18
128:6,17 205:21
219:2 286:4 292:12
330:4
**listed**
49:17,22,25 57:3
59:17 292:11
**lists**
39:13 56:19 167:23
216:2 299:4
**literally**
88:15
**litigate**
300:25
**litigation**
10:4 53:20,23,25
55:13,19 249:4,17
250:10 251:17
277:23 278:8,13
280:20,24 282:2
301:23 302:10,14
302:24 303:22
312:7,8 316:20
322:22
**litigations**
7:18 249:25 303:7,10
303:11 312:10
**litigious**
249:21
**little**
11:11 71:5 186:8
**live**
313:7
**lives**



313:13
**LLC**
12:8 39:15,16,25
40:5,20,23,24 57:4
60:22 129:17 130:5
130:8 131:8,13,21
132:6 287:8,17
299:5 308:17 309:4
325:5
**LLCs**
329:24
**LLP**
2:15
**located**
313:5
**location**
67:4 91:14,19,22
97:16,17,23 99:7
106:24
**locations**
101:10
**Loeb**
2:15,15 7:2,2
**log**
200:25 201:9
**long**
9:21 109:14 110:8
111:16 114:9
136:13,15 147:18
298:19 310:9 329:4
329:6 330:3,10
**longer**
111:18 136:19 152:9
157:25 158:9
**longstanding**
175:15
**look**
9:24 17:15,20 31:4
35:9,10 45:6,23
47:10,19,19 51:25
61:17 72:19 76:6,9
76:19 83:9 84:13
87:11 110:11 111:7
115:16 119:8,12
129:13 138:25
145:7 167:21

169:12 171:8,10,18
173:3,4 178:18
179:8,10,13 180:6
188:19 189:2
190:21 196:5,12,16
198:23 199:3,5,24
203:18 205:16
208:6 215:17 216:7
220:5,11,16 222:17
225:18 226:20
228:6,14,20 231:19
258:17 259:5
261:17 268:23
275:14 277:15
282:14 299:3
301:16 307:25
321:6 325:2 326:22
**looked**
9:17 10:6 22:14
76:14 144:15 189:5
224:21 228:9
248:22 270:24
271:2,7 283:15
**looking**
109:18 171:3 198:17
198:18,19 201:6
206:18 252:25
253:5 261:7,14
**looks**
205:23 216:19
319:12
**loss**
73:21 74:2 244:15
**lot**
116:2 180:20 248:2
251:8 313:14
**lower**
110:3 262:7
**LPs**
36:15,18 190:17
191:14 255:23
295:16 300:15
**luck**
199:11
**lunch**
162:12

**lying**
86:24

## M

**M**
1:16 2:7,10 5:6 7:8
130:6 196:20,25
215:24 216:2
221:13 222:14
223:4
**Madison**
110:15
**Magna**
5:14,16
**majority**
35:8 42:6 233:7,12
301:11
**making**
106:18 180:14
185:15 193:9
194:16 221:22
225:4,9 250:12
273:16 319:16
**Maletis**
2:8 6:10
**malfeasance**
248:23
**manage**
11:14 34:22,24 35:22
37:24 165:21
168:18 172:21
180:25 235:2
255:21 286:17
288:16,24 308:5,7
**managed**
255:8 287:5 310:23
**management**
89:14 100:11 104:19
105:10 123:20
164:4 168:16,17
169:8 170:10,11,21
172:14,16 174:7
**manager**
32:10 318:24 323:8
325:5
**managers**

89:17
**manages**
233:18 288:18
**managing**
22:25 25:5 26:12
28:18 29:11 30:2,21
30:24 31:20 32:21
32:24 33:11,25 40:2
130:19 131:10
169:9 171:15 174:8
174:12,17,18,24
175:9 178:10
179:23 180:14
232:18 289:18
**Manhattan**
121:25 122:20 123:7
124:4
**Marc**
61:14 70:16 72:25
119:14,24 145:10
145:20 150:6,19
151:11,18 152:14
153:22 154:7,8
155:2,6,13,23,24
156:7,11,19,21
160:3,5,11 161:4,5
161:8
**Marc's**
153:23
**March**
18:16 19:10,16 22:6
44:18 46:19 85:25
133:21 275:6,11,15
279:20 281:17
284:19
**mark**
17:11 110:8
**marked**
45:12 72:20 83:6
118:25 148:22
261:21,23 333:13
**market**
112:10,15,16,22
121:22,25 164:5
252:13 263:9,16
264:2,5,12



**markets**
176:19 251:9
**marking**
27:14
**markups**
219:18 221:10
222:11
**marriage**
334:15
**Marsden**
299:5,8,11,18,20
**material**
134:23 144:15
189:12,14 204:9,15
204:18 205:2 270:4
**materially**
116:8,16,18
**materials**
76:5 144:22 167:6
269:17 322:6
**math**
200:6,6
**matter**
5:6 34:17 72:13,14
99:16 156:9,13,17
194:14 237:22
334:17
**matters**
72:3,4,6 112:7
152:19,23 320:3
324:15
**mean**
12:4,18 16:7 26:13
33:17 65:6 79:22
80:2 96:24 97:10
101:9 112:24
115:24 140:15
142:23 147:13
284:21 306:18
**meaning**
15:6 289:24 323:7
330:8
**means**
12:20 59:8 174:2
182:6,18 241:5,12
241:13

**meant**
97:4 253:8
**Medical**
299:5,8,12
**medication**
9:11
**meet**
9:19 101:4,7 105:25
279:25 313:24
**meeting**
81:13 82:3,20 83:12
83:14,18,21 86:24
87:15 88:13,14
93:19,20,23,23 94:7
94:9,14,18,25 95:3
95:6,13,22 114:13
116:10,13,25
117:23 132:22
133:7,7,14 134:5,17
134:23 135:6,9,12
135:14,19,24,25
136:13 139:3,5
140:6,10 141:5,9,11
141:20 142:3,10,13
142:17,19,20,23
155:6 206:18
311:11,12
**meetings**
74:15 81:21 121:13
127:9 128:4 134:21
183:4,16 184:9
**member**
22:25 25:5 28:18
29:11 30:2,22,24
31:20 32:21,24
33:11,25 39:24 40:3
41:23 130:8,20
131:5,8,10,11,12
132:11
**members**
40:4,19,22,23 41:4,5
41:15 106:22
124:24 127:25
132:6,11 308:22
309:8,12 314:25
**memorializing**

138:16
**memory**
127:10 132:4 138:13
280:3
**mentioned**
196:9
**Merrick**
287:17 288:6,12,21
288:24 290:20
292:15,15,17,18,19
292:23 293:2,8,16
293:22
**message**
153:21
**met**
9:16 105:17 128:12
128:15,17 134:11
239:17 245:9
**Michael**
1:16,22 2:10 5:5 6:16
130:6 134:10
151:10 154:24
156:9,16 178:12
184:6 194:25
196:20,25 201:25
202:3 204:23 205:6
209:13 214:25
215:24 216:2 219:3
219:4,21 221:12
222:14 223:4 232:2
232:12 239:15,16
239:20 241:22
256:13 278:17
283:21 323:8 325:4
326:25 332:15
**mid-2019**
124:5 125:14,24
126:15,18
**mid-year**
93:8
**middle**
38:22 320:16
**Midtown**
124:4
**Mike**
111:9,14,15 114:5

163:5,7,14 164:12
178:8 183:4 195:8
206:15,23 208:11
215:2 226:4 235:20
269:3 275:16
**Millennium**
287:16 290:20 299:4
**million**
75:9 84:21,23,24
198:6,7,11 200:9,10
201:7,9 208:22,22
236:5 253:25
298:25 305:4,14,22
306:4
**mind**
38:12 42:16 178:16
178:17 185:9
207:20 237:7
**mine**
54:13 232:17 297:5
**minority**
35:4,11,23
**minute**
205:18 225:12 231:5
268:7 316:15
**minutes**
83:12,17 116:21
117:2,5 136:19
137:2 155:3,7,14
**mischaracterize**
263:14
**Mischaracterizes**
80:12
**misrepresentation**
155:4
**misstated**
94:11 150:23
**mistake**
38:18 119:6 201:25
**mistaken**
197:3
**mix**
188:7
**mixing**
205:25
**MJR**



314:21
**model**
83:25 84:11 169:14
169:20 170:2
171:23 178:15
187:18
**modeled**
184:10,15
**moment**
48:24 56:3 57:2
69:22 95:19 138:25
**moments**
179:4 193:14 228:6
328:24
**Monday**
5:8 276:3
**monetize**
165:22
**money**
27:24 28:11 32:6,25
34:2 36:23,25 37:14
37:16,20 72:18
95:12 113:7 138:7
139:17 140:22
141:23 163:24
167:24 180:14
197:14 246:13
247:22,23 253:18
253:23,24 254:23
255:2 265:20 266:5
271:12 272:20
274:14,15,22 275:3
275:7 276:9,24
277:8 278:25
280:15 294:21
300:25 301:5,6,7,22
301:25 302:9,13,17
303:2,6 304:12
305:13 307:13,21
308:2,7,12,16
310:23
**monies**
201:5 255:11
**month**
19:11 44:17 47:3
81:14,15 99:15

100:5 122:5 126:2
127:4,7,14 128:2
133:11 149:7 284:4
316:2
**monthly**
83:24 84:10 126:5
**months**
44:17
**morning**
275:17
**Morvillo**
2:4 5:11 6:2,6
**mother**
58:5,9 59:3,8
**move**
88:18 91:8 121:16
146:4 174:22 267:2
**moved**
102:10 276:23
**multiple**
24:3,6,10 27:24
28:12 32:7,25 34:2
36:3,7,8,12 38:6
58:14 145:3 173:2
197:17 204:21
222:3 230:24
231:18 232:4
235:25 236:7 250:5
251:5 252:14
254:24 255:2
**muster**
166:15
**mutual**
235:22

---

## N

N
2:2 7:8 332:2 333:2
**name**
17:3 18:14,24 33:7,9
33:10,12 39:14 59:4
150:6 151:18
154:15 157:12
186:7,8 192:24
197:19 221:2
222:21 225:3

226:25 228:3
258:15 318:7 327:4
327:17
**names**
127:13 128:11,14
153:23 202:13
244:2 247:16
316:19,23 317:3,10
318:2,15
**Nathan**
209:7,10,18 246:15
309:20,22 310:3,18
310:20 311:18
312:13,18 314:9,14
314:17
**nature**
297:25
**navigate**
17:18
**near**
88:8
**necessarily**
15:19 89:11
**necessary**
124:16,19 318:22
**need**
48:9 54:21,24 99:2
125:2 130:24 169:6
196:12 202:13
242:16 326:6
**needed**
54:8 89:6,15,16
98:23 107:19
173:20 197:14
227:15 230:5,16
256:6 272:3 285:11
**needing**
325:11
**needs**
51:17,22 98:14 99:24
100:11 229:22
**negatives**
257:24
**negotiable**
122:18,23 123:3
**negotiated**

123:2 213:16 216:8
216:15 221:5
223:12 227:20
**negotiating**
202:17
**negotiation**
213:15 214:12 231:6
**negotiations**
208:15 221:6,18
223:15 230:25
232:4
**neither**
206:20 219:8 230:17
**nephew**
286:25
**never**
30:8 88:10 97:23
98:2 116:22 144:13
174:8 202:10
205:15 228:6,13,14
228:17,17,19 229:9
232:12 268:3 279:4
311:3
**new**
1:2,25 2:6,11,17,17
2:20 7:10 15:2
16:19 85:11 94:3
142:5,7 143:4 163:2
202:14 249:25
250:9 251:15
262:13 274:2
313:10,13 329:2,6
334:3,4,7
**nice**
59:7
**night**
279:2
**normal**
96:22,24 270:22
**Notary**
1:24 4:11 7:10
332:22 334:6
**note**
147:25
**noted**
3:7 85:10



