1                   UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF NEW YORK
2

3     _____

CYPRESS HOLDINGS, III, L.P.,              Case No.
4     individually and derivatively       22-cv-01243(LGS)
      on behalf of SPORT-BLX, INC.,
5                   Plaintiff,
6        -v-                               VIDEOTAPED
                                           VIDEOCONFERENCE
7     GEORGE HALL, JOSEPH DE PERIO,        DEPOSITION UPON
      DANIEL STRAUSS, FRANCIS              ORAL EXAMINATION
8     RUCHALSKI, CESAR BAEZ,               OF
      CHRISTOPHER JOHNSON,                 GEORGE HALL
9     SPORT-BLX, INC., SPORT-BLX          (Vol. III)
      SECURITIES, INC., CLINTON
10    GROUP INC., and GLASSBRIDGE
      ENTERPRISES, INC.,
11                  Defendants.
12    _____
13    SPORT-BLX, INC., individually        Case No:
      and derivatively on behalf of        1:22-cv-8111(LGS)
14    its shareholders,
                    Plaintiff,
15

        -v-
16

MICHAEL M. SALERNO and
17    CYPRESS HOLDINGS, III, L.P.,
                    Defendants.
18

19    _____

***  CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER  ***
20

          T R A N S C R I P T of testimony taken
21    remotely stenographically by and before MARGARET
      VOLLMUTH-CORSON, a Certified Court Reporter of the
22    State of New Jersey, pursuant to Federal Rules
      Governing Civil Procedures, witness appearing from
23    the offices of MORVILLO ABRAMOWITZ GRAND IASON &
      ANELLO, P.C., 565 Fifth Avenue, New York, New York,
24    on Thursday, June 29, 2023, commencing at
      approximately 10:03 a.m.
25    Job No. NJ5987116

```
                                                    Page 568

 1    A P P E A R A N C E S: (All parties remote)
 2    CHIESA SHAHINIAN & GIANTOMASI, P.C.
      105 Eisenhower Parkway
 3    Roseland, New Jersey 07068
      (973) 530-2100
 4    BY:  A. ROSS PEARLSON, ESQ.
      rpearlson@csglaw.com
 5    BY:  DANIEL J. TYRRELL, ESQ.
      dtyrrell@csglaw.com
 6    Attorneys for the Plaintiff Cypress Holdings, III,
      L.P. and the Defendants Michael M. Salerno and
 7    Cypress Holdings, III, L.P.
 8    MORVILLO ABRAMOWITZ GRAND IASON & ANELLO, P.C.
      565 Fifth Avenue
 9    New York, New York 10017
      (212) 856-9600
10    BY:  JONATHAN S. SACK, ESQ.
      jsack@maglaw.com
11    BY:  JOSEPH STERN, ESQ.
      jstern@maglaw.com
12    Attorneys for the Defendants Sport-BLX, Inc.,
      Sport-BLX Securities, Inc., George Hall, Cesar
13    Baez, and Christopher Johnson
      (Present with the witness)
14
      COLE SCHOTZ P.C.
15    Court Plaza North, 25 Main Street
      Hackensack, New Jersey 07601
16    (201) 525-6305
      BY:  DAVID S. GOLD, ESQ.
17    dgold@coleschotz.com
      Attorneys for the Defendant Joseph De Perio
18
      LOEB & LOEB LLP
19    345 Park Avenue
      New York, New York 10154
20    (212) 407-4852
      BY:  CHRISTIAN D. CARBONE, ESQ.
21    ccarbone@loeb.com
      Attorneys for the Defendants Daniel Strauss, Francis
22    Ruchalski, and GlassBridge Enterprises, Inc.
23
24
25
```

1    A L S O   P R E S E N T:

2      Tom Olender, Videographer

3      Francis Ruchalski

4      Daniel Strauss

5      Joseph De Perio

6      Wylie Stecklow, Esq.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 570

1
                              INDEX
2
     WITNESS                                    PAGE
3
     GEORGE HALL
4
     By:  MR. PEARLSON                          576
5
          MR. SACK                              759
6
7
8
9
                            EXHIBITS
10
     NO.        DESCRIPTION                     PAGE
11
     Hall-52    Two-page Minutes of the         578
12               Regular Meeting of the
                 Board of Directors of
13               GlassBridge Enterprises,
                 Inc. dated December 9,
14               2019, Bates stamped
                 GBE_0009062 and 9063
15
     Hall-86    Two-page Minutes of the         607
16               Regular Meeting of the
                 Board of Directors of
17               GlassBridge Enterprises,
                 Inc. dated December 12,
18               2019, Bates stamped
                 GBE_0015714 and 15715
19
     Hall-98    71-page packet represented      612
20               to have been referenced as
                 Exhibit A in the December
21               12, 2019, GlassBridge board
                 minutes Bates stamped
22               GBE_0015398 through 15468
23
24
25

Page 571

| | | | |
|---|---|---|---|
| 1 | Hall-54 | Five-page Minutes of Meeting of the Board of | 631 |
| 2 | | Directors of Sport-BLX, Inc. dated November 26, | |
| 3 | | 2019, Bates stamped SPORTBLX0140791 through | |
| 4 | | 140795 | |
| 5 | Hall-55 | Minutes of the Special Meeting of the Board of | 643 |
| 6 | | Directors of Sport-BLX, Inc. dated December 6, | |
| 7 | | 2019, Bates stamped SPORTBLX00039509 | |
| 8 | | | |
| 9 | Hall-56 | Three-page Minutes of the Special Meeting of the | 648 |
| | | Board of Directors of | |
| 10 | | Sport-BLX, Inc. dated December 9, 2019, Bates | |
| 11 | | stamped SPORTBLX00039506 through 39508 | |
| 12 | | | |
| | Hall-57 | Three-page minutes of the | 659 |
| 13 | | Special Meeting of the Board of Directors of | |
| 14 | | Sport-BLX, Inc. (Continued from Suspended Meeting on | |
| 15 | | December 9, 2019) dated December 10, 2019, Bates | |
| 16 | | stamped SPORTBLX00039503 through 39505 | |
| 17 | | | |
| | Hall-61 | Two-page December 12, 2019, | 665 |
| 18 | | email from Daniel Strauss to Joseph De Perio and | |
| 19 | | George Hall forwarding another email of the same | |
| 20 | | date Bates stamped GBE_0015012 and 15013 | |
| 21 | | | |
| | Hall-66 | Nine-page Stock Purchase | 668 |
| 22 | | Agreement dated December 12, 2019, between George | |
| 23 | | Hall and GlassBridge Enterprises Bates stamped | |
| 24 | | GBE_0002131 through 2139 | |
| 25 | | | |

Page 572

| | | | |
|---|---|---|---|
| 1 | Hall-67 | Five-page December 12, 2019, Promissory Note Bates stamped SPORTBLX0174134 through 174138 | 670 |
| 2 | | | |
| 3 | | | |
| | Hall-68 | Nine-page Stock Purchase Agreement dated December 12, 2019, between Joseph De Perio and GlassBridge Enterprises Bates stamped GBE_0009065 through 9073 | 673 |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| 7 | Hall-70 | 44-page document covered by a December 17, 2019, email from Joseph De Perio to hws@sportblx.com and multiple BCCs Bates stamped SPORTBLX00029182 through 29225 | 676 |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | Hall-72 | Two-page December 26, 2019, email from Henry Sullivan to Joseph De Perio and George Hall Bates stamped SPORTBLX0265510 and 265511 | 678 |
| 12 | | | |
| 13 | | | |
| 14 | Hall-87 | Two charts labeled "GlassBridge Enterprises Summary Corporate Structure" and "GlassBridge Enterprises Corporate Structure" dated April 1, 2020, Bates stamped SPORTBLX0272781 and 272782 | 685 |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| | Hall-90 | 13-page Adara presentation slides titled "The Sports & Entertainment Fund LP" dated April 2020, Bates stamped SPORTBLX0277761 through 277773 | 693 |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

Page 573

| | | | |
|---|---|---|---|
| 1 | Hall-92 | 12-page July 7, 2020, email from George Hall to Daniel Strauss attaching Adara restructuring and reorganization documents, Bates stamped SPORTBLX0280410 through 280426 | 696 |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |
| 6 | Hall-95 | Four-page Assignment Agreement between GEH Capital, LLC and Adara Enterprises Corp. dated 20th day of July, 2020, Bates stamped SPORTBLX0273641 through 273644 | 702 |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | Hall-97 | 13-page presentation slides titled "The Athlete Empowerment Fund" Bates stamped SPORTBLX0273823 through 273835 | 705 |
| 11 | | | |
| 12 | | | |
| 13 | Hall-73 | 11-page Agreement dated July 31, 2021, between Hall, De Perio, creditors, and GlassBridge Enterprises Bates stamped SPORTBLX0265521 through 265531 | 710 |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | Hall-75 | Five-page Demand Note Assignment among GlassBridge Enterprises, FinTech Debt Corp., and Sport-BLX, Inc. dated July 31, 2021, Bates stamped GBE_0006855 through 6859 | 714 |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | Hall-77 | 10-page Stock Purchase Agreement between FinTech Debt Corp. and GlassBridge Enterprises dated December 30, 2021, Bates stamped GBE_0014750 through 114759 | 718 |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

Page 574

1       Hall-78    10-page Execution Copy          722
                   Subscription Agreement
2                  between Sport-BLX, Inc. and
                   Sport-BLX Securities, Inc.
3                  dated June 5, 2020, Bates
                   stamped GBE_0009101 through
4                  9110
5       Hall-80    Four-page Minutes of the        740
                   Regular Meeting of the
6                  Directors of Sport-BLX,
                   Inc. dated December 15,
7                  2021, Bates stamped
                   SPORTBLX0264418 through
8                  264421
9       Hall-81    81-page GlassBridge             749
                   Enterprises, Inc. Form 10-K
10                 for fiscal year ending
                   December 31, 2021
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 575

1           THE VIDEOGRAPHER:  Good morning.

2     We're going on the record at 10:03 a.m. on June 29,

3     2023.  Please note that this deposition is being

4     conducted virtually.  The quality of the recording

5     depends on the quality of the camera and internet

6     connections of participants.  What is seen from the

7     witness and heard on screen is what will be

8     recorded.  The audio and video recording will

9     continue to take place unless all parties agree to

10    go off the record.

11           This is media disk 1 of Volume III of

12    the continued dep- -- no, video-recorded deposition

13    of George Hall in the matter of Cypress, III, L.P.,

14    et al. v. George Hall, et al., Case No. 22-cv-01243

15    (LGS) and Sport-BLX, Inc., et al. v. Michael M.

16    Salerno, et al., Case No. 1:22-cv-8111 (LGS).  Both

17    actions are filed in the United States District

18    Court, Southern District of New York.

19           This deposition is being conducted

20    remotely using virtual technology.  My name is

21    Thomas Olender.  I am the certified legal

22    videographer.  The court reporter is Margaret

23    Corson, and we are both from Veritext Legal

24    Solutions.

25           All counsel consent to this remote

1  video arrangement and waive any objections to this

2  manner of reporting.  If there are any objections to

3  the court reporter swearing the witness in remotely,

4  please state your objections now.

5            The witness has been virtually -- has

6  been previously sworn, and all counsel have been

7  noted on the stenographic record, and you may

8  proceed.

9  G E O R G E    H A L L, residing at 6 East 69th

10 Street, New York, New York 10065, having been

11 previously duly sworn, continued to testify as

12 follows:

13 EXAMINATION BY MR. PEARLSON:

14            MR. PEARLSON:  Thank you.

15       Q.    Good morning, Mr. Hall.  We're

16 proceeding today via Zoom.  You're -- you're in a

17 conference room with your two lawyers, right?

18 Correct?  Mr. Sack and Mr. Stern?

19       A.    Yes.

20       Q.    And there's no one else in the room

21 with you besides those two people?

22       A.    No.

23       Q.    And there are no -- and you don't have

24 any documents or notes of any kind in front of you?

25       A.    Correct.

1        Q.    Okay.  I would just ask you that if

2   that changes for any reason, you let me know.  Okay?

3        A.    Yes.

4        Q.    Now, Mr. Hall, I'm just going to remind

5   you that you're -- you're still under oath, and I'm

6   not going to repeat the instructions we gave last

7   time, unless you feel like you need them.

8        A.    No.

9        Q.    Okay.  And is there any reason -- are

10  you under the influence of any medication, or is

11  there any reason you can't testify fully and

12  completely today?

13       A.    No.

14       Q.    Now, Mr. Hall, when we broke last time

15  we were discussing a proposed transaction whereby

16  you and Mr. De Perio were going to sell your shares

17  in Sport-BLX to GlassBridge in December of 2019.  Do

18  you recall that?

19       A.    Yes.

20       Q.    Okay.  And do you recall that that

21  proposed transaction was the subject of a

22  GlassBridge meeting on December 9, 2019?

23       A.    Yes.

24            MR. PEARLSON:  Okay.  If we could pull

25  up what's been marked Hall-52 for identification.

```
                                               Page 578

 1                  (Exhibit Hall-52, Two-page Minutes of

 2      the Regular Meeting of the Board of Directors of

 3      GlassBridge Enterprises, Inc. dated December 9,

 4      2019, Bates stamped GBE_0009062 and 9063, is

 5      produced.)

 6           Q.     Now, Mr. Hall, --

 7                  MR. PEARLSON:  If you could just

 8      scroll down.

 9           Q.     -- this -- this is the minutes from

10      that GlassBridge meeting, and as you can see, you

11      didn't attend that meeting, did you?

12                  MR. SACK:  Are you asking him what the

13      document says or what his memory is, Ross?

14           Q.     Let's stay first with the document.

15      The document reflects -- or it doesn't indicate that

16      you were present at the meeting, correct?

17           A.     The document does not indicate that.

18           Q.     Is that consistent with your

19      recollection?

20           A.     I believe I spoke to the board members

21      at this meeting.

22           Q.     Okay.  So your recollection is --

23      despite what the minutes say, is that you did appear

24      at -- at the meeting?

25                  MR. SACK:  Objection to the form.
```

1          A.     No, I -- I don't think there's

2     anything incorrect in the minutes.  It says "The

3     following directors of the corporation."

4          Q.     But then also --

5          A.     I was --

6          Q.     "Also present at the meeting were," and

7     it doesn't list you, does it?

8          A.     Well, the meeting -- I think the

9     interpretation of this is the meeting didn't start

10    till after I excused myself.  So I made a

11    presentation to the board, and then I -- I don't

12    know, I wasn't there for it, but I assume they

13    deliberated and had a meeting.

14         Q.     Okay.  So the first thing is December 9

15    at 6:30 p.m. did -- did the Sport-BLX board meet

16    that day as well?

17         A.     I don't recall.

18         Q.     Okay.  So you don't recall that there

19    was a Sport-BLX board meeting immediately preceding

20    this meeting?

21         A.     I -- actually, I do now.  I think

22    there was a meeting on December 9.

23         Q.     And in terms of this meeting, if you

24    look at the notes, it says -- first of all, it says

25    that Mr. Strauss, Mr. Ruchalski, and Mr. De Perio

Page 580

1    were there.  Do you see that?

2           A.    Yes.

3           Q.    And Mr. De Perio was a board member of

4    GlassBridge at the time?

5           A.    Yes.

6           Q.    And Mr. Strauss and Mr. Ruchalski were

7    officers of GlassBridge at the time.  Is that

8    correct?

9           A.    I don't recall.

10          Q.    Okay.  Were all -- were all three

11   members of the Sport-BLX board at the time?

12          A.    No.

13          Q.    They were not.  So which of those three

14   people -- start with Mr. De Perio.  Was he a -- as

15   of December 9, 2019, was he a member of the

16   Sport-BLX board?

17          A.    Yes.

18          Q.    Okay.  How about Mr. Strauss; as of

19   December 9, 2019, was he a member of the Sport-BLX

20   board?

21          A.    Yes.

22          Q.    Mr. Ruchalski; as of December 9, 2019,

23   was he also a member of the Sport-BLX board?

24          A.    Yes.

25          Q.    Okay.  So in any event, during this

1    meeting if you -- if you look at the -- if we scroll

2    down to where it says "Daniel Strauss Employment,"

3    it says, "Mr. De Perio informed the board that

4    Mr. Strauss resigned from Clinton Group, Inc."

5                    Do you recall the circumstances under

6    which Mr. Strauss resigned from the Clinton Group?

7            A.      He resigned from Clinton to become the

8    full-time CEO of GlassBridge.

9            Q.      Okay.  And were you involved in those

10   discussions whereby he was resigning from Clinton

11   Group to become full-time CEO of GlassBridge?

12           A.      Well, he was acting as CEO, so I don't

13   know how much discussion there was, but I was

14   involved in the process.

15           Q.      Okay.  When you say, "he was acting as

16   CEO," how long had he been acting as CEO of

17   GlassBridge?

18           A.      I think I answered before I wasn't

19   entirely sure.  I didn't really -- I don't really

20   recall if he was acting CEO or acting CFO or acting

21   COO, but he had been working exclusively for

22   GlassBridge for -- while he was a Clinton employee

23   for probably more than a year.  I don't know how

24   many years prior to this point.

25           Q.      Okay.  Did he assume a position or

Page 582

1    start acting in a position with GlassBridge once the

2    former CEO, Mr. Zheng, resigned?

3                    MR. SACK:  Objection to the form.

4            A.      No.  Had nothing to do with it.

5            Q.      Okay.  And in any event, his new

6    position, or what his position was going to be, CEO

7    of GlassBridge?

8                    MR. SACK:  Objection to form.

9            A.      That's what it says here, yes.

10           Q.      And did that, in fact, happen?  Did he

11   become the CEO of GlassBridge?

12           A.      Yes.

13           Q.      Okay.  And in this meeting it already

14   says on the -- on the meeting minutes they say,

15   "Daniel Strauss, Chief Executive Officer, Chief

16   Operating Officer."  Was he already acting in that

17   role as the -- as of the time of the meeting?

18                   MR. SACK:  Objection to form.

19           A.      Where, exactly, are you referring to

20   on this document?

21           Q.      Where it says, "Also present at the

22   meeting," what we looked at before.

23           A.      I didn't remember what was above, so I

24   appreciate your scrolling.

25                   MR. SACK:  So Ross, are you asking him

Page 583

```
 1   to interpret the GlassBridge minutes?
 2                 MR. PEARLSON:  No.  I'm asking him if
 3   he -- if it was his recollection that Mr. Strauss
 4   was acting as chief executive officer and chief
 5   operating officer of GlassBridge at the time of the
 6   meeting on December 9.
 7                 MR. SACK:  Objection, asked and
 8   answered, but you can answer.
 9        A.    I -- I don't recall the exact moment
10   where he moved from one company to the other.
11        Q.    Okay.
12                 MR. PEARLSON:  If we can scroll down
13   to -- to "Orix Transaction."
14        Q.    It says, "Mr. De Perio discussed the
15   proposed transaction with the first Sport-BLX
16   athlete."  Do you know what he was referring to
17   there?
18                 MR. SACK:  Objection to form.
19        A.    Yes.
20        Q.    What was he -- what was being discussed
21   there?
22                 MR. SACK:  Objection to form.
23        A.    Orix was considering putting money
24   into a vehicle to do a transaction with the first
25   Sport-BLX athlete.
```

1          Q.      And who was the first Sport-BLX

2    athlete?

3          A.      P.J. Washington, Jr.

4          Q.      Okay.  And were you involved in those

5    discussions with Mr. Washington?

6          A.      Through his representatives, yes.

7          Q.      Do you know whether -- had Sport-BLX

8    signed any kind of agreement with P.J. Washington at

9    this point?

10         A.      I don't recall what had been signed at

11   this point.

12         Q.      Do you know what it means when it says

13   "the first Sport-BLX athlete"?

14                 MR. SACK:  Objection to form.

15         A.      Well, I think -- I'm familiar with the

16   Orix transaction; I'm familiar with what I think

17   Mr. De Perio is referring to here.  I didn't write

18   these minutes, but I would assume "the first

19   Sport-BLX athlete" is the first athlete that

20   Sport-BLX was able to arrange a transaction with.

21         Q.      And what -- what did it mean then --

22   can you describe for us what it meant when it says

23   Orix would be funding the transaction?  What does

24   that mean?

25                 MR. SACK:  Objection to form.

Page 585

1          A.     The transaction with P.J. Washington,

2     in simplest terms, was to put money into a vehicle

3     that he owned, Mr. Washington owned, and in return

4     for a commitment of payments that Mr. Washington

5     would make to that vehicle and that that vehicle

6     would make to investors, so Orix was considering

7     being the investor in that -- in that vehicle.

8          Q.     And what role would Sport-BLX have in

9     that vehicle?

10          A.     None.

11          Q.     Okay.  So when it says he would be the

12     first Sport-BLX athlete, the transaction that's

13     being described would have no -- Sport-BLX would

14     have no role in that transaction, correct?

15          MR. SACK:  Objection to form.

16          A.     I didn't -- we're talking about the --

17     well, then let's be more specific with your

18     question.

19          Sport-BLX was not an owner of that

20     vehicle, Sport-BLX was not receiving any cash flows

21     out of that vehicle, Sport-BLX was not paying

22     anything into that vehicle, so that's what I meant

23     when I said Sport-BLX had no role in that vehicle.

24     If you want any -- if you have any other questions,

25     please be specific.

Page 586

1        Q.    Okay.  Now, it says that, you know, at

2    that -- at the request of the board Mr. De Perio

3    excused himself and left the meeting, and then it

4    references how the meeting continued, and management

5    suggested to the board that acquiring additional

6    ownership in Sport-BLX from Messrs. De Perio and

7    Hall could be beneficial to the company.  Do you see

8    that?

9        A.    I do.

10       Q.    Had you -- when they're talking about

11   management, do you know whether they're talking

12   about Mr. Strauss and Mr. Ruchalski?

13            MR. SACK:  Objection to the form.

14   Again, you're asking him to interpret a document he

15   didn't wrote about a meeting he didn't attend.

16            MR. PEARLSON:  Right.  I'm asking him

17   what -- what his knowledge was about whether he

18   understood the management of GlassBridge to be

19   Mr. -- at that time to include Mr. Ruchalski and

20   Mr. Strauss.

21       A.    So are you asking me separate from

22   this document?

23            I don't understand the question.

24       Q.    The question is -- well, let me

25   rephrase the question.

Page 587

```
1              Did you discuss with Mr. Strauss and
2   Mr. Ruchalski, prior to this meeting on December 9,
3   that they would recommend that GlassBridge acquire
4   additional shares in Sport-BLX?
5              MR. SACK:  Objection to form, but you
6   can try to answer.
7        A.    I don't recall if it was discussed
8   with Mr. Ruchalski.  It was, I believe, discussed
9   with Mr. Strauss.
10       Q.    Okay.  And do you -- what do you recall
11  about the conversations you had prior to this board
12  meeting about GlassBridge acquiring additional
13  shares that belonged to you and Mr. De Perio?
14             MR. SACK:  With Mr. Strauss you mean?
15             MR. PEARLSON:  Yes.
16       A.    I -- I suggested that Sport- --
17  GlassBridge consider buying more shares and taking a
18  bigger position in Sport-BLX.
19       Q.    And why did you suggest that?
20       A.    Well, I suggested it because I thought
21  it was good for Sport-BLX, but of course when I
22  suggested it to him I also had to make the case that
23  it would be good for GlassBridge.
24       Q.    Okay.  Let's -- let's start first with
25  that -- what you suggested.  Were you suggesting
```

Page 588

1    selling your shares, or were you selling -- selling

2    additional Sport-BLX shares to GlassBridge?

3         A.    I was suggesting selling my shares to

4    GlassBridge.

5         Q.    Okay.  And why was it that you were

6    suggesting selling your shares as opposed to selling

7    Sport-BLX shares to -- the company's shares to

8    GlassBridge?

9         A.    The company didn't have any shares to

10   sell.

11        Q.    Okay.  And --

12        A.    Matter of fact, they would -- they --

13             MR. SACK:  I think he just wants to

14   add to his answer briefly, Ross.

15        A.    It would -- it would have to issue new

16   shares to do a similar transaction with GlassBridge.

17        Q.    Was that something that you considered,

18   issuing additional shares so that they could be sold

19   to GlassBridge and raise additional capital for the

20   company?

21        A.    No.

22        Q.    Okay.  So your suggestion was to sell

23   your shares and Mr. De Perio's shares to

24   GlassBridge?

25        A.    Originally I suggested just doing my

Page 589

1   shares.

2            Q.       And what was the benefit to Sport-BLX

3   of you selling your shares to GlassBridge?

4            A.       Well, I think I answered this the last

5   time, but I'm happy to review.

6            Q.       Sure.

7            A.       The -- the goal was to get GlassBridge

8   a bigger position in Sport-BLX, and to the point

9   where they would consolidate Sport-BLX on their

10  balance sheet.  That gave Sport-BLX an advantage in

11  terms of relieving it of certain accounting

12  responsibilities, of Sport-BLX financials being held

13  to public company standards in terms of auditing,

14  which would be valuable going down the road.  Going

15  down the road when people look at the historical

16  financials of a company, if it's a public company

17  that's an advantage.

18                     GlassBridge also, despite their

19  relation- -- the very good relationship and mutually

20  beneficial relationship, GlassBridge had what would

21  -- what could be called a noose around Sport-BLX's

22  neck because of the demand note.  Now, GlassBridge I

23  don't think ever intended to try to force Sport-BLX

24  into bankruptcy, but certainly if they owned a

25  majority of the company, the risk that we

1  articulated to the board of leaving this demand note
2  outstanding would be lessened if -- if GlassBridge
3  had a -- had a bigger position.
4           The other reason was that by having a
5  bigger position, it would help with what I think I
6  called Phase 2 of the Orix transaction, which would
7  enure benefit to Sport-BLX.
8           And I think, as I said last time, this
9  was effectively a first step towards taking the
10 company public through a reverse merger as opposed
11 to an IPO.  Which going back to the original FAQs, I
12 think it refers to an IPO as potential end goal for
13 this company.  So there were a lot of advantages to
14 Sport-BLX to have GlassBridge own a majority.
15      Q.    Mr. Hall, you referred to a Phase 2
16 with Orix.  What were you referring to when you said
17 that?
18      A.    So Phase 1 was Orix wanted to acquire
19 a minority position in Imation, which was a
20 subsidiary of GlassBridge.  Based on the change of
21 control rules, they could only purchase
22 approximately 20 percent at the time.  There was the
23 ability to purchase more sometime in early to mid
24 2020 as more what we call headroom became available,
25 and they could purchase more without causing a

Page 591

1   change of control.  And a change of control is not

2   good for the value of the -- of the NOLs.

3           So Phase 2 was Orix was going to buy

4   more of the Imation shares to get a bigger position

5   and also potentially lend more to Imation.  So

6   having a bigger position, a bigger asset base made

7   that transaction more beneficial to GlassBridge, and

8   ultimately to Sport-BLX.

9       Q.    And this -- this Phase 2 was in -- was

10  in discussion as of the time of the December 9

11  meeting?

12      A.    Well, Phase 2 -- Phase 1 wouldn't have

13  existed without anticipation of Phase 2.  Orix had

14  no interest in loaning money to Imation and taking

15  Sport-BLX shares as collateral.  Orix only had

16  interest in Phase 1, putting money into Imation

17  through equity in debt, if there was a plan for

18  Phase 2.  So it had been anticipated since before

19  October of 2019.

20      Q.    When did -- when did Phase 1 of -- with

21  Orix go into effect?

22      A.    Sometime in August -- in October of

23  2019.

24      Q.    Okay.  And at the time that this

25  December 9 meeting took place it looks like they

1    were talking about acquiring shares from both you

2    and Mr. De Perio.  Do you know how -- do you have

3    any understanding as to how Mr. De Perio's shares

4    got into the equation?

5          A.      Well, I think at the time Mr. De Perio

6    and I both realized this was not a very good

7    transaction for me economically; that it was

8    beneficial for Sport-BLX and beneficial for

9    GlassBridge, so indirectly I'd benefit from both of

10    those, but I think Mr. De Perio took the view that

11    we've always been partners in this deal, and we've

12    -- we've had a relatively certain pro rata ownership

13    of the company, so he suggested, and I agreed, that

14    we -- we do it pro rata based on our share

15    ownership.

16          Q.     But you -- you ended up selling all

17    your -- all your shares, correct?

18          A.     No.

19          Q.    Mr. Hall, you said that this was not --

20    this transaction was not good economically for you.

21    What did you mean by that?

22          A.     Well, I got $35.00 in cash.  $35.00

23    per share in cash.  Not too long before we had

24    discussions, and, you know, I was being told how

25    ridiculous it was to think about the company's value

Page 593

1    of 50- or $60.00 a share, so we were taking $35.00 a

2    share in cash.  So potentially we'd never get

3    anything else besides the $35.00 a share.

4                    The -- what we did get was a note, a

5    promissory note, for another roughly $320.00 per

6    share, but that is -- that note is really

7    disadvantaged economically as compared to owning

8    equity in Sport-BLX itself.

9          Q.    So just so I understand, it was your

10   belief at the time you entered into it that getting

11   a total of 355 a share potentially, it was -- you

12   were better off holding on to your Sport-BLX shares

13   than selling at that time for that -- for that deal?

14                  MR. SACK:  Objection to form, but you

15   can answer.

16         A.    Sport-BLX shares were a better asset

17   to hold than that note.

18         Q.    And why is that?  Did you -- go ahead.

19   Why is that?

20         A.    Because the -- effectively, virtually

21   the only ability to pay that note would come from

22   the value of Sport-BLX.  So if Sport-BLX was worth

23   zero, the note would have paid zero.  If Sport-BLX

24   was worth $320.00 a share, the note would have paid

25   that much.  If Sport-BLX was worth $1,000.00 a

1  share, common stock owners of Sport-BLX would get

2  $1,000.00 a share, and Joe and I would get $320.00 a

3  share.  So we basically sold away any upside on

4  Sport-BLX, and we basically still maintained the

5  downside of Sport-BLX because Sport-BLX needed to be

6  valuable to make the note worth anything.

7      Q.    So GlassBridge had no capacity to repay

8  the note on its own?

9      A.    At that time they had some cash from

10  the Orix transaction, but if you look at their

11  operating expenses, GlassBridge would not have been

12  able -- in my view, would not have been able to pay

13  the note without a new injection of capital, so

14  that's -- I -- I think that their ability to pay the

15  note without Sport-BLX having significant value was

16  -- was pretty small.

17      Q.    Okay.  So is it your testimony that at

18  the time you entered into the transaction there was

19  no anticipation you were going to be able to collect

20  on the note?

21      A.    No.  My anticipation was that we would

22  try to make the company worth more than the value of

23  the note.  You know, as with everything, I have a

24  longer run plan at any given time, but -- and I

25  didn't say that there was no expectation of getting

Page 595

1    paid on the note.  What I said was the expectation
2    of getting paid on the note was very much related to
3    the value of Sport-BLX, except in the situation
4    where Sport-BLX became far more valuable, then I
5    wouldn't participate in that value.
6           Q.    Now, at the -- you referred to the
7    $35.00 in cash and a note.  As of the December 9
8    meeting had those terms already been negotiated:
9    The $35.00 in cash and a promissory note for the
10   remaining balance?
11          A.    I don't -- I don't know when the terms
12   were specifically negotiated.
13          Q.    Okay.  Was it discussed prior to the
14   December 9 meeting that it would be cash -- a
15   combination of cash and a note for the purchase of
16   your shares and Mr. De Perio's shares?
17          A.    I don't recall if the specifics were
18   -- of -- of the -- the amount of dollars or how big
19   the note would be was discussed at -- prior to this
20   meeting, but it was very clear to everybody that it
21   was gonna be paid through debt because GlassBridge
22   didn't have the capacity to pay for equity in cash.
23          Q.    Did you -- it also refers in these
24   notes to it would give the company voting control of
25   Sport-BLX.  Either -- prior to this meeting had you

1  had any discussions with anyone from GlassBridge

2  about acquiring voting control of Sport-BLX?

3          A.      When you said this "note," referring

4  to this "note," you're talking about the board

5  minutes?

6          Q.      I didn't -- I didn't mean -- if I said

7  "note," I misspoke.  The minutes refer to, in this

8  section under the Orix Transaction, it said, "It

9  would give the company voting control of Sport-BLX,"

10  referring to your -- the sale of your shares and

11  Mr. De Perio's shares to GlassBridge.  Did you have

12  any discussions with anyone from GlassBridge about

13  the change -- you know, the voting control that

14  would go with the sale of the shares?

15          MR. SACK:  Objection to form.

16          A.      Well, as I said before, the reason for

17  GlassBridge to -- there are lots of reasons why this

18  was good for GlassBridge.  One of the reasons was to

19  assist in the Phase 2 transaction with Orix, in

20  which case having another asset, a bigger asset on

21  the balance sheet, would help that transaction for

22  reasons I'm happy to explain if you're interested.

23          It's pretty well understood in finance,

24  corporate finance and -- and -- and shareholder

25  relationships that there's what's known as a control

Page 597

1    premium.  In other words, when you get control, it
2    actually justifies paying a higher price.  So by
3    giving them voting control, it adds to the argument
4    that their position was worth what Orix wanted it to
5    be worth so that they could complete Phase 2 and try
6    to get control of Imation.
7            Q.    Are you aware of what value for Sport-
8    -- your Sport-BLX stock and Mr. De Perio's
9    GlassBridge put on its balance sheets?
10           A.    I -- I don't recall at this time.
11           Q.    Okay.  And in terms of the -- the --
12   the voting control, did you have any discussions
13   with anyone prior to the December 9 meeting about
14   the board of directors of Sport-BLX and how that
15   would be impacted if there was a change in control?
16           MR. SACK:  Objection to form.
17           A.    Well, it was -- it was clear -- I
18   don't know about the specific discussions, but it
19   was clear that GlassBridge would control the vote at
20   the annual meeting.
21           Q.    And did you have any discussions
22   specifically about Mr. Salerno and Cypress' seat on
23   the board in the context of discussing the potential
24   sale of your shares and Mr. De Perio's shares?
25           A.    I don't recall when those discussions

1  occurred, but GlassBridge having voting control
2  would then have the power to -- well, virtually any
3  shareholder could have -- could have offered an
4  alternative slate, but GlassBridge offered an
5  alternative slate, as I recall, I'm going from
6  memory here, and it was, obviously, with voting
7  control their slate would win.
8        Q.    Okay.  My question, Mr. Hall, is do you
9  recall whether prior to the December 9 meeting you
10  had discussions with any representatives of
11  GlassBridge about the ability to remove Mr. Salerno
12  from the board of Sport-BLX as -- as a Cypress
13  representative?
14              MR. SACK:  Objection to form.
15        A.    Well, given the change of control, it
16  was obvious that GlassBridge had that -- had that
17  power now.  It was very clear that Joe and I would
18  vote our shares in favor of Mr. Salerno, as we had
19  agreed to.  It was clear that it's -- it was clear
20  when we signed the agreement with him that we can't
21  guarantee a board seat; all Joe and I can do is
22  guarantee a voting agreement.  It was a three-way
23  voting agreement that we would vote for each other.
24  So it was pretty well understood that GlassBridge
25  would now be able to change the board if they

Page 599

1    wanted.

2         Q.    Mr. Hall, my question's different.  My

3    question is not what they could have done or what

4    they might have done.  My question is did you have

5    particular discussions with anyone from GlassBridge

6    about the potential removal of Mr. Salerno from the

7    board in the context of discussing the -- the

8    potential sale of your shares?

9              MR. SACK:  Objection to form.

10        A.    Well, the sale of the shares gave them

11   control, so we discussed that.  The change of

12   control would allow them to basically change the

13   board if they wanted.  So I'm not exactly sure when

14   these discussions occurred because around this time

15   we were trying to plan for the annual meeting, so I

16   hope that answers your question.

17        Q.    It doesn't.  Mr. Hall, my -- my -- my

18   question is -- and maybe we can make it easier.

19   Prior to the annual meeting did you discuss with

20   anyone from GlassBridge the removal of Mr. Salerno

21   from the board as the representative of Cypress?

22             MR. SACK:  Objection to form.

23        A.    So with anybody at GlassBridge.  Who

24   -- when you say "GlassBridge," who do you mean at

25   GlassBridge because --

Page 600

```
 1          Q.      Anyone.
 2          A.      Well, GlassBridge didn't have any
 3   employees at the time; they had acting employees.
 4   They were Clinton Group employees.  So I want to be
 5   sure that --
 6          Q.      Well, let's not --
 7          A.      -- if you're talk- --
 8          Q.      -- take space then.
 9          A.      Yeah.
10          Q.      Mr. Hall, --
11          A.      Yeah.
12          Q.      -- prior to the meeting did you have
13   any discussions with anyone about the potential
14   removal of Mr. Salerno from his board seat on
15   Sport-BLX through the poten- -- through the sale of
16   your shares and Mr. De Perio's shares?
17          A.      I don't recall the specific
18   discussions, but clearly that was an option that
19   GlassBridge had, and they could remove Sport- -- the
20   Salerno or frankly anybody they wanted from the
21   board, and we knew that, of course.
22          Q.      Mr. Hall, are you saying, yes or no,
23   were there discussions specifically discussing
24   Mr. Salerno and his seat on the Glass- -- on the
25   Sport-BLX board?
```

```
 1              MR. SACK:  Objection to form.
 2        A.    At what time?
 3        Q.    At any time prior to the annual meeting
 4   in conjunction with the sale of your shares and
 5   Mr. De Perio's shares.
 6              MR. SACK:  Objection to form.
 7        A.    Well, prior to the annual meeting
 8   GlassBridge gave a proxy card with a different slate
 9   to everybody, so of course we discussed it.
10        Q.    Before the -- you saw the proxy card
11   did you discuss with anyone the idea that
12   Mr. Salerno could be removed from the board based on
13   the sale of your shares and Mr. De Perio's shares to
14   GlassBridge?
15              MR. SACK:  Objection to form.
16        A.    Yes.
17        Q.    Okay.  And who did you discuss it with?
18        A.    I -- I don't recall who specifically.
19        Q.    Do you recall -- do you recall whether
20   -- well, Mr. Strauss; do you recall if you discussed
21   it with Mr. Strauss?
22        A.    I don't recall specifically if I
23   discussed it with Mr. Strauss, but possibly, yes.
24        Q.    Okay.  Do you recall whether you
25   discussed it with Mr. Ruchalski?
```

Page 602

1          A.    I don't recall if I discussed it with

2    Mr. Ruchalski.

3          Q.    What about Mr. De Perio?

4          A.    Yes, I discussed it with Mr. De Perio.

5          Q.    Okay.  Why don't we -- Mr. De Perio.

6    Describe for me what the substance of your

7    conversations with Mr. De Perio were about the

8    potential removal of Mr. Salerno from the board of

9    Sport-BLX.

10               MR. SACK:  Objection to form.

11         A.    I don't think there was much substance

12   to the conversation.  It was obvious if GlassBridge

13   had a majority, given that Mr. Salerno had voted

14   against Mr. Strauss being on the board, even though

15   he had the contractual right to be on the board, and

16   GlassBridge had as much right to a board seat as

17   Mr. Salerno, yet he voted against Mr. Strauss being

18   on the board, so it was -- it was obvious that if

19   they had control, they would consider or -- or they

20   would remove Salerno from the board.

21         Q.    When you -- when you spoke to

22   Mr. De Perio about this, was it before the -- the

23   annual meeting?

24         A.    Well, I think it was discussed many

25   times prior to the annual meeting.  Once GlassBridge

Page 603

1  took control, there was -- Joe De Perio, with the

2  help of OCOPY, did all kinds of preparation for the

3  annual meeting, so of course having two cards and

4  two slates and -- and having to be sure that

5  everything was documented properly, of course we

6  talked about it.

7         Q.    Before the -- were these -- did you

8  have discussions -- before seeing GlassBridge's

9  proxy card did you have discussions with

10 Mr. De Perio about removing Mr. Salerno from the

11 board?

12            MR. SACK:  Objection to form.

13        A.    We discussed -- I don't know how much

14 detail because it was very apparent that GlassBridge

15 could remove Mr. Salerno from the board.

16        Q.    Okay.  And did you -- how about your

17 discussions with Mr. Strauss; did you have any

18 discussions with Mr. Strauss about removing

19 Mr. Salerno from the board?

20            MR. SACK:  Objection to form, and

21 asked and answered.

22        A.    I said before I don't recall

23 specifically, but I may have.

24        Q.    Okay.  Do you recall whether there were

25 any email exchanges concerning the topic of removing

Page 604

1    Mr. Salerno from the board of -- of Sport-BLX?

2         A.    At this moment --

3              THE WITNESS:  Do you have an

4    objection?

5              MR. SACK:  Yeah, I'm going to object

6    to the form, but you --

7              THE WITNESS:  Okay.

8              MR. SACK:  -- can answer.

9         A.    I don't recall any emails at this

10   point.

11        Q.    Okay.  Now, if you look -- if you look

12   at the -- at the minutes, it says the GlassBridge

13   board authorized management to negotiate a

14   transaction with you and -- and Mr. De Perio and

15   then report back to the board.

16              Did you begin negotiations for the

17   transaction with management of GlassBridge at that

18   point?

19        A.    I'm not sure how that refers to what's

20   on the board minutes.  You're talking about the

21   assignment --

22        Q.    In December 9 it says in the minutes

23   that "Upon a motion duly made and seconded, the

24   board authorized management to negotiate a

25   transaction with Messrs. De Perio and Hall and

Page 605

1  report back to the board."  Do you see that?

2          A.    I do.

3          Q.    Okay.  So following this meeting on

4  December 9 were you contacted by management at

5  GlassBridge to negotiate a transaction?

6          A.    I did negotiate a transaction.  I

7  don't recall when it was, and I don't -- this says

8  what it says.  I have no knowledge of these minutes,

9  but I did, in fact, negotiate a deal with

10 Mr. Strauss.

11         Q.    Okay.  And in terms of was -- who was

12 involved from GlassBridge besides Mr. Strauss?  Was

13 it only Mr. Strauss with whom you negotiated the

14 deal?

15         A.    I don't recall.

16         Q.    Okay.  And was Mr. De Perio part of

17 those discussions with Mr. Strauss?

18         A.    I -- I would assume so, yes.

19         Q.    Okay.  Was there any kind of email

20 exchanges about those negotiations?

21         A.    I do not recall.

22         Q.    Do you know whether the -- you know,

23 there was a back and forth of terms; or did you just

24 propose terms, and they agreed to them?

25               MR. SACK:  Objection to form.

1          A.      Well, I think the terms were pretty

2     well set out and had specific goals.  The -- the

3     price of the -- the headline price was 355 a share,

4     which was consistent with the transaction that Orix

5     did in October and would hopefully be consistent

6     with the transaction they would do subsequent.  The

7     amount of shares was determined ultimately by

8     getting to the -- getting enough shares that they

9     would consolidate Sport-BLX on their balance sheet

10    as a -- I don't know the technical accounting term,

11    but effectively as a subsidiary.  So the amount of

12    shares was pretty much determined just by the

13    arithmetic of it.

14                In terms of the amount of cash versus

15    debt, I don't recall any legal basis for it, but

16    I've generally held that if you do a transaction

17    that there should be somewhere around 10 percent to

18    -- to be considered true debt.  So -- so that number

19    was pretty much the only thing left to negotiate.

20          Q.      Okay.  So just so I understand it, but

21    in terms of the purchase price, there was no

22    negotiation back and forth; it was based on the

23    prior transaction that -- through which GlassBridge

24    had purchased shares?

25                MR. SACK:  Objection.  No, that's not

Page 607

1    what he said, but I'll object to form, but Mr. Hall
2    can clarify.
3           A.    I think the price was meant to be
4    consistent with the Orix transaction, but at -- at
5    this moment I don't recall any other discussion
6    about a different price, but I don't recall.
7           Q.    Okay.  Is it your recollection it
8    wasn't based on any new valuations or projections of
9    any kind?
10          A.    It was definitely not based on any
11   projections.  And as I said over and over before,
12   the price of -- of the company or -- or the
13   valuation of a transaction of this company really
14   didn't have anything to do with any cash flow
15   analysis or present value analysis.
16          Q.    Okay.  At any point during your
17   negotiations, Mr. Hall, did you suggest that
18   GlassBridge purchase shares directly from Sport-BLX?
19          A.    No.  That would have been ridiculous.
20          Q.    Okay.
21          MR. PEARLSON:  Can we go to Hall-86
22   for identification?
23                (Exhibit Hall-86, Two-page Minutes of
24   the Regular Meeting of the Board of Directors of
25   GlassBridge Enterprises, Inc. dated December 12,

Page 608

1    2019, Bates stamped GBE_0015714 and 15715, is marked

2    for identification.)

3         Q.     Now, Mr. Hall, I'm going to show you

4    board minutes from GlassBridge dated December 12,

5    2019.  It shows that the meeting started at five

6    o'clock, and you can see, actually, it lists you as

7    one of the attendees.  Do you see that?

8         A.     Yes.

9         Q.     Now, it says here this was a "Special

10   Meeting to discuss and evaluate a proposal from

11   management to enter into the following

12   transactions."

13              MR. PEARLSON:  Can we scroll down?

14        Q.     Do you see that?

15        A.     Yes.

16        Q.     Okay.  Now, does this represent -- it

17   says to purchase from you 37,924 shares of common

18   stock.  Did that represent all of your shares in

19   Sport-BLX?

20        A.     No.

21        Q.     Okay.  What did you have left after the

22   -- selling the 37,924?

23        A.     I don't recall.

24        Q.     Okay.  And do you recall whether the

25   purchase of Mr. De Perio's 17,076 shares was all of

Page 609

```
 1   his common stock?
 2        A.     It was not.
 3        Q.     Okay.  Do you recall what he had left
 4   after the -- after this transaction?
 5        A.     No.
 6        Q.     Okay.  If you could look down, there
 7   are bullet points reflecting the terms of the
 8   transaction.  Were these -- were these terms
 9   established between you and Mr. Strauss?
10        A.     Yeah, I think between Mr. De Perio and
11   Mr. Strauss and myself.
12        Q.     Okay.  And as you indicated, what you
13   received was broken up into a -- a cash payment and
14   a -- and debt in the form of a promissory note.  Do
15   you see that?
16             MR. SACK:  Are you asking him what
17   happened or what's written in the document, Ross?
18        Q.     What happened.  Is that what happened
19   as reflected in the document, that you received a
20   cash payment and -- and debt?
21             MR. SACK:  Objection to form.
22        A.     I did receive a cash payment and debt.
23   I don't recall the exact numbers.
24        Q.     Okay.  Do you recall, how much had you
25   paid for your Sport-BLX shares?
```

```
 1          A.      Nothing.

 2          Q.      Okay.  And do you recall whether you

 3     were paid the cash payment of -- it says

 4     $1,436,302.00?

 5          A.      I was paid some cash payment.  I'm not

 6     sure if that was the exact number, but some number

 7     in that ballpark, yes.

 8          Q.      Do you know, did Mr. De Perio pay

 9     anything for his shares in --

10          A.      No.

11          Q.      -- Sport-BLX?

12          A.      Not in cash.

13          Q.      And in terms of the -- of the

14     transaction, does this refresh your recollection

15     that you spoke to the board on December 12 as

16     opposed to December 9?

17              MR. SACK:  Objection to form.

18          A.      I don't recall if I spoke to the board

19     once or twice.  The other document didn't include

20     me, so maybe I was not at that meeting or not prior

21     to the meeting.  Now that I see this, the -- this

22     one I would assume I was at since my name is there,

23     so maybe I wasn't at the December 9 discussion.  So

24     I don't recall.

25          Q.      Do you recall whether you provided the
```

Page 611

1    GlassBridge board with any written materials or any

2    documents in connection with the proposed

3    transaction?

4         A.    I don't believe that I provided any

5    written materials.

6         Q.    Do you know if anyone else did from

7    Sport-BLX -- or strike that.

8              Do you know if any- -- do you know if

9    Mr. De Perio did?

10        A.    I don't recall.

11        Q.    Okay.  If you could look at the -- the

12   next page of the document, it says, "To assist the

13   board in evaluating potential acquisition of shares

14   from Mr. De Perio, a member of the board, and

15   Mr. Hall" -- I'm sorry.  I'm misreading that.

16             It says, "Mr. Strauss distributed to

17   the board the packet of materials attached hereto as

18   Exhibit A for the board's review and consideration

19   prior to the commencement of the special meeting."

20             Are you aware that there was a group --

21   a packet of materials that was given to the board by

22   Mr. Strauss?

23        A.    As I said before, I don't specifically

24   recall those materials.

25        Q.    Okay.  We're going to show you what's

Page 612

1    been marked for identification as Hall-98.

2                    (Exhibit Hall-98, 71-page packet

3    represented to have been referenced as Exhibit A in

4    the December 12, 2019, GlassBridge board minutes

5    Bates stamped GBE_0015398 through 15468, is marked

6    for identification.)

7        Q.    And this is --

8              MR. PEARLSON:  Can we turn to the...

9        Q.    So Mr. Hall, we're showing you what's

10   been marked as Hall-98, which has been represented

11   to us to be the package, Exhibit A, that was

12   presented to the GlassBridge board in connection

13   with the December 12, 2019, meeting.

14             I guess my first question is, did you

15   have any role in putting together any materials that

16   were presented to the GlassBridge board in

17   connection with their consideration of the purchase

18   of your shares and Mr. De Perio's?

19             MR. SACK:  Before Mr. Hall answers,

20   Ross, did you want to go through this whole packet

21   of material or just show him half of one page?

22             MR. PEARLSON:  I was going to show him

23   different materials and just go through specific

24   materials, but if you feel that he needs to or if he

25   wants to look at it, we can scroll through the

Page 613

```
 1   entire thing.
 2              MR. SACK:  So just so we understand,
 3   there's a 71-page packet of material?
 4              MR. PEARLSON:  Right.  Which was
 5   represented to us by counsel for GlassBridge that
 6   this was the package that was given out at the board
 7   meeting Exhibit A and what the board considered in
 8   connection with the -- the acquisition.
 9              MR. SACK:  Understood.  So why don't
10   you, if you don't mind, just having -- either
11   reasking your question or having the court reporter
12   read it back.  I just wanted to understand what was
13   the packet of material that you were referring to.
14              MR. PEARLSON:  Okay.  Madam Court
15   Reporter, can you read it back?
16              THE REPORTER:  Yes.  Give me one
17   second, please.
18              (Last question is read back by the
19   court reporter as follows:
20              "Question:  So Mr. Hall, we're showing
21   you what's been marked as Hall-98, which has been
22   represented to us to be the package, Exhibit A, that
23   was presented to the GlassBridge board in connection
24   with the December 12, 2019, meeting.
25              "I guess my first question is, did you
```

Page 614

1  have any role in putting together any materials that

2  were presented to the GlassBridge board in

3  connection with their consideration of the purchase

4  of your shares and Mr. De Perio's?")

5              THE WITNESS:  I don't have a

6  recollection of whether or not I put any materials

7  together.

8  BY MR. PEARLSON:

9       Q.    Do you recall being present for any

10 discussion of Exhibit A at the board meeting?

11      A.    I don't recall.

12      Q.    Do you -- do you know who put together

13 Exhibit A that was presented to the board?

14      A.    Can we -- can we scroll back to the --

15 to the minutes, please?

16            This is the exhibit to minutes?

17      Q.    Yeah.  We'll go back to the minutes.

18      A.    Thank you.

19            So in the minutes, which is consistent

20 with my recollection, that myself and Mr. De Perio

21 left the meeting.  So I don't recall whether

22 documents were presented while I was there or after

23 I left.

24      Q.    Okay.  It -- I mean, the board minutes

25 suggest that the board was given the packet of

materials prior to the commencement of the meeting, and that you then provided the board with an explanation of your offer and insights into the operations of Sport-BLX and the advantages and disadvantage of the contemplated transactions. Do you see that?

A. So could we go back up to the top?

Okay. Stop.

So it says here the members of the boards -- of the board participated telephonically, which is consistent with my memory. It also says here that Daiana Sersea was, for this meeting, secretary, so I'll make the assumption that she recorded the minutes. So I'm not really sure what she meant to say that documents were distributed when they were on the telephone. So he may very well have just emailed them to -- to the -- to the board members, but I wouldn't necessarily see them being emailed to the board members, but since they participated telephonically, it was pretty clear there was no paper moving around the room. So I don't really recall the timing of when the board got these materials.

Q. Okay. Do you -- do you recall in your discussions with the board on December 12 whether

Page 616

1    the -- whether the materials that were presented to

2    the board were discussed at all?

3                MR. SACK:  Objection to form.

4        A.    I don't recall, and I think I've

5    already answered this because if Daniel Strauss sent

6    the materials by email to the people that

7    participated telephonically, I don't think the fact

8    that he did it before the meeting started is really

9    relevant, as per your previous question about if

10   they were distributed prior to the meeting or prior

11   to when Joe and I left.  So I don't really remember

12   anything about the specific materials being

13   distributed or me seeing them at this meeting.  I

14   don't recall.

15       Q.    Okay.  Do you recall what you -- it

16   says you provided the board with an explanation of

17   your offer.  What -- do you recall what you told the

18   board that day?

19       A.    Well, I think the offer was that they

20   buy shares to get to a majority, and they paid for

21   it primarily with debt because they didn't have the

22   cash to pay for it, but if they purchased the shares

23   through debt, it would still have the benefit to

24   them -- some of the benefits that I enumerated in

25   our previous -- in my previous deposition, the

1    benefits for GlassBridge.  So -- but I don't recall
2    specifically what the -- the points in my
3    conversation then were.
4            Q.    Okay.  Do you recall any questions the
5    board asked you; GlassBridge board asked you?
6            A.    Yeah.  I think -- I believe they --
7    there was some back and forth discussion, which I
8    assume started with questions from the board, but I
9    don't recall the specific questions.
10           Q.    It says -- it says, "After a detailed
11   discussion on the valuation mechanism, opportunities
12   and business risk among members of the board and
13   Mr. Hall, where the board asked questions regarding
14   the valuation and business prospects of Sport-BLX,
15   Mr. Hall and Mr. De Perio left the meeting."
16               Do you recall what the detailed
17   discussion on the valuation mechanism, opportunities
18   and business risk was?
19               MR. SACK:  Objection to form, and
20   asked and answered.
21           A.    Well, the valuation -- the valuation
22   mechanism for the purposes of GlassBridge, I think,
23   were focused to -- any large part to Orix analysis
24   that had been done already, so we didn't really need
25   to review that.  As I've said many times, a typical

Page 618

1   valuation mechanism where you look at future cash

2   flows and take the present value is really not

3   necessarily accurate or meaningful in this type of

4   -- of transaction, so -- but I think ultimately the

5   valuation mechanism relied on previous transactions

6   that had been done and the valuation that Orix used

7   in their transaction.

8        Q.    Okay.  Am I to interpret from your

9   comments, Mr. Hall, that there was no cash flow

10  analysis performed?

11            MR. SACK:  Objection to form.

12       A.    No, I didn't say that.  As many times

13  as you ask me, I didn't say that.

14            There were pro formas, going back to

15  the data room, that may have been updated at

16  different times that gave future projections based

17  on certain variables.  As was pointed out in the

18  FAQs, those variables were wildly volatile and that

19  they -- they wouldn't necessarily need -- lead to

20  any meaningful valuation.  And that holds, I think,

21  for this meeting as well.

22       Q.    Well, let me -- my question is a little

23  different, Mr. Hall.  Is it -- for this meeting and

24  this transaction did you present the GlassBridge

25  board with any kind of projections and pro formas

Page 619

1    that -- like of the kind that you just discussed?

2            A.      I don't recall.

3            Q.      And can you --

4                    MR. PEARLSON:  Can we just go back to

5    Exhibit A?

6            Q.      Mr. Hall, part of Exhibit A that was

7    given to the GlassBridge board is a letter dated

8    June 10, 2019, from Marc Gross, who at the time was

9    counsel for Mr. Salerno and Cypress Holding.  Do you

10   see that?

11           A.      At which time was he counsel?  Because

12   that's --

13           Q.      As of -- as of June 2019 he wrote a

14   letter.

15           A.      Yes.  Yes.  I -- I believe he was

16   counsel then, yes.

17           Q.      And he was advising Sport-BLX of

18   certain claims that Mr. -- that Cypress Holdings and

19   Mr. Salerno might have against Sport-BLX.  Do you

20   see that?

21           A.      Yes.

22           Q.      Do you have any understanding as to why

23   that was included in the materials that were given

24   to the -- to the GlassBridge board?

25                   MR. SACK:  Objection to form, but you

Page 620

1    can answer it.

2         A.    I don't know.  I don't recall this

3    being presented to the GlassBridge board.

4         Q.    Okay.  So if that was rep- -- you think

5    they're just wrong if that's what was represented to

6    us by counsel for GlassBridge?

7              MR. SACK:  Objection to form.  I think

8    he said he just doesn't recall.

9         Q.    All right.  Let me ask you this.  Do

10   you recall during the board meeting on December 12

11   there being any discussion about Cypress,

12   Mr. Salerno, or any potential claims that they would

13   have against Sport-BLX?

14        A.    I don't recall a discussion about

15   claims against Sport-BLX.

16        Q.    All right.  Do you recall any

17   discussion about Mr. Salerno and Cypress in the

18   context of the December 12 meeting where GlassBridge

19   board was considering buying your shares and

20   Mr. De Perio's shares?

21              MR. SACK:  Objection to form.

22        A.    I don't recall that discussion in this

23   meeting.

24        Q.    Okay.  Was that -- there a discussion

25   about Mr. Salerno and Cypress at another meeting

Page 621

1   with GlassBridge?

2          A.    Well, I think -- I think you -- it

3   would be helpful to me if you'd define

4   "GlassBridge."

5          Q.    Well, GlassBridge is an entity with --

6   with certain representatives, and --

7          A.    But...

8          Q.    -- so when I ask you about GlassBridge,

9   I'm asking when you -- did you have any discussions

10  with a representative of GlassBridge about

11  Mr. Salerno and Cypress?

12         A.    If you're gonna refer to it as a

13  "representative," that's fine.  I had discussions

14  with Daniel Strauss and Joe De Perio constantly

15  about Sport-BLX and many times about Cypress and

16  Salerno, of course.

17         Q.    Now, in particular in the contemplation

18  of this transaction in this time period do you

19  recall any such discussions?

20             MR. SACK:  Objection to form.  With

21  those two individuals, Ross?

22             MR. PEARLSON:  Yes.

23         A.    I don't recall specific discussions.

24         Q.    Now, the agreements that were attached

25  to Exhibit A, GlassBridge had purchased stock in

Page 622

1    Sport-BLX for $263.40 a share three months earlier,

2    correct?

3              MR. SACK:  Objection to form.

4         A.    Did you refer to an exhibit?

5         Q.    We would -- we could scroll through.

6              MR. PEARLSON:  It's in this exhibit,

7    right?

8         Q.    There are agreements here.

9         A.    So you are referring to this agreement

10   that I didn't see at the time.  I just want to be

11   sure --

12             MR. SACK:  I guess if you're -- if

13   you're asking him about a particular document, I

14   understand why it's up, but if it's not about a

15   particular document, we can just take it down and

16   ask questions separately.

17        Q.    No.  So -- so my question is this.

18   This was part of the -- what the GlassBridge board

19   had in front of it at the time it was considering

20   your transaction.  Did you see -- were you -- or do

21   you recall that in September that GlassBridge had

22   purchased Sport-BLX stock for $263.00 and forty- --

23   almost 41 cents per share?

24        A.    I do recall that transaction, yes.

25        Q.    Okay.  And in between September and

Page 623

1  December what -- what had happened with respect to

2  the company and its prospects; Sport-BLX?

3            MR. SACK:  Objection to form.

4       A.    Well, -- I apologize.  Can you give me

5  the dates again?

6       Q.    Between the -- this transaction,

7  September 16, 2019, --

8       A.    Yes.

9       Q.    -- the board meeting we were just going

10  over --

11      A.    Yes.  Yes.

12      Q.    -- on December 12, what had happened

13  with respect to Sport-BLX's prospects?  Had they

14  gotten better, or they had gotten worse?

15            MR. SACK:  Objection, vague, but you

16  could try to answer that.

17      A.    Yeah.  I think gradually between this

18  point and the end of the year the prospects for

19  Sport-BLX had gotten worse.

20      Q.    And -- and why is that?

21      A.    We came to the ultimate understanding

22  that we -- we would have to forego a broker-dealer

23  license.

24      Q.    Okay.  And was that because of what you

25  had said earlier; that Cypress, they wouldn't

Page 624

1    disclose the limited partners?

2         A.     Yes.

3         Q.     And there were -- and your testimony is

4    there were no other obstacles to obtaining a -- for

5    Sport-BLX or BLX Trading obtaining a FINRA license?

6              MR. SACK:  Objection to form.

7         A.     Well, there were no other obstacles

8    that we knew of.  I -- I can't say that FINRA was

9    definitely going to approve it without throwing up

10   some other potential obstacles or requirements, but

11   it became clear that we wouldn't even get to that

12   point until we disclosed who all of the owners, the

13   beneficial owners of the company were.

14        Q.     Do you recall assembling any kind of

15   valuation materials that were presented to the

16   GlassBridge board in connection with this

17   transaction?

18              MR. SACK:  Objection.  Asked and

19   answered.

20        A.     I don't recall with respect to this

21   transaction.

22              MR. PEARLSON:  Okay.  Can we scroll

23   up?

24              MR. SACK:  I'm sorry.  David, did you

25   want to say something to the group?  I apologize if

Page 625

1    I missed something.

2              MR. GOLD:  Yeah, no, I'm just asking

3    can I have a Bates number for all of 98?

4              MR. PEARLSON:  Sure.  For the record,

5    it's -- again, this is what was told to us.

6    GBE_0015398 through 0015468.

7              MR. GOLD:  Thank you.

8    BY MR. PEARLSON:

9         Q.    Mr. Hall, I'm going to ask you, do you

10   recognize these materials?

11             MR. SACK:  Do you just want to show

12   him the cover page or any more, Ross?

13             MR. PEARLSON:  Well, you know what?

14   Why don't we go ahead and scroll through it so he

15   could see it, and then we'll ask him some questions,

16   then we'll take a quick break.

17             Go ahead.

18        Q.    Mr. Hall, just so you know, I'm only

19   going to refer to the -- the first three pages of

20   the document, but if you need to -- if you want to

21   see the entire thing, just let us know.

22        A.    No, that's fine.

23        Q.    Okay.  So --

24             MR. PEARLSON:  Can we go back?

25        Q.    So Mr. Hall, do you know who -- have

Page 626

1    you seen these materials before, what are called

2    "Valuation Materials" for Sport-BLX?

3         A.    I don't recall the term "Valuation

4    Materials."

5         Q.    Do you recall someone from Sport-BLX

6    putting together a slide packet or a PowerPoint like

7    the one we're looking at now?

8         A.    There were many slide decks over the

9    previous year prepared that looked something like

10   this.

11        Q.    Okay.  But my question is -- was

12   specifically with respect to this one.  Do you

13   remember or do you recall that a slide deck

14   Valuation Materials was put together in December of

15   2019 by someone at Sport-BLX?

16        A.    I don't specifically remember

17   throughout the month of December 2019, and if this

18   is an attachment, I don't -- as I said a number of

19   times before, I don't recall what materials were

20   presented to the GlassBridge board at the meeting.

21        Q.    So you don't recall one way or the

22   other whether valuation materials such as the one

23   we're looking at were put together specifically in

24   connection with the sale of your shares and

25   Mr. De Perio's shares?

Page 627

1          A.      Based on my recollection of that
2    meeting, I don't recall.
3          Q.      Okay.  Now, if we could look at the
4    second page, and specifically --
5                  MR. PEARLSON:  Keep going down.
6          Q.      -- it's what's called a "Valuation
7    Summary."  Mr. Hall, sitting here today can you tell
8    us what the -- what those numbers are reflected in
9    that chart and table at the bottom of the page?  And
10   if you would need to see the entire page, let us
11   know.
12         A.      No.  So it appears that those numbers
13   are enterprise values based on particular EBITDA
14   multiples, so yes.
15         Q.      Okay.  And -- and what are the
16   valuations that are reflected in that document for
17   Sport-BLX?
18         A.      Want me to read the numbers?
19         Q.      You can just tell me, yeah, what the
20   valuations are that are reflected in that document.
21         A.      Well, at 15 times EBITDA the valuation
22   in 2020 is 151.4 million.  At 20 times EBITDA
23   valuation was 201.8 million.  At 25 times EBITDA the
24   number was 252.3 million in 2020.  Should I
25   continue?

1      Q.     And -- and let me ask you this.  Were

2  these analyses or these projections presented to the

3  Sport-BLX board at any time?

4      A.     In this meeting or at any other time?

5      Q.     At any -- any time.  I'm talking about

6  the Sport-BLX board now.

7      A.     I don't know.

8             MR. PEARLSON:  Okay.  Could we go to

9  the next page?

10     Q.     Now, what is a valuation sensitivity

11  analysis, Mr. Hall?

12            MR. SACK:  Do you mean in this

13  document or just generally?

14            MR. PEARLSON:  Just generally.

15     A.     So I assume it's just -- well, it's

16  different enterprise values based on different

17  EBITDA multiples or different...

18            I'm not really sure I understand -- I'm

19  not sure I understand it.  I'd have to look at it a

20  little more carefully and think about it.  I didn't

21  -- I don't believe I -- I -- I didn't prepare this.

22     Q.     And you don't know who prepared it?

23     A.     I don't specifically, no.

24     Q.     And you don't know for what purpose?

25     A.     I -- I don't -- I don't -- well, I

Page 629

1  don't recall what this specific one was created for.

2  I understand what -- in general, what these types of

3  documents were created for, but I -- specifically,

4  I'm not sure I understand what the 50, 75, 100, 125

5  percent is.

6          MR. SACK:  You want to take a break,

7  Ross?

8          MR. PEARLSON:  No, I just want to

9  finish with this document.

10         Q.    So if -- so Mr. Hall, if this document

11  was presented to the board of GlassBridge in

12  connection with the potential purchase of your

13  shares, is it fair to say that you personally didn't

14  have anything to do with either the analysis or

15  presenting it to the GlassBridge board?

16         MR. SACK:  Objection to form.

17         A.    I'm not -- well, first of all, I don't

18  know what was presented to the board.  Certainly I

19  did not create this PowerPoint because, frankly, I

20  don't know how to do that.  Whether I had any

21  discussion about different metrics, very likely I

22  did, but I don't know if it was specific to this

23  document.

24         Q.    All right.  Do you recall having any --

25  with respect to this document, do you recall

Page 630

1   reviewing either this document or a document like it

2   in December of 2019?

3               MR. SACK:  Objection to form.

4               Could I have that question back again,

5   please?

6               (Last question is read back by the

7   court reporter.)

8               MR. SACK:  Objection to form.

9       A.      So this document, I'm told, is an

10  attachment to a presentation made to the GlassBridge

11  board, and I've already said I don't recall

12  documents in that meeting.  Whether I discussed any

13  document similar to this in December of '19, I don't

14  recall.

15              MR. PEARLSON:  Okay.  Why don't we

16  take a -- like a ten-minute break now, and we'll

17  resume at that point.

18              MR. SACK:  Very good.

19              MR. PEARLSON:  Thank you.

20              THE VIDEOGRAPHER:  This marks the end

21  of video file No. 1.  The time is 11:18 a.m., and

22  we're going off the record.

23              (Recess taken from 11:18 to 11:34

24  a.m.)

25              THE VIDEOGRAPHER:  We're back on the

Page 631

1    video record.  This is the start of video file No. 2

2    in the deposition of George Hall.  The time is 11:34

3    a.m.

4    BY MR. PEARLSON:

5          Q.    Mr. Hall, I'm going to direct your

6    attention to what's been marked as Hall-54 for

7    identification.  It's Minutes of a Meeting of the

8    Board of Directors of Sport-BLX on November 26,

9    2019.

10          (Exhibit Hall-54, Five-page Minutes of

11   Meeting of the Board of Directors of Sport-BLX, Inc.

12   dated November 26, 2019, Bates stamped

13   SPORTBLX0140791 through 140795, is marked for

14   identification.)

15          Q.    Mr. Hall, do you recall that at or

16   around this time that Mr. Baez and Mr. Johnson

17   joined the board of Sport-BLX?

18          A.    Yes.

19          Q.    Who was responsible for bringing them

20   on -- onto the board?

21          A.    Ultimately it was my invitation for

22   them to come in and consider being on the board.

23          Q.    Okay.  And were they brought in to be

24   independent directors on the -- on the Sport-BLX

25   board?

1          A.     Well, by definition they were

2     independent.  None of them -- neither of them owned

3     stock or had any business relationship with the

4     company.

5          Q.     Okay.  Were you -- did you bring them

6     on board with the intent of -- of forming a related

7     party transaction committee?

8          A.     That was part of the intent, yes.

9          Q.     Okay.  And why did -- why did you feel

10    like you needed them and to form a related party

11    transaction committee for Sport-BLX?

12               MR. SACK:  Objection to form.

13          A.     Well, it was part of the overall

14    extraordinary corporate governance that, for a small

15    company, Sport-BLX would undertake, and because we

16    now had a demand note and were somewhat dependent on

17    GlassBridge in terms of funding the company, we

18    thought it would be good to have the related party

19    committee for the board.

20          Q.     And what, specifically, was the related

21    party transaction committee supposed to do for

22    Sport-BLX?

23          A.     Any transaction between a related

24    party and Sport-BLX that the board wanted to

25    consider would be handed to the -- the related party

Page 633

1    committee for evaluation and report back to the

2    board.

3         Q.    What is a related party, in your view?

4         A.    I'm not sure if there's a legal

5    definition for it, but the practical definition is

6    where people are on -- someone is on two sides of

7    the transaction.  They have some duty to one

8    company, another duty to another company, and the --

9    whether it's through share ownership or employment,

10   so those would be related parties, and that --

11   that's -- that's my interpretation of what a related

12   party is.

13        Q.    Okay.  And was the -- you know, the

14   board supposed to provide -- the related party

15   transaction committee supposed to provide sort of an

16   independent view of the fairness of a related party

17   transaction?

18        MR. SACK:  Objection to form.

19        A.    Yeah, fairness -- I'm not sure that

20   "fairness" has an exact definition in any given

21   circumstances, but the -- the analysis for the

22   related party is whether it's a reasonable

23   transaction for -- for the company to do.  So in

24   their case is it a reasonable transaction for

25   Sport-BLX, Incorporated, whatever that transaction

Page 634

1    may be.

2          Q.    Right.  And that's -- that's in the --

3    and it's in the best interest of the company and the

4    shareholders, correct?

5          A.    Correct.

6                MR. PEARLSON:  Now, could we turn to

7    page 3?

8          Q.    If you look at the -- the --

9                MR. PEARLSON:  Keep going down.

10   There's a -- okay.  Keep going down.

11         Q.    Now, in there it says, "Mr. Salerno

12   continues that Mr. Hall represented there would be a

13   fund that would generate revenues for the company.

14   Mr. Hall explains that the effort to raise capital

15   for a fund was unsuccessful."

16               Mr. Hall, do you recall at the November

17   meeting having a discussion with Mr. Salerno about

18   the fund?

19         A.    I remember having conversations all

20   throughout the year about a term -- what was

21   referred to as a fund.

22         Q.    Okay.  Do you -- do you recall in this

23   board meeting telling Mr. -- Mr. Salerno that the

24   efforts to raise capital for the -- a fund was

25   unsuccessful?

1      A.      I don't know if I used this wording,

2   and I didn't record the minutes.  I tried to use

3   everything I could to try to make him understand

4   that there was no fund, that there were no revenues

5   going to any entity that should have gone to

6   Sport-BLX, that originally the fund concept was to

7   potentially have another -- another party manage the

8   fund to be basically our biggest customer.  So I

9   tried in every way to get him to understand that

10  there was no fund and that -- so something along

11  those lines I think is reasonable, although I didn't

12  write this -- this sentence.

13      Q.      Well, did you -- did you ever make any

14  efforts to raise capital for a fund?

15              MR. SACK:  Objection, asked and

16  answered, but you can answer it, Mr. Hall.

17      A.      There was preliminary discussions

18  about a fund when, I believe it was Sovereign Wealth

19  Fund of Qatar or one of the sheikhs in Qatar had

20  talked about potentially putting money in a fund,

21  and then there was some other potential discussion

22  about helping a fund -- helping to create a fund for

23  potentially some other partners to -- or some other

24  people to -- to manage, but ultimately in terms of

25  any fund of any kind at any time during the year,

Page 636

1    there was no fund.

2        Q.    Okay.  If you could turn -- if we could

3    turn to page 4 of the document and go to -- there's

4    a paragraph that says, "Mr. Hall and Mr. De Perio

5    then discussed strategic alternatives."  And I'm

6    just going to ask you to read that to yourself,

7    Mr. Hall.  I'm going to ask you some questions about

8    that paragraph.

9        A.    Okay.

10       Q.    Okay.  In November of 2013 [sic] were

11   you considering a potential sale of Sport-BLX?

12       A.    I didn't think a sale was possible, I

13   didn't think there would be anybody interested in

14   buying, but in throwing out all of the options and

15   opening up all the options for -- for the board, I

16   said we could consider trying to sell the whole

17   company.

18       Q.    Did you make any efforts to try to sell

19   the company in November of 2019?

20       A.    Specifically in November of 2019, no.

21       Q.    Okay.  And then it says, "Mr. Salerno

22   asks Mr. Hall what company is worth and Mr. Hall

23   says he does not know and that he may be interested

24   in selling his shares."

25            Was that true in November of 2019; you

1    really didn't know what the company was worth?

2         A.    I think specifically what I said,

3    which I heard in one of the secret recordings, was

4    that I said, "I'm a trader by nature, and it's worth

5    what somebody will pay."

6         Q.    Okay.  And what about did you -- did

7    you, in fact, say that you might be interested in

8    selling your shares?

9         A.    I said that I had considered potential

10   opportunity to sell the entire company, or if

11   somebody wanted to -- in the context of a sale of

12   the whole company, that if somebody wanted to take

13   control of the company and -- and buy just enough to

14   control the company, that I would consider

15   participating in that transaction for the benefit of

16   the shareholders.

17        Q.    At this point in November had you had

18   any discussions with anybody about selling your

19   shares?

20        A.    No.

21        Q.    At this point in November had you begun

22   any discussions with GlassBridge about selling your

23   shares to GlassBridge?

24        A.    No.

25        Q.    And it says, "Mr. De Perio states that

Page 638

1    a sale would be tough without proof of concept."  Do

2    you understand what he means by that?

3                    MR. SACK:  Objection to form.  You

4    mean does he recall what was said in the meeting,

5    Ross, or how does he interpret words written in the

6    document?

7         Q.    I guess the -- the question is, first

8    of all, do you recall Mr. De Perio saying that at

9    the meeting?

10        A.    I think words to that effect he did,

11   in fact, say.

12        Q.    Okay.  And what did you understand him

13   to mean when he said "a sale would be tough without

14   proof of concept"?

15                   MR. SACK:  Objection to form.

16        A.    Well, the concept is to convince an

17   athlete to do a transaction, basically issue shares

18   based on his future earnings.  That's one part of

19   the concept.  And then the other part of the concept

20   is that we could take the transaction with the

21   athlete, securitize it, and sell it to the public.

22   So -- so there are two parts to -- two concepts.

23                   Proof of concept would be demonstration

24   that we can do a deal with an athlete, at least one

25   athlete, to show that it was possible, and then to

1  sell the shares to investors would be the other part

2  of the concept.  So proof of concept would be either

3  one or both of those concepts actually happening and

4  being proven.

5        Q.    Did -- as of November of 2019 did

6  Sport-BLX have proof of concept with respect to

7  either one of those two parts you just described?

8        A.    We had a transaction that we were

9  working on with one basketball player, P.J.

10  Washington, Jr.

11        Q.    Okay.  And what about in terms of the

12  -- the -- the ability to tokenize and trade on the

13  -- on the Sport-BLX platform?

14        A.    Well, you can't really tokenize it and

15  trade it until you actually buy it and securitize it

16  or arrange to securitize it through a best efforts

17  transaction, so until you actually close the deal

18  with the athlete, there's nothing to sell.

19        Q.    Okay.  Now, do you recall during the

20  November 26 board meeting that you -- you stated

21  that if you sold your shares that you would offer

22  tag-along rights to the shareholders of Sport-BLX?

23             MR. SACK:  Objection to form.

24        A.    In the particular context, which was

25  about basically me giving up the shares and control

Page 640

1  of the company to someone that wanted to take

2  control, which would be a pretty low price.  That if

3  shareholders wanted to participate at that price,

4  that I would offer them tag-along rights.  But that

5  was in a very specific circumstance.

6          Q.      Okay.  And can you explain to us what

7  tag-along rights are?

8          A.      If one person sells shares, then other

9  people -- if they have tag-along rights, they have

10  the ability to sell the shares on the same terms.

11          Q.      And did any of the Sport-BLX

12  shareholders have tag-along rights?

13          A.      Are you talking about the tag-along

14  rights that were discussed in this board meeting?

15          Q.      No.  I'm just saying generally.  Did

16  they have -- did they have tag-along rights as you

17  described?

18          A.      I don't understand "generally" because

19  you're referring to tag-along rights that were

20  talked about in the meeting on the secret recording,

21  but you're saying in general.  So which shareholders

22  are you talking to?  I'm thrilled to answer your

23  question.

24          Q.      Fair enough.  Let me be specific.

25                  Did Cypress have tag-along rights under

Page 641

1    its agreement with you and Mr. De Perio?

2         A.    Cypress had certain tag-along rights

3    under certain circumstances as directed by the

4    Cypress counsel.

5         Q.    Okay.  And what were the tag-along

6    rights, to the best of your recollection, that

7    Cypress had?

8         A.    The -- if the -- if more than 50

9    percent of the outstanding shares were sold, that

10   they would have tag-along rights.

11        Q.    Now, this is different.  What you were

12   talking about in the meeting was just generally

13   offering tag-along rights if you sold your shares,

14   correct?

15             MR. SACK:  Objection to form.

16        A.    Yeah, I -- I think -- I think that's a

17   little out of context.  I wasn't offering tag-along

18   rights as a legal agreement in any scenario.  It was

19   in a discussion, it was at the end of a long

20   meeting, and basically this discussion was around we

21   just may have to turn the keys over to somebody

22   else.  I sell the company.  And I said if -- I have

23   in mind what I think I would sell for, which would

24   be lower than what I think other people would have

25   been willing to sell for, and I said that if other

1    people had gotten to the point where I was at where

2    they wanted to sell their shares at a low price and

3    walk away from this, that I would basically give

4    other shareholders that option.  But it was only in

5    the very specific circumstance that was described

6    then.

7            Q.    Okay.  And they weren't -- none of the

8    shareholders were offered tag-along rights in the

9    context of you and Mr. De Perio selling your shares

10   to GlassBridge, correct?

11           MR. SACK:  Objection to form.

12           A.    I didn't hear the first part of the --

13   could you repeat the question, please?

14           Q.    Sure.  Mr. Hall, none of the

15   shareholders of Sport-BLX were offered tag-along

16   rights in connection with your and Mr. De Perio's

17   sale of your shares to GlassBridge, correct?

18           MR. SACK:  Objection.

19           A.    Did you say "none of the

20   shareholders"?

21           Q.    Yes.

22           MR. SACK:  Objection to form.

23           A.    I think -- I don't recall what rights

24   GlassBridge may have had in their initial

25   transaction, but other than potentially GlassBridge,

Page 643

1    as far as I can recall, Cypress had -- Cypress was

2    the only one that had those specific tag-along

3    rights.

4        Q.    No.  No.  My question, Mr. Hall, is in

5    your transaction with GlassBridge when you and

6    Mr. De Perio sold your shares, none of the other

7    Sport-BLX shareholders were offered tag-along rights

8    in connection with that transaction, correct?

9            MR. SACK:  Objection to form.

10       A.    Correct.

11           MR. PEARLSON:  Okay.  Can we go to

12   Hall-55?

13           (Exhibit Hall-55, Minutes of the

14   Special Meeting of the Board of Directors of

15   Sport-BLX, Inc. dated December 6, 2019, Bates

16   stamped SPORTBLX00039509, is marked for

17   identification.)

18       Q.    Mr. Hall, I'm going to show you what's

19   been marked as Hall-55 for identification.  It's

20   Sport-BLX minute meetings -- meeting minutes from

21   December 6, 2019.  I'm just going to direct you to

22   the bottom of the page, and it shows that you were

23   at and actually presided over the meeting.

24           MR. PEARLSON:  Could we scroll to the

25   bottom?

1          A.      Can you hold up -- hold up, please?

2     Can I --

3          Q.      Yeah.

4          A.      Can I see the first part?

5                  Okay.

6          Q.      So, Mr. Hall, it says, you know, under

7     "Annual Stockholders Meeting" that you led a

8     discussion on the annual stockholders meeting of the

9     corporation, and then there was a motion that was

10    made and seconded that the date of the annual

11    meeting was set for December 20, 2019, and the

12    record date was set for December 10, 2019.  Do you

13    see that?

14         A.      I do.

15         Q.      Could you tell us what is the

16    significance of the record date?

17                 MR. SACK:  Objection to form.

18         A.      The record date is the date which the

19    ownership of shares on that particular date is the

20    ownership -- the number of shares that an entity

21    gets to vote at the annual meeting.

22         Q.      Okay.  And -- and in this case the

23    record date was approximately 10 days before the

24    annual meeting, correct?

25                 MR. SACK:  You're asking him to just

Page 645

1   say what the document says, Ross?

2             MR. PEARLSON:  Or if he -- if he

3   recalls.

4        A.    I'm reading off the document.  I don't

5   -- I don't recall.

6             The document says the record date was

7   December 10, and the annual meeting date was set for

8   December 20.

9        Q.    At this point in time as of December 6,

10  2019, Mr. Hall, had you begun your discussions with

11  GlassBridge about your potential -- your potential

12  sale of your shares to the -- to GlassBridge?

13       A.    I don't recall when those discussions

14  started.

15       Q.    Was there any discussion at this board

16  meeting about a need to delay the annual meeting?

17       A.    I -- I don't see it in the record, so

18  I don't -- but I don't recall specifically.

19       Q.    Okay.

20             MR. PEARLSON:  If we could go to

21  Hall-56.

22       Q.    Oh, oh, Mr. -- Mr. Hall, do you recall

23  when was the first time you advised the Sport-BLX

24  board that you were selling your shares to

25  GlassBridge?

1           A.      Well, there were people that were
2      aware of it that were on the Sport-BLX board that I
3      may have had the discussion with, so when you say
4      "the GlassBridge board," do you mean in its entirety
5      at a board meeting or just in general?
6                   I had discussions, obviously, with
7      Daniel Strauss and Joe De Perio, but -- who were
8      both on the board.  So can you be more specific?
9           Q.      Well, you had discussions concerning
10     the potential transaction with Mr. De Perio,
11     Mr. Strauss.  Did you also have discussions with
12     Mr. Ruchalski prior to the closing of the
13     transaction about the sale of your shares and
14     Mr. De Perio's shares to GlassBridge?
15          A.      Prior to the -- prior to the sale?  Or
16     prior to -- prior to what --
17          Q.      Prior to the sale that you recall.
18          A.      Well, I think in the documents you
19     showed me before Mr. Ruchalski was present at the
20     board meeting with -- for GlassBridge, so clearly he
21     knew about it.  Whether I specifically am the one
22     that told him or Daniel told him, I don't recall.
23          Q.      Did anyone advise the Sport-BLX board
24     in a board meeting of that sale; of the sale of your
25     shares and Mr. De Perio's shares to GlassBridge?

```
                                              Page 647
 1              MR. SACK:  Meaning in addition to the
 2    reference in the November 26 meeting to a possible
 3    sale?
 4         Q.    I'm talking about specifically --
 5              MR. PEARLSON:  Jonathan, please.
 6         Q.    Mr. Hall, my question is at any point
 7    after you began your discussions with GlassBridge
 8    about selling your shares and Mr. De Perio's shares
 9    to GlassBridge, did anyone in a board meeting advise
10    the Sport-BLX board as a whole that the transaction
11    was going to take place?
12         A.    I don't recall.
13         Q.    Okay.  Do you know whether the
14    Sport-BLX board was ever advised in advance of the
15    terms that -- on which you were selling your shares
16    and Mr. De Perio's shares to GlassBridge?
17              MR. SACK:  Objection to form.
18         A.    Well, I don't recall if the
19    transaction was discussed, so if I don't recall
20    that, I certainly don't recall whether -- discussing
21    what the terms were.  What I do recall is there was
22    a meeting, which I believe on -- was on December 9,
23    and because one of the board members urgently had to
24    give up the call, and because we didn't have enough
25    -- because of the -- the notice requirements to have
```

1    another board meeting, we ultimately decided to

2    adjourn the meeting and pick it up again the next

3    day.  I don't -- I don't recall if it was discussed

4    at that meeting or not.

5            Q.    Okay.  Well, let's -- let's look at the

6    -- the minutes from the December 9 meeting you just

7    referenced, Hall-56.

8                (Exhibit Hall-56, Three-page Minutes

9    of the Special Meeting of the Board of Directors of

10   Sport-BLX, Inc. dated December 9, 2019, Bates

11   stamped SPORTBLX00039506 through 39508, is marked

12   for identification.)

13           Q.    Before we get to those minutes,

14   Mr. Hall, do you recall, did you ever discuss with

15   Cesar Baez the -- the sale of your shares and

16   Mr. De Perio's shares to GlassBridge?

17           A.    I don't recall.

18           Q.    Do you recall whether you discussed

19   with Mr. Johnson the sale of your shares and

20   Mr. De Perio's shares to GlassBridge?

21           A.    I don't recall.

22           Q.    Okay.  If we could look at the December

23   9 board minutes for Sport-BLX.

24               Now, do you see, Mr. Hall, that the --

25   the Sport-BLX board meeting starts at five o'clock

Page 649

1    that day on December 9.  Do you see that?

2          A.    Yes.

3          Q.    Okay.  And it indicates that you were

4    -- you were there, correct?

5          A.    Yes.

6          Q.    And you presided over the meeting?

7          A.    Is that a question?

8                Yes, that's what it says.

9          Q.    Okay.  Now, do you recall -- if we look

10   at the annual meeting items, do you recall that

11   there was a discussion among the board about the

12   reelection of the board of directors of Sport-BLX?

13         A.    Yes.

14         Q.    Okay.  And was it agreed in that

15   meeting that the board would recommend that all the

16   directors be reelected?

17                MR. SACK:  Objection to form.

18         A.    No.

19         Q.    You don't recall that out of the -- the

20   result of that discussion was that the board voted

21   to recommend that the entire slate of directors

22   would be reelected?

23                MR. SACK:  Objection to form.

24         A.    So what it says -- what it says that

25   Mr. De Perio stated, and again, this is recorded and

1   not (inaudible) sure what it said, was that --

2                    THE REPORTER:  I apologize.  I'm

3   sorry, Mr. Hall.  "This is recorded and not," say

4   again?

5            A.      Without referring specifically to what

6   was said, what was recorded here is Mr. De Perio

7   stating that the votes to be recorded were to

8   determine whether the individual members would stand

9   for election at the annual meeting.  So this vote

10  was to vote for who would be -- would stand for

11  election at the annual meeting.

12           Q.      Okay.  Do you recall that the -- that

13  the board recommended the reelection of the existing

14  slate of directors at the annual meeting?

15                   MR. SACK:  Objection to form.

16           A.      The -- so they were vote -- they were

17  recommended by the board to -- to be on the

18  company's slate at the annual meeting.

19           Q.      Okay.  Now, it says on the next page,

20  page 2, that the second item for consideration was a

21  proposal to increase the number of authorized shares

22  of the corporation from 300,000 to 2 million shares.

23                   Do you recall a discussion of

24  increasing the number of authorized shares at that

25  meeting?

Page 651

1          A.      Yes.

2          Q.      And why -- why was the board

3     considering increasing the number of authorized

4     shares of the corporation at that time?

5          A.      Because it would give the board and

6     the company flexibility to issue more stock.

7          Q.      And what purpose would that serve?

8          A.      Allows the company to rai- -- issue

9     more shares to raise more capital.

10         Q.      And was the com- -- and did the company

11    need capital at this point in -- in Decem- -- on

12    December 9 of 2019?

13         A.      Well, maybe help me understand what

14    you mean by "need capital."

15         Q.      Well, was the company looking to raise

16    additional capital and -- and needed it for the

17    operations of the company?

18              MR. SACK:  Objection to form.

19         A.      Well, at this point the operations of

20    the company weren't in jeopardy because we had a

21    demand note from GlassBridge, and GlassBridge had

22    indicated willingness to fund the operation, so --

23    for some period of time.  So this is not a --

24    whether we raise it from 300 to 2 million or raise

25    it from 300 to 500,000, I don't think it's

Page 652

1    indicative of need, but it gave flexibility for the
2    company to issue more shares.
3         Q.    And raise additional capital to support
4    the needs of the corporation?
5              MR. SACK:  Objection to form.
6         A.    Well, additional capital is for
7    various corporate purposes.  If you want to call
8    those the needs of the corporation, yes.
9         Q.    Okay.  And if you look down at the --
10   further down the page, one of the other items is
11   called "Capital Plan," and it says that you led a
12   discussion on the need for the corporation to raise
13   capital.
14             What -- what do you recall about the
15   discussion you led about the need to raise capital?
16             MR. SACK:  Objection to form.
17        A.    Well, this -- the need here, I
18   specific- -- if I, in fact, said "need" as it's
19   recorded, which very possibly I did, the need for
20   capital was to replace the demand note.
21        Q.    Now -- and did you have a discussion
22   about a long-term capital plan about replacing the
23   demand note that GlassBridge held?
24             MR. SACK:  At that meeting?
25        Q.    Yes.  At that meeting.

1        A.    According to this, I -- yes.  Yes, we

2  -- one of the options was to raise capital to either

3  pay down the demand note or to -- we could always

4  make the demand note more favorable to the company,

5  which we would consider, so we would still want to

6  raise capital for ongoing operations.

7        Q.    Could you have also sold additional

8  shares of the company?

9        A.    I'm sorry?  I couldn't hear you.

10       Q.    Could you also have sold additional

11  shares of the company?

12       MR. SACK:  Objection to form.

13       A.    Well, I -- I think that's what -- when

14  we refer to raising capital, it was selling

15  additional shares, yes.

16       Q.    Okay.  Now, Mr. Hall, do you recall

17  having discussions at this board meeting about

18  whether 50- or $60.00 per share would be a

19  reasonable price for Sport-BLX stock?

20       MR. SACK:  Objection to form.

21       A.    Well, when you say "for Sport-BLX

22  stock," I think that's a little misleading, so maybe

23  could you be a little more specific?

24       Q.    Well, did you recall having any kind of

25  discussion with the members of the board and stating

1    that you believed that -- at that time that 50- or
2    $60.00 per share would be a reasonable price per
3    share for Sport-BLX stock?
4              MR. SACK:  Objection to form.
5         A.    I don't believe I -- I said that.
6         Q.    Do you -- do you recall telling the
7    board that -- at that time that a $7.5 million
8    valuation of Sport-BLX was -- was reasonable?
9              MR. SACK:  Objection to form.
10        A.    Reasonable under what circumstances?
11        Q.    At that time.
12             MR. SACK:  Objection to form.
13        A.    For what purpose?  I don't understand
14   your question.
15        Q.    Well, you're basing a price per share
16   on a valuation of the company, correct?
17             MR. SACK:  I don't think he said he
18   was doing that, Ross, so --
19        Q.    Let me -- let me ask you what did you
20   -- as of that time frame you have no recollection --
21   did you have any recollection of telling the board
22   anything about what you thought an appropriate
23   valuation of Sport-BLX was at that time?
24        A.    Well, maybe we can cut to the chase.
25   You're talking about the discussion of 50- to $60.00

Page 655

1  a share?  Is that the discussion you're referring

2  to?

3        Q.    Well, now we're talking about -- you

4  said you had no recollection of that.  I'm talking

5  about --

6             MR. SACK:  No, he didn't, Ross.

7  Please don't misstate the record.  He didn't say he

8  had no recollection of what he just mentioned.  So

9  why don't you just ask him what his recollection is

10 on that subject?

11       Q.    What -- what is your recollection of

12 what was discussed on the -- on the 50- to $60.00

13 per share?

14       A.    That was specifically for

15 GlassBridge's conversion of its demand note to

16 stock.

17       Q.    Okay.  What about -- do you recall

18 having any discussions about what a reasonable

19 valuation of the company was at the time?

20       A.    Well, I think 50- to $60.00 a share,

21 given the number of outstanding shares flux to debt,

22 would be an enterprise value of some number that I

23 think we calculated in the board meeting and quoted,

24 I just don't have the tape handy, but yes.

25       Q.    Did you recall advising the board at

Page 656

1    that time that the company was having difficulty

2    attracting -- attracting investors?

3         A.    Yes.  I -- I believe Mr. De Perio

4    advised the company, and I probably agreed with him,

5    or maybe I advised the board that -- Mr. De Perio

6    advised the board, and I probably advised the board

7    as well.

8         Q.    Now, do you recall, did you make an

9    offer to buy out Mr. Salerno/Cypress' stock for 50-

10   to $60.00 per share at that meeting?

11        A.    I did not.

12        Q.    Okay.  What -- do you recall discussing

13   potentially buying out Cypress' investment in

14   Sport-BLX at that meeting?

15        A.    At that meeting I don't believe we

16   made an offer to buy out his shares.

17        Q.    Okay.  Did you -- do you recall

18   advising the board that you weren't going to discuss

19   a sale of your personal shares because it wouldn't

20   help the company?

21             MR. SACK:  Ross, I couldn't hear that

22   question.  If I could have it back again either from

23   you or the reporter?

24             MR. PEARLSON:  Sure.  I could -- I can

25   read it back.  I could read it again or give it

Page 657

1   again.

2          Q.    Did you tell the Sport-BLX board that

3   you would not discuss the sale of your shares

4   because selling your personal shares would not help

5   the company?

6                MR. SACK:  Objection to form.

7          A.    Does it say that somewhere?  Is that

8   what you're referring to in the minutes here?

9          Q.    No, I'm asking you, Mr. -- Mr. Hall,

10  for your recollection.  Whether you recall telling

11  the -- the board of Sport-BLX in that meeting that

12  you would not even discuss the sale of your personal

13  shares because it would not help the company?

14         A.    I don't recall the "would not help the

15  company."  There was a meeting where, as we've

16  discussed before, I said that if somebody wanted to

17  take over the company through -- you know, buy the

18  whole company or at least buy a control of the

19  company, I'd consider selling my shares, but I'm not

20  sure -- actually, can you remind me what's the date

21  of this -- of this meeting?

22         Q.    This is the December 9 meeting,

23  Mr. Hall.

24         A.    Yeah.  So if this is the meeting where

25  we discussed converting GlassBridge debt to shares,

Page 658

1    I don't recall at that meeting discussing the sale

2    of my personal shares.

3         Q.    Okay.  Did you -- do you -- did you

4    advise the Sport-BLX board in this meeting that you

5    were in discussions with GlassBridge to sell your

6    personal shares?

7                MR. SACK:  Objection to form.

8         A.    No, I don't -- I don't recall -- no, I

9    don't think I said that to the board at this time.

10        Q.    Okay.  And then it says here that the

11   meeting was adjourned at 6:35.  Do you see that at

12   the bottom of the page?

13        A.    Yes.

14                MR. SACK:  It actually says

15   "suspended," Ross, not adjourned.

16        Q.    Okay.  Suspended at 6:35.  Do you see

17   that?

18        A.    I see that, yes.

19        Q.    Okay.  And then isn't it a fact,

20   Mr. Hall, that right after that there was a -- a

21   meeting of the GlassBridge board as we -- we just

22   went over today?

23        A.    Refresh my memory.  This is December

24   9?

25        Q.    December 9, correct.  Do you recall

Page 659

1    that we just went over a meeting of the GlassBridge

2    board where they authorized management to enter into

3    negotiations to purchase your shares and

4    Mr. De Perio's shares?

5            A.      Yes.

6            Q.      And that was -- that was the same day

7    right after this meeting, correct?

8            A.      Approximately the same time, yes.

9                    MR. PEARLSON:  Okay.  Could we turn to

10   Hall-57?

11                   (Exhibit Hall-57, Three-page minutes

12   of the Special Meeting of the Board of Directors of

13   Sport-BLX, Inc. (Continued from Suspended Meeting on

14   December 9, 2019) dated December 10, 2019, Bates

15   stamped SPORTBLX00039503 through 39505, is marked

16   for identification.)

17           Q.      And then there was another meeting of

18   the Sport-BLX board the following day, right,

19   Mr. Hall?

20           A.      I think it was the same meeting.

21           Q.      Okay.  It was a continuation of the

22   same meeting?

23           A.      Yes.

24           Q.      Okay.

25                   MR. PEARLSON:  If we could look at the

Page 660

1    -- scroll down to the annual meeting dates.

2         Q.    It says here that he led -- that

3    Mr. De Perio led a discussion on the corporation's

4    annual meeting, and he's citing a need for

5    additional time to prepare notice materials.

6    "Mr. De Perio requested that the board consider

7    December 23, 2019, at 4:00 p.m. Eastern for the date

8    of the annual meeting.  Accordingly, Mr. De Perio

9    requested that the board consider a new date of

10   December 13, 2019, for the record date."  Do you see

11   that?

12        A.    Yep.

13        Q.    Do you recall Mr. De Perio asking the

14   board to consider moving both the date of the annual

15   meeting and the date of the -- and the record date?

16        A.    I see it in the minutes.  I've

17   reviewed it in the minutes.  I don't recall the

18   specific language and the conversation, but

19   ultimately, yes.

20        Q.    Okay.  And the meeting date had been

21   set on December 6, and now he was asking for more

22   time to prepare notice materials.

23             When did you first become aware that

24   there was -- that Mr. De Perio wanted to move the

25   annual meeting date and the record date?

1          A.      Can we go back to a previous document?

2   What was the date that the record -- what was the

3   meeting that the record date was first set; was that

4   December 9?

5          Q.      December 6.

6          A.      December 6.  Okay.  I'm sorry.  Please

7   ask the question again?

8          Q.      My question is when did you first

9   become aware that Mr. De Perio was going to be

10  requesting that the board move the annual meeting

11  date and the record date?

12         A.      I don't recall when I specifically

13  became aware of this.

14         Q.      When do you -- do you recall discussing

15  with Mr. De Perio why he needed to move the record

16  date?  I mean, the -- the date of the annual

17  meeting?

18                 MR. SACK:  Objection to form.

19         A.      Well, I don't recall the specific

20  discussion or the specific reason, but I think there

21  were a number of reasons.

22         Q.      Okay.  What -- did you advise the board

23  or did Mr. De Perio advise the board that you were

24  in negotiations to sell your shares, your personal

25  shares, to GlassBridge at this time?

Page 662

1          A.     I don't recall if it was discussed at
2     -- on -- at this meeting.
3          Q.     Do you recall whether you advised the
4     board of Sport-BLX at this time that you intended to
5     sell your shares and close on a transaction before
6     the 13th?
7          A.     Can we -- can we scroll up to the
8     attendees in this meeting?
9          Q.     Sure.
10         A.     Okay.  So myself, De Perio, and
11    Ruchalski were present at the GlassBridge.  I -- I
12    was present -- I apologize.  Give me a second.
13              I don't recall if it was presented to
14    -- to the board in this meeting.
15         Q.     Now -- now, there was going to be a --
16    as we indi- -- as we saw, there was going to be an
17    election of the board of directors at the annual
18    meeting, correct?
19         A.     Yes.
20         Q.     And by the record date being changed,
21    didn't that give you and Mr. De Perio more time to
22    finalize the sale of your shares to GlassBridge?
23              MR. SACK:  Objection to form.
24         A.     I don't recall what time it took to
25    finalize the transaction with GlassBridge, but the

Page 663

1    record date being moved would allow GlassBridge to

2    -- to -- to vote the newly acquired shares at that

3    meeting.

4         Q.    And had that been discussed -- had you

5    discussed that with anyone, that the moving the

6    record date would give GlassBridge the opportunity

7    to vote its newly acquired shares at the board -- at

8    the shareholder meeting?

9         A.    I don't really -- I didn't say we

10   discussed it, I don't think.  I just said that was

11   the -- the fact of the -- of the matter.  The reason

12   the -- it was extended, as I said before, were --

13   were probably multiple reasons.  Getting organized

14   for the -- for the annual meeting, it was -- you

15   know, it's a complicated process, so I'm not exactly

16   sure what all the needs for moving the record date,

17   but certainly moving the record date allowed

18   GlassBridge to vote their shares.

19        Q.    And was moving the record date, was

20   that one of the reasons that the record date was

21   moved, so that GlassBridge could vote its newly

22   acquired shares that it acquired from you and

23   Mr. De Perio?

24        A.    That's probably one of the reasons,

25   yeah.

1      Q.     And my question was did you have any

2  discussions with anyone about that being the reason

3  to change the record date from what had been

4  originally scheduled or just change the meeting date

5  and the record date from when it had been originally

6  scheduled?

7      A.     As I said before, I think there were

8  multiple reasons for rescheduling the record date.

9  I did acknowledge that that might have been one

10  reason why we moved the record date, but I don't

11  recall any specific discussions about that.

12      Q.     And as the -- did you advise the

13  Sport-BLX board that that -- at this time on -- at

14  Decem- -- on December 10 that that was one of the

15  reasons for moving the record date and the annual

16  meeting date?

17      A.     Well, as I said before, I don't recall

18  whether I discussed the -- the sale of the shares to

19  GlassBridge at this board meeting to the people that

20  didn't already know about it.  So since I don't

21  recall whether I discussed the transaction, I'm

22  quite certain that I don't recall whether I

23  discussed the reasons for -- or whether that was one

24  of the reasons for changing the record date.

25                  MR. PEARLSON:  If we could go to

Page 665

1    Hall-61, please.

2                    (Exhibit Hall-61, Two-page December

3    12, 2019, email from Daniel Strauss to Joseph De

4    Perio and George Hall forwarding another email of

5    the same date Bates stamped GBE_0015012 and 15013,

6    is marked for identification.)

7          Q.    Mr. Hall, I'm showing you what's been

8    marked as Hall-61 for identification.  It's an email

9    from Mr. Strauss to you and Mr. De Perio attaching

10   certain documents.

11                  Do you recall that you received draft

12   documents from Mr. Strauss for the purchase of your

13   shares and Mr. De Perio's shares on December 12,

14   2019?

15         A.    Well, I am aware that I received

16   documents, and we did a transaction.  I don't recall

17   what date it was, but this email seems to indicate

18   that it was December 12.

19         Q.    Okay.  And were you trying to -- was

20   the -- was the -- one of the objectives to close the

21   transaction before December 13, 2019?

22         A.    Well, the -- the most important thing

23   was to close the transaction prior to December 31

24   for the purposes of consolidation and some of the

25   other things that I alluded to before.  In any

Page 666

1    transaction like this I believe once the terms are
2    set, you should close as quickly as possible.  So if
3    it were -- I'm not sure what date GlassBridge
4    approved it, but once they did, I would have wanted
5    to close it as soon as possible.
6           Q.    Who -- who drafted these documents, do
7    you know?
8           A.    These documents?
9           MR. SACK:  You mean the SPA and -- the
10   stock purchase agreement and the note, Ross?
11          MR. PEARLSON:  Yes.  Correct.  The
12   documents that are referenced in this email as
13   attachments.
14          A.    Well, they were sent from one attorney
15   at Loeb cc'd to another attorney at Loeb, so I don't
16   know specifically who drafted them.
17          Q.    Do you recall who negotiated these
18   agreements?
19          A.    I -- when you say the agreements or
20   the terms?
21          Q.    Well, let's say -- fair enough.
22          Who negotiated the terms?  Start with
23   that.
24          A.    Well, I think we discussed that in --
25   in -- in the past or previous questions.  The terms

Page 667

1    were certain amount of cash, certain amount of debt.

2    The amount of shares was determined through the

3    arithmetic of getting control.  So those terms were

4    negotiated before the document was created.

5            Q.    And who --

6            A.    In terms of --

7            Q.    -- represented -- who represented

8    GlassBridge in those negotiations of the terms?

9            A.    Well, I assume it was Loeb.

10           Q.    I'm talking about the terms, the terms

11   themselves, what you just described.  Not the -- not

12   the actual --

13           MR. SACK:  I think he's -- Ross, you

14   asked about representation.  Do you mean who did

15   Mr. Hall speak with about the terms?

16           Q.    Right.  Who did you negotiate the terms

17   with from -- on the GlassBridge side?

18           A.    So just maybe we could save time if

19   you help me out.  You have a document in front of me

20   from a law firm; now you're saying who represented

21   GlassBridge.  So maybe I'm confused, but I thought

22   we were talking about legal representation.  If

23   you're talking about --

24           Q.    No.  No.  My question -- and my

25   question was this.  You started talking about the

Page 668

1  terms, Mr. Hall.  My -- and you said that, you know,

2  you negotiated the terms as opposed to, you know,

3  the drafts of the agreement.  My question is who did

4  you negotiate the terms of the agreement with from

5  GlassBridge?

6          A.    I think, as was said before, it was

7  Daniel Strauss.

8          Q.    Okay.  And if we can turn to -- do you

9  recall how many drafts went back and forth between

10  you and -- you and GlassBridge concerning this

11  transaction or the documents?

12         A.    No.

13         Q.    I'm going to direct your -- do you

14  recall that you -- that you signed the documents on

15  -- on this same day, on December 12?

16         A.    I don't recall what day it was signed.

17         Q.    Okay.

18              MR. PEARLSON:  Can we turn to Hall-66?

19              (Exhibit Hall-66, Nine-page Stock

20  Purchase Agreement dated December 12, 2019, between

21  George Hall and GlassBridge Enterprises Bates

22  stamped GBE_0002131 through 2139, is marked for

23  identification.)

24         Q.    Mr. Hall, I'm showing you what's been

25  marked as Hall-66 for identification.  It's a Stock

Page 669

1   Purchase Agreement dated as of December 12, 2019.

2   And if we go to the -- the signature page, is that

3   your signature on the document?

4           A.      Yes.

5           Q.      Okay.  For the next page --

6                   (Videoconference interference.)

7                   MR. PEARLSON:  Someone needs to put

8   their phone on mute, please.

9                   MR. GOLD:  Hey, Joe, it's -- it's you.

10                  MR. PEARLSON:  Mr. De Perio, I believe

11  you need to mute your phone.

12                  Thank you.

13          Q.      Mr. Hall, if you look at the next page,

14  does that -- that Schedule 1, does that show the

15  number of shares and the price you were selling them

16  at?

17                  MR. SACK:  Objection to form.

18          A.      Yes.

19          Q.      Okay.  And if we go back to the first

20  page, does that indicate to you that the -- that you

21  signed this document on December 12, 2019?

22          A.      That's -- yes.  That's what it

23  indicates.

24          Q.      And that was the date before the -- the

25  record date for the annual meeting, correct?

Page 670

```
 1          A.      Correct.

 2          Q.      And then if you look at

 3   "Consideration," it shows the breakdown of the

 4   consideration in the manner you described earlier,

 5   correct?

 6          A.      Yes.  In a previous document you

 7   showed me the cash consideration, and it may have

 8   been a different number than this, and that's why I

 9   said I was confused when I saw the other number, but

10   basically the -- the gist of this is correct, that

11   there was a closing payment of some amount of cash

12   and a promissory note.

13          Q.      Okay.  And if we turn to Hall-67.

14                  (Exhibit Hall-67, Five-page December

15   12, 2019, Promissory Note Bates stamped

16   SPORTBLX0174134 through 174138, is marked for

17   identification.)

18          Q.      Is that, in fact, the promissory note

19   associated with the sale of your shares?

20                  MR. PEARLSON:  Do you want to scroll

21   for him and...

22          Q.      So Mr. Hall, my question is does this

23   appear to be the promissory note associated with the

24   sale of your shares on December 12, 2019, to

25   GlassBridge?
```

Page 671

```
 1          A.      Yes.
 2          Q.      Okay.  If we go back to the -- to the
 3   first page of the document, this is a note in the
 4   amount of $12,116,718.00, correct?
 5          A.      Yes.
 6          Q.      And it -- and it provides in paragraph
 7   1 for payments payable in cash on a quarterly basis
 8   on the first day of each calendar quarter commencing
 9   on January 1, 2020.  Do you see that?
10          A.      Yes.
11          Q.      And that's at an interest rate of 5
12   percent per annum, correct?
13          A.      Yes.
14          Q.      Did you receive any payments from
15   GlassBridge pursuant to this note?
16          A.      Yes.
17          Q.      Over what period of time did you
18   receive payments from GlassBridge pursuant to the
19   note?
20          A.      I don't recall when the payments were
21   made, but --
22          Q.      Um...
23          A.      -- there were -- sorry?
24          Q.      No, go ahead.  Finish what you were
25   saying.  I'm sorry to interrupt.
```

1         A.     But it was -- there was some payments

2    made between this date and sometime in 2021, but I

3    don't know the dates or the schedule of the

4    payments.

5         Q.     Do you recall how many payments?

6         A.     No.

7         Q.     And from your answer am I to assume

8    that at some point the payments stopped?

9         A.     I -- there -- there may have been some

10   accrual of payments, but I -- I don't know offhand.

11        Q.     Do you have any sort of schedule of

12   payments that you received under the notes?

13        A.     No, I don't have a schedule.

14        Q.     Did you ever make any effort to collect

15   the full amount due to you under the notes?

16        A.     I don't recall what -- what the

17   ultimate payments were, so I don't recall.

18              MR. PEARLSON:  Okay.  This might be a

19   good place to take a lunch break.  You want to say a

20   half hour, one o'clock?

21              MR. SACK:  Yeah.  Why --

22              MR. PEARLSON:  Does that work?

23              MR. SACK:  -- don't we -- why don't we

24   do thirty minutes.  We'll be back at one.

25              And just your best guess, Ross?  What

Page 673

1    do you think about when we'll wrap up?

2                    MR. PEARLSON:  About 3:00.

3                    MR. SACK:  Okay.

4                    THE VIDEOGRAPHER:  Okay.  I will

5    conclude this file.

6                    This is the end of video file No. 2.

7    The time is 12:30 p.m., and we're going off the

8    record.

9                    (Luncheon recess taken from 12:30 to

10   1:08 p.m.)

11                   THE VIDEOGRAPHER:  We're back on the

12   video record.  This is the start of video file No. 3

13   in the deposition of George Hall.  The time is 1:08

14   p.m.

15   BY MR. PEARLSON:

16       Q.    Mr. Hall, when we broke we were talking

17   about the purchase of your stock by GlassBridge, and

18   we saw a stock purchase agreement dated December 12,

19   2019.  Do you recall that?

20       A.    Yes.

21       Q.    If we could look at what's been marked

22   Hall-68 for identification.

23                   (Exhibit Hall-68, Nine-page Stock

24   Purchase Agreement dated December 12, 2019, between

25   Joseph De Perio and GlassBridge Enterprises Bates

Page 674

1  stamped GBE_0009065 through 9073, is marked for
2  identification.)
3        Q.    Mr. Hall, do you recall that the
4  purchase of Mr. De Perio's shares in Sport-BLX was
5  effectuated the same date as your date -- as your
6  sale?
7        A.    I believe so.
8        Q.    Okay.  And if you look here, this
9  appears to be a similar stock purchase agreement to
10 the one you had for Mr. De Perio, correct?
11       A.    I believe so.
12       Q.    Okay.  If we could just go down to
13 Consideration.  First of all, Mr. De Perio was
14 selling less shares than you were, correct?
15       A.    Yes.
16       Q.    Okay.  And you can see here that he was
17 receiving $606,198.00 as a closing payment and then
18 a promissory note for $5,455,782.00?
19       A.    Yes.
20       Q.    Okay.  Now, were you aware -- did you
21 and Mr. De Perio both confirm that date that your --
22 on December 12 that your agreements were signed and
23 delivered to GlassBridge?
24            MR. SACK:  Objection to the form.  I'm
25 not sure what you're asking, Ross.

1      Q.    So Mr. -- Mr. Hall, did you sign and

2  return your stock purchase agreement to GlassBridge

3  on the 12th?

4      A.    I believe so, yes.

5      Q.    Are you aware whether Mr. De Perio

6  signed and returned his stock purchase agreement to

7  GlassBridge on the 12th?

8      A.    I don't know.  I think that -- I don't

9  know.

10     Q.    Okay.  Did you have any discussions or

11 do you recall having any discussions with

12 Mr. De Perio on the 12th about the -- about the

13 transaction?

14     A.    I don't recall the discussions we had

15 on the 12th.

16     Q.    Did you -- do you recall having any

17 discussions with either Mr. De Perio or GlassBridge

18 about the need to get the documents executed on the

19 12th?

20     A.    I don't recall a specific discussion

21 about that.

22     Q.    Was there, in your view, a need to get

23 the documents signed on the 12th?

24     A.    Well, in my view there's always a need

25 to close a transaction as quickly as possible.

Page 676

1          Q.    And in addition to -- to the execution

2    of the documents, when did the closing actually

3    occur in terms of you getting the -- the money and a

4    fully executed document?

5               MR. SACK:  Objection to form.

6               MR. GOLD:  Join.

7          A.    So when you say "closing," and then

8    you mentioned money.  Can you be more specific?

9    Closing...

10         Q.    Well, did -- well, let me ask you --

11   that's fair enough.  When did you -- when did you

12   have a fully executed stock purchase agreement in

13   your hand?

14         A.    Well, I would assume it's the date --

15   well, this is Joe's document, but I would assume my

16   document is the day that I signed it.

17         Q.    Now, if we could look at Hall-70 for

18   identification.

19               (Exhibit Hall-70, 44-page document

20   covered by a December 17, 2019, email from Joseph De

21   Perio to hws@sportblx.com and multiple BCCs Bates

22   stamped SPORTBLX00029182 through 29225, is marked

23   for identification.)

24         Q.    Mr. Hall --

25               MR. PEARLSON:  Can you scroll down?

1          Q.     Mr. Hall, do you see there's a -- Joe

2    De Perio is sending out it looks like an email blast

3    with an updated notice for the annual meeting?

4          A.     Yeah.  Can we go back up to the top

5    though?  We scrolled through a little too quickly

6    for me.

7                 Yes, I see that.

8          Q.     Okay.  And if we could -- this is dated

9    December 17.  If we could go to the third page,

10   what's a proxy card.

11                Now, you see here is a proxy card in

12   connection with the annual meeting.  Do you see that

13   it's recommending the -- the -- it says, "The board

14   of directors recommends a vote 'for' the listed

15   nominees in Item 1"?  Do you see that?

16         A.     Yes.

17         Q.     And that the list of nominees is the

18   existing board of -- of Sport-BLX, correct?

19         A.     Correct.

20         Q.     As of December 17 were you aware of any

21   other proposed slates for the board of directors for

22   Sport-BLX?

23         A.     As of what date?

24         Q.     As of the date of this email, December

25   17, had you seen any other proposed alternative

Page 678

1    slates of directors?

2         A.    I don't know if I saw it on that date.

3         Q.    Okay.  Do you know -- do you know when

4    it was in relation to the annual shareholder meeting

5    that you first saw a proposed slate from GlassBridge

6    that didn't include Mr. Salerno?

7         A.    I don't recall the date.

8         Q.    Okay.  If we could look at Hall-72.

9               (Exhibit Hall-72, Two-page December

10   26, 2019, email from Henry Sullivan to Joseph De

11   Perio and George Hall Bates stamped SPORTBLX0265510

12   and 265511, is marked for identification.)

13        Q.    Did you -- did you attend the annual

14   meeting?

15        A.    Yes.

16        Q.    And do you recall who proposed the

17   alternative slate of directors on behalf of

18   GlassBridge?

19        A.    I don't recall.

20        Q.    Do you recall whether -- if you had

21   advised the Sport-BLX board that you had, in fact,

22   sold your shares prior to the meeting?

23             MR. SACK:  Objection to form.

24        A.    As I said, I don't recall if it was

25   discussed in the December 10 meeting.

Page 679

```
 1          Q.    Okay.  Do you -- do you -- do you ever
 2    -- did you ever have any discussions with
 3    Mr. Salerno about the sale of your shares to
 4    GlassBridge?
 5                 MR. SACK:  At any time, Ross?
 6          Q.    No.  Prior to the annual meeting.
 7          A.    I don't believe so.
 8          Q.    Okay.  Now, if we look at Hall-72, it's
 9    an email from Henry Sullivan to Mr. De Perio.  Do
10    you see that?
11          A.    Yes.
12          Q.    And it seems to be some sort of summary
13    of the -- of the annual meeting.  Do you see that?
14                 MR. SACK:  Objection to form.  Are you
15    asking him whether it is a summary?
16          Q.    Yes.  Does it appear to be a summary of
17    the -- of the annual shareholder meeting attendees
18    and minutes?
19          A.    It appears to be attendees and
20    minutes.
21          Q.    And is that something that was
22    Mr. Sullivan's responsibility on behalf of
23    GlassBridge?
24                 MR. SACK:  On behalf of --
25    GlassBridge.  Okay.
```

Page 680

1          A.     I don't think he had that

2     responsibility on behalf of GlassBridge.

3          Q.     Okay.  How about on behalf of

4     Sport-BLX; did he have the -- was that his

5     responsibility to record the minutes for the annual

6     meeting?

7          A.     I don't know if he recorded the

8     minutes, but he might have.  But I -- I don't recall

9     who recorded the minutes for that meeting.

10         Q.     Okay.  In the annual meeting, if we

11    turn to the second page of the document, after a

12    summary of the attendees.

13              It says, "George Hall - first item of

14    business - slate of directors."  Do you -- do you

15    recall what happened with -- with respect to

16    proposing the slate of directors to the shareholders

17    of Sport-BLX?

18         A.     I don't recall specifically what was

19    said.  I understand what "slate of directors" is.

20         Q.     Okay.  You don't have any recollection

21    as to how that was presented to the shareholders of

22    Sport-BLX?

23         A.     I don't recall.

24         Q.     Do you recall whether there was any

25    discussion at the annual meeting about the fact that

Page 681

```
1    GlassBridge now was the controlling shareholder of

2    Sport-BLX?

3             A.    I don't recall.

4             Q.    It says -- who is the Daiana, or

5    D-a-i-a-n-a, Sersea, S-e-r-s-e-a?

6             A.    She was an employee of -- I believe a

7    new employee at GlassBridge at this time.

8             Q.    It says that she nominated an altern-

9    -- an alternative board of directors.  Did she do

10   that at the annual meeting itself?

11            A.    Yes.

12            Q.    And prior to that had they -- had

13   GlassBridge ever presented an alternative slate of

14   directors?

15            A.    I'm not --

16                  MR. SACK:  At a prior shareholder

17   meeting, Ross?

18            Q.    Well, prior to this shareholder meeting

19   had GlassBridge presented an alternative slate of

20   directors?

21            A.    I don't recall what the procedures

22   were.

23            Q.    Okay.  And Ms. Sersea, was she -- was

24   she ever an employee of the Clinton Group?

25            A.    Yes.
```

Page 682

1      Q.    And how long did she work for the
2  Clinton Group?
3      A.    A long time.  Year -- at this time
4  over twenty years, I believe.
5      Q.    Okay.  And if -- and then how long did
6  she work for -- when did she start working for
7  GlassBridge?
8      A.    I don't know for certain, but I think
9  around the time that Daniel Strauss became an
10 employee of GlassBridge.
11     Q.    So around December of 2019?
12     A.    I don't know for certain, but that
13 sounds reasonable.
14     Q.    Okay.  And it says here that the second
15 item of business was to increase the number of
16 authorized shares.  Was that the -- the proposal we
17 had seen before, or was it what had been discussed
18 at the prior board meeting about an increase in the
19 shares from, I think it was, 200- or 300,000 to 2
20 million?
21     A.    Yeah.  You -- you have to keep in mind
22 that Henry Sullivan's not a corporate governance
23 expert, and he did that because we, you know, didn't
24 have a ton of people to do all this.  It was an
25 extraordinary amount of corporate governance for a

Page 683

1   company this small.

2            So he says "increase the number of

3   authorized shares," that was actually a proposal

4   that would be voted on by the shareholders, whether

5   or not to increase the number of authorized shares.

6        Q.    And was it voted upon?

7        A.    Yes.

8        Q.    And was it approved?

9        A.    As far as I recall, it was.

10       Q.    Okay.  And it says at the -- at the

11  bottom of the page, or right before it says "4:30

12  p.m. Meeting Adjourned," it says, "Also approved was

13  the slate of new directors:  Cesar Baez, Joseph

14  De Perio, George Hall, Chris Johnson, Fran

15  Ruchalski, Daniel Strauss, and Harlan Simon."

16            Was it your recollection that all the

17  directors, except for Mr. Salerno, were reelected to

18  the board?

19       A.    Yes.

20       Q.    Okay.  And do you recall if at that

21  meeting it was announced that -- or how it was

22  presented that the -- that GlassBridge now was the

23  controlling shareholder or had the majority of the

24  shares in Sport-BLX?

25       A.    I don't recall that.

Page 684

1         Q.    Okay.  And in the -- it looks like

2    Mr. Salerno was replaced by someone by the name of

3    Harlan Simon.  Do you -- do you see that?

4              MR. SACK:  Objection to form, that

5    characterization.

6         A.    I see that Harlan Simon was approved

7    -- was voted upon as a board member, so yes.

8         Q.    Okay.  And who was Harlan Simon?

9         A.    He was someone who was an investor in

10   Sport-BLX and someone that I've known for many, many

11   years, and -- and he was -- he was formerly, years

12   prior, a Clinton Group employee.

13        Q.    Okay.  And do you know who asked him to

14   serve as a -- a member of the board of Sport-BLX?

15        A.    I don't recall.

16        Q.    Was it you?

17        A.    I don't recall.

18        Q.    Was there any -- do you recall whether

19   there was any discussion among the shareholders

20   about why Mr. Salerno was not reelected to the

21   board?

22              MR. SACK:  At that meeting, Ross?

23              MR. PEARLSON:  Yeah, at the meeting.

24   At the annual meeting itself.

25        A.    I don't recall that discussion.

Page 685

1          Q.    Okay.  If we could turn to what's been

2    marked as Hall-87 for identification.

3                (Exhibit Hall-87, Two charts labeled

4    "GlassBridge Enterprises Summary Corporate

5    Structure" and "GlassBridge Enterprises Corporate

6    Structure" dated April 1, 2020, Bates stamped

7    SPORTBLX0272781 and 272782, is marked for

8    identification.)

9          Q.    Now, Mr. Hall, following your -- your

10   sale of your personal shares and Mr. De Perio's

11   shares to GlassBridge, it became the majority owner

12   of Sport-BLX, correct?

13         A.    Yes.

14         Q.    Okay.  Is that -- is that accurately

15   depicted in this chart, that it owned 51 percent of

16   Sport-BLX?

17         A.    Approximately 51 percent.  Yes, that's

18   correct.

19         Q.    Okay.  And were you familiar with the

20   -- the GlassBridge corporate structure that's

21   depicted in this chart?

22         A.    I'm sorry.  You broke up for a second.

23         Q.    Are you -- are you familiar with the

24   GlassBridge Enterprises corporate structure that's

25   set forth in this chart?

Page 686

1          A.     I don't recall this particular chart.

2          Q.     Are you familiar with the entities

3    depicted in this chart, the GlassBridge entities?

4          A.     Basically.  I have some general

5    understanding, --

6          Q.     Okay.  Do you know --

7          A.     -- yes.

8          Q.     Well, do you know what -- what is Adara

9    Enterprises Corp.?

10         A.     In previous questions I referred to

11   Imation, which is a wholly-owned subsidiary of

12   GlassBridge, that 20 -- a little over 20 percent of

13   it was sold to Orix.  Orix changed the name to Adara

14   Enterprises from Imation.

15         Q.     Do you have any knowledge as to what

16   Adara Enterprises and Adara Asset Management do?

17                MR. SACK:  Do or did?  Can you just

18   clarify the time period?

19                MR. PEARLSON:  Fair enough.

20         Q.     As of -- as of April 2020 were you

21   familiar with what Adara Enterprises and Adara Asset

22   Management did?

23         A.     Adara Asset Management -- I believe

24   Adara Asset Management was technically the manager

25   of the P.J. Washington -- or the entity that funded

Page 687

1    the P.J. Washington transaction.

2          Q.    Okay.  And that was the P.J. Washington

3    transaction that we were talking about earlier?

4          A.    Yes.

5          Q.    Okay.  Do you know what GlassBridge

6    Investment Management was doing as of April 1, 2020?

7          A.    I don't think on that date it was

8    doing anything other than -- well, I'm not really

9    sure of the dates, but I believe the goal of

10   GlassBridge Investment Management was to manage the

11   -- the -- the capital on behalf of P.J. Washington.

12         Q.    And what do you mean by that?

13         A.    Well, the transaction with P.J.

14   Washington was to purchase -- via an SPV to purchase

15   certain percentage of -- or a certain stream of cash

16   flows from P.J. Washington in return for giving him

17   capital up front.  Once he has that capital up

18   front, it has to be invested in stocks and bonds and

19   just like any other pool of capital would be

20   invested.  I believe GlassBridge Investment

21   Management, LLC was the entity that would be the

22   wealth manager for -- for that -- for that vehicle.

23         Q.    And what about GlassBridge Athlete,

24   LLC; what was that as of April 2020?

25         A.    Again, this is -- I'm not a hundred

1  percent sure of what was going on at GlassBridge,

2  but I -- if -- I believe GlassBridge Athlete was the

3  entity that was created for GlassBridge and Orix to

4  invest in the P.J. Washington transaction.

5          Q.      Okay.  And was that going to be done

6  with the involvement of Sport-BLX at all?

7                  MR. SACK:  Objection to the form.

8          A.      Was what going to be done?

9          Q.      The investments in the P.J. Washington

10  through Adara and GlassBridge Athlete, would that

11  involve the participation of Sport-BLX in any way?

12                 MR. SACK:  Objection to the form.

13         A.      Well, I don't think Adara invested in

14  P.J. Washington.  You mentioned Adara.  So maybe I'm

15  not understanding the question.

16         Q.      I thought you said that Adara or

17  Imation -- Adara Asset Management was going to

18  manage the assets through the P.J. Washington

19  transaction.

20         A.      They would be the manager of the

21  entity that funded P.J. Washington.

22         Q.      Okay.  And I guess my question was I

23  assume Sport-BLX was not going to have a role in

24  that transaction?

25         A.      Well, --

Page 689

1           MR. SACK:  Objection to form.  I guess
2     it's which transaction do you mean?
3           Q.    The P.J. Washington transaction.
4           A.    Well, Sport-BLX was the one who
5     sourced the deal and created the structure for the
6     P.J. Washington transaction, so there was
7     involvement from that perspective, but Sport-BLX did
8     not play a role in investing in P.J. Washington.
9           Q.    And Sport-BLX did not get any benefit
10    from the investment in P.J. Washington?
11          A.    "Benefit from the investment," you
12    mean in terms of return on capital?  No, because
13    they didn't contribute any capital.
14          Q.    Okay.  Now, do you recall that the
15    Clinton Group entered into a capacity agreement with
16    Imation?
17          A.    At what time frame?
18          Q.    In 2016.
19          A.    I do remember that agreement.
20          Q.    What was the purpose of that agreement?
21          A.    We were gonna -- we were trying to
22    create an asset management company within
23    GlassBridge.
24          Q.    And what was the -- what services, if
25    any, were the Clinton Group supposed to provide to

Page 690

1    Imation pursuant to that agreement?

2         A.    So Clinton Group would provide

3    algorithms and the ability for GlassBridge to raise

4    capital from outside investors to be managed by

5    GlassBridge with the algorithms of Clinton Group.

6         Q.    Okay.  And -- and pursuant to that

7    agreement did the Clinton Group acquire an interest

8    in GlassBridge?

9         A.    Yes.

10         Q.    Do you recall what it acquired; how

11    many shares or what percentage of GlassBridge?

12         A.    I -- I don't recall the specific

13    numbers.

14         Q.    Do you recall for how long the

15    (inaudible) held interest in GlassBridge?

16              THE REPORTER:  I'm sorry.  You broke

17    up.  "Do you recall for how long the..."

18         Q.    The Clinton Group held that interest in

19    GlassBridge?

20         A.    Well, it still owns it, so from then

21    till now.

22         Q.    Okay.  And -- and did -- GlassBridge is

23    a loss corporation for federal income tax purposes.

24    Is that correct?

25         A.    Well, GlassBridge, and its subsidiary

Page 691

1   Imation, have -- I believe have net operating losses

2   or net operating loss carry-forwards, so I don't

3   know -- I didn't understand the characterization

4   about "for federal tax purposes," but GlassBridge

5   does, in fact, have net operating losses or net

6   operating loss carry-forwards on its balance sheet.

7       Q.    Okay.  Now, you referred to, earlier in

8   your testimony, a transaction between GlassBridge

9   and Orix, correct?

10      A.    Correct.

11      Q.    And do you know whether GlassBridge

12  sold a portion of Imation to Orix in that

13  transaction?

14      A.    I think that's been answered many,

15  many times, but yes.

16      Q.    Okay.

17      A.    Orix bought a percentage of Imation,

18  approximately 20 percent, from GlassBridge.

19      Q.    Okay.  And as a -- as a result of that

20  did GlassBridge own almost 80 percent of Adara or

21  Imation?

22      A.    Well, it reduced its ownership from

23  100 percent to approximately 80 percent, having sold

24  off approximately 20 percent.

25      Q.    Now, you indicated that -- that Orix

```
                                        Page 692
1   was contemplating acquiring the other 20 percent --
2   I'm sorry -- the remaining portion of Adara as part
3   of Phase 2, correct?
4                MR. SACK:  Objection to form.  Ross,
5   are we still on this document, or should we take
6   that down?
7                MR. PEARLSON:  No, we can take it
8   down.
9                MR. SACK:  Thank you.
10               Why don't you try the question again?
11  And I'll just maintain my objection to the form.
12               THE WITNESS:  And this is almost out,
13  so...
14               MR. SACK:  Oh, Ross, can we just take
15  a one-minute break?  I need to look for a charger
16  for George's computer because of the -- the power
17  for the exhibits.
18               MR. PEARLSON:  Sure.
19               MR. SACK:  Yeah.  But we can stay on.
20  I'll be right back.  I asked my assistant to find
21  one.
22               I apologize.  Just give us five minutes
23  to try to find that charger.  I assume, Ross, you're
24  going to show him some other exhibits?
25               MR. PEARLSON:  Yes.
```

Page 693

1              MR. SACK:  Okay.  So let's just go off

2      the -- so you don't lose your time, let's just go

3      off the record, and we'll come back ASAP.  I have

4      someone looking for it; we just haven't gotten it

5      yet.

6              THE VIDEOGRAPHER:  Okay.  We're going

7      off the record.  The time is 1:36 p.m.

8              (Recess taken from 1:36 to 1:42 p.m.)

9              THE VIDEOGRAPHER:  We're back on the

10     video record.  The time is 1:42 p.m.

11     BY MR. PEARLSON:

12         Q.    Mr. Hall, I'm going to show you what's

13     been marked Hall-90 for identification.

14              (Exhibit Hall-90, 13-page Adara

15     presentation slides titled "The Sports &

16     Entertainment Fund LP" dated April 2020, Bates

17     stamped SPORTBLX0277761 through 277773, is marked

18     for identification.)

19         Q.    I'm going --

20              MR. PEARLSON:  If you could scroll

21     down, please.

22         Q.    Did you -- were you ever -- did you

23     ever see a deck in April of 2020 relating to a

24     Sports & Entertainment Fund LP?

25         A.    Yes.

Page 694

1          Q.     And -- and can you tell us what was the
2     Sports & Entertainment Fund LP?
3          A.     Can we scroll down a little bit more
4     and look at this?  Maybe a little faster.
5                 Okay.  Okay.  And just a little
6     further.  One more.
7                 Okay.  I think I have it.
8          Q.     Okay.  Can you tell us what the Sports
9     & Entertainment Fund was?
10         A.     I think this actually was the fund
11    that was used to invest in P.J. Washington.
12         Q.     Okay.  When you say it was the fund
13    used to invest in P.J. Washington, first of all, who
14    -- who owns the -- the Sports & Entertainment Fund
15    LP?
16         A.     Well, as -- as I recall, the LPs were
17    GlassBridge and Orix.
18         Q.     Okay.  And what was the role -- we saw
19    there's a role here for Adara Asset Management, and
20    -- with the fund.  What was the role of Adara Asset
21    Management?
22         A.     So Adara -- as it says here, Adara
23    serves as the general partner to the fund.
24         Q.     Okay.  And what would it do in that
25    capacity?

```
 1        A.        It's responsible for the operation of
 2   the fund.
 3        Q.        Okay.  And it says in the bullet above
 4   that that it's -- it was "Adara is a Commodity Pool
 5   Operator and is in the process of becoming an SEC
 6   Registered Investment Adviser."
 7                  Do you know why it was doing that; for
 8   what purpose?
 9        A.        Well, if they were successful raising
10   other capital for the fund, they potentially would
11   have to be registered, so I think it was just in
12   anticipation they -- it says here they were in the
13   process of becoming an SEC registered investment
14   adviser.
15                  MR. PEARLSON:  Okay.  And if we could
16   go to Bates stamp SPORTBLX02777772.
17                  MR. SACK:  See any other pages?
18        Q.        And if you want to stop, just let us
19   know.
20                  This is -- this refers to the fund
21   terms.  Do you see that, --
22        A.        Yes.
23        Q.        -- Mr. Hall?
24        A.        Yes.
25        Q.        Do you have an understanding of what it
```

Page 696

1    -- what it -- what it's referring to with those fees

2    that's listed under there?

3         A.    If they were to get outside capital in

4    the fund they would -- they would hope to charge

5    those fees.

6         Q.    And that's as -- as the manager of the

7    fund?

8         A.    As the general partner of the fund,

9    yes.

10             MR. PEARLSON:  Okay.  If we could turn

11   to Hall-92.

12             (Exhibit Hall-92, 12-page July 7,

13   2020, email from George Hall to Daniel Strauss

14   attaching Adara restructuring and reorganization

15   documents, Bates stamped SPORTBLX0280410 through

16   280426, is marked for identification.)

17        Q.    Mr. Hall, do you recall that there was

18   a restructuring of Adara in July of 2020?

19        A.    Yes.

20        Q.    Do you recall what that restructuring

21   was?

22        A.    They didn't go through -- they didn't

23   go forward with what I recall -- referred to as

24   Phase 2, so they unwound -- the transaction between

25   GlassBridge and Orix was unwound.

1          Q.     Okay.  Can you -- can you explain to us

2     what you mean by because the Phase 2 didn't go

3     forward they unwound the transaction?  What do you

4     mean by that?

5          A.     Well, the original intention was that

6     they would buy more of the -- what was then Imation

7     and then became Adara.  That they would buy

8     additional shares and potentially loan more money,

9     but that deal was never consummated.

10         Q.     Okay.  And -- and does ninety- -- 92,

11    if we could flip through it a little bit, does this

12    reflect -- this restructuring that's reflected in

13    here, it never took place?

14         A.     No, this restructuring did take place.

15         Q.     Okay.  And -- and in here it says that

16    there is an SPV to be formed to hold the interest of

17    George E. Hall, and it's GEH Group SPV.  What --

18    what is that?

19         A.     I don't recall specifically.  I'd need

20    to look through this document a little more.

21         Q.     Okay.  Do you -- do you recall whether

22    it was actually formed in connection with the

23    restructuring of Adara?

24         A.     I don't think it was formed.  I'd --

25    I'd need to know -- since it's square bracketed with

1  nothing in it, I think I'd need to know a little

2  more about -- about this before I could answer with

3  confidence.

4          MR. PEARLSON:  Okay.  If we could turn

5  to page 3 of the document.

6          Q.    It refers to -- item 6 says, "AEC will

7  sell AAM to GEH Group SPV."  What does that mean?

8          A.    I'm sure somewhere in the document it

9  says what AEC is.  Is that -- is that true?

10         Q.    AEC is Adara Enterprises Corp.

11         A.    Right.  So -- okay.  Oh --

12         Q.    And --

13         A.    Oh, let me -- let me get them all

14 while we have it.  Let me get them all so I

15 understand.

16          Okay.  I think I can remember.  There

17 you go.

18         Q.    Okay.  If we can go back to 6, can you

19 tell us what -- what that's referring to?

20         A.    So Adara Enterprises will sell Adara

21 Asset Management to GEH Group SPV.

22         Q.    And did that, in fact, take place?

23         A.    Yes.

24         Q.    And when did that happen?

25         A.    Oh, sometime in the summer of 2020.

1          Q.      And in the summer of 2020 is -- is the
2    GEH Group SPV, is that owned entirely by you?
3          A.      Well, the S- -- the SPV was owned
4    entirely by me, and it had been in existence for a
5    number of years, and it continued to be owned by me
6    after this transaction.
7          Q.      Okay.  And what, if anything, is it
8    doing with respect to Adara Management -- Asset
9    Management at this time?
10          A.      Well, I think it says that Adara
11    Enterprises will sell Adara Asset Management to this
12    company.
13          Q.      Right.  And the question is what have
14    you done with Adara Asset Management since it was
15    acquired by GEH Group SPV?
16                  MR. SACK:  Objection to form.
17          A.      Nothing really.
18          Q.      Okay.  How about in terms of No. 7, it
19    says as part of this restructuring there's going to
20    be a distribution of Sport-BLX shares to GEH Group
21    SPV.  Do you see that?
22          A.      Yes.
23          Q.      And -- and was there, in fact, a
24    distribution by Adara Asset Management of its
25    Sport-BLX shares to GEH Group SPV?

```
 1        A.     I'm going to have to think about this
 2   a little bit.
 3              Okay.  So I think, and I could be
 4   wrong, this is a complex transaction a number of
 5   years ago, but Adara Asset Management distributed
 6   its Sport-BLX shares to GEH Group SPV.
 7              Okay.  I think I understand.  So I'm
 8   sorry.  What was the question?
 9        Q.     Well, I guess the question is does G-
10   -- do you know what -- what the amount of shares
11   are, and does GEH Group SPV still own those
12   Sport-BLX shares?
13        A.     They -- if I recall correctly, it
14   owned the shares, but they were pledged back to
15   Orix, so -- so I'm not really sure.  I'd have to
16   look a little more carefully at this.
17        Q.     Okay.  Do you -- do you recall what GEH
18   Group SPV was contributing to this transaction as --
19   as -- in order to acquire these assets that we just
20   described?
21        A.     Well, GEH Group took on approximately
22   -- well, 13 million of debt that was owed to -- to
23   Orix, so GEH was a company that was used to move the
24   debt from Adara Enterprises -- to move it off the
25   balance sheet of Adara Enterprises and to put it on
```

Page 701

1    the balance sheet of this SPV.

2         Q.     Okay.  And -- and one of the things it

3    acquired in addition to acquiring the debt, it also

4    acquired shares in Sport-BLX?

5              MR. SACK:  Objection to form.

6         A.     I -- that's what this says, and I

7    haven't thought about this in a while, but that --

8    that looks correct.

9         Q.     What -- what was the status of

10   Sport-BLX's business in July of 2020?

11        A.     Sport-BLX, around that time, was

12   continuing to focus on its technology and to --

13   around that time signed a subscription agreement,

14   what we called a subscription agreement with

15   Sport-BLX Securities.

16        Q.     Was Sport-BLX's activity at that time

17   limited to trying to license its source code and

18   platform?

19        A.     Well, it was limited to licensing it

20   to Sport-BLX Securities.  There was really no other

21   market that would have been practical that we knew

22   about to license it to anybody else.

23        Q.     Okay.  Were there any efforts made to

24   license it to anybody else?

25        A.     I did try to use it as collateral with

1   the software company, but basically didn't think it
2   was really worth -- that the source code was really
3   worth anything significant, but there's lots of
4   things that I don't do when I make a judgment that
5   -- we'll call it a fool's errand.  Nobody would
6   license this technology at the stage it was at for
7   the purpose it was created unless it was somebody
8   affiliated with -- with it that -- or a related
9   party that understood the business, understood what
10  it was -- the technology was built for and how it
11  might be used.
12          Q.    Can you tell us what is GEH Sport, LLC?
13          A.    I think that's the ultimate name of
14  the entity that was referred to previously.
15              MR. PEARLSON:  Okay.  If we could look
16  at Hall-95 for identification.
17              (Exhibit Hall-95, Four-page Assignment
18  Agreement between GEH Capital, LLC and Adara
19  Enterprises Corp. dated 20th day of July, 2020,
20  Bates stamped SPORTBLX0273641 through 273644, is
21  marked for identification.)
22          Q.    This is an Assignment Agreement.  It
23  looks like it's dated about the same time as the
24  restructuring is going on, and it's between GEH
25  Capital, LLC and Adara Enterprises Corp.  Do you

Page 703

1   recognize this document?
2          A.    I don't know.  I'd need to see -- go a
3   little further and understand what it's -- what this
4   document is.
5              Okay.  Can you go back up to the top?
6              Okay.  So I'm not sure I totally
7   understand what this agreement is, but if you have a
8   question, I'll try to answer it.
9          Q.    I guess that 1 -- the question I have
10  is in the section 1.3 --
11         A.    Yeah.
12         Q.    -- it -- it says, "'Proprietary
13  Software' means Assignor's proprietary quantitative
14  trading software in object code and source code
15  form."  Do you know --
16         A.    Yes.
17         Q.    -- what -- first of all, I mean, what
18  is GEH Capital, LLC?
19         A.    GEH Capital, LLC is a subsidiary of
20  Clinton Group.
21         Q.    Okay.  And what proprietary software
22  did GEH Capital have the rights to as of June --
23  July 20, 2020?
24         A.    It was a quantitative trading software
25  that had been developed over a number of years.

1          Q.     Okay.  And that was separate and apart

2     from Sport-BLX's trading software and code?

3          A.     Yeah.  It had nothing to do with

4     Sport-BLX.

5          Q.     So is it fair to say that this

6     assignment agreement has nothing to do with -- with

7     Sport-BLX whatsoever?

8          A.     Section 1.3 has nothing to do with

9     Sport-BLX.  I don't -- I haven't read the entire

10    agreement.

11         Q.     Okay.  As you sit here today do you

12    have any idea of what this agreement refers to?

13         A.     Yeah.  Could we go back up to the top

14    again?  Now that I see 1.3 I think I might be able

15    to explain it.

16                Okay.  So I believe this is the sale of

17    software from GEH Capital to Adara Enterprises.

18         Q.     Okay.  And what was the purpose of that

19    transaction?

20         A.     So that Adara Enterprises would own

21    the source code.

22         Q.     And that was the source code of the

23    Clinton Group that you just described.  Is that

24    right?

25         A.     Of GEH Capital, which is a subsidiary

Page 705

1    of Clinton Group, yes.

2        Q.    And is it fair to say at that point was

3    the Clinton Group still operating as a trading

4    entity?

5        A.    It wasn't a trading entity with

6    outside investors.  It may have been doing trading

7    with its own assets.

8        Q.    Okay.  Mr. Hall, are you familiar with

9    something called the Athlete Empowerment Fund LP?

10       A.    Yes.

11       Q.    What is that?

12       A.    I think that was just a new name for

13   the -- for the old concept or the old fund Sports &

14   Entertainment, but I don't -- I don't recall

15   exactly.

16           MR. PEARLSON:  Okay.  If we could --

17   if we could turn to Hall-97 for identification.

18           (Exhibit Hall-97, 13-page presentation

19   slides titled "The Athlete Empowerment Fund" Bates

20   stamped SPORTBLX0273823 through 273835, is marked

21   for identification.)

22       Q.    Mr. Hall, I'm going to show you what's

23   been marked Hall-97 for identification and just ask

24   you if do you recall seeing a slide -- this slide

25   deck related to The Athlete Empowerment Fund?

1          A.      Well, I don't know about this slide

2     deck.  I think there were a number of slide decks

3     with a similar cover, but yes, I do recognize it.

4          Q.      Do you know who created it?

5          A.      Well, I don't know.  It wasn't me.

6          Q.      Okay.

7                  MR. PEARLSON:  Could we go to the

8     second page?

9          Q.      There's an executive summary there.

10    Could you just tell us what The Athlete Empowerment

11    Fund was supposed to do?

12         A.      This was intended to be a fund that

13    would raise capital from outside investors to invest

14    in sports assets.

15         Q.      Okay.  And what about SportBLX Asset

16    Management, what is that -- what was that supposed

17    to do?

18         A.      I think this was the company that

19    would be the manager of this fund.

20         Q.      Okay.  And if you -- was it going to be

21    the -- the fund manager or the general partner of

22    the fund?

23         A.      Generally it's the same entity.

24         Q.      And would it also receive fees for any

25    investments that were made in the fund?

1     A.     Yes, if it raised capital for the fund

2    it would -- it would generally receive fees.

3          Q.     Okay.  We're good with that.

4               Now, Mr. Hall, we had -- we had shown

5    you before that you and Mr. De Perio had received

6    notes as part of your sale of your shares to

7    GlassBridge.  Do you recall that?

8          A.     Yes.

9          Q.     And you indicated previously in your

10   testimony you received some payments pursuant to the

11   notes, correct?

12         A.     I -- I believe so, yes.

13         Q.     And but you weren't certain how many or

14   -- or when they stopped, correct?

15         A.     I believe that's correct, yes.

16         Q.     Did there come a time where you and

17   Mr. De Perio forgave the promissory notes that

18   GlassBridge had issued to you?

19         A.     I don't know if forgive is the right

20   word, but we did unwind the transaction.

21         Q.     Okay.  Do you recall how that came

22   about that you unwound the transaction?

23         A.     Well, GlassBridge wanted to get out of

24   its position in Sport-BLX.

25         Q.     Okay.  Why did -- why did GlassBridge

Page 708

1   want to get out of its position in Sport-BLX?

2            A.    Well, I don't want to speak for

3   GlassBridge.  I think there were a number of -- a

4   number of reasons that I was aware of, but I don't

5   know if that's the entire reason.

6            Q.    Well, I guess then why don't you tell

7   us what GlassBridge -- representatives of

8   GlassBridge expressed to you as to why they wanted

9   to get out of Sport-BLX?

10           A.    Well, one of the issues with

11  GlassBridge as a public company with outside

12  directors and management was insurance, directors

13  and officers insurance, which is important for a

14  public company.  The fact that they owned an asset

15  that was doing business potentially with athletes

16  made the insurance prohibitively expensive, so that

17  was one of the reasons.

18           Q.    Are there other reasons?

19           A.    I think around this time there were

20  other transactions that had been presented to the --

21  to GlassBridge, and with a company with net

22  operating losses, if you do a transaction with a

23  party that's interested in NOLs, the -- you have to

24  pretty much make that your -- your -- your only

25  business or your -- your main business.  It's hard

1    to have multiple -- you can't have another debt

2    holder if somebody else is interested in the NOLs.

3    So it was in their interest to basically simplify

4    their -- their balance sheet.  So...

5                    And also part of the reason that they

6    bought it in the first place, they bought the

7    shares, was in anticipation of another Orix

8    transaction, which ultimately did not come to

9    fruition.  So that's my potentially limited

10   understanding of -- of why GlassBridge wanted to

11   unwind -- get out of the Sport-BLX position.

12        Q.    Okay.  And do you recall whether you

13   approached Sport-BLX -- I mean -- strike that --

14   whether you approached GlassBridge or GlassBridge

15   approached you about unwinding the transaction?

16        A.    I don't know if I can characterize

17   these things as approaches.  We -- we -- we talk

18   every day, Joe and myself, Daniel Strauss virtually

19   every day.  I became aware of some of the

20   constraints that GlassBridge had, and, you know,

21   over time it evolved that we would ultimately try to

22   get -- to get Sport-BLX off the GlassBridge balance

23   sheet.

24        Q.    Okay.  And did that, in fact, result --

25   those discussions result in an agreement whereby you

Page 710

1   unwound the -- the GlassBridge transaction?

2                   MR. SACK:  Objection to form.

3        A.    Well, I don't know if "unwound" is

4   technically the right -- the right term, but

5   basically the -- the promissory note relationships

6   were -- were un- -- were unwound.  I guess unwound

7   is the proper way to --

8        Q.    Okay.

9        A.    -- term it.

10       Q.    Let's look at Hall-73 for

11   identification.

12                  (Exhibit Hall-73, 11-page Agreement

13   dated July 31, 2021, between Hall, De Perio,

14   creditors, and GlassBridge Enterprises Bates stamped

15   SPORTBLX0265521 through 265531, is marked for

16   identification.)

17       Q.    Mr. Hall, I'm going to ask you if you

18   recall or if you recognize this agreement that's

19   dated July 31, 2021?

20       A.    I do.

21       Q.    Okay.  Is this the agreement with

22   GlassBridge that you were referring to previously in

23   your testimony, just referring to?

24       A.    Well, I'd like to scroll down a little

25   more past -- past the whereas.

```
                                                    Page 711

 1              Okay.  Let's stop there, please.

 2              Okay.  I understand.

 3              MR. SACK:  Do you want to see more?

 4    You're okay with that?

 5              THE WITNESS:  No, I think that's -- I

 6    think that's okay.

 7         Q.    Okay.  And this is you were --

 8    essentially you and Mr. De Perio were -- they were

 9    buying you out of your promissory notes at the time?

10         A.    Yes.

11         Q.    And if we turn to Schedule 1, which is

12    SPORTBLX0265528, it shows that each of you received

13    closing payments in connection with those -- that --

14    those promissory notes, correct?

15         A.    That's what it says, yes.

16         Q.    Okay.  And so you were being paid to --

17    do you know what -- it doesn't refer specifically to

18    your -- oh, I see it.  I'm sorry.

19              So the unpaid principal for you, in

20    connection with your note, as of July 31, 2021, was

21    over $12 million, correct?

22         A.    I'm sorry.  Say that again?  The --

23    the un- -- the note?

24         Q.    Well, first of all, I guess let's just

25    stick with this page.  So you were getting paid, at
```

1    closing, a little over 2.3 million for the

2    forgiveness of the note, correct?

3          A.     I believe so, yes.

4          Q.     Okay.  And Mr. De Perio was receiving a

5    little over a million dollars for the forgiveness of

6    his note, correct?

7          A.     Yes.

8          Q.     And if we go back to the initial page,

9    that payment was to forgive a note that was over $12

10   million, at least as to you, of unpaid principal?

11         A.     That's the amount for the note that I

12   held.

13         Q.     Right.  And then it's -- then

14   Mr. De Perio was owed another 5.4 million or so on

15   his note?

16         A.     Correct.

17         Q.     Okay.  And why did you -- why would you

18   do that?  Why did you do that at this point in -- in

19   July 2021?  Why would you accept that sum for the --

20   for the promis- -- in -- excuse me.

21                Why would you accept that sum in order

22   to forgive the balance due on your promissory note?

23         A.     Well, it was unlikely that GlassBridge

24   could pay that amount, so the -- as -- as I said

25   when we did the initial transaction, despite the

1    fact that the headline number was $355.00 a share,
2    part cash, part in a note, it was clear to us, Joe
3    and I, that there was a good chance that that note
4    would be -- would never be paid upon, which is why I
5    also didn't think it was necessarily a good
6    transaction for shareholders at that time.  So --

7         Q.    Okay.  Now, this --

8         A.    -- we --

9         Q.    -- talks about --

10        A.    We -- what?  I'm not finished.

11              So at this point, with a lot of moving

12   pieces, it was arrived at that we would purch- -- or

13   we would sell back the note for -- for that

14   consideration.

15        Q.    Okay.  And was that done as part of a

16   -- a series of transactions between you and

17   Mr. De Perio and GlassBridge?

18        A.    Effectively beneficially, yes.

19        Q.    Okay.  And -- and was one of those

20   transactions around the same time done through an

21   entity called FinTech Debt?

22              MR. SACK:  Objection to form.

23        A.    So I said "beneficially" meaning I --

24   the transactions were done with FinTech Debt Corp.,

25   yes.

Page 714

1    Q.    Okay.  And was -- when was FinTech Debt
2    Corp. formed?
3    A.    I don't recall exactly, but it was
4    around this time, and it was formed for the purpose
5    of this transaction.
6    Q.    Okay.  And what was -- what was the --
7    who owned FinTech Debt Corp.?
8    A.    So the capital structure was debt,
9    which was provided by myself and Joe De Perio, and
10   when -- when I first formed the company at the
11   initial formation, I was the sole equity holder when
12   we formed it, the understanding would be over time
13   -- or that Joe would get the pro rata amount of --
14   of that company.
15   Q.    Okay.  And what was --
16   A.    Pro rata -- go ahead.
17   Q.    What was the business of FinTech?  What
18   was it going to do when you formed it?
19   A.    It was just a -- a holding company to
20   own those assets.
21   Q.    Okay.  And if we look at --
22   MR. PEARLSON:  Can we look at Hall-75?
23   (Exhibit Hall-75, Five-page Demand
24   Note Assignment among GlassBridge Enterprises,
25   FinTech Debt Corp., and Sport-BLX, Inc. dated July

Page 715

1    31, 2021, Bates stamped GBE_0006855 through 6859, is

2    marked for identification.)

3         Q.    Okay.  Mr. Hall, we can scroll through

4    this, but do you recall that -- that as part of

5    these transactions in late July or the end of July

6    of 2021 that -- between GlassBridge, FinTech, and

7    Sport-BLX, that the -- there was an assignment of

8    the demand note?

9         A.    Yes.

10        Q.    Okay.  And -- and why did -- why did

11   FinTech want to have the demand note assigned to it?

12        A.    Well, it was effectively a purchase of

13   the demand note, so that instead of owing the money

14   to GlassBridge, the money was owed to FinTech.

15        Q.    Okay.  And it refers here to a company

16   obligation under the note.  Do you know whether --

17   had Sport-BLX paid down anything on the note as of

18   the time of this assignment?

19        A.    I don't recall.

20        Q.    Do you know whether -- does FinTech

21   still hold this note?

22        A.    Yes.

23        Q.    And has -- has Sport-BLX paid down

24   anything with respect to the note?

25        A.    No.

1          Q.     Has FinTech made any efforts to collect

2     on the note?

3          A.     No.

4          Q.     And it says that this -- the payment to

5     GlassBridge, GlassBridge has accepted $400,000.00 to

6     assign this demand note for 4.572 million?

7          A.     Yes, that's what it says.

8          Q.     Okay.  Was it your understanding that

9     GlassBridge suffered a loss with respect to this

10    demand note?

11         A.     Yes.

12         Q.     Do you have any understanding as to

13    whether this -- this assignment was approved by the

14    GlassBridge board?

15         A.     I believe it was.

16         Q.     Okay.  Do you know why GlassBridge

17    wanted -- approved this -- the assignment of the

18    demand note for $400,000.00?

19                MR. SACK:  Objection to form, but the

20    witness can try to answer.

21         A.     Why did they do the trade, or why was

22    it $400,000.00?

23         Q.     Do you know why it accepted $400,000.00

24    for the demand note --

25         A.     Well, --

Page 717

1          Q.      -- to the extent that it was -- you
2     were advised of the -- of the reasons for it?
3          A.      I'm sorry.  I spoke over you.  Could
4     you repeat?
5          Q.      Yeah, no.  To the extent that you were
6     told, I don't want you to guess as to why, but if
7     anybody ever told you why did they accept
8     $400,000.00 for the demand note?
9          A.      Well, I don't know why they accepted
10    specifically 400,000, but if your -- is your
11    question really why did they take a loss on this?
12         Q.      Well, no.  Just why at the time they --
13    well, why at the time did they agree to take a loss
14    on it?
15         A.      Well, at the same time they had a gain
16    on the unwinding of the promissory note to -- to Joe
17    and I.
18         Q.      Okay.  And as part of this also was
19    there also a stock purchase agreement between
20    FinTech and GlassBridge?
21         A.      I believe so.
22         Q.      Was that at the same time or at a
23    different time?
24         A.      It was all part of the -- I believe it
25    was all part of the same transaction.

Page 718

1           Q.      Okay.

2                   MR. PEARLSON:  Can we show him what's

3       been marked as Hall-77?

4                   (Exhibit Hall-77, 10-page Stock

5       Purchase Agreement between FinTech Debt Corp. and

6       GlassBridge Enterprises dated December 30, 2021,

7       Bates stamped GBE_0014750 through 114759, is marked

8       for identification.)

9           Q.      Mr. Hall, do you recall that at some

10      point -- this agreement is dated December 30, 2021.

11      Do you recall that at some point FinTech agreed to

12      buy all of the shares of Sport-BLX held by

13      GlassBridge?

14          A.      I -- yes.

15          Q.      Okay.  And do you -- do you recall that

16      the -- that FinTech paid $137.38 for that stock?

17          A.      I don't -- I don't see that here.

18          Q.      If you look at paragraph 1(b), sir.

19          A.      I do see that.

20                  MR. SACK:  I think you said $137.00,

21      so just maybe why don't you make the record clear.

22          Q.      $137,038.00.  Do you see that that's

23      what FinTech paid for the -- for GlassBridge's

24      shares of -- of Sport-BLX stock?

25          A.      Yes.

Page 719

1          Q.     Okay.  And if we turn to GBE_0014757,

2     which is Schedule 1, that shows that the price per

3     share was $2.00, correct?

4          A.     Correct.

5          Q.     Do you know how the $2.00 -- the price

6     of $2.00 per share was arrived at in terms of this

7     purchase by FinTech?

8          A.     I think it was all part of the bigger

9     transaction, multiple pieces to -- to have

10    GlassBridge buy back the debt that it owed to Joe

11    and myself and for Joe and I to form an entity to

12    buy the demand note from Sport-BLX and the stock

13    from Sport-BLX.  So it was all an -- all of these

14    prices worked together to get us to an end result.

15         Q.     Okay.  But do you know how the price --

16    specifically price per share of $2.00 was arrived

17    at?

18         A.     Specifically $2.00 as opposed to

19    $3.00?  I don't think there was a specific

20    calculation that would give you a -- an answer in

21    that fine a detail.

22         Q.     Well, as of December of 2021 what was

23    the status of Sport-BLX's business?

24         A.     The -- we were -- well, as of December

25    of 2021 we had just effectively cancelled the

Page 720

1  capital raise that we were attempting to do when a
2  shareholder made out allegations about siphoning
3  money from the company, so we had to put that on
4  hold until those allegations were reported to the
5  board and investigated and vetted by the board.  But
6  at the same time, Sport-BLX was potentially going to
7  have -- Sport-BLX, Incorporated was potentially
8  going to get a significant value from consummating
9  the transaction with P.J. Washington, which at that
10 time I think would have been a significant amount of
11 value to Sport-BLX, Inc.
12     Q.    How far did the transaction with P.J.
13 Washington progress?  Was there ever any draft
14 agreements?
15     A.    Yeah, we -- yes, we had draft -- we
16 had agreements.  So we had firm agreements with P.J.
17 Washington, and I was in a number of discussions
18 with selling those shares to third party investors.
19 So we were pretty close to consummating that
20 transaction and actually leading to a reasonable
21 amount of revenue for a reasonable increase in asset
22 value for Sport-BLX.
23     Q.    And that was as of December of 2021?
24     A.    Well, it was the -- we had to -- I
25 think it was in roughly November of 2021 that we had

```
1    to -- maybe even October that we -- I felt we had to
2    cancel the -- the fund raise that we were doing for
3    Sport-BLX, Incorporated, so it was a little bit
4    before this time.
5           Q.    And what happened with the P.J.
6    Washington agreement?
7           A.    Well, I was negotiating and talking to
8    a number of parties about making the investment and
9    -- and that was December or January, and then once
10   the -- the company was sued, it was -- it was
11   impossible to get the transaction done.
12          Q.    Okay.  And in terms of the -- so in --
13   as we saw, in December of 2019 GlassBridge purchased
14   your shares and Mr. De Perio's shares for $355.00
15   per share, correct?
16                MR. SACK:  Objection to the form.
17          A.    I understand what you're saying.
18   That's not exactly how I look at it, but yes.
19          Q.    Okay.  And then two years later they --
20   they sold their shares for $2.00 per share, correct?
21          A.    That's way out of context.
22          Q.    Well, isn't it a fact that they sold
23   their shares -- that GlassBridge sold its shares to
24   FinTech for $2.00 per share?
25          A.    Well, then I would argue that they
```

```
                                            Page 722
 1   didn't purchase them for $355.00 a share.
 2        Q.     Okay.  Well, at the end of the day was
 3   the investment in Sport-BLX a loss for GlassBridge?
 4        A.     Yes.
 5        Q.     Now, you had spoken earlier about a
 6   subscription agreement that Sport-BLX had entered
 7   into.  That was after you -- Sport-BLX had decided
 8   to become a technology company in late 2019?
 9             MR. SACK:  Objection to the form.
10        A.     Well, by definition summer of 2020 is
11   after 2019, but in the summer of 2020 we did enter
12   into a subscription agreement.
13        Q.     Okay.  And as we've been through,
14   Sport-BLX became -- strike that.
15             If we -- let's look at Hall-78 for
16   identification.
17             (Exhibit Hall-78, 10-page Execution
18   Copy Subscription Agreement between Sport-BLX, Inc.
19   and Sport-BLX Securities, Inc. dated June 5, 2020,
20   Bates stamped GBE_0009101 through 9110, is marked
21   for identification.)
22        Q.     Is this the Subscription Agreement that
23   Sport-BLX entered into with Sport-BLX Securities,
24   Inc.?
25        A.     If this is actually the execution
```

Page 723

1   copy, yes.

2          Q.     Okay.  If you look at the -- at page

3   GBE_0009109, it's -- it's signed by Peter Rawlins

4   and -- on behalf of Sport-BLX and Mr. De Perio on

5   behalf of Sport-BLX Securities.  Do you see that?

6          A.     Yes.  Yes.

7          Q.     Okay.  Now, was this -- was this

8   transaction approved by the related party

9   transaction committee?

10                MR. SACK:  Objection to the form.

11         A.     I don't recall specifically, but I

12  believe so, yes.

13         Q.     Okay.  Do you recall having any

14  discussions with anybody from the related party

15  transaction committee about this subscription

16  agreement?

17         A.     I -- I don't recall specific

18  discussions.

19         Q.     Okay.  And this agreement is dated June

20  5, 2020, correct?

21         A.     That's what it says.

22         Q.     Okay.  If we could look at Exhibit A,

23  there's a schedule of fees there.

24         A.     Yes.

25         Q.     And those are the fees that Sport-BLX

Page 724

1  Securities was paying for -- in order to license the

2  platform and source code of -- of Sport-BLX, Inc.,

3  correct?

4          A.     Yes.

5          Q.     And I believe you indicated that no one

6  other than a company like Sport-BLX Securities would

7  want to license this particular technology.

8                 MR. SACK:   Objection to form.

9          A.     That's my opinion, yes.

10         Q.     Okay.  And do you -- do you recall the

11 status of the technology?  Had it been tested, and

12 was it working as of June 5, 2020?

13         A.     Well, there were a number of

14 transactions that were executed through the

15 platform.  In terms of saying it was working, I'm

16 not really sure what you mean by that.

17         Q.     Well, did it -- did it function as

18 intended, either through tests or through actual

19 trades?

20         A.     Well, it did, in fact, function for a

21 number of trades, but in terms of working as

22 expected, you know, we don't know how it would have

23 handled if there were a million trades, so -- but

24 basically at that point it had done what it was

25 asked to do on a small number of transactions.

1      Q.    Do you recall how much Sport-BLX paid

2  to develop the source code and the trading platform?

3      A.    There was a contract with ConsenSys

4  that's part of it.  I don't recall the exact number.

5  Then there was -- we -- we had employees that also

6  worked on it, so -- can you -- can you repeat the

7  question?

8      Q.    Yeah.  The question was do you recall

9  or do you know how much Sport-BLX paid to develop

10 the trading platform and source code that was being

11 licensed to Sport-BLX Securities?

12     A.    So I'm a little unclear, but I'll do

13 my best.  When you say "how much was paid," there

14 was a certain amount of dollars paid to ConsenSys,

15 and then they were no longer involved.  So that was

16 payments made for them to do the initial

17 construction.  Then there was -- there's always

18 ongoing maintenance and potentially modifications,

19 so that was done by internal employees.  I don't

20 know if you'd consider that payment for building the

21 software or payment for -- or costs of maintaining

22 the software, but if you want to be more specific in

23 the question, I'll try to answer it.

24     Q.    Let's limit it to ConsenSys.  Do you

25 know how much ConsenSys was paid for developing the

1   platform and the source code?

2       A.     I think the total amount paid to

3   ConsenSys was roughly two, two and a half million,

4   somewhere -- somewhere around there.

5       Q.     And why -- why was the license coming

6   up at this particular time?  Like why is it that

7   Sport-BLX Securities wanted to license Sport-BLX's

8   technology in June of 2020?

9       A.     Well, Sport-BLX Securities was created

10  to fill the gaps, the big gap that Sport-BLX,

11  Incorporated couldn't.  Sport-BLX, Incorporated was

12  not -- when it -- when it attempted to become a

13  broker-dealer, it couldn't go through with that, it

14  pivoted, as we called it, and changed and became a

15  technology company.  The -- and then the hope was

16  that we could create a company, a separate company

17  that could actually license it.  So we wound up

18  doing that.  In June of 2020 we -- we created this

19  -- or we -- we executed this agreement where

20  Sport-BLX Securities would license the software from

21  Sport-BLX, Inc.

22      Q.     Did -- between December of 2019 and

23  June of 2020 had Sport-BLX, either directly or

24  through BLX Trading, ever attempted to reapply to

25  FINRA to get registered?

1          A.     When you say Sport-BLX, you mean

2    Sport-BLX Securities or Incorporated?

3          Q.     Sport-BLX, Inc., either directly or

4    through -- it had used BLX Trading as the vehicle

5    previously.  Did it ever reapply to FINRA to be

6    registered as a broker-dealer?

7                 MR. SACK:  Objection to form.

8          A.     No.  I don't --

9          Q.     Had it used --

10         A.     -- believe so.

11         Q.     Had it used a third party as a -- as a

12   broker-dealer to try to effectuate any transactions?

13         A.     I'm sorry.  Did we use a third party?

14         Q.     Yeah.  Did you ever use -- did

15   Sport-BLX ever use a third party broker-dealer to

16   effectuate the trans- -- the transactions we've been

17   discussing?

18         A.     Yes.

19         Q.     Who did they use?

20         A.     North Capital.

21         Q.     And when did they use North Capital?

22         A.     I -- when we sold shares in a

23   Thoroughbred portfolio.

24         Q.     Okay.  And -- and those were -- who had

25   made the investment in the -- in the Thoroughbred

```
 1   portfolio?
 2          A.     In- -- third party investors.
 3          Q.     Okay.  And what was -- who was doing
 4   the -- was there a fund in which those investments
 5   were made?
 6          A.     Was there a fund?  Is that what you
 7   said?  I couldn't --
 8          Q.     A fund.  Yeah, --
 9          A.     Well, --
10          Q.     -- a fund.
11          A.     -- there was a corporation created to
12   hold the -- the racing assets, and investors bought
13   shares in that corporation.
14          Q.     Okay.  And what was the name of that
15   corporation?
16          A.     I believe it was Sport-BLX
17   Thoroughbreds.
18          Q.     Okay.  And who created that entity?
19          A.     Well, that -- that entity was created
20   by people at Sport-BLX to -- to hold the racing
21   assets so that we could have outside shareholders
22   invest in a portfolio of horses.
23          Q.     But was it a -- an affiliate or a
24   subsidiary of Sport-BLX?
25          A.     No.  No.  No.
```

1            Q.      Did you have an ownership in that --
2    interest in that entity?
3            A.      I may have had a small interest, but I
4    -- I don't think so.
5            Q.      Okay.  And does that entity still
6    exist?
7            A.      It's a different name, but yes, it
8    does still exist.
9            Q.      What is its name -- what is its current
10   name?
11           A.      I think it's Annestes -- Annestes
12   Racing.
13           Q.      And who owns Annestes Racing?
14           A.      A number of outside shareholders.  I
15   don't -- I don't have all their names.
16           Q.      But Sport-BLX did not participate in
17   that Thoroughbred investment vehicle in any way,
18   correct?
19           A.      Well, Sport-BLX, Incorporated was
20   originally the manager, so there were a small amount
21   of -- of fees that would enure to Sport-BLX.
22           Q.      And did -- did they enure to Sport-BLX?
23   Was it paid fees for that transaction?
24           A.      Well, it wasn't paid fees for the
25   transaction.  It was paid fees for management of the

Page 730

1    company.

2          Q.    Okay.  And from the way you're saying

3    it, it's no longer the manager of the company,

4    correct?

5          A.    Correct.

6          Q.    Who is?

7          A.    I think it's K and G Stables.

8          Q.    Now, Mr. Hall, going back to the

9    subscription agreement, do you know who determined

10   the fees that Sport-BLX Securities was going to pay

11   -- strike that.

12              First going back to the third party

13   broker-dealer that you mentioned, North Capital, did

14   -- did -- have you stopped using North Capital as a

15   -- as a broker-dealer for those purposes that you

16   were using them before?

17              MR. SACK:  You're saying at the

18   present time, Ross?

19              MR. PEARLSON:  Yes.

20         A.    We stopped using them -- using them

21   for broker-dealer, but we still use them for other

22   -- we -- subsequent to that we would still use them

23   for different services, like escrow and so forth.

24         Q.    Why did you stop using them as the

25   broker-dealer?

Page 731

1      A.      Well, I'm not sure exactly of the
2   timing when we stopped using them for the
3   broker-dealer, but I do know that when the company
4   was sued they pretty much insisted that we shut down
5   the website or put a big disclosure about the
6   lawsuit.  So at that point our relationship with
7   North Capital pretty much ended.
8      Q.      Okay.  Now, going back to the
9   subscription agreement, do you know who determined
10  the fees that are reflected in Exhibit A of the
11  agreement?
12     A.      Well, it was a discussion among Pete
13  Rawlins and Joe De Perio.
14     Q.      Okay.  Do you have any role in
15  determining those fees?
16     A.      Yes.
17     Q.      And were you in agreement with those
18  fees?
19     A.      It seemed to be the -- the best -- it
20  seemed to be the most appropriate fees for the
21  purposes we were trying to achieve.
22     Q.      Did you -- do you know how -- what, if
23  anything, Mr. Rawlins and Mr. De Perio looked at to
24  determine whether those were the correct fees; the
25  licensing fees were appropriate?

1          A.    Well, there really were no correct
2     fees since I don't think that was a -- a market
3     transaction that anybody else would have paid, so
4     the discussion was really more about how much
5     Sport-BLX, Inc. needs to cover the costs of
6     maintaining the code.
7          Q.    And did, in fact, Sport-BLX Securities
8     pay the fees reflected in the subscription
9     agreement?
10         A.    Well, the subscription agreement, I
11    think, had -- when you say "the fees," it did start
12    to pay the fees.  At some point it stopped paying
13    the fees, but -- so the -- the subscription
14    agreement, I think, I don't have it in front of me
15    anymore, anticipated a longer agreement, but yes,
16    Sport-BLX Securities did pay fees to Sport-BLX, Inc.
17         Q.    And how long after the agreement was
18    signed did Sport-BLX stop paying -- Sport-BLX
19    Securities stop paying the fees reflected in
20    Hall-78?
21         A.    Am I looking at a document, Hall
22    whatev- -- Hall seven- -- I don't see any document.
23         Q.    Oh, well, the document was dated June
24    2020.
25              MR. SACK:  Why don't you put the --

```
 1    why don't you put the schedule up again.  Thank you.
 2         A.    Okay.  So what was the question?
 3         Q.    The question was how long after -- you
 4    indicated that, you know, at some point Sport-BLX
 5    Securities stopped paying the fees.  How long was
 6    the agreement in effect and Sport-BLX Securities
 7    paying the fees until it -- it stopped paying the
 8    fees?
 9         A.    I -- I'm not exactly sure how long it
10    was, but I think the amount of fees paid in -- was
11    approximately $600,000.00, but I'm not exactly sure
12    of that number, and I'm not sure over what time
13    period.
14         Q.    Okay.  And you don't know how long the
15    agreement was in -- in effect?
16              MR. SACK:  Objection to form.  May
17    call for a legal conclusion.
18         Q.    Let me ask you this.  At some point,
19    Mr. Hall, did -- did the parties terminate the
20    agreement, the subscription agreement?
21         A.    As I recall, the -- there was what we
22    referred to -- I don't know if it's in the document,
23    but we referred to it as a trigger agreement where
24    Sport-BLX, Incorporated could no longer perform the
25    functions that Sport-BLX Securities had bargained
```

Page 734

1    for.

2          Q.    And so as a result did Sport-BLX

3    Securities terminate the agreement?

4          A.    I don't think it was a termination at

5    any one particular time.  It was a period of time

6    during which there was some discussion and

7    negotiation about how to deal with this.

8          Q.    And who -- who were the participants in

9    those discussions and negotiations?

10         A.    Well, I think the initial discussions

11   were Pete Rawlins and Joe De Perio.

12         Q.    And you indicated that the -- that

13   Sport-BLX was no longer able to provide the service

14   or service the -- the code and the platform

15   appropriately.  Why was that?

16         A.    Well, --

17               MR. SACK:  Objection to form, but you

18   can answer.

19         A.    There were a number of reasons, but

20   one was the CTO quit, and then at some point the

21   number two in command on technology quit, so the

22   only real ongoing development was people at

23   Sport-BLX Securities because Sport-BLX, Incorporated

24   couldn't fulfill any of its obligations.

25         Q.    Do you recall when it was -- first of

Page 735

1   all, who was the CTO of Sport-BLX?

2          A.      It was Ryan Fisch.

3          Q.      And do you recall when he quit?

4          A.      I -- I think it was in the -- oh, I

5   think it was August or so -- I don't recall exactly.

6   I think it was August of 2020.

7          Q.      And do you recall why he quit?

8          A.      Well, they never quite tell you, but

9   one thing I do know, he spent a lot of -- he had a

10  lot of interest in the alternative trading system

11  concept, or ATS.  I think one of the projects he

12  spoke about a lot and was interested in pursuing was

13  an ATS, so I think over time he realized that that

14  wouldn't likely happen.  You know, that was one of

15  the things that I knew was troubling to him, but I

16  don't really know specifically why he quit.

17         Q.      Okay.  Now, at -- you also indicated

18  that the second in command or the second ranked, you

19  know, technology officer quit too.  When -- do you

20  recall when that was?

21         A.      I think early 2021.

22         Q.      Okay.  At some point did the -- did the

23  discussion turn to Sport-BLX Securities purchasing

24  the source code and platform from Sport-BLX, Inc.?

25         A.      Yes.

Page 736

```
 1        Q.     Okay.  When did that happen?  When did
 2   those discussions begin?
 3        A.     I think towards the end or the end of
 4   2021.
 5        Q.     Okay.  And in terms of the -- when the
 6   payments stopped, do you recall if the payments
 7   stopped at or around the time that Mr. Fisch left
 8   Sport-BLX or -- go ahead.
 9        A.     I -- I don't recall.
10        Q.     Okay.  And who engaged in the
11   discussions for the purchase of the Sport-BLX --
12   Sport-BLX technology and platform by Sport-BLX
13   Securities?
14        A.     Well, the initial discussion was
15   around the fact that in the subscription agreement
16   Sport-BLX Securities had the right to just take the
17   code for its own purposes and do whatever it wanted
18   with the code that Sport-BLX, Incorporated could no
19   longer do.  And then there was a discussion at the
20   board meeting, which ultimately led to the final
21   transaction.
22        Q.     Okay.  Would you say that the -- there
23   was something in the agreement that allowed
24   Sport-BLX Securities to simply take the code and do
25   whatever it wanted to do with it?
```

1          A.     Well, I don't think it says that

2     specifically.  I was -- I was paraphrasing.  So do

3     you want to put it right back up?  I'll -- where it

4     was a second ago?  I'll tell you what the specific

5     language was.

6               MR. PEARLSON:  If you could pull up --

7     can you pull up the subscription agreement?

8          Q.     And if you could just direct us, we'll

9     scroll through it, you could tell us the paragraph

10    that you were just referring to.

11              MR. SACK:  And Ross, just while we're

12    doing that, we're going to have to -- George is

13    going to have to get off testimony to do another

14    call in about five minutes or so, for your planning

15    purposes.

16              MR. PEARLSON:  Okay.  And then I -- I

17    would say that I -- you know, that when we get back

18    on I probably have like 15 minutes.

19              MR. SACK:  Okay.  Good.  Why don't we

20    finish with this document and just come to a

21    convenient stopping point then.

22              THE WITNESS:  I think we can go faster

23    than that.  Okay.

24              MR. PEARLSON:  Slow down a little.

25              THE WITNESS:  Could we stop there?

Page 738

```
 1                  Okay.  You can keep going.
 2                  MR. SACK:  You can go ahead.  Thanks.
 3                  THE WITNESS:  I'm not -- I'm not sure
 4      I see it.
 5                  MR. SACK:  Maybe 5.5?
 6                  If you could scroll back up, please, a
 7      little bit.
 8                  THE WITNESS:  Maybe.  Hold on, please.
 9                  MR. PEARLSON:  Jonathan, please don't
10      suggest anything to the witness.
11                  MR. SACK:  I was really just trying to
12      be efficient.  I don't think I was suggesting.
13                  THE WITNESS:  I don't see it.  Keep
14      scrolling or just go to it.
15                  Ah.  Please stop.
16                  So I think -- and there may be other
17      sections, but part of what I was referring to was
18      section 8.2.
19                  Okay.  Continue, please.
20                  Please stop.
21                  Yeah, I -- I don't -- I -- I'm gonna
22      have to look at this a little closely.  The print is
23      small.  You can keep going, and I'll see if I can
24      find it.
25      BY MR. PEARLSON:
```

1          Q.    Mr. Hall, maybe -- regardless of what

2     the -- you know, what the particular provision of

3     the agreement says, what was your understanding of

4     Sport-BLX Securities, Inc.'s rights with respect to

5     the trading platform and source code that you just

6     described to us?

7          A.    Well, the Sport-BLX Securities was

8     paying for the use of code, and if Sport-BLX,

9     Incorporated were not able to support the code or

10    went bankrupt or any situation that they couldn't

11    fulfill their obligations, there needed to be some

12    protection that Sport-BLX Securities didn't throw

13    that money out the window for nothing.   So

14    ultimately if Sport-BLX, Incorporated defaulted and

15    couldn't fulfill its obligations, Sport-BLX

16    Securities can continue to use the code as -- use

17    and modify the code as it sees fit.

18          Q.    Without paying fees or with paying

19    fees?

20          A.    Without paying fees is my

21    recollection.

22               MR. PEARLSON:   Okay.   Why don't we

23    take a break here because I believe now is the time

24    you need to take your break to do the call.

25               How much time do you think -- let's go

Page 740

1    off the record.

2                    THE VIDEOGRAPHER:   Okay.   This marks

3    the end of video file No. 3.   The time is 2:50 p.m.,

4    and we're going off the record.

5                    (Recess taken from 2:50 to 3:38 p.m.)

6                    THE VIDEOGRAPHER:   We're back on the

7    video record.   This is the start of video file No. 4

8    in the deposition of George Hall.   The time is 3:38

9    p.m.

10   BY MR. PEARLSON:

11         Q.    Okay.   Mr. Hall, I'm going to show you

12   what's been marked Hall-80 for identification, the

13   board minutes from December 15, 2021.

14                    (Exhibit Hall-80, Four-page Minutes of

15   the Regular Meeting of the Directors of Sport-BLX,

16   Inc. dated December 15, 2021, Bates stamped

17   SPORTBLX0264418 through 264421, is marked for

18   identification.)

19         Q.    Okay.   If we scroll down, there's a

20   paragraph here that references, if we stop right

21   there, that -- it says that a managing member of an

22   entity that is a shareholder in Sport-BLX has made

23   allegations of siphoning money from the company.   Do

24   you see that?

25         A.    Yes.

1          Q.    Is that the -- is that the -- are those

2     the siphoning allegations you were referring to

3     earlier in your testimony?

4          A.    Yes.

5          Q.    Were those allegations made by

6     Mr. Salerno of Cypress?

7          A.    Made by Mr. Salerno.

8          Q.    And how did he make those allegations?

9          A.    I think either through an email or a

10    text.

11         Q.    To whom?

12         A.    To me.

13         Q.    Okay.  And what -- did he specifically

14    make any specific allegations of siphoning in that

15    email or text?

16         A.    No.  No.

17         Q.    Okay.  Now, if we go further down,

18    there's an entry, or I should say a paragraph, that

19    says, "He," I assume meaning you, Mr. Hall, "went on

20    to explain that although Sport-BLX Securities had

21    already taken possession of the source code at this

22    time, as acknowledged in the previous board meeting,

23    they would investigate paying some consideration for

24    its sole ownership."

25                Can you tell me, do you recall what you

1    said to the board at that time about Sport-BLX

2    Securities taking possession of the source code of

3    Sport-BLX at that time?

4         A.    So in the subscription agreement it

5    was contemplated that Sport-BLX Securities would be

6    able to take a copy of the source code and use it

7    for its own purposes and whatever purposes it wanted

8    and whatever development it wanted to pursue,

9    pursuant to a trigger event, as defined in the

10   agreement.

11        Q.    Okay.  And what were the trigger

12   events?

13        A.    Well, the -- you want to put that

14   document back up?  I read it during the break.

15        Q.    Sure.  When you say "that document,"

16   we're going back to the Subscription Agreement --

17        A.    Yes.

18        Q.    -- which is Hall-78 for identification.

19        A.    So I think if you scroll to 11 and 12.

20   Section 11, section 12.

21             Okay.  So basically 11.1 and 11.2.

22   11.2 is the "Trigger Event."  If you can go to the

23   next page.  The last section (G), letter (G),

24   "ceases to perform its material obligations under

25   the Agreement."

1      Q.     Okay.  Now, Mr. Hall, are you saying

2   that as of December 2021, that Sport-BLX, Inc. had

3   ceased providing the servicing of the -- that was

4   required under the agreement?

5              MR. SACK:  Objection to the form.

6      A.     Well, prior to that date, yes.

7      Q.     Okay.  And -- and that's what you were

8   referring to.  Is there anything else you're

9   referring to when -- when you say there was a

10  triggering event because Sport-BLX ceased to perform

11  its material obligations under the agreement?

12     A.     Well, no.  Let's go through all of

13  them then.  Can we go back a page?

14             So "becomes insolvent," I think the

15  supplier was, in fact, insolvent.  It was unable to

16  pay its debts.  It did not -- letter (C), it did not

17  file for bankruptcy.  (D), (E)...

18             It had not yet terminated or

19  permanently ceased its ongoing operations, so there

20  were three -- three of the letters, I think, were --

21  could be applicable to Sport-BLX, Inc. at the time.

22     Q.     So you considered there to have been

23  triggering events that would have allowed Sport-BLX

24  Securities to copy or take control of the -- of the

25  source code and use it for its own purposes.  Is

1    that your testimony?

2         A.    Yes.

3         Q.    Okay.  And then it says -- it says, "as

4    acknowledged in the previous board meeting, they

5    would investigate paying some consideration for its

6    sole ownership."

7         A.    Are we -- are we back to the minutes?

8    Can you -- can you put the minutes back up?

9              Go ahead.

10        Q.    So at some point the board looked into

11   a payment from Sport-BLX Securities, Inc. to

12   Sport-BLX for the -- for the ownership, the sole

13   ownership of the code?

14        A.    I don't -- I don't know if "the board

15   looked into it" is the right characterization, but

16   yes, it was my recommendation to the board that

17   Sport-BLX Securities pay some consideration for the

18   -- for the code.

19        Q.    Okay.  And how did you go about -- how

20   did the board go about determining what the

21   appropriate purchase price was for the code?

22        A.    Well, the -- the company was that

23   time -- or prior to that, at the time of the trigger

24   event, was a GlassBridge subsidiary.  Mr. Fisch had,

25   at one point, for purposes of GlassBridge's

Page 745

1    evaluation, I think, put a value on the -- on the
2    software at roughly $200,000.00.
3         Q.    For what purpose had Mr. Fisch
4    undertaken that task to value the software or the --
5    I should say the source code?
6              MR. SACK:  Objection to form.
7         A.    Well, it says it in the minutes, that
8    for the 2019 audit Mr. Ruchalski had spoken to
9    Mr. Fisch, the CTO at the time, about what costs
10   could be capitalized, if any.  So that was the
11   purpose.
12        Q.    Okay.  And what -- what was the -- what
13   2019 audit is he referring to there or are you
14   referring to there?
15        A.    I believe it's the 2019 audit of
16   GlassBridge.
17        Q.    Okay.  And then it says, "Mr. Fisch
18   wrote a memo stating that there were not any
19   takeaways from what ConsenSys built."  Did you ever
20   see that memo?
21        A.    I don't know if I specifically saw the
22   memo.
23        Q.    Do you know what was meant there when
24   it says "that there were not any takeaways from what
25   ConsenSys built"?

1          A.     I -- I think he was saying that he had

2     rebuilt a lot of it, and that -- what did the memo

3     -- it was takeaways.

4                 I think, again, this is Mr. Fisch

5     writing a memo, and this is recorded minutes of a

6     verbal board meeting, but I think basically he was

7     trying to put a value on the replacement cost of the

8     software.

9          Q.     So to be clear, in this -- in this

10    meeting Mr. Fisch was not there, correct; he had

11    left the company?

12         A.     Correct.

13         Q.     So what this says is this is someone

14    summarizing a memo that Mr. Fisch had written and

15    presented to the board?

16                MR. SACK:  Objection to the form.

17         A.     I think this was information -- in an

18    attempt to come up with some value that Sport-BLX

19    Securities could put on the software, this was an

20    attempt to put some objectivity around that value.

21         Q.     Do you have any idea why Mr. Fisch had

22    to rebuild most of what ConsenSys had built?

23                MR. SACK:  Objection to form.

24         A.     Well, I'm not really sure.  As I said,

25    this was a memo that I don't recall seeing, and this

Page 747

1  was minutes that were written down, so I don't know

2  how accurate or precise they are, but basically I

3  think his view was there are programmers that don't

4  charge as much as ConsenSys' programmers, and that

5  he could rebuild the system for a smaller amount of

6  money.

7      Q.    Okay.  And how did that impact your

8  discussions in terms of what the appropriate price

9  was for Sport-BLX's source code and platform?

10     A.    Didn't really have much impact.

11     Q.    How does the -- the fact that -- how

12 was it that you were paying -- "you" being Sport-BLX

13 Securities were supposed to pay over a million

14 dollars of fee -- a million dollars a year in

15 subscription fees jive with the fact that the -- the

16 source code and platform itself was supposedly only

17 worth $200,000.00?

18     A.    Well, I didn't say it was only worth

19 $200,000.00.  I think that's just what was recorded

20 in the minutes from a memo that Mr. Fisch wrote.

21     Q.    Okay.

22           MR. PEARLSON:  Could we go to Hall-81?

23     A.    But I'm happy to discuss the -- the

24 rest of it if you'd like, your question.  I don't

25 want to not answer your question.

Page 748

1          Q.      No, go ahead and answer my question.

2          A.      So the million dollars a year was an

3      extraordinarily generous amount of money for

4      Sport-BLX Securities to pay Sport-BLX, Inc.  It's my

5      view that no one else in the world would have paid

6      that amount of money, and it's the potential that

7      nobody in the world would have paid anything to use

8      that software.  That being said, even with the

9      amount of money you referred to, roughly a million

10     dollars a year, the costs of maintaining and

11     operating a system -- in other words, the costs of

12     Sport- -- the expenses at Sport-BLX, Incorporated

13     were pretty close to a million dollars a year, and

14     there's a spreadsheet that puts, you know, revenues

15     and costs.

16              So basically the revenue was created --

17     the fee stream was created to keep Sport-BLX, Inc.

18     afloat by paying enough revenue to cover the

19     expenses.  So if you took -- put a valuation on the

20     code itself, that's different than putting a

21     valuation on the business itself.  So if the

22     business had a million in revenues and almost a

23     million in expenses, that doesn't make the company

24     particularly valuable.

25          Q.      Mr. Hall, are you saying that when

Page 749

```
 1   Sports- -- the subscription fees or the fees in the
 2   subscription agreement were designed to pay the
 3   expenses exactly of -- of Sport-BLX in maintaining
 4   the source code and platform?
 5                   MR. SACK:  Objection to form.
 6          A.      I didn't say that.
 7          Q.      Okay.  Was there, in fact, a -- a -- a
 8   purchase by Sport-BLX Securities of Sport-BLX source
 9   code and platform?
10          A.      Yes.
11          Q.      Okay.  And do you know when that took
12   place?
13          A.      I think it was in December of 2021.
14          Q.      I'm going to direct your attention now
15   to what's been marked Hall-81 for identification,
16   and it's a long document.  It's a Form 10-K of
17   GlassBridge for December 31, 2021.
18                   (Exhibit Hall-81, 81-page GlassBridge
19   Enterprises, Inc. Form 10-K for fiscal year ending
20   December 31, 2021, is marked for identification.)
21          Q.      And unless you want me to show you more
22   pages, I'm just going to show you page 45 of 81 on
23   the 10-K.
24                   Now, this is note 14 -- note -- I'm
25   sorry.
```

1          MR. PEARLSON:  This is page 62 you're

2     on?

3          It doesn't matter.  It's the same

4     information.  It's fine.

5          Q.    So here it's called related party

6     transaction.  It's actually -- that's on page 62 of

7     the pdf.  It talks about on December 21 at the

8     beginning -- at the bottom of the page --

9          MR. PEARLSON:  What page are you on?

10          MR. TYRRELL:  (Inaudible.)

11          MR. PEARLSON:  I was on page 45.

12          Hold on one sec.  Sorry.

13          Here you go.

14          Q.    You see where it says under "Sports

15     Technology Platform" on December '21 "SportBLX sold

16     proprietary code to S-BLX Securities, a related

17     party, for 225,000."  Do you see that?

18          A.    I didn't see the first part.  You said

19     Sport Tech- -- Sports Technology Platform?

20          MR. PEARLSON:  Scroll up so he could

21     see it.

22          A.    Okay.  There we go.

23          Okay.  I can see it, yeah.

24          Q.    Okay.  Is that consistent with your

25     recollection as to the fact that there was a sale of

1    the code and platform to Sport-BLX Securities for

2    $225,000.00?

3              A.      Well, that was part of it.

4              Q.      What else was there?

5              A.      The next section below.

6              Q.      Okay.   This is all part of one

7    transaction here?

8              A.      They were done on different days, but

9    they were part of the same transaction.   GlassBridge

10   recorded it on different days, which is probably

11   just creating documents took another day or so, but

12   it's part of the same transaction.

13              You -- you might assume that

14   $225,000.00 for code that was created for roughly $2

15   million or some number bigger than the founders'

16   round was a low price.  So from Sport-BLX

17   Securities' standpoint, they didn't really

18   necessarily need to buy it, they could just use it,

19   but there would be advantages to actually owning it

20   in terms of marketing.  And once I realized that

21   effectively Mr. Salerno had destroyed most of the

22   possibilities of Sport-BLX's success, it was clear

23   that was the mission, I realized that the best way

24   to get shareholders a value and to create this

25   ecosystem was to have the code in the same place as

Page 752

1    the entity that was going to continue to do
2    business.

3                From Sport-BLX Securities' standpoint,
4    they didn't really have to pay anything, but I
5    thought it was reasonable that they did.  By the
6    same token, it would be unreasonable for Sport-BLX
7    Securities to write a check for some significant
8    amount of money for code that it had already spent
9    $600,000.00, plus an awful lot of time and energy
10   and employee time that went towards Sport-BLX, Inc.
11   So to jump in and make the transaction fair, in my
12   view, as close to fair as possible for both sides,
13   we basically wrote off $1.3 million or $1.35 million
14   of debt at Sport-BLX, Incorporated.  So the total
15   consideration was the cash plus the debt write-off.
16   And if Sport-BLX Securities did pay a big amount of
17   cash for the code, it would have gone to pay down
18   debt anyway.

19                So by doing it this way, effectively
20   Joe De Perio and myself wrote off debt that was
21   owned by FinTech Debt Corp. to make it seem -- to
22   make it not only fair to Sport-BLX Securities, but
23   reasonable compensation to Sport-BLX, Inc. for the
24   original cost of the code.
25                Q.    Mr. Hall, as of the time of this sale,

Page 753

1    December 21, 2021, what other assets did Sport-BLX
2    have besides its code and technology platform?
3         A.    It had the common stock of a company
4    that we created for P.J. Washington.
5         Q.    And other than that --
6         A.    It -- it al- -- sorry?
7         Q.    Go ahead.  I'm sorry I interrupted you.
8    Go ahead.  Finish your answer, please.
9         A.    It also had the -- the rights to a
10   certain amount of cash flow, albeit small, from
11   managing Sport-BLX Thoroughbreds, but the -- the
12   main asset was the common stock of the P.J.
13   Washington company.
14        Q.    And how much of the common stock of the
15   P.J. Washington company did it have?
16        A.    I don't recall.  Probably 40 percent.
17   But I'm guessing that.  I don't recall.
18        Q.    Now, you -- you just indicated that you
19   -- that the -- the forgiveness of the debt by -- by
20   FinTech was part of the transaction with the sale of
21   the code?
22        A.    The reason for the write-off of the
23   debt was to compensate Sport-BLX, Incorporated
24   without having the compensation come from Sport-BLX
25   Securities.

1          Q.     Is that indicated anywhere in any kind

2     of document?

3          A.     I don't know if it's in a doc- -- I

4     think it actually is in a document somewhere, but I

5     -- I don't -- I don't have it handy.

6          Q.     Do you know what document -- the name

7     of that document is?

8          A.     I don't recall.  I think it was -- it

9     may have been just an email from me to -- to someone

10    else in the company, but I don't recall.

11         Q.     Is what you just testified to reflected

12    in any board minutes or any meetings, any

13    discussions at any directors meetings?

14         A.     I don't recall.  I didn't -- I didn't

15    -- it wasn't my view that we needed to get a board

16    approval to write off a bunch of debt.

17         Q.     Okay.  And is -- is Sport-BLX

18    Securities -- what is it doing with the -- the

19    Sport-BLX code and technology platform right now?

20         A.     (Inaudible.)

21         Q.     And when was the last time that it --

22                THE REPORTER:  I apologize.  I didn't

23    -- I didn't hear the answer.  I apologize.  Say it

24    again?

25                THE WITNESS:  Nothing.

Page 755

1          Q.    And when was the last time it was used
2     for any purpose?
3          A.    I don't recall.
4          Q.    Are there any current contemplated uses
5     for the Sport-BLX code or source code or technology
6     platform?
7          A.    Well -- I'm sorry.  Say that again?
8          Q.    Are there any contemplated uses; are
9     there any potential deals or transactions or
10    anything that contemplates the future use of the
11    Sport-BLX source code or technology?
12         A.    I don't know -- I don't really know
13    the answer to that.  I'd have to -- I'd have to
14    think about that.
15         Q.    Is -- is Sport-BLX Securities engaged
16    in any kind of business at all right now?
17         A.    No.  It's just waiting around pending
18    this litigation.
19         Q.    What about Sport-BLX itself; what is
20    the current status of Sport-BLX?
21         A.    Just no operations.  The P.J.
22    Washington common stock, it's still technically
23    there, but we didn't go forward with forming that or
24    funding that corporation post the allegations, so
25    it's not really doing anything.

Page 756

1        Q.    Does it have any assets?

2              MR. SACK:  "Does it" meaning

3    Sport-BLX, Inc.?

4              MR. PEARLSON:  Yes.

5        A.    Well, in terms of -- I don't -- in

6    terms of balance sheet and accounting, GAAP, I don't

7    really know, but I don't think it really -- I don't

8    think it has any -- any significant assets.

9        Q.    Do you have any current business plans

10   for Sport-BLX, Inc.?

11       A.    Yes.

12       Q.    What are they?

13       A.    Well, it's all a function of the --

14   the pending litigation.  I don't believe there's any

15   business I can conduct in Sport-BLX, Inc. with

16   pending litigation, so when the litigation ends one

17   way or the other, I'll reevaluate.

18       Q.    Okay.  But what -- do you have -- do

19   you currently have plans as to what you're going to

20   do with it if it -- if the litigation is resolved?

21       A.    Well, I -- you know, now we know the

22   -- even though it's under protective order, we know

23   the LPs, so possible that it could form a

24   broker-dealer with permission to disclose to FINRA,

25   but, you know, other than that, I just have to see

Page 757

1   how this -- how this all ends.

2           Q.     Okay.   We -- you had talked earlier

3   about David Falk.  Can you just tell us who David

4   Falk is?

5           A.     He was a well-known sports agent.

6           Q.     And at some point did you have some

7   discussions with him in terms of being involved with

8   Sport-BLX, Inc.?

9           A.     Yes.

10          Q.     And what was his involvement with

11  Sport-BLX, Inc. going to be?

12                 MR. SACK:  Objection to form.

13          A.     Well, his involvement in the beginning

14  was just helping us think through the -- the

15  process.  He introduced us to a number of sports

16  agents and so forth.  We at some point created an

17  advisory board, which we thought he would be on, but

18  ultimately there was no official role with the

19  company.

20          Q.     Was he ever paid by Sport-BLX for

21  serving as an advisor to the company?

22          A.     I -- I don't know if he actually was

23  paid any cash.  We did accrue some -- I think, and I

24  could be wrong, but I think we accrued some -- some

25  expense to pay him, but I don't know if we

Page 758

1   ultimately paid him.

2               MR. PEARLSON:  Okay.  Can I just have

3   a minute?  I might -- I might be done.  Just --

4               MR. SACK:  Yeah.

5               MR. PEARLSON:  You don't even have to

6   go off the record.  Just give me a couple of

7   minutes.

8               MR. SACK:  Okay.

9               THE VIDEOGRAPHER:  I'm sorry.  You did

10  not want to go off?

11              MR. PEARLSON:  I don't think we need

12  to.  Just give me a couple --

13              THE VIDEOGRAPHER:  Okay.  I just

14  couldn't -- I didn't hear you.  Thank you.

15              (Three-minute pause in proceeding.)

16              THE VIDEOGRAPHER:  Mr. Pearlson?

17              MR. PEARLSON:  Yes.  I -- I -- I'm

18  ready to -- to wrap up.

19              THE VIDEOGRAPHER:  Okay.  Oh, the

20  witness is gone.

21              MR. PEARLSON:  I know.  That's why --

22  that's why -- I didn't know that he was --

23              THE VIDEOGRAPHER:  Okay.

24              MR. PEARLSON:  -- leaving the room.

25              THE VIDEOGRAPHER:  Okay.  Got it.

Page 759

1                MR. PEARLSON:  We're still on the

2     record, correct?

3                THE VIDEOGRAPHER:  Yes.

4                MR. PEARLSON:  Mr. Hall, I have

5     nothing further at this time.  Thank you for your

6     time.

7                THE WITNESS:  Thank you.

8                MR. SACK:  So let me ask -- I may have

9     -- I may just have a couple of very brief questions,

10    but let me see if either David Gold or Chris Carbone

11    have any questions.

12               MR. CARBONE:  I do not.

13               MR. GOLD:  Yeah, this is David Gold,

14    and we don't have any questions.  Thank you.

15               MR. SACK:  Okay.  Ross, I just have a

16    couple of very brief questions.

17    EXAMINATION BY MR. SACK:

18          Q.    Mr. Hall, when did -- when did

19    Sport-BLX become a technology company?

20          A.    Well, Sport-BLX was always a

21    technology company.  The -- the -- the overall

22    business plan changed over time, but it was always a

23    technology company.

24          Q.    And how did that business plan change?

25          A.    Once we realized that we couldn't get

Page 760

1    a FINRA application -- we couldn't get -- we had to

2    withdraw the FINRA application because we couldn't

3    answer their questions, we had built technology, we

4    had done a lot of legal research, we had

5    intellectual property that was created, so we tried

6    to focus on that and monetize that without being a

7    broker-dealer.  So it was a technology company

8    trying to sell technology as opposed to collecting

9    commissions for doing transactions.

10        Q.    A few moments ago Mr. Pearlson asked

11   you about assets that Sport-BLX has in addition to

12   interest in the P.J. Washington company and whatever

13   else -- and the other things you mentioned.  Does

14   the company have any intangibles that are valuable,

15   in your view?

16        A.    Well, the company spent a significant

17   amount of money on legal research.  It's got -- it's

18   created documents that could be used in

19   transactions.  It's got at least one tax opinion

20   that -- it may be dated, but ultimately could be

21   refreshed and reused.  So, you know, the company has

22   what I -- what you might call intangibles in terms

23   of know-how and intellectual property, but -- and

24   documents, but I think -- I think that's it for the

25   -- for the intellectual property.

```
                                          Page 761
  1              MR. SACK:  I have nothing further.
  2              THE VIDEOGRAPHER:  Okay.  I will
  3   conclude the video.
  4              This concludes today's testimony given
  5   by George Hall.  The total number of media disks
  6   used is four.  They'll be retained by Veritext Legal
  7   Solutions.
  8              The time is 4:10 p.m., and we're going
  9   off --
 10              MR. SACK:  I just want to stay on the
 11   record.  I'm just saying in our view the deposition
 12   is now concluded.  Is that your view, Mr. Pearlson?
 13              MR. PEARLSON:  Yes, it is.
 14              THE VIDEOGRAPHER:  Okay.  As I --
 15              MR. SACK:  Thank you.
 16              THE VIDEOGRAPHER:  As I said, the
 17   total number of disks consists of four.  They will
 18   be retained by Veritext Legal Solutions.  The time
 19   is 4:10 p.m., and we're going off the record.
 20              (Deposition concluded at 4:10 p.m.)
 21
 22
 23
 24
 25
```

Page 762

1                    CERTIFICATE OF DEPONENT

2

3          I have read the foregoing transcript of

4    my deposition and except for any corrections or

5    changes noted on the errata sheet, I hereby

6    subscribe to the transcript as an accurate record

7    of the statements made by me.

8

9

                _____

10                          GEORGE HALL

11

12          SUBSCRIBED AND SWORN before and to me

13    this _____ day of _____, 20___.

14

15

16              _____

17                          NOTARY PUBLIC

18

19

20    My Commission expires:

21

22

23

24

25

Page 763

C E R T I F I C A T E

1

2

3        I, MARGARET VOLLMUTH-CORSON, a Certified

4   Court Reporter of the State of New Jersey, DO HEREBY

5   CERTIFY that, prior to the commencement of the

6   examination, GEORGE HALL was duly sworn by me to

7   testify to the truth, the whole truth, and nothing

8   but the truth.

9        I DO FURTHER CERTIFY that the foregoing is a

10  true and accurate transcript of the testimony as

11  taken stenographically by and before me at the time

12  and place and on the date hereinbefore set forth.

13       I DO FURTHER CERTIFY that I am neither a

14  relative nor employee nor attorney nor counsel of

15  any of the parties to this action and that I am

16  neither a relative nor employee of such attorney or

17  counsel and that I am not financially interested in

18  this action.

19

20

21

22       MARGARET VOLLMUTH-CORSON, C.C.R. 30XI00158400

23

This transcript was prepared in accordance with

24  N.J.A.C. 13:43-5.9.

25

Page 764

```
 1                        ERRATA SHEET
                   VERITEXT/NEW YORK REPORTING, LLC
 2      CASE NAME: Sport-BLX, Inc., Individually And
        On Behalf Of Its Shareholders v. Michael Salerno
 3      DATE OF DEPOSITION: 6/29/2023
        WITNESSES' NAME: George  Hall
 4
 5      PAGE   LINE (S)        CHANGE              REASON
        ____|_____|_____|_____
 6
        ____|_____|_____|_____
 7
        ____|_____|_____|_____
 8
        ____|_____|_____|_____
 9
        ____|_____|_____|_____
10
        ____|_____|_____|_____
11
        ____|_____|_____|_____
12
        ____|_____|_____|_____
13
        ____|_____|_____|_____
14
        ____|_____|_____|_____
15
        ____|_____|_____|_____
16
        ____|_____|_____|_____
17
        ____|_____|_____|_____
18
        ____|_____|_____|_____
19
        ____|_____|_____|_____
20
21                  _____
                              George  Hall
22      SUBSCRIBED AND SWORN TO BEFORE ME
        THIS _____ DAY OF _____, 20__.
23
24
        _____    _____
25      (NOTARY PUBLIC)           MY COMMISSION EXPIRES:
```

**[& - 1:42]**                                                                    Page 1

| & | 1 |
|---|---|

**&**   567:23 568:2
568:8,18
572:19 693:15
693:24 694:2,9
694:14 705:13

**0**

**0002131**   571:24
668:22
**0006855**   573:20
715:1
**0009062**   570:14
578:4
**0009065**   572:6
674:1
**0009101**   574:3
722:20
**0009109**   723:3
**0014750**   573:23
718:7
**0014757**   719:1
**0015012**   571:20
665:5
**0015398**   570:22
612:5 625:6
**0015468**   625:6
**0015714**   570:18
608:1
**01243**   567:4
575:14
**07068**   568:3
**07601**   568:15

**1**   572:16
575:11 590:18
591:12,16,20
630:21 669:14
671:7,9 677:15
685:6 687:6
703:9 711:11
718:18 719:2
**1,000.00**   593:25
594:2
**1,436,302.00**
610:4
**1.3**   703:10
704:8,14
752:13
**1.35**   752:13
**10**   571:15
573:21 574:1,9
606:17 619:8
644:12,23
645:7 659:14
664:14 678:25
718:4 722:17
749:16,19,23
**100**   629:4
691:23
**10017**   568:9
**10065**   576:10
**10154**   568:19
**105**   568:2
**10:03**   567:24
575:2
**11**   573:13
710:12 742:19

742:20
**11.1**   742:21
**11.2**   742:22
**11.2.**   742:21
**114759**   573:23
718:7
**11:18**   630:21
630:23
**12**   570:17,21
571:17,22
572:1,4 573:1
607:25 608:4
610:15 612:4
612:13 613:24
615:25 620:10
620:18 623:12
665:3,13,18
668:15,20
669:1,21
670:15,24
673:18,24
674:22 696:12
711:21 712:9
742:19,20
**12,116,718.00**
671:4
**125**   629:4
**12:30**   673:7,9
**12th**   675:3,7,12
675:15,19,23
**13**   572:18
573:10 660:10
665:21 693:14
700:22 705:18

**137,038.00.**
718:22
**137.00**   718:20
**137.38**   718:16
**13966**   763:21
**13:43-5.9.**
763:24
**13th**   662:6
**14**   749:24
**140795**   571:4
631:13
**15**   574:6
627:21 737:18
740:13,16
**15013**   571:20
665:5
**151.4**   627:22
**15468**   570:22
612:5
**15715**   570:18
608:1
**16**   623:7
**17**   572:7
676:20 677:9
677:20,25
**17,076**   608:25
**174138**   572:2
670:16
**19**   630:13
**1:22**   567:13
575:16
**1:36**   693:7,8
**1:42**   693:8,10

**[2 - 30]**                                              Page 2

| **2** |
| --- |

**2**  590:6,15
591:3,9,12,13
591:18 596:19
597:5 631:1
650:20,22
651:24 673:6
682:19 692:3
696:24 697:2
751:14
**2.00**  719:3,5,6
719:16,18
721:20,24
**2.3**  712:1
**20**  590:22
627:22 644:11
645:8 686:12
686:12 691:18
691:24 692:1
703:23 762:13
764:22
**200**  682:19
**200,000.00**
747:17
**200,000.00.**
745:2 747:19
**201**  568:16
**201.8**  627:23
**2013**  636:10
**2016**  689:18
**2019**  570:14,18
570:21 571:3,7
571:10,15,15
571:17,22
572:1,4,7,11

577:17,22
578:4 580:15
580:19,22
591:19,23
608:1,5 612:4
612:13 613:24
619:8,13 623:7
626:15,17
630:2 631:9,12
636:19,20,25
639:5 643:15
643:21 644:11
644:12 645:10
648:10 651:12
659:14,14
660:7,10 665:3
665:14,21
668:20 669:1
669:21 670:15
670:24 673:19
673:24 676:20
678:10 682:11
721:13 722:8
722:11 726:22
745:8,13,15
**2020**  572:17,20
573:1,7 574:3
590:24 627:22
627:24 671:9
685:6 686:20
687:6,24
693:16,23
696:13,18
698:25 699:1
701:10 702:19

703:23 722:10
722:11,19
723:20 724:12
726:8,18,23
732:24 735:6
**2021**  573:13,19
573:23 574:7
574:10 672:2
710:13,19
711:20 712:19
715:1,6 718:6
718:10 719:22
719:25 720:23
720:25 735:21
736:4 740:13
740:16 743:2
749:13,17,20
753:1
**2023**  567:24
575:3
**20th**  573:7
702:19
**21**  750:7,15
753:1
**212**  568:9,20
**2139**  571:24
668:22
**22**  567:4
575:14
**225,000**  750:17
**225,000.00**
751:2,14
**23**  660:7
**25**  568:15
627:23

**252.3**  627:24
**26**  571:2
572:11 631:8
631:12 639:20
647:2 678:10
**263.00**  622:22
**263.40**  622:1
**264421**  574:8
740:17
**265511**  572:13
678:12
**265531**  573:16
710:15
**272782**  572:17
685:7
**273644**  573:9
702:20
**273835**  573:12
705:20
**277773**  572:21
693:17
**280426**  573:4
696:16
**29**  567:24
575:2
**29225**  572:10
676:22
**2:50**  740:3,5

| **3** |
| --- |

**3**  634:7 673:12
698:5 740:3
**3.00**  719:19
**30**  573:23
718:6,10

**[300 - 722]**

**300**  651:24,25
**300,000**  650:22
  682:19
**30xi00158400**
  763:22
**31**  573:13,19
  574:10 665:23
  710:13,19
  711:20 715:1
  749:17,20
**320.00**  593:5,24
  594:2
**345**  568:19
**35.00**  592:22,22
  593:1,3 595:7
  595:9
**355**  593:11
  606:3
**355.00**  713:1
  721:14 722:1
**37,924**  608:17
  608:22
**39505**  571:16
  659:15
**39508**  571:11
  648:11
**3:00**  673:2

---
**4**
---

**4**  636:3 740:7
**4.572**  716:6
**40**  753:16
**400,000**  717:10
**400,000.00**
  716:5,18,22,23
  717:8

**407-4852**
  568:20
**41**  622:23
**44**  572:7
  676:19
**45**  749:22
  750:11
**4:00**  660:7
**4:10**  761:8,19
  761:20

---
**5**
---

**5**  574:3 671:11
  722:19 723:20
  724:12
**5,455,782.00**
  674:18
**5.4**  712:14
**5.5**  738:5
**50**  593:1 629:4
  641:8 653:18
  654:1,25
  655:12,20
  656:9
**500,000**  651:25
**51**  685:15,17
**52**  570:11
  577:25 578:1
**525-6305**
  568:16
**530-2100**  568:3
**54**  571:1 631:6
  631:10
**55**  571:5
  643:12,13,19

**56**  571:8
  645:21 648:7,8
**565**  567:23
  568:8
**57**  571:12
  659:10,11
**576**  570:4
**578**  570:11

---
**6**
---

**6**  571:6 576:9
  643:15,21
  645:9 660:21
  661:5,6 698:6
  698:18
**6/29/2023**
  764:3
**60.00**  593:1
  653:18 654:2
  654:25 655:12
  655:20 656:10
**600,000.00**
  733:11 752:9
**606,198.00**
  674:17
**607**  570:15
**61**  571:17
  665:1,2,8
**612**  570:19
**62**  750:1,6
**631**  571:1
**643**  571:5
**648**  571:8
**659**  571:12
**66**  571:21
  668:18,19,25

**665**  571:17
**668**  571:21
**67**  572:1
  670:13,14
**670**  572:1
**673**  572:3
**676**  572:7
**678**  572:11
**68**  572:3
  673:22,23
**685**  572:14
**6859**  573:20
  715:1
**693**  572:18
**696**  573:1
**69th**  576:9
**6:30**  579:15
**6:35**  658:11,16

---
**7**
---

**7**  573:1 696:12
  699:18
**7.5**  654:7
**70**  572:7
  676:17,19
**702**  573:5
**705**  573:10
**71**  570:19
  612:2 613:3
**710**  573:13
**714**  573:17
**718**  573:21
**72**  572:11
  678:8,9 679:8
**722**  574:1

**[73 - actually]**

**73** 573:13
710:10,12
**740** 574:5
**749** 574:9
**75** 573:17
629:4 714:22
714:23
**759** 570:5
**77** 573:21
718:3,4
**78** 574:1
722:15,17
732:20 742:18

**8**

**8.2.** 738:18
**80** 574:5
691:20,23
740:12,14
**81** 574:9,9
747:22 749:15
749:18,18,22
**8111** 567:13
575:16
**856-9600** 568:9
**86** 570:15
607:21,23
**87** 572:14
685:2,3

**9**

**9** 570:13
571:10,15
577:22 578:3
579:14,22
580:15,19,22

583:6 587:2
591:10,25
595:7,14
597:13 598:9
604:22 605:4
610:16,23
647:22 648:6
648:10,23
649:1 651:12
657:22 658:24
658:25 659:14
661:4
**90** 572:18
693:13,14
**9063** 570:14
578:4
**9073** 572:6
674:1
**9110** 574:4
722:20
**92** 573:1
696:11,12
697:10
**95** 573:5
702:16,17
**97** 573:10
705:17,18,23
**973** 568:3
**98** 570:19
612:1,2,10
613:21 625:3

**a**

**a.m.** 567:24
575:2 630:21
630:24 631:3

**aam** 698:7
**ability** 590:23
593:21 594:14
598:11 639:12
640:10 690:3
**able** 584:20
594:12,12,19
598:25 704:14
734:13 739:9
742:6
**above** 582:23
695:3
**abramowitz**
567:23 568:8
**accept** 712:19
712:21 717:7
**accepted** 716:5
716:23 717:9
**accordance**
763:23
**accounting**
589:11 606:10
756:6
**accrual** 672:10
**accrue** 757:23
**accrued** 757:24
**accurate** 618:3
747:2 762:6
763:10
**accurately**
685:14
**achieve** 731:21
**acknowledge**
664:9

**acknowledged**
741:22 744:4
**acquire** 587:3
590:18 690:7
700:19
**acquired** 663:2
663:7,22,22
690:10 699:15
701:3,4
**acquiring**
586:5 587:12
592:1 596:2
692:1 701:3
**acquisition**
611:13 613:8
**acting** 581:12
581:15,16,20
581:20,20
582:1,16 583:4
600:3
**action** 763:15
763:18
**actions** 575:17
**activity** 701:16
**actual** 667:12
724:18
**actually** 579:21
597:2 608:6
639:3,15,17
643:23 657:20
658:14 676:2
683:3 694:10
697:22 720:20
722:25 726:17
750:6 751:19

| | | | |
|---|---|---|---|
| 754:4 757:22 | advance 647:14 | 718:11 | 666:18,19 |
| adara 572:18 | advantage | agreement | 674:22 720:14 |
| 573:2,6 686:8 | 589:10,17 | 571:22 572:4 | 720:16,16 |
| 686:13,16,16 | advantages | 573:6,13,21 | ah 738:15 |
| 686:21,21,23 | 590:13 615:4 | 574:1 584:8 | ahead 593:18 |
| 686:24 688:10 | 751:19 | 598:20,22,23 | 625:14,17 |
| 688:13,14,16 | advise 646:23 | 622:9 641:1,18 | 671:24 714:16 |
| 688:17 691:20 | 647:9 658:4 | 666:10 668:3,4 | 736:8 738:2 |
| 692:2 693:14 | 661:22,23 | 668:20 669:1 | 744:9 748:1 |
| 694:19,20,22 | 664:12 | 673:18,24 | 753:7,8 |
| 694:22 695:4 | advised 645:23 | 674:9 675:2,6 | al 575:14,14,15 |
| 696:14,18 | 647:14 656:4,5 | 676:12 689:15 | 575:16 753:6 |
| 697:7,23 | 656:6,6 662:3 | 689:19,20 | albeit 753:10 |
| 698:10,20,20 | 678:21 717:2 | 690:1,7 701:13 | algorithms |
| 699:8,10,11,14 | adviser 695:6 | 701:14 702:18 | 690:3,5 |
| 699:24 700:5 | 695:14 | 702:22 703:7 | allegations |
| 700:24,25 | advising | 704:6,10,12 | 720:2,4 740:23 |
| 702:18,25 | 619:17 655:25 | 709:25 710:12 | 741:2,5,8,14 |
| 704:17,20 | 656:18 | 710:18,21 | 755:24 |
| add 588:14 | advisor 757:21 | 717:19 718:5 | allow 599:12 |
| addition 647:1 | advisory | 718:10 721:6 | 663:1 |
| 676:1 701:3 | 757:17 | 722:6,12,18,22 | allowed 663:17 |
| 760:11 | aec 698:6,9,10 | 723:16,19 | 736:23 743:23 |
| additional | affiliate 728:23 | 726:19 730:9 | allows 651:8 |
| 586:5 587:4,12 | affiliated 702:8 | 731:9,11,17 | alluded 665:25 |
| 588:2,18,19 | afloat 748:18 | 732:9,10,14,15 | altern 681:8 |
| 651:16 652:3,6 | agent 757:5 | 732:17 733:6 | alternative |
| 653:7,10,15 | agents 757:16 | 733:15,20,20 | 598:4,5 677:25 |
| 660:5 697:8 | ago 700:5 | 733:23 734:3 | 678:17 681:9 |
| adds 597:3 | 737:4 760:10 | 736:15,23 | 681:13,19 |
| adjourn 648:2 | agree 575:9 | 737:7 739:3 | 735:10 |
| adjourned | 717:13 | 742:4,10,16,25 | alternatives |
| 658:11,15 | agreed 592:13 | 743:4,11 749:2 | 636:5 |
| 683:12 | 598:19 605:24 | agreements | amount 595:18 |
| | 649:14 656:4 | 621:24 622:8 | 606:7,11,14 |

667:1,1,2
670:11 671:4
672:15 682:25
700:10 712:11
712:24 714:13
720:10,21
725:14 726:2
729:20 733:10
747:5 748:3,6
748:9 752:8,16
753:10 760:17
**analyses** 628:2
**analysis** 607:15
607:15 617:23
618:10 628:11
629:14 633:21
**anello** 567:23
568:8
**annestes**
729:11,11,13
**announced**
683:21
**annual** 597:20
599:15,19
601:3,7 602:23
602:25 603:3
644:7,8,10,21
644:24 645:7
645:16 649:10
650:9,11,14,18
660:1,4,8,14,25
661:10,16
662:17 663:14
664:15 669:25
677:3,12 678:4

678:13 679:6
679:13,17
680:5,10,25
681:10 684:24
**annum** 671:12
**answer** 583:8
587:6 588:14
593:15 604:8
620:1 623:16
635:16 640:22
672:7 698:2
703:8 716:20
719:20 725:23
734:18 747:25
748:1 753:8
754:23 755:13
760:3
**answered**
581:18 583:8
589:4 603:21
616:5 617:20
624:19 635:16
691:14
**answers** 599:16
612:19
**anticipated**
591:18 732:15
**anticipation**
591:13 594:19
594:21 695:12
709:7
**anybody**
599:23 600:20
636:13 637:18
701:22,24

717:7 723:14
732:3
**anymore**
732:15
**anyway** 752:18
**apart** 704:1
**apologize** 623:4
624:25 650:2
662:12 692:22
754:22,23
**apparent**
603:14
**appear** 578:23
670:23 679:16
**appearing**
567:22
**appears** 627:12
674:9 679:19
**applicable**
743:21
**application**
760:1,2
**appreciate**
582:24
**approached**
709:13,14,15
**approaches**
709:17
**appropriate**
654:22 731:20
731:25 744:21
747:8
**appropriately**
734:15

**approval**
754:16
**approve** 624:9
**approved**
666:4 683:8,12
684:6 716:13
716:17 723:8
**approximately**
567:24 590:22
644:23 659:8
685:17 691:18
691:23,24
700:21 733:11
**april** 572:16,20
685:6 686:20
687:6,24
693:16,23
**argue** 721:25
**argument**
597:3
**arithmetic**
606:13 667:3
**arrange** 584:20
639:16
**arrangement**
576:1
**arrived** 713:12
719:6,16
**articulated**
590:1
**asap** 693:3
**asked** 583:7
603:21 617:5,5
617:13,20
624:18 635:15

667:14 684:13
692:20 724:25
760:10
**asking**  578:12
582:25 583:2
586:14,16,21
609:16 621:9
622:13 625:2
644:25 657:9
660:13,21
674:25 679:15
**asks**  636:22
**assembling**
624:14
**asset**  591:6
593:16 596:20
596:20 686:16
686:21,23,24
688:17 689:22
694:19,20
698:21 699:8
699:11,14,24
700:5 706:15
708:14 720:21
753:12
**assets**  688:18
700:19 705:7
706:14 714:20
728:12,21
753:1 756:1,8
760:11
**assign**  716:6
**assigned**
715:11

**assignment**
573:5,17
604:21 702:17
702:22 704:6
714:24 715:7
715:18 716:13
716:17
**assignor's**
703:13
**assist**  596:19
611:12
**assistant**
692:20
**associated**
670:19,23
**assume**  579:12
581:25 584:18
605:18 610:22
617:8 628:15
667:9 672:7
676:14,15
688:23 692:23
741:19 751:13
**assumption**
615:13
**athlete**  573:10
583:16,25
584:2,13,19,19
585:12 638:17
638:21,24,25
639:18 687:23
688:2,10 705:9
705:19,25
706:10

**athletes**  708:15
**ats**  735:11,13
**attached**
611:17 621:24
**attaching**  573:2
665:9 696:14
**attachment**
626:18 630:10
**attachments**
666:13
**attempt**  746:18
746:20
**attempted**
726:12,24
**attempting**
720:1
**attend**  578:11
586:15 678:13
**attendees**  608:7
662:8 679:17
679:19 680:12
**attention**  631:6
749:14
**attorney**
666:14,15
763:14,16
**attorneys**  568:6
568:12,17,21
**attracting**
656:2,2
**audio**  575:8
**audit**  745:8,13
745:15
**auditing**
589:13

**august**  591:22
735:5,6
**authorized**
604:13,24
650:21,24
651:3 659:2
682:16 683:3,5
**available**
590:24
**avenue**  567:23
568:8,19
**aware**  597:7
611:20 646:2
660:23 661:9
661:13 665:15
674:20 675:5
677:20 708:4
709:19
**awful**  752:9

**b**

**b**  718:18
**back**  590:11
604:15 605:1
605:23 606:22
613:12,15,18
614:14,17
615:7 617:7
618:14 619:4
625:24 630:4,6
630:25 633:1
656:22,25
661:1 668:9
669:19 671:2
672:24 673:11
677:4 692:20

**[back - blx]**

693:3,9 698:18
700:14 703:5
704:13 712:8
713:13 719:10
730:8,12 731:8
737:3,17 738:6
740:6 742:14
742:16 743:13
744:7,8
**baez** 567:8
568:13 631:16
648:15 683:13
**balance** 589:10
595:10 596:21
597:9 606:9
691:6 700:25
701:1 709:4,22
712:22 756:6
**ballpark** 610:7
**bankrupt**
739:10
**bankruptcy**
589:24 743:17
**bargained**
733:25
**base** 591:6
**based** 590:20
592:14 601:12
606:22 607:8
607:10 618:16
627:1,13
628:16 638:18
**basically** 594:3
594:4 599:12
635:8 638:17

639:25 641:20
642:3 670:10
686:4 702:1
709:3 710:5
724:24 742:21
746:6 747:2
748:16 752:13
**basing** 654:15
**basis** 606:15
671:7
**basketball**
639:9
**bates** 570:14,18
570:21 571:3,7
571:10,15,20
571:23 572:1,5
572:9,12,17,20
573:3,8,11,15
573:19,23
574:3,7 578:4
608:1 612:5
625:3 631:12
643:15 648:10
659:14 665:5
668:21 670:15
673:25 676:21
678:11 685:6
693:16 695:16
696:15 702:20
705:19 710:14
715:1 718:7
722:20 740:16
**bccs** 572:9
676:21

**becoming**
695:5,13
**began** 647:7
**beginning**
750:8 757:13
**begun** 637:21
645:10
**behalf** 567:4,13
678:17 679:22
679:24 680:2,3
687:11 723:4,5
764:2
**belief** 593:10
**believe** 578:20
587:8 611:4
617:6 619:15
628:21 635:18
647:22 654:5
656:3,15 666:1
669:10 674:7
674:11 675:4
679:7 681:6
682:4 686:23
687:9,20 688:2
691:1 704:16
707:12,15
712:3 716:15
717:21,24
723:12 724:5
727:10 728:16
739:23 745:15
756:14
**believed** 654:1
**belonged**
587:13

**beneficial**
586:7 589:20
591:7 592:8,8
624:13
**beneficially**
713:18,23
**benefit** 589:2
590:7 592:9
616:23 637:15
689:9,11
**benefits** 616:24
617:1
**best** 634:3
639:16 641:6
672:25 725:13
731:19 751:23
**better** 593:12
593:16 623:14
**big** 595:18
726:10 731:5
752:16
**bigger** 587:18
589:8 590:3,5
591:4,6,6
596:20 719:8
751:15
**biggest** 635:8
**bit** 694:3
697:11 700:2
721:3 738:7
**blast** 677:2
**blx** 567:4,9,9
567:13 568:12
568:12 571:2,6
571:10,14

| | | | |
|---|---|---|---|
| 573:19 574:2,2 | 631:8,11,17,24 | 720:6,7,11,22 | 755:5,11,15,19 |
| 574:6 575:15 | 632:11,15,22 | 721:3 722:3,6 | 755:20 756:3 |
| 577:17 579:15 | 632:24 633:25 | 722:7,14,18,19 | 756:10,15 |
| 579:19 580:11 | 635:6 636:11 | 722:23,23 | 757:8,11,20 |
| 580:16,19,23 | 639:6,13,22 | 723:4,5,25 | 759:19,20 |
| 583:15,25 | 640:11 642:15 | 724:2,6 725:1 | 760:11 764:2 |
| 584:1,7,13,19 | 643:7,15,20 | 725:9,11 726:7 | **blx's**   589:21 |
| 584:20 585:8 | 645:23 646:2 | 726:9,10,11,20 | 623:13 701:10 |
| 585:12,13,19 | 646:23 647:10 | 726:21,23,24 | 701:16 704:2 |
| 585:20,21,23 | 647:14 648:10 | 727:1,2,3,4,15 | 719:23 726:7 |
| 586:6 587:4,18 | 648:23,25 | 728:16,20,24 | 747:9 751:22 |
| 587:21 588:2,7 | 649:12 653:19 | 729:16,19,21 | **board**   570:12 |
| 589:2,8,9,10,12 | 653:21 654:3,8 | 729:22 730:10 | 570:16,21 |
| 589:23 590:7 | 654:23 656:14 | 732:5,7,16,16 | 571:1,5,9,13 |
| 590:14 591:8 | 657:2,11 658:4 | 732:18,18 | 578:2,20 |
| 591:15 592:8 | 659:13,18 | 733:4,6,24,25 | 579:11,15,19 |
| 593:8,12,16,22 | 662:4 664:13 | 734:2,13,23,23 | 580:3,11,16,20 |
| 593:22,23,25 | 674:4 677:18 | 735:1,23,24 | 580:23 581:3 |
| 594:1,4,5,5,15 | 677:22 678:21 | 736:8,11,12,12 | 586:2,5 587:11 |
| 595:3,4,25 | 680:4,17,22 | 736:16,18,24 | 590:1 596:4 |
| 596:2,9 597:8 | 681:2 683:24 | 739:4,7,8,12,14 | 597:14,23 |
| 597:14 598:12 | 684:10,14 | 739:15 740:15 | 598:12,21,25 |
| 600:15,25 | 685:12,16 | 740:22 741:20 | 599:7,13,21 |
| 602:9 604:1 | 688:6,11,23 | 742:1,3,5 | 600:14,21,25 |
| 606:9 607:18 | 689:4,7,9 | 743:2,10,21,23 | 601:12 602:8 |
| 608:19 609:25 | 699:20,25 | 744:11,12,17 | 602:14,15,16 |
| 610:11 611:7 | 700:6,12 701:4 | 746:18 747:12 | 602:18,20 |
| 615:4 617:14 | 701:11,15,20 | 748:4,4,12,17 | 603:11,15,19 |
| 619:17,19 | 704:4,7,9 | 749:3,8,8 | 604:1,13,15,20 |
| 620:13,15 | 707:24 708:1,9 | 750:16 751:1 | 604:24 605:1 |
| 621:15 622:1 | 709:11,13,22 | 751:16 752:3,6 | 607:24 608:4 |
| 622:22 623:2 | 714:25 715:7 | 752:10,14,16 | 610:15,18 |
| 623:19 624:5,5 | 715:17,23 | 752:22,23 | 611:1,13,14,17 |
| 626:2,5,15 | 718:12,24 | 753:1,11,23,24 | 611:21 612:4 |
| 627:17 628:3,6 | 719:12,13 | 754:17,19 | 612:12,16 |

613:6,7,23
614:2,10,13,24
614:25 615:2
615:10,18,19
615:22,25
616:2,16,18
617:5,5,8,12,13
618:25 619:7
619:24 620:3
620:10,19
622:18 623:9
624:16 626:20
628:3,6 629:11
629:15,18
630:11 631:8
631:11,17,20
631:22,25
632:6,19,24
633:2,14
634:23 636:15
639:20 640:14
643:14 645:15
645:24 646:2,4
646:5,8,20,23
646:24 647:9
647:10,14,23
648:1,9,23,25
649:11,12,15
649:20 650:13
650:17 651:2,5
653:17,25
654:7,21
655:23,25
656:5,6,6,18
657:2,11 658:4

658:9,21 659:2
659:12,18
660:6,9,14
661:10,22,23
662:4,14,17
663:7 664:13
664:19 677:13
677:18,21
678:21 681:9
682:18 683:18
684:7,14,21
716:14 720:5,5
736:20 740:13
741:22 742:1
744:4,10,14,16
744:20 746:6
746:15 754:12
754:15 757:17
**board's** 611:18
**boards** 615:10
**bonds** 687:18
**bottom** 627:9
643:22,25
658:12 683:11
750:8
**bought** 691:17
709:6,6 728:12
**bracketed**
697:25
**break** 625:16
629:6 630:16
672:19 692:15
739:23,24
742:14

**breakdown**
670:3
**brief** 759:9,16
**briefly** 588:14
**bring** 632:5
**bringing**
631:19
**broke** 577:14
673:16 685:22
690:16
**broken** 609:13
**broker** 623:22
726:13 727:6
727:12,15
730:13,15,21
730:25 731:3
756:24 760:7
**brought** 631:23
**building**
725:20
**built** 702:10
745:19,25
746:22 760:3
**bullet** 609:7
695:3
**bunch** 754:16
**business**
617:12,14,18
632:3 680:14
682:15 701:10
702:9 708:15
708:25,25
714:17 719:23
748:21,22
752:2 755:16

756:9,15
759:22,24
**buy** 591:3
616:20 637:13
639:15 656:9
656:16 657:17
657:18 697:6,7
718:12 719:10
719:12 751:18
**buying** 587:17
620:19 636:14
656:13 711:9

**c**

**c** 567:20 568:1
743:16 763:1,1
**c.c.r.** 763:22
**calculated**
655:23
**calculation**
719:20
**calendar** 671:8
**call** 590:24
647:24 652:7
702:5 733:17
737:14 739:24
760:22
**called** 589:21
590:6 626:1
627:6 652:11
701:14 705:9
713:21 726:14
750:5
**camera** 575:5
**cancel** 721:2

**cancelled**
719:25
**capacity** 594:7
595:22 689:15
694:25
**capital** 573:6
588:19 594:13
634:14,24
635:14 651:9
651:11,14,16
652:3,6,11,13
652:15,20,22
653:2,6,14
687:11,17,17
687:19 689:12
689:13 690:4
695:10 696:3
702:18,25
703:18,19,22
704:17,25
706:13 707:1
714:8 720:1
727:20,21
730:13,14
731:7
**capitalized**
745:10
**carbone** 568:20
759:10,12
**card** 601:8,10
603:9 677:10
677:11
**cards** 603:3
**carefully**
628:20 700:16

**carry** 691:2,6
**case** 567:3,13
575:14,16
587:22 596:20
633:24 644:22
764:2
**cash** 585:20
592:22,23
593:2 594:9
595:7,9,14,15
595:22 606:14
607:14 609:13
609:20,22
610:3,5,12
616:22 618:1,9
667:1 670:7,11
671:7 687:15
713:2 752:15
752:17 753:10
757:23
**causing** 590:25
**cc'd** 666:15
**ccarbone**
568:21
**ceased** 743:3,10
743:19
**ceases** 742:24
**cents** 622:23
**ceo** 581:8,11,12
581:16,16,20
582:2,6,11
**certain** 589:11
592:12 618:17
619:18 621:6
641:2,3 664:22

665:10 667:1,1
682:8,12
687:15,15
707:13 725:14
753:10
**certainly**
589:24 629:18
647:20 663:17
**certificate**
762:1
**certified**
567:21 575:21
763:3
**certify** 763:5,9
763:13
**cesar** 567:8
568:12 648:15
683:13
**cfo** 581:20
**chance** 713:3
**change** 590:20
591:1,1 596:13
597:15 598:15
598:25 599:11
599:12 664:3,4
759:24 764:5
**changed**
662:20 686:13
726:14 759:22
**changes** 577:2
762:5
**changing**
664:24
**characterizati...**
684:5 691:3

744:15
**characterize**
709:16
**charge** 696:4
747:4
**charger** 692:15
692:23
**chart** 627:9
685:15,21,25
686:1,3
**charts** 572:14
685:3
**chase** 654:24
**check** 752:7
**chief** 582:15,15
583:4,4
**chiesa** 568:2
**chris** 683:14
759:10
**christian**
568:20
**christopher**
567:8 568:13
**circumstance**
640:5 642:5
**circumstances**
581:5 633:21
641:3 654:10
**citing** 660:4
**civil** 567:22
**claims** 619:18
620:12,15
**clarify** 607:2
686:18

**[clear - compensate]**

| | | | |
|---|---|---|---|
| **clear**  595:20 | 741:21 742:2,6 | **commencing** | 637:14 640:1 |
| 597:17,19 | 743:25 744:13 | 567:24 671:8 | 641:22 651:6,8 |
| 598:17,19,19 | 744:18,21 | **comments** | 651:10,15,17 |
| 615:20 624:11 | 745:5 747:9,16 | 618:9 | 651:20 652:2 |
| 713:2 718:21 | 748:20 749:4,9 | **commission** | 653:4,8,11 |
| 746:9 751:22 | 750:16 751:1 | 762:20 764:25 | 654:16 655:19 |
| **clearly**  600:18 | 751:14,25 | **commissions** | 656:1,4,20 |
| 646:20 | 752:8,17,24 | 760:9 | 657:5,13,15,17 |
| **clinton**  567:9 | 753:2,21 | **commitment** | 657:18,19 |
| 581:4,6,7,10,22 | 754:19 755:5,5 | 585:4 | 683:1 689:22 |
| 600:4 681:24 | 755:11 | **committee** | 699:12 700:23 |
| 682:2 684:12 | **cole**  568:14 | 632:7,11,19,21 | 702:1 706:18 |
| 689:15,25 | **coleschotz.com** | 633:1,15 723:9 | 708:11,14,21 |
| 690:2,5,7,18 | 568:17 | 723:15 | 714:10,14,19 |
| 703:20 704:23 | **collateral** | **commodity** | 715:15 720:3 |
| 705:1,3 | 591:15 701:25 | 695:4 | 721:10 722:8 |
| **close**  639:17 | **collect**  594:19 | **common**  594:1 | 724:6 726:15 |
| 662:5 665:20 | 672:14 716:1 | 608:17 609:1 | 726:16,16 |
| 665:23 666:2,5 | **collecting** | 753:3,12,14 | 730:1,3 731:3 |
| 675:25 720:19 | 760:8 | 755:22 | 740:23 744:22 |
| 748:13 752:12 | **com**  651:10 | **company** | 746:11 748:23 |
| **closely**  738:22 | **combination** | 583:10 586:7 | 753:3,13,15 |
| **closing**  646:12 | 595:15 | 588:9,20 | 754:10 757:19 |
| 670:11 674:17 | **come**  593:21 | 589:13,16,16 | 757:21 759:19 |
| 676:2,7,9 | 631:22 693:3 | 589:25 590:10 | 759:21,23 |
| 711:13 712:1 | 707:16 709:8 | 590:13 592:13 | 760:7,12,14,16 |
| **code**  701:17 | 737:20 746:18 | 594:22 595:24 | 760:21 |
| 702:2 703:14 | 753:24 | 596:9 607:12 | **company's** |
| 703:14 704:2 | **coming**  726:5 | 607:13 623:2 | 588:7 592:25 |
| 704:21,22 | **command** | 624:13 632:4 | 650:18 |
| 724:2 725:2,10 | 734:21 735:18 | 632:15,17 | **compared** |
| 726:1 732:6 | **commencem...** | 633:8,8,23 | 593:7 |
| 734:14 735:24 | 611:19 615:1 | 634:3,13 | **compensate** |
| 736:17,18,24 | 763:5 | 636:17,19,22 | 753:23 |
| 739:5,8,9,16,17 | | 637:1,10,12,13 | |

**[compensation - control]**    Page 13

| | | | |
|---|---|---|---|
| **compensation** | **confidential** | 674:13 713:14 | **contemplates** |
| 752:23 753:24 | 567:19 | 741:23 744:5 | 755:10 |
| **complete** 597:5 | **confirm** 674:21 | 744:17 752:15 | **contemplating** |
| **completely** | **confused** | **considered** | 692:1 |
| 577:12 | 667:21 670:9 | 588:17 606:18 | **contemplation** |
| **complex** 700:4 | **conjunction** | 613:7 637:9 | 621:17 |
| **complicated** | 601:4 | 743:22 | **context** 597:23 |
| 663:15 | **connection** | **considering** | 599:7 620:18 |
| **computer** | 611:2 612:12 | 583:23 585:6 | 637:11 639:24 |
| 692:16 | 612:17 613:8 | 620:19 622:19 | 641:17 642:9 |
| **concept** 635:6 | 613:23 614:3 | 636:11 651:3 | 721:21 |
| 638:1,14,16,19 | 624:16 626:24 | **consistent** | **continuation** |
| 638:19,23 | 629:12 642:16 | 578:18 606:4,5 | 659:21 |
| 639:2,2,6 | 643:8 677:12 | 607:4 614:19 | **continue** 575:9 |
| 705:13 735:11 | 697:22 711:13 | 615:11 750:24 | 627:25 738:19 |
| **concepts** | 711:20 | **consists** 761:17 | 739:16 752:1 |
| 638:22 639:3 | **connections** | **consolidate** | **continued** |
| **concerning** | 575:6 | 589:9 606:9 | 571:14 575:12 |
| 603:25 646:9 | **consensys** | **consolidation** | 576:11 586:4 |
| 668:10 | 725:3,14,24,25 | 665:24 | 659:13 699:5 |
| **conclude** 673:5 | 726:3 745:19 | **constantly** | **continues** |
| 761:3 | 745:25 746:22 | 621:14 | 634:12 |
| **concluded** | 747:4 | **constraints** | **continuing** |
| 761:12,20 | **consent** 575:25 | 709:20 | 701:12 |
| **concludes** | **consider** | **construction** | **contract** 725:3 |
| 761:4 | 587:17 602:19 | 725:17 | **contractual** |
| **conclusion** | 631:22 632:25 | **consummated** | 602:15 |
| 733:17 | 636:16 637:14 | 697:9 | **contribute** |
| **conduct** 756:15 | 653:5 657:19 | **consummating** | 689:13 |
| **conducted** | 660:6,9,14 | 720:8,19 | **contributing** |
| 575:4,19 | 725:20 | **contacted** | 700:18 |
| **conference** | **consideration** | 605:4 | **control** 590:21 |
| 576:17 | 611:18 612:17 | **contemplated** | 591:1,1 595:24 |
| **confidence** | 614:3 650:20 | 615:5 742:5 | 596:2,9,13,25 |
| 698:3 | 670:3,4,7 | 755:4,8 | 597:1,3,6,12,15 |

597:19 598:1,7
598:15 599:11
599:12 602:19
603:1 637:13
637:14 639:25
640:2 657:18
667:3 743:24
**controlling**
681:1 683:23
**convenient**
737:21
**conversation**
602:12 617:3
660:18
**conversations**
587:11 602:7
634:19
**conversion**
655:15
**converting**
657:25
**convince**
638:16
**coo** 581:21
**copy** 574:1
722:18 723:1
742:6 743:24
**corp** 573:7,18
573:22 686:9
698:10 702:19
702:25 713:24
714:2,7,25
718:5 752:21
**corporate**
572:15,16

596:24 632:14
652:7 682:22
682:25 685:4,5
685:20,24
**corporation**
579:3 644:9
650:22 651:4
652:4,8,12
690:23 728:11
728:13,15
755:24
**corporation's**
660:3
**correct** 576:18
576:25 578:16
580:8 585:14
592:17 622:2
634:4,5 641:14
642:10,17
643:8,10
644:24 649:4
654:16 658:25
659:7 662:18
666:11 669:25
670:1,5,10
671:4,12
674:10,14
677:18,19
685:12,18
690:24 691:9
691:10 692:3
701:8 707:11
707:14,15
711:14,21
712:2,6,16

719:3,4 721:15
721:20 723:20
724:3 729:18
730:4,5 731:24
732:1 746:10
746:12 759:2
**corrections**
762:4
**correctly**
700:13
**corson** 567:21
575:23 763:3
763:22
**cost** 746:7
752:24
**costs** 725:21
732:5 745:9
748:10,11,15
**counsel** 575:25
576:6 613:5
619:9,11,16
620:6 641:4
763:14,17
**couple** 758:6,12
759:9,16
**course** 587:21
600:21 601:9
603:3,5 621:16
**court** 567:1,21
568:15 575:18
575:22 576:3
613:11,14,19
630:7 763:4
**cover** 625:12
706:3 732:5

748:18
**covered** 572:7
676:20
**create** 629:19
635:22 689:22
726:16 751:24
**created** 629:1,3
667:4 688:3
689:5 702:7
706:4 726:9,18
728:11,18,19
748:16,17
751:14 753:4
757:16 760:5
760:18
**creating** 751:11
**creditors**
573:14 710:14
**csglaw.com**
568:4,5
**cto** 734:20
735:1 745:9
**current** 729:9
755:4,20 756:9
**currently**
756:19
**customer** 635:8
**cut** 654:24
**cv** 567:4,13
575:14,16
**cypress** 567:3
567:17 568:6,7
575:13 597:22
598:12 599:21
619:9,18

620:11,17,25
621:11,15
623:25 640:25
641:2,4,7
643:1,1 656:9
656:13 741:6

**d**

**d** 568:20 681:5
743:17
**daiana** 615:12
681:4
**daniel** 567:7
568:5,21 569:4
571:18 573:1
581:2 582:15
616:5 621:14
646:7,22 665:3
668:7 682:9
683:15 696:13
709:18
**data** 618:15
**date** 571:20
644:10,12,16
644:18,18,19
644:23 645:6,7
657:20 660:7,9
660:10,14,15
660:15,20,25
660:25 661:2,3
661:11,11,16
661:16 662:20
663:1,6,16,17
663:19,20
664:3,4,5,8,10
664:15,16,24

665:5,17 666:3
669:24,25
672:2 674:5,5
674:21 676:14
677:23,24
678:2,7 687:7
743:6 763:12
764:3
**dated** 570:13
570:17 571:2,6
571:10,15,22
572:4,16,20
573:7,13,19,22
574:3,6 578:3
607:25 608:4
619:7 631:12
643:15 648:10
659:14 668:20
669:1 673:18
673:24 677:8
685:6 693:16
702:19,23
710:13,19
714:25 718:6
718:10 722:19
723:19 732:23
740:16 760:20
**dates** 623:5
660:1 672:3
687:9
**david** 568:16
624:24 757:3,3
759:10,13
**day** 573:7
579:16 616:18

648:3 649:1
659:6,18
668:15,16
671:8 676:16
702:19 709:18
709:19 722:2
751:11 762:13
764:22
**days** 644:23
751:8,10
**de** 567:7
568:17 569:5
571:18 572:4,8
572:12 573:14
577:16 579:25
580:3,14 581:3
583:14 584:17
586:2,6 587:13
588:23 592:2,3
592:5,10
595:16 596:11
597:8,24
600:16 601:5
601:13 602:3,4
602:5,7,22
603:1,10
604:14,25
605:16 608:25
609:10 610:8
611:9,14
612:18 614:4
614:20 617:15
620:20 621:14
626:25 636:4
637:25 638:8

641:1 642:9,16
643:6 646:7,10
646:14,25
647:8,16
648:16,20
649:25 650:6
656:3,5 659:4
660:3,6,8,13,24
661:9,15,23
662:10,21
663:23 665:3,9
665:13 669:10
673:25 674:4
674:10,13,21
675:5,12,17
676:20 677:2
678:10 679:9
683:14 685:10
707:5,17
710:13 711:8
712:4,14
713:17 714:9
721:14 723:4
731:13,23
734:11 752:20
**deal** 592:11
593:13 605:9
605:14 638:24
639:17 689:5
697:9 734:7
**dealer** 623:22
726:13 727:6
727:12,15
730:13,15,21
730:25 731:3

756:24 760:7
**deals**  755:9
**debt**  573:18,22
  591:17 595:21
  606:15,18
  609:14,20,22
  616:21,23
  655:21 657:25
  667:1 700:22
  700:24 701:3
  709:1 713:21
  713:24 714:1,7
  714:8,25 718:5
  719:10 752:14
  752:15,18,20
  752:21 753:19
  753:23 754:16
**debts**  743:16
**decem**  651:11
  664:14
**december**
  570:13,17,20
  571:6,10,15,15
  571:17,22
  572:1,4,7,11
  573:22 574:6
  574:10 577:17
  577:22 578:3
  579:14,22
  580:15,19,22
  583:6 587:2
  591:10,25
  595:7,14
  597:13 598:9
  604:22 605:4

607:25 608:4
610:15,16,23
612:4,13
613:24 615:25
620:10,18
623:1,12
626:14,17
630:2,13
643:15,21
644:11,12
645:7,8,9
647:22 648:6
648:10,22
649:1 651:12
657:22 658:23
658:25 659:14
659:14 660:7
660:10,21
661:4,5,6
664:14 665:2
665:13,18,21
665:23 668:15
668:20 669:1
669:21 670:14
670:24 673:18
673:24 674:22
676:20 677:9
677:20,24
678:9,25
682:11 718:6
718:10 719:22
719:24 720:23
721:9,13
726:22 740:13
740:16 743:2

749:13,17,20
750:7,15 753:1
**decided**  648:1
  722:7
**deck**  626:13
  693:23 705:25
  706:2
**decks**  626:8
  706:2
**defaulted**
  739:14
**defendant**
  568:17
**defendants**
  567:11,17
  568:6,12,21
**define**  621:3
**defined**  742:9
**definitely**
  607:10 624:9
**definition**
  632:1 633:5,5
  633:20 722:10
**delay**  645:16
**deliberated**
  579:13
**delivered**
  674:23
**demand**  573:17
  589:22 590:1
  632:16 651:21
  652:20,23
  653:3,4 655:15
  714:23 715:8
  715:11,13

716:6,10,18,24
717:8 719:12
**demonstration**
  638:23
**dep**  575:12
**dependent**
  632:16
**depends**  575:5
**depicted**
  685:15,21
  686:3
**deponent**  762:1
**deposition**
  567:7 575:3,12
  575:19 616:25
  631:2 673:13
  740:8 761:11
  761:20 762:4
  764:3
**derivatively**
  567:4,13
**describe**
  584:22 602:6
**described**
  585:13 639:7
  640:17 642:5
  667:11 670:4
  700:20 704:23
  739:6
**description**
  570:10
**designed**  749:2
**despite**  578:23
  589:18 712:25

**destroyed**
751:21
**detail**  603:14
719:21
**detailed**  617:10
617:16
**determine**
650:8 731:24
**determined**
606:7,12 667:2
730:9 731:9
**determining**
731:15 744:20
**develop**  725:2,9
**developed**
703:25
**developing**
725:25
**development**
734:22 742:8
**dgold**  568:17
**different**  599:2
601:8 607:6
612:23 618:16
618:23 628:16
628:16,17
629:21 641:11
670:8 717:23
729:7 730:23
748:20 751:8
751:10
**difficulty**  656:1
**direct**  631:5
643:21 668:13
737:8 749:14

**directed**  641:3
**directly**  607:18
726:23 727:3
**directors**
570:12,16
571:2,6,9,13
574:6 578:2
579:3 597:14
607:24 631:8
631:11,24
643:14 648:9
649:12,16,21
650:14 659:12
662:17 677:14
677:21 678:1
678:17 680:14
680:16,19
681:9,14,20
683:13,17
708:12,12
740:15 754:13
**disadvantage**
615:5
**disadvantaged**
593:7
**disclose**  624:1
756:24
**disclosed**
624:12
**disclosure**
731:5
**discuss**  587:1
599:19 601:11
601:17 608:10
648:14 656:18

657:3,12
747:23
**discussed**
583:14,20
587:7,8 595:13
595:19 599:11
601:9,20,23,25
602:1,4,24
603:13 616:2
619:1 630:12
636:5 640:14
647:19 648:3
648:18 655:12
657:16,25
662:1 663:4,5
663:10 664:18
664:21,23
666:24 678:25
682:17
**discussing**
577:15 597:23
599:7 600:23
647:20 656:12
658:1 661:14
727:17
**discussion**
581:13 591:10
607:5 610:23
614:10 617:7
617:11,17
620:11,14,17
620:22,24
629:21 634:17
635:21 641:19
641:20 644:8

645:15 646:3
649:11,20
650:23 652:12
652:15,21
653:25 654:25
655:1 660:3
661:20 675:20
680:25 684:19
684:25 731:12
732:4 734:6
735:23 736:14
736:19
**discussions**
581:10 584:5
592:24 596:1
596:12 597:12
597:18,21,25
598:10 599:5
599:14 600:13
600:18,23
603:8,9,17,18
605:17 615:25
621:9,13,19,23
635:17 637:18
637:22 645:10
645:13 646:6,9
646:11 647:7
653:17 655:18
658:5 664:2,11
675:10,11,14
675:17 679:2
709:25 720:17
723:14,18
734:9,10 736:2
736:11 747:8

754:13 757:7
**disk**   575:11
**disks**   761:5,17
**distributed**
   611:16 615:15
   616:10,13
   700:5
**distribution**
   699:20,24
**district**   567:1,1
   575:17,18
**doc**   754:3
**document**
   572:7 578:13
   578:14,15,17
   582:20 586:14
   586:22 609:17
   609:19 610:19
   611:12 622:13
   622:15 625:20
   627:16,20
   628:13 629:9
   629:10,23,25
   630:1,1,9,13
   636:3 638:6
   645:1,4,6
   661:1 667:4,19
   669:3,21 670:6
   671:3 676:4,15
   676:16,19
   680:11 692:5
   697:20 698:5,8
   703:1,4 732:21
   732:22,23
   733:22 737:20

742:14,15
   749:16 754:2,4
   754:6,7
**documented**
   603:5
**documents**
   573:3 576:24
   611:2 614:22
   615:15 629:3
   630:12 646:18
   665:10,12,16
   666:6,8,12
   668:11,14
   675:18,23
   676:2 696:15
   751:11 760:18
   760:24
**doing**   588:25
   654:18 687:6,8
   695:7 699:8
   705:6 708:15
   721:2 726:18
   728:3 737:12
   752:19 754:18
   755:25 760:9
**dollars**   595:18
   712:5 725:14
   747:14,14
   748:2,10,13
**downside**   594:5
**draft**   665:11
   720:13,15
**drafted**   666:6
   666:16

**drafts**   668:3,9
**dtyrrell**   568:5
**due**   672:15
   712:22
**duly**   576:11
   604:23 763:6
**duty**   633:7,8

## e

**e**   568:1,1 569:1
   569:1 576:9,9
   681:5,5 697:17
   743:17 763:1,1
**earlier**   622:1
   623:25 670:4
   687:3 691:7
   722:5 741:3
   757:2
**early**   590:23
   735:21
**earnings**
   638:18
**easier**   599:18
**east**   576:9
**eastern**   660:7
**ebitda**   627:13
   627:21,22,23
   628:17
**economically**
   592:7,20 593:7
**ecosystem**
   751:25
**effect**   591:21
   638:10 733:6
   733:15

**effectively**
   590:9 593:20
   606:11 713:18
   715:12 719:25
   751:21 752:19
**effectuate**
   727:12,16
**effectuated**
   674:5
**efficient**   738:12
**effort**   634:14
   672:14
**efforts**   634:24
   635:14 636:18
   639:16 701:23
   716:1
**eisenhower**
   568:2
**either**   595:25
   613:10 629:14
   630:1 639:2,7
   653:2 656:22
   675:17 724:18
   726:23 727:3
   741:9 759:10
**election**   650:9
   650:11 662:17
**email**   571:18
   571:19 572:7
   572:11 573:1
   603:25 605:19
   616:6 665:3,4
   665:8,17
   666:12 676:20
   677:2,24

678:10 679:9
696:13 741:9
741:15 754:9
**emailed**  615:17
615:19
**emails**  604:9
**employee**
581:22 681:6,7
681:24 682:10
684:12 752:10
763:14,16
**employees**
600:3,3,4
725:5,19
**employment**
581:2 633:9
**empowerment**
573:11 705:9
705:19,25
706:10
**ended**  592:16
731:7
**ends**  756:16
757:1
**energy**  752:9
**engaged**  736:10
755:15
**enter**  608:11
659:2 722:11
**entered**  593:10
594:18 689:15
722:6,23
**enterprise**
627:13 628:16
655:22

**enterprises**
567:10 568:22
570:13,17
571:23 572:5
572:14,16
573:7,14,18,22
574:9 578:3
607:25 668:21
673:25 685:4,5
685:24 686:9
686:14,16,21
698:10,20
699:11 700:24
700:25 702:19
702:25 704:17
704:20 710:14
714:24 718:6
749:19
**entertainment**
572:19 693:16
693:24 694:2,9
694:14 705:14
**entire**  613:1
625:21 627:10
637:10 649:21
704:9 708:5
**entirely**  581:19
699:2,4
**entirety**  646:4
**entities**  686:2,3
**entity**  621:5
635:5 644:20
686:25 687:21
688:3,21
702:14 705:4,5

706:23 713:21
719:11 728:18
728:19 729:2,5
740:22 752:1
**entry**  741:18
**enumerated**
616:24
**enure**  590:7
729:21,22
**equation**  592:4
**equity**  591:17
593:8 595:22
714:11
**errand**  702:5
**errata**  762:5
764:1
**escrow**  730:23
**esq**  568:4,5,10
568:11,16,20
569:6
**essentially**
711:8
**established**
609:9
**et**  575:14,14,15
575:16
**evaluate**
608:10
**evaluating**
611:13
**evaluation**
633:1 745:1
**event**  580:25
582:5 742:9,22
743:10 744:24

**events**  742:12
743:23
**everybody**
595:20 601:9
**evolved**  709:21
**exact**  583:9
609:23 610:6
633:20 725:4
**exactly**  582:19
599:13 663:15
705:15 714:3
721:18 731:1
733:9,11 735:5
749:3
**examination**
567:7 576:13
759:17 763:6
**except**  595:3
683:17 762:4
**exchanges**
603:25 605:20
**exclusively**
581:21
**excuse**  712:20
**excused**  579:10
586:3
**executed**
675:18 676:4
676:12 724:14
726:19
**execution**
574:1 676:1
722:17,25
**executive**
582:15 583:4

706:9
**exhibit** 570:20
578:1 607:23
611:18 612:2,3
612:11 613:7
613:22 614:10
614:13,16
619:5,6 621:25
622:4,6 631:10
643:13 648:8
659:11 665:2
668:19 670:14
673:23 676:19
678:9 685:3
693:14 696:12
702:17 705:18
710:12 714:23
718:4 722:17
723:22 731:10
740:14 749:18
**exhibits** 570:9
692:17,24
**exist** 729:6,8
**existed** 591:13
**existence** 699:4
**existing** 650:13
677:18
**expectation**
594:25 595:1
**expected**
724:22
**expense** 757:25
**expenses**
594:11 748:12
748:19,23

749:3
**expensive**
708:16
**expert** 682:23
**expires** 762:20
764:25
**explain** 596:22
640:6 697:1
704:15 741:20
**explains** 634:14
**explanation**
615:3 616:16
**expressed**
708:8
**extended**
663:12
**extent** 717:1,5
**extraordinarily**
748:3
**extraordinary**
632:14 682:25

**f**

**f** 763:1
**fact** 582:10
588:12 605:9
616:7 637:7
638:11 652:18
658:19 663:11
670:18 678:21
680:25 691:5
698:22 699:23
708:14 709:24
713:1 721:22
724:20 732:7
736:15 743:15

747:11,15
749:7 750:25
**fair** 629:13
640:24 666:21
676:11 686:19
704:5 705:2
752:11,12,22
**fairness** 633:16
633:19,20
**falk** 757:3,4
**familiar** 584:15
584:16 685:19
685:23 686:2
686:21 705:8
**faqs** 590:11
618:18
**far** 595:4 643:1
683:9 720:12
**faster** 694:4
737:22
**favor** 598:18
**favorable**
653:4
**federal** 567:22
690:23 691:4
**fee** 747:14
748:17
**feel** 577:7
612:24 632:9
**fees** 696:1,5
706:24 707:2
723:23,25
729:21,23,24
729:25 730:10
731:10,15,18

731:20,24,25
732:2,8,11,12
732:13,16,19
733:5,7,8,10
739:18,19,20
747:15 749:1,1
**felt** 721:1
**fifth** 567:23
568:8
**file** 630:21
631:1 673:5,6
673:12 740:3,7
743:17
**filed** 575:17
**fill** 726:10
**final** 736:20
**finalize** 662:22
662:25
**finance** 596:23
596:24
**financially**
763:17
**financials**
589:12,16
**find** 692:20,23
738:24
**fine** 621:13
625:22 719:21
750:4
**finish** 629:9
671:24 737:20
753:8
**finished** 713:10
**finra** 624:5,8
726:25 727:5

756:24 760:1,2
**fintech** 573:18
573:21 713:21
713:24 714:1,7
714:17,25
715:6,11,14,20
716:1 717:20
718:5,11,16,23
719:7 721:24
752:21 753:20
**firm** 667:20
720:16
**first** 578:14
579:14,24
583:15,24
584:1,13,18,19
585:12 587:24
590:9 612:14
613:25 625:19
629:17 638:7
642:12 644:4
645:23 660:23
661:3,8 669:19
671:3,8 674:13
678:5 680:13
694:13 703:17
709:6 711:24
714:10 730:12
734:25 750:18
**fiscal** 574:10
749:19
**fisch** 735:2
736:7 744:24
745:3,9,17
746:4,10,14,21

747:20
**fit** 739:17
**five** 571:1
572:1 573:17
608:5 631:10
648:25 670:14
692:22 714:23
737:14
**flexibility**
651:6 652:1
**flip** 697:11
**flow** 607:14
618:9 753:10
**flows** 585:20
618:2 687:16
**flux** 655:21
**focus** 701:12
760:6
**focused** 617:23
**following** 579:3
605:3 608:11
659:18 685:9
**follows** 576:12
613:19
**fool's** 702:5
**force** 589:23
**forego** 623:22
**foregoing**
762:3 763:9
**forgave** 707:17
**forgive** 707:19
712:9,22
**forgiveness**
712:2,5 753:19

**form** 574:9
578:25 582:3,8
582:18 583:18
583:22 584:14
584:25 585:15
586:13 587:5
593:14 596:15
597:16 598:14
599:9,22 601:1
601:6,15
602:10 603:12
603:20 604:6
605:25 607:1
609:14,21
610:17 616:3
617:19 618:11
619:25 620:7
620:21 621:20
622:3 623:3
624:6 629:16
630:3,8 632:10
632:12 633:18
638:3,15
639:23 641:15
642:11,22
643:9 644:17
647:17 649:17
649:23 650:15
651:18 652:5
652:16 653:12
653:20 654:4,9
654:12 657:6
658:7 661:18
662:23 669:17
674:24 676:5

678:23 679:14
684:4 688:7,12
689:1 692:4,11
699:16 701:5
703:15 710:2
713:22 716:19
719:11 721:16
722:9 723:10
724:8 727:7
733:16 734:17
743:5 745:6
746:16,23
749:5,16,19
756:23 757:12
**formas** 618:14
618:25
**formation**
714:11
**formed** 697:16
697:22,24
714:2,4,10,12
714:18
**former** 582:2
**formerly**
684:11
**forming** 632:6
755:23
**forth** 605:23
606:22 617:7
668:9 685:25
730:23 757:16
763:12
**forty** 622:22
**forward** 696:23
697:3 755:23

**[forwarding - giving]** Page 22

**forwarding**
571:19 665:4
**forwards** 691:2
691:6
**founders**
751:15
**four** 573:5
574:5 702:17
740:14 761:6
761:17
**frame** 654:20
689:17
**fran** 683:14
**francis** 567:7
568:21 569:3
**frankly** 600:20
629:19
**front** 576:24
622:19 667:19
687:17,18
732:14
**fruition** 709:9
**fulfill** 734:24
739:11,15
**full** 581:8,11
672:15
**fully** 577:11
676:4,12
**function**
724:17,20
756:13
**functions**
733:25
**fund** 572:19
573:11 634:13

634:15,18,21
634:24 635:4,6
635:8,10,14,18
635:19,20,22
635:22,25
636:1 651:22
693:16,24
694:2,9,10,12
694:14,20,23
695:2,10,20
696:4,7,8
705:9,13,19,25
706:11,12,19
706:21,22,25
707:1 721:2
728:4,6,8,10
**funded** 686:25
688:21
**funding** 584:23
632:17 755:24
**further** 652:10
694:6 703:3
741:17 759:5
761:1 763:9,13
**future** 618:1,16
638:18 755:10

**g**

**g** 576:9,9 700:9
730:7 742:23
742:23
**gaap** 756:6
**gain** 717:15
**gap** 726:10
**gaps** 726:10

**gbe** 570:14,18
570:22 571:20
571:24 572:6
573:20,23
574:3 578:4
608:1 612:5
625:6 665:5
668:22 674:1
715:1 718:7
719:1 722:20
723:3
**geh** 573:6
697:17 698:7
698:21 699:2
699:15,20,25
700:6,11,17,21
700:23 702:12
702:18,24
703:18,19,22
704:17,25
**general** 629:2
640:21 646:5
686:4 694:23
696:8 706:21
**generally**
606:16 628:13
628:14 640:15
640:18 641:12
706:23 707:2
**generate**
634:13
**generous** 748:3
**george** 567:7,8
568:12 570:3
571:19,22

572:12 573:1
575:13,14
631:2 665:4
668:21 673:13
678:11 680:13
683:14 696:13
697:17 737:12
740:8 761:5
762:10 763:6
764:3,21
**george's** 692:16
**getting** 593:10
594:25 595:2
606:8,8 663:13
667:3 676:3
711:25
**giantomasi**
568:2
**gist** 670:10
**give** 595:24
596:9 613:16
623:4 642:3
647:24 651:5
656:25 662:12
662:21 663:6
692:22 719:20
758:6,12
**given** 594:24
598:15 602:13
611:21 613:6
614:25 619:7
619:23 633:20
655:21 761:4
**giving** 597:3
639:25 687:16

| | | | |
|---|---|---|---|
| **glass**   600:24 | 612:4,12,16 | 682:7,10 | 619:4 625:14 |
| **glassbridge** | 613:5,23 614:2 | 683:22 685:4,5 | 625:17,24 |
| 567:10 568:22 | 617:1,5,22 | 685:11,20,24 | 628:8 636:3 |
| 570:13,17,21 | 618:24 619:7 | 686:3,12 687:5 | 643:11 645:20 |
| 571:23 572:5 | 619:24 620:3,6 | 687:10,20,23 | 661:1 664:25 |
| 572:14,15 | 620:18 621:1,4 | 688:1,2,3,10 | 669:2,19 671:2 |
| 573:14,18,22 | 621:5,8,10,25 | 689:23 690:3,5 | 671:24 674:12 |
| 574:9 577:17 | 622:18,21 | 690:8,11,15,19 | 677:4,9 693:1 |
| 577:22 578:3 | 624:16 626:20 | 690:22,25 | 693:2 695:16 |
| 578:10 580:4,7 | 629:11,15 | 691:4,8,11,18 | 696:22,23 |
| 581:8,11,17,22 | 630:10 632:17 | 691:20 694:17 | 697:2 698:17 |
| 582:1,7,11 | 637:22,23 | 696:25 707:7 | 698:18 703:2,5 |
| 583:1,5 586:18 | 642:10,17,24 | 707:18,23,25 | 704:13 706:7 |
| 587:3,12,17,23 | 642:25 643:5 | 708:3,7,8,11,21 | 712:8 714:16 |
| 588:2,4,8,16,19 | 645:11,12,25 | 709:10,14,14 | 726:13 736:8 |
| 588:24 589:3,7 | 646:4,14,20,25 | 709:20,22 | 737:22 738:2 |
| 589:18,20,22 | 647:7,9,16 | 710:1,14,22 | 738:14 739:25 |
| 590:2,14,20 | 648:16,20 | 712:23 713:17 | 741:17 742:22 |
| 591:7 592:9 | 651:21,21 | 714:24 715:6 | 743:12,13 |
| 594:7,11 | 652:23 657:25 | 715:14 716:5,5 | 744:9,19,20 |
| 595:21 596:1 | 658:5,21 659:1 | 716:9,14,16 | 747:22 748:1 |
| 596:11,12,17 | 661:25 662:11 | 717:20 718:6 | 750:13,22 |
| 596:18 597:9 | 662:22,25 | 718:13 719:10 | 753:7,8 755:23 |
| 597:19 598:1,4 | 663:1,6,18,21 | 721:13,23 | 758:6,10 |
| 598:11,16,24 | 664:19 666:3 | 722:3 744:24 | **goal**   589:7 |
| 599:5,20,23,24 | 667:8,17,21 | 745:16 749:17 | 590:12 687:9 |
| 599:25 600:2 | 668:5,10,21 | 749:18 751:9 | **goals**   606:2 |
| 600:19 601:8 | 670:25 671:15 | **glassbridge's** | **going**   575:2 |
| 601:14 602:12 | 671:18 673:17 | 603:8 655:15 | 577:4,6,16 |
| 602:16,25 | 673:25 674:23 | 718:23 744:25 | 582:6 589:14 |
| 603:14 604:12 | 675:2,7,17 | **go**   575:10 | 589:14 590:11 |
| 604:17 605:5 | 678:5,18 679:4 | 591:21 593:18 | 591:3 594:19 |
| 605:12 606:23 | 679:23,25 | 596:14 607:21 | 598:5 604:5 |
| 607:18,25 | 680:2 681:1,7 | 612:20,23 | 608:3 611:25 |
| 608:4 611:1 | 681:13,19 | 614:17 615:7 | 612:22 618:14 |

623:9 624:9
625:9,19 627:5
630:22 631:5
634:9,10 635:5
636:6,7 643:18
643:21 647:11
656:18 661:9
662:15,16
668:13 673:7
688:1,5,8,17,23
692:24 693:6
693:12,19
699:19 700:1
702:24 705:22
706:20 710:17
714:18 720:6,8
730:8,10,12
731:8 737:12
737:13 738:1
738:23 740:4
740:11 742:16
749:14,22
752:1 756:19
757:11 761:8
761:19
**gold** 568:16
625:2,7 669:9
676:6 759:10
759:13,13
**gonna** 595:21
621:12 689:21
738:21
**good** 575:1
576:15 587:21
587:23 589:19

591:2 592:6,20
596:18 630:18
632:18 672:19
707:3 713:3,5
737:19
**gotten** 623:14
623:14,19
642:1 693:4
**governance**
632:14 682:22
682:25
**governing**
567:22
**gradually**
623:17
**grand** 567:23
568:8
**gross** 619:8
**group** 567:10
581:4,6,11
600:4 611:20
624:25 681:24
682:2 684:12
689:15,25
690:2,5,7,18
697:17 698:7
698:21 699:2
699:15,20,25
700:6,11,18,21
703:20 704:23
705:1,3
**guarantee**
598:21,22
**guess** 612:14
613:25 622:12

638:7 672:25
688:22 689:1
700:9 703:9
708:6 710:6
711:24 717:6
**guessing**
753:17

## h

**h** 576:9
**hackensack**
568:15
**half** 612:21
672:20 726:3
**hall** 567:7,8
568:12 570:3
570:11,15,19
571:1,5,8,12,17
571:19,21,23
572:1,3,7,11,12
572:14,18
573:1,1,5,10,13
573:14,17,21
574:1,5,9
575:13,14
576:15 577:4
577:14,25
578:1,6 586:7
590:15 592:19
598:8 599:2,17
600:10,22
604:25 607:1
607:17,21,23
608:3 611:15
612:1,2,9,10,19
613:20,21

617:13,15
618:9,23 619:6
625:9,18,25
627:7 628:11
629:10 631:2,5
631:6,10,15
634:12,14,16
635:16 636:4,7
636:22,22
642:14 643:4
643:12,13,18
643:19 644:6
645:10,21,22
647:6 648:7,8
648:14,24
650:3 653:16
657:9,23
658:20 659:10
659:11,19
665:1,2,4,7,8
667:15 668:1
668:18,19,21
668:24,25
669:13 670:13
670:14,22
673:13,16,22
673:23 674:3
675:1 676:17
676:19,24
677:1 678:8,9
678:11 679:8
680:13 683:14
685:2,3,9
693:12,13,14
695:23 696:11

696:12,13,17
697:17 702:16
702:17 705:8
705:17,18,22
705:23 707:4
710:10,12,13
710:17 714:22
714:23 715:3
718:3,4,9
722:15,17
730:8 732:20
732:21,22
733:19 739:1
740:8,11,12,14
741:19 742:18
743:1 747:22
748:25 749:15
749:18 752:25
759:4,18 761:5
762:10 763:6
764:3,21
**hand** 676:13
**handed** 632:25
**handled** 724:23
**handy** 655:24
754:5
**happen** 582:10
698:24 735:14
736:1
**happened**
609:17,18,18
623:1,12
680:15 721:5
**happening**
639:3

**happy** 589:5
596:22 747:23
**hard** 708:25
**harlan** 683:15
684:3,6,8
**headline** 606:3
713:1
**headroom**
590:24
**hear** 642:12
653:9 656:21
754:23 758:14
**heard** 575:7
637:3
**held** 589:12
606:16 652:23
690:15,18
712:12 718:12
**help** 590:5
596:21 603:2
651:13 656:20
657:4,13,14
667:19
**helpful** 621:3
**helping** 635:22
635:22 757:14
**henry** 572:11
678:10 679:9
682:22
**hereinbefore**
763:12
**hereto** 611:17
**hey** 669:9
**higher** 597:2

**historical**
589:15
**hold** 593:17
644:1,1 697:16
715:21 720:4
728:12,20
738:8 750:12
**holder** 709:2
714:11
**holding** 593:12
619:9 714:19
**holdings** 567:3
567:17 568:6,7
619:18
**holds** 618:20
**hope** 599:16
696:4 726:15
**hopefully** 606:5
**horses** 728:22
**hour** 672:20
**hundred**
687:25
**hws** 572:8
676:21

**i**

**iason** 567:23
568:8
**idea** 601:11
704:12 746:21
**identification**
577:25 607:22
608:2 612:1,6
631:7,14
643:17,19
648:12 659:16

665:6,8 668:23
668:25 670:17
673:22 674:2
676:18,23
678:12 685:2,8
693:13,18
696:16 702:16
702:21 705:17
705:21,23
710:11,16
715:2 718:8
722:16,21
740:12,18
742:18 749:15
749:20
**iii** 567:3,9,17
568:6,7 575:11
575:13
**imation** 590:19
591:4,5,14,16
597:6 686:11
686:14 688:17
689:16 690:1
691:1,12,17,21
697:6
**immediately**
579:19
**impact** 747:7
747:10
**impacted**
597:15
**important**
665:22 708:13
**impossible**
721:11

inaudible 650:1
690:15 750:10
754:20
inc.'s 739:4
include 586:19
610:19 678:6
included
619:23
income 690:23
incorporated
633:25 720:7
721:3 726:11
726:11 727:2
729:19 733:24
734:23 736:18
739:9,14
748:12 752:14
753:23
incorrect 579:2
increase 650:21
682:15,18
683:2,5 720:21
increasing
650:24 651:3
independent
631:24 632:2
633:16
index 570:1
indi 662:16
indicate 578:15
578:17 665:17
669:20
indicated
609:12 651:22
691:25 707:9

724:5 733:4
734:12 735:17
753:18 754:1
indicates 649:3
669:23
indicative
652:1
indirectly
592:9
individual
650:8
individually
567:4,13 764:2
individuals
621:21
influence
577:10
information
746:17 750:4
informed 581:3
initial 642:24
712:8,25
714:11 725:16
734:10 736:14
injection
594:13
insights 615:3
insisted 731:4
insolvent
743:14,15
instructions
577:6
insurance
708:12,13,16

intangibles
760:14,22
intellectual
760:5,23,25
intended
589:23 662:4
706:12 724:18
intent 632:6,8
intention 697:5
interest 591:14
591:16 634:3
671:11 690:7
690:15,18
697:16 709:3
729:2,3 735:10
760:12
interested
596:22 636:13
636:23 637:7
708:23 709:2
735:12 763:17
interference
669:6
internal 725:19
internet 575:5
interpret 583:1
586:14 618:8
638:5
interpretation
579:9 633:11
interrupt
671:25
interrupted
753:7

introduced
757:15
invest 688:4
694:11,13
706:13 728:22
invested 687:18
687:20 688:13
investigate
741:23 744:5
investigated
720:5
investing 689:8
investment
656:13 687:6
687:10,20
689:10,11
695:6,13 721:8
722:3 727:25
729:17
investments
688:9 706:25
728:4
investor 585:7
684:9
investors 585:6
639:1 656:2
690:4 705:6
706:13 720:18
728:2,12
invitation
631:21
involve 688:11
involved 581:9
581:14 584:4
605:12 725:15

757:7

**involvement**
688:6 689:7
757:10,13

**ipo** 590:11,12

**issue** 588:15
638:17 651:6,8
652:2

**issued** 707:18

**issues** 708:10

**issuing** 588:18

**item** 650:20
677:15 680:13
682:15 698:6

**items** 649:10
652:10

**j**

**j** 568:5

**january** 671:9
721:9

**jeopardy**
651:20

**jersey** 567:22
568:3,15 763:4

**jive** 747:15

**job** 567:25

**joe** 594:2
598:17,21
603:1 616:11
621:14 646:7
669:9 677:1
709:18 713:2
714:9,13
717:16 719:10
719:11 731:13

734:11 752:20

**joe's** 676:15

**johnson** 567:8
568:13 631:16
648:19 683:14

**join** 676:6

**joined** 631:17

**jonathan**
568:10 647:5
738:9

**joseph** 567:7
568:11,17
569:5 571:18
572:4,8,12
665:3 673:25
676:20 678:10
683:13

**jr** 584:3 639:10

**jsack** 568:10

**jstern** 568:11

**judgment**
702:4

**july** 573:1,7,13
573:19 696:12
696:18 701:10
702:19 703:23
710:13,19
711:20 712:19
714:25 715:5,5

**jump** 752:11

**june** 567:24
574:3 575:2
619:8,13
703:22 722:19
723:19 724:12

726:8,18,23
732:23

**justifies** 597:2

**k**

**k** 574:9 730:7
749:16,19,23

**keep** 627:5
634:9,10
682:21 738:1
738:13,23
748:17

**keys** 641:21

**kind** 576:24
584:8 605:19
607:9 618:25
619:1 624:14
635:25 653:24
754:1 755:16

**kinds** 603:2

**knew** 600:21
624:8 646:21
701:21 735:15

**know** 577:2
579:12 581:13
581:23 583:16
584:7,12 586:1
586:11 592:2
592:24 594:23
595:11 596:13
597:18 603:13
605:22,22
606:10 610:8
611:6,8,8
614:12 620:2
625:13,18,21

625:25 627:11
628:7,22,24
629:18,20,22
633:13 635:1
636:23 637:1
644:6 647:13
657:17 663:15
664:20 666:7
666:16 668:1,2
672:3,10 675:8
675:9 678:2,3
678:3 680:7
682:8,12,23
684:13 686:6,8
687:5 691:3,11
695:7,19
697:25 698:1
700:10 703:2
703:15 706:1,4
706:5 707:19
708:5 709:16
709:20 710:3
711:17 715:16
715:20 716:16
716:23 717:9
719:5,15
724:22,22
725:9,20,25
730:9 731:3,9
731:22 733:4
733:14,22
735:9,14,16,19
737:17 739:2
744:14 745:21
745:23 747:1

**[know - looking]** Page 28

748:14 749:11
754:3,6 755:12
755:12 756:7
756:21,21,22
756:25 757:22
757:25 758:21
758:22 760:21
760:23
**knowledge**
586:17 605:8
686:15
**known** 596:25
684:10 757:5

**l**

**l** 569:1 576:9,9
**l.p.** 567:3,17
568:6,7 575:13
**labeled** 572:14
685:3
**language**
660:18 737:5
**large** 617:23
**late** 715:5
722:8
**law** 667:20
**lawsuit** 731:6
**lawyers** 576:17
**lead** 618:19
**leading** 720:20
**leaving** 590:1
758:24
**led** 644:7
652:11,15
660:2,3 736:20

**left** 586:3
606:19 608:21
609:3 614:21
614:23 616:11
617:15 736:7
746:11
**legal** 575:21,23
606:15 633:4
641:18 667:22
733:17 760:4
760:17 761:6
761:18
**lend** 591:5
**lessened** 590:2
**letter** 619:7,14
742:23 743:16
**letters** 743:20
**lgs** 567:4,13
575:15,16
**license** 623:23
624:5 701:17
701:22,24
702:6 724:1,7
726:5,7,17,20
**licensed** 725:11
**licensing**
701:19 731:25
**likely** 629:21
735:14
**limit** 725:24
**limited** 624:1
701:17,19
709:9
**line** 764:5

**lines** 635:11
**list** 579:7
677:17
**listed** 677:14
696:2
**lists** 608:6
**litigation**
755:18 756:14
756:16,16,20
**little** 618:22
628:20 641:17
653:22,23
677:5 686:12
694:3,4,5
697:11,20
698:1 700:2,16
703:3 710:24
712:1,5 721:3
725:12 737:24
738:7,22
**llc** 573:6
687:21,24
702:12,18,25
703:18,19
764:1
**llp** 568:18
**loan** 697:8
**loaning** 591:14
**loeb** 568:18,18
666:15,15
667:9
**loeb.com**
568:21
**long** 581:16
592:23 641:19

652:22 682:1,3
682:5 690:14
690:17 732:17
733:3,5,9,14
749:16
**longer** 594:24
725:15 730:3
732:15 733:24
734:13 736:19
**look** 579:24
581:1 589:15
594:10 604:11
604:11 609:6
611:11 612:25
618:1 627:3
628:19 634:8
648:5,22 649:9
652:9 659:25
669:13 670:2
673:21 674:8
676:17 678:8
679:8 692:15
694:4 697:20
700:16 702:15
710:10 714:21
714:22 718:18
721:18 722:15
723:2,22
738:22
**looked** 582:22
626:9 731:23
744:10,15
**looking** 626:7
626:23 651:15
693:4 732:21

**[looks - materials]**

**looks** 591:25
677:2 684:1
701:8 702:23
**lose** 693:2
**loss** 690:23
691:2,6 716:9
717:11,13
722:3
**losses** 691:1,5
708:22
**lot** 590:13
713:11 735:9
735:10,12
746:2 752:9
760:4
**lots** 596:17
702:3
**low** 640:2
642:2 751:16
**lower** 641:24
**lp** 572:19
693:16,24
694:2,15 705:9
**lps** 694:16
756:23
**lunch** 672:19
**luncheon** 673:9

**m**

**m** 567:16 568:6
575:15
**madam** 613:14
**made** 579:10
591:6 604:23
630:10 644:10
656:16 671:21

672:2 701:23
706:25 708:16
716:1 720:2
725:16 727:25
728:5 740:22
741:5,7 762:7
**maglaw.com**
568:10,11
**main** 568:15
708:25 753:12
**maintain**
692:11
**maintained**
594:4
**maintaining**
725:21 732:6
748:10 749:3
**maintenance**
725:18
**majority**
589:25 590:14
602:13 616:20
683:23 685:11
**make** 585:5,6
587:22 594:6
594:22 599:18
615:13 635:3
635:13 636:18
653:4 656:8
672:14 702:4
708:24 718:21
741:8,14
748:23 752:11
752:21,22

**making** 721:8
**manage** 635:7
635:24 687:10
688:18
**managed** 690:4
**management**
586:4,11,18
604:13,17,24
605:4 608:11
659:2 686:16
686:22,23,24
687:6,10,21
688:17 689:22
694:19,21
698:21 699:8,9
699:11,14,24
700:5 706:16
708:12 729:25
**manager**
686:24 687:22
688:20 696:6
706:19,21
729:20 730:3
**managing**
740:21 753:11
**manner** 576:2
670:4
**marc** 619:8
**margaret**
567:21 575:22
763:3,22
**marked** 577:25
608:1 612:1,5
612:10 613:21
631:6,13

643:16,19
648:11 659:15
665:6,8 668:22
668:25 670:16
673:21 674:1
676:22 678:12
685:2,7 693:13
693:17 696:16
702:21 705:20
705:23 710:15
715:2 718:3,7
722:20 740:12
740:17 749:15
749:20
**market** 701:21
732:2
**marketing**
751:20
**marks** 630:20
740:2
**material**
612:21 613:3
613:13 742:24
743:11
**materials** 611:1
611:5,17,21,24
612:15,23,24
614:1,6 615:1
615:23 616:1,6
616:12 619:23
624:15 625:10
626:1,2,4,14,19
626:22 660:5
660:22

| | | | |
|---|---|---|---|
| **matter**  575:13 | **meeting**  570:12 | 634:23 638:4,9 | 682:18 683:12 |
| 588:12 663:11 | 570:16 571:1,5 | 639:20 640:14 | 683:21 684:22 |
| 750:3 | 571:9,13,14 | 640:20 641:12 | 684:23,24 |
| **mean**  584:21 | 574:5 577:22 | 641:20 643:14 | 736:20 740:15 |
| 584:24 587:14 | 578:2,10,11,16 | 643:20,23 | 741:22 744:4 |
| 592:21 596:6 | 578:21,24 | 644:7,8,11,21 | 746:6,10 |
| 599:24 614:24 | 579:6,8,9,13,19 | 644:24 645:7 | **meetings** |
| 628:12 638:4 | 579:20,22,23 | 645:16,16 | 643:20 754:12 |
| 638:13 646:4 | 581:1 582:13 | 646:5,20,24 | 754:13 |
| 651:14 661:16 | 582:14,17,22 | 647:2,9,22 | **member**  580:3 |
| 666:9 667:14 | 583:6 586:3,4 | 648:1,2,4,6,9 | 580:15,19,23 |
| 687:12 689:2 | 586:15 587:2 | 648:25 649:6 | 611:14 684:7 |
| 689:12 697:2,4 | 587:12 591:11 | 649:10,15 | 684:14 740:21 |
| 698:7 703:17 | 591:25 595:8 | 650:9,11,14,18 | **members** |
| 709:13 724:16 | 595:14,20,25 | 650:25 652:24 | 578:20 580:11 |
| 727:1 | 597:13,20 | 652:25 653:17 | 615:9,18,19 |
| **meaning**  647:1 | 598:9 599:15 | 655:23 656:10 | 617:12 647:23 |
| 713:23 741:19 | 599:19 600:12 | 656:14,15 | 650:8 653:25 |
| 756:2 | 601:3,7 602:23 | 657:11,15,21 | **memo**  745:18 |
| **meaningful** | 602:25 603:3 | 657:22,24 | 745:20,22 |
| 618:3,20 | 605:3 607:24 | 658:1,4,11,21 | 746:2,5,14,25 |
| **means**  584:12 | 608:5,10 | 659:1,7,12,13 | 747:20 |
| 638:2 703:13 | 610:20,21 | 659:17,20,22 | **memory**  578:13 |
| **meant**  584:22 | 611:19 612:13 | 660:1,4,8,15,20 | 598:6 615:11 |
| 585:22 607:3 | 613:7,24 | 660:25 661:3 | 658:23 |
| 615:15 745:23 | 614:10,21 | 661:10,17 | **mentioned** |
| **mechanism** | 615:1,12 616:8 | 662:2,8,14,18 | 655:8 676:8 |
| 617:11,17,22 | 616:10,13 | 663:3,8,14 | 688:14 730:13 |
| 618:1,5 | 617:15 618:21 | 664:4,16,19 | 760:13 |
| **media**  575:11 | 618:23 620:10 | 669:25 677:3 | **merger**  590:10 |
| 761:5 | 620:18,23,25 | 677:12 678:4 | **messrs**  586:6 |
| **medication** | 623:9 626:20 | 678:14,22,25 | 604:25 |
| 577:10 | 627:2 628:4 | 679:6,13,17 | **metrics**  629:21 |
| **meet**  579:15 | 630:12 631:7 | 680:6,9,10,25 | **michael**  567:16 |
| | 631:11 634:17 | 681:10,17,18 | 568:6 575:15 |

764:2
**mid** 590:23
**million** 627:22
627:23,24
650:22 651:24
654:7 682:20
700:22 711:21
712:1,5,10,14
716:6 724:23
726:3 747:13
747:14 748:2,9
748:13,22,23
751:15 752:13
752:13
**mind** 613:10
641:23 682:21
**minority**
590:19
**minute** 630:16
643:20 692:15
758:3,15
**minutes** 570:11
570:15,21
571:1,5,8,12
574:5 578:1,9
578:23 579:2
582:14 583:1
584:18 596:5,7
604:12,20,22
605:8 607:23
608:4 612:4
614:15,16,17
614:19,24
615:14 631:7
631:10 635:2

643:13,20
648:6,8,13,23
657:8 659:11
660:16,17
672:24 679:18
679:20 680:5,8
680:9 692:22
737:14,18
740:13,14
744:7,8 745:7
746:5 747:1,20
754:12 758:7
**misleading**
653:22
**misreading**
611:15
**missed** 625:1
**mission** 751:23
**misspoke** 596:7
**misstate** 655:7
**modifications**
725:18
**modify** 739:17
**moment** 583:9
604:2 607:5
**moments**
760:10
**monetize** 760:6
**money** 583:23
585:2 591:14
591:16 635:20
676:3,8 697:8
715:13,14
720:3 739:13
740:23 747:6

748:3,6,9
752:8 760:17
**month** 626:17
**months** 622:1
**morning** 575:1
576:15
**morvillo**
567:23 568:8
**motion** 604:23
644:9
**move** 660:24
661:10,15
700:23,24
**moved** 583:10
663:1,21
664:10
**moving** 615:21
660:14 663:5
663:16,17,19
664:15 713:11
**multiple** 572:9
663:13 664:8
676:21 709:1
719:9
**multiples**
627:14 628:17
**mute** 669:8,11
**mutually**
589:19

**n**

**n** 567:20 568:1
569:1 681:5
**n.j.a.c.** 763:24
**name** 575:20
610:22 684:2

686:13 702:13
705:12 728:14
729:7,9,10
754:6 764:2,3
**names** 729:15
**nature** 637:4
**necessarily**
615:18 618:3
618:19 713:5
751:18
**neck** 589:22
**need** 577:7
617:24 618:19
625:20 627:10
645:16 651:11
651:14 652:1
652:12,15,17
652:18,19
660:4 669:11
675:18,22,24
692:15 697:19
697:25 698:1
703:2 739:24
751:18 758:11
**needed** 594:5
632:10 651:16
661:15 739:11
754:15
**needs** 612:24
652:4,8 663:16
669:7 732:5
**negotiate**
604:13,24
605:5,6,9
606:19 667:16

668:4
**negotiated**
595:8,12
605:13 666:17
666:22 667:4
668:2
**negotiating**
721:7
**negotiation**
606:22 734:7
**negotiations**
604:16 605:20
607:17 659:3
661:24 667:8
734:9
**neither**  632:2
763:13,16
**net**  691:1,2,5,5
708:21
**never**  593:2
697:9,13 713:4
735:8
**new**  567:1,22
567:23,23
568:3,9,9,15,19
568:19 575:18
576:10,10
582:5 588:15
594:13 607:8
660:9 681:7
683:13 705:12
763:4 764:1
**newly**  663:2,7
663:21

**nine**  571:21
572:3 668:19
673:23
**ninety**  697:10
**nj5987116**
567:25
**nols**  591:2
708:23 709:2
**nominated**
681:8
**nominees**
677:15,17
**noose**  589:21
**north**  568:15
727:20,21
730:13,14
731:7
**notary**  762:17
764:25
**note**  572:1
573:17 575:3
589:22 590:1
593:4,5,6,17,21
593:23,24
594:6,8,13,15
594:20,23
595:1,2,7,9,15
595:19 596:3,4
596:7 609:14
632:16 651:21
652:20,23
653:3,4 655:15
666:10 670:12
670:15,18,23
671:3,15,19

674:18 710:5
711:20,23
712:2,6,9,11,15
712:22 713:2,3
713:13 714:24
715:8,11,13,16
715:17,21,24
716:2,6,10,18
716:24 717:8
717:16 719:12
749:24,24
**noted**  576:7
762:5
**notes**  576:24
579:24 595:24
672:12,15
707:6,11,17
711:9,14
**notice**  647:25
660:5,22 677:3
**november**
571:2 631:8,12
634:16 636:10
636:19,20,25
637:17,21
639:5,20 647:2
720:25
**number**  606:18
610:6,6 625:3
626:18 627:24
644:20 650:21
650:24 651:3
655:21,22
661:21 669:15
670:8,9 682:15

683:2,5 699:5
700:4 703:25
706:2 708:3,4
713:1 720:17
721:8 724:13
724:21,25
725:4 729:14
733:12 734:19
734:21 751:15
757:15 761:5
761:17
**numbers**
609:23 627:8
627:12,18
690:13

**o**

**o**  569:1 576:9
**o'clock**  608:6
648:25 672:20
**oath**  577:5
**object**  604:5
607:1 703:14
**objection**
578:25 582:3,8
582:18 583:7
583:18,22
584:14,25
585:15 586:13
587:5 593:14
596:15 597:16
598:14 599:9
599:22 601:1,6
601:15 602:10
603:12,20
604:4 605:25

| | | | |
|---|---|---|---|
| 606:25 609:21 | **objections** | **offhand** 672:10 | 610:2 611:11 |
| 610:17 616:3 | 576:1,2,4 | **officer** 582:15 | 611:25 613:14 |
| 617:19 618:11 | **objectives** | 582:16 583:4,5 | 614:24 615:8 |
| 619:25 620:7 | 665:20 | 735:19 | 615:24 616:15 |
| 620:21 621:20 | **objectivity** | **officers** 580:7 | 617:4 618:8 |
| 622:3 623:3,15 | 746:20 | 708:13 | 620:4,24 |
| 624:6,18 | **obligation** | **offices** 567:23 | 622:25 623:24 |
| 629:16 630:3,8 | 715:16 | **official** 757:18 | 624:22 625:23 |
| 632:12 633:18 | **obligations** | **oh** 645:22,22 | 626:11 627:3 |
| 635:15 638:3 | 734:24 739:11 | 692:14 698:11 | 627:15 628:8 |
| 638:15 639:23 | 739:15 742:24 | 698:13,25 | 630:15 631:23 |
| 641:15 642:11 | 743:11 | 711:18 732:23 | 632:5,9 633:13 |
| 642:18,22 | **obstacles** 624:4 | 735:4 758:19 | 634:10,22 |
| 643:9 644:17 | 624:7,10 | **okay** 577:1,2,9 | 636:2,9,10,21 |
| 647:17 649:17 | **obtaining** | 577:20,24 | 637:6 638:12 |
| 649:23 650:15 | 624:4,5 | 578:22 579:14 | 639:11,19 |
| 651:18 652:5 | **obvious** 598:16 | 579:18 580:10 | 640:6 641:5 |
| 652:16 653:12 | 602:12,18 | 580:18,25 | 642:7 643:11 |
| 653:20 654:4,9 | **obviously** | 581:9,15,25 | 644:5,22 |
| 654:12 657:6 | 598:6 646:6 | 582:5,13 | 645:19 647:13 |
| 658:7 661:18 | **occur** 676:3 | 583:11 584:4 | 648:5,22 649:3 |
| 662:23 669:17 | **occurred** 598:1 | 585:11 586:1 | 649:9,14 |
| 674:24 676:5 | 599:14 | 587:10,24 | 650:12,19 |
| 678:23 679:14 | **ocopy** 603:2 | 588:5,11,22 | 652:9 653:16 |
| 684:4 688:7,12 | **october** 591:19 | 591:24 594:17 | 655:17 656:12 |
| 689:1 692:4,11 | 591:22 606:5 | 595:13 597:11 | 656:17 658:3 |
| 699:16 701:5 | 721:1 | 598:8 601:17 | 658:10,16,19 |
| 710:2 713:22 | **offer** 615:3 | 601:24 602:5 | 659:9,21,24 |
| 716:19 721:16 | 616:17,19 | 603:16,24 | 660:20 661:6 |
| 722:9 723:10 | 639:21 640:4 | 604:7,11 605:3 | 661:22 662:10 |
| 724:8 727:7 | 656:9,16 | 605:11,16,19 | 665:19 668:8 |
| 733:16 734:17 | **offered** 598:3,4 | 606:20 607:7 | 668:17 669:5 |
| 743:5 745:6 | 642:8,15 643:7 | 607:16,20 | 669:19 670:13 |
| 746:16,23 | **offering** 641:13 | 608:16,21,24 | 671:2 672:18 |
| 749:5 757:12 | 641:17 | 609:3,6,12,24 | 673:3,4 674:8 |

674:12,16,20
675:10 677:8
678:3,8 679:1
679:8,25 680:3
680:10,20
681:23 682:5
682:14 683:10
683:20 684:1,8
684:13 685:1
685:14,19
686:6 687:2,5
688:5,22
689:14 690:6
690:22 691:7
691:16,19
693:1,6 694:5
694:5,7,8,12,18
694:24 695:3
695:15 696:10
697:1,10,15,21
698:4,11,16,18
699:7,18 700:3
700:7,17 701:2
701:23 702:15
703:5,6,21
704:1,11,16,18
705:8,16 706:6
706:15,20
707:3,21,25
709:12,24
710:8,21 711:1
711:2,4,6,7,16
712:4,17 713:7
713:15,19
714:1,6,15,21

715:3,10,15
716:8,16
717:18 718:1
718:15 719:1
719:15 721:12
721:19 722:2
722:13 723:2,7
723:13,19,22
724:10 727:24
728:3,14,18
729:5 730:2
731:8,14 733:2
733:14 735:17
735:22 736:1,5
736:10,22
737:16,19,23
738:1,19
739:22 740:2
740:11,19
741:13,17
742:11,21
743:1,7 744:3
744:19 745:12
745:17 747:7
747:21 749:7
749:11 750:22
750:23,24
751:6 754:17
756:18 757:2
758:2,8,13,19
758:23,25
759:15 761:2
761:14
**old** 705:13,13

**olender** 569:2
575:21
**once** 582:1
602:25 610:19
666:1,4 687:17
721:9 751:20
759:25
**ongoing** 653:6
725:18 734:22
743:19
**opening** 636:15
**operating**
582:16 583:5
594:11 691:1,2
691:5,6 705:3
708:22 748:11
**operation**
651:22 695:1
**operations**
615:4 651:17
651:19 653:6
743:19 755:21
**operator** 695:5
**opinion** 724:9
760:19
**opportunities**
617:11,17
**opportunity**
637:10 663:6
**opposed** 588:6
590:10 610:16
668:2 719:18
760:8
**option** 600:18
642:4

**options** 636:14
636:15 653:2
**oral** 567:7
**order** 567:19
700:19 712:21
724:1 756:22
**organized**
663:13
**original** 590:11
697:5 752:24
**originally**
588:25 635:6
664:4,5 729:20
**orix** 583:13,23
584:16,23
585:6 590:6,16
590:18 591:3
591:13,15,21
594:10 596:8
596:19 597:4
606:4 607:4
617:23 618:6
686:13,13
688:3 691:9,12
691:17,25
694:17 696:25
700:15,23
709:7
**outside** 690:4
696:3 705:6
706:13 708:11
728:21 729:14
**outstanding**
590:2 641:9
655:21

| | | | |
|---|---|---|---|
| **overall** 632:13 759:21 | **p** | 573:1,5,10,13 573:17,21 | 616:20 711:16 711:25 713:4 |
| **owed** 700:22 712:14 715:14 719:10 | **p** 567:20 568:1 568:1 569:1 | 574:1,5,9 578:1 607:23 611:12 612:2 | 715:17,23 718:16,23 725:1,9,13,14 |
| **owing** 715:13 | **p.c.** 567:23 568:2,8,14 | 612:21 613:3 625:12 627:4,9 | 725:25 726:2 729:23,24,25 |
| **own** 590:14 594:8 691:20 700:11 704:20 705:7 714:20 736:17 742:7 743:25 | **p.j.** 584:3,8 585:1 639:9 686:25 687:1,2 687:11,13,16 688:4,9,14,18 688:21 689:3,6 689:8,10 694:11,13 720:9,12,16 721:5 753:4,12 753:15 755:21 760:12 | 627:10 628:9 631:10 634:7 636:3 643:22 648:8 650:19 650:20 652:10 658:12 659:11 665:2 668:19 669:2,5,13,20 670:14 671:3 673:23 676:19 677:9 678:9 | 732:3 733:10 748:5,7 757:20 757:23 758:1 |
| **owned** 585:3,3 589:24 632:2 685:15 686:11 699:2,3,5 700:14 708:14 714:7 752:21 | | | **paper** 615:21 **paragraph** 636:4,8 671:6 718:18 737:9 740:20 741:18 **paraphrasing** 737:2 **park** 568:19 **parkway** 568:2 |
| **owner** 585:19 685:11 | **p.m.** 579:15 660:7 673:7,10 673:14 683:12 693:7,8,10 740:3,5,9 761:8,19,20 | 680:11 683:11 693:14 696:12 698:5 702:17 705:18 706:8 710:12 711:25 712:8 714:23 718:4 722:17 723:2 740:14 742:23 743:13 749:18,22 750:1,6,8,9,11 764:5 | **part** 605:16 617:23 619:6 622:18 632:8 632:13 638:18 638:19 639:1 642:12 644:4 692:2 699:19 707:6 709:5 713:2,2,15 715:4 717:18 717:24,25 719:8 725:4 738:17 750:18 751:3,6,9,12 753:20 |
| **owners** 594:1 624:12,13 | | | |
| **ownership** 586:6 592:12 592:15 633:9 644:19,20 691:22 729:1 741:24 744:6 744:12,13 | **package** 612:11 613:6,22 **packet** 570:19 611:17,21 612:2,20 613:3 613:13 614:25 626:6 | | |
| **owning** 593:7 751:19 | **page** 570:2,10 570:11,15,19 571:1,8,12,17 571:21 572:1,3 572:7,11,18 | **pages** 625:19 695:17 749:22 **paid** 593:23,24 595:1,2,21 609:25 610:3,5 | |
| **owns** 690:20 694:14 729:13 | | | |

**participants**
575:6 734:8
**participate**
595:5 640:3
729:16
**participated**
615:10,20
616:7
**participating**
637:15
**participation**
688:11
**particular**
599:5 621:17
622:13,15
627:13 639:24
644:19 686:1
724:7 726:6
734:5 739:2
**particularly**
748:24
**parties** 568:1
575:9 633:10
721:8 733:19
763:15
**partner** 694:23
696:8 706:21
**partners**
592:11 624:1
635:23
**parts** 638:22
639:7
**party** 632:7,10
632:18,21,24
632:25 633:3

633:12,14,16
633:22 635:7
702:9 708:23
720:18 723:8
723:14 727:11
727:13,15
728:2 730:12
750:5,17
**past** 666:25
710:25,25
**pause** 758:15
**pay** 593:21
594:12,14
595:22 610:8
616:22 637:5
653:3 712:24
730:10 732:8
732:12,16
743:16 744:17
747:13 748:4
749:2 752:4,16
752:17 757:25
**payable** 671:7
**paying** 585:21
597:2 724:1
732:12,18,19
733:5,7,7
739:8,18,18,20
741:23 744:5
747:12 748:18
**payment**
609:13,20,22
610:3,5 670:11
674:17 712:9
716:4 725:20

725:21 744:11
**payments**
585:4 671:7,14
671:18,20
672:1,4,5,8,10
672:12,17
707:10 711:13
725:16 736:6,6
**pdf** 750:7
**pearlson** 568:4
570:4 576:13
576:14 577:24
578:7 583:2,12
586:16 587:15
607:21 608:13
612:8,22 613:4
613:14 614:8
619:4 621:22
622:6 624:22
625:4,8,13,24
627:5 628:8,14
629:8 630:15
630:19 631:4
634:6,9 643:11
643:24 645:2
645:20 647:5
656:24 659:9
659:25 664:25
666:11 668:18
669:7,10
670:20 672:18
672:22 673:2
673:15 676:25
684:23 686:19
692:7,18,25

693:11,20
695:15 696:10
698:4 702:15
705:16 706:7
714:22 718:2
730:19 737:6
737:16,24
738:9,25
739:22 740:10
747:22 750:1,9
750:11,20
756:4 758:2,5
758:11,16,17
758:21,24
759:1,4 760:10
761:12,13
**pending** 755:17
756:14,16
**people** 576:21
580:14 589:15
616:6 633:6
635:24 640:9
641:24 642:1
646:1 664:19
682:24 728:20
734:22
**percent** 590:22
606:17 629:5
641:9 671:12
685:15,17
686:12 688:1
691:18,20,23
691:23,24
692:1 753:16

**percentage**
687:15 690:11
691:17
**perform** 733:24
742:24 743:10
**performed**
618:10
**perio** 567:7
568:17 569:5
571:18 572:5,8
572:12 573:14
577:16 579:25
580:3,14 581:3
583:14 584:17
586:2,6 587:13
592:2,5,10
602:3,4,5,7,22
603:1,10
604:14,25
605:16 609:10
610:8 611:9,14
614:20 617:15
621:14 636:4
637:25 638:8
641:1 642:9
643:6 646:7,10
649:25 650:6
656:3,5 660:3
660:6,8,13,24
661:9,15,23
662:10,21
663:23 665:4,9
669:10 673:25
674:10,13,21
675:5,12,17

676:21 677:2
678:11 679:9
683:14 707:5
707:17 710:13
711:8 712:4,14
713:17 714:9
723:4 731:13
731:23 734:11
752:20
**perio's** 588:23
592:3 595:16
596:11 597:8
597:24 600:16
601:5,13
608:25 612:18
614:4 620:20
626:25 642:16
646:14,25
647:8,16
648:16,20
659:4 665:13
674:4 685:10
721:14
**period** 621:18
651:23 671:17
686:18 733:13
734:5
**permanently**
743:19
**permission**
756:24
**person** 640:8
**personal**
656:19 657:4
657:12 658:2,6

661:24 685:10
**personally**
629:13
**perspective**
689:7
**pete** 731:12
734:11
**peter** 723:3
**phase** 590:6,15
590:18 591:3,9
591:12,12,13
591:16,18,20
596:19 597:5
692:3 696:24
697:2
**phone** 669:8,11
**pick** 648:2
**pieces** 713:12
719:9
**pivoted** 726:14
**place** 575:9
591:25 647:11
672:19 697:13
697:14 698:22
709:6 749:12
751:25 763:12
**plaintiff** 567:5
567:14 568:6
**plan** 591:17
594:24 599:15
652:11,22
759:22,24
**planning**
737:14

**plans** 756:9,19
**platform**
639:13 701:18
724:2,15 725:2
725:10 726:1
734:14 735:24
736:12 739:5
747:9,16 749:4
749:9 750:15
750:19 751:1
753:2 754:19
755:6
**play** 689:8
**player** 639:9
**plaza** 568:15
**please** 575:3
576:4 585:25
613:17 614:15
630:5 642:13
644:1 647:5
655:7 661:6
665:1 669:8
693:21 711:1
738:6,8,9,15,19
738:20 753:8
**pledged** 700:14
**plus** 752:9,15
**point** 581:24
584:9,11 589:8
604:10,18
607:16 623:18
624:12 630:17
637:17,21
642:1 645:9
647:6 651:11

651:19 672:8
705:2 712:18
713:11 718:10
718:11 724:24
731:6 732:12
733:4,18
734:20 735:22
737:21 744:10
744:25 757:6
757:16
**pointed** 618:17
**points** 609:7
617:2
**pool** 687:19
695:4
**portfolio**
727:23 728:1
728:22
**portion** 691:12
692:2
**position** 581:25
582:1,6,6
587:18 589:8
590:3,5,19
591:4,6 597:4
707:24 708:1
709:11
**possession**
741:21 742:2
**possibilities**
751:22
**possible** 636:12
638:25 647:2
666:2,5 675:25
752:12 756:23

**possibly** 601:23
652:19
**post** 755:24
**poten** 600:15
**potential**
590:12 597:23
599:6,8 600:13
602:8 611:13
620:12 624:10
629:12 635:21
636:11 637:9
645:11,11
646:10 748:6
755:9
**potentially**
591:5 593:2,11
635:7,20,23
642:25 656:13
695:10 697:8
708:15 709:9
720:6,7 725:18
**power** 598:2,17
692:16
**powerpoint**
626:6 629:19
**practical** 633:5
701:21
**preceding**
579:19
**precise** 747:2
**preliminary**
635:17
**premium** 597:1
**preparation**
603:2

**prepare** 628:21
660:5,22
**prepared** 626:9
628:22 763:23
**present** 568:13
578:16 579:6
582:21 607:15
614:9 618:2,24
646:19 662:11
662:12 730:18
**presentation**
572:18 573:10
579:11 630:10
693:15 705:18
**presented**
612:12,16
613:23 614:2
614:13,22
616:1 620:3
624:15 626:20
628:2 629:11
629:18 662:13
680:21 681:13
681:19 683:22
708:20 746:15
**presenting**
629:15
**presided**
643:23 649:6
**pretty** 594:16
596:23 598:24
606:1,12,19
615:20 640:2
708:24 720:19
731:4,7 748:13

**previous** 616:9
616:25,25
618:5 626:9
661:1 666:25
670:6 686:10
741:22 744:4
**previously**
576:6,11
702:14 707:9
710:22 727:5
**price** 597:2
606:3,3,21
607:3,6,12
640:2,3 642:2
653:19 654:2
654:15 669:15
719:2,5,15,16
744:21 747:8
751:16
**prices** 719:14
**primarily**
616:21
**principal**
711:19 712:10
**print** 738:22
**prior** 581:24
587:2,11
595:13,19,25
597:13 598:9
599:19 600:12
601:3,7 602:25
606:23 610:20
611:19 615:1
616:10,10
646:12,15,15

**[prior - pursuing]**                                                        Page 39

646:16,16,17
665:23 678:22
679:6 681:12
681:16,18
682:18 684:12
743:6 744:23
763:5
**pro** 592:12,14
618:14,25
714:13,16
**probably**
581:23 656:4,6
663:13,24
737:18 751:10
753:16
**procedures**
567:22 681:21
**proceed** 576:8
**proceeding**
576:16 758:15
**process** 581:14
663:15 695:5
695:13 757:15
**produced**
578:5
**programmers**
747:3,4
**progress**
720:13
**prohibitively**
708:16
**projections**
607:8,11
618:16,25
628:2

**projects** 735:11
**promis** 712:20
**promissory**
572:1 593:5
595:9 609:14
670:12,15,18
670:23 674:18
707:17 710:5
711:9,14
712:22 717:16
**proof** 638:1,14
638:23 639:2,6
**proper** 710:7
**properly** 603:5
**property** 760:5
760:23,25
**proposal**
608:10 650:21
682:16 683:3
**propose** 605:24
**proposed**
577:15,21
583:15 611:2
677:21,25
678:5,16
**proposing**
680:16
**proprietary**
703:12,13,21
750:16
**prospects**
617:14 623:2
623:13,18
**protection**
739:12

**protective**
567:19 756:22
**proven** 639:4
**provide** 633:14
633:15 689:25
690:2 734:13
**provided**
610:25 611:4
615:2 616:16
714:9
**provides** 671:6
**providing**
743:3
**provision** 739:2
**proxy** 601:8,10
603:9 677:10
677:11
**public** 589:13
589:16 590:10
638:21 708:11
708:14 762:17
764:25
**pull** 577:24
737:6,7
**purch** 713:12
**purchase**
571:21 572:3
573:21 590:21
590:23,25
595:15 606:21
607:18 608:17
608:25 612:17
614:3 629:12
659:3 665:12
666:10 668:20

669:1 673:17
673:18,24
674:4,9 675:2
675:6 676:12
687:14,14
715:12 717:19
718:5 719:7
722:1 736:11
744:21 749:8
**purchased**
606:24 616:22
621:25 622:22
721:13
**purchasing**
735:23
**purpose** 628:24
651:7 654:13
689:20 695:8
702:7 704:18
714:4 745:3,11
755:2
**purposes**
617:22 652:7
665:24 690:23
691:4 730:15
731:21 736:17
737:15 742:7,7
743:25 744:25
**pursuant**
567:22 671:15
671:18 690:1,6
707:10 742:9
**pursue** 742:8
**pursuing**
735:12

| | | | |
|---|---|---|---|
| **put**  585:2 597:9 | 643:4 647:6 | **racing**  728:12 | **really**  581:19 |
| 614:6,12 | 649:7 654:14 | 728:20 729:12 | 581:19 593:6 |
| 626:14,23 | 656:22 661:7,8 | 729:13 | 607:13 615:14 |
| 669:7 700:25 | 664:1 667:24 | **rai**  651:8 | 615:22 616:8 |
| 720:3 731:5 | 667:25 668:3 | **raise**  588:19 | 616:11 617:24 |
| 732:25 733:1 | 670:22 688:15 | 634:14,24 | 618:2 628:18 |
| 737:3 742:13 | 688:22 692:10 | 635:14 651:9 | 637:1 639:14 |
| 744:8 745:1 | 699:13 700:8,9 | 651:15,24,24 | 663:9 687:8 |
| 746:7,19,20 | 703:8,9 717:11 | 652:3,12,15 | 699:17 700:15 |
| 748:19 | 725:7,8,23 | 653:2,6 690:3 | 701:20 702:2,2 |
| **puts**  748:14 | 733:2,3 747:24 | 706:13 720:1 | 717:11 724:16 |
| **putting**  583:23 | 747:25 748:1 | 721:2 | 732:1,4 735:16 |
| 591:16 612:15 | **question's** | **raised**  707:1 | 738:11 746:24 |
| 614:1 626:6 | 599:2 | **raising**  653:14 | 747:10 751:17 |
| 635:20 748:20 | **questions** | 695:9 | 752:4 755:12 |

|   q   | |
|---|---|
| | 585:24 617:4,8 | **ranked**  735:18 | 755:25 756:7,7 |
| **qatar**  635:19 | 617:9,13 | **rata**  592:12,14 | **reapply**  726:24 |
| 635:19 | 622:16 625:15 | 714:13,16 | 727:5 |
| **quality**  575:4,5 | 636:7 666:25 | **rate**  671:11 | **reasking** |
| **quantitative** | 686:10 759:9 | **rawlins**  723:3 | 613:11 |
| 703:13,24 | 759:11,14,16 | 731:13,23 | **reason**  577:2,9 |
| **quarter**  671:8 | 760:3 | 734:11 | 577:11 590:4 |
| **quarterly** | **quick**  625:16 | **read**  613:12,15 | 596:16 661:20 |
| 671:7 | **quickly**  666:2 | 613:18 627:18 | 663:11 664:2 |
| **question** | 675:25 677:5 | 630:6 636:6 | 664:10 708:5 |
| 585:18 586:23 | **quit**  734:20,21 | 656:25,25 | 709:5 753:22 |
| 586:24,25 | 735:3,7,16,19 | 704:9 742:14 | 764:5 |
| 598:8 599:3,4 | **quite**  664:22 | 762:3 | **reasonable** |
| 599:16,18 | 735:8 | **reading**  645:4 | 633:22,24 |
| 612:14 613:11 | **quoted**  655:23 | **ready**  758:18 | 635:11 653:19 |
| 613:18,20,25 | |   r   | | **real**  734:22 | 654:2,8,10 |
| 616:9 618:22 | | **realized**  592:6 | 655:18 682:13 |
| 622:17 626:11 | **r**  567:20,20 | 735:13 751:20 | 720:20,21 |
| 630:4,6 638:7 | 568:1 569:1 | 751:23 759:25 | 752:5,23 |
| 640:23 642:13 | 576:9 681:5 | | |
| | 763:1 | | |

**[reasons - recommending]**                                                    Page 41

| | | | |
|---|---|---|---|
| **reasons**  596:17 | 621:23 622:21 | 675:20 678:7 | **received** |
| 596:18,22 | 622:24 624:14 | 678:16,19,20 | 609:13,19 |
| 661:21 663:13 | 624:20 626:3,5 | 678:24 680:8 | 665:11,15 |
| 663:20,24 | 626:13,19,21 | 680:15,18,23 | 672:12 707:5 |
| 664:8,15,23,24 | 627:2 629:1,24 | 680:24 681:3 | 707:10 711:12 |
| 708:4,17,18 | 629:25 630:11 | 681:21 683:9 | **receiving** |
| 717:2 734:19 | 630:14 631:15 | 683:20,25 | 585:20 674:17 |
| **rebuild**  746:22 | 634:16,22 | 684:15,17,18 | 712:4 |
| 747:5 | 638:4,8 639:19 | 684:25 686:1 | **recess**  630:23 |
| **rebuilt**  746:2 | 642:23 643:1 | 689:14 690:10 | 673:9 693:8 |
| **recall**  577:18 | 645:5,13,18,22 | 690:12,14,17 | 740:5 |
| 577:20 579:17 | 646:17,22 | 694:16 696:17 | **recognize** |
| 579:18 580:9 | 647:12,18,19 | 696:20,23 | 625:10 703:1 |
| 581:5,20 583:9 | 647:20,21 | 697:19,21 | 706:3 710:18 |
| 584:10 587:7 | 648:3,14,17,18 | 700:13,17 | **recollection** |
| 587:10 595:17 | 648:21 649:9 | 705:14,24 | 578:19,22 |
| 597:10,25 | 649:10,19 | 707:7,21 | 583:3 607:7 |
| 598:5,9 600:17 | 650:12,23 | 709:12 710:18 | 610:14 614:6 |
| 601:18,19,19 | 652:14 653:16 | 714:3 715:4,19 | 614:20 627:1 |
| 601:20,22,24 | 653:24 654:6 | 718:9,11,15 | 641:6 654:20 |
| 602:1 603:22 | 655:17,25 | 723:11,13,17 | 654:21 655:4,8 |
| 603:24 604:9 | 656:8,12,17 | 724:10 725:1,4 | 655:9,11 |
| 605:7,15,21 | 657:10,14 | 725:8 733:21 | 657:10 680:20 |
| 606:15 607:5,6 | 658:1,8,25 | 734:25 735:3,5 | 683:16 739:21 |
| 608:23,24 | 660:13,17 | 735:7,20 736:6 | 750:25 |
| 609:3,23,24 | 661:12,14,19 | 736:9 741:25 | **recommend** |
| 610:2,18,24,25 | 662:1,3,13,24 | 746:25 753:16 | 587:3 649:15 |
| 611:10,24 | 664:11,17,21 | 753:17 754:8 | 649:21 |
| 614:9,11,21 | 664:22 665:11 | 754:10,14 | **recommendat...** |
| 615:22,24 | 665:16 666:17 | 755:3 | 744:16 |
| 616:4,14,15,17 | 668:9,14,16 | **recalls**  645:3 | **recommended** |
| 617:1,4,9,16 | 671:20 672:5 | **receive**  609:22 | 650:13,17 |
| 619:2 620:2,8 | 672:16,17 | 671:14,18 | **recommending** |
| 620:10,14,16 | 673:19 674:3 | 706:24 707:2 | 677:13 |
| 620:22 621:19 | 675:11,14,16 | | |

**recommends**
677:14
**record**   575:2
575:10 576:7
625:4 630:22
631:1 635:2
644:12,16,18
644:23 645:6
645:17 655:7
660:10,15,25
661:2,3,11,15
662:20 663:1,6
663:16,17,19
663:20 664:3,5
664:8,10,15,24
669:25 673:8
673:12 680:5
693:3,7,10
718:21 740:1,4
740:7 758:6
759:2 761:11
761:19 762:6
**recorded**   575:8
575:12 615:14
649:25 650:3,6
650:7 652:19
680:7,9 746:5
747:19 751:10
**recording**
575:4,8 640:20
**recordings**
637:3
**reduced**   691:22
**reelected**
649:16,22

683:17 684:20
**reelection**
649:12 650:13
**reevaluate**
756:17
**refer**   596:7
621:12 622:4
625:19 653:14
711:17
**reference**   647:2
**referenced**
570:20 612:3
648:7 666:12
**references**
586:4 740:20
**referred**   590:15
595:6 634:21
686:10 691:7
696:23 702:14
733:22,23
748:9
**referring**
582:19 583:16
584:17 590:16
596:3,10
613:13 622:9
640:19 650:5
655:1 657:8
696:1 698:19
710:22,23
737:10 738:17
741:2 743:8,9
745:13,14
**refers**   590:12
595:23 604:19

695:20 698:6
704:12 715:15
**reflect**   697:12
**reflected**
609:19 627:8
627:16,20
697:12 731:10
732:8,19
754:11
**reflecting**
609:7
**reflects**   578:15
**refresh**   610:14
658:23
**refreshed**
760:21
**regarding**
617:13
**regardless**
739:1
**registered**
695:6,11,13
726:25 727:6
**regular**   570:12
570:16 574:5
578:2 607:24
740:15
**related**   595:2
632:6,10,18,20
632:23,25
633:3,10,11,14
633:16,22
702:8 705:25
723:8,14 750:5
750:16

**relating**   693:23
**relation**   589:19
678:4
**relationship**
589:19,20
632:3 731:6
**relationships**
596:25 710:5
**relative**   763:14
763:16
**relatively**
592:12
**relevant**   616:9
**relied**   618:5
**relieving**
589:11
**remaining**
595:10 692:2
**remember**
582:23 616:11
626:13,16
634:19 689:19
698:16
**remind**   577:4
657:20
**remote**   568:1
575:25
**remotely**
567:21 575:20
576:3
**removal**   599:6
599:20 600:14
602:8
**remove**   598:11
600:19 602:20

603:15
**removed**
601:12
**removing**
603:10,18,25
**reorganization**
573:3 696:14
**rep** 620:4
**repay** 594:7
**repeat** 577:6
642:13 717:4
725:6
**rephrase**
586:25
**replace** 652:20
**replaced** 684:2
**replacement**
746:7
**replacing**
652:22
**report** 604:15
605:1 633:1
**reported** 720:4
**reporter**
567:21 575:22
576:3 613:11
613:15,16,19
630:7 650:2
656:23 690:16
754:22 763:4
**reporting**
576:2 764:1
**represent**
608:16,18

**representation**
667:14,22
**representative**
598:13 599:21
621:10,13
**representatives**
584:6 598:10
621:6 708:7
**represented**
570:19 612:3
612:10 613:5
613:22 620:5
634:12 667:7,7
667:20
**request** 586:2
**requested**
660:6,9
**requesting**
661:10
**required** 743:4
**requirements**
624:10 647:25
**rescheduling**
664:8
**research** 760:4
760:17
**residing** 576:9
**resigned** 581:4
581:6,7 582:2
**resigning**
581:10
**resolved**
756:20
**respect** 623:1
623:13 624:20

626:12 629:25
639:6 680:15
699:8 715:24
716:9 739:4
**responsibilities**
589:12
**responsibility**
679:22 680:2,5
**responsible**
631:19 695:1
**rest** 747:24
**restructuring**
573:2 696:14
696:18,20
697:12,14,23
699:19 702:24
**result** 649:20
691:19 709:24
709:25 719:14
734:2
**resume** 630:17
**retained** 761:6
761:18
**return** 585:3
675:2 687:16
689:12
**returned** 675:6
**reused** 760:21
**revenue** 720:21
748:16,18
**revenues**
634:13 635:4
748:14,22
**reverse** 590:10

**review** 589:5
611:18 617:25
**reviewed**
660:17
**reviewing**
630:1
**ridiculous**
592:25 607:19
**right** 576:17
586:16 602:15
602:16 613:4
620:9,16 622:7
629:24 634:2
658:20 659:7
659:18 667:16
683:11 692:20
698:11 699:13
704:24 707:19
710:4,4 712:13
736:16 737:3
740:20 744:15
754:19 755:16
**rights** 639:22
640:4,7,9,12,14
640:16,19,25
641:2,6,10,13
641:18 642:8
642:16,23
643:3,7 703:22
739:4 753:9
**risk** 589:25
617:12,18
**road** 589:14,15
**role** 582:17
585:8,14,23

612:15 614:1
688:23 689:8
694:18,19,20
731:14 757:18
**room** 576:17,20
615:21 618:15
758:24
**roseland** 568:3
**ross** 568:4
578:13 582:25
588:14 609:17
612:20 621:21
625:12 629:7
638:5 645:1
654:18 655:6
656:21 658:15
666:10 667:13
672:25 674:25
679:5 681:17
684:22 692:4
692:14,23
730:18 737:11
759:15
**roughly** 593:5
720:25 726:3
745:2 748:9
751:14
**round** 751:16
**rpearlson**
568:4
**ruchalski** 567:8
568:22 569:3
579:25 580:6
580:22 586:12
586:19 587:2,8

601:25 602:2
646:12,19
662:11 683:15
745:8
**rules** 567:22
590:21
**run** 594:24
**ryan** 735:2

**s**

**s** 567:20 568:1
568:10,16
569:1,1 681:5
681:5 699:3
750:16 764:5
**sack** 568:10
570:5 576:18
578:12,25
582:3,8,18,25
583:7,18,22
584:14,25
585:15 586:13
587:5,14
588:13 593:14
596:15 597:16
598:14 599:9
599:22 601:1,6
601:15 602:10
603:12,20
604:5,8 605:25
606:25 609:16
609:21 610:17
612:19 613:2,9
616:3 617:19
618:11 619:25
620:7,21

621:20 622:3
622:12 623:3
623:15 624:6
624:18,24
625:11 628:12
629:6,16 630:3
630:8,18
632:12 633:18
635:15 638:3
638:15 639:23
641:15 642:11
642:18,22
643:9 644:17
644:25 647:1
647:17 649:17
649:23 650:15
651:18 652:5
652:16,24
653:12,20
654:4,9,12,17
655:6 656:21
657:6 658:7,14
661:18 662:23
666:9 667:13
669:17 672:21
672:23 673:3
674:24 676:5
678:23 679:5
679:14,24
681:16 684:4
684:22 686:17
688:7,12 689:1
692:4,9,14,19
693:1 695:17
699:16 701:5

710:2 711:3
713:22 716:19
718:20 721:16
722:9 723:10
724:8 727:7
730:17 732:25
733:16 734:17
737:11,19
738:2,5,11
743:5 745:6
746:16,23
749:5 756:2
757:12 758:4,8
759:8,15,17
761:1,10,15
**sale** 596:10,14
597:24 599:8
599:10 600:15
601:4,13
626:24 636:11
636:12 637:11
638:1,13
642:17 645:12
646:13,15,17
646:24,24
647:3 648:15
648:19 656:19
657:3,12 658:1
662:22 664:18
670:19,24
674:6 679:3
685:10 704:16
707:6 750:25
752:25 753:20

**[salerno - securitize]** Page 45

| | | | |
|---|---|---|---|
| **salerno** 567:16 | 582:14,21 | 672:11,13 | **secret** 637:3 |
| 568:6 575:16 | 583:14 584:12 | 711:11 719:2 | 640:20 |
| 597:22 598:11 | 584:22 585:11 | 723:23 733:1 | **secretary** |
| 598:18 599:6 | 586:1 604:12 | **scheduled** | 615:13 |
| 599:20 600:14 | 604:22 605:7,8 | 664:4,6 | **section** 596:8 |
| 600:20,24 | 608:9,17 610:3 | **schotz** 568:14 | 703:10 704:8 |
| 601:12 602:8 | 611:12,16 | **screen** 575:7 | 738:18 742:20 |
| 602:13,17,20 | 615:9,11 | **scroll** 578:8 | 742:20,23 |
| 603:10,15,19 | 616:16 617:10 | 581:1 583:12 | 751:5 |
| 604:1 619:9,19 | 617:10 634:11 | 608:13 612:25 | **sections** 738:17 |
| 620:12,17,25 | 636:4,21,23 | 614:14 622:5 | **securities** 567:9 |
| 621:11,16 | 637:25 644:6 | 624:22 625:14 | 568:12 574:2 |
| 634:11,17,23 | 645:1,6 649:8 | 643:24 660:1 | 701:15,20 |
| 636:21 656:9 | 649:24,24 | 662:7 670:20 | 722:19,23 |
| 678:6 679:3 | 650:19 652:11 | 676:25 693:20 | 723:5 724:1,6 |
| 683:17 684:2 | 658:10,14 | 694:3 710:24 | 725:11 726:7,9 |
| 684:20 741:6,7 | 660:2 677:13 | 715:3 737:9 | 726:20 727:2 |
| 751:21 764:2 | 680:13 681:4,8 | 738:6 740:19 | 730:10 732:7 |
| **save** 667:18 | 682:14 683:2 | 742:19 750:20 | 732:16,19 |
| **saw** 601:10 | 683:10,11,12 | **scrolled** 677:5 | 733:5,6,25 |
| 662:16 670:9 | 694:22 695:3 | **scrolling** | 734:3,23 |
| 673:18 678:2,5 | 695:12 697:15 | 582:24 738:14 | 735:23 736:13 |
| 694:18 721:13 | 698:6,9 699:10 | **seat** 597:22 | 736:16,24 |
| 745:21 | 699:19 701:6 | 598:21 600:14 | 739:4,7,12,16 |
| **saying** 600:22 | 703:12 711:15 | 600:24 602:16 | 741:20 742:2,5 |
| 638:8 640:15 | 716:4,7 723:21 | **sec** 695:5,13 | 743:24 744:11 |
| 640:21 667:20 | 737:1 739:3 | 750:12 | 744:17 746:19 |
| 671:25 721:17 | 740:21 741:19 | **second** 613:17 | 747:13 748:4 |
| 724:15 730:2 | 744:3,3 745:7 | 627:4 650:20 | 749:8 750:16 |
| 730:17 743:1 | 745:17,24 | 662:12 680:11 | 751:1,17 752:3 |
| 746:1 748:25 | 746:13 750:14 | 682:14 685:22 | 752:7,16,22 |
| 761:11 | **scenario** | 706:8 735:18 | 753:25 754:18 |
| **says** 578:13 | 641:18 | 735:18 737:4 | 755:15 |
| 579:2,24,24 | **schedule** | **seconded** | **securitize** |
| 581:2,3 582:9 | 669:14 672:3 | 604:23 644:10 | 638:21 639:15 |

**[securitize - shares]** Page 46

639:16
**see** 578:10
580:1 586:7
605:1 608:6,7
608:14 609:15
610:21 615:6
615:18 619:10
619:20 622:10
622:20 625:15
625:21 627:10
644:4,13
645:17 648:24
649:1 658:11
658:16,18
660:10,16
671:9 674:16
677:1,7,11,12
677:15 679:10
679:13 684:3,6
693:23 695:17
695:21 699:21
703:2 704:14
711:3,18
718:17,19,22
723:5 732:22
738:4,13,23
740:24 745:20
750:14,17,18
750:21,23
756:25 759:10
**seeing** 603:8
616:13 705:24
746:25
**seem** 752:21

**seemed** 731:19
731:20
**seems** 665:17
679:12
**seen** 575:6
626:1 677:25
682:17
**sees** 739:17
**sell** 577:16
588:10,22
636:16,18
637:10 638:21
639:1,18
640:10 641:22
641:23,25
642:2 658:5
661:24 662:5
698:7,20
699:11 713:13
760:8
**selling** 588:1,1
588:1,3,6,6
589:3 592:16
593:13 608:22
636:24 637:8
637:18,22
642:9 645:24
647:8,15
653:14 657:4
657:19 669:15
674:14 720:18
**sells** 640:8
**sending** 677:2
**sensitivity**
628:10

**sent** 616:5
666:14
**sentence**
635:12
**separate**
586:21 704:1
726:16
**separately**
622:16
**september**
622:21,25
623:7
**series** 713:16
**sersea** 615:12
681:5,23
**serve** 651:7
684:14
**serves** 694:23
**service** 734:13
734:14
**services** 689:24
730:23
**servicing** 743:3
**serving** 757:21
**set** 606:2
644:11,12
645:7 660:21
661:3 666:2
685:25 763:12
**seven** 732:22
**shahinian**
568:2
**share** 592:14
592:23 593:1,2
593:3,6,11,24

594:1,2,3
606:3 622:1,23
633:9 653:18
654:2,3,15
655:1,13,20
656:10 713:1
719:3,6,16
721:15,20,24
722:1
**shareholder**
596:24 598:3
663:8 678:4
679:17 681:1
681:16,18
683:23 720:2
740:22
**shareholders**
567:14 634:4
637:16 639:22
640:3,12,21
642:4,8,15,20
643:7 680:16
680:21 683:4
684:19 713:6
728:21 729:14
751:24 764:2
**shares** 577:16
587:4,13,17
588:1,2,3,6,7,7
588:9,16,18,23
588:23 589:1,3
591:4,15 592:1
592:3,17
593:12,16
595:16,16

**[shares - small]**

| | | | |
|---|---|---|---|
| 596:10,11,14 | 658:2,6 659:3 | 669:14 692:24 | **similar**  588:16 |
| 597:24,24 | 659:4 661:24 | 693:12 705:22 | 630:13 674:9 |
| 598:18 599:8 | 661:25 662:5 | 718:2 740:11 | 706:3 |
| 599:10 600:16 | 662:22 663:2,7 | 749:21,22 | **simon**  683:15 |
| 600:16 601:4,5 | 663:18,22 | **showed**  646:19 | 684:3,6,8 |
| 601:13,13 | 664:18 665:13 | 670:7 | **simplest**  585:2 |
| 606:7,8,12,24 | 665:13 667:2 | **showing**  612:9 | **simplify**  709:3 |
| 607:18 608:17 | 669:15 670:19 | 613:20 665:7 | **simply**  736:24 |
| 608:18,25 | 670:24 674:4 | 668:24 | **siphoning** |
| 609:25 610:9 | 674:14 678:22 | **shown**  707:4 | 720:2 740:23 |
| 611:13 612:18 | 679:3 682:16 | **shows**  608:5 | 741:2,14 |
| 614:4 616:20 | 682:19 683:3,5 | 643:22 670:3 | **sir**  718:18 |
| 616:22 620:19 | 683:24 685:10 | 711:12 719:2 | **sit**  704:11 |
| 620:20 626:24 | 685:11 690:11 | **shut**  731:4 | **sitting**  627:7 |
| 626:25 629:13 | 697:8 699:20 | **sic**  636:10 | **situation**  595:3 |
| 636:24 637:8 | 699:25 700:6 | **side**  667:17 | 739:10 |
| 637:19,23 | 700:10,12,14 | **sides**  633:6 | **slate**  598:4,5,7 |
| 638:17 639:1 | 701:4 707:6 | 752:12 | 601:8 649:21 |
| 639:21,25 | 709:7 718:12 | **sign**  675:1 | 650:14,18 |
| 640:8,10 641:9 | 718:24 720:18 | **signature**  669:2 | 678:5,17 |
| 641:13 642:2,9 | 721:14,14,20 | 669:3 763:21 | 680:14,16,19 |
| 642:17 643:6 | 721:23,23 | **signed**  584:8,10 | 681:13,19 |
| 644:19,20 | 727:22 728:13 | 598:20 668:14 | 683:13 |
| 645:12,24 | **sheet**  589:10 | 668:16 669:21 | **slates**  603:4 |
| 646:13,14,25 | 596:21 606:9 | 674:22 675:6 | 677:21 678:1 |
| 646:25 647:8,8 | 691:6 700:25 | 675:23 676:16 | **slide**  626:6,8,13 |
| 647:15,16 | 701:1 709:4,23 | 701:13 723:3 | 705:24,24 |
| 648:15,16,19 | 756:6 762:5 | 732:18 | 706:1,2 |
| 648:20 650:21 | 764:1 | **significance** | **slides**  572:19 |
| 650:22,24 | **sheets**  597:9 | 644:16 | 573:10 693:15 |
| 651:4,9 652:2 | **sheikhs**  635:19 | **significant** | 705:19 |
| 653:8,11,15 | **show**  608:3 | 594:15 702:3 | **slow**  737:24 |
| 655:21 656:16 | 611:25 612:21 | 720:8,10 752:7 | **small**  594:16 |
| 656:19 657:3,4 | 612:22 625:11 | 756:8 760:16 | 632:14 683:1 |
| 657:13,19,25 | 638:25 643:18 | | 724:25 729:3 |

729:20 738:23
753:10
**smaller**  747:5
**software**  702:1
703:13,14,21
703:24 704:2
704:17 725:21
725:22 726:20
745:2,4 746:8
746:19 748:8
**sold**  588:18
594:3 639:21
641:9,13 643:6
653:7,10
678:22 686:13
691:12,23
721:20,22,23
727:22 750:15
**sole**  714:11
741:24 744:6
744:12
**solutions**
575:24 761:7
761:18
**somebody**
637:5,11,12
641:21 657:16
702:7 709:2
**somewhat**
632:16
**soon**  666:5
**sorry**  611:15
624:24 650:3
653:9 661:6
671:23,25

685:22 690:16
692:2 700:8
711:18,22
717:3 727:13
749:25 750:12
753:6,7 755:7
758:9
**sort**  633:15
672:11 679:12
**sounds**  682:13
**source**  701:17
702:2 703:14
704:21,22
724:2 725:2,10
726:1 735:24
739:5 741:21
742:2,6 743:25
745:5 747:9,16
749:4,8 755:5
755:11
**sourced**  689:5
**southern**  567:1
575:18
**sovereign**
635:18
**spa**  666:9
**space**  600:8
**speak**  667:15
708:2
**special**  571:5,9
571:13 608:9
611:19 643:14
648:9 659:12
**specific**  585:17
585:25 597:18

600:17 606:2
612:23 616:12
617:9 621:23
629:1,22 640:5
640:24 642:5
643:2 646:8
652:18 653:23
660:18 661:19
661:20 664:11
675:20 676:8
690:12 719:19
723:17 725:22
737:4 741:14
**specifically**
595:12 597:22
600:23 601:18
601:22 603:23
611:23 617:2
626:12,16,23
627:4 628:23
629:3 632:20
636:20 637:2
645:18 646:21
647:4 650:5
655:14 661:12
666:16 680:18
697:19 711:17
717:10 719:16
719:18 723:11
735:16 737:2
741:13 745:21
**specifics**
595:17
**spent**  735:9
752:8 760:16

**spoke**  578:20
602:21 610:15
610:18 717:3
735:12
**spoken**  722:5
745:8
**sport**  567:4,9,9
567:13 568:12
568:12 571:2,6
571:10,14
573:19 574:2,2
574:6 575:15
577:17 579:15
579:19 580:11
580:16,19,23
583:15,25
584:1,7,13,19
584:20 585:8
585:12,13,19
585:20,21,23
586:6 587:4,16
587:18,21
588:2,7 589:2
589:8,9,10,12
589:21,23
590:7,14 591:8
591:15 592:8
593:8,12,16,22
593:22,23,25
594:1,4,5,5,15
595:3,4,25
596:2,9 597:7
597:8,14
598:12 600:15
600:19,25

| | | | |
|---|---|---|---|
| 602:9 604:1 | 685:12,16 | 739:4,7,8,12,14 | **sportblx0140...** |
| 606:9 607:18 | 688:6,11,23 | 739:15 740:15 | 571:3 631:13 |
| 608:19 609:25 | 689:4,7,9 | 740:22 741:20 | **sportblx0174...** |
| 610:11 611:7 | 699:20,25 | 742:1,3,5 | 572:2 670:16 |
| 615:4 617:14 | 700:6,12 701:4 | 743:2,10,21,23 | **sportblx0264...** |
| 619:17,19 | 701:10,11,15 | 744:11,12,17 | 574:7 740:17 |
| 620:13,15 | 701:16,20 | 746:18 747:9 | **sportblx0265...** |
| 621:15 622:1 | 702:12 704:2,4 | 747:12 748:4,4 | 572:13 678:11 |
| 622:22 623:2 | 704:7,9 707:24 | 748:12,12,17 | **sportblx0265...** |
| 623:13,19 | 708:1,9 709:11 | 749:3,8,8 | 573:15 710:15 |
| 624:5 626:2,5 | 709:13,22 | 750:19 751:1 | **sportblx0265...** |
| 626:15 627:17 | 714:25 715:7 | 751:16,22 | 711:12 |
| 628:3,6 631:8 | 715:17,23 | 752:3,6,10,14 | **sportblx0272...** |
| 631:11,17,24 | 718:12,24 | 752:16,22,23 | 572:17 685:7 |
| 632:11,15,22 | 719:12,13,23 | 753:1,11,23,24 | **sportblx0273...** |
| 632:24 633:25 | 720:6,7,11,22 | 754:17,19 | 573:8 702:20 |
| 635:6 636:11 | 721:3 722:3,6 | 755:5,11,15,19 | **sportblx0273...** |
| 639:6,13,22 | 722:7,14,18,19 | 755:20 756:3 | 573:11 705:20 |
| 640:11 642:15 | 722:23,23 | 756:10,15 | **sportblx0277...** |
| 643:7,15,20 | 723:4,5,25 | 757:8,11,20 | 572:20 693:17 |
| 645:23 646:2 | 724:2,6 725:1 | 759:19,20 | **sportblx0277...** |
| 646:23 647:10 | 725:9,11 726:7 | 760:11 764:2 | 695:16 |
| 647:14 648:10 | 726:7,9,10,11 | **sportblx** | **sportblx0280...** |
| 648:23,25 | 726:20,21,23 | 706:15 750:15 | 573:4 696:15 |
| 649:12 653:19 | 727:1,2,3,15 | **sportblx.com** | **sports** 572:19 |
| 653:21 654:3,8 | 728:16,20,24 | 572:8 676:21 | 693:15,24 |
| 654:23 656:14 | 729:16,19,21 | **sportblx0002...** | 694:2,8,14 |
| 657:2,11 658:4 | 729:22 730:10 | 572:9 676:22 | 705:13 706:14 |
| 659:13,18 | 732:5,7,16,16 | **sportblx0003...** | 749:1 750:14 |
| 662:4 664:13 | 732:18,18 | 571:16 659:15 | 750:19 757:5 |
| 674:4 677:18 | 733:4,6,24,25 | **sportblx0003...** | 757:15 |
| 677:22 678:21 | 734:2,13,23,23 | 571:11 648:11 | **spreadsheet** |
| 680:4,17,22 | 735:1,23,24 | **sportblx0003...** | 748:14 |
| 681:2 683:24 | 736:8,11,12,12 | 571:7 643:16 | **spv** 687:14 |
| 684:10,14 | 736:16,18,24 | | 697:16,17 |

**[spv - subscribed]**                                    Page 50

698:7,21 699:2
699:3,15,21,25
700:6,11,18
701:1
**square**  697:25
**stables**  730:7
**stage**  702:6
**stamp**  695:16
**stamped**
   570:14,18,21
   571:3,7,11,16
   571:20,23
   572:2,5,9,12,17
   572:20 573:3,8
   573:11,15,19
   573:23 574:3,7
   578:4 608:1
   612:5 631:12
   643:16 648:11
   659:15 665:5
   668:22 670:15
   674:1 676:22
   678:11 685:6
   693:17 696:15
   702:20 705:20
   710:14 715:1
   718:7 722:20
   740:16
**stand**  650:8,10
**standards**
   589:13
**standpoint**
   751:17 752:3
**start**  579:9
   580:14 582:1

587:24 631:1
666:22 673:12
682:6 732:11
740:7
**started**  608:5
   616:8 617:8
   645:14 667:25
**starts**  648:25
**state**  567:22
   576:4 763:4
**stated**  639:20
   649:25
**statements**
   762:7
**states**  567:1
   575:17 637:25
**stating**  650:7
   653:25 745:18
**status**  701:9
   719:23 724:11
   755:20
**stay**  578:14
   692:19 761:10
**stecklow**  569:6
**stenographic**
   576:7
**stenographic...**
   567:21 763:11
**step**  590:9
**stern**  568:11
   576:18
**stick**  711:25
**stock**  571:21
   572:3 573:21
   594:1 597:8

608:18 609:1
621:25 622:22
632:3 651:6
653:19,22
654:3 655:16
656:9 666:10
668:19,25
673:17,18,23
674:9 675:2,6
676:12 717:19
718:4,16,24
719:12 753:3
753:12,14
755:22
**stockholders**
   644:7,8
**stocks**  687:18
**stop**  615:8
   695:18 711:1
   730:24 732:18
   732:19 737:25
   738:15,20
   740:20
**stopped**  672:8
   707:14 730:14
   730:20 731:2
   732:12 733:5,7
   736:6,7
**stopping**
   737:21
**strategic**  636:5
**strauss**  567:7
   568:21 569:4
   571:18 573:2
   579:25 580:6

580:18 581:2,4
581:6 582:15
583:3 586:12
586:20 587:1,9
587:14 601:20
601:21,23
602:14,17
603:17,18
605:10,12,13
605:17 609:9
609:11 611:16
611:22 616:5
621:14 646:7
646:11 665:3,9
665:12 668:7
682:9 683:15
696:13 709:18
**stream**  687:15
   748:17
**street**  568:15
   576:10
**strike**  611:7
   709:13 722:14
   730:11
**structure**
   572:15,16
   685:5,6,20,24
   689:5 714:8
**subject**  567:19
   577:21 655:10
**subscribe**
   762:6
**subscribed**
   762:12 764:22

**[subscription - task]**                                          Page 51

**subscription**
574:1 701:13
701:14 722:6
722:12,18,22
723:15 730:9
731:9 732:8,10
732:13 733:20
736:15 737:7
742:4,16
747:15 749:1,2
**subsequent**
606:6 730:22
**subsidiary**
590:20 606:11
686:11 690:25
703:19 704:25
728:24 744:24
**substance**
602:6,11
**success** 751:22
**successful**
695:9
**sued** 721:10
731:4
**suffered** 716:9
**suggest** 587:19
607:17 614:25
738:10
**suggested**
586:5 587:16
587:20,22,25
588:25 592:13
**suggesting**
587:25 588:3,6
738:12

**suggestion**
588:22
**sullivan** 572:11
678:10 679:9
**sullivan's**
679:22 682:22
**sum** 712:19,21
**summarizing**
746:14
**summary**
572:15 627:7
679:12,15,16
680:12 685:4
706:9
**summer** 698:25
699:1 722:10
722:11
**supplier** 743:15
**support** 652:3
739:9
**supposed**
632:21 633:14
633:15 689:25
706:11,16
747:13
**supposedly**
747:16
**sure** 581:19
589:6 599:13
600:5 603:4
604:19 610:6
615:14 622:11
625:4 628:18
628:19 629:4
633:4,19

642:14 650:1
656:24 657:20
662:9 663:16
666:3 674:25
687:9 688:1
692:18 698:8
700:15 703:6
724:16 731:1
733:9,11,12
738:3 742:15
746:24
**suspended**
571:14 658:15
658:16 659:13
**swearing** 576:3
**sworn** 576:6,11
762:12 763:6
764:22
**system** 735:10
747:5 748:11

**t**

**t** 567:20,20
569:1 763:1,1
**table** 627:9
**tag** 639:22
640:4,7,9,12,13
640:16,19,25
641:2,5,10,13
641:17 642:8
642:15 643:2,7
**take** 575:9
600:8 618:2
622:15 625:16
629:6 630:16
637:12 638:20

640:1 647:11
657:17 672:19
692:5,7,14
697:14 698:22
717:11,13
736:16,24
739:23,24
742:6 743:24
**takeaways**
745:19,24
746:3
**taken** 567:20
630:23 673:9
693:8 740:5
741:21 763:11
**talk** 600:7
709:17
**talked** 603:6
635:20 640:20
757:2
**talking** 585:16
586:10,11
592:1 596:4
604:20 628:5
640:13,22
641:12 647:4
654:25 655:3,4
667:10,22,23
667:25 673:16
687:3 721:7
**talks** 713:9
750:7
**tape** 655:24
**task** 745:4

tax  690:23
  691:4 760:19
tech  750:19
technical
  606:10
technically
  686:24 710:4
  755:22
technology
  575:20 701:12
  702:6,10 722:8
  724:7,11 726:8
  726:15 734:21
  735:19 736:12
  750:15,19
  753:2 754:19
  755:5,11
  759:19,21,23
  760:3,7,8
telephone
  615:16
telephonically
  615:10,20
  616:7
tell  627:7,19
  644:15 657:2
  694:1,8 698:19
  702:12 706:10
  708:6 735:8
  737:4,9 741:25
  757:3
telling  634:23
  654:6,21
  657:10

ten  630:16
term  606:10
  626:3 634:20
  652:22 710:4,9
terminate
  733:19 734:3
terminated
  743:18
termination
  734:4
terms  579:23
  585:2 589:11
  589:13 595:8
  595:11 597:11
  605:11,23,24
  606:1,14,21
  609:7,8 610:13
  632:17 635:24
  639:11 640:10
  647:15,21
  666:1,20,22,25
  667:3,6,8,10,10
  667:15,16
  668:1,2,4
  676:3 689:12
  695:21 699:18
  719:6 721:12
  724:15,21
  736:5 747:8
  751:20 756:5,6
  757:7 760:22
tested  724:11
testified  754:11
testify  576:11
  577:11 763:7

testimony
  567:20 594:17
  624:3 691:8
  707:10 710:23
  737:13 741:3
  744:1 761:4
  763:10
tests  724:18
text  741:10,15
thank  576:14
  614:18 625:7
  630:19 669:12
  692:9 733:1
  758:14 759:5,7
  759:14 761:15
thanks  738:2
thing  579:14
  606:19 613:1
  625:21 665:22
  735:9
things  665:25
  701:2 702:4
  709:17 735:15
  760:13
think  579:1,8
  579:21 581:18
  584:15,16
  588:13 589:4
  589:23 590:5,8
  590:12 592:5
  592:10,25
  594:14 602:11
  602:24 606:1
  607:3 609:10
  616:4,7,19

617:6,22 618:4
618:20 620:4,7
621:2,2 623:17
628:20 635:11
636:12,13
637:2 638:10
641:16,16,23
641:24 642:23
646:18 651:25
653:13,22
654:17 655:20
655:23 658:9
659:20 661:20
663:10 664:7
666:24 667:13
668:6 673:1
675:8 680:1
682:8,19 687:7
688:13 691:14
694:7,10
695:11 697:24
698:1,16
699:10 700:1,3
700:7 702:1,13
704:14 705:12
706:2,18 708:3
708:19 711:5,6
713:5 718:20
719:8,19
720:10,25
726:2 729:4,11
730:7 732:2,11
732:14 733:10
734:4,10 735:4
735:5,6,11,13

735:21 736:3
737:1,22
738:12,16
739:25 741:9
742:19 743:14
743:20 745:1
746:1,4,6,17
747:3,19
749:13 754:4,8
755:14 756:7,8
757:14,23,24
758:11 760:24
760:24
**third**   677:9
720:18 727:11
727:13,15
728:2 730:12
**thirty**   672:24
**thomas**   575:21
**thoroughbred**
727:23,25
729:17
**thoroughbreds**
728:17 753:11
**thought**   587:20
632:18 654:22
667:21 688:16
701:7 752:5
757:17
**three**   571:8,12
580:10,13
598:22 622:1
625:19 648:8
659:11 743:20
743:20 758:15

**thrilled**   640:22
**throw**   739:12
**throwing**   624:9
636:14
**thursday**
567:24
**till**   579:10
690:21
**time**   577:7,14
580:4,7,11
581:8,11
582:17 583:5
586:19 589:5
590:8,22
591:10,24
592:5 593:10
593:13 594:9
594:18,24
597:10 599:14
600:3 601:2,3
619:8,11
621:18 622:10
622:19 628:3,4
628:5 630:21
631:2,16
635:25 645:9
645:23 651:4
651:23 654:1,7
654:11,20,23
655:19 656:1
658:9 659:8
660:5,22
661:25 662:4
662:21,24
664:13 667:18

671:17 673:7
673:13 679:5
681:7 682:3,3
682:9 686:18
689:17 693:2,7
693:10 699:9
701:11,13,16
702:23 707:16
708:19 709:21
711:9 713:6,20
714:4,12
715:18 717:12
717:13,15,22
717:23 720:6
720:10 721:4
726:6 730:18
733:12 734:5,5
735:13 736:7
739:23,25
740:3,8 741:22
742:1,3 743:21
744:23,23
745:9 752:9,10
752:25 754:21
755:1 759:5,6
759:22 761:8
761:18 763:11
**times**   602:25
617:25 618:12
618:16 621:15
626:19 627:21
627:22,23
691:15
**timing**   615:22
731:2

**titled**   572:19
573:10 693:15
705:19
**today**   576:16
577:12 627:7
658:22 704:11
**today's**   761:4
**together**
612:15 614:1,7
614:12 626:6
626:14,23
719:14
**token**   752:6
**tokenize**
639:12,14
**told**   592:24
616:17 625:5
630:9 646:22
646:22 717:6,7
**tom**   569:2
**ton**   682:24
**took**   591:25
592:10 603:1
662:24 697:13
700:21 748:19
749:11 751:11
**top**   615:7 677:4
703:5 704:13
**topic**   603:25
**total**   593:11
726:2 752:14
761:5,17
**totally**   703:6
**tough**   638:1,13

**towards** 590:9
736:3 752:10
**trade** 639:12,15
716:21
**trader** 637:4
**trades** 724:19
724:21,23
**trading** 624:5
703:14,24
704:2 705:3,5
705:6 725:2,10
726:24 727:4
735:10 739:5
**trans** 727:16
**transaction**
577:15,21
583:13,15,24
584:16,20,23
585:1,12,14
588:16 590:6
591:7 592:7,20
594:10,18
596:8,19,21
604:14,17,25
605:5,6 606:4
606:6,16,23
607:4,13 609:4
609:8 610:14
611:3 618:4,7
618:24 621:18
622:20,24
623:6 624:17
624:21 632:7
632:11,21,23
633:7,15,17,23

633:24,25
637:15 638:17
638:20 639:8
639:17 642:25
643:5,8 646:10
646:13 647:10
647:19 662:5
662:25 664:21
665:16,21,23
666:1 668:11
675:13,25
687:1,3,13
688:4,19,24
689:2,3,6
691:8,13
696:24 697:3
699:6 700:4,18
704:19 707:20
707:22 708:22
709:8,15 710:1
712:25 713:6
714:5 717:25
719:9 720:9,12
720:20 721:11
723:8,9,15
729:23,25
732:3 736:21
750:6 751:7,9
751:12 752:11
753:20
**transactions**
608:12 615:5
618:5 708:20
713:16,20,24
715:5 724:14

724:25 727:12
727:16 755:9
760:9,19
**transcript**
762:3,6 763:10
763:23
**tried** 635:2,9
760:5
**trigger** 733:23
742:9,11,22
744:23
**triggering**
743:10,23
**troubling**
735:15
**true** 606:18
636:25 698:9
763:10
**truth** 763:7,7,8
**try** 587:6
589:23 594:22
597:5 623:16
635:3 636:18
692:10,23
701:25 703:8
709:21 716:20
725:23 727:12
**trying** 599:15
636:16 665:19
689:21 701:17
731:21 738:11
746:7 760:8
**turn** 612:8
634:6 636:2,3
641:21 659:9

668:8,18
670:13 680:11
685:1 696:10
698:4 705:17
711:11 719:1
735:23
**twenty** 682:4
**twice** 610:19
**two** 570:11,15
571:17 572:11
572:14 576:17
576:21 578:1
603:3,4 607:23
621:21 633:6
638:22,22
639:7 665:2
678:9 685:3
721:19 726:3,3
734:21
**type** 618:3
**types** 629:2
**typical** 617:25
**tyrrell** 568:5
750:10

**u**

**ultimate**
623:21 672:17
702:13
**ultimately**
591:8 606:7
618:4 631:21
635:24 648:1
660:19 709:8
709:21 736:20
739:14 757:18

758:1 760:20
**um** 671:22
**un** 710:6
711:23
**unable** 743:15
**unclear** 725:12
**under** 577:5,10
581:5 596:8
640:25 641:3
644:6 654:10
672:12,15
696:2 715:16
742:24 743:4
743:11 750:14
756:22
**understand**
586:23 593:9
606:20 613:2
613:12 622:14
628:18,19
629:2,4 635:3
635:9 638:2,12
640:18 651:13
654:13 680:19
691:3 698:15
700:7 703:3,7
711:2 721:17
**understanding**
592:3 619:22
623:21 686:5
688:15 695:25
709:10 714:12
716:8,12 739:3
**understood**
586:18 596:23

598:24 613:9
702:9,9
**undertake**
632:15
**undertaken**
745:4
**united** 567:1
575:17
**unpaid** 711:19
712:10
**unreasonable**
752:6
**unsuccessful**
634:15,25
**unwind** 707:20
709:11
**unwinding**
709:15 717:16
**unwound**
696:24,25
697:3 707:22
710:1,3,6,6
**updated** 618:15
677:3
**upside** 594:3
**urgently**
647:23
**use** 635:2
701:25 727:13
727:14,15,19
727:21 730:21
730:22 739:8
739:16,16
742:6 743:25
748:7 751:18

755:10
**used** 618:6
635:1 694:11
694:13 700:23
702:11 727:4,9
727:11 755:1
760:18 761:6
**uses** 755:4,8
**using** 575:20
730:14,16,20
730:20,24
731:2

**v**

**v** 567:6,15
575:14,15
764:2
**vague** 623:15
**valuable**
589:14 594:6
595:4 748:24
760:14
**valuation**
607:13 617:11
617:14,17,21
617:21 618:1,5
618:6,20
624:15 626:2,3
626:14,22
627:6,21,23
628:10 654:8
654:16,23
655:19 748:19
748:21
**valuations**
607:8 627:16

627:20
**value** 591:2
592:25 593:22
594:15,22
595:3,5 597:7
607:15 618:2
655:22 720:8
720:11,22
745:1,4 746:7
746:18,20
751:24
**values** 627:13
628:16
**variables**
618:17,18
**various** 652:7
**vehicle** 583:24
585:2,5,5,7,9
585:20,21,22
585:23 687:22
727:4 729:17
**verbal** 746:6
**veritext** 575:23
761:6,18 764:1
**versus** 606:14
**vetted** 720:5
**video** 575:8,12
576:1 630:21
631:1,1 673:6
673:12,12
693:10 740:3,7
740:7 761:3
**videoconfere...**
567:6 669:6

**videographer**
569:2 575:1,22
630:20,25
673:4,11 693:6
693:9 740:2,6
758:9,13,16,19
758:23,25
759:3 761:2,14
761:16
**videotaped**
567:6
**view** 592:10
594:12 633:3
633:16 675:22
675:24 747:3
748:5 752:12
754:15 760:15
761:11,12
**virtual** 575:20
**virtually** 575:4
576:5 593:20
598:2 709:18
**vol** 567:9
**volatile** 618:18
**vollmuth**
567:21 763:3
763:22
**volume** 575:11
**vote** 597:19
598:18,23
644:21 650:9
650:10,16
663:2,7,18,21
677:14

**voted** 602:13
602:17 649:20
683:4,6 684:7
**votes** 650:7
**voting** 595:24
596:2,9,13
597:3,12 598:1
598:6,22,23

**w**

**waiting** 755:17
**waive** 576:1
**walk** 642:3
**want** 585:24
600:4 612:20
622:10 624:25
625:11,20
627:18 629:6,8
652:7 653:5
670:20 672:19
695:18 708:1,2
711:3 715:11
717:6 724:7
725:22 737:3
742:13 747:25
749:21 758:10
761:10
**wanted** 590:18
597:4 599:1,13
600:20 613:12
632:24 637:11
637:12 640:1,3
642:2 657:16
660:24 666:4
707:23 708:8
709:10 716:17

726:7 736:17
736:25 742:7,8
**wants** 588:13
612:25
**washington**
584:3,5,8
585:1,3,4
639:10 686:25
687:1,2,11,14
687:16 688:4,9
688:14,18,21
689:3,6,8,10
694:11,13
720:9,13,17
721:6 753:4,13
753:15 755:22
760:12
**way** 598:22
626:21 635:9
688:11 710:7
721:21 729:17
730:2 751:23
752:19 756:17
**we've** 592:11
592:11,12
657:15 722:13
727:16
**wealth** 635:18
687:22
**website** 731:5
**went** 658:22
659:1 668:9
739:10 741:19
752:10

**whatev** 732:22
**whatsoever**
704:7
**wholly** 686:11
**wildly** 618:18
**willing** 641:25
**willingness**
651:22
**win** 598:7
**window** 739:13
**withdraw**
760:2
**witness** 567:22
568:13 570:2
575:7 576:3,5
604:3,7 614:5
692:12 711:5
716:20 737:22
737:25 738:3,8
738:10,13
754:25 758:20
759:7
**witnesses'**
764:3
**word** 707:20
**wording** 635:1
**words** 597:1
638:5,10
748:11
**work** 672:22
682:1,6
**worked** 719:14
725:6
**working**
581:21 639:9

**[working - zoom]**                                                                    Page 57

| | |
|---|---|
| 682:6 724:12 | 627:19 633:19 |
| 724:15,21 | 641:16 644:3 |
| **world** 748:5,7 | 657:24 663:25 |
| **worse** 623:14 | 672:21 677:4 |
| 623:19 | 682:21 684:23 |
| **worth** 593:22 | 692:19 703:11 |
| 593:24,25 | 704:3,13 717:5 |
| 594:6,22 597:4 | 720:15 725:8 |
| 597:5 636:22 | 727:14 728:8 |
| 637:1,4 702:2 | 738:21 750:23 |
| 702:3 747:17 | 758:4 759:13 |
| 747:18 | **year** 574:10 |
| **wound** 726:17 | 581:23 623:18 |
| **wrap** 673:1 | 626:9 634:20 |
| 758:18 | 635:25 682:3 |
| **write** 584:17 | 747:14 748:2 |
| 635:12 752:7 | 748:10,13 |
| 752:15 753:22 | 749:19 |
| 754:16 | **years** 581:24 |
| **writing** 746:5 | 682:4 684:11 |
| **written** 609:17 | 684:11 699:5 |
| 611:1,5 638:5 | 700:5 703:25 |
| 746:14 747:1 | 721:19 |
| **wrong** 620:5 | **yep** 660:12 |
| 700:4 757:24 | **york** 567:1,23 |
| **wrote** 586:15 | 567:23 568:9,9 |
| 619:13 745:18 | 568:19,19 |
| 747:20 752:13 | 575:18 576:10 |
| 752:20 | 576:10 764:1 |
| **wylie** 569:6 | **z** |
| **y** | **zero** 593:23,23 |
| **yeah** 600:9,11 | **zheng** 582:2 |
| 604:5 609:10 | **zoom** 576:16 |
| 614:17 617:6 | |
| 623:17 625:2 | |

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.