CONFIDENTIAL

Page 278

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
 2

 3   _____

     CYPRESS HOLDINGS, III, L.P.,            Case No.
 4   individually and derivatively    22-cv-01243(LGS)
     on behalf of SPORT-BLX, INC.,
 5              Plaintiff,
 6      -v-                                  VIDEOTAPED
                                        DEPOSITION UPON
 7   GEORGE HALL, JOSEPH DE PERIO,      ORAL EXAMINATION
     DANIEL STRAUSS, FRANCIS                     OF
 8   RUCHALSKI, CESAR BAEZ,              GEORGE HALL
     CHRISTOPHER JOHNSON,                  (Vol. II)
 9   SPORT-BLX, INC., SPORT-BLX
     SECURITIES, INC., CLINTON
10   GROUP INC., and GLASSBRIDGE
     ENTERPRISES, INC.,
11              Defendants.
12   _____
13   SPORT-BLX, INC., individually       Case No:
     and derivatively on behalf of    1:22-cv-8111(LGS)
14   its shareholders,
                Plaintiff,
15
        -v-
16
     MICHAEL M. SALERNO and
17   CYPRESS HOLDINGS, III, L.P.,
                Defendants.
18

19   _____

     ***  CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER  ***
20

21        T R A N S C R I P T of testimony taken
     stenographically by and before MARGARET
22   VOLLMUTH-CORSON, a Certified Court Reporter of the
     State of New Jersey, pursuant to Federal Rules
23   Governing Civil Procedures, at the offices of CHIESA
     SHAHINIAN & GIANTOMASI, P.C., 105 Eisenhower
24   Parkway, Roseland, New Jersey, on Wednesday,
     June 21, 2023, commencing at approximately 10:06
25   a.m.
```

CONFIDENTIAL

Page 279

```
 1   A P P E A R A N C E S:
 2   CHIESA SHAHINIAN & GIANTOMASI, P.C.
     105 Eisenhower Parkway
 3   Roseland, New Jersey 07068
     (973) 530-2100
 4   BY:  A. ROSS PEARLSON, ESQ.
     rpearlson@csglaw.com
 5   BY:  DANIEL J. TYRRELL, ESQ.
     dtyrrell@csglaw.com
 6   Attorneys for the Plaintiff Cypress Holdings, III,
     L.P. and the Defendants Michael M. Salerno and
 7   Cypress Holdings, III, L.P.
 8   MORVILLO ABRAMOWITZ GRAND IASON & ANELLO, P.C.
     565 Fifth Avenue
 9   New York, New York 10017
     (212) 856-9600
10   BY:  JONATHAN S. SACK, ESQ.
     jsack@maglaw.com
11   BY:  EDWARD M. SPIRO, ESQ.
     espiro@maglaw.com
12   BY:  JOSEPH STERN, ESQ.
     jstern@maglaw.com
13   Attorneys for the Defendants Sport-BLX, Inc.,
     Sport-BLX Securities, Inc., George Hall, Cesar
14   Baez, and Christopher Johnson
15   COLE SCHOTZ P.C.
     Court Plaza North, 25 Main Street
16   Hackensack, New Jersey 07601
     (201) 525-6305
17   BY:  DAVID S. GOLD, ESQ.
     dgold@coleschotz.com
18   Attorneys for the Defendant Joseph De Perio
19   LOEB & LOEB LLP
     345 Park Avenue
20   New York, New York 10154
     (212) 407-4852
21   BY:  CHRISTIAN D. CARBONE, ESQ.
     ccarbone@loeb.com
22   Attorneys for the Defendants Daniel Strauss, Francis
     Ruchalski, and GlassBridge Enterprises, Inc.
23
24
25
```

CONFIDENTIAL

Page 280

```
1    A L S O   P R E S E N T:

2      Tyler Thompson, Videographer

3      Joseph De Perio

4      Francis Ruchalski (via videoconference)

5      Daniel Strauss (via videoconference)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CONFIDENTIAL

Page 281

1

                            INDEX

2

    WITNESS                              PAGE

3

    GEORGE HALL

4

    By:  MR. PEARLSON                    288

5

6

7

                          EXHIBITS

8

    NO.     DESCRIPTION                  PAGE

9

    Hall-82  Complaint filed in the      295
10           Supreme Court of the State
             of New York, World Gold
11           Trust Services, LLC v. the
             Clinton Group, Inc.
12

    Hall-40  Three-page Minutes of the   303
13           Regular Quarterly Meeting
             of the Board of Directors
14           of Sport-BLX, Inc. dated
             August 14, 2019 Bates
15           stamped GBE_0003774 through
             3776
16

    Hall-85  Declaration in Opposition   314
17           in the World Gold Trust v.
             Clinton Group matter
18

    Hall-25  One-page email from Michael 326
19           Salerno to George Hall
             dated May 21, 2019, with
20           two-page attachment Bates
             stamped CYPRESS_00001215
21           through 1217
22  Hall-26  Three-page May 21 to May    347
             29, 2019, email exchange
23           between Michael Salerno,
             George Hall, and Joseph De
24           Perio Bates stamped
             SPORTBLX00048150 through
25           48152

Veritext Legal Solutions

CONFIDENTIAL

Page 282

| | | | |
|---|---|---|---|
| 1 | Hall-28 | 11-page email string, top email being from George | 368 |
| 2 | | Hall to Michael Salerno dated 7/20/2019, Bates | |
| 3 | | stamped CLINTONO0007033 through 7043 | |
| 4 | | | |
| 5 | Hall-29 | Three-page December 10, 2018, email from Ken | 384 |
| 6 | | Norensberq to various parties Bates stamped | |
| 7 | | SPORTBLX0153548 through 153550 | |
| 8 | Hall-30 | Three-page May 3 through May 8, 2019, email exchange | 387 |
| 9 | | between John Hall, Joseph De Perio, and Ken | |
| 10 | | Norensberg Bates stamped SPORTBLX0092551 through | |
| 11 | | 92553 | |
| 12 | Hall-32 | 29-page Form BD Uniform Application For | 390 |
| 13 | | Broker-Dealer Registration | |
| 14 | Hall-34 | 22-page July 3 and 9, 2019, email from Luxor Financial | 405 |
| 15 | | Group Operations Department to John Hall and Joseph De | |
| 16 | | Perio with attached BLX Trading Corp Proposed | |
| 17 | | Business Plan Bates stamped SPORTBLX00049502 through | |
| 18 | | 49523 | |
| 19 | Hall-35 | Five-page email string among multiple parties | 413 |
| 20 | | dated 8/2 to 8/5/2019, Bates stamped | |
| 21 | | SPORTBLX00050524 through 50528 | |
| 22 | | | |
| 23 | Hall-36 | Two-page email string between Joseph De Perio, | 421 |
| 24 | | Michael Salerno, and George Hall dated 8/5 through | |
| 25 | | 8/9/19, Bates stamped SPORTBLX00027555 and 27556 | |

Veritext Legal Solutions

CONFIDENTIAL

Page 283

| | | | |
|---|---|---|---|
| 1 | Hall-38 | Three-page email exchange between Michael Salerno, | 426 |
| 2 | | George Hall, and Joseph De Perio, dated 8/9/19, Bates | |
| 3 | | stamped SPORTBLX00050629 through 50631 | |
| 4 | | | |
| 5 | Hall-39 | 8/12/2019 email from George Hall to Michael Salerno | 432 |
| 6 | | Bates stamped SPORTBLX0140201 | |
| 7 | Hall-41 | Two-page 8/16 and 8/17/2019 email string between | 445 |
| 8 | | Michael Salerno, George Hall, and Joseph De Perio | |
| 9 | | Bates stamped SPORTBLX00050788 and 50789 | |
| 10 | | | |
| 11 | Hall-42 | Two-page 8/16 and 8/17/2019 email string between | 447 |
| 12 | | Michael Salerno, George Hall, and Joseph De Perio | |
| 13 | | Bates stamped SPORTBLX00050786 and 50787 | |
| 14 | Hall-43 | Six-page August 23, 2019, FINRA letter to Kenneth | 448 |
| 15 | | Norensberg Bates stamped SPORTBLX00052448 through | |
| 16 | | 52353 | |
| 17 | Hall-44 | Three-page Minutes of the Special Meeting of the | 458 |
| 18 | | Board of Directors of Sport-BLX, Inc. dated | |
| 19 | | September 10, 2019, Bates stamped GBE_0005173 through | |
| 20 | | 5175 | |
| 21 | Hall-45 | Two-page 12/16 through 12/23/2019 email exchange | 470 |
| 22 | | between Michael Salerno, George Hall, and Joseph De | |
| 23 | | Perio Bates stamped SPORTBLX00052396 and 52397 | |
| 24 | | | |
| 25 | | | |

CONFIDENTIAL

Page 284

| | | | |
|---|---|---|---|
| 1 | Hall-46 | Two-page 12/23 through 12/27/2019 email exchange between Michael Salerno, George Hall, and Joseph De Perio Bates stamped SPORTBLX00052409 and 52410 | 477 |
| | Hall-47 | One-page August 17, 2020, email from Ken Norensberg to Joseph De Perio and George Hall attaching 20-page Sport BLX Securities, Inc. Proposed Business Plan Bates stamped SPORTBLX0128701 through 128721 | 491 |
| | Hall-48 | 5/2/21 email from Joseph De Perio to Andrew Gadlin Bates stamped SPORTBLX00012773 | 500 |
| | Hall-49 | 66-page Execution Version Securities Purchase Agreement between GlassBridge and ORIX dated October 1, 2019, Bates stamped GBE_0009235 through 9300 | 517 |
| | Hall-11 | 85-page GlassBridge Enterprises, Inc. Form 10-K for fiscal year ending December 31, 2019 | 523 |
| | Hall-51 | Three-page Written Consent of Board of Directors of Imation Enterprises Corp. dated October of 2019 Bates stamped GBE_0011474 through 11476 | 534 |
| | Hall-52 | Two-page Minutes of the Regular Meeting of the Board of Directors of GlassBridge Enterprises, Inc. dated December 9, 2019, Bates stamped GBE_0009062 and 9063 | 549 |

CONFIDENTIAL

Page 285

1    Hall-53   Two-page Minutes of the          558
               Regular Meeting of the
2              Board of Directors of
               GlassBridge Enterprises,
3              Inc. dated December 11,
               2019, stamped GBE_0009060
4              and 9061
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CONFIDENTIAL

Page 286

1                    THE VIDEOGRAPHER:  Good morning.  We

2       are going on the record at 10:06 a.m. on June 21,

3       2023.  Please note that microphones are sensitive

4       and may pick up whispering and private

5       conversations.  Please mute your phones at this

6       time.  Audio and video recording will continue to

7       take place unless all parties agree to go off the

8       record.

9                    This media unit No. 1 in the

10      video-recorded deposition of George Hall in the

11      matters of Cypress Holdings, III, L.P., individually

12      and derivatively on behalf of Sport-BLX,

13      Incorporated v. George Hall, Joseph De Perio, et

14      al., Docket No. 22-cv-8111, as well as Sport-BLX,

15      Incorporated, individually and derivatively on

16      behalf of its shareholders v. Michael Salerno and

17      Cypress Holdings, III, L.P., Docket No. 22-cv-01243.

18                   The location of this deposition is

19      Chiesa Shahinian & Giantomasi, P.C. in Roseland, New

20      Jersey.  My name is Tyler Thompson, representing

21      Veritext, and I'm the videographer.  Court reporter

22      is Margaret Corson from the firm of Veritext.  I am

23      not authorized to administer an oath, I am not

24      related to any party in this action, nor am I

25      financially interested in the outcome.

CONFIDENTIAL

Page 287

1        If there are objections to proceeding,

2   please state them at the time of your appearance.

3   Counsel and all present, including remotely, will

4   now state their appearances and affiliations for the

5   record, beginning with the noticing attorney.

6        MR. PEARLSON:  This is Ross Pearlson.

7   I'm here with Dan Tyrrell.  We're with Chiesa

8   Shahinian & Giantomasi representing Cypress

9   Holdings, III, L.P. and Michael Salerno.

10       MR. SACK:  I'm Jonathan Sack with the

11  Morvillo Abramowitz law firm with my colleagues

12  Edward Spiro and Joseph Stern, and we represent

13  Sport-BLX, Sport-BLX Securities, George Hall,

14  Christopher Johnson, and Cesar Baez.

15       MR. CARBONE:  Chris Carbone, Loeb &

16  Loeb, here for GlassBridge, Daniel Strauss, and

17  Frank Ruchalski.  Mr. Ruchalski is participating

18  today remotely.

19       MR. GOLD:  David Gold, Cole Schotz,

20  P.C., on behalf of Joseph De Perio and joined with

21  Joseph De Perio.

22       THE REPORTER:  Mr. Hall, you are

23  reminded that you are still under oath from last

24  week.

25       THE WITNESS:  Yes, I understand.

CONFIDENTIAL

Page 288

1    G E O R G E    H A L L, residing at 6 East 69th

2    Street, New York, New York 10065, having been

3    reminded of his oath, testified as follows:

4    EXAMINATION BY MR. PEARLSON:

5        Q.    Good morning, Mr. Hall.  We're here for

6    the continuation of your deposition.  As you may

7    recall, I gave you certain instructions last time.

8    Do you need me to give you those instructions again?

9        A.    No.

10       Q.    Is there any reason that you can't

11   testify fully and completely today?

12       A.    No.

13       Q.    Okay.

14           MR. PEARLSON:  Before we begin, I just

15   want to note for the record again, unfortunately,

16   that last week we received three productions from

17   the defendants in our case in which Cypress Holdings

18   is a plaintiff.  We received a production on Monday

19   night, Tuesday night, and Friday night at 9:30, and

20   in light of that we're proceeding today, but we're

21   going to reserve all rights, including to seek the

22   appropriate relief from the Court.

23           With that, I'll begin.

24       Q.    Mr. Hall, when we broke last time we

25   were talking about the rent that Sport-BLX was

CONFIDENTIAL

Page 289

1  paying for the premises at 510 Madison Avenue.  Do

2  you remember that?

3      A.     Yes.

4      Q.     And was it your testimony that

5  ConsenSys had determined the amount of rent for --

6  that Sport-BLX would pay for those premises?

7             MR. SACK:  Objection to the form.

8      A.     ConsenSys created an overall pro forma

9  business plan with many different variables.  One of

10 the variables under expenses was rent, they also

11 looked at head count, the growth of the business,

12 and so on, and when I first saw it, the number was

13 -- that they attributed for rent was $500,000.00,

14 and that seemed like a reasonable number to me.

15     Q.     Okay.  Did -- when you -- what kind of

16 company is ConsenSys?

17     A.     They're a pretty large company.  They

18 do projects, outsource projects, computer

19 programming, they do consulting, they do marketing,

20 marketing research, lots of work in blockchain, so

21 they're -- they're a modern day technology and

22 infrastructure firm.

23     Q.     Are they in the real estate business?

24     A.     I don't know.

25     Q.     Did they have any information specific

Page 290

1  to 510 Madison Avenue when they made that sort of

2  projection or -- or determination as to the

3  $500,000.00 in rent?

4       A.    I don't know what they did

5  specifically.  I don't know if they communicated

6  with anybody at Clinton Group, but -- so I don't

7  really know.

8       Q.    Okay.  Do you know if they had any

9  information as to who was sharing the premises with

10  Sport-BLX?

11       A.    I don't know.

12       Q.    Or how much space Sport-BLX was using

13  at the time?

14            MR. SACK:  Objection to the form.

15       A.    At what time?

16       Q.    At the time they made this estimation

17  of $500,000.00 for the rent.

18       A.    Well, I think they anticipated how

19  much space Sport-BLX was using -- would be using in

20  the future, as well as what they were using at the

21  time.

22       Q.    Okay.  And did you have any discussions

23  with ConsenSys about the rent determination?

24            MR. SACK:  Do you mean him personally,

25  Ross?

CONFIDENTIAL

Page 291

1          Q.     Yes.  You personally.

2          A.     I don't recall if I had any discussion

3    with them.

4          Q.     Did you -- did you look at anything

5    else besides ConsenSys's estimation in determining

6    that the $500,000.00 number was reasonable?

7          A.     Well, obviously, I didn't have to

8    look, I know what the -- generally the rent that

9    Clinton Group was paying.  I could anticipate how

10   much space would be used, and that seemed like a

11   reasonable -- reasonable number.

12         Q.     Did you ever look at any alternative

13   space for Sport-BLX to occupy besides the 510

14   Madison Avenue space?

15         A.     No.

16         Q.     Now, in terms of the 510 Madison Avenue

17   space, you indicated -- well, let me strike that.

18                When did GlassBridge first begin using

19   the 510 Madison Avenue space?

20         A.     I don't think GlassBridge ever used

21   the space.

22         Q.     Did GlassBridge ever pay any rent for

23   the use for that space?

24         A.     Not specifically.

25         Q.     Okay.  So is it your testimony that the

CONFIDENTIAL

Page 292

1   space was used, at least in 2019, by Sport-BLX and

2   the Clinton Group?

3          A.    So with the exception of the last

4   couple of weeks of 2019, GlassBridge had no

5   employees using those space.  As I mentioned last

6   time, there was another firm, which I couldn't

7   remember the name of, I do remember the name now,

8   it's called Market Field, they had about three --

9   three or four desks that they used.

10         Q.    Okay.  And did they pay rent?

11         A.    They did.

12         Q.    Do you know how much?

13         A.    I don't recall.

14         Q.    And do you recall who they paid rent

15   to?

16         A.    I don't recall specifically.

17         Q.    Who was responsible for collecting --

18   so -- strike that.

19               So in 2019 it was Sport-BLX, this other

20   entity, and the Clinton Group that were paying rent

21   for that space, correct?

22               MR. SACK:  Objection to the form and

23   to the substance.

24         A.    So Clinton Group was paying the rent

25   to the -- to its landlord, which was a subtenant of

CONFIDENTIAL

Page 293

1    the overlease -- of the overlandlord.  Sport-BLX was

2    paying $500,000.00 a year to Clinton Group to offset

3    some of the cost of that rent based on the usage and

4    what was provided for Sport-BLX.

5            Q.    Okay.  And now who was responsible from

6    the Clinton Group for making sure the landlord was

7    paid?

8            A.    Well, that was one of the people in

9    the accounting department.

10           Q.    Okay.  Do you have a name in

11   particular?

12           A.    Could have been Francis Ruchalski,

13   could have been Daiana Sersea.  They're generally

14   the ones that make payments.

15           Q.    And were they also responsible for

16   collecting rent from Sport-BLX?

17                 MR. SACK:  Objection to form.

18           A.    I'm not sure what you mean by

19   "responsible."

20           Q.    Well, who was the one who wrote the --

21   well, let's break it down.

22                 Who from Sport-BLX was responsible for

23   paying the rent to the Clinton Group?

24           A.    Oh, I see.  The -- the same people.

25           Q.    Okay.  And -- and the same people who

CONFIDENTIAL

1    were responsible for paying the landlord as well,

2    right?

3         A.    Correct.

4         Q.    On behalf of the Clinton Group.

5               Okay.  Now, in -- in -- we were talking

6    before about, I believe, that the -- the space --

7    the Clinton Group was evicted from the space in

8    early 2020, correct?

9               MR. SACK:  Objection to form.

10        A.    I think it was actually late 2019.

11        Q.    Okay.  And -- and that was because the

12   Clinton Group had fell behind on its rent

13   obligations?

14        A.    That's not exactly the situation, but

15   that was ultimately what -- what led to the

16   situation with the -- with the landlord.

17        Q.    Okay.  Do you recall that the Clinton

18   Group was sued by the landlord?

19        A.    Yes.

20        Q.    And is that a lawsuit that's pending

21   today?

22        A.    What -- what time period are we

23   talking about?

24              MR. PEARLSON:  Why don't we -- can we

25   take out what's been marked as, I think it's Hall-82

CONFIDENTIAL

Page 295

1    for identification.

2                    (Exhibit Hall-82, Complaint filed in

3    the Supreme Court of the State of New York, World

4    Gold Trust Services, LLC v. the Clinton Group, Inc.,

5    is marked for identification.)

6        Q.    Mr. Hall, I'm going to show you what's

7    been marked as Hall-82 for identification.  It's a

8    complaint filed in the Supreme Court of the State of

9    New York, World Gold Trust Services, LLC v. the

10   Clinton Group, Inc.  Have you seen this document

11   before?

12       A.    Just looking at the cover page, I

13   believe so, yes.

14       Q.    Okay.  And is it a fact that the -- the

15   landlord for 510 Madison ended up suing the Clinton

16   Group in New York State Court?

17       A.    Yes.

18       Q.    Okay.  Now, do you know what the

19   current status of that lawsuit is?

20       A.    I'm not sure.  I'm not sure what the

21   current status is.

22       Q.    Okay.  And it says at the top, it says,

23   "Filed New York County Clerk May 27, 2020."  Does

24   that refresh your recollection that the landlord

25   filed this lawsuit on or about May 27 of 2020

CONFIDENTIAL

Page 296

1    against the Clinton Group?

2            A.    Yes.

3            Q.    Okay.  If you could turn to the second

4    page of the -- of the document, Mr. Hall, I'm going

5    to ask you to direct your attention to paragraph 3,

6    and in the second sentence --

7            A.    I'm sorry.  What page?

8            Q.    Paragraph -- on the second page of the

9    document.

10                MR. CARBONE:  Of the complaint.

11                MR. SACK:  Go a little bit further

12    into --

13            Q.    I'm sorry.

14                MR. SACK:  -- the complaint.

15            Q.    Page 2 of the complaint.

16                MR. SACK:  So turn that one over,

17    George.

18            Q.    It's page 4 of 12 on the bottom, and

19    it's page 2 of the complaint.

20            A.    4 of 12 on the bottom.

21            Q.    Yeah.

22            A.    I got it.

23            Q.    Now, Mr. Hall, it says in the -- in

24    paragraph 3 in the second paragraph, on about -- "On

25    or about November of 2018, CGI began to fall behind

CONFIDENTIAL

Page 297

1   on its rent obligations, first by failing to pay

2   rent on a timely basis, then later by stopping

3   payments of rent altogether on or about June of

4   2019."  Is that allegation correct?

5           A.     I don't recall if there were any

6   payments made after June 2019.

7           Q.     Okay.  Who would know that?

8           A.     I'd have to check the -- check the

9   records.

10          Q.     Okay.  Who from Sport-BLX -- I mean

11  from the Clinton Group would know when the Clinton

12  Group stopped paying rent to World group -- World

13  Gold Trust?

14          A.     Well, there's nobody at Clinton Group

15  now, so I would have to dig it out.

16          Q.     Who at the time would have been the one

17  to do that?

18          A.     Either Daiana Sersea or Fran

19  Ruchalski.

20          Q.     Okay.  Now, in paragraph 4 it says,

21  "CGI finally vacated the premises on or about

22  December 13, 2019."  Do you see that?

23          A.     I'm sorry.  Paragraph 4?

24          Q.     Yeah.  On the same page.

25          A.     Yeah.  Yep.

CONFIDENTIAL

Page 298

1          Q.     Okay.  And so does that refresh your

2     recollection as to about when the Clinton Group

3     vacated 510 Madison Avenue?

4          A.     Yes.

5          Q.     Now, when -- when did Sport-BLX begin

6     making rent payments to the Clinton Group for the

7     space?

8          A.     March of 2019.

9          Q.     And how long did those payments

10    continue?

11         A.     I think they continued through

12    December of -- in terms of payments or in terms of

13    for usage of the space?

14         Q.     When -- when -- when did the Sport-BLX

15    make payments, rental payments, to Clinton Group for

16    use of the space at 510?

17              MR. SACK:  Objection to form, but you

18    can answer.

19         A.     I don't recall the dates of the

20    payments.

21         Q.     Okay.  Who would -- who would know

22    that?

23         A.     Well, at the time it was Francis

24    Ruchalski or Daiana Sersea.

25         Q.     Okay.  And do you have any idea what

Page 299

1  was being done with the payments that -- that
2  Sport-BLX was making to the Clinton Group for rent?
3        A.    Well, I don't -- I don't recall the
4  specifics, but there was a significant security
5  deposit that World Gold was drawing down on, so
6  World Gold was -- was -- other than -- so World
7  Gold, as I recall, was whole every month.
8        Q.    Through when?
9        A.    Through December.
10       Q.    Okay.  Now, so in terms of the -- what
11  happened with the -- to your knowledge, what
12  happened with the rent payments that Sport-BLX was
13  making to the Clinton Group?
14             MR. SACK:  Objection to form.
15       A.    What do you mean, what happened to the
16  payments?
17       Q.    Were they passed on to the landlord?
18  Were they kept by the Clinton Group?  What happened
19  to them?
20             MR. SACK:  Objection to form.
21       A.    Well, they ultimately -- that amount
22  of cash plus the -- well, the entire balance of what
23  was owed to the landlord was paid to the landlord.
24  Clin- -- Sport-BLX paid a certain amount of money
25  each month for different periods to Clinton Group

CONFIDENTIAL

Page 300

1    for use of that space.

2         Q.    And if you'd turn to the next page of

3    the -- of the document, and I'm going to focus you

4    on paragraph 8.  It says, "In connection with its

5    efforts to evict CGI, WGTS has learned that several

6    entities, including GlassBridge Enterprises, Inc.,

7    have been occupying the premises in violation of the

8    lease and sublease."  Do you see that?

9         A.    I do.

10        Q.    Did Clinton Group ever get permission

11   for GlassBridge to occupy the premises?

12              MR. SACK:  Objection to form.  Lacks

13   factual foundation.

14        A.    This sentence is just the drama and

15   false statements of a typical lawsuit.

16        Q.    Well, that's not -- that's not my

17   question.

18        A.    Well, I'm -- I'm finishing my answer,

19   if I may.

20        Q.    Sure.

21        A.    GlassBridge did not use any space.

22        Q.    Okay.

23        A.    GlassBridge didn't have any employees.

24        Q.    So is it fair to say that Glass- --

25   that -- that you did -- Clinton Group did not seek

CONFIDENTIAL

Page 301

1    permission for GlassBridge to occupy the premises?

2        A.    That is correct.

3        Q.    Okay.  Is it also true that Clinton

4    Group did not seek permission for Sport-BLX to

5    occupy the premises?

6        A.    Correct.

7        Q.    Did anyone ever tell you that the

8    landlord's permission was required for Sport-BLX to

9    occupy those premises?

10              MR. SACK:  Objection to form, and just

11   to caution the witness about attorney-client

12   privilege.

13       A.    I don't believe it was required.

14       Q.    Okay.  And what is that belief based

15   on?

16       A.    I took a look at sections of the

17   lease, and I -- I was satisfied that it wasn't

18   necessary.

19       Q.    Okay.  So you actually reviewed the

20   lease at some points to see if a sublease was

21   permitted?

22       A.    Not the entire lease.  And we didn't

23   really call it a sublease.  We just -- it was a

24   reimbursement of expense, which on the pro forma was

25   under the moniker of rent.

CONFIDENTIAL

Page 302

1          Q.     Okay.  But whatever you called it,

2     wasn't it a fact that Clinton Group had a lease with

3     -- a written lease with World Gold, and in turn, it

4     was getting paid by Sport-BLX to use the same space?

5                 MR. SACK:  Objection to form.

6          A.     It was getting paid for use of a

7     portion of the space and the infrastructure within

8     that space.

9          Q.     Do you recall, when you looked at the

10    lease, whether you looked at -- there was a

11    provision about no assignment?  Did you look at that

12    provision, section 7 of the lease?

13         A.     I don't recall that section.

14         Q.     Okay.  When did you first engage with

15    the -- prior to the lawsuit, when did you first

16    engage with the -- with the landlord, or someone

17    from the Clinton Group engage with the landlord,

18    concerning the issues arising out of the partial

19    payment or nonpayment of rent?

20         A.     A number of times throughout the year.

21         Q.     "Throughout the year" being 2019?

22         A.     Yes.

23         Q.     When did the issue -- when did the

24    landlord first raise the issue with respect to the

25    rent with --

CONFIDENTIAL

Page 303

1          A.    I don't -- I don't recall the first

2    time.

3          Q.    Okay.  If we could look at Hall-40 for

4    identification.

5                (Exhibit Hall-40, Three-page Minutes

6    of the Regular Quarterly Meeting of the Board of

7    Directors of Sport-BLX, Inc. dated August 14, 2019

8    Bates stamped GBE_0003774 through 3776, is marked

9    for identification.)

10                MR. CARBONE:  This is 40?

11                MR. PEARLSON:  Yes, 40.

12                MR. CARBONE:  Thank you.

13          Q.    Mr. Hall, I'm going to show you what's

14    been marked as Hall-40 for identification.  It's the

15    Minutes of the Regular Quarterly Meeting of the

16    Board of Directors of Sport-BLX dated August 14,

17    2019.  I'm going to direct you to the second page of

18    that document, which is Bates stamped GBE_0003775.

19                Now, Mr. Hall, this is dated August 14,

20    2019.  So by this point Clinton Group had stopped

21    paying rent for 510 Madison Avenue, correct?

22                MR. SACK:  Objection to form.

23          A.    I don't know.

24          Q.    Okay.  And again, that would be

25    something Mr. Ruchalski would know?

CONFIDENTIAL

1          A.      I don't know if he would -- I don't

2      know if he would know.

3          Q.      Okay.  Did you ever report the problems

4      with the landlord to the board of Sport-BLX?

5                  MR. SACK:  Objection to form.

6          A.      No.

7          Q.      Did you ever report to the board of

8      Sport-BLX that the Clinton Group had stopped paying

9      rent for the premises?

10                 MR. SACK:  Objection to form.

11         A.      No.

12         Q.      Did you ever report to the Sport-BLX

13     board that the landlord threatened to evict the

14     Clinton Group from the premises?

15                 MR. SACK:  Objection to form.

16         A.      At what time period?

17         Q.      At any time period.

18         A.      Okay.  Because we're -- are we still

19     on the August 14?

20         Q.      Yes, August 14.

21         A.      So at that point we -- I don't think

22     we were threatened to be evicted.

23         Q.      Okay.  And when was the first time that

24     the landlord threatened to evict Clinton Group from

25     the premises?

CONFIDENTIAL

Page 305

1          A.     I -- I think it was in November or

2   December of 2019.

3          Q.     Okay.  Now, if -- if you -- if you look

4   -- and at that time did you advise the board, the

5   Sport-BLX board, that there was a potential they

6   would be evicted from the space?

7          A.     I don't recall if -- I probably didn't

8   say anything about being evicted, but I did tell the

9   board we were not going to be in the space anymore.

10         Q.     Okay.  And did -- at that point did you

11  look for alternative space for Sport-BLX to occupy?

12         A.     We started to look at some other space

13  throughout the year, yes.

14         Q.     Okay.  And who was involved in that

15  search?

16         A.     I don't recall exactly.

17         Q.     What -- did you end up signing a lease

18  for Sport-BLX -- on Sport-BLX's behalf for space?

19         A.     No.

20         Q.     All right.  What happened in terms of

21  what space did Sport-BLX use following the eviction

22  from 510 Madison Avenue?

23                MR. SACK:  Objection to form.

24         A.     Some people worked at home, some

25  people worked from my home in the city, some people

CONFIDENTIAL

Page 306

1    worked from their own homes in New Jersey, and maybe

2    some other -- some people may have worked remotely.

3    Other people worked remotely.  I'm not sure what

4    other addresses.

5            Q.    Okay.  So is it fair to say that

6    Sport-BLX went from 510 Madison Avenue to having

7    really no office, no physical office?

8            A.    It had multiple remote physical

9    offices.

10           Q.    That was depending on where the

11   individuals were located?

12           A.    Well, some of the individuals came to

13   my home in New York, and some of the -- we also had

14   a facility in New Jersey that people were able to

15   use as well, so there was -- Clinton Group had

16   another office with a different landlord separate

17   from this that people began to use.

18           Q.    Okay.  And did -- did Sport-BLX pay any

19   rent after December of 2019?

20           A.    I don't recall exactly.  There may

21   have been some minimal payment.

22           Q.    Okay.  Now, if you -- if you look at

23   this document, again, this is the section that's

24   labeled "Company's Office Space Requirements and

25   Hiring Projections."

CONFIDENTIAL

Page 307

1          A.     Yes.

2          Q.     And it talks -- if you could read that

3     to yourself, Mr. Hall.

4          A.     Okay.

5          Q.     Okay.  Now, at this time is it fair to

6     say that you -- that you led a discussion about the

7     board -- with the board about the company's needing

8     increasing space for its activities?

9          A.     Yes.

10         Q.     Okay.  And -- and you didn't mention in

11    this meeting that there were problems with the rent

12    at the current space, did you?

13              MR. SACK:  Objection.  Asked and

14    answered.

15         A.     I don't recall.

16         Q.     Okay.  Do you recall Mr. Salerno asking

17    you either at this meeting or prior to this meeting

18    for the lease for the premises?

19         A.     Yes.

20         Q.     Okay.  When did he do that?

21         A.     I think almost every meeting.

22         Q.     When did those -- when did those

23    requests start?

24         A.     Well, I don't know what you term a

25    request, but the lease issue was initially brought

CONFIDENTIAL

Page 308

1    up, I think, the -- well, let me rephrase that.

2                    He brought up the rent allocation of

3    500,000 before he invested.  Brought it up numerous

4    times.  And then once he made his investment he

5    brought it up -- the first time after making the

6    investment, I believe, was April 11.

7         Q.    Okay.  And did you ever provide

8    Mr. Salerno with any documents as to how the rent

9    had been determined?

10        A.    No.

11        Q.    Did you ever give him the analysis or

12   the pro forma by -- business plan by ConsenSys?

13        A.    I believe that -- well, that was in

14   the data room, so he saw that.

15        Q.    Okay.  And did that have any breakdown

16   as to how the $500,000.00 was determined?

17        A.    I -- I don't know.

18        Q.    Okay.  How did you explain, or did you

19   explain, the breakdown of the $500,000.00 number to

20   Mr. Salerno?

21                    MR. SACK:  At what time, Ross?

22        Q.    At any time.

23        A.    Well, we discussed it so many times,

24   I'm not sure if I -- there's one answer to all those

25   questions.

CONFIDENTIAL

Page 309

```
1         Q.     Well, what was the explanation you gave
2    him for the basis for the $500,000.00 rent?
3              MR. SACK:  Objection to form.
4         A.     It was based on the fact -- ultimately
5    it was based on the fact that the company could not
6    have gotten any other space with the same
7    infrastructure at any better price, in my view.
8         Q.     Okay.  And you had never looked at any
9    other space, had you?
10        A.     Well, the -- the spa- -- we generally
11   know what rents are in Manhattan.  We know how much
12   space we might need.  We also anticipate growth, so
13   if we had gotten a space that just hou- -- just
14   serviced the peo- -- or, you know, was the place of
15   business of the current employees, it wouldn't have
16   allowed for any growth, so we had to anticipate
17   growth, but most importantly, we looked at the
18   non-rent facts around this.
19              I've never heard of a commercial lease
20   without a security deposit, so we assumed that there
21   would be a security deposit.  We also assumed that
22   Sport-BLX didn't have the creditworthiness and were
23   pretty confident that it didn't have the
24   creditworthiness to get a typical commercial lease
25   in New York City.  But most importantly, the
```

CONFIDENTIAL

Page 310

1    infrastructure that was created:  The computers, the

2    -- the servers, the connections, the -- the backup,

3    the connection to a disaster recovery site, the fact

4    that there were -- there was significant

5    intellectual capacity of Clinton employees that

6    never show up on the Sport-BLX income statement.  So

7    the efficiency of no security deposit, no need to

8    buy computers, no need to get software, no need to

9    get a server, no need for various technol- --

10   technology administrators, it was, I think, a

11   generous deal for Sport-BLX.

12            Q.    Okay.  But you never looked at any --

13   going back to my question, you never looked at any

14   other space, correct?

15            A.    No.  My answer was all the things that

16   would not have been provided at any other space.

17            Q.    Okay.  But you didn't look at any other

18   space?

19            A.    At what time?

20            Q.    Ever for -- for Sport-BLX --

21            A.    No, I --

22            Q.    -- in 2019.

23            A.    I told you before at the end of 2019

24   we did look at some other spaces.

25            Q.    Okay.  Prior to that?

CONFIDENTIAL

Page 311

1          A.      If you give me a time frame, I'll
2    answer the question.
3          Q.      Okay.  So --
4          A.      Prior to when?
5          Q.      -- prior -- prior to the end of 2019
6    you didn't look for any other space for Sport-BLX?
7          A.      Prior to December 31 of 2019 we did
8    look at space.
9          Q.      Okay.  When did you do that?
10         A.      Sometime probably in the third or --
11   third quarter of -- third or fourth quarter of 2019.
12         Q.      Okay.  And where did you look?
13         A.      I don't recall.  I didn't look
14   specifically.
15         Q.      Did you end up signing a lease for that
16   space?
17         A.      For which company?
18         Q.      For -- for Sport-BLX.
19         A.      No.
20         Q.      Now, when -- did you -- the things you
21   -- all the things you just told me, did you tell
22   Mr. Salerno those things?
23         A.      I'm confident that we told him most of
24   those things, yes.
25         Q.      Okay.  Was that ever in writing?

CONFIDENTIAL

Page 312

1        A.      I don't recall.

2        Q.      Was that at a board meeting?

3        A.      I don't recall.

4        Q.      So why do you say you're confident you

5   told Mr. Salerno all those things we just went over?

6        A.      Well, we talked to him before he

7   invested.  As far as I know, those weren't recorded,

8   and we didn't take minutes of the pre-investment

9   meeting that he had at the space.

10        Q.      How about post-investment?

11        A.      We talked in generalities about the

12   need for space, the amount of space that was being

13   used, the fact that an allegation of having only

14   five employees was just fantasy, and we -- we talked

15   about the infrastructure, you know, things -- the

16   security deposit, things that made this a beneficial

17   deal for Sport-BLX.

18        Q.      What -- what did you do when he asked

19   for the lease?  What did you tell him?

20        A.      There was no lease.

21        Q.      Okay.  And what did he say?

22        A.      He -- his view was we needed a lease.

23        Q.      Okay.  And did you ever tell him that

24   -- that, you know, the -- you hadn't approached the

25   landlord about the -- about a lease, a sublease?

CONFIDENTIAL

Page 313

1          A.      I don't recall if we had that
2    discussion.
3          Q.      Did you ever tell him that Clinton
4    Group had stopped paying the rent on the property?
5                  MR. SACK:   Objection to form.
6          A.      I don't believe so.
7                  I'll also add that I -- I had said
8    before that they were making deductions to keep
9    themselves current on the security deposit.  So they
10   were getting paid the rent.  The security deposit
11   was declining, but they were getting paid the rent.
12         Q.      Okay.  But that didn't stop them from
13   suing you, correct, Clinton Group?
14         A.      As I said, that was a complex
15   situation, and it's not as simple as you've alleged.
16         Q.      Okay.  But they did sue you?
17         A.      They did sue me.
18         Q.      And they did evict you?
19         A.      They did.
20         Q.      And isn't it a fact that the
21   landlord --
22         A.      The eviction was not as a result of
23   the lawsuit.
24         Q.      The -- the -- I'm not -- that wasn't my
25   question.

CONFIDENTIAL

Page 314

1          A.      Okay.

2          Q.      Isn't it a fact also that the landlord

3   just was granted summary judgment on liability for

4   the nonpayment of rent?

5          A.      Yes, but the -- here's where I'm -- I

6   said I don't entirely know the status of this

7   because what's at issue is the -- the damages, which

8   I believe is still pending.

9          Q.      And the lawsuit is still pending?

10         A.      Well, you just told me there was a

11  summary judgment, so I'm gonna just say I'm -- I'm

12  not entirely sure of the process, but it's not been

13  completely resolved is my understanding as a lay

14  person, and that's -- in between the start and where

15  we are now, I'm not really sure of everything that's

16  happened.

17         Q.      Now, Mr. Hall, did you submit a -- a --

18  a sworn declaration in the lawsuit?

19         A.      I believe so.

20              MR. PEARLSON:  All right.  Can we show

21  him 85?

22              (Exhibit Hall-85, Declaration in

23  Opposition in the World Gold Trust v. Clinton Group

24  matter, is marked for identification.)

25         Q.      Okay.  Mr. Hall, I'm going to ask you

CONFIDENTIAL

Page 315

1   to look at a document that's been marked as Hall-85

2   for identification.  It's a document that's entitled

3   Declaration in Opposition.  Do you see that?

4                And --

5        A.     Yes.

6        Q.     And do you recognize that as a

7   declaration you submitted in connection with the

8   World Gold Trust v. Clinton Group lawsuit?

9        A.     I see my signature at the end, so I

10  assume, yes.

11       Q.     Were you aware that you were submitting

12  that document under oath?

13       A.     Yes.

14       Q.     Okay.  Now, if you could turn to

15  paragraph 9 of the document, and I'm going to ask

16  you to read that paragraph to yourself.

17       A.     Okay.

18       Q.     Okay.  It refers to a perfect storm of

19  business downturn, in the first sentence, made it a

20  very difficult year for CGI.  What was the perfect

21  storm of business downturn that you were referring

22  to in that paragraph?

23       A.     Well, it was primarily redemptions in

24  our main strategy that caused a reduction in monthly

25  revenues at Clinton Group.

CONFIDENTIAL

Page 316

1          Q.      Okay.  When you say "redemptions,"
2    these are redemptions by investors?
3          A.      Yes.
4          Q.      And there were unusual large number of
5    redemptions in that year?
6          A.      I don't recall in this year, but over
7    the previous couple of years.
8          Q.      Okay.  And what was the impact on the
9    Clinton Group caused by those redemptions?
10         A.      Well, it had less monthly revenues.
11         Q.      And -- and then you also refer to --
12   and how many years had that been happening, this
13   redemption issue that you just mentioned?
14         A.      Well, I don't know what the peak was,
15   so redemptions from -- from the peak, anytime the
16   assets go down there's -- there's a net redemption.
17   Then there are times where it goes back up, and then
18   times it goes back down, so I don't know month to
19   month what it is.
20         Q.      Okay.  Do you have -- on a yearly basis
21   do you have any idea how -- over what period of time
22   the -- the amount of redemptions had increased, and
23   the amount of funds had gone down?
24         A.      I believe 2017-18 was a period of
25   large redemptions.

CONFIDENTIAL

Page 317

1        Q.    Okay.  And those were difficult years

2    for Clinton Group?

3        A.    Eh, I don't -- I don't recall

4    specifically.  There was still a fair amount of

5    assets under management, so I'm not sure what

6    "difficult" really means.

7        Q.    Okay.  Was -- but was 2019 a difficult

8    year, as per your declaration?

9        A.    2019 was a transition year for the

10   firm, so it was difficult in terms of month-to-month

11   cash flow, but, you know, it -- Clinton was in the

12   process of, you know, reinventing what it was

13   working on, and there was a mismatch of revenues and

14   expenses.

15       Q.    Now, in terms of -- in terms of the

16   transition you just described, can you describe for

17   us what, exactly, that involved in terms of the

18   Clinton Group, I believe you used the term

19   reinventing, its business model?

20       A.    Well, we started to spend a lot of

21   time working on transactions for GlassBridge, and so

22   that is not the type of work that causes -- you

23   know, that leads to monthly revenues but could

24   potentially be extraordinarily valuable or

25   profitable.

CONFIDENTIAL

Page 318

1          Q.    What kind of work was it or services

2    was Clinton Group providing to GlassBridge?

3                MR. SACK:  What period, Ross?

4                MR. PEARLSON:  When he's talking about

5    the transition, I believe, in 2019.

6                MR. SACK:  Okay.

7          A.    Yeah.  Still in -- in 2019 the focus

8    was -- among other things, but primary focus was to

9    get capital into GlassBridge.

10         Q.    Okay.  And who was responsible for that

11   process?

12         A.    Well, Clinton Group had signed a

13   services agreement with GlassBridge to effectively

14   manage the operations and try to recapitalize the

15   company, so ultimately Clinton Group was responsible

16   for that.

17         Q.    And anybody in particular at the

18   Clinton Group?

19         A.    Well, Daniel Strauss primarily was

20   working on GlassBridge.  Daniel -- Joe De Perio was

21   also the chairman of GlassBridge, so -- so he had,

22   you know, some -- some involvement in the overall

23   strategy.  We had some outside consultants we used,

24   so there were a lot of people focused on

25   GlassBridge.

CONFIDENTIAL

Page 319

1           Q.      And what was -- what would be the

2     Clinton Group's role in the recapitalization of

3     GlassBridge?

4           A.      To find someone with capital that

5     wanted to invest in GlassBridge and then to bring

6     that transition to fruition.

7           Q.      And what was GlassBridge's capital

8     situation at the time that you were looking at this

9     reinventing of Clinton Group and recapitalization of

10    GlassBridge?

11          A.      I don't -- I don't recall what the

12    capitalization was.

13          Q.      Okay.  Do you know if it had negative

14    capital at the time or positive capital?

15                  MR. SACK:  I -- I think --

16          Q.      GlassBridge.

17                  MR. SACK:  I think you might want to

18    be a little bit more particular about time, given

19    that you're talking about --

20          Q.      No.  We're talking about a transition

21    period, I believe, at the end of 2019, correct?

22          A.      No, sir.  We're talking about 2019.  I

23    said from 2018 to '19.

24          Q.      Okay.  So --

25          A.      Not the end of 2019.

CONFIDENTIAL

Page 320

1          Q.     Okay.  So in 2019 did the -- did
2     GlassBridge have -- do you know whether it had a
3     positive or negative capital situation?
4          A.     Can you define "capital" for me?
5          Q.     What's your understanding of the term?
6          A.     I'm -- I'll use whatever term you
7     like.  I'll answer your question.
8          Q.     On its balance sheet was it showing
9     positive or negative capital situation?
10               MR. SACK:  Objection to form, but you
11    can try to answer that.
12         A.     From a -- from a balance sheet or a
13    GAAP standpoint, I don't recall.
14         Q.     Okay.  Do you know who would know that?
15         A.     Any -- any accountant that looks at
16    the publicly issued financials.
17         Q.     Okay.  Now, in your -- going back to
18    your declaration, in paragraph 9 it refers to that
19    -- it says, "Furthermore, certain of its affiliates
20    were beginning to thrive."
21               What affiliates are you talking about
22    at that period that were beginning to thrive?
23         A.     Well, GlassBridge was beginning to
24    thrive in 2019, and we believed Sport-BLX was
25    beginning to thrive.

CONFIDENTIAL

Page 321

1          Q.      Can you tell us first how GlassBridge

2     was beginning to thrive in 2019?

3          A.      So GlassBridge got a pretty

4     significant injection of capital in October of 2019.

5          Q.      From whom?

6          A.      Orix.  Not the technical corporate

7     name, but Orix something.

8          Q.      Okay.  So -- and that was -- when

9     you're saying it was beginning to thrive, it was

10    because of that injection of capital from Orix?

11         A.      Yes.

12         Q.      All right.  Was there anything else

13    that led GlassBridge to thrive in 2019?

14         A.      GlassBridge had another investment in

15    a company called ARRIVE, which I think was also

16    doing well.

17         Q.      What about Sport-BLX; how was Sport-BLX

18    thriving in 2019?

19         A.      Well, we had created a company that

20    started out with a nine-and-a-half-million-dollar

21    valuation.  We had investors that subsequently

22    invested at higher valuations.  We had built a

23    technology platform that we hoped would have some

24    value in the context of the business.  We had met

25    many, many sports figures in terms of families of

CONFIDENTIAL

Page 322

1    athletes, agents, wealth managers, so we developed a

2    pretty strong network.  We developed a pretty strong

3    brand, I believe.  We did a tremendous amount of

4    work on legal and structures that were going to be

5    valuable to the business, and we had, I think, a

6    pretty -- pretty strong business plan in --

7    throughout the year.

8         Q.    And did Sport-BLX, in 2019, enter into

9    any contracts with athletes?

10        A.    No contracts.  Correct.

11        Q.    Did it generate any revenues in 2019?

12        A.    No.

13        Q.    Now, if we could look at -- turn to

14   paragraph 26 of your declaration.  I'll just ask you

15   to read that paragraph to yourself.

16        A.    Okay.

17        Q.    Okay.  Now, it says here they were --

18   it was considering the possible sublet of the

19   premises to another company, and then in parens,

20   Affiliate No. 1.  Is Affiliate No. 1 GlassBridge?

21        A.    Yes.

22        Q.    Okay.  And GlassBridge is a publicly

23   traded entity, correct?

24        A.    Yes.

25        Q.    Okay.  Now, if you could turn to the

CONFIDENTIAL

Page 323

1    next page, paragraph 30.

2             A.      Mmm.

3             Q.      It says -- and if you could read that

4    to yourself.

5             A.      Okay.

6             Q.      Now, is Affiliate 2 Sport-BLX?

7             A.      Well, it doesn't specifically say, but

8    I believe that's correct.

9             Q.      Okay.  And -- and you were going -- and

10   it says you intended to raise Sport-BLX's use of the

11   subject premises to the board of Sport-BLX at its

12   next meeting, correct?

13            A.      Okay.  I see that.

14            Q.      Okay.  And did you raise it with

15   Sport-BLX at the -- at the next meeting?

16                    MR. SACK:  Objection to form.

17            Q.      Let me ask you this, Mr. Hall.  Looking

18   at this paragraph, it also says, "Before I could

19   bring it to the entity's board for approval, I

20   needed a final set of terms for the negotiated

21   sublease with World Gold."  Do you see that?

22            A.      Yes.

23            Q.      Why is that?  Why did you need to have

24   a final set of terms for the negotiated sublease

25   with World Gold, the landlord, before you could

CONFIDENTIAL

Page 324

```
 1   bring it to the entity's board for approval?
 2           A.    So we had agreed-upon terms in terms
 3   of the rent payment and in terms of security
 4   deposit, and then we were ready to go to
 5   documentation and sign, and then World Gold reneged
 6   on those terms.
 7           Q.    But why did you need to have a -- a --
 8   a negotiated sublease with World Gold before you
 9   could go to the Sport-BLX board for approval?
10           A.    I -- the real key was the -- was the
11   GlassBridge part.
12           Q.    Well, we're talking about Sport-BLX in
13   paragraph 30, correct?
14           A.    Okay.  So this says "In addition to
15   Affiliate 1."  So I'm sorry.  Go ahead.
16           Q.    No, my question was with that sentence
17   I just read to you.  Isn't it a fact that Sport-BLX
18   was already occupying the space?
19               MR. SACK:  Objection.  Asked and
20   answered.  I don't think there's an issue.
21           A.    Sport-BLX employees were using space.
22           Q.    And Sport-BLX was paying for the use of
23   that space?
24           A.    It was reimbursing Clinton for the use
25   of that space.
```

CONFIDENTIAL

Page 325

1          Q.      Okay.  And it was doing so without a
2    negotiated sublease with World Gold, correct?
3          A.      Correct.
4                  MR. SACK:  Objection.
5          Q.      And it did that for the entire period
6    in 2019?
7          A.      Correct.
8                  Correct with something I'm not sure
9    about between the middle of December and the end of
10   December, as I mentioned before.
11         Q.      Okay.  Now, previously, Mr. Hall, we
12   were talking about that Mr. Salerno had made a
13   request for the lease from Sport-BLX, correct?  Or
14   from you, I should say, in particular?
15                 MR. SACK:  What's the question, Ross?
16                 MR. PEARLSON:  Let me -- let me
17   rephrase it.  It was a badly phrased question.
18         Q.      Mr. Hall, isn't it the case that
19   Mr. Salerno had requested that you provide him with
20   a copy of the lease?
21         A.      Which lease?
22         Q.      The lease for the prem- -- Sport-BLX'S
23   use of the premises at 510.
24         A.      He did request that.
25         Q.      Okay.  And that was part of a broader

CONFIDENTIAL

Page 326

1    series of requests he made for information from

2    Sport-BLX, correct?

3            A.      What time frame?

4            Q.      In the spring of 2019.

5            A.      Can you be more specific?

6            MR. PEARLSON:  Could we show him

7    Hall-25?

8            A.      Thank you.

9            (Exhibit Hall-25, One-page email from

10   Michael Salerno to George Hall dated May 21, 2019,

11   with two-page attachment Bates stamped

12   CYPRESS_00001215 through 1217, is marked for

13   identification.)

14           Q.      Mr. Hall, I'm going to show you what's

15   been marked as Hall-25 for identification.  It's a

16   document Bates stamped CYPRESS_00001216 through

17   1217.

18           MR. CARBONE:  Ross, I have 1215 on my

19   first page.

20           MR. PEARLSON:  Oh, I'm sorry.  1215.

21   Sorry.  I skipped the cover.  Thank you, Chris.

22           Q.      If you could turn to the second page of

23   the document?

24           A.      Yes.

25           Q.      I'm going to ask you do you recognize

CONFIDENTIAL

Page 327

1    it?

2         A.    Yes.  The format looks different, but

3    I recognize it.

4         Q.    Okay.  Was this part of a -- a request

5    for information that Mr. Salerno submitted to you

6    and Mr. De Perio in May of 2019?

7         A.    Well, looking at this, it's for myself

8    and Marc Gross.  I don't see Mr. De Perio.

9         Q.    Okay.  Do you know whether these

10   requests were given to Mr. De Perio at some point?

11        A.    I don't know specifically.

12        Q.    Okay.  And -- and if you look at the

13   top of the document, this is being submitted by

14   Mr. Salerno as a founding shareholder and director

15   of Sport-BLX.  Do you see that?

16             MR. SACK:  Well, that's what it says.

17        Q.    That's what it says?

18        A.    That is what it says.

19        Q.    Okay.  Would you disagree that as of

20   May of 2019 that Mr. Salerno was a -- in fact, a

21   founding shareholder and director of Sport-BLX?

22        A.    I'm not sure what he meant by the term

23   "founding shareholder."  I don't believe we ever

24   used that term.

25        Q.    For him?

Page 328

 1          A.      For anybody.

 2          Q.      Okay.  And when --

 3          A.      Other than Joseph De Perio and myself.

 4          Q.      He, in fact, bought shares in the

 5     founders' round of -- of the company, correct?

 6          A.      I think that's distinct from being a

 7     founding shareholder, but yes, he did buy shares in

 8     the founders' round.

 9          Q.      Okay.  Now, Mr. Hall, do you recall

10     reviewing these requests at the time they were

11     provided to you?

12          A.      In general, yes.

13          Q.      Okay.  What -- what did -- how did you

14     respond to Mr. Salerno's request for information in

15     May of 2019?

16          A.      I don't recall exactly.

17          Q.      Did you provide him with any of the

18     information on the list?

19          A.      Well, I'm not sure -- let's see.

20              MR. SACK:  I'm going to object to the

21     form.  Do you want to go through each of the 25,

22     Ross?

23              MR. PEARLSON:  Well, no, he can --

24              MR. SACK:  I don't think it's -- I

25     don't think it's a fair question to have the witness

CONFIDENTIAL

Page 329

```
 1   look through each of the 25 and try to figure that
 2   out.
 3          Q.    Well, I'd -- I'd -- I'd like you to --
 4               MR. SACK:  There's 25 specific
 5   requests.
 6               MR. PEARLSON:  Okay.  I understand
 7   that, Jonathan.
 8          Q.    If you could look through the
 9   requests, --
10          A.    Um-hum.
11          Q.    -- and then I'm going to ask you
12   whether you recall providing Mr. Salerno any of the
13   information he requested in -- in this document.  So
14   take your time.
15          A.    Between May 21 and May 31?
16          Q.    Ever.
17          A.    Oh.  Most of this he was -- well,
18   let's go -- let's go through it.
19               I believe minutes -- minutes of
20   shareholder meetings he was provided.  Minutes of
21   board meetings he was provided.  I don't recall
22   providing him cash on hand.  The investment by John
23   Howe was provided to him.
24          Q.    What was the answer to that question,
25   No. 5?
```

CONFIDENTIAL

Page 330

1          A.     You want me to tell you what the
2     answer is?
3          Q.     Yes.
4          A.     Okay.  John Howe invested 250,000 into
5     the company.
6          Q.     Okay.  And what were the terms of his
7     investment?
8          A.     I believe it was about $200.00 a
9     share.
10          Q.     Okay.  Do you know how that price was
11     determined for Mr. Howe?
12          A.     That was the same price as the second
13     part of the Salerno investment.
14          Q.     Okay.  And -- and were there any
15     underlying valuations or projections for that price?
16          A.     Well, as I mentioned in the previous
17     deposition, the -- what was provided was the data
18     room was made available.  The data room had pro
19     formas.  The pro formas showed potentially
20     significant revenues.  The first round was at a
21     nine-and-a-half-million-dollar valuation.  The --
22     between the progress and the -- the potential of the
23     business, we attempted to raise money at a higher
24     valuation.
25          Q.     Okay.  And who -- who determined the

CONFIDENTIAL

Page 331

1    price that Mr. Howe paid and Mr. Salerno paid for

2    that second round?

3            A.    Well, --

4                  MR. SACK:  Objection to form.

5            A.    -- two different -- two different

6    questions, and I'll answer them individually, if I

7    may.

8                  We -- we were -- Joe De Perio was in

9    discussions with Salerno about investing at some

10    valuation, which I don't recall exactly what it was,

11    for one investment.  I believe it was Mr. Salerno's

12    request that it be split into two share purchases:

13    One at the original price, and one at a price of --

14    one at $95.00 a share and one at $200.00 a share.

15            Q.    So my question is who at Sport-BLX made

16    the determination that the $200.00 share price was

17    appropriate?

18                  MR. SACK:  Objection to form.  Your

19    question was who determined it?

20                  MR. PEARLSON:  Yes.  Who determined

21    it.

22                  MR. SACK:  It was an arm's length

23    transaction.

24                  MR. PEARLSON:  Jonathan --

25                  MR. SACK:  So two parties --

CONFIDENTIAL

Page 332

1            MR. PEARLSON:  Jonathan --

2            MR. SACK:  -- determined it.

3            MR. PEARLSON:  Jonathan, stop.

4       Q.    Who from Sport-BLX made the

5   determination to sell shares to the investors at

6   $200.00 a share?

7       A.    I think it was -- the original

8   transaction at $200.00 a share was a request by

9   Mr. Salerno.

10      Q.    Okay.  And on what basis did -- I

11  believe it was $200.18 a share.

12      A.    I'll take your word for it.

13      Q.    Okay.  So how -- how -- who on the

14  Sport-BLX side determined that that price was an

15  appropriate price to sell the shares to Mr. Salerno?

16      A.    Well, that price was -- I believe the

17  $200.18 a share was the equivalent of a pre-money

18  valuation of $25 million.

19      Q.    Okay.  And what support, if any, was

20  there for the $25 million pre-money evalu- --

21  valuation that supported that price?

22      A.    Well, that's -- that's just a

23  transaction between a buyer and a seller, a willing

24  buyer and a willing seller.  I believe the -- I

25  don't recall exactly the specifics of the -- of the

CONFIDENTIAL

Page 333

1    conversation, but I believe that was what

2    Mr. Salerno requested and what we agreed would be

3    acceptable to the company.

4         Q.    Okay.  But in determining it was

5    acceptable to the company, are you just saying that

6    it sounded right; you didn't rely on any

7    documentation or specific calculations or analysis?

8              MR. SACK:  Objection to form.

9         A.    As I said before, we -- the initial

10   round we did at nine and a half million dollars we

11   had a reasonable investor response.  We were able to

12   raise money.  That was based on the concept, the

13   idea, and the business plan.  The concept, the idea,

14   and the business plan didn't change for a while;

15   however, the progress and potentially the

16   appreciation of the business plan, some of the

17   success we were having with the plan, led us to

18   believe the valuation should be -- could be higher,

19   and that would be beneficial for the original

20   shareholders.

21        Q.    And when you sold the shares, I

22   believe, did -- did you indicate that you said that

23   Mr. Howe made his investment at the same price?

24        A.    He made an investment into the company

25   at the same price.

CONFIDENTIAL

Page 334

1      Q.    Okay.  And what success, in your view,
2  between the time of the founders' round and the
3  second round justified the increase in price?
4            MR. SACK:  Objection to form.
5      A.    Well, the founders' round began in
6  December, and the last investment in the founders'
7  round was Mr. Salerno, but that was at his request,
8  which we accommodated.  I don't recall the previous
9  last investment into the founders' round, but it was
10  before Mr. Salerno's.  So I'm happy to answer the
11  question on the progress, but as of what date?
12      Q.    As of the time that you sold the
13  additional shares to Mr. Howe.
14            MR. SACK:  I'm sorry.  Between when
15  and when?  From when to when?
16      Q.    Between the founders' round and the
17  time you sold the shares.
18            MR. SACK:  But the founders' round was
19  a period of time.  It wasn't one date.
20      Q.    When the -- when the founders' round
21  ended, and when you offered shares to Mr. Howe, or
22  he invested, I should say.
23      A.    Well, there's still some confusion as
24  to when the founders' round ended, but the progress
25  to that approximate time was just a response from a

CONFIDENTIAL

Page 335

```
 1   lot of meetings that we had had.  For example, we
 2   met with lots of people in the sports world, and
 3   this concept that we had developed actually seemed
 4   like it was a tremendous opportunity in that it
 5   would be even potentially easier to attract assets
 6   to list on the exchange than -- than we had
 7   anticipated.
 8        Q.    So is it fair to say that the increase
 9   in the share price that you offered to investors was
10   based on the indications of interest or enthusiasm
11   from meetings with sports agents and athletes?
12        A.    I think in an early stage company like
13   this you've got a pro forma, which generally in a
14   early stage venture capital business has pretty
15   significant potential, that's why people look at
16   these things, so much so, as we pointed out, that
17   the variables can make the valua- -- could make any
18   attempt at valuation wildly volatile, so there
19   wasn't a lot of accuracy to it.  So it really comes
20   down to what investors are willing to pay.
21        Q.    Now, if you could continue, Mr. Hall,
22   going through the list, and you could tell us what
23   information you provided to Mr. Salerno in response
24   to his requests contained in this document.
25             MR. SACK:  I'm going to object to
```

CONFIDENTIAL

Page 336

1  form, to the whole line of questions given the --

2  the detail in the list and the period of time we're

3  talking about, but if Mr. Hall can try to answer --

4              MR. PEARLSON:  That's kind of

5  interesting, --

6              MR. SACK:  -- to his best --

7              MR. PEARLSON:  -- considering you were

8  objecting to me trying to do a -- a general question

9  to him about the document and what information he

10  provided.  You said there are 25 requests, and we

11  have to go through the 25 requests.  So now we're

12  going through the 25 requests, per your --

13              MR. SACK:  I understand.

14              MR. PEARLSON:  Per your statement on

15  the record.

16              MR. SACK:  But you're asking for what

17  information provided over a one or longer year

18  period.  That's a very difficult thing to do.  It's

19  not a memory -- should -- this should not be a quiz.

20  He'll do his best to respond.  It's just very hard

21  to --

22              MR. PEARLSON:  Are you done --

23              MR. SACK:  -- go through point --

24              MR. PEARLSON:  -- with the speaking --

25              MR. SACK:  -- by point --

CONFIDENTIAL

Page 337

1          MR. PEARLSON:  -- objections, John?  I

2    mean, it -- it -- it -- you know, there --

3          MR. SACK:  The question is so im- --

4          MR. PEARLSON:  -- there's a -- it

5    should be, properly, "objection to form," and that's

6    it.  Not a -- a monologue.  So we can either stop

7    the deposition if you want to keep doing the

8    speaking objections, or we can move forward with

9    Mr. Hall's deposition.  It's up to you.

10         MR. SACK:  What's the question?

11   BY MR. PEARLSON:

12      Q.    Mr. Hall, let me -- let me try to be

13   more specific here.  There's a -- there's a series

14   of questions about the fund, do you see that,

15   beginning on No. 10, going through No. 18?

16      A.    Yes, I see question 10 through 18.

17      Q.    Okay.  Now, my -- my question is did

18   Mr. Salerno -- had Mr. Salerno been asking you

19   questions about a fund?

20      A.    At what time period?

21      Q.    Prior to this May document that he sent

22   you, this -- this formal request for information.

23      A.    So prior to this document?

24      Q.    Yes.

25      A.    Yes, I believe he had asked about a

CONFIDENTIAL

Page 338

```
 1   fund.
 2        Q.     Okay.  And what fund was he talking
 3   about?
 4        A.     No one knows.
 5        Q.     You have no idea what he's talking
 6   about?
 7        A.     No.
 8        Q.     Do you have any idea -- did he say to
 9   you what fund he was talking about?
10        A.     A number of times he actually
11   acknowledged that there was no fund.
12        Q.     Okay.  But here he is asking questions
13   about a fund, which would -- I mean, specifically,
14   he says, "It has been established that at minimum,
15   the president and CEO of BLX had been meeting with
16   potential investors with the intent to raise capital
17   for a fund which would purchase interest in athletes
18   and subsequently sell that interest via BLX."  Is
19   that untrue?
20        A.     Well, I don't know what that means by
21   "at minimum."  I don't think it was established, and
22   I don't -- but we did have meetings with some
23   potential investors.
24        Q.     To raise capital for a fund which would
25   purchase interests in athletes and subsequently sell
```

1   that interest via BLX?

2       A.    We -- the original idea for a fund, I

3   believe, was -- came from someone who was having

4   discussions with some entities in Qatar, and

5   sovereign wealth funds -- the sovereign wealth funds

6   many times invest in funds, so there was some

7   potential that they wanted to put money into a fund

8   for this purpose.

9       Q.    So had BLX been involved in efforts to

10  raise capital for a fund that would function in the

11  manner described in No. 10; yes or no?

12      A.    Well, let me read it carefully.

13            Other than Qatar, I don't know what

14  potential invest- -- I don't recall potential

15  investors.

16      Q.    Okay.  Was it still being discussed at

17  that point, the time of this request, that there

18  would be a fund that would purchase interests in

19  athletes and that would be sold through the BLX or

20  Sport-BLX platform?

21            MR. SACK:  Objection to form.

22      A.    So there's never a deterministic would

23  be for the fund.  That's up to the fund investors to

24  decide if they want to invest or not.  So there was

25  the potential to have an affiliation with a fund

CONFIDENTIAL

Page 340

1   that may do what this suggests, but there's never a

2   -- and this says "intent."  You said "would

3   purchase."  So the intent to raise capital for a

4   fund, I don't think I spoke to any investors, and

5   I'm not aware of any investors other than Qatar.

6          Q.    Okay.  When you say "Qatar,"

7   specifically, what are you talking about when you --

8                MR. SACK:  Objection.  Asked and

9   answered.

10         Q.    I assume it's not the government of

11  Qatar.  Or is it?

12         A.    No, actually, it is.

13         Q.    Okay.  And -- and so the idea would be

14  to develop a fund that would purchase these

15  interests in the athletes that would then be traded

16  on Sport-BLX's trading platform?

17               MR. SACK:  Objection to form.

18         A.    I'm confused by the word "develop."

19  As I said, I don't really know what fund we're

20  talking about, so I'm very -- I'm confused by the

21  whole question of a fund.  So if you could be more

22  specific, I'll answer your question.

23         Q.    Okay.  Well, again, we were talking

24  about the idea of a fund that would be used to

25  purchase interests in athletes and their

CONFIDENTIAL

Page 341

1    contracts --

2            A.      Um-hum.

3            Q.      -- and then subsequently sell those

4    interests over the Sport-BLX platform.

5            A.      Okay.

6            Q.      Was that a concept that had been

7    advanced and was being explored in the spring of

8    2019?

9                    MR. SACK:  Objection to form.

10           A.      That was being explored, but what's

11   spoken about here is meetings with potential

12   investors.  I don't recall that other than Qatar.

13           Q.      Okay.  Well, Qatar is one potential

14   investor, correct?

15           A.      Correct.

16           Q.      But you don't recall any meetings with

17   any other potential investors in the fund?

18                   MR. SACK:  Objection to form.

19           A.      In- -- instead of "the fund," we'll

20   call it a potential fund.  I don't recall any other

21   meetings with potential investors in a fund.

22           Q.      Did -- did Sport-BLX at this time

23   solicit any other potential investors for the

24   potential fund?

25           A.      I don't recall.  At the time we were

                                              Page 342

1    having discussions with potential partners that

2    could manage the fund, but I don't recall specific

3    investors.

4          Q.    Okay.  And this -- and the potential

5    fund, --

6          A.    Um-hum.

7          Q.    -- how would Sport-BLX benefit from the

8    -- as per Mr. Salerno's question No. 14, how would

9    Sport-BLX benefit from the fund?

10               MR. SACK:  Objection to form.

11         A.    If there was a fund managed by someone

12   other than Sport-BLX, then that would be a

13   continuous source of assets we could sell through

14   the Sport-BLX platform.

15         Q.    Okay.  And was it ever discussed that

16   Sport-BLX would receive a fee for partnering with

17   the fund manager in the --

18               MR. SACK:  Objec- --

19         Q.    -- in the potential fund?

20               MR. SACK:  Objection to form.

21         A.    So it really comes down to what

22   investors want to do.  If Qatar came and said the

23   only thing they wanted to do was invest in a fund,

24   then if there was a way for Sport-BLX to benefit, if

25   the fund was big enough, we potentially could have

CONFIDENTIAL

1    considered that, but it would have disintermediated

2    the entire Sport-BLX business.

3           Q.      I'm sorry.  It would have what?

4           A.      Disintermediated?  It would have made

5    -- is that the --

6           Q.      Yes.  Could you explain --

7                   MR. SACK:  Correct word.

8           Q.      -- what you mean by that?

9           A.      The original Sport-BLX model would

10   have not been possible.

11          Q.      And why is that?

12          A.      You can't serve two masters.  The

13   investors in a fund get the benefit of the increase

14   in value of the fund assets.  You can't play that

15   role of general partner for a fund and then also be

16   the same party that's taking out commissions for

17   selling that asset.  It's just a terrible conflict

18   of interests.

19                  So the fund actually was not something

20   that we wanted to do.  We would be happy if an

21   affiliated en- -- and when I say "affiliated," I

22   mean an entity where we had a relationship with

23   where that entity could independently represent its

24   investors and try to go out and make good decisions

25   on doing deals with athletes.  Given that we would

CONFIDENTIAL

Page 344

1    have a relationship with this entity, our platform

2    would have its biggest provider of assets that we

3    could list.

4         Q.    And it was never contemplated or

5    discussed that Sport-BLX or its affiliate would own

6    an interest in the fund manager?

7         A.    Well, if we found the right general

8    partner to -- to be the fund manager at this time,

9    or the time frame we're talking about, there were

10   potential fees that we could get, but they would be

11   limited.

12            The real goal -- and it really boils

13   down to if you have a choice, do you want to make 20

14   percent or a hundred percent, right?  When we, what

15   I'll call loosely, underwrite a deal and sell the

16   shares, we get a hundred percent of the fee.  If we

17   do it through a fund, we only get 20 percent of the

18   profits.  And you can't do both.

19        Q.    So how did you respond to Mr. -- or did

20   you respond to Mr. Salerno's questions concerning

21   the fund in -- in or around May of 2019?

22        A.    I told him in May of '19 and in April

23   of '19 and probably every month subsequent, there

24   was no fund.

25        Q.    Okay.  And what was his response to

CONFIDENTIAL

Page 345

1    that?

2            A.      Sometimes he said, okay, if you tell

3    me that I'll take your word for it, and then he

4    continued to bring it up.

5            Q.      Did he ever tell you that you had

6    represented to him that there would be a fund in

7    connection with Sport-BLX?

8            A.      I don't recall.  I think he probably

9    did because I do remember explaining to him that

10   there was -- that there was no fund, and if there

11   was an entity that would act as a fund, that it

12   would be apart from Sport-BLX itself.

13           Q.      Okay.  And just to be clear for the

14   record, your testimony is that you had told him this

15   not only in around this time about the no fund, but

16   previously in April you had also told him there was

17   no fund?

18           A.      Actually, I don't recall if it was --

19   if we spoke about it in April, so...

20           Q.      Okay.  But you have a recollection of

21   -- of advising him at this time, being May of 2019,

22   that there was no fund?

23           A.      Subsequent to this, in direct response

24   to this, I -- I don't recall.  So I apologize, we

25   tend to go back and forth between anytime during the

Page 346

1    year and this specific date.  There are many times

2    during the year where I told him there was no fund.

3    There were several times during the year where I

4    told him that if there was a fund, it would likely

5    be unaffiliated with Sport-BLX and -- unaffiliated

6    in a financial way.  We would have a relationship,

7    hopefully, with that fund, if it existed.  But I

8    explained to him a number of times that fund

9    management was not necessarily in the interest of

10   Sport-BLX.

11        Q.    Now, did you ever provide Mr. Salerno

12   with a written request -- I'm sorry -- a written

13   response to his informational requests contained in

14   Hall-25?

15        A.    I don't -- well, some of these were

16   provided in writing because he received minutes and

17   notices.  I don't think we did a written -- I'm

18   pretty confident we didn't do a written response to

19   the nonmonetary value of each of the shareholders of

20   Sport-BLX.  The -- I don't know if we ever shared

21   the names of potential investors.

22             Yeah, I -- I don't recall.  I don't

23   know of any document in writing, and I don't recall

24   if we responded to each and every one of these, but

25   many of them we did respond to him.

Page 347

1              MR. PEARLSON:  Can we show him

2      Hall-26?

3              (Exhibit Hall-26, Three-page May 21 to

4      May 29, 2019, email exchange between Michael

5      Salerno, George Hall, and Joseph De Perio Bates

6      stamped SPORTBLX00048150 through 48152, is marked

7      for identification.)

8              MR. SACK:  Ross, do you want to maybe

9      take a break after this document?

10             MR. PEARLSON:  Yeah, that's a good

11     idea.

12         Q.    Okay.  Mr. Hall, I'm going to show you

13     a document that's a string -- an email chain that's

14     been Bates stamped SPORTBLX00048150 through 152.

15     And I'm going to direct your attention to the middle

16     of page 2, where it's an email to you where it says,

17     "Hello, George.  See attached request for

18     information, as we discussed."

19             Do you recall that Mr. Salerno had sent

20     you a request for information, the request for

21     information we had looked at previously, in or

22     around May 19 or 20 of 2019?

23             MR. SACK:  Just so we're clear, Ross,

24     you're saying that reference to the information is

25     what we were just discussing --

CONFIDENTIAL

```
                                                 Page 348
 1                  MR. PEARLSON:  Yes.
 2                  MR. SACK:  -- in 25?
 3                  MR. PEARLSON:  Yes.
 4                  MR. SACK:  Okay.
 5          Q.     Is that consistent with your
 6   recollection?
 7                  MR. SACK:  Do you follow that, George,
 8   what we're talking about?
 9          A.     So we're talking about the message
10   from Salerno to me at the bottom of the page; is
11   that correct?
12          Q.     Right.  And do you understand that to
13   refer to the request for information we just went
14   over?
15          A.     Well, I don't necessarily know what he
16   was referring to, but...
17          Q.     Okay.  Did you know -- it says, "See
18   attached request for information, as we discussed."
19   Did he discuss with you that he would be sending
20   you --
21                  MR. SACK:  I just wanted -- I don't
22   think George is --
23                  MR. PEARLSON:  Okay.
24                  MR. SACK:  -- looking at that email.
25                  So let's go to page 2 --
```

CONFIDENTIAL

Page 349

1              MR. PEARLSON:  Okay.

2              MR. SACK:  -- of this -- oop, sorry,

3    George.

4              THE WITNESS:  No, it's fine.

5              MR. SACK:  Page 2.  Ross is referring

6    to -- to an email --

7              Why don't we just get the record clear?

8    This is an email from Salerno to George Hall, May

9    21, at 2:03 p.m.  Is that the one you're pointing

10   him to?

11             MR. PEARLSON:  Correct.

12             MR. SACK:  Okay.  So this is the email

13   that Ross is now asking you about, George.

14             MR. PEARLSON:  Right.

15             MR. SACK:  So why don't we go --

16   BY MR. PEARLSON:

17        Q.    So it says, "See attached request for

18   information, as we discussed."  My -- my first

19   question, Mr. Hall --

20        A.    Is this the attachment?

21        Q.    Well, that's one of my questions.

22             So, Mr. Hall, my first question is do

23   you recall that before Mr. Salerno sent you a

24   request for information that he advised you that he

25   would be making a written request for information

CONFIDENTIAL

Page 350

```
 1    from you and the company?
 2            A.    I don't specifically recall.
 3            Q.    Okay.  Do you remember him making --
 4    sending you any other written requests for
 5    information in or around May of 2019 other than the
 6    one that was in front of you that we marked
 7    previously?
 8            A.    I don't recall.
 9            Q.    Okay.  And then he -- if you turn to
10    the -- back to the first page of the -- at the
11    bottom of the page 1.
12            A.    Yeah.
13            Q.    It says, "Per our" -- "George, Per our
14    conversation, you stated there will be a board
15    meeting at the end of June, at which time most of
16    the information that I've requested will be
17    provided, which I expressed I am fine with."  Do you
18    see that?
19            A.    Yes.
20            Q.    So do you recall responding to
21    Mr. Salerno's information request by telling him
22    he'll get it at a board meeting at the end of June?
23            A.    Well, I do remember saying we
24    scheduled a board meeting.  I think it actually
25    occurred in July.
```

CONFIDENTIAL

Page 351

1          Q.     Okay.

2          A.     And as far as the information provided

3   at that board meeting, I don't recall if I re- --

4   but I'm not sure that he attended that board

5   meeting.

6          Q.     Okay.  The next sentence says, "In

7   addition, I expressed that it's only appropriate for

8   you to identify any" terms "that you are not

9   intending to provide to me prior to the board

10  meeting, along with the reasons why."  Did you --

11          MR. SACK:  I think it was "items," not

12  "terms," so you might want to read that again.  I

13  think you used the word --

14          MR. PEARLSON:  Oh, I'm sorry.

15          MR. SACK:  -- "terms" instead of

16  "items."

17          Q.     "In addition, I expressed that it's

18  only appropriate for you to identify any items that

19  you are not intending to provide to me prior to the

20  board meeting, along with the reason why."

21          Did you, in fact, advise Mr. Salerno

22  prior to the board meeting of the -- of the items

23  you were not going to provide to him that he had

24  requested?

25          A.     I -- at this time period between May

1    29 and May 31?  What time period?

2           Q.    Well, between -- between the time of

3    this email and the board meeting did you ever -- do

4    you recall advising Mr. Salerno, I'm not going to

5    give you these items that you requested in your

6    information request?

7           A.    Okay.  There were a number of

8    conversations, I don't recall if they fit within

9    this window or after, but I did, I believe, tell him

10   that I wasn't gonna provide information on a fund

11   that didn't exist.

12          Q.    Anything else that you recall that you

13   didn't provide him or you said -- told him you

14   weren't going to provide him?

15          A.    I don't recall if there was anything

16   else I told him that I would provide him, that I

17   would not provide him.

18          Q.    Did you tell him about the discussions

19   you previously referenced in your testimony with

20   Qatar?

21          A.    At what time period?

22          Q.    Prior to this email.  Had you -- had

23   you -- did you ever tell -- well, strike that.

24                Between the time you -- when were the

25   discussions with Qatar about -- concerning the fund?

CONFIDENTIAL

Page 353

1          A.    I -- well, prior to -- I don't know if

2     there -- prior to March 8 we were -- we were told

3     that Qatar may be interested in this.  There was one

4     individual who was affiliated with the government,

5     and then potentially that led to the possibility of

6     one of the sovereign wealth funds owned by the

7     government of being interested in this.

8               At one point it was -- there was an

9     email from, I believe, the gentleman that was in

10    Qatar to Mike Staisil that Qatar was interested in

11    investing in the company and in a fund.  I don't

12    think I ever spoke to -- I don't think I shared that

13    email with Mr. Salerno, and I don't recall if we had

14    any subsequent discussions about Qatar.

15         Q.    Did you -- did you share any of the

16    substance of the discussions with Qatar or the fact

17    that there were discussions with Mr. Salerno?

18         A.    I did not.

19         Q.    Now, if you could look at the paragraph

20    that begins "Lastly."  It says, "Lastly, I've

21    contemplated your offer to facilitate a buy-out of

22    my interest on a best efforts basis and would like

23    to take you up on it.  At the present time I am

24    willing to sell my position for $2 million."  Do you

25    see that?

CONFIDENTIAL

Page 354

1         A.      Yes.

2         Q.      Okay.  Had you had prior discussions

3    with Mr. Salerno about buying out his interest in

4    Sport-BLX?

5         A.      Well, I think he said that he wanted

6    to be bought out, and I said that if we did that I'd

7    have to go out and, you know, add to our capital

8    raising process or at least allow enough capital to

9    buy him out, and I think his response was he would

10   -- we would do that at a price of $2 million.

11        Q.      Okay.  Prior to this email had you made

12   an offer to purchase Mr. -- I would say Cypress'

13   shares in Sport-BLX?

14        A.      At one point I made a number of ver-

15   -- at several points I made a number of verbal

16   offers.  I don't recall if it was before this or

17   after.

18        Q.      Okay.  Do you recall at what price you

19   made the verbal offers to buy out Cypress' shares of

20   Sport-BLX?

21        A.      At what price?

22        Q.      Yes.

23        A.      It was -- to the best of my relection

24   -- recollection it was around $1.6 million.

25        Q.      Do you know how that translated into a

CONFIDENTIAL

Page 355

1   price per share for Cypress' shares?

2        A.    I think that's roughly about $200.00 a

3   share.

4        Q.    Okay.  And at the -- do you -- but you

5   don't recall when those discussions took place?

6        A.    I -- I don't.

7        Q.    Okay.  And do you recall, did you

8   actually present that as a -- as an offer to

9   Mr. Salerno?

10       A.    No.

11       Q.    Do you recall discussing that $200.00

12  per share price with Mr. De Perio or anybody at

13  Sport-BLX?

14       A.    I most likely discussed it with

15  Mr. De Perio, but I don't recall a specific

16  conversation.

17       Q.    Okay.  Do you recall why Mr. Salerno

18  wanted to have Cypress' interest in Sport-BLX bought

19  out in or around May of 2019?

20            MR. SACK:  Objection to form.

21       A.    Well, if you can invest for a million

22  dollars on March 12 and get back $2 million by May

23  29, I think that's a pretty good return on capital,

24  I would assume.

25       Q.    Did Mr. Salerno ever express to you why

CONFIDENTIAL

Page 356

```
 1   he wanted Cypress to be bought out in the spring of
 2   2019 in May?
 3        A.    Yeah, I believe there was some
 4   discussions about it's just not working out.  Again,
 5   I don't know if it was specific -- because we talked
 6   about buyout a number of times.  I don't know
 7   specifically before February -- May 29 or not, but
 8   he was unhappy with the relationship and thought we
 9   should potentially go our separate ways.
10        Q.    What did he express that he was unhappy
11   about in terms of the relationship with Sport-BLX?
12        A.    Well, there were so many
13   conversations, a lot of it -- putting a time frame
14   on it is difficult, but he was clearly unhappy that
15   there was no lease, written lease, and he had some
16   concept in his head that there was a fund that
17   people other than Sport-BLX were benefiting from,
18   primarily Joe De Perio and myself, I think, and it
19   just wasn't true.  So we couldn't seem to satisfy
20   his allegations that they weren't true.
21        Q.    Did you -- well, strike that.
22              What was your view of the $2 million --
23   do you know what that -- if that translates --
24   strike that.  Let me rephrase.
25              He -- he offered to sell Cypress'
```

CONFIDENTIAL

Page 357

1    position for $2 million in total, correct?

2         A.    That's what it says, yes.

3         Q.    To your recollection, does that convert

4    into a $257.00 per share price?

5         A.    I don't -- I'd have to do the

6    calculation, but that could be possible.  That could

7    be correct.

8         Q.    Okay.  And -- and what was your view at

9    the time of a $257.00 per share price for Sport-BLX

10   stock?

11        A.    Well, it was absurd.

12        Q.    Why was it absurd?

13        A.    Because the company was taking in

14   capital at a price of around $200.00 a share.  So if

15   a company raises capital at $200.00 a share and buys

16   an investor out at $257.00 a share, where does the

17   $57.00 come from?

18        Q.    So in your view the -- the -- the

19   reasonableness of the price is determined, in part,

20   by what the investors are willing to pay for their

21   shares when they come in to the investment?

22        A.    Well, there's a lot of things that go

23   into the reasonableness of it.  However, one -- one

24   test would be is it -- we'll call it -- we'll call

25   it upside down with the company's capital structure.

CONFIDENTIAL

Page 358

1   In other words, are we paying him more than we're

2   able to raise capital at?  Somebody has to eat that

3   loss.

4        Q.     What was your view of -- of -- you

5   know, you indicated, I believe, that Mr. Howe and

6   Mr. Salerno had purchased shares at $200.00,

7   approximately.  What was your view of the -- as of

8   the end of May, what was the value of the Sport-BLX

9   shares?

10       A.     Well, I think at that time the -- the

11  price -- the highest price we could raise capital at

12  was about $200.00 a share.

13       Q.     And you -- you believed that to be the

14  appropriate price per share at that time?

15       A.     I don't think --

16              MR. SACK:  Objection to form.

17       A.     There's not one single price for a

18  company like this.  There's a price at which you can

19  raise capital, and then there's a price at which you

20  will -- which investors will buy shares, and then

21  there's a price at which the company would buy

22  shares back from investors.  You could call that

23  bid-ask spread, if you want, in industry terms.  And

24  for a company like this, the price you would pay is

25  -- has got to be lower than the price you take in

CONFIDENTIAL

Page 359

1  capital.

2           There was also another data point where

3  a shareholder that was in the founders' round sold

4  his shares at approximately $118.00 a share.  So if

5  we look at the data points, there was one

6  transaction that occurred at a much lower price than

7  that.

8       Q.    So how did you respond to Mr. Salerno's

9  request for a buyout at $2 million for Cypress'

10 investment?

11          MR. SACK:  Would you like him to look

12 at that email above -- above that that responds?

13      Q.    Sure, if that would be helpful.

14      A.    Well, I think this was the answer

15 where in the email I said, "As far as buyout, that

16 price is a nonstarter."

17      Q.    Did you -- before sending that email

18 did you discuss that with anybody, your response to

19 Mr. Salerno's request for a buyout?

20      A.    I don't recall if I discussed it with

21 anybody.

22      Q.    Did you ever -- did you counter in any

23 way to Mr. Salerno's request for a buyout at or

24 around this time?

25      A.    As I said, I believe I made a number

CONFIDENTIAL

1    of verbal offers at different times.  I'm not sure

2    if they were before the 2 million or after the 2

3    million.

4         Q.    Okay.  And do -- other than what you've

5    already testified to, do you have any recollection

6    of specific discussions with Mr. Salerno about

7    buying out Cypress' investment in Sport-BLX?

8         A.    We had a number of discussions about

9    buying out Cypress' shares.

10        Q.    Okay.  And then other than the $200.00

11   per price share you mentioned, were there other

12   prices discussed?

13        A.    I --

14             MR. SACK:  Well, he mentioned a

15   different price.

16        Q.    I'm sorry.  What was the price you

17   mentioned, just to be clear for the record?  I

18   thought it was 200 a share, but...

19        A.    The price that I was gonna --

20             MR. SACK:  Oh.  Oh.

21        A.    -- purchase at?

22        Q.    Yeah, the -- the price -- to be clear,

23   the price that you offered to buy out Cypress'

24   investment at.  I believe you mentioned at one point

25   $200.00 per share.  Is that correct?

Veritext Legal Solutions

800-227-8440                                              973-410-4040

CONFIDENTIAL

Page 361

1          A.     I think what I said was somewhere

2     around a million six.  I said there were several

3     different offers, and I think at that time a million

4     six was -- was approximately $200.00 a share.

5          Q.     Okay.  And you don't recall when that

6     offer was made?

7          A.     I don't recall if it was before or

8     after this.

9          Q.     Do you recall what context that offer

10    was made?  Was it made in a board meeting?  Was it

11    made in -- you know, do you have any recollection at

12    all?

13         A.     I think I made an offer to him through

14    Mike Staisil, since he spoke to him pretty

15    frequently, I think.

16         Q.     And you have -- you have no

17    recollection of when that was?

18         A.     I, at this -- sitting here, I do not.

19              MR. PEARLSON:  Okay.  Why don't we

20    take a break now?

21              THE VIDEOGRAPHER:  It is 1:38 a.m.  We

22    are going off the record.

23              MR. CARBONE:  Eleven, right?

24              (Recess taken from 11:38 to 11:53

25    a.m.)

CONFIDENTIAL

Page 362

```
 1              THE VIDEOGRAPHER:  It's 11:53 a.m.  We
 2    are back on the record.
 3    BY MR. PEARLSON:
 4         Q.    So Mr. Hall, we were -- when we broke
 5    we were talking about certain requests for
 6    information that Mr. Salerno had -- had made to you.
 7    Is it fair to say that your view of Mr. Salerno's
 8    requests for information that day were excessive?
 9              MR. SACK:  Objection to form.
10         A.    I think some of them just made no
11    sense because there was no fund.  Other ones were
12    reasonable, but the -- the time frames he put on
13    them were just a complete distraction and
14    potentially not possible to do, given the bus- --
15              THE WITNESS:  I'm turning this off,
16    and I'm gonna give it back to you in case I...
17         A.    I apologize.
18              So the making requests of very detailed
19    information and demanding it in a week in writing
20    with a cc to the lawyer, while we had lots of
21    business, lots of meetings, lots of traveling to do
22    to advance the business, that seemed inappropriate.
23         Q.    Did you view the scope of the request
24    inappropriate, given his role as a director in the
25    company?
```

CONFIDENTIAL

Page 363

1          A.     I think directors are entitled to all

2     the books and records of a company, but the demands

3     in writing and some of the requests go beyond

4     because the requests were about things that didn't

5     exist or demanding that a dashboard be built.

6     That's not a request for a document or information,

7     that's a request for running the business a certain

8     way, and that's not necessarily appropriate for a

9     director.

10          Q.     What was your view of Mr. Salerno and

11     his participation as a director of Sport-BLX?

12                 MR. SACK:  Unlimited by time?  At any

13     time?

14          Q.     At any time.

15                 MR. SACK:  I'm going to object to the

16     form, but you can try to answer.

17          A.     Well, directors are entitled to

18     information and books and records, but their role

19     primarily is to, with the other directors, agree on

20     business plan and strategy.  Ultimately the

21     directors agree on management, and management runs

22     the day-to-day.

23          Q.     And as a member of management did you

24     believe it was part of your job to provide the board

25     with the information they needed to make decisions

CONFIDENTIAL

Page 364

1   concerning the strategy and business plan of
2   Sport-BLX?
3        A.    Yes, at board meetings and at the
4   appropriate timing, if the information actually did,
5   in fact, exist.
6        Q.    Now, at some point did you develop the
7   view that you wanted to remove Mr. Salerno as a
8   director of Sport-BLX?
9             MR. SACK:  Objection to form.
10       A.    I believe at one point I actually
11  asked him if he would voluntarily resign.
12       Q.    Okay.  Do you recall when that was?
13       A.    I don't recall the date.
14       Q.    Do you recall why that was?
15       A.    I think his -- I think he was focused
16  on issues that were detrimental to putting together
17  the kind of board that I thought could help the
18  company grow.
19       Q.    Okay.  And at the time -- first of all,
20  what were those issues that you found detrimental
21  that he was focused on?
22       A.    Well, if you think about what board
23  members do, they focus on strategy, they focus on
24  where the business can go, they focus on trying to
25  assist management where they can in terms of the

CONFIDENTIAL

Page 365

```
1   overall goals of the business.  I think it's
2   ineffective, inefficient, and certainly
3   uninteresting to most board members to have
4   continuous debates about an issue that was settled,
5   which is the cost of space, and to have continuous
6   debates about what the monthly office expense was.
7   The line item, using just as a term of art here,
8   forensic analysis of costs is really too micro for
9   the types of board members that I think I wanted to
10  put on the board.
11        Q.    And in terms of the office expenses, in
12  addition to paying the Clinton Group rent do you
13  know if Sport-BLX also paid the Clinton Group for
14  use of the computers and the other infrastructure --
15              MR. SACK:  Objec- --
16        Q.    -- related to 510 Madison?
17              MR. SACK:  Objection to form.
18        A.    So in terms of office expenses, that
19  would be things like bills from Staples for paper to
20  send out presentations, that was -- Sport-BLX paid
21  its own way for that.  So, you know, purchasing
22  things like guidebooks for a Series 7 study for
23  those that were going to take the Series 7 exam,
24  that's an office expense or may be listed under
25  office expense that -- that Sport-BLX pays its own
```

Page 366

1  way.  So I think the intent was always to Sport-BLX

2  would pay the -- the expenses -- the direct expenses

3  attributed to its business, and that be would it.

4        Q.    My question was a little different one.

5        A.    Go ahead.

6        Q.    Are you aware if in addition to paying

7  the rent for 510, you know, you had described using

8  the computers and -- and certain infrastructure

9  items.  Do you know whether Sport-BLX paid the

10  Clinton Group separately for the use of the

11  computers and the servers and the items that

12  constitute the infrastructure at 510?

13        A.    I don't believe there was any charge

14  for use of computers.  Certainly there was no charge

15  for the purchase of the computers.  There may have

16  been technology charges for things that were

17  specific to Sport-BLX and its technology, but other

18  than that, I don't recall specifically.

19        Q.    Who would know the answer to those

20  questions as to what Sport-BLX was paying the

21  Clinton Group for in addition to rent?

22              MR. SACK:  Objection to form.

23        A.    I don't think the things I enumerated

24  were paid to Clinton Group.

25        Q.    Okay.  So it's your testimony that

CONFIDENTIAL

Page 367

```
 1    there were no payments beyond the rent?
 2              A.    I didn't say that.
 3                    MR. SACK:  Objection to form.
 4              Q.    Beyond the rent and the direct expenses
 5    that you just described.
 6                    MR. SACK:  Objection to form.
 7              A.    If there was a -- I mentioned Staples.
 8    If there's a bill for paper, it's paid by an
 9    American Express card, it would be paid by
10    Sport-BLX.  It's -- I don't recall exactly if it was
11    any kind of a flow-through through Clinton Group,
12    for example.  Clinton Group had accounts open with
13    lots of different vendors, so I don't know, there
14    may have been the possibility that something flowed
15    through Clinton Group, but it was for direct
16    expenses to the Sport-BLX business.
17              Q.    And you testified that you requested
18    that Mr. Salerno resign from the Sport-BLX board,
19    correct?
20              A.    At one --
21                    MR. SACK:  Objection to -- objection
22    to form.
23              A.    At one point I believe that's correct.
24              Q.    Do you have any recollection as to when
25    that took place?
```

CONFIDENTIAL

Page 368

1          A.      I don't recall.

2          Q.      Do you recall how it took place?  Was

3    it by -- in a conversation at a board meeting?  Do

4    you recall when?

5          A.      I think it was an email.

6          Q.      An email?

7          A.      I believe so, but I don't know for

8    sure.

9          Q.      Do you recall how Mr. Salerno responded

10   to your request?

11         A.      I think it was an email that I made

12   the request, but I am not entirely sure.  And I

13   think there may be an email in response where he

14   alluded to the concept of I'll think about it.

15         Q.      Okay.  Did he ever get back to you

16   beyond that?

17         A.      No.

18         Q.      If we could look at Hall-28 for

19   identification.

20                 (Exhibit Hall-28, 11-page email

21   string, top email being from George Hall to Michael

22   Salerno dated 7/20/2019, Bates stamped

23   CLINTON00007033 through 7043, is marked for

24   identification.)

25         Q.      Before we look at that document,

Page 369

1    Mr. Hall, do you -- do you recall that Mr. Salerno

2    was insisting on greater transparency from the

3    management team at Sport-BLX?

4         A.    I do recall him using the word

5    transparently a number of time -- transparency a

6    number of times.

7         Q.    Okay.  And how did you respond to those

8    requests for greater transparency?

9              MR. SACK:  Objection to form.

10        A.    I think we were reasonably

11   transparent.

12        Q.    Okay.  If we could turn now to exhibit

13   -- what's been marked as Hall-28 for identification.

14   It's a document that is CLINT- -- CLINTON00007033

15   through 7043.  And it's an email chain between

16   yourself and Mr. Salerno.  Do you see that?

17        A.    Yes.

18        Q.    Okay.  Now, if you can turn to the --

19   to page 7035?

20             MR. SACK:  You should feel free to

21   look through the entire document if you -- if you

22   want.

23        Q.    And -- and --

24             MR. SACK:  Mr. Pearlson will direct

25   you to --

CONFIDENTIAL

Page 370

1          Q.     Right.  And that --

2                 MR. SACK:  -- something, --

3          Q.     And that goes for --

4                 MR. SACK:  -- but you can look through

5     the whole --

6          Q.     -- any document, --

7                 MR. SACK:  -- document.

8          Q.     -- Mr. Hall.  You should tell me if you

9     need additional time to review the entire document,

10    but I'm going to be directing you to specific items

11    here.

12                So Mr. Hall, on 7035 you see there's an

13    email from Michael Salerno at 11:40, and he has item

14    "1.  On April 4 you disclosed that a purchase

15    agreement was sent to an investor for 2,244 shares

16    at $218.00 per share," and then he requests certain

17    information.  Do you see that?

18         A.     It's a little hard to read in this

19    format, but I do see it, yes.

20         Q.     Okay.  And does that relate to

21    Mr. Howe's investment that we were discussing

22    earlier?

23                MR. SACK:  Objection to form.

24         Q.     If you recall.

25         A.     I don't recall.

CONFIDENTIAL

Page 371

1          Q.    Okay.  Now, if you could turn to the
2    page before that, 7034, you see there there's an
3    email from you to Mr. -- well, first he emails you.
4    "Joe/George, I have not received info yet?"  And
5    that's in response to the information that he -- he
6    put on 7035.  Do you see that?
7          A.    Yes.
8          Q.    Okay.  And that's two days later.  Do
9    you see that?
10         A.    Yes.
11         Q.    Okay.  And then your response -- you
12   see your response there to Mr. Salerno?
13         A.    Yes.
14         Q.    And at the end of it, it says, "And I
15   asked you to stop emailing us both."  Was that the
16   first time you had told him to stop emailing you?
17         A.    Looks like "I asked" is past tense, so
18   I would assume I asked him once before or a number
19   of times before.
20         Q.    Okay.  And why did you email and ask
21   Mr. Salerno to stop emailing you?
22         A.    Well, if there are things that he
23   thought were best provided by Joe De Perio, there's
24   no need to cc me.
25         Q.    Okay.  But you -- you asked him to stop

CONFIDENTIAL

Page 372

1    emailing you both.

2          A.    I think -- I think that's technically

3    correct.  If my point was to email Joe directly and

4    not attach my name, you'd -- I may have asked him to

5    stop emailing us both, just email Joe De Perio.

6          Q.    Okay.  And -- and -- and in fact,

7    despite what you said, Mr. Salerno kept emailing

8    you, correct, as reflected in this email chain?

9          A.    Well, I believe there was a previous

10   one where he said if it's important, I will email

11   you both, so...

12         Q.    Okay.  And if you -- if you could turn

13   to the first page of the document.

14               And so you see an email from

15   Mr. Salerno that says, "That is the question, hiding

16   acts of malfeasance?"

17         A.    I do see that.

18         Q.    Had Mr. Salerno accused you and

19   Mr. De Perio of acts of malfeasance?

20         A.    I don't know if this is the first time

21   he used the word or if he had used it before.

22         Q.    Okay.

23         A.    So...

24         Q.    Did -- did he give you any specific

25   examples of what he considered potential acts of

CONFIDENTIAL

Page 373

1   malfeasance?

2              MR. SACK:  You mean in this time, --

3        Q.    Yeah, at --

4              MR. SACK:  -- July, or --

5        Q.    -- this time frame.

6              MR. SACK:  -- earlier?

7        Q.    This time.

8        A.    I -- I never understood what he --

9   what he meant.  I think he -- I'm only speculating,

10  but he constantly asked about a fund, and I

11  constantly kept saying there is no fund.

12       Q.    No, I don't want to you speculate,

13  Mr. Hall.

14       A.    Okay.

15       Q.    So did he -- did he ever specifically

16  mention to you what he considered to be acts of --

17  potential acts of malfeasance?

18       A.    No.

19       Q.    And then you respond at the top of the

20  page that same day, July 20, "This is why we can't

21  put a high class board together with your idiotic

22  behavior."  Do you see that?

23       A.    Yes.

24       Q.    Okay.  So who -- who were the members

25  of Sport-BLX's board as of -- as of July 20, 2019?

CONFIDENTIAL

Page 374

1          A.      I don't recall on that specific date
2     who were the board members.
3          Q.      Okay.  And what efforts had been made
4     -- were there efforts being made to attract
5     additional board members in July of 2019?
6          A.      Well, prior to that there was some
7     interest in having David Falk join the board.  There
8     were another -- a number of other potential people
9     who we may have considered for the board.
10         Q.      What happened with David Falk with the
11    board?
12         A.      Well, we just -- as I recall, we
13    didn't follow through with putting him on the board.
14    I think for a time we -- we had him as a -- an
15    advisor to the company.
16         Q.      But you never formally asked him to be
17    a -- a member of -- a member of the board of
18    Sport-BLX?
19         A.      I don't recall if we ever asked him,
20    but certainly we never put him on the board.
21         Q.      Okay.  Anybody else that you tried to
22    get on the board prior to July 20?
23         A.      I don't remember prior to July 20 who
24    we were -- we were thinking about.
25         Q.      Okay.  What did you mean when you say,

CONFIDENTIAL

Page 375

1    "This is why we can't put a high class board
2    together with your idiotic behavior"?
3         A.    Well, if someone comes to a board
4    meeting and talks about a fund that doesn't exist,
5    that would be confusing, to say the least, to a
6    party that came in good faith and wanted to be on
7    the board and help the company grow.
8              The -- the rent was clearly -- what we
9    termed "rent," the cost of using space, was clearly
10   laid out before we invested -- before Mr. Salerno
11   invested.  To keep bringing it up over and over
12   after we had said, both before he invested and
13   after, that that's -- that's the number that we --
14   we put in the pro forma, and that's the number we're
15   sticking with, and we think that number is
16   reasonable, to keep talking about it over and over
17   would not be interesting use of time for the type of
18   board member that we wanted.
19              To throw out words like "malfeasance"
20   without anything to back it up, to refer to
21   something as a "George Hall delay and diversion
22   tactic" because he didn't get what he wanted two
23   days later, all of these things, you put them all
24   together, it would have been humiliating to have a
25   significant sports or financial professional on the

CONFIDENTIAL

Page 376

 1    board.

 2         Q.    You say in the next sentence, "So we

 3    will have to work around you."  What did you mean by

 4    that?

 5         A.    There were discussions about actually

 6    bringing the rent number -- again, what we referred

 7    to as "rent" in the pro forma, the cost of space,

 8    bringing that directly to a shareholder vote because

 9    if I have any understanding of corporate governance

10    in Delaware law, if the shareholders -- the

11    shareholders can vote on certain issues, and that

12    would be, hopefully, the end of it.  That it was

13    acknowledged that that's what the shareholders

14    agreed to, or that they at least would agree to at

15    the time of the vote, and we could not have to

16    continue to address the same issue.

17         Q.    Was the rent issue ever presented to

18    the shareholders for a vote?

19         A.    No.

20         Q.    Was there any discussion at this time

21    -- "So we will have to work around you" doesn't have

22    any reference or does it have a reference to

23    Mr. Salerno's role as a director in Sport-BLX?

24              MR. SACK:  Objection to form.

25         A.    Well, it had to do with taking at

CONFIDENTIAL

Page 377

```
1    least one issue off the board of directors' plate,
2    the rent, because if there was a shareholder vote,
3    then it really would be a nonissue.  We had hoped
4    then it would be a nonissue for Mr. Salerno.
5              Then -- so the -- the other concept
6    that was -- and again, I don't know exactly at this
7    time, but the workaround was to have a separate
8    board of advisors.  No official role, not directors,
9    just a group of consultants that we would retain to
10   help the company grow.  So some of the people that I
11   think to be -- that I would have been embarrassed to
12   have at a board meeting, if we had him on a board of
13   advisors, we could do that and get the benefit of
14   their counsel.
15        Q.   Did you ever try to establish a board
16   of advisors?
17        A.   We did.  We actually asked David Falk
18   to be on a board of advisors.  He was technically --
19   I don't recall technically whether we ever formed
20   the board of advisors, but he was helpful to us as
21   an unaffiliated expert in the -- in the field.
22        Q.   Okay.  In terms of Mr. Salerno, as of
23   July 20, 2019, had you had any discussions with
24   anyone at this point about trying to remove
25   Mr. Salerno from the board?
```

CONFIDENTIAL

Page 378

1          A.    At this time I don't believe we had

2     discussed removing him from the board, and so I

3     would say at this time frame most likely not.

4          Q.    Okay.  When was the first time you had

5     any discussions concerning Mr. Salerno's removal

6     from the board?

7          A.    When --

8               MR. PEARLSON:  Off the record.

9               (Discussion off the written record

10    with the court reporter.)

11              THE VIDEOGRAPHER:  It's 12:14 p.m.

12    We're going off record.

13              It is 12:17 p.m.  We are back on the

14    record.

15              (Last question is read back by the

16    court reporter.)

17         A.    So at this point the -- the workaround

18    was to just get business done while he was on the

19    board, nothing about removing him from the board.

20    The first discussion I remember having about remo-

21    -- the possibility to remove him off the board was,

22    without giving anything up that's privileged, with

23    Delaware counsel.

24         Q.    Okay.  Do you know -- without getting

25    into the substance of it, do you remember when you

Page 379

1    had those conversations with Delaware counsel?

2         A.    Somewhere between probably August and

3    September of 2019 in response to the refusal to

4    disclose the shareholders of Cypress.

5         Q.    Okay.  And what did his -- and we'll

6    get into this, but what did his refusal to provide

7    that information regarding the owners of Cypress

8    have to do with his position as a director?

9         A.    Well, this was -- the -- the previous

10   issues that he raised were not huge issues.  The --

11   you know, they were potentially time consuming, and

12   I think a lot of wasted time, but not disclosing the

13   LPs actually was going to cripple the business, so

14   we talked about whether -- we talked about --

15              MR. SACK:  Object- -- hold on a

16   second.

17        Q.    Yeah.  Just to --

18              MR. SACK:  Yeah.

19        Q.    Just to make sure that it's --

20        A.    I understand.

21        Q.    -- not going into the --

22        A.    I understand.

23        Q.    -- discussions with counsel.

24              MR. SACK:  Yeah.

25        A.    I talked about a number of issues on

CONFIDENTIAL

Page 380

1    how to deal with this, and that's the first time I
2    remember thinking about whether he could be removed
3    from the board.
4           Q.    Okay.  Now, under your agreement, your
5    personal agreement with Mr. Salerno and Cypress, you
6    were obligated to vote your shares in favor of him
7    being on the board at a vote of the -- for the
8    directors, correct?
9           A.    Correct.
10          Q.    Okay.  Based on your conversations with
11   counsel, what, if anything -- strike that.
12               Following your conversations with
13   Delaware counsel, what, if anything, steps did you
14   take to try to remove Mr. Salerno from the Sport-BLX
15   board of directors?
16          A.    It was my impression, without
17   disclosing anything disclosed by counsel, from my
18   own research it was my impression that we had no
19   affirmative way to remove him from the board based
20   on his conduct.
21          Q.    Okay.  Was your -- was it your view at
22   the time also that your agreement to vote your
23   shares in favor of him was a barrier to removing him
24   from the board?
25               MR. SACK:  Objection to form.

Page 381

1          A.     I don't think -- I think we're in the
2     -- you said post this, but I'm talking in the
3     several months post it, the August/September time
4     frame that --
5          Q.     Correct.
6          A.     -- we're talking about.  The -- the
7     discussion was potentially --
8               MR. SACK:  Objec- -- uh...
9               THE WITNESS:  Not with the lawyer.
10              MR. SACK:  Okay.
11         A.     Amongst the -- amongst manage- --
12    myself and Joe in particular, maybe the other board
13    members, about whether he could be removed for
14    cause.  So it had nothing to do with the two and a
15    half percent; it was whether his behavior as a board
16    member -- if we had the right to remove him for
17    cause.
18         Q.     Did you also discuss whether or not you
19    could vote him off the board?
20         A.     That was understood that we -- we had
21    to vote our shares -- Joe -- Joe De Perio and myself
22    had to vote our shares for him, but that was not --
23    there was no annual meeting scheduled; that wasn't
24    under consideration.  The question at this time
25    period was does his behavior rise to the -- the

1  point of him being removed for cause by a vote of
2  the other directors.
3       Q.    You know, in your testimony you also
4  mentioned a FINRA application.  Can you tell us what
5  you mean by that, a FINRA application?
6       A.    The -- the way that we had hoped that
7  we could generate revenues was through commissions.
8  Taking an asset, which could be an athlete's
9  contract, securitizing it, and selling shares with a
10 commission attached to it that we would receive at
11 Sport-BLX.  To do that, to collect those commissions
12 and to sell shares to the public, you need an -- you
13 need to be regulated by FINRA as a broker-dealer.
14 So we made an application to FINRA.
15      Q.    When did the -- the efforts to get a --
16 to make a FINRA application begin with respect to
17 Sport-BLX?
18      A.    I don't know when the first -- when
19 the first efforts towards it went, but probably -- I
20 -- I don't know.  I don't know exactly.
21      Q.    And was it Sport-BLX itself that was
22 going to be the registered broker-dealer, or was
23 there another entity that was going to act as an
24 affiliate of Sport-BLX that would be the registered
25 broker-dealer?

CONFIDENTIAL

Page 383

1        A.      Well, I don't know if you would call

2   it an affiliate.  It was a wholly-owned subsidiary

3   called BLX Trading that was gonna be -- that was

4   gonna be the applicant for the broker-dealer.

5        Q.      Okay.  And when was BLX Trading formed?

6        A.      I don't recall.

7        Q.      Do you -- and in terms of -- in terms

8   of the BLX Trading, it's my understanding from your

9   testimony that it was going to be paid commissions

10  per trade for the -- trading the assets that would

11  be -- the athlete's assets or -- that would be

12  monetized?

13       A.      Well, it -- it, itself, didn't trade

14  them.  It would facilitate, through the platform,

15  trade between either the athlete and the buyers of

16  the security or shareholders that traded amongst

17  themselves we would facilitate.

18       Q.      And that would be done through the

19  platform that had been developed by ConsenSys and

20  paid for by Sport-BLX?

21       A.      Well, it was developed with the help

22  of ConsenSys, but very much by Joe De Perio and

23  myself.

24       Q.      Okay.  And paid for by Sport-BLX?

25       A.      Correct.

CONFIDENTIAL

Page 384

1          Q.     Now, did Sport-BLX use or employ the
2    services of a consultant in connection with its
3    FINRA application?
4          A.     Yes.
5          Q.     And who was that?
6          A.     Ken Norensberg.
7          Q.     And who was Ken Norensberg?
8          A.     He has a business called Luxor
9    something, and his business is consulting on various
10   FINRA issues, such as applications for a
11   broker-dealer designation.
12         Q.     And did Sport-BLX, in fact, employ
13   Luxor or Mr. Norensberg to assist them in the --
14   assist it in the application process?
15                MR. SACK:  Objection to form.
16         A.     We -- we hired his firm to do that.
17   We didn't employ him.
18         Q.     Okay.  And -- and do you know when that
19   took place?
20         A.     I don't remember when we first engaged
21   him.
22                MR. PEARLSON:  Okay.  Can we show him
23   Hall-29?
24                (Exhibit Hall-29, Three-page December
25   10, 2018, email from Ken Norensberg to various

CONFIDENTIAL

Page 385

1   parties Bates stamped SPORTBLX0153548 through

2   153550, is marked for identification.)

3        Q.    Mr. Hall, if you could just take your

4   time to look through what's been marked as Hall-29

5   for identification.  It's a document that's been

6   Bates stamped SPORTBLX0153548 through 0153550.

7        A.    Okay.

8        Q.    Okay.  Mr. Hall, have you seen this

9   document before?

10       A.    I don't recall if I -- one of my email

11  addresses is on the "To" line.  I don't recall if I

12  read this specifically or not.

13       Q.    Do you remember that -- do you have any

14  -- does this refresh your recollection that you were

15  searching for a consultant to assist with

16  Sport-BLX's FINRA application going back to December

17  of 2018?

18       A.    Yes, that was part of the process.

19       Q.    Okay.  Does this refresh your

20  recollection at all as to when you actually retained

21  Luxor?

22       A.    I don't know if he was retained at

23  this point or not.  I could read it more carefully,

24  but...

25       Q.    Do you see that Mr. Norensberg is

Page 386

1    laying out for you some of the requirements for the
2    FINRA application?
3            A.    Yes.
4            Q.    And do you see that one of those is a
5    -- under d. is a lease and floor plan?
6            A.    I do.
7            Q.    And it says -- he says in the third
8    paragraph down, "We will need, (for the Form BD) the
9    names of the broker-dealer and the holding company
10   and the formation documents for both"?
11               MR. SACK:  Excuse me, Ross.  I'm
12   sorry.  I don't see where you're -- what are you
13   referring to?
14               MR. PEARLSON:  The third paragraph
15   down.
16               MR. SACK:  Oh, I see.  Thank you.
17           Q.    What is the Form BD?
18           A.    That's the form that gets filed with
19   FINRA that they review for applicants seeking a
20   broker-dealer license.
21           Q.    Okay.  And that's the form that the
22   Sport-BLX entity would need to fill out in order to
23   apply to FINRA, correct?
24               MR. SACK:  Objection to form.
25           A.    Well, we need the Form BD.  There may

CONFIDENTIAL

Page 387

1    be other forms that we have to -- I don't know

2    exactly if that's all-inclusive.

3         Q.    Okay.  But this doesn't refresh your

4    recollection as to when the actual FINRA application

5    process started?

6         A.    Well, it looks like it -- I'm not

7    really sure -- maybe you could help me with what do

8    you mean, "started"?  This looks to me like Ken

9    Norensberg making a statement as to what has to

10   happen.  So when you say "started," what, exactly,

11   would you like me to answer in terms of started?

12        Q.    Do you recall who introduced you to

13   Luxor or Mr. Norensberg?

14        A.    I don't recall.

15             MR. PEARLSON:  If we could show him

16   Hall-30.

17             (Exhibit Hall-30, Three-page May 3

18   through May 8, 2019, email exchange between John

19   Hall, Joseph De Perio, and Ken Norensberg Bates

20   stamped SPORTBLX0092551 through 92553, is marked for

21   identification.)

22             MR. SACK:  I'm not rushing you, Ross.

23   I just did want to get a sense of timing, so...

24             MR. PEARLSON:  I think we'll just do

25   this document and then take a break.

CONFIDENTIAL

Page 388

1            MR. SACK:  Okay.

2       Q.    Mr. Hall, I'm going to show you what's

3  been marked as Hall-30 for identification.  It's

4  SPORTBLX0092551 through 92553.

5            My first question is do you recall your

6  brother, John Hall, having a role in the FINRA

7  application process?

8       A.    I don't recall what his role was, but

9  I think he's the -- one of the few people that had

10 worked at a broker-dealer and was familiar with

11 broker-dealer regulatory requirements, so I believe

12 he was involved.

13      Q.    Okay.  This email is dated -- and

14 you're not on the email chain, but it's dated May 8,

15 2019.  Do you -- do you recall that that was the --

16 at or around that time, that's when they started

17 engaging with Mr. Norensberg and Luxor?

18      A.    Well, there was a December 18 of --

19 email from 2018, so I'm not sure what you mean by

20 "engaging."

21      Q.    Let me ask you this.  Are you aware of

22 any actions or efforts taking place between the

23 December 2018 email and this May email with respect

24 to efforts to make -- to submit a FINRA application?

25      A.    I believe Mr. Norensberg was helping

CONFIDENTIAL

Page 389

1   us prepare an application for FINRA.

2       Q.    You believe that was going on between

3   December of 2018 and May of 2019?

4       A.    Well, let me read this.

5             Yes, I think we were working on this

6   prior to this May 8 email.

7       Q.    Do you see under Mr. Norensberg's

8   signature block there's a disclaimer?

9       A.    Under the "View Website" and "Ken's

10  Bio"?  Below the signature block I see --

11      Q.    The one that begins "Any information or

12  service."  Do you see that?

13      A.    I do see it.

14      Q.    Okay.  And it says, "Any information or

15  service provided by Luxor Financial Group ('LFG') or

16  its representatives is not to be construed or

17  represented as legal advice/opinion."

18            Mr. Hall, did you understand that

19  Mr. Norensberg was not providing legal advice to

20  Sport-BLX?

21      A.    You're asking me with respect to the

22  disclaimer?

23      Q.    With respect to the FINRA application,

24  that it wasn't being retained to provide legal

25  advice to --

CONFIDENTIAL

Page 390

1          A.     I don't believe --

2          Q.     -- Sport-BLX?

3          A.     I don't believe Mr. Norensberg was an

4    attorney.

5          Q.     And so my question is did you

6    understand that he wasn't providing legal advice to

7    Sport-BLX in connection with its FINRA application?

8          A.     It was not my impression that he was

9    providing legal advice.

10                MR. PEARLSON:  Okay.  Why don't we --

11   why don't we go off the record and take a lunch

12   break now.

13                THE VIDEOGRAPHER:  It's 12:33 p.m.

14   We're going off the record.

15                (Luncheon recess taken from 12:33 to

16   1:24 p.m.)

17                THE VIDEOGRAPHER:  It is 1:24 p.m.  We

18   are back on the record.

19                (Exhibit Hall-32, 29-page Form BD

20   Uniform Application For Broker-Dealer Registration,

21   is marked for identification.)

22   BY MR. PEARLSON:

23         Q.     Mr. Hall, I'd like you to look at

24   what's been marked as Hall-32 for identification.

25   It's a Form BD, a Uniform Application For

CONFIDENTIAL

Page 391

1    Broker-Dealer Registration.  Have you ever seen one
2    of these before?
3             A.    I don't recall specifically when I
4    might have seen it.
5             Q.    Did you see the one that was submitted
6    by Sport-BLX?
7             A.    I don't recall specific scenario where
8    I saw it, but I'm sure I did.
9             Q.    Okay.  Did you have any role in filling
10   out the information on the Form BD for Sport-BLX?
11   Or I should say BLX Trading.
12            A.    There may have been questions asked of
13   me which I answered, but basically we let the
14   experts take care of this.
15            Q.    Okay.  And what's your understanding as
16   to who, specifically, handled submitting this
17   application to FINRA?
18                  MR. SACK:  Objection to form.
19            A.    I believe it was Ken Norensberg and
20   his team at Luxor.
21            Q.    Did counsel assist at all in the
22   submission of the -- of the BD application?
23            A.    We had some counsel involved early on
24   in the process, and then counsel was involved later.
25   I'm not sure what their specific role was with the

CONFIDENTIAL

Page 392

1   application.

2           Q.      Okay.  And who was the counsel?

3           A.      I don't remember the first -- the

4   first lawyer we were in discussion with, but

5   ultimately the -- the firm's corporate counsel was

6   Greenberg Traurig, and the specific FINRA slash

7   broker-dealer counsel was Will Mack.

8           Q.      Okay.  And are you aware of whether

9   Mr. -- did Mr. Mack, when you -- strike that.

10          Do you recall whether he got involved

11  before or after the application was submitted?

12          A.      I don't recall.

13          Q.      Do you recall whether Mr. Mack had any

14  direct contact or communications with FINRA?

15          A.      I don't recall.

16          Q.      What -- did Mr. Mack provide you with a

17  written legal opinion in any respect with respect to

18  the FINRA application?

19          A.      I don't recall.

20          Q.      If you could look at page 11.  I don't

21  know how else to describe it.  It's Schedule A of

22  Form BD.

23          A.      So we have to count.

24          Q.      Yeah, you have to count because there's

25  no pages on it.

CONFIDENTIAL

Page 393

1           A.      Understood.

2           Q.      It should get you to Schedule A, if I

3     counted correctly.

4           A.      Yes.

5           Q.      Okay.  So if you look under paragraph 1

6     there it says, "Use Schedule A only in new

7     applications to provide information on the direct

8     owners and executive officers of the applicant.  Use

9     Schedule B in new applications to provide

10    information on indirect owners."  Do you see that?

11          A.      Yes.

12          Q.      Okay.  Now, this was a -- an

13    application being submitted on behalf of BLX

14    Trading, correct?

15          A.      This has no names on it, so...

16          Q.      Well, did -- I'm sorry.  The

17    application that was submitted was submitted on

18    behalf of BLX Trading?

19          A.      Any applications Sport-BLX did with

20    FINRA, as I recall, was on behalf of BLX Trading, a

21    wholly-owned subsidiary.

22          Q.      Okay.  And the direct owner of BLX

23    Trading was Sport-BLX, correct?

24          A.      Yes.  I don't recall -- as far as I

25    recall, the plan was to have BLX Trading remain a

CONFIDENTIAL

Page 394

1    wholly-owned subsidiary of Sport-BLX.

2          Q.    Okay.  In which case then Sport-BLX

3    would be the direct owner of BLX Trading?

4                MR. SACK:  Objection to form.  That

5    may call for a legal conclusion.

6          A.    If my memory is correct, yes.

7          Q.    Okay.  And do you see the -- they say

8    under 2(b) that you're supposed to provide certain

9    information.  "In the case of an applicant that is a

10   corporation, each shareholder that directly owns 5

11   percent or more of a class of a voting of the

12   applicant."  Do you see that?

13         A.    Yes.

14         Q.    Okay.  And then you see under (c), "In

15   the case of an applicant that is a partnership, all

16   general partners, and those limited and special

17   partners that have the right to receive upon

18   dissolution, or have contributed, 5 percent or more

19   of the partnership's capital."  Do you see that?

20         A.    Oh, that's (c).  I'm sorry.

21         Q.    I'm sorry.  (c).  Yes.

22         A.    I was still on (b).

23               Okay.  I see that.

24         Q.    Okay.  Is it fair to say that Sport-BLX

25   -- that Cypress was not a -- a direct owner of 5

CONFIDENTIAL

Page 395

```
1    percent or more of a class of a voting -- of a class
2    of a voting of the applicant?
3                MR. SACK:  Objection to form.  May
4    call for a legal conclusion.
5         A.    So -- I'm sorry.  Can you repeat that?
6         Q.    Well, let me try to cut through this.
7         A.    Okay.
8         Q.    Is it fair to say that Cypress was not
9    a direct owner of BLX Trading?
10               MR. SACK:  Objection to form.
11        A.    Correct.
12        Q.    Okay.  If we could turn to Schedule B.
13   And we just saw that Schedule B is supposed to apply
14   to indirect owners, correct?
15               MR. SACK:  Objection to form.
16        A.     I do now see the Schedule B of Form
17   BD, Indirect Owners, yes.
18        Q.    Okay.  And is it fair to say that
19   Cypress was an indirect owner of BLX Trading through
20   its ownership interest in Sport-BLX?
21               MR. SACK:  Objection to form.
22        A.    I'm not -- I'm not clear on what --
23   how "indirect owner" is defined in general.  And for
24   purposes of this, yeah, I believe that Cypress was
25   an indirect owner.
```

Page 396

1          Q.     Okay.  And then it says for, you know,
2     disclosure obligations with respect to indirect
3     owners.  Do you see in item (d) it says, "In the
4     case of an owner that is a Limited Liability
5     Company, those members that have the right to
6     receive upon dissolution, or have contributed, 25
7     percent or more of the LLC's capital, and if managed
8     by elected managers, all elected managers."  Do you
9     see that?
10         A.     I do.
11         Q.     Okay.  Is there anything that you see
12    on this that would require the disclosure of
13    Cypress' -- all of Cypress' limited partners?
14               MR. SACK:  Objection to form.  Calls
15    for a legal conclusion.
16         A.     Well, you're talking about section
17    (d)?
18         Q.     Yes.  In -- well, in any of the
19    sections, but in particular section (d).  Is there
20    anything in there that would require -- that would
21    require the disclosure of the LPs of Cypress?
22         A.     Well, section (d) refers to a limited
23    liability company.
24         Q.     Okay.  And what about in terms of LPs
25    under (b)?

CONFIDENTIAL

Page 397

1          Well, strike that.  Let me -- let me
2    ask you this.
3          It says, "In the case of an owner that
4    is a partnership, all general partners, and those
5    limited and special partners that have the right to
6    receive upon dissolution, or have contributed, 25
7    percent or more of the partnership's capital."  Do
8    you see that?
9      A.    I see 25 percent or more of a class of
10   voting secured.  Am I in the wrong place?
11          MR. SACK:  It's B as in boy.
12     A.    (b).  Okay.
13     Q.    (b) -- right.  Correct.  Thank you.
14     A.    All right.  Case of an owner that's a
15   partnership, all general partners...
16          Okay.  I've read it.
17     Q.    Okay.  Doesn't that suggest to you that
18   only 25 -- owners who are 25 percent or more owners
19   or have contributed 25 percent more of the capital
20   of a partnership have to report?
21     A.    No.
22          MR. SACK:  Objection to form.
23     Q.    Have to be disclosed?
24     A.    No.
25     Q.    That isn't what it says?

CONFIDENTIAL

Page 398

1              MR. SACK:  You're asking him what it

2     says or what his understanding was?

3          Q.    Yeah.  Well, let me ask you both.

4     First of all, isn't that what it says?

5          A.    It is what it says, clearly.

6          Q.    Okay.  And why isn't that -- why isn't

7     that consistent with your understanding?

8          A.    Of -- what's the question?

9          Q.    The question is, doesn't this suggest

10    that the only partners of Cypress that would have to

11    be disclosed on the -- according to the Form BD are

12    those limited and special general partners and

13    limited and special partners that have the right to

14    receive upon dissolution, or have contributed, 25

15    percent or more of the partnership's capital?

16             MR. SACK:  So what was the question?

17    I think we need to hear it, and I may have an

18    objection.  I just want to hear it.

19             MR. PEARLSON:  Can you read it back,

20    please?

21             (Last question is read back by the

22    court reporter.)

23             MR. SACK:  Objection to form.

24         A.    My answer to that is no.

25         Q.    Okay.  What's the basis for your

CONFIDENTIAL

Page 399

1    answer?

2            A.    I don't think Schedule B is

3    dispositive in terms of who needs to disclose.

4            Q.    Okay.  But that's what -- I'm just

5    asking you now as to what Schedule B of Form BD

6    says.

7            A.    Schedule form -- Schedule B of Form BD

8    says "list below," and section (b) would not apply

9    to Cypress.

10           Q.    Why wouldn't (b) apply to Cyp- -- I'm

11   not saying -- are you saying (b) of Schedule B does

12   not apply to Cypress?

13           A.    (b) of Schedule B, as you pointed out,

14   does not apply to Cypress.

15           Q.    And why is that?

16           A.    Well, actually, I'm not totally sure

17   that's true either.

18           Q.    Okay.

19           A.    So...

20           Q.    Is there anything you see on either

21   Schedule A or Schedule B that would require Cypress

22   to disclose all of its beneficial owners?

23               MR. SACK:  Objection to form.  Calls

24   for a legal conclusion.

25           A.    Possibly (b).  I may stand corrected.

CONFIDENTIAL

Page 400

1    (b).

2            Q.      (b) of sched- -- 2(b) of Schedule B?

3            A.      Yes.

4            Q.      That would require the disclosure, in

5    your view, of all limited partners of Cypress?

6            A.      It's possible.  I -- I would have to

7    seek further advice from an expert, but it seems

8    possible, yes.

9            Q.      Okay.  Are you aware of any limited

10   partners of Cypress who contributed 25 percent or

11   more of the partnership's capital?

12                  MR. SACK:  You're asking him what his

13   awareness is now?

14                  MR. PEARLSON:  Yes.

15                  MR. SACK:  As of what period of time?

16           Q.      I'm saying as of now are you aware of

17   any partners of Cypress who hold 25 percent or more

18   of the partnership's capital?

19           A.      Well, I'm not sure I totally

20   understand the meaning of section (b), but it says

21   all general partners and those limited special

22   partners.  At the time the application went in

23   Cypress may very well have contributed more than 25

24   percent of the partnership's capital.

25           Q.      Wait.  Sport-BLX, Inc. is a

CONFIDENTIAL

Page 401

1   corporation, correct?

2          A.    Yes.

3          Q.    Okay.  And it says for -- for the --

4   each in the case of an owner that's a corporation,

5   it has the right to vote or has the power to sell or

6   direct the sale of 25 percent or more of a class of

7   a voting security.

8                MR. SACK:  You're referring to 2(a)

9   now?

10               MR. PEARLSON:  Correct.

11         A.    Okay.  I may need reading glasses

12  after this.

13               May I read (a) again just to be sure --

14         Q.    Sure.

15         A.    -- I understand?

16               "In the case of an owner that's a

17  corporation..."

18         Q.    Mr. Hall, let me try to be clear here.

19         A.    Okay.

20         Q.    So we're talking about which form,

21  which schedule --

22         A.    Um-hum.

23         Q.    -- Cypress would be on, if any, with

24  respect to the Form BD.

25         A.    Okay.

CONFIDENTIAL

Page 402

1          Q.     And as we've established, Cypress is an
2     indirect owner of BLX Trading, right?
3          A.     I said I believe that's correct, yes.
4          Q.     And it has a direct ownership in
5     Sport-BLX, which is a direct owner, correct?
6          A.     Yes.
7          Q.     Okay.  So in terms of what would apply
8     to Cypress on Schedule B of Form BD, isn't it the
9     case that it would be 2(b), which is an indirect
10    owner that is a partnership?
11                MR. SACK:  Objection to form.
12                And we're now just talking about what
13    the document says?
14                MR. PEARLSON:  That is correct.
15         A.     Okay.  So I'm confused by this
16    document, and if you help me understand it, I'm
17    happy to answer your question.
18         Q.     Let me just try to cut through it, --
19         A.     Okay.
20         Q.     -- if I can.
21         A.     Good.
22         Q.     And the question is, is there anything
23    in Schedule B that you understand required Cypress
24    to disclose all of the limited partners?
25                MR. SACK:  You say understands today

CONFIDENTIAL

Page 403

1    as he's sitting here?

2                MR. PEARLSON:  Correct.

3          A.      Potentially (b).

4          Q.      Potentially (b)?

5          A.      Well, I'd have to read -- since (b) is

6    subsection of 2, and 2 refers to owners listed on

7    Schedule A, I'd have to look at it a little more

8    carefully.

9          Q.      Okay.

10         A.      If you'd like, I'll do that.

11         Q.      Okay.  Under what circumstances would

12   you understand 2(b) to require the disclosure of all

13   the limited partners of Cypress?

14               MR. SACK:  His opinion now as he's --

15               MR. PEARLSON:  Yes.

16               MR. SACK:  -- sitting here?

17         A.      Well, I believe the total capital

18   raised for Sport-BLX by the summer of 2019 was about

19   3 something million dollars.  So Cypress' investment

20   was $1 million, which I think would be more than 25

21   percent of the contributed capital.

22         Q.      Okay.  So you understood that Cyp- --

23   that would require Cypress to be disclosed under

24   Schedule B?

25               MR. SACK:  Objection to form.  Now

CONFIDENTIAL

Page 404

1   you're going to past tense.  Understood at the time

2   or understands now?

3         Q.    Your understanding now.  Is that your

4   understanding now, based on this document?

5         A.    This is a complex schedule that I'd

6   rely on experts to -- to help us if we were going to

7   make this application.  Reading it now, I do believe

8   that Cypress contributed more than 25 percent of the

9   partnership's capital, but it's a corporation.

10  Sport-BLX is a corporation, so I'm not sure if (b)

11  applies.  I'd have to look at it more carefully --

12        Q.    Okay.

13        A.    -- to give --

14        Q.    Fair enough.

15        A.    -- you an answer.

16        Q.    Did you ever see the -- what -- how

17  Cypress -- if Cypress was disclosed in the original

18  application that was submitted on behalf of

19  Sport-BLX Trading?  BLX Trading I mean?

20        A.    I don't know if I have direct

21  knowledge of it, but my understanding is that

22  Cypress was disclosed.

23        Q.    Okay.  And do you know whether all the

24  limited partners of Cypress were disclosed in the

25  original application?

CONFIDENTIAL

Page 405

1          A.      We didn't know the limited partners at

2     the time.

3          Q.      Okay.  Do you know when that

4     application was submitted?

5          A.      I don't recall specifically.

6          Q.      Did you have any specific discussions

7     with Mr. Norensberg or anybody from Luxor about what

8     needed to be disclosed with respect to Cypress in

9     connection with the FINRA application of BLX

10    Trading?

11         A.      Well, my understanding is the

12    application was submitted, and FINRA had follow-up

13    questions.

14         Q.      Okay.  And did you speak directly to

15    anybody about that?

16         A.      I may have spoken directly to

17    Mr. Norensberg.  I definitely spoke to Mr. Mack, and

18    I'm sure I spoke to Mr. De Perio about it.

19         Q.      Do you know whether Mr. Mack was in

20    direct contact with FINRA?

21         A.      I don't know, but I don't believe so.

22         Q.      Okay.  If we could look at what's been

23    marked as Hall-34.

24                 (Exhibit Hall-34, 22-page July 3 and

25    9, 2019, email from Luxor Financial Group Operations

CONFIDENTIAL

Page 406

1    Department to John Hall and Joseph De Perio with

2    attached BLX Trading Corp Proposed Business Plan

3    Bates stamped SPORTBLX00049502 through 49523, is

4    marked for identification.)

5          Q.     Mr. Hall, I'm going to show you what's

6    been marked as Hall No. 34 for identification.  It's

7    an email chain Bates stamped SPORTBLX00049502

8    through 50528.

9                 MR. SACK:  I think the last page is

10   523.

11         A.     I see 23.

12                MR. PEARLSON:  I'm sorry.  Say that

13   again?

14                MR. SACK:  523, I think, is the last

15   page of our document.

16                MR. PEARLSON:  Oh, I'm sorry.  523.

17         A.     Yes.

18         Q.     Okay.  Have you seen this document

19   before, both the email and the attachment?

20         A.     I don't know if I saw the email.  I

21   don't know if I saw this specific attachment, but I

22   may have seen similar attachments.

23         Q.     Okay.  Do you know -- do you know what

24   the attachment is that says "BLX Trading Corp.

25   Proposed Business Plan"?

CONFIDENTIAL

Page 407

1          A.      That's what it says, yes.

2          Q.      Okay.  Do you know who -- who -- what

3     that document is?

4          A.      It's a proposed business plan to be

5     part of the application to FINRA.

6          Q.      Do you know who prepared the proposed

7     business plan for BLX Trading?

8          A.      Well, it was -- ultimately I believe

9     it was prepared by Mr. Norensberg with input from

10    various people at Sport-BLX.

11         Q.      Did you participate in putting it

12    together?

13         A.      Not in the actual answering of

14    questions, but the providing some of the

15    information, --

16         Q.      Did you --

17         A.      -- I would assume so.

18         Q.      Did you review it before it was

19    submitted to FINRA?

20         A.      I don't recall specifically reviewing

21    it.

22         Q.      Okay.  Did you -- do you -- do you know

23    who did from Sport-BLX before it was submitted to

24    FINRA?

25         A.      I would be speculating on who it would

CONFIDENTIAL

Page 408

1    be.  Probably a number of people.

2         Q.    Okay.  And do you see at the -- on the

3    -- in the cover there's a -- it's a -- it's an email

4    from the operations department at Luxor on July 9

5    sending an email to John Hall.  Do you see that?

6         A.    Yes.

7         Q.    And it cc's Mr. De Perio and Ken

8    Norensberg.  Do you see that?

9         A.    Yes.

10        Q.    So this is an email from -- do you know

11   who it's from at Luxor?

12        A.    No.

13        Q.    Do you know who Marcus is?  It says at

14   the bottom of the email.

15        A.    I think he was one of Mr. Norensberg's

16   associates.

17        Q.    Okay.  And he has -- and you see in

18   that email he has a few questions.  Do you see that?

19        A.    Yes.

20        Q.    Okay.  And then in there he says --

21   No. 2, it says, "FINRA needs to see the owners, even

22   if less than 10 percent ownership.  The current

23   ownership adds up to 71.9 percent.  We need the

24   rest."  Do you see that?

25        A.    I do.

CONFIDENTIAL

Page 409

1          Q.     Do you know who -- where the rest -- if
2     you add up the -- and if you look at the business
3     plan.  I'm sorry.  If you go to 49509, do you see
4     that it has the ownership interests that -- that
5     were set forth in the business plan?
6          A.     I see "Ownership Structure," section
7     B, yes.
8          Q.     Okay.  Do you -- were those numbers
9     accurate at the time?  Did you own 49.6 percent; did
10    Mr. De Perio own 22.3 percent?
11               MR. SACK:  Objection to form.
12         A.     Without doing the precise calculation
13    I can't say for sure, but that sounds about right.
14         Q.     Okay.  It says that you were indirect
15    owners through Sport-BLX, Inc.  Do you see that?
16         A.     Yes.
17         Q.     And also Mr. De Perio as an indirect
18    owner of BLX Trading through Sport-BLX, Inc., right?
19         A.     Yes.
20         Q.     Who were the other owners of --
21    indirect owners of BLX Trading through Sport-BLX,
22    Inc. at this time that made up the remaining
23    percentage?
24         A.     Well, the investors that put money
25    into the company through various rounds of financing

CONFIDENTIAL

Page 410

1    that we did.

2         Q.     Okay.  Do you know who they were at

3    this time?

4         A.     At this time, yes.

5         Q.     All right.  Who were they?

6         A.     Oh, I don't -- I don't know if I could

7    rattle off all the names, no.

8         Q.     Okay.  Do you know how many there were?

9         A.     I don't know.  Probably 15 or so.

10        Q.     And do you know where I could see a

11   document that would set forth the names of the

12   owners and the different percentages they held at

13   this time?

14        A.     I do.

15        Q.     Where would I find that?

16        A.     It's been produced.

17        Q.     In what document?

18        A.     I don't recall the Bates number.

19        Q.     Well, can you tell me -- does the

20   document have a name?

21        A.     Could get it for you.

22               I think Cap Table.

23        Q.     Okay.  And that would tell me the other

24   owners, and they -- and in this document, in the

25   email, Luxor is saying that "We need the rest,"

CONFIDENTIAL

Page 411

1  referring to the rest of the indirect owners.  Is

2  that correct?

3            MR. SACK:  You're saying what the

4  document says?

5        Q.    Yeah.  The email that --

6            MR. SACK:  The email.

7        Q.    That Luxor is asking for the rest of

8  the current ownership.

9        A.    That's what this says.

10       Q.    Okay.  Do you -- do you know whether

11  that was provided to Luxor?

12       A.    I don't recall.

13       Q.    Do you know whether that was submitted

14  -- the full ownership information was submitted to

15  -- the names of the indirect owners was submitted to

16  FINRA?

17       A.    I don't think we were ever able to get

18  the names of the indirect owners.

19       Q.    Well, wasn't Cypress an indirect owner?

20       A.    My understanding, and again, this is

21  not something that I'm directly involved in by

22  conversation, but Cypress was not an adequate

23  disclosure of the indir- -- indirect owners.

24       Q.    Okay.  Are you saying that's what is

25  being said as of July of 2019, or is that at another

CONFIDENTIAL

Page 412

1    time?
2                    MR. SACK:  Said by whom to whom?  I'm
3    -- objection to form.
4         Q.    Well, when Luxor asks for the
5    ownership, the current ownership, and they're
6    talking about the 71.9 percent that you and
7    Mr. De Perio hold, do you understand them to just be
8    asking for the -- the ownership of Sport-BLX that
9    are indirect owners of BLX Trading?
10                   MR. SACK:  Objection to form.  Calls
11   for speculation.
12        A.    So this email wasn't sent to me, so I
13   don't know if I could answer that with respect to
14   this email.
15        Q.    Okay.  Did there come a time where you
16   learned that -- or did you understand that Cypress
17   did have to disclose all of the LPs that comprised
18   Cypress?
19        A.    Yes.
20        Q.    Okay.  And when did you learn that?
21        A.    Well, after we learned that there were
22   investors other than Mr. Salerno in Cypress.
23        Q.    Okay.  But specifically in the -- in
24   the FINRA application process --
25        A.    Um-hum.

CONFIDENTIAL

Page 413

1          Q.      -- was there a point in time where

2     someone told you we have to disclose all of the LPs

3     of Cypress, L.P.?

4                  MR. SACK:   "We" being Sport-BLX?

5          Q.      Yes.  Or BLX Trading as the applicant.

6          A.      I think there were a number of

7     questions that led to that question, but ultimately

8     that's where we arrived.

9          Q.      Okay.  And who did -- who told you

10    that?

11         A.      I would assume Joe De Perio or John

12    Hall.

13         Q.      Okay.  Do you recall having a specific

14    discussion with them?

15         A.      No.

16                 MR. PEARLSON:  Can we do -- look at

17    Hall-35?

18                 (Exhibit Hall-35, Five-page email

19    string among multiple parties dated 8/2 to 8/5/2019,

20    Bates stamped SPORTBLX00050524 through 50528, is

21    marked for identification.)

22                 MR. SACK:  Which number, Ross?

23                 MR. CARBONE:  35.  Sorry.

24                 MR. SACK:  Thank you.

25         Q.      Okay.  Mr. Hall, I'd like you to look

Page 414

1   at what's been marked Hall-35 for identification.

2   It's an email chain that's Bates stamped

3   SPORTBLX00050524 through 50528.

4               If you could turn to the -- to 50526,

5   at the --

6               MR. SACK:  Just if you'd like to look

7   at the whole document, you can do that as well.

8        Q.    Drawing your attention to the email at

9   the top, Mr. Norensberg writes to you, John Hall,

10  and Mr. De Perio asking, "How are we looking?"  Do

11  you see that?

12       A.    I do.

13       Q.    Okay.  Does this refresh your

14  recollection that you were in the process of the

15  FINRA application in August of 2019?

16       A.    I was in the dis- -- I was --

17  participated in various discussions about the FINRA

18  application and the disclosure of the Cypress LPs.

19  I can't necessarily say that with respect to this

20  email.

21       Q.    Okay.  And if you look at the page

22  before, it says, "Michael Salerno is the owner of

23  Cypress Holdings III.  He is a local (NJ)

24  entrepreneur."  Do you see that?

25       A.    Yep, I do.

CONFIDENTIAL

Page 415

1          Q.     Okay.  And then if you -- if you look

2     above that, Luxor -- Marcus from Luxor responds, if

3     you see No. 2, "FINRA asked for the individuals who

4     own all the entities listed in the schedule of

5     shareholders (Cypress Holdings, GlassBridge, and

6     others.  You only sent the" owners "of Cypress

7     Holding" -- "you only sent the owner of Cypress

8     Holdings.  Also FINRA wanted to know that you have

9     performed due diligence on these individuals."  Do

10    you see that?

11         A.     I do.

12         Q.     Okay.  And were you a participation in

13    these conversations or correspondence with Marcus

14    about what FINRA was asking for?

15         A.     I don't know if I ever spoke directly

16    to Marcus.

17         Q.     Okay.  And do you -- do you know what,

18    if anything, BLX Trading had disclosed about Cypress

19    other than Mr. Salerno was the owner?

20              MR. SACK:  Are you saying does he know

21    -- does he have a specific memory of it?

22              MR. PEARLSON:  Yes.

23         A.     I don't have a specific memory of

24    anything other than what's here.

25         Q.     Okay.  Who -- who at Sport-BLX would

CONFIDENTIAL

Page 416

1    have been directly involved in these correspon- --
2    in the correspondence and the communications leading
3    up to the FINRA application?
4                MR. SACK:  With Luxor?
5                MR. PEARLSON:  Luxor.
6         A.     At times myself, at times John Hall,
7    at times Joe De Perio, potentially others that I
8    don't recall at this moment.
9         Q.     Okay.  Do you know, were you aware when
10   the FINRA application was first submitted or the
11   Form BD?
12        A.     I don't recall.
13        Q.     Do you recall if there was a business
14   plan attached to it?
15        A.     I don't recall specifically, but --
16   no, I don't recall specifically.
17        Q.     Okay.  Do you -- was there a point in
18   time where someone came back to you and said FINRA
19   has requested additional information that we need?
20        A.     Not necessarily in those words, but
21   yes.
22        Q.     Okay.  And -- and when was that?
23        A.     I don't recall.
24        Q.     Who was that?
25        A.     Probably either Joe De Perio or John

CONFIDENTIAL

Page 417

1    Hall, I would assume.

2         Q.    Okay.  And did you -- first, did you

3    speak to Mr. Salerno about disclosing the ownership

4    of Cypress to FINRA?

5                   MR. SACK:  At any time?

6         Q.    At any time.

7         A.    Well, let me be more clear.  I spoke

8    to him about -- first I asked if he was the sole

9    owner, as we thought, and eventually I asked him to

10   disclose to Sport-BLX so that Sport-BLX could put it

11   in the application which would eventually get to

12   FINRA.

13        Q.    Okay.  And when you say -- did you --

14   did you specifically -- did someone request for you

15   to make a request of Mr. Salerno of the information

16   relating to the ownership of Cypress?

17                  MR. SACK:  Objection to form.

18        A.    As I recall, Joe De Perio made a

19   number of requests that were unanswered, and after a

20   while I believe I sent him an email asking for the

21   information.

22        Q.    Did you ever see anything from FINRA

23   that requested that Cypress disclose all the

24   beneficial owners?

25        A.    I don't recall.

CONFIDENTIAL

Page 418

1          Q.     And other than yourself and
2     Mr. De Perio, are you aware of anybody else at
3     Sport-BLX discussing the disclosure of Cypress --
4     Cypress' limited partners to FINRA?
5                     MR. SACK:  Objection --
6          A.     Discussions with who?
7                     MR. SACK:  -- to form.  Yeah.
8          A.     Discussions with who?
9          Q.     Well, did -- let me rephrase that.
10         A.     Well, clearly John Hall is in the
11    discussion --
12         Q.     Right.
13         A.     -- in this email.
14         Q.     Did any -- did anyone other than
15    yourself and Mr. De Perio speak directly to
16    Mr. Salerno about disclosing the limited partners of
17    Cypress to FINRA?
18                    MR. SACK:  And do you mean by email as
19    well as phone?
20                    MR. PEARLSON:  Sure.
21                    MR. SACK:  What do you mean,
22    "communicate"?
23         Q.     Any kind of communication or
24    correspondence.
25         A.     During what time period?

CONFIDENTIAL

Page 419

1          Q.      Around this time in August of 2019.

2          A.      Well, at some point Mr. Mack made a

3    presentation to the entire board, so that was, I

4    guess, ultimately a communication to Mr. Salerno as

5    well.  Joe De Perio did, and I did.

6          Q.      Okay.  And when -- when did Mr. Mack

7    make his presentation to the board?

8          A.      I forget which board meeting it was.

9          Q.      Okay.  What was the nature of his

10   presentation?

11         A.      To -- it was part of -- there were two

12   parts to the presentation by attorneys.  Mr. Mack

13   specifically was speaking about the FINRA

14   application.

15         Q.      And what did he say about the FINRA

16   application to the board?

17         A.      That we needed to -- FINRA had

18   requested the ultimate owners of Cypress, and that

19   had to be disclosed, or the application would be

20   rejected.

21         Q.      Okay.  Did he make any kind of -- did

22   he give out any materials at the board meeting?

23         A.      I -- I don't believe so.

24         Q.      Did he give any kind of legal opinion

25   to the -- to the company about the -- about the need

CONFIDENTIAL

Page 420

1    to disclose the limited partners of Cypress?

2              MR. SACK:  Objection to form.

3         A.    He told us that it had to be done.  I

4    don't think that's technically what law firms

5    consider an opinion, a legal opinion.

6         Q.    Did he say what the --

7              MR. SACK:  But -- were you finished

8    with your answer?

9         Q.    Did he -- did he say what the basis was

10   for that requirement that Cypress had to disclose

11   its bene- -- the beneficial owners of the limited

12   partnership?

13        A.    Because FINRA wanted not only to know

14   but also wanted the applicant to know who the

15   beneficial owners are.

16        Q.    Was this his opinion, or was this based

17   on his correspondence with FINRA?

18              MR. SACK:  Objection to form.

19        Q.    To your understanding.

20        A.    My understanding, it's based on his

21   general expertise in FINRA regulatory issues.

22        Q.    Prior to that meeting had Mr. Mack

23   expressed that opinion to anyone at Sport-BLX?

24              MR. SACK:  Objection.  I just want to

25   think about that for a moment.  Hold on one second.

CONFIDENTIAL

Page 421

```
 1                  (Confers with co-counsel.)
 2                  MR. SACK:  Okay.  Let's hear the
 3      question back, and let's see if Mr. Hall can give a
 4      "yes" or "no" answer, and then we'll take it from
 5      there.
 6                  (Last question is read back by the
 7      court reporter.)
 8           A.     Without remembering specific
 9      conversations, yes.
10           Q.     Was that in writing?
11           A.     I don't recall.
12           Q.     Can we look at what's been marked
13      Hall-36 for identification?
14                  (Exhibit Hall-36, Two-page email
15      string between Joseph De Perio, Michael Salerno, and
16      George Hall dated 8/5 through 8/9/19, Bates stamped
17      SPORTBLX00027555 and 27556, is marked for
18      identification.)
19                  (Discussion off the written record
20      while exhibit is being exchanged.)
21           Q.     Mr. Hall, I'm going to ask you to look
22      at what's been marked Hall-36.  It's a two-page
23      email that's been Bates stamped SPORTBLX00027555 to
24      27556.  The first one, if you go to the back page,
25      is dated August 5.  It says, "Mike - As a matter of
```

CONFIDENTIAL

Page 422

1  normal course with our FINRA review, they have asked
2  us to note who the beneficial owners are of Cypress
3  Holdings, the shareholder of record.  Can you please
4  advise so we can complete their interrogatories?"
5                Are you aware, first of all, whether
6  this was the first time that Sport-BLX had requested
7  that information from Mr. Salerno?
8        A.    I don't know if this was the first
9  time.
10       Q.    Okay.  Do you know -- when it says,
11 "Can you advise so we can complete their
12 interrogatories," had you ever seen any written
13 questions from FINRA asking for that information?
14       A.    I don't know if I saw it.
15       Q.    Okay.  And if you look at --
16             THE REPORTER:  I'm sorry.  I didn't
17 hear that.
18             THE WITNESS:  If it existed.
19       Q.    Okay.  And then you see on the first
20 page there are a couple of follow-up emails with
21 Mr. De Perio asking for the beneficial owners of
22 Cypress.  Do you see that?
23       A.    Yes.
24       Q.    Okay.  And in the top email
25 Mr. De Perio says, "We would like your cooperation"

CONFIDENTIAL

Page 423

1    -- first of all, he asks -- he says, "I want to

2    follow up again on the FINRA interrogatory on our

3    shareholding.  We are prepared to disclose

4    beneficial ownership of all investment entities

5    within our shareholding with the exception of

6    Cypress."

7              Does that mean all the other

8    shareholders had disclosed their beneficial

9    ownership?

10         A.    I think with the exception of

11   GlassBridge, which as a public company, and an

12   enormous group of shareholders, did not have to

13   disclose the beneficial owners of GlassBridge.

14         Q.    Do you know whether GlassBridge had to

15   disclose certain shareholders who owned a certain

16   percentage of stock in the company?

17         A.    I don't recall.

18         Q.    Okay.  And he says, "We would like your

19   cooperation here to push forward" with "the FINRA

20   compliance to advance our business.  If not, we will

21   take structural steps with Sport-BLX, Inc. and our

22   broker-dealer sub to make sure we are compliant."

23              Do you know what he meant by that,

24   taking structural steps with Sport-BLX, Inc.?

25              MR. GOLD:  Objection to form.

CONFIDENTIAL

Page 424

1          A.     Well, I think at one point there was a

2    consideration of making the -- not having BLX

3    Trading be a wholly-owned subsidiary of Sport-BLX,

4    but to be an entity that was owned by those that

5    were willing to cooperate with what was required for

6    the FINRA application.

7          Q.     Okay.  What -- what -- were there

8    alternatives available to Sport-BLX, Inc. if it

9    wanted to have a relationship with a broker-dealer

10   to engage in its business model?

11               MR. SACK:  Objection to form.  May

12   call for a legal conclusion.

13         A.     No.  Not with the existing business

14   model.

15         Q.     Okay.  So there was no alternative if

16   it did not have a wholly-owned broker-dealer; there

17   was no way for it to move forward with its business

18   plan?

19               MR. SACK:  Objection to form.

20         A.     Well, if you define for me what you're

21   including in the business plan.

22               The business plan included being FINRA

23   -- collecting commissions, which required FINRA, so

24   without a FINRA registered broker-dealer, we

25   couldn't collect commissions.

1    Q.    And was it your understanding that it
2  required a wholly-owned broker-dealer as opposed to
3  one that was either partially owned or had a
4  relationship with a third party broker-dealer?
5              MR. SACK:  Objection to form.
6    A.    The commissions go to the registered
7  broker-dealer entity, so the beneficiary of those
8  commissions would be the owners of that entity.
9    Q.    Did you ever direct Mr. Salerno to --
10  strike that.
11             Did you discuss the issue directly with
12  Mr. Salerno of disclosure of the LPs of Cypress?
13    A.    Yes.
14    Q.    Okay.  What were the nature of your
15  discussions with him?
16    A.    I asked -- when he didn't respond to
17  Joe De Perio's multiple requests, I asked him to
18  respond to me very simply if he was the sole owner
19  of Cypress, and there were further discussions after
20  that.
21    Q.    And did you -- were these discussions
22  by email, or were they in-person discussions?
23    A.    Well, we discussed it either at board
24  meetings or by phone calls, as well as emails.
25  There was communication about this subject.

CONFIDENTIAL

Page 426

1          Q.     And at any time did you -- did

2    Mr. Salerno indicate to you why he was reluctant to

3    disclose the limited partners of Cypress to you?

4          A.     Well, the first excuse he gave was he

5    didn't want to disclose issues around his estate

6    plan.

7                 MR. PEARLSON:  Could we show --

8                 THE VIDEOGRAPHER:  Off the record?

9                 THE WITNESS:  You want some more

10   water?

11                MR. PEARLSON:  Could we go off the

12   record?

13                THE VIDEOGRAPHER:  2:09 p.m.  We're

14   going off the record.

15                (Discussion off the record.)

16                THE VIDEOGRAPHER:  It's 2:11.  We are

17   now on the record.

18   BY MR. PEARLSON:

19                (Exhibit Hall-38, Three-page email

20   exchange between Michael Salerno, George Hall, and

21   Joseph De Perio, dated 8/9/19, Bates stamped

22   SPORTBLX00050629 through 50631, is marked for

23   identification.)

24         Q.     Mr. Hall, if you could look at what's

25   been marked as Hall-38 for identification.  It's an

CONFIDENTIAL

Page 427

```
 1    email exchange between you and Mr. Salerno on August
 2    9.  Do you see that?
 3              A.    Yes.
 4              Q.    And you see that you're asking him to
 5    confirm that he's the sole owner of Cypress or to
 6    disclose whether there's other ownership; do you see
 7    that?
 8              A.    Yes.
 9              Q.    And he responds by saying, "Let's
10    discuss as my concern is my estate plan structure
11    which I am not inclined to make public."  Do you see
12    that?
13              A.    I do.
14              Q.    Did you discuss that with him, that
15    issue with him that he raised?
16              A.    I believe there were some discussions
17    about it, yes.
18              Q.    Okay.  What were the nature of your
19    discussions with Mr. Salerno about his reluctance to
20    disclose his estate plan structure?
21              A.    Well, I didn't really understand what
22    he meant by "estate plan structure."  I certainly
23    didn't care about any legal or tax structure he had.
24    I wanted to know beneficial owners.  So that comment
25    made no sense to me.
```

CONFIDENTIAL

Page 428

1    Q.    Did he explain to you why he had that

2    concern?

3    A.    I --

4    Q.    I'm sorry.  Go ahead.

5    A.    If I may.

6          And then I believe I also discussed the

7    concept of making it public.  We weren't -- we were

8    -- Sport-BLX management would know who the

9    beneficial owners are, FINRA would know who the

10   beneficial owners are.  I don't know of any public

11   disclosure other than something that FINRA may put

12   in -- in their public disclosures, but...

13   Q.    In the context of your conversations

14   with Mr. Salerno did you ever discuss with him

15   speaking to either Mr. Norensberg or Mr. Mack about

16   the need to disclose Cypress' LPs?

17          MR. SACK:  At any time.

18   Q.    At any time.

19          MR. SACK:  At any time you spoke with

20   Salerno.

21   A.    Well, we were proactive, and we

22   brought Mr. Mack, by phone, into a board meeting to

23   answer questions and explain the issue.

24   Q.    Did Mr. Salerno ask questions in that

25   meeting?

CONFIDENTIAL

Page 429

1          A.      I don't recall.

2          Q.      Do you recall whether Mr. Salerno asked

3     for his counsel to have access to Mr. Norensberg or

4     Mr. Mack so that he could make inquiries about the

5     need to disclose the LPs of Cypress?

6          A.      So there was -- there were evolving

7     answers from him.  Originally he wanted to disclose

8     to FINRA and not to Sport-BLX, and then at some

9     point I think he may have asked if his counsel could

10    talk to our counsel, and it was much later, I think,

11    in retrospect, and not quite accurate that -- the

12    concept of having the two counsels call together,

13    but none of those were acceptable.

14         Q.      Okay.  Do you recall when it was that

15    Mr. Salerno first raised the idea of disclosing

16    directly to FINRA the beneficial ownership of

17    Cypress?

18         A.      No.

19         Q.      Do you recall discussing with anyone

20    why that was unacceptable?

21         A.      Well, it was unacceptable to --

22    according to our counsel, it was unacceptable to

23    FINRA.

24         Q.      Do you recall if he -- now, when you're

25    -- this is Mr. Mack, correct?

CONFIDENTIAL

Page 430

1          A.      Correct.

2          Q.      Do you know if Mr. Mack spoke directly

3     to FINRA, or is he just basing it on his opinion and

4     prior experience?

5                  MR. SACK:  Objection to form.

6          A.      I can't give you a definitive answer

7     on what his communications with FINRA are or were

8     with respect to this, if any, but Mr. Mack's

9     background and experience made us comfortable that

10    he had the appropriate -- he was the appropriate

11    counsel to advise the company on these issues.

12         Q.      Did you tell Mr. Salerno he couldn't

13    directly contact FINRA with that information?

14         A.      I did.

15         Q.      Okay.  You did or did not?

16         A.      I did.

17         Q.      Okay.  And why did you do that?

18         A.      So one of the points that Mr. Mack

19    raised was that it was unlikely that FINRA would

20    even take his call because -- "call" being

21    communication -- because he wasn't an applicant.  He

22    didn't have any standing with FINRA, and they

23    wouldn't likely engage with him.

24         Q.      So what was the harm in letting

25    Mr. Salerno try to give that information directly to

1  -- concerning Cypress directly to FINRA?

2       A.     Well, we were afraid that it would

3  potentially, for lack of a better word, embarrass or

4  give FINRA the wrong impression of Sport-BLX or BLX

5  Trading.

6       Q.     So you told him not to do it?

7       A.     Yes.

8       Q.     Do you know if FINRA's -- anyone asked

9  FINRA whether he could submit that information

10  directly to FINRA?

11       A.     As I think I just said, our advice

12  from Mr. Mack was that FINRA wouldn't take his call,

13  so me forbidding him to make that call was kind of

14  irrelevant, but Mr. Mack did say even if he did

15  communicate directly with FINRA, there's no way they

16  would allow an application to go through without

17  management of the applicant knowing who the

18  beneficial owners are.

19       Q.     My question is a little bit different,

20  Mr. Hall.  My question is do you know if anybody

21  specifically asked FINRA whether Mr. Salerno could

22  directly contact them with the information about the

23  beneficial owners of Cypress?

24       A.     I don't know.

25            MR. PEARLSON:  If we could do Hall-39.

CONFIDENTIAL

Page 432

1                    (Exhibit Hall-39, 8/12/2019 email from

2     George Hall to Michael Salerno Bates stamped

3     SPORTBLX0140201, is marked for identification.)

4         Q.    Mr. Hall, I'm going to show you -- I'm

5     showing you what's been marked as Hall-39 for

6     identification.  It's a one-page email, Bates stamp

7     SPORTBLX0140201, dated August 12, 2019.  I'm just

8     going to direct your attention to -- this is an

9     email from you to Michael Salerno, correct?

10        A.    Yes.

11        Q.    And at the top it says, "Mike, I had

12    hoped our most recent" conversation "would lead to

13    more productive interaction."

14              Do you know what conversation you're

15    referring to there?

16              MR. SACK:  I think it was plural,

17    Ross.

18        Q.    "Our recent conversations," correct,

19    I'm sorry, "would lead to more productive

20    interaction."  Do you know what conversations you're

21    referring to there?

22        A.    I could be wrong, but I believe that

23    they were conversations about an injury that his

24    child sustained.

25        Q.    Okay.

CONFIDENTIAL

Page 433

1              MR. SACK:  And when is this -- the

2      email is 2019.  Okay.

3              MR. PEARLSON:  Yeah.  August 12, 2019.

4         Q.    Then you say there, we have -- we have

5      "also decided that certain issues may be taken

6      directly to" the "shareholders, and we intend to

7      have a shareholder meeting in the near future."

8              What are you talking about there?

9         A.    I don't recall specifically which

10     issues.  Let me just read it a little more

11     carefully.

12        Q.    Sure.

13        A.    Yeah.  I don't recall specifically

14     what those issues were, but -- yeah.  I don't recall

15     what specific issues I was referring to after these

16     recent conversations.

17        Q.    Okay.  So you don't know when you're

18     saying "We also decided that certain issues may be

19     taken directly to" the "shareholders"?

20        A.    Well, that -- one issue we knew was

21     the rent issue would be taken to shareholders.  I

22     don't recall if there were other issues that would

23     be taken to shareholders, whether it was total

24     shareholder approval of the budget, including the

25     line items for corporate expenses and paper and

CONFIDENTIAL

Page 434

```
 1   binders and paper clips and so forth.  There may
 2   have been other issues that we -- we thought we
 3   might just have to take directly to shareholders.
 4           Q.    Okay.  Then it says in the next
 5   sentence, "Separately, we need to have answers for
 6   FINRA on the ownership of Cypress or we will have to
 7   make some modifications to our application."
 8                 What are you talking about there?
 9           A.    I don't specifically recall what the
10   modifications to the application would have been in
11   this -- at the time of this email, but one of the
12   modifications would be to just withdraw it and
13   forego the broker-dealer.
14           Q.    Well, that's not a modification, is it?
15           A.    I understand.  It's not worded
16   properly, but that was something that was definitely
17   being considered, was --
18           Q.    But you -- do you understand whether --
19   what the -- what modifications could be -- could
20   have been made to the application?
21           A.    Well, we could --
22           Q.    At that time.
23           A.    -- modify -- we could modify the
24   applicant, who the applicant was.
25           Q.    And how would you do that?
```

CONFIDENTIAL

Page 435

1          A.      Well, we could create another entity
2    where all of the beneficial owners were willing to
3    disclose the ownership to management and to FINRA.
4          Q.      Did you resubmit an application to
5    FINRA on behalf of such an entity later?
6          A.      I don't recall.
7          Q.      Did you create an entity instead of BLX
8    Trading that would serve the same function in terms
9    of trading?
10         A.      We did create an entity that we
11   considered applying to FINRA for the broker-dealer
12   license.
13         Q.      And did you, in fact, submit a
14   broker-dealer license on behalf of that entity?
15         A.      I don't recall if it was ever
16   submitted.
17         Q.      And what was the name of that entity?
18         A.      Sport-BLX Securities.
19         Q.      And do you recall when Sport-BLX
20   Securities was created?
21         A.      Somewhere around April of 2020, so not
22   relevant to this email.
23         Q.      Okay.  And -- and who were the owners
24   of Sport-BLX Securities at the time it submitted its
25   FINRA application?

CONFIDENTIAL

Page 436

1          A.      I don't --

2          Q.      Or let me rephrase that.

3                  At the time that a FINRA application

4   was being considered for Sport-BLX Securities, who

5   was the owner -- who were the owners?

6          A.      Joe De Perio and myself.

7          Q.      If we could look at Sport-BLX 40.  I

8   mean Hall-40.

9                  Before we look at this document,

10  Mr. Hall, you testified that there was actually --

11  there was a board meeting at which Mr. Mack appeared

12  and gave his opinion and answered questions

13  concerning the FINRA application?

14                 MR. SACK:  Objection to form.  I don't

15  think he used the word "opinion," but he gave his

16  view.

17         A.      There was a board call that Mr. Mack

18  attended by phone.  He made some comments, and I

19  don't recall what the questions were, if there were

20  any questions.

21         Q.      Okay.  And -- and does Sport-BLX -- or

22  did Sport-BLX, in 2019, keep minutes from its board

23  meetings?

24         A.      Yes.

25         Q.      Okay.  And how were those minutes

CONFIDENTIAL

Page 437

1    prepared?

2         A.     Somebody would take notes on the

3    meeting and then prepare a draft, and then we would

4    distribute the draft to board members.

5         Q.     Who was the -- generally the secretary

6    who prepared the notes from the meeting?

7         A.     Sometimes Joe De Perio, other times I

8    think we -- we may have had John Hall serve as the

9    secretary for a meeting.

10        Q.     If Mr. Mack appeared at a -- at a board

11   meeting, would that show up in the minutes?

12        A.     I believe so.  Are we talking about

13   this specific one that I'm looking at?

14        Q.     No, I'm just saying generally if -- if

15   Mr. Mack had -- had appeared even by phone at a

16   Sport-BLX board meeting and answered questions and

17   given his view of the -- the necessity to disclose

18   Cypress ben- -- the beneficial owners of Cypress,

19   would that be something that you would expect to

20   appear on the board minutes?

21              MR. SACK:  Objection.

22        A.     If Mr. Mack was on a call with the

23   board, I assume that would be something that would

24   be noted in the minutes.

25        Q.     Now, if you could turn to -- we're

CONFIDENTIAL

Page 438

1   looking at what's been marked as Hall-40 for

2   identification.  It is Bates stamped GBE_0003774

3   through 3776, and it appears to be minutes from a

4   board meeting on August 14, 2019.  Do you see that?

5          A.    Yes.

6          Q.    Okay.  If you could turn to the second

7   page, and there's a section entitled "FINRA

8   Application."

9          A.    Yes.

10         Q.    And that -- I'd like you to read that

11  to yourself, and then I'm going to ask you a few

12  questions about it.

13         A.    Okay.

14         Q.    Okay.  Do you recall this meeting

15  taking place in or around August 14 of 2019?

16         A.    Yes.

17         Q.    And the discussion being of the -- of

18  the FINRA application at that time?

19         A.    I believe these minutes are -- apply

20  to a meeting that was, in fact, on August 14, yes.

21         Q.    Okay.  And do you recall as of August

22  14 whether the FINRA application had been submitted?

23         A.    If I recall correctly, the application

24  was submitted, and that's what led to them asking

25  for the beneficial owners.

CONFIDENTIAL

Page 439

1          Q.    Okay.  And -- and do you recall, did

2     Mr. Forensberg or -- Norensberg or Mr. Mack

3     participate in this board meeting?

4          A.    I don't recall, but it's not in the

5     minutes, so I think possibly not.

6          Q.    Okay.  And it says in here that

7     "Mr. Salerno reiterated his position that Cypress

8     did not intend to provide such beneficial ownership

9     information to the company."  Do you see that?

10          A.    Yes.

11          Q.    Okay.  And then it says, "Mr. Hall

12     described the requirement of FINRA for an applicant

13     to 'know its investors'."

14                What -- what is that, the requirement

15     of FINRA for an applicant to, quote, know it is

16     investors, closed quote?

17                MR. SACK:  Objection to form.

18          A.    It means that the applicant for a

19     FINRA license has to know who the investors are in

20     its company.

21          Q.    Okay.  And -- and is that a rule or

22     regulation?

23          A.    I don't know if it's a rule or

24     regulation or policy, but I think it's pretty firm.

25          Q.    Okay.  Then what's that -- what's your

CONFIDENTIAL

Page 440

1  knowledge based on?

2          A.     Discussions with Mr. Mack and

3  potentially others.

4          Q.     Okay.  Then it says "and explained that

5  the broker-dealer regulations required BLX Trading

6  to identify and disclose the identity of the

7  beneficial owners of the company."

8                 What regulations are you talking about

9  there?

10                MR. SACK:  Objection to form.

11         A.     So we're talking about a conversation

12  that was recorded in notes and transposed into

13  minutes.  I'm not sure we were specifically citing a

14  particular FINRA regulation, even though it's

15  recorded here as a -- such regulations.

16         Q.     Are you saying that the meeting minutes

17  are inaccurate?

18                MR. SACK:  Objection to form.

19         A.     I'm saying that it's our understanding

20  that -- it was our understanding very clearly that

21  FINRA needed to know the -- and then that the

22  applicant needed to know the beneficial owners.

23                FINRA can ask whatever questions they

24  want, and they can reject any application they want,

25  so I would say very likely there is some regulation

CONFIDENTIAL

Page 441

1  that would give FINRA this power, but I don't know

2  if we were referring to a specific regulation.  So

3  in terms of the accuracy, I think it's reasonably

4  accurate.

5          Q.      Okay.  Now, Mr. Hall, the next sentence

6  says, "Mr. Salerno stated that he desired to review

7  the matters with his counsel and, on behalf of

8  Cypress, Mr. Salerno agreed to get back to the

9  company regarding the company's request that Cypress

10 provide its beneficial ownership as required by such

11 regulations by end of business on August 16, 2019."

12 Do you see that?

13         A.      I see that's what it says, yes.

14         Q.      Okay.  Do you know, to your knowledge,

15 did Mr. Salerno review the matter with his counsel

16 and get back to the company?

17         A.      I don't recall.

18         Q.      You don't recall one way or the other?

19         A.      I certainly don't know if he reviewed

20 it with his counsel.  I don't recall if he got back

21 to the company.

22         Q.      Okay.  And do you recall that Mr. -- in

23 the same meeting Mr. Salerno asked for the

24 application, to see the application?

25         A.      I don't know if he did in this

CONFIDENTIAL

Page 442

1    meeting.

2         Q.    You don't recall him saying that he

3    wanted to review the application itself with his

4    counsel before disclosing the limited partners of

5    Cypress?

6         A.    I don't recall if he requested that in

7    -- in this meeting.

8         Q.    Do you recall him requesting it at any

9    time, the application itself?

10        A.    At some point I think he did request

11   the application.

12        Q.    Did you give it to him?

13        A.    No.

14        Q.    Why not?

15        A.    I don't recall if we were -- if we

16   were advised that we -- we didn't need to give it to

17   him, but ultimately we did decide it was in the best

18   interest of the company not to give it to him.

19        Q.    And who made that decision?

20        A.    Ultimately me.

21        Q.    Do you recall whether it was discussed

22   whether a broker-dealer separate from Sport-BLX

23   could be created in the context of this meeting?

24             MR. SACK:  Objection to form.

25        A.    I don't recall if this meeting we

Page 443

1    discussed an alternative company that would make an
2    application for a broker-dealer license.
3         Q.    Do you -- you don't recall saying in
4    the meeting we're not -- we're just going to change
5    the beneficial owners and say that Sport-BLX is not
6    an owner and issue shares to all the people who
7    would disclose?
8              MR. SACK:   Objection to form.
9         A.    As I said before, one of the
10   possibilities was to -- for -- for example, BLX
11   Trading could potentially have a different ownership
12   group than Sport-BLX, Incorporated, and the BLX
13   Trading would have owners that were willing to
14   cooperate with FINRA's requests, and -- but I just
15   don't -- I don't know if that was discussed in this
16   board meeting.
17        Q.    Do you recall saying in this board
18   meeting that -- once again that you would work
19   around Mr. Salerno?
20        A.    I don't recall saying that in this
21   board meeting.
22        Q.    Do you recall saying that at any time?
23        A.    Well, as we saw in previous documents,
24   we referred to working around them as far as
25   creating an advisory board to have people that would

CONFIDENTIAL

Page 444

```
 1   have, frankly, been embarrassing to have on the
 2   board itself, so that was one workaround
 3   conversation.  I believe there was another
 4   conversation about getting shareholders to vote on
 5   the rent so that we could stop discussing that ad
 6   nauseam.  So in this board meeting there -- I don't
 7   recall specifically if we spoke about working around
 8   any of these issues.
 9        Q.    Did you ever speak to anyone about
10   working around Mr. Salerno in the context of the
11   broker-dealer that would work with Sport-BLX?
12              MR. SACK:  Objection to form.
13        A.    I don't really recall the workaround
14   phrase being used with respect to the broker-dealer,
15   but we clearly had discussions about how could we
16   best accomplish what was in the -- in the business
17   plan when it was clear that Sport-BLX, Incorporated
18   could not become a broker-dealer.
19        Q.    Now, Mr. Salerno said that he would get
20   back to the board -- or as the minutes reflect,
21   Mr. Salerno would get back to the -- said he would
22   get back to the board by August 16, 2019.  Do you
23   see that?
24        A.    Yes.
25        Q.    And did he, in fact, get back to the
```

CONFIDENTIAL

Page 445

1    board at that time?

2         A.    I don't recall.

3         Q.    All right.  If we could look at what's

4    been marked as Hall-41 for identification.

5               (Exhibit Hall-41, Two-page 8/16 and

6    8/17/2019 email string between Michael Salerno,

7    George Hall, and Joseph De Perio Bates stamped

8    SPORTBLX00050788 and 50789, is marked for

9    identification.)

10        Q.    Mr. Hall, I'm going to show you what's

11   been marked as Hall-41 for identification.  It's a

12   two-page email chain dated August 16, 2019, Bates

13   stamped SPORTBLX00050789 -- 788 through 789.  Do you

14   see that?

15        A.    Yes.

16        Q.    Okay.  And I'm going to just direct

17   your attention to -- of course you can look at

18   whatever you feel you need to to answer the

19   questions, but I'm going to direct you to the middle

20   of the page where it says -- and this is an email

21   from Michael Salerno, "I am willing to provide FINRA

22   with ownership information that they want however I

23   am not willing to provide it to you or any other

24   Sport-BLX directors as you do not have a right to

25   this information at this time.  Once you provide me

CONFIDENTIAL

Page 446

```
 1   with the FINRA representative we will" probably --
 2   "we will promptly reach out to them to expedite."
 3   Do you see that?
 4        A.    Yes.
 5        Q.    Is that the -- is that the
 6   communication you were referring to previously where
 7   Mr. Salerno asked to speak directly to FINRA?
 8             MR. SACK:  Objection to form.
 9        Q.    Well, let me just rephrase it.
10             Did -- Mr. Hall, isn't it the case that
11   Mr. Salerno asked to speak directly to FINRA as
12   provided in this email, August 16 email?
13        A.    He made a statement that he would
14   speak to FINRA and wanted me to provide him the
15   FINRA representative.
16        Q.    Okay.  And what did -- what did you --
17   what was your response to him on that?
18        A.    "Give me a call if you can."
19        Q.    Okay.  And at some point did you tell
20   him not to do it?
21        A.    Yes.
22        Q.    Okay.  And in between the time you
23   spoke to Mr. Salerno -- he made this request, and
24   you spoke to Mr. Salerno, did you speak to Mr. Mack?
25        A.    I don't know the specific time frames
```

CONFIDENTIAL

Page 447

1   that I spoke to Mr. Mack.

2               MR. PEARLSON:  If we could look at

3   Hall-42.

4               (Exhibit Hall-42, Two-page 8/16 and

5   8/17/2019 email string between Michael Salerno,

6   George Hall, and Joseph De Perio Bates stamped

7   SPORTBLX00050786 and 50787, is marked for

8   identification.)

9       Q.     I'm going to show you what's been

10  marked as Hall-42 for identification.  Mr. Hall, do

11  you see in the -- the email, the first email down

12  from the top of the page, there's an email from you

13  to Mr. Salerno copying Marc Gross dated August 16,

14  2019?

15      A.     I do see that.

16      Q.     And you're responding to Mr. Salerno's

17  email that he wanted to provide FINRA with ownership

18  information?

19      A.     Yes.

20      Q.     Okay.  And you say, "I don't think that

21  is a viable option."  Do you see that?

22      A.     Yes.

23      Q.     On what did you base that opinion?

24      A.     That Sport-BLX management was entitled

25  to know who the beneficial owners of Cypress was.

CONFIDENTIAL

Page 448

1          Q.     And -- and in terms of correspondence

2     with FINRA, did you see any direct correspondence

3     with FINRA, any -- any either letters or emails from

4     FINRA that demanded the beneficial owners of

5     Cypress?

6          A.     I think when the application went in

7     FINRA made further requests for information,

8     including the list of beneficial owners.

9          Q.     Okay.  And my question is did you ever

10    see that request from FINRA?

11         A.     I don't know if I saw anything on a

12    FINRA letterhead.

13         Q.     Okay.  If we could turn to Hall-43.

14                (Exhibit Hall-43, Six-page August 23,

15    2019, FINRA letter to Kenneth Norensberg Bates

16    stamped SPORTBLX00052448 through 52353, is marked

17    for identification.)

18         Q.     What I would suggest is, Mr. Hall, why

19    don't you take a -- we're going to take a quick

20    break.  Maybe you could take some time to just look

21    over this letter, and then I'll ask you a few

22    questions about it when we come back.

23         A.     Okay.

24                THE VIDEOGRAPHER:  It's 2:39 p.m.

25    We're going off the record.

CONFIDENTIAL

Page 449

1                    (Recess taken from 2:39 to 2:59 p.m.)

2                    THE VIDEOGRAPHER:  It's 2:59 p.m.

3      We're back on the record.

4      BY MR. PEARLSON:

5          Q.    Mr. Hall, I asked you to look over

6      what's been marked as Hall-44 -- 43, I'm sorry, for

7      identification.  Did you get a chance to look at

8      that letter?

9          A.    I gave it a cursory reading, yes.

10         Q.    Okay.  And that's an August 23, 2019,

11     letter to Ken Norensberg.  It lists him as a

12     managing director of BLX Trading Corp. at 510

13     Madison Avenue, Ninth Floor.  Do you see that?

14         A.    I do.

15         Q.    Was he a managing director of BLX

16     Trading Corp. at the time?

17         A.    I don't believe so.  That could be a

18     mistake by FINRA, or there could be some other

19     explanation for it, but I don't think so.

20         Q.    Was it ever intended that

21     Mr. Norensberg would, in fact, have a position of

22     employment with BLX Trading?

23         A.    No.

24         Q.    Okay.  Did you see this letter from

25     FINRA at or around the time it was sent on August

CONFIDENTIAL

Page 450

1    23, 2019?

2        A.    I don't recall if I looked

3    specifically at this letter.

4        Q.    Did Mr. Norensberg generally forward

5    you the letters he was getting from FINRA?

6            MR. SACK:  "You" being George Hall?

7            MR. PEARLSON:  Yeah.

8        A.    He -- he may have forwarded them to

9    me.

10        Q.    Okay.  Do you have any recollection of

11    him forwarding them to you?

12        A.    Which ones?

13        Q.    The letters from FINRA that he

14    received.

15        A.    I don't know how many letters he

16    received, so there may be some forwards that I have.

17    I don't know if that's exhaustive of what he

18    received.

19        Q.    Okay.  How many letters did you get

20    that he had sent on to you from -- that he had

21    received from FINRA?

22        A.    I don't specifically recall any, but I

23    am saying that he may very likely have forwarded me

24    things.

25        Q.    Okay.  But you don't have -- as you sit

CONFIDENTIAL

Page 451

1    here today you have no specific recollection of him

2    sending you a letter that he had received from FINRA

3    such as this one?

4          A.    I don't have a specific recall of that

5    at a particular time.

6          Q.    Okay.  Do you recall seeing this letter

7    in particular?

8          A.    I'm familiar with some of the issues

9    in this letter.  I don't know if I specifically

10   received this letter from Mr. Norensberg.

11         Q.    Okay.  And do you see that FINRA was

12   asking for some information from BLX Trading as the

13   applicant for the BD?

14         A.    Yes.

15         Q.    Okay.  Do you see anywhere in this

16   letter where they're asking for the beneficial

17   owners of Cypress or any additional information

18   concerning Cypress Holdings?

19         A.    I don't see this -- I don't see that

20   in this particular letter.

21         Q.    Okay.  If you could turn to page 5 of

22   the letter, which is Bates stamped SPORTBLX00052452.

23   Do you see that?

24         A.    Yes.

25         Q.    Okay.  And it says -- you know, one of

CONFIDENTIAL

Page 452

1  the pieces of information that they're requesting in

2  item No. 23 is "...a copy of the lease or sublease

3  agreement for the firm's office spaces, along with a

4  floor plan for the office space.  Per the firm's

5  submission, BLX's main office will be located at 510

6  Madison Avenue, New York, New York 10022."  Do you

7  see that?

8          A.      I do.

9          Q.      Okay.  Did you provide FINRA with a

10  copy of the lease or sublease for the office space

11  at 510 Madison Avenue?

12          A.      I don't recall.

13          Q.      Isn't it true that Sport-BLX didn't

14  have a -- didn't have a lease for that location?

15          A.      Sport-BLX did not have a lease for

16  that location, and this was a question requesting

17  the lease or sublease.

18          Q.      Okay.  Do you know what, if anything,

19  BLX Trading did in response to that request No. 23?

20          A.      I don't know if we responded.

21          Q.      Did BLX Trading have a lease anywhere?

22          A.      No.

23          Q.      Now, it says -- if you look at

24  paragraph 9 on page 2 of the letter, it says -- it

25  lists you, John Hall, Mr. Ruchalski, Mr. De Perio,

CONFIDENTIAL

Page 453

1    and your, you know, CRD numbers.  You're all

2    registered brokers?

3              MR. SACK:  Objection to form.  You

4    mean at that time, Ross?

5         Q.    Yes.  At that time you all had

6    licenses?

7         A.    I did not.  I don't know if John Hall

8    did at that time.  I don't know about Fran Ruchalski

9    or Joe De Perio at that time.

10        Q.    Do you know whether Mr. Norensberg

11   prepared an answer or a response to this letter on

12   behalf of BLX Trading?

13        A.    I don't recall.

14        Q.    Do you know whether -- it says here,

15   "Please state whether the firm or its parent,"

16   they're talking about the Clinton Group, "will have

17   a business" -- please state -- strike that.

18              "Please state whether the firm or its

19   parent will have a business relationship with

20   Clinton Group, Inc.  Provide a detailed description

21   of any business, referral or other relationship."

22              Was it intended that BLX Trading was

23   going to have a business relationship with the

24   Clinton Group?

25        A.    At that time other than using space

CONFIDENTIAL

Page 454

1    the Clinton Group had, I don't think there was any

2    -- any intended business relationship between the

3    two companies.

4         Q.    Was it intended that BLX Trading was

5    going to remain in 510 Madison Avenue or operate out

6    of 510 Madison Avenue?

7         A.    I think at that time the answer would

8    be yes.

9         Q.    Did you seek the permission of the

10   landlord for BLX Trading to occupy that -- those

11   premises?

12        A.    No.

13        Q.    Do you see -- if you could turn to page

14   4?  And I'm going to direct your attention to item

15   12.  It says, "Mr. George E. Hall, Jr. will serve as

16   the firm's CEO."  Do you see that?

17             MR. SACK:  Number 12.

18             THE WITNESS:  I see that.  I want to

19   see which firm they're referring to.

20        A.    Okay.  Anyway, I see that, yes.

21        Q.    Okay.  You were -- you were -- were you

22   going to serve as the CEO of BLX Trading?

23        A.    Well, as CEO of Sport-BLX,

24   Incorporated, I'm not sure if there was going to be

25   a separate CEO for BLX Trading, or if it would just

CONFIDENTIAL

Page 455

1    be a flow-through to the parent, but in substance, I

2    would ultimately be the CEO of the company.

3         Q.    Do you see there that FINRA is asking

4    -- well, first of all, it states that -- it appears

5    you do not hold a securities license and haven't

6    scheduled any examinations.  Do you see that?

7         A.    Yes.

8         Q.    Did you understand that if you were to

9    serve as an officer of BLX Trading, you'd have to

10   have a securities license?

11        A.    I'm not entirely -- I'm not sure

12   that's entirely correct, but at that time it was my

13   intention to take the test and get the license.

14        Q.    Okay.  And how long a process would

15   that take?

16        A.    Just -- I don't recall how long it

17   takes to schedule.

18        Q.    Okay.  And do you see that also the

19   same thing -- they're saying the same thing for

20   Mr. Ruchalski, who's going to be the firm's CEO,

21   Mr. John Hall and Mr. De Perio, who are all going to

22   serve as officers:  They need to schedule and pass

23   their required examinations before BLX could be a

24   registered broker-dealer?

25        A.    Yes, I see that.

CONFIDENTIAL

Page 456

1        Q.      Did you have any discussions with

2    anybody about that requirement that -- that BLX

3    Trading needed to have all of its officers take and

4    pass the securities license exams -- exam?

5        A.      Yes, we had those discussions, and

6    then there were also discussions about -- I think

7    part of the reason we created a subsidiary was to

8    potentially have different people work at different

9    entities, and I don't recall the advice we got, but

10   at this time we were all ready and willing to

11   schedule and take the exam.

12       Q.      Were the exams scheduled at the point

13   of this August 23, 2019, letter?

14       A.      Well, FINRA says at this time no, so

15   I'll take their word for it that I wasn't scheduled.

16       Q.      When was the first time you heard about

17   the requirement that if you were going to act as an

18   officer of BLX Trading that you needed a securities

19   license?

20       A.      I don't know.  Sometime in the --

21   during this time period.

22       Q.      Did you schedule -- following this

23   letter, following August 23, 2019, did you schedule

24   a securities examination?

25       A.      I don't recall if one was scheduled or

CONFIDENTIAL

Page 457

1    not.

2            Q.    Do you know if Mr. Ruchalski, Mr. Hall

3    -- Mr. John Hall, or Mr. De Perio scheduled a

4    securities examination in connection with the FINRA

5    application by BLX Trading?

6            A.    I don't recall the time, but I'm

7    confident that Joe De Perio scheduled and took the

8    exam, and the same thing for John Hall, but I don't

9    know the dates.

10           Q.    Okay.  Do you know if it was before or

11   after this letter?

12           A.    I don't know.

13           Q.    Does it indicate on --

14           A.    Well --

15           Q.    -- the letter --

16           A.    Well, hold -- hold --

17           Q.    -- that they hadn't scheduled it as of

18   the date of the letter?

19           A.    Well, let me -- let me rephrase, or

20   let me qualify the previous.

21                 It says that Mr. John Hall had a window

22   open, so I would assume that implied that he hadn't

23   taken it yet.  So I think this implies that nobody

24   had taken it yet.

25           Q.    Okay.  If we could look at what's --

CONFIDENTIAL

Page 458

1    and that would -- that would be a process that would

2    take several months, correct?

3         A.    I don't know how long the scheduling

4    was.  The taking and passing it would take a day.

5         Q.    You mean to take the exam itself?

6         A.    To take it and study for it and know

7    all the material in it.

8         Q.    That would be --

9         A.    Beyond passing the test.

10        Q.    Okay.  If we could look at what's been

11   marked Hall-44 for identification.

12              (Exhibit Hall-44, Three-page Minutes

13   of the Special Meeting of the Board of Directors of

14   Sport-BLX, Inc. dated September 10, 2019, Bates

15   stamped GBE_0005173 through 5175, is marked for

16   identification.)

17        Q.    Mr. Hall, before we go to this -- these

18   particular minutes, could you tell me what

19   materials, if any, were generally sent to the board

20   in connection -- in advance of a -- of a meeting?

21        A.    Usually it was the previous meeting's

22   minutes and a brief agenda of the -- what would be

23   talked about at the board meeting.

24        Q.    And who -- who would send out the

25   agenda?

Page 459

1          A.     I think most of the time it was Joe
2    De Perio.
3          Q.     Were there also ever written materials
4    provided to the board in connection with meetings?
5          A.     Other than minutes?
6          Q.     Other than minutes and an agenda
7    itself.
8          A.     I don't recall.
9          Q.     Do you recall ever giving out written
10   materials at a -- at a Sport-BLX -- Sport-BLX
11   meeting?
12         A.     In addition to minutes and agenda?  I
13   don't recall.
14         Q.     Okay.  If you could -- if you could
15   look at these are minutes from September 10, 2019, a
16   board meeting that was held by Sport-BLX
17   Corporation.  The -- the Bates numbers are
18   GBE_0005173 through 5175.
19                Mr. Hall, first of all, are there --
20   did you and Mr. De Perio sign board minutes once
21   they were approved?
22         A.     I believe in most cases we signed,
23   yes.
24         Q.     Okay.  Were there ever changes made
25   between the time that the minutes were approved or

CONFIDENTIAL

Page 460

1    presented for approval and when they were signed?

2          A.    I think occasionally there were some

3    changes.  Occasionally we had objections without any

4    specifics and no follow-up, but we did our best.

5          Q.    Okay.  Now, could you look at the

6    section called "FINRA Application" in here?  And I'm

7    going to ask you just to read this to yourself, and

8    then I'm going to ask you a few questions.

9          A.    Okay.

10         Q.    Okay.  Mr. Hall, this references that

11   you were the one speaking to the board about the

12   FINRA application, correct?

13         A.    Yes.

14         Q.    And that you were reporting to the

15   board the advice from Mr. Norensberg.  Do you see

16   that?

17         A.    Yes.

18         Q.    And -- and his advice was that the

19   topic of Cypress' beneficial ownership was not a

20   topic that could be avoided.  Do you see that?

21         A.    Yes.

22         Q.    And then you also talked about advice

23   from Mr. Mack.  Do you see that in the last

24   paragraph of that section?

25         A.    Yes.

CONFIDENTIAL

Page 461

1          Q.     Okay.  Does this refresh your
2   recollection that Mr. Mack didn't speak to the
3   board; that you were reporting what you -- Mr. Mack
4   had told you?
5          A.     When you say refresh my
6   recollection, --
7          Q.     That Mr. --
8          A.     -- you're referring to another
9   recollection --
10         Q.     Well, at least --
11         A.     -- from previous testimony?
12         Q.     Well, you had indicated that there was
13  a meeting -- let me rephrase it.
14                Does this indicate to you that this was
15  not the meeting you referenced earlier in your
16  testimony where Mr. Mack directly spoke to the
17  board?
18         A.     Yes.
19                MR. SACK:  Objec- --
20                THE WITNESS:  Sorry.
21         A.     Yeah, I -- I believe that he spoke to
22  the board directly at a different meeting.  I
23  believe my previous testimony was that I didn't
24  recall the dates.
25         Q.     Okay.  And then -- and it's Mr. Mack's

CONFIDENTIAL

Page 462

1  view, as reflected here -- first of all, did you

2  present any sort of written materials or advice from

3  either Mr. Norensberg or Mr. Mack to the board?

4          MR. SACK:  At this meeting?

5      Q.    At this meeting.

6      A.    I don't recall.

7      Q.    Did you ever present the board with any

8  written advice from either Mr. Norensberg or

9  Mr. Mack concerning the disclosure of Cypress' LPs

10  to FINRA?

11      A.    I don't recall.

12      Q.    Do you see that it says here that you

13  reported to the board that "Mr. Mack's view was that

14  it was inappropriate for FINRA to have a

15  conversation or a meeting with a shareholder of an

16  applicant, and that such shareholder would have no

17  standing in the matters of an application made by a

18  corporate entity such as BLX Trading"?  Do you see

19  that?

20      A.    I see that's what it says.

21      Q.    Okay.  And was that -- was that in

22  response to Mr. Salerno's request that he con- -- be

23  able to contact FINRA directly to provide the

24  beneficial ownership of Cypress?

25          MR. SACK:  Objection to form.

CONFIDENTIAL

Page 463

1              Could we have the question back again,
2    please?
3              (Last question is read back by the
4    court reporter.)
5         A.    Well, in this meeting it refers to an
6    email exchange which is not dated, so I'm not sure
7    if it's directly related to the email exchange in
8    this meeting, but everything is past tense, so prior
9    to this meeting I had sought the advice of Mr. Mack,
10   and it was in response to Mr. Salerno's request.
11        Q.    Do you recall telling Mr. Salerno in
12   this meeting that it was unacceptable for him to
13   contact FINRA directly?
14              MR. SACK:  Objection to form.
15        A.    I don't recall in this meeting, but --
16   so I'm not sure in this meeting if I said that.
17        Q.    But you did say it at some point?
18        A.    Yes.
19        Q.    Okay.  Did you -- do you --
20        A.    In substance, yes.
21        Q.    Do you recall stating, in sum and
22   substance, either in this meeting or elsewhere, that
23   you refused to put Mr. Salerno in touch with the
24   FINRA representative handling BLX Trading's
25   application?

CONFIDENTIAL

Page 464

1              MR. SACK:   Objection to form.

2         A.    Well, I don't really have the power to

3    put them in touch.

4         Q.    Well, didn't Mr. Norensberg have a

5    contact at FINRA that he was dealing with with

6    respect to BLX Trading's application?

7         A.    I don't know if he was dealing with a

8    person or dealing with this application online and

9    through emails.

10        Q.    Okay.  Do you recall ever telling

11   Mr. Salerno that you wouldn't put him in touch with

12   a representative from FINRA?

13        A.    I don't recall the issue of me putting

14   him in touch ever really coming -- coming out.  His

15   request was to contact them, and I believe the words

16   I used was that the company forbids you from doing

17   that.

18        Q.    Now, do you recall asking Mr. Salerno

19   in the meeting, saying to him, in words and

20   substance, confirming that he was unwilling to

21   disclose the ownership of Cypress in this meeting?

22        A.    I don't recall in this meeting whether

23   I asked for that confirmation.

24        Q.    So do you recall him telling you at

25   some point, no, those are your words.  As I put in

CONFIDENTIAL

Page 465

1    writing, I'm willing to disclose it; I'm not willing

2    to disclose it to you?

3         A.    I do remember him saying, in words and

4    substance, that he would not disclose it to me or

5    management of the company.

6         Q.    Did he ever indicate to you that he was

7    willing to disclose it to a compliance officer of

8    the company?

9         A.    I believe it was much later in the

10   conversation, but I actually don't -- actually, I'm

11   not sure he ever -- I -- I don't recall the

12   disclosure to a compliance officer.

13        Q.    Did he ever tell you that he would --

14   he was willing to disclose it to the company if the

15   company was willing to maintain it confidential

16   within the company?

17        A.    I don't recall that.

18        Q.    Now, if you look under the section

19   Alternate Path Forward; do you see that?

20        A.    Yes.

21        Q.    And it said that you led a discussion

22   of the company's business plan to date and the

23   current requirement to alter that business plan.  Do

24   you see that?

25        A.    I -- I see that's what it says.

CONFIDENTIAL

Page 466

1         Q.     Okay.  Now, so this -- this is a

2    meeting in September 10.  How long had -- at that

3    point had BLX Trading been pursuing an application

4    with FINRA?

5         A.     Well, I'm not sure when you say

6    "pursuing," when that moment in time starts, but --

7         Q.     Well, --

8         A.     -- clearly there --

9         Q.     Let me rephrase it then.  I'm sorry.

10              How long had it been since the time it

11   submitted the application and this September 10

12   board meeting?

13        A.     I don't recall when the application

14   was originally submitted.

15        Q.     Okay.  And this indicates, does it not,

16   that you were ready to alter the business plan of

17   Sport-BLX because you believed it wasn't going to be

18   successful in its application to register as a

19   broker-dealer, correct?

20              MR. SACK:  Objection to form.

21        A.     There is always the potential for the

22   recorded minutes to be somewhat different than what

23   was actually discussed.  Clearly, I did discuss an

24   alternative path forward.  I did not have any

25   intention to immediately foreclose the option for

Page 467

1    Mr. Salerno to cooperate and disclose the -- the

2    owners, but it was clear to me that if he continued

3    with his resolve not to disclose the owners, that it

4    was prudent to begin to start to think about an

5    alternative path forward.

6         Q.    So you were not, as it -- you were not

7    expressing the view, as stated in here, that the

8    best course of action forward was to refocus the

9    business plan of the company?

10              MR. SACK:  Where are you focusing?  I

11   take it you're quoting from the document.  What are

12   you referring to?

13              MR. PEARLSON:  Yes.  If you look at in

14   the second -- in the paragraph Alternate Path

15   Forward, --

16              MR. SACK:  Um-hum.

17              MR. PEARLSON:  -- it says, "Given that

18   the company's inability to disclose Cypress'

19   beneficial owners, and therefore, the company's

20   beneficial owners, would preclude BLX Trading from

21   successfully applying to register as a

22   broker-dealer, it was his view," referring to

23   Mr. Hall, "that the best course of action forward

24   was to refocus the business plan of the company."

25         Q.    Was that your view at the time?

CONFIDENTIAL

Page 468

1          A.     I'm not so sure "refocus" is the exact
2    phrase I would have used, but it was clear at this
3    time I wanted to bring to the board's attention that
4    we should start thinking about an alternative path
5    forward.
6          Q.     Okay.  And what was the alternative
7    path forward you were considering at that time?
8          A.     Well, I didn't really know exactly.
9    One of the concepts, of course, was to create a
10   separate broker-dealer.  There were other potential
11   concepts, but the most likely would be to create a
12   separate broker-dealer that could actually pay
13   revenues to Sport-BLX, Incorporated to make
14   Sport-BLX, Incorporated a successful entity.
15         Q.     And that would be an entity that,
16   assuming Mr. Salerno was unwilling to disclose the
17   beneficial ownership of Cypress, that would not have
18   Cypress as an owner of the entity?
19         A.     It -- without the disclosure of the
20   owners of Cypress, it was my understanding and the
21   -- the corporate -- the corporation's view that it
22   could not be a broker-dealer, so we looked at what
23   Sport-BLX, Inc. could do and what it couldn't do and
24   realized that one portion of the original business
25   plan, the broker-dealer portion, would have to be --

CONFIDENTIAL

Page 469

1  if -- if we were going to pursue it at all, would

2  have to be in a different entity.  That entity, by

3  definition, would not include Mr. Salerno unless, of

4  course, he disclosed the owners of Cypress.

5          Q.    Do you recall whether the FINRA

6  application on behalf of BLX Trading, was it

7  rejected by FINRA?

8          A.    I can't say with certainty, but I

9  believe we withdrew it.

10         Q.    Okay.  Do you know when it was

11  withdrawn?

12         A.    I don't recall.

13         Q.    Do you recall that at some point

14  Mr. Salerno advised you that he was willing to

15  disclose Cypress' limited partners?

16         A.    To FINRA?

17         Q.    Yes.

18         A.    I think a number of times he suggested

19  he would disclose directly to FINRA.

20         Q.    No.  No.  I'm sorry.  That he would

21  disclose -- disclose that to you, to Sport-BLX?

22         A.    I think he -- if I recall correctly,

23  he suggested that to Cesar Baez months later, and

24  Cesar Baez may have informed me of that.

25                MR. PEARLSON:  If we could look at

CONFIDENTIAL

Page 470

1   Hall-45.

2                (Exhibit Hall-45, Two-page 12/16

3   through 12/23/2019 email exchange between Michael

4   Salerno, George Hall, and Joseph De Perio Bates

5   stamped SPORTBLX00052396 and 52397, is marked for

6   identification.)

7        Q.    Okay.  I'm going to show you now,

8   Mr. Hall, what's been marked as Hall-45 for

9   identification.  It's Bates stamped SPORTBLX00052396

10  through 52397.  It's a two-page email chain dated --

11  it goes from December 16 at the beginning to

12  December 23.

13               I'm going to ask you, do you recognize

14  that document?

15       A.    Yes.

16       Q.    Okay.  Now, you put at the bottom of

17  the page on the first page of the document, "Do you

18  want to discuss broker dealer at the board level or

19  not?  The company has moved on from this potential

20  opportunity because we had to withdraw our FINRA

21  application.  We have made the appropriate changes

22  at the company level to pursue monetizing the

23  companies [sic] technology.  If you want to discuss

24  another strategy, you can present it to the board

25  for consideration."

CONFIDENTIAL

Page 471

1            What are you referencing here when you

2    say -- well, first of all, when you're asking him do

3    you want to discuss broker-dealer at the board level

4    or not, had Mr. Salerno raised with you, prior to

5    December 17, the idea of going back to the

6    broker-dealer model?

7         A.    I think there was some confusion

8    between Joe and Michael and myself about having a

9    board call, whether -- if you go to the previous --

10   or the next page, there is discussion about him

11   speaking to me, then there's an answer from Joe

12   saying we must have misunderstood your desire to

13   have a board call, and just the usual cryptic

14   communication from Salerno, so I said, basically, do

15   you want to have a meeting about broker-dealer or

16   not?

17        Q.    Well, what did you understand the

18   meeting to discuss broker-dealer, what did you mean

19   by that?

20        A.    I -- I think he had -- yeah.  I don't

21   -- I don't really recall.  There was something that

22   led me to believe that he wanted to discuss the

23   broker-dealer.

24        Q.    Okay.  And then you say, "The company

25   has moved on from this potential opportunity because

CONFIDENTIAL

Page 472

1    we had to withdraw our FINRA application."

2              What did the company do to move on from

3    the potential opportunity?

4         A.    So Joe began to focus on some

5    businesses that would not require a broker-dealer

6    registration, working on a -- effectively a

7    technology and software development project with the

8    -- what I'll loosely call the European equivalent of

9    the PGA.  There was also another potential

10   opportunity to use the technology and those

11   personnel for another non-sports-related project, so

12   we began to start to look at ways to monetize the

13   technology and the -- the people, the skill set that

14   we had within the firm.

15        Q.    Okay.  And -- and what changes did that

16   require at the company level?

17        A.    Well, we had to -- the one change is

18   it changes the whole marketing process.  So at

19   Sport-BLX, Incorporated we'd no longer be marketing

20   for a broker-dealer who was going to collect

21   commissions.  We had to think about repurposing all

22   the people that would be irrelevant to a technology

23   business, and we had to start to get the technology

24   people to think about using their programming skills

25   to either use the technology, modify the technology,

CONFIDENTIAL

Page 473

1  or create new technology that could be used for

2  these other purposes.

3          Q.    And that had all already been done by

4  the time -- well, first of all, do you recall -- we

5  were looking at board minutes from September.

6  Again, you don't recall what month it was that

7  Sport-BLX decided to withdraw -- or BLX Trading

8  decided to withdraw its FINRA application between

9  September and December?

10         A.    I don't recall.

11         Q.    Do you -- were these changes that were

12 made at the company level irreversible between

13 September and December?

14         A.    No, they were not irreversible.

15         Q.    And so Mr. Salerno responds to you,

16 "Like you, I like the broker-dealer model.  As for

17 the FINRA application, I am more than happy to

18 provide the Cypress ownership information to be

19 included in the application as I have communicated

20 prior.  That said, I would just like to be assured

21 that such information will be maintained on a

22 confidential basis, within the company."

23              Do you see that?  That's what he -- his

24 response to you on December 23?

25         A.    Yeah, I see the December 23 date and

CONFIDENTIAL

Page 474

1   something about being stuck in the outbox.  So yes,

2   I see what he wrote.

3          Q.    Okay.  And had Mr. Salerno told you

4   before December 23 that he was happy to provide the

5   Cypress ownership information to be included in the

6   FINRA application?

7          A.    I don't recall that, if he had or not.

8          Q.    Had he told you prior to this email

9   that he just wanted to be assured that such

10  information would be maintained on a confidential

11  basis within the company?

12         A.    Best of my recollection, there were a

13  number of times where he said he didn't want me to

14  know specifically, and he didn't want management to

15  know.  This is a departure from that.  Whether this

16  was the first departure, or if there was one

17  previously, I don't know.

18         Q.    How did you react or how did you

19  respond to this email from Mr. Salerno?

20         A.    Well, I was perfectly ready to receive

21  the -- the list of LPs and consider whether or not

22  we should go back to the old model.

23         Q.    And what happened with that?

24         A.    Well, he never sent them.

25         Q.    So you're saying that even after this

CONFIDENTIAL

Page 475

```
1    you requested the list of LPs, and Mr. Salerno never
2    provided them?
3                MR. SACK:  Objection to the form.
4         A.    I didn't say that.  I didn't request
5    them.  After five months of the -- well, first after
6    his misleading us about who Cypress was in the first
7    place, when we were led to believe that it was just
8    him, and then when we asked him to -- we didn't
9    really ask him to disclose LPs.  I think the
10   original question was will you confirm that you're
11   the only one?  And that -- those requests went
12   ignored, and then when I asked it again, he
13   mentioned his estate plan.
14              So after that he said if -- could he
15   just call.  Then he said could he and his counsel
16   call.  Then he said could my counsel call your
17   counsel.  And then none of those got him to -- to
18   where -- none of them got the company to a
19   successful application, so this just seemed like one
20   more thing he was throwing out there.  But it wasn't
21   clear whether he was serious or not.
22        Q.     Okay.  So is it fair to say
23   notwithstanding what Mr. Salerno said in this email,
24   that you didn't -- you decided not to pursue another
25   FINRA application on behalf of BLX Trading?
```

CONFIDENTIAL

Page 476

1              MR. SACK:  Objection to the form.

2        A.     What I'm saying is after six months of

3   back and forth and the nonsense and the

4   nondisclosure and the misleading the company, the --

5   the estate plan was completely false and misleading,

6   we had doubts about his sincerity in virtually

7   anything.  Had he said I'm going to -- instead of

8   saying I'm willing to disclose, he could have sent

9   me an email saying these are the LPs, but he didn't.

10  He didn't do that.  He could have sent me a

11  nondisclosure agreement saying as soon as this is

12  signed, I'll send you the LPs.  So this statement

13  didn't really seem sincere, but we would have been

14  happy to take the names of the LPs and reconsider.

15       Q.     Okay.  So I'm just trying to figure out

16  what you're saying is you decided not to pursue it

17  further because you doubted the veracity of what he

18  was saying?

19              MR. SACK:  Objection to the form.

20       A.     Decided not to pursue it further

21  because he wouldn't -- he didn't disclose the LPs.

22       Q.     Okay.  But he offered to in this -- in

23  this email, correct?

24       A.     He offered to if he was assured that

25  it would be maintained on a confidential basis,

Page 477

1    which of course it always would have been, so that
2    was never the issue.  But it -- at -- you know, I
3    think I asked him subsequent to this are you the
4    sole owner, or is your family the sole owner, and I
5    think even after this he said something about his
6    estate plan.  So he was never sincere, he was never
7    transparent, to use that word.  He -- I was never
8    convinced that he was sincere.  And if he was
9    sincere, we would have reconsidered.
10        Q.    And Mr. Hall, do you know if -- you
11   didn't respond, I take it, to this email from
12   Mr. Salerno?
13        A.    I don't recall.
14        Q.    Do you know if anybody from Sport-BLX
15   responded to this email from Mr. Salerno?
16        A.    I don't recall.
17             MR. PEARLSON:  All right.  If we could
18   go to Hall-46.
19             (Exhibit Hall-46, Two-page 12/23
20   through 12/27/2019 email exchange between Michael
21   Salerno, George Hall, and Joseph De Perio Bates
22   stamped SPORTBLX00052409 and 52410, is marked for
23   identification.)
24        Q.    Mr. Hall, before we look at what's been
25   marked as Hall-46, was -- was the only issue

CONFIDENTIAL

Page 478

1   preventing BLX Trading from getting registered as a

2   broker-dealer Mr. Salerno's unwillingness to

3   disclose the limited partners of Cypress?

4        A.    I have no way to know whether an

5   application would ever get approved or not.  What I

6   did know was that this was one issue that they had

7   requested that we were advised by our counsel was an

8   issue that had to be responded to, and that he

9   refused to.  So I can't opine on whether or not

10  there are any other issues that would have come up

11  that would have prevented the -- the license from

12  being successful, but this was one thing that

13  clearly would make it not successful.

14       Q.    Okay.  My -- my question is this,

15  Mr. Hall.  Were you made aware by either

16  Mr. Norensberg, Mr. Mack, or someone else of an

17  issue that arose with respect to BLX's Trading

18  broker-dealer registration that was an obstacle to

19  it getting approved as a broker-dealer?

20            MR. SACK:  Objection to form.

21       A.    I don't recall.

22       Q.    So if we can look at what's been marked

23  as Hall-46 for identification, I'm going to draw

24  your attention -- it's a two-page email chain,

25  SPORTBLX00052409 through 52410.  Direct your

CONFIDENTIAL

Page 479

1    attention to the email on the bottom of page 2 --

2    well, it's actually the bottom of -- I'm sorry.  The

3    bottom of the first page.  Where it's Mr. De Perio

4    to Mr. Salerno, he says, "I understand you had a

5    conversation with Cesar last week regarding your

6    potential disclosure of shareholders of Cypress."

7                 Is that something you were made aware

8    of, a conversation between Mr. Salerno and Cesar

9    Baez concerning his potential disclosure of the

10   shareholders of Cypress?

11        A.    I think I mentioned that previously,

12   that there was some conversation with Mr. Baez.

13        Q.    Okay.  And who made you aware of that

14   conversation?

15        A.    I don't recall.

16        Q.    Do you know what the substance of that

17   conversation was?

18             MR. SACK:  Objection to the form.

19        A.    I don't think there was much substance

20   of the conversation.

21        Q.    Okay.  Do you know whether Mr. Baez

22   asked Mr. Salerno to provide the list of the LPs

23   from Cypress?

24        A.    I don't know.

25        Q.    Okay.  And then in response, Michael

Page 480

1  Salerno responds to Mr. De Perio on Friday, December
2  27, 2019.  He says, I don't agree with many of your
3  statements, and he says "Per" -- in the second
4  paragraph, "Per our board call in December George
5  agreed to have my counsel speak to BLX counsel,
6  Mr. Mack.  When they spoke my counsel communicated
7  to Mr. Mack that I am willing to provide Cypress
8  ownership for the FINRA application.  Mr. Mack
9  directed us to communicate same to George which I
10 did.  I left it in George's hands whether or not to
11 have a call last week and obviously he decided to
12 cancel the call."
13          First of all, were you aware of
14 communications between Mr. Salerno's or Cypress'
15 counsel and Mr. Mack?
16     A.    I believe I said that I didn't have
17 any problem if his counsel spoke to Mr. Mack.
18     Q.    Okay.  And do you -- did you -- were
19 you aware that -- that he indicated or his counsel
20 indicated to Mr. Mack he was willing to provide
21 Cypress ownership information for the FINRA
22 application?
23          MR. SACK:  Objection to form.
24     A.    I don't recall if his counsel spoke to
25 Mr. Mack.

CONFIDENTIAL

Page 481

1        Q.    Okay.  You were never notified one way

2    or the other whether his counsel spoke to Mr. Mack?

3        A.    I'm saying I don't recall.

4        Q.    Okay.  Were you ever made aware that --

5    that, like he had said to you, Mr. Salerno had also

6    indicated to Mr. Baez that he was willing to move

7    forward with the disclosure of the shareholders of

8    Cypress or the limited members -- limited partners

9    --

10            MR. SACK:  Objec- --

11        Q.    -- of Cypress?

12            MR. SACK:  Objection to form.

13        A.    I believe he communicated something

14    along those lines to Mr. Baez.  I don't recall if

15    Mr. Mack spoke to Salerno's counsel or not.

16        Q.    Okay.  So this is a -- a second time

17    that Mr. Salerno is communicating to someone at

18    Sport-BLX his willingness to disclose the ownership

19    information of Cypress, correct?

20            MR. SACK:  Objection to form.

21        A.    Well, I'm not sure.  It's around the

22    same time, then we have the delay in the outbox, so

23    --

24        Q.    We're looking at December 23 and

25    December 27, correct?

CONFIDENTIAL

Page 482

1        A.     Yeah.  So I'm not sure -- if it's on

2    the 23rd now, I think this would be the first,

3    right?  This came before the 27th?

4        Q.     So --

5        A.     Maybe I'm confused.

6        Q.     Well, the one we're looking at is the

7    27th, Mr. Hall.

8        A.     Okay.  27th.

9        Q.     The one before it was the --

10       A.     Okay.

11       Q.     -- 23rd.

12       A.     Right, so the 23rd --

13       Q.     As is the email on the bottom.

14       A.     So the 23rd was Joe saying I

15   understand you had you a conversation with Cesar.

16       Q.     Last week.  Late last week.

17       A.     Yeah.  And then on the 27th there was

18   another communication between Salerno and Joe.

19   Okay.

20              So I'm sorry.  The question?

21       Q.     So my question is this.  Following

22   these communications between Mr. Salerno and

23   representatives of Sport-BLX, did you have any

24   discussions as to whether -- with anyone regarding

25   whether or not to resubmit BLX Trading's FINRA

Page 483

1  application?

2       A.    We didn't know who the beneficial

3  owners were.

4       Q.    Given the willingness that he had

5  indicated to disclose them, did anybody -- well, the

6  first question is did anybody follow up with

7  Mr. Salerno to say please give us the -- the owners

8  so we can move forward?

9            MR. SACK:  Objection to form.

10      A.    We had been asking him that for six

11 months.  All he had to do was email the list.

12      Q.    Okay.  Did anyone, following these

13 conversations where he indicated he was willing to

14 disclose it, ask him to send over a list of the

15 Cypress limited partners?

16           MR. SACK:  Objection to the form.

17      A.    We had asked for six months for him to

18 disclose.

19      Q.    What six months, by the way, Mr. Hall?

20      A.    Well, I'm estimating from August --

21 from August until December.

22      Q.    Sounds like four months to me, but...

23      A.    August, September -- five months,

24 inclusive.  Split the difference?

25      Q.    I'm not going to quibble -- yeah, okay.

CONFIDENTIAL

Page 484

1  Fine.  We -- we're on the same page as to the time

2  --

3          A.      Yeah.

4          Q.      -- period.  Go ahead.

5          A.      It was a lot longer than it should

6  have been.

7                  So after six months and these

8  iterations and these unacceptable offerings, we

9  tried hard over and over to get the list of the LPs.

10 At this point, obviously, this was either an

11 awakening on his part that he actually did damage to

12 the business or an awakening that his attempts to

13 shake the company down for big buyout weren't going

14 to work, and he threw this out, most likely for the

15 record, but if it was really sincere, he would have

16 called me and said, here's the -- the -- the --

17 called me or sent me an email with the list of the

18 LPs.

19         Q.      And again, my question is did anybody

20 from Sport-BLX ask him to provide those -- after --

21 following these communications from him, did anybody

22 from Sport-BLX ask him to provide the list of the

23 Cypress LPs?

24         A.      I don't recall if anybody discussed it

25 with him after December 27.

Page 485

1      Q.     And following these disclos- -- these

2   communications that we just looked at, did you have

3   any discussions with anybody from Sport-BLX on

4   whether you should renew the broker-dealer model

5   that was reflected in the BLX Trading application to

6   FINRA?

7      A.     Well, I'm sure I had that discussion

8   with Joe.  Obviously, it's easier if -- if you had

9   one company, but you also -- it's difficult to have

10  a company shift business plans for somewhere between

11  four and six months, somewhere around five, to turn

12  the ship, as he said, and create a new business

13  plan, to do all the -- the workaround of what the

14  plan would be, and then to just have an email

15  saying, okay, after all this time now I'm ready.

16  You can't just keep going back and forth.

17     Q.     Well, that's not my question, Mr. Hall.

18  My question is did you have any -- did you have any

19  discussions with anyone about whether or not to

20  reapply to FINRA or otherwise resuscitate the

21  broker-dealer model that you had started with?

22         MR. SACK:  Objection to the form.

23     A.     I don't recall a specific conversation

24  about that, but that was always a possibility.

25     Q.     Okay.  Did you recall having any

Page 486

1  specific conversations with anyone from Sport-BLX
2  where you said we're not gonna do this; we're not
3  gonna try to resuscitate the broker-dealer model,
4  and we're going to move on with a technology model?
5         A.    At what time?
6         MR. SACK:  Objection to the form.
7         A.    At what time?
8         Q.    At or around the time of these
9  communications from Mr. Salerno.
10        A.    I think prior to these communications
11 we had said we were going to get -- we were going to
12 move on, and Mr. Salerno acknowledged that we were
13 going to move on, and Mr. Salerno expressed
14 enthusiasm for the new business in one of the
15 meetings, and --
16        Q.    So Mr. -- Mr. Hall, I'm sorry to
17 interrupt, but my question's a little different.  My
18 question is following these conversations -- or not
19 these conversations -- these communications from
20 Mr. Salerno, did you have a discussion with anyone
21 from Sport-BLX as to whether to stick with the
22 technology model or go back to the broker-dealer
23 model?
24        MR. SACK:  Objection to the form.
25        A.    I most likely had discussions with Joe

CONFIDENTIAL

Page 487

1  De Perio, but I don't remember any specific

2  discussion about it.

3          Q.     Did you have any discussions with

4  anyone else about that topic?

5                 MR. SACK:  Objection to form.

6          A.     I don't recall.

7          Q.     Do you recall whether there were any

8  writings or communications, emails, about this

9  topic, whether you're gonna stick with the

10  technology model or go to the broker-dealer model?

11                 MR. SACK:  Objection to form.

12          A.     The company had made a shift to a

13  technology model.  At this point it was not an

14  either/or.  The company, with all the board members

15  agreeing, had decided to focus on technology.

16  Mr. Salerno offered up new information that he might

17  be willing to disclose his LPs after all this time,

18  but the company, on December 27, was not either/or.

19  The company was technology.

20          Q.     Now, following the withdrawal of BLX

21  Trading's application did Sport-BLX or any of its --

22  did Sport-BLX or any of its affiliates make a

23  subsequent application to FINRA for a broker-dealer

24  license?

25                 MR. SACK:  Objection to form.

CONFIDENTIAL

Page 488

1          A.      I don't recall if the -- if an
2    application was made.
3          Q.      Okay.  And that was referring to
4    Sport-BLX Securities?
5          A.      Based on the question, I'm referring
6    to any entity that I was aware of --
7          Q.      All right.  Did --
8          A.      -- or affiliated with.
9          Q.      Did you and Mr. De Perio create an
10   entity called Sport-BLX Securities that would serve
11   the same function as BLX -- as -- yeah, BLX Trading
12   would have --
13              MR. SACK:  Objection to form.
14         Q.      -- served?
15              MR. GOLD:  Join.
16         A.      The purpose of Sport-BLX Securities
17   was to -- to form a broker-dealer so that it could
18   pay -- so it could earn commissions to pay
19   technology fees to Sport-BLX, Incorporated.
20         Q.      Okay.  And when was that done?  When
21   was Sport-BLX Securities formed?
22         A.      I think it was around April of 2020.
23         Q.      And that was a corporation that was
24   owned by you and Mr. De Perio?
25         A.      Correct.

CONFIDENTIAL

Page 489

1          Q.      And in the interim did Sport-BLX do

2     anything to try to develop a relationship with any

3     other broker-dealer?

4                  MR. SACK:  Excuse me.  What period?

5          Q.      Between -- between the time that in

6     December, late December, when you abandoned BLX

7     Trading and when you formed Sport-BLX Securities,

8     did you make any efforts to develop a relationship

9     with any other broker-dealers?

10                 MR. SACK:  Objection to form.

11         A.      I'm not sure what kind of relationship

12    you're refer- -- you're referring to.

13         Q.      Well, that it would develop a

14    relationship with a third -- a third party broker to

15    trade in the assets of Sport-BLX?

16                 MR. SACK:  Objection to form.

17         A.      Well, there are no assets of

18    Sport-BLX.  I'm not sure what you mean by that, --

19         Q.      Okay.

20         A.      -- to trade in the assets of

21    Sport-BLX.

22         Q.      Well, to trade in -- strike that.

23                 Explain to me what -- what the role of

24    Sport-BLX Securities was going to be in conjunction

25    with Sport-BLX?

CONFIDENTIAL

Page 490

1              MR. SACK:  Objection to form.

2        A.      Sport-BLX Securities, the original

3    intention was to be a customer of Sport-BLX,

4    Incorporated, and it would pay fees to put assets on

5    the platform with the hopes of collecting

6    commissions.

7              MR. PEARLSON:  Okay.  Why don't we

8    take a quick break, and then we'll get back together

9    in maybe ten minutes?

10             MR. SACK:  Yeah, that's good.

11             THE VIDEOGRAPHER:  It's 3:52 p.m.

12   We're going off the record.

13             (Recess taken from 3:52 to 4:08 p.m.)

14             THE VIDEOGRAPHER:  It is 4:08 p.m.  We

15   are back on the record.

16   BY MR. PEARLSON:

17        Q.      Mr. Hall, we were talking about

18   Sport-BLX Securities when we broke, and that it was

19   -- at some point it had applied to or it was

20   considering applying to be a broker-dealer with

21   FINRA, correct?

22        A.      It was created with the long run

23   intention of creating a broker-dealer.

24        Q.      Okay.  The way you said that, does that

25   mean that it never was registered as a

CONFIDENTIAL

Page 491

1    broker-dealer?

2           A.    No, it means that you can't just start

3    the company and be a broker-dealer quickly.  There's

4    months of preparation, months, if not a year, of

5    FINRA back and forth and approvals, so it was a

6    plan.

7           Q.    Okay.  Is it -- is that plan -- has it

8    ever submitted an application to FINRA?

9           A.    I don't recall if the application was

10   submitted or not.

11          Q.    Okay.  Does it have any intention to

12   still be a broker-dealer, Sport-BLX Securities?

13               MR. SACK:  Excuse me -- okay.

14          A.    Potentially.

15          Q.    Do you have any idea as to the timing

16   of that, as to when it would -- when it would look

17   to become a broker-dealer?

18          A.    After the resolution of this

19   litigation.

20          Q.    If you could look at what's been marked

21   as Hall-47 for identification.

22               (Exhibit Hall-47, One-page August 17,

23   2020, email from Ken Norensberg to Joseph De Perio

24   and George Hall attaching 20-page Sport BLX

25   Securities, Inc. Proposed Business Plan Bates

CONFIDENTIAL

Page 492

1   stamped SPORTBLX0128701 through 128721, is marked

2   for identification.)

3                  MR. SACK:  Do we have that, Dan?

4                  MR. CARBONE:  We don't have it yet.

5                  MR. SACK:  Hmm?

6                  MR. CARBONE:  We don't have it.

7                  MR. SACK:  I just wasn't sure whether

8   it was given to the witness.  Thank you.  I didn't

9   mean to hasten you.

10                  MR. TYRRELL:  I could use the workout.

11                  MR. SACK:  Thank you.

12                  MR. PEARLSON:  Don't hasten him.  Only

13  I could hasten him.

14                  MR. SACK:  I'll chasten him, you can

15  hasten him.

16                  MR. PEARLSON:  Okay.  I also want to

17  know that word you used before that I never heard a

18  witness use before in a deposition.

19                  THE WITNESS:  Which one?

20                  MR. SACK:  Disintermediation.

21                  THE WITNESS:  I had to go look in the

22  dictionary to be sure I didn't make a mistake.

23                  MR. PEARLSON:  Good word.

24  BY MR. PEARLSON:

25        Q.    All right.  So Mr. Hall, if you could

CONFIDENTIAL

Page 493

1    look at what's been marked as Hall-47 for

2    identification, the cover is a -- an email from

3    Mr. De Perio to you, and the subject is forward

4    "Business Plan_Ken Revisions from Markup."  Do you

5    see that?

6          A.    Yes.

7          Q.    And then it refers to attachments,

8    "Sport-BLX Securities Business Plan_Ken

9    Revisions_August 17, 2020."  Do you see that?

10         A.    Yes.

11         Q.    Does this refresh -- and this document,

12   just for the record, is -- is SPORTBLX0128701

13   through 0128721.  Do you see that?

14         A.    Yes.

15         Q.    Okay.  And this is -- does this appear

16   to be a business plan that was prepared for

17   Sport-BLX Securities to make its application for

18   FINRA for a broker-dealer license?

19         A.    Yes.

20         Q.    And did you participate in the -- in

21   the -- in putting together the plan that's attached

22   to this email?

23         A.    Potentially some cursory

24   participation.

25         Q.    Okay.  And it indicates that

CONFIDENTIAL

Page 494

1    Mr. Norensberg, from Luxor, was also involved in

2    this -- the preparation of this plan?

3             A.    Yes.

4             Q.    And that was, again, in anticipation of

5    applying to FINRA for a broker-dealer registration?

6             A.    Yes.

7             Q.    Okay.  Now, do you recall whether this,

8    the business plan -- first of all, the ownership is

9    -- the owners, as you indicated, were yourself --

10   well, turn to page 5 of the business plan, please.

11             And it indicates the ownership

12   structure is -- is you, Mr. De Perio, and then a

13   stage one investor group.  Do you see that?

14            A.    Yes.

15            Q.    Did you already have investors in

16   Sport-BLX Securities as of the time of this

17   document?

18            MR. SACK:  You mean the time of the

19   email?

20            MR. PEARLSON:  Yes.

21            A.    Yes.

22            Q.    Okay.  And who were -- who were the

23   other investors?

24            A.    They were just people investing that

25   like to invest in tech companies.  I don't recall

CONFIDENTIAL

Page 495

1    all their names.

2         Q.    Were they investors who had invested in

3    Sport-BLX?

4         A.    No.

5         Q.    And was the intention of -- of this --

6    of Sport-BLX Securities to -- to not involve Cypress

7    or Mr. Salerno?

8         A.    The intention --

9              MR. SACK:  Objection to form, but you

10   can try to answer.

11        A.    At what time?

12        Q.    Well, did you -- was it your -- was it

13   your intention specifically, because of the prior

14   experience with Mr. Salerno and Cypress, to not

15   include Mr. Salerno and Cypress in this entity,

16   Sport-BLX Securities?

17             MR. SACK:  Objection to the form.

18        A.    The plan for Sport-BLX Securities was

19   first to do the things that Sport-BLX did not have

20   -- Sport-BLX, Inc. did not have the opportunity to

21   do, so that is primarily to collect commissions.

22        Q.    Was the business plan for Sport-BLX

23   Securities essentially the same as BLX Trading?

24        A.    No.

25        Q.    How -- how do they differ?

CONFIDENTIAL

Page 496

1          A.     Sport-BLX Securities was never

2    intending to build technology and to be a technology

3    company.  It was to lease the technology from

4    Sport-BLX, Incorporated.

5          Q.     Okay.  Was BLX Trading going to be a

6    technology company?

7          A.     BLX Trading was going to be the

8    broker-dealer subsidiary of a technology company.

9          Q.     So maybe -- maybe I -- my question was

10   bad.

11              Mr. Hall, my question is what was --

12   what were the differences in the business plans

13   between BLX Trading and BLX Securities?

14         A.     When you say "the business plan," are

15   you referring to the FINRA business plan?

16         Q.     Yes.

17         A.     Oh.  I'd have to look carefully at the

18   -- each plan and compare them to -- to be precise on

19   what the differences would be.

20         Q.     Okay.  How about just generally, what

21   were the differences between the two business plans

22   for the two entities?

23         A.     So the original entity was gonna get

24   licensed as a broker-dealer -- the intention was to

25   become a broker-dealer and also to have the

CONFIDENTIAL

Page 497

```
 1    technology be designated as an ATS, or alternative
 2    trading system.  So that was never the intention of
 3    Sport-BLX Securities because it didn't have
 4    technology, and it wasn't going to try to form an
 5    ATS or have technology that would be designated as
 6    an ATS.
 7          Q.     Did -- did Sport-BLX Securities have
 8    plans to either license or acquire technology in
 9    order to do what you just described?
10          A.     Well, that's one of the issues that I
11    don't know if we ever got resolved, whether you
12    could license -- license an ATS or whether you could
13    be an ATS relying on -- relying on some other
14    company's technology, but basically the -- Sport-BLX
15    Securities was to -- to collect -- to sell
16    securities, to earn commissions using the technology
17    that it would lease from Sport-BLX, Incorporated.
18    Sport-BLX Securities most likely was not gonna ever
19    be an ATS.
20          Q.     When -- when you made the decision to
21    switch the models for Sport-BLX, and it became a
22    technol- -- what you've called a technology company,
23    how did that -- how did that -- the use of -- how
24    did -- strike that.
25                 How did Sport-BLX intend to use its
```

CONFIDENTIAL

Page 498

1    technology in connection with the technology model;

2    was it going to license out its technology to

3    others?

4                MR. SACK:  Objection to form.  And

5    when you say "you" changed, do you mean when

6    Sport-BLX changed its --

7                MR. PEARLSON:  Correct.

8                MR. SACK:  -- approach?

9        Q.    Let me -- let me be clear.  When you --

10   as you testified, when Sport-BLX decided to change

11   its business plan to a technology company back in

12   2019, the fall of 2019, how did it intend to use its

13   technology to generate revenues?

14       A.    Well, there were two transactions that

15   it started to look at immediately, which I referred

16   to before.  One was a European golf transaction,

17   which was different in the sense that it wasn't

18   gonna be the sale of securities, wasn't gonna

19   require us to have a broker-dealer, and wasn't going

20   to collect commissions.  The second one was a

21   potential opportunity to do some technology

22   development for a third party.

23       Q.    And what happened with the -- when did

24   you pursue the European golf opportunity, and can

25   you describe for us what it was in greater detail?

CONFIDENTIAL

Page 499

1          A.    I don't recall specifically what the
2    revenue source was.  Joe De Perio worked on that
3    deal, and I don't recall specifically what the
4    transaction was about.
5          Q.    And what happ- -- happened?  Was there
6    ever a deal struck on the European golf matter?
7          A.    I don't believe there was -- there was
8    -- there was never a deal struck.  Correct.
9          Q.    Okay.  And when you say "technology
10   development," who -- who was -- who were you going
11   to develop technology for?
12         A.    Well, I don't know if it was a joint
13   venture with the European entity or develop it and
14   sell it to them or develop it and license it.  I
15   don't -- I don't recall.
16         Q.    And do you know the -- any name -- the
17   name of the European entity?
18         A.    No.
19         Q.    And who negotiated -- who was
20   negotiating that?
21         A.    Joe De Perio.
22         Q.    And what happened with that deal;
23   anything?
24         A.    I don't recall, but it didn't happen.
25         Q.    Okay.  Just going back to Sport-BLX

CONFIDENTIAL

Page 500

1  Security...

2            MR. PEARLSON:  Why don't we show him

3  Hall-48?

4            (Exhibit Hall-48, 5/2/21 email from

5  Joseph De Perio to Andrew Gadlin Bates stamped

6  SPORTBLX00012773, is marked for identification.)

7       Q.    So Mr. Hall, I'm showing you what's

8  been marked as Hall-48.  It's a one-page email,

9  SPORTBLX00012773, an email from Mr. De Perio to

10 Andrew Gadlin dated May 2, 2021.

11            My first question is, who is

12 Mr. Gadlin?

13       A.    He's what might be called a

14 salesperson or an investment banker with a company

15 named Odeon.

16       Q.    How -- can you spell that for the

17 record, sir?

18       A.    O-d-e-o-n.

19       Q.    Okay.  And when did you first meet

20 Mr. Gadlin?  Or did you meet Mr. Gadlin?

21       A.    Only through Zoom, and I think it was

22 sometime towards the end of 2020.

23       Q.    Okay.  And what was the purpose of the

24 meeting between you and Mr. Gadlin?

25       A.    We want- -- we were going to engage

CONFIDENTIAL

Page 501

1    Odeon, primarily Mr. Gadlin, to look for financing

2    sources to buy athlete contracts.

3            Q.    Okay.  And -- and towards -- towards

4    what end?

5            A.    To have a pool of capital that could

6    buy athlete contracts and that could be sold through

7    the platform.

8            Q.    Okay.  Is that similar to what we

9    described earlier as "the fund"?  Would he -- would

10   that be operating a fund similar to what we had

11   discussed earlier?

12           A.    The purpose is similar, but the

13   structure was different.

14           Q.    Okay.  And how so?

15           A.    So the transaction we were pursuing

16   was a debt transaction, and we were ultimately

17   offered a number of -- a number of entities

18   ultimately offered us financing so that we would

19   have the opportunity to buy the -- buy the assets

20   and then list them on the platform.

21           Q.    Okay.  And here Mr. De Perio -- do you

22   know why he's sending this email to Mr. Gadlin?

23           A.    I don't know specifically, but I think

24   it was just background on the situation of why there

25   were two companies.

CONFIDENTIAL

Page 502

1          Q.     When you say "two companies,"

2     Sport-BLX, Inc. and Sport-BLX --

3          A.     Sport-BLX --

4          Q.     -- Securities?

5          A.     -- Securities, correct.

6          Q.     Okay.  Now, it says in -- in the email,

7     the -- the third sentence, "In January, Sport-BLX,

8     Inc. became an independent entity, and key SportBLX

9     staff members moved over from Clinton to Sport-BLX,

10    Inc."

11               What is he talking about there; in

12    January it became an independent entity?

13         A.     I think in January --

14               MR. SACK:  I'm going to --

15         A.     Oh, this is --

16               MR. SACK:  -- object -- I'm going to

17    object to the form, but you can try to answer.

18         A.     This is January of 2019.

19         Q.     Okay.  In January 2019 or January 2020?

20         A.     Well, --

21               MR. SACK:  Well, you're -- it's not

22    his --

23               MR. PEARLSON:  Well, yeah.

24               MR. SACK:  -- email, but I guess --

25         A.     First sentence --

CONFIDENTIAL

Page 503

1            MR. SACK:  -- you're being asked for
2     your understanding.
3        Q.    Yeah.  What is -- what do you
4     understand Mr. De Perio to be saying?
5        A.    Well, his first sentence refers to the
6     third and fourth quarter of 2018, and then, as was
7     said in the FAQs and other information, Clinton
8     Group funded the -- the business until this time,
9     and then in January of 2019 Sport-BLX, Incorporated
10    became an independent entity from -- from Clinton
11    Group.  And then in addition to hiring people for
12    Sport-BLX, Incorporated, certain members of --
13    former Clinton Group members became full-time
14    Sport-BLX members.
15       Q.    And who were those individuals?
16       A.    Henry Sullivan, Jacob Simon, and
17    Joseph De Perio.
18       Q.    And in the -- in the next paragraph
19    it's discussing -- it's discussing Sport-BLX
20    Securities.  Do you see that?
21       A.    In the middle of the paragraph?
22       Q.    Correct.
23       A.    Yes.
24       Q.    And it refers to the fact that because
25    of the impasse with FINRA, and it couldn't register

CONFIDENTIAL

Page 504

1    as a broker-dealer, that the founders created

2    Sport-BLX Securities, Inc.  Do you see that?

3            A.    Correct.

4            Q.    Okay.  Now, it said -- it says, "Total

5    third-party capital raised to support Sport-BLX

6    Securities, Inc. equates to $2.0 million."

7                  At -- at this point in May of 2021 did

8    you have additional investors beyond the ones

9    described in the business plan we just went over?

10           A.    I don't know what the business plan

11   said.  I haven't looked at it yet.

12           Q.    Okay.  It then -- we don't need to go

13   through that, Mr. Hall.

14                 It then says, "Securities has a license

15   to use Inc.'s technology in perpetuity."  What does

16   that mean?

17           A.    So Sport-BLX Securities created what

18   we -- I believe we called a subscription agreement

19   that was between Sport-BLX Securities and Sport-BLX,

20   Incorporated to license the firm's technology to

21   list assets on the platform.

22           Q.    Do you know when that subscription

23   agreement was entered into between the two

24   companies?

25           A.    Somewhere in the summer, maybe June,

CONFIDENTIAL

Page 505

1    but I'm not exactly sure, of 2020.

2         Q.    And do you know how the terms of that

3    subscription agreement were negotiated?

4         A.    There was an upfront payment and then

5    a monthly payment and then some customary terms

6    about escalations and the parties' responsibilities.

7         Q.    Do you know who negotiated that

8    transaction on behalf of Sport-BLX?

9         A.    Sport-BLX, Incorporated, Pete Rawlins.

10        Q.    Anybody else?

11        A.    I believe Ryan Fisch was involved.

12        Q.    Who's Ryan Fisch?

13        A.    He was the chief technology officer.

14        Q.    And was Sport-BLX represented by

15   counsel?

16        A.    No.

17        Q.    And how about -- was there anybody else

18   on the Sport-BLX, Inc. side in that transaction?

19        A.    Only to the extent that I was

20   involved, but not -- I was really more involved in

21   both sides, but it was Pete Rawlins that led the

22   negotiations.

23        Q.    For Sport-BLX, Inc.?

24        A.    Correct.

25        Q.    And what about on behalf of Sport-BLX

CONFIDENTIAL

Page 506

1    Securities, who -- who represented Sport-BLX

2    Securities in the transaction?

3          A.    Joe De Perio.

4          Q.    Do you know, was the -- was this

5    transaction approved by the Sport-BLX board of

6    directors?

7                MR. SACK:  By Inc.?  By the Inc. --

8          Q.    By the Inc. --

9                MR. SACK:  -- board of directors?

10         Q.    -- board of directors.

11         A.    We'll assume for now that Sport-BLX is

12   Sport-BLX, Inc.

13         Q.    Yes.

14               THE WITNESS:  That's okay?

15               MR. SACK:  Yeah.

16         A.    I believe it was, yes.

17         Q.    Do you know if -- if that's reflected

18   in any minutes?

19         A.    I don't -- I don't recall.

20         Q.    Do you know whether that -- was that

21   transaction approved by any -- any independent group

22   of directors?

23         A.    I don't recall.

24         Q.    And it says in this email "has a

25   license to use Inc.'s technology in perpetuity."

CONFIDENTIAL

Page 507

1    What does that mean?

2          A.      That for as long as Sport-BLX

3    Securities wanted to use the technology to list

4    assets, that it had the right to do that.

5          Q.      When you say "in perpetuity," you're

6    referring to that it was a renewable license?

7          A.      Well, this was from Joe to Andrew.

8    I'm just trying to interpret what I think he meant.

9              I think the point of perpetuity was

10   that we were comfortable that there wasn't the risk

11   that we could be not -- denied the use of the

12   technology, which would be necessary for the

13   Sport-BLX Securities plan.

14         Q.      As of May 2021 did Sport-BLX license

15   its technology to any other entity other than

16   Sport-BLX Securities?

17         A.      No.

18         Q.      Do you know, were there any attempts

19   made to license Sport-BLX technology to any other

20   entity besides Sport-BLX Securities?

21             MR. SACK:  You mean other than the PGA

22   example?

23         Q.      Right.  Other than the PGA example we

24   went over.

25         A.      I don't recall.

CONFIDENTIAL

Page 508

1          Q.     Are you aware of any other efforts to
2     try to license the Sport-BLX technology to any
3     entity other than Sport-BLX Securities and the --
4     and the European golf venture?
5          A.     Well, we have -- I think we have to
6     distinguish the -- the licensing of the technology.
7     The technology was built for a very specific purpose
8     around sports.  If there was an opportunity to
9     repurpose the technology or use it for other things,
10    we would have considered that, but we didn't have --
11    I don't believe we had any opportunities to do that.
12              In terms of licensing it from -- to
13    someone else that would do the same kind of sport
14    deals, that was a pretty inefficient use of time at
15    the -- at that time.
16         Q.     Why is that?
17         A.     Well, who would do it?  I don't think
18    anybody would do it.
19         Q.     Because -- why -- why is that?
20         A.     Well, I don't think the -- we had
21    created a new construct, a new ecosystem.  Athletes
22    are not in the habit, generally, of securitizing
23    their contracts, and there's no platform that I know
24    of that was in the business of selling those to --
25    selling shares of those contracts to the public.  So

Page 509

1    we created a platform for a new business that we,

2    for lack of a better word, invented or created, so

3    it seemed like given the time constraints and the

4    resource constraints, it would be a bit of a fool's

5    errand to run around and try to get people to use

6    our platform to underwrite the deals that only we

7    understood.

8         Q.    So I'm trying to understand, Mr. Hall,

9    is how did you think that Sport-BLX was going to

10   succeed as a technology company given the

11   limitations you just described?

12        A.    I don't think I described any

13   limitations other than the commissions.

14        Q.    Okay.  I guess the question is as a

15   technology company, was it your understanding that

16   it was only going to have one customer?

17        A.    Well, in the short run the focus was

18   on this one customer because it was the fastest way

19   to -- to try to use the technology.  But over time

20   the technology -- once we had advanced the concept

21   of securitization of athletes' contracts, there may

22   have been others that wanted to follow the business.

23   For example, agents and other people involved in

24   sports could have followed our lead and said that we

25   have athletes that we'd like to securitize.  They

CONFIDENTIAL

Page 510

1  potentially could go to Sport-BLX, Inc. and use the
2  technology, but that was off in the future.  We had
3  to develop the business before that would happen.
4        Q.    Now, it says in the next sentence that,
5  "Founders are currently working on a transaction to
6  combine the entities and eliminate the third-party
7  shareholder who prevented the filing for Inc."
8              What is that referring to?
9              MR. SACK:  If you know.  I'm going to
10  object to the form, but you can try to answer that.
11        A.    So the first thing that comes to mind
12  would be the potential to buy out the shareholder so
13  that we didn't have the issue.  So -- but other than
14  that, I'm not sure what -- what he was referring to.
15        Q.    Are you aware of any attempts to buy
16  out Cypress in -- following 2019?
17        A.    Yeah, I think -- I think there was a
18  discussion about that in 2021, and I'm not sure if
19  there were any in 2020.
20        Q.    What do you recall about the
21  discussions to buy out Cypress in 2021?
22        A.    I think it was after GlassBridge sold
23  their shares and got out of this business I had a
24  discussion with them about buying -- buying Cypress
25  shares.

CONFIDENTIAL

Page 511

1          Q.     You and Mr. Salerno had a discussion?

2          A.     I think so, although I'm not sure

3     about the date.

4          Q.     Okay.  Do you recall what the

5     discussions were?

6          A.     Do you want to sell your shares?  And

7     there was some -- some discussion about price, but

8     it didn't lead anywhere.

9          Q.     Okay.  Do you recall what the

10    discussions in price were?

11         A.     Well, for the stock I think I quoted

12    where GlassBridge sold the shares.  I think I may

13    have quoted a price somewhere around $10.00 a share.

14         Q.     And that -- that wasn't successful,

15    those negotiations?

16         A.     No.

17         Q.     Now, it says here that the "Founders

18    are currently working on a transaction to combine

19    the entities."  Were you involved in discussions in

20    May of 2021 to merge Sport-BLX Securities and

21    Sport-BLX?

22         A.     Well, I don't know about specific -- I

23    don't know specifically what Joe was referring to

24    here.  I don't recall that specific time frame and

25    specific discussions, but all along there was the

CONFIDENTIAL

Page 512

1    intention to either combine the entities or have one

2    entity acquire the other.

3        Q.    Okay.  And what would be the purpose of

4    that?

5        A.    Well, I think it's more efficient to

6    have one entity rather than this, you know,

7    potentially confusing agreement with one company

8    that's a broker-dealer, but it's relying on the

9    other company's technology, so I always thought the

10    most efficient thing would be to recombine the

11    companies.

12        Q.    And would that have the effect that --

13    have the same capability that Sport-BLX would have

14    had if it had BLX Trading and -- as a registered

15    broker-dealer that was a wholly-owned sub?

16            MR. SACK:  Objection to form.

17        Q.    Do you understand the question?

18        A.    Not exactly.

19        Q.    So if you had -- if you had -- if you

20    had Sport-BLX Securities merged with Sport-BLX,

21    would it have the same capabilities as Sport-BLX

22    would have had if it had BLX Trading as a registered

23    broker-dealer that was a wholly-owned sub?

24            MR. SACK:  Objection to form.

25        A.    Yeah, there were -- I think there were

CONFIDENTIAL

Page 513

1    multiple potential structural options.  Sport-BLX

2    technology could have acquired Sport-BLX Securities

3    and made Sport-BLX Securities, the broker-dealer, a

4    subsidiary, which is the way BLX Trading was

5    structured.  Or Sport-BLX Securities could acquire

6    Sport-BLX, Incorporated.  So there were multiple

7    ways that we could structure it.  Or we could just

8    have shareholders do a swap from one company to the

9    other, so...

10         Q.    And you don't recall, as you sit here

11   today, in or around May of 2021 discussing pursuing

12   one of those alternatives in a way that would

13   eliminate Cypress as a shareholder of Sport-BLX?

14         A.    Well, --

15         MR. SACK:  Objection to form.

16         A.    -- if -- if we had -- if we had done a

17   combination of the entities, as I said, there are

18   multiple ways we could do that.  The easiest way to

19   eliminate the third party would be to buy his shares

20   if he would agree, and if -- if we felt that it was

21   more efficient to operate as one company, we, in

22   fact, could have invited all the shareholders to

23   swap their stock in one entity for the other with

24   the requirement that you have to disclose the

25   beneficial owners; otherwise, it would kill the

CONFIDENTIAL

Page 514

1  broker-dealer at the new company.  So I don't recall

2  what the specific -- what this is specifically

3  referring to.

4         Q.    Okay.  And you don't recall any

5  specific discussions in or around this time as to

6  that -- what's referenced in this email?

7         A.    I don't.  I don't recall.

8         Q.    Now, Mr. Hall, are you familiar with a

9  company by the name of Orix PTP Holdings, LLC?

10        A.    Yes, I referred to Orix before without

11  knowing the full name, but I think we're --

12        Q.    Okay.  And --

13        A.    -- talking about the same entity.

14        Q.    And what is Orix PTP Holdings, LLC,

15  which I'll refer to Orix as well?

16        A.    I'm not sure what the PTP, LLC is, so

17  I assume that's an American subsidiary of a company

18  that the parent is a Japanese company.

19        Q.    Okay.  When's the first time you came

20  in contact with Orix in any fashion?

21             MR. SACK:  How about if we just agree

22  that it's an Orix entity without a particular

23  corporate designation?  Just an --

24             MR. PEARLSON:  Sure.  I'm --

25             MR. SACK:  -- Orix entity?

CONFIDENTIAL

Page 515

1          MR. PEARLSON:  I'll just -- we'll just

2     call it Orix.

3          MR. SACK:  Yeah.

4          A.     Okay.  I think sometime in 2018 or

5     2019 there was a proposed transaction for

6     GlassBridge from Orix through a consultant that we

7     -- that we used, an advisor.

8          Q.     Okay.  And at that time what was your

9     relationship with GlassBridge?

10         A.     Well, that was the time where we had

11    the, I think we called it management and services

12    agreement, so, you know, I was ultimately

13    responsible for the bulk of, along with the board,

14    the -- the day-to-day -- well, me the day-to-day

15    operations, you know, following the board's

16    objectives for the company.

17         Q.     Okay.  Now, just to be clear for the

18    record, what you're saying is through the management

19    services the Clinton Group had with GlassBridge, you

20    were serving in those roles?

21         A.     Yes.

22         Q.     Okay.  And -- and did you -- in

23    addition to that did you also have an ownership

24    interest in GlassBridge?

25         A.     Yes.  Somewhere around 29 percent or

CONFIDENTIAL

Page 516

1    30 percent.

2         Q.    And in terms of Orix, did you have

3    direct role in discussing transactions with Orix?

4         A.    Yes.

5         Q.    Okay.  And who else was involved from

6    GlassBridge?

7         A.    Well, --

8              MR. SACK:  Objection to form.  He

9    wasn't -- he was a Clinton Group.  Just who else was

10   involved, I think is the question.

11        Q.    In discussions with Orix from either

12   the Clinton Group or GlassBridge?

13        A.    Well, at that time I think GlassBridge

14   still had the CFO Danny Zheng, who was the CEO for a

15   number of years before we were involved at

16   GlassBridge.

17        Q.    Can you just spell his name for the

18   record?

19        A.    I believe Z-h-e-n-g?

20             So I believe he was still the CFO of

21   GlassBridge.  Daniel Strauss was the primary person

22   working for Clinton Group on behalf of GlassBridge.

23        Q.    Okay.  And what role was he serving at

24   GlassBridge?

25        A.    I don't recall if he was -- at which

CONFIDENTIAL

Page 517

1  time frame; when Orix showed up?

2          Q.     Yes.

3          A.     Okay.  I don't exactly remember when

4  Orix showed up.  I said sometime 2018 or '19.  I

5  don't know exactly what Daniel Strauss' role was,

6  but it was either -- I think it was either acting

7  COO or acting CFO or acting CEO.  I don't recall.

8          Q.     And at some point did Orix and -- and

9  GlassBridge enter into or begin discussions

10  concerning the sale of certain securities by

11  GlassBridge to Orix?

12          A.     Yes.

13          Q.     Okay.  Do you recall when those

14  discussions began?

15          A.     Sometime in 2019.  I don't recall

16  exactly.

17                MR. PEARLSON:  Okay.  If we could show

18  him Hall-49.

19                (Exhibit Hall-49, 66-page Execution

20  Version Securities Purchase Agreement between

21  GlassBridge and ORIX dated October 1, 2019, Bates

22  stamped GBE_0009235 through 9300, is marked for

23  identification.)

24                THE WITNESS:  Thank you.

25          Q.     Mr. Hall, I'm going to ask you to look

CONFIDENTIAL

Page 518

1   at what's been marked as Hall-49 for identification.

2   It's a -- a securities purchase agreement Bates

3   stamped GBE_0009235 through 9300.

4                   Do you recall that in October of 2019

5   that GlassBridge entered into a securities purchase

6   agreement with Orix?

7           A.      Yes.

8           Q.      Okay.  And do you see that on page 1

9   that it says Seller owns all of the issued and

10  outstanding shares of common star- -- common stock,

11  excuse me, of Imation Enterprises Corp.?

12          A.      Yes.

13          Q.      Can you tell us what Imation

14  Enterprises Corp. is?

15          A.      It was a wholly-owned subsidiary of

16  GlassBridge Enterprises.

17          Q.      And did you hold any ownership interest

18  in Imation at the time of this securities purchase

19  agreement?

20          A.      Not directly.

21          Q.      Okay.  Did you hold it indirectly?

22          A.      Well, I own 28 to 30 percent of the

23  parent, so indirectly, yes.

24          Q.      Okay.  And did -- and did you hold any

25  position or title at Imation at the time of this

CONFIDENTIAL

Page 519

1    trans- -- transfer or securities agreement?

2            A.      No.

3            Q.      Okay.  Then it says at the -- in the

4    second paragraph, "immediately prior to the closing,

5    the company issued to seller a promissory note,

6    dated as of September 30, 2019, in the original

7    principal amount of 9 million and with a maturity

8    date of September 30, 2026, and a promissory note,

9    dated as of September 30, 2019, in the original

10   principal amount of $4 million and with a maturity

11   date of September 30, 2026."  And that's called the

12   Sport-BLX Note, and the first one's a Levy Note, and

13   it says they're collectively referred to as the

14   "Notes."

15           Can you -- can you tell us, in sum and

16   substance, what this transaction involved and what

17   -- what was the involvement of Sport-BLX in it?

18           A.      Sport-BLX had no involvement in this

19   transaction.  GlassBridge owned shares of --

20   actually, Imation owned shares of Sport-BLX, and it

21   also had a claim on some Levies from prior business,

22   and Orix made a loan to the company with those two

23   assets as collateral in two different promissory

24   notes.

25           Q.      Okay.  So -- so GlassBridge sold and

CONFIDENTIAL

                                                        Page 520

1    assigned the Levy note which was originally issued

2    by Imation in favor of GlassBridge to Orix as part

3    of this transaction, correct?

4                 MR. SACK:  Could we hear the question

5    again?

6                 THE WITNESS:  Yeah, I don't -- I don't

7    --

8                 MR. SACK:  Yeah.

9                 THE WITNESS:  Yeah.

10                MR. SPIRO:  Slowly.

11                (Last question is read back by the

12   court reporter.)

13         A.    I don't entirely know what that means,

14   but I'll try to answer it this way.  Imation owned a

15   claim, which we called the Levy claims, and it

16   assigned it as collateral for a loan from Orix.

17         Q.    Okay.  And it did the same thing in

18   connection with a note collateralizing a debt that

19   was owed by Sport-BLX?

20                MR. SPIRO:  No.

21         A.    No.

22                MR. SACK:  No.

23         Q.    Okay.  Could you explain what -- what

24   the Sport-BLX note was?

25         A.    Imation owned a certain number of

CONFIDENTIAL

Page 521

1  shares of Sport-BLX common stock, and Orix made a

2  loan to Imation and held Sport-BLX -- the Sport-BLX

3  shares as collateral for the loan.

4        Q.    And do you know how much Orix paid to

5  purchase the combination of the stock and the notes

6  referenced in this agreement?

7              MR. SACK:  Objection to form.

8        A.    Well, the notes were 9 million and 4

9  million respectively.  I don't recall what they paid

10 for the common stock.

11       Q.    Does -- if you look at paragraph 1.2,

12 does that refresh your recollection?

13       A.    Okay.  I think I understand.

14              So I think this -- the way this is

15 structured is as a -- a loan, but they -- the way

16 they worded this here is they took possession of the

17 collateral.  Kind of like what we call a repurchase

18 agreement is the way it seems worded here, but I'd

19 have to look a little closer at some of the other

20 parts of the document to -- to be definitive.  But

21 the total amount -- the total consideration for the

22 two notes and for the common stock of Imation that

23 was purchased by Orix appears to be the $17 million

24 number.

25       Q.    And what role, if any, did the Clinton

CONFIDENTIAL

Page 522

1    Group play in this transaction?

2         A.    We helped negotiate that deal with

3    Orix.

4         Q.    Was that pursuant to any kind of

5    agreement with GlassBridge?  Was that part of the

6    management services agreement?

7         A.    Well, the management services

8    agreement was -- I don't -- I don't recall the

9    specific language -- was basically do whatever you

10   can to help GlassBridge survive.

11        Q.    Do you know if GlassBridge had a

12   specific retention agreement with GlassBridge for

13   this transaction for the services it provided?

14        A.    I don't --

15              MR. SPIRO:  Can you read the question

16   back?  I think you used GlassBridge twice in that

17   sentence.

18              MR. SACK:  Yeah.

19              MR. PEARLSON:  Okay.

20              (Last question is read back by the

21   court reporter.)

22        Q.    No, the -- let me rephrase it because

23   it was -- it was garbled.

24              My question is do you know whether the

25   Clinton Group had a retention agreement with

CONFIDENTIAL

Page 523

1    GlassBridge for -- in order to provide services in

2    connection with this transaction?

3            A.    I think the -- I don't think there was

4    a specific agreement with respect to this

5    transaction.

6            Q.    Okay.  So there was no -- you don't

7    believe there was a specific written agreement in

8    connection with this transaction?

9            A.    I think it was part of the written

10   agreement that was in place, which would include

11   this, as well as other things.

12           Q.    And that's -- is that the management

13   services agreement that you referred to previously?

14           A.    Yes.

15           Q.    Okay.  If we could go back to Hall-11.

16                 (Exhibit Hall-11, 85-page GlassBridge

17   Enterprises, Inc. Form 10-K for fiscal year ending

18   December 31, 2019, is marked for identification.)

19           Q.    Do you know the amount of -- of this --

20   of the -- what the Clinton Group was paid -- strike

21   that.

22                 First of all, can you describe the

23   services the Clinton Group provided in connection

24   with the transaction?

25           A.    With this transaction?

CONFIDENTIAL

Page 524

1          Q.     Yes.

2          A.     Negotiation of the documents.

3     Negotiation of the documents, negotiation of the

4     terms, coming to -- helping Orix understand Imation.

5     They were just from start to finish, the whole deal.

6          Q.     If you could turn -- I'm going back to

7     what's the form 10-K for GlassBridge Enterprises

8     that was marked as Hall-11.  If you could turn to --

9               MR. SACK:  For calendar -- for fiscal

10    year ending December 31, 2019?

11              MR. PEARLSON:  Correct.

12         Q.     And if you could turn to page 74 of 85

13    at the bottom of that document.  The top of the page

14    says "Note 15 - Related Party Transactions."

15              MR. SACK:  I'll just caution the

16    witness that if he feels he needs to refer to other

17    portions of the document to do so.

18         A.     Okay.

19         Q.     Okay.  In the middle of the page it

20    says, "On September 13, 2019, the board approved a

21    success fee in connection with the completion of the

22    Orix transaction and the pension settlement to

23    Clinton."  Do you see that?

24         A.     Yes.

25         Q.     Okay.  Is that referring to the

CONFIDENTIAL

Page 525

1   transaction, the securities purchase agreement we
2   just looked at?
3          A.      Well, it's one part of it.
4          Q.      Okay.  And what is it referring to when
5   it says "and the pension settlement to Clinton"?
6          A.      The -- no, the pension settlement
7   wasn't to Clinton.  The -- Clinton was paid the fee,
8   so there was a fee for the pension settlement paid
9   to Clinton.
10         Q.      For -- for performing services in
11  connection with the pension settlement?
12         A.      Correct.
13         Q.      Okay.  And then it says, "The board
14  approved a fee equal to 15 percent of the cash
15  consideration," what is that, "for its work on the
16  Orix transaction"?
17         A.      So I -- well, I could see what it
18  said.  What's the question?
19         Q.      Well, first of all, I guess who
20  negotiated that -- or strike that.
21                 How was the 15 percent fee determined?
22         A.      It was discussion between myself and
23  Daniel Strauss, and the board of directors
24  ultimately approved.
25         Q.      How would you characterize that fee?

CONFIDENTIAL

Page 526

1    Is it an advisory fee, a success fee?  How would you

2    describe the fee described in there?

3           A.    Well, they char- -- characterize it as

4    a success fee in the document.  If the Orix

5    transaction had not closed, or if we had not settled

6    -- if GlassBridge had not settled with PBGC,

7    probably wouldn't have gotten that fee, so I think

8    it's reasonable to call it a success fee.

9           Q.    Okay.  And how was it negotiated, that

10   fee, that 15 percent fee, success fee?

11          A.    I think we just looked at what was

12   customary or what was reasonable under the

13   circumstances, and it was reasonable to me and

14   reasonable to the board.

15          Q.    Okay.  And -- and which side of the

16   transaction were you on:  The Clinton Group or the

17   GlassBridge side?

18                MR. SACK:  Objection to form.

19          A.    Well, I was on the Clinton Group side.

20          Q.    Okay.  And in terms of -- who else was

21   on the Clinton Group side in terms of negotiating

22   the success fee of 15 percent that we -- that's

23   reflected here?

24          A.    Only me.

25          Q.    And how about on the GlassBridge side;

CONFIDENTIAL

Page 527

1    who participated on behalf of GlassBridge and agreed

2    to the 15 percent success fee reflected here?

3         A.    Okay.  So I'm not exactly sure I

4    remember the timing because this says on September

5    13, so I'm not sure if there was a percentage

6    negotiated or -- or -- because the Orix transaction

7    happened -- I'm not exactly sure when the Orix

8    transaction closed.  But in terms of the

9    negotiation, it was ultimately between me and the

10   board.

11        Q.    And -- and in terms of the -- the 2

12   million 600 -- I believe it's -- I can't read it

13   that well.  Either 655 or 635,000.

14        A.    Yeah.

15        Q.    2,635,000.  Was that success fee paid?

16        A.    Yes.

17        Q.    Okay.  And the transaction closed?

18        A.    Yes.

19        Q.    Do you know when that -- when that

20   happened?

21        A.    When it was paid, or when it closed?

22        Q.    When it closed.

23        A.    I think it was -- it was right around

24   this time.  I don't know if it was -- the actual

25   close was October 1, but, you know, there was a long

CONFIDENTIAL

Page 528

1    period of time where the -- the deal was effectively

2    done, subject to documentation, so I'm not really

3    sure of the dates, but it was right around this

4    time.

5              Q.    Was anyone from Sport-BLX advised about

6    this transaction with Orix?

7              A.    Well, "advised"?  Joe De Perio knew

8    about it because he was on the board of GlassBridge,

9    but I don't think anybody at Sport-BLX was -- people

10   knew about it, so I'm not sure what you mean by

11   "advised."

12             Q.    When you say "people knew about it,"

13   people on the Sport-BLX side knew about this

14   transaction?

15             A.    Well, --

16             Q.    Other than you and Mr. De Perio.

17             MR. SACK:  Objection to form.

18             A.    I don't re- -- I don't recall at this

19   time who was on the Sport-BLX board and who may have

20   known about this, but in terms of advising them,

21   Sport-BLX was completely unrelated to this

22   transaction.

23             Q.    Okay.  And -- and the same thing in

24   terms of the Clinton Group getting a success fee

25   with this transaction:  There was no need, in your

Page 529

1  view, to inform anybody at Sport-BLX about it?

2          A.     Sport-BLX had nothing to do with it,

3  so it was a separate transaction.

4          Q.     Okay.  Now, in October, this -- this,

5  as we saw, the securities purchase agreement at

6  least was dated in September of 2019.  In October of

7  2019 did GlassBridge make an investment in

8  Sport-BLX, an additional investment in Sport-BLX?

9          A.     Yes, I believe they did.

10         Q.     Okay.  Now, as of October 2019, before

11  this additional investment, how much had GlassBridge

12  invested in Sport-BLX?

13         A.     Their original investment from the

14  beginning was about a million dollars -- was a

15  million dollars.  And then they may have made a

16  small additional investment in September, and then I

17  think they made another investment in October.

18         Q.     Do you recall how much -- well, first

19  of all, do you recall how did the September

20  transaction come about?

21         A.     I don't recall.  They -- I think -- I

22  don't recall the specifics.  I think -- I think

23  GlassBridge may have done two transactions.  They

24  may have added some money to ARRIVE, its other

25  company, and they added some money to Sport-BLX.

CONFIDENTIAL

Page 530

1      Q.      The September transaction, would that
2  have been approved by the Sport-BLX board, the sale
3  of the -- of the stock to GlassBridge?
4      A.      I don't know if that was something
5  that was specifically approved by the board.
6      Q.      Okay.  Do you have any -- do you have
7  any recollection as to the price per share for the
8  -- for the September purchase by GlassBridge of --
9  of Sport-BLX stock?
10     A.      I think the purchase was $263.00 a
11 share with some cents, somewhere around there.
12     Q.      Okay.  And on what basis did -- who
13 made that determination as to the price per share to
14 sell -- and this was Sport-BLX selling its shares to
15 GlassBridge, correct?
16     A.      Sport-BLX was creating new shares and
17 issuing them to GlassBridge, yes.
18     Q.      Okay.  And how did -- how was the --
19 the price of approximately $263.00 a share, how was
20 that arrived at?
21     A.      It was the price that equated to about
22 a $35 million valuation of the company pre-money.
23     Q.      Okay.  So I believe when we -- we were
24 talking about the second round, you had talked about
25 a valuation of about 200 a share, which was based on

1   a $25 million valuation, correct?

2          A.    Yes.

3          Q.    Okay.  So what had changed with respect

4   to the company between the spring of 2019 and

5   September that justified the increased valuation to

6   $35 million?

7                MR. SACK:  Objection to form.

8          A.    Well, GlassBridge's investment was --

9   and the valuation that GlassBridge used was somewhat

10  unrelated to the -- the ongoing operations of the

11  business.

12         Q.    How so?

13         A.    So Orix wanted to make a loan to

14  GlassBridge -- I apologize -- to Imation.  They

15  wanted to buy stock and make a loan to Imation with

16  the ultimate goal of acquiring Imation for the

17  purpose of acquiring the net operating losses of

18  Imation.  They didn't care at all about Sport-BLX,

19  they didn't care about the Levies, they wanted the

20  NOLs.

21               THE REPORTER:  They wanted the...

22               THE WITNESS:  Net operating losses, or

23  NOLs.

24         Q.    So I'm trying to understand where --

25  how -- so what is that -- how does that relate to

CONFIDENTIAL

Page 532

1    the $263.00 per share, which was based on a $25

2    million valuation?

3            A.      No, I think the 263 was --

4                    MR. SPIRO:  35 million.

5            A.      -- was based on 35 million.

6            Q.      I'm sorry.  35 million.

7            A.      And there were a couple of independent

8    investors earlier that had come in at that

9    valuation, I think in late June, early July, but the

10   GlassBridge -- the Orix transaction really was a

11   two-part transaction, and the second part was

12   scheduled to happen sometime in 2020, and it was in

13   GlassBridge's interest to get more assets on the

14   balance sheet.  That's why it purchased more.

15           Q.      Okay.  I'm -- I'm still not following

16   you.  You -- you said a few things there.

17           A.      Okay.

18           Q.      The -- the GlassBridge purchase of

19   additional shares in September was at $263.00 a

20   share based on the $35 million valuation, correct?

21           A.      That's how -- that equates to a $35

22   million valuation, so that's correct.

23           Q.      Okay.  And that valuation was based, in

24   part, on what other investors had been willing to

25   pay more recently, like in late June or early July,

CONFIDENTIAL

Page 533

1  and that's what that valuation was based, in part,

2  on?

3        A.      Correct.

4        Q.      Okay.  And in terms of the -- the $35

5  million valuation, it wasn't based on new

6  projections or new pro formas or anything like that;

7  it was rather based on what investors were willing

8  to pay at the time?

9              MR. SACK:  Objection to form.

10       A.      In June/July, or when GlassBridge did

11  it?

12       Q.      When GlassBridge did it, that -- that

13  -- that $263.00 per share.

14       A.      When GlassBridge did it, it was really

15  based on the valuation of the loan that Orix made to

16  Imation.

17       Q.      That's -- that's true for the September

18  purchase?

19       A.      I think it's pretty close, yeah.

20       Q.      Okay.  And you indicated that a second

21  stage of the transaction was contemplated?

22       A.      Yes.

23       Q.      What was that second stage?

24       A.      To buy more of the stock and

25  potentially loan more money to Imation.

CONFIDENTIAL

Page 534

1          Q.     Buy more of what stock?

2          A.     Imation stock.

3          Q.     And again, was that with the goal of

4     taking over the net operating losses?

5          A.     Taking over the company, which had

6     NOLs.

7                 MR. PEARLSON:  If we can show him

8     Hall-51.

9                 (Exhibit Hall-51, Three-page Written

10    Consent of Board of Directors of Imation Enterprises

11    Corp. dated October of 2019 Bates stamped

12    GBE_0011474 through 11476, is marked for

13    identification.)

14         Q.     And Mr. Hall, just to be clear, the

15    transaction we were talking about -- just talking

16    about, you believe that took place in September of

17    2019?

18         A.     I think there was one in September and

19    one in October.

20         Q.     Okay.  And the one in September, I

21    believe you indicated you don't think it was

22    necessarily approved by the -- the board of

23    Sport-BLX?

24         A.     In general, I don't think we approved

25    the new investors.  We -- other than management's

Page 535

1    approval, I don't think that was a board -- I don't
2    recall.  I don't think there were board approvals of
3    new investments.
4         Q.    Okay.  So in terms of new investments,
5    is it fair to say it was left to you and
6    Mr. De Perio in your discretion in terms of the --
7    the share price and the transactions?
8         A.    Well, it was certainly left to
9    De Perio and I to represent to the board what we
10    thought the value of the company was.  When I say I
11    don't think it was a board action, I don't think we
12    approved and took a yes or no vote on it, but the
13    board was apprised of capital transactions along the
14    way.
15         Q.    And -- and at this time was -- was
16    Sport-BLX still in need of capital injections such
17    as the ones that -- such as the one that was
18    presented by the sale of the shares to GlassBridge?
19              MR. SACK:  Objection to form.
20         A.    Well, at this time I think -- or
21    around this time GlassBridge agreed to loan money to
22    Sport-BLX through a demand note, so I think with
23    that, the need for capital was -- through the
24    historical equity raises was less critical, but
25    certainly it's always important to try to raise

CONFIDENTIAL

Page 536

1    capital.

2            Q.    When did the loan take place with the

3    demand note in relation to the purchase of -- by

4    GlassBridge of the stock in September?

5            A.    I don't recall the date.

6            Q.    Okay.  Do you recall what month it was?

7            A.    I don't recall.  It was -- it was

8    around this time, but I don't recall.

9            Q.    Do you recall that in October

10   GlassBridge made another investment through the

11   purchase of Sport-BLX shares?

12           A.    Yes.  I think I just said that.

13           Q.    Okay.  Can you look at what's been

14   marked Hall-51 for identification?  And I'm just

15   going to ask you to turn to -- it's Bates stamped

16   GBE_0011474 through -- I'm sorry.  Hold on one sec.

17   Through 11476.

18           A.    Okay.

19           Q.    First question I had for you, this is a

20   Written Consent of Board of Directors of Imation.

21   Do you see that?

22           A.    Yes.

23           Q.    And -- and this is reflecting a

24   purchase of Sport-BLX common stock.  Do you see that

25   on the second page?

CONFIDENTIAL

Page 537

1          A.     Yes.

2          Q.     Now, this was -- this was a purchase by

3    Imation as opposed to GlassBridge?

4          A.     Yes.

5          Q.     Okay.  And do you know how this

6    transaction came about?

7          A.     There -- I don't recall.  There was

8    some -- I don't recall what it was, but there was

9    some event that led to some capital in Imation that

10   they wanted to reinvest.  I don't recall the -- the

11   -- specifically what it was.

12         Q.     And do you know who from Imation had

13   the idea of buying Sport-BLX stock?

14         A.     Well, Imation had a separate board of

15   directors.  Daniel Strauss was on the board, along

16   with the Imation -- the Orix representative, so I

17   don't recall whose idea it was at Imation, but at

18   Sport-BLX it was always my idea that people invest

19   more capital --

20         Q.     Do you know --

21         A.     -- and Joe's idea.

22         Q.     -- whether Daniel Strauss had -- had

23   any role in initiating this transaction, the

24   transaction reflected in this document?

25         A.     Well, all the directors had a role in

CONFIDENTIAL

Page 538

1  it, yes.

2      Q.    Okay.  And -- and do you -- did this

3  transaction actually go forward, the sale of 1,681

4  shares of common stock at a price of 346?

5      A.    And what's the date?  October 2'19.

6            So I -- I don't know if this is the

7  September or the October purchase.  I think there

8  were two.  So --

9      Q.    Well, it says --

10     A.    October.  October.

11     Q.    Okay.  And -- and was this the October

12 purchase that you were just referencing before in

13 your testimony; it's by Imation instead of

14 GlassBridge?

15     A.    Yes.

16     Q.    Okay.  And Imation was purchasing these

17 shares directly from Sport-BLX, correct?

18     A.    Yes.

19     Q.    And in terms of the price, this is

20 $346.00 per share?

21     A.    Yes.

22     Q.    Do you have any idea how this price was

23 arrived at?

24     A.    I think that equates to a price of

25 about $50 million for the entire company pre-money.

CONFIDENTIAL

Page 539

1          Q.     Okay.  And again, do you have any idea
2     as to why the valuation of 50 million was justified
3     at this point in time in October of 2019 as opposed
4     to the $35 million valuation we just saw?
5          A.     So Orix -- I don't know the inner
6     workings of Orix, but basically I think Orix
7     suggested that they were going to make a loan to
8     Imation, and they were going to use different
9     valuations for different pieces of collateral.  One
10    of those pieces of collateral was Sport-BLX,
11    Incorporated shares, and I think between them and
12    their outside consultant they agreed that a loan at
13    the valuation of 50 million was what they were going
14    to do.
15         Q.     Did you -- did you, being Sport-BLX,
16    give any materials to Orix to make that
17    determination?
18         A.     Orix did a lot of due diligence on the
19    company, yes.
20         Q.     Are you saying that the -- Orix made
21    the determination that the price of $346.00 per
22    share was acceptable?
23         A.     Orix made the determination that that
24    was as much money as they could loan to the company
25    based on that collateral.

Page 540

1              MR. PEARLSON:  Okay.  Why don't we
2    take a quick break now?
3              THE VIDEOGRAPHER:  It is 5:12 p.m.  We
4    are going off the record.
5              (Recess taken from 5:12 to 5:23 p.m.)
6              THE VIDEOGRAPHER:  It's 5:23 p.m.  We
7    are back on the record.
8    BY MR. PEARLSON:
9        Q.    Mr. Hall, as of the fall of 2019 what
10   -- what was the interest you held in Sport-BLX
11   personally?
12       A.    I think somewhere around 49 percent.
13       Q.    And what was the interest that
14   Mr. De Perio held in Sport-BLX around the fall of
15   2019?
16       A.    Probably something in the twenties.  I
17   don't know exactly.
18       Q.    Did there come a time when you and
19   Mr. De Perio discussed the possibility of selling
20   your personal shares to GlassBridge?
21       A.    Yes.
22       Q.    Okay.  And when did that come about,
23   those discussions?
24       A.    In the early part of December of 2019
25   or the middle part of December.  I don't recall the

CONFIDENTIAL

Page 541

1    date.

2         Q.    And do you recall who initiated those

3    discussions?  Was it GlassBridge came to you to buy

4    your shares, or did you go to GlassBridge to sell

5    your shares?

6         A.    I went to GlassBridge.

7         Q.    You went to GlassBridge?  And why did

8    you want to sell your shares as of December of 2019?

9         A.    It occurred to me that there were some

10   significant advantage or advantages for Sport-BLX,

11   Inc. to -- if -- if they were -- if GlassBridge

12   owned the majority of the company, and so there were

13   a number of advantages for Sport-BLX, Inc., and then

14   there were a number of advantages for GlassBridge,

15   so it seemed like a transaction that benefited both

16   parties.

17        Q.    Okay.  So you were doing it -- you were

18   selling your personal shares to benefit both

19   GlassBridge and Sport-BLX?  That's what you were

20   doing?

21        A.    Well, ultimately I was -- the goal was

22   to benefit Sport-BLX, but of course GlassBridge is

23   not going to do it for the benefit of Sport-BLX

24   without some benefit to GlassBridge, so I obviously

25   look at the benefit to GlassBridge when I suggest to

CONFIDENTIAL

Page 542

1    them that they consider an opportunity.

2         Q.    Okay.  So first in terms of the

3    transaction, who did you approach from GlassBridge

4    about this potential transaction in December?

5         A.    Most likely Daniel Strauss and --

6    yeah, Daniel Strauss.

7         Q.    And in terms of selling your personal

8    shares in Sport-BLX, why did you want to sell your

9    personal shares in Sport-BLX as opposed to selling

10   Sport-BLX shares to GlassBridge?

11        A.    Well, Sport-BLX didn't have any shares

12   to sell.  It would have to create and issue new

13   shares.  Is that what you're talking about?

14        Q.    Yeah.  Why -- why wouldn't you have

15   done that?

16        A.    That seems like -- it doesn't seem

17   appropriate, and certainly was nothing we had ever

18   represented, nor was it anything that any

19   shareholder ever expressed any interest in.

20        Q.    So if -- for example, why, if you were

21   looking for capital for Sport-BLX, wouldn't you

22   issue new shares to GlassBridge?

23        A.    It would have been a -- I think a

24   terrible deviation from what the business plan was.

25        Q.    Okay.  And in what respect?

CONFIDENTIAL

Page 543

1        A.      Well, people signed on for a

2  sports-related venture capital company.  They didn't

3  sign on to be a corporate debt holder of a public

4  company that could be on the verge of bankruptcy at

5  any time.

6        Q.      And in terms of the -- you know, you

7  spoke about the significant advantages to Sport-BLX

8  as a result of you selling your shares.  Was it also

9  were those advantages only realized if you and

10  Mr. De Perio sold your shares together?

11        A.      No, I think the advantages were if

12  GlassBridge got up to a number higher than 50

13  percent.  Whether the shares came from me or Joe

14  didn't matter.

15        Q.      Can you describe for us what you

16  perceived as the advantages to Sport-BLX by you

17  selling your shares to GlassBridge?

18        A.      Well, there are a lot of them, and if

19  you go back to the FAQs, I think we talked about an

20  ultimate potential exit as being an IPO, so you

21  could look at this as a first step towards an IPO.

22  Second of all, GlassBridge, by taking a majority

23  ownership of Sport-BLX, would ultimately be taking

24  responsibility for doing all the financials and

25  consolidating those financials on the public

CONFIDENTIAL

Page 544

1    GlassBridge shares -- GlassBridge financial

2    statements.  So that's an advantage for Sport-BLX

3    because it relieved us of accounting responsibility.

4    Public companies are known and viewed to have the --

5    you know, the highest standard of care when it comes

6    to accounting, and so that could be a potential

7    advantage to Sport-BLX, Inc. if there was ever a --

8    another transaction to do having those quality --

9    that quality of financials.  The -- so -- and, you

10   know, there were a number of other -- other

11   advantages, I think, for -- for Sport-BLX, but it

12   was really the first step towards reverse merger

13   slash IPO.

14        Q.    Okay.  When you say "reverse

15   merger/IPO," what would happen in that transaction

16   that you just described?

17        A.    Well, if we did a complete IPO, that

18   -- well, an IPO is taking a private company and

19   making it public.  If GlassBridge bought a hundred

20   percent of the company, then the company would be a

21   wholly-owned subsidiary of GlassBridge, or if they

22   bought 50 percent, they -- it would be a

23   consolidated affiliate and take care of all the

24   accounting and the public company documents, public

25   company reporting.  So by doing this amount, it

CONFIDENTIAL

Page 545

1    actually -- it really kind of made GlassBridge

2    beholden to Sport-BLX to be sure that Sport-BLX was

3    successful.  And the biggest advantage to

4    GlassBridge was the fact that it was another asset

5    with a high valuation on its balance sheet for the

6    next part of the Orix transaction.

7                  So Orix wanted to -- as crazy as it

8    sounds, Orix wanted to put as much money into

9    Imation as it could so that it could get control of

10   the NOLs, and this was just an asset that was

11   readily available that they understood that we could

12   put on the balance sheet of Imation to help with the

13   part two of the Orix transaction.

14       Q.    Why didn't you just propose a merger

15   between GlassBridge and Sport-BLX that included all

16   the shareholders?

17       A.    That would have been bad for other

18   shareholders.  It's -- it's a transaction that would

19   have first been difficult to explain, and second of

20   all, it wouldn't have been in their interest, and I

21   wouldn't have recommended it, and if they did it,

22   and it didn't work out, it would be based on the

23   information I gave them.  So it was -- it was a bad

24   transaction, in my view, for the other shareholders.

25       Q.    Did you advise anybody on the Sport-BLX

CONFIDENTIAL

Page 546

1   board other than Mr. De Perio of these discussions

2   you were having with GlassBridge about selling your

3   personal shares to GlassBridge?

4          A.     I don't recall -- excuse me.  I don't

5   -- I don't recall what discussions I had with the

6   board members.

7          Q.     When you approached Mr. Strauss -- or

8   who else did you speak with besides Mr. Strauss

9   about this potential transaction in which

10  GlassBridge would purchase your shares as well as

11  Mr. De Perio's?

12         A.     Well, we talked about it to the board

13  of directors of GlassBridge.

14         Q.     Did you make a presentation to the

15  board of directors of GlassBridge concerning this

16  potential transaction?

17         A.     Verbal.  Verbal presentation, yeah.

18         Q.     You didn't give them any written

19  materials of any kind?

20         A.     We might have.  I don't recall.

21         Q.     Do you recall when that -- was it at a

22  formal board meeting?

23         A.     No, it was a special board meeting of

24  the GlassBridge shareholders in December of 2019.

25         Q.     Okay.  And prior to that board meeting

CONFIDENTIAL

Page 547

1   had you already had negotiations with GlassBridge

2   about the -- with representatives of GlassBridge

3   concerning the potential terms of the sale of your

4   shares and Mr. De Perio's shares?

5        A.    I think those discussions happened

6   over the course of a day or two, so I don't know

7   what you mean by "prior."

8        Q.    Okay.  Well, did you -- let me ask you

9   this.  When you came to GlassBridge with this

10  potential transaction did you propose terms --

11       A.    Um-hum.

12       Q.    -- when you came to them?

13       A.    Yes.

14       Q.    And what were the proposed terms?

15       A.    That they initiate a purchase of

16  enough shares to get them over 50 percent, and that

17  they pay as little as possible in cash with as much

18  debt as possible.

19       Q.    And that was your proposal to them,

20  generally?

21       A.    Yes.

22       Q.    All right.  Did you -- did you have any

23  specific numbers to present to them in terms of the

24  price per share in terms of cash and the amount of

25  debt?

CONFIDENTIAL

Page 548

1        A.      Well, I don't want to get into legal

2    things, and a lot of it is just relying on

3    experience, but to have a transaction be

4    appropriate, withstand scrutiny, there has to be a

5    certain amount of equity.  Can't be zero equity and

6    all debt.  So kind of the benchmark that I've used

7    historically is 10 percent equity makes the debt

8    look like what's called true debt, and I'm taxing

9    some of my memory on the accounting stuff.

10               So the idea was that GlassBridge could

11   acquire as much of the -- of the -- of this number

12   of shares they were going to buy with as little cash

13   and as much debt as possible.  That's what we were

14   targeting.

15       Q.      Okay.  And who negotiated those deals

16   on -- that transaction on behalf of the GlassBridge

17   side of the equation?

18       A.      Well, we presented it to Daniel,

19   Daniel presented it to the board, and the board

20   deliberated.  I don't really know what was said.

21   Joe recused himself, and then ultimately within a

22   day or so the board agreed that they wanted to do

23   the transaction.

24       Q.      So did the board agree to the terms you

25   presented to the board?

CONFIDENTIAL

Page 549

1          A.    I don't recall if there was any

2    negotiation, but the basic terms of the price, we

3    wanted it to be consistent with Orix's loan and

4    understanding of the -- of the -- the previous

5    transaction, with the -- the numbers used in the

6    previous transaction.  We wanted that to be the same

7    for the part two of the transaction, and we wanted

8    as little cash as possible, so I think ultimately

9    there wasn't much to negotiate.

10                    MR. PEARLSON:  Can we show him

11   Hall-52?

12                    (Exhibit Hall-52, Two-page Minutes of

13   the Regular Meeting of the Board of Directors of

14   GlassBridge Enterprises, Inc. dated December 9,

15   2019, Bates stamped GBE_0009062 and 9063, is marked

16   for identification.)

17          Q.    Let me ask you this, Mr. Hall.  Were

18   there any documents or correspondence exchanged

19   between you and Mr. Strauss or any representatives

20   of GlassBridge before the deal was presented to the

21   GlassBridge board?

22                    MR. SACK:  Could I have the question

23   back again, please?

24                    (Last question is read back by the

25   court reporter.)

1      A.      I think the question is exchanged
2  between myself and the board or Daniel?  I don't
3  think any from myself.
4      Q.      And did -- do you recall if you
5  presented a price per share for the equity side of
6  the -- of the deal?
7      A.      I think the price per share was around
8  the previous investment, as well as our
9  understanding of -- of Orix's internal valuation of
10 the company.
11     Q.      Okay.  And did you -- to be clear, did
12 you present that price per share to GlassBridge?
13     A.      I don't know if I presented it or if
14 it was just mutually agreed to, but both parties
15 knew what the target was.
16     Q.      Okay.  What was the target?
17     A.      To be consistent with Orix's
18 understanding of the value of the company, of the
19 previous transaction, and to set up GlassBridge to
20 do the second part of this transaction at as high a
21 value as possible.
22     Q.      Okay.  So if you could break it down,
23 so in terms of to be consistent with the Orix
24 transaction, what was the value per share that you
25 were talking about with GlassBridge?

CONFIDENTIAL

Page 551

1        A.     The price per share with GlassBridge

2    was about 355 or 356.

3        Q.     Okay.  And then is that what was agreed

4    upon as to the equity part of the deal?

5        A.     The equity part of the deal was, I

6    believe, $35.00 a share.

7        Q.     Was what?

8        A.     The equity part of the deal was $35.00

9    a share.  The cash part of the deal.  Is that what

10   you meant by the --

11       Q.     Yes.

12       A.     Yeah, $35.00 a share.

13       Q.     And the rest of the -- so the total

14   share price was 355 --

15       A.     Right.

16       Q.     -- broken down by equity and debt?

17       A.     Correct.

18       Q.     Now, if you could look at what's been

19   marked as Hall-52 for identification.  This is

20   minutes from the -- from GlassBridge's board of

21   directors meeting on December 9, 2019.  It's been

22   Bates stamped GBE_0009062 through 9063.

23              The -- the first thing I want to ask

24   you is it reflects here that Daniel Strauss was the

25   CEO and chief operating officer of GlassBridge at

Page 552

1     the time.  Do you see that?

2          A.     I'm sorry.  Where is that?

3          Q.     It says "Also present at the meeting."

4          A.     Yes.

5          Q.     Was that Mr. Strauss' title with

6     GlassBridge at this time?

7          A.     Well, ultimately, although below,

8     where it says "Daniel Strauss Employment," there

9     were some terms that were being negotiated, but it

10    is clear that the intention was to make -- for him

11    to be the chief executive officer and the chief

12    oper- -- chief operating officer, and that he had

13    resigned from Clinton Group.

14         Q.     Why did he resign from the Clinton

15    Group?

16         A.     To become the chief executive officer

17    of GlassBridge.

18         Q.     Did it have anything to do with the

19    declining business of Clinton Group and the

20    refocusing?

21         A.     No.

22         Q.     And it says here on Office Move,

23    "Management informed the board that the company's

24    office is moving to a smaller office."

25               Does that have anything to do with the

CONFIDENTIAL

Page 553

1    problems that Sport-BLX or the Clinton Group was

2    having with the space located at 510 Madison Avenue?

3              MR. SACK:  Objection to form.

4         A.    Well, I don't keep the minutes of the

5    GlassBridge meeting, I wasn't in the meeting, so I

6    don't know specifically what they're referring to in

7    terms of a smaller office, and Ms. Sersea, serving

8    as secretary of the meeting, probably doesn't think

9    about these types of subtleties, but at this time

10   there was -- this was around the time that we had

11   tried to renegotiate -- Clinton had tried to

12   renegotiate with World Gold, and they had reneged on

13   the deal, so I'm not sure if it was 12/12, but it

14   was around that time.  So...

15             And also at this point, GlassBridge

16   taking on these employees, GlassBridge would be

17   responsible for providing office space.  So I think

18   at this point GlassBridge was considering

19   independently moving to a smaller office because

20   they had a small number of employees.

21        Q.    Okay.  Now, it says here, if you look

22   to the second page, it says, "The meeting continued"

23   and -- and -- first of all, it says, "Mr. De Perio

24   excused himself and left the meeting."

25             Do you understood -- did you understand

CONFIDENTIAL

Page 554

1   that he left the meeting because of a perceived

2   conflict in the transaction that was being

3   discussed?

4                   MR. SACK:  You mean did he understand

5   at that time?

6           Q.    Right.  That he -- that that's why he

7   was leaving the meeting?

8                   MR. SACK:  Does it show Mr. Hall was

9   at the meeting?

10          Q.    Were you -- that's a good question.

11  Were you at this meeting?

12          A.    No, I think I said earlier that I

13  wasn't at this meeting.

14          Q.    Okay.  It says, "The meeting continued

15  and management suggested to the board that acquiring

16  additional ownership in SportBLX from," it says

17  "Mrs.," but it -- it's -- I assume it's Messrs.

18  "De Perio and Hall could be beneficial to the

19  company.  It would give the company voting control

20  of SportBLX.  The board asked questions, discussed

21  and deliberated.  Upon a motion duly made and

22  seconded, the board authorized management to

23  negotiate a transaction," again, when it says

24  "Mrs.," but I assume it would mean Messrs. "De Perio

25  and Hall and report back to the board."

CONFIDENTIAL

Page 555

1          Do you know who the management is

2      they're referring to there?

3          A.    I think manage- --

4          MR. SACK:   Objection to the form.

5          A.    I think management was Daniel Strauss.

6          Q.    Okay.  And -- and in fact, it -- as of

7      after this meeting on December 9, did you begin to

8      negotiate a transaction for the sale of your shares

9      and Mr. De Perio's shares to GlassBridge?

10         A.    Well, at some point after this we did

11     the transaction.  I'm not sure what days the

12     negotiation were on, but after this meeting I would

13     assume so, yes.

14         Q.    And just so, again, so I understand it,

15     as of the date of the board meeting had you already

16     proposed the terms for both -- well, start with the

17     purchase price of the -- of the shares.

18         A.    I don't recall if the terms had been

19     specifically discussed at -- at this point, but I

20     think it was known by both sides that part of the

21     advantage was given the upcoming Orix transaction,

22     that needed to be somewhat consistent with the

23     previous transaction.

24         Q.    Okay.  And -- and had you discussed at

25     this point, going into this board meeting on

CONFIDENTIAL

Page 556

1    December 9, do you know whether you had already
2    discussed the -- the breakup between the debt and
3    the equity of the deal?
4         A.    Well, I don't know if -- when you say
5    going into the meeting, I wasn't in the meeting.
6    You're just talking about going into December 9?
7         Q.    Yeah, going into December 9.
8         A.    I was somewhere else.  Yes.
9               It was clear at that point that most of
10   it would have to be debt.
11              So everything really changed when Orix
12   did the transaction.  GlassBridge was on the verge
13   of bankruptcy, the verge of insolvency and
14   defaulting on various obligations until the Orix
15   transaction happened.  Once the Orix transaction
16   happened, GlassBridge had not only cash on its
17   balance sheet, but had the ability to look at other
18   transactions and had to focus on the second part of
19   the Orix transaction, which is somewhat complicated.
20   One of the -- one of the things they did along those
21   lines was increase their position in what was then
22   one of their -- one of the few assets that they had.
23        Q.    Now, in terms --
24        A.    If -- if I may, one of the things that
25   was also important that I didn't mention before, the

CONFIDENTIAL

Page 557

1    -- by having 51 percent or 50 percent of an

2    operating company, it relieved GlassBridge of

3    potential risks of becoming an investment company

4    per the 1940 Act, which is always on the company's

5    mind.  So the big asset that they had other than

6    Sport-BLX was ARRIVE, and Sport-BLX, because of

7    their minority position, would be viewed as a

8    security under the SEC's definition and the Howey

9    test and so forth.  But by taking more than 50

10   percent, then there's exceptions to the investment

11   company rule that that would no longer be considered

12   a security.

13              So there were a lot of complex reasons

14   why this was done, but it certainly helped

15   Sport-BLX, Incorporated because it now had a

16   well-capitalized big brother, for lack of a better

17   word.

18         Q.    And is it fair to say that you never

19   considered including other shareholders from

20   Sport-BLX in this transaction?

21              MR. SACK:  Objection to the form.

22         A.    Well, to include -- I'm quite

23   confident that none of the shareholders, if they

24   really understood it, would have wanted to do this

25   transaction because it was not in their interests.

Page 558

1      Q.    So the -- it's fair to say that based
2  on your judgment, you decided not to include the
3  other shareholders in this transaction?
4            MR. SACK:  Objection to the form.
5      A.    The transaction was between three
6  parties:  GlassBridge, De Perio, and myself.  It had
7  nothing to do with the company itself.  As manager
8  of the company, it's -- it's up to -- up to me to
9  decide which -- or to present things that I think
10 are good for shareholders, and given the information
11 I had at the time, it was clear that this deal would
12 not have been acceptable to any shareholders, given
13 the most recent board meeting and valuations that at
14 least one of the shareholders thought the company
15 was worth.
16     Q.    Okay.  Mr. Hall, can you turn to --
17 we're going to show you what's been marked Hall-53
18 for identification.  These are GlassBridge board
19 minutes from December 11, 2019, that have been Bates
20 stamped GBE_0009060 through 9061.
21            (Exhibit Hall-53, Two-page Minutes of
22 the Regular Meeting of the Board of Directors of
23 GlassBridge Enterprises, Inc. dated December 11,
24 2019, stamped GBE_0009060 and 9061, is marked for
25 identification.)

CONFIDENTIAL

Page 559

1      Q.    So Mr. Hall, this -- this is another

2  set of board minutes from GlassBridge dated December

3  11, 2019, and as you see, it's a board meeting where

4  you were not present as well.  Do you recall that

5  two days after your initial -- the initial board

6  meeting to consider your transaction that there was

7  a subsequent board meeting?

8              MR. SACK:  I'm sorry.  Could I have

9  that question again, please?

10             (Last question is read back by the

11  court reporter.)

12     A.    Actually, I'm not sure the premise is

13  correct.  I think I was in attendance at this

14  meeting.

15     Q.    You think you were -- you were present?

16  Is there someplace --

17     A.    Well, --

18     Q.    -- on this -- on this document that

19  indicates --

20     A.    Well, --

21     Q.    -- that you were present at that

22  December 11 board meeting?

23     A.    "The board asked questions and

24  discussed the opportunity to purchase shares in

25  Sport-BLX from George Hall and Joe De Perio," so

CONFIDENTIAL

Page 560

1    it's a little -- it's not totally clearly written,
2    but this may have been the meeting where Joe and I
3    answered questions from the board.
4         Q.    How many -- how many meetings did you
5    and Mr. De Perio attend of the -- of the GlassBridge
6    board where you were asked and answered questions?
7         A.    Just one.
8         Q.    Okay.
9         A.    For me.  I don't -- I don't know about
10   Joe De Perio.
11        Q.    Okay.  And again, this -- this
12   indicates that you weren't there?
13        A.    I assume that -- I'm not sure.  It
14   says "The board asked questions," and at the end it
15   says "from George Hall and Joe De Perio."
16             MR. SACK:  I think the reference is to
17   who was present at the meeting up here.  I think
18   that's maybe --
19             THE WITNESS:  Oh.
20             MR. SACK:  -- what Mr. Pearlson is
21   referring to.
22        A.    Okay.  This -- I was not there.
23        Q.    Okay.  Do you recall what discussions,
24   if any, took place between you and representatives
25   of GlassBridge concerning the potential purchase of

CONFIDENTIAL

Page 561

1    your shares and Mr. De Perio's shares between
2    December 9 and December 11?
3         A.    I don't specifically recall what
4    occurred between the 9th and the 11th.
5         Q.    Had you agreed upon terms at that
6    point?
7         A.    I don't recall when the terms were
8    agreed to.
9         Q.    Had you drafted any documents for -- in
10   contemplation of the proposed transaction?
11        A.    I did not draft any documents.
12        Q.    Did you present -- in connection with
13   the December 11 meeting, did you present the
14   GlassBridge board with any documents or materials to
15   consider in their deliberations?
16        A.    Well, I think -- I think it was said
17   before that I wasn't at the meeting.
18        Q.    No, I know, but the question is are you
19   aware of either yourself or Mr. De Perio giving any
20   written materials or -- for the board to consider in
21   conjunction with the proposed transaction that you
22   were discussing with GlassBridge?
23        A.    I'm confident I didn't give them any
24   written material.  I'm -- I don't know if Joe did,
25   but very likely not.

CONFIDENTIAL

Page 562

1          Q.    Did you use counsel in connection with
2    this transaction?
3          A.    No.
4          Q.    Did -- who drafted the documents --
5    well, strike that.
6                First of all, ultimately did you reach
7    a deal with GlassBridge to sell your shares and
8    Mr. De Perio's shares?
9          A.    I reached a deal with GlassBridge to
10   sell my shares.  Mr. De Perio reached a deal with
11   GlassBridge to sell his shares.
12         Q.    And who drafted the documents that were
13   used to memorialize that transaction?
14         A.    I believe it was Loeb & Loeb.
15         Q.    Okay.  And who retained Loeb & Loeb for
16   that purpose?
17         A.    GlassBridge.
18         Q.    Okay.  And do you recall when they
19   first drafted the documents?  When you first saw the
20   drafts of documents?
21         A.    I don't recall.
22               MR. PEARLSON:  Okay.  Why don't we
23   break here, and this is a good breaking point, and
24   we'll have to have another day where we do a few
25   hours by Zoom, and we'll be done.

CONFIDENTIAL

Page 563

1           Okay.  Thank you, Mr. Hall.

2           THE WITNESS:  Thank you.

3           THE VIDEOGRAPHER:  It's 5:52 p.m.

4     We're going off the record.

5           (Deposition concluded at 5:52 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 564

1                    CERTIFICATE OF DEPONENT

2

3            I have read the foregoing transcript of

4    my deposition and except for any corrections or

5    changes noted on the errata sheet, I hereby

6    subscribe to the transcript as an accurate record

7    of the statements made by me.

8

9

                   _____

10                         GEORGE HALL

11

12           SUBSCRIBED AND SWORN before and to me

13   this _____ day of _____, 20____.

14

15

16                 _____

17                        NOTARY PUBLIC

18

19

20   My Commission expires:

21

22

23

24

25

CONFIDENTIAL

Page 565

1                C E R T I F I C A T E

2

3          I, MARGARET VOLLMUTH-CORSON, a Certified

4   Court Reporter of the State of New Jersey, DO HEREBY

5   CERTIFY that, prior to the commencement of the

6   examination, GEORGE HALL was reminded of his oath to

7   testify to the truth, the whole truth, and nothing

8   but the truth.

9          I DO FURTHER CERTIFY that the foregoing is a

10  true and accurate transcript of the testimony as

11  taken stenographically by and before me at the time

12  and place and on the date hereinbefore set forth.

13         I DO FURTHER CERTIFY that I am neither a

14  relative nor employee nor attorney nor counsel of

15  any of the parties to this action and that I am

16  neither a relative nor employee of such attorney or

17  counsel and that I am not financially interested in

18  this action.

19

20

21

22         MARGARET VOLLMUTH-CORSON, C.C.R. 30XI00158400

23

    This transcript was prepared in accordance with

24  N.J.A.C. 13:43-5.9.

25

CONFIDENTIAL

Page 566

1                           ERRATA SHEET
                      VERITEXT/NEW YORK REPORTING, LLC
2         CASE NAME: Sport-BLX, Inc., Individually And
          Derivatively On Behalf Of Its Shareholders v. Michael
3         Salerno
          DATE OF DEPOSITION: 6/21/2023
4         WITNESSES' NAME: George Hall
5          PAGE   LINE (S)        CHANGE              REASON
          ____|_____|_____|_____
6
          ____|_____|_____|_____
7
          ____|_____|_____|_____
8
          ____|_____|_____|_____
9
          ____|_____|_____|_____
10
          ____|_____|_____|_____
11
          ____|_____|_____|_____
12
          ____|_____|_____|_____
13
          ____|_____|_____|_____
14
          ____|_____|_____|_____
15
          ____|_____|_____|_____
16
          ____|_____|_____|_____
17
          ____|_____|_____|_____
18
          ____|_____|_____|_____
19
          ____|_____|_____|_____
20
21                         _____
                                    George Hall
22        SUBSCRIBED AND SWORN TO BEFORE ME
          THIS _____ DAY OF _____, 20__.
23
24
          _____    _____
25        (NOTARY PUBLIC)          MY COMMISSION EXPIRES:

**[& - 2]**                                        Page 1

| & | | | |
|---|---|---|---|

**&**

**&**   278:23 279:2
279:8,19
286:19 287:8
287:15 562:14
562:15

**0**

**00001215**
281:20 326:12
**00001216**
326:16
**0003774**  281:15
303:8 438:2
**0003775**  303:18
**0005173**  283:19
458:15 459:18
**0009060**  285:3
558:20,24
**0009062**  284:25
549:15 551:22
**0009235**  284:14
517:22 518:3
**0011474**  284:20
534:12 536:16
**01243**  278:4
286:17
**0128721**  493:13
**0153550**  385:6
**07068**  279:3
**07601**  279:16

**1**

**1**  284:14 286:9
322:20,20
324:15 350:11

370:14 393:5
403:20 517:21
518:8 527:25
**1,681**  538:3
**1.2**  521:11
**1.6**  354:24
**10**  282:4
283:19 284:16
337:15,16
339:11 384:25
408:22 458:14
459:15 466:2
466:11 523:17
524:7 548:7
**10.00**  511:13
**10017**  279:9
**10022**  452:6
**10065**  288:2
**10154**  279:20
**105**  278:23
279:2
**11**  282:1
284:16 285:3
308:6 368:20
392:20 523:15
523:16 524:8
558:19,23
559:3,22 561:2
561:13
**11476**  284:21
534:12 536:17
**118.00**  359:4
**11:38**  361:24
**11:40**  370:13

**11th**  561:4
**12**  296:18,20
355:22 432:7
433:3 454:15
454:17
**12/12**  553:13
**12/16**  283:21
470:2
**12/23**  284:1
477:19
**12/23/2019**
283:21 470:3
**12/27/2019**
284:1 477:20
**1215**  326:18,20
**1217**  281:21
326:12,17
**128721**  284:8
492:1
**12:14**  378:11
**12:17**  378:13
**12:33**  390:13
390:15
**13**  297:22
524:20 527:5
**13966**  565:21
**13:43-5.9.**
565:24
**14**  281:14
303:7,16,19
304:19,20
342:8 438:4,15
438:20,22
**15**  410:9
524:14 525:14

525:21 526:10
526:22 527:2
**152**  347:14
**153550**  282:7
385:2
**16**  441:11
444:22 445:12
446:12 447:13
470:11
**17**  284:4 471:5
491:22 493:9
521:23
**18**  337:15,16
388:18
**19**  319:23
344:22,23
347:22 517:4
**1940**  557:4
**1:22**  278:13
**1:24**  390:16,17
**1:38**  361:21

**2**

**2**  296:15,19
323:6 347:16
348:25 349:5
353:24 354:10
355:22 356:22
357:1 359:9
360:2,2 394:8
400:2 401:8
402:9 403:6,6
403:12 408:21
415:3 452:24
479:1 500:10
527:11

CONFIDENTIAL

**[2'19 - 26]**

| | | | |
|---|---|---|---|
| **2'19**   538:5 | 284:17,20,24 | 480:2 498:12 | **212**   279:9,20 |
| **2,244**   370:15 | 285:3 292:1,4 | 498:12 502:18 | **218.00**   370:16 |
| **2,635,000** | 292:19 294:10 | 502:19 503:9 | **22**   278:4 |
| 527:15 | 297:4,6,22 | 510:16 515:5 | 282:14 286:14 |
| **2.0**   504:6 | 298:8 302:21 | 517:15,21 | 286:17 405:24 |
| **20**   284:6 | 303:7,17,20 | 518:4 519:6,9 | **22.3**   409:10 |
| 344:13,17 | 305:2 306:19 | 523:18 524:10 | **23**   283:14 |
| 347:22 373:20 | 310:22,23 | 524:20 529:6,7 | 406:11 448:14 |
| 373:25 374:22 | 311:5,7,11 | 529:10 531:4 | 449:10 450:1 |
| 374:23 377:23 | 317:7,9 318:5 | 534:11,17 | 452:2,19 |
| 491:24 564:13 | 318:7 319:21 | 539:3 540:9,15 | 456:13,23 |
| 566:22 | 319:22,25 | 540:24 541:8 | 470:12 473:24 |
| **200**   360:18 | 320:1,24 321:2 | 546:24 549:15 | 473:25 474:4 |
| 530:25 | 321:4,13,18 | 551:21 558:19 | 481:24 |
| **200.00**   330:8 | 322:8,11 325:6 | 558:24 559:3 | **23rd**   482:2,11 |
| 331:14,16 | 326:4,10 327:6 | **2020**   284:4 | 482:12,14 |
| 332:6,8 355:2 | 327:20 328:15 | 294:8 295:23 | **25**   279:15 |
| 355:11 357:14 | 341:8 344:21 | 295:25 435:21 | 281:18 326:7,9 |
| 357:15 358:6 | 345:21 347:4 | 488:22 491:23 | 326:15 328:21 |
| 358:12 360:10 | 347:22 350:5 | 493:9 500:22 | 329:1,4 332:18 |
| 360:25 361:4 | 355:19 356:2 | 502:19 505:1 | 332:20 336:10 |
| **200.18**   332:11 | 373:25 374:5 | 510:19 532:12 | 336:11,12 |
| 332:17 | 377:23 379:3 | **2021**   500:10 | 346:14 348:2 |
| **201**   279:16 | 387:18 388:15 | 504:7 507:14 | 396:6 397:6,9 |
| **2017-18**   316:24 | 389:3 403:18 | 510:18,21 | 397:18,18,19 |
| **2018**   282:5 | 405:25 411:25 | 511:20 513:11 | 398:14 400:10 |
| 296:25 319:23 | 414:15 419:1 | **2023**   278:24 | 400:17,23 |
| 384:25 385:17 | 432:7 433:2,3 | 286:3 | 401:6 403:20 |
| 388:19,23 | 436:22 438:4 | **2026**   519:8,11 | 404:8 531:1 |
| 389:3 503:6 | 438:15 441:11 | **21**   278:24 | 532:1 |
| 515:4 517:4 | 444:22 445:12 | 281:19,22 | **250,000**   330:4 |
| **2019**   281:14,19 | 447:14 448:15 | 286:2 326:10 | **257.00**   357:4,9 |
| 281:22 282:8 | 449:10 450:1 | 329:15 347:3 | 357:16 |
| 282:14 283:14 | 456:13,23 | 349:9 | **26**   281:22 |
| 283:19 284:14 | 458:14 459:15 | | 322:14 347:2,3 |

**[263 - 5]**                                                                                                   Page 3

**263**  532:3
**263.00**  530:10
  530:19 532:1
  532:19 533:13
**27**  295:23,25
  480:2 481:25
  484:25 487:18
**27556**  282:25
  421:17,24
**27th**  482:3,7,8
  482:17
**28**  282:1
  368:18,20
  369:13 518:22
**288**  281:4
**29**  281:22
  282:4,12 347:4
  352:1 355:23
  356:7 384:23
  384:24 385:4
  390:19 515:25
**295**  281:9
**2:03**  349:9
**2:09**  426:13
**2:11**  426:16
**2:39**  448:24
  449:1
**2:59**  449:1,2

**3**

**3**  282:8,14
  296:5,24
  387:17 403:19
  405:24
**30**  282:8 323:1
  324:13 387:16

387:17 388:3
516:1 518:22
519:6,8,9,11
**303**  281:12
**30xi00158400**
  565:22
**31**  284:17
  311:7 329:15
  352:1 523:18
  524:10
**314**  281:16
**32**  282:12
  390:19,24
**326**  281:18
**34**  282:14
  405:23,24
  406:6
**345**  279:19
**346**  538:4
**346.00**  538:20
  539:21
**347**  281:22
**35**  282:19
  413:17,18,23
  414:1 530:22
  531:6 532:4,5
  532:6,20,21
  533:4 539:4
**35.00**  551:6,8
  551:12
**355**  551:2,14
**356**  551:2
**36**  282:22
  421:13,14,22

**368**  282:1
**3776**  281:15
  303:8 438:3
**38**  283:1
  426:19,25
**384**  282:4
**387**  282:8
**39**  283:4
  431:25 432:1,5
**390**  282:12
**3:52**  490:11,13

**4**

**4**  296:18,20
  297:20,23
  370:14 454:14
  519:10 521:8
**40**  281:12
  303:3,5,10,11
  303:14 436:7,8
  438:1
**405**  282:14
**407-4852**
  279:20
**41**  283:7 445:4
  445:5,11
**413**  282:19
**42**  283:10
  447:3,4,10
**421**  282:22
**426**  283:1
**43**  283:14
  448:13,14
  449:6
**432**  283:4

**44**  283:17
  449:6 458:11
  458:12
**445**  283:7
**447**  283:10
**448**  283:14
**45**  283:21
  470:1,2,8
**458**  283:17
**46**  284:1
  477:18,19,25
  478:23
**47**  284:4
  491:21,22
  493:1
**470**  283:21
**477**  284:1
**48**  284:9 500:3
  500:4,8
**48152**  281:25
  347:6
**49**  284:12
  517:18,19
  518:1 540:12
**49.6**  409:9
**491**  284:4
**49509**  409:3
**49523**  282:18
  406:3
**4:08**  490:13,14

**5**

**5**  329:25
  394:10,18,25
  421:25 451:21
  494:10

CONFIDENTIAL

## [5/2/21 - 9300]

Page 4

**5/2/21**  284:9
  500:4
**50**  538:25
  539:2,13
  543:12 544:22
  547:16 557:1,9
**500**  284:9
**500,000**  308:3
**500,000.00**
  289:13 290:3
  290:17 291:6
  293:2 308:16
  308:19 309:2
**50526**  414:4
**50528**  282:21
  406:8 413:20
  414:3
**50631**  283:3
  426:22
**50787**  283:13
  447:7
**50789**  283:9
  445:8
**51**  284:18
  534:8,9 536:14
  557:1
**510**  289:1
  290:1 291:13
  291:16,19
  295:15 298:3
  298:16 303:21
  305:22 306:6
  325:23 365:16
  366:7,12
  449:12 452:5

**452:11 454:5,6**
  553:2
**517**  284:12
**5175**  283:20
  458:15 459:18
**52**  284:22
  549:11,12
  551:19
**523**  284:16
  406:10,14,16
**52353**  283:16
  448:16
**52397**  283:23
  470:5,10
**52410**  284:3
  477:22 478:25
**525-6305**
  279:16
**53**  285:1
  558:17,21
**530-2100**  279:3
**534**  284:18
**549**  284:22
**558**  285:1
**565**  279:8
**57.00**  357:17
**5:12**  540:3,5
**5:23**  540:5,6
**5:52**  563:3,5

### 6

**6**  288:1
**6/21/2023**
  566:3
**600**  527:12

**635,000**  527:13
**655**  527:13
**66**  284:12
  517:19
**69th**  288:1

### 7

**7**  302:12
  365:22,23
**7/20/2019**
  282:2 368:22
**7034**  371:2
**7035**  369:19
  370:12 371:6
**7043**  282:3
  368:23 369:15
**71.9**  408:23
  412:6
**74**  524:12
**788**  445:13
**789**  445:13

### 8

**8**  282:8 300:4
  353:2 387:18
  388:14 389:6
**8/12/2019**
  283:4 432:1
**8/16**  283:7,10
  445:5 447:4
**8/17/2019**
  283:7,10 445:6
  447:5
**8/2**  282:20
  413:19

**8/5**  282:24
  421:16
**8/5/2019**
  282:20 413:19
**8/9/19**  282:24
  283:2 421:16
  426:21
**8111**  278:13
  286:14
**82**  281:9
  294:25 295:2,7
**85**  281:16
  284:16 314:21
  314:22 315:1
  523:16 524:12
**856-9600**  279:9

### 9

**9**  282:14
  284:24 315:15
  320:18 405:25
  408:4 427:2
  452:24 519:7
  521:8 549:14
  551:21 555:7
  556:1,6,7
  561:2
**9061**  285:4
  558:20,24
**9063**  284:25
  549:15 551:22
**92553**  282:11
  387:20 388:4
**9300**  284:15
  517:22 518:3

CONFIDENTIAL

**[95.00 - advising]**                                                   Page 5

| | | | |
|---|---|---|---|
| **95.00** 331:14 | **accounts** | **actually** 294:10 | **adds** 408:23 |
| **973** 279:3 | 367:12 | 301:19 335:3 | **adequate** |
| **9:30** 288:19 | **accuracy** | 338:10 340:12 | 411:22 |
| **9th** 561:4 | 335:19 441:3 | 343:19 345:18 | **administer** |
| **a** | **accurate** 409:9 | 350:24 355:8 | 286:23 |
| **a.m.** 278:24 | 429:11 441:4 | 364:4,10 376:5 | **administrators** |
| 286:2 361:21 | 564:6 565:10 | 377:17 379:13 | 310:10 |
| 361:25 362:1 | **accused** 372:18 | 385:20 399:16 | **advance** 362:22 |
| **abandoned** | **acknowledged** | 436:10 465:10 | 423:20 458:20 |
| 489:6 | 338:11 376:13 | 465:10 466:23 | **advanced** |
| **ability** 556:17 | 486:12 | 468:12 479:2 | 341:7 509:20 |
| **able** 306:14 | **acquire** 497:8 | 484:11 519:20 | **advantage** |
| 333:11 358:2 | 512:2 513:5 | 538:3 545:1 | 541:10 544:2,7 |
| 411:17 462:23 | 548:11 | 559:12 | 545:3 555:21 |
| **above** 359:12 | **acquired** 513:2 | **ad** 444:5 | **advantages** |
| 359:12 415:2 | **acquiring** | **add** 313:7 | 541:10,13,14 |
| **abramowitz** | 531:16,17 | 354:7 409:2 | 543:7,9,11,16 |
| 279:8 287:11 | 554:15 | **added** 529:24 | 544:11 |
| **absurd** 357:11 | **act** 345:11 | 529:25 | **advice** 389:17 |
| 357:12 | 382:23 456:17 | **addition** | 389:19,25 |
| **acceptable** | 557:4 | 324:14 351:7 | 390:6,9 400:7 |
| 333:3,5 429:13 | **acting** 517:6,7 | 351:17 365:12 | 431:11 456:9 |
| 539:22 558:12 | 517:7 | 366:6,21 | 460:15,18,22 |
| **access** 429:3 | **action** 286:24 | 459:12 503:11 | 462:2,8 463:9 |
| **accommodated** | 467:8,23 | 515:23 | **advise** 305:4 |
| 334:8 | 535:11 565:15 | **additional** | 351:21 422:4 |
| **accomplish** | 565:18 | 334:13 370:9 | 422:11 430:11 |
| 444:16 | **actions** 388:22 | 374:5 416:19 | 545:25 |
| **accordance** | **activities** 307:8 | 451:17 504:8 | **advised** 349:24 |
| 565:23 | **acts** 372:16,19 | 529:8,11,16 | 442:16 469:14 |
| **accountant** | 372:25 373:16 | 532:19 554:16 | 478:7 528:5,7 |
| 320:15 | 373:17 | **address** 376:16 | 528:11 |
| **accounting** | **actual** 387:4 | **addresses** | **advising** |
| 293:9 544:3,6 | 407:13 527:24 | 306:4 385:11 | 345:21 352:4 |
| 544:24 548:9 | | | 528:20 |

CONFIDENTIAL

**[advisor - anybody]**                                                         Page 6

**advisor**  374:15
  515:7
**advisors**  377:8
  377:13,16,18
  377:20
**advisory**
  443:25 526:1
**affiliate**  322:20
  322:20 323:6
  324:15 344:5
  382:24 383:2
  544:23
**affiliated**
  343:21,21
  353:4 488:8
**affiliates**
  320:19,21
  487:22
**affiliation**
  339:25
**affiliations**
  287:4
**affirmative**
  380:19
**afraid**  431:2
**agenda**  458:22
  458:25 459:6
  459:12
**agents**  322:1
  335:11 509:23
**agree**  286:7
  363:19,21
  376:14 480:2
  513:20 514:21
  548:24

**agreed**  324:2
  333:2 376:14
  441:8 480:5
  527:1 535:21
  539:12 548:22
  550:14 551:3
  561:5,8
**agreeing**
  487:15
**agreement**
  284:13 318:13
  370:15 380:4,5
  380:22 452:3
  476:11 504:18
  504:23 505:3
  512:7 515:12
  517:20 518:2,6
  518:19 519:1
  521:6,18 522:5
  522:6,8,12,25
  523:4,7,10,13
  525:1 529:5
**ahead**  324:15
  366:5 428:4
  484:4
**al**  286:14
**allegation**
  297:4 312:13
**allegations**
  356:20
**alleged**  313:15
**allocation**
  308:2
**allow**  354:8
  431:16

**allowed**  309:16
**alluded**  368:14
**alter**  465:23
  466:16
**alternate**
  465:19 467:14
**alternative**
  291:12 305:11
  424:15 443:1
  466:24 467:5
  468:4,6 497:1
**alternatives**
  424:8 513:12
**altogether**
  297:3
**american**  367:9
  514:17
**amount**  289:5
  299:21,24
  312:12 316:22
  316:23 317:4
  322:3 519:7,10
  521:21 523:19
  544:25 547:24
  548:5
**analysis**  308:11
  333:7 365:8
**andrew**  284:10
  500:5,10 507:7
**anello**  279:8
**annual**  381:23
**answer**  298:18
  300:18 308:24
  310:15 311:2
  320:7,11

329:24 330:2
  331:6 334:10
  336:3 340:22
  359:14 363:16
  366:19 387:11
  398:24 399:1
  402:17 404:15
  412:13 420:8
  421:4 428:23
  430:6 445:18
  453:11 454:7
  471:11 495:10
  502:17 510:10
  520:14
**answered**
  307:14 324:20
  340:9 391:13
  436:12 437:16
  560:3,6
**answering**
  407:13
**answers**  429:7
  434:5
**anticipate**
  291:9 309:12
  309:16
**anticipated**
  290:18 335:7
**anticipation**
  494:4
**anybody**  290:6
  318:17 328:1
  355:12 359:18
  359:21 374:21
  405:7,15 418:2

**[anybody - asked]** Page 7

431:20 456:2
477:14 483:5,6
484:19,21,24
485:3 505:10
505:17 508:18
528:9 529:1
545:25
**anymore** 305:9
**anytime** 316:15
345:25
**anyway** 454:20
**apart** 345:12
**apologize**
345:24 362:17
531:14
**appear** 437:20
493:15
**appearance**
287:2
**appearances**
287:4
**appeared**
436:11 437:10
437:15
**appears** 438:3
455:4 521:23
**applicant** 383:4
393:8 394:9,12
394:15 395:2
413:5 420:14
430:21 431:17
434:24,24
439:12,15,18
440:22 451:13
462:16

**applicants**
386:19
**application**
282:12 382:4,5
382:14,16
384:3,14
385:16 386:2
387:4 388:7,24
389:1,23 390:7
390:20,25
391:17,22
392:1,11,18
393:13,17
400:22 404:7
404:18,25
405:4,9,12
407:5 412:24
414:15,18
416:3,10
417:11 419:14
419:16,19
424:6 431:16
434:7,10,20
435:4,25 436:3
436:13 438:8
438:18,22,23
440:24 441:24
441:24 442:3,9
442:11 443:2
448:6 457:5
460:6,12
462:17 463:25
464:6,8 466:3
466:11,13,18
469:6 470:21

472:1 473:8,17
473:19 474:6
475:19,25
478:5 480:8,22
483:1 485:5
487:21,23
488:2 491:8,9
493:17
**applications**
384:10 393:7,9
393:19
**applied** 490:19
**applies** 404:11
**apply** 386:23
395:13 399:8
399:10,12,14
402:7 438:19
**applying**
435:11 467:21
490:20 494:5
**appreciation**
333:16
**apprised**
535:13
**approach**
498:8 542:3
**approached**
312:24 546:7
**appropriate**
288:22 331:17
332:15 351:7
351:18 358:14
363:8 364:4
430:10,10
470:21 542:17

548:4
**approval**
323:19 324:1,9
433:24 460:1
535:1
**approvals**
491:5 535:2
**approved**
459:21,25
478:5,19 506:5
506:21 524:20
525:14,24
530:2,5 534:22
534:24 535:12
**approximate**
334:25
**approximately**
278:24 358:7
359:4 361:4
530:19
**april** 308:6
344:22 345:16
345:19 370:14
435:21 488:22
**arising** 302:18
**arm's** 331:22
**arose** 478:17
**arrive** 321:15
529:24 557:6
**arrived** 413:8
530:20 538:23
**art** 365:7
**asked** 307:13
312:18 324:19
337:25 340:8

**[asked - authorized]**

364:11 371:15
371:17,18,25
372:4 373:10
374:16,19
377:17 391:12
415:3 417:8,9
422:1 425:16
425:17 429:2,9
431:8,21
441:23 446:7
446:11 449:5
464:23 475:8
475:12 477:3
479:22 483:17
503:1 554:20
559:23 560:6
560:14
**asking** 307:16
336:16 337:18
338:12 349:13
389:21 398:1
399:5 400:12
411:7 412:8
414:10 415:14
417:20 422:13
422:21 427:4
438:24 451:12
451:16 455:3
464:18 471:2
483:10
**asks** 412:4
423:1
**asset** 343:17
382:8 545:4,10
557:5

**assets** 316:16
317:5 335:5
342:13 343:14
344:2 383:10
383:11 489:15
489:17,20
490:4 501:19
504:21 507:4
519:23 532:13
556:22
**assigned** 520:1
520:16
**assignment**
302:11
**assist** 364:25
384:13,14
385:15 391:21
**associates**
408:16
**assume** 315:10
340:10 355:24
371:18 407:17
413:11 417:1
437:23 457:22
506:11 514:17
554:17,24
555:13 560:13
**assumed**
309:20,21
**assuming**
468:16
**assured** 473:20
474:9 476:24
**athlete** 383:15
501:2,6

**athlete's** 382:8
383:11
**athletes** 322:1,9
335:11 338:17
338:25 339:19
340:15,25
343:25 508:21
509:21,25
**ats** 497:1,5,6,12
497:13,19
**attach** 372:4
**attached**
282:16 347:17
348:18 349:17
382:10 406:2
416:14 493:21
**attaching** 284:6
491:24
**attachment**
281:20 326:11
349:20 406:19
406:21,24
**attachments**
406:22 493:7
**attempt** 335:18
**attempted**
330:23
**attempts**
484:12 507:18
510:15
**attend** 560:5
**attendance**
559:13
**attended** 351:4
436:18

**attention** 296:5
347:15 414:8
432:8 445:17
454:14 468:3
478:24 479:1
**attorney** 287:5
301:11 390:4
565:14,16
**attorneys** 279:6
279:13,18,22
419:12
**attract** 335:5
374:4
**attributed**
289:13 366:3
**audio** 286:6
**august** 281:14
283:14 284:4
303:7,16,19
304:19,20
379:2 381:3
414:15 419:1
421:25 427:1
432:7 433:3
438:4,15,20,21
441:11 444:22
445:12 446:12
447:13 448:14
449:10,25
456:13,23
483:20,21,23
491:22 493:9
**authorized**
286:23 554:22

CONFIDENTIAL

**[available - bd]**                                                    Page 9

**available**
  330:18 424:8
  545:11
**avenue**  279:8
  279:19 289:1
  290:1 291:14
  291:16,19
  298:3 303:21
  305:22 306:6
  449:13 452:6
  452:11 454:5,6
  553:2
**avoided**  460:20
**awakening**
  484:11,12
**aware**  315:11
  340:5 366:6
  388:21 392:8
  400:9,16 416:9
  418:2 422:5
  478:15 479:7
  479:13 480:13
  480:19 481:4
  488:6 508:1
  510:15 561:19
**awareness**
  400:13

**b**

**b**  393:9 394:8
  394:22 395:12
  395:13,16
  396:25 397:11
  397:12,13
  399:2,5,7,8,10
  399:11,11,13

399:13,21,25
400:1,2,2,2,20
402:8,9,23
403:3,4,5,12,24
404:10 409:7
**back**  310:13
  316:17,18
  320:17 345:25
  350:10 355:22
  358:22 362:2
  362:16 368:15
  375:20 378:13
  378:15 385:16
  390:18 398:19
  398:21 416:18
  421:3,6,24
  441:8,16,20
  444:20,21,22
  444:25 448:22
  449:3 463:1,3
  471:5 474:22
  476:3 485:16
  486:22 490:8
  490:15 491:5
  498:11 499:25
  520:11 522:16
  522:20 523:15
  524:6 540:7
  543:19 549:23
  549:24 554:25
  559:10
**background**
  430:9 501:24
**backup**  310:2

**bad**  496:10
  545:17,23
**badly**  325:17
**baez**  278:8
  279:14 287:14
  469:23,24
  479:9,12,21
  481:6,14
**balance**  299:22
  320:8,12
  532:14 545:5
  545:12 556:17
**banker**  500:14
**bankruptcy**
  543:4 556:13
**barrier**  380:23
**base**  447:23
**based**  293:3
  301:14 309:4,5
  333:12 335:10
  380:10,19
  404:4 420:16
  420:20 440:1
  488:5 530:25
  532:1,5,20,23
  533:1,5,7,15
  539:25 545:22
  558:1
**basic**  549:2
**basically**
  391:13 471:14
  497:14 522:9
  539:6
**basing**  430:3

**basis**  297:2
  309:2 316:20
  332:10 353:22
  398:25 420:9
  473:22 474:11
  476:25 530:12
**bates**  281:14,20
  281:24 282:2,6
  282:10,17,20
  282:24 283:2,5
  283:9,12,15,19
  283:23 284:3,7
  284:10,14,20
  284:24 303:8
  303:18 326:11
  326:16 347:5
  347:14 368:22
  385:1,6 387:19
  406:3,7 410:18
  413:20 414:2
  421:16,23
  426:21 432:2,6
  438:2 445:7,12
  447:6 448:15
  451:22 458:14
  459:17 470:4,9
  477:21 491:25
  500:5 517:21
  518:2 534:11
  536:15 549:15
  551:22 558:19
**bd**  282:12
  386:8,17,25
  390:19,25
  391:10,22

CONFIDENTIAL

**[bd - blockchain]**                                                            Page 10

392:22 395:17
398:11 399:5,7
401:24 402:8
416:11 451:13
**becoming**
557:3
**began**  296:25
306:17 334:5
472:4,12
517:14
**beginning**
287:5 320:20
320:22,23,25
321:2,9 337:15
470:11 529:14
**begins**  353:20
389:11
**behalf**  278:4,13
286:12,16
287:20 294:4
305:18 393:13
393:18,20
404:18 435:5
435:14 441:7
453:12 469:6
475:25 505:8
505:25 516:22
527:1 548:16
566:2
**behavior**
373:22 375:2
381:15,25
**beholden**  545:2
**belief**  301:14

**believe**  294:6
295:13 301:13
308:6,13 313:6
314:8,19
316:24 317:18
318:5 319:21
322:3 323:8
327:23 329:19
330:8 331:11
332:11,16,24
333:1,18,22
337:25 339:3
352:9 353:9
356:3 358:5
359:25 360:24
363:24 364:10
366:13 367:23
368:7 372:9
378:1 388:11
388:25 389:2
390:1,3 391:19
395:24 402:3
403:17 404:7
405:21 407:8
417:20 419:23
427:16 428:6
432:22 437:12
438:19 444:3
449:17 459:22
461:21,23
464:15 465:9
469:9 471:22
475:7 480:16
481:13 499:7
504:18 505:11

506:16 508:11
516:19,20
523:7 527:12
529:9 530:23
534:16,21
551:6 562:14
**believed**  320:24
358:13 466:17
**ben**  437:18
**benchmark**
548:6
**bene**  420:11
**beneficial**
312:16 333:19
399:22 417:24
420:11,15
422:2,21 423:4
423:8,13
427:24 428:9
428:10 429:16
431:18,23
435:2 437:18
438:25 439:8
440:7,22
441:10 443:5
447:25 448:4,8
451:16 460:19
462:24 467:19
467:20 468:17
483:2 513:25
554:18
**beneficiary**
425:7
**benefit**  342:7,9
342:24 343:13

377:13 541:18
541:22,23,24
541:25
**benefited**
541:15
**benefiting**
356:17
**best**  336:6,20
353:22 354:23
371:23 442:17
444:16 460:4
467:8,23
474:12
**better**  309:7
431:3 509:2
557:16
**beyond**  363:3
367:1,4 368:16
458:9 504:8
**bid**  358:23
**big**  342:25
484:13 557:5
557:16
**biggest**  344:2
545:3
**bill**  367:8
**bills**  365:19
**binders**  434:1
**bio**  389:10
**bit**  296:11
319:18 431:19
509:4
**block**  389:8,10
**blockchain**
289:20

| blx 278:4,9,9 | 342:9,12,14,16 | 413:5 415:18 | 484:22 485:3,5 |
|---|---|---|---|
| 278:13 279:13 | 342:24 343:2,9 | 415:25 417:10 | 486:1,21 |
| 279:13 281:14 | 344:5 345:7,12 | 417:10 418:3 | 487:20,21,22 |
| 282:16 283:18 | 346:5,10,20 | 420:23 422:6 | 488:4,10,11,11 |
| 284:6 286:12 | 354:4,13,20 | 423:21,24 | 488:16,19,21 |
| 286:14 287:13 | 355:13,18 | 424:2,3,8 | 489:1,6,7,15,18 |
| 287:13 288:25 | 356:11,17 | 428:8 429:8 | 489:21,24,25 |
| 289:6 290:10 | 357:9 358:8 | 431:4,4 435:7 | 490:2,3,18 |
| 290:12,19 | 360:7 363:11 | 435:18,19,24 | 491:12,24 |
| 291:13 292:1 | 364:2,8 365:13 | 436:4,7,21,22 | 493:8,17 |
| 292:19 293:1,4 | 365:20,25 | 437:16 440:5 | 494:16 495:3,6 |
| 293:16,22 | 366:1,9,17,20 | 442:22 443:5 | 495:16,18,19 |
| 297:10 298:5 | 367:10,16,18 | 443:10,12,12 | 495:20,22,23 |
| 298:14 299:2 | 369:3 374:18 | 444:11,17 | 496:1,4,5,7,13 |
| 299:12,24 | 376:23 380:14 | 445:24 447:24 | 496:13 497:3,7 |
| 301:4,8 302:4 | 382:11,17,21 | 449:12,15,22 | 497:14,17,18 |
| 303:7,16 304:4 | 382:24 383:3,5 | 451:12 452:13 | 497:21,25 |
| 304:8,12 305:5 | 383:8,20,24 | 452:15,19,21 | 498:6,10 |
| 305:11,18,21 | 384:1,12 | 453:12,22 | 499:25 502:2,2 |
| 306:6,18 | 386:22 389:20 | 454:4,10,22,23 | 502:3,7,9 |
| 309:22 310:6 | 390:2,7 391:6 | 454:25 455:9 | 503:9,12,14,19 |
| 310:11,20 | 391:10,11 | 455:23 456:2 | 504:2,5,17,19 |
| 311:6,18 | 393:13,18,19 | 456:18 457:5 | 504:19 505:8,9 |
| 312:17 320:24 | 393:20,22,23 | 458:14 459:10 | 505:14,18,23 |
| 321:17,17 | 393:25 394:1,2 | 459:10,16 | 505:25 506:1,5 |
| 322:8 323:6,11 | 394:3,24 395:9 | 462:18 463:24 | 506:11,12 |
| 323:15 324:9 | 395:19,20 | 464:6 466:3,17 | 507:2,13,14,16 |
| 324:12,17,21 | 400:25 402:2,5 | 467:20 468:13 | 507:19,20 |
| 324:22 325:13 | 403:18 404:10 | 468:14,23 | 508:2,3 509:9 |
| 326:2 327:15 | 404:19,19 | 469:6,21 | 510:1 511:20 |
| 327:21 331:15 | 405:9 406:2,24 | 472:19 473:7,7 | 511:21 512:13 |
| 332:4,14 | 407:7,10,23 | 475:25 477:14 | 512:14,20,20 |
| 338:15,18 | 409:15,18,18 | 478:1 480:5 | 512:21,22 |
| 339:1,9,19,20 | 409:21,21 | 481:18 482:23 | 513:1,2,3,4,5,6 |
| 341:4,22 342:7 | 412:8,9 413:4 | 482:25 484:20 | 513:13 519:12 |

CONFIDENTIAL

**[blx - broker]**                                                              Page 12

| | | | |
|---|---|---|---|
| 519:17,18,20 | 323:11,19 | 466:12 470:18 | 470:16 479:1,2 |
| 520:19,24 | 324:1,9 329:21 | 470:24 471:3,9 | 479:3 482:13 |
| 521:1,2,2 | 350:14,22,24 | 471:13 473:5 | 524:13 |
| 528:5,9,13,19 | 351:3,4,9,20,22 | 480:4 487:14 | **bought** 328:4 |
| 528:21 529:1,2 | 352:3 361:10 | 506:5,9,10 | 354:6 355:18 |
| 529:8,8,12,25 | 363:24 364:3 | 515:13 524:20 | 356:1 544:19 |
| 530:2,9,14,16 | 364:17,22 | 525:13,23 | 544:22 |
| 531:18 534:23 | 365:3,9,10 | 526:14 527:10 | **boy** 397:11 |
| 535:16,22 | 367:18 368:3 | 528:8,19 530:2 | **brand** 322:3 |
| 536:11,24 | 373:21,25 | 530:5 534:10 | **break** 293:21 |
| 537:13,18 | 374:2,5,7,9,11 | 534:22 535:1,2 | 347:9 361:20 |
| 538:17 539:10 | 374:13,17,20 | 535:9,11,13 | 387:25 390:12 |
| 539:15 540:10 | 374:22 375:1,3 | 536:20 537:14 | 448:20 490:8 |
| 540:14 541:10 | 375:7,18 376:1 | 537:15 546:1,6 | 540:2 550:22 |
| 541:13,19,22 | 377:1,8,12,12 | 546:12,15,22 | 562:23 |
| 541:23 542:8,9 | 377:15,18,20 | 546:23,25 | **breakdown** |
| 542:10,11,21 | 377:25 378:2,6 | 548:19,19,22 | 308:15,19 |
| 543:7,16,23 | 378:19,19,21 | 548:24,25 | **breaking** |
| 544:2,7,11 | 380:3,7,15,19 | 549:13,21 | 562:23 |
| 545:2,2,15,25 | 380:24 381:12 | 550:2 551:20 | **breakup** 556:2 |
| 553:1 557:6,6 | 381:15,19 | 552:23 554:15 | **brief** 458:22 |
| 557:15,20 | 419:3,7,8,16,22 | 554:20,22,25 | **bring** 319:5 |
| 559:25 566:2 | 425:23 428:22 | 555:15,25 | 323:19 324:1 |
| **blx's** 305:18 | 436:11,17,22 | 558:13,18,22 | 345:4 468:3 |
| 323:10 325:22 | 437:4,10,16,20 | 559:2,3,5,7,22 | **bringing** |
| 340:16 373:25 | 437:23 438:4 | 559:23 560:3,6 | 375:11 376:6,8 |
| 385:16 452:5 | 439:3 443:16 | 560:14 561:14 | **broader** 325:25 |
| 478:17 | 443:17,21,25 | 561:20 | **broke** 288:24 |
| **board** 281:13 | 444:2,6,20,22 | **board's** 468:3 | 362:4 490:18 |
| 283:18 284:19 | 445:1 458:13 | 515:15 | **broken** 551:16 |
| 284:23 285:2 | 458:19,23 | **boils** 344:12 | **broker** 282:13 |
| 303:6,16 304:4 | 459:4,16,20 | **books** 363:2,18 | 382:13,22,25 |
| 304:7,13 305:4 | 460:11,15 | **bottom** 296:18 | 383:4 384:11 |
| 305:5,9 307:7 | 461:3,17,22 | 296:20 348:10 | 386:9,20 |
| 307:7 312:2 | 462:3,7,13 | 350:11 408:14 | 388:10,11 |

CONFIDENTIAL

**[broker - cancel]**                                                           Page 13

390:20 391:1
392:7 423:22
424:9,16,24
425:2,4,7
434:13 435:11
435:14 440:5
442:22 443:2
444:11,14,18
455:24 466:19
467:22 468:10
468:12,22,25
470:18 471:3,6
471:15,18,23
472:5,20
473:16 478:2
478:18,19
485:4,21 486:3
486:22 487:10
487:23 488:17
489:3,9,14
490:20,23
491:1,3,12,17
493:18 494:5
496:8,24,25
498:19 504:1
512:8,15,23
513:3 514:1
**brokers** 453:2
**brother** 388:6
557:16
**brought** 307:25
308:2,3,5
428:22
**budget** 433:24

**build** 496:2
**built** 321:22
363:5 508:7
**bulk** 515:13
**bus** 362:14
**business**
282:17 284:7
289:9,11,23
308:12 309:15
315:19,21
317:19 321:24
322:5,6 330:23
333:13,14,16
335:14 343:2
362:21,22
363:7,20 364:1
364:24 365:1
366:3 367:16
378:18 379:13
384:8,9 406:2
406:25 407:4,7
409:2,5 416:13
423:20 424:10
424:13,17,21
424:22 441:11
444:16 453:17
453:19,21,23
454:2 465:22
465:23 466:16
467:9,24
468:24 472:23
484:12 485:10
485:12 486:14
491:25 493:4,8
493:16 494:8

494:10 495:22
496:12,14,15
496:21 498:11
503:8 504:9,10
508:24 509:1
509:22 510:3
510:23 519:21
531:11 542:24
552:19
**businesses**
472:5
**buy** 310:8
328:7 353:21
354:9,19
358:20,21
360:23 501:2,6
501:19,19
510:12,15,21
513:19 531:15
533:24 534:1
541:3 548:12
**buyer** 332:23
332:24
**buyers** 383:15
**buying** 354:3
360:7,9 510:24
510:24 537:13
**buyout** 356:6
359:9,15,19,23
484:13
**buys** 357:15

**c**

**c** 278:20 279:1
394:14,20,21
565:1,1

**c.c.r.** 565:22
**calculation**
357:6 409:12
**calculations**
333:7
**calendar** 524:9
**call** 301:23
341:20 344:15
357:24,24
358:22 383:1
394:5 395:4
424:12 429:12
430:20,20
431:12,13
436:17 437:22
446:18 471:9
471:13 472:8
475:15,16,16
480:4,11,12
515:2 521:17
526:8
**called** 292:8
302:1 321:15
383:3 384:8
460:6 484:16
484:17 488:10
497:22 500:13
504:18 515:11
519:11 520:15
548:8
**calls** 396:14
399:23 412:10
425:24
**cancel** 480:12

cap   410:22
capabilities
  512:21
capability
  512:13
capacity   310:5
capital   318:9
  319:4,7,14,14
  320:3,4,9
  321:4,10
  335:14 338:16
  338:24 339:10
  340:3 354:7,8
  355:23 357:14
  357:15,25
  358:2,11,19
  359:1 394:19
  396:7 397:7,19
  398:15 400:11
  400:18,24
  403:17,21
  404:9 501:5
  504:5 535:13
  535:16,23
  536:1 537:9,19
  542:21 543:2
capitalization
  319:12
capitalized
  557:16
carbone   279:21
  287:15,15
  296:10 303:10
  303:12 326:18
  361:23 413:23

492:4,6
card   367:9
care   391:14
  427:23 531:18
  531:19 544:5
  544:23
carefully
  339:12 385:23
  403:8 404:11
  433:11 496:17
case   278:3,13
  288:17 325:18
  362:16 394:2,9
  394:15 396:4
  397:3,14 401:4
  401:16 402:9
  446:10 566:2
cases   459:22
cash   299:22
  317:11 329:22
  525:14 547:17
  547:24 548:12
  549:8 551:9
  556:16
cause   381:14
  381:17 382:1
caused   315:24
  316:9
causes   317:22
caution   301:11
  524:15
cc   362:20
  371:24
cc's   408:7

ccarbone
  279:21
cents   530:11
ceo   338:15
  454:16,22,23
  454:25 455:2
  455:20 516:14
  517:7 551:25
certain   288:7
  299:24 320:19
  362:5 363:7
  366:8 370:16
  376:11 394:8
  423:15,15
  433:5,18
  503:12 517:10
  520:25 548:5
certainly   365:2
  366:14 374:20
  427:22 441:19
  535:8,25
  542:17 557:14
certainty   469:8
certificate
  564:1
certified
  278:21 565:3
certify   565:5,9
  565:13
cesar   278:8
  279:13 287:14
  469:23,24
  479:5,8 482:15
cfo   516:14,20
  517:7

cgi   296:25
  297:21 300:5
  315:20
chain   347:13
  369:15 372:8
  388:14 406:7
  414:2 445:12
  470:10 478:24
chairman
  318:21
chance   449:7
change   333:14
  443:4 472:17
  498:10 566:5
changed   498:5
  498:6 531:3
  556:11
changes   459:24
  460:3 470:21
  472:15,18
  473:11 564:5
char   526:3
characterize
  525:25 526:3
charge   366:13
  366:14
charges   366:16
chasten   492:14
check   297:8,8
chief   505:13
  551:25 552:11
  552:11,12,16
chiesa   278:22
  279:2 286:19
  287:7

CONFIDENTIAL

**[child - commercial]**                                      Page 15

child  432:24
choice  344:13
chris  287:15
  326:21
christian
  279:21
christopher
  278:8 279:14
  287:14
circumstances
  403:11 526:13
citing  440:13
city  305:25
  309:25
civil  278:22
claim  519:21
  520:15
claims  520:15
class  373:21
  375:1 394:11
  395:1,1 397:9
  401:6
clear  345:13
  347:23 349:7
  360:17,22
  395:22 401:18
  417:7 444:17
  467:2 468:2
  475:21 498:9
  515:17 534:14
  550:11 552:10
  556:9 558:11
clearly  356:14
  375:8,9 398:5
  418:10 440:20

444:15 466:8
  466:23 478:13
  560:1
clerk  295:23
client  301:11
clin  299:24
clint  369:14
clinton  278:9
  281:11,17
  290:6 291:9
  292:2,20,24
  293:2,6,23
  294:4,7,12,17
  295:4,10,15
  296:1 297:11
  297:11,14
  298:2,6,15
  299:2,13,18,25
  300:10,25
  301:3 302:2,17
  303:20 304:8
  304:14,24
  306:15 310:5
  313:3,13
  314:23 315:8
  315:25 316:9
  317:2,11,18
  318:2,12,15,18
  319:2,9 324:24
  365:12,13
  366:10,21,24
  367:11,12,15
  453:16,20,24
  454:1 502:9
  503:7,10,13

515:19 516:9
  516:12,22
  521:25 522:25
  523:20,23
  524:23 525:5,7
  525:7,9 526:16
  526:19,21
  528:24 552:13
  552:14,19
  553:1,11
clinton00007...
  368:23 369:14
clintono0007...
  282:3
clips  434:1
close  527:25
  533:19
closed  439:16
  526:5 527:8,17
  527:21,22
closer  521:19
closing  519:4
cole  279:15
  287:19
coleschotz.com
  279:17
collateral
  519:23 520:16
  521:3,17 539:9
  539:10,25
collateralizing
  520:18
colleagues
  287:11

collect  382:11
  424:25 472:20
  495:21 497:15
  498:20
collecting
  292:17 293:16
  424:23 490:5
collectively
  519:13
combination
  513:17 521:5
combine  510:6
  511:18 512:1
come  357:17,21
  412:15 448:22
  478:10 529:20
  532:8 540:18
  540:22
comes  335:19
  342:21 375:3
  510:11 544:5
comfortable
  430:9 507:10
coming  464:14
  464:14 524:4
commencem...
  565:5
commencing
  278:24
comment
  427:24
comments
  436:18
commercial
  309:19,24

CONFIDENTIAL

**[commission - concepts]**                                    Page 16

| | | | |
|---|---|---|---|
| **commission** | **companies** | 485:9,10 | **complete** |
| 382:10 564:20 | 454:3 470:23 | 487:12,14,18 | 362:13 422:4 |
| 566:25 | 494:25 501:25 | 487:19 491:3 | 422:11 544:17 |
| **commissions** | 502:1 504:24 | 496:3,6,8 | **completely** |
| 343:16 382:7 | 512:11 544:4 | 497:22 498:11 | 288:11 314:13 |
| 382:11 383:9 | **company** | 500:14 509:10 | 476:5 528:21 |
| 424:23,25 | 289:16,17 | 509:15 512:7 | **completion** |
| 425:6,8 472:21 | 309:5 311:17 | 513:8,21 514:1 | 524:21 |
| 488:18 490:6 | 318:15 321:15 | 514:9,17,18 | **complex** |
| 495:21 497:16 | 321:19 322:19 | 515:16 519:5 | 313:14 404:5 |
| 498:20 509:13 | 328:5 330:5 | 519:22 529:25 | 557:13 |
| **common** | 333:3,5,24 | 530:22 531:4 | **compliance** |
| 518:10,10 | 335:12 350:1 | 534:5 535:10 | 423:20 465:7 |
| 521:1,10,22 | 353:11 357:13 | 538:25 539:19 | 465:12 |
| 536:24 538:4 | 357:15 358:18 | 539:24 541:12 | **compliant** |
| **communicate** | 358:21,24 | 543:2,4 544:18 | 423:22 |
| 418:22 431:15 | 362:25 363:2 | 544:20,20,24 | **complicated** |
| 480:9 | 364:18 374:15 | 544:25 550:10 | 556:19 |
| **communicated** | 375:7 377:10 | 550:18 554:19 | **comprised** |
| 290:5 473:19 | 386:9 396:5,23 | 554:19 557:2,3 | 412:17 |
| 480:6 481:13 | 409:25 419:25 | 557:11 558:7,8 | **computer** |
| **communicating** | 423:11,16 | 558:14 | 289:18 |
| 481:17 | 430:11 439:9 | **company's** | **computers** |
| **communication** | 439:20 440:7 | 306:24 307:7 | 310:1,8 365:14 |
| 418:23 419:4 | 441:9,16,21 | 357:25 441:9 | 366:8,11,14,15 |
| 425:25 430:21 | 442:18 443:1 | 465:22 467:18 | **con**   462:22 |
| 446:6 471:14 | 455:2 464:16 | 467:19 497:14 | **concept**   333:12 |
| 482:18 | 465:5,8,14,15 | 512:9 552:23 | 333:13 335:3 |
| **communicati...** | 465:16 467:9 | 557:4 | 341:6 356:16 |
| 392:14 416:2 | 467:24 470:19 | **compare** | 368:14 377:5 |
| 430:7 480:14 | 470:22 471:24 | 496:18 | 428:7 429:12 |
| 482:22 484:21 | 472:2,16 | **complaint** | 509:20 |
| 485:2 486:9,10 | 473:12,22 | 281:9 295:2,8 | **concepts**   468:9 |
| 486:19 487:8 | 474:11 475:18 | 296:10,14,15 | 468:11 |
| | 476:4 484:13 | 296:19 | |

CONFIDENTIAL

**[concern - contracts]**                                    Page 17

concern   427:10
  428:2
concerning
  302:18 344:20
  352:25 364:1
  378:5 431:1
  436:13 451:18
  462:9 479:9
  517:10 546:15
  547:3 560:25
concluded
  563:5
conclusion
  394:5 395:4
  396:15 399:24
  424:12
conduct   380:20
confers   421:1
confident
  309:23 311:23
  312:4 346:18
  457:7 557:23
  561:23
confidential
  278:19 465:15
  473:22 474:10
  476:25
confirm   427:5
  475:10
confirmation
  464:23
confirming
  464:20
conflict   343:17
  554:2

confused
  340:18,20
  402:15 482:5
confusing
  375:5 512:7
confusion
  334:23 471:7
conjunction
  489:24 561:21
connection
  300:4 310:3
  315:7 345:7
  384:2 390:7
  405:9 457:4
  458:20 459:4
  498:1 520:18
  523:2,8,23
  524:21 525:11
  561:12 562:1
connections
  310:2
consensys
  289:5,8,16
  290:23 308:12
  383:19,22
consensys's
  291:5
consent   284:18
  534:10 536:20
consider   420:5
  474:21 542:1
  559:6 561:15
  561:20
consideration
  381:24 424:2

470:25 521:21
  525:15
considered
  343:1 372:25
  373:16 374:9
  434:17 435:11
  436:4 508:10
  557:11,19
considering
  322:18 336:7
  468:7 490:20
  553:18
consistent
  348:5 398:7
  549:3 550:17
  550:23 555:22
consolidated
  544:23
consolidating
  543:25
constantly
  373:10,11
constitute
  366:12
constraints
  509:3,4
construct
  508:21
construed
  389:16
consultant
  384:2 385:15
  515:6 539:12
consultants
  318:23 377:9

consulting
  289:19 384:9
consuming
  379:11
contact   392:14
  405:20 430:13
  431:22 462:23
  463:13 464:5
  464:15 514:20
contained
  335:24 346:13
contemplated
  344:4 353:21
  533:21
contemplation
  561:10
context   321:24
  361:9 428:13
  442:23 444:10
continuation
  288:6
continue   286:6
  298:10 335:21
  376:16
continued
  298:11 345:4
  467:2 553:22
  554:14
continuous
  342:13 365:4,5
contract   382:9
contracts   322:9
  322:10 341:1
  501:2,6 508:23
  508:25 509:21

| | | | |
|---|---|---|---|
| **contributed** | **cooperation** | 367:23 372:3,8 | **corson**  278:21 |
| 394:18 396:6 | 422:25 423:19 | 380:8,9 381:5 | 286:22 565:3 |
| 397:6,19 | **copy**  325:20 | 383:25 386:23 | 565:22 |
| 398:14 400:10 | 452:2,10 | 393:14,23 | **cost**  293:3 |
| 400:23 403:21 | **copying**  447:13 | 394:6 395:11 | 365:5 375:9 |
| 404:8 | **corp**  282:16 | 395:14 397:13 | 376:7 |
| **control**  545:9 | 284:19 406:2 | 401:1,10 402:3 | **costs**  365:8 |
| 554:19 | 406:24 449:12 | 402:5,14 403:2 | **counsel**  287:3 |
| **conversation** | 449:16 518:11 | 411:2 429:25 | 377:14 378:23 |
| 333:1 350:14 | 518:14 534:11 | 430:1 432:9,18 | 379:1,23 |
| 355:16 368:3 | **corporate** | 455:12 458:2 | 380:11,13,17 |
| 411:22 432:12 | 321:6 376:9 | 460:12 466:19 | 391:21,23,24 |
| 432:14 440:11 | 392:5 433:25 | 476:23 481:19 | 392:2,5,7 |
| 444:3,4 462:15 | 462:18 468:21 | 481:25 488:25 | 421:1 429:3,9 |
| 465:10 479:5,8 | 514:23 543:3 | 490:21 498:7 | 429:10,22 |
| 479:12,14,17 | **corporation** | 499:8 502:5 | 430:11 441:7 |
| 479:20 482:15 | 394:10 401:1,4 | 503:22 504:3 | 441:15,20 |
| 485:23 | 401:17 404:9 | 505:24 520:3 | 442:4 475:15 |
| **conversations** | 404:10 459:17 | 524:11 525:12 | 475:16,17 |
| 286:5 352:8 | 488:23 | 530:15 531:1 | 478:7 480:5,5 |
| 356:13 379:1 | **corporation's** | 532:20,22 | 480:6,15,17,19 |
| 380:10,12 | 468:21 | 533:3 538:17 | 480:24 481:2 |
| 415:13 421:9 | **correct**  292:21 | 551:17 559:13 | 481:15 505:15 |
| 428:13 432:18 | 294:3,8 297:4 | **corrected** | 562:1 565:14 |
| 432:20,23 | 301:2,6 303:21 | 399:25 | 565:17 |
| 433:16 483:13 | 310:14 313:13 | **corrections** | **counsels** |
| 486:1,18,19 | 319:21 322:10 | 564:4 | 429:12 |
| **convert**  357:3 | 322:23 323:8 | **correctly**  393:3 | **count**  289:11 |
| **convinced** | 323:12 324:13 | 438:23 469:22 | 392:23,24 |
| 477:8 | 325:2,3,7,8,13 | **correspon** | **counted**  393:3 |
| **coo**  517:7 | 326:2 328:5 | 416:1 | **counter**  359:22 |
| **cooperate** | 341:14,15 | **corresponden...** | **county**  295:23 |
| 424:5 443:14 | 343:7 348:11 | 415:13 416:2 | **couple**  292:4 |
| 467:1 | 349:11 357:1,7 | 418:24 420:17 | 316:7 422:20 |
| | 360:25 367:19 | 448:1,2 549:18 | 532:7 |

[course - data]                                                    Page 19

course  422:1
  445:17 467:8
  467:23 468:9
  469:4 477:1
  541:22 547:6
court  278:1,21
  279:15 281:10
  286:21 288:22
  295:3,8,16
  378:10,16
  398:22 421:7
  463:4 520:12
  522:21 549:25
  559:11 565:4
cover  295:12
  326:21 408:3
  493:2
crazy  545:7
crd  453:1
create  435:1,7
  435:10 468:9
  468:11 473:1
  485:12 488:9
  542:12
created  289:8
  310:1 321:19
  435:20 442:23
  456:7 490:22
  504:1,17
  508:21 509:1,2
creating  443:25
  490:23 530:16
creditworthin...
  309:22,24

cripple  379:13
critical  535:24
cryptic  471:13
csglaw.com
  279:4,5
current  295:19
  295:21 307:12
  309:15 313:9
  408:22 411:8
  412:5 465:23
currently  510:5
  511:18
cursory  449:9
  493:23
customary
  505:5 526:12
customer  490:3
  509:16,18
cut  395:6
  402:18
cv  278:4,13
  286:14,17
cyp  399:10
  403:22
cypress  278:3
  278:17 279:6,7
  281:20 286:11
  286:17 287:8
  288:17 326:12
  326:16 354:12
  354:19 355:1
  355:18 356:1
  356:25 359:9
  360:7,9,23
  379:4,7 380:5

394:25 395:8
395:19,24
396:13,13,21
398:10 399:9
399:12,14,21
400:5,10,17,23
401:23 402:1,8
402:23 403:13
403:19,23
404:8,17,17,22
404:24 405:8
411:19,22
412:16,18,22
413:3 414:18
414:23 415:5,6
415:7,18 417:4
417:16,23
418:3,4,17
419:18 420:1
420:10 422:2
422:22 423:6
425:12,19
426:3 427:5
428:16 429:5
429:17 431:1
431:23 434:6
437:18,18
439:7 441:8,9
442:5 447:25
448:5 451:17
451:18 460:19
462:9,24
464:21 467:18
468:17,18,20
469:4,15

473:18 474:5
475:6 478:3
479:6,10,23
480:7,14,21
481:8,11,19
483:15 484:23
495:6,14,15
510:16,21,24
513:13

d

d  279:21 386:5
  396:3,17,19,22
  500:18
daiana  293:13
  297:18 298:24
damage  484:11
damages  314:7
dan  287:7
  492:3
daniel  278:7
  279:5,22 280:5
  287:16 318:19
  318:20 516:21
  517:5 525:23
  537:15,22
  542:5,6 548:18
  548:19 550:2
  551:24 552:8
  555:5
danny  516:14
dashboard
  363:5
data  308:14
  330:17,18
  359:2,5

CONFIDENTIAL

**[date - deals]** Page 20

| | | | |
|---|---|---|---|
| **date** 334:11,19 | 458:4 515:14 | 453:9 455:21 | 388:10,11 |
| 346:1 364:13 | 515:14,14,14 | 457:3,7 459:2 | 390:20 391:1 |
| 374:1 457:18 | 547:6 548:22 | 459:20 470:4 | 392:7 423:22 |
| 465:22 473:25 | 562:24 564:13 | 477:21 479:3 | 424:9,16,24 |
| 511:3 519:8,11 | 566:22 | 480:1 487:1 | 425:2,4,7 |
| 536:5 538:5 | **days** 371:8 | 488:9,24 | 434:13 435:11 |
| 541:1 555:15 | 375:23 555:11 | 491:23 493:3 | 435:14 440:5 |
| 565:12 566:3 | 559:5 | 494:12 499:2 | 442:22 443:2 |
| **dated** 281:14 | **de** 278:7 | 499:21 500:5,9 | 444:11,14,18 |
| 281:19 282:2 | 279:18 280:3 | 501:21 503:4 | 455:24 466:19 |
| 282:20,24 | 281:23 282:9 | 503:17 506:3 | 467:22 468:10 |
| 283:2,18 | 282:15,23 | 528:7,16 535:6 | 468:12,22,25 |
| 284:13,20,24 | 283:2,8,12,22 | 535:9 540:14 | 470:18 471:3,6 |
| 285:3 303:7,16 | 284:2,5,9 | 540:19 543:10 | 471:15,18,23 |
| 303:19 326:10 | 286:13 287:20 | 546:1,11 547:4 | 472:5,20 |
| 368:22 388:13 | 287:21 318:20 | 553:23 554:18 | 473:16 478:2 |
| 388:14 413:19 | 327:6,8,10 | 554:24 555:9 | 478:18,19 |
| 421:16,25 | 328:3 331:8 | 558:6 559:25 | 485:4,21 486:3 |
| 426:21 432:7 | 347:5 355:12 | 560:5,10,15 | 486:22 487:10 |
| 445:12 447:13 | 355:15 356:18 | 561:1,19 562:8 | 487:23 488:17 |
| 458:14 463:6 | 371:23 372:5 | 562:10 | 489:3 490:20 |
| 470:10 500:10 | 372:19 381:21 | **deal** 310:11 | 490:23 491:1,3 |
| 517:21 519:6,9 | 383:22 387:19 | 312:17 344:15 | 491:12,17 |
| 529:6 534:11 | 405:18 406:1 | 380:1 499:3,6 | 493:18 494:5 |
| 549:14 558:23 | 408:7 409:10 | 499:8,22 522:2 | 496:8,24,25 |
| 559:2 | 409:17 412:7 | 524:5 528:1 | 498:19 504:1 |
| **dates** 298:19 | 413:11 414:10 | 549:20 550:6 | 512:8,15,23 |
| 457:9 461:24 | 416:7,25 | 551:4,5,8,9 | 513:3 514:1 |
| 528:3 | 417:18 418:2 | 553:13 556:3 | **dealers** 489:9 |
| **david** 279:17 | 418:15 419:5 | 558:11 562:7,9 | **dealing** 464:5,7 |
| 287:19 374:7 | 421:15 422:21 | 562:10 | 464:8 |
| 374:10 377:17 | 422:25 425:17 | **dealer** 282:13 | **deals** 343:25 |
| **day** 289:21 | 426:21 436:6 | 382:13,22,25 | 508:14 509:6 |
| 362:8 363:22 | 437:7 445:7 | 383:4 384:11 | 548:15 |
| 363:22 373:20 | 447:6 452:25 | 386:9,20 | |

| debates 365:4,6 | decided 433:5 | definitive 430:6 | 492:18 563:5 |
|---|---|---|---|
| debt 501:16 | 433:18 473:7,8 | 521:20 | 564:4 566:3 |
| 520:18 543:3 | 475:24 476:16 | delaware | derivatively |
| 547:18,25 | 476:20 480:11 | 376:10 378:23 | 278:4,13 |
| 548:6,7,8,13 | 487:15 498:10 | 379:1 380:13 | 286:12,15 |
| 551:16 556:2 | 558:2 | delay 375:21 | 566:2 |
| 556:10 | decision 442:19 | 481:22 | describe |
| december | 497:20 | deliberated | 317:16 392:21 |
| 282:4 284:17 | decisions | 548:20 554:21 | 498:25 523:22 |
| 284:24 285:3 | 343:24 363:25 | deliberations | 526:2 543:15 |
| 297:22 298:12 | declaration | 561:15 | described |
| 299:9 305:2 | 281:16 314:18 | demand 535:22 | 317:16 339:11 |
| 306:19 311:7 | 314:22 315:3,7 | 536:3 | 366:7 367:5 |
| 325:9,10 334:6 | 317:8 320:18 | demanded | 439:12 497:9 |
| 384:24 385:16 | 322:14 | 448:4 | 501:9 504:9 |
| 388:18,23 | declining | demanding | 509:11,12 |
| 389:3 470:11 | 313:11 552:19 | 362:19 363:5 | 526:2 544:16 |
| 470:12 471:5 | deductions | demands 363:2 | description |
| 473:9,13,24,25 | 313:8 | denied 507:11 | 281:8 453:20 |
| 474:4 480:1,4 | defaulting | department | designated |
| 481:24,25 | 556:14 | 282:15 293:9 | 497:1,5 |
| 483:21 484:25 | defendant | 406:1 408:4 | designation |
| 487:18 489:6,6 | 279:18 | departure | 384:11 514:23 |
| 523:18 524:10 | defendants | 474:15,16 | desire 471:12 |
| 540:24,25 | 278:11,17 | depending | desired 441:6 |
| 541:8 542:4 | 279:6,13,22 | 306:10 | desks 292:9 |
| 546:24 549:14 | 288:17 | deponent 564:1 | despite 372:7 |
| 551:21 555:7 | define 320:4 | deposit 299:5 | detail 336:2 |
| 556:1,6,7 | 424:20 | 309:20,21 | 498:25 |
| 558:19,23 | defined 395:23 | 310:7 312:16 | detailed 362:18 |
| 559:2,22 561:2 | definitely | 313:9,10 324:4 | 453:20 |
| 561:2,13 | 405:17 434:16 | deposition | determination |
| decide 339:24 | definition | 278:6 286:10 | 290:2,23 |
| 442:17 558:9 | 469:3 557:8 | 286:18 288:6 | 331:16 332:5 |
| | | 330:17 337:7,9 | 530:13 539:17 |

**[determination - disclosed]**                                        Page 22

539:21,23
**determined**
  289:5 308:9,16
  330:11,25
  331:19,20
  332:2,14
  357:19 525:21
**determining**
  291:5 333:4
**deterministic**
  339:22
**detrimental**
  364:16,20
**develop**  340:14
  340:18 364:6
  489:2,8,13
  499:11,13,14
  510:3
**developed**
  322:1,2 335:3
  383:19,21
**development**
  472:7 498:22
  499:10
**deviation**
  542:24
**dgold**  279:17
**dictionary**
  492:22
**differ**  495:25
**difference**
  483:24
**differences**
  496:12,19,21

**different**  289:9
  299:25 306:16
  327:2 331:5,5
  360:1,15 361:3
  366:4 367:13
  410:12 431:19
  443:11 456:8,8
  461:22 466:22
  469:2 486:17
  498:17 501:13
  519:23 539:8,9
**difficult**  315:20
  317:1,6,7,10
  336:18 356:14
  485:9 545:19
**dig**  297:15
**diligence**  415:9
  539:18
**direct**  296:5
  303:17 345:23
  347:15 366:2
  367:4,15
  369:24 392:14
  393:7,22 394:3
  394:25 395:9
  401:6 402:4,5
  404:20 405:20
  425:9 432:8
  445:16,19
  448:2 454:14
  478:25 516:3
**directed**  480:9
**directing**
  370:10

**directly**  372:3
  376:8 394:10
  405:14,16
  411:21 415:15
  416:1 418:15
  425:11 429:16
  430:2,13,25
  431:1,10,15,22
  433:6,19 434:3
  446:7,11
  461:16,22
  462:23 463:7
  463:13 469:19
  518:20 538:17
**director**  327:14
  327:21 362:24
  363:9,11 364:8
  376:23 379:8
  449:12,15
**directors**
  281:13 283:18
  284:19,23
  285:2 303:7,16
  363:1,17,19,21
  377:1,8 380:8
  380:15 382:2
  445:24 458:13
  506:6,9,10,22
  525:23 534:10
  536:20 537:15
  537:25 546:13
  546:15 549:13
  551:21 558:22
**dis**  414:16

**disagree**
  327:19
**disaster**  310:3
**disclaimer**
  389:8,22
**disclos**  485:1
**disclose**  379:4
  399:3,22
  402:24 412:17
  413:2 417:10
  417:23 420:1
  420:10 423:3
  423:13,15
  426:3,5 427:6
  427:20 428:16
  429:5,7 435:3
  437:17 440:6
  443:7 464:21
  465:1,2,4,7,14
  467:1,3,18
  468:16 469:15
  469:19,21,21
  475:9 476:8,21
  478:3 481:18
  483:5,14,18
  487:17 513:24
**disclosed**
  370:14 380:17
  397:23 398:11
  403:23 404:17
  404:22,24
  405:8 415:18
  419:19 423:8
  469:4

**disclosing**
379:12 380:17
417:3 418:16
429:15 442:4
**disclosure**
396:2,12,21
400:4 403:12
411:23 414:18
418:3 425:12
428:11 462:9
465:12 468:19
479:6,9 481:7
**disclosures**
428:12
**discretion**
535:6
**discuss**  348:19
359:18 381:18
425:11 427:10
427:14 428:14
466:23 470:18
470:23 471:3
471:18,22
**discussed**
308:23 339:16
342:15 344:5
347:18 348:18
349:18 355:14
359:20 360:12
378:2 425:23
428:6 442:21
443:1,15
466:23 484:24
501:11 540:19
554:3,20

555:19,24
556:2 559:24
**discussing**
347:25 355:11
370:21 418:3
429:19 444:5
503:19,19
513:11 516:3
561:22
**discussion**
291:2 307:6
313:2 376:20
378:9,20 381:7
392:4 413:14
418:11 421:19
426:15 438:17
465:21 471:10
485:7 486:20
487:2 510:18
510:24 511:1,7
525:22
**discussions**
290:22 331:9
339:4 342:1
352:18,25
353:14,16,17
354:2 355:5
356:4 360:6,8
376:5 377:23
378:5 379:23
405:6 414:17
418:6,8 425:15
425:19,21,22
427:16,19
440:2 444:15

456:1,5,6
482:24 485:3
485:19 486:25
487:3 510:21
511:5,10,19,25
514:5 516:11
517:9,14
540:23 541:3
546:1,5 547:5
560:23
**disintermedia...**
343:1,4
**disintermedia...**
492:20
**dispositive**
399:3
**dissolution**
394:18 396:6
397:6 398:14
**distinct**  328:6
**distinguish**
508:6
**distraction**
362:13
**distribute**
437:4
**district**  278:1,1
**diversion**
375:21
**docket**  286:14
286:17
**document**
295:10 296:4,9
300:3 303:18
306:23 315:1,2

315:12,15
326:16,23
327:13 329:13
335:24 336:9
337:21,23
346:23 347:9
347:13 363:6
368:25 369:14
369:21 370:6,7
370:9 372:13
385:5,9 387:25
402:13,16
404:4 406:15
406:18 407:3
410:11,17,20
410:24 411:4
414:7 436:9
467:11 470:14
470:17 493:11
494:17 521:20
524:13,17
526:4 537:24
559:18
**documentation**
324:5 333:7
528:2
**documents**
308:8 386:10
443:23 524:2,3
544:24 549:18
561:9,11,14
562:4,12,19,20
**doing**  321:16
325:1 337:7
343:25 409:12

| | | | |
|---|---|---|---|
| 464:16 541:17 | **early** 294:8 | 399:20 416:25 | 405:25 406:7 |
| 541:20 543:24 | 335:12,14 | 425:3,23 | 406:19,20 |
| 544:25 | 391:23 532:9 | 428:15 448:3 | 408:3,5,10,14 |
| **dollar** 321:20 | 532:25 540:24 | 462:3,8 463:22 | 408:18 410:25 |
| 330:21 | **earn** 488:18 | 472:25 478:15 | 411:5,6 412:12 |
| **dollars** 333:10 | 497:16 | 484:10 487:14 | 412:14 413:18 |
| 355:22 403:19 | **easier** 335:5 | 487:18 497:8 | 414:2,8,20 |
| 529:14,15 | 485:8 | 512:1 516:11 | 417:20 418:13 |
| **doubted** 476:17 | **easiest** 513:18 | 517:6,6 527:13 | 418:18 421:14 |
| **doubts** 476:6 | **east** 288:1 | 561:19 | 421:23 422:24 |
| **downturn** | **eat** 358:2 | **elected** 396:8,8 | 425:22 426:19 |
| 315:19,21 | **ecosystem** | **eleven** 361:23 | 427:1 432:1,6 |
| **draft** 437:3,4 | 508:21 | **eliminate** 510:6 | 432:9 433:2 |
| 561:11 | **edward** 279:11 | 513:13,19 | 434:11 435:22 |
| **drafted** 561:9 | 287:12 | **email** 281:18 | 445:6,12,20 |
| 562:4,12,19 | **effect** 512:12 | 281:22 282:1,1 | 446:12,12 |
| **drafts** 562:20 | **effectively** | 282:5,8,14,19 | 447:5,11,11,12 |
| **drama** 300:14 | 318:13 472:6 | 282:22 283:1,4 | 447:17 463:6,7 |
| **draw** 478:23 | 528:1 | 283:7,11,21 | 470:3,10 474:8 |
| **drawing** 299:5 | **efficiency** | 284:1,5,9 | 474:19 475:23 |
| 414:8 | 310:7 | 326:9 347:4,13 | 476:9,23 |
| **dtyrrell** 279:5 | **efficient** 512:5 | 347:16 348:24 | 477:11,15,20 |
| **due** 415:9 | 512:10 513:21 | 349:6,8,12 | 478:24 479:1 |
| 539:18 | **efforts** 300:5 | 352:3,22 353:9 | 482:13 483:11 |
| **duly** 554:21 | 339:9 353:22 | 353:13 354:11 | 484:17 485:14 |
| **e** | 374:3,4 382:15 | 359:12,15,17 | 491:23 493:2 |
| | 382:19 388:22 | 368:5,6,11,13 | 493:22 494:19 |
| **e** 279:1,1 280:1 | 388:24 489:8 | 368:20,21 | 500:4,8,9 |
| 280:1 288:1,1 | 508:1 | 369:15 370:13 | 501:22 502:6 |
| 454:15 500:18 | **eh** 317:3 | 371:3,20 372:3 | 502:24 506:24 |
| 516:19 565:1,1 | **eisenhower** | 372:5,8,10,14 | 514:6 |
| **earlier** 370:22 | 278:23 279:2 | 384:25 385:10 | **emailing** |
| 373:6 461:15 | **either** 297:18 | 387:18 388:13 | 371:15,16,21 |
| 501:9,11 532:8 | 307:17 337:6 | 388:14,19,23 | 372:1,5,7 |
| 554:12 | 383:15 399:17 | 388:23 389:6 | |

**[emails - evict]** Page 25

| | | | |
|---|---|---|---|
| **emails** 371:3 | **entered** 504:23 | 425:7,8 435:1 | **escalations** |
| 422:20 425:24 | 518:5 | 435:5,7,10,14 | 505:6 |
| 448:3 464:9 | **enterprises** | 435:17 462:18 | **espiro** 279:11 |
| 487:8 | 278:10 279:22 | 468:14,15,18 | **esq** 279:4,5,10 |
| **embarrass** | 284:16,19,23 | 469:2,2 488:6 | 279:11,12,17 |
| 431:3 | 285:2 300:6 | 488:10 495:15 | 279:21 |
| **embarrassed** | 518:11,14,16 | 496:23 499:13 | **essentially** |
| 377:11 | 523:17 524:7 | 499:17 502:8 | 495:23 |
| **embarrassing** | 534:10 549:14 | 502:12 503:10 | **establish** |
| 444:1 | 558:23 | 507:15,20 | 377:15 |
| **employ** 384:1 | **enthusiasm** | 508:3 512:2,6 | **established** |
| 384:12,17 | 335:10 486:14 | 513:23 514:13 | 338:14,21 |
| **employee** | **entire** 299:22 | 514:22,25 | 402:1 |
| 565:14,16 | 301:22 325:5 | **entity's** 323:19 | **estate** 289:23 |
| **employees** | 343:2 369:21 | 324:1 | 426:5 427:10 |
| 292:5 300:23 | 370:9 419:3 | **entrepreneur** | 427:20,22 |
| 309:15 310:5 | 538:25 | 414:24 | 475:13 476:5 |
| 312:14 324:21 | **entirely** 314:6 | **enumerated** | 477:6 |
| 553:16,20 | 314:12 368:12 | 366:23 | **estimating** |
| **employment** | 455:11,12 | **equal** 525:14 | 483:20 |
| 449:22 552:8 | 520:13 | **equated** 530:21 | **estimation** |
| **en** 343:21 | **entities** 300:6 | **equates** 504:6 | 290:16 291:5 |
| **ended** 295:15 | 339:4 415:4 | 532:21 538:24 | **et** 286:13 |
| 334:21,24 | 423:4 456:9 | **equation** | **european** 472:8 |
| **engage** 302:14 | 496:22 501:17 | 548:17 | 498:16,24 |
| 302:16,17 | 510:6 511:19 | **equity** 535:24 | 499:6,13,17 |
| 424:10 430:23 | 512:1 513:17 | 548:5,5,7 | 508:4 |
| 500:25 | **entitled** 315:2 | 550:5 551:4,5 | **evalu** 332:20 |
| **engaged** 384:20 | 363:1,17 438:7 | 551:8,16 556:3 | **event** 537:9 |
| **engaging** | 447:24 | **equivalent** | **eventually** |
| 388:17,20 | **entity** 292:20 | 332:17 472:8 | 417:9,11 |
| **enormous** | 322:23 343:22 | **errand** 509:5 | **evict** 300:5 |
| 423:12 | 343:23 344:1 | **errata** 564:5 | 304:13,24 |
| **enter** 322:8 | 345:11 382:23 | 566:1 | 313:18 |
| 517:9 | 386:22 424:4 | | |

evicted   294:7
   304:22 305:6,8
eviction   305:21
   313:22
evolving   429:6
exact   468:1
exactly   294:14
   305:16 306:20
   317:17 328:16
   331:10 332:25
   367:10 377:6
   382:20 387:2
   387:10 468:8
   505:1 512:18
   517:3,5,16
   527:3,7 540:17
exam   365:23
   456:4,11 457:8
   458:5
examination
   278:7 288:4
   456:24 457:4
   565:6
examinations
   455:6,23
example   335:1
   367:12 443:10
   507:22,23
   509:23 542:20
examples
   372:25
exams   456:4,12
except   564:4
exception
   292:3 423:5,10

exceptions
   557:10
excessive   362:8
exchange
   281:22 282:8
   283:1,21 284:1
   335:6 347:4
   387:18 426:20
   427:1 463:6,7
   470:3 477:20
exchanged
   421:20 549:18
   550:1
excuse   386:11
   426:4 489:4
   491:13 518:11
   546:4
excused   553:24
execution
   284:12 517:19
executive   393:8
   552:11,16
exhaustive
   450:17
exhibit   295:2
   303:5 314:22
   326:9 347:3
   368:20 369:12
   384:24 387:17
   390:19 405:24
   413:18 421:14
   421:20 426:19
   432:1 445:5
   447:4 448:14
   458:12 470:2

477:19 491:22
   500:4 517:19
   523:16 534:9
   549:12 558:21
exhibits   281:7
exist   352:11
   363:5 364:5
   375:4
existed   346:7
   422:18
existing   424:13
exit   543:20
expect   437:19
expedite   446:2
expense   301:24
   365:6,24,25
expenses
   289:10 317:14
   365:11,18
   366:2,2 367:4
   367:16 433:25
experience
   430:4,9 495:14
   548:3
expert   377:21
   400:7
expertise
   420:21
experts   391:14
   404:6
expires   564:20
   566:25
explain   308:18
   308:19 343:6
   428:1,23

489:23 520:23
   545:19
explained
   346:8 440:4
explaining
   345:9
explanation
   309:1 449:19
explored   341:7
   341:10
express   355:25
   356:10 367:9
expressed
   350:17 351:7
   351:17 420:23
   486:13 542:19
expressing
   467:7
extent   505:19
extraordinarily
   317:24

f

f   565:1
facilitate
   353:21 383:14
   383:17
facility   306:14
fact   295:14
   302:2 309:4,5
   310:3 312:13
   313:20 314:2
   324:17 327:20
   328:4 351:21
   353:16 364:5
   372:6 384:12

| | | | |
|---|---|---|---|
| 435:13 438:20 | **fastest** 509:18 | **financial** | 415:14 416:3 |
| 444:25 449:21 | **favor** 380:6,23 | 282:14 346:6 | 416:10,18 |
| 503:24 513:22 | 520:2 | 375:25 389:15 | 417:4,12,22 |
| 545:4 555:6 | **february** 356:7 | 405:25 544:1 | 418:4,17 |
| **facts** 309:18 | **federal** 278:22 | **financially** | 419:13,15,17 |
| **factual** 300:13 | **fee** 342:16 | 286:25 565:17 | 420:13,17,21 |
| **failing** 297:1 | 344:16 524:21 | **financials** | 422:1,13 423:2 |
| **fair** 300:24 | 525:7,8,14,21 | 320:16 543:24 | 423:19 424:6 |
| 306:5 307:5 | 525:25 526:1,1 | 543:25 544:9 | 424:22,23,24 |
| 317:4 328:25 | 526:2,4,7,8,10 | **financing** | 428:9,11 429:8 |
| 335:8 362:7 | 526:10,10,22 | 409:25 501:1 | 429:16,23 |
| 394:24 395:8 | 527:2,15 | 501:18 | 430:3,7,13,19 |
| 395:18 404:14 | 528:24 | **find** 319:4 | 430:22 431:1,4 |
| 475:22 535:5 | **feel** 369:20 | 410:15 | 431:9,10,12,15 |
| 557:18 558:1 | 445:18 | **fine** 349:4 | 431:21 434:6 |
| **faith** 375:6 | **feels** 524:16 | 350:17 484:1 | 435:3,5,11,25 |
| **falk** 374:7,10 | **fees** 344:10 | **finish** 524:5 | 436:3,13 438:7 |
| 377:17 | 488:19 490:4 | **finished** 420:7 | 438:18,22 |
| **fall** 296:25 | **fell** 294:12 | **finishing** | 439:12,15,19 |
| 498:12 540:9 | **felt** 513:20 | 300:18 | 440:14,21,23 |
| 540:14 | **field** 292:8 | **finra** 283:14 | 441:1 445:21 |
| **false** 300:15 | 377:21 | 382:4,5,13,14 | 446:1,7,11,14 |
| 476:5 | **fifth** 279:8 | 382:16 384:3 | 446:15 447:17 |
| **familiar** 388:10 | **figure** 329:1 | 384:10 385:16 | 448:2,3,4,7,10 |
| 451:8 514:8 | 476:15 | 386:2,19,23 | 448:12,15 |
| **families** 321:25 | **figures** 321:25 | 387:4 388:6,24 | 449:18,25 |
| **family** 477:4 | **filed** 281:9 | 389:1,23 390:7 | 450:5,13,21 |
| **fantasy** 312:14 | 295:2,8,23,25 | 391:17 392:6 | 451:2,11 452:9 |
| **faqs** 503:7 | 386:18 | 392:14,18 | 455:3 456:14 |
| 543:19 | **filing** 510:7 | 393:20 405:9 | 457:4 460:6,12 |
| **far** 312:7 351:2 | **fill** 386:22 | 405:12,20 | 462:10,14,23 |
| 359:15 393:24 | **filling** 391:9 | 407:5,19,24 | 463:13,24 |
| 443:24 | **final** 323:20,24 | 408:21 411:16 | 464:5,12 466:4 |
| **fashion** 514:20 | **finally** 297:21 | 412:24 414:15 | 469:5,7,16,19 |
| | | 414:17 415:3,8 | 470:20 472:1 |

**[finra - form]**                                      Page 28

| | | | |
|---|---|---|---|
| 473:8,17 474:6 | 416:10 417:2,8 | **flowed**   367:14 | **forensberg** |
| 475:25 480:8 | 421:24 422:5,6 | **focus**   300:3 | 439:2 |
| 480:21 482:25 | 422:8,19 423:1 | 318:7,8 364:23 | **forensic**   365:8 |
| 485:6,20 | 426:4 429:15 | 364:23,24 | **forget**   419:8 |
| 487:23 490:21 | 447:11 455:4 | 472:4 487:15 | **form**   282:12 |
| 491:5,8 493:18 | 456:16 459:19 | 509:17 556:18 | 284:16 289:7 |
| 494:5 496:15 | 462:1 470:17 | **focused**   318:24 | 290:14 292:22 |
| 503:25 | 471:2 473:4 | 364:15,21 | 293:17 294:9 |
| **finra's**   431:8 | 474:16 475:5,6 | **focusing** | 298:17 299:14 |
| 443:14 | 479:3 480:13 | 467:10 | 299:20 300:12 |
| **firm**   286:22 | 482:2 483:6 | **follow**   348:7 | 301:10 302:5 |
| 287:11 289:22 | 494:8 495:19 | 374:13 405:12 | 303:22 304:5 |
| 292:6 317:10 | 500:11,19 | 422:20 423:2 | 304:10,15 |
| 384:16 439:24 | 502:25 503:5 | 460:4 483:6 | 305:23 309:3 |
| 453:15,18 | 510:11 514:19 | 509:22 | 313:5 320:10 |
| 454:19 472:14 | 519:12 523:22 | **followed** | 323:16 328:21 |
| **firm's**   392:5 | 525:19 529:18 | 509:24 | 331:4,18 333:8 |
| 452:3,4 454:16 | 536:19 542:2 | **following** | 334:4 336:1 |
| 455:20 504:20 | 543:21 544:12 | 305:21 380:12 | 337:5 339:21 |
| **firms**   420:4 | 545:19 551:23 | 456:22,23 | 340:17 341:9 |
| **first**   289:12 | 553:23 562:6 | 482:21 483:12 | 341:18 342:10 |
| 291:18 297:1 | 562:19,19 | 484:21 485:1 | 342:20 355:20 |
| 302:14,15,24 | **fiscal**   284:17 | 486:18 487:20 | 358:16 362:9 |
| 303:1 304:23 | 523:17 524:9 | 510:16 515:15 | 363:16 364:9 |
| 308:5 315:19 | **fisch**   505:11,12 | 532:15 | 365:17 366:22 |
| 321:1 326:19 | **fit**   352:8 | **follows**   288:3 | 367:3,6,22 |
| 330:20 349:18 | **five**   282:19 | **fool's**   509:4 | 369:9 370:23 |
| 349:22 350:10 | 312:14 413:18 | **forbidding** | 376:24 380:25 |
| 364:19 371:3 | 475:5 483:23 | 431:13 | 384:15 386:8 |
| 371:16 372:13 | 485:11 | **forbids**   464:16 | 386:17,18,21 |
| 372:20 378:4 | **floor**   386:5 | **foreclose** | 386:24,25 |
| 378:20 380:1 | 449:13 452:4 | 466:25 | 390:19,25 |
| 382:18,19 | **flow**   317:11 | **forego**   434:13 | 391:10,18 |
| 384:20 388:5 | 367:11 455:1 | **foregoing** | 392:22 394:4 |
| 392:3,4 398:4 | | 564:3 565:9 | 395:3,10,15,16 |

395:21 396:14
397:22 398:11
398:23 399:5,7
399:7,23
401:20,24
402:8,11
403:25 409:11
412:3,10
416:11 417:17
418:7 420:2,18
423:25 424:11
424:19 425:5
430:5 436:14
439:17 440:10
440:18 442:24
443:8 444:12
446:8 453:3
462:25 463:14
464:1 466:20
475:3 476:1,19
478:20 479:18
480:23 481:12
481:20 483:9
483:16 485:22
486:6,24 487:5
487:11,25
488:13,17
489:10,16
490:1 495:9,17
497:4 498:4
502:17 510:10
512:16,24
513:15 516:8
521:7 523:17
524:7 526:18

528:17 531:7
533:9 535:19
553:3 555:4
557:21 558:4
**forma** 289:8
301:24 308:12
335:13 375:14
376:7
**formal** 337:22
546:22
**formally**
374:16
**formas** 330:19
330:19 533:6
**format** 327:2
370:19
**formation**
386:10
**formed** 377:19
383:5 488:21
489:7
**former** 503:13
**forms** 387:1
**forth** 345:25
409:5 410:11
434:1 476:3
485:16 491:5
557:9 565:12
**forward** 337:8
423:19 424:17
450:4 465:19
466:24 467:5,8
467:15,23
468:5,7 481:7
483:8 493:3

538:3
**forwarded**
450:8,23
**forwarding**
450:11
**forwards**
450:16
**found** 344:7
364:20
**foundation**
300:13
**founders** 328:5
328:8 334:2,5
334:6,9,16,18
334:20,24
359:3 504:1
510:5 511:17
**founding**
327:14,21,23
328:7
**four** 292:9
483:22 485:11
**fourth** 311:11
503:6
**frame** 311:1
326:3 344:9
356:13 373:5
378:3 381:4
511:24 517:1
**frames** 362:12
446:25
**fran** 297:18
453:8
**francis** 278:7
279:22 280:4

293:12 298:23
**frank** 287:17
**frankly** 444:1
**free** 369:20
**frequently**
361:15
**friday** 288:19
480:1
**front** 350:6
**fruition** 319:6
**full** 411:14
503:13 514:11
**fully** 288:11
**function**
339:10 435:8
488:11
**fund** 337:14,19
338:1,2,9,11,13
338:17,24
339:2,7,10,18
339:23,23,25
340:4,14,19,21
340:24 341:17
341:19,20,21
341:24 342:2,5
342:9,11,17,19
342:23,25
343:13,14,15
343:19 344:6,8
344:17,21,24
345:6,10,11,15
345:17,22
346:2,4,7,8
352:10,25
353:11 356:16

**[fund - glassbridge]** Page 30

362:11 373:10
373:11 375:4
501:9,10
**funded** 503:8
**funds** 316:23
339:5,5,6
353:6
**further** 296:11
400:7 425:19
448:7 476:17
476:20 565:9
565:13
**furthermore**
320:19
**future** 290:20
433:7 510:2

**g**

**g** 288:1,1
516:19
**gaap** 320:13
**gadlin** 284:10
500:5,10,12,20
500:20,24
501:1,22
**garbled** 522:23
**gbe** 281:15
283:19 284:14
284:20,25
285:3 303:8,18
438:2 458:15
459:18 517:22
518:3 534:12
536:16 549:15
551:22 558:20
558:24

**general** 328:12
336:8 343:15
344:7 394:16
395:23 397:4
397:15 398:12
400:21 420:21
534:24
**generalities**
312:11
**generally** 291:8
293:13 309:10
335:13 437:5
437:14 450:4
458:19 496:20
508:22 547:20
**generate**
322:11 382:7
498:13
**generous**
310:11
**gentleman**
353:9
**george** 278:7,8
279:13 281:3
281:19,23
282:1,23 283:2
283:4,8,11,22
284:2,6 286:10
286:13 287:13
296:17 326:10
347:5,17 348:7
348:22 349:3,8
349:13 350:13
368:21 371:4
375:21 421:16

426:20 432:2
445:7 447:6
450:6 454:15
470:4 477:21
480:4,9 491:24
559:25 560:15
564:10 565:6
566:4,21
**george's** 480:10
**getting** 302:4,6
313:10,11
378:24 444:4
450:5 478:1,19
528:24
**giantomasi**
278:23 279:2
286:19 287:8
**give** 288:8
308:11 311:1
352:5 362:16
372:24 404:13
419:22,24
421:3 430:6,25
431:4 441:1
442:12,16,18
446:18 483:7
539:16 546:18
554:19 561:23
**given** 319:18
327:10 336:1
343:25 362:14
362:24 437:17
467:17 483:4
492:8 509:3,10
555:21 558:10

558:12
**giving** 378:22
459:9 561:19
**glass** 300:24
**glassbridge**
278:10 279:22
284:13,16,23
285:2 287:16
291:18,20,22
292:4 300:6,11
300:21,23
301:1 317:21
318:2,9,13,20
318:21,25
319:3,5,10,16
320:2,23 321:1
321:3,13,14
322:20,22
324:11 415:5
423:11,13,14
510:22 511:12
515:6,9,19,24
516:6,12,13,16
516:21,22,24
517:9,11,21
518:5,16
519:19,25
520:2 522:5,10
522:11,12,16
523:1,16 524:7
526:6,17,25
527:1 528:8
529:7,11,23
530:3,8,15,17
531:9,14

CONFIDENTIAL

**[glassbridge - governing]**                                    Page 31

532:10,18
533:10,12,14
535:18,21
536:4,10 537:3
538:14 540:20
541:3,4,6,7,11
541:14,19,22
541:24,25
542:3,10,22
543:12,17,22
544:1,1,19,21
545:1,4,15
546:2,3,10,13
546:15,24
547:1,2,9
548:10,16
549:14,20,21
550:12,19,25
551:1,25 552:6
552:17 553:5
553:15,16,18
555:9 556:12
556:16 557:2
558:6,18,23
559:2 560:5,25
561:14,22
562:7,9,11,17
**glassbridge's**
319:7 531:8
532:13 551:20
**glasses** 401:11
**go** 286:7
296:11 316:16
324:4,9,15
328:21 329:18

329:18 336:11
336:23 343:24
345:25 348:25
349:15 354:7
356:9 357:22
363:3 364:24
366:5 390:11
409:3 421:24
425:6 426:11
428:4 431:16
458:17 471:9
474:22 477:18
484:4 486:22
487:10 492:21
504:12 510:1
523:15 538:3
541:4 543:19
**goal** 344:12
531:16 534:3
541:21
**goals** 365:1
**goes** 316:17,18
370:3 470:11
**going** 286:2
288:21 295:6
296:4 300:3
303:13,17
305:9 310:13
314:25 315:15
320:17 322:4
323:9 326:14
326:25 328:20
329:11 335:22
335:25 336:12
337:15 347:12

347:15 351:23
352:4,14
361:22 363:15
365:23 370:10
378:12 379:13
379:21 382:22
382:23 383:9
385:16 388:2
389:2 390:14
404:1,6 406:5
421:21 426:14
432:4,8 438:11
443:4 445:10
445:16,19
447:9 448:19
448:25 453:23
454:5,14,22,24
455:20,21
456:17 460:7,8
466:17 469:1
470:7,13 471:5
472:20 476:7
478:23 483:25
484:13 485:16
486:4,11,11,13
489:24 490:12
496:5,7 497:4
498:2,19
499:10,25
500:25 502:14
502:16 509:9
509:16 510:9
517:25 524:6
536:15 539:7,8
539:13 540:4

541:23 548:12
555:25 556:5,6
556:7 558:17
563:4
**gold** 279:17
281:10,17
287:19,19
295:4,9 297:13
299:5,6,7
302:3 314:23
315:8 323:21
323:25 324:5,8
325:2 423:25
488:15 553:12
**golf** 498:16,24
499:6 508:4
**gonna** 314:11
352:10 360:19
362:16 383:3,4
486:2,3 487:9
496:23 497:18
498:18,18
**good** 286:1
288:5 343:24
347:10 355:23
375:6 402:21
490:10 492:23
554:10 558:10
562:23
**gotten** 309:6,13
526:7
**governance**
376:9
**governing**
278:22

[government - hall]                                                                    Page 32

**government**
 340:10 353:4,7
**grand** 279:8
**granted** 314:3
**greater** 369:2,8
 498:25
**greenberg**
 392:6
**gross** 327:8
 447:13
**group** 278:10
 281:11,17
 282:15 290:6
 291:9 292:2,20
 292:24 293:2,6
 293:23 294:4,7
 294:12,18
 295:4,10,16
 296:1 297:11
 297:12,12,14
 298:2,6,15
 299:2,13,18,25
 300:10,25
 301:4 302:2,17
 303:20 304:8
 304:14,24
 306:15 313:4
 313:13 314:23
 315:8,25 316:9
 317:2,18 318:2
 318:12,15,18
 319:9 365:12
 365:13 366:10
 366:21,24
 367:11,12,15

 377:9 389:15
 405:25 423:12
 443:12 453:16
 453:20,24
 454:1 494:13
 503:8,11,13
 506:21 515:19
 516:9,12,22
 522:1,25
 523:20,23
 526:16,19,21
 528:24 552:13
 552:15,19
 553:1
**group's** 319:2
**grow** 364:18
 375:7 377:10
**growth** 289:11
 309:12,16,17
**guess** 419:4
 502:24 509:14
 525:19
**guidebooks**
 365:22

**h**

**h** 288:1 516:19
**habit** 508:22
**hackensack**
 279:16
**half** 321:20
 330:21 333:10
 381:15
**hall** 278:7,8
 279:13 281:3,9
 281:12,16,18

281:19,22,23
282:1,2,4,8,9
282:12,14,15
282:19,22,24
283:1,2,4,5,7,8
283:10,12,14
283:17,21,22
284:1,2,4,6,9
284:12,16,18
284:22 285:1
286:10,13
287:13,22
288:5,24
294:25 295:2,6
295:7 296:4,23
303:3,5,13,14
303:19 307:3
314:17,22,25
315:1 323:17
325:11,18
326:7,9,10,14
326:15 328:9
335:21 336:3
337:12 346:14
347:2,3,5,12
349:8,19,22
362:4 368:18
368:20,21
369:1,13 370:8
370:12 373:13
375:21 384:23
384:24 385:3,4
385:8 387:16
387:17,19
388:2,3,6

389:18 390:19
390:23,24
401:18 405:23
405:24 406:1,5
406:6 408:5
413:12,17,18
413:25 414:1,9
416:6 417:1
418:10 421:3
421:13,14,16
421:21,22
426:19,20,24
426:25 431:20
431:25 432:1,2
432:4,5 436:8
436:10 437:8
438:1 439:11
441:5 445:4,5
445:7,10,11
446:10 447:3,4
447:6,10,10
448:13,14,18
449:5,6 450:6
452:25 453:7
454:15 455:21
457:2,3,8,21
458:11,12,17
459:19 460:10
467:23 470:1,2
470:4,8,8
477:10,18,19
477:21,24,25
478:15,23
482:7 483:19
485:17 486:16

490:17 491:21
491:22,24
492:25 493:1
496:11 500:3,4
500:7,8 504:13
509:8 514:8
517:18,19,25
518:1 523:15
523:16 524:8
534:8,9,14
536:14 540:9
549:11,12,17
551:19 554:8
554:18,25
558:16,17,21
559:1,25
560:15 563:1
564:10 565:6
566:4,21
**hall's** 337:9
**hand** 329:22
**handled** 391:16
**handling**
  463:24
**hands** 480:10
**happ** 499:5
**happen** 387:10
  499:24 510:3
  532:12 544:15
**happened**
  299:11,12,15
  299:18 305:20
  314:16 374:10
  474:23 498:23
  499:5,22 527:7

527:20 547:5
556:15,16
**happening**
  316:12
**happy** 334:10
  343:20 402:17
  473:17 474:4
  476:14
**hard** 336:20
  370:18 484:9
**harm** 430:24
**hasten** 492:9
  492:12,13,15
**he'll** 336:20
  350:22
**head** 289:11
  356:16
**hear** 398:17,18
  421:2 422:17
  520:4
**heard** 309:19
  456:16 492:17
**held** 410:12
  459:16 521:2
  540:10,14
**hello** 347:17
**help** 364:17
  375:7 377:10
  383:21 387:7
  402:16 404:6
  522:10 545:12
**helped** 522:2
  557:14
**helpful** 359:13
  377:20

**helping** 388:25
  524:4
**henry** 503:16
**hereinbefore**
  565:12
**hiding** 372:15
**high** 373:21
  375:1 545:5
  550:20
**higher** 321:22
  330:23 333:18
  543:12
**highest** 358:11
  544:5
**hired** 384:16
**hiring** 306:25
  503:11
**historical**
  535:24
**historically**
  548:7
**hmm** 492:5
**hold** 379:15
  400:17 412:7
  420:25 455:5
  457:16,16
  518:17,21,24
  536:16
**holder** 543:3
**holding** 386:9
  415:7
**holdings** 278:3
  278:17 279:6,7
  286:11,17
  287:9 288:17

414:23 415:5,8
422:3 451:18
514:9,14
**home** 305:24
  305:25 306:13
**homes** 306:1
**hoped** 321:23
  377:3 382:6
  432:12
**hopefully** 346:7
  376:12
**hopes** 490:5
**hou** 309:13
**hours** 562:25
**howe** 329:23
  330:4,11 331:1
  333:23 334:13
  334:21 358:5
**howe's** 370:21
**howey** 557:8
**huge** 379:10
**hum** 329:10
  341:2 342:6
  401:22 412:25
  467:16 547:11
**humiliating**
  375:24
**hundred**
  344:14,16
  544:19

**i**

**iason** 279:8
**idea** 298:25
  316:21 333:13
  333:13 338:5,8

339:2 340:13
340:24 347:11
429:15 471:5
491:15 537:13
537:17,18,21
538:22 539:1
548:10
**identification**
295:1,5,7
303:4,9,14
314:24 315:2
326:13,15
347:7 368:19
368:24 369:13
385:2,5 387:21
388:3 390:21
390:24 406:4,6
413:21 414:1
421:13,18
426:23,25
432:3,6 438:2
445:4,9,11
447:8,10
448:17 449:7
458:11,16
470:6,9 477:23
478:23 491:21
492:2 493:2
500:6 517:23
518:1 523:18
534:13 536:14
549:16 551:19
558:18,25
**identify** 351:8
351:18 440:6

**identity** 440:6
**idiotic** 373:21
375:2
**ignored** 475:12
**ii** 278:8
**iii** 278:3,17
279:6,7 286:11
286:17 287:9
414:23
**imation** 284:19
518:11,13,18
518:25 519:20
520:2,14,25
521:2,22 524:4
531:14,15,16
531:18 533:16
533:25 534:2
534:10 536:20
537:3,9,12,14
537:16,17
538:13,16
539:8 545:9,12
**immediately**
466:25 498:15
519:4
**impact** 316:8
**impasse** 503:25
**implied** 457:22
**implies** 457:23
**important**
372:10 535:25
556:25
**importantly**
309:17,25

**impression**
380:16,18
390:8 431:4
**inability**
467:18
**inaccurate**
440:17
**inappropriate**
362:22,24
462:14
**inc.'s** 504:15
506:25
**inclined** 427:11
**include** 469:3
495:15 523:10
557:22 558:2
**included**
424:22 473:19
474:5 545:15
**including** 287:3
288:21 300:6
424:21 433:24
448:8 557:19
**inclusive** 387:2
483:24
**income** 310:6
**incorporated**
286:13,15
443:12 444:17
454:24 468:13
468:14 472:19
488:19 490:4
496:4 497:17
503:9,12
504:20 505:9

513:6 539:11
557:15
**increase** 334:3
335:8 343:13
556:21
**increased**
316:22 531:5
**increasing**
307:8
**independent**
502:8,12
503:10 506:21
532:7
**independently**
343:23 553:19
**index** 281:1
**indicate** 333:22
426:2 457:13
461:14 465:6
**indicated**
291:17 358:5
461:12 480:19
480:20 481:6
483:5,13 494:9
533:20 534:21
**indicates**
466:15 493:25
494:11 559:19
560:12
**indications**
335:10
**indir** 411:23
**indirect** 393:10
395:14,17,19
395:23,25

**[indirect - introduced]**                                                    Page 35

396:2 402:2,9
409:14,17,21
411:1,15,18,19
411:23 412:9
**indirectly**
518:21,23
**individual**
353:4
**individually**
278:4,13
286:11,15
331:6 566:2
**individuals**
306:11,12
415:3,9 503:15
**industry**
358:23
**ineffective**
365:2
**inefficient**
365:2 508:14
**info**  371:4
**inform**  529:1
**information**
289:25 290:9
326:1 327:5
328:14,18
329:13 335:23
336:9,17
337:22 347:18
347:20,21,24
348:13,18
349:18,24,25
350:5,16,21
351:2 352:6,10

362:6,8,19
363:6,18,25
364:4 370:17
371:5 379:7
389:11,14
391:10 393:7
393:10 394:9
407:15 411:14
416:19 417:15
417:21 422:7
422:13 430:13
430:25 431:9
431:22 439:9
445:22,25
447:18 448:7
451:12,17
452:1 473:18
473:21 474:5
474:10 480:21
481:19 487:16
503:7 545:23
558:10
**informational**
346:13
**informed**
469:24 552:23
**infrastructure**
289:22 302:7
309:7 310:1
312:15 365:14
366:8,12
**initial**  333:9
559:5,5
**initially**  307:25

**initiate**  547:15
**initiated**  541:2
**initiating**
537:23
**injection**  321:4
321:10
**injections**
535:16
**injury**  432:23
**inner**  539:5
**input**  407:9
**inquiries**  429:4
**insisting**  369:2
**insolvency**
556:13
**instructions**
288:7,8
**intellectual**
310:5
**intend**  433:6
439:8 497:25
498:12
**intended**
323:10 449:20
453:22 454:2,4
**intending**
351:9,19 496:2
**intent**  338:16
340:2,3 366:1
**intention**
455:13 466:25
490:3,23
491:11 495:5,8
495:13 496:24
497:2 512:1

552:10
**interaction**
432:13,20
**interest**  335:10
338:17,18
339:1 344:6
346:9 353:22
354:3 355:18
374:7 395:20
442:18 515:24
518:17 532:13
540:10,13
542:19 545:20
**interested**
286:25 353:3,7
353:10 565:17
**interesting**
336:5 375:17
**interests**
338:25 339:18
340:15,25
341:4 343:18
409:4 557:25
**interim**  489:1
**internal**  550:9
**interpret**  507:8
**interrogatories**
422:4,12
**interrogatory**
423:2
**interrupt**
486:17
**introduced**
387:12

CONFIDENTIAL

**[invented - joe]**                                                Page 36

| | | | |
|---|---|---|---|
| **invented** 509:2 | 338:16,23 | **irreversible** | 370:10 433:25 |
| **invest** 319:5 | 339:15,23 | 473:12,14 | **iterations** |
| 339:6,14,24 | 340:4,5 341:12 | **issue** 302:23,24 | 484:8 |
| 342:23 355:21 | 341:17,21,23 | 307:25 314:7 | **j** |
| 494:25 537:18 | 342:3,22 | 316:13 324:20 | |
| **invested** 308:3 | 343:13,24 | 365:4 376:16 | **j** 279:5 |
| 312:7 321:22 | 346:21 357:20 | 376:17 377:1 | **jacob** 503:16 |
| 330:4 334:22 | 358:20,22 | 425:11 427:15 | **january** 502:7 |
| 375:10,11,12 | 409:24 412:22 | 428:23 433:20 | 502:12,13,18 |
| 495:2 529:12 | 439:13,16,19 | 433:21 443:6 | 502:19,19 |
| **investing** 331:9 | 494:15,23 | 464:13 477:2 | 503:9 |
| 353:11 494:24 | 495:2 504:8 | 477:25 478:6,8 | **japanese** |
| **investment** | 532:8,24 533:7 | 478:17 510:13 | 514:18 |
| 308:4,6 312:8 | 534:25 | 542:12,22 | **jersey** 278:22 |
| 312:10 321:14 | **invited** 513:22 | **issued** 320:16 | 278:23 279:3 |
| 329:22 330:7 | **involve** 495:6 | 518:9 519:5 | 279:16 286:20 |
| 330:13 331:11 | **involved** | 520:1 | 306:1,14 565:4 |
| 333:23,24 | 305:14 317:17 | **issues** 302:18 | **job** 363:24 |
| 334:6,9 357:21 | 339:9 388:12 | 364:16,20 | **joe** 318:20 |
| 359:10 360:7 | 391:23,24 | 376:11 379:10 | 331:8 356:18 |
| 360:24 370:21 | 392:10 411:21 | 379:10,25 | 371:4,23 372:3 |
| 403:19 423:4 | 416:1 494:1 | 384:10 420:21 | 372:5 381:12 |
| 500:14 529:7,8 | 505:11,20,20 | 426:5 430:11 | 381:21,21 |
| 529:11,13,16 | 509:23 511:19 | 433:5,10,14,15 | 383:22 413:11 |
| 529:17 531:8 | 516:5,10,15 | 433:18,22 | 416:7,25 |
| 536:10 550:8 | 519:16 | 434:2 444:8 | 417:18 419:5 |
| 557:3,10 | **involvement** | 451:8 478:10 | 425:17 436:6 |
| **investments** | 318:22 519:17 | 497:10 | 437:7 453:9 |
| 535:3,4 | 519:18 | **issuing** 530:17 | 457:7 459:1 |
| **investor** 333:11 | **ipo** 543:20,21 | **item** 365:7 | 471:8,11 472:4 |
| 341:14 357:16 | 544:13,15,17 | 370:13 396:3 | 482:14,18 |
| 370:15 494:13 | 544:18 | 452:2 454:14 | 485:8 486:25 |
| **investors** 316:2 | **irrelevant** | **items** 351:11,16 | 499:2,21 506:3 |
| 321:21 332:5 | 431:14 472:22 | 351:18,22 | 507:7 511:23 |
| 335:9,20 | | 352:5 366:9,11 | 528:7 543:13 |
| | | | 548:21 559:25 |

560:2,10,15
561:24
**joe's** 537:21
**john** 282:9,15
329:22 330:4
337:1 387:18
388:6 406:1
408:5 413:11
414:9 416:6,25
418:10 437:8
452:25 453:7
455:21 457:3,8
457:21
**johnson** 278:8
279:14 287:14
**join** 374:7
488:15
**joined** 287:20
**joint** 499:12
**jonathan**
279:10 287:10
329:7 331:24
332:1,3
**joseph** 278:7
279:12,18
280:3 281:23
282:9,15,23
283:2,8,12,22
284:2,5,9
286:13 287:12
287:20,21
328:3 347:5
387:19 406:1
421:15 426:21
445:7 447:6

470:4 477:21
491:23 500:5
503:17
**jr** 454:15
**jsack** 279:10
**jstern** 279:12
**judgment**
314:3,11 558:2
**july** 282:14
350:25 373:4
373:20,25
374:5,22,23
377:23 405:24
408:4 411:25
532:9,25
533:10
**june** 278:24
286:2 297:3,6
350:15,22
504:25 532:9
532:25 533:10
**justified** 334:3
531:5 539:2

**k**

**k** 284:16
523:17 524:7
**keep** 313:8
337:7 375:11
375:16 436:22
485:16 553:4
**ken** 282:5,9
284:5 384:6,7
384:25 387:8
387:19 391:19
408:7 449:11

491:23 493:4,8
**ken's** 389:9
**kenneth** 283:14
448:15
**kept** 299:18
372:7 373:11
**key** 324:10
502:8
**kill** 513:25
**kind** 289:15
318:1 336:4
364:17 367:11
418:23 419:21
419:24 431:13
489:11 508:13
521:17 522:4
545:1 546:19
548:6
**knew** 433:20
528:7,10,12,13
550:15
**know** 289:24
290:4,5,7,8,11
291:8 292:12
295:18 297:7
297:11 298:21
303:23,25
304:1,2,2
307:24 308:17
309:11,11,14
312:7,15,24
314:6 316:14
316:18 317:11
317:12,23
318:22 319:13

320:2,14,14
327:9,11
330:10 337:2
338:20 339:13
340:19 346:20
346:23 348:15
348:17 353:1
354:7,25 356:5
356:6,23 358:5
361:11 365:13
365:21 366:7,9
366:19 367:13
368:7 372:20
377:6 378:24
379:11 382:3
382:18,20,20
383:1 384:18
385:22 387:1
392:21 396:1
404:20,23
405:1,3,19,21
406:20,21,23
406:23 407:2,6
407:22 408:10
408:13 409:1
410:2,6,8,9,10
411:10,13
412:13 415:8
415:15,17,20
416:9 420:13
420:14 422:8
422:10,14
423:14,23
427:24 428:8,9
428:10 430:2

**[know - letter]**                                                Page 38

431:8,20,24
432:14,20
433:17 439:13
439:15,19,23
440:21,22
441:1,14,19,25
443:15 446:25
447:25 448:11
450:15,17
451:9,25
452:18,20
453:1,7,8,10,14
456:20 457:2,9
457:10,12
458:3,6 464:7
468:8 469:10
474:14,15,17
477:2,10,14
478:4,6 479:16
479:21,24
483:2 492:17
497:11 499:12
499:16 501:22
501:23 504:10
504:22 505:2,7
506:4,17,20
507:18 508:23
510:9 511:22
511:23 512:6
515:12,15
517:5 520:13
521:4 522:11
522:24 523:19
527:19,24,25
530:4 537:5,12

537:20 538:6
539:5 540:17
543:6 544:5,10
547:6 548:20
550:13 553:6
555:1 556:1,4
560:9 561:18
561:24
**knowing**
431:17 514:11
**knowledge**
299:11 404:21
440:1 441:14
**known** 528:20
544:4 555:20
**knows** 338:4

**l**

**l** 280:1 288:1,1
**l.p.** 278:3,17
279:6,7 286:11
286:17 287:9
413:3
**labeled** 306:24
**lack** 431:3
509:2 557:16
**lacks** 300:12
**laid** 375:10
**landlord**
292:25 293:6
294:1,16,18
295:15,24
299:17,23,23
302:16,17,24
304:4,13,24
306:16 312:25

313:21 314:2
323:25 454:10
**landlord's**
301:8
**language** 522:9
**large** 289:17
316:4,25
**lastly** 353:20
353:20
**late** 294:10
482:16 489:6
532:9,25
**law** 287:11
376:10 420:4
**lawsuit** 294:20
295:19,25
300:15 302:15
313:23 314:9
314:18 315:8
**lawyer** 362:20
381:9 392:4
**lay** 314:13
**laying** 386:1
**lead** 432:12,19
509:24 511:8
**leading** 416:2
**leads** 317:23
**learn** 412:20
**learned** 300:5
412:16,21
**lease** 300:8
301:17,20,22
302:2,3,10,12
305:17 307:18
307:25 309:19

309:24 311:15
312:19,20,22
312:25 325:13
325:20,21,22
356:15,15
386:5 452:2,10
452:14,15,17
452:21 496:3
497:17
**leaving** 554:7
**led** 294:15
307:6 321:13
333:17 353:5
413:7 438:24
465:21 471:22
475:7 505:21
537:9
**left** 480:10
535:5,8 553:24
554:1
**legal** 322:4
389:17,19,24
390:6,9 392:17
394:5 395:4
396:15 399:24
419:24 420:5
424:12 427:23
548:1
**length** 331:22
**letter** 283:14
448:15,21
449:8,11,24
450:3 451:2,6
451:9,10,16,20
451:22 452:24

CONFIDENTIAL

**[letter - look]**                                                      Page 39

453:11 456:13
456:23 457:11
457:15,18
**letterhead**
448:12
**letters** 448:3
450:5,13,15,19
**letting** 430:24
**level** 470:18,22
471:3 472:16
473:12
**levies** 519:21
531:19
**levy** 519:12
520:1,15
**lfg** 389:15
**lgs** 278:4,13
**liability** 314:3
396:4,23
**license** 386:20
435:12,14
439:19 443:2
455:5,10,13
456:4,19
478:11 487:24
493:18 497:8
497:12,12
498:2 499:14
504:14,20
506:25 507:6
507:14,19
508:2
**licensed** 496:24
**licenses** 453:6

**licensing** 508:6
508:12
**light** 288:20
**likely** 346:4
355:14 378:3
430:23 440:25
450:23 468:11
484:14 486:25
497:18 542:5
561:25
**limitations**
509:11,13
**limited** 344:11
394:16 396:4
396:13,22
397:5 398:12
398:13 400:5,9
400:21 402:24
403:13 404:24
405:1 418:4,16
420:1,11 426:3
442:4 469:15
478:3 481:8,8
483:15
**line** 336:1
365:7 385:11
433:25 566:5
**lines** 481:14
556:21
**list** 328:18
335:6,22 336:2
344:3 399:8
448:8 474:21
475:1 479:22
483:11,14

484:9,17,22
501:20 504:21
507:3
**listed** 365:24
403:6 415:4
**lists** 449:11
452:25
**litigation**
491:19
**little** 296:11
319:18 366:4
370:18 403:7
431:19 433:10
486:17 521:19
547:17 548:12
549:8 560:1
**llc** 281:11
295:4,9 514:9
514:14,16
566:1
**llc's** 396:7
**llp** 279:19
**loan** 519:22
520:16 521:2,3
521:15 531:13
531:15 533:15
533:25 535:21
536:2 539:7,12
539:24 549:3
**local** 414:23
**located** 306:11
452:5 553:2
**location** 286:18
452:14,16

**loeb** 279:19,19
287:15,16
562:14,14,15
562:15
**loeb.com**
279:21
**long** 298:9
455:14,16
458:3 466:2,10
490:22 507:2
527:25
**longer** 336:17
472:19 484:5
557:11
**look** 291:4,8,12
301:16 302:11
303:3 305:3,11
305:12 306:22
310:17,24
311:6,8,12,13
315:1 322:13
327:12 329:1,8
335:15 353:19
359:5,11
368:18,25
369:21 370:4
385:4 390:23
392:20 393:5
403:7 404:11
405:22 409:2
413:16,25
414:6,21 415:1
421:12,21
422:15 426:24
436:7,9 445:3

**[look - madison]** Page 40

| | | | |
|---|---|---|---|
| 445:17 447:2 | **loss** 358:3 | 405:25 408:4 | 333:24 343:4 |
| 448:20 449:5,7 | **losses** 531:17 | 408:11 410:25 | 354:11,14,15 |
| 452:23 457:25 | 531:22 534:4 | 411:7,11 412:4 | 354:19 359:25 |
| 458:10 459:15 | **lot** 317:20 | 415:2,2 416:4 | 361:6,10,10,11 |
| 460:5 465:18 | 318:24 335:1 | 416:5 494:1 | 361:13 362:6 |
| 467:13 469:25 | 335:19 356:13 | | 362:10 368:11 |
| 472:12 477:24 | 357:22 379:12 | **m** | 374:3,4 382:14 |
| 478:22 491:16 | 484:5 539:18 | **m** 278:16 279:6 | 409:22 417:18 |
| 491:20 492:21 | 543:18 548:2 | 279:11 | 419:2 427:25 |
| 493:1 496:17 | 557:13 | **mack** 392:7,9 | 430:9 434:20 |
| 498:15 501:1 | **lots** 289:20 | 392:13,16 | 436:18 442:19 |
| 517:25 521:11 | 335:2 362:20 | 405:17,19 | 446:13,23 |
| 521:19 536:13 | 362:21,21 | 419:2,6,12 | 448:7 459:24 |
| 541:25 543:21 | 367:13 | 420:22 428:15 | 462:17 470:21 |
| 548:8 551:18 | **lower** 358:25 | 428:22 429:4 | 473:12 478:15 |
| 553:21 556:17 | 359:6 | 429:25 430:2 | 479:7,13 481:4 |
| **looked** 289:11 | **lps** 379:13 | 430:18 431:12 | 487:12 488:2 |
| 302:9,10 309:8 | 396:21,24 | 431:14 436:11 | 497:20 507:19 |
| 309:17 310:12 | 412:17 413:2 | 436:17 437:10 | 513:3 519:22 |
| 310:13 347:21 | 414:18 425:12 | 437:15,22 | 521:1 529:15 |
| 450:2 468:22 | 428:16 429:5 | 439:2 440:2 | 529:17 530:13 |
| 485:2 504:11 | 462:9 474:21 | 446:24 447:1 | 533:15 536:10 |
| 525:2 526:11 | 475:1,9 476:9 | 460:23 461:2,3 | 539:20,23 |
| **looking** 295:12 | 476:12,14,21 | 461:16 462:3,9 | 545:1 554:21 |
| 319:8 323:17 | 479:22 484:9 | 463:9 478:16 | 564:7 |
| 327:7 348:24 | 484:18,23 | 480:6,7,8,15,17 | **madison** 289:1 |
| 414:10 437:13 | 487:17 | 480:20,25 | 290:1 291:14 |
| 438:1 473:5 | **lunch** 390:11 | 481:2,15 | 291:16,19 |
| 481:24 482:6 | **luncheon** | **mack's** 430:8 | 295:15 298:3 |
| 542:21 | 390:15 | 461:25 462:13 | 303:21 305:22 |
| **looks** 320:15 | **luxor** 282:14 | **made** 290:1,16 | 306:6 365:16 |
| 327:2 371:17 | 384:8,13 | 297:6 308:4 | 449:13 452:6 |
| 387:6,8 | 385:21 387:13 | 312:16 315:19 | 452:11 454:5,6 |
| **loosely** 344:15 | 388:17 389:15 | 325:12 326:1 | 553:2 |
| 472:8 | 391:20 405:7 | 330:18 331:15 | |
| | | 332:4 333:23 | |

**[maglaw.com - mean]**                                    Page 41

| | | | |
|---|---|---|---|
| **maglaw.com** | 544:19 | **march** 298:8 | **market** 292:8 |
| 279:10,11,12 | **malfeasance** | 353:2 355:22 | **marketing** |
| **main** 279:15 | 372:16,19 | **marcus** 408:13 | 289:19,20 |
| 315:24 452:5 | 373:1,17 | 415:2,13,16 | 472:18,19 |
| **maintain** | 375:19 | **margaret** | **markup** 493:4 |
| 465:15 | **manage** 318:14 | 278:21 286:22 | **masters** 343:12 |
| **maintained** | 342:2 381:11 | 565:3,22 | **material** 458:7 |
| 473:21 474:10 | 555:3 | **marked** 294:25 | 561:24 |
| 476:25 | **managed** | 295:5,7 303:8 | **materials** |
| **majority** | 342:11 396:7 | 303:14 314:24 | 419:22 458:19 |
| 541:12 543:22 | **management** | 315:1 326:12 | 459:3,10 462:2 |
| **make** 293:14 | 317:5 346:9 | 326:15 347:6 | 539:16 546:19 |
| 298:15 335:17 | 363:21,21,23 | 350:6 368:23 | 561:14,20 |
| 335:17 343:24 | 364:25 369:3 | 369:13 385:2,4 | **matter** 281:17 |
| 344:13 363:25 | 428:8 431:17 | 387:20 388:3 | 314:24 421:25 |
| 379:19 382:16 | 435:3 447:24 | 390:21,24 | 441:15 499:6 |
| 388:24 404:7 | 465:5 474:14 | 405:23 406:4,6 | 543:14 |
| 417:15 419:7 | 515:11,18 | 413:21 414:1 | **matters** 286:11 |
| 419:21 423:22 | 522:6,7 523:12 | 421:12,17,22 | 441:7 462:17 |
| 427:11 429:4 | 552:23 554:15 | 426:22,25 | **maturity** 519:7 |
| 431:13 434:7 | 554:22 555:1,5 | 432:3,5 438:1 | 519:10 |
| 443:1 468:13 | **management's** | 445:4,8,11 | **mean** 290:24 |
| 478:13 487:22 | 534:25 | 447:7,10 | 293:18 297:10 |
| 489:8 492:22 | **manager** | 448:16 449:6 | 299:15 337:2 |
| 493:17 529:7 | 342:17 344:6,8 | 458:11,15 | 338:13 343:8 |
| 531:13,15 | 558:7 | 470:5,8 477:22 | 343:22 373:2 |
| 539:7,16 | **managers** | 477:25 478:22 | 374:25 376:3 |
| 546:14 552:10 | 322:1 396:8,8 | 491:20 492:1 | 382:5 387:8 |
| **makes** 548:7 | **managing** | 493:1 500:6,8 | 388:19 404:19 |
| **making** 293:6 | 449:12,15 | 517:22 518:1 | 418:18,21 |
| 298:6 299:2,13 | **manhattan** | 523:18 524:8 | 423:7 436:8 |
| 308:5 313:8 | 309:11 | 534:12 536:14 | 453:4 458:5 |
| 349:25 350:3 | **manner** 339:11 | 549:15 551:19 | 471:18 489:18 |
| 362:18 387:9 | **marc** 327:8 | 558:17,24 | 490:25 492:9 |
| 424:2 428:7 | 447:13 | | 494:18 498:5 |

**[mean - million]**                                      Page 42

504:16 507:1
507:21 528:10
547:7 554:4,24
**meaning**
400:20
**means**  317:6
338:20 439:18
491:2 520:13
**meant**  327:22
373:9 423:23
427:22 507:8
551:10
**media**  286:9
**meet**  500:19,20
**meeting**  281:13
283:17 284:22
285:1 303:6,15
307:11,17,17
307:21 312:2,9
323:12,15
338:15 350:15
350:22,24
351:3,5,10,20
351:22 352:3
361:10 368:3
375:4 377:12
381:23 419:8
419:22 420:22
428:22,25
433:7 436:11
437:3,6,9,11,16
438:4,14,20
439:3 440:16
441:23 442:1,7
442:23,25

443:4,16,18,21
444:6 458:13
458:20,23
459:11,16
461:13,15,22
462:4,5,15
463:5,8,9,12,15
463:16,22
464:19,21,22
466:2,12
471:15,18
500:24 546:22
546:23,25
549:13 551:21
552:3 553:5,5
553:8,22,24
554:1,7,9,11,13
554:14 555:7
555:12,15,25
556:5,5 558:13
558:22 559:3,6
559:7,14,22
560:2,17
561:13,17
**meeting's**
458:21
**meetings**
329:20,21
335:1,11
338:22 341:11
341:16,21
362:21 364:3
425:24 436:23
459:4 486:15
560:4

**member**  363:23
374:17,17
375:18 381:16
**members**
364:23 365:3,9
373:24 374:2,5
381:13 396:5
437:4 481:8
487:14 502:9
503:12,13,14
546:6
**memorialize**
562:13
**memory**  336:19
394:6 415:21
415:23 548:9
**mention**  307:10
373:16 556:25
**mentioned**
292:5 316:13
325:10 330:16
360:11,14,17
360:24 367:7
382:4 475:13
479:11
**merge**  511:20
**merged**  512:20
**merger**  544:12
544:15 545:14
**message**  348:9
**messrs**  554:17
554:24
**met**  321:24
335:2

**michael**  278:16
279:6 281:18
281:23 282:2
282:23 283:1,5
283:8,11,22
284:2 286:16
287:9 326:10
347:4 368:21
370:13 414:22
421:15 426:20
432:2,9 445:6
445:21 447:5
470:3 471:8
477:20 479:25
566:2
**micro**  365:8
**microphones**
286:3
**middle**  325:9
347:15 445:19
503:21 524:19
540:25
**mike**  353:10
361:14 421:25
432:11
**million**  321:20
330:21 332:18
332:20 333:10
353:24 354:10
354:24 355:21
355:22 356:22
357:1 359:9
360:2,3 361:2
361:3 403:19
403:20 504:6

**[million - necessarily]** Page 43

519:7,10 521:8
521:9,23
527:12 529:14
529:15 530:22
531:1,6 532:2
532:4,5,6,20,22
533:5 538:25
539:2,4,13
**mind**   510:11
557:5
**minimal**   306:21
**minimum**
338:14,21
**minority**   557:7
**minutes**   281:12
283:17 284:22
285:1 303:5,15
312:8 329:19
329:19,20
346:16 436:22
436:25 437:11
437:20,24
438:3,19 439:5
440:13,16
444:20 458:12
458:18,22
459:5,6,12,15
459:20,25
466:22 473:5
490:9 506:18
549:12 551:20
553:4 558:19
558:21 559:2
**misleading**
475:6 476:4,5

**mismatch**
317:13
**mistake**   449:18
492:22
**misunderstood**
471:12
**mmm**   323:2
**model**   317:19
343:9 424:10
424:14 471:6
473:16 474:22
485:4,21 486:3
486:4,22,23
487:10,10,13
498:1
**models**   497:21
**modern**   289:21
**modification**
434:14
**modifications**
434:7,10,12,19
**modify**   434:23
434:23 472:25
**moment**   416:8
420:25 466:6
**monday**   288:18
**monetize**
472:12
**monetized**
383:12
**monetizing**
470:22
**money**   299:24
330:23 332:17
332:20 333:12

339:7 409:24
529:24,25
530:22 533:25
535:21 538:25
539:24 545:8
**moniker**
301:25
**monologue**
337:6
**month**   299:7,25
316:18,19
317:10,10
344:23 473:6
536:6
**monthly**
315:24 316:10
317:23 365:6
505:5
**months**   381:3
458:2 469:23
475:5 476:2
483:11,17,19
483:22,23
484:7 485:11
491:4,4
**morning**   286:1
288:5
**morvillo**   279:8
287:11
**motion**   554:21
**move**   337:8
424:17 472:2
481:6 483:8
486:4,12,13
552:22

**moved**   470:19
471:25 502:9
**moving**   552:24
553:19
**multiple**
282:19 306:8
413:19 425:17
513:1,6,18
**mute**   286:5
**mutually**
550:14

**n**

**n**   278:20 279:1
280:1 500:18
516:19
**n.j.a.c.**   565:24
**name**   286:20
292:7,7 293:10
321:7 372:4
410:20 435:17
499:16,17
514:9,11
516:17 566:2,4
**named**   500:15
**names**   346:21
386:9 393:15
410:7,11
411:15,18
476:14 495:1
**nature**   419:9
425:14 427:18
**nauseam**   444:6
**near**   433:7
**necessarily**
346:9 348:15

363:8 414:19
416:20 534:22
**necessary**
301:18 507:12
**necessity**
437:17
**need**  288:8
309:12 310:7,8
310:8,9 312:12
323:23 324:7
370:9 371:24
382:12,13
386:8,22,25
398:17 401:11
408:23 410:25
416:19 419:25
428:16 429:5
434:5 442:16
445:18 455:22
504:12 528:25
535:16,23
**needed**  312:22
323:20 363:25
405:8 419:17
440:21,22
456:3,18
555:22
**needing**  307:7
**needs**  399:3
408:21 524:16
**negative**
319:13 320:3,9
**negotiate**  522:2
549:9 554:23
555:8

**negotiated**
323:20,24
324:8 325:2
499:19 505:3,7
525:20 526:9
527:6 548:15
552:9
**negotiating**
499:20 526:21
**negotiation**
524:2,3,3
527:9 549:2
555:12
**negotiations**
505:22 511:15
547:1
**neither**  565:13
565:16
**net**  316:16
531:17,22
534:4
**network**  322:2
**never**  309:8,19
310:6,12,13
339:22 340:1
344:4 373:8
374:16,20
474:24 475:1
477:2,6,6,7
481:1 490:25
492:17 496:1
497:2 499:8
557:18
**new**  278:1,22
278:23 279:3,9

279:9,16,20,20
281:10 286:19
288:2,2 295:3
295:9,16,23
306:1,13,14
309:25 393:6,9
452:6,6 473:1
485:12 486:14
487:16 508:21
508:21 509:1
514:1 530:16
533:5,6 534:25
535:3,4 542:12
542:22 565:4
566:1
**night**  288:19,19
288:19
**nine**  321:20
330:21 333:10
**ninth**  449:13
**nj**  414:23
**nols**  531:20,23
534:6 545:10
**non**  309:18
472:11
**nondisclosure**
476:4,11
**nonissue**  377:3
377:4
**nonmonetary**
346:19
**nonpayment**
302:19 314:4
**nonsense**  476:3

**nonstarter**
359:16
**norensberg**
282:10 283:15
284:5 384:6,7
384:13 385:25
387:9,13,19
388:17,25
389:19 390:3
391:19 405:7
405:17 407:9
408:8 414:9
428:15 429:3
439:2 448:15
449:11,21
450:4 451:10
453:10 460:15
462:3,8 464:4
478:16 491:23
494:1
**norensberg's**
389:7 408:15
**norensberq**
282:5 384:25
**normal**  422:1
**north**  279:15
**notary**  564:17
566:25
**note**  286:3
288:15 422:2
519:5,8,12,12
520:1,18,24
524:14 535:22
536:3

**noted** 437:24
564:5
**notes** 437:2,6
440:12 519:14
519:24 521:5,8
521:22
**notices** 346:17
**noticing** 287:5
**notified** 481:1
**notwithstandi...**
475:23
**november**
296:25 305:1
**number** 289:12
289:14 291:6
291:11 302:20
308:19 316:4
338:10 346:8
352:7 354:14
354:15 356:6
359:25 360:8
369:5,6 371:18
374:8 375:13
375:14,15
376:6 379:25
408:1 410:18
413:6,22
417:19 454:17
469:18 474:13
501:17,17
516:15 520:25
521:24 541:13
541:14 543:12
544:10 548:11
553:20

**numbers** 409:8
453:1 459:17
547:23 549:5
**numerous**
308:3

**o**

**o** 280:1 288:1
500:18,18
**oath** 286:23
287:23 288:3
315:12 565:6
**objec** 342:18
365:15 381:8
461:19 481:10
**object** 328:20
335:25 363:15
379:15 502:16
502:17 510:10
**objecting** 336:8
**objection** 289:7
290:14 292:22
293:17 294:9
298:17 299:14
299:20 300:12
301:10 302:5
303:22 304:5
304:10,15
305:23 307:13
309:3 313:5
320:10 323:16
324:19 325:4
331:4,18 333:8
334:4 337:5
339:21 340:8
340:17 341:9

341:18 342:10
342:20 355:20
358:16 362:9
364:9 365:17
366:22 367:3,6
367:21,21
369:9 370:23
376:24 380:25
384:15 386:24
391:18 394:4
395:3,10,15,21
396:14 397:22
398:18,23
399:23 402:11
403:25 409:11
412:3,10
417:17 418:5
420:2,18,24
423:25 424:11
424:19 425:5
430:5 436:14
437:21 439:17
440:10,18
442:24 443:8
444:12 446:8
453:3 462:25
463:14 464:1
466:20 475:3
476:1,19
478:20 479:18
480:23 481:12
481:20 483:9
483:16 485:22
486:6,24 487:5
487:11,25

488:13 489:10
489:16 490:1
495:9,17 498:4
512:16,24
513:15 516:8
521:7 526:18
528:17 531:7
533:9 535:19
553:3 555:4
557:21 558:4
**objections**
287:1 337:1,8
460:3
**objectives**
515:16
**obligated** 380:6
**obligations**
294:13 297:1
396:2 556:14
**obstacle** 478:18
**obviously**
291:7 480:11
484:10 485:8
541:24
**occasionally**
460:2,3
**occupy** 291:13
300:11 301:1,5
301:9 305:11
454:10
**occupying**
300:7 324:18
**occurred**
350:25 359:6
541:9 561:4

**[october - okay]**                                                                 Page 46

| | | | |
|---|---|---|---|
| **october** 284:14 | **officers** 393:8 | 311:3,9,12,25 | 361:19 364:12 |
| 284:20 321:4 | 455:22 456:3 | 312:21,23 | 364:19 366:25 |
| 517:21 518:4 | **offices** 278:22 | 313:12,16 | 368:15 369:7 |
| 527:25 529:4,6 | 306:9 | 314:1,25 | 369:12,18 |
| 529:10,17 | **official** 377:8 | 315:14,17,18 | 370:20 371:1,8 |
| 534:11,19 | **offset** 293:2 | 316:1,8,20 | 371:11,20,25 |
| 536:9 538:5,7 | **oh** 293:24 | 317:1,7 318:6 | 372:6,12,22 |
| 538:10,10,11 | 326:20 329:17 | 318:10 319:13 | 373:14,24 |
| 539:3 | 351:14 360:20 | 319:24 320:1 | 374:3,21,25 |
| **odeon** 500:15 | 360:20 386:16 | 320:14,17 | 377:22 378:4 |
| 501:1 | 394:20 406:16 | 321:8 322:16 | 378:24 379:5 |
| **offer** 353:21 | 410:6 496:17 | 322:17,22,25 | 380:4,10,21 |
| 354:12 355:8 | 502:15 560:19 | 323:5,9,13,14 | 381:10 383:5 |
| 361:6,9,13 | **okay** 288:13 | 324:14 325:1 | 383:24 384:18 |
| **offered** 334:21 | 289:15 290:8 | 325:11,25 | 384:22 385:7,8 |
| 335:9 356:25 | 290:22 291:25 | 327:4,9,12,19 | 385:19 386:21 |
| 360:23 476:22 | 292:10 293:5 | 328:2,9,13 | 387:3 388:1,13 |
| 476:24 487:16 | 293:10,25 | 329:6 330:4,6 | 389:14 390:10 |
| 501:17,18 | 294:5,11,17 | 330:10,14,25 | 391:9,15 392:2 |
| **offerings** 484:8 | 295:14,18,22 | 332:10,13,19 | 392:8 393:5,12 |
| **offers** 354:16 | 296:3 297:7,10 | 333:4 334:1 | 393:22 394:2,7 |
| 354:19 360:1 | 297:20 298:1 | 337:17 338:2 | 394:14,23,24 |
| 361:3 | 298:21,25 | 338:12 339:16 | 395:7,12,18 |
| **office** 306:7,7 | 299:10 300:22 | 340:6,13,23 | 396:1,11,24 |
| 306:16,24 | 301:3,14,19 | 341:5,13 342:4 | 397:12,16,17 |
| 365:6,11,18,24 | 302:1,14 303:3 | 342:15 344:25 | 398:6,25 399:4 |
| 365:25 452:3,4 | 303:24 304:3 | 345:2,13,20 | 399:18 400:9 |
| 452:5,10 | 304:18,23 | 347:12 348:4 | 401:3,11,19,25 |
| 552:22,24,24 | 305:3,10,14 | 348:17,23 | 402:7,15,19 |
| 553:7,17,19 | 306:5,18,22 | 349:1,12 350:3 | 403:9,11,22 |
| **officer** 455:9 | 307:4,5,10,16 | 350:9 351:1,6 | 404:12,23 |
| 456:18 465:7 | 307:20 308:7 | 352:7 354:2,11 | 405:3,14,22 |
| 465:12 505:13 | 308:15,18 | 354:18 355:4,7 | 406:18,23 |
| 551:25 552:11 | 309:8 310:12 | 355:17 357:8 | 407:2,22 408:2 |
| 552:12,16 | 310:17,25 | 360:4,10 361:5 | 408:17,20 |

CONFIDENTIAL

**[okay - opportunity]**                                Page 47

| | | | |
|---|---|---|---|
| 409:8,14 410:2 | 459:14,24 | 517:13,17 | 445:25 459:20 |
| 410:8,23 | 460:5,9,10 | 518:8,21,24 | 509:20 556:15 |
| 411:10,24 | 461:1,25 | 519:3,25 | **one's** 519:12 |
| 412:15,20,23 | 462:21 463:19 | 520:17,23 | **ones** 293:14 |
| 413:9,13,25 | 464:10 466:1 | 521:13 522:19 | 362:11 450:12 |
| 414:13,21 | 466:15 468:6 | 523:6,15 | 504:8 535:17 |
| 415:1,12,17,25 | 469:10 470:7 | 524:18,19,25 | **ongoing** 531:10 |
| 416:9,17,22 | 470:16 471:24 | 525:4,13 526:9 | **online** 464:8 |
| 417:2,13 419:6 | 472:15 474:3 | 526:15,20 | **oop** 349:2 |
| 419:9,21 421:2 | 475:22 476:15 | 527:3,17 | **open** 367:12 |
| 422:10,15,19 | 476:22 478:14 | 528:23 529:4 | 457:22 |
| 422:24 423:18 | 479:13,21,25 | 529:10 530:6 | **oper** 552:12 |
| 424:7,15 | 480:18 481:1,4 | 530:12,18,23 | **operate** 454:5 |
| 425:14 427:18 | 481:16 482:8 | 531:3 532:15 | 513:21 |
| 429:14 430:15 | 482:10,19 | 532:17,23 | **operating** |
| 430:17 432:25 | 483:12,25 | 533:4,20 | 501:10 531:17 |
| 433:2,17 434:4 | 485:15,25 | 534:20 535:4 | 531:22 534:4 |
| 435:23 436:21 | 488:3,20 | 536:6,13,18 | 551:25 552:12 |
| 436:25 438:6 | 489:19 490:7 | 537:5 538:2,11 | 557:2 |
| 438:13,14,21 | 490:24 491:7 | 538:16 539:1 | **operations** |
| 439:1,6,11,21 | 491:11,13 | 540:1,22 | 282:15 318:14 |
| 439:25 440:4 | 492:16 493:15 | 541:17 542:2 | 405:25 408:4 |
| 441:5,14,22 | 493:25 494:7 | 542:25 544:14 | 515:15 531:10 |
| 445:16 446:16 | 494:22 496:5 | 546:25 547:8 | **opine** 478:9 |
| 446:19,22 | 496:20 499:9 | 548:15 550:11 | **opinion** 389:17 |
| 447:20 448:9 | 499:25 500:19 | 550:16,22 | 392:17 403:14 |
| 448:13,23 | 500:23 501:3,8 | 551:3 553:21 | 419:24 420:5,5 |
| 449:10,24 | 501:14,21 | 554:14 555:6 | 420:16,23 |
| 450:10,19,25 | 502:6,19 504:4 | 555:24 558:16 | 430:3 436:12 |
| 451:6,11,15,21 | 504:12 506:14 | 560:8,11,22,23 | 436:15 447:23 |
| 451:25 452:9 | 509:14 511:4,9 | 562:15,18,22 | **opportunities** |
| 452:18 454:20 | 512:3 514:4,12 | 563:1 | 508:11 |
| 454:21 455:14 | 514:19 515:4,8 | **old** 474:22 | **opportunity** |
| 455:18 457:10 | 515:17,22 | **once** 308:4 | 335:4 470:20 |
| 457:25 458:10 | 516:5,23 517:3 | 371:18 443:18 | 471:25 472:3 |

472:10 495:20
498:21,24
501:19 508:8
542:1 559:24
**opposed**   425:2
537:3 539:3
542:9
**opposition**
281:16 314:23
315:3
**option**   447:21
466:25
**options**   513:1
**oral**   278:7
**order**   278:19
386:22 497:9
523:1
**original**   331:13
332:7 333:19
339:2 343:9
404:17,25
468:24 475:10
490:2 496:23
519:6,9 529:13
**originally**
429:7 466:14
520:1
**orix**   284:13
321:6,7,10
514:9,10,14,15
514:20,22,25
515:2,6 516:2
516:3,11 517:1
517:4,8,11,21
518:6 519:22

520:2,16 521:1
521:4,23 522:3
524:4,22
525:16 526:4
527:6,7 528:6
531:13 532:10
533:15 537:16
539:5,6,6,16,18
539:20,23
545:6,7,8,13
550:23 555:21
556:11,14,15
556:19
**orix's**   549:3
550:9,17
**outbox**   474:1
481:22
**outcome**
286:25
**outside**   318:23
539:12
**outsource**
289:18
**outstanding**
518:10
**overall**   289:8
318:22 365:1
**overlandlord**
293:1
**overlease**   293:1
**owed**   299:23
520:19
**own**   306:1
344:5 365:21
365:25 380:18

409:9,10 415:4
518:22
**owned**   353:6
383:2 393:21
394:1 423:15
424:3,4,16
425:2,3 488:24
512:15,23
518:15 519:19
519:20 520:14
520:25 541:12
544:21
**owner**   393:22
394:3,25 395:9
395:19,23,25
396:4 397:3,14
401:4,16 402:2
402:5,10
409:18 411:19
414:22 415:7
415:19 417:9
425:18 427:5
436:5 443:6
468:18 477:4,4
**owners**   379:7
393:8,10
395:14,17
396:3 397:18
397:18 399:22
403:6 408:21
409:15,20,21
410:12,24
411:1,15,18,23
412:9 415:6
417:24 419:18

420:11,15
422:2,21
423:13 425:8
427:24 428:9
428:10 431:18
431:23 435:2
435:23 436:5
437:18 438:25
440:7,22 443:5
443:13 447:25
448:4,8 451:17
467:2,3,19,20
468:20 469:4
483:3,7 494:9
513:25
**ownership**
395:20 402:4
408:22,23
409:4,6 411:8
411:14 412:5,5
412:8 417:3,16
423:4,9 427:6
429:16 434:6
435:3 439:8
441:10 443:11
445:22 447:17
460:19 462:24
464:21 468:17
473:18 474:5
480:8,21
481:18 494:8
494:11 515:23
518:17 543:23
554:16

**owns** 394:10
518:9

**p**

**p** 278:20 279:1
279:1 280:1
**p.c.** 278:23
279:2,8,15
286:19 287:20
**p.m.** 349:9
378:11,13
390:13,16,17
426:13 448:24
449:1,2 490:11
490:13,14
540:3,5,6
563:3,5
**page** 281:2,8,12
281:18,20,22
282:1,4,8,12,14
282:19,22
283:1,7,10,14
283:17,21
284:1,4,6,12,16
284:18,22
285:1 295:12
296:4,7,8,15,18
296:19 297:24
300:2 303:5,17
323:1 326:9,11
326:19,22
347:3,16
348:10,25
349:5 350:10
350:11 368:20
369:19 371:2

372:13 373:20
384:24 387:17
390:19 392:20
405:24 406:9
406:15 413:18
414:21 421:14
421:22,24
422:20 426:19
432:6 438:7
445:5,12,20
447:4,12
448:14 451:21
452:24 454:13
458:12 470:2
470:10,17,17
471:10 477:19
478:24 479:1,3
484:1 491:22
491:24 494:10
500:8 517:19
518:8 523:16
524:12,13,19
534:9 536:25
549:12 553:22
558:21 566:5
**pages** 392:25
**paid** 292:14
293:7 299:23
299:24 302:4,6
313:10,11
331:1,1 365:13
365:20 366:9
366:24 367:8,9
383:9,20,24
521:4,9 523:20

525:7,8 527:15
527:21
**paper** 365:19
367:8 433:25
434:1
**paragraph**
296:5,8,24,24
297:20,23
300:4 315:15
315:16,22
320:18 322:14
322:15 323:1
323:18 324:13
353:19 386:8
386:14 393:5
452:24 460:24
467:14 480:4
503:18,21
519:4 521:11
**parens** 322:19
**parent** 453:15
453:19 455:1
514:18 518:23
**park** 279:19
**parkway**
278:23 279:2
**part** 324:11
325:25 327:4
330:13 357:19
363:24 385:18
407:5 419:11
456:7 484:11
520:2 522:5
523:9 525:3
532:11,11,24

533:1 540:24
540:25 545:6
545:13 549:7
550:20 551:4,5
551:8,9 555:20
556:18
**partial** 302:18
**partially** 425:3
**participate**
407:11 439:3
493:20
**participated**
414:17 527:1
**participating**
287:17
**participation**
363:11 415:12
493:24
**particular**
293:11 318:17
319:18 325:14
381:12 396:19
440:14 451:5,7
451:20 458:18
514:22
**parties** 282:6
282:19 286:7
331:25 385:1
413:19 505:6
541:16 550:14
558:6 565:15
**partner** 343:15
344:8
**partnering**
342:16

**partners** 342:1
394:16,17
396:13 397:4,5
397:15 398:10
398:12,13
400:5,10,17,21
400:22 402:24
403:13 404:24
405:1 418:4,16
420:1 426:3
442:4 469:15
478:3 481:8
483:15
**partnership**
394:15 397:4
397:15,20
402:10 420:12
**partnership's**
394:19 397:7
398:15 400:11
400:18,24
404:9
**parts** 419:12
521:20
**party** 286:24
343:16 375:6
425:4 489:14
498:22 504:5
510:6 513:19
524:14
**pass** 455:22
456:4
**passed** 299:17
**passing** 458:4,9

**past** 371:17
404:1 463:8
**path** 465:19
466:24 467:5
467:14 468:4,7
**pay** 289:6
291:22 292:10
297:1 306:18
335:20 357:20
358:24 366:2
468:12 488:18
488:18 490:4
532:25 533:8
547:17
**paying** 289:1
291:9 292:20
292:24 293:2
293:23 294:1
297:12 303:21
304:8 313:4
324:22 358:1
365:12 366:6
366:20
**payment**
302:19 306:21
324:3 505:4,5
**payments**
293:14 297:3,6
298:6,9,12,15
298:15,20
299:1,12,16
367:1
**pays** 365:25
**pbgc** 526:6

**peak** 316:14,15
**pearlson** 279:4
281:4 287:6,6
288:4,14
294:24 303:11
314:20 318:4
325:16 326:6
326:20 328:23
329:6 331:20
331:24 332:1,3
336:4,7,14,22
336:24 337:1,4
337:11 347:1
347:10 348:1,3
348:23 349:1
349:11,14,16
351:14 361:19
362:3 369:24
378:8 384:22
386:14 387:15
387:24 390:10
390:22 398:19
400:14 401:10
402:14 403:2
403:15 406:12
406:16 413:16
415:22 416:5
418:20 426:7
426:11,18
431:25 433:3
447:2 449:4
450:7 467:13
467:17 469:25
477:17 490:7
490:16 492:12

492:16,23,24
494:20 498:7
500:2 502:23
514:24 515:1
517:17 522:19
524:11 534:7
540:1,8 549:10
560:20 562:22
**pending** 294:20
314:8,9
**pension** 524:22
525:5,6,8,11
**peo** 309:14
**people** 293:8,24
293:25 305:24
305:25,25
306:2,3,14,17
318:24 335:2
335:15 356:17
374:8 377:10
388:9 407:10
408:1 443:6,25
456:8 472:13
472:22,24
494:24 503:11
509:5,23 528:9
528:12,13
537:18 543:1
**perceived**
543:16 554:1
**percent** 344:14
344:14,16,17
381:15 394:11
394:18 395:1
396:7 397:7,9

397:18,19
398:15 400:10
400:17,24
401:6 403:21
404:8 408:22
408:23 409:9
409:10 412:6
515:25 516:1
518:22 525:14
525:21 526:10
526:22 527:2
540:12 543:13
544:20,22
547:16 548:7
557:1,1,10
**percentage**
409:23 423:16
527:5
**percentages**
410:12
**perfect** 315:18
315:20
**perfectly**
474:20
**performed**
415:9
**performing**
525:10
**perio** 278:7
279:18 280:3
281:24 282:9
282:16,23
283:2,8,12,23
284:3,5,10
286:13 287:20

287:21 318:20
327:6,8,10
328:3 331:8
347:5 355:12
355:15 356:18
371:23 372:5
372:19 381:21
383:22 387:19
405:18 406:1
408:7 409:10
409:17 412:7
413:11 414:10
416:7,25
417:18 418:2
418:15 419:5
421:15 422:21
422:25 426:21
436:6 437:7
445:7 447:6
452:25 453:9
455:21 457:3,7
459:2,20 470:4
477:21 479:3
480:1 487:1
488:9,24
491:23 493:3
494:12 499:2
499:21 500:5,9
501:21 503:4
503:17 506:3
528:7,16 535:6
535:9 540:14
540:19 543:10
546:1 553:23
554:18,24

558:6 559:25
560:5,10,15
561:19 562:10
**perio's** 425:17
546:11 547:4
555:9 561:1
562:8
**period** 294:22
304:16,17
316:21,24
318:3 319:21
320:22 325:5
334:19 336:2
336:18 337:20
351:25 352:1
352:21 381:25
400:15 418:25
456:21 484:4
489:4 528:1
**periods** 299:25
**permission**
300:10 301:1,4
301:8 454:9
**permitted**
301:21
**perpetuity**
504:15 506:25
507:5,9
**person** 314:14
425:22 464:8
516:21
**personal** 380:5
540:20 541:18
542:7,9 546:3

**personally**
290:24 291:1
540:11
**personnel**
472:11
**pete** 505:9,21
**pga** 472:9
507:21,23
**phone** 418:19
425:24 428:22
436:18 437:15
**phones** 286:5
**phrase** 444:14
468:2
**phrased** 325:17
**physical** 306:7
306:8
**pick** 286:4
**pieces** 452:1
539:9,10
**place** 286:7
309:14 355:5
367:25 368:2
384:19 388:22
397:10 438:15
475:7 523:10
534:16 536:2
560:24 565:12
**plaintiff** 278:5
278:14 279:6
288:18
**plan** 282:17
284:7 289:9
308:12 322:6
333:13,14,16

| | | | |
|---|---|---|---|
| 333:17 363:20 | **play** 343:14 | 562:23 | **possibly** 399:25 |
| 364:1 386:5 | 522:1 | **pointed** 335:16 | 439:5 |
| 393:25 406:2 | **plaza** 279:15 | 399:13 | **post** 312:10 |
| 406:25 407:4,7 | **please** 286:3,5 | **pointing** 349:9 | 381:2,3 |
| 409:3,5 416:14 | 287:2 398:20 | **points** 301:20 | **potential** 305:5 |
| 424:18,21,22 | 422:3 453:15 | 354:15 359:5 | 330:22 335:15 |
| 426:6 427:10 | 453:17,18 | 430:18 | 338:16,23 |
| 427:20,22 | 463:2 483:7 | **policy** 439:24 | 339:7,14,14,25 |
| 444:17 452:4 | 494:10 549:23 | **pool** 501:5 | 341:11,13,17 |
| 465:22,23 | 559:9 | **portion** 302:7 | 341:20,21,23 |
| 466:16 467:9 | **plural** 432:16 | 468:24,25 | 341:24 342:1,4 |
| 467:24 468:25 | **plus** 299:22 | **portions** | 342:19 344:10 |
| 475:13 476:5 | **point** 303:20 | 524:17 | 346:21 372:25 |
| 477:6 485:13 | 304:21 305:10 | **position** 353:24 | 373:17 374:8 |
| 485:14 491:6,7 | 327:10 336:23 | 357:1 379:8 | 466:21 468:10 |
| 491:25 493:4,8 | 336:25 339:17 | 439:7 449:21 | 470:19 471:25 |
| 493:16,21 | 353:8 354:14 | 518:25 556:21 | 472:3,9 479:6 |
| 494:2,8,10 | 359:2 360:24 | 557:7 | 479:9 498:21 |
| 495:18,22 | 364:6,10 | **positive** 319:14 | 510:12 513:1 |
| 496:14,15,18 | 367:23 372:3 | 320:3,9 | 542:4 543:20 |
| 498:11 504:9 | 377:24 378:17 | **possession** | 544:6 546:9,16 |
| 504:10 507:13 | 382:1 385:23 | 521:16 | 547:3,10 557:3 |
| 542:24 | 413:1 416:17 | **possibilities** | 560:25 |
| **plans** 485:10 | 419:2 424:1 | 443:10 | **potentially** |
| 496:12,21 | 429:9 442:10 | **possibility** | 317:24 330:19 |
| 497:8 | 446:19 456:12 | 353:5 367:14 | 333:15 335:5 |
| **plate** 377:1 | 463:17 464:25 | 378:21 485:24 | 342:25 353:5 |
| **platform** | 466:3 469:13 | 540:19 | 356:9 362:14 |
| 321:23 339:20 | 484:10 487:13 | **possible** 322:18 | 379:11 381:7 |
| 340:16 341:4 | 490:19 504:7 | 343:10 357:6 | 403:3,4 416:7 |
| 342:14 344:1 | 507:9 517:8 | 362:14 400:6,8 | 431:3 440:3 |
| 383:14,19 | 539:3 553:15 | 547:17,18 | 443:11 456:8 |
| 490:5 501:7,20 | 553:18 555:10 | 548:13 549:8 | 491:14 493:23 |
| 504:21 508:23 | 555:19,25 | 550:21 | 510:1 512:7 |
| 509:1,6 | 556:9 561:6 | | 533:25 |

**[power - probably]** Page 53

**power** 401:5
441:1 464:2
**pre** 312:8
332:17,20
530:22 538:25
**precise** 409:12
496:18
**preclude**
467:20
**prem** 325:22
**premise** 559:12
**premises** 289:1
289:6 290:9
297:21 300:7
300:11 301:1,5
301:9 304:9,14
304:25 307:18
322:19 323:11
325:23 454:11
**preparation**
491:4 494:2
**prepare** 389:1
437:3
**prepared** 407:6
407:9 423:3
437:1,6 453:11
493:16 565:23
**present** 287:3
353:23 355:8
462:2,7 470:24
547:23 550:12
552:3 558:9
559:4,15,21
560:17 561:12
561:13

**presentation**
419:3,7,10,12
546:14,17
**presentations**
365:20
**presented**
376:17 460:1
535:18 548:18
548:19,25
549:20 550:5
550:13
**president**
338:15
**pretty** 289:17
309:23 321:3
322:2,2,6,6
335:14 346:18
355:23 361:14
439:24 508:14
533:19
**prevented**
478:11 510:7
**preventing**
478:1
**previous** 316:7
330:16 334:8
372:9 379:9
443:23 457:20
458:21 461:11
461:23 471:9
549:4,6 550:8
550:19 555:23
**previously**
325:11 345:16
347:21 350:7

352:19 446:6
474:17 479:11
523:13
**price** 309:7
330:10,12,15
331:1,13,13,16
332:14,15,16
332:21 333:23
333:25 334:3
335:9 354:10
354:18,21
355:1,12 357:4
357:9,14,19
358:11,11,14
358:17,18,19
358:21,24,25
359:6,16
360:11,15,16
360:19,22,23
511:7,10,13
530:7,13,19,21
535:7 538:4,19
538:22,24
539:21 547:24
549:2 550:5,7
550:12 551:1
551:14 555:17
**prices** 360:12
**primarily**
315:23 318:19
356:18 363:19
495:21 501:1
**primary** 318:8
516:21

**principal** 519:7
519:10
**prior** 302:15
307:17 310:25
311:4,5,5,7
337:21,23
351:9,19,22
352:22 353:1,2
354:2,11 374:6
374:22,23
389:6 420:22
430:4 463:8
471:4 473:20
474:8 486:10
495:13 519:4
519:21 546:25
547:7 565:5
**private** 286:4
544:18
**privilege**
301:12
**privileged**
378:22
**pro** 289:8
301:24 308:12
330:18,19
335:13 375:14
376:7 533:6
**proactive**
428:21
**probably** 305:7
311:10 344:23
345:8 379:2
382:19 408:1
410:9 416:25

**[probably - purpose]**                                                    Page 54

446:1 526:7
540:16 553:8
**problem**
480:17
**problems** 304:3
307:11 553:1
**procedures**
278:22
**proceeding**
287:1 288:20
**process** 314:12
317:12 318:11
354:8 384:14
385:18 387:5
388:7 391:24
412:24 414:14
455:14 458:1
472:18
**produced**
410:16
**production**
288:18
**productions**
288:16
**productive**
432:13,19
**professional**
375:25
**profitable**
317:25
**profits** 344:18
**programming**
289:19 472:24
**progress**
330:22 333:15

334:11,24
**project** 472:7
472:11
**projection**
290:2
**projections**
306:25 330:15
533:6
**projects** 289:18
289:18
**promissory**
519:5,8,23
**promptly** 446:2
**properly** 337:5
434:16
**property** 313:4
**proposal**
547:19
**propose** 545:14
547:10
**proposed**
282:16 284:7
406:2,25 407:4
407:6 491:25
515:5 547:14
555:16 561:10
561:21
**protective**
278:19
**provide** 308:7
325:19 328:17
346:11 351:9
351:19,23
352:10,13,14
352:16,17

363:24 379:6
389:24 392:16
393:7,9 394:8
439:8 441:10
445:21,23,25
446:14 447:17
452:9 453:20
462:23 473:18
474:4 479:22
480:7,20
484:20,22
523:1
**provided** 293:4
310:16 328:11
329:20,21,23
330:17 335:23
336:10,17
346:16 350:17
351:2 371:23
389:15 411:11
446:12 459:4
475:2 522:13
523:23
**provider** 344:2
**providing**
318:2 329:12
329:22 389:19
390:6,9 407:14
553:17
**provision**
302:11,12
**prudent** 467:4
**ptp** 514:9,14,16
**public** 382:12
423:11 427:11

428:7,10,12
508:25 543:3
543:25 544:4
544:19,24,24
564:17 566:25
**publicly** 320:16
322:22
**purchase**
284:12 338:17
338:25 339:18
340:3,14,25
354:12 360:21
366:15 370:14
517:20 518:2,5
518:18 521:5
525:1 529:5
530:8,10
532:18 533:18
536:3,11,24
537:2 538:7,12
546:10 547:15
555:17 559:24
560:25
**purchased**
358:6 521:23
532:14
**purchases**
331:12
**purchasing**
365:21 538:16
**purpose** 339:8
488:16 500:23
501:12 508:7
512:3 531:17
562:16

CONFIDENTIAL

**[purposes - read]**                                              Page 55

| | | | |
|---|---|---|---|
| **purposes** | **qualify** 457:20 | 520:4,11 | **quoted** 511:11 |
| 395:24 473:2 | **quality** 544:8,9 | 522:15,20,24 | 511:13 |
| **pursuant** | **quarter** 311:11 | 525:18 536:19 | **quoting** 467:11 |
| 278:22 522:4 | 311:11 503:6 | 549:22,24 | **r** |
| **pursue** 469:1 | **quarterly** | 550:1 554:10 | **r** 278:20,20 |
| 470:22 475:24 | 281:13 303:6 | 559:9,10 | 279:1 280:1 |
| 476:16,20 | 303:15 | 561:18 | 288:1 565:1 |
| 498:24 | **question** | **question's** | **raise** 302:24 |
| **pursuing** 466:3 | 300:17 310:13 | 486:17 | 323:10,14 |
| 466:6 501:15 | 311:2 313:25 | **questions** | 330:23 333:12 |
| 513:11 | 320:7 324:16 | 308:25 331:6 | 338:16,24 |
| **push** 423:19 | 325:15,17 | 336:1 337:14 | 339:10 340:3 |
| **put** 339:7 | 328:25 329:24 | 337:19 338:12 | 358:2,11,19 |
| 362:12 365:10 | 331:15,19 | 344:20 349:21 | 535:25 |
| 371:6 373:21 | 334:11 336:8 | 366:20 391:12 | **raised** 379:10 |
| 374:20 375:1 | 337:3,10,16,17 | 405:13 407:14 | 403:18 427:15 |
| 375:14,23 | 340:21,22 | 408:18 413:7 | 429:15 430:19 |
| 409:24 417:10 | 342:8 349:19 | 422:13 428:23 | 471:4 504:5 |
| 428:11 463:23 | 349:22 366:4 | 428:24 436:12 | **raises** 357:15 |
| 464:3,11,25 | 372:15 378:15 | 436:19,20 | 535:24 |
| 470:16 490:4 | 381:24 388:5 | 437:16 438:12 | **raising** 354:8 |
| 545:8,12 | 390:5 398:8,9 | 440:23 445:19 | **rather** 512:6 |
| **putting** 356:13 | 398:16,21 | 448:22 460:8 | 533:7 |
| 364:16 374:13 | 402:17,22 | 554:20 559:23 | **rattle** 410:7 |
| 407:11 464:13 | 413:7 421:3,6 | 560:3,6,14 | **rawlins** 505:9 |
| 493:21 | 431:19,20 | **quibble** 483:25 | 505:21 |
| **q** | 448:9 452:16 | **quick** 448:19 | **reach** 446:2 |
| **qatar** 339:4,13 | 463:1,3 475:10 | 490:8 540:2 | 562:6 |
| 340:5,6,11 | 478:14 482:20 | **quickly** 491:3 | **reached** 562:9 |
| 341:12,13 | 482:21 483:6 | **quite** 429:11 | 562:10 |
| 342:22 352:20 | 484:19 485:17 | 557:22 | **react** 474:18 |
| 352:25 353:3 | 485:18 486:18 | **quiz** 336:19 | **read** 307:2 |
| 353:10,10,14 | 488:5 496:9,11 | **quote** 439:15 | 315:16 322:15 |
| 353:16 | 500:11 509:14 | 439:16 | 323:3 324:17 |
| | 512:17 516:10 | | 339:12 351:12 |

**[read - recall]**                                                            Page 56

| | | | |
|---|---|---|---|
| 370:18 378:15 | 548:20 556:11 | 341:25 342:2 | 433:13,14,22 |
| 385:12,23 | 557:24 | 345:8,18,24 | 434:9 435:6,15 |
| 389:4 397:16 | **reapply** 485:20 | 346:22,23 | 435:19 436:19 |
| 398:19,21 | **reason** 288:10 | 347:19 349:23 | 438:14,21,23 |
| 401:13 403:5 | 351:20 456:7 | 350:2,8,20 | 439:1,4 441:17 |
| 421:6 433:10 | 566:5 | 351:3 352:4,8 | 441:18,20,22 |
| 438:10 460:7 | **reasonable** | 352:12,15 | 442:2,6,8,15,21 |
| 463:3 520:11 | 289:14 291:6 | 353:13 354:16 | 442:25 443:3 |
| 522:15,20 | 291:11,11 | 354:18 355:5,7 | 443:17,20,22 |
| 527:12 549:24 | 333:11 362:12 | 355:11,15,17 | 444:7,13 445:2 |
| 559:10 564:3 | 375:16 526:8 | 359:20 361:5,7 | 450:2,22 451:4 |
| **readily** 545:11 | 526:12,13,14 | 361:9 364:12 | 451:6 452:12 |
| **reading** 401:11 | **reasonableness** | 364:13,14 | 453:13 455:16 |
| 404:7 449:9 | 357:19,23 | 366:18 367:10 | 456:9,25 457:6 |
| **ready** 324:4 | **reasonably** | 368:1,2,4,9 | 459:8,9,13 |
| 456:10 466:16 | 369:10 441:3 | 369:1,4 370:24 | 461:24 462:6 |
| 474:20 485:15 | **reasons** 351:10 | 370:25 374:1 | 462:11 463:11 |
| **real** 289:23 | 557:13 | 374:12,19 | 463:15,21 |
| 324:10 344:12 | **recall** 288:7 | 377:19 383:6 | 464:10,13,18 |
| **realized** 468:24 | 291:2 292:13 | 385:10,11 | 464:22,24 |
| 543:9 | 292:14,16 | 387:12,14 | 465:11,17 |
| **really** 290:7 | 294:17 297:5 | 388:5,8,15 | 466:13 469:5 |
| 301:23 306:7 | 298:19 299:3,7 | 391:3,7 392:10 | 469:12,13,22 |
| 314:15 317:6 | 302:9,13 303:1 | 392:12,13,15 | 471:21 473:4,6 |
| 335:19 340:19 | 305:7,16 | 392:19 393:20 | 473:10 474:7 |
| 342:21 344:12 | 306:20 307:15 | 393:24,25 | 477:13,16 |
| 365:8 377:3 | 307:16 311:13 | 405:5 407:20 | 478:21 479:15 |
| 387:7 427:21 | 312:1,3 313:1 | 410:18 411:12 | 480:24 481:3 |
| 444:13 464:2 | 316:6 317:3 | 413:13 416:8 | 481:14 484:24 |
| 464:14 468:8 | 319:11 320:13 | 416:12,13,15 | 485:23,25 |
| 471:21 475:9 | 328:9,16 | 416:16,23 | 487:6,7 488:1 |
| 476:13 484:15 | 329:12,21 | 417:18,25 | 491:9 494:7,25 |
| 505:20 528:2 | 331:10 332:25 | 421:11 423:17 | 499:1,3,15,24 |
| 532:10 533:14 | 334:8 339:14 | 429:1,2,14,19 | 506:19,23 |
| 544:12 545:1 | 341:12,16,20 | 429:24 433:9 | 507:25 510:20 |

CONFIDENTIAL

**[recall - reflecting]**                                                      Page 57

511:4,9,24
513:10 514:1,4
514:7 516:25
517:7,13,15
518:4 521:9
522:8 528:18
529:18,19,21
529:22 535:2
536:5,6,7,8,9
537:7,8,10,17
540:25 541:2
546:4,5,20,21
549:1 550:4
555:18 559:4
560:23 561:3,7
562:18,21
**recapitalization**
319:2,9
**recapitalize**
318:14
**receive**  342:16
382:10 394:17
396:6 397:6
398:14 474:20
**received**
288:16,18
346:16 371:4
450:14,16,18
450:21 451:2
451:10
**recent**  432:12
432:18 433:16
558:13
**recently**  532:25

**recess**  361:24
390:15 449:1
490:13 540:5
**recognize**
315:6 326:25
327:3 470:13
**recollection**
295:24 298:2
345:20 348:6
354:24 357:3
360:5 361:11
361:17 367:24
385:14,20
387:4 414:14
450:10 451:1
461:2,6,9
474:12 521:12
530:7
**recombine**
512:10
**recommended**
545:21
**reconsider**
476:14
**reconsidered**
477:9
**record**  286:2,8
287:5 288:15
336:15 345:14
349:7 360:17
361:22 362:2
378:8,9,12,14
390:11,14,18
421:19 422:3
426:8,12,14,15

426:17 448:25
449:3 484:15
490:12,15
493:12 500:17
515:18 516:18
540:4,7 563:4
564:6
**recorded**
286:10 312:7
440:12,15
466:22
**recording**
286:6
**records**  297:9
363:2,18
**recovery**  310:3
**recused**  548:21
**redemption**
316:13,16
**redemptions**
315:23 316:1,2
316:5,9,15,22
316:25
**reduction**
315:24
**refer**  316:11
348:13 375:20
489:12 514:15
524:16
**reference**
347:24 376:22
376:22 560:16
**referenced**
352:19 461:15
514:6 521:6

**references**
460:10
**referencing**
471:1 538:12
**referral**  453:21
**referred**  376:6
443:24 498:15
514:10 519:13
523:13
**referring**
315:21 348:16
349:5 386:13
401:8 411:1
432:15,21
433:15 441:2
446:6 454:19
461:8 467:12
467:22 488:3,5
489:12 496:15
507:6 510:8,14
511:23 514:3
524:25 525:4
553:6 555:2
560:21
**refers**  315:18
320:18 396:22
403:6 463:5
493:7 503:5,24
**reflect**  444:20
**reflected**  372:8
462:1 485:5
506:17 526:23
527:2 537:24
**reflecting**
536:23

CONFIDENTIAL

**[reflects - rent]**                                    Page 58

**reflects**  551:24
**refocus**  467:8
  467:24 468:1
**refocusing**
  552:20
**refresh**  295:24
  298:1 385:14
  385:19 387:3
  414:13 461:1,5
  493:11 521:12
**refusal**  379:3,6
**refused**  463:23
  478:9
**regarding**
  379:7 441:9
  479:5 482:24
**register**  466:18
  467:21 503:25
**registered**
  382:22,24
  424:24 425:6
  453:2 455:24
  478:1 490:25
  512:14,22
**registration**
  282:13 390:20
  391:1 472:6
  478:18 494:5
**regular**  281:13
  284:22 285:1
  303:6,15
  549:13 558:22
**regulated**
  382:13

**regulation**
  439:22,24
  440:14,25
  441:2
**regulations**
  440:5,8,15
  441:11
**regulatory**
  388:11 420:21
**reimbursement**
  301:24
**reimbursing**
  324:24
**reinventing**
  317:12,19
  319:9
**reinvest** 537:10
**reiterated**
  439:7
**reject**  440:24
**rejected**  419:20
  469:7
**relate**  370:20
  531:25
**related**  286:24
  365:16 463:7
  472:11 524:14
  543:2
**relating**  417:16
**relation**  536:3
**relationship**
  343:22 344:1
  346:6 356:8,11
  424:9 425:4
  453:19,21,23

  454:2 489:2,8
  489:11,14
  515:9
**relative**  565:14
  565:16
**relection**
  354:23
**relevant**  435:22
**relief**  288:22
**relieved**  544:3
  557:2
**reluctance**
  427:19
**reluctant**  426:2
**rely**  333:6
  404:6
**relying**  497:13
  497:13 512:8
  548:2
**remain**  393:25
  454:5
**remaining**
  409:22
**remember**
  289:2 292:7,7
  345:9 350:3,23
  374:23 378:20
  378:25 380:2
  384:20 385:13
  392:3 465:3
  487:1 517:3
  527:4
**remembering**
  421:8

**reminded**
  287:23 288:3
  565:6
**remo**  378:20
**remote**  306:8
**remotely**  287:3
  287:18 306:2,3
**removal**  378:5
**remove**  364:7
  377:24 378:21
  380:14,19
  381:16
**removed**  380:2
  381:13 382:1
**removing**
  378:2,19
  380:23
**reneged**  324:5
  553:12
**renegotiate**
  553:11,12
**renew**  485:4
**renewable**
  507:6
**rent**  288:25
  289:5,10,13
  290:3,17,23
  291:8,22
  292:10,14,20
  292:24 293:3
  293:16,23
  294:12 297:1,2
  297:3,12 298:6
  299:2,12
  301:25 302:19

**[rent - respect]**                                    Page 59

302:25 303:21
304:9 306:19
307:11 308:2,8
309:2,18 313:4
313:10,11
314:4 324:3
365:12 366:7
366:21 367:1,4
375:8,9 376:6
376:7,17 377:2
433:21 444:5
**rental** 298:15
**rents** 309:11
**repeat** 395:5
**rephrase** 308:1
325:17 356:24
418:9 436:2
446:9 457:19
461:13 466:9
522:22
**report** 304:3,7
304:12 397:20
554:25
**reported**
462:13
**reporter**
278:21 286:21
287:22 378:10
378:16 398:22
421:7 422:16
463:4 520:12
522:21 531:21
549:25 559:11
565:4

**reporting**
460:14 461:3
544:25 566:1
**represent**
287:12 343:23
535:9
**representative**
446:1,15
463:24 464:12
537:16
**representatives**
389:16 482:23
547:2 549:19
560:24
**represented**
345:6 389:17
505:14 506:1
542:18
**representing**
286:20 287:8
**repurchase**
521:17
**repurpose**
508:9
**repurposing**
472:21
**request** 307:25
325:13,24
327:4 328:14
331:12 332:8
334:7 337:22
339:17 346:12
347:17,20,20
348:13,18
349:17,24,25

350:21 352:6
359:9,19,23
362:23 363:6,7
368:10,12
417:14,15
441:9 442:10
446:23 448:10
452:19 462:22
463:10 464:15
475:4
**requested**
325:19 329:13
333:2 350:16
351:24 352:5
367:17 416:19
417:23 419:18
422:6 442:6
475:1 478:7
**requesting**
442:8 452:1,16
**requests**
307:23 326:1
327:10 328:10
329:5,9 335:24
336:10,11,12
346:13 350:4
362:5,8,18
363:3,4 369:8
370:16 417:19
425:17 443:14
448:7 475:11
**require** 396:12
396:20,21
399:21 400:4
403:12,23

472:5,16
498:19
**required** 301:8
301:13 402:23
424:5,23 425:2
440:5 441:10
455:23
**requirement**
420:10 439:12
439:14 456:2
456:17 465:23
513:24
**requirements**
306:24 386:1
388:11
**research**
289:20 380:18
**reserve** 288:21
**residing** 288:1
**resign** 364:11
367:18 552:14
**resigned**
552:13
**resolution**
491:18
**resolve** 467:3
**resolved**
314:13 497:11
**resource** 509:4
**respect** 302:24
382:16 388:23
389:21,23
392:17,17
396:2 401:24
405:8 412:13

414:19 430:8
444:14 464:6
478:17 523:4
531:3 542:25
**respectively**
521:9
**respond**  328:14
336:20 344:19
344:20 346:25
359:8 369:7
373:19 425:16
425:18 474:19
477:11
**responded**
346:24 368:9
452:20 477:15
478:8
**responding**
350:20 447:16
**responds**
359:12 415:2
427:9 473:15
480:1
**response**
333:11 334:25
335:23 344:25
345:23 346:13
346:18 354:9
359:18 368:13
371:5,11,12
379:3 446:17
452:19 453:11
462:22 463:10
473:24 479:25

**responsibilities**
505:6
**responsibility**
543:24 544:3
**responsible**
292:17 293:5
293:15,19,22
294:1 318:10
318:15 515:13
553:17
**rest**  408:24
409:1 410:25
411:1,7 551:13
**resubmit**  435:4
482:25
**result**  313:22
543:8
**resuscitate**
485:20 486:3
**retain**  377:9
**retained**
385:20,22
389:24 562:15
**retention**
522:12,25
**retrospect**
429:11
**return**  355:23
**revenue**  499:2
**revenues**
315:25 316:10
317:13,23
322:11 330:20
382:7 468:13
498:13

**reverse**  544:12
544:14
**review**  370:9
386:19 407:18
422:1 441:6,15
442:3
**reviewed**
301:19 441:19
**reviewing**
328:10 407:20
**revisions**  493:4
493:9
**right**  294:2
305:20 314:20
321:12 333:6
344:7,14
348:12 349:14
361:23 370:1
381:16 394:17
396:5 397:5,13
397:14 398:13
401:5 402:2
409:13,18
410:5 418:12
445:3,24
477:17 482:3
482:12 488:7
492:25 507:4
507:23 527:23
528:3 547:22
551:15 554:6
**rights**  288:21
**rise**  381:25
**risk**  507:10

**risks**  557:3
**role**  319:2
343:15 362:24
363:18 376:23
377:8 388:6,8
391:9,25
489:23 516:3
516:23 517:5
521:25 537:23
537:25
**roles**  515:20
**room**  308:14
330:18,18
**roseland**
278:23 279:3
286:19
**ross**  279:4
287:6 290:25
308:21 318:3
325:15 326:18
328:22 347:8
347:23 349:5
349:13 386:11
387:22 413:22
432:17 453:4
**roughly**  355:2
**round**  328:5,8
330:20 331:2
333:10 334:2,3
334:5,7,9,16,18
334:20,24
359:3 530:24
**rounds**  409:25
**rpearlson**
279:4

CONFIDENTIAL

**[ruchalski - sale]**                                      Page 61

| | | | |
|---|---|---|---|
| **ruchalski**  278:8 | 320:10 323:16 | 391:18 394:4 | 481:12,20 |
| 279:22 280:4 | 324:19 325:4 | 395:3,10,15,21 | 483:9,16 |
| 287:17,17 | 325:15 327:16 | 396:14 397:11 | 485:22 486:6 |
| 293:12 297:19 | 328:20,24 | 397:22 398:1 | 486:24 487:5 |
| 298:24 303:25 | 329:4 331:4,18 | 398:16,23 | 487:11,25 |
| 452:25 453:8 | 331:22,25 | 399:23 400:12 | 488:13 489:4 |
| 455:20 457:2 | 332:2 333:8 | 400:15 401:8 | 489:10,16 |
| **rule**  439:21,23 | 334:4,14,18 | 402:11,25 | 490:1,10 |
| 557:11 | 335:25 336:6 | 403:14,16,25 | 491:13 492:3,5 |
| **rules**  278:22 | 336:13,16,23 | 406:9,14 | 492:7,11,14,20 |
| **run**  490:22 | 336:25 337:3 | 409:11 411:3,6 | 494:18 495:9 |
| 509:5,17 | 337:10 339:21 | 412:2,10 413:4 | 495:17 498:4,8 |
| **running**  363:7 | 340:8,17 341:9 | 413:22,24 | 502:14,16,21 |
| **runs**  363:21 | 341:18 342:10 | 414:6 415:20 | 502:24 503:1 |
| **rushing**  387:22 | 342:18,20 | 416:4 417:5,17 | 506:7,9,15 |
| **ryan**  505:11,12 | 343:7 347:8,23 | 418:5,7,18,21 | 507:21 510:9 |
| | 348:2,4,7,21,24 | 420:2,7,18,24 | 512:16,24 |
| **s** | 349:2,5,12,15 | 421:2 424:11 | 513:15 514:21 |
| **s**  278:20 279:1 | 351:11,15 | 424:19 425:5 | 514:25 515:3 |
| 279:10,17 | 355:20 358:16 | 428:17,19 | 516:8 520:4,8 |
| 280:1,1 566:5 | 359:11 360:14 | 430:5 432:16 | 520:22 521:7 |
| **sack**  279:10 | 360:20 362:9 | 433:1 436:14 | 522:18 524:9 |
| 287:10,10 | 363:12,15 | 437:21 439:17 | 524:15 526:18 |
| 289:7 290:14 | 364:9 365:15 | 440:10,18 | 528:17 531:7 |
| 290:24 292:22 | 365:17 366:22 | 442:24 443:8 | 533:9 535:19 |
| 293:17 294:9 | 367:3,6,21 | 444:12 446:8 | 549:22 553:3 |
| 296:11,14,16 | 369:9,20,24 | 450:6 453:3 | 554:4,8 555:4 |
| 298:17 299:14 | 370:2,4,7,23 | 454:17 461:19 | 557:21 558:4 |
| 299:20 300:12 | 373:2,4,6 | 462:4,25 | 559:8 560:16 |
| 301:10 302:5 | 376:24 379:15 | 463:14 464:1 | 560:20 |
| 303:22 304:5 | 379:18,24 | 466:20 467:10 | **sale**  401:6 |
| 304:10,15 | 380:25 381:8 | 467:16 475:3 | 498:18 517:10 |
| 305:23 307:13 | 381:10 384:15 | 476:1,19 | 530:2 535:18 |
| 308:21 309:3 | 386:11,16,24 | 478:20 479:18 | 538:3 547:3 |
| 313:5 318:3,6 | 387:22 388:1 | 480:23 481:10 | 555:8 |
| 319:15,17 | | | |

**[salerno - says]**                                    Page 62

| | | | |
|---|---|---|---|
| **salerno**  278:16 | 415:19 417:3 | **salerno's** | 476:2,8,9,11,16 |
| 279:6 281:19 | 417:15 418:16 | 328:14 331:11 | 476:18 481:3 |
| 281:23 282:2 | 419:4 421:15 | 334:10 342:8 | 482:14 485:15 |
| 282:23 283:1,5 | 422:7 425:9,12 | 344:20 350:21 | 503:4 515:18 |
| 283:8,11,22 | 426:2,20 427:1 | 359:8,19,23 | 539:20 |
| 284:2 286:16 | 427:19 428:14 | 362:7 376:23 | **says**  295:22,22 |
| 287:9 307:16 | 428:20,24 | 378:5 447:16 | 296:23 297:20 |
| 308:8,20 | 429:2,15 | 462:22 463:10 | 300:4 320:19 |
| 311:22 312:5 | 430:12,25 | 478:2 480:14 | 322:17 323:3 |
| 325:12,19 | 431:21 432:2,9 | 481:15 | 323:10,18 |
| 326:10 327:5 | 439:7 441:6,8 | **salesperson** | 324:14 327:16 |
| 327:14,20 | 441:15,23 | 500:14 | 327:17,18 |
| 329:12 330:13 | 443:19 444:10 | **satisfied**  301:17 | 338:14 340:2 |
| 331:1,9 332:9 | 444:19,21 | **satisfy**  356:19 | 347:16 348:17 |
| 332:15 333:2 | 445:6,21 446:7 | **saw**  289:12 | 349:17 350:13 |
| 334:7 335:23 | 446:11,23,24 | 308:14 391:8 | 351:6 353:20 |
| 337:18,18 | 447:5,13 | 395:13 406:20 | 357:2 371:14 |
| 346:11 347:5 | 463:11,23 | 406:21 422:14 | 372:15 386:7,7 |
| 347:19 348:10 | 464:11,18 | 443:23 448:11 | 389:14 393:6 |
| 349:8,23 | 467:1 468:16 | 529:5 539:4 | 396:1,3 397:3 |
| 351:21 352:4 | 469:3,14 470:4 | 562:19 | 397:25 398:2,4 |
| 353:13,17 | 471:4,14 | **saying**  321:9 | 398:5 399:6,8 |
| 354:3 355:9,17 | 473:15 474:3 | 333:5 347:24 | 400:20 401:3 |
| 355:25 358:6 | 474:19 475:1 | 350:23 373:11 | 402:13 406:24 |
| 360:6 362:6 | 475:23 477:12 | 399:11,11 | 407:1 408:13 |
| 363:10 364:7 | 477:15,21 | 400:16 410:25 | 408:20,21 |
| 367:18 368:9 | 479:4,8,22 | 411:3,24 | 409:14 411:4,9 |
| 368:22 369:1 | 480:1 481:5,17 | 415:20 427:9 | 414:22 421:25 |
| 369:16 370:13 | 482:18,22 | 433:18 437:14 | 422:10,25 |
| 371:12,21 | 483:7 486:9,12 | 440:16,19 | 423:1,18 |
| 372:7,15,18 | 486:13,20 | 442:2 443:3,17 | 432:11 434:4 |
| 375:10 377:4 | 487:16 495:7 | 443:20,22 | 439:6,11 440:4 |
| 377:22,25 | 495:14,15 | 450:23 455:19 | 441:6,13 |
| 380:5,14 | 511:1 566:3 | 464:19 465:3 | 445:20 451:25 |
| 412:22 414:22 | | 471:12 474:25 | 452:23,24 |

**[says - see]**                                                    Page 63

| | | | |
|---|---|---|---|
| 453:14 454:15 | 532:12 | 460:6,24 | **securitizing** |
| 456:14 457:21 | **scheduling** | 465:18 | 382:9 508:22 |
| 462:12,20 | 458:3 | **sections** 301:16 | **security** 299:4 |
| 465:25 467:17 | **schotz** 279:15 | 396:19 | 309:20,21 |
| 479:4 480:2,3 | 287:19 | **secured** 397:10 | 310:7 312:16 |
| 502:6 504:4,14 | **scope** 362:23 | **securities** 278:9 | 313:9,10 324:3 |
| 506:24 510:4 | **scrutiny** 548:4 | 279:13 284:7 | 383:16 401:7 |
| 511:17 518:9 | **search** 305:15 | 284:12 287:13 | 500:1 557:8,12 |
| 519:3,13 | **searching** | 435:18,20,24 | **see** 293:24 |
| 524:14,20 | 385:15 | 436:4 455:5,10 | 297:22 300:8 |
| 525:5,13 527:4 | **sec** 536:16 | 456:4,18,24 | 301:20 315:3,9 |
| 538:9 552:3,8 | **sec's** 557:8 | 457:4 488:4,10 | 323:13,21 |
| 552:22 553:21 | **second** 296:3,6 | 488:16,21 | 327:8,15 |
| 553:22,23 | 296:8,24 | 489:7,24 490:2 | 328:19 337:14 |
| 554:14,16,23 | 303:17 326:22 | 490:18 491:12 | 337:16 347:17 |
| 560:14,15 | 330:12 331:2 | 491:25 493:8 | 348:17 349:17 |
| **scenario** 391:7 | 334:3 379:16 | 493:17 494:16 | 350:18 353:25 |
| **sched** 400:2 | 420:25 438:6 | 495:6,16,18,23 | 369:16 370:12 |
| **schedule** | 467:14 480:3 | 496:1,13 497:3 | 370:17,19 |
| 392:21 393:2,6 | 481:16 498:20 | 497:7,15,16,18 | 371:2,6,9,12 |
| 393:9 395:12 | 519:4 530:24 | 498:18 502:4,5 | 372:14,17 |
| 395:13,16 | 532:11 533:20 | 503:20 504:2,6 | 373:22 385:25 |
| 399:2,5,7,7,11 | 533:23 536:25 | 504:14,17,19 | 386:4,12,16 |
| 399:13,21,21 | 543:22 545:19 | 506:1,2 507:3 | 389:7,10,12,13 |
| 400:2 401:21 | 550:20 553:22 | 507:13,16,20 | 391:5 393:10 |
| 402:8,23 403:7 | 556:18 | 508:3 511:20 | 394:7,12,14,19 |
| 403:24 404:5 | **seconded** | 512:20 513:2,3 | 394:23 395:16 |
| 415:4 455:17 | 554:22 | 513:5 517:10 | 396:3,9,11 |
| 455:22 456:11 | **secretary** 437:5 | 517:20 518:2,5 | 397:8,9 399:20 |
| 456:22,23 | 437:9 553:8 | 518:18 519:1 | 404:16 406:11 |
| **scheduled** | **section** 302:12 | 525:1 529:5 | 408:2,5,8,17,18 |
| 350:24 381:23 | 302:13 306:23 | **securitization** | 408:21,24 |
| 455:6 456:12 | 396:16,19,22 | 509:21 | 409:3,6,15 |
| 456:15,25 | 399:8 400:20 | **securitize** | 410:10 414:11 |
| 457:3,7,17 | 409:6 438:7 | 509:25 | 414:24 415:3 |

CONFIDENTIAL

**[see - set]** Page 64

| | | | |
|---|---|---|---|
| 415:10 417:22 | **seemed** 289:14 | **sense** 362:11 | 529:6,16,19 |
| 421:3 422:19 | 291:10 335:3 | 387:23 427:25 | 530:1,8 531:5 |
| 422:22 427:2,4 | 362:22 475:19 | 498:17 | 532:19 533:17 |
| 427:6,11 438:4 | 509:3 541:15 | **sensitive** 286:3 | 534:16,18,20 |
| 439:9 441:12 | **seems** 400:7 | **sent** 337:21 | 536:4 538:7 |
| 441:13,24 | 521:18 542:16 | 347:19 349:23 | **series** 326:1 |
| 444:23 445:14 | **seen** 295:10 | 370:15 412:12 | 337:13 365:22 |
| 446:3 447:11 | 385:8 391:1,4 | 415:6,7 417:20 | 365:23 |
| 447:15,21 | 406:18,22 | 449:25 450:20 | **serious** 475:21 |
| 448:2,10 | 422:12 | 458:19 474:24 | **sersea** 293:13 |
| 449:13,24 | **sell** 332:5,15 | 476:8,10 | 297:18 298:24 |
| 451:11,15,19 | 338:18,25 | 484:17 | 553:7 |
| 451:19,23 | 341:3 342:13 | **sentence** 296:6 | **serve** 343:12 |
| 452:7 454:13 | 344:15 353:24 | 300:14 315:19 | 435:8 437:8 |
| 454:16,18,19 | 356:25 382:12 | 324:16 351:6 | 454:15,22 |
| 454:20 455:3,6 | 401:5 497:15 | 376:2 434:5 | 455:9,22 |
| 455:18,25 | 499:14 511:6 | 441:5 502:7,25 | 488:10 |
| 460:15,20,23 | 530:14 541:4,8 | 503:5 510:4 | **served** 488:14 |
| 462:12,18,20 | 542:8,12 562:7 | 522:17 | **server** 310:9 |
| 465:19,24,25 | 562:10,11 | **separate** | **servers** 310:2 |
| 473:23,25 | **seller** 332:23,24 | 306:16 356:9 | 366:11 |
| 474:2 493:5,9 | 518:9 519:5 | 377:7 442:22 | **service** 389:12 |
| 493:13 494:13 | **selling** 343:17 | 454:25 468:10 | 389:15 |
| 503:20 504:2 | 382:9 508:24 | 468:12 529:3 | **serviced** 309:14 |
| 518:8 524:23 | 508:25 530:14 | 537:14 | **services** 281:11 |
| 525:17 536:21 | 540:19 541:18 | **separately** | 295:4,9 318:1 |
| 536:24 552:1 | 542:7,9 543:8 | 366:10 434:5 | 318:13 384:2 |
| 559:3 | 543:17 546:2 | **september** | 515:11,19 |
| **seeing** 451:6 | **send** 365:20 | 283:19 379:3 | 522:6,7,13 |
| **seek** 288:21 | 458:24 476:12 | 381:3 458:14 | 523:1,13,23 |
| 300:25 301:4 | 483:14 | 459:15 466:2 | 525:10 |
| 400:7 454:9 | **sending** 348:19 | 466:11 473:5,9 | **serving** 515:20 |
| **seeking** 386:19 | 350:4 359:17 | 473:13 483:23 | 516:23 553:7 |
| **seem** 356:19 | 408:5 451:2 | 519:6,8,9,11 | **set** 323:20,24 |
| 476:13 542:16 | 501:22 | 524:20 527:4 | 409:5 410:11 |

CONFIDENTIAL

**[set - signed]**                                           Page 65

| | | | |
|---|---|---|---|
| 472:13 550:19 | **shared** 346:20 | 357:21 358:6,9 | **ship** 485:12 |
| 559:2 565:12 | 353:12 | 358:20,22 | **short** 509:17 |
| **settled** 365:4 | **shareholder** | 359:4 360:9 | **show** 295:6 |
| 526:5,6 | 327:14,21,23 | 370:15 380:6 | 303:13 310:6 |
| **settlement** | 328:7 329:20 | 380:23 381:21 | 314:20 326:6 |
| 524:22 525:5,6 | 359:3 376:8 | 381:22 382:9 | 326:14 347:1 |
| 525:8,11 | 377:2 394:10 | 382:12 443:6 | 347:12 384:22 |
| **several** 300:5 | 422:3 433:7,24 | 508:25 510:23 | 387:15 388:2 |
| 346:3 354:15 | 462:15,16 | 510:25 511:6 | 406:5 426:7 |
| 361:2 381:3 | 510:7,12 | 511:12 513:19 | 432:4 437:11 |
| 458:2 | 513:13 542:19 | 518:10 519:19 | 445:10 447:9 |
| **shahinian** | **shareholders** | 519:20 521:1,3 | 470:7 500:2 |
| 278:23 279:2 | 278:14 286:16 | 530:14,16 | 517:17 534:7 |
| 286:19 287:8 | 333:20 346:19 | 532:19 535:18 | 549:10 554:8 |
| **shake** 484:13 | 376:10,11,13 | 536:11 538:4 | 558:17 |
| **share** 330:9 | 376:18 379:4 | 538:17 539:11 | **showed** 330:19 |
| 331:12,14,14 | 383:16 415:5 | 540:20 541:4,5 | 517:1,4 |
| 331:16 332:6,8 | 423:8,12,15 | 541:8,18 542:8 | **showing** 320:8 |
| 332:11,17 | 433:6,19,21,23 | 542:9,10,11,13 | 432:5 500:7 |
| 335:9 353:15 | 434:3 444:4 | 542:22 543:8 | **sic** 470:23 |
| 355:1,3,12 | 479:6,10 481:7 | 543:10,13,17 | **side** 332:14 |
| 357:4,9,14,15 | 513:8,22 | 544:1 546:3,10 | 505:18 526:15 |
| 357:16 358:12 | 545:16,18,24 | 547:4,4,16 | 526:17,19,21 |
| 358:14 359:4 | 546:24 557:19 | 548:12 555:8,9 | 526:25 528:13 |
| 360:11,18,25 | 557:23 558:3 | 555:17 559:24 | 548:17 550:5 |
| 361:4 370:16 | 558:10,12,14 | 561:1,1 562:7 | **sides** 505:21 |
| 511:13 530:7 | 566:2 | 562:8,10,11 | 555:20 |
| 530:11,13,19 | **shareholding** | **sharing** 290:9 | **sign** 324:5 |
| 530:25 532:1 | 423:3,5 | **sheet** 320:8,12 | 459:20 543:3 |
| 532:20 533:13 | **shares** 328:4,7 | 532:14 545:5 | **signature** 315:9 |
| 535:7 538:20 | 332:5,15 | 545:12 556:17 | 389:8,10 |
| 539:22 547:24 | 333:21 334:13 | 564:5 566:1 | 565:21 |
| 550:5,7,12,24 | 334:17,21 | **shift** 485:10 | **signed** 318:12 |
| 551:1,6,9,12,14 | 344:16 354:13 | 487:12 | 459:22 460:1 |
| | 354:19 355:1 | | 476:12 543:1 |

CONFIDENTIAL

## [significant - specific]

Page 66

significant
299:4 310:4
321:4 330:20
335:15 375:25
541:10 543:7
signing 305:17
311:15
similar 406:22
501:8,10,12
simon 503:16
simple 313:15
simply 425:18
sincere 476:13
477:6,8,9
484:15
sincerity 476:6
single 358:17
sir 319:22
500:17
sit 450:25
513:10
site 310:3
sitting 361:18
403:1,16
situation
294:14,16
313:15 319:8
320:3,9 501:24
six 283:14
361:2,4 448:14
476:2 483:10
483:17,19
484:7 485:11
skill 472:13

skills 472:24
skipped 326:21
slash 392:6
544:13
slowly 520:10
small 529:16
553:20
smaller 552:24
553:7,19
software 310:8
472:7
sold 333:21
334:12,17
339:19 359:3
501:6 510:22
511:12 519:25
543:10
sole 417:8
425:18 427:5
477:4,4
solicit 341:23
somebody
358:2 437:2
someplace
559:16
somewhat
466:22 531:9
555:22 556:19
soon 476:11
sorry 296:7,13
297:23 324:15
326:20,21
334:14 343:3
346:12 349:2
351:14 360:16

386:12 393:16
394:20,21
395:5 406:12
406:16 409:3
413:23 422:16
428:4 432:19
449:6 461:20
466:9 469:20
479:2 482:20
486:16 532:6
536:16 552:2
559:8
sort 290:1
462:2
sought 463:9
sounded 333:6
sounds 409:13
483:22 545:8
source 342:13
499:2
sources 501:2
southern 278:1
sovereign
339:5,5 353:6
spa 309:10
space 290:12
290:19 291:10
291:13,14,17
291:19,21,23
292:1,5,21
294:6,7 298:7
298:13,16
300:1,21 302:4
302:7,8 305:6
305:9,11,12,18

305:21 306:24
307:8,12 309:6
309:9,12,13
310:14,16,18
311:6,8,16
312:9,12,12
324:18,21,23
324:25 365:5
375:9 376:7
452:4,10
453:25 553:2
553:17
spaces 310:24
452:3
speak 405:14
417:3 418:15
444:9 446:7,11
446:14,24
461:2 480:5
546:8
speaking
336:24 337:8
419:13 428:15
460:11 471:11
special 283:17
394:16 397:5
398:12,13
400:21 458:13
546:23
specific 289:25
326:5 329:4
333:7 337:13
340:22 342:2
346:1 355:15
356:5 360:6

**[specific - sport]**                                                      Page 67

| | | | |
|---|---|---|---|
| 366:17 370:10 | 553:6 555:19 | 279:13 281:14 | 346:5,10,20 |
| 372:24 374:1 | 561:3 | 283:18 284:6 | 354:4,13,20 |
| 391:7,25 392:6 | **specifics**  299:4 | 286:12,14 | 355:13,18 |
| 405:6 406:21 | 332:25 460:4 | 287:13,13 | 356:11,17 |
| 413:13 415:21 | 529:22 | 288:25 289:6 | 357:9 358:8 |
| 415:23 421:8 | **speculate** | 290:10,12,19 | 360:7 363:11 |
| 433:15 437:13 | 373:12 | 291:13 292:1 | 364:2,8 365:13 |
| 441:2 446:25 | **speculating** | 292:19 293:1,4 | 365:20,25 |
| 451:1,4 485:23 | 373:9 407:25 | 293:16,22 | 366:1,9,17,20 |
| 486:1 487:1 | **speculation** | 297:10 298:5 | 367:10,16,18 |
| 508:7 511:22 | 412:11 | 298:14 299:2 | 369:3 373:25 |
| 511:24,25 | **spell**  500:16 | 299:12,24 | 374:18 376:23 |
| 514:2,5 522:9 | 516:17 | 301:4,8 302:4 | 380:14 382:11 |
| 522:12 523:4,7 | **spend**  317:20 | 303:7,16 304:4 | 382:17,21,24 |
| 547:23 | **spiro**  279:11 | 304:8,12 305:5 | 383:20,24 |
| **specifically** | 287:12 520:10 | 305:11,18,18 | 384:1,12 |
| 290:5 291:24 | 520:20 522:15 | 305:21 306:6 | 385:16 386:22 |
| 292:16 311:14 | 532:4 | 306:18 309:22 | 389:20 390:2,7 |
| 317:4 323:7 | **split**  331:12 | 310:6,11,20 | 391:6,10 |
| 327:11 338:13 | 483:24 | 311:6,18 | 393:19,23 |
| 340:7 350:2 | **spoke**  340:4 | 312:17 320:24 | 394:1,2,24 |
| 356:7 366:18 | 345:19 353:12 | 321:17,17 | 395:20 400:25 |
| 373:15 385:12 | 361:14 405:17 | 322:8 323:6,10 | 402:5 403:18 |
| 391:3,16 405:5 | 405:18 415:15 | 323:11,15 | 404:10,19 |
| 407:20 412:23 | 417:7 428:19 | 324:9,12,17,21 | 407:10,23 |
| 416:15,16 | 430:2 444:7 | 324:22 325:13 | 409:15,18,21 |
| 417:14 419:13 | 446:23,24 | 325:22 326:2 | 412:8 413:4 |
| 431:21 433:9 | 447:1 461:16 | 327:15,21 | 415:25 417:10 |
| 433:13 434:9 | 461:21 480:6 | 331:15 332:4 | 417:10 418:3 |
| 440:13 444:7 | 480:17,24 | 332:14 339:20 | 420:23 422:6 |
| 450:3,22 451:9 | 481:2,15 543:7 | 340:16 341:4 | 423:21,24 |
| 474:14 495:13 | **spoken**  341:11 | 341:22 342:7,9 | 424:3,8 428:8 |
| 499:1,3 501:23 | 405:16 | 342:12,14,16 | 429:8 431:4 |
| 511:23 514:2 | **sport**  278:4,9,9 | 342:24 343:2,9 | 435:18,19,24 |
| 530:5 537:11 | 278:13 279:13 | 344:5 345:7,12 | 436:4,7,21,22 |

CONFIDENTIAL

**[sport - stamped]**                                                    Page 68

| | | | |
|---|---|---|---|
| 437:16 442:22 | 505:25 506:1,5 | **sportblx**  502:8 | **sportblx0128...** |
| 443:5,12 | 506:11,12 | 554:16,20 | 284:8 492:1 |
| 444:11,17 | 507:2,13,14,16 | **sportblx0001...** | 493:12 |
| 445:24 447:24 | 507:19,20 | 284:11 500:6,9 | **sportblx0140...** |
| 452:13,15 | 508:2,3,13 | **sportblx0002...** | 283:6 432:3,7 |
| 454:23 458:14 | 509:9 510:1 | 282:25 421:17 | **sportblx0153...** |
| 459:10,10,16 | 511:20,21 | 421:23 | 282:6 385:1,6 |
| 466:17 468:13 | 512:13,20,20 | **sportblx0004...** | **sports**  321:25 |
| 468:14,23 | 512:21 513:1,2 | 281:24 347:6 | 335:2,11 |
| 469:21 472:19 | 513:3,5,6,13 | 347:14 | 375:25 472:11 |
| 473:7 477:14 | 519:12,17,18 | **sportblx0004...** | 508:8 509:24 |
| 481:18 482:23 | 519:20 520:19 | 282:17 406:3,7 | 543:2 |
| 484:20,22 | 520:24 521:1,2 | **sportblx0005...** | **spread**  358:23 |
| 485:3 486:1,21 | 521:2 528:5,9 | 282:21 413:20 | **spring**  326:4 |
| 487:21,22 | 528:13,19,21 | 414:3 | 341:7 356:1 |
| 488:4,10,16,19 | 529:1,2,8,8,12 | **sportblx0005...** | 531:4 |
| 488:21 489:1,7 | 529:25 530:2,9 | 283:3 426:22 | **staff**  502:9 |
| 489:15,18,21 | 530:14,16 | **sportblx0005...** | **stage**  335:12,14 |
| 489:24,25 | 531:18 534:23 | 283:13 447:7 | 494:13 533:21 |
| 490:2,3,18 | 535:16,22 | **sportblx0005...** | 533:23 |
| 491:12,24 | 536:11,24 | 283:9 445:8 | **staisil**  353:10 |
| 493:8,17 | 537:13,18 | **sportblx0005...** | 361:14 |
| 494:16 495:3,6 | 538:17 539:10 | 445:13 | **stamp**  432:6 |
| 495:16,18,19 | 539:15 540:10 | **sportblx0005...** | **stamped** |
| 495:20,22 | 540:14 541:10 | 283:23 470:5,9 | 281:15,20,24 |
| 496:1,4 497:3 | 541:13,19,22 | **sportblx0005...** | 282:3,6,10,17 |
| 497:7,14,17,18 | 541:23 542:8,9 | 284:3 477:22 | 282:20,24 |
| 497:21,25 | 542:10,11,21 | 478:25 | 283:3,5,9,12,15 |
| 498:6,10 | 543:7,16,23 | **sportblx0005...** | 283:19,23 |
| 499:25 502:2,2 | 544:2,7,11 | 283:15 448:16 | 284:3,7,10,14 |
| 502:3,7,9 | 545:2,2,15,25 | **sportblx0005...** | 284:20,24 |
| 503:9,12,14,19 | 553:1 557:6,6 | 451:22 | 285:3 303:8,18 |
| 504:2,5,17,19 | 557:15,20 | **sportblx0092...** | 326:11,16 |
| 504:19 505:8,9 | 559:25 566:2 | 282:10 387:20 | 347:6,14 |
| 505:14,18,23 | | 388:4 | 368:22 385:1,6 |

CONFIDENTIAL

**[stamped - sublease]**                                                    Page 69

387:20 406:3,7
413:20 414:2
421:16,23
426:21 432:2
438:2 445:7,13
447:6 448:16
451:22 458:15
470:5,9 477:22
492:1 500:5
517:22 518:3
534:11 536:15
549:15 551:22
558:20,24
**stand** 399:25
**standard** 544:5
**standing**
430:22 462:17
**standpoint**
320:13
**staples** 365:19
367:7
**star** 518:10
**start** 307:23
314:14 467:4
468:4 472:12
472:23 491:2
524:5 555:16
**started** 305:12
317:20 321:20
387:5,8,10,11
388:16 485:21
498:15
**starts** 466:6
**state** 278:22
281:10 287:2,4

295:3,8,16
453:15,17,18
565:4
**stated** 350:14
441:6 467:7
**statement**
310:6 336:14
387:9 446:13
476:12
**statements**
300:15 480:3
544:2 564:7
**states** 278:1
455:4
**stating** 463:21
**status** 295:19
295:21 314:6
**stenographic...**
278:21 565:11
**step** 543:21
544:12
**steps** 380:13
423:21,24
**stern** 279:12
287:12
**stick** 486:21
487:9
**sticking** 375:15
**stock** 357:10
423:16 511:11
513:23 518:10
521:1,5,10,22
530:3,9 531:15
533:24 534:1,2
536:4,24

537:13 538:4
**stop** 313:12
332:3 337:6
371:15,16,21
371:25 372:5
444:5
**stopped** 297:12
303:20 304:8
313:4
**stopping** 297:2
**storm** 315:18
315:21
**strategy** 315:24
318:23 363:20
364:1,23
470:24
**strauss** 278:7
279:22 280:5
287:16 318:19
516:21 517:5
525:23 537:15
537:22 542:5,6
546:7,8 549:19
551:24 552:5,8
555:5
**street** 279:15
288:2
**strike** 291:17
292:18 352:23
356:21,24
380:11 392:9
397:1 425:10
453:17 489:22
497:24 523:20
525:20 562:5

**string** 282:1,19
282:22 283:7
283:11 347:13
368:21 413:19
421:15 445:6
447:5
**strong** 322:2,2
322:6
**struck** 499:6,8
**structural**
423:21,24
513:1
**structure**
357:25 409:6
427:10,20,22
427:23 494:12
501:13 513:7
**structured**
513:5 521:15
**structures**
322:4
**stuck** 474:1
**study** 365:22
458:6
**stuff** 548:9
**sub** 423:22
512:15,23
**subject** 278:19
323:11 425:25
493:3 528:2
**sublease** 300:8
301:20,23
312:25 323:21
323:24 324:8
325:2 452:2,10

**[sublease - take]**                                              Page 70

452:17

**sublet** 322:18

**submission**
391:22 452:5

**submit** 314:17
388:24 431:9
435:13

**submitted**
315:7 327:5,13
391:5 392:11
393:13,17,17
404:18 405:4
405:12 407:19
407:23 411:13
411:14,15
416:10 435:16
435:24 438:22
438:24 466:11
466:14 491:8
491:10

**submitting**
315:11 391:16

**subscribe**
564:6

**subscribed**
564:12 566:22

**subscription**
504:18,22
505:3

**subsection**
403:6

**subsequent**
344:23 345:23
353:14 477:3
487:23 559:7

**subsequently**
321:21 338:18
338:25 341:3

**subsidiary**
383:2 393:21
394:1 424:3
456:7 496:8
513:4 514:17
518:15 544:21

**substance**
292:23 353:16
378:25 455:1
463:20,22
464:20 465:4
479:16,19
519:16

**subtenant**
292:25

**subtleties** 553:9

**succeed** 509:10

**success** 333:17
334:1 524:21
526:1,4,8,10,22
527:2,15
528:24

**successful**
466:18 468:14
475:19 478:12
478:13 511:14
545:3

**successfully**
467:21

**sue** 313:16,17

**sued** 294:18

**suggest** 397:17
398:9 448:18
541:25

**suggested**
469:18,23
539:7 554:15

**suggests** 340:1

**suing** 295:15
313:13

**sullivan** 503:16

**sum** 463:21
519:15

**summary** 314:3
314:11

**summer** 403:18
504:25

**support** 332:19
504:5

**supported**
332:21

**supposed** 394:8
395:13

**supreme**
281:10 295:3,8

**sure** 293:6,18
295:20,20
300:20 306:3
308:24 314:12
314:15 317:5
325:8 327:22
328:19 351:4
359:13 360:1
368:8,12
379:19 387:7
388:19 391:8

391:25 399:16
400:19 401:13
401:14 404:10
405:18 409:13
418:20 423:22
433:12 440:13
454:24 455:11
463:6,16
465:11 466:5
468:1 481:21
482:1 485:7
489:11,18
492:7,22 505:1
510:14,18
511:2 514:16
514:24 527:3,5
527:7 528:3,10
545:2 553:13
555:11 559:12
560:13

**survive** 522:10

**sustained**
432:24

**swap** 513:8,23

**switch** 497:21

**sworn** 314:18
564:12 566:22

**system** 497:2

**t**

**t** 278:20,20
280:1 565:1,1

**table** 410:22

**tactic** 375:22

**take** 286:7
294:25 312:8

CONFIDENTIAL

**[take - terms]**                                                  Page 71

| | | | |
|---|---|---|---|
| 329:14 332:12 | 320:21 324:12 | 321:23 366:16 | **ten** 490:9 |
| 345:3 347:9 | 325:12 336:3 | 366:17 470:23 | **tend** 345:25 |
| 353:23 358:25 | 338:2,5,9 | 472:7,10,13,22 | **tense** 371:17 |
| 361:20 365:23 | 340:7,20,23 | 472:23,25,25 | 404:1 463:8 |
| 380:14 385:3 | 344:9 348:8,9 | 473:1 486:4,22 | **term** 307:24 |
| 387:25 390:11 | 362:5 375:16 | 487:10,13,15 | 317:18 320:5,6 |
| 391:14 421:4 | 381:2,6 396:16 | 487:19 488:19 | 327:22,24 |
| 423:21 430:20 | 401:20 402:12 | 496:2,2,3,6,8 | 365:7 |
| 431:12 434:3 | 412:6 433:8 | 497:1,4,5,8,14 | **termed** 375:9 |
| 437:2 448:19 | 434:8 437:12 | 497:16,22 | **terms** 291:16 |
| 448:19,20 | 440:8,11 | 498:1,1,2,11,13 | 298:12,12 |
| 455:13,15 | 453:16 490:17 | 498:21 499:9 | 299:10 305:20 |
| 456:3,11,15 | 502:11 514:13 | 499:11 504:15 | 317:10,15,15 |
| 458:2,4,5,6 | 530:24 534:15 | 504:20 505:13 | 317:17 321:25 |
| 467:11 476:14 | 534:15 542:13 | 506:25 507:3 | 323:20,24 |
| 477:11 490:8 | 550:25 556:6 | 507:12,15,19 | 324:2,2,3,6 |
| 536:2 540:2 | **talks** 307:2 | 508:2,6,7,9 | 330:6 351:8,12 |
| 544:23 | 375:4 | 509:10,15,19 | 351:15 356:11 |
| **taken** 278:20 | **target** 550:15 | 509:20 510:2 | 358:23 364:25 |
| 361:24 390:15 | 550:16 | 512:9 513:2 | 365:11,18 |
| 433:5,19,21,23 | **targeting** | **tell** 301:7 305:8 | 377:22 383:7,7 |
| 449:1 457:23 | 548:14 | 311:21 312:19 | 387:11 396:24 |
| 457:24 490:13 | **tax** 427:23 | 312:23 313:3 | 399:3 402:7 |
| 540:5 565:11 | **taxing** 548:8 | 321:1 330:1 | 435:8 441:3 |
| **takes** 455:17 | **team** 369:3 | 335:22 345:2,5 | 448:1 505:2,5 |
| **talk** 429:10 | 391:20 | 352:9,18,23 | 508:12 516:2 |
| **talked** 312:6,11 | **tech** 494:25 | 370:8 382:4 | 524:4 526:20 |
| 312:14 356:5 | **technical** 321:6 | 410:19,23 | 526:21 527:8 |
| 379:14,14,25 | **technically** | 430:12 446:19 | 527:11 528:20 |
| 458:23 460:22 | 372:2 377:18 | 458:18 465:13 | 528:24 533:4 |
| 530:24 543:19 | 377:19 420:4 | 518:13 519:15 | 535:4,6 538:19 |
| 546:12 | **technol** 310:9 | **telling** 350:21 | 542:2,7 543:6 |
| **talking** 288:25 | 497:22 | 463:11 464:10 | 547:3,10,14,23 |
| 294:5,23 318:4 | **technology** | 464:24 | 547:24 548:24 |
| 319:19,20,22 | 289:21 310:10 | | 549:2 550:23 |

**[terms - third]**                                                    Page 72

| | | | |
|---|---|---|---|
| 552:9 553:7 | 311:24 312:5 | 366:23 368:5 | 511:2,11,12 |
| 555:16,18 | 312:15,16 | 368:11,13,14 | 512:5,25 |
| 556:23 561:5,7 | 318:8 335:16 | 369:10 372:2,2 | 514:11 515:4 |
| **terrible** 343:17 | 357:22 363:4 | 373:9 374:14 | 515:11 516:10 |
| 542:24 | 365:19,22 | 375:15 377:11 | 516:13 517:6 |
| **test** 357:24 | 366:16,23 | 379:12 381:1,1 | 521:13,14 |
| 455:13 458:9 | 371:22 375:23 | 387:24 388:9 | 522:16 523:3,3 |
| 557:9 | 450:24 495:19 | 389:5 398:17 | 523:9 526:7,11 |
| **testified** 288:3 | 508:9 523:11 | 399:2 403:20 | 527:23 528:9 |
| 360:5 367:17 | 532:16 548:2 | 406:9,14 | 529:17,21,22 |
| 436:10 498:10 | 556:20,24 | 408:15 410:22 | 529:22 530:10 |
| **testify** 288:11 | 558:9 | 411:17 413:6 | 532:3,9 533:19 |
| 565:7 | **think** 290:18 | 420:4,25 | 534:18,21,24 |
| **testimony** | 291:20 294:10 | 423:10 424:1 | 535:1,2,11,11 |
| 278:20 289:4 | 294:25 298:11 | 429:9,10 | 535:20,22 |
| 291:25 345:14 | 304:21 305:1 | 431:11 432:16 | 536:12 538:7 |
| 352:19 366:25 | 307:21 308:1 | 436:15 437:8 | 538:24 539:6 |
| 382:3 383:9 | 310:10 319:15 | 439:5,24 441:3 | 539:11 540:12 |
| 461:11,16,23 | 319:17 321:15 | 442:10 447:20 | 542:23 543:11 |
| 538:13 565:10 | 322:5 324:20 | 448:6 449:19 | 543:19 544:11 |
| **thank** 303:12 | 328:6,24,25 | 454:1,7 456:6 | 547:5 549:8 |
| 326:8,21 | 332:7 335:12 | 457:23 459:1 | 550:1,3,7 |
| 386:16 397:13 | 338:21 340:4 | 460:2 467:4 | 553:8,17 |
| 413:24 492:8 | 345:8 346:17 | 469:18,22 | 554:12 555:3,5 |
| 492:11 517:24 | 348:22 350:24 | 471:7,20 | 555:20 558:9 |
| 563:1,2 | 351:11,13 | 472:21,24 | 559:13,15 |
| **thing** 336:18 | 353:12,12 | 475:9 477:3,5 | 560:16,17 |
| 342:23 455:19 | 354:5,9 355:2 | 479:11,19 | 561:16,16 |
| 455:19 457:8 | 355:23 356:18 | 482:2 486:10 | **thinking** |
| 475:20 478:12 | 358:10,15 | 488:22 500:21 | 374:24 380:2 |
| 510:11 512:10 | 359:14 361:1,3 | 501:23 502:13 | 468:4 |
| 520:17 528:23 | 361:13,15 | 507:8,9 508:5 | **third** 311:10,11 |
| 551:23 | 362:10 363:1 | 508:17,20 | 311:11 386:7 |
| **things** 310:15 | 364:15,15,22 | 509:9,12 | 386:14 425:4 |
| 311:20,21,22 | 365:1,9 366:1 | 510:17,17,22 | 489:14,14 |

**[third - told]**                                                      Page 73

| | | | |
|---|---|---|---|
| 498:22 502:7 | 305:4 307:5 | 416:18 417:5,6 | 536:8 539:3 |
| 503:6 504:5 | 308:5,21,22 | 418:25 419:1 | 540:18 543:5 |
| 510:6 513:19 | 310:19 311:1 | 422:6,9 426:1 | 552:1,6 553:9 |
| **thompson** | 316:21 317:21 | 428:17,18,19 | 553:10,14 |
| 280:2 286:20 | 319:8,14,18 | 434:11,22 | 554:5 558:11 |
| **thought**  356:8 | 326:3 328:10 | 435:24 436:3 | 565:11 |
| 360:18 364:17 | 329:14 334:2 | 438:18 442:9 | **timely**  297:2 |
| 371:23 417:9 | 334:12,17,19 | 443:22 445:1 | **times**  302:20 |
| 434:2 512:9 | 334:25 336:2 | 445:25 446:22 | 308:4,23 |
| 535:10 558:14 | 337:20 339:17 | 446:25 448:20 | 316:17,18 |
| **threatened** | 341:22,25 | 449:16,25 | 338:10 339:6 |
| 304:13,22,24 | 344:8,9 345:15 | 451:5 453:4,5 | 346:1,3,8 |
| **three**  281:12,22 | 345:21 350:15 | 453:8,9,25 | 356:6 360:1 |
| 282:4,8 283:1 | 351:25 352:1,2 | 454:7 455:12 | 369:6 371:19 |
| 283:17 284:18 | 352:21,24 | 456:10,14,16 | 416:6,6,7 |
| 288:16 292:8,9 | 353:23 356:13 | 456:21 457:6 | 437:7 469:18 |
| 303:5 347:3 | 357:9 358:10 | 459:1,25 466:6 | 474:13 |
| 384:24 387:17 | 358:14 359:24 | 466:10 467:25 | **timing**  364:4 |
| 426:19 458:12 | 361:3 362:12 | 468:3,7 473:4 | 387:23 491:15 |
| 534:9 558:5 | 363:12,13,14 | 481:16,22 | 527:4 |
| **threw**  484:14 | 364:19 369:5 | 484:1 485:15 | **title**  518:25 |
| **thrive**  320:20 | 370:9 371:16 | 486:5,7,8 | 552:5 |
| 320:22,24,25 | 372:20 373:2,5 | 487:17 489:5 | **today**  287:18 |
| 321:2,9,13 | 373:7 374:14 | 494:16,18 | 288:11,20 |
| **thriving**  321:18 | 375:17 376:15 | 495:11 503:8 | 294:21 402:25 |
| **throw**  375:19 | 376:20 377:7 | 503:13 508:14 | 451:1 513:11 |
| **throwing** | 378:1,3,4 | 508:15 509:3 | **together** |
| 475:20 | 379:11,12 | 509:19 511:24 | 364:16 373:21 |
| **time**  286:6 | 380:1,22 381:3 | 514:5,19 515:8 | 375:2,24 |
| 287:2 288:7,24 | 381:24 385:4 | 515:10 516:13 | 407:12 429:12 |
| 290:13,15,16 | 388:16 400:15 | 517:1 518:18 | 490:8 493:21 |
| 290:21 292:6 | 400:22 404:1 | 518:25 527:24 | 543:10 |
| 294:22 297:16 | 405:2 409:9,22 | 528:1,4,19 | **told**  310:23 |
| 298:23 303:2 | 410:3,4,13 | 533:8 535:15 | 311:21,23 |
| 304:16,17,23 | 412:1,15 413:1 | 535:20,21 | 312:5 314:10 |

CONFIDENTIAL

**[told - tremendous]**                                            Page 74

| | | | |
|---|---|---|---|
| 344:22 345:14 | **traded**  322:23 | **trading's** | 556:12,15,15 |
| 345:16 346:2,4 | 340:15 383:16 | 463:24 464:6 | 556:19 557:20 |
| 352:13,16 | **trading**  282:16 | 482:25 487:21 | 557:25 558:3,5 |
| 353:2 371:16 | 340:16 383:3,5 | **trans**  519:1 | 559:6 561:10 |
| 413:2,9 420:3 | 383:8,10 | **transaction** | 561:21 562:2 |
| 431:6 461:4 | 391:11 393:14 | 331:23 332:8 | 562:13 |
| 474:3,8 | 393:18,20,23 | 332:23 359:6 | **transactions** |
| **took**  301:16 | 393:25 394:3 | 498:16 499:4 | 317:21 498:14 |
| 355:5 367:25 | 395:9,19 402:2 | 501:15,16 | 516:3 524:14 |
| 368:2 384:19 | 404:19,19 | 505:8,18 506:2 | 529:23 535:7 |
| 457:7 521:16 | 405:10 406:2 | 506:5,21 510:5 | 535:13 556:18 |
| 534:16 535:12 | 406:24 407:7 | 511:18 515:5 | **transcript** |
| 560:24 | 409:18,21 | 519:16,19 | 564:3,6 565:10 |
| **top**  282:1 | 412:9 413:5 | 520:3 522:1,13 | 565:23 |
| 295:22 327:13 | 415:18 424:3 | 523:2,5,8,24,25 | **transfer**  519:1 |
| 368:21 373:19 | 431:5 435:8,9 | 524:22 525:1 | **transition** |
| 414:9 422:24 | 440:5 443:11 | 525:16 526:5 | 317:9,16 318:5 |
| 432:11 447:12 | 443:13 449:12 | 526:16 527:6,8 | 319:6,20 |
| 524:13 | 449:16,22 | 527:17 528:6 | **translated** |
| **topic**  460:19,20 | 451:12 452:19 | 528:14,22,25 | 354:25 |
| 487:4,9 | 452:21 453:12 | 529:3,20 530:1 | **translates** |
| **total**  357:1 | 453:22 454:4 | 532:10,11 | 356:23 |
| 403:17 433:23 | 454:10,22,25 | 533:21 534:15 | **transparency** |
| 504:4 521:21 | 455:9 456:3,18 | 537:6,23,24 | 369:2,5,8 |
| 521:21 551:13 | 457:5 462:18 | 538:3 541:15 | **transparent** |
| **totally**  399:16 | 466:3 467:20 | 542:3,4 544:8 | 369:11 477:7 |
| 400:19 560:1 | 469:6 473:7 | 544:15 545:6 | **transparently** |
| **touch**  463:23 | 475:25 478:1 | 545:13,18,24 | 369:5 |
| 464:3,11,14 | 478:17 485:5 | 546:9,16 | **transposed** |
| **towards**  382:19 | 488:11 489:7 | 547:10 548:3 | 440:12 |
| 500:22 501:3,3 | 495:23 496:5,7 | 548:16,23 | **traurig**  392:6 |
| 543:21 544:12 | 496:13 497:2 | 549:5,6,7 | **traveling** |
| **trade**  383:10,13 | 512:14,22 | 550:19,20,24 | 362:21 |
| 383:15 489:15 | 513:4 | 554:2,23 555:8 | **tremendous** |
| 489:20,22 | | 555:11,21,23 | 322:3 335:4 |

**[tried - understanding]** Page 75

| | | | |
|---|---|---|---|
| **tried** 374:21 | 369:18 371:1 | **type** 317:22 | **unanswered** |
| 484:9 553:11 | 372:12 395:12 | 375:17 | 417:19 |
| 553:11 | 414:4 437:25 | **types** 365:9 | **under** 287:23 |
| **true** 301:3 | 438:6 448:13 | 553:9 | 289:10 301:25 |
| 356:19,20 | 451:21 454:13 | **typical** 300:15 | 315:12 317:5 |
| 399:17 452:13 | 485:11 494:10 | 309:24 | 365:24 380:4 |
| 533:17 548:8 | 524:6,8,12 | **tyrrell** 279:5 | 381:24 386:5 |
| 565:10 | 536:15 558:16 | 287:7 492:10 | 389:7,9 393:5 |
| **trust** 281:11,17 | **turning** 362:15 | **u** | 394:8,14 |
| 295:4,9 297:13 | **twenties** 540:16 | | 396:25 403:11 |
| 314:23 315:8 | **twice** 522:16 | **uh** 381:8 | 403:23 465:18 |
| **truth** 565:7,7,8 | **two** 281:20 | **ultimate** | 526:12 557:8 |
| **try** 318:14 | 282:22 283:7 | 419:18 531:16 | **underlying** |
| 320:11 329:1 | 283:10,21 | 543:20 | 330:15 |
| 336:3 337:12 | 284:1,22 285:1 | **ultimately** | **understand** |
| 343:24 363:16 | 326:11 331:5,5 | 294:15 299:21 | 287:25 329:6 |
| 377:15 380:14 | 331:12,25 | 309:4 318:15 | 336:13 348:12 |
| 395:6 401:18 | 343:12 371:8 | 363:20 392:5 | 379:20,22 |
| 402:18 430:25 | 375:22 381:14 | 407:8 413:7 | 389:18 390:6 |
| 486:3 489:2 | 419:11 421:14 | 419:4 442:17 | 400:20 401:15 |
| 495:10 497:4 | 421:22 429:12 | 442:20 455:2 | 402:16,23 |
| 502:17 508:2 | 445:5,12 447:4 | 501:16,18 | 403:12 412:7 |
| 509:5,19 | 454:3 470:2,10 | 515:12 525:24 | 412:16 427:21 |
| 510:10 520:14 | 477:19 478:24 | 527:9 541:21 | 434:15,18 |
| 535:25 | 496:21,22 | 543:23 548:21 | 455:8 471:17 |
| **trying** 336:8 | 498:14 501:25 | 549:8 552:7 | 479:4 482:15 |
| 364:24 377:24 | 502:1 504:23 | 562:6 | 503:4 509:8 |
| 476:15 507:8 | 519:22,23 | **um** 329:10 | 512:17 521:13 |
| 509:8 531:24 | 521:22 529:23 | 341:2 342:6 | 524:4 531:24 |
| **tuesday** 288:19 | 532:11 538:8 | 401:22 412:25 | 553:25 554:4 |
| **turn** 296:3,16 | 545:13 547:6 | 467:16 547:11 | 555:14 |
| 300:2 302:3 | 549:7,12 | **unacceptable** | **understanding** |
| 315:14 322:13 | 558:21 559:5 | 429:20,21,22 | 314:13 320:5 |
| 322:25 326:22 | **tyler** 280:2 | 463:12 484:8 | 376:9 383:8 |
| 350:9 369:12 | 286:20 | **unaffiliated** | 391:15 398:2,7 |
| | | 346:5,5 377:21 | |

CONFIDENTIAL

**[understanding - videographer]**                    Page 76

404:3,4,21
405:11 411:20
420:19,20
425:1 440:19
440:20 468:20
503:2 509:15
549:4 550:9,18
**understands**
402:25 404:2
**understood**
373:8 381:20
393:1 403:22
404:1 509:7
545:11 553:25
557:24
**underwrite**
344:15 509:6
**unfortunately**
288:15
**unhappy**  356:8
356:10,14
**uniform**  282:12
390:20,25
**uninteresting**
365:3
**unit**  286:9
**united**  278:1
**unlimited**
363:12
**unrelated**
528:21 531:10
**untrue**  338:19
**unusual**  316:4
**unwilling**
464:20 468:16

**unwillingness**
478:2
**upcoming**
555:21
**upfront**  505:4
**upside**  357:25
**usage**  293:3
298:13
**use**  291:23
298:16 300:1
300:21 302:4,6
305:21 306:15
306:17 320:6
323:10 324:22
324:24 325:23
365:14 366:10
366:14 375:17
384:1 393:6,8
472:10,25
477:7 492:10
492:18 497:23
497:25 498:12
504:15 506:25
507:3,11 508:9
508:14 509:5
509:19 510:1
539:8 562:1
**used**  291:10,20
292:1,9 312:13
317:18 318:23
327:24 340:24
351:13 372:21
372:21 436:15
444:14 464:16
468:2 473:1

492:17 515:7
522:16 531:9
548:6 549:5
562:13
**using**  290:12
290:19,19,20
291:18 292:5
324:21 365:7
366:7 369:4
375:9 453:25
472:24 497:16
**usual**  471:13
**usually**  458:21

**v**

**v**  278:6,15
281:11,17
286:13,16
295:4,9 314:23
315:8 566:2
**vacated**  297:21
298:3
**valua**  335:17
**valuable**
317:24 322:5
**valuation**
321:21 330:21
330:24 331:10
332:18,21
333:18 335:18
530:22,25
531:1,5,9
532:2,9,20,22
532:23 533:1,5
533:15 539:2,4
539:13 545:5

550:9
**valuations**
321:22 330:15
539:9 558:13
**value**  321:24
343:14 346:19
358:8 535:10
550:18,21,24
**variables**  289:9
289:10 335:17
**various**  282:5
310:9 384:9,25
407:10 409:25
414:17 556:14
**vendors**  367:13
**venture**  335:14
499:13 508:4
543:2
**ver**  354:14
**veracity**  476:17
**verbal**  354:15
354:19 360:1
546:17,17
**verge**  543:4
556:12,13
**veritext**  286:21
286:22 566:1
**version**  284:12
517:20
**viable**  447:21
**video**  286:6,10
**videoconfere...**
280:4,5
**videographer**
280:2 286:1,21

**[videographer - willingness]**                          Page 77

361:21 362:1
378:11 390:13
390:17 426:8
426:13,16
448:24 449:2
490:11,14
540:3,6 563:3
**videotaped**
278:6
**view** 309:7
312:22 334:1
356:22 357:8
357:18 358:4,7
362:7,23
363:10 364:7
380:21 389:9
400:5 436:16
437:17 462:1
462:13 467:7
467:22,25
468:21 529:1
545:24
**viewed** 544:4
557:7
**violation** 300:7
**virtually** 476:6
**vol** 278:8
**volatile** 335:18
**vollmuth**
278:21 565:3
565:22
**voluntarily**
364:11
**vote** 376:8,11
376:15,18

377:2 380:6,7
380:22 381:19
381:21,22
382:1 401:5
444:4 535:12
**voting** 394:11
395:1,2 397:10
401:7 554:19

**w**

**wait** 400:25
**want** 288:15
319:17 328:21
330:1 337:7
339:24 342:22
344:13 347:8
351:12 358:23
369:22 373:12
387:23 398:18
420:24 423:1
426:5,9 440:24
440:24 445:22
454:18 470:18
470:23 471:3
471:15 474:13
474:14 492:16
500:25 511:6
541:8 542:8
548:1 551:23
**wanted** 319:5
339:7 342:23
343:20 348:21
354:5 355:18
356:1 364:7
365:9 375:6,18
375:22 415:8

420:13,14
424:9 427:24
429:7 442:3
446:14 447:17
468:3 471:22
474:9 507:3
509:22 531:13
531:15,19,21
537:10 545:7,8
548:22 549:3,6
549:7 557:24
**wasted** 379:12
**water** 426:10
**way** 342:24
346:6 359:23
363:8 365:21
366:1 380:19
382:6 424:17
431:15 441:18
478:4 481:1
483:19 490:24
509:18 513:4
513:12,18
520:14 521:14
521:15,18
535:14
**ways** 356:9
472:12 513:7
513:18
**we've** 402:1
**wealth** 322:1
339:5,5 353:6
**website** 389:9
**wednesday**
278:23

**week** 287:24
288:16 362:19
479:5 480:11
482:16,16
**weeks** 292:4
**went** 306:6
312:5 348:13
382:19 400:22
448:6 475:11
504:9 507:24
541:6,7
**wgts** 300:5
**when's** 514:19
**whispering**
286:4
**wholly** 383:2
393:21 394:1
424:3,16 425:2
512:15,23
518:15 544:21
**wildly** 335:18
**willing** 332:23
332:24 335:20
353:24 357:20
424:5 435:2
443:13 445:21
445:23 456:10
465:1,1,7,14,15
469:14 476:8
480:7,20 481:6
483:13 487:17
532:24 533:7
**willingness**
481:18 483:4

CONFIDENTIAL

**[window - york]**                                                    Page 78

| | | | |
|---|---|---|---|
| **window** 352:9 | **worded** 434:15 | 315:8 323:21 | 392:24 395:24 |
| 457:21 | 521:16,18 | 323:25 324:5,8 | 398:3 411:5 |
| **withdraw** | **words** 358:1 | 325:2 335:2 | 418:7 433:3,13 |
| 434:12 470:20 | 375:19 416:20 | 553:12 | 433:14 450:7 |
| 472:1 473:7,8 | 464:15,19,25 | **worth** 558:15 | 461:21 471:20 |
| **withdrawal** | 465:3 | **writes** 414:9 | 473:25 482:1 |
| 487:20 | **work** 289:20 | **writing** 311:25 | 482:17 483:25 |
| **withdrawn** | 317:22 318:1 | 346:16,23 | 484:3 488:11 |
| 469:11 | 322:4 376:3,21 | 362:19 363:3 | 490:10 502:23 |
| **withdrew** | 443:18 444:11 | 421:10 465:1 | 503:3 506:15 |
| 469:9 | 456:8 484:14 | **writings** 487:8 | 510:17 512:25 |
| **withstand** | 525:15 545:22 | **written** 284:18 | 515:3 520:6,8 |
| 548:4 | **workaround** | 302:3 346:12 | 520:9 522:18 |
| **witness** 281:2 | 377:7 378:17 | 346:12,17,18 | 527:14 533:19 |
| 287:25 301:11 | 444:2,13 | 349:25 350:4 | 542:6,14 |
| 328:25 349:4 | 485:13 | 356:15 378:9 | 546:17 551:12 |
| 362:15 381:9 | **worked** 305:24 | 392:17 421:19 | 556:7 |
| 422:18 426:9 | 305:25 306:1,2 | 422:12 459:3,9 | **year** 284:17 |
| 454:18 461:20 | 306:3 388:10 | 462:2,8 523:7 | 293:2 302:20 |
| 492:8,18,19,21 | 499:2 | 523:9 534:9 | 302:21 305:13 |
| 506:14 517:24 | **working** | 536:20 546:18 | 315:20 316:5,6 |
| 520:6,9 524:16 | 317:13,21 | 560:1 561:20 | 317:8,9 322:7 |
| 531:22 560:19 | 318:20 356:4 | 561:24 | 336:17 346:1,2 |
| 563:2 | 389:5 443:24 | **wrong** 397:10 | 346:3 491:4 |
| **witnesses'** | 444:7,10 472:6 | 431:4 432:22 | 523:17 524:10 |
| 566:4 | 510:5 511:18 | **wrote** 293:20 | **yearly** 316:20 |
| **word** 332:12 | 516:22 | 474:2 | **years** 316:7,12 |
| 340:18 343:7 | **workings** 539:6 | | 317:1 516:15 |
| 345:3 351:13 | **workout** | **y** | **yep** 297:25 |
| 369:4 372:21 | 492:10 | **yeah** 296:21 | 414:25 |
| 431:3 436:15 | **world** 281:10 | 297:24,25 | **york** 278:1 |
| 456:15 477:7 | 281:17 295:3,9 | 318:7 346:22 | 279:9,9,20,20 |
| 492:17,23 | 297:12,12 | 347:10 350:12 | 281:10 288:2,2 |
| 509:2 557:17 | 299:5,6,6 | 356:3 360:22 | 295:3,9,16,23 |
| | 302:3 314:23 | 373:3 379:17 | 306:13 309:25 |
| | | 379:18,24 | |

CONFIDENTIAL

**[york - zoom]**                                            Page 79

| 452:6,6 566:1 |
|---|

| **z** |
|---|

**z**  516:19
**zero**   548:5
**zheng**   516:14
**zoom**   500:21
  562:25

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.