CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 1

1            UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF NEW YORK
2

     _____
3

     CYPRESS HOLDINGS, III, L.P.,              Case No.
4    individually and derivatively       22-cv-01243(LGS)
     on behalf of SPORT-BLX, INC.,
5                   Plaintiff,
6        -v-                                   VIDEOTAPED
                                          DEPOSITION UPON
7    GEORGE HALL, JOSEPH DE PERIO,        ORAL EXAMINATION
     DANIEL STRAUSS, FRANCIS                      OF
8    RUCHALSKI, CESAR BAEZ,                   GEORGE HALL
     CHRISTOPHER JOHNSON,
9    SPORT-BLX, INC., SPORT-BLX
     SECURITIES, INC., CLINTON
10   GROUP INC., and GLASSBRIDGE
     ENTERPRISES, INC.,
11                  Defendants.
12   _____
13   SPORT-BLX, INC., individually          Case No:
     and derivatively on behalf of     1:22-cv-8111(LGS)
14   its shareholders,
                    Plaintiff,
15
         -v-
16
     MICHAEL M. SALERNO and
17   CYPRESS HOLDINGS, III, L.P.,
                    Defendants.
18

     _____
19

     ***  CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER  ***
20

21        T R A N S C R I P T of testimony taken
     stenographically by and before MARGARET
22   VOLLMUTH-CORSON, a Certified Court Reporter of the
     State of New Jersey, pursuant to Federal Rules
23   Governing Civil Procedures, at the offices of CHIESA
     SHAHINIAN & GIANTOMASI, P.C., 105 Eisenhower
24   Parkway, Roseland, New Jersey, on Wednesday,
     June 14, 2023, commencing at approximately 10:01
25   a.m.
     Job No. NJ5960469

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 2

```
 1      A P P E A R A N C E S:
 2      CHIESA SHAHINIAN & GIANTOMASI, P.C.
        105 Eisenhower Parkway
 3      Roseland, New Jersey 07068
        (973) 530-2100
 4      BY:  A. ROSS PEARLSON, ESQ.
        rpearlson@csglaw.com
 5      BY:  DANIEL J. TYRRELL, ESQ.
        dtyrrell@csglaw.com
 6      BY:  KELLY KORTES, ESQ.
        kkortes@csglaw.com
 7      Attorneys for the Plaintiff Cypress Holdings, III,
        L.P. and the Defendants Michael M. Salerno and
 8      Cypress Holdings, III, L.P.
 9      MORVILLO ABRAMOWITZ GRAND IASON & ANELLO, P.C.
        565 Fifth Avenue
10      New York, New York 10017
        (212) 856-9600
11      BY:  JONATHAN S. SACK, ESQ.
        jsack@maglaw.com
12      BY:  EDWARD M. SPIRO, ESQ.
        espiro@maglaw.com
13      BY:  JOSEPH STERN, ESQ.
        jstern@maglaw.com
14      Attorneys for the Defendants Sport-BLX, Inc.,
        Sport-BLX Securities, Inc., George Hall, Cesar
15      Baez, and Christopher Johnson
16      COLE SCHOTZ P.C.
        Court Plaza North, 25 Main Street
17      Hackensack, New Jersey 07601
        (201) 525-6305
18      BY:  DAVID S. GOLD, ESQ.
        dgold@coleschotz.com
19      Attorneys for the Defendant Joseph De Perio
20      LOEB & LOEB LLP
        345 Park Avenue
21      New York, New York 10154
        (212) 407-4852
22      BY:  CHRISTIAN D. CARBONE, ESQ.
        ccarbone@loeb.com
23      BY:  DAVID FORREST, ESQ.  (via videoconference)
        dforrest@loeb.com
24      Attorneys for the Defendants Daniel Strauss, Francis
        Ruchalski, and GlassBridge Enterprises, Inc.
25
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 3

1

A L S O   P R E S E N T:

2

Peter Cooper, Videographer

3

Joseph De Perio

4

Michael Salerno (via videoconference)

5

Francis Ruchalski (via videoconference)

6

Daniel Strauss (via videoconference)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 4

1

                                INDEX
2

        WITNESS                                    PAGE
3

        GEORGE HALL
4

        By:  MR. PEARLSON                              8
5
6
7
8

                               EXHIBITS
9

        NO.        DESCRIPTION                      PAGE
10

        Hall-1     16-page Cypress Holdings,         25
11                  III, L.P.'s First Request
                    for the Production of
12                  Documents to Defendant
                    George Hall
13

        Hall-2     45-page Part 2A of Form          115
14                  ADV:  Firm Brochure -
                    Clinton Group, Inc. - March
15                  2019
16      Hall-3     36-page Clinton Group Form       123
                    ADV Rev. 10/2021
17

        Hall-4     18-page ConsenSys AG             145
18                  December 5, 2018, letter to
                    Clinton Group and
19                  Sports-BLX with attached
                    schedules Bates stamped
20                  SPORTBLX0264725 through
                    264742
21

        Hall-6     Four-page Sport-BLX             163
22                  Frequently Asked Diligence
                    Questions Bates stamped
23                  SPORTBLX0264858 through
                    264861
24
25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 5

| 1 | Hall-7 | Five-page Sport-BLX | 171 |
| 2 | | Investment Fund Opportunity February 8, 2019 presentation slides Bates | |
| 3 | | stamped SPORTBLX0264692 through 264696 | |
| 4 | | | |
| | Hall-9 | 19-page Sports Asset | 177 |
| 5 | | Investment Fund February 2019 presentation slides | |
| 6 | | Bates stamped SPORTBLX 0172847 through 172864 | |
| 7 | | | |
| | Hall-14 | Two-page Minutes of the | 186 |
| 8 | | Regular Meeting of the Board of Directors of | |
| 9 | | GlassBridge Enterprises, Inc. dated March 29, 2019, | |
| 10 | | Bates stamped GBE_0002989 and 2990 | |
| 11 | | | |
| | Hall-15 | Two-page January 12 and 13, | 195 |
| 12 | | 2019, email exchange between Joe De Perio and | |
| 13 | | George Hall Bates stamped CLINTON00009219 and 9220 | |
| 14 | | | |
| | Hall-16 | 30-page Amended Complaint | 203 |
| 15 | | in the Sport-BLX v. Salerno matter | |
| 16 | | | |
| | Hall-17 | 10-page Sport-BLX, Inc. | 209 |
| 17 | | Common Stock Purchase Agreement made as of | |
| 18 | | February 28, 2019, Bates stamped SPORTBLX00028990 | |
| 19 | | through 28999 | |
| 20 | Hall-18 | 10-page Sport-BLX, Inc. | 222 |
| 21 | | Common Stock Purchase Agreement made as of | |
| | | February 28, 2019, Bates | |
| 22 | | stamped SPORTBLX00028976 through 28985 | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 6

| 1 | Hall-19 | Four-page Sport-BLX, Inc. | 233 |
| | | February 28, 2019, letter | |
| 2 | | agreement to Cypress | |
| | | Holdings, III, L.P. Bates | |
| 3 | | stamped SPORTBLX00028986 | |
| | | through 28989 | |
| 4 | | | |
| | Hall-20 | March 8, 2019, email | 243 |
| 5 | | exchange between Joe De | |
| | | Perio and George Hall Bates | |
| 6 | | stamped CLINTON00009423 | |
| 7 | Hall-22 | Nine-page email string | 248 |
| | | between Joe De Perio, | |
| 8 | | Michael Salerno, and George | |
| | | Hall dated April 1 through | |
| 9 | | April 26, 2019, Bates | |
| | | stamped SPORTBLX0065062 | |
| 10 | | through 65070 | |
| 11 | Hall-23 | 28-page Consent to Sublease | 256 |
| | | dated the 31st day of | |
| 12 | | August, 2015, Bates stamped | |
| | | CLINTON00034105 through | |
| 13 | | 34132 | |
| 14 | Hall-24 | 35-page packet of Sport-BLX | 264 |
| | | financial documents Bates | |
| 15 | | stamped GBE_0000517 to 551 | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 7

1            THE VIDEOGRAPHER:  Good morning.  We

2     are going on the record at 10:01 a.m. on Wednesday,

3     June 14, 2023.  Please note that the microphones are

4     sensitive and may pick up whispering and private

5     conversations.  Audio and video recording will

6     continue to take place unless all parties agree to

7     go off the record.

8                This is media 1 of the video-recorded

9     deposition of George Hall taken in the matters of

10    Cypress Holdings, III, L.P., et al. v. George Hall,

11    et al., with case 22-cv-01243, and Sport-BLX,

12    Incorporated, et al. v. Michael M. Salerno, et al.,

13    Civil Action 1:22-cv-8111, both actions filed in the

14    United States District Court for the Southern

15    District of New York.

16                The location of the deposition is 105

17    Eisenhower Parkway in Roseland, New Jersey.  My name

18    is Pete Cooper, representing Veritext, and I am the

19    videographer.  The court reporter is Maggie Corson

20    from the firm Veritext.

21                If there are any objections to

22    proceeding, please state them at the time of your

23    appearance.  Counsel and all present will now state

24    their appearance and affiliations for the record,

25    beginning with the noticing attorney.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 8

1            MR. PEARLSON:  Good morning.  My name

2    is Ross Pearlson of Chiesa Shahinian & Giantomasi.

3    We represent the plaintiff, Cypress Holdings, III,

4    L.P., in the matter of Cypress Holdings, III, L.P.

5    v. George Hall, et al.  We also represent defendants

6    Michael Salerno and Cypress in the matter of

7    Sport-BLX, Inc. v. Michael M. Salerno, et al.

8            MR. GOLD:  David Gold, Cole Schotz,

9    P.C., on behalf of defendant Joseph De Perio.

10            MR. CARBONE:  Chris Carbone, Loeb &

11    Loeb, for GlassBridge, Daniel Strauss, and Francis

12    Ruchalski.

13            MR. SACK:  Jonathan Sack with the law

14    firm Morvillo Abramowitz for the witness, George

15    Hall, and Sport-BLX and affiliated individuals in

16    both cases, and I'm here with my colleagues Edward

17    Spiro and Joseph Stern.

18            THE VIDEOGRAPHER:  All right.  Thank

19    you.  At this time the court reporter may swear in

20    the witness, and we can proceed.

21    G E O R G E   H A L L, residing at 6 East 69th

22    Street, New York, New York, having been duly sworn,

23    testified as follows:

24    EXAMINATION BY MR. PEARLSON:

25            MR. PEARLSON:  All right.  Before we

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 9

1    begin, I just want to note for the record that on

2    Monday we received a supplemental production from

3    Sport-BLX -- on behalf of Sport-BLX I should say,

4    and last night we received the supplemental

5    production from GlassBridge.  Obviously, we object

6    to the late production of these documents, don't

7    understand why they're being produced at this time

8    after depositions have already begun, and we're just

9    going to reserve all rights in that regard either to

10   continue Mr. Hall's deposition or seek whatever

11   relief might be appropriate from the Court.

12        Q.    Okay.  Mr. Hall, you're represented

13   here by counsel today, correct?

14        A.    Yes.

15        Q.    Mr. Sack of the Morvillo firm?

16        A.    Yes.

17        Q.    Okay.  And you understand that you're

18   testifying under oath today?

19        A.    Yes.

20        Q.    And that's the same oath that you would

21   give if you were testifying at trial?

22        A.    Yes.

23        Q.    Okay.  And do you understand that the

24   court reporter is taking down everything we say and

25   making a transcript of these proceedings?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1          A.      Yes.

2          Q.      Okay.  So do you understand that you

3    have to give a verbal answer to my questions?

4          A.      Yes.

5          Q.      Do you also understand that you need to

6    wait until I finish my questions before giving an

7    answer?

8          A.      Yes.

9          Q.      Okay.  So if we talk over each other,

10   it will muddle the transcript.  You understand that?

11         A.      Yes.

12         Q.      Okay.  And I ask that you tell me if

13   you don't understand a question that I ask.  If you

14   do say that, I'll try to rephrase it.  However, if

15   you answer a question, I'll assume you understood

16   it.  Do you understand that?

17         A.      Yes.

18         Q.      I'll ask that you don't guess when you

19   give an answer to any of my questions.  If a

20   question requires you to approximate or give your

21   best estimation, that's fine, but I don't want your

22   speculation.  Do you understand that?

23         A.      Yes.

24         Q.      I'll also ask that time to time your

25   attorney might be making objections or -- to my

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 11

1    questions, so I ask that you wait until that

2    objection is resolved before going forward with your

3    -- going forward with your answer, and unless your

4    attorney directs you not to answer, you should

5    eventually respond to the questions.  Do you

6    understand that?

7            A.    Yes.

8            Q.    Are you on any medications today that

9    would affect your ability to testify?

10           A.    No.

11           Q.    Is there any other reason today that

12   you can't testify fully and completely with respect

13   to this matter?

14           A.    No.

15           Q.    And do you understand that your

16   deposition, there's a stipulation and order

17   governing the production and exchange of

18   confidential information in this case, a protective

19   order?

20           A.    Yes.

21           Q.    And that your deposition will be

22   governed by the terms of that protective order.  Do

23   you understand that?

24               (Videoconference interference.)

25               MR. PEARLSON:  Could we ask that all

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 12

```
 1    the people participating by Zoom mute their -- their
 2    phones and computers, please?
 3            Q.    Mr. Hall, have you ever been deposed
 4    before?
 5            A.    Yes.
 6            Q.    How many times?
 7            A.    Several.
 8            Q.    When you say "several," how many --
 9    approximately how many times?
10            A.    Three, four, I -- that's an
11    approximation.
12            Q.    And in what kind of cases?  Can you
13    break down for me the kind of cases in which you've
14    been deposed before?
15            A.    One was a civil case between a hedge
16    fund and investors.  Um...
17            Q.    Were you a party to that lawsuit?
18            A.    No.
19            Q.    You were just a witness?
20            A.    Yes.
21            Q.    Okay.  How about -- how about any other
22    times that you've testified?
23            A.    I'd have to think.  I'm not sure if
24    they were actual depositions or just interviews with
25    various -- involving various legal issues.
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 13

1           Q.    Okay.  If it -- if it was a -- a
2    deposition would be like what we're doing today
3    where there's a court -- you're under oath, and a
4    court reporter is taking down everything that's
5    being said.  With that clarification, can you tell
6    me when else you've been deposed?
7           A.    I think one time by the Securities and
8    Exchange Commission.
9           Q.    Okay.  And what type of matter was
10   that?
11          A.    A securities litigation.
12          Q.    Was it a matter brought by the SEC
13   against -- against someone?
14          A.    I don't think it was the matter was
15   brought.  I think this was before there was any --
16   any issue brought.
17          Q.    Okay.  And what was -- was the SEC
18   investigating an entity that you were affiliated
19   with?
20          A.    Yes.
21          Q.    Okay.  What was the name of the entity?
22          A.    Oh, Clinton Group, Incorporated.
23          Q.    Okay.  And what was the nature -- first
24   of all, when was this investigation?
25          A.    Somewhere around 2008 or '9.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 14

1          Q.     And what was the nature of the
2    investigation that the SEC was undertaking with
3    respect to the Clinton Group?
4          A.     It was part of a broad investigation
5    of asset managers that managed money for the New
6    York State Common Retirement Fund.
7          Q.     Were there any allegations of
8    wrongdoing against the Clinton Group or you
9    personally involved?
10                MR. SACK:  Objection to the form.
11         Q.     You could answer.
12         A.     Can you -- can you tell me what --
13   when you say allegation...
14         Q.     Well, was there any specific
15   allegations made by the SEC during the investigation
16   that either you or the Clinton Group had acted
17   improperly?
18         A.     Yes.
19         Q.     And what were the natures of those
20   allegations?
21         A.     The allegation was -- had to do with
22   the paying of fees to political operatives.
23         Q.     And was it -- was it an allegation made
24   that the Clinton Group or yourself had done that?
25         A.     No.  It wasn't an allegation that we

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 15

1    had done that; it was an investigation of whether

2    that was done and an allegation of potentially

3    considering doing it before the money was allocated

4    by the pension fund.

5        Q.    And you gave a deposition to the SEC in

6    connection with that matter; you personally?

7        A.    Yes.

8        Q.    Okay.  And what eventually happened

9    with that investigation?

10        A.    It was dropped.

11        Q.    Okay.  No settlement on behalf of

12    Clinton Group?

13        A.    No settlement, no charge.

14        Q.    Okay.  Other than the SEC testimony and

15    the hedge fund cases, have you been deposed in any

16    other cases?

17        A.    Those are the only two that come to

18    mind.

19        Q.    Are you currently -- strike that.

20            Have you ever been named as a defendant

21    in a case personally?  Other than this case.

22        A.    In a civil case?

23        Q.    Yes.

24        A.    Yes.  Personally, I'd -- I'd have to

25    think about it.  I don't know.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 16

1          Q.      So there are entities that you've

2     either owned or are affiliated with that have been

3     sued?

4          A.      Yes.

5          Q.      Okay.  First personally.  You don't

6     recall which suits other than this one that you've

7     been sued in personally?

8          A.      I'm not -- nothing's coming to mind at

9     the moment.

10         Q.      Okay.  So you've never been sued

11    personally for your role as a director or officer of

12    a company?

13              MR. SACK:  Objection to the form.

14         A.      Not that I recall.

15         Q.      Okay.  What about the entities that you

16    -- you indicated that there were entities that you

17    either have an ownership interest or affiliated with

18    that might have been sued.  What -- what lawsuits

19    involve those entities?

20         A.      Clinton Group was sued a number of

21    times.

22         Q.      Can you give us sort of a list of the

23    cases in which the Clinton Group was sued?

24         A.      One is still ongoing about settlement

25    with a landlord.  One -- another was a suit brought

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 17

1     by a former employee, and there were a number of

2     vendor suits that -- that have been settled.

3          Q.    Okay.  We could first start with the --

4     the ongoing landlord suit.  Who is -- who is the

5     landlord that sued the Clinton Group?

6          A.    World Gold.

7          Q.    And did it just sue the Clinton Group

8     as a defendant?

9          A.    As far as I know, yes.

10          Q.    Okay.  What was the -- what's the

11     nature of that lawsuit?

12          A.    We -- the lawsuit was to -- for a re-

13     -- World Gold was suing for a recovery for rent, and

14     the suit is still ongoing about the damages.

15          Q.    Did -- when you say the recovery of

16     rent, was that -- was there a lease for -- between

17     World Gold and Clinton Group?

18          A.    There was.

19          Q.    And there's an allegation that Clinton

20     Group breached that lease?

21          A.    Clinton Group was -- I think

22     ultimately that's probably what the allegation was.

23     I don't recall exactly.

24          Q.    Was the allegation that it failed to

25     pay rent pursuant to a lease?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 18

1              A.      I don't recall exactly.

2              Q.      When was this lawsuit filed?

3              A.      Two thousand and twenty- -- I believe

4     2020.

5              Q.      And what -- what space does that

6     lawsuit relate to?

7              A.      510 Madison Avenue.

8              Q.      And how long did the Clinton Group

9     occupy that space?

10             A.      I don't recall exactly.  Several

11    years.

12             Q.      Did you give testimony in that case?

13             A.      No.

14             Q.      And you said that case is still

15    ongoing?

16             A.      Yes.

17             Q.      Okay.  Now, you said there was also a

18    suit brought by a former employee?

19             A.      Yes.

20             Q.      First of all, I'm sorry, to go back,

21    the -- the World Gold suit, where is that pending;

22    do you know?  What -- what court?

23             A.      New York State.

24             Q.      And who represents you in connection

25    with that case?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 19

1          A.      Wylie Stecklow.

2          Q.      Now, you said there's also a suit

3   brought by a former employee.  Who was the former

4   employee?

5          A.      Gontran, and I can't really pronounce

6   his last name.  I don't really remember his last

7   name.

8          Q.      Do you know what it -- letter it begins

9   with or --

10         A.      It begins with a D.  De Quillacq,

11  something like that.

12         Q.      And when did -- and this was a suit

13  brought by a former employee of the Clinton Group?

14         A.      Correct.

15         Q.      What position did this individual hold?

16         A.      He was an analyst.  I think that's the

17  best way to describe his role.

18         Q.      And what were the nature of the

19  allegations brought against the Clinton Group in

20  this lawsuit?

21         A.      Prior to joining the firm as an

22  analyst he was a headhunter, and when his -- when it

23  didn't work out, and we had to let him go, he wanted

24  a fee for placing himself.

25         Q.      And when was that lawsuit filed?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 20

1          A.      Twenty- -- around 2020, I believe.

2          Q.      And what happened with that lawsuit?

3          A.      It's still -- still in New York State

4    Court.

5          Q.      And did you give --

6          A.      Sorry.

7          Q.      -- any testimony in that case?

8          A.      No.

9          Q.      Then you said there were a number of --

10   of vendor suits that were settled.  The Clinton

11   Group was sued by a number of its vendors?

12         A.      Yes.

13         Q.      Okay.  Can you just tell me, the best

14   of your recollection, the suits -- who the vendors

15   were who brought suit against the Clinton Group?

16         A.      One was the Deutsche Börse.

17                 Actually, I -- I apologize.  I don't

18   know if they brought a suit.  There were a number of

19   vendors that I either settled with, and a couple

20   brought suit.  I don't remember which ones were the

21   actual suits.

22         Q.      You make it sound like there was a

23   whole group that -- that you had issues -- potential

24   legal issue with or legal issues with.  Is that

25   correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 21

1              MR. SACK:  Objection to the form.

2        A.      So when we left the space, and when

3    COVID became an issue for people working together,

4    and everybody scattered, the -- there were a lot of

5    -- Clinton Group had very complex relationships with

6    lots of vendors that we purchased data from, and it

7    was really just a lapse in our ability to keep track

8    of all the -- the bills that were -- that were

9    outstanding.  So when they were brought to my

10   attention I paid them, and if they weren't brought

11   to my attention, they eventually became brought to

12   my attention by a lawsuit, which we would settle.

13       Q.      So when you say that happened at or

14   around the time that Clinton Group -- Clinton Group

15   left the space, you're referring to 510 Madison?

16       A.      Yeah.  Well, yes, and COVID was --

17   became a -- a big issue two or three months later,

18   and people scattered.

19       Q.      Okay.  Did -- did the Clinton Group

20   leaving the space have anything to do with the

21   issues with the landlord you discussed that are the

22   subject of the lawsuit?

23              MR. SACK:  Objection to the form.

24       A.      Which lawsuit?

25       Q.      The lawsuit by the landlord, World

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 22

1    Gold.  Did -- did the fact that the Clinton Group

2    left the space at 510 Madison have anything to do

3    with the issues with the landlord?

4            MR. SACK:  Objection to the form.

5        A.    The landlord evicted Clinton Group.

6        Q.    So it wasn't -- it didn't voluntarily

7    leave the space?

8        A.    No.

9        Q.    Okay.  Then you said there -- there

10   were lots of vendors from whom the Clinton Group had

11   purchased data that raised issues of payment.  Do

12   you know the names of any of the vendors?

13       A.    The vendors that sued or vendors in

14   general?

15       Q.    Well, let's break it down.  Fair

16   enough.  Let's break it down into two categories.

17   First, the vendors who were just claiming payment

18   prior to suit that you had to pay off.

19            MR. SACK:  Objection to the form.

20       A.    So Deutsche Börse comes to mind,

21   Euronext, I think, comes to mind, Insight comes to

22   mind.  So those are the ones that I -- that I

23   recall.

24       Q.    And those were ones who you settled

25   without a lawsuit, correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 23

1          A.       Insight actually got a judgment.

2          Q.       Got a judgment?

3          A.       (No verbal response.)

4          Q.       So was it a default judgment?

5          A.       Well, without deep understanding of

6     the legal process, I believe the -- the claim was

7     filed with the Secretary of State, and so we didn't

8     ultimately know about the claim, and I -- if that's

9     a default judgment, then that's what it is.

10         Q.       Do you recall approximately how much

11    Clinton Group owed to each of these vendors?

12         A.       It was various, various amounts.  Some

13    were, you know, in the 10- or $15,000.00 range, some

14    were in the hundred-thousand-dollar range.

15         Q.       And these -- and these issues arose

16    after the Clinton Group left the space, the 510

17    Madison Avenue space?

18         A.       The ones that come to mind, yes.

19         Q.       Okay.  Were there others?

20         A.       I think there were other vendors, but

21    I don't recall the names of them.

22         Q.       Okay.  And when you -- when you say

23    left the space, approximately when was that?

24         A.       December of 2019.

25         Q.       Was the Clinton Group having financial

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1     issues at that point?

2               MR. SACK:  Objection to the form.

3          A.    No.  Clinton Group was -- was fine.

4          Q.    The Clinton Group was fine financially?

5          A.    Yes.

6          Q.    The issues it had with the landlord

7     about the rent, was it -- well, was it choosing not

8     to pay its rent?

9          A.    No.

10              MR. SACK:  I was going to object to

11    the form, but you may answer.

12         A.    There were some late payments, there

13    were some partial payments, and we -- the landlord

14    made an offer to renegotiate the terms of the rent

15    -- of the lease, and we negotiated with them in good

16    faith, and we came to a -- an agreement on terms,

17    and then they decided they would -- they wanted more

18    money and more security deposit.  And then while I

19    was seeing if I could meet their new terms, even

20    though they had agreed to previous terms, they --

21    whatever clause was in the lease, they said, we've

22    changed our mind; we're just gonna evict you.

23         Q.    Okay.  And do you recall approximately

24    how much the Clinton Group owed World Gold at that

25    point?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 25

1              MR. SACK:  Objection to the form.

2        A.      Nothing.  The suit was for the rent

3    amount between when we left and when the end of the

4    lease was.

5        Q.      So at the time -- it's your testimony

6    that at the time Clinton Group left the space it was

7    current in its rent?

8        A.      I believe so.

9        Q.      Okay.  Let's -- I'd like to show you

10   what's been marked as Hall-1 for identification.

11              (Exhibit Hall-1, 16-page Cypress

12   Holdings, III, L.P.'s First Request for the

13   Production of Documents to Defendant George Hall, is

14   marked for identification.)

15       Q.      Oh, and Mr. Hall, other than those --

16   those lawsuits that we described, you don't recall

17   any other lawsuits in which you or an entity that

18   you owned has been sued?  Other than this case.

19       A.      I don't -- I -- nothing's coming to

20   mind, but very possible.

21       Q.      Okay.

22              Okay.  Mr. Hall, I'd like you to look

23   at what's been marked as Hall-1 for identification

24   purposes.  It's Cypress Holding, III, L.P.'s first

25   request for the production of documents dated

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 26

```
1     November 22, 2022.  Have you seen this document
2     before?
3              A.      Yes.
4              Q.      Okay.  When did you first see it?
5              A.      I don't recall.
6              Q.      Okay.  If I -- if I told you this was
7     served on your counsel in November of 2022, does
8     that refresh your recollection as to when you might
9     have first seen it?
10             A.      Uh, November 2022.  Well, let me look
11    closer.
12                     I would assume I saw it.
13             Q.      Do you have any recollection of seeing
14    it?
15             A.      November 2022.  Yeah, I probably saw
16    it in November of 2022.
17             Q.      Okay.  That was almost seven months
18    ago, correct?
19             A.      Yes.  I'll take your word for that.
20             Q.      Okay.  And did you -- when you received
21    these document requests did you review them?
22             A.      Yes.
23             Q.      Okay.  And if you look at the -- it
24    asks you to -- if you look at the first page -- to
25    produce the following documents, tangible items, and
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 27

1    electronically stored information to our firm.  Do

2    you see that?

3            A.     Uh...

4            Q.     On the first page, the first paragraph.

5            A.     First par- -- yes.

6            Q.     Okay.  And then do you see, if you turn

7    to the actual requests, which are after the

8    instructions and definitions, it's -- they start on

9    page 10, and pages 10 through 15 set forth 45

10   categories of documents that my firm requested to be

11   produced.

12                  MR. SACK:  Is there a question, Ross?

13                  MR. PEARLSON:  I'm just wondering --

14   I'm just directing him to that --

15                  MR. SACK:  Yeah.

16                  MR. PEARLSON:  -- portion.

17           A.     I'm here.

18           Q.     Did you review each one of those

19   requests at the time you saw this document?

20           A.     I believe I read through the whole

21   document.

22           Q.     Okay.  And where did you maintain your

23   documents that would be relevant to the requests

24   contained in this?

25                  MR. SACK:  Objection to the form.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 28

1          A.      My documents were all electronic, so

2     they were either on my laptop or in the server that

3     the company uses.

4          Q.      Okay.  So you don't maintain any hard

5     copies of any documents that would be relevant to

6     the requests contained in here?

7          A.      I don't believe so.

8          Q.      Okay.  Did you -- and you say in your

9     laptop.  Do you have a company laptop as well as a

10    personal laptop?

11         A.      Just one laptop.  It's a company

12    laptop.

13         Q.      Okay.  And you said also there was a

14    company server.  What company server was that?

15         A.      That's beyond my technical expertise.

16    We have -- I assume it's Google.

17         Q.      Okay.  What -- what --

18         A.      Or Microsoft.

19         Q.      You don't know which company you

20    maintain documents on, which server?

21              MR. SACK:  Objection to the form.

22         A.      I don't handle that part of the

23    business.

24         Q.      Okay.  Do you -- what -- what e- --

25    back in 2019 what email addresses were you using?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 29

1          A.       George.hall@clinton.com,

2     george.hall@sportblx.com, and there was a residual

3     email address, GEH@clinton.com.

4          Q.       Did you have any personal email

5     addresses at that time too?

6          A.       George Hall --

7     george.hall@clinton.com.

8          Q.       Are you aware -- well, first of all,

9     did you personally search for the documents

10    responsive to the Hall-1?

11         A.       I searched the -- my laptop for

12    documents, and the -- the remainder of the search

13    was done by counsel and another gentleman who

14    connected counsel to Microsoft and Google and

15    wherever these things are stored.

16         Q.       So -- so the only search you did

17    personally was on your -- on the company laptop?

18         A.       In terms of search, yes, I believe

19    that's correct.

20         Q.       Okay.  Did you search all the email

21    addresses you just described to us?

22         A.       My laptop search was for documents.

23    Email searches were covered by the -- the lawyers.

24         Q.       Did you have an iCloud account?

25         A.       Not that I know of.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 30

1          Q.      And do you recall when the -- you did

2     these searches?

3          A.      I don't recall the -- when I did the

4     searches.

5          Q.      Okay.  Back in 2019 did you also have

6     telephones, cell phones?

7          A.      Yes.

8          Q.      Okay.  Can you give us the numbers of

9     those cell phones that you maintained back in 2019?

10         A.      (646) 752-7505.

11         Q.      Was that the only one?  You had one

12    cell phone?

13         A.      Yes.

14         Q.      And that was for personal and for

15    business?

16         A.      Yes.

17         Q.      Did you review those -- that cell phone

18    for text -- strike that.

19                 First of all, do you still maintain

20    that cell phone account, the same one?

21         A.      Yes.

22         Q.      Okay.  Did you look at that phone at

23    all for texts related to the -- that would be

24    responsive to the document requests contained in

25    Hall-1?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 31

1          A.      I may have looked for a few things,

2     but I turned it over to the document firm that we

3     used, and they -- they did a -- a download of all

4     the text messages.

5          Q.      Okay.  So it's fair to say they used a

6     consultant?  Do you know the name of the consultant?

7          A.      Empire Security, I believe.  Something

8     like that.

9          Q.      And you turned over your cell phone for

10    them to search for potentially responsive texts?

11         A.      I turned it over for them to download

12    -- I believe they downloaded all the texts, and then

13    search terms were applied to those texts.

14         Q.      And back in -- in 2019 how did you

15    communicate -- let me just go through some of the

16    defendants that are named in this case, and let's

17    start with Mr. De Perio.  Back in 2019 how would you

18    communicate with Mr. De Perio?

19         A.      Most of the time I would walk into his

20    office and talk to him.

21         Q.      Okay.  Were you both located in the

22    same location?

23         A.      Yes.

24         Q.      And where was that?

25         A.      510 Madison.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 32

1          Q.    Okay.  And how else did you communicate

2     with Mr. De Perio in 2019?

3          A.    Sometimes by text, and sometimes by

4     email.

5          Q.    Okay.  And -- and which email would you

6     use to communicate with Mr. De Perio?

7          A.    I don't recall what his email address

8     was.

9          Q.    Okay.  And which email did you use?

10         A.    Either -- if -- if I was receiving an

11    email, it would be whatever email address he sent it

12    to, and if I was sending an email, I think it would

13    come from george.hall@clinton.com.

14         Q.    Okay.  And how about Mr. Strauss; how

15    would you communicate with Mr. Strauss in 2019?

16         A.    Most of the time I'd walk to his desk

17    and talk to him.

18         Q.    Okay.  So he was also located at 510

19    Madison Avenue?

20         A.    Yes.

21         Q.    And was -- how often was Mr. De Perio

22    in the office in 2019?

23         A.    I -- virtually every workday, except

24    when traveling on business.

25         Q.    How about Mr. Strauss; how often was he

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 33

1    in the office during 2019?

2         A.    He was -- he was there, you know,

3    other than vacations and travel, every day.

4         Q.    Okay.  And -- and at that -- during

5    that time, 2019, who was Mr. Strauss employed by?

6         A.    He was employed by Clinton Group until

7    sometime in October or -- between October and

8    December of 2019.

9         Q.    And what was his position with the

10   Clinton Group?

11        A.    He was an analyst -- well, his -- I

12   don't know if we have a title for his position, but

13   in 2019 he was focusing on and he was the acting --

14   I believe acting CEO of GlassBridge in GlassBridge.

15        Q.    Okay.  And that happened in 2019 where

16   he assumed that position?

17        A.    I don't recall when he assumed that

18   position.

19        Q.    Okay.  Prior to that had he only been

20   employed by the Clinton Group?

21             MR. SACK:  Objection to the form.

22        A.    When he was doing that he was still

23   employed by the Clinton Group.  He was seconded to

24   GlassBridge for -- to serve their needs, but he had

25   been a Clinton Group employee for many years before.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 34

1      Q.     Do you know when he started working for

2   the Clinton Group?

3      A.     I don't recall.

4      Q.     Were you the one who hired him to work

5   for the Clinton Group?

6      A.     Yes.

7      Q.     Okay.  And what about Francis

8   Ruchalski; in 2019 how did you communicate with him?

9      A.     I would generally walk into his office

10  and talk to him.

11     Q.     Okay.  And when you say "generally walk

12  into his office," again, 510 Madison?

13     A.     Yes.

14     Q.     And what position did Francis Ruchalski

15  hold in 2019?

16     A.     He was the -- the head of accounting.

17  I think his -- the title we used to use was

18  controller.  So he handled accounting for the firm

19  and its entities.

20     Q.     Okay.  When you say "the firm and its

21  entities," are you referring to the Clinton Group?

22     A.     Yes.  Clinton Group was a holding

23  company with lots of subsidiaries.

24     Q.     Okay.  When you emailed with

25  Mr. Ruchalski would you use the Clinton Group email

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 35

1    address?

2            A.      When I email him -- I believe when I

3    sent an email it automatically came from

4    george.hall@clinton.com.

5            Q.      Okay.  What about Cesar Baez; how did

6    you communicate with Mr. Baez -- well, strike that.

7                    First let me ask you with respect to

8    Mr. Strauss and Mr. Ruchalski, did you also

9    communicate with them by text?

10           A.      I believe so, yes.

11           Q.      Okay.  And did you also communicate

12   with them just phone conversations?

13           A.      If they were out of the office, but

14   usually it was -- they were close enough to just

15   walk over and talk to them.

16           Q.      What about Cesar Baez; how did you

17   communicate with him in 2019?

18           A.      I would see him in Rumson

19   occasionally, I would see him in the city for a meal

20   occasionally, I would speak to him on the phone, and

21   occasionally by text or email.

22           Q.      Okay.  And where was he located in

23   2019?  Where was his work address?

24           A.      I don't know.

25           Q.      Okay.  And what role was he serving in

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 36

1    2019 with respect to any of the entities with which

2    you were affiliated?

3             A.    In 2019, I believe in November, he

4    joined the board of Sport-BLX, Incorporated.

5             Q.    I'm sorry.  What time?

6             A.    I believe it was November of 2019.

7             Q.    Okay.  And what position did he assume

8    with respect to Sport-BLX at that time?

9             A.    He was a director of the company.

10            Q.    Okay.  Did he -- did that change where

11   he was located in terms of -- in terms of work?

12            A.    No.

13            Q.    Now, so you had one cell phone that you

14   turned over to the consultant, correct?

15            A.    Correct.

16            Q.    You -- you believe you don't -- you

17   didn't have any hard copies of any documents that

18   might be relevant to the -- or responsive to the

19   document requests?

20            A.    I believe that's correct.

21            Q.    Okay.  So as you sit here today do you

22   believe you've produced everything that was required

23   pursuant to Hall-1?

24                  MR. SACK:  Objection to the form.

25            A.    Well, in terms of documents that are

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 37

1    -- that were stored electronically, I believe yes,

2    pursuant to the search terms that were agreed by the

3    attorneys, and I don't believe I have any hard

4    copies.

5         Q.    Are you aware of anybody else who might

6    have hard copies of these -- of the documents that

7    would be responsive to these requests?

8              MR. SACK:  Objection to the form.  I

9    mean, there's a lot of people in and outside of

10   Sport-BLX or Clinton Group who might have responsive

11   documents, Ross.

12        Q.    Well, let me ask you -- let me rephrase

13   it.  Are you aware of anybody who does have hard

14   copies -- let's start with the Clinton Group -- that

15   might be responsive to these requests?

16        A.    I don't know.

17        Q.    Okay.  How about in terms of Sport-BLX,

18   are you aware of anybody who stored hard copies of

19   documents on behalf of Sport-BLX?

20        A.    I don't know.

21        Q.    Now, Mr. Hall, what did you do today to

22   prepare for your deposition?

23        A.    Today, nothing.

24        Q.    Okay.  And --

25        A.    I came over.  That's it.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 38

```
 1          Q.     How about -- how about what did you do
 2    generally to prepare for your deposition today?
 3          A.     Today?  I came over and sat in the
 4    conference room.
 5          Q.     No.  No.  I -- I meant --
 6          A.     Did you -- did I misunderstand that?
 7    I apologize.
 8          Q.     Yeah.  And it might have been my
 9    phrasing of the question.
10                 So the question is what have you done
11    to prepare for today's deposition?
12          A.     I had a meeting with the attorneys
13    yesterday, and prior to that I reviewed documents.
14          Q.     Okay.  First, how long did you meet
15    with your attorneys yesterday?
16          A.     Approximately four hours.
17          Q.     Okay.  And had you met with them prior
18    to that to prepare for your deposition?
19          A.     Yes.
20                 MR. SACK:  Objection to the form.
21          A.     Yes, several times.
22          Q.     Okay.  How many times did you meet with
23    them?
24                 MR. SACK:  The question is to prepare
25    for your deposition, as opposed to meeting with -- I
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 39

1    take it you're --

2              MR. PEARLSON:  Right.  Right.  Right.

3              MR. SACK:  -- distinguishing between

4    meetings with attorneys versus meetings to prepare

5    for a deposition.

6              MR. PEARLSON:  Fair enough.

7         A.    Yesterday was the only meeting to

8    prepare for deposition.

9         Q.    Okay.  And you said you reviewed

10   documents?  Or you have reviewed documents --

11        A.    I have --

12        Q.    -- in prepar- --

13        A.    -- reviewed documents.  The purpose is

14   to review documents, not necessarily to prepare for

15   deposition.

16        Q.    Okay.  Why did you review documents, if

17   not to prepare for your deposition?

18        A.    I was curious.

19        Q.    Okay.  So what documents did you review

20   to satisfy your curiosity?

21             MR. SACK:  Objection to the form.

22        A.    I quickly scrolled through a lot of

23   documents that were in the production.

24        Q.    Can you tell us if there are any

25   documents you focused on in particular?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 40

1          A.      Well, if there were documents relevant
2      to the case, I -- I took a close look at them.
3          Q.      Okay.  Can you tell us some of those
4      documents?
5          A.      Well, the frequently asked questions,
6      the subscription agreements.  That's probably where
7      I spent the most time.
8          Q.      Did you -- you attended certain of the
9      depositions in this case, correct?
10         A.      Yes.
11         Q.      Which depositions?
12         A.      Michael Salerno twice, I -- Chris
13     Sansone, Alan Cohen, Mr. Roth.  I forget his first
14     name.  David Roth, I believe.  And Mr. Cross.
15             I don't know if I missed one, but those
16     are the ones that I recall.
17         Q.      Now, in preparation for your deposition
18     have you reviewed any of the transcripts of their
19     testimony?
20         A.      I reviewed the transcript -- the first
21     transcript of Michael Salerno.
22         Q.      Did you also review any of the exhibits
23     associated with the deposition of Mr. Salerno?
24         A.      No, I just read the transcript.
25         Q.      And did you speak to anyone else other

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 41

1    than counsel in preparation for the deposition?

2            A.      No.

3            Q.      Since the filing of the law -- of the

4    two lawsuits have you discussed the substance of the

5    allegations in the complaints with anyone other than

6    your counsel?

7            A.      Over the last year and a half we've

8    had conversations, but nothing particularly

9    substantive.

10           Q.      Okay.  When you say "we've had

11   conversations," who are you referring to?

12           A.      Well, the other parties.

13           Q.      Okay.  And you said that you haven't

14   discussed the substance of the allegations with

15   respect to the other parties?

16           A.      No, not in -- not in detail.

17           Q.      Where do you currently live, Mr. Hall?

18           A.      69th Street in Manhattan.

19           Q.      Okay.  What is your address, your

20   actual address?

21           A.      6 East 69th Street, New York, New York

22   10021.

23           Q.      And how long have you lived there?

24           A.      Since February of 2002.

25           Q.      Okay.  And where did you live before

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 42

1    that?

2              A.      Rumson, New Jersey.

3              Q.      Okay.  The particular address?

4              A.      23 North Ward Avenue, Rumson, New

5    Jersey 07760.

6              Q.      And how long did you live at that

7    location?

8              A.      Since from -- since 1995, I believe.

9              Q.      And do I understand from your testimony

10   that you no longer have that residence in Rumson?

11             A.      That's correct.

12             Q.      Okay.  So your only residence now is

13   the one on East 69th Street?

14             A.      I own another home, but my residence

15   is New York.

16             Q.      Okay.  And where is that other home?

17             A.      Rumson.

18             Q.      But it's different from the other

19   Rumson address you just gave us?

20             A.      Yes.

21             Q.      Okay.  Where is that?

22             A.      80 West River Road, Rumson, New

23   Jersey, 0 --

24             Q.      And it --

25             A.      -- 7 --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 43

1          Q.     I'm sorry.  Go ahead.  Finish your

2     answer.

3          A.     -- 760.

4          Q.     Okay.  And how long have you had that

5     house?

6          A.     I brought that in 2011, I believe.

7          Q.     Okay.  Now, Mr. Hall, do you have any

8     siblings?

9          A.     Yes.

10         Q.     How many siblings do you have?

11         A.     Four.

12         Q.     And what are their names?

13         A.     John Hall, Deborah Sullivan, Victoria

14    Gmelich, and Jessica Hickey.

15         Q.     Okay.  Now, John Hall is your brother?

16         A.     Yes.

17         Q.     And did you go in order of age, by the

18    way, when you were --

19         A.     I did.

20         Q.     When you were going -- and where do you

21    fit in that?

22         A.     I'm the oldest.

23         Q.     Okay.  Now, what -- does John Hall work

24    for you in any capacity?

25         A.     Well, John Hall started working at the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 44

1    Clinton Group in 1995 or thereabouts.

2            Q.      Okay.  And what role did he have in the

3    Clinton Group?

4            A.      He was the CFO.

5            Q.      Okay.  And was he hired as the CFO in

6    1995?

7            A.      Yes.

8            Q.      And did he continue in that role -- is

9    he still CFO of the Clinton Group?

10           A.      Well, Clinton Group doesn't have any

11   operations to speak of, but if -- if I need to do

12   something for Clinton Group, he would do that for

13   me.

14           Q.      Okay.  And when did Clinton Group cease

15   having operations?

16           A.      It ceased having op- -- active

17   operations in 2019 or '20 and had some residual --

18   still had some residual business until 2023.

19           Q.      Okay.  You said sometime in 2019 or

20   2020 it ceased active operations.  What do you mean

21   when you say "active operations"?

22           A.      Trading securities on behalf of third

23   parties.

24           Q.      Okay.  And can you be more precise as

25   to when that stopped, the trading of securities?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 45

1          A.      I don't recall exactly.

2          Q.      Can you tell me why Clinton Group

3    ceased active operations at that time?

4          A.      Mostly redemptions from funds that are

5    some of the funds, and once we -- and also focusing

6    more on other projects like GlassBridge and

7    Sport-BLX.

8          Q.      Okay.  Well, first in terms of the

9    redemption of the funds, how -- how -- in the time

10   you're describing what were the assets under

11   management for the Clinton Group?

12                 MR. SACK:  Objection to the form.  Why

13   don't we specify the time a little bit, Ross?

14                 MR. PEARLSON:  Well, he is the one

15   describing the time.

16                 MR. SACK:  Well, no.  No.  No.

17         Q.      In late 2019, early 2020 can you

18   estimate for us what the assets under management

19   were for the Clinton Group?

20         A.      I don't recall.

21         Q.      Okay.  And you said there was

22   redemptions of the funds.  Was it at that time:

23   Late 2019/early 2020, or before that?

24         A.      No, redemptions occur on a monthly

25   basis, so I don't -- I don't recall the assets at

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 46

1    any particular time.

2         Q.    So one of the reasons that the Clinton

3    Group ceased active operations was that customers

4    had redeemed the funds that they had had with the

5    Clinton Group?

6         A.    It ceased actively managing the types

7    of funds it had been managing for years before,

8    partly redemptions in those funds, and partly taking

9    on other roles and responsibilities.  Clinton Group

10   was always reinventing itself and reevaluating where

11   it would spend its time.

12        Q.    Okay.  And as of -- you said that in

13   1995 your brother, John Hall, was the CFO of the

14   Clinton Group.  Did that -- between 1995 and this

15   time we're describing had his role with the Clinton

16   Group changed in any respect?  Was he always the

17   CFO?

18        A.    Yes, I believe so.

19        Q.    Okay.  Other than working with the

20   Clinton Group -- do you recall what your brother was

21   paid by the Clinton Group?

22        A.    Well, he was paid a base salary and

23   occasionally a bonus.  I don't recall what his

24   salary was or what his bonus was.

25        Q.    Other than working for the Clinton

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 47

1    Group, did -- what other companies with which you're

2    affiliated or you have an ownership interest in did

3    John Hall work for?

4            A.      He -- he worked for -- I believe he

5    became an employee of Sport-BLX Securities.

6            Q.      Okay.  When you say "Sport-BLX

7    Securities," what are you -- what are you referring

8    to?

9            A.      The company named Sport-BLX

10   Securities.

11           Q.      What -- what does that company do?

12           A.      That company is inactive.  What it did

13   at the time was to -- was it was created -- I want

14   to make sure I answer the question.  Maybe are you

15   specifying a certain time?

16           Q.      Well, when -- first of all, when was

17   Sport-BLX Securities formed?

18           A.      I believe it was April of 2020.

19           Q.      And what was the purpose or -- yeah,

20   what was the -- what business was Sport-BLX

21   Securities supposed to be in in April of 2020?

22                   MR. SACK:  Objection to the form.

23           A.      What date?  Did you say '20 or '21?

24           Q.      When you formed it in April 2020, what

25   was the intended business that Sport-BLX Securities

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 48

1    was supposed to be engaged in?

2              MR. SACK:  Objection to the form.

3         A.    The -- it was -- it was created to

4    arrange for the listing of assets and sale of

5    securities through a broker-dealer that it would --

6    that it intended to form.

7         Q.    And what was your brother's position

8    with Sport-BLX Securities?

9         A.    At that time?

10         Q.    At that time.

11         A.    I don't believe he was an employee of

12    Sport-BLX Securities at that time.  I don't recall.

13         Q.    Did that change at some point?  Did he

14    become employed by Sport-BLX Securities?

15         A.    I -- I don't recall when that was, and

16    so I don't recall.

17         Q.    Okay.  Other than Sport-BLX Securities

18    and the Clinton Group, has your brother worked for

19    any of the other companies in which you have an

20    ownership interest or are affiliated with?

21         A.    No, not as an employee.

22         Q.    Did he have any role in Sport-BLX?

23         A.    Which Sport-BLX entity are you talking

24    about?

25         Q.    The Sport-BLX, Inc.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 49

```
 1          A.      Inc.?  He did a lot of work for
 2    Sport-BLX, Inc.  I don't recall whether or not he
 3    was ever paid by Sport-BLX, Inc.
 4          Q.      What kind of work did he do for
 5    Sport-BLX, Inc.?
 6          A.      Well, Sport-BLX, Inc. was a -- a -- it
 7    was supposed to be a securities company, which
 8    required dealing with the transfer of securities,
 9    operations, back office administration, custodial
10    records, so these were all the things he was well
11    versed in.
12          Q.      Was it -- was it contemplated that he
13    would be the CFO of Sport-BLX, Inc.?
14          A.      No.
15          Q.      What services did he provide Sport-BLX,
16    Inc.?
17                  MR. SACK:  Objection.  Asked and
18    answered.  I think he described them.
19          A.      So Sport-BLX, Inc. was a securities
20    company.  It was arranging -- intent -- it was --
21    the goal was to arrange for the purchase and sale of
22    securities.  Those securities would -- we had to
23    have a custodian and transfer agents and lots of
24    operational issues to consider, and those are the
25    areas that he has expertise.
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 50

1          Q.      And other than Sport-BLX, Inc., Clinton

2     Group, and Sport-BLX Securities, any other roles or

3     capacities in which your brother, John Hall, acted

4     on your behalf or the companies you were -- you

5     owned or were affiliated with?

6          A.      I don't recall if there were any

7     others.

8          Q.      Now, I believe you mentioned one of

9     your sisters is named Sullivan?

10         A.      Correct.

11         Q.      Which sister is that?

12         A.      Deborah.

13         Q.      Deborah?  What's her husband's name?

14         A.      Henry.

15         Q.      Henry?  Does -- has Henry provided any

16    services to any of the companies with which you --

17    in which you have an ownership interest or are

18    affiliated with?

19         A.      Yes.

20         Q.      Okay.  Which companies?

21         A.      He was an employee of Clinton Group at

22    various times, he was an employee of Sport-BLX,

23    Incorporated, and then he became an employee of

24    Sport-BLX Securities.

25         Q.      Okay.  Can you break it down for me,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 51

1    starting first with the Clinton Group, when was he

2    employed by the Clinton Group, and what was his role

3    with the Clinton Group?

4          A.    He started sometime in the 1990s.  I

5    don't remem- -- mid to late 1990s.  He left for a

6    time somewhere around 2004, and then he came back, I

7    believe, sometime around 2011.

8          Q.    Is he currently an employee of the

9    Clinton Group?

10         A.    No.

11         Q.    When did he stop working for the

12   Clinton Group?

13         A.    Probably January of 2019.

14         Q.    What about your brother, is he still an

15   employee of the Clinton Group?

16         A.    Clinton Group doesn't have employees

17   anymore.

18         Q.    And when did -- when did he stop

19   working for the Clinton Group?

20               MR. SACK:  You mean his brother?

21               MR. PEARLSON:  Yeah, his brother, John

22   Hall.

23         A.    I don't recall.

24         Q.    Was it sometime in 2019?

25         A.    I don't recall.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 52

1          Q.      Okay.  Your brother-in-law Henry

2     Sullivan, what role did he play with respect to

3     Sport-BLX, Inc.?

4          A.      Marketing.

5          Q.      Was he -- was he an employee of

6     Sport-BLX, Inc.?

7          A.      He became -- he resigned from Clinton

8     Group and became an employee of Sport-BLX, Inc.

9          Q.      And in terms of marketing, what -- what

10     services did he provide to Sport-BLX, Inc.?

11          A.      Raising capital for operations.

12          Q.      And how would he go about doing that?

13          A.      Well, I don't know specifically, but

14     basically reach out to potential investors and see

15     if they were interested in investing.

16          Q.      Did he have any role in developing any

17     of the materials that were provided to investors

18     prior to their investment?

19          A.      When you say "role," what -- please

20     describe that.

21          Q.      Well, for example, if any -- any

22     written materials that were given to investors

23     before they invested, did Mr. Sullivan have any role

24     in preparing those?

25          A.      I would say probably not.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 53

```
1            Q.     So he was more just out there trying
2       to, you know, beat the bushes, for lack of a better
3       term, to find investors?
4                   MR. SACK:  Objection to the form, but
5       you can answer.
6            A.     I'm perfectly happy with that
7       description.
8            Q.     Okay.  And did he also engage in
9       substantive discussions with investors on behalf of
10      Sport-BLX, Inc.?
11           A.     Can you help me out with
12      "substantive"?
13           Q.     Well, would he -- would he have
14      actually -- once he found a potential investor,
15      would he have the discussions with the investor in
16      terms of describing the investment?
17           A.     He would describe the investment, yes.
18           Q.     Would he have substantive discussions
19      concerning the terms of the investment?
20           A.     No.
21                  MR. SACK:  Obje- --
22                  THE WITNESS:  Sorry.
23                  MR. SACK:  It's okay.
24           Q.     Okay.  You also mentioned Sport -- and
25      how long did he work for Sport-BLX, Inc. in -- as a
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 54

1      -- in the terms of marketing?

2              A.      For I -- I don't know exactly, but

3      till sometime in 2020.

4              Q.      And why did he stop working for

5      Sport-BLX at that time?

6              A.      He stopped working for Sport-BLX,

7      Incorporated at that time.

8              Q.      Yes.  Why -- why did he stop working at

9      Sport-BLX, Incorporated at that time?

10             A.      We had created Sport-BLX Securities

11     and moved as many employees as we could from

12     Sport-BLX, Inc. to Sport-BLX Securities.

13             Q.      Was that when he first became employed

14     by Sport-BLX Securities, in -- when these employees

15     were moved in 2020?

16             A.      I don't recall if they were all moved

17     at one particular time or over time, but I -- so I

18     don't recall exactly when he moved.

19             Q.      Okay.  Can you describe for us why you

20     moved -- or why this decision was made to move

21     employees from Sport-BLX, Inc. to Sport-BLX

22     Securities?

23             A.      Well, we -- we had to create two

24     firms, and the -- the firms had different mandates,

25     and we tried to leave only the employees necessary

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 55

1    for the mandate for Sport-BLX, Incorporated at

2    Sport-BLX, Incorporated, and all the other

3    employees, we moved them to Sport-BLX Securities.

4           Q.    Okay.  And I believe you described what

5    Sport-BLX Securities was intended to do, correct,

6    earlier in your testimony?

7           A.    Briefly.

8           Q.    Okay.  Well, do you want to expand on

9    that in terms of what Sport -- strike that.

10          Can you describe for us what Sport-BLX

11   Securities' mandate was at this time when you

12   describe it for me in 2020?

13          A.    Well, Sport-BLX Securities was created

14   to fill the gaps that Sport-BLX, Inc. could not

15   fulfill on its own.

16          Q.    And what gaps were those?

17          A.    Sport-BLX, Inc. was not able to become

18   a registered broker-dealer.

19          Q.    And so the idea was that Sport-BLX

20   Securities was created that -- and it was going to

21   become a registered broker-dealer?

22          A.    That -- I couldn't hear you.

23          Q.    No.  So the idea was that Sport-BLX

24   Securities was created so that it could become a

25   registered broker-dealer?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 56

1          A.      Yes.  That was the intention.

2          Q.      Did Sport-BLX Securities ever become a

3    registered broker-dealer?

4          A.      No.

5          Q.      Why not?

6          A.      Well, the application to become a

7    broker-dealer is pretty complex in and of itself.

8    It takes a fair amount of time.  And then as the

9    application is being created and being ready for

10   submission there has to be a business plan, so part

11   of it is our business plan was needed to be figured

12   out.  It was different from our business plan that

13   we had considered at Sport-BLX, Incorporated.  And

14   then certain employees need to take various

15   licensing exams, so there was some timing issues,

16   and all of this with employees working remotely just

17   made it cumbersome, and we just never got -- got it

18   done.

19         Q.      Did you ever submit a -- and to be

20   clear, the form -- the application for this process

21   is a Form BD, correct?

22         A.      I believe so.

23         Q.      Okay.  Do you know if an application

24   was ever submitted by Sport-BLX Securities to become

25   a registered broker-dealer?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 57

1          A.     I don't know for certain, but I don't
2      think so.  I believe it wa- -- it wasn't.
3          Q.     And that was a -- a decision you made
4      on behalf of Sport-BLX Securities not to submit it?
5          A.     Well, it wasn't a decision.  I don't
6      -- to -- to not submit it.  I don't think it ever
7      was fully completed.
8          Q.     Whose decision was it not to go forward
9      with it?
10          A.     I don't think it was a deterministic
11      decision.  I think it was never got to the point of
12      completion.
13          Q.     I'm confused.  I don't understand.  I
14      mean, you -- you -- it's a process, correct, to
15      submit a -- a broker-dealer registration, correct?
16          A.     Yes.
17          Q.     Okay.  So at -- at some point did you
18      or someone else from Sport-BLX Securities decide to
19      abandon that process?
20              MR. SACK:  Objection to the form.
21          A.     No.  Part of the process is describing
22      for FINRA what the business would be and how you
23      would conduct business, and that was a bit of a
24      moving target at the time.
25          Q.     Okay.  And then you -- you also said

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 58

1    that Sport-BLX, Inc. had had a different mandate

2    than Sport-BLX Securities.  What was --

3            A.     It --

4            Q.     How did they differ, and what was

5    Sport-BLX, Inc.'s mandate?

6                   MR. SACK:  Objection to the form, but

7    you can try to answer that.

8            A.     So Sport-BLX, Incorporated originally

9    was going to apply to FINRA in basically two

10   capacities:  One was to form a registered

11   broker-dealer so that it could collect commissions

12   from executing transactions, and also the technology

13   that was built would be -- the hope would be that it

14   would become an alternative trading system, or ATS,

15   which is also a FINRA process to -- to be approved

16   as -- as an ATS.

17           Q.     Did that require two separate

18   applications, or was it one application for both

19   functions?

20           A.     I don't recall if they were separate

21   applications or the same.

22           Q.     Okay.  Was a -- a FINRA application

23   submitted on behalf of Sport-BLX, Inc.?

24           A.     Yes.

25           Q.     Was it ever approved?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 59

```
 1              A.      No.
 2              Q.      Do you know when it was submitted?
 3              A.      I don't recall when it was submitted.
 4              Q.      Other than Mr. Sullivan and Mr. Hall,
 5      do any of your siblings or their spouses work on
 6      behalf of either an entity which you have an
 7      ownership interest or with which you're affiliated
 8      in some way?
 9              A.      Present tense or past tense?
10              Q.      Let's start with past tense.
11              A.      Yes.  Brian Hickey, my brother-in-law,
12      worked for Clinton Group for a period.
13              Q.      And what was his posi- -- when did he
14      do that?
15              A.      He started sometime in the late '90s,
16      mid to late '90s, and he left sometime in 2005, I
17      think, but I don't recall exactly.
18              Q.      And what was his role with the Clinton
19      Group?
20              A.      Marketing.
21              Q.      And what -- what did that entail on
22      behalf of the Clinton Group?
23              A.      Beating the bushes to raise money.
24              Q.      Other than the Clinton Group, did
25      Mr. Hickey work for any of the other companies in
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 60

1    which you have an ownership interest or with which

2    you're affiliated?

3              A.    I don't recall.

4              Q.    Any other -- anyone else from your

5    family or their spouses that worked for any of these

6    entities that we've been talking about?

7              A.    My sister Victoria worked for Clinton

8    Group from about 1994 to 1998.  Nineteen- -- maybe

9    1995 to 1998.  Somewhere around there.

10             Q.    Did she work for any of the other

11   companies besides the Clinton Group?

12             A.    No.

13             Q.    Okay.  How about your wife, had she

14   ever worked for any of your companies?

15             A.    My ex-wife.

16             Q.    Your ex-wife.  I'm sorry.  Maybe I

17   should get some of the background there first.

18                   Are you presently married?

19             A.    No.

20             Q.    Were you married?

21             A.    I was.

22             Q.    Okay.  Can you tell us when you were

23   married, for what period of time?

24             A.    February of 2002.

25             Q.    Until February of 2002?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 61

```
 1          A.      I was married in February of 2002.
 2          Q.      Okay.  And then from what you were
 3    saying, you got -- you were divorced?
 4          A.      Yes.
 5          Q.      When was that?
 6          A.      I don't recall the date of it.
 7          Q.      Do you recall the year?
 8          A.      No.
 9          Q.      Okay.  Well, what is your ex-wife's
10    name?
11          A.      Lori.
12          Q.      Did she ever work for any of the
13    companies?
14          A.      No.
15          Q.      Was she ever compensated by any of the
16    companies?
17          A.      No.
18          Q.      Do you have any children from your --
19    from your marriage?
20          A.      Yes.  Yes.
21          Q.      How many children?
22          A.      Three.
23          Q.      Okay.  And what are their names and
24    ages, please?
25          A.      Kathryn is twenty, George, Jr. is
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 62

1    nineteen, and Charlotte is fourteen.

2         Q.    Based on the ages, have any of them

3    ever worked for any of your companies?

4         A.    No.

5         Q.    Can you tell us -- just give us your

6    ed- -- educational background since high school,

7    Mr. Hall?

8         A.    I went to college at the United States

9    Merchant Marine Academy, and I got an M.B.A. from

10   the Wharton School at the University of

11   Pennsylvania.

12        Q.    Okay.  Can you tell us the dates of

13   your graduation?

14        A.    June of 1982 was college, and

15   graduation from business school was '85 or '86.

16        Q.    Do you have any other degrees besides

17   your M.B.A.?

18        A.    No.

19        Q.    Can you give us a summary of your

20   employment history since you received your M.B.A. in

21   1985 or 1986?

22        A.    I went to work for Citicorp Investment

23   Bank.

24        Q.    In what capacity?

25        A.    I went to their training program and

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 63

1      then ultimately became a trader.

2              Q.      And how long were you at Citicorp?

3              A.      Approximately two years.

4              Q.      And then what did you do after that?

5              A.      I went to a firm Greenwich Capital and

6      spent about two years there.

7              Q.      What does Greenwich Capital do?

8              A.      It's a trading -- at the time it was a

9      trading firm.

10             Q.      What did you do after Greenwich

11     Capital?

12             A.      Started preparation to start Clinton

13     Group.

14             Q.      When did you begin that process?

15             A.      Well, the process of creating the firm

16     started while I was still at Greenwich Capital, but

17     the completion of that process was August of 1991.

18             Q.      That's when the Clinton Group was

19     formed?

20             A.      That's when we formed a joint venture

21     with our capital partner.  The actual corporate

22     formation may have been September of 1991.

23             Q.      And in terms of your background, did

24     you -- were you required to get any professional

25     licenses?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 64

1      A.     Yes.  A Series 7, a Series 3, Series
2    63, I believe.
3      Q.     And when did you obtain each of those
4    licenses?
5      A.     I think they were all required at
6    Citicorp.
7      Q.     So it goes all the way back to about
8    1988 or so?  1987?
9      A.     Probably eighty- -- eighty- --
10   probably '86.
11     Q.     Have you maintained those licenses
12   since back then?
13     A.     No.  I got re-licensed at Clinton
14   Group with the Series 7 and Series 3, I believe, --
15     Q.     Can you --
16     A.     -- but --
17     Q.     I'm sorry.  Go ahead.
18     A.     But I haven't maintained them.
19     Q.     What are those -- can you just describe
20   to us what each of those are:  Series 7, Series 3,
21   Series 63?
22     A.     Well, Series 7 is basically a
23   securities test on understanding securities markets,
24   execution, stock market transaction terms, options,
25   valuation and trading, those types of issues.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 65

1          Q.      What about a Series 3?

2          A.      Series 3, I believe, focuses a little

3     more on derivatives like futures and options.

4          Q.      And what about a Series 63?

5          A.      I think Series 63 is more on

6     regulatory issues, but I don't really recall.

7          Q.      Okay.  Is it fair to say that based on

8     your -- your work history and your licenses that

9     you're generally familiar with FINRA's rules and

10    regulations?

11         A.      I wouldn't make that, uh, uh, a broad

12    comment.  I have an understanding of the areas that

13    I was involved with, I understand the material that

14    was on those tests, I had some basic understanding

15    of the formation of a broker-dealer, but that

16    changes over time.  The regulations changed.  FINRA

17    used to be called the NASD, so things evolve.  So as

18    I sit here I have a basic understanding of what

19    FINRA does and some of the regulations, but we need

20    counsel to advise us on specific issues.

21         Q.      When's the last time you were licensed?

22         A.      I think I took Series 7 or -- and

23    Series 3 probably in the mid-'90s.  I don't recall

24    if they expire or if they're not renewed, I don't

25    recall, but I would say they're -- they're not --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 66

1    well, they're clearly not in existence now.

2         Q.    Outside of the companies that are the

3    subject of these two lawsuits, are you a member of

4    any board of directors of any other entities?

5              Do you understand the question?

6         A.    Well, "any other entities" is broad,

7    but --

8              MR. SACK:  Do you mean businesses,

9    Ross, or do --

10        Q.    Well, --

11             MR. SACK:  -- you mean not profits, or

12   what -- what do you have in mind?

13        Q.    Well, let me -- let me ask you just

14   generally do you serve on the board of directors of

15   any entities outside the ones that are named in the

16   lawsuit?

17        A.    Well, Clinton Group has many entities,

18   so if we include Clinton Group as one organization,

19   and other than those boards, I don't believe I'm on

20   any other boards.

21        Q.    And which of the boards did you serve

22   on of the entities that are in the lawsuit?

23   Lawsuits?

24        A.    Sport-BLX, Incorporated, and then -- I

25   was never on the board of GlassBridge, and for a

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 67

1  time I may have been on the board of Sport-BLX

2  Securities.

3          Q.     Okay.  As a -- as a result of your

4  service as a member of the board, are you generally

5  familiar with the duties and obligations of a

6  director?

7          A.     I think generally, yes.

8          Q.     Okay.  Can you describe for us what

9  those are?

10          A.     The directors basically are --

11  basically set the macro strategy, hire the CEO, and

12  the CEO runs the day-to-day operations.

13          Q.     Okay.  Do you -- do you believe a

14  director should be fully informed of any significant

15  matters that relate to the company?

16                  MR. SACK:  Objection to the form.

17          Q.     Go ahead.  You can answer that.

18                  MR. SACK:  And you're not answering as

19  a -- in a technical legal capacity.  To the best of

20  your ability.

21          A.     Can you help me with "significant"?

22          Q.     Well, if there's something of -- well,

23  I'm -- material -- something that's material to the

24  operations of the business, should a director be

25  informed of any information they need in order to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 68

1    help the company make decisions with respect to

2    that?

3                    MR. SACK:  Objection to the form.

4         A.    I think I would ask you to give me a

5    little more on "material."

6         Q.    Okay.  Well, for example, if -- if a

7    company -- for example, if a company was going to be

8    evicted from its premises, do you think that's

9    material to the company's operations?

10                   MR. SACK:  Objection to the form.

11        A.    That is material to the operations,

12   yes.

13        Q.    Okay.  Do you think a director should

14   be informed of that situation if it's coming up?

15        A.    Of the company that's being evicted?

16        Q.    Yes.  If -- if a company is occupying

17   premises and is about to be evicted from those

18   premises, do you think that the company's directors

19   should be advised of that?

20                   MR. SACK:  Objection to the form.

21        A.    I think it depends on the specific

22   circumstances.

23        Q.    Okay.  Do you think that the CEO and

24   the other -- and the management of a company have an

25   obligation to tell its directors the truth?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 69

1              A.      Generally, yes.

2                      MR. PEARLSON:  Okay.  Can we go off

3       the record for a second?

4                      THE VIDEOGRAPHER:  The time is 11:17

5       a.m.  We're going off the video record.

6                      MR. PEARLSON:  Take like a five-minute

7       break?

8                      THE VIDEOGRAPHER:  This ends media 1.

9                      MR. SACK:  Sure.

10                     (Recess taken from 11:18 to 11:28

11      a.m.)

12                     THE VIDEOGRAPHER:  The time is 11:28

13      a.m.  This is the beginning of media 2, and we are

14      on the record.

15      BY MR. PEARLSON:

16              Q.      Mr. Hall, before you were talking about

17      one of the reas- -- some of the reasons why BLX

18      Securities was never registered as a broker-dealer.

19      Do you recall that?

20              A.      Yes.

21              Q.      And one of the things you had indicated

22      was that certain employees needed to take exams to

23      get licensed.  Is that correct?

24              A.      I believe that's correct.

25              Q.      And that part of the reason that Sport-

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 70

1     -- Sport-BLX Securities didn't get registered was

2     that there was going to be a time delay for these

3     people to get licensed, correct?

4             A.      I think, as to the best of my

5     recollection, there are certain windows you register

6     for -- an employee, a person registers for a certain

7     time period during which he could take the exam, and

8     they all have to be completed at a certain time

9     before the application goes in, so as I recall,

10    there was some issues managing all those and getting

11    them all done.

12            Q.      Do you recall how many employees needed

13    to be licensed for Sport-BLX Securities to get

14    registered before it could get registered?

15            A.      I don't recall the exact number.

16            Q.      Do you recall any of the names?

17            A.      Well, I believe Joe De Perio was

18    already licensed.  And when I say "licensed" I mean

19    had taken and passed the Series 7.  I think John

20    Hall took the exam.  I think Henry Sullivan had

21    already had a license from his previous career, and

22    Peter Rawlins may be another one that was going to

23    get the license, so -- but I don't recall exactly.

24            Q.      Were these all -- the employees that

25    needed to get licensed and take the exam, were these

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 71

1    all former Sport-BLX, Inc.'s employees who came over

2    to Sport-BLX Securities?

3          A.    I don't know if John Hall was ever a

4    Sport-BLX, Incorporated employee, but when he was

5    preparing to take the license it was -- I don't -- I

6    really don't recall when he took it and if he was

7    ever a Sport-BLX Securities employee.

8                MR. SACK:  Do you mean Sport-BLX

9    Securities --

10               THE WITNESS:  Sport --

11               MR. SACK:  -- or Sport-BLX --

12               THE WITNESS:  Inc.

13               MR. SACK:  Inc.?

14               THE WITNESS:  I apologize.  Inc.

15         Q.    Okay.  What about the others who needed

16   to take the exam, were -- were those former

17   Sport-BLX, Inc. employees that had come over to

18   Sport-BLX Securities when you did this transfer that

19   you described?

20         A.    With the exception of Pete Rawlins,

21   who remained at Sport-BLX, Incorporated.

22         Q.    Can you tell us when you first met

23   Mr. De Perio?

24         A.    I believe it was in 2005.

25         Q.    Okay.  And under what circumstances did

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 72

1    you meet Mr. De Perio?

2         A.    Someone that was employed by Clinton

3    Group brought him in as someone that he had worked

4    with before and recommended that we consider hiring

5    him.

6         Q.    Okay.  So that -- and that was to be

7    employed by the Clinton Group?

8         A.    Correct.

9         Q.    And in what capacity?

10         A.    As an analyst and portfolio manager

11    for a private equity fund that we were managing.

12         Q.    And did you end up hiring Mr. De Perio

13    at that time?

14         A.    Yes.

15         Q.    Okay.  And did you end up hiring him in

16    that position?

17         A.    Well, that's the basic description of

18    the position, but things are not quite so

19    compartmentalized.

20         Q.    Okay.  Can you describe for us what

21    roles Mr. De Perio served for the Clinton Group once

22    he was employed there in 2005?

23         A.    So Clinton Group became the general

24    partner of a private equity entity, and he played a

25    role working on those investments.  Whether he was

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 73

1    actually employed by that general partner or just

2    did it as a service as a Clinton Group employee, I

3    don't recall.

4              The other thing he focused on was what

5    we call shareholder activism, where we make an

6    investment in a company and try to engage with

7    management to exact certain changes.

8        Q.    And was he employed full-time by the

9    Clinton Group?

10       A.    Yes.

11       Q.    And how was he compensated by the

12   Clinton Group?

13             MR. SACK:  Over the whole period,

14   Ross, or a --

15       Q.    Well, --

16             MR. SACK:  -- particular time?

17       Q.    When he was first hired.  Fair enough.

18   When he was first hired, and then you can tell us if

19   it changed over -- you know, over the course of his

20   employment.

21       A.    He got a salary, and I assume, I hope,

22   a bonus.

23       Q.    And what was the bonus based on?

24       A.    Performance.

25       Q.    Did he have any equity in the Clinton

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 74

1    Group?

2         A.    No.

3         Q.    Who owned the Clinton Group?

4         A.    I did.

5         Q.    When you say you did, you owned it a

6    hundred percent?

7         A.    Yes.

8         Q.    Was that always the case?

9         A.    In terms of actual corporate stock

10   ownership, no.  Clinton Group was originally formed

11   in a partnership with two founding partners as well

12   as a Japanese corporation.

13        Q.    Okay.  At some point did you become the

14   hundred percent owner of the Clinton Group?

15        A.    Yes.

16        Q.    Okay.  When did that happen?

17        A.    It was a gradual process of buying out

18   the other shareholders.  The completion was probably

19   two thousand and -- around 2000 or 2001.

20        Q.    Okay.  And since that time were you the

21   sole owner of the Clinton Group?

22        A.    Yes.

23        Q.    Are you currently the sole owner of the

24   Clinton Group?

25        A.    Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 75

1    Q.    And what -- was Mr. -- did Mr. De Perio

2    cease being employed by the Clinton Group at some --

3    at some point?

4    A.    Yes.

5    Q.    Okay.  When did he cease being an

6    employee of the Clinton Group?

7    A.    I don't recall the year.  Probably

8    somewhere in the 2008 or 9 range, but I don't recall

9    exactly.

10    Q.    And why did he stop serving as an

11    employee of the Clinton Group at that time?

12    A.    Well, the person that brought him in

13    in the first place left the firm to go to another

14    firm, and Mr. De Perio resigned from Clinton and

15    went to that firm.  I assume there was some

16    connection between the two, but...

17    Q.    Who was the employee of the Clinton

18    Group who brought Mr. De Perio to you?

19    A.    Conrad Bringsjord.

20        THE WITNESS:  Which I'll spell for you

21    later.

22        MR. SACK:  Regular spelling.

23    Q.    And what was the name of the firm that

24    Mr. De Perio went to after he left the Clinton

25    Group?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 76

1            A.      Millennium something.

2            Q.      And do you know how -- were you still

3     in touch with Mr. De Perio after he left the Clinton

4     Group?

5            A.      I wasn't in touch with him.  Other

6     employees were in touch with him.

7            Q.      Okay.  And how long was Mr. De Perio

8     with the Clinton -- I mean with this Millennium

9     group?

10           A.      I -- I don't know exactly.  A year or

11    two years, something in that range.

12           Q.      And was there a time when you

13    reemployed Mr. De Perio?

14           A.      Yes.

15           Q.      And when was that?

16           A.      Again, I'm -- I don't know exactly.

17    Somewhere shortly after he left the other firm, but

18    I don't know.

19           Q.      Okay.  And which company was that that

20    reemployed him?  Was it -- was he hired back by the

21    Clinton Group?

22           A.      Yes.

23           Q.      Was he hired back in the same capacity?

24           A.      We didn't have -- we weren't managing

25    the private equity fund that I alluded to before,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 77

1      but his capacity was continuing shareholder activism

2      and then looking at some other new projects we were

3      interested in.

4              Q.    Okay.  And -- and in terms of is he --

5      is Mr. De Perio still employed by the Clinton Group?

6              A.    No.

7              Q.    And when did that end?

8              A.    December -- probably December of 2018.

9              Q.    Okay.  And why -- why did his

10     employment by the Clinton Group end?

11             A.    Because he became a founding partner

12     and full-time employee of Sport-BLX, Incorporated.

13             Q.    Is it -- did Mr. -- did the Clinton

14     Group's sort of winding down or lessening its

15     activities have anything to do with Mr. De Perio

16     switching over to Sport-BLX?

17             A.    No.

18             Q.    And so he -- he became, at that time,

19     just a founding member, and what was his role in --

20     in Sport-BLX at the start?

21             A.    He was the -- as best I recall, he's

22     president.

23             Q.    Okay.  And what were his duties and

24     responsibilities as president of Sport-BLX, Inc.?

25             A.    A little bit of everything.  Anything

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 78

1    that was necessary to advance the company's goals.

2         Q.    And is he -- was he paid a salary by

3    Sport-BLX, Inc.?

4         A.    Yes.

5         Q.    Do you know what it was?

6         A.    I believe it was $300,000.00 annually.

7         Q.    Did he receive any other compensation

8    from Sport-BLX, Inc., again, at the start of his

9    employment as president?

10        A.    No.  He had the stock, but no other

11   compensation that I can recall.

12        Q.    Okay.  And what percentage of the stock

13   did he have at the -- at the onset?

14        A.    Thirty.

15        Q.    And who owned the rest of it at --

16        A.    I did.

17        Q.    -- the onset?

18        A.    I did.

19        Q.    So is it fair to say that you and

20   Mr. De Perio started Sport-BLX together?

21        A.    Yes.

22        Q.    Did Mr. De Perio have any role or

23   position at GlassBridge?

24        A.    He was the, at that time, chairman of

25   the board.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 79

1          Q.    When you say "at that time," are you

2    talking about the time that -- strike that.

3              When did Mr. De Perio serve as the

4    chairman of the -- excuse me -- of the board of

5    GlassBridge?

6          A.    I don't recall the dates.

7          Q.    Did it overlap with him serving as

8    president of Sport-BLX?

9          A.    For part of the time, yes.

10         Q.    Okay.  Do you recall when -- was there

11   -- from your answer, am I to assume that

12   Mr. De Perio at some point no longer served as

13   chairman of the board of GlassBridge?

14         A.    Yes.

15         Q.    Okay.  Do you know when he stopped

16   serving as chairman of the board?

17         A.    I don't recall the -- the date.

18         Q.    When -- do you recall whether he was

19   still chairman of the board of GlassBridge in 2019?

20         A.    I believe in 2019, in the beginning of

21   2019 I believe he still was.

22         Q.    Okay.  And from your answer am I to

23   assume that he -- at some point he stopped serving

24   as chairman of the board in 2019?

25         A.    No.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 80

1      Q.    Okay.  Do you know why he stopped
2  serving as chairman of the board of GlassBridge?
3      A.    I think the other directors voted to
4  make one of the other directors chairman.
5      Q.    Okay.  Do you know why?
6      A.    I -- that's a board deliberation I'm
7  not privy to.
8      Q.    Okay.  Do you -- you weren't part of
9  the -- ever part of the board at GlassBridge?
10      A.    Never.
11      Q.    Did you ever sit in on board meetings?
12      A.    No.
13      Q.    Other than chairman of the board, did
14  Mr. De Perio have any other role at GlassBridge?
15      A.    Well, when he wasn't chairman he was
16  still a director.
17      Q.    Is he still a director of GlassBridge?
18      A.    I believe so.
19      Q.    What about Sport-BLX Securities, Inc.,
20  does -- did Mr. De Perio have any role or position
21  with respect to Sport-BLX Securities, Inc.?
22      A.    Sport-BLX Securities, Inc.  I already
23  said he was president.  Yes, he was director.
24      Q.    No, I -- I want to make sure that it's
25  clear for the record to distinguish between

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 81

1    Sport-BLX, Inc. and Sport-BLX Securities, --

2           A.    Right.

3           Q.    -- Inc.

4           A.    If I misunder- --

5           Q.    'Cause I -- I -- I --

6           A.    Which one are you talking about?

7           Q.    Okay.  So I thought before you were

8    referencing Sport-BLX, Inc. when you said

9    Mr. De Perio was the president.

10          A.    Correct.

11          Q.    Okay.  So now we're talking about

12   Sport-BLX Securities, and --

13          A.    I thought we were still in 2019, so I

14   apologize.  If you reask the question, I'll answer

15   it.

16          Q.    Let me -- let me -- let me -- and let's

17   be specific.  Did --

18          A.    Yes, please.

19          Q.    Did Mr. De Perio have any role or

20   position with respect to Sport-BLX Securities, Inc.?

21   Or Sport-BLX -- yeah, Sport-BLX Securities, Inc.?

22          A.    Yes.  He was a founder, so he had

23   stock, and then he, I think, was actually CEO of

24   Sport-BLX Securities.

25          Q.    And for the record, can you just tell

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 82

```
 1    us again when was Sport-BLX Securities, Inc.
 2    founded?
 3            A.      I believe it was April of 2020 or
 4    thereabouts.
 5            Q.      Okay.  And what percentage of stock did
 6    Mr. De Perio hold when it was founded?
 7            A.      Thirty percent.
 8            Q.      And did you hold the other 70 percent?
 9            A.      Yes.
10            Q.      Is that still the case?
11            A.      No.
12            Q.      Okay.  What -- what changed with
13    respect to the ownership of Sport-BLX Securities,
14    Inc.?
15            A.      We issued shares to outside investors.
16            Q.      And when did you do that?
17            A.      Starting in April of 2020 or
18    thereabouts.
19            Q.      Is -- I might have asked this already.
20    Does Mr. De Perio still hold the same role with
21    respect to Sport-BLX Securities, Inc.?
22            A.      No.
23            Q.      When did he stop -- what did he -- does
24    he have any role now?
25            A.      No.
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 83

1      Q.      And when did he stop serving in any

2      capacity with Sport-BLX Securities, Inc.?

3              A.      He left the firm, I believe, in --

4      somewhere around the summer of 2021.

5              Q.      And why did he leave the firm at that

6      time?

7              A.      He didn't say.

8              Q.      He never discussed it with you?

9              A.      No.  Not specifically.

10             Q.      Okay.  Do you have any understanding as

11     to why he left in the summer of 2021?

12             A.      No.

13             Q.      What was the status of Sport-BLX

14     Securities, Inc.'s business in the summer of 2021?

15             A.      We were working on a -- a new

16     structure for to do a transaction with a particular

17     athlete, and we had created -- we had come up with

18     financing lines from a number of banks and

19     institutions where they offered to lend us money

20     against these contracts, and we -- so we were

21     focusing on rebuilding the athlete pipeline and also

22     with the -- with the factor we had these financing

23     sources available.

24             Q.      Okay.  You mentioned a new structure.

25     What was the new structure?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 84

1       A.      Well, the structure with the athlete

2   evolved over time.  The original model was just a

3   straight percentage of the athlete's earnings we

4   would try to securitize, then based on discussions

5   with investors and with athletes and also research

6   we had done on taxes and various securities laws, we

7   came up with what we thought was an improved

8   structure, and then later on we continued to think

9   of better ways to restructure these securities.  So

10  around that time we had come up with what I thought

11  was a pretty -- pretty interesting structure for

12  doing a deal with an athlete.

13      Q.      And did you present that business plan

14  to these financing sources, the banks and the other

15  institutions that were going to provide financing

16  for it?

17      A.      I don't think it was part of a

18  business plan.  We're just talking about legal

19  nuances that we were -- that we were focusing on.

20      Q.      And what athletes were involved in

21  these discussions?

22      A.      Well, P.J. Washington was the first

23  athlete that we did a transaction with, and then we

24  had done -- we found it necessary to unwind the

25  transaction, and then we were trying to reoffer the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 85

1    transaction in the fall of 2021, I believe.

2            Q.    So why did you have to unwind the

3    transaction with P.J. Washington?

4            A.    So we did the original transaction

5    with Mr. Washington somewhere around -- somewhere in

6    February, I believe, February of 2020.  And shortly

7    thereafter when COVID escalated, and leagues were

8    forced to shut down, there was obviously a lot of

9    turmoil in financial markets and sports, and we --

10   we found that -- we found that unwinding the

11   transaction would be in everybody's interests.

12           Q.    Now, did you ever -- you indicated that

13   in 2021 you were trying to sort of restart the

14   transaction or, you know, sign him up again.  Did

15   that ever happen?

16           A.    Yeah, we actually engaged with his

17   attorney.  I -- I believe a new attorney had

18   surfaced on Mr. Washington's behalf.  I spent a lot

19   of time negotiating with him on terms, and we did

20   get to a transaction that he was willing to do; we

21   just had to arrange the financing for it.

22           Q.    Did the transaction ever occur, ever

23   happen?

24           A.    No.

25           Q.    So is it fair to say you agreed upon

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    terms, but it never was implemented?

2            A.    No, becau- -- we were -- we were

3    actually focusing on implementing it in the late

4    fall of 2021.

5            Q.    Okay.  Did that ever happen?

6            A.    Did the transaction ever happen?

7            Q.    Yeah.  Did you ever implement the --

8    the -- the deal?

9            A.    No.

10           Q.    Other than P.J. Washington, did you --

11   what other athletes did you seek to engage in this

12   way in -- on behalf of Sport-BLX Securities, Inc.?

13           A.    It's almost too numerous to list, and

14   I wouldn't be able to remember them, but I will

15   point out that we generally engaged with either

16   agents, wealth advisors, or the family of athletes.

17   We -- we didn't directly deal with the athletes.

18           Q.    Did you sign up any of these other

19   athletes?

20           A.    We -- we did not get to a closed

21   transaction with any other athlete.

22           Q.    And that's on behalf of Sport-BLX

23   Securities, correct?

24           A.    Well, the transaction with the athlete

25   is with the athlete and a -- a new entity that would

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 87

1    be set up.  Whether it was set up by Sport-BLX

2    Securities or Sport-BLX, Inc. was kind of

3    irrelevant.

4         Q.    Okay.  Well, what -- can you describe

5    for us what that new entity, what its function would

6    be and its structure?

7         A.    So we would set up a corporation that

8    would -- the intention would be to have it

9    capitalized by investors, and then the athlete would

10   execute a contract with that corporation to

11   basically make certain payments over some portion of

12   his career.

13        Q.    Did you ever open that entity?  Did you

14   ever form that entity?

15             Let me strike that.  Let's -- because I

16   asked you two different questions.

17             First was did you ever form that

18   entity?

19             MR. SACK:  By "that" do you mean any

20   entity like that or --

21        Q.    To serve that -- to serve that function

22   that you just described.

23        A.    Yes.

24        Q.    Okay.  What was the name of that

25   entity?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 88

1          A.      I think it was PJW, Limited, but I
2      don't -- I don't recall.
3          Q.      And who were the owners of PJW,
4      Limited?
5          A.      That entity, the -- there may have
6      been another entity in between, but the ultimate
7      beneficial owners, meaning those that put in the
8      capital, were Orix and GlassBridge.
9          Q.      Okay.  And do you recall what
10     percentage they owned of PJW?
11         A.      It wasn't a percentage of his
12     earnings; it was a fixed payment schedule that he
13     agreed to pay.
14         Q.      Okay.  And again, I believe you
15     testified that was -- that arrangement was never
16     implemented?
17         A.      No, it was implemented.
18         Q.      So were payments made to GlassBridge
19     and -- I forget the other entity you named.  On
20     be- -- on --
21         A.      Orix.
22         Q.      Orix by PJW?
23         A.      So I think we have to reset here.
24         Q.      Okay.
25         A.      We were talking in 2021 about the new

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 89

1    structure that did not get implemented, and then I

2    believe you asked did it ever get implemented.  Back

3    in 2020, as I said, we did actually implement it and

4    fund P.J. Washington's company, but that was

5    unwound, and the capital was returned.

6            Q.    Okay.  With no payments being made to

7    GlassBridge or Orix?

8            A.    Correct.

9            Q.    Okay.  What is your current -- what are

10   your current business relationships with

11   Mr. De Perio?

12           A.    None.  Codefendants in a lawsuit.

13           Q.    But otherwise you -- you do not --

14   there are no entities in which you share ownership

15   that are still operating.  Is that correct?

16           A.     I think Joe has a small residual

17   position in Sport-BLX Securities, and actually, he

18   owns debt of a corporation that I also own debt and

19   I own the equity of.

20           Q.    Okay.  What corporation is that?

21           A.    FinTech Debt Corp.

22           Q.    Okay.  And -- and in connection with

23   that do you -- do either of you own shares of

24   Sport-BLX, Inc.?

25                 MR. SACK:  You're saying "do"

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 90

1    currently?

2                    Objection to form.

3            Q.      Yeah.  Currently do you -- do --

4    through FinTech do you -- either of you or both of

5    you own shares of Sport-BLX, Inc.?

6                    MR. SACK:  Objection to form.

7            A.      I do.

8            Q.      Okay.  And how much of Sport-BLX, Inc.

9    do you own?

10           A.      I believe I own some personally, and I

11   own some through FinTech Debt Corp.

12           Q.      Can you break it down for us how you

13   own -- what your ownership interest is through each?

14           A.      I don't know.  I would have to

15   calculate it.

16           Q.      Okay.  Do you know what your total

17   ownership -- percentage ownership is of Sport-BLX

18   between those -- between owning it personally and

19   through FinTech?

20           A.      Well, I think it's probably -- between

21   Joe and I is probably close to 80 percent, but

22   again, I'm just rough estimating.

23           Q.      Okay.  Under what circumstances did you

24   meet Daniel Strauss?

25           A.      His father-in-law asked me to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 91

1    interview him.

2          Q.    And when you said asked you to

3    interview him, that was in connection with Clinton

4    Group?

5          A.    Yes.

6          Q.    And what position was he seeking with

7    the Clinton Group?

8          A.    Well, his experience was in corporate

9    finance and private equity, so it was a position

10   where he would be an analyst and focus on various

11   deals that we would look at.

12         Q.    Did you, in fact, hire Mr. Strauss to

13   work for the Clinton Group?

14         A.    Yes.

15         Q.    When was that?

16         A.    I don't recall the date.

17         Q.    Do you recall what position he held

18   with the Clinton Group?

19         A.    As I think I said before, we don't

20   compartmentalize by titles.  People join the firm

21   with certain skill sets, and they try to find the

22   best ways to implement those skill sets.

23         Q.    Do you recall how Mr. Strauss was

24   compensated by the Clinton Group?

25         A.    Salary and a potential bonus.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 92

1              Q.      Based on performance?

2              A.      Yes.

3              Q.      And is he currently a -- an employee of

4       the Clinton Group?

5              A.      No.

6              Q.      When did he stop being an employee of

7       the Clinton Group?

8              A.      I think I -- that was already asked

9       and answered, but I believe it was December of 2019.

10             Q.      Okay.  Why did he end up leaving the

11      Clinton Group?

12             A.      To take the full-time CEO job at

13      GlassBridge.

14             Q.      And is that -- is that his full-time

15      job currently; he's the CEO of GlassBridge?

16             A.      As best as I know, yes.

17             Q.      You don't know whether he's the CEO of

18      GlassBridge as we sit here?

19             A.      I believe he's the CEO of GlassBridge.

20      I don't know if that's his -- if he does anything

21      else.

22             Q.      Okay.  Does he -- did Mr. Strauss ever

23      have a relationship to Sport-BLX, Inc.?

24             A.      Well, as -- he was on the board of

25      directors representing GlassBridge and stayed on the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 93

```
 1    board of directors until GlassBridge sold their
 2    stock.
 3             Q.      Okay.  Did his tenure as a director on
 4    Sport-BLX's board coincide with both GlassBridge's
 5    purchase and sale of -- of its interest in
 6    Sport-BLX?
 7                     MR. SACK:  Objection to the form.
 8             Q.      Do you understand my question?
 9             A.      Yes, but I'll have to answer it in a
10    number of parts.
11             Q.      Okay.
12             A.      When -- GlassBridge bought shares of
13    Sport-BLX at different times.  Their first purchase
14    he was not on the board of Sport-BLX.  He ultimately
15    joined the board of Sport-BLX some point in 2019.
16    GlassBridge made an additional purchase, or two or
17    maybe three additional purchases of Sport-BLX
18    throughout 2019, and he was on the board.
19             Q.      Okay.  Can you just give us the
20    chronology of the different GlassBridge purchases of
21    Sport-BLX stock?
22             A.      GlassBridge committed to purchase a
23    million dollars worth of stock in, I believe,
24    December of 2018, but I'm not exactly sure when that
25    was.
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 94

1          Q.      Do you recall the purchase price of

2    that stock?

3          A.      It was $95.00 a share.

4          Q.      When was the next -- did it actually go

5    forward, that purchase?

6          A.      Yes.

7          Q.      What was the next purchase by

8    GlassBridge of stock -- of Sport-BLX stock?

9          A.      I don't know exactly, but I believe

10   they purchased more stock in October of 2019.

11         Q.      And do you recall how much they paid

12   for that stock?

13         A.      Somewhere around $600,000.00.

14         Q.      And do you recall the price per share

15   for that stock?

16         A.      To the best of my recollection, I

17   think it was $263.00 per share.

18         Q.      And that was in October of 2019?

19         A.      Correct.

20         Q.      What was the next purchase of Sport-BLX

21   shot -- stock, excuse me, by -- by GlassBridge?

22         A.      I don't -- I don't know if there was

23   any other purchase between that purchase and another

24   one in December of 2019 where they purchased stock

25   from Joe De Perio and myself.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 95

1        Q.      And what was the -- do you recall the

2    purchase price for that stock?

3        A.      It was a combination of cash and debt.

4    The cash component was $35.00 per share, and the

5    debt component was somewhere around $315.00 a share,

6    but I'm -- I'm estimating.

7        Q.      When you say it was broken down that

8    way, what do you mean by that?  In other words, that

9    it was broken out into per share by cash and debt?

10              MR. SACK:  Objection to the form, but

11   you can answer if you understand.

12       A.      Well, they bought a certain amount of

13   stock.  They paid a certain amount of cash up front

14   with a promissory note to pay the balance over time.

15       Q.      And the -- and the -- and that

16   transaction was with you and Mr. De Perio?

17       A.      Correct.

18       Q.      Okay.  Any other GlassBridge purchases

19   of stock?

20       A.      There may have been another -- I thi-

21   -- I believe there was another one prior to this

22   one; I just can't remember the terms or the date.

23       Q.      Okay.

24              MR. CARBONE:  Ross, before you go to

25   the next question, I understand that the audio isn't

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 96

```
 1    going through to the remote folks very well.
 2                    THE VIDEOGRAPHER:  Do you want to go
 3    off?
 4                    MR. CARBONE:  I'm just raising it in
 5    case there was any- -- I don't know if it's a mic
 6    issue or something.  I just wanted to --
 7                    MR. SACK:  Do you want to do a brief
 8    test, just to...
 9                    THE VIDEOGRAPHER:  Let's go off the
10    record.
11                    The time is 12:01 p.m.  We're going off
12    the video record.
13                    (Discussion off the record.)
14                    THE VIDEOGRAPHER:  Time is 12:03 p.m.
15    We're back on the video record.
16    BY MR. PEARLSON:
17         Q.    Mr. Hall, you indicated that
18    Mr. Strauss stepped down from the board of Sport-BLX
19    at the time that GlassBridge sold its interest in
20    Sport-BLX, correct?
21         A.    I believe that's correct, yes.
22         Q.    Okay.  Do you know when that was?
23         A.    Sometime in the latter part of -- of
24    2021.
25         Q.    Okay.  And was that part of the FinTech
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 97

1      transaction you described earlier in your testimony?

2           A.      FinTech purchased the shares from

3      GlassBridge.

4           Q.      Okay.  And that's when Mr. Strauss

5      stepped down from the Sport-BLX board?

6           A.      I believe that's correct.

7           Q.      Now, does Mr. Strauss currently have

8      any role or position with respect to Sport-BLX

9      Securities?

10          A.      No.

11          Q.      Does he have any ownership interest in

12     any of the entities with which -- in which you have

13     an ownership interest or with which you're

14     affiliated?

15          A.      I believe he owns stock in

16     GlassBridge, and I own stock in GlassBridge, but I

17     have no operational affiliation with GlassBridge.

18          Q.      Okay.

19                  THE REPORTER:  I have no...

20                  THE WITNESS:  Operational affiliation

21     with GlassBridge.

22          Q.      And GlassBridge is a public company?

23          A.      Yes.

24          Q.      What about Francis Ruchalski; when did

25     you first meet him?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 98

1          A.      Sometime before his high school prom.

2          Q.      Under what circumstances did you meet

3     him?

4          A.      He was my brother's friend in high

5     school.

6          Q.      Okay.  And you have a social

7     relationship with him?

8          A.      No.  We played softball occasionally,

9     but he's more socially related to my brother.

10         Q.      Okay.  I meant to ask you, do you have

11    a social relationship with either Mr. Strauss or

12    Mr. De Perio?

13         A.      Occasionally.

14         Q.      And did there come a time when you

15    employed Mr. Ruchalski?

16         A.      Yes.

17         Q.      And when was that?

18         A.      Sometime in the mid-1990s.

19         Q.      Was that also through the Clinton

20    Group?

21         A.      He became an employee of Clinton

22    Group.

23         Q.      Okay.  And what was he hired to do?

24         A.      Accounting.

25         Q.      And is he still an employee of the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 99

1    Clinton Group?

2         A.     No.

3         Q.     When did he stop being an employee of

4    the Clinton Group?

5         A.     I believe it was December of 2019.

6         Q.     Okay.  Why did he stop become -- why

7    did he stop serving as an employee of the Clinton

8    Group at that time?

9         A.     If I remember correctly, he became --

10    that was the time when he became a full-time

11    employee of GlassBridge.

12         Q.     Okay.  And why was it that these

13    Clinton Group employees, at least a couple of them

14    you mentioned at that time, were switching over from

15    the Clinton Group to GlassBridge specifically to

16    become full-time employees --

17            MR. SACK:  Objection.

18         Q.     -- in December of 2019?

19            MR. SACK:  Objection to the form.  Do

20    you mean Strauss and Ruchalski, or --

21            MR. PEARLSON:  Yes.

22            MR. SACK:  -- you want to expand that?

23         Q.     Strauss and Ruchalski.

24         A.     So GlassBridge was a project that Joe

25    and I took on a company that was struggling.  We

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 100

1    took control of -- we -- we changed the board and

2    put the control into a new board's hands.  Joe spent

3    a lot of time working on the restructuring of

4    GlassBridge, Daniel Strauss worked a lot on

5    GlassBridge, and ultimately the goal was to find a

6    capital provider that would inject capital into

7    GlassBridge so it could become a functional entity

8    and go forward.

9            Q.    Did their -- did their switch, and

10   again, I'm specifically talking about Mr. Ruchalski,

11   Mr. Strauss, have anything to do with the fact also

12   that the Clinton Group was winding down its

13   operations at that time?

14           A.    No.

15           Q.    What -- what role does Mr. Ruchalski

16   serve at GlassBridge?

17           A.    I'd like to go back.  Clinton Group,

18   as I said, was winding down certain trading

19   operations, but Clinton Group was still functional

20   and doing other -- other things.

21           Q.    Okay.

22           A.    So Clinton Group was not winding down

23   all of its operations; it was winding down the

24   trading operations.

25           Q.    Is it still performing other trading

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 101

1    operations?

2         A.    No.    That's what we unwound.    That's

3    what we wound down.

4         Q.    Okay.    And I think I asked you the --

5    what -- what role does Mr. Ruchalski serve at

6    GlassBridge?

7              MR. SACK:    Presently?

8         Q.    Presently.

9         A.    I believe he's the CFO.

10        Q.    And was he -- what was -- did he have a

11   relationship with Sport-BLX?

12        A.    He was on the board of Sport-BLX,

13   Incorporated.

14        Q.    Okay.    And when did he serve as a

15   director of Sport-BLX, Incorporated?

16        A.    I don't recall when he joined,

17   sometime in 2019, and I -- I don't recall when he

18   resigned.

19        Q.    How did he become a director of

20   Sport-BLX?

21        A.    We invited him to be on the board and

22   to focus on -- we needed someone with an accounting

23   background to be on the board, and so we asked him

24   to be on the board.

25        Q.    When you say "we," are you referring to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 102

1      you and Mr. De Perio?

2              A.      Yes.

3              Q.      How about with Mr. Strauss; how did he

4      end up becoming a member of the board on Sport-BLX

5      -- of Sport-BLX?

6              A.      Well, he was serving the acting CEO

7      role of GlassBridge at the time, if -- if I

8      remember, whether it was CEO or CFO, but he was an

9      office- -- an acting officer of GlassBridge, and

10     GlassBridge, with their million-dollar investment,

11     was offered a board seat.  I don't recall if that

12     was -- actually, I believe that was a contractual

13     right that they had --

14             Q.      Okay.

15             A.      -- to have a board member.

16             Q.      Did you have any role in Mr. Strauss

17     becoming a board member of Sport-BLX?

18             A.      Well, it was really GlassBridge's role

19     to put him on the board of Sport-BLX.

20             Q.      Okay.  Did you have any input in that

21     decision by GlassBridge?

22             A.      Well, I -- on that particular

23     decision, no.

24             Q.      What -- did Mr. Ruchalski ever hold a

25     position with respect to Sport-BLX Securities?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1        A.    I don't believe so.

2        Q.    When did you meet Christopher Johnson?

3        A.    Sometime in the 2006 or 7 or 5 or 6

4  range.  Somewhere around then.

5        Q.    Under what circumstances did you meet

6  Mr. Johnson?

7        A.    He began a relationship and married a

8  close friend of my wife at the time.

9        Q.    Okay.  Did -- was it -- was he looking

10  to be employed by the Clinton Group?

11        A.    He was employed by the Clinton Group

12  for a short period of time.

13        Q.    Okay.  When -- when was he first

14  employed by the Clinton Group?

15        A.    Somewhere in the 2006 or 7 range.

16        Q.    Okay.  And how long was he with the

17  Clinton Group?

18        A.    I -- I don't recall exactly.  A year

19  or two.

20        Q.    And do you know why --

21        A.    Maybe less.

22        Q.    -- he left?

23        A.    I don't recall the exact

24  circumstances.

25        Q.    Did he ever have any relationship to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 104

1    Sport-BLX?

2           A.    Yes.  In 2019, in November, we invited

3    him to be interviewed by the board members, the

4    other board members, to consider a position on the

5    board of directors.

6           Q.    Okay.  Why did -- why were you

7    interviewing him to be a board member at that time?

8    Or why did you invite him to be interviewed to be a

9    board member at that time?

10          A.    Well, we wanted to add some directors

11   that were not stockholders of Sport-BLX, were not

12   Clinton Group employees, and were not GlassBridge

13   employees, so ultimately independent directors.

14          Q.    Okay.  And why -- why did you feel that

15   you needed an independent director at that time?

16          A.    Well, at that time GlassBridge had,

17   despite its -- in addition to its equity position,

18   had loaned some money to Sport-BLX, and I could an-

19   -- anticipate other potential transactions that

20   GlassBridge could do with Sport-BLX and thought it

21   would be wise to have an independent group of

22   directors that could opine on things where others

23   would either be or feel conflicted.

24          Q.    Okay.  And was this the first time you

25   were looking to have a group of independent

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 105

1    directors on the board?

2          A.    We had talked to a number of people

3    over the previous number of months about the project

4    and being on the board.

5          Q.    And did Mr. Johnson, in fact, become a

6    independent director?

7          A.    Yes.

8          Q.    And that was -- so you -- you brought

9    him to the board to be interviewed, and then he was

10   selected to serve as an independent director

11   sometime in November of 2019.  Is that correct?

12         A.    Best of my recollection, that's

13   correct.

14         Q.    Okay.  And were there other independent

15   directors that were brought to the Sport-BLX board

16   at that time?

17               MR. SACK:  At any time in 2019 or just

18   in November?

19         Q.    Well, any time in 2019.

20         A.    Repeat the question, please?

21         Q.    Let me re- -- let me rephrase it.

22         A.    Okay.

23         Q.    Other than Mr. Johnson, did Sport-BLX

24   go out -- go out and try to find other independent

25   directors?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 106

1          A.     We met certain people we thought would

2     be good directors, and we had discussions with them

3     about potentially being directors, but in answer to

4     your specific question, I don't think we

5     specifically were targeting them as directors.

6          Q.     Okay.  Was Mr. Baez one of those

7     people?

8          A.     No.

9          Q.     Okay.  Did he, in fact, become a

10     director at Sport-BLX?

11          A.     Yes.

12          Q.     Okay.  How did he become a director of

13     Sport-BLX?

14          A.     Similar circumstances to Mr. Johnson.

15     He was independent, didn't own any stock in any of

16     the entities that were mentioned, and we -- had good

17     experience and connections that we thought would be

18     valuable, and we invited him to be on the board.

19          Q.     Okay.  Were -- when -- did he join the

20     board around the -- at or around the same time as

21     Mr. Johnson?

22          A.     The same time.

23          Q.     Okay.  And were they the only two

24     independent directors on the -- on the Sport-BLX

25     board?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 107

1         A.     Yes.

2         Q.     And how many directors were on the

3    Sport-BLX board?

4         A.     I don't recall.  There were probably

5    four -- there were probably four or five others plus

6    these two.

7         Q.     Okay.  Can you tell me who the other

8    directors were in the fall of 2019 in addition --

9         A.     Myself, Joe De Perio, Fran Ruchalski,

10   Daniel Strauss, and Michael Salerno, so I guess

11   that's five.

12        Q.     And first with Mr. Johnson, did he have

13   any role in -- in Sport-BLX Securities, Inc.?

14        A.     No.

15        Q.     How about Mr. Baez, did he have any

16   role in Sport-BLX Securities, Inc.?

17        A.     No.

18        Q.     Who is Michael Staisil?

19        A.     He's a gentleman who I first met in

20   December of -- December of 2018, and he introduced

21   us to a number of people that could potentially be

22   helpful with Sport-BLX.

23        Q.     Was he ever employed by Sport-BLX?

24        A.     No, he was never an employee.  He did

25   receive some expense reimbursement, and I believe

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 108

1    what probably would be characterized as a finder's

2    fee for bringing in an investor.

3           Q.    Did he have a written agreement with

4    Sport-BLX?

5           A.    I don't believe so.

6           Q.    Do you know what the finder's fee was

7    that he was paid for bringing investors to

8    Sport-BLX?

9           A.    I don't recall.

10          Q.    Do you know if he was disclosing the

11   existence of the finder's fee to the investors he

12   was bringing?

13          A.    I -- I believe he did.

14          Q.    How long was he affiliated with

15   Sport-BLX in this role?

16          A.    Could we define the role we're talking

17   about?

18          Q.    Yeah.  You were talking about him

19   helping attract investors to Sport-BLX and being

20   paid a finder's fee.

21          A.    No, that's not what I said.

22          Q.    Okay.  Could you correct me?

23          A.    The original role, I believe I said,

24   was introducing us to people that could be helpful

25   with Sport-BLX, and one of those roles -- actually,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 109

1    the first role was finding an investor, Mr. Salerno,

2    and introducing Sport-BLX to him, but after that his

3    role was not on capital raising.  It was introducing

4    us to other contacts that he had that could help us

5    with the business.

6            Q.    Was he paid a finder's fee in

7    connection with Mr. Salerno/Cypress' investment in

8    Sport-BLX?

9            A.    I don't recall what the actual outcome

10   of that was.

11           Q.    Was he paid any finder's fees for

12   bringing anyone to Sport-BLX besides Mr. Salerno?

13                 MR. SACK:  Objection to the form.

14           A.    He was -- he was -- I believe he was

15   paid a fee for either consulting work or partly a

16   finder's fee.  I don't recall exactly how it was

17   structured.

18           Q.    And who was he paid by?

19           A.    Sport-BLX, Incorporated.

20           Q.    And how long did he -- was he

21   affiliated, Mr. Staisil, with Sport-BLX in any

22   capacity?

23           A.    I think probably about five months.

24   Four to five months.

25           Q.    When he wasn't capital raising, I

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 110

1    believe, you des- -- was the way you described him,

2    what was he doing for Sport-BLX?

3         A.    Basically making introductions and

4    bringing people into our office that could

5    potentially help us advance the business.

6         Q.    Okay.  When you say that, was he

7    introducing you to agents?

8         A.    Well, he did know some agents.  He

9    knew some sports wealth managers.  He knew a number

10   of people that were related to athletes.  And I may

11   have said plural mistakenly; it was at least one

12   wealth manager, maybe more.  But he introduced us to

13   a fair number of people that were involved in sports

14   not only on the athletes' side, but people that

15   owned stakes in sports teams, so just generally lots

16   of sports contacts.

17        Q.    Was he paid for the introduction part

18   of what he was -- you know, what he was doing on

19   behalf of Sport-BLX as opposed to the raising

20   capital?

21        A.    I don't recall exactly the nature of

22   the payment that he received.

23        Q.    Did he ever -- other than Sport-BLX,

24   did he ever have a role with respect to either the

25   Clinton Group -- Mr. Staisil have either a role with

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 111

1     respect to the Clinton Group or Sport-BLX

2     Securities?

3          A.     No.

4          Q.     Who is Peter Rawlins?

5          A.     He was -- he is an -- he was an

6     employee of Clinton Group, and he became the head of

7     Sport-BLX, Incorporated sometime in early 2020.

8          Q.     Okay.  When did he start working for

9     the Clinton Group?

10          A.     Probably 1993?

11          Q.     And what position did he hold with

12     respect to the Clinton Group?

13          A.     He was the head of operations and

14     trading.

15          Q.     Now, you said that at some point he

16     became -- he had a relation -- he was employed by

17     Sport-BLX.  When was that?

18          A.     Sometime in early 2020, I believe.

19          Q.     And was he still -- was that a

20     full-time job that he -- he had with Sport-BLX, or

21     was he still working for the Clinton Group at that

22     time?

23          A.     No, it was full-time for Sport-BLX.

24          Q.     Why did he switch over from Clinton

25     Group to Sport-BLX in 2020?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 112

1          A.     As we -- as I said, we moved out --

2     most of the employees that were at Sport-BLX,

3     Incorporated we moved to Sport-BLX Securities.  We

4     kept the -- the people that were necessary to

5     continue to advance the current Sport-BLX,

6     Incorporated business, which included several

7     programmers and Pete Rawlins, who was responsible

8     for operations and back office and those types of

9     functions.

10          Q.     So is it fair to say that Mr. Rawlins

11    was one of the employees who remained with Sport-BLX

12    at the time you were doing the switchover?

13          A.     I don't know if he was part of the

14    switchover.  I'm not sure when he joined Sport-BLX,

15    Incorporated.

16          Q.     Okay.  And at some point was he -- when

17    he joined Sport-BLX was he not employed -- no longer

18    employed by Clinton Group?

19          A.     Yes, I believe that's true.

20          Q.     Okay.  And was he ever an employee of

21    Sport-BLX Securities?

22          A.     I don't -- I don't recall.

23                 Yes.  I think the answer is yes, but I

24    don't recall when.

25          Q.     Okay.  Where is Mr. Rawlins currently

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 113

1    employed?

2          A.    He's still technically an employee of

3    Sport-BLX Securities, I believe.

4          Q.    Sport-BLX Securities?

5          A.    Yes.

6          Q.    So in the -- in the year two- -- 2019,

7    what was his employment during 2019?

8          A.    He was employed by Clinton Group.

9          Q.    No role in Sport-BLX at that time?

10          A.    Well, he definitely had an operational

11    role.  I don't recall if there was -- there may have

12    been some allocation of his salary back to

13    Sport-BLX, Incorporated for the work he was doing

14    for Sport-BLX, Incorporated.

15                  MR. PEARLSON:  Okay.  Why don't we go

16    off the record.

17                  THE VIDEOGRAPHER:  The time is 12:24

18    p.m.  This is the end of media No. 2.

19                  THE WITNESS:  Was that a little

20    better?

21                  THE VIDEOGRAPHER:  We are going off

22    the record.

23                  (Luncheon recess taken from 12:24 to

24    1:08 p.m.)

25                  THE VIDEOGRAPHER:  The time is 1:08

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 114

1      p.m.  This is the beginning of media 3, and we are

2      on the record.

3      BY MR. PEARLSON:

4           Q.    Mr. Hall, we were speaking this morning

5      about the Clinton Group.  Can you just describe the

6      various services the Clinton Group provided?

7           A.    Investment advisory services.  That

8      pretty much covers it.

9           Q.    Okay.  And was it -- as a result of

10     providing investment advisory services was it

11     registered as an investment adviser with the SEC?

12          A.    Yes.

13          Q.    And as a result of that did it have to

14     -- was it required to file Form ADVs with the SEC?

15          A.    Yes.

16          Q.    Can you tell us what that form is?

17          A.    It's a form that registered investment

18     advisors provide to the SEC, and parts of it are for

19     investor -- for investor disclosure.

20          Q.    Okay.  And -- and as -- as -- in filing

21     those forms it was important that you file accurate

22     information with the SEC, correct?

23          A.    It's important that the firm file

24     accurate information, yes.

25          Q.    Okay.  Did you have any role in the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 115

1    filing of the ADV?

2         A.    Not directly.

3         Q.    Did you ever review it before it was

4    filed?

5         A.    At times.

6         Q.    Okay.  If you could look at what we've

7    marked as Hall-2 for identification.

8              (Exhibit Hall-2, 45-page Part 2A of

9    Form ADV:  Firm Brochure - Clinton Group, Inc. -

10   March 2019, is marked for identification.)

11        Q.    This is Part 2A of Form ADV dated March

12   2019 for the Clinton Group.  Do you see that?

13        A.    Yes.

14        Q.    And it lists the Clinton Group, Inc. at

15   510 Madison Avenue, New York, New York.  Do you see

16   that?

17        A.    Yes.

18        Q.    Was that the Clinton Group's office

19   location as of 2019?

20        A.    Yes.

21        Q.    Okay.  And could you -- could you

22   describe for us, first of all, what -- the address

23   is 510 Madison Avenue.  What is the cross street?

24        A.    52nd Street.

25        Q.    Would you describe that as prime

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 116

1     Manhattan real estate?

2          A.     I think it's nice.  I don't know -- I

3     don't know what a real estate broker would say.

4          Q.     Okay.  Would you -- would you think --

5     do you think it's a -- has some cachet, the address?

6                 MR. SACK:  Objection to the form.

7          A.     I think it's a very nice building.

8          Q.     Okay.  And very nice area?

9          A.     I believe so.

10          Q.     Okay.  And when did you first start

11     occupying that space?

12          A.     I don't recall the date.

13          Q.     Okay.  Could you describe the space

14     that you -- that the Clinton Group occupied at 510

15     Madison Avenue?

16          A.     The physical space?

17          Q.     Yes.

18          A.     Well, it had a number of offices.  We

19     built some what we called trading desks, had two

20     conference rooms, a kitchen, and restrooms.

21          Q.     And how -- how long had you leased that

22     space?

23          A.     I don't recall.

24                 MR. SACK:  Yeah.  Objection, asked and

25     answered, but you can obviously try --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 117

1          A.     I -- I don't recall.

2          Q.     Okay.  Do you know what the square

3     footage was that you leased?

4          A.     It was close to -- somewhere in the

5     neighborhood of 10,000, but there's different

6     definitions of usable square foot, rentable square

7     foot, so it's in that neighborhood.

8          Q.     Do you know how many offices were on

9     that -- in that space?

10         A.     I think -- one, two -- I think five.

11    Uh, I think seven.

12         Q.     Seven offices and two conference rooms?

13         A.     Yes.

14         Q.     And did you occupy -- was that the

15    entire ninth floor of that building?

16         A.     Yes.

17         Q.     Now, that was the space that you had --

18    we had talked about previously that you had leased

19    from -- what was name of the landlord?  World Gold?

20         A.     World Gold.

21         Q.     And do you recall the rent you were

22    paying for that space, the Clinton Group was paying

23    for that space?

24         A.     I don't recall exactly.

25         Q.     Did World Gold own the space, or were

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 118

1    they subleasing it to Clinton Group?

2              MR. SACK:   Objection to the form.

3         A.    They were subleasing it to Clinton

4    Group.

5         Q.    Okay.  And Clinton Group occupied that

6    entire space as of the beginning of the lease?

7         A.    Yes.

8         Q.    Okay.  There comes a point in time

9    where the -- where Clinton Group was no longer

10   leasing the entire space or -- or using the entire

11   space, I should say.

12        A.    We -- well, we allocated -- well, we

13   made the space available to Sport-BLX, Incorporated.

14        Q.    When was that?

15        A.    March of 2019.

16        Q.    And was anybody else using the space

17   besides -- when you say make space -- the space

18   available to Sport-BLX, what are you -- what are you

19   talking about?

20        A.    We gave the -- they had use of the

21   conference room, use of as many trading desks as

22   they needed, use of offices, use of the kitchen.

23   That's what I mean.

24        Q.    Did Sport-BLX have any need for trading

25   desks in 2019?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 119

1      A.     Well, Sport-BLX wasn't trading, but

2  the trading desks serve an equally good function for

3  people that want to sit in close proximity and

4  communicate on a regular basis.

5      Q.     And what did Sport-BLX need the

6  conference rooms for?

7      A.     Well, in the beginning Sport-BLX

8  needed a conference room to house the folks from

9  ConsenSys that were helping us with the technology

10  build.

11      Q.     ConsenSys didn't have offices or

12  physical facilities?

13      A.     I don't know a whole lot about

14  ConsenSys.  I assume they have physical space, but

15  we -- we had them on site.

16      Q.     And that's in March -- starting in

17  March of 2019?

18      A.     No, I think it started in January,

19  early January of 2019.

20      Q.     Okay.  But did -- was Sport-BLX paying

21  rent to -- to Clinton Group in -- before March of

22  2019?

23      A.     No.

24      Q.     That's -- when -- when Clinton Group --

25  I'm sorry.  Say that again.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 120

1           When Sport-BLX started using the

2    Clinton Group space did it start paying rent to

3    Clinton Group?

4           A.     No.

5           Q.     It never paid rent to the Clinton

6    Group?

7                  MR. SACK:  No.  You could -- objection

8    to the form.  I think there was a miscommunication,

9    but you could try to answer that.

10          A.     When Sport-BLX was started in December

11   of 2018 Sport-BLX had begun, Sport-BLX was hosting

12   meetings with ConsenSys, meetings with potential

13   investors, and it paid no rent to Clinton Group

14   during that period.

15          Q.     When did it start paying rent to the

16   Clinton Group?

17          A.     I believe I answered that already, but

18   March of 2019.

19          Q.     And was the rent paid directly to the

20   Clinton Group?

21          A.     Yes.  I believe that's correct.

22          Q.     It didn't pay the landlord?

23          A.     I don't believe so.

24          Q.     Do you recall what the Clinton Group's

25   original assets under management were?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 121

1              MR. SACK:  Objection to the form.  As

2      of when?

3          Q.     When it started.

4          A.     Zero.

5          Q.     Okay.  And can you describe for us how

6      the assets under management went in terms of up- --

7      up- -- declines, in a sense, in -- in terms of the

8      assets under management between the start and 2019?

9          A.     Well, it changes virtually -- starting

10     in July of two thousand and -- or I'm sorry -- of

11     1992 is when I believe it first got assets under

12     management, and then after that it changes

13     month-to-month.

14         Q.     What were the most in terms of the

15     maximum assets under management that the Clinton

16     Group had?

17         A.     So there's multiple definitions of

18     "assets under management."  Are we talking about in

19     ADV terms?  It would be probably different than what

20     practitioners would say.

21         Q.     Okay.  In ADV terms.

22         A.     I believe there's calculations that

23     include funds under management, as well as

24     structured products that you're managing.  In some

25     cases assets that are produced with leverage get

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

                                                    Page 122

1    lumped into the asset number as well.

2            Q.    Can you turn to page 5 of the ADV?

3                  I'm sorry.  It's on -- I'm sorry.  It's

4    on page 1 of the document, it's page 5 of the pdf

5    where it's -- where I'm referring to assets under

6    management.

7            A.    Um-hum.

8            Q.    If you could just read that section E

9    to yourself.

10           A.    Okay.

11           Q.    And that says that it had approximately

12   592 million in regulatory assets under management as

13   of December 31, 2018, on a discretionary basis.  Can

14   you explain to us what that means?

15           A.    Well, as I said, there's a definition

16   of regulatory assets under management and other

17   definitions, so I'm not sure I fully understand, as

18   we sit here now, what the technical definition of

19   "regulatory assets" is.

20           Q.    Do you have, as you sit here today, any

21   understanding as -- as to how this number for assets

22   under management compared to prior years for Clinton

23   Group?

24           A.    Oh, in prior years it -- many prior

25   years it was higher.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 123

1          Q.     Okay.  Did you ever exceed a billion

2     dollars in assets under management?

3                 MR. SACK:  Objection to the form.

4          A.     Yes.

5          Q.     Okay.  When did you do that; do you

6     recall what years?

7          A.     Various years from 1997 to probably

8     two thousand and -- 2008 or 9.

9          Q.     Were those the -- is it fair to say

10    those were the peak years for the Clinton Group?

11         A.     Well, depending on what -- how big the

12    peak is or how wide the peak you want it to be, the

13    peak was within those -- within those years.

14         Q.     Okay.  And I'm going to show you now

15    what's been marked as Hall No. 3.

16                (Exhibit Hall-3, 36-page Clinton Group

17    Form ADV Rev. 10/2021, is marked for

18    identification.)

19         Q.     Mr. Hall, I'm going to ask you to look

20    at the front page of -- of what's been marked as

21    Hall-3 for identification.  It's a Form ADV, and do

22    you see there that it lists under the -- under F the

23    principal office and place of business for the

24    Clinton Group is 6 East 69th Street?

25         A.     Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 124

1          Q.      Is that your home address?

2          A.      Correct.

3          Q.      And is that -- did the -- in fact, the

4     principal place of business for the Clinton Group

5     change from 510 Madison to your apartment?

6                  MR. SACK:   Object to the form, but the

7     witness may answer.

8          Q.      As of the date of this document, which

9     is 2023.

10         A.      As of the date of this document the

11    mailing address was my home.  Was that the question?

12         Q.      No.  My question was where were the

13    principal offices of -- of the Clinton Group as of

14    the time of the filing of this Form ADV?

15         A.      Well, the principal office of this --

16    of the business was 6 East 69th Street, where we

17    received -- I think that's where we received mail.

18         Q.      And that's your home address?

19         A.      Yes.

20         Q.      Now, if you could turn to page 8.

21                 Actually, I'm sorry.  If you could turn

22    to -- it's under Section 1.M.  Wish they had been

23    Bates stamped.  Which I guess -- I think it's the

24    fifth page of the pdf.  One, two -- no, it's the

25    fourth page.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 125

1            MR. SACK:  Just tell us what's at the
2    top, Ross, so we make sure we're on the same page.
3            MR. PEARLSON:  Where it says
4    "Facsimile number, if any:"  "Telephone Number."
5            MR. SACK:  We're not there just yet.
6            So of the document, do you know what
7    page of the document we're on?  4?
8            MR. PEARLSON:  4, yeah.
9            MR. SACK:  So I have at the top
10   "Securities Authority Notice Filings and State
11   Reporting by Exempt Reporting."  That's what I have
12   at the top of page 4.
13           MR. PEARLSON:  I have it.  I think you
14   go back a page, and it should say "Telephone Number:
15   Facsimile number, if any."
16           MR. SACK:  I -- I don't see that.  I'm
17   sorry.
18           MR. PEARLSON:  I'm on page 4 of the
19   pdf.
20           MR. SACK:  Well, I just have a
21   physical copy, so I don't see --
22           MR. PEARLSON:  No, page 4--
23           MR. SACK:  -- that on my page 4.
24           MR. PEARLSON:  -- of the -- of the
25   document.  If you go to the fourth -- count four

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 126

1      pages, including the cover page.

2                  THE WITNESS:  Four inclusive?  Or the

3      fourth page?

4                  MR. PEARLSON:  No, the fourth page.

5                  MR. SACK:  So what I have at the top

6      is "State Securities Authority Notice Filings," the

7      next is called "Related Adviser" box.

8                  MR. PEARLSON:  No, if you go back one

9      page.

10                 MR. SACK:  Okay.

11                 MR. PEARLSON:  And it should have --

12                 MR. SACK:  Ah, I see at the very top.

13     There's a telephone number listed at the very top.

14     Okay.  Got it.

15                 MR. PEARLSON:  Okay.

16     BY MR. PEARLSON:

17          Q.     Mr. Hall, at the very bottom of that

18     page there's a checkmark on item No. 13.  It says,

19     "are no longer eligible to remain registered with

20     the SEC."

21                 Did there become a point in time when

22     the Clinton Group was no longer eligible to be

23     registered with the SEC as an investment adviser?

24          A.     I don't know what they mean by

25     "eligible," and I'm not -- I would have to read the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1        -- the introduction.
 2             Q.     Was there --
 3                    MR. SACK:  Well, I think he's reading
 4        the document, --
 5                    MR. PEARLSON:  Okay.
 6                    MR. SACK:  -- so why don't you just --
 7             A.     Go ahead.  You can ask me.
 8             Q.     So aside from the document, are you
 9        aware of a point in time where the Clinton Group was
10        no longer eligible to remain an investment adviser
11        with the SEC?
12             A.     I don't really know what "eligible" is
13        -- means right now.
14             Q.     Okay.  If you could turn to -- one,
15        two, three -- if you could turn another four pages,
16        it should say -- it should have a -- the first box
17        you will see is "Compensation Arrangements."  Do you
18        see that?
19             A.     So turn three pages.  Yes.
20             Q.     Yeah.  So Mr. Hall, under Advisory
21        Activities it says -- if you look down under G, it
22        says "None."  Was there a point in time where the
23        Clinton Group ceased providing advisory services?
24             A.     I'd have to look a little more
25        carefully at the definition of "advisory services."
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 128

1          Q.     Okay.  Do you -- aside from the form,
2      are you aware of a time where the Clinton Group
3      stopped providing advisory services to clients?
4          A.     I'm not really sure what the SEC's
5      definition of advisory services is.
6          Q.     Well, under your definition of advisory
7      services was there a time where the Clinton Group
8      stopped providing advisory services to its clients?
9              MR. SACK:  Objection to the form.
10     You're asking about a document, and now you're
11     shifting to his understanding of a word unrelated to
12     this document?
13         Q.     I'm saying if you have an understanding
14     -- let me ask you what is your understanding as to
15     what advisory services means?
16             MR. SACK:  And I'll object to the form
17     and instruct the witness that if it calls for
18     information received from a lawyer, then I'll
19     instruct you not to answer and to limit your answer
20     to be not based on legal advice.
21         A.     Yeah.  I -- I don't know what the
22     SEC's definition with respect to this document is of
23     advisory services.
24         Q.     What -- what about your definition of
25     advisory services?  Do you have an understanding --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 129

1      you're the -- the CEO of the Clinton Group, correct?

2           A.    I'm the owner of the Clinton Group.

3           Q.    Are you the compliance officer for the

4      Clinton Group?

5           A.    No.

6           Q.    Okay.  Do you have any understanding of

7      when I use the term "advisory services," what --

8      what do you understand that to mean?

9                 MR. SACK:  Objection to the form.  You

10     mean does Mr. Hall understand what you mean by the

11     word advisory services?

12                MR. PEARLSON:  I've asked him.

13          Q.    What do you understand the term

14     advisory services to mean?

15                MR. SACK:  Objection to the form.

16          A.    My personal definition of advisory

17     services, which may not conform to what the SEC's

18     definition is, when an adviser makes investment

19     decisions on behalf of clients.

20          Q.    And using that definition, when did the

21     Clinton Group stop doing that?

22          A.    Probably somewhere around the end of

23     2019 or -- probably the end of 2019 or early 2020.

24          Q.    Did the Clinton Group receive advisory

25     fees for the Orix transaction?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 130

1          MR. SACK:  Objection to the form.
2     What Orix -- which Orix -- Orix transaction?
3          Q.    Did the -- did the Clinton Group
4     receive an advisory fee for its participation in a
5     transaction involving Orix in 2019?
6                MR. SACK:  Objection to the form.
7          A.    Clinton Group was paid a fee by
8     GlassBridge, and I don't know if that would be
9     considered an advisory fee.  Based on the definition
10    I gave you, it wouldn't be considered an advisory
11    fee.
12         Q.    Okay.  What was the fee for?
13         A.    Consulting, negotiations for services
14    that we provided, but it -- but it wasn't investment
15    services.
16         Q.    Okay.  And -- and so why -- why
17    wouldn't that be an advisory fee, what you --
18                MR. SACK:  Objec- --
19         Q.    -- just described?
20                MR. SACK:  Objection to the form.
21         A.    I don't know the SEC's technical
22    definition of advisory services.  I gave you my
23    definition of advisory services.  What we did for
24    Orix does not fit into my definition of advisory
25    services, but it was a function that we performed on

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 131

1    behalf of GlassBridge, and we were paid a fee for

2    it.

3              Q.    Now, was that the last time that the

4    Clinton Group received a fee for performing

5    services?

6              A.    From who?

7              Q.    From anyone.  From any of its clients.

8              A.    No.

9              MR. SACK:  Objection to the form.

10             A.    No.

11             Q.    No?

12                   Do you have any idea why you would have

13   been listed as the chief compliance officer of the

14   Clinton Group in a Form ADV?

15             MR. SACK:  Objection to the form.

16             A.    When you said past tense, were you the

17   compliance officer, I was answering there -- there

18   was a compliance officer for thirty -- however many

19   years of the Clinton Group.  When we stopped

20   operating, actively providing fund advice, I, by

21   default, became the chief compliant officer --

22   compliance officer.

23             Q.    And when was that?

24             A.    I don't recall.

25             Q.    What were your job -- what were your

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 132

1    functions as the -- when you became the chief

2    compliance officer?

3          A.     Well, there really wasn't much

4    function since we weren't managing any money or

5    investing -- making any investments on behalf of

6    investors, so it was ultimately responsibility for a

7    number of filings and the process to unwind the

8    residual assets and withdraw as a registered

9    investment adviser.

10         Q.     And were you responsible for ensuring

11   that the Clinton Group was compliant with SEC

12   regulations and rules at that time?

13                MR. SACK:  Objection to the form.

14         A.     Ultimately I was responsible, yes.

15         Q.     Now, going back to the -- the space at

16   510 Madison Avenue, besides the Clinton Group and

17   Sport-BLX, Inc., did anybody else occupy that space

18   in 2019?

19         A.     There were a number of people, and I

20   forget the name of the firm, that used a few of the

21   -- of the trading desks and potentially one office.

22         Q.     You don't remember the name of the

23   firm?

24         A.     I don't recall.

25         Q.     Was it a trading company?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1          A.      It -- it was originally an asset

2    management firm, and I don't recall exactly what

3    they were doing at the time they were using the

4    space.

5          Q.      And how much of the space did they use?

6          A.      Three or four desks.

7          Q.      Did they use any of the offices?

8          A.      I don't recall if they used an office

9    or not, but it was primarily just the desks.

10         Q.      And for what period of time did they

11   use the desks?

12         A.      I don't recall.  They left in December

13   of 2019.  I don't recall when they started.

14         Q.      Were they charged rent?  This asset

15   management firm, was it charged rent for the space?

16         A.      They paid Clinton Group a certain

17   amount of money for use of the space.

18         Q.      Do you recall what that was?

19         A.      No.

20         Q.      Do you recall what Clinton Group paid

21   overall for the rent for the space?

22         A.      It was somewhere in the $100,000.00 a

23   month range.

24         Q.      And --

25         A.      But that's rough.  I don't quite

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 134

1    remember.

2         Q.    And do you recall -- you have no

3    recollection of what the asset management firm paid

4    the Clinton Group for the --

5         A.    I don't.

6         Q.    Okay.  What about Sport-BLX; what did

7    it pay for out of that hundred thousand a month?

8         A.    Well, --

9              MR. SACK:  Objection to the form.

10        Q.    Let me rephrase it.  What did -- what

11   did the -- what did Sport-BLX pay Clinton Group for

12   the use of the space starting in March of 2019?

13        A.    I think it was 500 divided by 12 per

14   month.

15        Q.    Did GlassBridge use the space at all?

16        A.    GlassBridge didn't have any employees

17   until December of 2019, and we moved out a few weeks

18   later.

19        Q.    So does that mean it didn't use the

20   space?

21        A.    GlassBridge had -- there were Clinton

22   Group employees, as I said, that were working on

23   behalf of GlassBridge, and they used space, but

24   GlassBridge itself did not have any space.

25        Q.    Okay.  And did -- did GlassBridge pay

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 135

1    the Clinton Group rent for the use of this space for

2    its employees?

3            A.      GlassBridge had a contract by which

4    they paid an overall consulting fee -- and I use

5    that term loosely.  They paid a fee for various

6    services that Clinton Group provided.

7            Q.      Did it include rent?

8            A.      No, I don't believe specifically.

9            Q.      How was the number 500,000 determined

10   for Sport-BLX?

11           A.      Ultimately a financial model was put

12   together by ConsenSys, probably with a fair amount

13   of input from -- from various people, and they came

14   back with a model, and the rent number that they

15   used was $500,000.00 annually in the first year,

16   then a million two in the second year, and some

17   escalation after that.

18           Q.      So are you saying ConsenSys determined

19   the $500,000.00 number?

20           A.      Ultimately they determined that --

21   they, I'm sure, based some of the information on

22   discussions of how many head -- how -- what we

23   expected the head count to be, but ultimately that

24   number was -- came out of the ConsenSys financial

25   model that they helped us create.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 136

```
1              Q.      What was the head count for Sport-BLX
2       in the spring of 2019?
3                      MR. SACK:  Objection to the form.  Do
4       you want to be more specific, or just in general the
5       spring of '19?
6              Q.      In March of 2019, when it started
7       paying rent, how many employees did Sport-BLX have?
8              A.      I think there were 10 to 13 full-time
9       employees and a number of interns that were not
10      paid.  We -- and we had a number of unpaid
11      consultants that were using the space, and also
12      ConsenSys was using the space.
13             Q.      Did you ever make any determination --
14      you said you -- I believe you said that ConsenSys --
15      strike that.
16                     Did you ever have any discussions with
17      ConsenSys as to how they came up with the
18      $500,000.00 number?
19             A.      I don't think I specifically discussed
20      it with ConsenSys.
21             Q.      Okay.  As you sit here today do you
22      have any idea how the number 500,000 came up?
23             A.      I think they probably did it based on
24      analysis of the business, of the head count, of the
25      growth of the company, of the need to use space for
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 137

1    marketing and presentations for, you know, all the

2    various people that would be getting involved in

3    this business.

4         Q.    When you say that, though, you didn't

5    have any discussions; you're just guessing?

6              MR. SACK:  Well, you asked him, Ross.

7    He already said he didn't have discussions with them

8    directly, and you asked him.  So he did -- gave the

9    best answer he could.

10        Q.    You don't -- you don't know how

11   ConsenSys arrived at that number, do you?

12        A.    I don't know precisely how they came

13   up with it, but I know they considered head count.

14        Q.    Okay.  And you didn't make any

15   determination as to an allocation of the rent

16   between Sport-BLX and Clinton Group?

17        A.    I didn't have much involvement in that

18   calculation, no.

19        Q.    Did Mr. De Perio?

20        A.    I think Mr. De Perio spent time with

21   -- on the model with ConsenSys, so there may have

22   been some discussions with Mr. De Perio about head

23   counts in addition to, you know, the potential for

24   the business, the deals we would do, and how much

25   space we would need, so I think -- I -- I believe he

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    may have had some discussions like that.

2            Q.    Is Sport-BLX Securities affiliated with

3    the Clinton Group in any way?

4                  MR. SACK:  Is, present tense?

5                  MR. PEARLSON:  Yes.

6            A.    No.

7                  MR. SACK:  Objection to the form.

8            Q.    Sport-BLX Securities is not affiliated

9    with the Clinton Group in any way?

10           A.    No.

11                 MR. SACK:  Objection to the form.

12           Q.    Was it ever?

13           A.    No.

14           Q.    And I might have asked this already.

15   Who currently owns the Sport-BLX Securities?

16           A.    There are a number of investors.  I

17   believe Joe De Perio still owns a small percentage,

18   and I own the balance.

19           Q.    Did you -- did you contribute any

20   capital to get your interest in Sport-BLX

21   Securities?

22           A.    No capital was contributed for shares.

23           Q.    Is that true for Mr. De Perio as well?

24           A.    I believe that's correct, yes.

25           Q.    And what assets does Sport-BLX

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    Securities currently own?

2         A.    Doesn't -- doesn't own any assets.

3         Q.    Does it own any technology?

4         A.    No.

5         Q.    It doesn't own a platform or a code of

6    any kind?

7         A.    No.

8         Q.    So what is Sport-BLX Securities'

9    current status in terms of what it's doing?

10        A.    At the moment, nothing.

11        Q.    Okay.  Are there -- are there plans for

12   Sport-BLX Securities?

13        A.    Yes.

14        Q.    And what are those plans?

15        A.    To try to benefit from the growth in

16   the -- in whatever business we can do with Sport-BLX

17   Securities.

18        Q.    What do you mean by that:  Whatever

19   business you can do?

20        A.    Well, there's still shareholders of

21   Sport-BLX Securities.  There's no active business

22   now, but those -- those shareholders are expecting

23   to get a return, and I'll do my best to get it for

24   them.

25        Q.    Do your plans involve any -- anything

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 140

1    involving sports-related assets, the trading of

2    sports-related assets?

3            A.      Possibly, but potentially not.  So

4    it's not an important part of the plan.

5            Q.      Is there a business plan for Sport-BLX

6    Securities?

7            A.      No.

8            Q.      Are there any kind of forecasts or

9    projections for Sport-BLX Securities?

10           A.      No.

11           Q.      Are there any kind of valuations?

12           A.      At this time, no.  No valuation that's

13   not so variable based on various extraneous events

14   that -- that would make a valuation reasonable.

15           Q.      Is there a valuation, though,

16   regardless of whether it's reliable or not in your

17   view?

18           A.      It would be a very complex analysis,

19   and I haven't done it recently.

20           Q.      Okay.  When's the last time you did a

21   valuation of Sport-BLX Securities?

22           A.      Well, we did take in some capital into

23   Sport-BLX Securities in November of 2021.

24           Q.      And was a valuation performed in

25   connection with that?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 141

1          A.      Well, they bought shares at a certain

2     valuation.

3          Q.      And how -- how was that share price

4     determined?

5          A.      There was a little bit based on

6     previous valuations, a little bit based on the

7     current -- then current capital structure, and a

8     little bit on the -- the strategic nature of the

9     investors at that time.

10         Q.      And what was the price per share at

11    which these investors brought -- bought their shares

12    in Sport-BLX Securities?

13         A.      I believe it was something around

14    $25.00 a share.

15         Q.      And was there any kind of analysis or a

16    valuation, underlying forecasts or projections, on

17    which that number was based?

18                 MR. SACK:  Objection to form.

19         A.      Any analysis that I did, or any

20    analysis I used to -- for the outside investors?

21         Q.      Either one.

22         A.      I don't think we gave them any -- any

23    outside analysis.

24         Q.      Okay.  Did you perform any analysis for

25    that -- that -- on which that $25.00 per share price

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 142

1    was based?

2         A.    No.  Other than what I already said.

3         Q.    Can you tell us when you first came up

4    with the concept of Sport-BLX, Inc.?

5         A.    Well, actually, the original idea was

6    Joe De Perio's.

7         Q.    Okay.  And when -- when did he first

8    bring that idea to you, that concept?

9         A.    Sometime in 2018.

10        Q.    And what was the idea that he brought

11   to you?

12        A.    That we could take a racehorse that

13   was valuable and potentially successful and

14   fractionalize it and sell shares to the public.

15        Q.    And he brought you this idea while he

16   was an employee of the Clinton Group?

17        A.    Yes.

18        Q.    And what did you do -- what, if

19   anything, did you do and Mr. De Perio do to develop

20   that idea once he brought you the initial concept?

21        A.    Well, we did some -- we originally

22   just started thinking about some of the regulatory

23   aspects, and then as the -- the process continued we

24   thought about how we would distribute those shares,

25   and then we ultimately came up with the concept of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 143

1     applying it to other sports assets, which could be

2     shares of a professional team, shares of a Formula 1

3     car or a Formula 1 team, and eventually we arrived

4     at a relatively new concept of securitizing the

5     future earnings of a professional athlete.

6            Q.    Okay.  And when did you form Sport-BLX,

7     Inc. itself?

8            A.    I don't recall the date of

9     incorporation.

10           Q.    And when you incorporated it was it the

11    70/30 split you've been describing?

12           A.    Yes.

13           Q.    How did you determine how you were

14    going to split up the company?

15           A.    Well, throughout the time period that

16    Joe did the research and started thinking about this

17    idea it was in the employment of Clinton Group, and

18    we just basically had a discussion and agreed on

19    these numbers.

20           Q.    And did either one of you initially

21    contribute money to the formation of Sport-BLX?

22           A.    No.

23           Q.    And so is it fair to say that you and

24    Mr. De Perio were the founders of Sport-BLX?

25           A.    Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 144

1      Q.    Okay.  Now, did the Sport-BLX -- first
2  of all, can you just describe to us how the
3  Sport-BLX business plan was going -- was intended to
4  work?
5      A.    Can you be more specific?
6      Q.    In terms of the fractionalization of
7  these assets, can you describe for us what
8  Sport-BLX's role was going to be in -- in developing
9  a market for those items?
10     MR. SACK:  As of when, Ross?
11     Q.    As of the time that you were forming
12  Sport-BLX.
13     A.    The -- the concept was to build a --
14  an online platform that people can buy and sell
15  these shares elec- -- electronically, and the
16  business would be to effectively build a client base
17  of people that came to the platform and made
18  investments.
19     Q.    And did that require the -- the
20  creation of some sort of platform for the trading of
21  those fractionalized assets?
22     A.    We call it a platform, yes.
23     Q.    Okay.  And what is -- what is a -- what
24  is the platform, as we just talked?
25     A.    You could think of it like a website.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 145

1      Q.      And was Sport-BLX creating this

2   platform on its own, or was it using an outside

3   vendor?

4      A.      Sport-BLX intended to hire ConsenSys

5   to build the platform.

6      Q.      And what is ConsenSys?

7      A.      I don't know everything that they do,

8   but one of the things they do is they take on

9   various projects and assign a certain number of

10  engineers and practitioners to perform the task.  So

11  in our case the task was to build this -- build this

12  platform.

13     Q.      Who found ConsenSys?  Who brought it to

14  Sport-BLX's attention?

15     A.      I think they're a pretty well-known

16  firm, so I don't recall exactly.

17     Q.      Was there a written agreement with --

18  between ConsenSys and Sport-BLX?

19     A.      Yes.

20             MR. PEARLSON:  Can we, Kelly, get

21  Exhibit 4?

22             (Exhibit Hall-4, 18-page ConsenSys AG

23  December 5, 2018, letter to Clinton Group and

24  Sports-BLX with attached schedules Bates stamped

25  SPORTBLX0264725 through 264742, is marked for

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 146

1       identification.)

2              Q.      Mr. Hall, I'm going to ask you to look

3       at what's been marked as Hall-4 for identification.

4       It's a document that's been Bates stamped

5       SPORTBLX0264725 to SPORTBLX0264742, and it's the

6       engagement letter between ConsenSys and the -- well,

7       it's the ConsenSys agreement with Sport-BLX.  Do you

8       see that?

9              A.      Yes.

10             Q.      Okay.  And if you could turn to the --

11      to page 10, do you see there that it's signed by

12      Mr. De Perio on behalf of Sport-BLX?

13             A.      Yes.

14             Q.      Okay.  And if you look at the -- on

15      page 3 of the -- of the document, do you see under

16      section 3.1 it references Phase 1 of the engagement?

17             A.      Yes.

18             Q.      And you see there that they're charging

19      a fixed fee of $296,000.00?

20             A.      Yes.

21             Q.      And it says there they'll be invoiced

22      -- sorry.  ConsenSys shall invoice the client at the

23      end of week 4?

24             A.      Yes.

25             Q.      Do you see that?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 147

1          A.     Yes.

2          Q.     Okay.  Do you have any understanding as

3     to what Phase 1 was of the engagement?

4          A.     There was a schedule of phases from

5     the beginning to the completion of the technology

6     build.  I'm not sure exactly what the deliverable

7     was for the end of Phase 1.

8          Q.     Okay.  If you could turn to page 12 of

9     the document.

10          Do you recall that was, in fact,

11     ConsenSys paid -- whatever it was, was it paid

12     $296,000.00 for Phase 1 of the -- of the agreement?

13          A.     I don't know if this was the final

14     agreement.

15          Q.     Well, it's a signed agreement.  Do you

16     have any reason to believe it's not?

17          A.     I believe after this agreement they

18     changed some of the terms, and we executed a new

19     agreement.

20          Q.     Okay.  What -- when -- do you know when

21     that was done?

22          A.     Well, I think it was December of 2018,

23     but towards the end of the month.  I'm not sure when

24     that agreement was actually executed.

25          Q.     Okay.  Because we -- this is the only

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 148

1    agreement we have.

2                    MR. SACK:  No, no.  There's another

3    one, Ross.  You have it.  You have another version.

4            Q.    Okay.  On page 12 it talks about Phase

5    2.  Do you see that?

6                    Do you know whether the fee -- I'm

7    sorry.  Do you know whether the fee changed under

8    the two agreements?

9            A.    Yes.

10           Q.    Do you know how it changed?

11           A.    Well, the agreement that I remember,

12   --

13           Q.    Yes.

14           A.    -- the fee was higher.

15           Q.    And was it higher for both Phase 1 and

16   Phase 2?

17           A.    I don't recall how the phases broke

18   down.

19           Q.    Okay.  If you'd turn to page 12, it has

20   -- it has a schedule for Phase 2.  Do you see that?

21           A.    Yes.

22           Q.    Do you recall whether the -- this has a

23   15- to 16-week time frame for Phase 2.  Do you

24   recall whether the timing of the phases changed

25   under the agreement?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 149

1          A.      I don't recall.

2          Q.      If you could look at page 13, it has a

3     payment schedule for Phase 2.  Do you see that?

4          Do you know whether this was revised

5     under the second agreement you described?

6          A.      I don't recall.

7          Q.      Do you know whether -- if you'd turn to

8     page 15 of the agreement, there's a -- there's a

9     Convertible Note Purchase Terms.  Do you see that?

10          A.      Yes.

11          Q.      Did you understand that there was an

12     option for ConsenSys to take a convertible note in

13     lieu of actually paying the monies referenced in

14     Phase 2?

15          A.      You're -- you referred to it as an

16     option?  Are you suggesting it was an option?

17          Q.      Did -- did you understand that they

18     could -- that ConsenSys could -- let me strike that.

19          Did Sport-BLX have the ability to pay

20     ConsenSys with a convertible note in lieu of the

21     cash payments referenced on -- in Phase 2?

22          A.      Well, it says here "ConsenSys may

23     receive in lieu of periodic milestone cash

24     payments," so if we interpret "may receive" as an

25     option, then the answer would be yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 150

1          Q.     Do you know whether ConsenSys did

2     receive a convertible note from Sport-BLX in lieu of

3     the cash payments?

4               MR. SACK:  Objection to form.

5          A.     I believe they did.

6          Q.     Okay.  And do you see here that under

7     -- it says "Valuation Cap" under the -- the terms of

8     the note?

9          A.     Um-hum.

10         Q.     And it has a nine and a half million

11    pre-money valuation?

12         A.     Um-hum.

13         Q.     I'm going to ask --

14         A.     Yes.

15         Q.     -- that you just --

16         A.     I'm sorry.  I apologize.

17         Q.     No, it's okay.

18               Do you know where that number came

19    from, the nine and a half million pre-money

20    valuation?

21         A.     Not specifically.

22         Q.     Okay.  Was that also a number used in

23    terms of the purchase of founders' shares, that

24    valuation?

25         A.     That valuation was.  I don't know if

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    "also" is the right word, but that valuation was the

2    valuation for the founders' round.

3         Q.    Was there any analysis, projections,

4    valuations underlying that nine and a half million

5    dollars number?

6              MR. SACK:  Objection to the form.

7         A.    I -- I believe we looked at other

8    startup companies and -- and what the -- their

9    valuations were, but there was really no

10   statistically significant quantitative analysis of

11   the valuation.

12        Q.    So what did the

13   nine-and-a-half-million-dollar founders' share price

14   represent?

15        A.    Represented where Joe and I would give

16   up our shares to take in outside investors, as well

17   as the price that outside investors were willing to

18   pay to buy a share of the company.

19        Q.    And do you have any idea how much

20   ConsenSys was paid in total for doing the -- well,

21   strike that.

22             First of all, did ConsenSys, in fact,

23   develop a platform for Sport-BLX?

24        A.    Yes.

25        Q.    And when was that completed, that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 152

1    platform?

2         A.    Well, they completed their portion of

3    it sometime in the spring of 2019.

4         Q.    When you say "they completed their

5    portion," what did you mean by that?

6         A.    Well, spring -- and let me revise that

7    to spring or summer.

8              Platforms are never completed, there's

9    always ongoing maintenance, but they delivered the

10   agreed-upon work product sometime in late spring or

11   early summer of 2019.

12        Q.    And do you -- and do you have any idea

13   how much ConsenSys was paid in total for doing that?

14        A.    I think it was about $2.4 million.

15        Q.    And does that include cash plus the --

16   what it received by way of convertible note?

17        A.    So we traded the convertible note for

18   cash.  So basically ConsenSys did not keep the

19   convertible note; they took cash.

20        Q.    So in total, the total purchase price

21   for the -- the platform used by Sport-BLX was $2.4

22   million?

23              MR. SACK:  Objection to the form, but

24   you can answer.

25        A.    I don't recall, but that is the number

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 153

1    that comes to mind.  Something in --

2            Q.      Okay.

3            A.      -- that range.

4            Q.      Do you -- do you have any recollection

5    as to where those funds came from, the 2.4 million?

6            A.      From the capital of Sport-BLX,

7    Incorporated.

8            Q.      And do you recall when ConsenSys was

9    paid?

10           A.      They were paid over time.  I don't

11   recall when the last payment was.

12           Q.      Did ConsenSys ever have equity, hold

13   equity in Sport-BLX?

14           A.      I don't recall if they ever had equity

15   or just had a convertible note that was akin to

16   equity.  I don't really recall the exact security

17   that they owned.

18           Q.      And you said they -- they -- the note

19   was cashed in.  Do you recall when that was?

20                   MR. SACK:  Objection to the form.

21           A.      Sometime in late 2019.

22                   And I'm not agreeing with "cashed in."

23   They basically traded their interest in whatever

24   security it was for cash, yes.

25           Q.      Was that a transaction that was

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 154

1    approved by the board of directors?

2        A.    I don't recall if there was a vote on

3    that transaction, but it was -- the board was

4    informed of it.

5        Q.    And was that something -- was that a

6    transaction that you and Mr. De Perio approved?

7        A.    Well, clearly we both agreed that it

8    was a good transaction.

9        Q.    Why was it a good transaction for

10   Sport-BLX in the fall of 2019?

11       A.    Well, we had been raising -- and

12   again, I'm not entirely sure of what the date was,

13   but it was sometime -- I -- I believe I said late

14   2019, meaning post June 30.  I don't think I -- I

15   don't think I said the late fall.  But whenever we

16   did the transaction, $95.00 a share seemed like a

17   good price to take back the stock or the stock

18   equivalent of a note.

19       Q.    Now, we -- when did you begin

20   soliciting investors for Sport-BLX?

21            MR. SACK:  Objection to the form.  You

22   mean "you" personally, or investors were solicited?

23       Q.    When were --

24            MR. PEARLSON:  Good -- good point.

25       Q.    When were investors first solicited by

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 155

1    Sport-BLX to invest in the company?

2           A.     Probably in December of 2018.

3           Q.     And how did Sport-BLX go about

4    soliciting investors?

5           A.     Primarily Henry Sullivan reached out

6    to potential investors.

7           Q.     Were written materials prepared in

8    connection with the marketing and solicitation of

9    investors?

10          A.     Yes.

11          Q.     Who prepared these materials?

12          A.     Generally the material was prepared by

13   Joe De Perio.

14          Q.     Did you review it?

15          A.     I'm not sure I reviewed every

16   document, but in general, I reviewed the document --

17   many of the documents and certainly the concepts and

18   ideas behind the documents.

19          Q.     Did you want to make sure that these

20   materials that were being given to investors were

21   accurate?

22          A.     We always want investor material to be

23   accurate.

24          Q.     Now, other than -- you had mentioned

25   before that Mr. Staisil received a finder's fee for

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 156

1   business referrals?

2        A.    I think I corre- -- I qualified that

3   and said he was paid a fee for various services that

4   he was providing, and I don't specifically recall

5   how that fee was -- was -- for what that fee was.

6        Q.    Other than Mr. Staisil, was anybody

7   compensated for finding investors on behalf of

8   Sport-BLX?

9           MR. SACK:  Objection to the form.  He

10   just said he couldn't say that Mr. Staisil was

11   compensated for finding investors, --

12        Q.    Well, let --

13           MR. SACK:  -- so why don't you ask the

14   question again?

15        Q.    Well, I meant that excluding

16   Mr. Staisil, was there anybody who was -- who was

17   compensated for finding potential investors for

18   Sport-BLX?

19        A.    Sport-BLX, Incorporated?

20        Q.    Yes.

21        A.    I don't recall.

22           MR. SACK:  And you mean other than

23   Henry Sullivan receiving a salary?

24           MR. PEARLSON:  Correct.

25        A.    Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 157

1    Q.    And who -- who were the individuals

2    from Sport-BLX that were involved in the -- the

3    finding and -- and soliciting of investors for the

4    company?

5    A.    Henry Sullivan was responsible for

6    finding them, and generally potential investors

7    would come and talk to Joe or myself about the

8    business concept.

9    Q.    Now, how many rounds of fundraising

10   were done by Sport-BLX initially?

11   A.    Well, there was fundraising done at

12   three different prices at different times, so if we

13   consider a price a round, since it didn't come in

14   simultaneously, then I believe there were three

15   rounds of fundraising.

16   Q.    Can you tell me when those three

17   different rounds took place and the pricing for each

18   round?

19   A.    The initial round was at $95.00 a

20   share, and the first investment, I believe, was

21   December of 2018, and the final investment in that

22   round was somewhere between February 28 and March 12

23   of 2019.

24   Q.    And you said that was the initial

25   round?  You said there were -- there were three

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 158

1      rounds.

2              A.      Yes.

3              Q.      So I'm not following when the -- the

4      timing and the pricing.

5              A.      Okay.

6              Q.      So can you go over again what the

7      timing was?  I know you got -- you gave me the

8      initial round started in December of 2018, correct?

9              A.      I believe the first investors, at

10     $95.00 a share, were in December of 2018.

11             Q.      Okay.  When were the second round of

12     investors?

13             A.      Second round of investors, meaning at

14     a new price, started somewhere late February or

15     early March of 2019.

16             Q.      And what was the price that those

17     investors were offered shares at?

18             A.      200 -- approximately $200.00 a share.

19                     MR. GOLD:  Sorry.  Did you say 2019?

20                     THE WITNESS:  Yes.

21             Q.      How do you explain the -- the change in

22     price, the difference in number between the 95 and

23     the $200.00 per share?

24             A.      Well, there was a lot of progress made

25     with the business in January and February of 2019.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 159

1          Q.      What was the progress?

2          A.      We had made contacts with athletes, we

3    had solved certain legal questions that we knew

4    needed to be figured out, the technology was -- the

5    technology build was moving along, we were starting

6    to establish a number of relationships that we

7    thought would be valuable, things like that.

8          Q.      Did you have any contracts or

9    agreements with athletes as of this time in --

10         A.      No.

11         Q.      -- this...

12                 Now, you indicated that there was one

13   more round that -- what was that round?

14         A.      There was a small amount of money at a

15   price of $263.00 a share in late July of 2019, and

16   then GlassBridge added a little bit more at that

17   same price, I believe, sometime in September or

18   October of 2019.

19         Q.      Now, in terms of the -- the -- the

20   second round, for lack of a better term, at 200 per

21   share, is it fair to say there were no valuations or

22   projections or analyses that underlined that number,

23   the 200?

24         A.      Well, we did a -- a pro forma of -- in

25   the model that I referred to that ConsenSys had,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 160

1   which made certain projections, but those

2   projections don't really equate to a valuation of

3   the company.

4           Q.    Was the 200 based, though, on the pro

5   forma by ConsenSys in any way?

6                 MR. SACK:  Objection to the form.

7           A.    The pro forma of ConsenSys led to a

8   certain calcu- -- or there was a certain calculation

9   of potential earnings that we called pro forma.  If

10  those earnings were actually achieved, the valuation

11  of the company would have been some enormous number

12  far beyond the numbers we're talking about now.

13                So in the beginning for a startup

14  company we sold a few shares at a

15  nine-and-a-half-million-dollar valuation, and as the

16  progress grew, or the progress continued, we tried

17  to raise money at higher valuations because every --

18  every day there's progress the risk declines, and

19  the potential becomes more certain.

20          Q.    Between March of 2019 and the -- when

21  you -- when you did the next round in late July, and

22  it was at $263.00 a share, about, what was the

23  progress that justified that increase in price?

24                MR. SACK:  Objection to the form.

25          A.    Well, there's probably a long list of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 161

1    things that we could refer to, but one particular

2    thing was we had a -- an agreement in principle with

3    our first athlete, we had an agreement in principle

4    with a horse trainer, and we had lots of other

5    things in the pipeline in terms of athletes we were

6    in discussions with.

7                    We had also come a long way in the

8    process of becoming a broker-dealer, so a lot of

9    time and effort was spent on -- on that application,

10   so at that point the business looked like it was

11   that many months closer to operating as we projected

12   in the -- in the pro forma.

13        Q.    When you were talking about the

14   agreement in principle with an athlete, was that

15   P.J. Washington?

16        A.    Yes.

17        Q.    And who was the horse trainer that you

18   had an agreement in principle with?

19        A.    Kenny McPeek.

20        Q.    And what happened with that potential

21   transaction?

22        A.    We created a company to raise money

23   for -- to have McPeek effectively be the trainer

24   for.  So we would raise money, he would be the

25   designated trainer, and we would manage that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 162

1    company, and -- but we weren't able to raise any

2    capital for that.

3            Q.    And so that deal never came to

4    fruition?

5            A.    The -- correct.  We never raised any

6    capital for it.

7            Q.    Did -- with respect to the founders'

8    round, the initial round, did you make

9    representations to investors about how those funds

10   would be used?

11                MR. SACK:  Do you mean, again,

12   Mr. Hall personally or the company --

13           Q.    Why don't we start with --

14                MR. SACK:  -- or something --

15           Q.    -- you --

16                MR. SACK:  -- else?

17           Q.    You personally.

18           A.    I don't recall making any

19   representations.

20           Q.    Do you remember making any

21   representations that the -- to any investor that the

22   proceeds raised through the founders' round would be

23   used solely for technology development, associated

24   legal expenses, and marketing?

25           A.    That's language that was used in the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 163

1     frequently asked questions that we created and made

2     available to investors.   Whether that's a legal

3     representation or not, I don't know.

4            Q.    Okay.  Did you personally ever make

5     that representation --

6            A.    I don't recall.

7            Q.    -- to any -- to any investor?

8                  You don't recall?

9            A.    I don't recall ma- -- I apologize for

10    interrupting.

11           Q.    Okay.

12           A.    I don't recall making that

13    representation.

14           Q.    Could you have made that

15    representation?

16                 MR. SACK:  Objection to the form.

17           A.    If it was in the frequently asked

18    questions, and somebody asked me about it, I may

19    have made a representation like that, but I don't

20    know.

21           Q.    If we could look at what's been marked

22    Hall-6 for identification.

23                 (Exhibit Hall-6, Sport-BLX Frequently

24    Asked Diligence Questions Bates stamped

25    SPORTBLX0264858 through 264861, is marked for

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 164

1    identification.)

2                MR. SACK:  Yeah, I think the -- I

3    think the December 5, the ConsenSys, may have been

4    Exhibit 4.

5                MR. PEARLSON:  We skipped to 6.

6                MR. STERN:  Oh, okay.

7                MR. SACK:  Okay.

8                MR. GOLD:  We're not doing 5?

9                MR. PEARLSON:  Not yet.

10               MR. SACK:  Page intentionally left

11   blank.

12               MR. GOLD:  Intentionally omitted.

13   BY MR. PEARLSON:

14        Q.    Mr. Hall, I'll show you what's been

15   marked as Hall-6 for identification.  It's a --

16   Bates numbered SPORTBLX0264858 to SPORTBLX0264861.

17   Do you recognize that document?

18        A.    Yes.

19        Q.    Okay.  And is that the frequently asked

20   questions that you've been referring to earlier in

21   your testimony?

22        A.    Yes.

23        Q.    And who prepared this document?

24        A.    I believe Joe De Perio.

25        Q.    Did you -- I'm sorry.  Go ahead.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 165

1          A.      I don't know if he had help from Henry

2     Sullivan or anybody else.

3          Q.      Did you have any role in preparing it?

4          A.      I don't recall what my role was.

5          Q.      Did you have any role in reviewing it?

6          A.      I'm quite sure I probably reviewed it.

7          Q.      Did you personally give this document

8     to -- well, first of all, do you know why this

9     document was prepared?

10         A.      It's a pretty standard way of

11    providing information, trying to anticipate

12    questions so that the answers are readily available.

13         Q.      And was it -- was it prepared to give

14    to investors?

15         A.      Yes.

16         Q.      And in terms of No. 2, it says,

17    "Clinton Group resources will be devoted to the

18    creation and development of Sport-BLX, Inc.

19    Currently, there is no pass-through or bill back of

20    any direct expenses incurred by Clinton, including

21    personnel, technology, financial and legal

22    resources."

23                 Was there any kind of -- does that

24    include rent, in your understanding?

25         A.      At the time this was created Clinton

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 166

1    Group was not being paid anything, --

2        Q.    Okay.

3        A.    -- as far as I remember.

4        Q.    And do you see at the end of that

5    paragraph it says, "All of the proceeds raised

6    through the currently contemplated Founders' Round

7    (described below) will be used solely for technology

8    development, associated legal expenses, and

9    marketing"?

10       A.    I see that it says that, yes.

11       Q.    Okay.  And again, was that something

12   that you verbally repeated to investors?

13            MR. SACK:  Objection.  Asked and

14   answered.

15       A.    Probably not.

16       Q.    If you could look at paragraph 13.  It

17   says, "We recently launched a Founders Class

18   financing round with the goal of bringing in

19   strategic, value-added shareholders in the early

20   stages of our company's development."

21            What is a strategic, value-added

22   shareholder?

23       A.    Shareholders that, in addition to

24   providing capital, could be helpful with the

25   business in one way or another.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 167

1        Q.     Okay.  Would that mean that you were --
2   you were looking for a certain type of investor?
3        A.     Well, it says it was the goal, so
4   there were definitely certain types of investors we
5   would welcome to the -- to be investors.
6        Q.     So were you looking at the background
7   of investors when you were taking in money?
8        A.     Yes.
9        Q.     Now, it also says under 13, "Our plan
10  is to raise $2 million in common equity" as a -- "at
11  a pre-money valuation of 9.5 million."
12            Was that the -- the first round, the
13  founders' round you just described?
14        A.     Yes.
15        Q.     And did you raise $2 million at -- at a
16  valuation of 9.5 million?
17        A.     Ultimately as an accommodation we let
18  someone put in a little more, and the founders'
19  round wound up being about $2.3 million.
20        Q.     Did -- did Sport-BLX's business plan
21  ever contemplate an affiliation with a sports asset
22  management fund?
23            MR. SACK:  Objection to the form.
24        A.     It wasn't a big part of the original
25  concept, but over time we started to consider such

Veritext Legal Solutions

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 168

1    an affiliation.

2          Q.    Okay.  Can you describe for me what you

3    mean by that in terms of the -- the affiliation with

4    a sports asset management fund and how that

5    developed over time?

6                MR. SACK:  Objection to the form, but

7    you may answer.

8          A.    So we were introduced to someone who

9    had a relationship with someone else in Qatar who

10   worked for some member of the royal family, as I

11   recall, and this member of the royal family was

12   potentially interested in being an investor

13   personally.

14                At the same time, discussion came up of

15   whether there was other strategic business to do

16   with the State of Qatar.  For example, they own a

17   soccer team, or they owned a soccer team, and it was

18   considered a possibility that they may want to sell

19   a portion of their soccer team, so they could --

20   they could potentially be a provider of assets that

21   we could securitize.

22                At the same time, and I don't -- I

23   don't really know the evolution of -- of where this

24   concept came up, but it was considered that

25   potentially one of the sovereign wealth funds in

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 169

1    Qatar could be an investor in this -- this business
2    in one way or another, and typically the sovereign
3    wealth funds invest in funds themselves.  They
4    basically allocate money to a fund manager.  So that
5    was one of the reasons we started thinking about a
6    fund concept.
7            Q.    When did these discussions with Qatar
8    take place?
9            A.    Well, we didn't have direct
10   discussions, this was information that was flowing
11   back to us, and at some point Joe De Perio went to
12   Qatar, at some point I went to Qatar, but the
13   original discussions were probably in February --
14   maybe January/February of 2019.
15           Q.    And what was the -- how would the fund
16   work with Sport-BLX in the manner you just
17   described?
18           MR. SACK:  Objection to the form, but
19   you could answer.
20           A.    Can you explain to me what you mean by
21   "the fund"?
22           Q.    Well, how -- you were talking about a
23   -- you know, them contributing assets which would be
24   managed in a fund.  How would that work with
25   Sport-BLX, and how is that part of Sport-BLX's

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 170

1    model, business model?

2         A.    Well, if the Qatar investment -- or

3    Qatar Sports Investment Authority or if the Qatar

4    sovereign wealth fund wanted to put a significant

5    amount of capital into these types of investments,

6    they could do it through a fund, in which case that

7    would be a source of product that could be

8    securitized and sold out through the platform.

9         Q.    Was it contemplated that Sport-BLX

10   would have a role as perhaps a fund manager or

11   serving with a partner that would be a fund manager

12   of such assets?

13        A.    Well, there was no real meaningful

14   discussion with Qatar about this at all.  It was a

15   little bit of a telephone game from the fellow that

16   was in Qatar and his uncle, I think it was, flowing

17   back to us.  So if Qatar wanted to have a fund, we

18   would have helped them start a fund, but it was not

19   a real discussion at the time.

20        Q.    Did you ever describe to investors a

21   potential opportunity for Sport-BLX to partner with

22   another entity in creating a fund and serving as

23   fund manager in the manner you just described?

24        A.    I don't think I ever -- in this period

25   we're talking about I don't think I ever represented

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 171

1    to an investor that a fund would be a part of

2    Sport-BLX's business.  It would -- potentially it

3    would be a fund that had an affiliation with

4    Sport-BLX, but not owned by Sport-BLX.

5              MR. PEARLSON:  Okay.  Can we take out

6    Hall-7, please?

7              (Exhibit Hall-7, Five-page Sport-BLX

8    Investment Fund Opportunity February 8, 2019

9    presentation slides Bates stamped SPORTBLX0264692

10   through 264696, is marked for identification.)

11             THE WITNESS:  Thank you.

12        Q.    Mr. Hall, I'm going to show you what's

13   been marked as Hall-7 for identification.  It's a

14   document entitled "Sport-BLX Investment Fund

15   Opportunity February 8, 2019."  Do you see that?

16        A.    Yes.

17        Q.    Do you recognize this document?

18        A.    Yes.

19        Q.    What is it?

20        A.    It's a document describing how a fund

21   would work with athletes.

22        Q.    Okay.  And who created this document?

23        A.    I would assume Joe De Perio.

24        Q.    Did you -- do you know whether this

25   document was created to give to investors or

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 172

1    potential investors in Sport-BLX?

2         A.    As this document, I think, was created

3    specifically for David Falk and Boomer Esiason.

4         Q.    Okay.  Do you know whether it was given

5    to any inve- -- potential investors in Sport-BLX?

6         A.    It was forwarded to Michael Salerno as

7    representative of our discussion with David Falk and

8    Boomer Esiason.  I don't know if it was forwarded to

9    any other investors.

10        Q.    Okay.  When it says "Investment Fund

11   Opportunity," what do you -- what do you understand

12   that to be referring to?

13        A.    An opportunity for investors to put

14   money into a fund to purchase contracts or

15   securities related to professional athletes.

16        Q.    Do you know whether this -- this

17   document was posted in -- in the data room for

18   Sport-BLX?

19        A.    I don't know.

20        Q.    If you could turn to the -- page 1 of

21   the document?

22        A.    Yes.

23        Q.    It says -- entitled "Fund Structure."

24   Can you tell us what that slide means?

25        A.    So limited partners would invest in a

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 173

1    fund, and the fund would purchase sports assets,

2    such as a piece of the Oakland Raiders, or the

3    contract of -- of an athlete, such as the three that

4    are listed.

5          Q.    And when it -- when it says -- next to

6    it there's a box there for Fund Manager, and it says

7    "Sport-BLX/Partner," what is that referring to?

8          A.    Well, we definitely needed a partner

9    to manage the fund, but Sport-BLX would have to be

10   helpful with that manager in getting the fund up and

11   running, so it would be a fund that had a -- a

12   relationship with Sport-BLX.

13         Q.    Was it -- was it anticipated that

14   Sport-BLX would receive any kind of fees in

15   connection with its role in working with this fund

16   manager?

17         A.    I don't believe so.

18         Q.    Do you recall whether you ever told any

19   investors that Sport-BLX would make additional fees

20   in serving as a fund manager or partnering with a

21   fund manager in this structure?

22               MR. SACK:  Objection to form.

23         A.    During this time period, no, I don't

24   believe I made that representation to investors.

25         Q.    Okay.  And do you -- you said that this

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 174

1    was given to David Falk and Boomer Esiason.  Can you
2    explain to us why that was done?
3         A.    So Boomer Esiason we first had dinner
4    with -- we knew him from previous interactions.  We
5    had dinner with him to discuss the concept.  He --
6    he liked the concept, thought it was extraordinarily
7    interesting.  He suggested that he bring David Falk
8    into the office.  David Falk was his agent, but he
9    was more well known for being Michael Jordan's agent
10   and doing the Air Jordan deals and all kinds of
11   things, so one of the most historically important
12   men in sports.
13        So they came in, and we had a meeting,
14   and we discussed the concept, and based on those
15   discussions it occurred to me that there's a
16   possibility that we could create a fund, and they
17   could be in- -- involved in that fund in various
18   ways.
19        Q.    If you could turn to page 3.
20        So is it your testimony that this
21   presentation or this slide deck was prepared
22   especially for them?
23        A.    I don't recall exactly the creation of
24   this.  I do know that it was forwarded to
25   Mr. Salerno, and it was referenced that this was

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 175

1    something -- as a matter of fact, this slide deck
2    was attached to an email sent to Mr. Falk and Boomer
3    Esiason, and the -- that email was forwarded to
4    Michael Salerno.  So the attachment was to an email
5    that was forwarded to at least one investor.
6            Q.    And -- and why was it forwarded to
7    Michael Salerno?
8            MR. SACK:  Objection to the form.
9    Calls for speculation.  But you can try to answer.
10           A.    Michael Salerno's main interest was in
11   Thoroughbred racing, as I recall, and I think Joe
12   was trying to use this as a -- kind of a
13   demonstration of the type of structure that could be
14   created for Thoroughbred racehorses.
15           Q.    If you could turn to -- and you're
16   saying this wasn't generally given to investors;
17   this was only forwarded to Michael Salerno at his
18   request?
19           MR. SACK:  Objection to the form.
20           A.    I'm not saying that.
21           Q.    Okay.  Do you know whether this was a
22   document that was given to investors generally?
23           A.    I don't know.
24           Q.    If you could turn to page 3 of the
25   document.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 176

1          A.      Yes.

2          Q.      And you see there that it talks about

3    the Role of Investment Fund on the left side?

4          A.      Yes.

5          Q.      And then on the right side it says

6    "Revenue Model"?

7          A.      Yes.

8          Q.      Do you know what it means when it says

9    "Backstop economics in the form of commitment fees"?

10          A.      So backstop is basically an agreement

11    to provide capital if necessary.  To backstop, stop

12    a deal.  So in a case where there's the potential to

13    do a deal, but you need a commitment of capital to

14    consummate the deal, a backstop model is someone

15    with capital gives, effectively, a standby agreement

16    to provide the capital if necessary.

17          Q.      Why -- why -- why is that under Revenue

18    Model?

19          A.      Well, if there is a fund that has

20    capital and says I will agree to purchase a

21    particular athlete's contract, or I will agree that

22    I'll do it if you need it to be done, then that's

23    what the backstop means.  And generally people would

24    be paid some type of a commitment fee for providing

25    that.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 177

1          Q.      So the commitment fee would be for the
2     party that was contributing the capital?
3          A.      Yes.
4          Q.      And it has nothing to do with what the
5     -- the fund or the fund manager would get in terms
6     of fees?
7          A.      Well, they're related.
8          Q.      Okay.  How are they related?
9          A.      The fund manager generally gets paid
10    based on the performance of the fund.  So the
11    commitment fees, or what we call backstop economics
12    here that flows to the fund, in typical case would
13    be shared, in some percentage, with the fund
14    manager.
15                 MR. PEARLSON:  Let's go to Hall-9.
16                 (Exhibit Hall-9, 19-page Sports Asset
17    Investment Fund February 2019 presentation slides
18    Bates stamped SPORTBLX0172847 through 172864, is
19    marked for identification.)
20                 MR. PEARLSON:  Again, intentionally
21    omitted.
22          Q.      Mr. Hall, I'm going to ask you to look
23    at what's titled Sports Asset Investment Fund
24    February 2019.  It's Bates stamped SPORTBLX0172846
25    to 0172864.  Have you seen this document before?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 178

1          A.     I believe so.  There were -- I believe

2     I've seen it before, yes.

3          Q.     Okay.  Where -- in terms of the -- you

4     had described before that the other document was

5     created to give to Mr. Falk and Boomer Esiason.  Was

6     this document created for that same purpose?

7          A.     I don't know what this document was

8     created for or who it was distributed to.

9          Q.     Okay.  So you don't know whether it was

10    given to investors, potential investors?

11              MR. SACK:  Objection to form.

12    Investors in what?

13          Q.     In Sport-BLX.

14          A.     I don't know.

15          Q.     Do you recall ever seeing this document

16    or reviewing it to see if it was accurate?

17              MR. SACK:  At the time?

18          Q.     At the time.

19          A.     I don't recall the specific review at

20    the time, but I have seen this document or many of

21    the pages of this document and did review them for

22    accuracy.

23          Q.     Okay.  And do you believe it to be

24    accurate?

25          A.     I don't -- I don't know of any

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    inaccuracy in it.

2         Q.    Okay.  If you could turn to page 12 of

3    the document, Mr. Hall.

4         A.    Okay.

5         Q.    It says here that "The Fund's

6    relationship with Sport-BLX is a gamechanger," and

7    then it goes on to describe some other things.

8              Why was the -- why would the

9    relationship with a fund be a game changer for

10   Sport-BLX?

11        A.    I don't think it says that.

12        Q.    Okay.

13             THE WITNESS:  Can you read back the

14   question, may I ask?

15        Q.    Well, let -- let me ask you this then.

16   It says, "The Fund's relationship with Sport-BLX is

17   a gamechanger."  What do you understand that to

18   mean?

19        A.    Well, I think it means a game changer

20   for the fund.  And funds typically buy assets, and

21   then they sell assets.  So just to use an example,

22   if the asset is a contract or a transaction with a

23   professional athlete, then the fund would hold that

24   and earn a certain amount of yield or cash flow or

25   return until it matured or until such time as they

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 180

1    could find another buyer to buy it.  So they buy a

2    contract, and over time they earn a yield from it,

3    it matures, or they sell it.

4                  The relationship with Sport-BLX being a

5    game changer is the goal and the business of

6    Sport-BLX was to work with the fund to take a

7    contract that it had purchased and fractionalize it

8    into smaller shares and distribute those shares to

9    the public.  So the game changer reference is to the

10   creating a new disposition vehicle for a fund to

11   sell its assets to a brand new group of buyers that

12   Sport-BLX would hopefully create.

13        Q.    If you could turn to page 17, Mr. Hall.

14              Now, you see here that it refers to a

15   target size 300 million to 500 million.  Do you know

16   what that means?

17        A.    Well, the target size of a fund is how

18   much capital an entity would like to raise for the

19   -- for the fund itself.

20        Q.    Okay.  And then it says "Fees,

21   Management fee of 2 percent and Incentive fee of 20

22   percent."  What does that refer to?

23        A.    Customarily a management fee is an

24   amount -- a payment that a -- an asset manager gets

25   based on the assets under management, and the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1      incentive fee is a percentage of the profits that

 2      the manager gets.

 3             Q.      And if you look over to the right, do

 4      you see next to where it says "New Investment Fund"

 5      it says "Fund Manager Sport-BLX/Partner"?

 6             A.      Yes.

 7             Q.      Do you see that?

 8             A.      Yes.

 9             Q.      Do you think that would lead someone to

10      reasonably believe that Sport-BLX would be getting a

11      portion of the management fee and incentive fee

12      described on the left-hand side?

13             A.      It -- it might -- it would potentially

14      convince someone to believe that Sport-BLX or a

15      partner of Sport-BLX would be the manager.

16             Q.      Okay.

17             A.      So Sport-BLX would be a -- have some

18      small economic interest in it, or Sport-BLX would

19      basically create or develop the partner that could

20      manage the assets.

21             Q.      Why would you write -- why would you

22      put under Fund Manager "Sport-BLX/Partner" if

23      Sport-BLX wasn't going to be participating with the

24      fund manager in the fees described on this page?

25                     MR. SACK:  Objection to the form, but
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 182

1    you can try to answer.

2         A.    Well, maybe I'll give you the reason

3    the alternative would be unknown partner or unknown

4    fund manager. So the idea of putting Sport-BLX

5    there was to indicate that it was part of the

6    Sport-BLX ecosystem, for lack of a better word, that

7    we intended to create, and we would find a suitable

8    partner to be the -- the general partner of the fund

9    with our guidance and potentially some -- some

10   potential of economics.

11        Q.    Couldn't you do that by just saying

12   "Partner" under Fund Manager?

13        A.    They would ask who's the partner?

14        Q.    Okay.  And -- and -- so by putting

15   Sport-BLX there doesn't it, in a sense, give the

16   reader the impression that Sport-BLX would be

17   participating with the partner?

18             MR. GOLD:  Objection to form.

19        A.    Well, if Sport-BLX helped the partner

20   raise money, helped the partner create investment

21   guidelines and create a document, gave the partner

22   the -- the legal background, the appropriate

23   securities exemptions needed, the tax analysis to do

24   these contracts with athletes, potentially Sport-BLX

25   would get paid something for that in the startup,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 183

1     but the ultimate partner would be the long-term

2     manager of the fund.

3          Q.    Did you ever describe that to any of

4     the potential investors?  What you just described to

5     me, did you ever describe that to any of the

6     potential investors in Sport-BLX?

7          A.    I never described the fund as a part

8     of Sport-BLX business.

9          Q.    Ever?

10         A.    In the time frame we're talking about.

11         Q.    In terms of March of 2019?

12         A.    Correct.

13         Q.    You never told Mike Salerno or any

14    other investor that there was a potential for

15    Sport-BLX to earn fees through the fund?

16         A.    I don't recall telling Michael Salerno

17    or any other investor that.

18         Q.    And do you know whether this document

19    was available in the data room that Sport-BLX made

20    available to potential investors?

21         A.    Well, I would say if you look at page

22    16, it's unlikely, but I don't know for a fact.

23         Q.    And that's --

24              THE REPORTER:  I don't -- I'm sorry.

25    "But I don't know for a fact"?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 184

1              THE WITNESS:  I don't know for a fact.

2        Q.   And you're just saying that because

3   there's no investment team described in this slide?

4        A.   Because this is clearly a draft and

5   not a real -- real document.

6        Q.   Okay.  It's not stamped "Draft"

7   anywhere, is it?

8        A.   I haven't looked through the whole

9   document, but I don't know.

10        Q.   Did -- did Sport-BLX ever make any

11   efforts to -- to set up the fund depicted in the

12   materials we just went over?

13        A.   At what time period?

14        Q.   At any time.

15              MR. SACK:  Could I have the question

16   back, please?

17              (Last question is read back by the

18   court reporter.)

19              MR. SACK:  Objection to the form, but

20   you can try to answer.

21        A.   There are parts of the material that

22   we used in the creation of a vehicle, but not all of

23   it, so in terms of this particular presentation, the

24   answer would be no.

25        Q.   Was a fund ever set up that -- that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 185

1    functioned in the way described in these materials?

2                  MR. SACK:  Objection to form, but you

3    can try to answer.

4         A.    There was a vehicle set up with two

5    investors to purchase cash flows from P.J.

6    Washington in early 2020.

7         Q.    And what vehicle was that?

8         A.    I believe it was called the Sports and

9    Entertainment Fund.

10        Q.    Was there a fund manager for that fund?

11        A.    I believe the fund manager was Imation

12   Asset Management or Imation Enterprises Asset

13   Management.

14        Q.    Is that an affiliate of GlassBridge?

15        A.    It was a -- if I remember correctly, I

16   believe it's a subsidiary of GlassBridge, but I -- I

17   don't recall.

18        Q.    Do you know if -- if that subsidiary

19   was paid management fees in connection with that

20   vehicle?

21        A.    I don't re- -- the vehicle was only in

22   existence for a short period of time.  Well, at

23   least the capital in the vehicle was only there for

24   a short period of time.  I don't recall if any fees

25   were actually paid.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 186

1          Q.      Is that because the P.J. Washington

2     deal got unwound, as you described earlier?

3          A.      That's one reason why fees may not

4     have been paid.

5          Q.      Any other reasons?

6          A.      The capital provider was the same one

7     that received the -- would have received the fees,

8     so it was sort of irrelevant.

9          Q.      Um-hum.

10              MR. PEARLSON:  Okay.  Off the record.

11              THE VIDEOGRAPHER:  The time is 2:43

12    p.m.  This is the end of media 3, and we are going

13    off the record.

14              (Recess taken from 2:43 to 2:58 p.m.)

15              THE VIDEOGRAPHER:  The time is 2:59

16    p.m.  This is the beginning of media 4, and we are

17    on the record.

18    BY MR. PEARLSON:

19          Q.      Okay.  Mr. Hall, I'd like to show you

20    what's been marked as Hall-14 for identification.

21              (Exhibit Hall-14, Two-page Minutes of

22    the Regular Meeting of the Board of Directors of

23    GlassBridge Enterprises, Inc. dated March 29, 2019,

24    Bates stamped GBE_0002989 and 2990, is marked for

25    identification.)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 187

1          Q.      Okay.  Mr. Hall, these are minutes of
2     the regular meeting of the board of directors of
3     GlassBridge Enterprises dated March 29, 2019.  It's
4     GBE_0002989 through 0002990.  I'm just going to
5     direct your attention to the section that says
6     "Additional Sports-BLX Share Purchase."  Do you see
7     that?
8          A.      Yes.
9          Q.      And in that section it indicates that
10    you sold some of your shares to GlassBridge at
11    $133.50 per share.  Do you see that?
12         A.      I do.
13         Q.      Can you tell us how that purchase came
14    up or how -- who initiated that purchase?
15         A.      I don't recall this purchase.
16         Q.      Do you know whether you did, in fact,
17    sell Sport-BLX -- did you sell your Sport-BLX shares
18    indicated here to GlassBridge for $133.50 per share?
19         A.      I don't recall doing that.
20         Q.      Okay.  Do you know where the $133.50
21    per share comes from?
22         A.      I -- no.
23         Q.      Then it says underneath that "Clinton
24    Services Fee Proposal."  Can you tell us what that
25    references?

Veritext Legal Solutions

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 188

1          A.     That was -- I assume that was the same

2      fee...

3                 Okay.  So I'm sorry.  What's the

4      question?

5          Q.     The question is do you know what this

6      references, this Clinton Services Fee Proposal?

7          A.     Well, as was mentioned before, Clinton

8      was providing various services for -- for

9      GlassBridge.

10         Q.     Okay.  Does this have anything to do

11     with Sport-BLX?

12         A.     No.

13         Q.     Mr. Hall, did you -- did you offer

14     GlassBridge to purchase your shares, your purchased

15     -- before the transaction with GlassBridge in

16     December of 2019 did you ever offer to GlassBridge

17     to purchase your personal shares of Sport-BLX?

18         A.     I don't recall that.

19         Q.     Now, in terms of Michael Salerno, when

20     did you first meet him?

21         A.     I met him at my house in Rumson

22     sometime, I believe, in January of 2019.

23         Q.     Okay.  And when you say your house in

24     Rumson, what address -- which Rumson address was

25     that?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 189

1          A.      80 West River Road.

2          Q.      And why -- why were you meeting

3    Mr. Salerno at your house on that occasion?

4          A.      He was introduced by Michael -- Mike

5    Staisil as someone that might be interested in

6    Sport-BLX.

7          Q.      Do you know if -- what, if anything,

8    Mr. Staisil had told Mr. Salerno about Sport-BLX at

9    that point?

10         A.      No.

11         Q.      Do you know whether Mr. Staisil had

12   given Mr. Salerno any written materials relating to

13   Sport-BLX?

14         A.      I -- I don't know.

15         Q.      What did you know about Mr. Salerno at

16   this first -- going into this first meeting what did

17   you know, if anything, about Mr. Salerno?

18         A.      Nothing.

19         Q.      And was there anything that Mr. Staisil

20   had told you that led you to accept a meeting with

21   Mr. Salerno?

22         A.      Well, I knew that he was from the

23   neighborhood and that he was potentially interested

24   in investing.

25         Q.      And do you recall how long this meeting

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 190

1    lasted in January of 2019?

2          A.    No.  I don't recall.

3          Q.    Do you recall what was said in the --

4    discussed in the meeting?

5          A.    We discussed a fair amount about

6    horses.  He told me what he was doing in horse

7    racing and people that he knew in horse racing and

8    so forth.  I talked a little bit about the Sport-BLX

9    business, and that was pretty much it.

10         Q.    Did you discuss how much you were

11   looking for Mr. Salerno to invest in Sport-BLX?

12         A.    I don't believe so.

13         Q.    Did you discuss the price per share

14   that you were offering the shares at?

15         A.    I don't believe so.

16         Q.    Did you present him with any budgets or

17   projections or pro formas?

18         A.    I don't believe I gave him any written

19   material.

20         Q.    Okay.  And at -- at the time you met

21   with Mr. Salerno in January of 2019 what -- what --

22   what was the stage of the company's development at

23   that point, of Sport-BLX's development?

24         A.    Well, we had already raised a certain

25   amount of capital.  We had -- ConsenSys had started

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 191

1    building the technology, and I was doing work on

2    trying to figure out the -- how to actually make

3    these transactions happen.

4         Q.    When you said you had already raised

5    capital, was that at the founders' round rate or

6    price?

7         A.    At $95.00 a share.

8         Q.    Did you discuss with Mr. Salerno in

9    that meeting whether or not he would be receiving

10   his shares at the founders' price?

11        A.    No.

12        Q.    Do you recall, in any of the meetings

13   with Mr. Salerno, whether you provided him with the

14   FAQs?

15             MR. SACK:  Objection to the form.

16        A.    I believe the FAQs were provided

17   through the data room, so it wasn't directly from

18   me.

19        Q.    Okay.  What about the investment fund

20   slides that we were talking about, was that provided

21   through -- by forwarding an email as you described

22   earlier?

23             MR. SACK:  Objection to the form.

24        A.    There was an email forwarded to

25   Mr. Salerno as I described before, which was the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 192

1     forward of an email from Falk and Esiason.  I don't

2     know of any other -- I didn't -- I don't believe I

3     sent him any documents or handed him any documents

4     ever.

5              Q.    And at the time you met with

6     Mr. Salerno ConsenSys was still in the Phase 2 of

7     development, or it had completed Phase 2?

8              A.    I don't recall the dates on the

9     phases.

10             Q.    When was the first time you discussed

11    with Mr. Salerno the possibility that he would have

12    a seat on the Sport-BLX board?

13             A.    I don't think I discussed that with

14    Mr. Salerno.

15             Q.    Do you know how that came up?

16             A.    Yeah, I think he had discussions with

17    Joe De Perio.  He ultimately, I believe, said he

18    wanted to invest a million dollars.  I think he

19    wanted to break it up into two pieces, and I'm sure

20    Joe and I discussed that, and then I believe Joe

21    reported to him that -- that we -- we had an

22    agreement in principle.

23             Q.    And do you recall that you had a

24    meeting with Mr. Salerno at the Clinton Group's

25    offices on 510 Madison Avenue?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 193

1          A.      Yes.

2          Q.      In January of 2019?

3          A.      January or February, but yes.

4          Q.      Do you recall what happened at that

5     meeting?

6          A.      He asked some questions, we discussed

7     a few of the issues, and nothing particularly

8     memorable.

9          Q.      Do you recall whether in either of

10    these two meetings, the one at your house or at 510

11    Madison Avenue, whether you discussed the fund?

12         A.      I don't believe we discussed the fund

13    at either meeting that I was at.

14         Q.      Or that Sport-BLX might receive fees

15    for serving as fund manager?

16         A.      That time I didn't think Sport-BLX

17    would receive fees for being a fund manager.

18         Q.      How would you describe the meetings and

19    the discussions you had with Mr. Salerno in January

20    of 2019?

21                 MR. SACK:  Objection to the form.

22         A.      The meeting at the house was, again,

23    about horse racing, a little bit about the company,

24    about how I thought the company would operate, and

25    he asked a little bit about -- he did at one point

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 194

1    ask why I didn't fund the whole thing myself.  I

2    said I'd like to have outside investors come along,

3    particularly strategic investors, so that was the

4    gist of the conversation.

5            Q.    Did -- in those initial conversations

6    in January of 2019 did you have any concerns about

7    Mr. Salerno after your first few discussions with

8    him?

9            MR. SACK:  Objection to the form.

10           A.    At some point his cousin, who used to

11   work for me, told a friend that was still working

12   for Clinton Group that we shouldn't take his

13   investment.

14           Q.    So Michael Salerno's cousin told

15   someone that worked with you that you shouldn't take

16   his investment?

17           A.    Yeah.

18           Q.    And why did they --

19           A.    We shouldn't -- we shouldn't consider

20   him as a potential investor.

21           Q.    Did they say why?

22           A.    I don't remember the exact words, but

23   basically he would not be an investor that we'd be

24   happy with.

25           Q.    And did you, yourself, have any

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 195

1        concerns based on your discussions with Mr. Salerno
2        in January of 2019?
3               A.      Which discussion, at the house?
4               Q.      Or in Edie's -- yeah.  Or at Edie's or
5        at the Clinton Group offices.
6                    MR. SACK:  Objection to the form.
7               A.      The meeting at the house, when he left
8        I had no understanding or even -- I did not think of
9        him as a potential investor.  I was actually
10       surprised when Joe told me he wanted to invest.
11              Q.      Okay.  Why was that?
12              A.      It just wasn't a substantive
13       conversation, and it seemed more like a kicking
14       tires meeting more than a substantive conversation
15       about an actual investment.
16              Q.      Did you do any kind of background check
17       or due diligence on Mr. Salerno?
18              A.      Well, we got some information from his
19       cousin, we looked a little bit at NPPG.  We did not
20       do a formal security background check.
21                    MR. PEARLSON:  Can we, Kelly, show him
22       15?
23                    (Exhibit Hall-15, Two-page January 12
24       and 13, 2019, email exchange between Joe De Perio
25       and George Hall Bates stamped CLINTON00009219 and

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 196

1    9220, is marked for identification.)

2          Q.    Mr. Hall, I'm going to show you what's

3    been marked as Hall-15 for identification.  It's a

4    document -- email chain that's Bates numbered

5    CLINTON0000929 -- 9219 to CLINTON00009220.  I'm

6    going to ask you to look at that, and we're going to

7    read it from the -- the bottom up.  And it appears

8    to be a -- some emails between yourself and

9    Mr. De Perio.  Do you see that?

10          A.    Yes.

11          Q.    Okay.  Do you recall these emails?

12          A.    I don't recall them specifically,

13    but...

14          Q.    Do you remember in January of 2019

15    talking to Mr. De Perio about the terms under which

16    you would accept an investment from Mr. Salerno?

17          A.    I don't remember the specif- --

18    specifics of such conversation.

19          Q.    Okay.  If you -- do you know what

20    you're saying here when you write to him -- I'm

21    looking at the line where it says Saturday, January

22    12, 2019, at 11:41.  It's written by

23    george.hall@clinton.com?

24          A.    Yes.

25          Q.    Do you see that?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 197

1          A.      Yes.

2          Q.      It says, "I think capital raising

3    should be more than 5 percent.  I think 10 percent

4    is good for.  We need to think about round 2 and

5    what valuation."

6                  What are you talking about there?

7          A.      Well, by this time we had almost

8    completed the founders' round, which we had said

9    would be -- it was contemplated to be $2 million.  I

10   think we had pretty close to that, so we were

11   starting to think about the next round and what

12   valuation we would use.

13         Q.      And what did you -- did you do anything

14   at or around this time in that regard as to what

15   valuation -- determining a valuation for the second

16   round?

17         A.      I don't think -- I don't think at this

18   time we were really -- I don't think we had come up

19   with what the appropriate second round was.

20         Q.      Okay.  And then it says, "We have to

21   have a heart to heart with Salerno and be sure we

22   can keep him under control before we do anything

23   along this lines."

24                 What are you talking about there?

25         A.      Just his general behavior was

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 198

1      something that caused some concern.

2          Q.    What in -- was there anything in

3      particular?

4          A.    Well, you know, his representations

5      about his involvement in horse racing, the people

6      that he knew, the what I'll call name dropping.

7      That -- you know, saying he wanted to be active in

8      the company if he were to invest, so...

9          Q.    What did he say to you about being

10     active in the company if he was going to invest?

11         A.    At this point I don't -- I don't

12     really know -- I don't -- I don't know if it had

13     been discussed whether he would be on the board or

14     not, but just in general, would he be a difficult

15     investor without really knowing.

16              Part of it was based on the things that

17     his cousin had told our guy, so, you know, we

18     considered that, and we just had to consider whether

19     he was somebody that we wanted to allow to invest.

20         Q.    Did Mr. Salerno tell you before his

21     investment that he wanted to be active in the

22     company and involved?

23         A.    I don't recall him speaking about this

24     company or being on this board.  He may have talked

25     about his general investment philosophy of being

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 199

1    active, but I don't recall at the meeting at the
2    home him discussing anything about being on the
3    board of this company.  I didn't really think he was
4    going to be an investor at all.
5            Q.    At this time?
6            A.    Well, I'm not really sure when the
7    meeting at the house was, so I don't -- I don't know
8    exactly what I'm referring to here, whether it was
9    just information that I had gotten from Henry
10   Sullivan or Mike Staisil or Joe himself.  I don't
11   really recall the timing -- recall the timing.
12           Q.    It says "Also maybe have Galasso do a
13   background check."  Who is Galasso?
14           A.    Galasso is a gentleman who's done
15   security work for -- for the company at times.
16           Q.    Did Galasso do a background check on --
17   on Michael Salerno?
18           A.    I don't think we did.
19           Q.    Okay.  And then it says next, "And his
20   investment should be at least 500k."  Was that --
21   was that something new, or was that something that
22   had already been discussed as to what the level of
23   his investment needed to be?
24                 MR. SACK:  Objection to the form.
25           A.    So can you ask that again?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 200

1          Q.     It says, "And his investment should be
2     at least 500k."  Was that something new, setting a
3     new level for his initial investment, or was that
4     something that had already been discussed and set?
5                      MR. SACK:  With whom?
6          A.     New rel- --
7                      MR. SACK:  Discussed with whom?
8          Q.     With Mr. De Perio.
9          A.     New relative to what?
10         Q.     Well, in other words, had you gone into
11    -- was there a set level of investment for new
12    investors into Sport-BLX at this time?
13         A.     No.
14         Q.     So was -- when you say his investment
15    should be at least 500k, was that something you were
16    going to set personally for Mr. Salerno as a --
17         A.     I think --
18         Q.     As a mi- -- as a minimum?
19         A.     -- any investor that comes in, they
20    decide -- they tell us how much they want to invest,
21    and we have the ability to say yes or no.  This was
22    a potential investor that we did have some concern
23    about, and we thought if we're gonna allow him to
24    come in, and we're gonna take the risk of his
25    involvement, we should -- it should be for a -- a

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 201

```
 1    significant amount of money on a relative basis.
 2              Q.    And -- and Mr. De Perio writes back to
 3    you right above that, and in the second sentence he
 4    says, "So we can be careful with diligence with
 5    Salerno, or offer him an expensive deal which deters
 6    him."  Do you see that?
 7              A.    Yes.
 8              Q.    Were you careful with diligence with
 9    Salerno?
10              A.    Well, it's -- it's kind of a relative
11    term.  This was a company with a limited budget
12    trying to mini- -- you know, minimize expenses.  So
13    we could have done more diligence, obviously, but,
14    you know, we did do some diligence, and -- you know,
15    I think we probably relied a little bit on the fact
16    that his company dealt with retirement accounts and
17    retirement funds, and he was a registered investment
18    adviser, I think we probably took some comfort in
19    that, and also despite the things that his cousin
20    said -- again, I didn't talk to him directly, and he
21    didn't really want to talk to me directly, I
22    understood the conflict that he was in, but I said,
23    well, just at least find -- are we talking about
24    something criminal or something, you know, specific
25    in terms of violations or historical trouble?  And
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 202

1    he said no, it was ultimately just he was a

2    difficult guy and probably was not necessarily

3    somebody we wanted.

4         Q.    And it says -- after that it says "or

5    offer him an expensive deal which deters him."  Did

6    you offer Mr. Salerno an expensive -- an expensive

7    deal?

8         A.    I think Joe was thinking out loud, so

9    I don't think that was specifically -- had a

10   specific deal in mind, but we were trying to balance

11   the fact that we have someone like Henry Sullivan

12   trying to find investors and bring investors to the

13   company to invest, and that's his job, and if he

14   brings an investor to the company we have to be

15   mindful of the fact that we can't just refuse every

16   investment because we don't like the guy.

17             So we tried to give the consideration

18   to the fact that this person wanted to invest.  We

19   also took into account that there was potentially

20   some risk with him investing, and we said, you know,

21   one way -- and again, this is not the only reason --

22   I'm not saying what -- what Joe necessarily was

23   writing here, but one way you could satisfy both,

24   particularly since we were already thinking about

25   raising the price, was that we could raise the price

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 203

1    or make the terms such that he'd probably be

2    deterred, and it would be his decision not to invest

3    as opposed to us rejecting him and then, you know,

4    kind of creating a little bit of an issue for the

5    marketing process.

6         Q.    Did you -- did you do that?  Did you

7    offer -- make him an offer that you considered to be

8    expensive to try to deter him?

9         A.    I don't think specifically.  I mean,

10   the offer was the offer, and I knew what the offer

11   was.  Joe made the offer to him via email, and that

12   was it.

13        Q.    Okay.  And -- and then at the end of

14   February you actually entered into agreements with

15   Mr. Salerno and Cypress Holdings, correct?

16        A.    We thought the agreements were with

17   Michael Salerno.  We thought that Cypress Holdings

18   was a company that Michael Salerno owned in its

19   entirety.

20        Q.    Okay.

21             MR. PEARLSON:  Could we turn to 16?

22             (Exhibit Hall-16, 30-page Amended

23   Complaint in the Sport-BLX v. Salerno matter, is

24   marked for identification.)

25             MR. SACK:  Whenever you're

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 204

1     comfortable.

2          Q.     Now, Mr. Hall, you said that you were

3     -- you believed that your deal was with Michael

4     Salerno individually, that he would be investing

5     individually, correct?

6          A.     Well, the documents that went back and

7     forth all said Michael Salerno.  There was never any

8     Cypress.  The documents that were redlined and --

9     were Michael Salerno, and then at the last minute --

10    well, the last hour or couple of hours there was

11    what was intended, I think, to be an innocuous my

12    attorney forgot to put in my holding company name,

13    which I have and people I know have many, many sole

14    member LLCs for different assets for various

15    reasons, and we would make the natural assumption

16    that Cypress was Michael Salerno himself.

17         Q.     Okay.  Now, when did you start

18    exchanging drafts of the -- of the documents?

19         A.     As best I can tell, the first set of

20    documents were sent to Salerno on somewhere around

21    February 1.

22         Q.     Okay.  And then the final versions were

23    on February 28?

24         A.     That's correct.

25         Q.     And are you saying that between

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 205

```
 1     February 1 and February 28 you never heard the name
 2     Cypress before?
 3          A.    I don't believe I ever heard the name
 4     Cypress, and I don't -- Cypress was never in any of
 5     the documents that were exchanged.
 6          Q.    Now, who was negotiating the deal on
 7     your behalf?
 8                MR. SACK:  Objection to form.  I think
 9     you mean Sport-BLX's behalf.
10          Q.    On Sport-BLX behalf.
11          A.    So most of the back and forth was
12     between Michael Salerno and Joe De Perio.
13          Q.    Was counsel involved?
14          A.    Yes.
15          Q.    Who represented Sport-BLX?
16          A.    Oh, I don't think -- I don't think
17     Sport-BLX had counsel.
18          Q.    No?
19          A.    I don't believe so.  I don't know.  I
20     don't believe so.
21          Q.    Did Cyp- -- did Mr. Salerno have
22     counsel?
23          A.    So the documents that we originally
24     created were at some point created by counsel.  We
25     had also done a number of deals prior with the same
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 206

1      common stock purchase agreement.  The -- whether

2      some of those modifications to the purchase

3      agreement required counsel, I don't know.

4           Q.    And this is your -- if you could look

5      at Hall-16, and then we have to take a break at that

6      point.  This is the amended complaint that you filed

7      --

8           A.    Um-hum.

9           Q.    Or I should say Sport-BLX filed as a --

10     as a plaintiff.  Have you seen this document before?

11          A.    Yes.

12          Q.    And did you review it before it was

13     filed for accuracy?

14          A.    I did.

15          Q.    And do you believe it to be accurate?

16          A.    I believed it to be accurate at the

17     time.

18          Q.    At the time it was filed?

19          A.    Yes.

20          Q.    Okay.  If I can direct your attention

21     to paragraph 29, I'm going to ask you to read that

22     to yourself.

23          A.    Okay.

24                Okay.

25          Q.    Okay.  Now, are the facts in that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 207

1    paragraph true?

2          A.    To the best of my knowledge, looking

3    at the email traffic, yes.

4          Q.    Did Mr. Salerno say to you that he

5    needed the agreements to be "updated with my holding

6    company's name"?

7          A.    He sent an email to Joe De Perio is my

8    best recollection.

9          Q.    Okay.  And how long after that were the

10   documents finalized and executed by Sport-BLX?

11         A.    I believe at that point he sent them

12   signed with the change made.

13         Q.    Okay.  And then did Sport-BLX sign them

14   at that point?

15         A.    Yes.

16         Q.    Did anybody ask Mr. Salerno anything

17   more about what Cypress was?

18         A.    I didn't speak to him at all, so I

19   certainly didn't ask him, no.

20         Q.    Now, is Cyp- -- I'm sorry.  Were you

21   done?

22               MR. SACK:  Well, wait.

23         A.    Repeat the question, please?

24               MR. SACK:  Yeah.

25         Q.    My question was did anybody ask

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 208

1    Mr. Salerno anything more about what Cypress was at

2    that point?

3            A.    Right.  So "anybody," I assume, is

4    multiple people.  I'm describing myself first.  The

5    answer is no.

6            Q.    Okay.  And Cypress is an L.P., correct,

7    a limited partnership?

8            A.    I -- I believe that's correct.

9            Q.    Was there any -- just one more

10   question.  Was there any urgency to this deal?  Is

11   there any reason why it had to be signed up on

12   February 28?

13           A.    Well, they already had planned what

14   we'll call a closing dinner for a couple hours

15   later, so they were all planning to meet for dinner

16   that night, and it was only a few hours before that,

17   so there was no urgency that we needed to sign it,

18   so we could have rejected it.  But we, based on the

19   -- the way the document was in its final form and

20   the way the drafts went back and forth during the

21   month, I think we were pretty convinced that it was

22   a sole member LLC or a, you know, one partner

23   partnership.

24                 MR. PEARLSON:  Okay.  Why don't we

25   take a break?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 209

1          THE VIDEOGRAPHER:  The time is 3:27

2     p.m.  We're going off the video record.

3          (Recess taken from 3:27 to 4:26 p.m.)

4          THE VIDEOGRAPHER:  The time is 4:26

5     p.m., and we're back on the video record.

6     BY MR. PEARLSON:

7          Q.    Mr. Hall, did you ever have Mr. Salerno

8     fill out an investor questionnaire of any kind?

9          A.    I don't believe so.

10         Q.    Was there any -- was there any investor

11    questionnaire for investors who were investing in

12    Sport-BLX?

13         A.    Not that I recall.

14         Q.    Was there any application form that you

15    had investors fill out?

16         A.    I don't believe so.

17         Q.    Okay.  Mr. Hall, if you could look at

18    -- we're going to show you what's been marked as

19    Hall-17 for identification.  It's a common -- first

20    Common Stock Purchase Agreement between Cypress and

21    Sport-BLX dated February 28, 2019.

22              (Exhibit Hall-17, 10-page Sport-BLX,

23    Inc. Common Stock Purchase Agreement made as of

24    February 28, 2019, Bates stamped SPORTBLX00028990

25    through 28999, is marked for identification.)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 210

1          Q.    And Mr. Hall, before we get to this

2     document, I just want to understand the process by

3     which these documents were executed.  I thought you

4     indicated in your testimony that you were sent a

5     redline whereby Mr. Salerno had changed the name of

6     the investor from Salerno to Cypress.

7                MR. SACK:  Objection to the form.

8          A.    I -- I think that's correct.

9          Q.    Okay.  And if you look at the document

10    in front of you, it's not a redline, and it says

11    "Execution Version."  Do you see that?

12         A.    Yes.

13         Q.    So do you recall that Mr. Salerno sent

14    you an execution copy after he had already sent the

15    redline showing that Cypress was going to be the

16    company that was making the purchase of the

17    Sport-BLX shares?

18                MR. SACK:  Objection to the form.

19         A.    I'm not entirely sure.  I -- generally

20    redline copies and non-redline copies are sent

21    together.

22         Q.    Okay.  So he may have sent you both the

23    redline and the execution copy together?

24                MR. SACK:  Objection to the form.

25         A.    I don't recall when the redline copy

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 211

1    showed up or if it was part of the same email, but

2    the signed execution copy was the afternoon of the

3    28th, I believe.

4         Q.    Okay.  And were you aware that, based

5    on the redline, that Cypress was now going to be the

6    purchaser of the shares?

7                   MR. SACK:  Was he aware on that day?

8         Q.    On that day.

9         A.    I didn't see the -- I didn't look at

10   the redline.

11        Q.    Okay.  And if you could -- this is

12   called a common stock purchase agreement.

13   Mr. Salerno, or Cypress I should say, made two

14   purchases that day pursuant to two separate

15   agreements, correct?

16        A.    Correct.

17        Q.    Okay.  And this agreement is -- is

18   purchasing certain shares at the founder price,

19   correct, of $95.00 a share?

20        A.    Correct.

21        Q.    How was it determined how many shares

22   Mr. Salerno, or Cypress I should say, was going to

23   purchase at the founders' price versus another

24   price?

25        A.    The -- it's just by negotiation.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 212

1           Q.      I guess my question is -- is a little

2      different.  Was it -- was it based on -- was there a

3      certain total purchase price, and then it was broken

4      down by price per share, or was it price per share,

5      and there was a certain number of shares?

6                      MR. SACK:  Objection --

7           Q.      Do you --

8                      MR. SACK:  -- to form.

9           Q.      Do you understand my question?

10          A.      Well, let me give you this answer.

11     We'll see.

12          Q.      Okay.

13          A.      The -- the agreement in principle was

14     $500,000.00 of investment at $95.00 a share and

15     another $500.00 -- $500,000.00 investment at the

16     approximate price of $200.00 per share, I believe.

17          Q.      Okay.  And this is -- this is the

18     agreement that relates to the $95.00 per share,

19     correct?

20          A.      Correct.

21          Q.      Okay.  And if you could turn to page 8

22     of the document, I'm going to ask you if -- if you

23     signed the document on behalf of Sport-BLX?

24          A.      Yes.

25          Q.      And then also you signed it in your

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 213

1    individual capacity?

2         A.    Correct.

3         Q.    And you reviewed this document before

4    you signed it?

5         A.    I don't know if I reviewed this

6    specific document before signing it.

7         Q.    Okay.  Had you reviewed other versions

8    of this document?

9         A.    Well, this was a standard purchase

10   agreement that we used for other investors.  There

11   were some tweaks for Mr. Salerno's transaction, but

12   I was basically familiar with the document itself.

13        Q.    Okay.  And was it basically the form

14   agreement that you were talking about with the

15   exception of the fact that he had put Cypress

16   instead of Michael Salerno into the document?

17             MR. SACK:  Objection to the form.

18        A.    I was familiar with the form of

19   agreement that went to other parties, I was familiar

20   with the form of the agreement went to Michael

21   Salerno.  I did not re- -- review or read the whole

22   document at the time this was signed, as is typical

23   with virtually any closing of any transaction with

24   signature pages.

25        Q.    Were you familiar with the reps and

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 214

1    warranties that were made in connection with this

2    agreement?

3            A.     I think at the time, yes.

4            Q.     Were there any reps and warranties made

5    by Mr. Salerno as to the nature or ownership of

6    Cypress?

7            A.     At what time?  At what period?

8            Q.     In -- in this document is there

9    anything that -- that -- in which Mr. Salerno

10   represents anything concerning the nature or the

11   ownership of Cypress?

12           A.     Well, it says "Purchase for Own

13   Account," so given the fact that he told us he was

14   investing -- over time he led us to believe he was

15   investing personally, and then there were a number

16   of turns of the document with his name in every

17   place, we assumed that this was a purchase for his

18   own account from previous versions of the document.

19   We also assumed that he was an accredited investor

20   from previous turns of the document.  So at the time

21   we signed, given the fact -- given the history, we

22   simply took him at his word that this was a holding

23   company of his.

24           Q.     Okay.  Mr. -- that's not my question,

25   Mr. Hall.  My question is, is there anything in this

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 215

1    document in particular, any representations by the

2    purchaser that indicate anything concerning the --

3    the ownership of Cypress or the nature of Cypress?

4            MR. SACK:  Objection to the form.  I

5    think he did talk about what Mr. Salerno was

6    representing in this document, but --

7            MR. PEARLSON:  I'm talking about in

8    the document itself, not what he claims happened in

9    conversations.

10           MR. SACK:  Was he purchased for his

11   own account, an accredited investor.  This is in the

12   document.  It's what Mr. Hall referred to.

13       Q.    Are you saying, Mr. Hall, that Cypress

14   isn't an accredited investor?

15       A.    At the time I didn't know there was a

16   Cypress that was not solely Mr. Salerno.

17       Q.    Okay.  And you said something about

18   purchasing for your own account.  The language says,

19   "Purchaser is purchasing the Shares," and that's

20   purchaser being Cypress is purchasing the shares,

21   "solely for investment purposes for its own account,

22   and not with a view to the resale or distribution of

23   any part thereof."  Isn't that what it says?

24       A.    That is what it says.

25       Q.    Okay.  Anything else that you -- you --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 216

1    indicates to you that any representations made by

2    Cypress as to the -- or Mr. Salerno as to the nature

3    of ownership of Cypress in this document?

4         A.    I believe the purchase for own account

5    was a representation that it was for him personally.

6         Q.    Even though it was -- the purchaser is

7    listed as Cypress at the beginning of the document?

8         A.    And he referred to Cypress as his

9    holding company.  So as we talked about before with

10   Clinton Group has potentially a hundred

11   subsidiaries, and I am the ultimate beneficial owner

12   of every one of them because I own a hundred percent

13   of the holding company.  So at the -- the eleventh

14   hour, after multiple execution copy drafts with

15   redlines made, and in the customary drafting of

16   documents where you take a document, we sent him a

17   document that we could live with, he sends back

18   redlines on changes, and you make the assumption

19   that the part that's not redlined is the

20   transaction.  So it should have been -- customarily

21   it would have been redlined on the first turn of the

22   documents it would have said Cypress, and then we

23   would have had -- thought about more investigation

24   of that.

25        Q.    But the fact is the change to Cypress

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 217

1    as the purchaser, that was redlined, right?  It

2    wasn't -- he didn't try to hide it from you?

3          A.    I don't know -- well, I didn't see it

4    because it wasn't sent to me.  I don't know...

5                THE WITNESS:  Did you want to object?

6                MR. SACK:  No, you can continue.

7          A.    I saw a redline in the production, but

8    I don't know if we saw it when -- when this was

9    signed.

10          Q.    Okay.  And you didn't have to sign the

11    document, but you did?

12          A.    Correct.

13          Q.    And it's an integrated agreement, isn't

14    it?

15          A.    It's a -- you want to help me

16    understand "integrated"?

17          Q.    There's a clause on page 6 that talks

18    about it being an integrated agreement.

19          A.    Um-hum.

20          Q.    Do you know what that is?

21          A.    Yes.

22          Q.    What is an integrated agreement?

23          A.    So this is the entire agreement

24    between the parties.

25          Q.    Okay.  Now, it also talks in paragraph

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 218

1     H on page 5 about tag-along rights.  What are --

2     what are tag-along rights?

3             A.    On H on page 5?

4             Q.    Yes.

5             A.    I'll go back.

6                   So if the founders sell shares of the

7     company's stock that represent more than 50 percent

8     of the aggregate number shares, then the purchaser

9     can -- can sell, I think, a pro rata share of his

10    own shares.

11            Q.    And why -- why would a -- why would

12    that be important to an investor to have tag-along

13    rights?

14                  MR. SACK:  Objection to the form.

15            A.    Well, when an investor invests he's

16    investing in a certain business, a certain

17    management team.  If the management team sells more

18    than 50 percent of the shares and is no longer

19    involved in the company, it's a way for an investor

20    to protect themself that the company is not changing

21    dramatically in terms of management and so forth,

22    that he would have the ability to get out of his

23    shares.

24            Q.    Following -- besides in this agreement,

25    did you ever make representations to Mr. Salerno

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 219

1    concerning the tag-along rights or the fact that you

2    wouldn't sell your shares without allowing other

3    shareholders to have tag-along rights?

4                    MR. SACK:  Objection to the form, but

5    you could answer.

6            A.    That was a conversation in a very

7    specific scenario about the sale of shares.

8            Q.    Okay.  When did that conversation take

9    place?

10           A.    One of the board meetings.  I don't

11   recall which one.

12           Q.    Was it in November of -- of 2019?

13           A.    Likely.  Prob- -- probably, yeah.

14           Q.    Did you -- at that time did you tell

15   Mr. Salerno that you were not going to sell your

16   shares without providing the other shareholders with

17   tag-along rights?

18           A.    No.

19                    MR. SACK:  Objection to the form.

20           A.    No.

21           Q.    What did -- what did you tell

22   Mr. Salerno about tag-along rights in that meeting?

23           A.    I said that we -- this was part of a

24   -- part of the entire board meeting, the -- this was

25   a discussion about basically auctioning off and

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 220

1    selling the whole company, which would be to

2    somebody else that wanted to run the company, take

3    over the company, either buy the whole company, and

4    we'd basically turn the keys over and get out.

5          Q.    Why would tag-along rights apply in a

6    sale of the entire company?

7          A.    They wouldn't.

8          Q.    So why would you be discussing

9    tag-along rights in that context at all?

10               MR. SACK:  Objection to the form.

11         A.    Because there's also the conceivable

12   scenario that somebody just wanted to buy -- to

13   reduce the amount of money they have to spend would

14   want to just buy enough shares to take over the

15   company to sell the company, cha- -- to buy the

16   company or buy a majority of the company, change

17   management, change the board of directors, so

18   basically it would be me relinquishing my position

19   within the company, both shares and management.

20               In that scenario, for lack of a better

21   wor- -- term to say bailing out, me bailing out and

22   moving on, I wouldn't leave the other shareholders

23   behind.  That was the intent of that discussion.

24         Q.    So it was -- it was if you were leaving

25   the company altogether that the tag-along rights

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 221

1    would apply?

2              MR. SACK:  Objection to the form.

3         A.    The -- the discussion started with

4    sale of the whole company.  We assume that if the

5    whole company is sold, they'll put in their whole --

6    their own management team, or they buy it for their

7    own purposes.  But there's also a conceivable

8    scenario where somebody wants to buy just enough to

9    take over management, to take over control, to take

10   over the board of directors.

11             This was not -- this was a comment as

12   part of a bigger conversation in a board meeting.

13   It was not intended to be a legal representation,

14   but the point that I was trying to make was if we

15   found a strategic investor that wanted to take over

16   this business, somebody -- most likely somebody that

17   had a broker-dealer license already, that the only

18   way they could get control is come to me.  I was the

19   only one that had enough shares.  So I was saying if

20   -- if a strategic investor wants to take over this

21   business, and I sell my shares to give them control,

22   I would, of course, invite the other shareholders to

23   come along.

24        Q.    And that was a representation you made

25   in a board meeting?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 222

1           A.      That was a discussion at a board

2     meeting, yes.

3           Q.      Okay.  And that's your testimony as to

4     what the nature of the discussion was?

5           A.      Yes.

6                   MR. PEARLSON:  Can we go to Hall-18?

7                   (Exhibit Hall-18, 10-page Sport-BLX,

8     Inc. Common Stock Purchase Agreement made as of

9     February 28, 2019, Bates stamped SPORTBLX00028976

10    through 28985, is marked for identification.)

11          Q.      Mr. Hall, I'm going to direct your

12    attention to a document that's been marked Hall-18

13    for identification.  This is called Common Stock

14    Purchase Agreement, and it's Bates stamp SPORTBLX

15    28976 through 28985.  I'm going to ask you if you've

16    seen this document before?

17          A.      I've seen versions of this document,

18    yes.

19          Q.      Okay.  And this -- was this a document

20    -- if you'd turn to page 8, I believe.

21                  Is -- is your signature on that

22    document as well?  It might be -- yeah, --

23          A.      Yes.

24          Q.      -- page 8.

25          A.      Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 223

1          Q.      And again, you signed in both

2     capacities as a -- the executive chairman of

3     Sport-BLX and on your own behalf?

4          A.      Correct.

5          Q.      Why were you signing in both

6     capacities?

7          A.      Well, I was the executive chairman,

8     which is an active role in the company as

9     management, and George Hall as a 70 -- or, you know,

10    originally 70 percent shareholder of the company.

11         Q.      Okay.  And -- and do you recall, was

12    this document sent to you, a redline with the

13    execution version, on -- on or about February 28?

14         A.      I don't believe so.

15         Q.      You never -- you didn't see a redline

16    version of this one?

17         A.      I don't believe I saw it then, no.  I

18    don't think I saw the other document either then.  I

19    didn't say I saw the redline.

20         Q.      Oh, you don't think you saw either

21    redline?

22         A.      I think I -- I don't think I saw

23    either redline.

24         Q.      Were you aware when you -- when you got

25    the execution version were you aware that the -- the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 224

1    name of the purchaser had been changed from Salerno

2    to Cypress Holdings, III, L.P.?

3                    MR. SACK:  Objection, Ross.  The

4    execution version was sent on February 1.  Every

5    document from February 1, so which execution version

6    are you talking about?

7                    MR. PEARLSON:  The one we're looking

8    at, John.

9                    MR. SACK:  Okay.

10                    MR. PEARLSON:  Okay.

11                    MR. SACK:  But --

12                    MR. PEARLSON:  The -- the -- the

13    version --

14                    MR. SACK:  -- there are multiple

15    documents that --

16                    MR. PEARLSON:  I'm talking about the

17    --

18                    MR. SACK:  -- say execution version.

19    BY MR. PEARLSON:

20        Q.    Well, the execution version that you

21    signed on February 28 that's in front of us, did you

22    notice when you signed it that the purchaser was

23    Cypress Holdings, III, L.P. instead of Salerno?

24        A.    I think I noticed that Michael Salerno

25    was the signature -- the -- the -- on the signature

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 225

1      line, and I -- it was clear to me that Cypress

2      Holdings was an entity that he owned.

3              Q.      Okay.  So if you look at it on page 8

4      again, it says Michael Salerno signing as the

5      manager of Cypress Holdings, L.P.  You see that?

6              A.      Yes.

7              Q.      And you realized that Cypress Holdings

8      was a limited partnership, correct?

9              A.      It says LLC.  Cypress Property

10     Holdings, LLC.

11             Q.      No, above it.  Cypress Holdings, the

12     name of the purchaser.  If you look on the first

13     page, --

14             A.      Yep.

15             Q.      -- Cypress Holdings, III, L.P.

16             A.      Um-hum.

17             Q.      You realize it was a -- it says a

18     Delaware Limited Partnership?

19                     MR. SACK:  You're saying it's a

20     present tense question; does he see that now?

21             Q.      No.  No.  Well, let me ask you did you

22     -- did you see that at the time you signed the

23     document on February 28?

24             A.      I don't recall if I noticed the L.P.

25             Q.      Okay.  Now, if you look at the -- this

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 226

1     is the second agreement, and this is a -- for two

2     thousand four -- if you look at paragraph 1 -- 2,497

3     shares at $218.00 per share.  Do you see that?

4          A.    Yes.

5          Q.    How is that -- that price of $218.00

6     per share determined?

7          A.    That -- that equated to a $25 million

8     pre-money valuation.

9          Q.    Okay.  Now, when we were talking

10    before, you were talking about in the founders'

11    round that it was a nine-and-a-half-million-dollar

12    founders' round valuation, correct?

13         A.    Can you say that again?

14         Q.    The valuation used for the founders'

15    round and to determine the price of the founders'

16    round was a nine-and-a-half-million-dollar

17    valuation, --

18              MR. SACK:  Objection.

19         Q.    -- correct?

20              MR. SACK:  Objection to the form, in

21    your use of the word "valuation."

22         A.    We earlier, for sake of this

23    discussion, defined the founders' round as $95.00 a

24    share.  People that purchased -- investors that

25    purchased shares at $95.00 a share.  So he did

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 227

1    purchase shares at $95.00 a share, and he purchased

2    shares at $200.00 a share.

3          Q.    And I guess my question is -- for you

4    is what was the $218.00 per share price based on

5    that was -- that's referenced in this document?

6          A.    That's referenced in the document?

7          Q.    Yeah.  In paragraph 1.

8          A.    Well, I see the 200's referenced.

9    You're saying what's that based on?

10         Q.    Yes.

11         A.    In the document?  I don't think it's

12   based on anything.

13         Q.    No.  No.  No.  You put -- you put a

14   price per share --

15         A.    Yeah.

16         Q.    -- of $200.18.

17         A.    Yeah.

18         Q.    What did -- how did you come to that

19   number?

20         A.    I already told you.  We inve- -- we --

21   we -- the valuation was 25 million pre-money.

22         Q.    Okay.  And how did you get to a $25

23   million valuation at this point in time, February

24   28, 2019?

25               MR. SACK:  I'm going to object to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 228

1      asked and answered.  I think he already answered

2      about all the progress made in the company --

3                    MR. PEARLSON:  John, --

4                    MR. SACK:  -- between the --

5                    MR. PEARLSON:  -- don't --

6                    MR. SACK:  No, no, no, no.

7                    MR. PEARLSON:  -- start with the

8      coaching and the speaking objections.  He didn't

9      answer it, --

10                   MR. SACK:  Oh, stop.  Of course --

11                   MR. PEARLSON:  -- and you're --

12                   MR. SACK:  -- he did.

13                   MR. PEARLSON:  And you're -- and now

14     you're -- now you're trying to --

15                   MR. SACK:  You asked him before --

16                   MR. PEARLSON:  -- feed him an

17     answer -- John, --

18                   MR. SACK:  -- about --

19                   MR. PEARLSON:  John, --

20                   MR. SACK:  -- how the pricing --

21                   MR. PEARLSON:  -- stop.

22                   MR. SACK:  -- has changed.

23                   MR. PEARLSON:  Stop.  Stop.

24                   MR. SACK:  I'll let the --

25          Q.    Mr. Hall, --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 229

1              MR. SACK:  -- record speak for itself,

2     Ross.

3              MR. PEARLSON:  Certainly.

4              MR. SACK:  You asked specifically --

5              MR. PEARLSON:  Certainly.  John, --

6              MR. SACK:  -- how the different --

7              MR. PEARLSON:  John, stop.

8              MR. SACK:  -- prices have changed.

9              MR. PEARLSON:  You made your

10    objection.  Stop.

11              THE WITNESS:  I'm going to ask you to

12    repeat the question.

13    BY MR. PEARLSON:

14         Q.    The question is, Mr. Hall, what was the

15    $25 million valuation on February 28, 2019, based

16    on?

17         A.    We thought, as I believe I answered

18    before, that the progress of the company was -- made

19    it more valuable, and we would try to raise money at

20    a higher valuation.

21         Q.    Okay.  Was -- did you offer any other

22    investors at or around this time the price of

23    $200.18 per share for their -- for their investment?

24         A.    Yes.

25         Q.    Who was the other investor or who were

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 230

1    the other investors?

2         A.    I think there were a number of

3    investors that invested at 200 -- $200.00 per share.

4         Q.    Okay.  Can you tell us some of them?

5         A.    When you said "around this time," can

6    you be more specific?

7         Q.    Well, at or around February 28, 2019,

8    were -- were there other investors who were

9    purchasing their shares of Sport-BLX common stock at

10   a price of $200.18?

11        A.    Not on February 28, so tell me how --

12   how far out in the future is "around"?

13        Q.    Within a few months.

14        A.    Oh, yes.

15        Q.    Okay.  Can you tell me who invested in

16   that time frame for that price?

17        A.    I don't have the capital structure.  I

18   don't recall who the investors were at that price.

19        Q.    Okay.  Are there any documents to

20   support the $25 million valuation, any projections,

21   pro formas, valuations of any kind?

22        A.    No.  I think as I said before, but if

23   you'll indulge me, I'll say it again, the pro

24   formas, the analysis of the company, as we said in

25   the FAQ, the variables made it impossible to really

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 231

1    be scientific about a valuation.  If the pro formas

2    turned out to be true, the company would be worth

3    billions.  So there's really no mathematical

4    valuation for $200.00 a share, nor was there for

5    nine- -- nine- -- $95.00 a share.

6         Q.    So is the ques- -- is the answer to my

7    question there were no documents analyzing or

8    underlying the $200.00 per share price?

9              MR. SACK:  Objection to the form.

10        A.    I think there were documents -- there

11   were documents that showed the potential of the

12   company.  There's no document that calculates a --

13   that I know of that calculates a $200.00 per share

14   price based on the pro formas for the company.

15        Q.    And if you could just go to Schedule B

16   of that document, which is the very last page.

17             MR. GOLD:  Schedule A?

18             MR. PEARLSON:  Well, at the top it

19   says Schedule A, then it says Schedule B right under

20   it.

21             MR. GOLD:  All right.

22             MR. PEARLSON:  They're both on the

23   last page.

24        Q.    Are you with me, Mr. Hall?

25        A.    I'm with you, Mr. --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 232

1          Q.      Okay.

2          A.      -- Pearlson.

3          Q.      All right.  Mr. Hall, could you explain

4    to us what this shows in terms of the capitalization

5    of Sport-BLX at this time?

6                  MR. SACK:  Objection to the form.

7          A.      I don't think it says anything about

8    the capitalization in this particular schedule.

9          Q.      What -- what -- it says "Schedule B

10   Capitalization."  What does it show then, I guess?

11         A.      Well, it shows the number of shares

12   that groups of people own.  To actually figure out

13   how much capital was in the company I'd need to know

14   the share price of each one, so...

15         Q.      Well, in terms of you and Mr. De Perio,

16   you didn't pay anything for your shares, correct?

17         A.      Correct.

18         Q.      And then in terms of the -- where it

19   says third parties, does that refre- -- reflect

20   at --

21         A.      I -- I --

22         Q.      -- that time --

23         A.      I stand corrected.  May I --

24                 THE WITNESS:  May I?

25         Q.      Sure.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 233

1                MR. SACK:  Yeah, go ahead.

2        A.     I was looking at the pro forma at the

3   bottom.  The -- the top several lines under

4   Capitalization, it does, in fact, show the capital

5   as being 1.864 million 280,000 [sic] for the

6   purchase of 19,624 shares.  So yes, that -- that

7   section is the capitalization of the company.

8        Q.     And those shares were all purchased at

9   the founders' round of $95.00 per share, according

10  to this table, correct?

11       A.     According to this, yes.

12       Q.     And was Mr. Salerno -- I should say was

13  Cypress the first investor to purchase stock at more

14  than $95.00 per share?

15       A.     Yes.

16       Q.     If you could --

17                MR. PEARLSON:  If we could show him

18  Hall-19.

19                (Exhibit Hall-19, Four-page Sport-BLX,

20  Inc. February 28, 2019, letter agreement to Cypress

21  Holdings, III, L.P. Bates stamped SPORTBLX00028986

22  through 28989, is marked for identification.)

23       Q.     Now, Mr. Hall, just before we move on

24  to this one, you signed the other agreement even

25  though it said it was -- it was -- purchaser was

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 234

1    Cypress Holdings, L.P., correct?

2         A.    Yes.

3         Q.    You didn't stop and say, no, no, no,

4    we're not doing the deal right now?

5              MR. SACK:  Objection to the form.

6         A.    I definitely didn't say, no, no, no,

7    we're gonna not do the deal.  I assumed that Cypress

8    Holdings was Salerno.

9         Q.    Okay.  And that was your assumption,

10   correct?

11        A.    I -- I also think that was what he

12   told us.

13        Q.    Okay.  Now, Mr. Hall, we can look at

14   Hall-19.  I'm going to ask you just to take a quick

15   look at this, and if you could look at the last

16   page, and I want to know if that's your signature on

17   the document.

18        A.    Yes.

19        Q.    And you're signing, again, in your

20   individual capacity and as executive chairman of

21   Sport-BLX?

22        A.    Correct.

23        Q.    Okay.  Now, the -- we saw that the

24   first two agreements that we were looking at, one

25   related to the purchase of stock for $95.00 a share

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 235

1    at the founders' price, then we just saw the one --

2    the second one at $200.18 per share.  What does --

3    what does this document relate to, this third

4    agreement?

5            A.    This is a stockholder agreement

6    between Salerno and the company, which we call a

7    right of first offer, and provides a board seat and

8    antidilution protection.

9            Q.    Okay.  And was this document negotiated

10    and -- and drafted at the same time as the other two

11    agreements we just looked at?

12            A.    Well, not likely at the very same

13    moment, so what are we talking about in terms of

14    time frame?

15            Q.    Between February 1 and February 28,

16    like the other --

17            A.    I believe so.

18            Q.    -- two documents?

19            A.    I believe so, yes.

20            Q.    Okay.  And -- and was the exe- -- did

21    you receive the execution version at or around the

22    same time as the other two documents on February 28?

23                  MR. SACK:  Objection to the form.

24            A.    I don't know if I received the entire

25    document or just the signature page.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 236

1           Q.     So now -- were you saying with the

2      other two documents you -- you just received the

3      signature page?

4           A.     I -- I'm not saying either.  I don't

5      re- -- I don't re- -- I don't recall whether or not

6      I received the entire document or just the signature

7      page.

8           Q.     You've signed a lot of agreements in

9      your time, correct?

10          A.     I have.

11          Q.     Okay.  And do you generally review the

12     agreements you sign?

13          A.     Generally the agreements are reviewed

14     with redlines.  Many times you rely on the -- the --

15     the part that's not redlined as being accepted among

16     both parties, and virtually every closing I have,

17     particularly the most sophisticated of closings,

18     there is documents around the room, and you just go

19     with a pen, and you sign and sign and sign, and you

20     rely on the fact that the previous drafts were

21     truthful.

22          Q.     So you -- I'm just trying to understand

23     your testimony here.  Are you saying that you signed

24     these documents without having the full document in

25     front of you?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 237

1          A.     I don't recall is what I said.

2          Q.     Okay.  Is there any reason for you to

3     think that you signed these documents without hav-

4     -- with only having the signature page in front of

5     you?

6                     MR. SACK:  Objection to the form.

7          A.     The documents -- that morning a

8     version of the documents were sent by Joe De Perio

9     to Michael Salerno that we viewed as the -- the

10    final version.  When it came back to me I don't

11    recall if I had the whole document or if I -- or if

12    I just had the signature page.

13         Q.     Okay.  And I guess my question is as a

14    matter of practice do you generally sign documents

15    when all you have is the signature page in front of

16    you?

17                    MR. SACK:  Objection to the form, and

18    asked and answered.

19         A.     I will say that generally at a closing

20    of a transaction I do not sit there and read, many

21    times, hundreds and thousands of pages of documents

22    at the time I sign.

23         Q.     Okay.  My question was a little

24    different one.  My question --

25         A.     Okay.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 238

1           Q.      -- is do you generally sign documents
2      when all you have is the signature page?
3                   MR. SACK:  Objection to the form, and
4      asked and answered, but you can --
5           A.      When you say "generally sign
6      documents," I'm giving you my experience in closings
7      of transactions.  Is that the question?
8           Q.      No, that wasn't the question, but --
9           A.      Okay.
10          Q.      -- we can move on.
11          A.      You said generally.  Tell me what
12     generally means.
13          Q.      I'd like to know as -- as a general
14     matter, and even in closings, --
15          A.      Um-hum.
16          Q.      -- do you sign documents -- do you just
17     sign signature pages without having the document
18     attached to it?
19                  MR. SACK:  Objection to the form, and
20     asked and answered.
21          A.      The -- generally the signature pages
22     are -- are -- are pulled out.  The document may be
23     there, it may not necessarily be there.  Sometimes
24     signature pages are exchanged and held in escrow
25     before the transaction actually closes.  So I will

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 239

1    say I've rarely been at a closing of a transaction

2    where I read the -- read the document for the first

3    time and sign it.  I generally rely on the -- the

4    versions of the document that I've read in the

5    beginning that I approved when we sent an execution

6    copy on February 1, I reviewed the redlines in the

7    negotiations, and once all the negotiations were

8    completed I approved the final sending of the

9    documents to Mr. Salerno by Mr. De Perio, I believe,

10   and when these came back I don't recall if I got the

11   whole document or just the signature page, but I did

12   sign it.

13            Q.    Okay.  But you don't recall what the

14   process was here?

15            MR. SACK:  Objection to the form.  I

16   think he just described the process, and he's --

17   it's asked and answered.

18            MR. PEARLSON:  No, he -- he didn't

19   describe the process.

20            Q.    You don't recall what happened here.

21   You described generally what you do at closings, but

22   you -- you don't have any recollection, as you sit

23   here today, as to what happened with the signing of

24   these particular documents.  Isn't --

25            MR. SACK:  Objection --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 240

1          Q.      -- that the case?

2                  MR. SACK:  -- to the form.  He's

3     answered that extensively, but if you can answer it

4     again, go ahead.

5                  Do you mean on that one day or in the

6     month relating to the --

7          Q.      No, on --

8                  MR. SACK:  -- process?

9          Q.      -- the one day with the signing of

10    these particular documents.  Do you have any

11    recollection as you sit here today, a specific

12    recollection of what you did with respect to the

13    signing of these documents, these three documents we

14    just went over?

15         A.      So I -- there's probably a little blur

16    between my recollection and what I've learned from

17    production.  What would you like me to answer?

18         Q.      Well, I'd like to -- for you to answer

19    what your recollection is as to what happened that

20    day.

21         A.      My recollection is I signed the

22    documents.  I don't recall if I reviewed the whole

23    document or I had the whole document.

24         Q.      Okay.  Fair enough.

25                 If you could turn to paragraph 2.A. of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 241

1        -- of the agreement we were just looking at,

2        Mr. Hall?

3                A.      Yep.

4                Q.      Now, this agreement, by the way, is --

5        happens to be between Cypress Holding -- Sport-BLX,

6        Cypress Holding, Salerno, and you and Mr. De Perio.

7        Do you see that in the first paragraph, just to go

8        back to the first paragraph?  You were all parties

9        to the agreement?

10               A.      Yes.

11               Q.      Okay.  If you could turn back to Board

12       Composition, paragraph 2.A., Salerno Board Seat?

13               A.      Yes.

14               Q.      Okay.  Can you -- can you just describe

15       for us what the Saler- -- the provisions of the

16       Salerno board seat are and what they mean?

17               A.      That if he owned two and a half

18       percent of the capital stack -- stock of the

19       company, he would -- the -- the -- Joseph De Perio

20       and myself agree to vote for him in the -- at an

21       annual meeting or special meeting of stockholders

22       where there's an election of directors.

23               Q.      Okay.  And at the time that you entered

24       into this agreement, as we saw, you and Mr. De Perio

25       held a majority of the Sport-BLX stock at that time,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 242

1    correct?

2             A.      Correct.

3             Q.      In fact, you held 83 percent of the

4    stock, based on the schedule we just looked at?

5             A.      That's on the other document?  Or I'll

6    take your word for it.

7             Q.      You could take my word for it.

8             A.      58 -- yes, 83.6 percent.

9             Q.      Okay.  Did you ever discuss with

10   Mr. Salerno your intention with respect to holding

11   or disposing of your stock?

12            A.      What period?

13            Q.      At the time of these agreements.

14            MR. SACK:  Could I have the question

15   back, please?

16            (Last question is read back by the

17   court reporter.)

18            Q.      I meant disposing of your stock.

19            A.      Not that I recall.

20            Q.      Okay.  So you never told him that you

21   intended to hold on to your stock of -- Sport-BLX

22   stock?

23            A.      I don't recall.

24            Q.      To your knowledge, has Cypress always

25   held at least 2.5 percent of the capital stock of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 243

1    Sport-BLX since this agreement?

2         A.    Yes.

3         Q.    Now, when did Mr. Salerno wire the

4    funds for -- for the investment by Cypress?

5         A.    I believe it was March 12.

6         Q.    Okay.  Can you --

7              MR. PEARLSON:  No. 20.  Hall-20.

8              (Exhibit Hall-20, March 8, 2019, email

9    exchange between Joe De Perio and George Hall Bates

10   stamped CLINTON00009423, is marked for

11   identification.)

12        Q.    Mr. Hall, I'm going to ask you to look

13   at Hall-20.  The first question I have is when was

14   Cypress supposed to wire the funds to Sport-BLX for

15   the investment that was reflected in the agreements

16   that we looked at?

17        A.    Well, it was probably too late on

18   February 28, so we would have expected them the next

19   day.

20        Q.    Okay.  And did you get them the next

21   day?

22        A.    No.

23        Q.    Okay.  Can you tell us what -- this is

24   an email from Joe De Perio to you at the top in

25   response to an email you sent to him.  What are --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 244

1    what are you saying in the email that you sent to

2    Mr. De Perio that day on Friday, March 8?

3         A.    Well, I spoke to David Falk, he's

4    interested in the company, and we sent wiring

5    instructions to Salerno a while back from before

6    March 8.  That we had been taken advantage of, and I

7    didn't think his money was valuable.  I mean, I

8    could read the whole thing.  I think you understand

9    it.  I think --

10        Q.    So are you --

11        A.    -- I understand it.

12        Q.    -- saying that you wanted -- you wanted

13   to back out of the deal with Cypress?

14             MR. SACK:  Objection to the form.

15        A.    No, I wouldn't say we wanted to back

16   out of the deal with Cypress.  We -- we acknowledged

17   that -- or we -- we decided that we would rather he

18   didn't invest because of various reasons, most

19   important being that he didn't send the money in

20   when he was supposed to.

21        Q.    It says, "I feel like we've been taken

22   advantage of."  What are you referring to there?

23        A.    I think he purposefully -- in that

24   case I was -- I think he purposefully delayed wiring

25   the capital.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 245

1          Q.      And then you say later on, "I think we
2    can do better without."  Are you saying you think
3    Sport-BLX can do better without Cypress' investment?
4          A.      Well, there's clearly a typo here, so
5    I can't be entirely sure what I meant by the typo,
6    but I, at that point, did think we could do bitter
7    -- better without Mr. Salerno as an investor.
8          Q.      Okay.  And did you tell that to
9    Mr. Salerno?
10         A.      No.  As it says here, I said if you're
11   in agreement, I'd be fine if you emailed him that
12   we're not proceeding with accepting his investment.
13         Q.      So you were prepared, like I said, to
14   say that you weren't going forward with his
15   investment in Sport-BLX or Cypress' investment in
16   Sport-BLX?
17              MR. SACK:  Objection to the form.
18         A.      At that point in time we would have
19   preferred if he was not an investor.
20         Q.      Okay.  But weren't you authorizing
21   Mr. De Perio to tell Mr. Salerno that in this email,
22   that he -- that you were not proceeding with
23   accepting his investment?
24              MR. SACK:  Objection to the form.
25         A.      That is what I said in this email.  I

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 246

1    don't recall exactly what Mr. De Perio sent, but the

2    message was the same.

3           Q.    Did you later come to learn that there

4    had been a mistake made in terms of where the wiring

5    instructions were sent?

6           A.    Well, the wiring instructions were

7    attached to a number of emails.  He did, in fact,

8    ask them to be resent, and there was a mistake.

9    They -- they didn't get sent to him after he had

10   asked for them.

11          Q.    Okay.  And did -- did you eventually

12   agree to accept his investment or Cypress'

13   investment in Sport-BLX?

14          A.    Well, once he wired in the money we

15   thought about it, discussed it, and we realized that

16   we had a signed agreement, we did not put a term on

17   when he could send the money in, so that we

18   ultimately felt like it was the right thing to do to

19   just accept the money and do the best we could.

20          Q.    So you did?

21          A.    We didn't --

22          Q.    So you accepted the money?

23          A.    We did.

24          Q.    And did -- at any other point in time

25   -- when was the money sent, by the way; do you have

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 247

1      any recollection?

2              A.      I think it was March 12.

3              Q.      Okay.  At any time between February 28

4      and March 12 did you make any inquiries to

5      Mr. Salerno of what Cypress was?

6              A.      I didn't personally.  I didn't speak

7      to him.

8              Q.      Are you aware of anybody at Sport-BLX

9      making any -- any inquiries in that time frame as to

10     what Cypress was?

11             A.      Given the -- the way the documents

12     were written and drafted and referred to as his

13     holding company, we took him at his word that it was

14     his holding company, and if we -- if you look at the

15     documents, it says in the -- the stockholder

16     agreement Cypress Holdings, III, L.P., Delaware

17     Limited Partnership, parentheses, Salerno.  That is

18     absolutely not customary for what you would put

19     parenthetically.  You would put Cypress for short,

20     you could put CH3, but putting Salerno, to me, was

21     indicative that Salerno was, in fact, the sole

22     beneficial owner of Cypress Holdings.

23             Q.      Okay.  And do you know whether that was

24     a carryover from the previous drafts where it was --

25     he was identified as Salerno, and he was the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 248

1    investor?

2         A.    Because he was identified as Michael

3    Salerno.

4         Q.    Following the -- Cypress' investment in

5    Sport-BLX, do you recall Mr. Salerno raising certain

6    issues with Sport-BLX in or around April of 2019?

7         A.    Yes.

8         Q.    Okay.  And how did he raise those

9    issues, and who did he raise those issues with?

10        A.    He sent an email, I don't recall who

11   it was to, asking for information, and if I recall,

12   parenthetically said self-dealing issue.

13        Q.    Okay.

14        A.    The issue of self-dealing.

15              MR. PEARLSON:  Can we show him

16   Hall-22?

17              (Exhibit Hall-22, Nine-Page email

18   string between Joe De Perio, Michael Salerno, and

19   George Hall dated April 1 through April 26, 2019,

20   Bates stamped SPORTBLX0065062 through 65070, is

21   marked for identification.)

22        Q.    Okay.  I'm going to ask you to look at

23   what's been marked as Hall-22 for identification.

24   It's Bates stamped SPORTBLX0065062 to

25   SPORTBLX0065070, and I'm going to direct your

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 249

1    attention to the second page of the document.

2        A.    Okay.

3        Q.    And I'm going to ask you if you

4    recognize that to be -- it's an email dated April 17

5    from Mike -- Michael Salerno to yourself -- oh,

6    actually, it's to Joseph De Perio, and you're copied

7    on that document.  Do you see that?

8        A.    Yes.

9        Q.    Okay.  And do you -- do you -- is this

10   the document you were speaking of, the email you

11   were speaking of in which Mr. Salerno requested

12   certain information from Sport-BLX?

13       A.    This is not the one I was referring

14   to.

15       Q.    Okay.  Did -- do you recall -- whether

16   this was the first email, do you recall this email?

17       A.    I think there was a -- I do recall

18   this email.  I think there was a previous email.

19       Q.    Oh, I'm sorry.  If you could turn to

20   page -- it's the carryover.  The Bates stamp 5065 to

21   5066.  It's an email from Michael Salerno to

22   Mr. De Perio and yourself dated April 11, 2019.

23   Could you take a look at that and advise me if

24   that's the email you were speaking about in which

25   Mr. Salerno requested information from you and

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 250

1    Mr. De Perio?

2         A.    Yes.  I was incorrect.  The

3    self-dealing is not parenthetical, but this is the

4    document I was referring to.

5         Q.    Okay.  And -- and the email -- one of

6    the things he asks for is the rental agreement, and

7    it says -- it says under one of the bullets "Rental

8    agreement - market rent and address issue of

9    self-dealing."  Do you see that?

10        A.    Yes.

11        Q.    And did Sport-BLX have a rental

12   agreement at that time?

13        A.    It did not have a rental agreement

14   other than the $500,000.00 agreement that was in the

15   -- the pro formas and the data room.

16        Q.    Okay.  When you say the $500,000.00

17   agreement that was in the pro forma and the data

18   room, you're referring to an item that just said 400

19   -- $500,000.00 for rent?

20             MR. SACK:  Objection to form.

21        A.    In the -- the model of the -- the

22   company, the -- under expenses, one of the line

23   items was rent, and it was -- in the first year it

24   was $500,000.00.

25        Q.    Okay.  And do you understand what he

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 251

1    was saying, "and address issue of self-dealing"?

2                    MR. SACK:  Objection to form.  You can

3    try to answer.

4         A.    Well, I -- I'm -- I think I know what

5    self-dealing is.  I don't really necessarily

6    understand what was in his mind.

7         Q.    Okay.  Did you -- had he raised this

8    issue with you other than in this email?

9         A.    Yes.

10        Q.    Was this the first time he had raised

11   the accusation of self-dealing?

12                    MR. SACK:  Objection to form.

13        A.    I don't know if he raised the

14   accusation of self-dealing, I appreciate your

15   characterizing it as an accusation, but the rent was

16   discussed before he invested.

17        Q.    Okay.  I'm not asking that question.

18   When he used the term "and address issue of

19   self-dealing," --

20        A.    Um-hum.

21        Q.    -- had you addressed -- did you

22   understand what the issue of self-dealing was that

23   he's referring to there?

24        A.    I think I said I know what

25   self-dealing is.  I can make an assumption as to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 252

1      what he meant, but I don't necessarily know what he
2      meant.
3              Q.    At the time had he said to you we have
4      an issue of self-dealing and explained what it is,
5      or he just -- he just sent you this email?
6              A.    When you say "at the time" and then
7      "said" past tense, help me with the time you want to
8      know.
9              Q.    Okay.
10                   MR. SACK:  You mean before this
11     email --
12                   MR. PEARLSON:  Before.
13                   MR. SACK:  -- had he raised --
14                   MR. PEARLSON:  Exactly.
15                   MR. SACK:  -- the issue of the rent
16     and self-dealing?
17             Q.    Before this -- before he sent you this
18     email, had he ever raised an issue of self-dealing
19     with you in connection with the rent?
20             A.    He raised the issue of the rent.  I
21     don't believe he ever said self-dealing.  If he had,
22     we clearly would not have taken his investment in.
23             Q.    Okay.  And that -- and that email is
24     dated April 11, 2019.  You see that?
25             A.    Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 253

1          Q.     Did -- how did you respond to

2    Mr. Salerno's request for information in the --

3    that's reflected in those bullet points?

4          A.     I don't think I directly responded.

5                 There were two parts to this.  He

6    wanted to buy more securities in the first

7    paragraph, and then he was suggesting we schedule a

8    first board meeting and then started to make demands

9    for information.  So the -- when you say the

10   response, what time frame are you talking about?

11         Q.     Well, did you provide him with any of

12   the information he requested in those bullet points

13   on April 11?

14         A.     Over time we did -- we did provide him

15   the information.  There's an email right above where

16   we -- where Joe had sent him the purchase agreement

17   that he asked for, and I -- it says that Joe had --

18   was gonna schedule a call with him.

19         Q.     Okay.  And then there's an email, if

20   you look at what's Bates stamped 65063, which is an

21   email from Michael Salerno to you -- I'm sorry -- to

22   Mr. De Perio and copying you dated April 17.  Do you

23   see that?

24         A.     I do.

25         Q.     And again, he's requesting certain

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 254

1    information that he had previously requested in the

2    prior email, correct?

3                MR. SACK:  Do you want him to compare

4    the two emails, Ross?  Because they're both --

5    they're fairly detailed emails.

6         Q.    Let's try to short-circuit it.  He's

7    again requesting certain information, correct?

8         A.    Yes.

9         Q.    Okay.  And one of the things it says

10   here is, "You are sending me the lease so I can

11   review with respect to Article VII, Section 1 of the

12   Bylaws."  What lease is he talking about?

13        A.    We did not have a lease at that time.

14        Q.    Did he know that you didn't have a

15   lease at that time, as of April 17?

16                MR. SACK:  Objection to form.  Calls

17   for speculation.

18        A.    Yeah, I don't know what he knew.

19        Q.    Okay.  Had you told him that there was

20   no lease for the premises at 510 Madison Avenue?

21        A.    At what -- when?

22        Q.    As of April 17.

23        A.    I don't think I discussed it with him

24   as of April 17.

25        Q.    Okay.  Then one of the other items he

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 255

1    says, "I want to have a better understanding of the

2    'Sport-BLX fund' as you continually stated it is not

3    a part of Sport-BLX however it appears to be a

4    related party as you liked to call it."

5                    Did you have a discussion with

6    Mr. Salerno about the Sport-BLX fund following this

7    email?

8        A.    The only discussion I had with him

9    about -- anytime following this fund about --

10   following this email about a Sport-BLX fund was that

11   there was no fund.

12       Q.    Okay.  And when did you tell him there

13   was no fund?

14       A.    Many, many times during the year.

15       Q.    Okay.  And that was after April 17?

16       A.    Yes.

17       Q.    Do you know how far after April 17?

18       A.    Well, we continuously told him until

19   the end of 2019 when we told him we were -- we had

20   Orix and effectively GlassBridge lined up to pool

21   their money to do a transaction with P.J.

22   Washington, but that was not a Sport-BLX fund.

23       Q.    Okay.

24                    MR. PEARLSON:  Could we show him

25   what's been marked as Hall-23?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 256

1              (Exhibit Hall-23, 28-page Consent to

2     Sublease dated the 31st day of August, 2015, Bates

3     stamped CLINTON00034105 through 34132, is marked for

4     identification.)

5              MR. SPIRO:  Ross, maybe after this

6     exhibit could we take a short break and see where we

7     are?  We could keep going afterwards, but...

8              MR. PEARLSON:  Sure.

9         Q.    Mr. Hall, I'm going to show you what's

10    been marked as CLINTON00034105 through 3412 -- 132.

11             MR. SACK:  Which exhibit is this?

12             MR. PEARLSON:  This is Exhibit 23.

13             MR. SACK:  Thank you.

14             MR. PEARLSON:  Hall-23.

15        Q.    I'm going to ask you to turn to what's

16    been Bates stamped CLINTON00034119.

17        A.    Okay.

18        Q.    I'm going to ask you if you recognize

19    that document, Mr. Hall?

20        A.    Yeah.  I don't have any recollection

21    of -- of when, but this looks familiar.

22        Q.    Okay.  If you could turn to

23    CLINTON00034127, do you see that it was signed by

24    John Hall?

25        A.    Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 257

1          Q.      Do you recognize that to be your

2     brother's signature?

3          A.      I assume so.

4          Q.      Such as it is?

5          A.      Such as it is, I guess.

6          Q.      Okay.  If you would turn back to the

7     first page of the document, do you recognize this to

8     be a sublease agreement between World Gold Trust

9     Services, LLC and Clinton Group, Inc.?

10         A.      Yes.

11         Q.      And is this the -- the lease that

12    Clinton Group entered into for the space at 510

13    Madison Avenue?

14              MR. SACK:  Objection to the form.

15         A.      I'd have to look a little closer at

16    it.

17         Q.      All right.  You know what?  Why don't

18    we go off the record if you want to take some time

19    to look at it while we take a break, --

20         A.      Okay.

21         Q.      -- and then we can come back to the

22    document after -- after that.

23              THE VIDEOGRAPHER:  The time is 5:22

24    p.m.  We're going off the video record.

25              (Recess taken from 5:22 to 5:39 p.m.)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1              THE VIDEOGRAPHER:  The time is 5:39

2     p.m.  We're back on the video record.

3     BY MR. PEARLSON:

4          Q.    Mr. Hall, during the break did you have

5     the opportunity to review the document that I put in

6     front of you, Hall-23?

7          A.    Very briefly.

8          Q.    Okay.  Again, looking at 34119 of that

9     document, --

10         A.    Um-hum.

11         Q.    -- which is titled Sublease, I'm going

12    to ask you do you recognize that document to be a

13    sublease between the World Group Trust Services and

14    the Clinton Group for the space at 510 Madison

15    Avenue?

16         A.    That's what it says, yes.  I agree

17    with that.

18         Q.    Okay.  Did -- did you have any role in

19    negotiating that lease?

20         A.    Not the specific terms of the lease,

21    but obviously agreed to the -- the cost and the

22    basic terms.

23         Q.    Okay.  And you -- and do you see under

24    Term under paragraph 1 it provides for a

25    commencement date of September 1, 2015, and then an

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 259

1    expiration date of December 30, 2021?

2           A.    Yes.

3           Q.    Okay.  And do you also see that there's

4    a rent amount that's provided for certain periods of

5    time under paragraph 2?

6           A.    Yes.

7           Q.    And if you look specifically under

8    2(d), do you see that it -- it has a rent of

9    $88,986.72 per month from January 1, 2019, through

10   December 31, 2019?

11          A.    Yes.

12          Q.    Okay.  And that was the Clinton Group's

13   obligation to pay that rent, correct?

14          A.    Yes.

15          Q.    And that's -- that's approx- -- that's

16   approximately a million dollars, a little over a

17   million dollars a year in rent, correct?

18          A.    Yes.

19          Q.    And at this time was the Clinton Group

20   in the process -- in the year 2019 was it in the

21   process of downsizing?

22          A.    It was downsizing in the number of

23   employees to the traditional Clinton Group business

24   in favor of focusing on other things.

25          Q.    Okay.  And as a result of needing less

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 260

1    employees did it need less space?

2            MR. SACK:  Objection to the form.

3        A.    Well, we didn't need to downsize the

4    number of employees, we were downsizing particular

5    parts of the business.  We could have continued to

6    continue with that business and try to upsize that

7    business, or we could have created some new

8    businesses, and ultimately we decided to -- or I

9    decided to focus on GlassBridge and Sport-BLX.

10       Q.    Okay.  And you -- in the process of

11   doing that you allocated a portion of the rent due

12   under the sublease to Sport-BLX, correct?

13           MR. SACK:  Objection to the form.

14       A.    We allocated -- well, we didn't

15   allocate a specific amount of space.  We -- we

16   basically allowed -- we made an al- -- we allowed

17   Sport-BLX to use -- use the space.  I just don't

18   know if allocation is the right word.

19       Q.    Well, I meant more did you allo- -- you

20   allocated a portion of the rent to Sport-BLX.  In

21   other words, that Sport-BLX was responsible for, on

22   an annual basis, $500,000.00 of the rent for this

23   space?

24           MR. SACK:  Objection to the form.

25       A.    We -- we did -- Sport-BLX -- we did

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 261

1        agree that Sport-BLX would pay $500,000.00 a year as

2        a reimbursement to Clinton for the use of the space.

3                Q.      And you didn't look at any other space

4        for Sport-BLX, did you?

5                A.      No.

6                Q.      And can you turn to paragraph 7 of this

7        document?  It's on page 5.

8                A.      Paragraphs -- page 3, 4, 5.  Okay.

9                Q.      It's a paragraph that's entitled No

10       Assignment Sublet.  Mr. Hall, did you realize that

11       this sublease prevented Clinton Group from

12       subleasing the space to Sport-BLX?

13                      MR. SACK:  Objection to the form.

14               A.      I'd have to read this more carefully

15       to answer that question.

16               Q.      Okay.  Were you aware that this

17       paragraph required the landlord's consent for -- for

18       Clinton Group to sublease the space to Sport-BLX?

19                      MR. SACK:  Objection to the form.  It

20       puts in a fact that's not been established and has

21       been rejected.

22               A.      If you want, it'll take me a little

23       time to read this more carefully.

24               Q.      Well, let me ask you did you ever --

25       did Clinton Group obtain the landlord's consent to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 262

1     sublet the space to Sport-BLX?

2               MR. SACK:  Objection to the form, and

3     it may call for a legal conclusion as well.

4          A.    I -- I'm not convinced the

5     relationship with Sport-BLX and Clinton Group was --

6     was a sublet.

7          Q.    Let me ask you this.  Sport-BLX was

8     using Clinton Group's space, correct?

9          A.    Clinton Group had a lease and had the

10    obligation to pay the lease for the space.

11    Sport-BLX was given the ability to use that space.

12         Q.    And it paid for that space, correct?

13         A.    It did -- it reimbursed Clinton Group

14    for the cost of that space.

15         Q.    What do you mean, "it reimbursed

16    Clinton Group"?

17         A.    Well, Clinton Group -- they didn't pay

18    rent directly to any landlord.  They paid Clinton

19    Group, and Clinton Group made the payment to the

20    landlord.

21         Q.    What am I missing, Mr. Hall?  Why isn't

22    that a sublease?

23               MR. SACK:  Objection to the form.

24    Calls for a legal conclusion.

25         A.    Yeah.  I'd have to think about what a

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 263

```
 1      -- what a sublease entails.

 2           Q.    Okay.  Well, what facts are -- are not

 3      there to make this a sublease?

 4                 MR. SACK:  Objection to the form.

 5      Calls for a legal conclusion.

 6           A.    I don't know what a sublease

 7      technically means.

 8           Q.    Okay.  You don't -- you don't think it

 9      means renting space from someone who always --

10      already has a lease and paying them for the use of

11      the same space?

12                 MR. SACK:  Objection to the form.

13      Calls for a legal conclusion.

14           A.    Yeah, I'm not sure.

15           Q.    Did you ever talk to the landlord or

16      did you ever -- strike that.

17                 Did you ever notify the landlord that

18      the -- that Sport-BLX was using the space at 510

19      Madison Avenue?

20           A.    I don't believe so.

21           Q.    Did you ever tell Sport-BLX or the

22      Sport-BLX board that it wasn't allowed to use the

23      space without the landlord's consent?

24                 MR. SACK:  Objection to the form.  Has

25      a premise of a legal conclusion in it.
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 264

1          Q.      You could answer.

2          A.      I'm not sure what you said is correct,

3    and we did not -- I did not make that statement to

4    the board.

5          Q.      Okay.

6                  MR. PEARLSON:  Let's look at Hall-24.

7                  (Exhibit Hall-24, 35-page packet of

8    Sport-BLX financial documents Bates stamped

9    GBE_0000517 to 551, is marked for identification.)

10         Q.      Mr. Hall, I'm going to ask you to look

11   at what's been marked as Hall-24 for identification.

12   It's a document that begins with a balance sheet

13   that's Bates numbered GBE_0000517 to GBE_0000551.

14   Do you recognize what that document is?

15         A.      Yes, the first page of it.

16         Q.      Okay.  And what is it?

17         A.      It's a balance sheet for Sport-BLX,

18   Incorporated.

19         Q.      For what time period?

20         A.      For the 2019 year.

21         Q.      Okay.  And what does it say about --

22   this balance sheet, looking at it, what does it say

23   about Sport-BLX's capital position at the end of

24   2019?

25         A.      So the total capital was negative

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 265

1    $2.55 million.

2            Q.      Does that indicate to you that -- that

3    Sport-BLX could have used an injection of new

4    capital?

5            A.      Potentially.

6            Q.      And what -- what does it say about the

7    company's revenues?

8            A.      I don't think the balance sheet says

9    anything about revenues.

10           Q.      I'm sorry.  If you turn to the next

11   page, the income statement.

12           A.      Oh.  Okay.

13           Q.      What does that say about the company's

14   revenues?

15           A.      They were negative.

16           Q.      Does that indicate to you in any way

17   that Sport-BLX should have been using -- looking at

18   ways to reduce its costs in 2019?

19                   MR. SACK:  Objection to the form.

20           A.      Say that again?

21           Q.      Does that indicate to you that

22   Sport-BLX should have been looking at ways to reduce

23   its expenses in 2019?

24           A.      It did.  It did look for ways to

25   reduce its expenses.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 266

1      Q.     Okay.  And what -- what revenues did

2   Sport-BLX have in 2019?

3      A.     I believe there was a -- I think in

4   2019 there weren't any revenues.

5      Q.     Now, if you could turn to 536, GBE 536

6   in the document.

7      A.     Um-hum.

8      Q.     It's a document entitled "Demand Note."

9   Can you explain to us what that is?

10     A.     Sport-BLX borrowed money from

11  GlassBridge Enterprises.

12     Q.     I'm sorry.  First can you look at 535

13  and then 536 and tell me collectively what those two

14  documents represent?

15     A.     They're both demand notes between

16  Sport-BLX, Incorporated and GlassBridge.

17     Q.     Okay.  And can you tell us, just in

18  general terms, what happened with respect to

19  Sport-BLX borrowing money from GlassBridge pursuant

20  to these demand notes in 2019?

21     A.     Sport-BLX needed capital for -- to

22  continue the business, so we borrowed it from

23  GlassBridge.

24     Q.     And how much did you borrow from

25  GlassBridge or Sport-BLX borrow from GlassBridge --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 267

1          A.     Well, --

2          Q.     -- in 2019?

3          A.     -- this demand note was for up to

4    1.75, then on December 27 there was another 250,000.

5    So just looking at these two, I could be wrong, but

6    my -- it appears to me that we borrowed the -- we

7    drew down the entire 1.75 million and then borrowed

8    another 250,000.

9          Q.     From GlassBridge?

10         A.     From GlassBridge.

11         Q.     Now, if you could look to the page 551.

12                First of all, Mr. Hall, do you have any

13   idea who prepared this schedule?

14         A.     I don't know who prepared it.

15         Q.     Okay.  And can you tell us what it

16   reflects?

17         A.     It is rents, rent taxes, I would

18   assume DR is disaster recovery.

19         Q.     And does this reflect the rent that

20   Sport-BLX was paying to Clinton Group in 2019?

21         A.     That's what it says.  I -- I don't

22   know if I -- I don't think I was involved

23   specifically in this schedule.

24         Q.     Does the number at the bottom, the

25   total of 560,035.41, does that approximately reflect

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 268

1    what you believe the rent to have been in 2019 that

2    Sport-BLX paid to the Clinton Group?

3               MR. SACK:  Objection to the form.

4        A.    Well, it's partly rents for 510

5    Madison and then partly use of a separate facility,

6    which we refer to as the disaster recovery, but also

7    gets used on a -- on a frequent basis during the

8    year.

9        Q.    Okay.  But I'm referring now to the --

10   the far right column, DR.  Where it says total,

11   where it says 560,035.41, --

12       A.    Um-hum.

13       Q.    -- you see a series of rent payments.

14   Does that seem to approximate how much Sport-BLX

15   paid to the Clinton Group for rent in 2019?

16               MR. SACK:  I think you're

17   misrepresenting the document.  The rent column has a

18   different number, Ross.

19       Q.    Oh, I'm sorry.  513,228.  Does that

20   approximate the --

21       A.    Wait.  Start all over.  Just help me

22   with this.

23       Q.    So when you look at the column that

24   says "Rent," --

25       A.    Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 269

1          Q.      -- does that seem to approximate what

2     you believe Sport-BLX paid to the Clinton Group for

3     rent for 510 Madison Avenue in 2019?

4          A.      Yes.  If the numbers are correct,

5     that's -- 513,000 is approximately what they paid.

6          Q.      Now, you had indicated that -- that the

7     -- one of the uses of the office for Sport-BLX was

8     that agents and athletes came to the office?

9          A.      Um-hum.

10          Q.      How often did agents and athletes come

11     to visit Sport-BLX's offices in 2019?

12          A.      Well, it was more agents and

13     representatives of athletes.

14          Q.      Okay.  Well, let's start first with

15     athletes.  How many athletes actually came to the

16     offices in 2019?

17          A.      In terms of currently playing

18     athletes, only a couple.

19          Q.      Okay.  And then how about in terms of

20     agents; how many agents came to the offices in --

21     into Sport-BLX's offices in 2019?

22          A.      I -- I would -- I don't know.

23          Q.      Who was the one who was hosting the

24     agents at the offices; were you part of those

25     visits?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 270

1         A.    I was part of a lot of the meetings,

2    yes.

3         Q.    Okay.  And you have no idea how many

4    there were in 2019?

5         A.    In terms of specific agents, no.

6         Q.    Okay.  How about in terms of other

7    representatives of athletes in 2019?

8         A.    There were a number of wealth

9    managers.  I don't recall how many.

10        Q.    Okay.

11        A.    There were other people that had

12   relationships with athletes that could make

13   introductions to athletes, so there were a lot of

14   people that were coming to the office.

15        Q.    Okay.  And is it fair to say based on

16   the figures, if they're accurate, that Sport-BLX was

17   paying about one half of the rent for the space at

18   510 Madison Avenue?

19        A.    Yes.

20        Q.    Now, Mr. Salerno questioned the amount

21   of rent that Sport-BLX was paying in 2019, correct?

22             MR. SACK:  He questioned it in 2019,

23   or he questioned the rent paid --

24        Q.    Well, --

25             MR. SACK:  -- for 2019?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 271

1          Q.      -- in -- in -- in the spring of 2019
2     Mr. Salerno started raising questions about the
3     amount of rent that Sport-BLX was paying for the
4     space at 510 Madison, correct?
5                  MR. SACK:  Objection to the form.
6          A.      I think he -- well, he originally
7     raised it before we started paying it.
8          Q.      He raised it even before you started
9     paying it?
10         A.      He raised it in a meeting in the
11    office prior to his investment.
12         Q.      And -- and did he ask you to start
13    looking at alternative space for Sport-BLX?
14         A.      I don't know if he asked us -- I don't
15    think he asked us that in that meeting, but over --
16    over time once he was invested, he -- he did come up
17    with the idea of looking at other space.
18         Q.      Okay.  And did you take him up on that,
19    or no?
20         A.      I told him I'd be happy to have him
21    look for other space and present it, but I wasn't
22    going to be going out visiting other spaces.
23         Q.      And did he present you with any
24    alternatives?
25         A.      One alternative at WeWork.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 272

1          Q.      And you didn't find that suitable for

2     Sport-BLX?

3          A.      I did not find it suitable for

4     Sport-BLX.

5          Q.      Why?

6          A.      Well, WeWork in general is not

7     suitable for -- for Sport-BLX, but the space was

8     inadequate, the number of offices and conference

9     rooms was inadequate, and it didn't seem to me that

10    it was anywhere near what we needed in terms of

11    office space.

12         Q.      Did Sport-BLX, in fact, make rental

13    payments to Clinton Group for the space it used at

14    510 Madison Avenue?

15                 MR. SACK:  Objection to the form.  May

16    call for a legal conclusion.

17                 MR. PEARLSON:  I don't think it does,

18    but...

19         Q.      You can answer.

20                 MR. SACK:  Well, you're calling it

21    rent.  You're calling it rent, Ross, so I think

22    that's an implicit legal definition there.

23                 MR. PEARLSON:  Well, in the document

24    it says rent.

25         Q.      Mr. -- Mr. Hall, did Sport-BLX, in

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 273

1     fact, make payments to the Clinton Group for rent to

2     use the space at 510 Madison Avenue?

3          A.     It made payments for the use of the

4     space, yes.

5          Q.     Okay.  And when was the last time that

6     Sport-BLX made those payments to the Clinton Group?

7          A.     Somewhere around December or --

8     probably December.  I think December of 2019.

9          Q.     And why did it stop paying the monthly

10    rent at that time?

11         A.     Because we left the space.

12         Q.     And that was because you were evicted

13    by the landlord?

14         A.     Correct.

15         Q.     Okay.  You indicated before in your

16    testimony there was a time when the Clinton Group

17    began to fall behind in its rent obligations,

18    correct?

19         A.     Yes.

20         Q.     Okay.  When did that happen?

21         A.     It was different months.  Some months

22    the payment was late, some months the payment was

23    partial, but -- so it was different months.  I don't

24    recall.

25         Q.     What was the reason for the fact that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 274

1    the rent was either being paid partially or late?

2              MR. SACK:  Objection to the form,

3    asked and answered, but you can answer it.

4         A.    Well, there were a number of reasons,

5    but sometimes the revenues of the company don't

6    necessarily match up with the expenses, so I think

7    in that year there was some timing differences.

8         Q.    Was there a time when the Clinton Group

9    stopped paying rent for 510 Madison Avenue

10   altogether?

11        A.    Well, certainly after we were evicted.

12        Q.    No.  Before you were evicted.  In June

13   of 2019 did you -- did the Clinton Group stop paying

14   rent at -- for 510 Madison --

15        A.    I don't --

16        Q.    -- altogether?

17        A.    I don't recall when the last rent

18   payment was made from Clinton Group to World Gold.

19        Q.    Okay.  Do you -- do you recall why

20   Clinton Group stopped paying rent altogether?

21        A.    I -- I don't recall if it did stop

22   paying altogether.

23        Q.    Okay.  And did the Clinton Group ever

24   stop charging Sport-BLX for the use of the space?

25        A.    When it stopped using the space.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 275

1          Q.     In 2019?

2          A.     At the end of 2019.

3          Q.     So when -- when the Clinton Group was

4     making pay- -- I mean when -- strike that.

5                 When the Sport-BLX was making payments

6     to the Clinton Group, was the Clinton Group making

7     payments, in turn, to the landlord?

8          A.     I'm not involved in the actual

9     payments or the timing of payments, so I don't have

10    the answer to that question.

11         Q.     So you don't know one way or the other

12    whether the Clinton Group forwarded the monies that

13    Sport-BLX was giving it for the rent to the

14    landlord?

15                MR. SACK:  Objection to the form.

16         A.     I can't answer that as a matter of

17    timing, but Clinton Group paid all of the amounts

18    owed until the eviction.

19                MR. PEARLSON:  This might be a good

20    place --

21                MR. SACK:  Yeah, --

22                MR. PEARLSON:  -- to break.

23                MR. SACK:  -- I think so.

24                THE VIDEOGRAPHER:  All right.  Stand

25    by.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 276

1                We are off the record at 6:01 p.m., and

2        this concludes today's testimony by George Hall.

3        The total number of media used was four and will be

4        retained by Veritext.

5                     (Deposition concluded at 6:01 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 277

1                    C E R T I F I C A T E

2

3            I, MARGARET VOLLMUTH-CORSON, a Certified

4    Court Reporter of the State of New Jersey, DO HEREBY

5    CERTIFY that, prior to the commencement of the

6    examination, GEORGE HALL was duly sworn by me to

7    testify to the truth, the whole truth, and nothing

8    but the truth.

9            I DO FURTHER CERTIFY that the foregoing is a

10   true and accurate transcript of the testimony as

11   taken stenographically by and before me at the time

12   and place and on the date hereinbefore set forth.

13           I DO FURTHER CERTIFY that I am neither a

14   relative nor employee nor attorney nor counsel of

15   any of the parties to this action and that I am

16   neither a relative nor employee of such attorney or

17   counsel and that I am not financially interested in

18   this action.

19

20

21

22       MARGARET VOLLMUTH-CORSON, C.C.R. 30XI00158400

23

     This transcript was prepared in accordance with

24   N.J.A.C. 13:43-5.9.

25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 278

1    Jonathan S. Sacks, Esq.

2    jsack@maglaw.com

3                      June 26, 2023.

4    RE: Sport-BLX, Inc., et al v. Salerno & Cypress Holdings, III
         L.P.

5        6/14/2023, Mr. George Hall (#5960469)

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-ny@veritext.com.

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19      If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                   Yours,

23                   Veritext Legal Solutions

24

25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 279

1    Sport-BLX, Inc., et al v. Salerno & Cypress Holdings, III L.P.

2    Mr. George Hall (#5960469)

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   Mr. George Hall                              Date

25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 280

1    Sport-BLX, Inc., et al v. Salerno & Cypress Holdings, III L.P.

2    Mr. George Hall (#5960469)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Mr. George Hall, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11    _____    _____

12    Mr. George Hall                          Date

13    *If notary is required

14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                    _____ DAY OF _____, 20____.

16

17

18                    _____

19                    NOTARY PUBLIC

20

21

22

23

24

25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[& - 2.5]**                                                          Page 1

| & |
|---|
| **&**   1:23 2:2,9,20 8:2,10 278:4 279:1 280:1 |

| 0 |
|---|
| **0**   42:23
**0000517**   6:15 264:9,13
**0000551**   264:13
**0002989**   5:10 186:24 187:4
**0002990**   187:4
**01243**   1:4 7:11
**0172847**   5:6
**0172864**   177:25
**07068**   2:3
**07601**   2:17
**07760**   42:5 |

| 1 |
|---|
| **1**   4:10 6:8 7:8 25:10,11,23 29:10 30:25 36:23 69:8 122:4 143:2,3 146:16 147:3,7 147:12 148:15 172:20 204:21 205:1 224:4,5 226:2 227:7 235:15 239:6 248:19 254:11 258:24,25 259:9 |

**1.75**   267:4,7
**1.864**   233:5
**1.m.**   124:22
**10**   5:16,20 23:13 27:9,9 136:8 146:11 197:3 209:22 222:7
**10,000**   117:5
**10/2021**   4:16 123:17
**100,000.00** 133:22
**10017**   2:10
**10021**   41:22
**10154**   2:21
**105**   1:23 2:2 7:16
**11**   249:22 252:24 253:13
**115**   4:13
**11:18**   69:10
**11:41**   196:22
**12**   5:11 134:13 147:8 148:4,19 157:22 179:2 195:23 196:22 243:5 247:2,4
**123**   4:16
**12:01**   96:11
**12:03**   96:14
**13**   5:11 126:18 136:8 149:2 166:16 167:9 195:24

**132**   256:10
**133.50**   187:11 187:18,20
**13966**   277:21
**13:43-5.9.** 277:24
**14**   1:24 5:7 7:3 186:20,21
**145**   4:17
**15**   5:11 27:9 148:23 149:8 195:22,23 196:3
**15,000.00**   23:13
**16**   4:10 5:14 25:11 148:23 183:22 203:21 203:22 206:5
**163**   4:21
**17**   5:16 180:13 209:19,22 249:4 253:22 254:15,22,24 255:15,17
**171**   5:1
**172864**   5:6 177:18
**177**   5:4
**18**   4:17 5:20 145:22 222:6,7 222:12
**186**   5:7
**19**   5:4 6:1 136:5 177:16 233:18,19

234:14
**19,624**   233:6
**195**   5:11
**1982**   62:14
**1985**   62:21
**1986**   62:21
**1987**   64:8
**1988**   64:8
**1990s**   51:4,5 98:18
**1991**   63:17,22
**1992**   121:11
**1993**   111:10
**1994**   60:8
**1995**   42:8 44:1 44:6 46:13,14 60:9
**1997**   123:7
**1998**   60:8,9
**1:22**   1:13 7:13

| 2 |
|---|
| **2**   4:13 69:13 113:18 115:7,8 148:5,16,20,23 149:3,14,21 165:16 167:10 167:15 180:21 192:6,7 197:4 197:9 259:5,8
**2,497**   226:2
**2.3**   167:19
**2.4**   152:14,21 153:5
**2.5**   242:25 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[2.55 - 25]**                                                    Page 2

| | | | |
|---|---|---|---|
| **2.55** 265:1 | 142:9 145:23 | 159:15,18 | 111:25 129:23 |
| **2.a.** 240:25 | 147:22 155:2 | 160:20 169:14 | 185:6 |
| 241:12 | 157:21 158:8 | 171:8,15 | **2021** 83:4,11,14 |
| **20** 6:4 44:17 | 158:10 | 177:17,24 | 85:1,13 86:4 |
| 47:23 180:21 | **2019** 4:15 5:2,5 | 183:11 186:23 | 88:25 96:24 |
| 243:7,7,8,13 | 5:9,12,18,21 | 187:3 188:16 | 140:23 259:1 |
| 280:15 | 6:1,4,9 23:24 | 188:22 190:1 | **2022** 26:1,7,10 |
| **200** 158:18 | 28:25 30:5,9 | 190:21 193:2 | 26:15,16 |
| 159:20,23 | 31:14,17 32:2 | 193:20 194:6 | **2023** 1:24 7:3 |
| 160:4 230:3 | 32:15,22 33:1 | 195:2,24 | 44:18 124:9 |
| **200's** 227:8 | 33:5,8,13,15 | 196:14,22 | 278:3 |
| **200.00** 158:18 | 34:8,15 35:17 | 209:21,24 | **203** 5:14 |
| 158:23 212:16 | 35:23 36:1,3,6 | 219:12 222:9 | **209** 5:16 |
| 227:2 230:3 | 44:17,19 45:17 | 227:24 229:15 | **21** 47:23 |
| 231:4,8,13 | 45:23 51:13,24 | 230:7 233:20 | **212** 2:10,21 |
| **200.18** 229:23 | 79:19,20,21,24 | 243:8 248:6,19 | **218.00** 226:3,5 |
| 230:10 235:2 | 81:13 92:9 | 249:22 252:24 | 227:4 |
| **200.18.** 227:16 | 93:15,18 94:10 | 255:19 259:9 | **22** 1:4 6:7 7:11 |
| **2000** 74:19 | 94:18,24 99:5 | 259:10,20 | 26:1 248:16,17 |
| **2001** 74:19 | 99:18 101:17 | 264:20,24 | 248:23 |
| **2002** 41:24 | 104:2 105:11 | 265:18,23 | **222** 5:20 |
| 60:24,25 61:1 | 105:17,19 | 266:2,4,20 | **23** 6:11 42:4 |
| **2004** 51:6 | 107:8 113:6,7 | 267:2,20 268:1 | 255:25 256:1 |
| **2005** 59:16 | 115:10,12,19 | 268:15 269:3 | 256:12,14 |
| 71:24 72:22 | 118:15,25 | 269:11,16,21 | 258:6 |
| **2006** 103:3,15 | 119:17,19,22 | 270:4,7,21,22 | **233** 6:1 |
| **2008** 13:25 | 120:18 121:8 | 270:25 271:1 | **24** 6:14 264:6,7 |
| 75:8 123:8 | 129:23,23 | 273:8 274:13 | 264:11 |
| **201** 2:17 | 130:5 132:18 | 275:1,2 | **243** 6:4 |
| **2011** 43:6 51:7 | 133:13 134:12 | **2020** 18:4 20:1 | **248** 6:7 |
| **2015** 6:12 | 134:17 136:2,6 | 44:20 45:17,23 | **25** 2:16 4:10 |
| 256:2 258:25 | 152:3,11 | 47:18,21,24 | 226:7 227:21 |
| **2018** 4:18 77:8 | 153:21 154:10 | 54:3,15 55:12 | 227:22 229:15 |
| 93:24 107:20 | 154:14 157:23 | 82:3,17 85:6 | 230:20 |
| 120:11 122:13 | 158:15,19,25 | 89:3 111:7,18 | |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[25.00 - 5960469]**                                    Page 3

**25.00**   141:14,25
**250,000**   267:4,8
**256**   6:11
**26**   6:9 248:19
   278:3
**263.00**   94:17
   159:15 160:22
**264**   6:14
**264696**   5:3
   171:10
**264742**   4:20
   145:25
**264861**   4:23
   163:25
**27**   267:4
**28**   5:18,21 6:1
   6:11 157:22
   204:23 205:1
   208:12 209:21
   209:24 222:9
   223:13 224:21
   225:23 227:24
   229:15 230:7
   230:11 233:20
   235:15,22
   243:18 247:3
   256:1
**280,000**   233:5
**28976**   222:15
**28985**   5:22
   222:10,15
**28989**   6:3
   233:22
**28999**   5:19
   209:25

**28th**   211:3
**29**   5:9 186:23
   187:3 206:21
**296,000.00**
   146:19 147:12
**2990**   5:10
   186:24
**2:58**   186:14
**2a**   4:13 115:8
   115:11

**3**

**3**   4:16 64:1,14
   64:20 65:1,2
   65:23 114:1
   123:15,16,21
   146:15 174:19
   175:24 186:12
   261:8
**3.1**   146:16
**30**   5:14 154:14
   203:22 259:1
   278:17
**300**   180:15
**300,000.00**   78:6
**30xi00158400**
   277:22
**31**   122:13
   259:10
**315.00**   95:5
**31st**   6:11 256:2
**34119**   258:8
**3412**   256:10
**34132**   6:13
   256:3

**345**   2:20
**35**   6:14 264:7
**35.00**   95:4
**36**   4:16 123:16

**4**

**4**   4:17 125:7,8
   125:12,18,22
   125:23 145:21
   145:22 146:3
   146:23 164:4
   186:16 261:8
**400**   250:18
**407-4852**   2:21
**45**   4:13 27:9
   115:8

**5**

**5**   4:18 103:3
   122:2,4 145:23
   164:3,8 197:3
   218:1,3 261:7
   261:8
**50**   218:7,18
**500**   134:13
   180:15
**500,000**   135:9
   136:22
**500,000.00**
   135:15,19
   136:18 212:14
   212:15 250:14
   250:16,19
   260:22 261:1
**500,000.00.**
   250:24

**500.00**   212:15
**500k**   199:20
   200:2,15
**5065**   249:20
**5066**   249:21
**510**   18:7 21:15
   22:2 23:16
   31:25 32:18
   34:12 115:15
   115:23 116:14
   124:5 132:16
   192:25 193:10
   254:20 257:12
   258:14 263:18
   268:4 269:3
   270:18 271:4
   272:14 273:2
   274:9,14
**513,000**   269:5
**513,228**   268:19
**525-6305**   2:17
**52nd**   115:24
**530-2100**   2:3
**535**   266:12
**536**   266:5,5,13
**551**   6:15 264:9
   267:11
**560,035.41**
   267:25 268:11
**565**   2:9
**58**   242:8
**592**   122:12
**5960469**   278:5
   279:2 280:2

**6**

**6**  4:21 8:21
41:21 103:3
123:24 124:16
163:22,23
164:5,15
217:17
**6/14/2023**
278:5
**600,000.00.**
94:13
**63**  64:2,21 65:4
65:5
**646**  30:10
**65063**  253:20
**65070**  6:10
248:20
**69th**  8:21 41:18
41:21 42:13
123:24 124:16
**6:01**  276:1,5

**7**

**7**  5:1 42:25
64:1,14,20,22
65:22 70:19
103:3,15 171:6
171:7,13 261:6
**70**  82:8 223:9
223:10
**70/30**  143:11
**752-7505**  30:10
**760**  43:3

**8**

**8**  4:4 5:2 6:4
124:20 171:8
171:15 212:21
222:20,24
225:3 243:8
244:2,6
**80**  42:22 90:21
189:1
**8111**  1:13 7:13
**83**  242:3
**83.6**  242:8
**85**  62:15
**856-9600**  2:10
**86**  62:15 64:10
**88,986.72**  259:9

**9**

**9**  5:4 13:25
75:8 123:8
177:15,16
**9.5**  167:11,16
**90s**  59:15,16
65:23
**9219**  196:5
**9220**  5:13
196:1
**95**  158:22
**95.00**  94:3
154:16 157:19
158:10 191:7
211:19 212:14
212:18 226:23
226:25 227:1
231:5 233:9,14
234:25

**973**  2:3

**a**

**a.m.**  1:24 7:2
69:5,11,13
**abandon**  57:19
**ability**  11:9
21:7 67:20
149:19 200:21
218:22 262:11
**able**  55:17
86:14 162:1
**above**  201:3
225:11 253:15
278:6 280:7
**abramowitz**
2:9 8:14
**absolutely**
247:18
**academy**  62:9
**accept**  189:20
196:16 246:12
246:19
**accepted**
236:15 246:22
**accepting**
245:12,23
**accommodati...**
167:17
**accordance**
277:23
**account**  29:24
30:20 202:19
214:13,18
215:11,18,21
216:4

**accounting**
34:16,18 98:24
101:22
**accounts**
201:16
**accredited**
214:19 215:11
215:14
**accuracy**
178:22 206:13
278:9
**accurate**
114:21,24
155:21,23
178:16,24
206:15,16
270:16 277:10
**accusation**
251:11,14,15
**achieved**
160:10
**acknowledged**
244:16
**acknowledge...**
280:3
**acknowledg...**
278:12
**acted**  14:16
50:3
**acting**  33:13,14
102:6,9
**action**  7:13
277:15,18
**actions**  7:13

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[active - agreement]**                                                    Page 5

| | | | |
|---|---|---|---|
| **active**  44:16,20 | **additional** | 127:10 129:18 | **agents**  49:23 |
| 44:21 45:3 | 93:16,17 | 132:9 201:18 | 86:16 110:7,8 |
| 46:3 139:21 | 173:19 187:6 | **advisors**  86:16 | 269:8,10,12,20 |
| 198:7,10,21 | **additions**  280:6 | 114:18 | 269:20,24 |
| 199:1 223:8 | **address**  29:3 | **advisory**  114:7 | 270:5 |
| **actively**  46:6 | 32:7,11 35:1 | 114:10 127:20 | **ages**  61:24 62:2 |
| 131:20 | 35:23 41:19,20 | 127:23,25 | **aggregate** |
| **activism**  73:5 | 42:3,19 115:22 | 128:3,5,6,8,15 | 218:8 |
| 77:1 | 116:5 124:1,11 | 128:23,25 | **ago**  26:18 |
| **activities**  77:15 | 124:18 188:24 | 129:7,11,14,16 | **agree**  7:6 |
| 127:21 | 188:24 250:8 | 129:24 130:4,9 | 176:20,21 |
| **actual**  12:24 | 251:1,18 | 130:10,17,22 | 241:20 246:12 |
| 20:21 27:7 | **addressed** | 130:23,24 | 258:16 261:1 |
| 41:20 63:21 | 251:21 | **advs**  114:14 | **agreed**  24:20 |
| 74:9 109:9 | **addresses** | **affect**  11:9 | 37:2 85:25 |
| 195:15 275:8 | 28:25 29:5,21 | **affiliate**  185:14 | 88:13 143:18 |
| **actually**  20:17 | **administration** | **affiliated**  8:15 | 152:10 154:7 |
| 23:1 53:14 | 49:9 | 13:18 16:2,17 | 258:21 |
| 73:1 81:23 | **adv**  4:14,16 | 36:2 47:2 | **agreeing** |
| 85:16 86:3 | 115:1,9,11 | 48:20 50:5,18 | 153:22 |
| 89:3,17 94:4 | 121:19,21 | 59:7 60:2 | **agreement**  5:17 |
| 102:12 108:25 | 122:2 123:17 | 97:14 108:14 | 5:21 6:2 24:16 |
| 124:21 142:5 | 123:21 124:14 | 109:21 138:2,8 | 108:3 145:17 |
| 147:24 149:13 | 131:14 | **affiliation** | 146:7 147:12 |
| 160:10 185:25 | **advance**  78:1 | 97:17,20 | 147:14,15,17 |
| 191:2 195:9 | 110:5 112:5 | 167:21 168:1,3 | 147:19,24 |
| 203:14 232:12 | **advantage** | 171:3 | 148:1,11,25 |
| 238:25 249:6 | 244:6,22 | **affiliations** | 149:5,8 161:2 |
| 269:15 | **advice**  128:20 | 7:24 | 161:3,14,18 |
| **add**  104:10 | 131:20 | **afternoon** | 176:10,15 |
| **added**  159:16 | **advise**  65:20 | 211:2 | 192:22 206:1,3 |
| 166:19,21 | 249:23 | **ag**  4:17 145:22 | 209:20,23 |
| **addition** | **advised**  68:19 | **age**  43:17 | 211:12,17 |
| 104:17 107:8 | **adviser**  114:11 | **agent**  174:8,9 | 212:13,18 |
| 137:23 166:23 | 126:7,23 | | 213:10,14,19 |

| | | | |
|---|---|---|---|
| 213:20 214:2 | 17:24 | 190:5,25 201:1 | 137:9 149:25 |
| 217:13,18,22 | **allegations** | 220:13 259:4 | 152:24 168:7 |
| 217:23 218:24 | 14:7,15,20 | 260:15 270:20 | 169:19 175:9 |
| 222:8,14 226:1 | 19:19 41:5,14 | 271:3 | 182:1 184:20 |
| 233:20,24 | **allo** 260:19 | **amounts** 23:12 | 184:24 185:3 |
| 235:4,5 241:1 | **allocate** 169:4 | 275:17 | 208:5 212:10 |
| 241:4,9,24 | 260:15 | **analyses** | 219:5 228:9,17 |
| 243:1 245:11 | **allocated** 15:3 | 159:22 | 231:6 240:3,17 |
| 246:16 247:16 | 118:12 260:11 | **analysis** 136:24 | 240:18 251:3 |
| 250:6,8,12,13 | 260:14,20 | 140:18 141:15 | 261:15 264:1 |
| 250:14,17 | **allocation** | 141:19,20,23 | 272:19 274:3 |
| 253:16 257:8 | 113:12 137:15 | 141:24 151:3 | 275:10,16 |
| **agreements** | 260:18 | 151:10 182:23 | **answered** |
| 40:6 148:8 | **allotted** 278:20 | 230:24 | 49:18 92:9 |
| 159:9 203:14 | **allow** 198:19 | **analyst** 19:16 | 116:25 120:17 |
| 203:16 207:5 | 200:23 | 19:22 33:11 | 166:14 228:1,1 |
| 211:15 234:24 | **allowed** 260:16 | 72:10 91:10 | 229:17 237:18 |
| 235:11 236:8 | 260:16 263:22 | **analyzing** | 238:4,20 |
| 236:12,13 | **allowing** 219:2 | 231:7 | 239:17 240:3 |
| 242:13 243:15 | **alluded** 76:25 | **anello** 2:9 | 274:3 |
| **ah** 126:12 | **alternative** | **annual** 241:21 | **answering** |
| **ahead** 43:1 | 58:14 182:3 | 260:22 | 67:18 131:17 |
| 64:17 67:17 | 271:13,25 | **annually** 78:6 | **answers** 165:12 |
| 127:7 164:25 | **alternatives** | 135:15 | **anticipate** |
| 233:1 240:4 | 271:24 | **answer** 10:3,7 | 104:19 165:11 |
| **air** 174:10 | **altogether** | 10:15,19 11:3 | **anticipated** |
| **akin** 153:15 | 220:25 274:10 | 11:4 14:11 | 173:13 |
| **al** 7:10,11,12 | 274:16,20,22 | 24:11 43:2 | **antidilution** |
| 7:12 8:5,7 | **amended** 5:14 | 47:14 53:5 | 235:8 |
| 260:16 278:4 | 203:22 206:6 | 58:7 67:17 | **anybody** 37:5 |
| 279:1 280:1 | **amount** 25:3 | 79:11,22 81:14 | 37:13,18 |
| **alan** 40:13 | 56:8 95:12,13 | 93:9 95:11 | 118:16 132:17 |
| **allegation** | 133:17 135:12 | 106:3 112:23 | 156:6,16 165:2 |
| 14:13,21,23,25 | 159:14 170:5 | 120:9 124:7 | 207:16,25 |
| 15:2 17:19,22 | 179:24 180:24 | 128:19,19 | 208:3 247:8 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

| | | | |
|---|---|---|---|
| **anymore** 51:17 | **approx** 259:15 | **arrived** 137:11 | 120:25 121:6,8 |
| **anytime** 255:9 | **approximate** | 143:3 | 121:11,15,18 |
| **apartment** | 10:20 212:16 | **article** 254:11 | 121:25 122:5 |
| 124:5 | 268:14,20 | **aside** 127:8 | 122:12,16,19 |
| **apologize** 20:17 | 269:1 | 128:1 | 122:21 123:2 |
| 38:7 71:14 | **approximately** | **asked** 4:22 40:5 | 132:8 138:25 |
| 81:14 150:16 | 1:24 12:9 | 49:17 82:19 | 139:2 140:1,2 |
| 163:9 | 23:10,23 24:23 | 87:16 89:2 | 143:1 144:7,21 |
| **appearance** | 38:16 63:3 | 90:25 91:2 | 168:20 169:23 |
| 7:23,24 | 122:11 158:18 | 92:8 101:4,23 | 170:12 173:1 |
| **appears** 196:7 | 259:16 267:25 | 116:24 129:12 | 179:20,21 |
| 255:3 267:6 | 269:5 | 137:6,8 138:14 | 180:11,25 |
| **appended** | **approximation** | 163:1,17,18,24 | 181:20 204:14 |
| 280:7 | 12:11 | 164:19 166:13 | **assign** 145:9 |
| **applicable** | **april** 6:8,9 | 193:6,25 228:1 | **assignment** |
| 278:8 | 47:18,21,24 | 228:15 229:4 | 261:10 |
| **application** | 82:3,17 248:6 | 237:18 238:4 | **associated** |
| 56:6,9,20,23 | 248:19,19 | 238:20 239:17 | 40:23 162:23 |
| 58:18,22 70:9 | 249:4,22 | 246:10 253:17 | 166:8 |
| 161:9 209:14 | 252:24 253:13 | 271:14,15 | **assume** 10:15 |
| **applications** | 253:22 254:15 | 274:3 | 26:12 28:16 |
| 58:18,21 | 254:22,24 | **asking** 128:10 | 36:7 73:21 |
| **applied** 31:13 | 255:15,17 | 248:11 251:17 | 75:15 79:11,23 |
| **apply** 58:9 | **area** 116:8 | **asks** 26:24 | 119:14 171:23 |
| 220:5 221:1 | **areas** 49:25 | 250:6 | 188:1 208:3 |
| **applying** 143:1 | 65:12 | **aspects** 142:23 | 221:4 257:3 |
| **appreciate** | **arose** 23:15 | **asset** 5:4 14:5 | 267:18 |
| 251:14 | **arrange** 48:4 | 122:1 133:1,14 | **assumed** 33:16 |
| **appropriate** | 49:21 85:21 | 134:3 167:21 | 33:17 214:17 |
| 9:11 182:22 | **arrangement** | 168:4 177:16 | 214:19 234:7 |
| 197:19 | 88:15 | 177:23 179:22 | **assumption** |
| **approved** | **arrangements** | 180:24 185:12 | 204:15 216:18 |
| 58:15,25 154:1 | 127:17 | 185:12 | 234:9 251:25 |
| 154:6 239:5,8 | **arranging** | **assets** 45:10,18 | **athlete** 83:17 |
| | 49:20 | 45:25 48:4 | 83:21 84:1,12 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[athlete - basically]**                                                    Page 8

84:23 86:21,24
86:25 87:9
143:5 161:3,14
173:3 179:23
**athlete's** 84:3
176:21
**athletes** 84:5,20
86:11,16,17,19
110:10,14
159:2,9 161:5
171:21 172:15
182:24 269:8
269:10,13,15
269:15,18
270:7,12,13
**ats** 58:14,16
**attached** 4:19
145:24 175:2
238:18 246:7
278:11
**attachment**
175:4
**attended** 40:8
**attention** 21:10
21:11,12
145:14 187:5
206:20 222:12
249:1
**attorney** 7:25
10:25 11:4
85:17,17
204:12 277:14
277:16 278:13
**attorneys** 2:7
2:14,19,24

37:3 38:12,15
39:4
**attract** 108:19
**auctioning**
219:25
**audio** 7:5 95:25
**august** 6:12
63:17 256:2
**authority**
125:10 126:6
170:3
**authorizing**
245:20
**automatically**
35:3
**available** 83:23
118:13,18
163:2 165:12
183:19,20
278:6
**avenue** 2:9,20
18:7 23:17
32:19 42:4
115:15,23
116:15 132:16
192:25 193:11
254:20 257:13
258:15 263:19
269:3 270:18
272:14 273:2
274:9
**aware** 29:8
37:5,13,18
127:9 128:2
211:4,7 223:24

223:25 247:8
261:16

**b**

**b** 231:15,19
232:9
**back** 18:20
28:25 30:5,9
31:14,17 49:9
51:6 64:7,12
76:20,23 89:2
96:15 100:17
112:8 113:12
125:14 126:8
132:15 135:14
154:17 165:19
169:11 170:17
179:13 184:16
184:17 201:2
204:6 205:11
208:20 209:5
216:17 218:5
237:10 239:10
241:8,11
242:15,16
244:5,13,15
257:6,21 258:2
**background**
60:17 62:6
63:23 101:23
167:6 182:22
195:16,20
199:13,16
**backstop** 176:9
176:10,11,14
176:23 177:11

**baez** 1:8 2:15
35:5,6,16
106:6 107:15
**bailing** 220:21
220:21
**balance** 95:14
138:18 202:10
264:12,17,22
265:8
**bank** 62:23
**banks** 83:18
84:14
**base** 46:22
144:16
**based** 62:2 65:7
73:23 84:4
92:1 128:20
130:9 135:21
136:23 140:13
141:5,6,17
142:1 160:4
174:14 177:10
180:25 195:1
198:16 208:18
211:4 212:2
227:4,9,12
229:15 231:14
242:4 270:15
**basic** 65:14,18
72:17 258:22
**basically** 52:14
58:9 64:22
67:10,11 87:11
110:3 143:18
152:18 153:23

| | | | |
|---|---|---|---|
| 169:4 176:10 | 114:1 118:6 | 66:19 67:13 | 193:12 205:3 |
| 181:19 194:23 | 119:7 147:5 | 69:24 70:17 | 205:19,20 |
| 213:12,13 | 160:13 186:16 | 71:24 78:6 | 206:15 207:11 |
| 219:25 220:4 | 216:7 239:5 | 79:20,21 80:18 | 208:8 209:9,16 |
| 220:18 260:16 | **begins** 19:8,10 | 82:3 83:3 85:1 | 211:3 212:16 |
| **basis** 45:25 | 264:12 | 85:6,17 88:14 | 214:14 216:4 |
| 119:4 122:13 | **begun** 9:8 | 89:2 90:10 | 222:20 223:14 |
| 201:1 260:22 | 120:11 | 92:9,19 93:23 | 223:17 229:17 |
| 268:7 | **behalf** 1:4,13 | 94:9 95:21 | 235:17,19 |
| **bates** 4:19,22 | 8:9 9:3 15:11 | 96:21 97:6,15 | 239:9 243:5 |
| 5:2,6,10,13,18 | 37:19 44:22 | 99:5 101:9 | 252:21 263:20 |
| 5:21 6:2,5,9,12 | 50:4 53:9 57:4 | 102:12 103:1 | 266:3 268:1 |
| 6:14 124:23 | 58:23 59:6,22 | 107:25 108:5 | 269:2 |
| 145:24 146:4 | 85:18 86:12,22 | 108:13,23 | **believed** 204:3 |
| 163:24 164:16 | 110:19 129:19 | 109:14 110:1 | 206:16 |
| 171:9 177:18 | 131:1 132:5 | 111:18 112:19 | **beneficial** 88:7 |
| 177:24 186:24 | 134:23 146:12 | 113:3 116:9 | 216:11 247:22 |
| 195:25 196:4 | 156:7 205:7,9 | 120:17,21,23 | **benefit** 139:15 |
| 209:24 222:9 | 205:10 212:23 | 121:11,22 | **best** 10:21 |
| 222:14 233:21 | 223:3 | 135:8 136:14 | 19:17 20:13 |
| 243:9 248:20 | **behavior** | 137:25 138:17 | 67:19 70:4 |
| 248:24 249:20 | 197:25 | 138:24 141:13 | 77:21 91:22 |
| 253:20 256:2 | **believe** 18:3 | 147:16,17 | 92:16 94:16 |
| 256:16 264:8 | 20:1 23:6 25:8 | 150:5 151:7 | 105:12 137:9 |
| 264:13 | 27:20 28:7 | 154:13 157:14 | 139:23 204:19 |
| **bd** 56:21 | 29:18 31:7,12 | 157:20 158:9 | 207:2,8 246:19 |
| **beat** 53:2 | 33:14 35:2,10 | 159:17 164:24 | **better** 53:2 |
| **beating** 59:23 | 36:3,6,16,20,22 | 173:17,24 | 84:9 113:20 |
| **becau** 86:2 | 37:1,3 40:14 | 178:1,1,23 | 159:20 182:6 |
| **becoming** | 42:8 43:6 | 181:10,14 | 220:20 245:2,3 |
| 102:4,17 161:8 | 46:18 47:4,18 | 185:8,11,16 | 245:7 255:1 |
| **began** 103:7 | 48:11 50:8 | 188:22 190:12 | **beyond** 28:15 |
| 273:17 | 51:7 55:4 | 190:15,18 | 160:12 |
| **beginning** 7:25 | 56:22 57:2 | 191:16 192:2 | **big** 21:17 |
| 69:13 79:20 | 64:2,14 65:2 | 192:17,20 | 123:11 167:24 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

| | | | |
|---|---|---|---|
| **bigger** 221:12 | 55:23 56:2,13 | 112:2,3,5,11,14 | 181:17,18,22 |
| **bill** 165:19 | 56:24 57:4,18 | 112:17,21 | 181:23 182:4,6 |
| **billion** 123:1 | 58:1,2,5,8,23 | 113:3,4,9,13,14 | 182:15,16,19 |
| **billions** 231:3 | 66:24 67:1 | 118:13,18,24 | 182:24 183:6,8 |
| **bills** 21:8 | 69:17 70:1,13 | 119:1,5,7,20 | 183:15,19 |
| **bit** 45:13 57:23 | 71:1,2,4,7,8,11 | 120:1,10,11,11 | 184:10 187:6 |
| 77:25 141:5,6 | 71:17,18,21 | 132:17 134:6 | 187:17,17 |
| 141:8 159:16 | 77:12,16,20,24 | 134:11 135:10 | 188:11,17 |
| 170:15 190:8 | 78:3,8,20 79:8 | 136:1,7 137:16 | 189:6,8,13 |
| 193:23,25 | 80:19,21,22 | 138:2,8,15,20 | 190:8,11 |
| 195:19 201:15 | 81:1,1,8,12,20 | 138:25 139:8 | 192:12 193:14 |
| 203:4 | 81:21,21,24 | 139:12,16,21 | 193:16 200:12 |
| **bitter** 245:6 | 82:1,13,21 | 140:5,9,21,23 | 203:23 205:10 |
| **blank** 164:11 | 83:2,13 86:12 | 141:12 142:4 | 205:15,17 |
| **blur** 240:15 | 86:22 87:1,2 | 143:6,21,24 | 206:9 207:10 |
| **blx** 1:4,9,9,13 | 89:17,24 90:5 | 144:1,3,12 | 207:13 209:12 |
| 2:14,14 4:19 | 90:8,17 92:23 | 145:1,4,18,24 | 209:21,22 |
| 4:21 5:1,15,16 | 93:6,13,14,15 | 146:7,12 | 210:17 212:23 |
| 5:20 6:1,14 | 93:17,21 94:8 | 149:19 150:2 | 222:7 223:3 |
| 7:11 8:7,15 9:3 | 94:20 96:18,20 | 151:23 152:21 | 230:9 232:5 |
| 9:3 36:4,8 | 97:5,8 101:11 | 153:6,13 | 233:19 234:21 |
| 37:10,17,19 | 101:12,15,20 | 154:10,20 | 241:5,25 |
| 45:7 47:5,6,9 | 102:4,5,17,19 | 155:1,3 156:8 | 242:21 243:1 |
| 47:17,20,25 | 102:25 104:1 | 156:18,19 | 243:14 245:3 |
| 48:8,12,14,17 | 104:11,18,20 | 157:2,10 | 245:15,16 |
| 48:22,23,25 | 105:15,23 | 163:23 165:18 | 246:13 247:8 |
| 49:2,3,5,6,13 | 106:10,13,24 | 169:16,25 | 248:5,6 249:12 |
| 49:15,19 50:1 | 107:3,13,16,22 | 170:9,21 171:4 | 250:11 255:2,3 |
| 50:2,22,24 | 107:23 108:4,8 | 171:4,7,14 | 255:6,10,22 |
| 52:3,6,8,10 | 108:15,19,25 | 172:1,5,18 | 260:9,12,17,20 |
| 53:10,25 54:5 | 109:2,8,12,19 | 173:7,9,12,14 | 260:21,25 |
| 54:6,9,10,12,12 | 109:21 110:2 | 173:19 178:13 | 261:1,4,12,18 |
| 54:14,21,21 | 110:19,23 | 179:6,10,16 | 262:1,5,7,11 |
| 55:1,2,3,5,10 | 111:1,7,17,20 | 180:4,6,12 | 263:18,21,22 |
| 55:13,14,17,19 | 111:23,25 | 181:5,10,14,15 | 264:8,17 265:3 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

265:17,22
266:2,10,16,19
266:21,25
267:20 268:2
268:14 269:2,7
270:16,21
271:3,13 272:2
272:4,7,12,25
273:6 274:24
275:5,13 278:4
279:1 280:1
**blx's** 93:4
144:8 145:14
167:20 169:25
171:2 190:23
205:9 264:23
269:11,21
**board** 5:8 36:4
66:4,14,25
67:1,4 78:25
79:4,13,16,19
79:24 80:2,6,9
80:11,13 92:24
93:1,4,14,15,18
96:18 97:5
100:1 101:12
101:21,23,24
102:4,11,15,17
102:19 104:3,4
104:5,7,9
105:1,4,9,15
106:18,20,25
107:3 154:1,3
186:22 187:2
192:12 198:13

198:24 199:3
219:10,24
220:17 221:10
221:12,25
222:1 235:7
241:11,12,16
253:8 263:22
264:4
**board's** 100:2
**boards** 66:19
66:20,21
**bonus** 46:23,24
73:22,23 91:25
**boomer** 172:3,8
174:1,3 175:2
178:5
**borrow** 266:24
266:25
**borrowed**
266:10,22
267:6,7
**borrowing**
266:19
**bottom** 126:17
196:7 233:3
267:24
**bought** 93:12
95:12 141:1,11
**box** 126:7
127:16 173:6
**brand** 180:11
**breached** 17:20
**break** 12:13
22:15,16 50:25
69:7 90:12

192:19 206:5
208:25 256:6
257:19 258:4
275:22
**brian** 59:11
**brief** 96:7
**briefly** 55:7
258:7
**bring** 142:8
174:7 202:12
**bringing** 108:2
108:7,12
109:12 110:4
166:18
**brings** 202:14
**bringsjord**
75:19
**broad** 14:4
65:11 66:6
**brochure** 4:14
115:9
**broke** 148:17
**broken** 95:7,9
212:3
**broker** 48:5
55:18,21,25
56:3,7,25
57:15 58:11
65:15 69:18
116:3 161:8
221:17
**brother** 43:15
46:13,20 48:18
50:3 51:14,20
51:21 52:1

59:11 98:9
**brother's** 48:7
98:4 257:2
**brought** 13:12
13:15,16 16:25
18:18 19:3,13
19:19 20:15,18
20:20 21:9,10
21:11 43:6
72:3 75:12,18
105:8,15
141:11 142:10
142:15,20
145:13
**budget** 201:11
**budgets** 190:16
**build** 119:10
144:13,16
145:5,11,11
147:6 159:5
**building** 116:7
117:15 191:1
**built** 58:13
116:19
**bullet** 253:3,12
**bullets** 250:7
**bushes** 53:2
59:23
**business** 28:23
30:15 32:24
44:18 47:20,25
56:10,11,12
57:22,23 62:15
67:24 83:14
84:13,18 89:10

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[business - ceased]**                                        Page 12

109:5 110:5
112:6 123:23
124:4,16
136:24 137:3
137:24 139:16
139:19,21
140:5 144:3,16
156:1 157:8
158:25 161:10
166:25 167:20
168:15 169:1
170:1 171:2
180:5 183:8
190:9 218:16
221:16,21
259:23 260:5,6
260:7 266:22
**businesses** 66:8
260:8
**buy** 144:14
151:18 179:20
180:1,1 220:3
220:12,14,15
220:16 221:6,8
253:6
**buyer** 180:1
**buyers** 180:11
**buying** 74:17
**bylaws** 254:12
**börse** 20:16
22:20

**c**

**c** 1:20 2:1 277:1
277:1

**c.c.r.** 277:22
**cachet** 116:5
**calcu** 160:8
**calculate** 90:15
**calculates**
231:12,13
**calculation**
137:18 160:8
**calculations**
121:22
**call** 73:5
144:22 177:11
198:6 208:14
235:6 253:18
255:4 262:3
272:16
**called** 65:17
116:19 126:7
160:9 185:8
211:12 222:13
**calling** 272:20
272:21
**calls** 128:17
175:9 254:16
262:24 263:5
263:13
**cap** 150:7
**capacities** 50:3
58:10 223:2,6
**capacity** 43:24
62:24 67:19
72:9 76:23
77:1 83:2
109:22 213:1
234:20

**capital** 52:11
63:5,7,11,16,21
88:8 89:5
100:6,6 109:3
109:25 110:20
138:20,22
140:22 141:7
153:6 162:2,6
166:24 170:5
176:11,13,15
176:16,20
177:2 180:18
185:23 186:6
190:25 191:5
197:2 230:17
232:13 233:4
241:18 242:25
244:25 264:23
264:25 265:4
266:21
**capitalization**
232:4,8,10
233:4,7
**capitalized**
87:9
**car** 143:3
**carbone** 2:22
8:10,10 95:24
96:4
**career** 70:21
87:12
**careful** 201:4,8
**carefully**
127:25 261:14
261:23

**carryover**
247:24 249:20
**case** 1:3,13
7:11 11:18
12:15 15:21,21
15:22 18:12,14
18:25 20:7
25:18 31:16
40:2,9 74:8
82:10 96:5
145:11 170:6
176:12 177:12
240:1 244:24
**cases** 8:16
12:12,13 15:15
15:16 16:23
121:25
**cash** 95:3,4,9
95:13 149:21
149:23 150:3
152:15,18,19
153:24 179:24
185:5
**cashed** 153:19
153:22
**categories**
22:16 27:10
**cause** 81:5
**caused** 198:1
**ccarbone** 2:22
**cease** 44:14
75:2,5
**ceased** 44:16,20
45:3 46:3,6
127:23

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

[cell - clinton]                                                              Page 13

**cell**  30:6,9,12
  30:17,20 31:9
  36:13
**ceo**  33:14 67:11
  67:12 68:23
  81:23 92:12,15
  92:17,19 102:6
  102:8 129:1
**certain**  40:8
  47:15 56:14
  57:1 69:22
  70:5,6,8 73:7
  87:11 91:21
  95:12,13
  100:18 106:1
  133:16 141:1
  145:9 159:3
  160:1,8,8,19
  167:2,4 179:24
  190:24 211:18
  212:3,5 218:16
  218:16 248:5
  249:12 253:25
  254:7 259:4
**certainly**
  155:17 207:19
  229:3,5 274:11
**certified**  1:21
  277:3
**certify**  277:5,9
  277:13
**cesar**  1:8 2:14
  35:5,16
**cfo**  44:4,5,9
  46:13,17 49:13

  101:9 102:8
**ch3**  247:20
**cha**  220:15
**chain**  196:4
**chairman**
  78:24 79:4,13
  79:16,19,24
  80:2,4,13,15
  223:2,7 234:20
**change**  36:10
  48:13 124:5
  158:21 207:12
  216:25 220:16
  220:17 279:4,7
  279:10,13,16
  279:19
**changed**  24:22
  46:16 65:16
  73:19 82:12
  100:1 147:18
  148:7,10,24
  210:5 224:1
  228:22 229:8
**changer**  179:9
  179:19 180:5,9
**changes**  65:16
  73:7 121:9,12
  216:18 278:10
  280:6
**changing**
  218:20
**characterized**
  108:1
**characterizing**
  251:15

**charge**  15:13
**charged**  133:14
  133:15
**charging**
  146:18 274:24
**charlotte**  62:1
**check**  195:16
  195:20 199:13
  199:16
**checkmark**
  126:18
**chief**  131:13,21
  132:1
**chiesa**  1:22 2:2
  8:2
**children**  61:18
  61:21
**choosing**  24:7
**chris**  8:10
  40:12
**christian**  2:22
**christopher**  1:8
  2:15 103:2
**chronology**
  93:20
**circuit**  254:6
**circumstances**
  68:22 71:25
  90:23 98:2
  103:5,24
  106:14
**citicorp**  62:22
  63:2 64:6
**city**  35:19

**civil**  1:22 7:13
  12:15 15:22
**claim**  23:6,8
**claiming**  22:17
**claims**  215:8
**clarification**
  13:5
**class**  166:17
**clause**  24:21
  217:17
**clear**  56:20
  80:25 225:1
**clearly**  66:1
  154:7 184:4
  245:4 252:22
**client**  144:16
  146:22
**clients**  128:3,8
  129:19 131:7
**clinton**  1:9 4:14
  4:16,18 13:22
  14:3,8,16,24
  15:12 16:20,23
  17:5,7,17,19,21
  18:8 19:13,19
  20:10,15 21:5
  21:14,14,19
  22:1,5,10
  23:11,16,25
  24:3,4,24 25:6
  33:6,10,20,23
  33:25 34:2,5
  34:21,22,25
  37:10,14 44:1
  44:3,9,10,12,14

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[clinton - commencement]** Page 14

45:2,11,19
46:2,5,9,14,15
46:20,21,25
48:18 50:1,21
51:1,2,3,9,12
51:15,16,19
52:7 59:12,18
59:22,24 60:7
60:11 63:12,18
64:13 66:17,18
72:2,7,21,23
73:2,9,12,25
74:3,10,14,21
74:24 75:2,6
75:11,14,17,24
76:3,8,21 77:5
77:10,13 91:3
91:7,13,18,24
92:4,7,11
98:19,21 99:1
99:4,7,13,15
100:12,17,19
100:22 103:10
103:11,14,17
104:12 110:25
111:1,6,9,12,21
111:24 112:18
113:8 114:5,6
115:9,12,14,18
116:14 117:22
118:1,3,5,9
119:21,24
120:2,3,5,13,16
120:20,24
121:15 122:22

123:10,16,24
124:4,13
126:22 127:9
127:23 128:2,7
129:1,2,4,21,24
130:3,7 131:4
131:14,19
132:11,16
133:16,20
134:4,11,21
135:1,6 137:16
138:3,9 142:16
143:17 145:23
165:17,20,25
187:23 188:6,7
192:24 194:12
195:5 216:10
257:9,12
258:14 259:12
259:19,23
261:2,11,18,25
262:5,8,9,13,16
262:17,18,19
267:20 268:2
268:15 269:2
272:13 273:1,6
273:16 274:8
274:13,18,20
274:23 275:3,6
275:6,12,17
**clinton.com**
29:1 196:23
**clinton.com.**
29:3,7 32:13
35:4

**clinton00009...**
5:13 195:25
**clinton00009...**
196:5
**clinton00009...**
196:5
**clinton00009...**
6:6 243:10
**clinton00034...**
6:12 256:3,10
**clinton00034...**
256:16
**clinton00034...**
256:23
**close** 35:14
40:2 90:21
103:8 117:4
119:3 197:10
**closed** 86:20
**closer** 26:11
161:11 257:15
**closes** 238:25
**closing** 208:14
213:23 236:16
237:19 239:1
**closings** 236:17
238:6,14
239:21
**coaching** 228:8
**code** 139:5
**codefendants**
89:12
**cohen** 40:13
**coincide** 93:4

**cole** 2:16 8:8
**coleschotz.com**
2:18
**colleagues** 8:16
**collect** 58:11
**collectively**
266:13
**college** 62:8,14
**column** 268:10
268:17,23
**combination**
95:3
**come** 15:17
23:18 32:13
71:17 83:17
84:10 98:14
157:7,13 161:7
194:2 197:18
200:24 221:18
221:23 227:18
246:3 257:21
269:10 271:16
**comes** 22:20,21
22:21 118:8
153:1 187:21
200:19
**comfort** 201:18
**comfortable**
204:1
**coming** 16:8
25:19 68:14
270:14
**commencem...**
258:25 277:5

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**commencing**
  1:24
**comment**  65:12
  221:11
**commission**
  13:8
**commissions**
  58:11
**commitment**
  176:9,13,24
  177:1,11
**committed**
  93:22
**common**  5:17
  5:20 14:6
  167:10 206:1
  209:19,20,23
  211:12 222:8
  222:13 230:9
**communicate**
  31:15,18 32:1
  32:6,15 34:8
  35:6,9,11,17
  119:4
**companies**  47:1
  48:19 50:4,16
  50:20 59:25
  60:11,14 61:13
  61:16 62:3
  66:2 151:8
**company**  16:12
  28:3,9,11,14,14
  28:19 29:17
  34:23 36:9
  47:9,11,12

49:7,20 67:15
68:1,7,7,15,16
68:24 73:6
76:19 89:4
97:22 99:25
132:25 136:25
143:14 151:18
155:1 157:4
160:3,11,14
161:22 162:1
162:12 193:23
193:24 198:8
198:10,22,24
199:3,15
201:11,16
202:13,14
203:18 204:12
210:16 214:23
216:9,13
218:19,20
220:1,2,3,3,6
220:15,15,16
220:16,19,25
221:4,5 223:8
223:10 228:2
229:18 230:24
231:2,12,14
232:13 233:7
235:6 241:19
244:4 247:13
247:14 250:22
274:5
**company's**
  68:9,18 78:1
  166:20 190:22

207:6 218:7
265:7,13
**compare**  254:3
**compared**
  122:22
**compartment...**
  91:20
**compartment...**
  72:19
**compensated**
  61:15 73:11
  91:24 156:7,11
  156:17
**compensation**
  78:7,11 127:17
**complaint**  5:14
  203:23 206:6
**complaints**
  41:5
**complete**  280:8
**completed**  57:7
  70:8 151:25
  152:2,4,8
  192:7 197:8
  239:8 278:17
**completely**
  11:12
**completion**
  57:12 63:17
  74:18 147:5
**complex**  21:5
  56:7 140:18
**compliance**
  129:3 131:13
  131:17,18,22

132:2
**compliant**
  131:21 132:11
**component**
  95:4,5
**composition**
  241:12
**computers**  12:2
**conceivable**
  220:11 221:7
**concept**  142:4,8
  142:20,25
  143:4 144:13
  157:8 167:25
  168:24 169:6
  174:5,6,14
**concepts**
  155:17
**concern**  198:1
  200:22
**concerning**
  53:19 214:10
  215:2 219:1
**concerns**  194:6
  195:1
**concluded**
  276:5
**concludes**
  276:2
**conclusion**
  262:3,24 263:5
  263:13,25
  272:16
**conduct**  57:23

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[conference - copying]**                                          Page 16

**conference**
  38:4 116:20
  117:12 118:21
  119:6,8 272:8
**confidential**
  1:19 11:18
**conflict** 201:22
**conflicted**
  104:23
**conform**
  129:17
**confused** 57:13
**connected**
  29:14
**connection**
  15:6 18:24
  75:16 89:22
  91:3 109:7
  140:25 155:8
  173:15 185:19
  214:1 252:19
**connections**
  106:17
**conrad** 75:19
**consensys** 4:17
  119:9,11,14
  120:12 135:12
  135:18,24
  136:12,14,17
  136:20 137:11
  137:21 145:4,6
  145:13,18,22
  146:6,7,22
  147:11 149:12
  149:18,20,22

150:1 151:20
151:22 152:13
152:18 153:8
153:12 159:25
160:5,7 164:3
190:25 192:6
**consent** 6:11
  256:1 261:17
  261:25 263:23
**consider** 49:24
  72:4 104:4
  157:13 167:25
  194:19 198:18
**consideration**
  202:17
**considered**
  56:13 130:9,10
  137:13 168:18
  168:24 198:18
  203:7
**considering**
  15:3
**consultant** 31:6
  31:6 36:14
**consultants**
  136:11
**consulting**
  109:15 130:13
  135:4
**consummate**
  176:14
**contacts** 109:4
  110:16 159:2
**contained**
  27:24 28:6

30:24
**contemplate**
  167:21
**contemplated**
  49:12 166:6
  170:9 197:9
**context** 220:9
**continually**
  255:2
**continue** 7:6
  9:10 44:8
  112:5 217:6
  260:6 266:22
**continued** 84:8
  142:23 160:16
  260:5
**continuing**
  77:1
**continuously**
  255:18
**contract** 87:10
  135:3 173:3
  176:21 179:22
  180:2,7
**contracts** 83:20
  159:8 172:14
  182:24
**contractual**
  102:12
**contribute**
  138:19 143:21
**contributed**
  138:22
**contributing**
  169:23 177:2

**control** 100:1,2
  197:22 221:9
  221:18,21
**controller**
  34:18
**conversation**
  194:4 195:13
  195:14 196:18
  219:6,8 221:12
**conversations**
  7:5 35:12 41:8
  41:11 194:5
  215:9
**convertible**
  149:9,12,20
  150:2 152:16
  152:17,19
  153:15
**convince**
  181:14
**convinced**
  208:21 262:4
**cooper** 3:2 7:18
**copied** 249:6
**copies** 28:5
  36:17 37:4,6
  37:14,18
  210:20,20
  278:14
**copy** 125:21
  210:14,23,25
  211:2 216:14
  239:6
**copying** 253:22

corp  89:21
  90:11
corporate
  63:21 74:9
  91:8
corporation
  74:12 87:7,10
  89:18,20
corre  156:2
correct  9:13
  19:14 20:25
  22:25 26:18
  29:19 36:14,15
  36:20 40:9
  42:11 50:10
  55:5 56:21
  57:14,15 69:23
  69:24 70:3
  72:8 81:10
  86:23 89:8,15
  94:19 95:17
  96:20,21 97:6
  105:11,13
  108:22 114:22
  120:21 124:2
  129:1 138:24
  156:24 158:8
  162:5 183:12
  203:15 204:5
  204:24 208:6,8
  210:8 211:15
  211:16,19,20
  212:19,20
  213:2 217:12
  223:4 225:8

226:12,19
232:16,17
233:10 234:1
234:10,22
236:9 242:1,2
254:2,7 259:13
259:17 260:12
262:8,12 264:2
269:4 270:21
271:4 273:14
273:18 280:8
corrected
  232:23
corrections
  280:6
correctly  99:9
  185:15
corson  1:21
  7:19 277:3,22
cost  258:21
  262:14
costs  265:18
counsel  7:23
  9:13 26:7
  29:13,14 41:1
  41:6 65:20
  205:13,17,22
  205:24 206:3
  277:14,17
  278:14
count  125:25
  135:23 136:1
  136:24 137:13
counts  137:23

couple  20:19
  99:13 204:10
  208:14 269:18
course  73:19
  221:22 228:10
court  1:1,21
  2:16 7:14,19
  8:19 9:11,24
  13:3,4 18:22
  20:4 184:18
  242:17 277:4
cousin  194:10
  194:14 195:19
  198:17 201:19
cover  126:1
covered  29:23
covers  114:8
covid  21:3,16
  85:7
create  54:23
  135:25 174:16
  180:12 181:19
  182:7,20,21
created  47:13
  48:3 54:10
  55:13,20,24
  56:9 83:17
  161:22 163:1
  165:25 171:22
  171:25 172:2
  175:14 178:5,6
  178:8 205:24
  205:24 260:7
creating  63:15
  145:1 170:22

180:10 203:4
creation  144:20
  165:18 174:23
  184:22
criminal
  201:24
cross  40:14
  115:23
cs  278:15
csglaw.com  2:4
  2:5,6
cumbersome
  56:17
curiosity  39:20
curious  39:18
current  25:7
  89:9,10 112:5
  139:9 141:7,7
currently  15:19
  41:17 51:8
  74:23 90:1,3
  92:3,15 97:7
  112:25 138:15
  139:1 165:19
  166:6 269:17
custodial  49:9
custodian
  49:23
customarily
  180:23 216:20
customary
  216:15 247:18
customers  46:3
cv  1:4,13 7:11
  7:13

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

[cyp - december]                                                    Page 18

| | | | |
|---|---|---|---|
| **cyp**  205:21 | **daniel**  1:7 2:5 | **days**  278:17 | **deal**  84:12 86:8 |
| 207:20 | 2:24 3:6 8:11 | **de**  1:7 2:19 3:3 | 86:17 162:3 |
| **cypress**  1:3,17 | 90:24 100:4 | 5:12 6:5,7 8:9 | 176:12,13,14 |
| 2:7,8 4:10 6:2 | 107:10 | 19:10 31:17,18 | 186:2 201:5 |
| 7:10 8:3,4,6 | **data**  21:6 22:11 | 32:2,6,21 | 202:5,7,10 |
| 25:11,24 109:7 | 172:17 183:19 | 70:17 71:23 | 204:3 205:6 |
| 203:15,17 | 191:17 250:15 | 72:1,12,21 | 208:10 234:4,7 |
| 204:8,16 205:2 | 250:17 | 75:1,14,18,24 | 244:13,16 |
| 205:4,4 207:17 | **date**  47:23 61:6 | 76:3,7,13 77:5 | **dealer**  48:5 |
| 208:1,6 209:20 | 79:17 91:16 | 77:15 78:20,22 | 55:18,21,25 |
| 210:6,15 211:5 | 95:22 116:12 | 79:3,12 80:14 | 56:3,7,25 |
| 211:13,22 | 124:8,10 143:8 | 80:20 81:9,19 | 57:15 58:11 |
| 213:15 214:6 | 154:12 258:25 | 82:6,20 89:11 | 65:15 69:18 |
| 214:11 215:3,3 | 259:1 277:12 | 94:25 95:16 | 161:8 221:17 |
| 215:13,16,20 | 279:24 280:12 | 98:12 102:1 | **dealing**  49:8 |
| 216:2,3,7,8,22 | **dated**  5:9 6:8 | 107:9 137:19 | 248:12,14 |
| 216:25 224:2 | 6:11 25:25 | 137:20,22 | 250:3,9 251:1 |
| 224:23 225:1,5 | 115:11 186:23 | 138:17,23 | 251:5,11,14,19 |
| 225:7,9,11,15 | 187:3 209:21 | 142:6,19 | 251:22,25 |
| 233:13,20 | 248:19 249:4 | 143:24 146:12 | 252:4,16,18,21 |
| 234:1,7 241:5 | 249:22 252:24 | 154:6 155:13 | **deals**  91:11 |
| 241:6 242:24 | 253:22 256:2 | 164:24 169:11 | 137:24 174:10 |
| 243:4,14 | **dates**  62:12 | 171:23 192:17 | 205:25 |
| 244:13,16 | 79:6 192:8 | 195:24 196:9 | **dealt**  201:16 |
| 245:3,15 | **david**  2:18,23 | 196:15 200:8 | **deborah**  43:13 |
| 246:12 247:5 | 8:8 40:14 | 201:2 205:12 | 50:12,13 |
| 247:10,16,19 | 172:3,7 174:1 | 207:7 232:15 | **debt**  89:18,18 |
| 247:22 248:4 | 174:7,8 244:3 | 237:8 239:9 | 89:21 90:11 |
| 278:4 279:1 | **day**  6:11 33:3 | 241:6,19,24 | 95:3,5,9 |
| 280:1 | 67:12,12 | 243:9,24 244:2 | **december**  4:18 |
| | 160:18 211:7,8 | 245:21 246:1 | 23:24 33:8 |
| **d** | 211:14 240:5,9 | 248:18 249:6 | 77:8,8 92:9 |
| **d**  2:22 19:10 | 240:20 243:19 | 249:22 250:1 | 93:24 94:24 |
| 259:8 | 243:21 244:2 | 253:22 | 99:5,18 107:20 |
| **damages**  17:14 | 256:2 280:15 | | 107:20 120:10 |

Veritext Legal Solutions

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

122:13 133:12
134:17 145:23
147:22 155:2
157:21 158:8
158:10 164:3
188:16 259:1
259:10 267:4
273:7,8,8
**decide** 57:18
200:20
**decided** 24:17
244:17 260:8,9
**decision** 54:20
57:3,5,8,11
102:21,23
203:2
**decisions** 68:1
129:19
**deck** 174:21
175:1
**declare** 280:4
**declines** 121:7
160:18
**deemed** 280:6
**deep** 23:5
**default** 23:4,9
131:21
**defendant** 2:19
4:12 8:9 15:20
17:8 25:13
**defendants**
1:11,17 2:7,14
2:24 8:5 31:16
**define** 108:16

**defined** 226:23
**definitely**
113:10 167:4
173:8 234:6
**definition**
122:15,18
127:25 128:5,6
128:22,24
129:16,18,20
130:9,22,23,24
272:22
**definitions** 27:8
117:6 121:17
122:17
**degrees** 62:16
**delaware**
225:18 247:16
**delay** 70:2
**delayed** 244:24
**deliberation**
80:6
**deliverable**
147:6
**delivered** 152:9
**demand** 266:8
266:15,20
267:3
**demands** 253:8
**demonstration**
175:13
**depending**
123:11
**depends** 68:21
**depicted**
184:11

**deponent**
278:13 280:3
**deposed** 12:3
12:14 13:6
15:15
**deposing**
278:13
**deposit** 24:18
**deposition** 1:6
7:9,16 9:10
11:16,21 13:2
15:5 37:22
38:2,11,18,25
39:5,8,15,17
40:17,23 41:1
276:5
**depositions** 9:8
12:24 40:9,11
**derivatively**
1:4,13
**derivatives**
65:3
**des** 110:1
**describe** 19:17
52:20 53:17
54:19 55:10,12
64:19 67:8
72:20 87:4
114:5 115:22
115:25 116:13
121:5 144:2,7
168:2 170:20
179:7 183:3,5
193:18 239:19
241:14

**described**
25:16 29:21
49:18 55:4
71:19 87:22
97:1 110:1
130:19 149:5
166:7 167:13
169:17 170:23
178:4 181:12
181:24 183:4,7
184:3 185:1
186:2 191:21
191:25 239:16
239:21
**describing**
45:10,15 46:15
53:16 57:21
143:11 171:20
208:4
**description** 4:9
53:7 72:17
**designated**
161:25
**desk** 32:16
**desks** 116:19
118:21,25
119:2 132:21
133:6,9,11
**despite** 104:17
201:19
**detail** 41:16
**detailed** 254:5
**deter** 203:8
**determination**
136:13 137:15

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[determine - district]**                                    Page 20

**determine**
143:13 226:15
**determined**
135:9,18,20
141:4 211:21
226:6
**determining**
197:15
**deterministic**
57:10
**deterred** 203:2
**deters** 201:5
202:5
**deutsche** 20:16
22:20
**develop** 142:19
151:23 181:19
**developed**
168:5
**developing**
52:16 144:8
**development**
162:23 165:18
166:8,20
190:22,23
192:7
**devoted** 165:17
**dforrest** 2:23
**dgold** 2:18
**differ** 58:4
**difference**
158:22
**differences**
274:7

**different** 42:18
54:24 56:12
58:1 87:16
93:13,20 117:5
121:19 157:12
157:12,17
204:14 212:2
229:6 237:24
268:18 273:21
273:23
**difficult** 198:14
202:2
**diligence** 4:22
163:24 195:17
201:4,8,13,14
**dinner** 174:3,5
208:14,15
**direct** 165:20
169:9 187:5
206:20 222:11
248:25
**directing** 27:14
**directly** 86:17
115:2 120:19
137:8 191:17
201:20,21
253:4 262:18
**director** 16:11
36:9 67:6,14
67:24 68:13
80:16,17,23
93:3 101:15,19
104:15 105:6
105:10 106:10
106:12

**directors** 5:8
66:4,14 67:10
68:18,25 80:3
80:4 92:25
93:1 104:5,10
104:13,22
105:1,15,25
106:2,3,5,24
107:2,8 154:1
186:22 187:2
220:17 221:10
241:22
**directs** 11:4
**disaster** 267:18
268:6
**disclosing**
108:10
**disclosure**
114:19
**discretionary**
122:13
**discuss** 174:5
190:10,13
191:8 242:9
**discussed** 21:21
41:4,14 83:8
136:19 174:14
190:4,5 192:10
192:13,20
193:6,11,12
198:13 199:22
200:4,7 246:15
251:16 254:23
**discussing**
199:2 220:8

**discussion**
96:13 143:18
168:14 170:14
170:19 172:7
195:3 219:25
220:23 221:3
222:1,4 226:23
255:5,8
**discussions**
53:9,15,18
84:4,21 106:2
135:22 136:16
137:5,7,22
138:1 161:6
169:7,10,13
174:15 192:16
193:19 194:7
195:1
**disposing**
242:11,18
**disposition**
180:10
**distinguish**
80:25
**distinguishing**
39:3
**distribute**
142:24 180:8
**distributed**
178:8
**distribution**
215:22
**district** 1:1,1
7:14,15

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[divided - early]**                                              Page 21

| | | | |
|---|---|---|---|
| **divided**  134:13 | 227:11 231:12 | 237:3,7,8,14,21 | **dr**  267:18 |
| **divorced**  61:3 | 231:16 234:17 | 238:1,6,16 | 268:10 |
| **document**  26:1 | 235:3,9,25 | 239:9,24 | **draft**  184:4,6 |
| 26:21 27:19,21 | 236:6,24 | 240:10,13,13 | **drafted**  235:10 |
| 30:24 31:2 | 237:11 238:17 | 240:22 247:11 | 247:12 |
| 36:19 122:4 | 238:22 239:2,4 | 247:15 264:8 | **drafting**  216:15 |
| 124:8,10 125:6 | 239:11 240:23 | 266:14 | **drafts**  204:18 |
| 125:7,25 127:4 | 240:23 242:5 | **doing**  13:2 15:3 | 208:20 216:14 |
| 127:8 128:10 | 249:1,7,10 | 33:22 52:12 | 236:20 247:24 |
| 128:12,22 | 250:4 256:19 | 84:12 100:20 | **dramatically** |
| 146:4,15 147:9 | 257:7,22 258:5 | 110:2,18 | 218:21 |
| 155:16,16 | 258:9,12 261:7 | 112:12 113:13 | **drew**  267:7 |
| 164:17,23 | 264:12,14 | 129:21 133:3 | **dropped**  15:10 |
| 165:7,9 171:14 | 266:6,8 268:17 | 139:9 151:20 | **dropping**  198:6 |
| 171:17,20,22 | 272:23 | 152:13 164:8 | **dtyrrell**  2:5 |
| 171:25 172:2 | **documents** | 174:10 187:19 | **due**  195:17 |
| 172:17,21 | 4:12 6:14 9:6 | 190:6 191:1 | 260:11 |
| 175:22,25 | 25:13,25 26:25 | 234:4 260:11 | **duly**  8:22 277:6 |
| 177:25 178:4,6 | 27:10,23 28:1 | **dollar**  23:14 | **duties**  67:5 |
| 178:7,15,20,21 | 28:5,20 29:9 | 102:10 151:13 | 77:23 |
| 179:3 182:21 | 29:12,22 36:17 | 160:15 226:11 | |
| 183:18 184:5,9 | 36:25 37:6,11 | 226:16 | **e** |
| 196:4 206:10 | 37:19 38:13 | **dollars**  93:23 | **e**  2:1,1 3:1,1 |
| 208:19 210:2,9 | 39:10,10,13,14 | 123:2 151:5 | 8:21,21 28:24 |
| 212:22,23 | 39:16,19,23,25 | 192:18 259:16 | 122:8 277:1,1 |
| 213:3,6,8,12,16 | 40:1,4 155:17 | 259:17 | 279:3,3,3 |
| 213:22 214:8 | 155:18 192:3,3 | **download**  31:3 | **earlier**  55:6 |
| 214:16,18,20 | 204:6,8,18,20 | 31:11 | 97:1 164:20 |
| 215:1,6,8,12 | 205:5,23 | **downloaded** | 186:2 191:22 |
| 216:3,7,16,17 | 207:10 210:3 | 31:12 | 226:22 |
| 217:11 222:12 | 216:16,22 | **downsize**  260:3 | **early**  45:17,23 |
| 222:16,17,19 | 224:15 230:19 | **downsizing** | 111:7,18 |
| 222:22 223:12 | 231:7,10,11 | 259:21,22 | 119:19 129:23 |
| 223:18 224:5 | 235:18,22 | 260:4 | 152:11 158:15 |
| 225:23 227:5,6 | 236:2,18,24 | | 166:19 185:6 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**earn** 179:24
180:2 183:15
**earnings** 84:3
88:12 143:5
160:9,10
**east** 8:21 41:21
42:13 123:24
124:16
**economic**
181:18
**economics**
176:9 177:11
182:10
**ecosystem**
182:6
**ed** 62:6
**edie's** 195:4,4
**educational**
62:6
**edward** 2:12
8:16
**effectively**
144:16 161:23
176:15 255:20
**effort** 161:9
**efforts** 184:11
**eighty** 64:9,9
**eisenhower**
1:23 2:2 7:17
**either** 9:9 14:16
16:2,17 20:19
28:2 32:10
59:6 86:15
89:23 90:4
98:11 104:23

109:15 110:24
110:25 141:21
143:20 193:9
193:13 220:3
223:18,20,23
236:4 274:1
**elec** 144:15
**election** 241:22
**electronic** 28:1
**electronically**
27:1 37:1
144:15
**eleventh**
216:13
**eligible** 126:19
126:22,25
127:10,12
**email** 5:12 6:4
6:7 28:25 29:3
29:4,20,23
32:4,5,7,9,11
32:11,12 34:25
35:2,3,21
175:2,3,4
191:21,24
192:1 195:24
196:4 203:11
207:3,7 211:1
243:8,24,25
244:1 245:21
245:25 248:10
248:17 249:4
249:10,16,16
249:18,18,21
249:24 250:5

251:8 252:5,11
252:18,23
253:15,19,21
254:2 255:7,10
**emailed** 34:24
245:11
**emails** 196:8,11
246:7 254:4,5
**empire** 31:7
**employed** 33:5
33:6,20,23
48:14 51:2
54:13 72:2,7
72:22 73:1,8
75:2 77:5
98:15 103:10
103:11,14
107:23 111:16
112:17,18
113:1,8
**employee** 17:1
18:18 19:3,4
19:13 33:25
47:5 48:11,21
50:21,22,23
51:8,15 52:5,8
70:6 71:4,7
73:2 75:6,11
75:17 77:12
92:3,6 98:21
98:25 99:3,7
99:11 107:24
111:6 112:20
113:2 142:16
277:14,16

**employees**
51:16 54:11,14
54:21,25 55:3
56:14,16 69:22
70:12,24 71:1
71:17 76:6
99:13,16
104:12,13
112:2,11
134:16,22
135:2 136:7,9
259:23 260:1,4
**employment**
62:20 73:20
77:10 78:9
113:7 143:17
**ends** 69:8
**engage** 53:8
73:6 86:11
**engaged** 48:1
85:16 86:15
**engagement**
146:6,16 147:3
**engineers**
145:10
**enormous**
160:11
**ensuring**
132:10
**entail** 59:21
**entails** 263:1
**entered** 203:14
241:23 257:12
**enterprises**
1:10 2:24 5:9

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[enterprises - execution]** Page 23

185:12 186:23
187:3 266:11
**entertainment**
185:9
**entire** 117:15
118:6,10,10
217:23 219:24
220:6 235:24
236:6 267:7
**entirely** 154:12
210:19 245:5
**entirety** 203:19
**entities** 16:1,15
16:16,19 34:19
34:21 36:1
60:6 66:4,6,15
66:17,22 89:14
97:12 106:16
**entitled** 171:14
172:23 261:9
266:8
**entity** 13:18,21
25:17 48:23
59:6 72:24
86:25 87:5,13
87:14,18,20,25
88:5,6,19
100:7 170:22
180:18 225:2
**equally** 119:2
**equate** 160:2
**equated** 226:7
**equity** 72:11,24
73:25 76:25
89:19 91:9

104:17 153:12
153:13,14,16
167:10
**equivalent**
154:18
**errata** 278:11
278:13,17
**escalated** 85:7
**escalation**
135:17
**escrow** 238:24
**esiason** 172:3,8
174:1,3 175:3
178:5 192:1
**especially**
174:22
**espiro** 2:12
**esq** 2:4,5,6,11
2:12,13,18,22
2:23 278:1
**establish** 159:6
**established**
261:20
**estate** 116:1,3
**estimate** 45:18
**estimating**
90:22 95:6
**estimation**
10:21
**et** 7:10,11,12,12
8:5,7 278:4
279:1 280:1
**euronext** 22:21
**events** 140:13

**eventually** 11:5
15:8 21:11
143:3 246:11
**everybody** 21:4
**everybody's**
85:11
**evict** 24:22
**evicted** 22:5
68:8,15,17
273:12 274:11
274:12
**eviction** 275:18
**evolution**
168:23
**evolve** 65:17
**evolved** 84:2
**ex** 60:15,16
61:9
**exact** 70:15
73:7 103:23
153:16 194:22
**exactly** 17:23
18:1,10 45:1
54:2,18 59:17
70:23 75:9
76:10,16 93:24
94:9 103:18
109:16 110:21
117:24 133:2
145:16 147:6
174:23 199:8
246:1 252:14
**exam** 70:7,20
70:25 71:16

**examination**
1:7 8:24 277:6
**example** 52:21
68:6,7 168:16
179:21
**exams** 56:15
69:22
**exceed** 123:1
**except** 32:23
**exception**
71:20 213:15
**exchange** 5:12
6:5 11:17 13:8
195:24 243:9
**exchanged**
205:5 238:24
**exchanging**
204:18
**excluding**
156:15
**excuse** 79:4
94:21
**exe** 235:20
**execute** 87:10
**executed**
147:18,24
207:10 210:3
**executing**
58:12
**execution**
64:24 210:11
210:14,23
211:2 216:14
223:13,25
224:4,5,18,20

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

235:21 239:5
**executive** 223:2
223:7 234:20
**exempt** 125:11
**exemptions**
182:23
**exhibit** 25:11
115:8 123:16
145:21,22
163:23 164:4
171:7 177:16
186:21 195:23
203:22 209:22
222:7 233:19
243:8 248:17
256:1,6,11,12
264:7
**exhibits** 4:8
40:22
**existence** 66:1
108:11 185:22
**expand** 55:8
99:22
**expected**
135:23 243:18
**expecting**
139:22
**expense** 107:25
**expenses**
162:24 165:20
166:8 201:12
250:22 265:23
265:25 274:6
**expensive**
201:5 202:5,6

202:6 203:8
**experience** 91:8
106:17 238:6
**expertise** 28:15
49:25
**expiration**
259:1
**expire** 65:24
**explain** 122:14
158:21 169:20
174:2 232:3
266:9
**explained**
252:4
**extensively**
240:3
**extraneous**
140:13
**extraordinarily**
174:6

### f

**f** 123:22 277:1
**facilities**
119:12
**facility** 268:5
**facsimile** 125:4
125:15
**fact** 22:1 91:12
100:11 105:5
106:9 124:3
147:10 151:22
175:1 183:22
183:25 184:1
187:16 201:15
202:11,15,18

213:15 214:13
214:21 216:25
219:1 233:4
236:20 242:3
246:7 247:21
261:20 272:12
273:1,25
**factor** 83:22
**facts** 206:25
263:2
**failed** 17:24
**fails** 278:19
**fair** 22:15 31:5
39:6 56:8 65:7
73:17 78:19
85:25 110:13
112:10 123:9
135:12 143:23
159:21 190:5
240:24 270:15
**fairly** 254:5
**faith** 24:16
**falk** 172:3,7
174:1,7,8
175:2 178:5
192:1 244:3
**fall** 85:1 86:4
107:8 154:10
154:15 273:17
**familiar** 65:9
67:5 213:12,18
213:19,25
256:21
**family** 60:5
86:16 168:10

168:11
**faq** 230:25
**faqs** 191:14,16
**far** 17:9 160:12
166:3 230:12
255:17 268:10
**father** 90:25
**favor** 259:24
**february** 5:2,5
5:18,21 6:1
41:24 60:24,25
61:1 85:6,6
157:22 158:14
158:25 169:13
169:14 171:8
171:15 177:17
177:24 193:3
203:14 204:21
204:23 205:1,1
208:12 209:21
209:24 222:9
223:13 224:4,5
224:21 225:23
227:23 229:15
230:7,11
233:20 235:15
235:15,22
239:6 243:18
247:3
**federal** 1:22
**fee** 19:24 108:2
108:6,11,20
109:6,15,16
130:4,7,9,11,12
130:17 131:1,4

135:4,5 146:19
148:6,7,14
155:25 156:3,5
156:5 176:24
177:1 180:21
180:21,23
181:1,11,11
187:24 188:2,6
**feed** 228:16
**feel** 104:14,23
244:21
**fees** 14:22
109:11 129:25
173:14,19
176:9 177:6,11
180:20 181:24
183:15 185:19
185:24 186:3,7
193:14,17
**fellow** 170:15
**felt** 246:18
**fifth** 2:9 124:24
**figure** 191:2
232:12
**figured** 56:11
159:4
**figures** 270:16
**file** 114:14,21
114:23
**filed** 7:13 18:2
19:25 23:7
115:4 206:6,9
206:13,18
**filing** 41:3
114:20 115:1

124:14
**filings** 125:10
126:6 132:7
**fill** 55:14 209:8
209:15
**final** 147:13
157:21 204:22
208:19 237:10
239:8
**finalized**
207:10
**finance** 91:9
**financial** 6:14
23:25 85:9
135:11,24
165:21 264:8
**financially** 24:4
277:17
**financing** 83:18
83:22 84:14,15
85:21 166:18
**find** 53:3 91:21
100:5 105:24
180:1 182:7
201:23 202:12
272:1,3
**finder's** 108:1,6
108:11,20
109:6,11,16
155:25
**finding** 109:1
156:7,11,17
157:3,6
**fine** 10:21 24:3
24:4 245:11

**finish** 10:6 43:1
**finra** 57:22
58:9,15,22
65:16,19
**finra's** 65:9
**fintech** 89:21
90:4,11,19
96:25 97:2
**firm** 4:14 7:20
8:14 9:15
19:21 27:1,10
31:2 34:18,20
63:5,9,15
75:13,14,15,23
76:17 83:3,5
91:20 114:23
115:9 132:20
132:23 133:2
133:15 134:3
145:16
**firms** 54:24,24
**first** 4:11 13:23
16:5 17:3
18:20 22:17
25:12,24 26:4
26:9,24 27:4,4
27:5 29:8
30:19 35:7
38:14 40:13,20
45:8 47:16
51:1 54:13
60:17 71:22
73:17,18 75:13
84:22 87:17
93:13 97:25

103:13 104:24
107:12,19
109:1 115:22
116:10 121:11
127:16 135:15
142:3,7 144:1
151:22 154:25
157:20 158:9
161:3 165:8
167:12 174:3
188:20 189:16
189:16 192:10
194:7 204:19
208:4 209:19
216:21 225:12
233:13 234:24
235:7 239:2
241:7,8 243:13
249:16 250:23
251:10 253:6,8
257:7 264:15
266:12 267:12
269:14
**fit** 43:21 130:24
**five** 5:1 69:6
107:5,11
109:23,24
117:10 171:7
**fixed** 88:12
146:19
**floor** 117:15
**flow** 179:24
**flowing** 169:10
170:16

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[flows - founder]**                                    Page 26

**flows**  177:12
  185:5
**focus**  91:10
  101:22 260:9
**focused**  39:25
  73:4
**focuses**  65:2
**focusing**  33:13
  45:5 83:21
  84:19 86:3
  259:24
**folks**  96:1
  119:8
**following**  26:25
  158:3 218:24
  248:4 255:6,9
  255:10
**follows**  8:23
**foot**  117:6,7
**footage**  117:3
**forced**  85:8
**forecasts**  140:8
  141:16
**foregoing**
  277:9 280:5
**forget**  40:13
  88:19 132:20
**forgot**  204:12
**form**  4:13,16
  14:10 16:13
  21:1,23 22:4
  22:19 24:2,11
  25:1 27:25
  28:21 33:21
  36:24 37:8

38:20 39:21
45:12 47:22
48:2,6 53:4
56:20,21 57:20
58:6,10 67:16
68:3,10,20
87:14,17 90:2
90:6 93:7
95:10 99:19
109:13 114:14
114:16,17
115:9,11 116:6
118:2 120:8
121:1 123:3,17
123:21 124:6
124:14 128:1,9
128:16 129:9
129:15 130:1,6
130:20 131:9
131:14,15
132:13 134:9
136:3 138:7,11
141:18 143:6
150:4 151:6
152:23 153:20
154:21 156:9
160:6,24
163:16 167:23
168:6 169:18
173:22 175:8
175:19 176:9
178:11 181:25
182:18 184:19
185:2 191:15
191:23 193:21

194:9 195:6
199:24 205:8
208:19 209:14
210:7,18,24
212:8 213:13
213:17,18,20
215:4 218:14
219:4,19
220:10 221:2
226:20 231:9
232:6 234:5
235:23 237:6
237:17 238:3
238:19 239:15
240:2 244:14
245:17,24
250:20 251:2
251:12 254:16
257:14 260:2
260:13,24
261:13,19
262:2,23 263:4
263:12,24
265:19 268:3
271:5 272:15
274:2 275:15
**forma**  159:24
  160:5,7,9
  161:12 233:2
  250:17
**formal**  195:20
**formas**  190:17
  230:21,24
  231:1,14
  250:15

**formation**
  63:22 65:15
  143:21
**formed**  47:17
  47:24 63:19,20
  74:10
**former**  17:1
  18:18 19:3,3
  19:13 71:1,16
**forming**  144:11
**forms**  114:21
**formula**  143:2
  143:3
**forrest**  2:23
**forth**  27:9
  190:8 204:7
  205:11 208:20
  218:21 277:12
**forward**  11:2,3
  57:8 94:5
  100:8 192:1
  245:14
**forwarded**
  172:6,8 174:24
  175:3,5,6,17
  191:24 275:12
**forwarding**
  191:21
**found**  53:14
  84:24 85:10,10
  145:13 221:15
**founded**  82:2,6
**founder**  81:22
  211:18

**founders**
143:24 150:23
151:2,13 162:7
162:22 166:6
166:17 167:13
167:18 191:5
191:10 197:8
211:23 218:6
226:10,12,14
226:15,23
233:9 235:1
**founding**  74:11
77:11,19
**four**  4:21 6:1
12:10 38:16
43:11 107:5,5
109:24 125:25
126:2 127:15
133:6 226:2
233:19 276:3
**fourteen**  62:1
**fourth**  124:25
125:25 126:3,4
**fractionalizat...**
144:6
**fractionalize**
142:14 180:7
**fractionalized**
144:21
**frame**  148:23
183:10 230:16
235:14 247:9
253:10
**fran**  107:9

**francis**  1:7 2:24
3:5 8:11 34:7
34:14 97:24
**frequent**  268:7
**frequently**  4:22
40:5 163:1,17
163:23 164:19
**friday**  244:2
**friend**  98:4
103:8 194:11
**front**  95:13
123:20 210:10
224:21 236:25
237:4,15 258:6
**fruition**  162:4
**fulfill**  55:15
**full**  73:8 77:12
92:12,14 99:10
99:16 111:20
111:23 136:8
236:24
**fully**  11:12 57:7
67:14 122:17
**function**  87:5
87:21 119:2
130:25 132:4
**functional**
100:7,19
**functioned**
185:1
**functions**  58:19
112:9 132:1
**fund**  5:1,5
12:16 14:6
15:4,15 72:11

76:25 89:4
131:20 167:22
168:4 169:4,6
169:15,21,24
170:4,6,10,11
170:17,18,22
170:23 171:1,3
171:8,14,20
172:10,14,23
173:1,1,6,9,10
173:11,15,20
173:21 174:16
174:17 176:3
176:19 177:5,5
177:9,10,12,13
177:17,23
179:9,20,23
180:6,10,17,19
181:4,5,22,24
182:4,8,12
183:2,7,15
184:11,25
185:9,10,10,11
191:19 193:11
193:12,15,17
194:1 255:2,6
255:9,10,11,13
255:22
**fund's**  179:5,16
**fundraising**
157:9,11,15
**funds**  45:4,5,9
45:22 46:4,7,8
121:23 153:5
162:9 168:25

169:3,3 179:20
201:17 243:4
243:14
**further**  277:9
277:13
**future**  143:5
230:12
**futures**  65:3

**g**

**g**  8:21,21
127:21
**galasso**  199:12
199:13,14,16
**game**  170:15
179:9,19 180:5
180:9
**gamechanger**
179:6,17
**gaps**  55:14,16
**gbe**  5:10 6:15
186:24 187:4
264:9,13,13
266:5
**geh**  29:3
**general**  22:14
72:23 73:1
136:4 155:16
182:8 197:25
198:14,25
238:13 266:18
272:6
**generally**  34:9
34:11 38:2
65:9 66:14
67:4,7 69:1

86:15 110:15
155:12 157:6
175:16,22
176:23 177:9
210:19 236:11
236:13 237:14
237:19 238:1,5
238:11,12,21
239:3,21
**gentleman**
29:13 107:19
199:14
**george** 1:7,8
2:14 4:3,12
5:13 6:5,8 7:9
7:10 8:5,14
25:13 29:6
61:25 195:25
223:9 243:9
248:19 276:2
277:6 278:5
279:2,24 280:2
280:4,12
**george.hall**
29:1,2,7 32:13
35:4 196:23
**getting** 70:10
137:2 173:10
181:10
**giantomasi**
1:23 2:2 8:2
**gist** 194:4
**give** 9:21 10:3
10:19,20 16:22
18:12 20:5

30:8 62:5,19
68:4 93:19
151:15 165:7
165:13 171:25
178:5 182:2,15
202:17 212:10
221:21
**given** 52:22
155:20 172:4
174:1 175:16
175:22 178:10
189:12 214:13
214:21,21
247:11 262:11
280:9
**gives** 176:15
**giving** 10:6
238:6 275:13
**glassbridge**
1:10 2:24 5:9
8:11 9:5 33:14
33:14,24 45:6
66:25 78:23
79:5,13,19
80:2,9,14,17
88:8,18 89:7
92:13,15,18,19
92:25 93:1,12
93:16,20,22
94:8,21 95:18
96:19 97:3,16
97:16,17,21,22
99:11,15,24
100:4,5,7,16
101:6 102:7,9

102:10,21
104:12,16,20
130:8 131:1
134:15,16,21
134:23,24,25
135:3 159:16
185:14,16
186:23 187:3
187:10,18
188:9,14,15,16
255:20 260:9
266:11,16,19
266:23,25,25
267:9,10
**glassbridge's**
93:4 102:18
**gmelich** 43:14
**go** 7:7 18:20
19:23 31:15
43:1,17 52:12
57:8 64:17
67:17 69:2
75:13 94:4
95:24 96:2,9
100:8,17
105:24,24
113:15 125:14
125:25 126:8
127:7 155:3
158:6 164:25
177:15 218:5
222:6 231:15
233:1 236:18
240:4 241:7
257:18

**goal** 49:21
100:5 166:18
167:3 180:5
**goals** 78:1
**goes** 64:7 70:9
179:7
**going** 7:2 9:9
11:2,3 24:10
43:20 55:20
58:9 68:7 69:5
70:2,22 84:15
96:1,11 113:21
123:14,19
132:15 143:14
144:3,8 146:2
150:13 171:12
177:22 181:23
186:12 187:4
189:16 196:2,6
196:6 198:10
199:4 200:16
206:21 209:2
209:18 210:15
211:5,22
212:22 219:15
222:11,15
227:25 229:11
234:14 243:12
245:14 248:22
248:25 249:3
256:7,9,15,18
257:24 258:11
264:10 271:22
271:22

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[gold - half]**                                                    Page 29

| | | | |
|---|---|---|---|
| **gold**  2:18 8:8,8 | 16:20,23 17:5 | 100:22 103:10 | 262:17,19,19 |
| 17:6,13,17 | 17:7,17,20,21 | 103:11,14,17 | 267:20 268:2 |
| 18:21 22:1 | 18:8 19:13,19 | 104:12,21,25 | 268:15 269:2 |
| 24:24 117:19 | 20:11,15,23 | 110:25 111:1,6 | 272:13 273:1,6 |
| 117:20,25 | 21:5,14,14,19 | 111:9,12,21,25 | 273:16 274:8 |
| 158:19 164:8 | 22:1,5,10 | 112:18 113:8 | 274:13,18,20 |
| 164:12 182:18 | 23:11,16,25 | 114:5,6 115:9 | 274:23 275:3,6 |
| 231:17,21 | 24:3,4,24 25:6 | 115:12,14 | 275:6,12,17 |
| 257:8 274:18 | 33:6,10,20,23 | 116:14 117:22 | **group's**  77:14 |
| **gonna**  24:22 | 33:25 34:2,5 | 118:1,4,5,9 | 115:18 120:24 |
| 200:23,24 | 34:21,22,25 | 119:21,24 | 192:24 259:12 |
| 234:7 253:18 | 37:10,14 44:1 | 120:2,3,6,13,16 | 262:8 |
| **gontran**  19:5 | 44:3,9,10,12,14 | 120:20 121:16 | **groups**  232:12 |
| **good**  7:1 8:1 | 45:2,11,19 | 122:23 123:10 | **growth**  136:25 |
| 24:15 106:2,16 | 46:3,5,9,14,16 | 123:16,24 | 139:15 |
| 119:2 154:8,9 | 46:20,21 47:1 | 124:4,13 | **guess**  10:18 |
| 154:17,24,24 | 48:18 50:2,21 | 126:22 127:9 | 107:10 124:23 |
| 197:4 275:19 | 51:1,2,3,9,12 | 127:23 128:2,7 | 212:1 227:3 |
| **google**  28:16 | 51:15,16,19 | 129:1,2,4,21,24 | 232:10 237:13 |
| 29:14 | 52:8 59:12,19 | 130:3,7 131:4 | 257:5 |
| **gotten**  199:9 | 59:22,24 60:8 | 131:14,19 | **guessing**  137:5 |
| **governed**  11:22 | 60:11 63:13,18 | 132:11,16 | **guidance**  182:9 |
| **governing**  1:22 | 64:14 66:17,18 | 133:16,20 | **guidelines** |
| 11:17 | 72:3,7,21,23 | 134:4,11,22 | 182:21 |
| **gradual**  74:17 | 73:2,9,12 74:1 | 135:1,6 137:16 | **guy**  198:17 |
| **graduation** | 74:3,10,14,21 | 138:3,9 142:16 | 202:2,16 |
| 62:13,15 | 74:24 75:2,6 | 143:17 145:23 | **h** |
| **grand**  2:9 | 75:11,18,25 | 165:17 166:1 | |
| **greenwich**  63:5 | 76:4,9,21 77:5 | 180:11 194:12 | **h**  8:21 218:1,3 |
| 63:7,10,16 | 77:10 91:4,7 | 195:5 216:10 | 279:3 |
| **grew**  160:16 | 91:13,18,24 | 257:9,12 | **hackensack** |
| **group**  1:10 | 92:4,7,11 | 258:13,14 | 2:17 |
| 4:14,16,18 | 98:20,22 99:1 | 259:19,23 | **half**  41:7 |
| 13:22 14:3,8 | 99:4,8,13,15 | 261:11,18,25 | 150:10,19 |
| 14:16,24 15:12 | 100:12,17,19 | 262:5,9,13,16 | 151:4,13 |
| | | | 160:15 226:11 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[half - hold]**                                          Page 30

226:16 241:17
270:17
**hall**  1:7,8 2:14
4:3,10,12,13,16
4:17,21 5:1,4,7
5:11,13,14,16
5:20 6:1,4,5,7,8
6:11,14 7:9,10
8:5,15 9:12
12:3 25:10,11
25:13,15,22,23
29:6,10 30:25
36:23 37:21
41:17 43:7,13
43:15,23,25
46:13 47:3
50:3 51:22
59:4 62:7
69:16 70:20
71:3 96:17
114:4 115:7,8
123:15,16,19
123:21 126:17
127:20 129:10
145:22 146:2,3
162:12 163:22
163:23 164:14
164:15 171:6,7
171:12,13
177:15,16,22
179:3 180:13
186:19,20,21
187:1 188:13
195:23,25
196:2,3 203:22

204:2 206:5
209:7,17,19,22
210:1 214:25
215:12,13
222:6,7,11,12
223:9 228:25
229:14 231:24
232:3 233:18
233:19,23
234:13,14
241:2 243:7,8
243:9,12,13
248:16,17,19
248:23 255:25
256:1,9,14,19
256:24 258:4,6
261:10 262:21
264:6,7,10,11
267:12 272:25
276:2 277:6
278:5 279:2,24
280:2,4,12
**hall's**  9:10
**hand**  181:12
**handed**  192:3
**handle**  28:22
**handled**  34:18
**hands**  100:2
**happen**  74:16
85:15,23 86:5
86:6 191:3
273:20
**happened**  15:8
20:2 21:13
33:15 161:20

193:4 215:8
239:20,23
240:19 266:18
**happens**  241:5
**happy**  53:6
194:24 271:20
**hard**  28:4
36:17 37:3,6
37:13,18
**hav**  237:3
**head**  34:16
111:6,13
135:22,23
136:1,24
137:13,22
**headhunter**
19:22
**hear**  55:22
**heard**  205:1,3
**heart**  197:21,21
**hedge**  12:15
15:15
**held**  91:17
238:24 241:25
242:3,25
**help**  53:11
67:21 68:1
109:4 110:5
165:1 217:15
252:7 268:21
**helped**  135:25
170:18 182:19
182:20
**helpful**  107:22
108:24 166:24

173:10
**helping**  108:19
119:9
**henry**  50:14,15
50:15 52:1
70:20 155:5
156:23 157:5
165:1 199:9
202:11
**hereinbefore**
277:12
**hereto**  280:7
**hickey**  43:14
59:11,25
**hide**  217:2
**high**  62:6 98:1
98:4
**higher**  122:25
148:14,15
160:17 229:20
**hire**  67:11
91:12 145:4
**hired**  34:4 44:5
73:17,18 76:20
76:23 98:23
**hiring**  72:4,12
72:15
**historical**
201:25
**historically**
174:11
**history**  62:20
65:8 214:21
**hold**  19:15
34:15 82:6,8

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

[hold - incorporated]                                      Page 31

82:20 102:24
111:11 153:12
179:23 242:21
**holding** 25:24
34:22 204:12
207:5 214:22
216:9,13 241:5
241:6 242:10
247:13,14
**holdings** 1:3,17
2:7,8 4:10 6:2
7:10 8:3,4
25:12 203:15
203:17 224:2
224:23 225:2,5
225:7,10,11,15
233:21 234:1,8
247:16,22
278:4 279:1
280:1
**home** 42:14,16
124:1,11,18
199:2
**hope** 58:13
73:21
**hopefully**
180:12
**horse** 161:4,17
190:6,7 193:23
198:5
**horses** 190:6
**hosting** 120:11
269:23
**hour** 204:10
216:14

**hours** 38:16
204:10 208:14
208:16
**house** 43:5
119:8 188:21
188:23 189:3
193:10,22
195:3,7 199:7
**hum** 122:7
150:9,12 186:9
206:8 217:19
225:16 238:15
251:20 258:10
266:7 268:12
269:9
**hundred** 23:14
74:6,14 134:7
216:10,12
**hundreds**
237:21
**husband's**
50:13

**i**

**iason** 2:9
**icloud** 29:24
**idea** 55:19,23
131:12 136:22
142:5,8,10,15
142:20 143:17
151:19 152:12
182:4 267:13
270:3 271:17
**ideas** 155:18
**identification**
25:10,14,23

115:7,10
123:18,21
146:1,3 163:22
164:1,15
171:10,13
177:19 186:20
186:25 196:1,3
203:24 209:19
209:25 222:10
222:13 233:22
243:11 248:21
248:23 256:4
264:9,11
**identified**
247:25 248:2
**iii** 1:3,17 2:7,8
4:11 6:2 7:10
8:3,4 25:12,24
224:2,23
225:15 233:21
247:16 278:4
279:1 280:1
**imation** 185:11
185:12
**implement** 86:7
89:3 91:22
**implemented**
86:1 88:16,17
89:1,2
**implementing**
86:3
**implicit** 272:22
**important**
114:21,23
140:4 174:11

218:12 244:19
**impossible**
230:25
**impression**
182:16
**improperly**
14:17
**improved** 84:7
**inaccuracy**
179:1
**inactive** 47:12
**inadequate**
272:8,9
**inc.'s** 58:5 71:1
83:14
**incentive**
180:21 181:1
181:11
**include** 66:18
121:23 135:7
152:15 165:24
**included** 112:6
**including** 126:1
165:20
**inclusive** 126:2
**income** 265:11
**incorporated**
7:12 13:22
36:4 50:23
54:7,9 55:1,2
56:13 58:8
66:24 71:4,21
77:12 101:13
101:15 109:19
111:7 112:3,6

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[incorporated - invest]**                                      Page 32

112:15 113:13
113:14 118:13
143:10 153:7
156:19 264:18
266:16
**incorporation**
143:9
**incorrect**  250:2
**increase**  160:23
**incurred**
165:20
**independent**
104:13,15,21
104:25 105:6
105:10,14,24
106:15,24
**index**  4:1
**indicate**  182:5
215:2 265:2,16
265:21
**indicated**  16:16
69:21 85:12
96:17 159:12
187:18 210:4
269:6 273:15
**indicates**  187:9
216:1
**indicative**
247:21
**individual**
19:15 213:1
234:20
**individually**
1:4,13 204:4,5

**individuals**
8:15 157:1
**indulge**  230:23
**information**
11:18 27:1
67:25 114:22
114:24 128:18
135:21 165:11
169:10 195:18
199:9 248:11
249:12,25
253:2,9,12,15
254:1,7
**informed**  67:14
67:25 68:14
154:4
**initial**  142:20
157:19,24
158:8 162:8
194:5 200:3
**initially**  143:20
157:10
**initiated**
187:14
**inject**  100:6
**injection**  265:3
**innocuous**
204:11
**input**  102:20
135:13
**inquiries**  247:4
247:9
**insight**  22:21
23:1

**institutions**
83:19 84:15
**instruct**  128:17
128:19
**instructions**
27:8 244:5
246:5,6
**integrated**
217:13,16,18
217:22
**intended**  47:25
48:6 55:5
144:3 145:4
182:7 204:11
221:13 242:21
**intent**  49:20
220:23
**intention**  56:1
87:8 242:10
**intentionally**
164:10,12
177:20
**interactions**
174:4
**interest**  16:17
47:2 48:20
50:17 59:7
60:1 90:13
93:5 96:19
97:11,13
138:20 153:23
175:10 181:18
**interested**
52:15 77:3
168:12 189:5

189:23 244:4
277:17
**interesting**
84:11 174:7
**interests**  85:11
**interference**
11:24
**interns**  136:9
**interpret**
149:24
**interrupting**
163:10
**interview**  91:1
91:3
**interviewed**
104:3,8 105:9
**interviewing**
104:7
**interviews**
12:24
**introduced**
107:20 110:12
168:8 189:4
**introducing**
108:24 109:2,3
110:7
**introduction**
110:17 127:1
**introductions**
110:3 270:13
**inve**  172:5
227:20
**invest**  155:1
169:3 172:25
190:11 192:18

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[invest - issues]**                                                  Page 33

195:10 198:8
198:10,19
200:20 202:13
202:18 203:2
244:18
**invested**  52:23
230:3,15
251:16 271:16
**investigating**
13:18
**investigation**
13:24 14:2,4
14:15 15:1,9
216:23
**investing**  52:15
132:5 189:24
202:20 204:4
209:11 214:14
214:15 218:16
**investment**  5:1
5:5 52:18
53:16,17,19
62:22 73:6
102:10 109:7
114:7,10,11,17
126:23 127:10
129:18 130:14
132:9 157:20
157:21 170:2,3
171:8,14
172:10 176:3
177:17,23
181:4 182:20
184:3 191:19
194:13,16

195:15 196:16
198:21,25
199:20,23
200:1,3,11,14
201:17 202:16
212:14,15
215:21 229:23
243:4,15 245:3
245:12,15,15
245:23 246:12
246:13 248:4
252:22 271:11
**investments**
72:25 132:5
144:18 170:5
**investor**  53:14
53:15 108:2
109:1 114:19
114:19 155:22
162:21 163:7
167:2 168:12
169:1 171:1
175:5 183:14
183:17 194:20
194:23 195:9
198:15 199:4
200:19,22
202:14 209:8
209:10 210:6
214:19 215:11
215:14 218:12
218:15,19
221:15,20
229:25 233:13
245:7,19 248:1

**investors**  12:16
52:14,17,22
53:3,9 82:15
84:5 87:9
108:7,11,19
120:13 132:6
138:16 141:9
141:11,20
151:16,17
154:20,22,25
155:4,6,9,20
156:7,11,17
157:3,6 158:9
158:12,13,17
162:9 163:2
165:14 166:12
167:4,5,7
170:20 171:25
172:1,5,9,13
173:19,24
175:16,22
178:10,10,12
183:4,6,20
185:5 194:2,3
200:12 202:12
202:12 209:11
209:15 213:10
226:24 229:22
230:1,3,8,18
**invests**  218:15
**invite**  104:8
221:22
**invited**  101:21
104:2 106:18

**invoice**  146:22
**invoiced**
146:21
**involve**  16:19
139:25
**involved**  14:9
65:13 84:20
110:13 137:2
157:2 174:17
198:22 205:13
218:19 267:22
275:8
**involvement**
137:17 198:5
200:25
**involving**  12:25
130:5 140:1
**irrelevant**  87:3
186:8
**issue**  13:16
20:24 21:3,17
96:6 203:4
248:12,14
250:8 251:1,8
251:18,22
252:4,15,18,20
**issued**  82:15
**issues**  12:25
20:23,24 21:21
22:3,11 23:15
24:1,6 49:24
56:15 64:25
65:6,20 70:10
193:7 248:6,9
248:9

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[it'll - know]**                                                              Page 34

**it'll**  261:22
**item**  126:18
    250:18
**items**  26:25
    144:9 250:23
    254:25

**j**

**j**  2:5
**january**  5:11
    51:13 119:18
    119:19 158:25
    169:14 188:22
    190:1,21 193:2
    193:3,19 194:6
    195:2,23
    196:14,21
    259:9
**japanese**  74:12
**jersey**  1:22,23
    2:3,17 7:17
    42:2,5,23
    277:4
**jessica**  43:14
**job**  1:25 92:12
    92:15 111:20
    131:25 202:13
**joe**  5:12 6:5,7
    70:17 89:16
    90:21 94:25
    99:24 100:2
    107:9 138:17
    142:6 143:16
    151:15 155:13
    157:7 164:24
    169:11 171:23

175:11 192:17
192:20,20
195:10,24
199:10 202:8
202:22 203:11
205:12 207:7
237:8 243:9,24
248:18 253:16
253:17
**john**  43:13,15
    43:23,25 46:13
    47:3 50:3
    51:21 70:19
    71:3 224:8
    228:3,17,19
    229:5,7 256:24
**johnson**  1:8
    2:15 103:2,6
    105:5,23
    106:14,21
    107:12
**join**  91:20
    106:19
**joined**  36:4
    93:15 101:16
    112:14,17
**joining**  19:21
**joint**  63:20
**jonathan**  2:11
    8:13 278:1
**jordan**  174:10
**jordan's**  174:9
**joseph**  1:7 2:13
    2:19 3:3 8:9,17
    241:19 249:6

**jr**  61:25
**jsack**  2:11
    278:2
**jstern**  2:13
**judgment**  23:1
    23:2,4,9
**july**  121:10
    159:15 160:21
**june**  1:24 7:3
    62:14 154:14
    274:12 278:3
**justified**  160:23

**k**

**kathryn**  61:25
**keep**  21:7
    152:18 197:22
    256:7
**kelly**  2:6
    145:20 195:21
**kenny**  161:19
**kept**  112:4
**keys**  220:4
**kicking**  195:13
**kind**  12:12,13
    49:4 87:2
    139:6 140:8,11
    141:15 165:23
    173:14 175:12
    195:16 201:10
    203:4 209:8
    230:21
**kinds**  174:10
**kitchen**  116:20
    118:22

**kkortes**  2:6
**knew**  110:9,9
    159:3 174:4
    189:22 190:7
    198:6 203:10
    254:18
**know**  15:25
    17:9 18:22
    19:8 20:18
    22:12 23:8,13
    28:19 29:25
    31:6 33:2,12
    34:1 35:24
    37:16,20 40:15
    52:13 53:2
    54:2 56:23
    57:1 59:2 71:3
    73:19 76:2,10
    76:16,18 78:5
    79:15 80:1,5
    85:14 90:14,16
    92:16,17,20
    94:9,22 96:5
    96:22 103:20
    108:6,10 110:8
    110:18 112:13
    116:2,3 117:2
    117:8 119:13
    125:6 126:24
    127:12 128:21
    130:8,21 137:1
    137:10,12,13
    137:23 145:7
    147:13,20
    148:6,7,10

149:4,7 150:1
150:18,25
158:7 163:3,20
165:1,8 168:23
169:23 171:24
172:4,8,16,19
174:24 175:21
175:23 176:8
178:7,9,14,25
180:15 183:18
183:22,25
184:1,9 185:18
187:16,20
188:5 189:7,11
189:14,15,17
192:2,15
196:19 198:4,7
198:12,12,17
199:7 201:12
201:14,14,24
202:20 203:3
204:13 205:19
206:3 208:22
213:5 215:15
217:3,4,8,20
223:9 231:13
232:13 234:16
235:24 238:13
247:23 251:4
251:13,24
252:1,8 254:14
254:18 255:17
257:17 260:18
263:6 267:14
267:22 269:22

271:14 275:11
**knowing**
  198:15
**knowledge**
  207:2 242:24
**known**  145:15
  174:9
**kortes**  2:6

**l**

**l**  3:1 8:21,21
**l.p.**  1:3,17 2:7,8
  6:2 7:10 8:4,4
  208:6 224:2,23
  225:5,15,24
  233:21 234:1
  247:16 278:4
  279:1 280:1
**l.p.'s**  4:11
  25:12,24
**lack**  53:2
  159:20 182:6
  220:20
**landlord**  16:25
  17:4,5 21:21
  21:25 22:3,5
  24:6,13 117:19
  120:22 262:18
  262:20 263:15
  263:17 273:13
  275:7,14
**landlord's**
  261:17,25
  263:23
**language**
  162:25 215:18

**lapse**  21:7
**laptop**  28:2,9,9
  28:10,11,12
  29:11,17,22
**lasted**  190:1
**late**  9:6 24:12
  45:17,23 51:5
  59:15,16 86:3
  152:10 153:21
  154:13,15
  158:14 159:15
  160:21 243:17
  273:22 274:1
**launched**
  166:17
**law**  8:13 41:3
  52:1 59:11
  90:25
**laws**  84:6
**lawsuit**  12:17
  17:11,12 18:2
  18:6 19:20,25
  20:2 21:12,22
  21:24,25 22:25
  66:16,22 89:12
**lawsuits**  16:18
  25:16,17 41:4
  66:3,23
**lawyer**  128:18
**lawyers**  29:23
**lead**  181:9
**leagues**  85:7
**learn**  246:3
**learned**  240:16

**lease**  17:16,20
  17:25 24:15,21
  25:4 118:6
  254:10,12,13
  254:15,20
  257:11 258:19
  258:20 262:9
  262:10 263:10
**leased**  116:21
  117:3,18
**leasing**  118:10
**leave**  22:7
  54:25 83:5
  220:22
**leaving**  21:20
  92:10 220:24
**led**  160:7
  189:20 214:14
**left**  21:2,15
  22:2 23:16,23
  25:3,6 51:5
  59:16 75:13,24
  76:3,17 83:3
  83:11 103:22
  133:12 164:10
  176:3 181:12
  195:7 273:11
**legal**  12:25
  20:24,24 23:6
  67:19 84:18
  128:20 159:3
  162:24 163:2
  165:21 166:8
  182:22 221:13
  262:3,24 263:5

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[legal - lot]**                                                    Page 36

263:13,25
272:16,22
278:23
**lend** 83:19
**lessening** 77:14
**letter** 4:18 6:1
  19:8 145:23
  146:6 233:20
**level** 199:22
  200:3,11
**leverage**
  121:25
**lgs** 1:4,13
**license** 70:21
  70:23 71:5
  221:17
**licensed** 64:13
  65:21 69:23
  70:3,13,18,18
  70:25
**licenses** 63:25
  64:4,11 65:8
**licensing** 56:15
**lieu** 149:13,20
  149:23 150:2
**liked** 174:6
  255:4
**likely** 219:13
  221:16 235:12
**limit** 128:19
**limited** 88:1,4
  172:25 201:11
  208:7 225:8,18
  247:17

**line** 196:21
  225:1 250:22
  279:4,7,10,13
  279:16,19
**lined** 255:20
**lines** 83:18
  197:23 233:3
**list** 16:22 86:13
  160:25
**listed** 126:13
  131:13 173:4
  216:7
**listing** 48:4
**lists** 115:14
  123:22
**litigation** 13:11
**little** 45:13 65:2
  68:5 77:25
  113:19 127:24
  141:5,6,8
  159:16 167:18
  170:15 190:8
  193:23,25
  195:19 201:15
  203:4 212:1
  237:23 240:15
  257:15 259:16
  261:22
**live** 41:17,25
  42:6 216:17
**lived** 41:23
**llc** 208:22
  225:9,10 257:9
**llcs** 204:14

**llp** 2:20
**loaned** 104:18
**located** 31:21
  32:18 35:22
  36:11
**location** 7:16
  31:22 42:7
  115:19
**loeb** 2:20,20
  8:10,11
**loeb.com** 2:22
  2:23
**long** 18:8 38:14
  41:23 42:6
  43:4 53:25
  63:2 76:7
  103:16 108:14
  109:20 116:21
  160:25 161:7
  183:1 189:25
  207:9
**longer** 42:10
  79:12 112:17
  118:9 126:19
  126:22 127:10
  218:18
**look** 25:22
  26:10,23,24
  30:22 40:2
  91:11 115:6
  123:19 127:21
  127:24 146:2
  146:14 149:2
  163:21 166:16
  177:22 181:3

183:21 196:6
206:4 209:17
210:9 211:9
225:3,12,25
226:2 234:13
234:15,15
243:12 247:14
248:22 249:23
253:20 257:15
257:19 259:7
261:3 264:6,10
265:24 266:12
267:11 268:23
271:21
**looked** 31:1
  151:7 161:10
  184:8 195:19
  235:11 242:4
  243:16
**looking** 77:2
  103:9 104:25
  167:2,6 190:11
  196:21 207:2
  224:7 233:2
  234:24 241:1
  258:8 264:22
  265:17,22
  267:5 271:13
  271:17
**looks** 256:21
**loosely** 135:5
**lori** 61:11
**lot** 21:4 37:9
  39:22 49:1
  85:8,18 100:3

Veritext Legal Solutions

800-227-8440                                                973-410-4040

100:4 119:13
158:24 161:8
236:8 270:1,13
**lots** 21:6 22:10
34:23 49:23
110:15 161:4
**loud** 202:8
**lumped** 122:1
**luncheon**
113:23

**m**

**m** 1:16 2:7,12
7:12 8:7
**m.b.a.** 62:9,17
62:20
**ma** 163:9
**macro** 67:11
**made** 5:17,21
14:15,23 24:14
54:20 56:17
57:3 88:18
89:6 93:16
118:13 144:17
158:24 159:2
160:1 163:1,14
163:19 173:24
183:19 203:11
207:12 209:23
211:13 214:1,4
216:1,15
221:24 222:8
228:2 229:9,18
230:25 246:4
260:16 262:19
273:3,6 274:18

280:5
**madison** 18:7
21:15 22:2
23:17 31:25
32:19 34:12
115:15,23
116:15 124:5
132:16 192:25
193:11 254:20
257:13 258:14
263:19 268:5
269:3 270:18
271:4 272:14
273:2 274:9,14
**maggie** 7:19
**maglaw.com**
2:11,12,13
278:2
**mail** 124:17
**mailing** 124:11
**main** 2:16
175:10
**maintain** 27:22
28:4,20 30:19
**maintained**
30:9 64:11,18
**maintenance**
152:9
**majority**
220:16 241:25
**make** 20:22
47:14 65:11
68:1 73:5 80:4
80:24 87:11
118:17 125:2

136:13 137:14
140:14 155:19
162:8 163:4
173:19 184:10
191:2 203:1,7
204:15 216:18
218:25 221:14
247:4 251:25
253:8 263:3
264:3 270:12
272:12 273:1
**makes** 129:18
**making** 9:25
10:25 110:3
132:5 162:18
162:20 163:12
210:16 247:9
275:4,5,6
**manage** 161:25
173:9 181:20
**managed** 14:5
169:24
**management**
45:11,18 68:24
73:7 120:25
121:6,8,12,15
121:18,23
122:6,12,16,22
123:2 133:2,15
134:3 167:22
168:4 180:21
180:23,25
181:11 185:12
185:13,19
218:17,17,21

220:17,19
221:6,9 223:9
**manager** 72:10
110:12 169:4
170:10,11,23
173:6,10,16,20
173:21 177:5,9
177:14 180:24
181:2,5,15,22
181:24 182:4
182:12 183:2
185:10,11
193:15,17
225:5
**managers** 14:5
110:9 270:9
**managing** 46:6
46:7 70:10
72:11 76:24
121:24 132:4
**mandate** 55:1
55:11 58:1,5
**mandates**
54:24
**manhattan**
41:18 116:1
**manner** 169:16
170:23
**march** 4:14 5:9
6:4 115:10,11
118:15 119:16
119:17,21
120:18 134:12
136:6 157:22
158:15 160:20

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[march - men]**                                                    Page 38

| | | | |
|---|---|---|---|
| 183:11 186:23 | **married** 60:18 | 76:8 87:19 | 90:24 97:25 |
| 187:3 243:5,8 | 60:20,23 61:1 | 95:8 99:20 | 98:2 103:2,5 |
| 244:2,6 247:2 | 103:7 | 118:23 126:24 | 188:20 208:15 |
| 247:4 | **match** 274:6 | 129:8,10,10,14 | **meeting** 5:8 |
| **margaret** 1:21 | **material** 65:13 | 134:19 139:18 | 38:12,25 39:7 |
| 277:3,22 | 67:23,23 68:5 | 152:5 154:22 | 174:13 186:22 |
| **marine** 62:9 | 68:9,11 155:12 | 156:22 162:11 | 187:2 189:2,16 |
| **marked** 25:10 | 155:22 184:21 | 167:1 168:3 | 189:20,25 |
| 25:14,23 115:7 | 190:19 | 169:20 179:18 | 190:4 191:9 |
| 115:10 123:15 | **materials** 52:17 | 203:9 205:9 | 192:24 193:5 |
| 123:17,20 | 52:22 155:7,11 | 240:5 241:16 | 193:13,22 |
| 145:25 146:3 | 155:20 184:12 | 244:7 252:10 | 195:7,14 199:1 |
| 163:21,25 | 185:1 189:12 | 262:15 275:4 | 199:7 219:22 |
| 164:15 171:10 | **mathematical** | **meaning** 88:7 | 219:24 221:12 |
| 171:13 177:19 | 231:3 | 154:14 158:13 | 221:25 222:2 |
| 186:20,24 | **matter** 5:15 8:4 | **meaningful** | 241:21,21 |
| 196:1,3 203:24 | 8:6 11:13 13:9 | 170:13 | 253:8 271:10 |
| 209:18,25 | 13:12,14 15:6 | **means** 122:14 | 271:15 |
| 222:10,12 | 175:1 203:23 | 127:13 128:15 | **meetings** 39:4,4 |
| 233:22 243:10 | 237:14 238:14 | 172:24 176:8 | 80:11 120:12 |
| 248:21,23 | 275:16 | 176:23 179:19 | 120:12 191:12 |
| 255:25 256:3 | **matters** 7:9 | 180:16 238:12 | 193:10,18 |
| 256:10 264:9 | 67:15 | 263:7,9 | 219:10 270:1 |
| 264:11 | **matured** | **meant** 38:5 | **member** 66:3 |
| **market** 64:24 | 179:25 | 98:10 156:15 | 67:4 77:19 |
| 144:9 250:8 | **matures** 180:3 | 242:18 245:5 | 102:4,15,17 |
| **marketing** 52:4 | **maximum** | 252:1,2 260:19 | 104:7,9 168:10 |
| 52:9 54:1 | 121:15 | **media** 7:8 69:8 | 168:11 204:14 |
| 59:20 137:1 | **mcpeek** 161:19 | 69:13 113:18 | 208:22 |
| 155:8 162:24 | 161:23 | 114:1 186:12 | **members** 104:3 |
| 166:9 203:5 | **meal** 35:19 | 186:16 276:3 | 104:4 |
| **markets** 64:23 | **mean** 37:9 | **medications** | **memorable** |
| 85:9 | 44:20 51:20 | 11:8 | 193:8 |
| **marriage** 61:19 | 57:14 66:8,11 | **meet** 24:19 | **men** 174:12 |
| | 70:18 71:8 | 38:14,22 72:1 | |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[mentioned - move]**                                                    Page 39

| | | | |
|---|---|---|---|
| **mentioned** 50:8 | **mid** 51:5 59:16 | **minimum** | 150:11,19 |
| 53:24 83:24 | 65:23 98:18 | 200:18 | 159:14 160:17 |
| 99:14 106:16 | **mike** 183:13 | **minute** 69:6 | 161:22,24 |
| 155:24 188:7 | 189:4 199:10 | 204:9 | 167:7,11 169:4 |
| **merchant** 62:9 | 249:5 | **minutes** 5:7 | 172:14 182:20 |
| **message** 246:2 | **milestone** | 186:21 187:1 | 201:1 220:13 |
| **messages** 31:4 | 149:23 | **miscommuni...** | 226:8 227:21 |
| **met** 38:17 | **millennium** | 120:8 | 229:19 244:7 |
| 71:22 106:1 | 76:1,8 | **misrepresenti...** | 244:19 246:14 |
| 107:19 188:21 | **million** 93:23 | 268:17 | 246:17,19,22 |
| 190:20 192:5 | 102:10 122:12 | **missed** 40:15 | 246:25 255:21 |
| **mi** 200:18 | 135:16 150:10 | **missing** 262:21 | 266:10,19 |
| **mic** 96:5 | 150:19 151:4 | **mistake** 246:4 | **monies** 149:13 |
| **michael** 1:16 | 151:13 152:14 | 246:8 | 275:12 |
| 2:7 3:4 6:8 | 152:22 153:5 | **mistakenly** | **month** 121:13 |
| 7:12 8:6,7 | 160:15 167:10 | 110:11 | 121:13 133:23 |
| 40:12,21 | 167:11,15,16 | **misunder** 81:4 | 134:7,14 |
| 107:10,18 | 167:19 180:15 | **misunderstand** | 147:23 208:21 |
| 172:6 174:9 | 180:15 192:18 | 38:6 | 240:6 259:9 |
| 175:4,7,10,17 | 197:9 226:7,11 | **model** 84:2 | **monthly** 45:24 |
| 183:16 188:19 | 226:16 227:21 | 135:11,14,25 | 273:9 |
| 189:4 194:14 | 227:23 229:15 | 137:21 159:25 | **months** 21:17 |
| 199:17 203:17 | 230:20 233:5 | 170:1,1 176:6 | 26:17 105:3 |
| 203:18 204:3,7 | 259:16,17 | 176:14,18 | 109:23,24 |
| 204:9,16 | 265:1 267:7 | 250:21 | 161:11 230:13 |
| 205:12 213:16 | **mind** 15:18 | **modifications** | 273:21,21,22 |
| 213:20 224:24 | 16:8 22:20,21 | 206:2 | 273:23 |
| 225:4 237:9 | 22:22 23:18 | **moment** 16:9 | **morning** 7:1 |
| 248:2,18 249:5 | 24:22 25:20 | 139:10 235:13 | 8:1 114:4 |
| 249:21 253:21 | 66:12 153:1 | **monday** 9:2 | 237:7 |
| **microphones** | 202:10 251:6 | **money** 14:5 | **morvillo** 2:9 |
| 7:3 | **mindful** 202:15 | 15:3 24:18 | 8:14 9:15 |
| **microsoft** | **mini** 201:12 | 59:23 83:19 | **move** 54:20 |
| 28:18 29:14 | **minimize** | 104:18 132:4 | 233:23 238:10 |
| | 201:12 | 133:17 143:21 | |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[moved - noted]**                                    Page 40

| | | | |
|---|---|---|---|
| **moved** 54:11 | **nature** 13:23 | **needs** 33:24 | 86:25 87:5 |
| 54:15,16,18,20 | 14:1 17:11 | **negative** | 88:25 100:2 |
| 55:3 112:1,3 | 19:18 110:21 | 264:25 265:15 | 115:15,15 |
| 134:17 | 141:8 214:5,10 | **negotiated** | 143:4 147:18 |
| **moving** 57:24 | 215:3 216:2 | 24:15 235:9 | 158:14 180:10 |
| 159:5 220:22 | 222:4 | **negotiating** | 180:11 181:4 |
| **muddle** 10:10 | **natures** 14:19 | 85:19 205:6 | 199:21 200:2,3 |
| **multiple** | **near** 272:10 | 258:19 | 200:6,9,11 |
| 121:17 208:4 | **necessarily** | **negotiation** | 260:7 265:3 |
| 216:14 224:14 | 39:14 202:2,22 | 211:25 | 277:4 |
| **mute** 12:1 | 238:23 251:5 | **negotiations** | **nice** 116:2,7,8 |
| **n** | 252:1 274:6 | 130:13 239:7,7 | **night** 9:4 |
| | **necessary** | **neighborhood** | 208:16 |
| **n** 1:20 2:1 3:1 | 54:25 78:1 | 117:5,7 189:23 | **nine** 6:7 150:10 |
| **n.j.a.c.** 277:24 | 84:24 112:4 | **neither** 277:13 | 150:19 151:4 |
| **name** 7:17 8:1 | 176:11,16 | 277:16 | 151:13 160:15 |
| 13:21 19:6,7 | 280:6 | **never** 16:10 | 226:11,16 |
| 31:6 40:14 | **need** 10:5 44:11 | 56:17 57:11 | 231:5,5 248:17 |
| 50:13 61:10 | 56:14 65:19 | 66:25 69:18 | **nineteen** 60:8 |
| 75:23 87:24 | 67:25 118:24 | 80:10 83:8 | 62:1 |
| 117:19 132:20 | 119:5 136:25 | 86:1 88:15 | **ninth** 117:15 |
| 132:22 198:6 | 137:25 176:13 | 107:24 120:5 | **nj5960469** 1:25 |
| 204:12 205:1,3 | 176:22 197:4 | 152:8 162:3,5 | **non** 210:20 |
| 207:6 210:5 | 232:13 260:1,3 | 183:7,13 204:7 | **north** 2:16 42:4 |
| 214:16 224:1 | **needed** 56:11 | 205:1,4 223:15 | **notary** 280:13 |
| 225:12 | 69:22 70:12,25 | 242:20 | 280:19 |
| **named** 15:20 | 71:15 101:22 | **new** 1:1,22,23 | **note** 7:3 9:1 |
| 31:16 47:9 | 104:15 118:22 | 2:3,10,10,17,21 | 95:14 149:9,12 |
| 50:9 66:15 | 119:8 159:4 | 2:21 7:15,17 | 149:20 150:2,8 |
| 88:19 | 173:8 182:23 | 8:22,22 14:5 | 152:16,17,19 |
| **names** 22:12 | 199:23 207:5 | 18:23 20:3 | 153:15,18 |
| 23:21 43:12 | 208:17 266:21 | 24:19 41:21,21 | 154:18 266:8 |
| 61:23 70:16 | 272:10 | 42:2,4,15,22 | 267:3 278:10 |
| **nasd** 65:17 | **needing** 259:25 | 77:2 83:15,24 | **noted** 280:7 |
| **natural** 204:15 | | 83:25 85:17 | |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[notes - occasionally]**                                    Page 41

| | | | |
|---|---|---|---|
| **notes** 266:15,20 | 205:25 212:5 | 38:20 39:21 | 220:10 221:2 |
| **nothing's** 16:8 | 214:15 218:8 | 45:12 47:22 | 224:3 226:18 |
| 25:19 | 227:19 230:2 | 48:2 49:17 | 226:20 229:10 |
| **notice** 125:10 | 232:11 246:7 | 53:4 57:20 | 231:9 232:6 |
| 126:6 224:22 | 259:22 260:4 | 58:6 67:16 | 234:5 235:23 |
| **noticed** 224:24 | 267:24 268:18 | 68:3,10,20 | 237:6,17 238:3 |
| 225:24 | 270:8 272:8 | 90:2,6 93:7 | 238:19 239:15 |
| **noticing** 7:25 | 274:4 276:3 | 95:10 99:17,19 | 239:25 244:14 |
| **notify** 263:17 | **numbered** | 109:13 116:6 | 245:17,24 |
| **november** 26:1 | 164:16 196:4 | 116:24 118:2 | 250:20 251:2 |
| 26:7,10,15,16 | 264:13 | 120:7 121:1 | 251:12 254:16 |
| 36:3,6 104:2 | **numbers** 30:8 | 123:3 128:9 | 257:14 260:2 |
| 105:11,18 | 143:19 160:12 | 129:9,15 130:1 | 260:13,24 |
| 140:23 219:12 | 269:4 | 130:6,20 131:9 | 261:13,19 |
| **nppg** 195:19 | **numerous** | 131:15 132:13 | 262:2,23 263:4 |
| **nuances** 84:19 | 86:13 | 134:9 136:3 | 263:12,24 |
| **number** 16:20 | **ny** 278:15 | 138:7,11 | 265:19 268:3 |
| 17:1 20:9,11 | | 141:18 150:4 | 271:5 272:15 |
| 20:18 70:15 | **o** | 151:6 152:23 | 274:2 275:15 |
| 83:18 93:10 | | 153:20 154:21 | **objections** 7:21 |
| 105:2,3 107:21 | **o** 3:1 8:21 | 156:9 160:6,24 | 10:25 228:8 |
| 110:9,13 | **oakland** 173:2 | 163:16 166:13 | **obligation** |
| 116:18 122:1 | **oath** 9:18,20 | 167:23 168:6 | 68:25 259:13 |
| 122:21 125:4,4 | 13:3 | 169:18 173:22 | 262:10 |
| 125:14,15 | **obje** 53:21 | 175:8,19 | **obligations** |
| 126:13 132:7 | **objec** 130:18 | 178:11 181:25 | 67:5 273:17 |
| 132:19 135:9 | **object** 9:5 | 182:18 184:19 | **obtain** 64:3 |
| 135:14,19,24 | 24:10 124:6 | 185:2 191:15 | 261:25 |
| 136:9,10,18,22 | 128:16 217:5 | 191:23 193:21 | **obviously** 9:5 |
| 137:11 138:16 | 227:25 | 194:9 195:6 | 85:8 116:25 |
| 141:17 145:9 | **objection** 11:2 | 199:24 205:8 | 201:13 258:21 |
| 150:18,22 | 14:10 16:13 | 210:7,18,24 | **occasion** 189:3 |
| 151:5 152:25 | 21:1,23 22:4 | 212:6 213:17 | **occasionally** |
| 158:22 159:6 | 22:19 24:2 | 215:4 218:14 | 35:19,20,21 |
| 159:22 160:11 | 25:1 27:25 | 219:4,19 | 46:23 98:8,13 |
| | 28:21 33:21 | | |
| | 36:24 37:8 | | |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[occupied - okay]**                                    Page 42

| | | | |
|---|---|---|---|
| **occupied** | 131:21,22 | 35:5,11,22,25 | 95:23 96:22,25 |
| 116:14 118:5 | 132:2 | 36:7,10,21 | 97:4,18 98:6 |
| **occupy**  18:9 | **offices**  1:22 | 37:17,24 38:14 | 98:10,23 99:6 |
| 117:14 132:17 | 116:18 117:8 | 38:17,22 39:9 | 99:12 100:21 |
| **occupying** | 117:12 118:22 | 39:16,19 40:3 | 101:4,14 |
| 68:16 116:11 | 119:11 124:13 | 41:10,13,19,25 | 102:14,20 |
| **occur**  45:24 | 133:7 192:25 | 42:3,12,16,21 | 103:9,13,16 |
| 85:22 | 195:5 269:11 | 43:4,7,15,23 | 104:6,14,24 |
| **occurred** | 269:16,20,21 | 44:2,5,14,19,24 | 105:14,22 |
| 174:15 | 269:24 272:8 | 45:8,21 46:12 | 106:6,9,12,19 |
| **october**  33:7,7 | **oh**  13:22 25:15 | 46:19 47:6 | 106:23 107:7 |
| 94:10,18 | 122:24 164:6 | 48:17 50:20,25 | 108:22 110:6 |
| 159:18 | 205:16 223:20 | 52:1 53:8,23 | 111:8 112:16 |
| **offer**  24:14 | 228:10 230:14 | 53:24 54:19 | 112:20,25 |
| 188:13,16 | 249:5,19 | 55:4,8 56:23 | 113:15 114:9 |
| 201:5 202:5,6 | 265:12 268:19 | 57:17,25 58:22 | 114:20,25 |
| 203:7,7,10,10 | **okay**  9:12,17 | 60:13,22 61:2 | 115:6,21 116:4 |
| 203:10,11 | 9:23 10:2,9,12 | 61:9,23 62:12 | 116:8,10,13 |
| 229:21 235:7 | 12:21 13:1,9 | 65:7 67:3,8,13 | 117:2 118:5,8 |
| **offered**  83:19 | 13:17,21,23 | 68:6,13,23 | 119:20 121:5 |
| 102:11 158:17 | 15:8,11,14 | 69:2 71:15,25 | 121:21 122:10 |
| **offering**  190:14 | 16:5,10,15 | 72:6,15,20 | 123:1,5,14 |
| **office**  31:20 | 17:3,10 18:17 | 74:13,16,20 | 126:10,14,15 |
| 32:22 33:1 | 20:13 21:19 | 75:5 76:7,19 | 127:5,14 128:1 |
| 34:9,12 35:13 | 22:9 23:19,22 | 77:4,9,23 | 129:6 130:12 |
| 49:9 102:9 | 24:23 25:9,21 | 78:12 79:10,15 | 130:16 134:6 |
| 110:4 112:8 | 25:22 26:4,6 | 79:22 80:1,5,8 | 134:25 136:21 |
| 115:18 123:23 | 26:17,20,23 | 81:7,11 82:5 | 137:14 139:11 |
| 124:15 132:21 | 27:6,22 28:4,8 | 82:12 83:10,24 | 140:20 141:24 |
| 133:8 174:8 | 28:13,17,24 | 86:5 87:4,24 | 142:7 143:6 |
| 269:7,8 270:14 | 29:20 30:5,8 | 88:9,14,24 | 144:1,23 |
| 271:11 272:11 | 30:22 31:5,21 | 89:6,9,20,22 | 146:10,14 |
| **officer**  16:11 | 32:1,5,9,14,18 | 90:8,16,23 | 147:2,8,20,25 |
| 102:9 129:3 | 33:4,15,19 | 92:10,22 93:3 | 148:4,19 150:6 |
| 131:13,17,18 | 34:7,11,20,24 | 93:11,19 95:18 | 150:17,22 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[okay - outside]**                                    Page 43

| | | | |
|---|---|---|---|
| 153:2 158:5,11 | 227:22 229:21 | 274:19,23 | **operatives** |
| 163:4,11 164:6 | 230:4,15,19 | **oldest** 43:22 | 14:22 |
| 164:7,19 166:2 | 232:1 234:9,13 | **omitted** 164:12 | **opine** 104:22 |
| 166:11 167:1 | 234:23 235:9 | 177:21 | **opportunity** |
| 168:2 171:5,22 | 235:20 236:11 | **once** 45:5 53:14 | 5:1 170:21 |
| 172:4,10 | 237:2,13,23,25 | 72:21 142:20 | 171:8,15 |
| 173:25 175:21 | 238:9 239:13 | 239:7 246:14 | 172:11,13 |
| 177:8 178:3,9 | 240:24 241:11 | 271:16 | 258:5 |
| 178:23 179:2,4 | 241:14,23 | **ones** 20:20 | **opposed** 38:25 |
| 179:12 180:20 | 242:9,20 243:6 | 22:22,24 23:18 | 110:19 203:3 |
| 181:16 182:14 | 243:20,23 | 40:16 66:15 | **option** 149:12 |
| 184:6 186:10 | 245:8,20 | **ongoing** 16:24 | 149:16,16,25 |
| 186:19 187:1 | 246:11 247:3 | 17:4,14 18:15 | **options** 64:24 |
| 187:20 188:3 | 247:23 248:8 | 152:9 | 65:3 |
| 188:10,23 | 248:13,22 | **online** 144:14 | **oral** 1:7 |
| 190:20 191:19 | 249:2,9,15 | **onset** 78:13,17 | **order** 1:19 |
| 195:11 196:11 | 250:5,16,25 | **op** 44:16 | 11:16,19,22 |
| 196:19 197:20 | 251:7,17 252:9 | **open** 87:13 | 43:17 67:25 |
| 199:19 203:13 | 252:23 253:19 | **operate** 193:24 | **organization** |
| 203:20 204:17 | 254:9,19,25 | **operating** | 66:18 |
| 204:22 206:20 | 255:12,15,23 | 89:15 131:20 | **original** 84:2 |
| 206:23,24,25 | 256:17,22 | 161:11 | 85:4 108:23 |
| 207:9,13 208:6 | 257:6,20 258:8 | **operational** | 120:25 142:5 |
| 208:24 209:17 | 258:18,23 | 49:24 97:17,20 | 167:24 169:13 |
| 210:9,22 211:4 | 259:3,12,25 | 113:10 | **originally** 58:8 |
| 211:11,17 | 260:10 261:8 | **operations** | 74:10 133:1 |
| 212:12,17,21 | 261:16 263:2,8 | 44:11,15,17,20 | 142:21 205:23 |
| 213:7,13 | 264:5,16,21 | 44:21 45:3 | 223:10 271:6 |
| 214:24 215:17 | 265:12 266:1 | 46:3 49:9 | **orix** 88:8,21,22 |
| 215:25 217:10 | 266:17 267:15 | 52:11 67:12,24 | 89:7 129:25 |
| 217:25 219:8 | 268:9 269:14 | 68:9,11 100:13 | 130:2,2,2,5,24 |
| 222:3,19 | 269:19 270:3,6 | 100:19,23,24 | 255:20 |
| 223:11 224:9 | 270:10,15 | 101:1 111:13 | **outcome** 109:9 |
| 224:10 225:3 | 271:18 273:5 | 112:8 | **outside** 37:9 |
| 225:25 226:9 | 273:15,20 | | 66:2,15 82:15 |

141:20,23
145:2 151:16
151:17 194:2
**outstanding**
21:9
**overall**  133:21
135:4
**overlap**  79:7
**owed**  23:11
24:24 275:18
**own**  42:14
55:15 89:18,19
89:23 90:5,9
90:10,11,13
97:16 106:15
117:25 138:18
139:1,2,3,5
145:2 168:16
214:12,18
215:11,18,21
216:4,12
218:10 221:6,7
223:3 232:12
**owned**  16:2
25:18 50:5
74:3,5 78:15
88:10 110:15
153:17 168:17
171:4 203:18
225:2 241:17
**owner**  74:14,21
74:23 129:2
216:11 247:22
**owners**  88:3,7

**ownership**
16:17 47:2
48:20 50:17
59:7 60:1
74:10 82:13
89:14 90:13,17
90:17 97:11,13
214:5,11 215:3
216:3
**owning**  90:18
**owns**  89:18
97:15 138:15
138:17

**p**

**p**  1:20 2:1,1 3:1
**p.c.**  1:23 2:2,9
2:16 8:9
**p.j.**  84:22 85:3
86:10 89:4
161:15 185:5
186:1 255:21
**p.m.**  96:11,14
113:18,24
114:1 186:12
186:14,16
209:2,3,5
257:24,25
258:2 276:1,5
**packet**  6:14
264:7
**page**  4:2,9,10
4:13,16,17,21
5:1,4,7,11,14
5:16,20 6:1,7
6:11,14 25:11

26:24 27:4,9
115:8 122:2,4
122:4 123:16
123:20 124:20
124:24,25
125:2,7,12,14
125:18,22,23
126:1,3,4,9,18
145:22 146:11
146:15 147:8
148:4,19 149:2
149:8 164:10
171:7 172:20
174:19 175:24
177:16 179:2
180:13 181:24
183:21 186:21
195:23 203:22
209:22 212:21
217:17 218:1,3
222:7,20,24
225:3,13
231:16,23
233:19 234:16
235:25 236:3,7
237:4,12,15
238:2 239:11
248:17 249:1
249:20 256:1
257:7 261:7,8
264:7,15
265:11 267:11
279:4,7,10,13
279:16,19

**pages**  27:9
126:1 127:15
127:19 178:21
213:24 237:21
238:17,21,24
**paid**  21:10
46:21,22 49:3
78:2 94:11
95:13 108:7,20
109:6,11,15,18
110:17 120:5
120:13,19
130:7 131:1
133:16,20
134:3 135:4,5
136:10 147:11
147:11 151:20
152:13 153:9
153:10 156:3
166:1 176:24
177:9 182:25
185:19,25
186:4 262:12
262:18 268:2
268:15 269:2,5
270:23 274:1
275:17
**par**  27:5
**paragraph**
27:4 166:5,16
206:21 207:1
217:25 226:2
227:7 240:25
241:7,8,12
253:7 258:24

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

[paragraph - pearlson]                                          Page 45

259:5 261:6,9
261:17
**paragraphs**
261:8
**parentheses**
247:17
**parenthetical**
250:3
**parenthetically**
247:19 248:12
**park**  2:20
**parkway**  1:23
2:2 7:17
**part**  4:13 14:4
28:22 56:10
57:21 69:25
79:9 80:8,9
84:17 96:23,25
110:17 112:13
115:8,11 140:4
167:24 169:25
171:1 182:5
183:7 198:16
211:1 215:23
216:19 219:23
219:24 221:12
236:15 255:3
269:24 270:1
**partial**  24:13
273:23
**partially**  274:1
**participating**
12:1 181:23
182:17

**participation**
130:4
**particular**
39:25 42:3
46:1 54:17
73:16 83:16
102:22 161:1
176:21 184:23
198:3 215:1
232:8 239:24
240:10 260:4
**particularly**
41:8 193:7
194:3 202:24
236:17
**parties**  7:6
41:12,15 44:23
213:19 217:24
232:19 236:16
241:8 277:15
**partly**  46:8,8
109:15 268:4,5
**partner**  63:21
72:24 73:1
77:11 170:11
170:21 173:7,8
181:5,15,19,22
182:3,8,8,12,13
182:17,19,20
182:21 183:1
208:22
**partnering**
173:20
**partners**  74:11
172:25

**partnership**
74:11 208:7,23
225:8,18
247:17
**parts**  93:10
114:18 184:21
253:5 260:5
**party**  12:17
177:2 255:4
**pass**  165:19
**passed**  70:19
**past**  59:9,10
131:16 252:7
**pay**  17:25
22:18 24:8
88:13 95:14
120:22 134:7
134:11,25
149:19 151:18
232:16 259:13
261:1 262:10
262:17 275:4
**paying**  14:22
117:22,22
119:20 120:2
120:15 136:7
149:13 263:10
267:20 270:17
270:21 271:3,7
271:9 273:9
274:9,13,20,22
**payment**  22:11
22:17 88:12
110:22 149:3
153:11 180:24

262:19 273:22
273:22 274:18
**payments**
24:12,13 87:11
88:18 89:6
149:21,24
150:3 268:13
272:13 273:1,3
273:6 275:5,7
275:9,9
**pdf**  122:4
124:24 125:19
**peak**  123:10,12
123:12,13
**pearlson**  2:4
4:4 8:1,2,24,25
11:25 27:13,16
39:2,6 45:14
51:21 69:2,6
69:15 96:16
99:21 113:15
114:3 125:3,8
125:13,18,22
125:24 126:4,8
126:11,15,16
127:5 129:12
138:5 145:20
154:24 156:24
164:5,9,13
171:5 177:15
177:20 186:10
186:18 195:21
203:21 208:24
209:6 215:7
222:6 224:7,10

224:12,16,19
228:3,5,7,11,13
228:16,19,21
228:23 229:3,5
229:7,9,13
231:18,22
232:2 233:17
239:18 243:7
248:15 252:12
252:14 255:24
256:8,12,14
258:3 264:6
272:17,23
275:19,22
**pen** 236:19
**pending** 18:21
**pennsylvania**
62:11
**pension** 15:4
**people** 12:1
21:3,18 37:9
70:3 91:20
105:2 106:1,7
107:21 108:24
110:4,10,13,14
112:4 119:3
132:19 135:13
137:2 144:14
144:17 176:23
190:7 198:5
204:13 208:4
226:24 232:12
270:11,14
**percent** 74:6,14
82:7,8 90:21

180:21,22
197:3,3 216:12
218:7,18
223:10 241:18
242:3,8,25
**percentage**
78:12 82:5
84:3 88:10,11
90:17 138:17
177:13 181:1
**perfectly** 53:6
**perform** 141:24
145:10
**performance**
73:24 92:1
177:10
**performed**
130:25 140:24
**performing**
100:25 131:4
**perio** 1:7 2:19
3:3 5:12 6:5,7
8:9 31:17,18
32:2,6,21
70:17 71:23
72:1,12,21
75:1,14,18,24
76:3,7,13 77:5
77:15 78:20,22
79:3,12 80:14
80:20 81:9,19
82:6,20 89:11
94:25 95:16
98:12 102:1
107:9 137:19

137:20,22
138:17,23
142:19 143:24
146:12 154:6
155:13 164:24
169:11 171:23
192:17 195:24
196:9,15 200:8
201:2 205:12
207:7 232:15
237:8 239:9
241:6,19,24
243:9,24 244:2
245:21 246:1
248:18 249:6
249:22 250:1
253:22
**perio's** 142:6
**period** 59:12
60:23 70:7
73:13 103:12
120:14 133:10
143:15 170:24
173:23 184:13
185:22,24
214:7 242:12
264:19
**periodic** 149:23
**periods** 259:4
**person** 70:6
75:12 202:18
**personal** 28:10
29:4 30:14
129:16 188:17

**personally** 14:9
15:6,21,24
16:5,7,11 29:9
29:17 90:10,18
154:22 162:12
162:17 163:4
165:7 168:13
200:16 214:15
216:5 247:6
**personnel**
165:21
**pete** 7:18 71:20
112:7
**peter** 3:2 70:22
111:4
**phase** 146:16
147:3,7,12
148:4,15,16,20
148:23 149:3
149:14,21
192:6,7
**phases** 147:4
148:17,24
192:9
**philosophy**
198:25
**phone** 30:12,17
30:20,22 31:9
35:12,20 36:13
**phones** 12:2
30:6,9
**phrasing** 38:9
**physical** 116:16
119:12,14
125:21

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[pick - prepared]**                                                Page 47

| | | | |
|---|---|---|---|
| **pick** 7:4 | **playing** 269:17 | 260:11,20 | 140:3 142:13 |
| **piece** 173:2 | **plaza** 2:16 | **posi** 59:13 | 168:12,20,25 |
| **pieces** 192:19 | **please** 7:3,22 | **position** 19:15 | 171:2 181:13 |
| **pipeline** 83:21 | 12:2 52:19 | 33:9,12,16,18 | 182:9,24 |
| 161:5 | 61:24 81:18 | 34:14 36:7 | 189:23 202:19 |
| **pjw** 88:1,3,10 | 105:20 171:6 | 48:7 72:16,18 | 216:10 265:5 |
| 88:22 | 184:16 207:23 | 78:23 80:20 | **practice** 237:14 |
| **place** 7:6 75:13 | 242:15 | 81:20 89:17 | **practitioners** |
| 123:23 124:4 | **plural** 110:11 | 91:6,9,17 97:8 | 121:20 145:10 |
| 157:17 169:8 | **plus** 107:5 | 102:25 104:4 | **pre** 150:11,19 |
| 214:17 219:9 | 152:15 | 104:17 111:11 | 167:11 226:8 |
| 275:20 277:12 | **point** 24:1,25 | 220:18 264:23 | 227:21 |
| **placing** 19:24 | 48:13 57:11,17 | **possibility** | **precise** 44:24 |
| **plaintiff** 1:5,14 | 74:13 75:3 | 168:18 174:16 | **precisely** |
| 2:7 8:3 206:10 | 79:12,23 86:15 | 192:11 | 137:12 |
| **plan** 56:10,11 | 93:15 111:15 | **possible** 25:20 | **preferred** |
| 56:12 84:13,18 | 112:16 118:8 | **possibly** 140:3 | 245:19 |
| 140:4,5 144:3 | 126:21 127:9 | **post** 154:14 | **premise** 263:25 |
| 167:9,20 | 127:22 154:24 | **posted** 172:17 | **premises** 68:8 |
| **planned** 208:13 | 161:10 169:11 | **potential** 20:23 | 68:17,18 |
| **planning** | 169:12 189:9 | 52:14 53:14 | 254:20 |
| 208:15 | 190:23 193:25 | 91:25 104:19 | **prepar** 39:12 |
| **plans** 139:11 | 194:10 198:11 | 120:12 137:23 | **preparation** |
| 139:14,25 | 205:24 206:6 | 155:6 156:17 | 40:17 41:1 |
| **platform** 139:5 | 207:11,14 | 157:6 160:9,19 | 63:12 |
| 144:14,17,20 | 208:2 221:14 | 161:20 170:21 | **prepare** 37:22 |
| 144:22,24 | 227:23 245:6 | 172:1,5 176:12 | 38:2,11,18,24 |
| 145:2,5,12 | 245:18 246:24 | 178:10 182:10 | 39:4,8,14,17 |
| 151:23 152:1 | **points** 253:3,12 | 183:4,6,14,20 | **prepared** 155:7 |
| 152:21 170:8 | **political** 14:22 | 194:20 195:9 | 155:11,12 |
| **platforms** | **pool** 255:20 | 200:22 231:11 | 164:23 165:9 |
| 152:8 | **portfolio** 72:10 | **potentially** | 165:13 174:21 |
| **play** 52:2 | **portion** 27:16 | 15:2 31:10 | 245:13 267:13 |
| **played** 72:24 | 87:11 152:2,5 | 106:3 107:21 | 267:14 277:23 |
| 98:8 | 168:19 181:11 | 110:5 132:21 | |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

| | | | |
|---|---|---|---|
| **preparing** | **price** 94:1,14 | 205:25 254:2 | **proceed** 8:20 |
| 52:24 71:5 | 95:2 141:3,10 | 271:11 277:5 | **proceeding** |
| 165:3 | 141:25 151:13 | **private** 7:4 | 7:22 245:12,22 |
| **present** 7:23 | 151:17 152:20 | 72:11,24 76:25 | **proceedings** |
| 59:9 84:13 | 154:17 157:13 | 91:9 | 9:25 |
| 138:4 190:16 | 158:14,16,22 | **privy** 80:7 | **proceeds** |
| 225:20 271:21 | 159:15,17 | **pro** 159:24 | 162:22 166:5 |
| 271:23 | 160:23 190:13 | 160:4,7,9 | **process** 23:6 |
| **presentation** | 191:6,10 | 161:12 190:17 | 56:20 57:14,19 |
| 5:2,5 171:9 | 202:25,25 | 218:9 230:21 | 57:21 58:15 |
| 174:21 177:17 | 211:18,23,24 | 230:23 231:1 | 63:14,15,17 |
| 184:23 | 212:3,4,4,16 | 231:14 233:2 | 74:17 132:7 |
| **presentations** | 226:5,15 227:4 | 250:15,17 | 142:23 161:8 |
| 137:1 | 227:14 229:22 | **prob** 219:13 | 203:5 210:2 |
| **presently** 60:18 | 230:10,16,18 | **probably** 17:22 | 239:14,16,19 |
| 101:7,8 | 231:8,14 | 26:15 40:6 | 240:8 259:20 |
| **president** 77:22 | 232:14 235:1 | 51:13 52:25 | 259:21 260:10 |
| 77:24 78:9 | **prices** 157:12 | 64:9,10 65:23 | **produce** 26:25 |
| 79:8 80:23 | 229:8 | 74:18 75:7 | **produced** 9:7 |
| 81:9 | **pricing** 157:17 | 77:8 90:20,21 | 27:11 36:22 |
| **pretty** 56:7 | 158:4 228:20 | 107:4,5 108:1 | 121:25 |
| 84:11,11 114:8 | **primarily** | 109:23 111:10 | **product** 152:10 |
| 145:15 165:10 | 133:9 155:5 | 121:19 123:7 | 170:7 |
| 190:9 197:10 | **prime** 115:25 | 129:22,23 | **production** |
| 208:21 | **principal** | 135:12 136:23 | 4:11 9:2,5,6 |
| **prevented** | 123:23 124:4 | 155:2 160:25 | 11:17 25:13,25 |
| 261:11 | 124:13,15 | 165:6 166:15 | 39:23 217:7 |
| **previous** 24:20 | **principle** 161:2 | 169:13 201:15 | 240:17 |
| 70:21 105:3 | 161:3,14,18 | 201:18 202:2 | **products** |
| 141:6 174:4 | 192:22 212:13 | 203:1 219:13 | 121:24 |
| 214:18,20 | **prior** 19:21 | 240:15 243:17 | **professional** |
| 236:20 247:24 | 22:18 33:19 | 273:8 | 63:24 143:2,5 |
| 249:18 | 38:13,17 52:18 | **procedures** | 172:15 179:23 |
| **previously** | 95:21 122:22 | 1:22 | **profits** 66:11 |
| 117:18 254:1 | 122:24,24 | | 181:1 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[program - question]**                                    Page 49

**program**  62:25
**programmers**
    112:7
**progress**
    158:24 159:1
    160:16,16,18
    160:23 228:2
    229:18
**project**  99:24
    105:3
**projected**
    161:11
**projections**
    140:9 141:16
    151:3 159:22
    160:1,2 190:17
    230:20
**projects**  45:6
    77:2 145:9
**prom**  98:1
**promissory**
    95:14
**pronounce**
    19:5
**property**  225:9
**proposal**
    187:24 188:6
**protect**  218:20
**protection**
    235:8
**protective**  1:19
    11:18,22
**provide**  49:15
    52:10 84:15
    114:18 176:11

176:16 253:11
253:14
**provided**  50:15
    52:17 114:6
    130:14 135:6
    191:13,16,20
    259:4
**provider**  100:6
    168:20 186:6
**provides**  235:7
    258:24
**providing**
    114:10 127:23
    128:3,8 131:20
    156:4 165:11
    166:24 176:24
    188:8 219:16
**provisions**
    241:15
**proximity**
    119:3
**public**  97:22
    142:14 180:9
    280:19
**pulled**  238:22
**purchase**  5:17
    5:20 49:21
    93:5,13,16,22
    94:1,5,7,20,23
    94:23 95:2
    149:9 150:23
    152:20 172:14
    173:1 176:20
    185:5 187:6,13
    187:14,15

188:14,17
206:1,2 209:20
209:23 210:16
211:12,23
212:3 213:9
214:12,17
216:4 222:8,14
227:1 233:6,13
234:25 253:16
**purchased**  21:6
    22:11 94:10,24
    97:2 180:7
    188:14 215:10
    226:24,25
    227:1 233:8
**purchaser**
    211:6 215:2,19
    215:20 216:6
    217:1 218:8
    224:1,22
    225:12 233:25
**purchases**
    93:17,20 95:18
    211:14
**purchasing**
    211:18 215:18
    215:19,20
    230:9
**purpose**  39:13
    47:19 178:6
**purposefully**
    244:23,24
**purposes**  25:24
    215:21 221:7

**pursuant**  1:22
    17:25 36:23
    37:2 211:14
    266:19
**put**  88:7 100:2
    102:19 135:11
    167:18 170:4
    172:13 181:22
    204:12 213:15
    221:5 227:13
    227:13 246:16
    247:18,19,20
    258:5
**puts**  261:20
**putting**  182:4
    182:14 247:20

**q**

**qatar**  168:9,16
    169:1,7,12,12
    170:2,3,3,14,16
    170:17
**qualified**  156:2
**quantitative**
    151:10
**ques**  231:6
**question**  10:13
    10:15,20 27:12
    38:9,10,24
    47:14 66:5
    81:14 93:8
    95:25 105:20
    106:4 124:11
    124:12 156:14
    179:14 184:15
    184:17 188:4,5

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[question - recall]**                                    Page 50

207:23,25
208:10 212:1,9
214:24,25
225:20 227:3
229:12,14
231:7 237:13
237:23,24
238:7,8 242:14
242:16 243:13
251:17 261:15
275:10
**questioned**
270:20,22,23
**questionnaire**
209:8,11
**questions** 4:22
10:3,6,19 11:1
11:5 40:5
87:16 159:3
163:1,18,24
164:20 165:12
193:6 271:2
**quick** 234:14
**quickly** 39:22
**quillacq** 19:10
**quite** 72:18
133:25 165:6

**r**

**r** 1:20,20 2:1
3:1 8:21 277:1
279:3,3
**racehorse**
142:12
**racehorses**
175:14

**racing** 175:11
190:7,7 193:23
198:5
**raiders** 173:2
**raise** 59:23
160:17 161:22
161:24 162:1
167:10,15
180:18 182:20
202:25 229:19
248:8,9
**raised** 22:11
162:5,22 166:5
190:24 191:4
251:7,10,13
252:13,18,20
271:7,8,10
**raising** 52:11
96:4 109:3,25
110:19 154:11
197:2 202:25
248:5 271:2
**range** 23:13,14
75:8 76:11
103:4,15
133:23 153:3
**rarely** 239:1
**rata** 218:9
**rate** 191:5
**rather** 244:17
**rawlins** 70:22
71:20 111:4
112:7,10,25
**reach** 52:14

**reached** 155:5
**read** 27:20
40:24 122:8
126:25 179:13
184:17 196:7
206:21 213:21
237:20 239:2,2
239:4 242:16
244:8 261:14
261:23 278:9
280:5
**reader** 182:16
**readily** 165:12
**reading** 127:3
**ready** 56:9
**real** 116:1,3
170:13,19
184:5,5
**realize** 225:17
261:10
**realized** 225:7
246:15
**really** 19:5,6
21:7 65:6 71:6
102:18 127:12
128:4 132:3
151:9 153:16
160:2 168:23
197:18 198:12
198:15 199:3,6
199:11 201:21
230:25 231:3
251:5
**reas** 69:17

**reask** 81:14
**reason** 11:11
69:25 147:16
182:2 186:3
202:21 208:11
237:2 273:25
278:11 279:6,9
279:12,15,18
279:21
**reasonable**
140:14
**reasonably**
181:10
**reasons** 46:2
69:17 169:5
186:5 204:15
244:18 274:4
**rebuilding**
83:21
**recall** 16:6,14
17:23 18:1,10
22:23 23:10,21
24:23 25:16
26:5 30:1,3
32:7 33:17
34:3 40:16
45:1,20,25
46:20,23 48:12
48:15,16 49:2
50:6 51:23,25
54:16,18 58:20
59:3,17 60:3
61:6,7 65:6,23
65:25 69:19
70:9,12,15,16

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[recall - references]**                                                              Page 51

| | | | |
|---|---|---|---|
| 70:23 71:6 | 191:12 192:8 | **recess** 69:10 | **redeemed** 46:4 |
| 73:3 75:7,8 | 192:23 193:4,9 | 113:23 186:14 | **redemption** |
| 77:21 78:11 | 196:11,12 | 209:3 257:25 | 45:9 |
| 79:6,10,17,18 | 198:23 199:1 | **recognize** | **redemptions** |
| 88:2,9 91:16 | 199:11,11 | 164:17 171:17 | 45:4,22,24 |
| 91:17,23 94:1 | 209:13 210:13 | 249:4 256:18 | 46:8 |
| 94:11,14 95:1 | 210:25 219:11 | 257:1,7 258:12 | **redline** 210:5 |
| 101:16,17 | 223:11 225:24 | 264:14 | 210:10,15,20 |
| 102:11 103:18 | 230:18 236:5 | **recollection** | 210:20,23,25 |
| 103:23 107:4 | 237:1,11 | 20:14 26:8,13 | 211:5,10 217:7 |
| 108:9 109:9,16 | 239:10,13,20 | 70:5 94:16 | 223:12,15,19 |
| 110:21 112:22 | 240:22 242:19 | 105:12 134:3 | 223:21,23 |
| 112:24 113:11 | 242:23 246:1 | 153:4 207:8 | **redlined** 204:8 |
| 116:12,23 | 248:5,10,11 | 239:22 240:11 | 216:19,21 |
| 117:1,21,24 | 249:15,16,17 | 240:12,16,19 | 217:1 236:15 |
| 120:24 123:6 | 270:9 273:24 | 240:21 247:1 | **redlines** 216:15 |
| 131:24 132:24 | 274:17,19,21 | 256:20 | 216:18 236:14 |
| 133:2,8,12,13 | **receipt** 278:18 | **recommended** | 239:6 |
| 133:18,20 | **receive** 78:7 | 72:4 | **reduce** 220:13 |
| 134:2 143:8 | 107:25 129:24 | **record** 7:2,7,24 | 265:18,22,25 |
| 145:16 147:10 | 130:4 149:23 | 9:1 69:3,5,14 | **reemployed** |
| 148:17,22,24 | 149:24 150:2 | 80:25 81:25 | 76:13,20 |
| 149:1,6 152:25 | 173:14 193:14 | 96:10,12,13,15 | **reevaluating** |
| 153:8,11,14,16 | 193:17 235:21 | 113:16,22 | 46:10 |
| 153:19 154:2 | **received** 9:2,4 | 114:2 186:10 | **refer** 161:1 |
| 156:4,21 | 26:20 62:20 | 186:13,17 | 180:22 268:6 |
| 162:18 163:6,8 | 110:22 124:17 | 209:2,5 229:1 | **reference** 180:9 |
| 163:9,12 165:4 | 124:17 128:18 | 257:18,24 | **referenced** |
| 168:11 173:18 | 131:4 152:16 | 258:2 276:1 | 149:13,21 |
| 174:23 175:11 | 155:25 186:7,7 | **recorded** 7:8 | 174:25 227:5,6 |
| 178:15,19 | 235:24 236:2,6 | **recording** 7:5 | 227:8 278:6 |
| 183:16 185:17 | **receiving** 32:10 | **records** 49:10 | **references** |
| 185:24 187:15 | 156:23 191:9 | **recovery** 17:13 | 146:16 187:25 |
| 187:19 188:18 | **recently** 140:19 | 17:15 267:18 | 188:6 |
| 189:25 190:2,3 | 166:17 | 268:6 | |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[referencing - rent]**                                          Page 52

| | | | |
|---|---|---|---|
| **referencing** | 126:23 132:8 | **relation** 111:16 | 102:8 132:22 |
| 81:8 | 201:17 | **relationship** | 134:1 148:11 |
| **referrals** 156:1 | **registers** 70:6 | 92:23 98:7,11 | 162:20 166:3 |
| **referred** 149:15 | **registration** | 101:11 103:7 | 185:15 194:22 |
| 159:25 215:12 | 57:15 | 103:25 168:9 | 196:14,17 |
| 216:8 247:12 | **regular** 5:8 | 173:12 179:6,9 | **remote** 96:1 |
| **referring** 21:15 | 75:22 119:4 | 179:16 180:4 | **remotely** 56:16 |
| 34:21 41:11 | 186:22 187:2 | 262:5 | **renegotiate** |
| 47:7 101:25 | **regulations** | **relationships** | 24:14 |
| 122:5 164:20 | 65:10,16,19 | 21:5 89:10 | **renewed** 65:24 |
| 172:12 173:7 | 132:12 | 159:6 270:12 | **rent** 17:13,16 |
| 199:8 244:22 | **regulatory** 65:6 | **relative** 200:9 | 17:25 24:7,8 |
| 249:13 250:4 | 122:12,16,19 | 201:1,10 | 24:14 25:2,7 |
| 250:18 251:23 | 142:22 | 277:14,16 | 117:21 119:21 |
| 268:9 | **reimbursed** | **relatively** 143:4 | 120:2,5,13,15 |
| **refers** 180:14 | 262:13,15 | **relevant** 27:23 | 120:19 133:14 |
| **reflect** 232:19 | **reimbursement** | 28:5 36:18 | 133:15,21 |
| 267:19,25 | 107:25 261:2 | 40:1 | 135:1,7,14 |
| **reflected** | **reinventing** | **reliable** 140:16 | 136:7 137:15 |
| 243:15 253:3 | 46:10 | **relied** 201:15 | 165:24 250:8 |
| **reflects** 267:16 | **rejected** 208:18 | **relief** 9:11 | 250:19,23 |
| **refre** 232:19 | 261:21 | **relinquishing** | 251:15 252:15 |
| **refresh** 26:8 | **rejecting** 203:3 | 220:18 | 252:19,20 |
| **refuse** 202:15 | **rel** 200:6 | **rely** 236:14,20 | 259:4,8,13,17 |
| **regard** 9:9 | **relate** 18:6 | 239:3 | 260:11,20,22 |
| 197:14 | 67:15 235:3 | **remain** 126:19 | 262:18 267:17 |
| **regardless** | **related** 30:23 | 127:10 | 267:19 268:1 |
| 140:16 | 98:9 110:10 | **remainder** | 268:13,15,17 |
| **register** 70:5 | 126:7 140:1,2 | 29:12 | 268:24 269:3 |
| **registered** | 172:15 177:7,8 | **remained** 71:21 | 270:17,21,23 |
| 55:18,21,25 | 234:25 255:4 | 112:11 | 271:3 272:21 |
| 56:3,25 58:10 | **relates** 212:18 | **remem** 51:5 | 272:21,24 |
| 69:18 70:1,14 | **relating** 189:12 | **remember** 19:6 | 273:1,10,17 |
| 70:14 114:11 | 240:6 | 20:20 86:14 | 274:1,9,14,17 |
| 114:17 126:19 | | 95:22 99:9 | 274:20 275:13 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[rentable - revenue]**                                    Page 53

| | | | |
|---|---|---|---|
| **rentable** 117:6 | 216:1 218:25 | **requires** 10:20 | **response** 23:3 |
| **rental** 250:6,7 | **representative** | **resale** 215:22 | 243:25 253:10 |
| 250:11,13 | 172:7 | **research** 84:5 | **responsibilities** |
| 272:12 | **representatives** | 143:16 | 46:9 77:24 |
| **renting** 263:9 | 269:13 270:7 | **resent** 246:8 | **responsibility** |
| **rents** 267:17 | **represented** | **reserve** 9:9 | 132:6 |
| 268:4 | 9:12 151:15 | **reset** 88:23 | **responsible** |
| **reoffer** 84:25 | 170:25 205:15 | **residence** 42:10 | 112:7 132:10 |
| **repeat** 105:20 | **representing** | 42:12,14 | 132:14 157:5 |
| 207:23 229:12 | 7:18 92:25 | **residing** 8:21 | 260:21 |
| **repeated** | 215:6 | **residual** 29:2 | **responsive** |
| 166:12 | **represents** | 44:17,18 89:16 | 29:10 30:24 |
| **rephrase** 10:14 | 18:24 214:10 | 132:8 | 31:10 36:18 |
| 37:12 105:21 | **reps** 213:25 | **resigned** 52:7 | 37:7,10,15 |
| 134:10 | 214:4 | 75:14 101:18 | **rest** 78:15 |
| **reported** | **request** 4:11 | **resolved** 11:2 | **restart** 85:13 |
| 192:21 | 25:12,25 | **resources** | **restrooms** |
| **reporter** 1:21 | 175:18 253:2 | 165:17,22 | 116:20 |
| 7:19 8:19 9:24 | **requested** | **respect** 11:12 | **restructure** |
| 13:4 97:19 | 27:10 249:11 | 14:3 35:7 36:1 | 84:9 |
| 183:24 184:18 | 249:25 253:12 | 36:8 41:15 | **restructuring** |
| 242:17 277:4 | 254:1 | 46:16 52:2 | 100:3 |
| **reporting** | **requesting** | 68:1 80:21 | **result** 67:3 |
| 125:11,11 | 253:25 254:7 | 81:20 82:13,21 | 114:9,13 |
| **represent** 8:3,5 | **requests** 26:21 | 97:8 102:25 | 259:25 |
| 151:14 218:7 | 27:7,19,23 | 110:24 111:1 | **retained** 276:4 |
| 266:14 | 28:6 30:24 | 111:12 128:22 | **retirement** 14:6 |
| **representation** | 36:19 37:7,15 | 162:7 240:12 | 201:16,17 |
| 163:3,5,13,15 | **require** 58:17 | 242:10 254:11 | **return** 139:23 |
| 163:19 173:24 | 144:19 | 266:18 | 179:25 278:13 |
| 216:5 221:13 | **required** 36:22 | **respond** 11:5 | 278:17 |
| 221:24 | 49:8 63:24 | 253:1 | **returned** 89:5 |
| **representations** | 64:5 114:14 | **responded** | **rev** 4:16 123:17 |
| 162:9,19,21 | 206:3 261:17 | 253:4 | **revenue** 176:6 |
| 198:4 215:1 | 280:13 | | 176:17 |

**[revenues - sack]**                                          Page 54

**revenues** 265:7
265:9,14 266:1
266:4 274:5
**review** 26:21
27:18 30:17
39:14,16,19
40:22 115:3
155:14 178:19
178:21 206:12
213:21 236:11
254:11 258:5
278:7
**reviewed** 38:13
39:9,10,13
40:18,20
155:15,16
165:6 213:3,5
213:7 236:13
239:6 240:22
**reviewing**
165:5 178:16
**revise** 152:6
**revised** 149:4
**right** 8:18,25
39:2,2,2 81:2
102:13 127:13
151:1 176:5
181:3 201:3
208:3 217:1
231:19,21
232:3 234:4
235:7 246:18
253:15 257:17
260:18 268:10
275:24

**rights** 9:9
218:1,2,13
219:1,3,17,22
220:5,9,25
**risk** 160:18
200:24 202:20
**river** 42:22
189:1
**road** 42:22
189:1
**role** 16:11
19:17 35:25
44:2,8 46:15
48:22 51:2
52:2,16,19,23
59:18 72:25
77:19 78:22
80:14,20 81:19
82:20,24 97:8
100:15 101:5
102:7,16,18
107:13,16
108:15,16,23
109:1,3 110:24
110:25 113:9
113:11 114:25
144:8 165:3,4
165:5 170:10
173:15 176:3
223:8 258:18
**roles** 46:9 50:2
72:21 108:25
**room** 38:4
118:21 119:8
172:17 183:19

191:17 236:18
250:15,18
**rooms** 116:20
117:12 119:6
272:9
**roseland** 1:23
2:3 7:17
**ross** 2:4 8:2
27:12 37:11
45:13 66:9
73:14 95:24
125:2 137:6
144:10 148:3
224:3 229:2
254:4 256:5
268:18 272:21
**roth** 40:13,14
**rough** 90:22
133:25
**round** 151:2
157:13,18,19
157:22,25
158:8,11,13
159:13,13,20
160:21 162:8,8
162:22 166:6
166:18 167:12
167:13,19
191:5 197:4,8
197:11,16,19
226:11,12,15
226:16,23
233:9
**rounds** 157:9
157:15,17

158:1
**royal** 168:10,11
**rpearlson** 2:4
**ruchalski** 1:8
2:24 3:5 8:12
34:8,14,25
35:8 97:24
98:15 99:20,23
100:10,15
101:5 102:24
107:9
**rules** 1:22 65:9
132:12
**rumson** 35:18
42:2,4,10,17,19
42:22 188:21
188:24,24
**run** 220:2
**running** 173:11
**runs** 67:12

s

**s** 1:20 2:1,11,18
3:1,1 278:1
279:3
**sack** 2:11 8:13
8:13 9:15
14:10 16:13
21:1,23 22:4
22:19 24:2,10
25:1 27:12,15
27:25 28:21
33:21 36:24
37:8 38:20,24
39:3,21 45:12
45:16 47:22

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[sack - salerno]** Page 55

| | | | |
|---|---|---|---|
| 48:2 49:17 | 163:16 164:2,7 | 245:17,24 | 183:16 188:19 |
| 51:20 53:4,21 | 164:10 166:13 | 250:20 251:2 | 189:3,8,12,15 |
| 53:23 57:20 | 167:23 168:6 | 251:12 252:10 | 189:17,21 |
| 58:6 66:8,11 | 169:18 173:22 | 252:13,15 | 190:11,21 |
| 67:16,18 68:3 | 175:8,19 | 254:3,16 | 191:8,13,25 |
| 68:10,20 69:9 | 178:11,17 | 256:11,13 | 192:6,11,14,24 |
| 71:8,11,13 | 181:25 184:15 | 257:14 260:2 | 193:19 194:7 |
| 73:13,16 75:22 | 184:19 185:2 | 260:13,24 | 195:1,17 |
| 87:19 89:25 | 191:15,23 | 261:13,19 | 196:16 197:21 |
| 90:6 93:7 | 193:21 194:9 | 262:2,23 263:4 | 198:20 199:17 |
| 95:10 96:7 | 195:6 199:24 | 263:12,24 | 200:16 201:5,9 |
| 99:17,19,22 | 200:5,7 203:25 | 265:19 268:3 | 202:6 203:15 |
| 101:7 105:17 | 205:8 207:22 | 268:16 270:22 | 203:17,18,23 |
| 109:13 116:6 | 207:24 210:7 | 270:25 271:5 | 204:4,7,9,16,20 |
| 116:24 118:2 | 210:18,24 | 272:15,20 | 205:12,21 |
| 120:7 121:1 | 211:7 212:6,8 | 274:2 275:15 | 207:4,16 208:1 |
| 123:3 124:6 | 213:17 215:4 | 275:21,23 | 209:7 210:5,6 |
| 125:1,5,9,16,20 | 215:10 217:6 | **sacks** 278:1 | 210:13 211:13 |
| 125:23 126:5 | 218:14 219:4 | **sake** 226:22 | 211:22 213:16 |
| 126:10,12 | 219:19 220:10 | **salary** 46:22,24 | 213:21 214:5,9 |
| 127:3,6 128:9 | 221:2 224:3,9 | 73:21 78:2 | 215:5,16 216:2 |
| 128:16 129:9 | 224:11,14,18 | 91:25 113:12 | 218:25 219:15 |
| 129:15 130:1,6 | 225:19 226:18 | 156:23 | 219:22 224:1 |
| 130:18,20 | 226:20 227:25 | **sale** 48:4 49:21 | 224:23,24 |
| 131:9,15 | 228:4,6,10,12 | 93:5 219:7 | 225:4 233:12 |
| 132:13 134:9 | 228:15,18,20 | 220:6 221:4 | 234:8 235:6 |
| 136:3 137:6 | 228:22,24 | **saler** 241:15 | 237:9 239:9 |
| 138:4,7,11 | 229:1,4,6,8 | **salerno** 1:16 | 241:6,12,16 |
| 141:18 144:10 | 231:9 232:6 | 2:7 3:4 5:15 | 242:10 243:3 |
| 148:2 150:4 | 233:1 234:5 | 6:8 7:12 8:6,7 | 244:5 245:7,9 |
| 151:6 152:23 | 235:23 237:6 | 40:12,21,23 | 245:21 247:5 |
| 153:20 154:21 | 237:17 238:3 | 107:10 109:1,7 | 247:17,20,21 |
| 156:9,13,22 | 238:19 239:15 | 109:12 172:6 | 247:25 248:3,5 |
| 160:6,24 | 239:25 240:2,8 | 174:25 175:4,7 | 248:18 249:5 |
| 162:11,14,16 | 242:14 244:14 | 175:17 183:13 | 249:11,21,25 |

253:21 255:6
270:20 271:2
278:4 279:1
280:1

**salerno's**
175:10 194:14
213:11 253:2

**sansone** 40:13

**sat** 38:3

**satisfy** 39:20
202:23

**saturday**
196:21

**saw** 26:12,15
27:19 217:7,8
223:17,18,19
223:20,22
234:23 235:1
241:24

**saying** 61:3
89:25 128:13
135:18 175:16
175:20 182:11
184:2 196:20
198:7 202:22
204:25 215:13
221:19 225:19
227:9 236:1,4
236:23 244:1
244:12 245:2
251:1

**says** 122:11
125:3 126:18
127:21,22
146:21 149:22

150:7 165:16
166:5,10,17
167:3,9 172:10
172:23 173:5,6
176:5,8,20
179:5,11,16
180:20 181:4,5
187:5,23
196:21 197:2
197:20 199:12
199:19 200:1
201:4 202:4,4
210:10 214:12
215:18,23,24
225:4,9,17
231:19,19
232:7,9,19
244:21 245:10
247:15 250:7,7
253:17 254:9
255:1 258:16
265:8 267:21
268:10,11,24
272:24

**scattered** 21:4
21:18

**scenario** 219:7
220:12,20
221:8

**schedule** 88:12
147:4 148:20
149:3 231:15
231:17,19,19
232:8,9 242:4
253:7,18

267:13,23

**schedules** 4:19
145:24

**school** 62:6,10
62:15 98:1,5

**schotz** 2:16 8:8

**scientific** 231:1

**scrolled** 39:22

**search** 29:9,12
29:16,18,20,22
31:10,13 37:2

**searched** 29:11

**searches** 29:23
30:2,4

**seat** 102:11
192:12 235:7
241:12,16

**sec** 13:12,17
14:2,15 15:5
15:14 114:11
114:14,18,22
126:20,23
127:11 132:11

**sec's** 128:4,22
129:17 130:21

**second** 69:3
135:16 149:5
158:11,13
159:20 197:15
197:19 201:3
226:1 235:2
249:1

**seconded** 33:23

**secretary** 23:7

**section** 122:8
124:22 146:16
187:5,9 233:7
254:11

**securities** 1:9
2:14 13:7,11
44:22,25 47:5
47:7,10,17,21
47:25 48:5,8
48:12,14,17
49:7,8,19,22,22
50:2,24 54:10
54:12,14,22
55:3,5,11,13,20
55:24 56:2,24
57:4,18 58:2
64:23,23 67:2
69:18 70:1,13
71:2,7,9,18
80:19,21,22
81:1,12,20,21
81:24 82:1,13
82:21 83:2,14
84:6,9 86:12
86:23 87:2
89:17 97:9
102:25 107:13
107:16 111:2
112:3,21 113:3
113:4 125:10
126:6 138:2,8
138:15,21
139:1,8,12,17
139:21 140:6,9
140:21,23

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[securities - settled]**                                      Page 57

| | | | |
|---|---|---|---|
| 141:12 172:15 | 259:3,8 268:13 | **sensitive** 7:4 | **server** 28:2,14 |
| 182:23 253:6 | **seeing** 24:19 | **sent** 32:11 35:3 | 28:14,20 |
| **securitize** 84:4 | 26:13 178:15 | 175:2 192:3 | **service** 67:4 |
| 168:21 | **seek** 9:10 86:11 | 204:20 207:7 | 73:2 |
| **securitized** | **seeking** 91:6 | 207:11 210:4 | **services** 49:15 |
| 170:8 | **seem** 268:14 | 210:13,14,20 | 50:16 52:10 |
| **securitizing** | 269:1 272:9 | 210:22 216:16 | 114:6,7,10 |
| 143:4 | **seemed** 154:16 | 217:4 223:12 | 127:23,25 |
| **security** 24:18 | 195:13 | 224:4 237:8 | 128:3,5,7,8,15 |
| 31:7 153:16,24 | **seen** 26:1,9 | 239:5 243:25 | 128:23,25 |
| 195:20 199:15 | 177:25 178:2 | 244:1,4 246:1 | 129:7,11,14,17 |
| **see** 26:4 27:2,6 | 178:20 206:10 | 246:5,9,25 | 130:13,15,22 |
| 35:18,19 52:14 | 222:16,17 | 248:10 252:5 | 130:23,25 |
| 115:12,15 | **selected** 105:10 | 252:17 253:16 | 131:5 135:6 |
| 123:22 125:16 | **self** 248:12,14 | 278:14 | 156:3 187:24 |
| 125:21 126:12 | 250:3,9 251:1 | **sentence** 201:3 | 188:6,8 257:9 |
| 127:17,18 | 251:5,11,14,19 | **separate** 58:17 | 258:13 |
| 146:8,11,15,18 | 251:22,25 | 58:20 211:14 | **serving** 35:25 |
| 146:25 148:5 | 252:4,16,18,21 | 268:5 | 75:10 79:7,16 |
| 148:20 149:3,9 | **sell** 142:14 | **september** | 79:23 80:2 |
| 150:6 166:4,10 | 144:14 168:18 | 63:22 159:17 | 83:1 99:7 |
| 171:15 176:2 | 179:21 180:3 | 258:25 | 102:6 170:11 |
| 178:16 180:14 | 180:11 187:17 | **series** 64:1,1,1 | 170:22 173:20 |
| 181:4,7 187:6 | 187:17 218:6,9 | 64:14,14,20,20 | 193:15 |
| 187:11 196:9 | 219:2,15 | 64:21,22 65:1 | **set** 27:9 67:11 |
| 196:25 201:6 | 220:15 221:21 | 65:2,4,5,22,23 | 87:1,1,7 |
| 210:11 211:9 | **selling** 220:1 | 70:19 268:13 | 184:11,25 |
| 212:11 217:3 | **sells** 218:17 | **serve** 33:24 | 185:4 200:4,11 |
| 223:15 225:5 | **send** 244:19 | 66:14,21 79:3 | 200:16 204:19 |
| 225:20,22 | 246:17 | 87:21,21 | 277:12 |
| 226:3 227:8 | **sending** 32:12 | 100:16 101:5 | **sets** 91:21,22 |
| 241:7 249:7 | 239:8 254:10 | 101:14 105:10 | **setting** 200:2 |
| 250:9 252:24 | **sends** 216:17 | 119:2 | **settle** 21:12 |
| 253:23 256:6 | **sense** 121:7 | **served** 26:7 | **settled** 17:2 |
| 256:23 258:23 | 182:15 | 72:21 79:12 | 20:10,19 22:24 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[settlement - sister]**                                    Page 58

| settlement | shareholders | short 103:12 | signature |
|---|---|---|---|
| 15:11,13 16:24 | 1:14 74:18 | 185:22,24 | 213:24 222:21 |
| **seven** 26:17 | 139:20,22 | 247:19 254:6 | 224:25,25 |
| 117:11,12 | 166:19,23 | 256:6 | 234:16 235:25 |
| **several** 12:7,8 | 219:3,16 | **shortly** 76:17 | 236:3,6 237:4 |
| 18:10 38:21 | 220:22 221:22 | 85:6 | 237:12,15 |
| 112:6 233:3 | **shares** 82:15 | **shot** 94:21 | 238:2,17,21,24 |
| **shahinian** 1:23 | 89:23 90:5 | **show** 25:9 | 239:11 257:2 |
| 2:2 8:2 | 93:12 97:2 | 123:14 164:14 | 277:21 |
| **share** 89:14 | 138:22 141:1 | 171:12 186:19 | **signed** 146:11 |
| 94:3,14,17 | 141:11 142:14 | 195:21 196:2 | 147:15 207:12 |
| 95:4,5,9 141:3 | 142:24 143:2,2 | 209:18 232:10 | 208:11 211:2 |
| 141:10,14,25 | 144:15 150:23 | 233:4,17 | 212:23,25 |
| 151:13,18 | 151:16 158:17 | 248:15 255:24 | 213:4,22 |
| 154:16 157:20 | 160:14 180:8,8 | 256:9 | 214:21 217:9 |
| 158:10,18,23 | 187:10,17 | **showed** 211:1 | 223:1 224:21 |
| 159:15,21 | 188:14,17 | 231:11 | 224:22 225:22 |
| 160:22 187:6 | 190:14 191:10 | **showing** 210:15 | 233:24 236:8 |
| 187:11,18,21 | 210:17 211:6 | **shows** 232:4,11 | 236:23 237:3 |
| 190:13 191:7 | 211:18,21 | **shut** 85:8 | 240:21 246:16 |
| 211:19 212:4,4 | 212:5 215:19 | **siblings** 43:8,10 | 256:23 278:20 |
| 212:14,16,18 | 215:20 218:6,8 | 59:5 | **significant** |
| 218:9 226:3,6 | 218:10,18,23 | **sic** 233:5 | 67:14,21 |
| 226:24,25 | 219:2,7,16 | **side** 110:14 | 151:10 170:4 |
| 227:1,2,4,14 | 220:14,19 | 176:3,5 181:12 | 201:1 |
| 229:23 230:3 | 221:19,21 | **sign** 85:14 | **signing** 213:6 |
| 231:4,5,8,13 | 226:3,25 227:1 | 86:18 207:13 | 223:5 225:4 |
| 232:14 233:9 | 227:2 230:9 | 208:17 217:10 | 234:19 239:23 |
| 233:14 234:25 | 232:11,16 | 236:12,19,19 | 240:9,13 |
| 235:2 | 233:6,8 | 236:19 237:14 | **similar** 106:14 |
| **shared** 177:13 | **sheet** 264:12,17 | 237:22 238:1,5 | **simply** 214:22 |
| **shareholder** | 264:22 265:8 | 238:16,17 | **simultaneously** |
| 73:5 77:1 | 278:11 | 239:3,12 | 157:14 |
| 166:22 223:10 | **shifting** 128:11 | 278:12 | **sister** 50:11 |
|  |  |  | 60:7 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[sisters - specifying]**                                          Page 59

| | | | |
|---|---|---|---|
| **sisters** 50:9 | 215:21 | **source** 170:7 | 273:2,4,11 |
| **sit** 36:21 65:18 | **solicitation** | **sources** 83:23 | 274:24,25 |
| 80:11 92:18 | 155:8 | 84:14 | **spaces** 271:22 |
| 119:3 122:18 | **solicited** 154:22 | **southern** 1:1 | **speak** 35:20 |
| 122:20 136:21 | 154:25 | 7:14 | 40:25 44:11 |
| 237:20 239:22 | **soliciting** | **sovereign** | 207:18 229:1 |
| 240:11 | 154:20 155:4 | 168:25 169:2 | 247:6 |
| **site** 119:15 | 157:3 | 170:4 | **speaking** 114:4 |
| **situation** 68:14 | **solutions** | **space** 18:5,9 | 198:23 228:8 |
| **size** 180:15,17 | 278:23 | 21:2,15,20 | 249:10,11,24 |
| **skill** 91:21,22 | **solved** 159:3 | 22:2,7 23:16 | **special** 241:21 |
| **skipped** 164:5 | **somebody** | 23:17,23 25:6 | **specif** 196:17 |
| **slide** 172:24 | 163:18 198:19 | 116:11,13,16 | **specific** 14:14 |
| 174:21 175:1 | 202:3 220:2,12 | 116:22 117:9 | 65:20 68:21 |
| 184:3 | 221:8,16,16 | 117:17,22,23 | 81:17 106:4 |
| **slides** 5:2,5 | **sophisticated** | 117:25 118:6 | 136:4 144:5 |
| 171:9 177:17 | 236:17 | 118:10,11,13 | 178:19 201:24 |
| 191:20 | **sorry** 18:20 | 118:16,17,17 | 202:10 213:6 |
| **small** 89:16 | 20:6 36:5 43:1 | 119:14 120:2 | 219:7 230:6 |
| 138:17 159:14 | 53:22 60:16 | 132:15,17 | 240:11 258:20 |
| 181:18 | 64:17 119:25 | 133:4,5,15,17 | 260:15 270:5 |
| **smaller** 180:8 | 121:10 122:3,3 | 133:21 134:12 | **specifically** |
| **soccer** 168:17 | 124:21 125:17 | 134:15,20,23 | 52:13 83:9 |
| 168:17,19 | 146:22 148:7 | 134:24 135:1 | 99:15 100:10 |
| **social** 98:6,11 | 150:16 158:19 | 136:11,12,25 | 106:5 135:8 |
| **socially** 98:9 | 164:25 183:24 | 137:25 257:12 | 136:19 150:21 |
| **softball** 98:8 | 188:3 207:20 | 258:14 260:1 | 156:4 172:3 |
| **sold** 93:1 96:19 | 249:19 253:21 | 260:15,17,23 | 196:12 202:9 |
| 160:14 170:8 | 265:10 266:12 | 261:2,3,12,18 | 203:9 229:4 |
| 187:10 221:5 | 268:19 | 262:1,8,10,11 | 259:7 267:23 |
| **sole** 74:21,23 | **sort** 16:22 | 262:12,14 | **specifics** |
| 204:13 208:22 | 77:14 85:13 | 263:9,11,18,23 | 196:18 |
| 247:21 | 144:20 186:8 | 270:17 271:4 | **specify** 45:13 |
| **solely** 162:23 | **sound** 20:22 | 271:13,17,21 | **specifying** |
| 166:7 215:16 | | 272:7,11,13 | 47:15 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

| | | | |
|---|---|---|---|
| **speculation** | 58:1,2,5,8,23 | 113:3,4,9,13,14 | 181:23 182:4,6 |
| 10:22 175:9 | 66:24 67:1 | 118:13,18,24 | 182:15,16,19 |
| 254:17 | 69:25 70:1,13 | 119:1,5,7,20 | 182:24 183:6,8 |
| **spell** 75:20 | 71:1,2,4,7,8,10 | 120:1,10,11,11 | 183:15,19 |
| **spelling** 75:22 | 71:11,17,18,21 | 132:17 134:6 | 184:10 187:17 |
| **spend** 46:11 | 77:12,16,20,24 | 134:11 135:10 | 187:17 188:11 |
| 220:13 | 78:3,8,20 79:8 | 136:1,7 137:16 | 188:17 189:6,8 |
| **spent** 40:7 63:6 | 80:19,21,22 | 138:2,8,15,20 | 189:13 190:8 |
| 85:18 100:2 | 81:1,1,8,12,20 | 138:25 139:8 | 190:11,23 |
| 137:20 161:9 | 81:21,21,24 | 139:12,16,21 | 192:12 193:14 |
| **spiro** 2:12 8:17 | 82:1,13,21 | 140:5,9,21,23 | 193:16 200:12 |
| 256:5 | 83:2,13 86:12 | 141:12 142:4 | 203:23 205:9 |
| **split** 143:11,14 | 86:22 87:1,2 | 143:6,21,24 | 205:10,15,17 |
| **spoke** 244:3 | 89:17,24 90:5 | 144:1,3,8,12 | 206:9 207:10 |
| **sport** 1:4,9,9,13 | 90:8,17 92:23 | 145:1,4,14,18 | 207:13 209:12 |
| 2:14,14 4:21 | 93:4,6,13,14,15 | 146:7,12 | 209:21,22 |
| 5:1,15,16,20 | 93:17,21 94:8 | 149:19 150:2 | 210:17 212:23 |
| 6:1,14 7:11 8:7 | 94:20 96:18,20 | 151:23 152:21 | 222:7 223:3 |
| 8:15 9:3,3 36:4 | 97:5,8 101:11 | 153:6,13 | 230:9 232:5 |
| 36:8 37:10,17 | 101:12,15,20 | 154:10,20 | 233:19 234:21 |
| 37:19 45:7 | 102:4,5,17,19 | 155:1,3 156:8 | 241:5,25 |
| 47:5,6,9,17,20 | 102:25 104:1 | 156:18,19 | 242:21 243:1 |
| 47:25 48:8,12 | 104:11,18,20 | 157:2,10 | 243:14 245:3 |
| 48:14,17,22,23 | 105:15,23 | 163:23 165:18 | 245:15,16 |
| 48:25 49:2,3,5 | 106:10,13,24 | 167:20 169:16 | 246:13 247:8 |
| 49:6,13,15,19 | 107:3,13,16,22 | 169:25,25 | 248:5,6 249:12 |
| 50:1,2,22,24 | 107:23 108:4,8 | 170:9,21 171:2 | 250:11 255:2,3 |
| 52:3,6,8,10 | 108:15,19,25 | 171:4,4,7,14 | 255:6,10,22 |
| 53:10,24,25 | 109:2,8,12,19 | 172:1,5,18 | 260:9,12,17,20 |
| 54:5,6,9,10,12 | 109:21 110:2 | 173:7,9,12,14 | 260:21,25 |
| 54:12,14,21,21 | 110:19,23 | 173:19 178:13 | 261:1,4,12,18 |
| 55:1,2,3,5,9,10 | 111:1,7,17,20 | 179:6,10,16 | 262:1,5,7,11 |
| 55:13,14,17,19 | 111:23,25 | 180:4,6,12 | 263:18,21,22 |
| 55:23 56:2,13 | 112:2,3,5,11,14 | 181:5,10,14,15 | 264:8,17,23 |
| 56:24 57:4,18 | 112:17,21 | 181:17,18,22 | 265:3,17,22 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[sport - stern]**                                                    Page 61

| | | | |
|---|---|---|---|
| 266:2,10,16,19 | **sportblx0264...** | **stamped** 4:19 | 142:22 143:16 |
| 266:21,25 | 146:5 | 4:22 5:3,6,10 | 158:8,14 |
| 267:20 268:2 | **sportblx0264...** | 5:13,18,22 6:3 | 167:25 169:5 |
| 268:14 269:2,7 | 4:23 163:25 | 6:6,9,12,15 | 190:25 221:3 |
| 269:11,21 | 164:16 | 124:23 145:24 | 253:8 271:2,7 |
| 270:16,21 | **sportblx0264...** | 146:4 163:24 | 271:8 |
| 271:3,13 272:2 | 164:16 | 171:9 177:18 | **starting** 51:1 |
| 272:4,7,12,25 | **sports** 4:19 5:4 | 177:24 184:6 | 82:17 119:16 |
| 273:6 274:24 | 85:9 110:9,13 | 186:24 195:25 | 121:9 134:12 |
| 275:5,13 278:4 | 110:15,16 | 209:24 222:9 | 159:5 197:11 |
| 279:1 280:1 | 140:1,2 143:1 | 233:21 243:10 | **startup** 151:8 |
| **sportblx** 5:6 | 145:24 167:21 | 248:20,24 | 160:13 182:25 |
| 222:14 | 168:4 170:3 | 253:20 256:3 | **state** 1:22 7:22 |
| **sportblx.com** | 173:1 174:12 | 256:16 264:8 | 7:23 14:6 |
| 29:2 | 177:16,23 | **stand** 232:23 | 18:23 20:3 |
| **sportblx0002...** | 185:8 187:6 | 275:24 | 23:7 125:10 |
| 5:22 222:9 | **spouses** 59:5 | **standard** | 126:6 168:16 |
| **sportblx0002...** | 60:5 | 165:10 213:9 | 277:4 |
| 6:3 233:21 | **spring** 136:2,5 | **standby** 176:15 | **stated** 255:2 |
| **sportblx0002...** | 152:3,6,7,10 | **start** 17:3 27:8 | **statement** |
| 5:18 209:24 | 271:1 | 31:17 37:14 | 264:3 265:11 |
| **sportblx0065...** | **square** 117:2,6 | 59:10 63:12 | **states** 1:1 7:14 |
| 6:9 248:20,24 | 117:6 | 77:20 78:8 | 62:8 |
| **sportblx0065...** | **stack** 241:18 | 111:8 116:10 | **statistically** |
| 248:25 | **stage** 190:22 | 120:2,15 121:8 | 151:10 |
| **sportblx0172...** | **stages** 166:20 | 162:13 170:18 | **status** 83:13 |
| 177:24 | **staisil** 107:18 | 204:17 228:7 | 139:9 |
| **sportblx0172...** | 109:21 110:25 | 268:21 269:14 | **stayed** 92:25 |
| 177:18 | 155:25 156:6 | 271:12 | **stecklow** 19:1 |
| **sportblx0264...** | 156:10,16 | **started** 34:1 | **stenographic...** |
| 5:3 171:9 | 189:5,8,11,19 | 43:25 51:4 | 1:21 277:11 |
| **sportblx0264...** | 199:10 | 59:15 63:12,16 | **stepped** 96:18 |
| 4:20 145:25 | **stakes** 110:15 | 78:20 119:18 | 97:5 |
| 146:5 | **stamp** 222:14 | 120:1,10 121:3 | **stern** 2:13 8:17 |
| | 249:20 | 133:13 136:6 | 164:6 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[stipulation - summary]**                                      Page 62

| | | | |
|---|---|---|---|
| **stipulation** | 80:1 128:3,8 | 84:8,11 87:6 | **substance**  41:4 |
| 11:16 | 131:19 274:9 | 89:1 141:7 | 41:14 |
| **stock**  5:17,20 | 274:20,25 | 172:23 173:21 | **substantive** |
| 64:24 74:9 | **stored**  27:1 | 175:13 230:17 | 41:9 53:9,12 |
| 78:10,12 81:23 | 29:15 37:1,18 | **structured** | 53:18 195:12 |
| 82:5 93:2,21 | **straight**  84:3 | 109:17 121:24 | 195:14 |
| 93:23 94:2,8,8 | **strategic**  141:8 | **struggling** | **successful** |
| 94:10,12,15,21 | 166:19,21 | 99:25 | 142:13 |
| 94:24 95:2,13 | 168:15 194:3 | **subject**  1:19 | **sue**  17:7 |
| 95:19 97:15,16 | 221:15,20 | 21:22 66:3 | **sued**  16:3,7,10 |
| 106:15 154:17 | **strategy**  67:11 | **sublease**  6:11 | 16:18,20,23 |
| 154:17 206:1 | **strauss**  1:7 | 256:2 257:8 | 17:5 20:11 |
| 209:20,23 | 2:24 3:6 8:11 | 258:11,13 | 22:13 25:18 |
| 211:12 218:7 | 32:14,15,25 | 260:12 261:11 | **suggested** |
| 222:8,13 230:9 | 33:5 35:8 | 261:18 262:22 | 174:7 |
| 233:13 234:25 | 90:24 91:12,23 | 263:1,3,6 | **suggesting** |
| 241:18,25 | 92:22 96:18 | **subleasing** | 149:16 253:7 |
| 242:4,11,18,21 | 97:4,7 98:11 | 118:1,3 261:12 | **suing**  17:13 |
| 242:22,25 | 99:20,23 100:4 | **sublet**  261:10 | **suit**  16:25 17:4 |
| **stockholder** | 100:11 102:3 | 262:1,6 | 17:14 18:18,21 |
| 235:5 247:15 | 102:16 107:10 | **submission** | 19:2,12 20:15 |
| **stockholders** | **street**  2:16 8:22 | 56:10 | 20:18,20 22:18 |
| 104:11 241:21 | 41:18,21 42:13 | **submit**  56:19 | 25:2 |
| **stop**  51:11,18 | 115:23,24 | 57:4,6,15 | **suitable**  182:7 |
| 54:4,8 75:10 | 123:24 124:16 | **submitted** | 272:1,3,7 |
| 82:23 83:1 | **strike**  15:19 | 56:24 58:23 | **suits**  16:6 17:2 |
| 92:6 99:3,6,7 | 30:18 35:6 | 59:2,3 | 20:10,14,21 |
| 129:21 176:11 | 55:9 79:2 | **subscribed** | **sullivan**  43:13 |
| 228:10,21,23 | 87:15 136:15 | 280:14 | 50:9 52:2,23 |
| 228:23 229:7 | 149:18 151:21 | **subscription** | 59:4 70:20 |
| 229:10 234:3 | 263:16 275:4 | 40:6 | 155:5 156:23 |
| 273:9 274:13 | **string**  6:7 | **subsidiaries** | 157:5 165:2 |
| 274:21,24 | 248:18 | 34:23 216:11 | 199:10 202:11 |
| **stopped**  44:25 | **structure**  83:16 | **subsidiary** | **summary**  62:19 |
| 54:6 79:15,23 | 83:24,25 84:1 | 185:16,18 | |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[summer - tell]**                                      Page 63

| | | | |
|---|---|---|---|
| **summer** 83:4 | **system** 58:14 | **talk** 10:9 31:20 | **taxes** 84:6 |
| 83:11,14 152:7 | **t** | 32:17 34:10 | 267:17 |
| 152:11 | | 35:15 157:7 | **team** 143:2,3 |
| **supplemental** | **t** 1:20,20 3:1 | 201:20,21 | 168:17,17,19 |
| 9:2,4 | 277:1,1 279:3 | 215:5 263:15 | 184:3 218:17 |
| **support** 230:20 | 279:3 | **talked** 105:2 | 218:17 221:6 |
| **supposed** 47:21 | **table** 233:10 | 117:18 144:24 | **teams** 110:15 |
| 48:1 49:7 | **tag** 218:1,2,12 | 190:8 198:24 | **technical** 28:15 |
| 243:14 244:20 | 219:1,3,17,22 | 216:9 | 67:19 122:18 |
| **sure** 12:23 | 220:5,9,25 | **talking** 48:23 | 130:21 |
| 47:14 69:9 | **take** 7:6 26:19 | 60:6 69:16 | **technically** |
| 80:24 93:24 | 39:1 56:14 | 79:2 81:6,11 | 113:2 263:7 |
| 112:14 122:17 | 69:6,22 70:7 | 84:18 88:25 | **technology** |
| 125:2 128:4 | 70:25 71:5,16 | 100:10 108:16 | 58:12 119:9 |
| 135:21 147:6 | 92:12 140:22 | 108:18 118:19 | 139:3 147:5 |
| 147:23 154:12 | 142:12 145:8 | 121:18 160:12 | 159:4,5 162:23 |
| 155:15,19 | 149:12 151:16 | 161:13 169:22 | 165:21 166:7 |
| 165:6 192:19 | 154:17 169:8 | 170:25 183:10 | 191:1 |
| 197:21 199:6 | 171:5 180:6 | 191:20 196:15 | **telephone** |
| 210:19 232:25 | 194:12,15 | 197:6,24 | 125:4,14 |
| 245:5 256:8 | 200:24 206:5 | 201:23 213:14 | 126:13 170:15 |
| 263:14 264:2 | 208:25 216:16 | 215:7 224:6,16 | **telephones** 30:6 |
| **surfaced** 85:18 | 219:8 220:2,14 | 226:9,10 | **tell** 10:12 13:5 |
| **surprised** | 221:9,9,9,15,20 | 235:13 253:10 | 14:12 20:13 |
| 195:10 | 234:14 242:6,7 | 254:12 | 39:24 40:3 |
| **swear** 8:19 | 249:23 256:6 | **talks** 148:4 | 45:2 60:22 |
| **switch** 100:9 | 257:18,19 | 176:2 217:17 | 62:5,12 68:25 |
| 111:24 | 261:22 271:18 | 217:25 | 71:22 73:18 |
| **switching** | **taken** 1:20 7:9 | **tangible** 26:25 | 81:25 107:7 |
| 77:16 99:14 | 69:10 70:19 | **target** 57:24 | 114:16 125:1 |
| **switchover** | 113:23 186:14 | 180:15,17 | 142:3 157:16 |
| 112:12,14 | 209:3 244:6,21 | **targeting** 106:5 | 172:24 187:13 |
| **sworn** 8:22 | 252:22 257:25 | **task** 145:10,11 | 187:24 198:20 |
| 277:6 280:14 | 277:11 | **tax** 182:23 | 200:20 204:19 |
| | **takes** 56:8 | | 219:14,21 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[tell - think]**                                          Page 64

| | | | |
|---|---|---|---|
| 230:4,11,15 | 183:11 184:23 | **themself** | 101:4 106:4 |
| 238:11 243:23 | 188:19 196:15 | 218:20 | 109:23 112:23 |
| 245:8,21 | 201:25 203:1 | **thereabouts** | 116:2,4,5,7 |
| 255:12 263:21 | 218:21 232:4 | 44:1 82:4,18 | 117:10,10,11 |
| 266:13,17 | 232:15,18 | **thereof** 215:23 | 119:18 120:8 |
| 267:15 | 235:13 246:4 | **thi** 95:20 | 124:17,23 |
| **telling** 183:16 | 258:20,22 | **thing** 73:4 | 125:13 127:3 |
| **tense** 59:9,9,10 | 266:18 269:17 | 161:2 194:1 | 134:13 136:8 |
| 131:16 138:4 | 269:19 270:5,6 | 244:8 246:18 | 136:19,23 |
| 225:20 252:7 | 272:10 | **things** 29:15 | 137:20,25 |
| **tenure** 93:3 | **test** 64:23 96:8 | 31:1 49:10 | 141:22 144:25 |
| **term** 53:3 | **testified** 8:23 | 65:17 69:21 | 145:15 147:22 |
| 129:7,13 135:5 | 12:22 88:15 | 72:18 100:20 | 152:14 154:14 |
| 159:20 183:1 | **testify** 11:9,12 | 104:22 145:8 | 154:15 156:2 |
| 201:11 220:21 | 277:7 | 159:7 161:1,5 | 164:2,3 170:16 |
| 246:16 251:18 | **testifying** 9:18 | 174:11 179:7 | 170:24,25 |
| 258:24 | 9:21 | 198:16 201:19 | 172:2 175:11 |
| **terms** 11:22 | **testimony** 1:20 | 250:6 254:9 | 179:11,19 |
| 24:14,16,19,20 | 15:14 18:12 | 259:24 | 181:9 192:13 |
| 29:18 31:13 | 20:7 25:5 | **think** 12:23 | 192:16,18 |
| 36:11,11,25 | 40:19 42:9 | 13:7,14,15 | 193:16 195:8 |
| 37:2,17 45:8 | 55:6 97:1 | 15:25 17:21 | 197:2,3,4,10,11 |
| 52:9 53:16,19 | 164:21 174:20 | 19:16 22:21 | 197:17,17,18 |
| 54:1 55:9 | 210:4 222:3 | 23:20 32:12 | 199:3,18 |
| 63:23 64:24 | 236:23 273:16 | 34:17 49:18 | 200:17 201:15 |
| 74:9 77:4 | 276:2 277:10 | 57:2,6,10,11 | 201:18 202:8,9 |
| 85:19 86:1 | 278:9,18 280:8 | 59:17 64:5 | 203:9 204:11 |
| 95:22 121:6,7 | **tests** 65:14 | 65:5,22 67:7 | 205:8,16,16 |
| 121:14,19,21 | **text** 30:18 31:4 | 68:4,8,13,18,21 | 208:21 210:8 |
| 139:9 144:6 | 32:3 35:9,21 | 68:23 70:4,19 | 214:3 215:5 |
| 147:18 149:9 | **texts** 30:23 | 70:20 80:3 | 218:9 223:18 |
| 150:7,23 | 31:10,12,13 | 81:23 84:8,17 | 223:20,22,22 |
| 159:19 161:5 | **thank** 8:18 | 88:1,23 89:16 | 224:24 227:11 |
| 165:16 168:3 | 171:11 256:13 | 90:20 91:19 | 228:1 230:2,22 |
| 177:5 178:3 | | 92:8 94:17 | 231:10 232:7 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[think - timing]**                                                    Page 65

| | | | |
|---|---|---|---|
| 234:11 237:3 | 134:7 226:2 | 98:14 99:8,10 | 214:3,7,14,20 |
| 239:16 244:7,8 | **thousands** | 99:10,14,16 | 215:15 219:14 |
| 244:9,23,24 | 237:21 | 100:3,13 102:7 | 225:22 227:23 |
| 245:1,2,6 | **three** 12:10 | 103:8,12 104:7 | 229:22 230:5 |
| 247:2 249:17 | 21:17 61:22 | 104:9,15,16,24 | 230:16 232:5 |
| 249:18 251:4 | 93:17 127:15 | 105:16,17,19 | 232:22 235:10 |
| 251:24 253:4 | 127:19 133:6 | 106:20,22 | 235:14,22 |
| 254:23 262:25 | 157:12,14,16 | 111:20,22,23 | 236:9 237:22 |
| 263:8 265:8 | 157:25 173:3 | 112:12 113:9 | 239:3 241:23 |
| 266:3 267:22 | 240:13 | 113:17,25 | 241:25 242:13 |
| 268:16 271:6 | **till** 54:3 | 118:8 124:14 | 245:18 246:24 |
| 271:15 272:17 | **time** 7:22 8:19 | 126:21 127:9 | 247:3,9 250:12 |
| 272:21 273:8 | 9:7 10:24,24 | 127:22 128:2,7 | 251:10 252:3,6 |
| 274:6 275:23 | 13:7 21:14 | 131:3 132:12 | 252:7 253:10 |
| **thinking** | 25:5,6 27:19 | 133:3,10 136:8 | 253:14 254:13 |
| 142:22 143:16 | 29:5 31:19 | 137:20 140:12 | 254:15 257:18 |
| 169:5 202:8,24 | 32:16 33:5 | 140:20 141:9 | 257:23 258:1 |
| **third** 44:22 | 36:5,8 40:7 | 143:15 144:11 | 259:5,19 |
| 232:19 235:3 | 45:3,9,13,15,22 | 148:23 153:10 | 261:23 264:19 |
| **thirty** 78:14 | 46:1,11,15 | 159:9 161:9 | 271:16 273:5 |
| 82:7 131:18 | 47:13,15 48:9 | 165:25 167:25 | 273:10,16 |
| **thoroughbred** | 48:10,12 51:6 | 168:5,14,22 | 274:8 277:11 |
| 175:11,14 | 54:5,7,9,17,17 | 170:19 173:23 | 278:19 |
| **thought** 81:7 | 55:11 56:8 | 178:17,18,20 | **timeframe** |
| 81:13 84:7,10 | 57:24 60:23 | 179:25 180:2 | 278:8 |
| 104:20 106:1 | 63:8 65:16,21 | 183:10 184:13 | **times** 12:6,9,22 |
| 106:17 142:24 | 67:1 69:4,12 | 184:14 185:22 | 16:21 38:21,22 |
| 159:7 174:6 | 70:2,7,8 72:13 | 185:24 186:11 | 50:22 93:13 |
| 193:24 200:23 | 73:8,16 74:20 | 186:15 190:20 | 115:5 157:12 |
| 203:16,17 | 75:11 76:12 | 192:5,10 | 199:15 236:14 |
| 210:3 216:23 | 77:12,18 78:24 | 193:16 197:7 | 237:21 255:14 |
| 229:17 246:15 | 79:1,2,9 83:6 | 197:14,18 | **timing** 56:15 |
| **thousand** 18:3 | 84:2,10 85:19 | 199:5 200:12 | 148:24 158:4,7 |
| 23:14 74:19 | 92:12,14 95:14 | 206:17,18 | 199:11,11 |
| 121:10 123:8 | 96:11,14,19 | 209:1,4 213:22 | 274:7 275:9,17 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[tires - turn]**                                                      Page 66

| | | | |
|---|---|---|---|
| **tires**  195:14 | 243:24 | 130:2,5 153:25 | **try**  10:14 58:7 |
| **title**  33:12 | **total**  90:16 | 154:3,6,8,9,16 | 73:6 84:4 |
| 34:17 | 151:20 152:13 | 161:21 179:22 | 91:21 105:24 |
| **titled**  177:23 | 152:20,20 | 188:15 213:11 | 116:25 120:9 |
| 258:11 | 212:3 264:25 | 213:23 216:20 | 139:15 175:9 |
| **titles**  91:20 | 267:25 268:10 | 237:20 238:25 | 182:1 184:20 |
| **today**  9:13,18 | 276:3 | 239:1 255:21 | 185:3 203:8 |
| 11:8,11 13:2 | **touch**  76:3,5,6 | **transactions** | 217:2 229:19 |
| 36:21 37:21,23 | **towards**  147:23 | 58:12 104:19 | 251:3 254:6 |
| 38:2,3 122:20 | **track**  21:7 | 191:3 238:7 | 260:6 |
| 136:21 239:23 | **traded**  152:17 | **transcript**  9:25 | **trying**  53:1 |
| 240:11 | 153:23 | 10:10 40:20,21 | 84:25 85:13 |
| **today's**  38:11 | **trader**  63:1 | 40:24 277:10 | 165:11 175:12 |
| 276:2 | **trading**  44:22 | 277:23 278:6 | 191:2 201:12 |
| **together**  21:3 | 44:25 58:14 | 278:20 280:5,8 | 202:10,12 |
| 78:20 135:12 | 63:8,9 64:25 | **transcripts** | 221:14 228:14 |
| 210:21,23 | 100:18,24,25 | 40:18 | 236:22 |
| **told**  26:6 | 111:14 116:19 | **transfer**  49:8 | **turmoil**  85:9 |
| 173:18 183:13 | 118:21,24 | 49:23 71:18 | **turn**  27:6 122:2 |
| 189:8,20 190:6 | 119:1,2 132:21 | **travel**  33:3 | 124:20,21 |
| 194:11,14 | 132:25 140:1 | **traveling**  32:24 | 127:14,15,19 |
| 195:10 198:17 | 144:20 | **trial**  9:21 | 146:10 147:8 |
| 214:13 227:20 | **traditional** | **tried**  54:25 | 148:19 149:7 |
| 234:12 242:20 | 259:23 | 160:16 202:17 | 172:20 174:19 |
| 254:19 255:18 | **traffic**  207:3 | **trouble**  201:25 | 175:15,24 |
| 255:19 271:20 | **trainer**  161:4 | **true**  112:19 | 179:2 180:13 |
| **took**  40:2 65:22 | 161:17,23,25 | 138:23 207:1 | 203:21 212:21 |
| 70:20 71:6 | **training**  62:25 | 231:2 277:10 | 216:21 220:4 |
| 99:25 100:1 | **transaction** | 280:8 | 222:20 240:25 |
| 152:19 157:17 | 64:24 83:16 | **trust**  257:8 | 241:11 249:19 |
| 201:18 202:19 | 84:23,25 85:1 | 258:13 | 256:15,22 |
| 214:22 247:13 | 85:3,4,11,14,20 | **truth**  68:25 | 257:6 261:6 |
| **top**  125:2,9,12 | 85:22 86:6,21 | 277:7,7,8 | 265:10 266:5 |
| 126:5,12,13 | 86:24 95:16 | **truthful**  236:21 | 275:7 |
| 231:18 233:3 | 97:1 129:25 | | |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[turned - updated]**                                                    Page 67

**turned** 31:2,9
  31:11 36:14
  231:2
**turns** 214:16
  214:20
**tweaks** 213:11
**twenty** 18:3
  20:1 61:25
**twice** 40:12
**two** 5:7,11
  15:17 18:3
  21:17 22:16
  41:4 54:23
  58:9,17 63:3,6
  66:3 74:11,19
  75:16 76:11
  87:16 93:16
  103:19 106:23
  107:6 113:6
  116:19 117:10
  117:12 121:10
  123:8 124:24
  127:15 135:16
  148:8 185:4
  186:21 192:19
  193:10 195:23
  211:13,14
  226:1 234:24
  235:10,18,22
  236:2 241:17
  253:5 254:4
  266:13 267:5
**type** 13:9 167:2
  175:13 176:24

**types** 46:6
  64:25 112:8
  167:4 170:5
**typical** 177:12
  213:22
**typically** 169:2
  179:20
**typo** 245:4,5
**tyrrell** 2:5

**u**

**uh** 26:10 27:3
  65:11,11
  117:11
**ultimate** 88:6
  183:1 216:11
**ultimately**
  17:22 23:8
  63:1 93:14
  100:5 104:13
  132:6,14
  135:11,20,23
  142:25 167:17
  192:17 202:1
  246:18 260:8
**um** 12:16 122:7
  150:9,12 186:9
  206:8 217:19
  225:16 238:15
  251:20 258:10
  266:7 268:12
  269:9
**uncle** 170:16
**under** 9:18
  13:3 45:10,18
  71:25 90:23

98:2 103:5
  120:25 121:6,8
  121:11,15,18
  121:23 122:5
  122:12,16,22
  123:2,22,22
  124:22 127:20
  127:21 128:6
  146:15 148:7
  148:25 149:5
  150:6,7 167:9
  176:17 180:25
  181:22 182:12
  196:15 197:22
  231:19 233:3
  250:7,22
  258:23,24
  259:5,7 260:12
**underlined**
  159:22
**underlying**
  141:16 151:4
  231:8
**underneath**
  187:23
**understand** 9:7
  9:17,23 10:2,5
  10:10,13,16,22
  11:6,15,23
  42:9 57:13
  65:13 66:5
  93:8 95:11,25
  122:17 129:8
  129:10,13
  149:11,17

172:11 179:17
  210:2 212:9
  217:16 236:22
  244:8,11
  250:25 251:6
  251:22
**understanding**
  23:5 64:23
  65:12,14,18
  83:10 122:21
  128:11,13,14
  128:25 129:6
  147:2 165:24
  195:8 255:1
**understood**
  10:15 201:22
**undertaking**
  14:2
**united** 1:1 7:14
  62:8
**university**
  62:10
**unknown** 182:3
  182:3
**unpaid** 136:10
**unrelated**
  128:11
**unwind** 84:24
  85:2 132:7
**unwinding**
  85:10
**unwound** 89:5
  101:2 186:2
**updated** 207:5

**upsize** 260:6
**urgency** 208:10
  208:17
**usable** 117:6
**use** 32:6,9
  34:17,25
  118:20,21,22
  118:22 129:7
  133:5,7,11,17
  134:12,15,19
  135:1,4 136:25
  175:12 179:21
  197:12 226:21
  260:17,17
  261:2 262:11
  263:10,22
  268:5 273:2,3
  274:24
**used** 31:3,5
  34:17 65:17
  132:20 133:8
  134:23 135:15
  141:20 150:22
  152:21 162:10
  162:23,25
  166:7 184:22
  194:10 213:10
  226:14 251:18
  265:3 268:7
  272:13 276:3
  278:20
**uses** 28:3 269:7
**using** 28:25
  118:10,16
  120:1 129:20

133:3 136:11
136:12 145:2
262:8 263:18
265:17 274:25
**usually** 35:14

**v**

**v** 1:6,15 5:15
  7:10,12 8:5,7
  203:23 278:4
  279:1 280:1
**vacations** 33:3
**valuable**
  106:18 142:13
  159:7 229:19
  244:7
**valuation** 64:25
  140:12,14,15
  140:21,24
  141:2,16 150:7
  150:11,20,24
  150:25 151:1,2
  151:11 160:2
  160:10,15
  167:11,16
  197:5,12,15,15
  226:8,12,14,17
  226:21 227:21
  227:23 229:15
  229:20 230:20
  231:1,4
**valuations**
  140:11 141:6
  151:4,9 159:21
  160:17 230:21

**value** 166:19
  166:21
**variable** 140:13
**variables**
  230:25
**various** 12:25
  12:25 23:12,12
  50:22 56:14
  84:6 91:10
  114:6 123:7
  135:5,13 137:2
  140:13 145:9
  156:3 174:17
  188:8 204:14
  244:18
**vehicle** 180:10
  184:22 185:4,7
  185:20,21,23
**vendor** 17:2
  20:10 145:3
**vendors** 20:11
  20:14,19 21:6
  22:10,12,13,13
  22:17 23:11,20
**venture** 63:20
**verbal** 10:3
  23:3
**verbally** 166:12
**verify** 278:9
**veritext** 7:18,20
  276:4 278:14
  278:23
**veritext.com.**
  278:15

**versed** 49:11
**version** 148:3
  210:11 223:13
  223:16,25
  224:4,5,13,18
  224:20 235:21
  237:8,10
**versions** 204:22
  213:7 214:18
  222:17 239:4
**versus** 39:4
  211:23
**victoria** 43:13
  60:7
**video** 7:5,8
  69:5 96:12,15
  209:2,5 257:24
  258:2
**videoconfere...**
  2:23 3:4,5,6
  11:24
**videographer**
  3:2 7:1,19 8:18
  69:4,8,12 96:2
  96:9,14 113:17
  113:21,25
  186:11,15
  209:1,4 257:23
  258:1 275:24
**videotaped** 1:6
**view** 140:17
  215:22
**viewed** 237:9
**vii** 254:11

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[violations - word]** Page 69

| | | | |
|---|---|---|---|
| **violations** 201:25 | **wanted** 19:23 24:17 96:6 104:10 170:4 170:17 192:18 192:19 195:10 198:7,19,21 202:3,18 220:2 220:12 221:15 244:12,12,15 253:6 | **ways** 84:9 91:22 174:18 265:18,22,24 | **wife's** 61:9 |
| **virtually** 32:23 121:9 213:23 236:16 | | **we've** 24:21 41:7,10 60:6 115:6 244:21 | **willing** 85:20 151:17 |
| **visit** 269:11 | | | **winding** 77:14 100:12,18,22 100:23 |
| **visiting** 271:22 | | **wealth** 86:16 110:9,12 168:25 169:3 170:4 270:8 | **windows** 70:5 |
| **visits** 269:25 | | | **wire** 243:3,14 |
| **vollmuth** 1:21 277:3,22 | | **website** 144:25 | **wired** 246:14 |
| **voluntarily** 22:6 | **wants** 221:8,20 | **wednesday** 1:23 7:2 | **wiring** 244:4 244:24 246:4,6 |
| **vote** 154:2 241:20 | **ward** 42:4 | **week** 146:23 148:23 | **wise** 104:21 |
| **voted** 80:3 | **warranties** 214:1,4 | | **wish** 124:22 |
| **w** | **washington** 84:22 85:3,5 86:10 161:15 185:6 186:1 255:22 | **weeks** 134:17 | **withdraw** 132:8 |
| **wa** 57:2 | | **welcome** 167:5 | **witness** 4:2 8:14,20 12:19 53:22 71:10,12 71:14 75:20 97:20 113:19 124:7 126:2 128:17 158:20 171:11 179:13 184:1 217:5 229:11 232:24 278:8,10,12,19 |
| **wait** 10:6 11:1 207:22 268:21 | | **went** 62:8,22 62:25 63:5 75:15,24 121:6 169:11,12 184:12 204:6 208:20 213:19 213:20 240:14 | |
| **walk** 31:19 32:16 34:9,11 35:15 | **washington's** 85:18 89:4 | | |
| **want** 9:1 10:21 47:13 55:8 80:24 96:2,7 99:22 119:3 123:12 136:4 155:19,22 168:18 200:20 201:21 210:2 217:5,15 220:14 234:16 252:7 254:3 255:1 257:18 261:22 | **way** 19:17 43:18 59:8 64:7 86:12 95:8 110:1 138:3,9 152:16 160:5 161:7 165:10 166:25 169:2 185:1 202:21,23 208:19,20 218:19 221:18 241:4 246:25 247:11 265:16 275:11 | **west** 42:22 189:1 | **wondering** 27:13 |
| | | **wework** 271:25 272:6 | **wor** 220:21 |
| | | **wharton** 62:10 | **word** 26:19 128:11 129:11 151:1 182:6 214:22 226:21 242:6,7 247:13 260:18 |
| | | **when's** 65:21 140:20 | |
| | | **whispering** 7:4 | |
| | | **wide** 123:12 | |
| | | **wife** 60:13,15 60:16 103:8 | |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**[words - zoom]**                                                    Page 70

| | | |
|---|---|---|
| **words** 95:8 | 257:8 258:13 | 263:14 275:21 |
| 194:22 200:10 | 274:18 | **year** 41:7 61:7 |
| 260:21 | **worth** 93:23 | 75:7 76:10 |
| **work** 19:23 | 231:2 | 103:18 113:6 |
| 34:4 35:23 | **wound** 101:3 | 135:15,16 |
| 36:11 43:23 | 167:19 | 250:23 255:14 |
| 47:3 49:1,4 | **write** 181:21 | 259:17,20 |
| 53:25 59:5,25 | 196:20 | 261:1 264:20 |
| 60:10 61:12 | **writes** 201:2 | 268:8 274:7 |
| 62:22 65:8 | **writing** 202:23 | **years** 18:11 |
| 91:13 109:15 | **written** 52:22 | 33:25 46:7 |
| 113:13 144:4 | 108:3 145:17 | 63:3,6 76:11 |
| 152:10 169:16 | 155:7 189:12 | 122:22,24,25 |
| 169:24 171:21 | 190:18 196:22 | 123:6,7,10,13 |
| 180:6 191:1 | 247:12 | 131:19 |
| 194:11 199:15 | **wrong** 267:5 | **yep** 225:14 |
| **workday** 32:23 | **wrongdoing** | 241:3 |
| **worked** 47:4 | 14:8 | **yesterday** |
| 48:18 59:12 | **wylie** 19:1 | 38:13,15 39:7 |
| 60:5,7,14 62:3 | | **yield** 179:24 |
| 72:3 100:4 | **y** | 180:2 |
| 168:10 194:15 | **yeah** 21:16 | **york** 1:1 2:10 |
| **working** 21:3 | 26:15 27:15 | 2:10,21,21 |
| 34:1 43:25 | 38:8 47:19 | 7:15 8:22,22 |
| 46:19,25 51:11 | 51:21 81:21 | 14:6 18:23 |
| 51:19 54:4,6,8 | 85:16 86:7 | 20:3 41:21,21 |
| 56:16 72:25 | 90:3 108:18 | 42:15 115:15 |
| 83:15 100:3 | 116:24 125:8 | 115:15 |
| 111:8,21 | 127:20 128:21 | **z** |
| 134:22 173:15 | 164:2 192:16 | **zero** 121:4 |
| 194:11 | 194:17 195:4 | **zoom** 12:1 |
| **world** 17:6,13 | 207:24 219:13 | |
| 17:17 18:21 | 222:22 227:7 | |
| 21:25 24:24 | 227:15,17 | |
| 117:19,20,25 | 233:1 254:18 | |
| | 256:20 262:25 | |

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.