**notice**
201:24
**noticed**
197:5
**November**
157:9,13,19 158:19
159:2
**NPPG**
10:10 11:6,21 12:7
12:12 14:19 16:9,21
16:23 17:8 28:23,24
29:4 39:16 48:22
49:16,19 50:6,17
56:20 59:9 60:22
61:2,3,3,9 129:7,16
204:23 288:7,10,11
288:16,18,23
**number**
5:5 18:15,17 22:22
37:20 53:4 67:20
72:21 73:13,14,18
73:24 74:7,17,22
75:18,25 76:3,13,15
76:17 77:5,7,9,11
77:12,21,22 78:2
81:9,9,18 85:5 89:6
89:15 98:14 108:8
114:21 116:17
117:2 127:23
128:10 140:11
143:18,25 149:9
150:4 167:25 168:6
169:12,17 171:4,6
171:17 172:19,22
173:3,8 175:14
208:17 210:13
215:12,14 217:3
259:20 261:18
268:21 282:20
287:16 290:19
292:11,15,22 299:4
307:25 309:18
314:21
**numbers**
117:16 186:16 286:7
301:16 313:16

**numerous**
40:13 66:11 121:16
178:6 266:22
310:22
**NY**
2:6,11,20

**O**

**O**
7:8 332:2
**object**
7:20 21:17 30:14
42:2 57:25 60:7
103:15 152:11
158:4 161:23
180:17 241:10
242:17 254:12
264:9 306:7 318:4
**objected**
87:25 92:17 317:7
**objection**
3:11,17 7:22 14:8
16:5 26:5,14 30:6
30:13 31:16,16,22
37:3 54:10 55:20
58:13 66:14 68:5
69:2,5 74:19,25
78:12,22 79:9 80:11
82:11 87:18 90:12
94:10 98:16 99:8,9
99:9,19 102:5,24
104:25 113:18
116:11 117:19
123:22 138:5 139:8
165:15 187:7
200:18 202:5 204:2
204:12 205:11
210:4 222:7 225:14
225:16 227:22
229:4 231:7,14,16
232:8 238:5 240:25
242:10 243:11,12
245:16 247:4,9
252:7 256:2 258:6
260:14 261:2
271:22 274:4 281:5

285:14 303:8,17
304:14 306:22
307:9 311:3 317:5
327:20
**objections**
3:3,3,3,7,9,10 9:2
30:16
**obligated**
48:16 280:5 296:24
**obligation**
100:8 271:4,16,18
**obligations**
122:15 280:2,13,19
280:23 320:21
**observed**
87:17
**obtain**
81:8
**obviously**
64:24 276:3
**occasions**
81:19
**occupancy**
63:5 120:17
**occur**
306:25 307:18
**occurred**
88:10 155:5
**occurring**
100:21
**off-the-record**
70:11 95:20 110:6
167:3 268:8
**offer**
259:21,24 261:12
**offering**
173:2
**offerings**
171:24,25 172:7,11
172:18
**office**
6:11 31:7 63:3,14,15
64:2 67:5,10,23
68:14,25 69:12
85:11 86:10 92:3,10
92:12 95:24 96:8,12

96:13 99:3 100:21
101:20 102:2
107:20 108:25
109:4 110:14,18
111:13,15 120:16
121:13 124:14,25
126:17 128:2
188:25
**officer**
3:7 49:25 50:12,16
50:23 51:5,12,18
**officers**
39:13 96:19
**offices**
1:24 90:19,23 92:13
97:7 99:24 108:9
114:15,23 128:18
133:8 134:7
**official**
94:9 321:24
**Oh**
19:12 33:13 55:11
58:7 147:8
**okay**
9:7 18:20 19:12 27:6
29:7 30:5 37:7 62:2
63:24 76:24 82:17
82:25 83:11 84:15
86:5 88:25 103:4
108:2 109:10 128:9
133:6,24 140:14
146:3 147:22
148:15 150:25
160:25 169:6,18
170:8 175:13
179:12 186:10
190:22 192:7
214:10 222:17
223:6 238:25 262:8
275:10 291:19
293:13 306:20
317:12 320:25
323:24 324:7,14
326:3,24
**omnibus**
24:3



once
  205:15 311:3
one-page
  110:11
one-pager
  110:9
ones
  61:8
online
  124:10
open
  122:8 220:21 269:6
opened
  310:25
opening
  228:7,9,14
operate
  8:8
operating
  96:16
operations
  269:16
opex
  269:18
opinion
  15:14 54:12 97:22
    103:9 106:10
    173:17,23,25 229:5
    235:6,7 240:14
    251:19 265:16,22
    265:25 266:2
    302:25 321:20,21
    328:4
opinions
  100:5
opportunities
  235:22
opportunity
  122:4 196:14 213:11
    233:4 234:5,8
    237:20 247:15
opposed
  60:15 191:17
opposite
  71:15
order

1:23 3:19 8:14,16 9:5
    284:24
ordinary
  270:5,23
originally
  164:8
origins
  327:11
outcome
  102:15 103:10,11,18
    334:16
outside
  25:15 26:19 296:3,5
    330:23
outstanding
  215:5 217:4 226:7
    270:4,21
overall
  185:17,18,18
overlap
  249:12
overpay
  113:4
overpayment
  266:10,12
oversee
  51:13
oversees
  12:5,14
oversight
  12:3
owed
  270:14 271:11
owned
  92:22 113:3 166:16
    264:14
owner
  14:20 35:24 39:15,19
    39:21 42:6 204:16
    231:5 233:7
owners
  39:12 56:13,20 59:9
    130:7 168:2 243:8
ownership
  41:22 173:13 233:14
    233:20,22 240:16

owning
  180:14
owns
  61:2 176:25 177:2,7
    177:23

—————————
          P
—————————
P
  2:2,2
P-E-A-R-L-S-O-N
  6:14
P&L
  93:14
P.C
  2:19
p.m
  149:6 275:16
page
  18:12,14,17,19 20:23
    20:24 21:22,23 22:2
    22:9,15,16,17,18
    27:18 30:4 31:4
    38:21,23,25 39:4
    42:12,17,18 49:9
    50:3 52:2,3,18
    56:11,15,16 129:21
    149:5 154:24 156:4
    167:22 173:7,8
    174:20 179:13,16
    179:24 180:6,7,12
    180:17 181:10,23
    191:2,21 199:14
    200:4 210:10
    215:18,20 226:3,21
    262:3 269:2 294:24
    319:20 320:6,14,15
    321:7 333:3,7,10,13
PAGE/LINE
  335:3
pages
  17:17,20 22:14 38:13
    38:19 179:11
    180:20 199:15
paid
  74:8 85:12 86:7
    107:18 112:22

117:2 137:13,16
    138:2,2,4,6,7,14
    248:24 270:20
pair
  17:23
Pam
  150:5 151:17 156:5
Pamela
  153:19
pandemic
  97:19,20,21 107:3,4
    107:8
paper
  187:14,17
paragraph
  21:20 28:4 45:16
    62:3,5 112:6 119:5
    119:7 120:13,13
    121:9 130:2 150:10
    151:22,22 156:11
    191:22 196:19
    202:10 215:18
    219:24 220:11,12
    220:14 221:15
    222:18 223:24
    228:7,9,14,21 259:7
    259:13,21 262:13
    263:5 270:2 320:16
    323:25 325:3,19
    326:24 328:3
paragraphs
  45:15,23
paralegal
  2:8
paraphrase
  138:22 193:18
paraphrasing
  138:16,24 274:17
    279:10 298:2 318:9
parentheses
  287:14
Park
  2:16 298:6,9
part
  34:12 41:2 42:8
    43:20 58:18 129:17



134:16 164:25
165:2,4,20 173:9
188:7,9 276:15
278:18 286:20
319:14
**parted**
277:9
**participate**
210:16
**particular**
10:5 58:16 104:20,21
109:16 119:5
129:14 148:17
181:18 192:21
286:18 293:11
308:4,15
**particularly**
163:18 225:8
**parties**
4:5,17,21 5:17 8:15
192:3 216:3 217:16
264:7 334:14
**partly**
301:7
**partner**
22:25 25:5 28:17
29:11 30:2,21,25
31:19 32:11,21,23
33:12,25 192:4
200:23 232:18
309:3,19 317:25
319:15,20 320:13
320:18 321:4,13
325:6
**partner's**
301:22
**partners**
36:19,21,22 149:22
191:19 192:2,9
209:12,12 235:25
236:3 242:6 246:14
247:3,8 248:10,13
249:3 260:22 274:3
286:5,9 295:21,25
296:8,12 304:3,25
305:8,20 307:8

315:12 316:13,17
317:11,24 319:10
321:8,9 322:12
329:11,15,18 330:2
330:20
**partnership**
24:7,11 34:7,21 35:5
35:15,22 36:17 37:8
37:21 235:2 255:6,7
255:10,10,20,22
296:25 319:2,5,9,17
319:22 320:2,11,17
320:24 321:9,11,12
322:2,16,24 323:7
327:23,25
**partnerships**
289:16
**parts**
250:5
**party**
3:25 100:6 204:17
205:22 219:4
228:10
**pass**
166:14 251:12
**pasted**
199:21
**path**
267:3
**pay**
122:16 320:19
**paying**
90:17 92:15,19
122:21 248:21
263:16 264:4,12
266:5,7
**payment**
90:3
**payments**
137:4,7 139:6 140:7
143:14 144:11
**payroll**
69:20 74:4,11 87:10
114:24 115:10,13
**PC**
2:9 6:22

**Pearlson**
2:12 6:13,13 8:20
14:8 16:5 17:10
18:22 21:16 22:10
22:15 25:8 26:3,14
27:6,14 28:21 29:22
30:5 31:15,22 37:3
39:3,8 41:25 42:22
45:11 46:8 49:10
50:4 51:6 52:7,14
52:19 54:10 55:20
56:14 57:24 58:13
60:6 61:21 66:14
68:5 69:2,5 71:18
72:7,15 74:19,25
75:12,22 77:15
78:12,22 79:2,9,11
80:11 81:5 82:11,21
82:25 87:18,25
90:12 91:17 94:10
98:16 99:8,19
100:13 101:22
102:5,24 103:14
104:25 108:21
109:17,21 113:18
114:20 116:11
117:19 118:14,19
121:3,15 123:22
125:9 128:23
129:22 131:4 138:5
139:8 145:18 146:3
146:14,22 148:4,13
148:19 150:21
151:4 152:11 153:3
155:8 156:20 158:3
158:11 159:13,16
160:16 161:22
162:13 165:15
168:23 169:4
174:21 175:7
180:16 181:8 187:6
199:9,14,18,25
200:18 202:5 204:2
204:12 205:11
206:24 210:4 211:7
211:18 213:8

216:10 222:7
223:25 225:14
227:22 229:4 230:8
231:7,14,16 232:8
235:13 238:5
240:25 241:9,19
242:10,14 243:10
245:16 247:4,9
248:5 249:5 250:2
252:7 254:11 256:2
257:4,12,19 258:6
259:2 260:14,18
261:2,20 264:8
271:22 274:4
277:24 278:19
281:5 285:14 289:2
295:8 303:8,17
304:14 306:6,22
307:9 311:19 317:5
318:3 323:18
325:21 326:13,19
327:20 328:9 331:2
**Pearlson's**
324:20
**penalty**
21:5
**pending**
269:6
**people**
10:22,25 37:10,22
38:2 41:14,17 54:25
55:3 64:21 65:3
66:7,11,17,23 67:12
67:13,14,19 68:3,7
68:19 73:15,24
76:18 77:9 80:17
82:15 89:15 96:5
98:14 101:13,19
102:20 107:8,8,11
108:3,12,17,19
114:14 116:2
121:22 124:13,14
125:16 126:4 127:6
127:24 128:11,12
128:14 149:9 150:4
164:8 183:12



201:10 234:2 253:9
253:10,17 254:5
274:23 289:22
304:12
**percent**
35:14,20 99:22 111:5
115:2 149:15,15,19
216:20 217:3
227:16 256:22
264:14 266:22
279:17 281:24
288:25 301:13
**percentage**
35:18 41:22 179:21
218:12
**percentages**
179:20
**perform**
11:13
**performance**
84:14 321:10
**performing**
96:21
**performs**
10:18
**Perio**
1:8 2:19,25 6:23,24
63:13 64:18 66:6
68:17,24 69:12
74:15 83:22 85:10
86:13,24 88:21 89:5
91:16,25 94:20
95:14 101:3,16
102:21 103:6
108:14 111:20
113:14 114:2,18
115:25 116:15
117:21 132:23
134:6,11 135:17
140:20 141:13
142:3,17,21 143:2,8
143:12,16,24 144:8
149:5 150:4 151:15
153:19 154:25
155:14 156:6 162:9
178:13,16 183:6,24

184:12 186:6,7,9,12
187:3 195:8 196:4
200:14 201:24
203:3,4,4,11,12
205:18 206:12
207:7,15 208:2,15
211:15 214:25
216:25 219:2 222:4
224:21,25 225:6
226:15 227:7,20
235:9,17 238:3
239:22 240:5,7,13
245:9 257:10
258:11,11,13
262:10 265:6,14,23
267:2 268:18 269:2
272:12,18 273:4,10
274:12 275:6,15
276:8 281:14
282:22 283:18,23
284:12
**Perio's**
64:15 226:4 278:6
**period**
84:19 100:18 123:8
125:23 127:3,4
187:12 203:23
267:18 295:18
**periodically**
322:12
**periods**
60:16
**perjury**
21:5
**permitted**
3:14 7:20
**person**
3:9,21 22:24 23:2
28:25 29:2,3,6
51:16 58:25 128:17
135:21 136:5,10
142:24 194:22
**personal**
46:2 123:13 290:22
290:25 291:5 294:3
310:23 321:20

**personally**
28:23 246:2,5 260:23
261:11,14 330:16
**persons**
3:15
**Peter**
2:24 5:13
**phase**
74:14,24
**Philip**
190:4 208:10 209:16
**phone**
136:10 139:3,4
279:12
**phrase**
21:15
**physical**
135:24 139:3,5
**picked**
13:23 295:14
**pile**
220:19
**Pinnacle**
61:4
**pinpoint**
183:15
**PJ**
103:19 104:16
105:14 106:6
**place**
76:17 78:4 81:14
97:12 133:7 177:14
190:25 313:11,24
326:8 332:11
**placement**
13:9
**placements**
297:24
**places**
319:8
**plainly**
3:20
**Plaintiff**
1:5,13
**plaintiffs**
249:3

**plan**
10:10,19 11:6,15,21
12:6,15,17,19,22,25
13:12,16,22 14:3
15:6 16:9,23 42:9
47:15 48:22 49:16
49:19 50:7,17 56:20
58:19 59:9 61:3
286:21 287:20
288:7,17,19 290:22
293:17,17 299:6,8
310:5
**planning**
11:7 298:5
**plans**
10:21,24 11:10,16
288:24 329:24
**platform**
163:20 164:24 165:6
166:11,17 172:6
176:11,25 177:7,13
177:24 178:2,11
270:10 271:20
**play**
266:9
**player**
104:4
**please**
7:6 8:5 17:20 27:19
33:3,7,12 38:10
42:11 45:10,24
51:25 72:19 75:23
76:25 87:21 91:18
121:17 123:18
125:6,10 126:20
160:25 167:21
170:6,7 173:3,15
179:10 206:16
220:11 243:22
252:21 257:16
268:24 269:5
275:14 282:19
294:18 317:14
319:3 324:6 331:6
**plus**
121:21



point
68:23,25 76:7 109:15
169:23 170:3,13
181:9 187:4,21
190:24 197:5 202:7
203:16 204:22
214:4 218:20
230:17 258:22
264:25 267:7,9
273:20 275:19
277:8 279:5 289:6
325:18
points
112:8 215:5,7 226:7
263:6
policy
13:21 14:16 293:18
293:19,23
pool
27:24 28:11 32:6
34:2 182:2,8 255:4
pooled
22:22 23:3,4,6,11,17
23:22,25 24:11 25:6
25:23,25 26:12
27:10,20,22 28:3,9
28:13,16,18 29:11
29:20 30:3,19,25
31:20,24 32:4,11,14
34:6,10 254:9,17,22
pooling
254:23 255:2
pools
32:24
pop
207:22
portfolio
298:22
portion
31:13 33:4 77:2
87:23 125:7,11,21
126:13,23 137:23
139:23 181:16
217:9 230:13
252:22 258:4
304:20 308:5,12,14

317:17
portions
319:5
position
14:18 49:19 50:6
89:5,9 175:16 227:3
236:13 252:6,9
265:7,14 266:19
280:14 330:7
positions
176:10
possibility
186:25
possible
54:5 65:18 230:22
273:18 306:13
312:19
possibly
15:21 132:24
potential
102:2 124:23 153:13
191:25 192:8
306:12,15,21
powers
319:21
practicable
321:15
Practice
3:5
practices
79:4
precede
157:7
preclude
153:14
predictions
194:9
prefer
111:25
prejudice
3:21
premise
8:8
premises
108:4,13,18,20
preparation

11:14 19:2,17 324:21
prepare
9:14
prepared
53:9,17 267:23
321:13 323:15
326:6,8,22 328:7,13
prepares
53:15
prescription
18:6
present
2:23 5:18 85:12
134:16 175:18
298:21 325:8
presented
83:25 84:11 191:13
preseries
269:20 275:24
preserve
3:18
president
149:17
pretty
316:5
previous
130:16 154:18 289:6
previously
86:15 261:21,23
287:9
price
215:13,15
pricing
208:19
primary
174:6
principal
130:6 177:8,9,10
printed
189:11
prior
42:12 50:3 64:24
65:12 66:4 67:11
85:21 97:21 98:3,5
128:10 137:12,21
138:3 174:3 188:2

192:23 222:16
229:10 232:10,14
262:18 269:19
289:11 297:12
private
13:9,14,24 14:3
40:15 244:22
249:17,24 250:8,11
251:14,18 297:24
298:12,14
privilege
3:18 7:24 72:10
146:2 211:20
privileged
211:23
pro
85:3 91:5 104:13
112:5 136:7,17
185:17 186:16
188:3,11 262:12,16
264:21
probably
19:7 64:4 88:14
105:15 233:10
291:17
problem
33:20 119:12 159:17
159:20,22 283:19
problems
248:21
procedurally
191:4,9
proceed
3:8
proceeding
43:19 44:3 46:5 48:4
53:6
proceeds
168:9
process
172:23
produce
269:12
produced
198:10,22 199:24
281:25 286:5 295:3



295:5 322:21
**product**
168:5 179:20
**productively**
89:17
**products**
312:5
**professional**
71:9,11,16 105:12
**professionals**
10:11 11:7,21 15:6
16:9,23 48:23 49:16
49:19 50:7,17 56:20
59:10 61:3 107:20
288:7
**profit**
73:21 74:2 164:2
**program**
68:8
**prohibiting**
9:8
**project**
67:25 68:9 98:9,20
144:16 298:19
330:4,10,21
**projected**
74:21 75:16,19 90:25
91:3 135:7,10,17
140:12 143:2,10,25
144:19 145:6
183:10,11 189:15
**projection**
75:4 185:6
**projections**
74:14 75:4,6,8 76:9
76:14 136:2 142:18
144:19 183:9
185:24 193:20,25
194:6
**promising**
282:7
**promptly**
272:2,24 276:24
282:5
**proof**
104:5,15

**proper**
89:7 275:23
**proposal**
88:7
**propose**
204:10
**proposing**
202:19
**proprietary**
177:15,25 181:25
182:3,5,8,14,18,21
**prosecute**
302:19 303:3
**prospect**
165:13
**protect**
285:9
**protecting**
82:14
**protection**
208:23
**protections**
8:17
**protective**
8:14,16 9:5
**prove**
104:19 105:9 284:25
**provide**
19:22 77:8 78:3
81:10 88:7 243:2
288:11 300:14,15
315:11 322:10
**provided**
3:22 4:14,17 9:18
14:15 64:11 97:23
98:2 128:11,14
144:22 167:2 188:3
191:11 212:4
297:12
**provides**
8:16 9:5 13:22 28:13
226:16
**providing**
151:14 191:18
**provision**
210:23 213:13

216:24
**public**
1:24 4:11 7:10 15:17
20:12 40:16 164:6
168:7 234:10,12
298:13 332:22
334:6
**publically**
129:19
**published**
27:20
**pull**
45:9 69:22 330:4
**purchase**
112:5 132:21 133:10
134:2,4,8 135:15
141:12 172:24
196:7,17 202:2
208:18 210:24
211:2,6 212:24
215:9,11 216:18
218:25 259:5
262:12,16 264:21
269:8 270:25
281:21
**purchaser**
196:19,23 202:2
203:13 204:17
205:21 206:22
215:25 219:3,11,21
221:12 222:14
259:9
**purchasing**
228:3
**purpose**
4:4,6 94:24 95:2
285:3
**purposes**
4:14
**pursuant**
1:23 3:4,10 293:14
293:22
**put**
13:12 29:18 30:7
32:18 37:13,16,20
120:23 182:13

187:14,16 210:23
251:22 259:17
**putting**
47:6 211:5 253:18

---

**Q**

**qualified**
201:16
**question**
3:20,24 4:6 7:21,22
8:7,9 14:10 15:9
22:21 23:9 26:23,24
28:15 29:8,9,19
31:12 32:9 37:6
43:15 46:16 47:20
48:13,17 50:5 56:25
69:9 74:20 75:10,24
76:21,25 77:16 79:5
79:6 83:4 87:22
90:13 92:6 101:22
103:3,3 104:9,10
106:9 107:25 121:5
121:7 125:6,20
126:8,16,22 130:9
137:17,25 143:22
146:10,10 147:2
150:24 151:5,6
152:5 156:22
160:19,23,25
167:24 168:21
171:6,16 181:12
184:24 186:4
188:14 210:13
211:25 217:19
230:10 231:23,24
231:25 236:17,20
236:25 237:5
238:23 240:15
241:11 242:18
247:13 248:6,7
250:3 255:18
256:15 257:7,13,21
257:25 258:3
259:22 261:6
303:20 304:19
305:11 311:4



317:14,19,21,22,23
318:8 323:5 333:13
**questionable**
89:25
**questioned**
297:6
**questioning**
3:12,16 42:2
**questionnaire**
54:9 240:16,18,22
242:3 245:7 251:22
252:4
**questions**
3:18 8:4 19:7,25
52:11,21 59:13
61:18 62:4 82:24
83:10 93:15 110:3
119:10 126:12
147:24 167:6,12,20
168:25 184:18,23
185:2,4 193:14
195:15 196:11,15
214:22 226:12,17
245:12 250:16,18
268:21 286:10
292:2 329:16
333:13
**quick**
70:4
**quickly**
248:24
**quite**
240:18

_____

**R**

**R**
2:2 7:8 286:11,14
332:2 334:2
**R-O-T-H**
70:21
**racehorses**
173:13
**raise**
163:23 165:20 169:6
**raised**
3:11 215:7

**rata**
112:5 262:12,16
264:22
**ratification**
325:12
**ratified**
325:8
**ratifying**
325:20 326:17
**read**
28:4 31:12,14 33:2,5
42:23,25 47:9,11,12
58:22 77:3 87:24
107:23 125:6,8,12
125:22 126:14,24
137:20,24 139:11
139:24 150:10
153:20 160:24
170:5 173:17 175:4
175:5 180:12
181:17 199:2,4,4
202:10 209:22
217:7,10 220:2,11
220:23 230:14
243:22 252:21,23
258:2,5 269:11
270:2 304:21
317:14,18 324:5
**reading**
17:23 18:2,6 32:3
182:13 198:3
**reads**
27:22
**ready**
61:24 227:14
**real**
40:15 121:25 124:4
124:15 297:23
298:5,12,18,19
328:25 329:19
330:3,21
**realize**
253:16 277:19 283:8
283:13
**realized**
168:10 272:15

**really**
13:8 44:2 47:10 54:6
54:24 70:25 163:21
182:7,9 196:10,11
196:14 202:10
204:19,22,24 208:7
209:5,6 257:17
318:21
**realty**
169:22 187:20
**reason**
4:7 130:10 211:11
237:3 249:23 282:4
285:6,8 303:5
307:14 326:16
**reasonable**
113:24 185:15,16,24
193:25 194:2,6
250:22,23 251:14
251:14,19,20,25
**reasonably**
7:25 186:24
**reasoning**
325:25
**reasons**
198:17
**recall**
16:21 19:8 54:2 55:9
55:25 58:3,16 63:16
63:19,23 64:23 66:9
68:21 71:25 75:20
76:7 81:17 83:20
85:23 86:3,22 91:5
93:12,13 94:8 95:2
95:3,7,15,18 111:17
113:11 114:11,16
115:12,12,19 116:5
127:21 131:16,18
132:8,12 133:19,23
134:5,9,19,25 135:4
135:4,8,12,24 136:5
136:12,18,20 141:6
143:6 144:7 145:7
147:11,21 149:14
152:14,20 153:11
153:12,16 154:9,12

155:16,18 156:18
156:23 157:6,20
162:24 171:19
183:19 185:3,4,7
191:15 194:14
195:19 207:5,22
212:6,10,11 213:10
213:19,23 214:15
225:4,8,11 228:16
236:2 238:14 239:6
239:9,18 241:21
249:9 256:21
257:14 258:9,23
263:10 270:16
271:8 277:11 278:4
278:5 279:10,16,17
289:8,17 294:25
298:17,23 299:2
312:3 323:22
324:12,13,22
325:15 326:5
328:12
**receivable**
201:4,8,11
**receive**
69:20 114:24 149:21
156:12 248:25
272:4
**received**
25:11 115:22 178:25
181:6 201:3 218:23
218:24 220:22,24
222:19 271:11
276:18
**receiving**
92:25 93:11 179:4
189:21 203:9
**recollection**
10:3 127:22 136:21
149:2 153:25
278:22 325:10
327:11
**recommendations**
202:25 203:2
**record**
4:8 5:4 49:10 61:4



69:23 70:9,13
128:24 129:4
162:13,14,18
224:14,18 268:6,10
268:14 273:15
281:8,19 284:24
285:6,8,21,25
288:25 311:7
328:17,21 331:5,7
334:11
**recorded**
273:3,4 281:13,17
**recording**
82:4,20 93:17 141:6
141:10 218:9
272:25 273:9,11
274:2 282:2 283:23
284:18,20 285:3,17
**recordings**
81:19,21 94:2,5
127:9,10,18 285:12
**recordkeeping**
177:12,24
**records**
64:9 83:13 87:10
114:25 115:10,13
157:8,13 158:15,19
158:23 159:5
**red**
163:2 164:13 206:17
215:3 226:5 268:19
329:2 330:13,20
**refer**
33:21 129:20 156:25
167:18 233:23
262:15
**reference**
152:4 172:4,5 179:22
180:13 181:23
195:11 263:15,25
264:2
**references**
181:25
**referencing**
131:10 182:15 260:3
**referred**

27:23 28:10 32:5
57:12 69:10 94:2
107:3 156:9 157:14
181:3,5 183:4
196:23 202:3
265:22 292:21
297:10 322:6 328:2
328:24,24
**referring**
32:12 60:14 78:6
95:6,10,23 110:16
112:13 124:12
130:18,19 136:16
139:5 143:24
150:17 166:24
172:20 179:3
182:21 235:15
264:16
**refers**
60:7 130:3 263:8
292:15 293:9
**reflect**
219:9 268:19
**reflected**
116:20 117:23
219:19 221:11
222:13 264:3
270:22
**reflecting**
224:3
**reflects**
170:20 215:3 226:5
**refresh**
10:2 153:24 327:10
**refreshes**
148:25
**refusal**
3:17,22
**refuse**
242:7,8
**refused**
242:24 243:2
**regard**
87:14 120:14 138:11
158:9 171:6 238:15
240:16 267:2

277:18 296:9
303:22 318:21
324:2,15,20
**regarding**
191:13 220:4 296:14
296:15
**regardless**
67:24 125:2
**regards**
269:7 276:6
**registered**
11:20,21 12:9 14:24
15:4 21:25 23:21,24
175:16 176:16,20
**registration**
15:24 16:3,15 20:9
175:22
**regular**
195:22
**regulation**
31:9
**regulations**
43:15 44:5 45:25
46:3,7,24 47:25
48:7 53:2 175:23
176:4
**reiterated**
219:20 221:11
222:13
**relate**
146:18
**related**
22:24 28:25 29:2,3,6
41:17,18 43:14 44:4
46:6,23 47:24 48:6
53:2 54:16 72:3,6
96:2 264:7,11 302:4
334:14
**relating**
48:5 163:13
**relation**
65:11 132:7 147:6,8
147:12,13,14
152:10,18 154:4
**relationship**
71:16 163:6 181:25

265:9 267:14 271:3
286:16,18 287:21
299:11,19 309:15
310:6 314:13,16
**relationships**
60:19 105:24 246:13
**relative**
124:20 185:18
**relevance**
42:3 57:25 306:7
**relevant**
54:15,17 68:10,12,15
77:22 123:8 204:22
218:14 236:4,12,14
236:19,21,22,25
237:6 246:22
283:17 302:13
305:18,19 306:11
**relied**
20:17 24:24 25:17
39:18 43:6 65:20
176:14 187:25
188:4 220:7
**relief**
3:9
**relies**
120:8 175:19
**rely**
24:15 44:22 47:12
48:10,21 59:12
176:22 197:21
**relying**
106:3 166:19 267:5
**remember**
61:16 65:2,25 93:14
131:25 133:11
136:11 140:4 141:2
143:7 144:5 145:2
148:2 163:12 186:5
198:3 239:13 275:9
276:19 316:3
**remotely**
97:19,21 107:8,9,17
**rendered**
271:12
**rent**



83:24 84:10 85:7
90:2 95:12 112:10
112:15,16,21 137:4
139:6,18,19 140:22
141:15,23 143:11
144:11 263:9,16
264:2,5 265:8
267:13,20 284:8
**rental**
90:24 91:2 112:9,18
263:9,25
**rents**
89:23 264:12 265:24
**repeat**
26:4 69:9 143:22
181:12 230:10
**repeatedly**
221:7,18
**repeating**
224:3
**rephrase**
60:10 116:14 188:13
211:24 231:24
250:7
**report**
68:14
**reported**
49:3 60:12,20 94:23
95:14 200:7
**reporter**
5:15 7:6 70:2 148:21
259:3 275:13
**reports**
74:11 77:13 114:25
296:20 321:8,10
**represent**
5:19,22 7:15 129:12
149:23 152:18
157:25 158:9,25
160:6 198:8 200:5
221:21 223:3
311:17
**representation**
146:19 159:4,10,23
191:24
**represented**

159:18 176:14 217:2
221:7,19 237:16
**representing**
4:22 6:2,7,15 145:14
152:7,22 153:8,9,15
156:8,16 159:3
173:11 223:8
**represents**
31:6
**request**
3:12 5:11 72:25 80:8
80:9 210:14,15,21
211:21 212:8 213:7
327:7,18
**REQUESTED**
333:10
**requirements**
197:24
**reread**
126:22
**resale**
175:23
**research**
122:3 123:10,16,25
124:6,11 247:7
**reserve**
27:5
**resolution**
322:16,25 323:7,10
323:14 326:17
327:15 328:7
**resolve**
267:4
**resolved**
150:11 151:23 265:3
265:11 267:7 325:3
**respect**
4:18 7:23 31:3 55:14
55:23 76:22 85:2
112:19 209:15
309:24 326:7
**respective**
4:21
**respectively**
149:16
**respond**

226:10
**responding**
104:10
**response**
23:8 226:16 269:24
**responses**
167:23 187:10
**responsibilities**
51:11,21
**responsibility**
51:15
**responsible**
23:15 24:24
**rest**
171:18 173:4 199:9
269:13 298:17
**restaurant**
162:22 164:13
**restricted**
3:10
**result**
43:20 48:5 53:6
102:9
**resulted**
104:20
**resurfaced**
150:6 151:18
**retain**
62:6,11 119:24
**retained**
119:14 333:8
**retirement**
10:19 11:10 12:6,15
12:17,19,22,25
13:12,16 14:3
293:16,17
**retrospect**
212:19,21
**return**
315:20 321:19,23
**returns**
316:12
**reveal**
207:2 323:19 325:25
**revealing**
25:10 161:25 277:25

**revenue**
75:9,16 144:16 145:4
145:6 169:14,21
170:10 171:14,22
173:11 174:6
187:19 189:16
**revenues**
104:8 135:11 170:2
170:14 183:10
185:18
**review**
8:23 20:4,12,15,19
181:22 188:15
224:9 269:6 311:3
**reviewed**
76:5 120:2 171:4
188:11,24 193:4
202:24
**reviewing**
189:22 193:16
194:15 202:18
**revise**
213:12
**revised**
206:16
**reward**
186:22
**RIA**
16:22 17:6 130:24
197:22
**ridiculous**
44:14
**right**
3:9,18,25 11:17
13:19 22:4 35:6,10
42:17,18 48:14 54:9
55:5,7 58:10 59:18
65:14 67:15 69:13
73:8 78:11 80:21
81:7 83:15 86:2,21
88:23 89:2 97:20
99:20 100:18
106:10 112:4
116:25 117:18
119:15 121:14
122:9 123:2,5,9,15



124:19 138:21
139:7,15 141:3
142:9 145:18 155:9
163:11 164:20,21
165:9 172:12 183:6
188:6 190:24
192:11 193:5 197:9
202:13 203:6
211:13 214:17
228:3 237:7 245:24
248:10 256:11
259:20,24 261:12
262:6,7,12,15,17
264:7,21 281:4,7,14
282:12 287:11
295:9 301:4,14,18
301:20 302:21
317:10
**right-hand**
110:4 180:9
**rights**
4:17 36:23,25 100:3
100:4 210:14,15,23
211:2,5 212:3,7,13
212:17,24 213:5,6
213:12,22 214:2,6
214:14 215:17
216:5,7,24 217:5,15
217:18,20 218:7,11
260:11 261:9
**rigorous**
175:17
**risk**
182:3,8 186:18,20,21
194:10 236:14
244:14,15 249:22
253:11 291:20
307:8,12,14
**River**
313:18
**road**
165:14
**role**
51:23
**room**
93:16 101:12 102:2

104:17,20,22
105:10,11 106:24
167:16 188:12,16
188:19,21,23 189:4
189:8,10 269:18,22
271:7 282:25
**Ross**
2:12 6:13 30:12
39:10 42:19 49:13
52:6 70:20 128:21
146:2 208:13
257:17 295:5
311:24 324:18
**Roth**
70:19,20,21 190:8,11
192:13,15,16,18,23
315:2 322:8
**Rothschild**
149:10 150:5,14
151:16,25 152:8
160:12 161:6
324:17
**Rothschild's**
146:19
**roughly**
71:3 164:19 284:4
**round**
66:22 205:18 245:2
251:16
**routinely**
78:9
**Rpearlson@csglaw…**
2:13
**Ruchalski**
1:8 2:16 7:4 94:21
108:15 114:6 184:3
184:5
**rule**
3:5,6,14,15,22 31:8
45:20
**rules**
3:2,5 4:2,7
**RULINGS**
333:13
**run**
32:19 50:22 51:4

89:16 297:6
**running**
51:16
**runs**
50:9
**rushing**
61:25
**Ryan**
17:3,3

— S —

**S**
2:2,6 7:8 333:6
**Sack**
1:23 2:6 5:20,20 6:9
7:13 8:25 14:9
17:12 22:12,18 27:3
27:7,12,16 30:12
31:11 39:6,10 42:19
45:9,13 49:12 52:10
52:16 56:17 60:9
61:23 69:24 70:5
71:20 72:11 75:14
76:24 77:18 82:23
87:21 88:18 94:12
105:4 109:20,24
110:8 114:21
116:14 118:17
125:5,19 126:9,20
128:21 129:24
131:6 137:20
139:21 145:22
146:8 150:25 151:8
155:10 160:22
162:11 168:24
178:18 181:5,14
190:22 191:6
195:25 198:24
199:16,21 206:2
208:13 211:13,24
216:13 217:7
224:12 225:20
230:11 249:7 250:6
252:20 257:6,16
258:2 261:22 268:6
275:11 278:21

282:18 285:19
295:4 311:17
317:13 318:25
327:22 328:14
330:24 331:6 333:4
**Saddle**
313:18
**sale**
168:7,8 210:16
**Salerno**
1:16,22 2:10 5:6 6:16
7:14 8:18 9:7 17:13
17:14,16 18:3 20:22
21:23 26:25 27:17
27:19 28:8 29:3,17
30:17 31:10,18
32:20,22 36:17 38:9
38:24 42:9,24 43:23
44:15 45:21 49:6
50:12 52:20 56:5
57:19 58:21,24
59:15,20 60:2,3
61:13,19,25 64:14
66:20 67:16 68:11
70:15 72:24 73:4
77:21 80:19 81:12
82:10 83:5,6,9,15
85:15 89:8 98:12,18
99:17 100:15
102:17 104:23
105:7 106:5 107:2
109:15,25 110:12
114:13 117:15
118:25 121:25
122:11 124:4 129:6
129:10 130:6,7
131:7 132:16,20
139:2,16 144:14
145:9 147:3 148:16
148:19 149:2
150:16 151:8,11
152:3 153:17
154:21,24 155:12
156:9,10,13,16
157:11 162:20
167:8,13 168:15



169:12 175:3,25
180:23 183:3 191:3
193:23 194:25
196:3,20,25 198:25
199:13 200:22
201:25 202:3
204:23 205:7 206:4
206:23 207:8
208:11,16 209:13
212:5,21 214:25
215:10,24 216:2,15
218:17 219:3,4,21
220:21,22,24 221:7
221:13,18 222:15
222:18 223:4
224:20 225:24,25
227:4 228:5,23
229:20 232:2
234:10 241:6 242:5
247:20,24 248:8
250:20 253:2
254:10 256:11
258:10 259:6,12,15
259:20,23 260:3
261:11 262:17
263:4 264:24
268:16 271:24
274:14,25 277:17
277:23 283:3,22
286:3,6 287:13
302:21 303:13
305:12 317:15
321:7,22 322:19
323:8 325:4 327:2
328:23 332:15
**Salerno's**
137:21 139:22
191:23 219:18
221:9 222:11
**Sam**
300:2,3,15
**sand**
265:19
**satisfies**
322:3
**satisfy**

321:17
**saved**
122:5
**savings**
123:11
**saw**
75:4 76:4 110:17,18
116:25 167:12,15
207:11 225:2
226:24 228:2,10
272:14 303:5
**saying**
15:22,23 31:24 32:2
32:18 50:19 51:2
54:4 58:8 63:8
67:18,19,19 74:6
77:4 80:10,14 86:6
86:23 87:5 88:20
92:5 94:6 105:8,13
106:11 127:19
131:25 136:10
139:14 140:2,3
142:22 144:25
153:7 164:22
166:20 173:15
178:8 182:19
190:16 195:20
199:25 206:5 210:6
211:21 213:24,25
214:19 216:21
224:25 228:16,22
228:25 233:15
238:18,19 239:10
240:21 241:5 255:9
258:24 261:10
267:11,20 274:3
278:20 282:15
291:23 293:4,20
296:6 308:8 320:10
**says**
20:25 21:18,19 22:22
29:20 30:8 31:5
32:17 39:9,12 43:17
48:2 50:21 52:10,15
59:14 62:25 78:3
81:10 83:16 84:3,7

85:9 130:4,7 151:15
151:22 153:20
167:25 170:12
174:23,24 175:8,8
179:16 180:9,17,18
181:24 182:5,7,14
182:16,20,25 210:5
210:5,19 215:2
221:17 223:8,22
231:21 237:19
259:20 261:3,9,11
269:3 283:19
319:14 320:11,16
320:17 321:8
323:25 326:25
**scared**
276:22 277:2
**schedule**
39:9,11 52:18 56:13
**Schotz**
2:19 6:22
**seat**
100:3
**sec**
15:18,21,25 16:4,13
16:14,16 19:16 20:5
20:6,7,8 26:4 27:9
27:20 29:12,14,19
29:20 30:10,18 31:2
31:5,9 47:6 166:15
175:16,18,23 176:4
176:7,9 178:3
**SEC's**
28:16 30:19
**second**
22:8,16 52:4 62:3,5
112:6 171:3 206:3
223:11 229:8
242:15,17 250:3
268:25 287:3,3
325:2
**secret**
82:7,8,18 93:25
141:10 285:11
**secretly**
81:23,24 82:2,16,20

273:3,14,15 274:2
285:6
**section**
4:7 42:21 44:8 45:19
171:2 269:11
319:13,23 320:4,5
322:3
**sections**
4:18
**securities**
1:9 44:8,11,13,19
45:4,19,24 53:20,23
54:16 175:21
176:19 250:21,24
251:9,10 262:13
277:18 302:4
**security**
122:17,21 251:6
**see**
18:14,17,24 20:22,22
21:11,13,14,19,24
22:20,21 23:8,10
27:11 29:13 38:22
42:3 45:22 47:7
52:7 54:22 56:19
63:6 72:25 74:13,21
77:13 83:17,21
101:6 112:11
120:19 132:14
145:25 146:10
148:25 159:17,19
159:22 170:19
180:22 181:22
196:18 197:3 199:7
205:20 206:12,16
208:16,19 225:24
226:8,13,18 227:23
229:11 249:19
259:6,12,17 261:24
267:16 270:6 271:2
276:7,10 283:2,15
283:16 306:24,25
307:5 317:15
319:13,19,23 320:4
320:5,9,25 328:15
**seeing**



93:14 169:16
**seek**
8:5 73:12
**seeking**
73:12 145:24 168:3
305:2 325:11
**seen**
30:8 64:10 186:9
**select**
13:13
**self**
112:10,25 113:3
263:10,17 264:3,15
**self-interested**
100:6
**sell**
164:9 210:17 252:15
**seller**
168:10
**sellers**
168:13
**selling**
164:5 312:5
**semblance**
169:24 187:22
**send**
61:14 62:19 68:18
69:4 227:2 258:19
272:15,17,20 275:5
275:7 276:9 277:8
279:3 280:14
283:11,20 295:11
296:20 322:4,5,5,7
**sending**
69:17 211:15 224:22
**sends**
268:18
**sense**
105:19 113:17,21
232:15,17
**sent**
62:7 68:4 69:13 73:7
81:3,16 145:10
150:18,22,22 151:7
155:19 157:8,12
158:21,22,24,25

159:5 205:18 225:7
227:7,12,20 262:9
272:17,23,24 273:8
275:4,17 276:24
282:16 283:15,21
**sentence**
27:21 32:4 131:6
191:22 222:10,16
222:18 223:9,11,17
223:18 224:8
269:10
**separate**
21:24 22:2 27:7
36:16,24 37:9,11
96:12 327:14
**separately**
20:11 329:20
**September**
115:18 154:24 156:5
156:15
**series**
203:5 218:24 251:6,7
251:7 263:7 286:9
**serious**
264:17,23
**serve**
312:22,25
**services**
5:14,16 10:19,20
12:8,12 14:19 15:7
16:17,22 17:8 28:25
29:4 39:16 49:21
50:3,10 51:14 52:22
61:4,5 129:8,17
271:12 288:11,23
**serving**
23:2
**set**
3:19 4:7 22:2,21 34:8
38:9 88:17 112:8
115:22 148:24
167:11 206:16
207:24,25 279:15
323:9 334:10,19
**setting**
279:13

**settled**
248:24
**seven**
37:10,22,25 38:19
254:4 297:5
**Shahinian**
2:9 6:14
**share**
18:8 148:6,8 199:8
215:13,15 233:2
262:12,16 264:22
**shared**
116:8 173:11 256:21
**shareholder**
99:23 146:21 214:7
**shareholders**
1:12 88:8 100:9
218:8 245:7
**shares**
112:5 210:17 215:12
215:15 217:4
**sheet**
73:22 198:20 199:19
201:2,6 335:2
**short**
128:22,23 129:2
162:16 224:16
268:12 269:25
284:3 285:23
328:19
**shorthand**
33:22
**shortly**
63:22 68:17
**show**
17:7 27:9 69:21
73:24 109:13 110:5
129:9 147:22 167:5
174:12 198:21
201:3 207:24 220:8
259:4 318:25 319:4
**showed**
75:9 122:3 123:10
129:19 166:22
254:16
**showing**

111:9 199:19 282:21
286:3 322:15
**shown**
218:23
**shows**
155:12 199:12 201:2
**shuttling**
91:25
**side**
71:15,15 180:9 196:8
196:17,20 202:4
204:18 205:22
215:25 218:25
219:4 259:11
262:14
**sign**
21:2 104:12 228:20
**signatory**
49:18
**signature**
20:25 221:4 222:22
222:25 223:5
322:23
**signed**
4:10,11 24:23 56:7
132:21 133:9,25
134:3,7 136:7
137:15 141:11
207:9 212:22 213:2
217:23,25 227:2,15
258:19 270:15,25
271:17,24 276:11
277:3 279:6 280:2
281:20 323:23
326:17 327:24
328:7
**significance**
207:21
**significant**
3:21 102:20 103:22
103:22,25 104:3,11
104:13 146:20
271:16,18
**significantly**
120:8
**signing**



104:15 135:15
137:12 138:3
228:11 232:11
244:14 323:8
324:13 325:19
**similar**
23:2
**simple**
231:12
**simply**
200:11 316:9
**simultaneously**
275:25
**single**
103:24 125:25,25
126:2 176:24
181:10
**sir**
31:3 172:9
**sit**
35:13 86:11 113:11
148:4 194:18 295:9
**site**
74:18
**sitting**
197:24 237:4 256:18
256:25 257:8
**six**
70:24 85:12 86:8
107:19
**size**
199:3
**skip**
150:9
**skipping**
151:21 156:11
**small**
31:7 42:15 124:15,19
124:20 179:17,25
180:4 249:23 250:8
252:2,10,24
**sold**
163:19,20 217:2
218:8
**sole**
39:24 130:8,19 131:5

131:8,10,11,12
132:11 253:20
319:16
**solely**
92:22 303:21 318:17
**solution**
124:9 284:23
**somebody**
284:25
**soon**
321:15
**sophisticated**
252:14
**sorry**
10:23 19:13 36:18
38:23 46:15,18 50:4
50:14 52:16 56:14
58:7 59:23 63:19
66:25 70:21 78:25
79:10 87:20 92:21
94:12 95:9,18 99:12
103:2 106:8 107:6
107:24 109:17
119:5 123:18 126:7
126:21 137:17
142:14 150:21
153:6,20 187:6
188:13 198:6 199:2
209:9 215:20 217:6
220:15,16 225:17
230:7 248:15,16
260:16,19 271:23
271:23 280:21
289:4,24 294:17
296:14 304:18
305:23 310:2
314:15 316:16
323:4
**sort**
11:24 325:11
**sorted**
169:23 187:21
**sound**
301:18
**sounds**
54:12 55:7 163:11

164:21 301:20
**sources**
174:6 182:2,4,6,9,14
182:18,21
**South**
313:10
**SOUTHERN**
1:2
**space**
63:3 68:19 73:15,25
76:18 77:9,23 81:13
83:23 84:16 89:8,16
90:3,17,24 93:2
95:14 98:14,24
99:13,24 100:11,21
102:2,13,23 103:7
107:4,19 113:8
116:18 117:4
120:16 122:6 123:7
123:14 124:11,16
124:19 140:7
**speak**
19:20 54:22 68:23
79:10,12 170:13,15
170:16,18 174:15
192:7,14,16 193:2,8
220:3 245:3 262:19
266:24 277:21
278:4 306:11
310:17 311:9
312:21 326:7,21
**speaking**
3:10 30:13 173:21
280:18 285:18
318:20
**specific**
8:23 73:11 76:13
97:23 98:2 117:16
120:6 133:2,3,4
257:13 293:3,9
297:15 319:8
**specifically**
68:7 76:7,11 86:3
95:3 125:15 129:20
135:9 136:5 141:7
143:6 185:7 214:5

218:6 235:12
239:18 283:10
327:5
**Specifics**
297:18
**specified**
332:11
**speculate**
113:19 147:21
247:25 250:14
253:12
**speculating**
136:25 248:3
**speculation**
256:3,12 306:8
**speculative**
13:10,14
**spent**
245:25 246:4
**Spiro**
2:7 5:25,25 9:4 29:24
199:23 220:18
**spoke**
124:13,14 183:23,24
183:25 184:2
190:16 266:24
275:18 276:17,19
280:22,25
**spoken**
300:11 305:5 311:6
312:18 315:21
**sponsor**
13:22
**sport**
172:3
**Sport-BLX**
1:4,9,9,12 2:5 5:7,23
5:24 6:3,7 7:15,17
62:25 63:9 66:13,18
66:21 67:4,9,25
68:3,8 72:3 73:16
73:25 74:16 76:19
77:10 83:7 88:22
90:20 92:4 93:20
94:14,24 96:2,8,12
96:15,18,20,21 97:5



97:12,19,20,22 98:9
98:20 99:3,7 100:17
101:14 102:11
103:21 105:16
106:19,20,21,23
107:9,12 108:4
112:19 113:15
114:7,15,23 115:9
116:3 119:3 120:9
120:10,14 122:4,12
123:11,14 128:2,18
134:24 135:7
143:19,20 144:14
146:20 149:17,20
152:10,19,23 154:4
157:13 158:2,10,25
159:8,19 160:7
162:8,21 163:4,13
163:21,23 164:2,6
164:10,23 165:19
166:3,6,9 167:24
168:17 169:3,8
170:11 171:13,14
172:21 173:10,19
174:7 176:3,6
178:10,25 179:17
180:9,24 182:6,16
182:19,22 189:20
190:13,18 191:25
192:8,17,22 194:19
194:21,24 195:2
201:17,18 205:3
207:7 208:8 215:17
216:9 220:10 221:5
221:8,20 222:4
223:13 229:2 235:5
235:8 236:5,22
243:3,8 244:13,19
244:24 245:3,22,23
246:8,10,22,25
249:15 250:13
252:24 254:4,5
263:2,16 264:4,6,12
265:5,20,23 266:4
266:15 267:22
269:2 270:19

271:16,18 276:8
277:7 284:6,8 291:6
297:10 298:16,22
300:12,16 312:2
316:20 318:2 327:9
327:19
**Sport-BLX's**
68:20 114:15 165:23
179:4 226:2
**Sport-BLX-147207**
178:23
**sports**
101:18 102:20
163:18 164:25
**spot**
59:22
**Square**
2:11
**SS**
334:4
**staff**
31:6 98:19
**stages**
271:14
**Staisil**
101:4 111:9,14,15
114:5 134:11,13
163:5,7 164:13,14
166:2 178:8,12
183:5 184:6 195:9
235:20 239:15,16
239:21 241:22
256:13
**stake**
304:13
**stamp**
167:9
**stand**
288:14
**standard**
104:18
**standing**
263:3
**standpoint**
233:14
**staple**

52:9
**star**
104:4
**start**
200:24 252:3 273:14
291:20
**started**
232:22 248:20 273:9
273:11 283:22
284:18 302:15
310:10
**starting**
251:21
**startup**
186:23 236:14
**startups**
297:25
**state**
1:25 5:18 7:10 11:3
12:9 15:2,2 16:3,19
20:9 21:25 214:5
334:3,7
**stated**
3:11 4:8 29:23,25
218:6 276:2
**statement**
3:13,24 13:21 14:16
24:21 25:19 31:9
43:23 66:3 73:21
74:3,10 84:6 106:12
106:14,16,18 116:4
117:7,9,10 118:2,5
120:22 121:8,19
129:15 130:11
131:3 174:10
187:12,13 190:18
192:5 194:11,12
219:12 221:15,16
293:18,19,24
321:24,25 322:11
**statements**
3:16 21:7,11 65:20
73:19,22,23 74:22
76:16 77:8 93:15
95:4 115:17,20,21
115:24 117:22

187:23 194:15
321:12
**states**
1:2 21:6,12 44:20
45:4 59:25 88:6
120:13
**static**
67:16
**stating**
229:22
**status**
60:12,15
**statutes**
43:14 44:5 46:7,23
47:24 48:6 53:2
**stay**
56:2 134:13
**staying**
153:17
**steakhouse**
142:5
**Stern**
2:7 6:5,5 282:20
**stipulate**
174:23 175:7,13
218:13
**STIPULATED**
4:10,13,16,20
**stock**
13:4 40:16 132:21
133:9,25 134:4,7
135:15 141:11
149:16,20 196:7,17
202:2 204:17
208:18 210:24
211:2,5 212:24
215:9,11 216:18
217:2 218:9,25
234:9,12 259:5
264:22 270:20,25
271:11 281:20
284:6
**stockholder**
196:24 327:8
**stood**
185:10 193:15,19



**stop**
159:4
**strategic**
252:25 253:5,8,13,15
**strategy**
175:19
**Strauss**
1:8 2:16 7:4 94:21
108:15 114:6
149:11 150:5
**Street**
313:10
**strike**
88:18 112:16
**string**
206:7
**structure**
42:9
**studied**
251:8
**stuff**
202:11
**sub**
43:12
**subdivision**
3:4,6,22
**subject**
3:9 8:13 43:19 44:3
46:5,12,21 48:4
53:5 54:16 72:12,14
81:12 137:4,7 140:7
140:10 143:10,14
143:18 185:9
194:13 213:14
**subjective**
105:20 106:4 118:12
**submits**
53:13,16
**submitted**
21:9 53:10 191:10
**submitting**
55:3,18
**subparagraph**
43:17 48:2 320:2
**subpart**
215:19

**Subpoena**
312:22 313:2
**Subscribed**
332:18
**subsequent**
168:11 268:22
**substance**
84:5 141:14 157:24
160:17,20 185:25
187:24 194:5 204:8
211:22 216:14
278:18 324:9
**substantial**
180:2 189:12
**substituting**
123:19
**succeeded**
183:11
**successful**
246:12
**succinct**
3:23
**succinctly**
3:11 4:8
**sudden**
178:15
**sue**
159:19 160:13 161:6
277:10
**sued**
44:7 277:13 302:3,16
305:13
**suggest**
3:12 213:21
**suggested**
205:19 212:12
323:16
**suggesting**
325:15
**suggestion**
210:22 214:2,14
**suit**
44:20 47:2 160:6
162:7 277:16
**suitable**
123:6,14 291:11,20

291:21
**Sullivan**
86:13 108:15 114:5
134:15 163:16
164:15 166:3 178:8
178:13,22 183:5,25
195:9
**summarize**
263:13
**summarizing**
294:20
**summary**
294:13,18 297:9,11
**superseded**
217:24 218:2,5
**supporting**
66:21 74:5,10 117:9
118:3
**supposed**
89:18 240:13 248:25
**sure**
9:25 10:9 13:8 15:22
19:4 24:13 35:7,19
38:17,20 42:12,17
43:7 52:3 53:18
58:9 59:17 61:6,20
70:8,25 91:19 93:22
110:22 139:7,16
154:12,22 183:14
184:20 190:19
199:8 202:13
203:15,22 206:3
245:11,12 272:9
281:18,24 288:25
295:8 297:3,4 313:8
313:15 314:7 316:6
326:4
**surprise**
90:4
**swear**
7:6
**sworn**
7:9 332:5,18 334:10
**synergies**
99:5
**synonymous**

209:4,8,13,20 262:19
262:23 263:22,23
**syphoned**
100:6
**syphoning**
265:19
**system**
175:20

---

**T**

**T**
332:2 333:6 334:2,2
**table**
246:7,10
**tactic**
274:19,21
**tagalong**
210:14,15,23,25
211:5 212:3,6,13,17
212:23 213:5,6,12
213:22 214:2,6,14
214:16 215:17
216:5,6,24 217:5,17
217:20 218:7,11
**take**
17:20 18:10,10 27:3
38:8,24 43:2 47:18
61:17 70:4 72:19
76:19 83:9 101:7
110:11 111:7 117:8
119:8 125:10
128:22 130:18
146:9 148:13
167:21 177:14
178:18 179:10,13
179:17 180:6 196:5
196:16 198:22
202:25 205:16
208:6 216:7 224:12
247:17 258:17
259:5 261:17 266:3
275:14 276:22
277:14 284:17,21
284:22 285:19
310:13 313:11
321:6 325:2 328:14



**taken**
1:22 3:8 5:10 129:3
130:16 162:17
175:17 224:17
251:5 268:13
285:24 325:6
328:20

**talk**
112:4,6 115:23
130:24 139:19
148:10 189:19
190:8,11 215:6
233:18 276:20
297:15 300:18
312:6 316:7

**talked**
179:25 183:17
194:16 227:5 263:4
263:7,11 293:7

**talking**
26:22 71:19 96:3
102:16,17 144:10
160:18 164:11,18
174:16 182:9
209:17 214:8,11
234:7,8 273:5 323:2

**talks**
233:19 276:14

**tax**
248:20,20 297:23
315:10,19 316:11
321:19,23

**teams**
173:14

**technical**
176:21

**technologically**
165:5

**technology**
165:4,24 270:10
271:20

**telephone**
135:20

**tell**
39:5 46:4 55:12,16
55:17 66:10 77:11

80:16,19 82:3,6
91:7 157:17 165:11
180:12 184:7
186:14 195:6,7,10
235:11,17 237:10
237:24 238:7,11,25
240:4,6,10 241:17
243:5 247:2 279:23
281:2 295:9 298:4
300:24 303:5
311:16,20 312:16
315:24 316:3

**telling**
64:20 87:3 89:2
169:25 251:3
296:18

**ten**
127:2,6 131:22,23
132:2

**ten-minute**
136:22

**term**
79:22 88:8 122:18,24
124:20 204:18
259:9,14

**terminology**
279:11,14

**terms**
123:4,6 202:12,19
207:19,20

**test**
104:23 251:12

**testified**
7:11 116:12

**testify**
25:16,20 332:5

**testifying**
4:22

**testimony**
9:9,12 31:14 33:5
77:3 87:24 108:20
108:24 125:8,12,22
126:14,24 137:24
139:24 181:17
217:10 230:14
252:23 258:5

304:21 317:18
332:6,10 334:12

**testing**
11:13

**text**
275:17

**Thank**
22:19 39:2 49:12
56:18,24 59:2,24
110:9 225:20
230:15

**Thein**
153:19 156:5

**therefor**
3:24

**thing**
67:16 111:12 170:5
181:21 272:11
317:10

**things**
116:19 138:21
174:22 176:21
180:21 202:15
255:15,19,24
267:10,19 297:25

**think**
9:4 13:25 14:6,12
28:8 33:16,23 34:11
35:19 38:13,23 39:3
39:6 42:7 43:8,25
44:2 48:8 55:11,12
57:11 59:11,14 61:5
62:8,12 67:17 71:22
72:8 81:7 83:7
88:11,16 91:12
94:11 96:11,13
100:2,7,8,25 101:11
105:19 106:9,12
111:3,12 114:2
122:19,25 127:22
128:3,5,19 133:20
134:18 139:9,12
150:23 159:25
162:11 163:9 166:8
172:16,19,22 176:5
176:8,9,23 189:5

190:10 192:21
193:13 196:18
197:17 204:16
209:12,22 229:12
229:14 231:19
234:19,21 235:7
236:9,11 237:8
244:12 246:4,21
249:20,23 251:13
255:16 256:6 257:4
257:12 260:8
271:13 273:12,13
277:12 281:15,22
283:17,19 284:2,13
285:2,16 288:18
297:23 299:15
302:12 305:7,18,19
306:4,13,14,20
309:13,14 310:10
311:23 314:7 318:7
318:10 322:2
326:16 328:5
330:11,12,24

**thinks**
209:8

**third**
22:16,18 56:11,15,15
151:22 167:21
223:17 226:3 287:3
326:25

**third-party**
182:2,7,10 288:15
299:13

**thoroughly**
224:11

**thought**
19:13 43:3 80:8
91:15,24 150:10
151:6,23 166:3,14
176:23 178:7
240:22 245:4
248:15 265:17
266:3,6 280:13
282:7 285:10
306:11

**thoughts**



326:2
**thread**
109:14 110:9
**threat**
280:20,24
**three**
63:17 64:4 73:5 81:2
82:23 117:20
118:16 145:3
167:23,23 257:23
259:15 315:25
**Thursday**
59:6 275:22
**tied**
269:21
**Tiffany**
287:13
**Tim**
287:20,22 289:5
292:18 295:13
**time**
1:19 5:9 19:6,9 27:8
35:8 40:18 44:22
47:8 60:16 76:8,12
76:19 96:12,14
97:18 103:12
114:12 119:8,11
125:23 127:3
128:20 129:3 134:9
138:19 142:4
146:12 147:14
162:17 168:6
171:18 187:5
198:13 210:7 214:4
217:6,21 218:17,20
221:21 224:17
237:8 245:25 246:5
250:11 251:17
252:16 264:18,25
267:18 268:13
269:25 275:20
279:20 284:3
285:24 289:9
295:18,24 302:12
310:22 328:10,20
331:3 332:10

**timeframe**
66:3 131:20 235:14
235:16
**timeline**
156:18,24 157:6,20
158:17 183:19
210:9 266:21 275:9
**times**
2:11 63:17 87:17
117:20 118:16
121:4,16 195:19
245:10 257:20
**timing**
81:17 111:12 156:22
**title**
50:8
**today**
5:8 9:9 35:13,18,25
36:9 113:12 129:7
194:18 263:5
312:11 328:16
330:25
**today's**
9:15
**tokenization**
168:2,5 179:18
**tokens**
168:3,7,9,12 175:20
**told**
46:10 53:19,24 66:19
84:18,20,22 86:15
87:16 90:2 91:10
92:14,19 100:20
102:12 107:13,15
107:16 108:3,8,12
108:17,19 109:5
127:23 128:3
138:18 145:17,20
152:14 153:16,22
157:24 158:18
163:16 164:23
165:8 168:20 174:3
174:5 186:15 194:4
195:4,12 205:13
229:10 235:23,24
236:2 238:15,19

239:8,10,12,14,15
239:21,23,25
241:23 243:6,24,25
256:13,15,18,23,25
257:9 258:10,11,13
267:24 279:25
284:4 285:4 302:2,7
304:24 316:5
323:20
**tomorrow**
206:18
**top**
52:6 109:23,24
129:21 169:18
179:16 181:24
191:21 206:8,14
214:23 225:22
268:16
**topic**
237:13
**totally**
176:3
**touting**
252:11
**TPA**
288:13,14 299:13
**tracks**
117:12
**trade**
168:3,9,11 177:15,18
178:2,3 179:18,21
312:5
**traded**
166:5,16,18 176:12
**trades**
171:24,24 172:7,18
173:2 177:2,13
**trading**
164:24 165:6 166:11
176:11,25 177:7,24
178:11
**transaction**
168:12 179:18 180:2
250:24
**Transamerica**
177:17,21,22

**transcript**
4:10 332:9,9
**transparent**
82:10
**traveling**
101:6
**travels**
313:14
**trepidation**
161:9
**trial**
1:21 4:14
**tried**
187:18 275:16
**true**
13:8 21:9 50:22,25
80:18 98:11,22
114:18 117:18
118:5,8 120:22,24
121:2,9,11,21 124:2
131:3 147:20 154:7
235:7 305:12 332:9
334:11
**trust**
57:20,21,23 58:12,17
58:18 59:15 60:3
82:15 286:12,13,17
286:19 287:6,17
290:20 299:4
313:17 314:3,4,8
**trusted**
187:14,16
**trustee**
58:4 59:15 60:8
286:21,22 314:7
**trustees**
57:22 314:5
**trusts**
22:23
**truth**
87:3 89:2 285:18
332:5
**truthful**
9:9 194:2
**try**
8:3 18:7,8 42:24



161:2 169:14,20
211:24 263:24
**trying**
59:13 107:7 127:20
138:13 181:6,20
192:20 193:17
263:14
**turn**
21:23 27:18 42:11
48:22 49:8 175:14
206:21 215:8 216:4
262:3
**turned**
206:10
**two**
9:22 17:17,20 22:14
44:17 63:16 64:4
109:13 164:11,18
196:7,16 199:15
208:18 215:5 226:7
259:15 266:11
272:5 291:25
315:25
**two-page**
72:22 294:19,24
295:5
**type**
102:23 294:20
**typically**
47:11 74:3,9
**typo**
130:15
**Tyrrell**
2:13 6:20

**U**

**unable**
83:14 269:12
**unaudited**
321:10,11
**undated**
87:17
**undermine**
98:23
**undersigned**
20:25

**understand**
8:10,18 15:8 18:18
50:21 78:8 103:2
132:3 139:13 181:7
181:8 187:9 209:19
242:19 246:6 251:2
257:21 261:5
303:19 313:3
**understanding**
23:22,25 25:2,7,15
25:22,25 26:7,16,19
63:11 64:16 65:8,23
67:21 76:21 86:9
92:6 122:15 146:18
165:25 176:18
200:22 201:14
206:20 210:25
229:15 251:11
**understood**
59:2,16 96:20 128:16
175:25 186:17
194:8 245:11 253:9
271:10,15 274:18
**undertaken**
312:25
**undisclosed**
269:14
**UNIFORM**
3:2 4:2
**United**
1:2 21:6,12 44:20
45:4
**units**
166:10,12
**unpaid**
66:12 85:12 86:8
103:8 107:19 117:3
270:20
**unresponsive**
75:15 88:19
**untrue**
130:21
**update**
19:12 225:2 226:24
229:25 230:2
255:21 258:14

**updated**
229:23 230:5,17,18
230:19 232:10
**updates**
300:16
**updating**
227:5 229:19
**upper**
49:2
**usage**
81:13 83:23 84:16
95:14
**use**
79:7,15 89:7 90:17
93:2 103:6 107:4
113:8 170:17 175:9
223:14 279:14
289:7 300:21
**utilized**
4:14

**V**

**V-**
1:6,14
**valid**
260:9
**validity**
265:8,8
**valuation**
298:21
**value**
163:25
**Van**
2:24 5:13
**variables**
169:22 187:21
**various**
8:17 28:13 130:3
138:20
**vehicle**
23:3,5,7,12,17,23
24:6,12 25:6,23
26:2,13 27:11,21,22
28:3,10,14,17 29:12
29:21 30:3,20,25
31:21 32:4,11,15

254:9,18,23,25
255:3,4
**vehicles**
22:23 28:19
**venture**
186:18 194:11
**verify**
69:16
**versed**
252:17
**version**
203:18 207:11
215:23 216:12
224:22 225:6 227:8
227:12,20 231:11
231:22 232:6
282:23
**versions**
207:14 212:3 215:4
226:6 231:19
268:20
**versus**
5:7 28:7 122:13
206:23
**video**
6:19
**videographer**
2:24 5:3,13 7:5 70:9
70:13 128:24 129:4
162:14,18 224:14
224:18 268:10,14
285:21,25 328:17
328:21 331:4,7
**videotape**
5:4
**view**
77:21 78:20 79:6
105:21 117:21
252:2
**views**
31:6
**violated**
44:10,19
**violating**
45:3
**violation**



43:14 44:4,8 45:19
46:2,6,23 47:23
48:6 52:25
**violations**
302:5
**virtually**
2:13,24 5:10
**vis-à-vis**
158:2
**visit**
68:25 86:10 101:20
109:6 110:14
**visited**
90:19 109:4
**visiting**
128:2
**visitors**
103:7
**visits**
64:2,3 69:12 110:16
**visual**
64:16
**Vlugt**
2:24 5:14
**voice**
100:4,9 169:6 289:3
**volume**
189:12
**vulnerable**
285:11

_____
**W**
_____
**W-2**
73:13 80:23 81:4
**W-2s**
64:8
**wait**
229:8 242:14,14,15
242:15
**waiting**
282:6,10
**waived**
3:5 4:17
**waiver**
211:15,19
**Walker**

17:4
**Walsh**
286:11,14
**Walter**
17:4
**want**
18:7 29:18 30:18
62:10 72:7 101:23
119:11 126:4
138:10 139:2,4,13
146:4 147:21 148:2
148:25 153:3
156:20 175:5
180:19 200:2 204:3
206:25 208:4,7
210:13,14 211:7,21
220:16 237:20
244:24 249:15,20
249:24 250:3,15,23
251:15 255:21
260:10 264:20
271:6 274:14,15,22
275:3 276:9 277:24
278:17 279:19,22
279:24 281:23
316:10,18 323:18
325:21 328:15
330:5
**wanted**
148:9 213:17 232:23
237:22 245:14,22
246:6 253:15,16
284:5
**wants**
160:18
**Washington**
103:20 104:16
105:15 106:6
**wasn't**
24:21 82:18 90:4
98:7 104:2,11
116:12 121:20
152:22 178:17
195:23 207:5,6
228:2,22 229:2,5,11
236:4,20

**wave**
168:4
**way**
19:2 21:15 30:15
32:12 57:12 73:12
78:14 126:4 135:3
141:3 144:5 171:15
180:19 186:8
203:20 212:17
232:24 233:4
234:24 235:4
257:14 271:6 276:4
278:9 280:25 281:3
334:16
**ways**
167:23 197:17 198:4
276:15 277:9
278:18
**we'll**
17:8,12,18 18:10
27:4 38:13,20 42:12
48:23 52:2 83:5
88:18 115:23
129:10 138:25
148:13 167:8
178:19 218:16
254:20
**we're**
22:12 38:20 42:13,17
47:19 52:3 56:12
71:2 72:8 102:17
109:18 129:10
144:9 164:18
190:23 200:3
205:25 214:8,11
234:7,8 247:17
330:24
**we've**
105:2 117:20 248:22
257:4,19
**website**
20:8
**Wednesday**
109:22
**week**
9:20 126:2 273:10,16

273:25 274:13
276:21 283:24
285:12 315:25
**weekly**
126:5
**weeks**
73:5 81:2 221:6,17
272:5 316:2
**went**
19:23 20:5,13 30:15
52:21 62:23 120:3
135:8,13,16 136:2,6
188:23 212:13
220:6 230:23,24
253:25 266:12
301:13
**weren't**
66:19 68:10 75:7
89:4 101:18 205:8
222:3
**WeWork**
122:6 124:11
**whatsoever**
304:12
**WHEREOF**
334:18
**whichever**
326:22
**wife**
35:3 37:16,25 41:7
287:14 330:9
**wife's**
71:6 301:12
**Wilentz**
324:17,25
**willing**
192:3 242:7,20
**wind**
265:17
**wire**
272:2,3,6,19,20
273:8 279:3,4
282:16 283:11,12
283:20
**wiring**
272:23 273:5 282:25



283:5
**wish**
250:9
**withdraw**
154:8
**withdrawing**
77:16
**withdrawn**
24:19 30:22 34:18
40:21 77:6 96:6
136:14 154:2,15
185:21 202:17
240:5 278:21
306:16
**withdrew**
77:18 153:22 154:7
**withheld**
238:2 243:7,14
**withhold**
240:23 241:3,5,12,15
243:15
**witness**
4:22 6:16 7:6,9 25:9
30:14 33:2 70:8
72:8 78:25 148:8
159:11,15 175:4,11
199:11 206:25
211:8 224:2 225:17
230:15 257:17
260:16,19 271:23
289:4 295:7 311:23
326:4 334:9,12,18
**Woods**
49:14,15 51:17 53:9
53:19 55:17,24
**word**
62:11 117:25 142:23
170:17 180:4
223:14 284:15,18
284:22
**wording**
65:25 298:3
**words**
15:21 174:8,12,17,24
175:9 277:2 281:2
320:22

**work**
11:7,12,19,25 12:12
67:14,24 68:19
76:18 77:10 92:3
97:5,11,24 99:2
107:8,9 152:9 154:3
267:3 280:17 284:7
284:16 299:14
300:6 313:22
314:19 315:8,14
**worked**
66:11,13 67:22 68:8
68:13,13 88:22
97:21 269:4
**working**
62:12,14,16 64:21
65:3 66:7,18 67:6,8
67:11 68:3 71:13,16
71:19 74:18 96:22
97:19 98:8,15,19
107:11,17 108:3,9
108:13,17,19 109:2
110:18 114:14,22
115:8 116:3 143:20
158:7 284:13
**works**
10:21,24 33:23
**world**
102:20
**worth**
171:21
**would've**
239:7 265:10
**wouldn't**
15:24 21:14 38:12
81:24 82:7 89:11
104:6 118:24
161:15 205:2
223:14 244:23
250:8 253:23
280:15,16
**write**
147:25 148:10,11
149:8,12 208:21,24
**writes**
30:18

**written**
30:19 58:23 130:21
298:24
**wrong**
198:7 220:15 228:10
**wrote**
153:21 190:15
210:17 224:25
225:19 226:23
229:24 258:18
265:13 266:20
275:8

———————— **X** ————————

**X**
1:3,11,18 285:5
333:2,6
**XXX**
290:21
**XYZ**
204:24

———————— **Y** ————————

**Y**
285:5
**yeah**
11:6 21:16 37:5
57:13 67:12 70:5
72:11 84:4 143:23
147:10 148:21
155:23 156:23
159:15 206:6
208:20 210:19
228:11 249:14
251:13 255:12
259:3,23 260:18
261:23 281:16
301:7 323:6
**year**
60:21 84:21,23,25
121:21 124:16
144:17,18 145:5
315:20 316:12
321:14
**year-to-date**
73:19 76:16

**years**
60:19,20 67:11 70:24
105:24 131:22,22
131:23 132:2
144:17 145:3
246:12 252:12
300:4 310:21,24
**yell**
242:16
**York**
1:2,25 2:6,11,17,17
2:20 7:10 85:11
334:3,4,7
**young**
104:13

———————— **Z** ————————

**Z**
29:15 30:9
**Zoom**
6:19

———————— **0** ————————

———————— **1** ————————

**1**
1:19 5:5,8 17:13,14
22:24 38:11 43:21
47:21 73:18 76:15
77:5,7,11,12,21
129:23,25 167:25
173:8 174:20 196:2
196:5 197:7,12
200:13 201:15
203:10,24 208:17
230:20 231:2,21
232:3 259:20,21
262:13 282:22
333:8
**1:09**
162:15
**1:22-cv-1243-LGS**
1:7
**1:22-cv-8111-LGS**
1:15
**10**



44:8 45:19,20 49:3
49:18 70:7 73:6
119:2 145:10 149:6
167:22 307:25
**10:25**
270:3
**10:41**
208:12
**10:58**
70:10
**10017**
2:6
**10019**
2:20
**10036**
2:11
**10154**
2:17
**1028**
110:3 111:21 262:3,6
262:7
**10th**
110:15 147:6,9,15,16
149:7,24
**11**
2:11 43:21 111:19
113:6 114:9 129:10
129:11 169:12,17
171:4,7,17 172:19
172:22 262:9
266:19
**11:00**
70:6,7
**11:09**
214:24 215:23 219:7
224:23 225:7 226:4
227:7 268:17
**11:10**
151:17
**11:12**
70:14
**1105**
321:6
**11250**
148:23 156:4
**11251**

154:20 155:10
**11252**
155:8,12
**11254**
153:18
**11255**
150:3
**11256**
151:9 152:17
**11259**
149:3
**11261**
148:23
**11th**
261:19 267:12,25
284:5
**12**
42:15 148:20 173:3
175:14 179:13
275:6
**12/31**
269:12
**12:10**
226:10
**12:17**
128:25
**12:25**
226:15
**12:27**
224:24 226:21
**12:29**
129:5
**1215**
72:21
**1217**
72:22
**12th**
133:21 208:11
**13**
83:13,18 85:12 86:7
95:13 107:18
116:20 121:21
167:9 180:7
**1325**
2:20
**14**

179:2
**147208**
178:24
**147220**
179:14
**147221**
180:7
**148275**
208:8
**148277**
208:10
**148278**
210:12
**148285**
208:9
**14th**
178:19,22
**15**
27:18 181:23 190:23
190:23 191:6
198:25 321:7
**16**
151:12,17 154:11
216:5 282:20
**1607**
167:10
**1609**
167:22
**1610**
167:10 175:14
**1614**
286:7
**1616**
286:7
**16290**
269:2
**16300**
215:17,21 216:5
**16th**
150:2 152:17 153:13
**17**
109:22 198:25
**18535**
226:2,21
**18539**
226:2

**19**
86:20 121:21,22
200:9 208:2,8
314:22
**1934**
44:9 45:20
**19th**
2:20
**1st**
282:18 283:6 334:19

**2**

**2**
22:22 27:17 43:17
48:2 53:4 129:17
149:15 168:6 270:2
**2:03**
162:19
**2:20**
149:6
**2:23**
153:18
**20**
252:12 310:21
**2000**
310:11,12
**2001**
310:11
**2002**
310:11
**2003**
290:4
**2004**
290:4
**2005**
290:4
**2006**
290:4
**2007**
290:5
**2016**
286:12
**2017**
71:3
**2018**
71:3,3 132:9 163:10



164:19 295:20
**2019**
35:5 61:13 63:18,22
73:3 83:13,19 85:14
86:7,19 88:22 93:10
100:19 102:18
103:5,13,21 107:5
109:8,22 115:8,17
115:18 116:20
123:8 132:9,21
133:9,18 134:2
140:12 141:21
143:19 144:2,17,25
145:10 151:12
152:5,6 154:2,11,25
156:15 157:5,9,14
157:19 158:19
159:2 161:4 163:10
164:20 167:12
179:2 187:11 196:5
214:9,24 218:4
221:2 222:20 233:9
235:16 246:19
248:8 317:4 329:10
**2020**
145:2
**2022**
60:4,13 119:4,6
159:9 301:12
**2023**
1:19 5:8 18:16 19:10
19:16 22:6 44:18
46:19 49:3,18 71:2
332:19 334:19
**21**
73:3 78:2 80:8 81:9
**21294**
83:8
**22**
225:25
**221**
3:2 4:2
**221.1**
3:3
**221.2**
3:17 4:7

**221.3**
4:3
**229**
178:24
**23**
18:12 21:21 119:7,11
120:13,13 121:9
259:2
**24**
88:15 275:13
**24-page**
17:18
**25**
35:14 73:10 81:2
105:24 208:22
246:12 286:6
301:13
**25-item**
77:5
**26**
149:14 319:6,11
**27**
322:15 333:8
**28**
133:18 134:2 141:21
214:24 219:24
220:11,11,12,14,22
222:18 223:24
231:2 232:3 235:16
268:17
**28th**
133:21 136:3 183:17
188:6 207:10,12
212:22 214:13,21
219:7 224:23 233:6
233:8 239:5 271:25
272:7 281:20
283:25

———————————
3
———————————
**3**
45:12 154:25 168:11
220:9,18
**3.01**
319:14
**3.02**

319:19
**3:44**
224:19
**3:57**
224:15
**30**
73:19 93:8,13 115:17
115:18 136:19
252:12
**30,000**
122:5 123:11
**303**
320:5
**31**
3:10 18:16 19:10,16
22:6 46:19
**3115**
3:5,14,22
**3118**
319:7
**3152**
319:7
**345**
2:16
**3456**
199:17
**34th**
2:11
**3rd**
156:5

———————————
4
———————————
**4**
49:11 129:21 130:3,5
198:11 210:13
215:19 320:6,15
**4.35**
200:8
**4.355**
198:11
**4:30**
268:11
**4:34**
268:15
**4:53**
285:22

**40**
35:20
**401K**
287:18,20 288:17,19
288:21,24 289:7
290:15,21,22,25
291:5,12,16,24
292:4,5,16,17,20,22
293:2,3,8,9,16,21
293:23 294:4 308:8
308:10 310:5
329:23
**45,000**
99:14
**47461**
290:21
**4th**
200:7

———————————
5
———————————
**5**
45:20 61:22 191:3,21
198:5,7 201:7,9
287:16
**5.4**
200:10
**5:00**
67:23 68:15
**5:11**
286:2
**5:19**
275:16
**50**
75:9 84:21,23,24
217:3
**50,000**
100:5
**500,000**
63:4 84:15 90:25
92:16,20 120:16
121:21 124:16
**500K**
208:22,22
**510**
110:14
**536**



226:11
**537**
226:3
**5500**
11:13
**565**
2:5
**57**
199:17

— 6 —

**6**
69:25 72:20 99:22
121:21 203:19
205:17
**6:00**
328:18
**6:09**
328:22
**6:12**
331:8
**63**
251:7
**6th**
2:20 207:10

— 7 —

**7**
83:6 251:7 299:4
313:17
**75**
149:19

— 8 —

**8**
109:18,20 110:9,12
**88**
45:15,16,24
**89**
313:9
**8th**
275:11,16 279:20

— 9 —

**9**
110:9 111:18 261:24

**9.5**
208:22
**9:00**
67:23 68:15
**9:33**
111:20 262:10
**9:43**
1:19 5:9
**90**
321:13
**95**
83:8
**96**
45:15,24

