BP 510 MADISON AVE LLC,

Landlord,

TO

WORLD GOLD TRUST SERVICES LLC,

Tenant

LEASE

Premises at:

510 Madison Avenue
New York, New York

s:\server docs\boston properties\510 madison\world gold council\world gold council lease version 5.docx

Confidential – Subject to Protective Order

CLINTON00033973

# TABLE OF CONTENTS

PAGE

ARTICLE 1 BASIC LEASE PROVISIONS AND ENUMERATION OF EXHIBITS ...................................1

    1.1   INTRODUCTION ........................................................................1
    1.2   BASIC DATA. ............................................................................1
    1.3   ENUMERATION OF EXHIBITS ................................................3
    1.4   OTHER DEFINITIONS ..............................................................4

ARTICLE 2 PREMISES .........................................................................5

    2.1   DEMISE -- PREMISES .............................................................5
    2.2   APPURTENANT RIGHTS AND RESERVATIONS. ...................6

ARTICLE 3 LEASE TERM ....................................................................6

    3.1   COMMENCEMENT DATE. .......................................................6
    3.2   EXPIRATION DATE. .................................................................6
    3.3   COMMENCEMENT DATE AGREEMENT ...............................7

ARTICLE 4 COMPLETION OF THE PREMISES ................................7

    4.1   PERFORMANCE OF WORK. .....................................................7
    4.2   QUALITY AND PERFORMANCE OF WORK. ...........................7
    4.3   LANDLORD'S CONTRIBUTION ..............................................7

ARTICLE 5 ANNUAL FIXED RENT AND ADDITIONAL RENT ........7

    5.1   FIXED RENT. ............................................................................7
    5.2   ADVANCE PAYMENT OF ONE MONTH'S RENT. ...................8
    5.3   ADDITIONAL RENT. ................................................................8
    5.4   LATE PAYMENT. .....................................................................8
    5.5   RENT CONCESSION. ...............................................................8

ARTICLE 6 ESCALATION ...................................................................9

    6.1   TAX ESCALATION. ..................................................................9
    6.2   OPERATING EXPENSE ESCALATION. ..................................12

ARTICLE 7 REPAIRS AND SERVICES ...............................................20

    7.1   LANDLORD'S OBLIGATION TO REPAIR. ............................20
    7.2   TENANT'S REPAIRS AND MAINTENANCE. ..........................21
    7.3   SERVICES. ...............................................................................21
    7.4   LANDLORD'S FAILURE TO REPAIR OR PROVIDE SERVICES. ......................................................................212

ARTICLE 8 ALTERATIONS .................................................................22

    8.1   TENANT'S RIGHTS. ................................................................22
    8.2   CONFORMITY WITH LAW. ....................................................23
    8.3   PERFORMANCE OF WORK, GOVERNMENTAL APPROVALS, INSURANCE. ...........................24
    8.4   LIENS. .....................................................................................25
    8.5   VIOLATIONS; DISRUPTION. ..................................................25
    8.6   TENANT'S PROPERTY. ...........................................................26
    8.7   SURVIVAL. ..............................................................................26

ARTICLE 9 LAWS, ORDINANCES, REQUIREMENTS OF PUBLIC AUTHORITIES ..................................27

    9.1   CERTIFICATE OF OCCUPANCY. ..........................................27
    9.2   TENANT'S OBLIGATIONS. .....................................................27
    9.3   TENANT'S RIGHT TO CONTEST. ...........................................27
    9.4   WINDOW CLEANING. ............................................................28

i

Confidential – Subject to Protective Order                                       CLINTON00033974

9.5   LANDLORD'S OBLIGATIONS. ............................................................................28

ARTICLE 10 USE ....................................................................................................................28

10.1   OFFICE USE. ..........................................................................................................28
10.2   ADDITIONAL PERMITTED USES. ....................................................................28
10.3   RESTRICTIONS. ....................................................................................................28
10.4   PROHIBITED USES. ..............................................................................................29
10.5   LICENSES AND PERMITS. ..................................................................................30
10.6   HAZARDOUS SUBSTANCES. ............................................................................31

ARTICLE 11 INDEMNITY AND INSURANCE ....................................................................32

11.1   TENANT'S INDEMNITY. ......................................................................................32
11.2   TENANT'S RISK. ....................................................................................................33
11.3   TENANT'S COMMERCIAL GENERAL LIABILITY INSURANCE. .................33
11.4   TENANT'S PROPERTY INSURANCE. .................................................................34
11.5   TENANT'S OTHER INSURANCE. .........................................................................34
11.6   REQUIREMENTS FOR INSURANCE. ..................................................................35
11.7   ADDITIONAL INSUREDS. ....................................................................................35
11.8   CERTIFICATES OF INSURANCE. ........................................................................35
11.9   SUBTENANTS AND OTHER OCCUPANTS. .......................................................36
11.10  NO VIOLATION OF BUILDING POLICIES. .......................................................36
11.11  TENANT TO PAY PREMIUM INCREASES. .........................................................36
11.12  WAIVER OF SUBROGATION. ...............................................................................36
11.13  TENANT'S WORK AND ALTERATIONS. ............................................................37
11.14  LANDLORD'S INDEMNITY ..................................................................................367

ARTICLE 12 FIRE, CASUALTY OR TAKING ......................................................................38

12.1   RIGHT TO TERMINATE LEASE. ..........................................................................38
12.2   RESTORATION OF THE PREMISES. ....................................................................39
12.3   PAYMENT OF RENT FOLLOWING CASUALTY. ...............................................39
12.4   UNINSURED CASUALTY. .....................................................................................40
12.5   LANDLORD NOT TO INSURE ALTERATIONS OR TENANT'S PROPERTY. ...40
12.6   EMINENT DOMAIN -- COMPLETE OR SUBSTANTIAL TAKING. ...................40
12.7   EMINENT DOMAIN -- PARTIAL TAKING. ..........................................................40
12.8   LANDLORD TO RECEIVE ENTIRE AWARD. ......................................................41

ARTICLE 13 ASSIGNMENT, SUBLETTING, MORTGAGING .............................................42

13.1   LANDLORD'S CONSENT REQUIRED. .................................................................42
13.2   OFFER NOTICE. ......................................................................................................43
13.3   LANDLORD'S RIGHT TO UNDERLET. ................................................................44
13.4   LANDLORD'S RIGHT TO TERMINATE. ..............................................................45
13.5   ADDITIONAL CONDITIONS. ................................................................................46
13.6   LANDLORD MAY COLLECT RENT FROM SUBTENANT OR ASSIGNEE. ......48
13.7   ASSUMPTION OF LEASE. .....................................................................................48
13.8   TENANT'S INDEMNIFICATION. ..........................................................................48
13.9   TIME LIMITATION; AMENDMENTS. ...................................................................49
13.10  ADDITIONAL RENT DUE UPON ASSIGNMENT OR SUBLETTING. ...............49
13.11  LIABILITY NOT DISCHARGED. ..........................................................................50
13.12  EFFECT OF LISTING OF NAMES. ........................................................................50

ARTICLE 14 NO LIABILITY OR REPRESENTATIONS BY LANDLORD; FORCE MAJEURE .....50

14.1   NO LIABILITY. .......................................................................................................50
14.2   NO REPRESENTATIONS BY LANDLORD. ..........................................................51
14.3   FORCE MAJEURE. ..................................................................................................51

ARTICLE 15 ENTRY, RIGHT TO CHANGE PUBLIC PORTIONS OF THE BUILDING ...........52

ii

15.1  LANDLORD'S RIGHT OF ENTRY. .............................................................................52
15.2  LANDLORD'S RIGHT TO CHANGE ENTRIES, ETC. .................................................53
15.3  EXCAVATION. ...........................................................................................................53

ARTICLE 16 ELECTRICITY .......................................................................................................53

16.1  TENANT TO PURCHASE ELECTRICITY. ..................................................................53
16.2  LANDLORD NOT LIABLE. ........................................................................................54
16.3  TENANT NOT TO OVERLOAD CIRCUITS. ...............................................................55
16.4  TENANT NOT TO EXCEED CAPACITY; LIGHT BULBS. ..........................................55

ARTICLE 17 SUBORDINATION; ASSIGNMENT OF RENTS .....................................................55

17.1  SUBORDINATION TO MORTGAGES, ETC. ...............................................................55
17.2  RIGHTS OF MORTGAGEES, ETC. ............................................................................56
17.3  MODIFICATIONS REQUIRED BY LENDERS. ...........................................................56
17.4  ASSIGNMENT OF LEASE TO MORTGAGEE, ETC. ...................................................57
17.5  SUBORDINATION OF MORTGAGE, ETC., TO LEASE. ............................................57
17.6  NON-DISTURBANCE AGREEMENT. .........................................................................57

ARTICLE 18 CERTAIN ADDITIONAL TENANT COVENANTS ..................................................57

ARTICLE 19 TENANT'S DEFAULT; LANDLORD'S REMEDIES .................................................59

19.1  TENANT'S DEFAULT. ...............................................................................................59
19.2  TERMINATION. .........................................................................................................61
19.3  RE-ENTRY; CONTINUED LIABILITY; RELETTING. .................................................64
19.4  LIQUIDATED DAMAGES. ..........................................................................................65
19.5  RIGHTS IN THE EVENT OF TENANT'S BANKRUPTCY. ...........................................66
19.6  WAIVER OF REDEMPTION, ETC. .............................................................................66
19.7  ADDITIONAL RIGHTS OF LANDLORD. ....................................................................66
19.8  LANDLORD'S DEFAULT. ..........................................................................................67

ARTICLE 20 MISCELLANEOUS .................................................................................................67

20.1  WAIVER. ....................................................................................................................67
20.2  CONSENTS. ...............................................................................................................68
20.3  QUIET ENJOYMENT. ................................................................................................68
20.4  SURRENDER. ............................................................................................................69
20.5  BROKER. ...................................................................................................................69
20.6  INVALIDITY OF PARTICULAR PROVISIONS. ..........................................................70
20.7  PROVISIONS BINDING, ETC. ...................................................................................70
20.8  NO RECORDING. ......................................................................................................70
20.9  NOTICES. ..................................................................................................................70
20.10 WHEN LEASE BECOMES BINDING. .......................................................................71
20.11 HEADINGS. ..............................................................................................................71
20.12 SUSPENSION OF SERVICES. ...................................................................................71
20.13 RULES AND REGULATIONS. ...................................................................................72
20.14 DEVELOPMENT RIGHTS. ........................................................................................72
20.15 ESTOPPEL CERTIFICATES. .....................................................................................73
20.16 SELF-HELP. ..............................................................................................................73
20.17 HOLDING OVER. ......................................................................................................74
20.18 RENT CONTROL. ......................................................................................................74
20.19 COUNTERPARTS. .....................................................................................................75
20.20 ENTIRE AGREEMENT. .............................................................................................75
20.21 NO PARTNERSHIP. ...................................................................................................75
20.22 SECURITY DEPOSIT. ................................................................................................75
20.23 FINANCIAL STATEMENTS. ......................................................................................76
20.24 GOVERNING LAW, ETC. ..........................................................................................77
20.25 CONFIDENTIALITY OF LEASE. ...............................................................................77

iii

20.26 PATRIOT ACT AND EXECUTIVE ORDER 13224................................................................77
20.27 FITNESS FACILITY...................................................................................................................78

ARTICLE 21 OPTION TO EXTEND................................................................................................81

21.1  TENANT'S OPTION.................................................................................................................81
21.2  EXTENDED TERM RENT......................................................................................................82
21.3  EXTENDED TERM RENT DETERMINATION...................................................................82
21.4  RETROACTIVE ADJUSTMENTS; AMENDMENT.........................................................84

iv

CLINTON00033977

THIS INSTRUMENT IS AN INDENTURE OF LEASE in which the Landlord and the Tenant are the parties hereinafter named, and which relates to space in the building (the "Building") known as, and with an address at, 510 Madison Avenue, New York, New York 10022.

The parties to this instrument hereby agree with each other as follows:

## ARTICLE 1

BASIC LEASE PROVISIONS AND ENUMERATION OF EXHIBITS

1.1    INTRODUCTION.  The following sets forth the basic data and identifying Exhibits, elsewhere hereinafter referred to in this Lease, and, where appropriate, constitutes definitions of the terms hereinafter listed.

1.2    BASIC DATA.

Date:                                     April 22, 2011

Landlord:                                 BP 510 MADISON AVE LLC,
                                          a Delaware limited liability company

Present Mailing Address                   c/o Boston Properties Limited Partnership
    of Landlord:                          599 Lexington Avenue, Suite 1800
                                          New York, New York 10022
                                          Attn.:  Robert E. Selsam,
                                                  Senior Vice President

                                          with a copy to:

                                          Matthew W. Mayer
                                          Senior Vice President - Regional General Counsel
                                          Boston Properties Limited Partnership
                                          599 Lexington Avenue, Suite 1800
                                          New York, New York 10022

Landlord's Construction                   Robert A. Schubert
    Representative:                       Senior Vice President, Construction
                                          Boston Properties Limited Partnership
                                          599 Lexington Avenue, Suite 1800
                                          New York, New York 10022

Tenant:                                   WORLD GOLD TRUST SERVICES LLC,

CLINTON00033978

a Delaware limited liability company

| | |
|---|---|
| Present Mailing Address of Tenant: | 424 Madison Avenue, 3rd Floor<br>New York, New York 10022<br>Attn.: Jason Toussaint |
| Tenant's Construction Representative: | Scott E. Spector, AIA<br>spectorgroup<br>19 West 44th Street, 17th Floor<br>New York, New York 10036<br>Tel.: (212) 599-0055<br>Fax: (212) 599-1043 |
| Commencement Date: | The Date of this Lease. |
| Rent Commencement Date: | The date which is eight (8) months after the Commencement Date. |
| Expiration Date: | As defined in Section 3.2 hereof. |
| Lease Term: | As defined in Section 3.1 hereof. |
| Lease Year: | A period of twelve (12) consecutive calendar months, commencing on the first day of January in each year, except that the first Lease Year of the Lease Term shall be the period commencing on the Commencement Date and ending on the succeeding December 31, and the last Lease Year of the Lease Term shall be the period commencing on January 1 of the calendar year in which the Lease Term ends and ending with the Expiration Date. |
| Building: | The building and other improvements erected on the Land known as and by the street number 510 Madison Avenue, New York, New York. |
| Premises: | That portion of the Building depicted in Exhibit B hereto. |
| Annual Fixed Rent: | From the Commencement Date through the day preceding the fifth (5th) anniversary of the Commencement Date, the sum of One Million Thirty-Five Thousand and 00/100 Dollars ($1,035,000.00);<br><br>and from the fifth (5th) anniversary of the Commencement Date through the Expiration Date, the sum of One Million |

2

CLINTON00033979

|  | One Hundred Fifty Thousand and 00/100 Dollars ($1,150,000.00). |
|---|---|
| Additional Rent: | All charges and other sums payable by Tenant as set forth in this Lease, other than and in addition to Annual Fixed Rent. |
| Tenant's Share: | 3.48% with respect to Operating Expenses and Fitness Facility Operating Expenses; and |
|  | 3.33% with respect to Taxes. |
| CPI: | The Consumer Price Index for All Urban Consumers, New York, N.Y. — Northern New Jersey — Long Island, 1982-84=100; provided, however, that if the CPI or any successor index shall cease to be published, Landlord shall reasonably designate a substitute therefor. |
| GAAP: | United States generally accepted accounting principles consistently applied. |
| Security Deposit: | Five Hundred Seventeen Thousand Five Hundred and 00/100 Dollars ($517,500.00) |
| Brokers: | CB Richard Ellis, Inc. and Studley, Inc. |

1.3    ENUMERATION OF EXHIBITS.  The following Exhibits are a part of this Lease, are incorporated herein by reference, attached hereto, and are to be treated as a part of this Lease for all purposes.  Undertakings contained in such Exhibits are agreements on the part of Landlord and Tenant, as the case may be, to perform the obligations stated therein.

| Exhibit A | -- | Description of the Land. |
|---|---|---|
| Exhibit B | -- | Floor Plan of Premises. |
| Exhibit C | -- | Work Letter. |
| Exhibit D | -- | Landlord's Services. |
| Exhibit E | -- | Rules and Regulations. |
| Exhibit F | -- | Tenant Design & Alteration Criteria. |
| Exhibit G | -- | Form of Letter of Credit. |

3

CLINTON00033980

Exhibit H    --    Form of Commencement Date Agreement.

1.4    <u>OTHER DEFINITIONS</u>.  The following additional terms, wherever used in this Lease (unless the context requires otherwise), shall have the respective meanings specified in the Sections of this Lease set forth below after such Terms:

"2014 Tax Year" ........................................................................... Section 6.1
"2015 Tax Year" ........................................................................... Section 6.1
"AAA" ........................................................................................... Section 6.2
"Additional Insureds" .................................................................. Section 11.7
"Additional Membership" ............................................................ Section 20.27
"Affiliate" ..................................................................................... Section 13.1
"Alterations" ................................................................................. Section 8.1
"Annual Membership Fee" ........................................................... Section 20.27
"Average Rate" ............................................................................. Section 16.1
"Base Operating Expenses" ......................................................... Section 6.2
"Base Taxes" ................................................................................. Section 6.1
"Building HVAC System" ............................................................ Exhibit D
"Building Standard" ...................................................................... Exhibit C
"Date of the taking" ...................................................................... Section 12.6
"Due date" ..................................................................................... Section 5.4
"Event of Default" ........................................................................ Section 19.1
"Excess Operating Expenses" ...................................................... Section 6.2
"Existing Mortgage" ..................................................................... Section 17.1
"Extended Term" .......................................................................... Section 21.1
"Extension Option" ....................................................................... Section 21.1
"Fair Market Rent" ....................................................................... Section 21.3
"Fair Market Rent Proposal" ........................................................ Section 21.3
"Fitness Facility" .......................................................................... Section 20.27
"Fitness Facility Operating Expenses" ........................................ Section 20.27
"Force Majeure" ........................................................................... Section 14.3
"Hazardous Substance" ................................................................ Section 10.6
"Initiating Party" .......................................................................... Section 21.3
"ISO" ............................................................................................. Section 11.3
"Joining Fee" ................................................................................ Section 20.27
"Land" ........................................................................................... Section 2.1
"Landlord Parties" ........................................................................ Section 11.12
"Landlord's Contribution" ........................................................... Exhibit C
"Lease Interest Rate" .................................................................... Section 5.4
"Letter" .......................................................................................... Section 20.22
"Legal Fees" .................................................................................. Article 18
"Letter of Credit" .......................................................................... Section 20.22
"Lien" ............................................................................................ Section 8.4
"notice" ......................................................................................... Section 20.9; Exhibit C
"Mortgage" .................................................................................... Section 17.1
"Mortgagee" .................................................................................. Section 17.1

4

    CLINTON00033981

"OFAC" ................................................................... Section 20.27
"Offer Notice" ........................................................ Section 13.2
"Operating Days" .................................................... Exhibit D
"Operating Expense Statement Date" ................... Section 6.2
"Operating Expenses" ............................................ Section 6.2
"Operating Hours" ................................................. Exhibit D
"Operating Year" ................................................... Section 6.2
"Original Tenant" ................................................... Section 13.1
"Overlandlord" ....................................................... Section 17.1
"Overtime Service" ................................................ Exhibit D
"Permitted Capital Expenditures" ......................... Section 6.2
"Plans and Specifications" .................................... Exhibit C
"Prohibited Person" ............................................... Section 20.27
"Projected Annual Savings" ................................. Section 6.2
"Property" .............................................................. Section 6.2
"Qualified Appraiser" ........................................... Section 21.3
"REIT" ................................................................... Section 7.3
"rent" ..................................................................... Section 5.3
"Replacement Letter" ............................................ Section 20.22
"Responding Party" ............................................... Section 21.3
"Rules and Regulations" ....................................... Section 20.13
"Service Provider" ................................................ Section 7.3
"Specialty Alterations" ......................................... Section 8.1
"Tax Excess" ......................................................... Section 6.1
"Taxes" .................................................................. Section 6.1
"Tax Expenses" ..................................................... Section 6.1
"Tax Year" ............................................................. Section 6.1
"Tenant Parties" .................................................... Section 11.12
"Tenant's Architect" .............................................. Exhibit C
"Tenant's Cost" ..................................................... Exhibit C
"Tenant's Property" ............................................... Section 8.6
"Tenant's Work" .................................................... Exhibit C
"Third Qualified Appraiser" .................................. Section 21.3
"Underlying Lease" ............................................... Section 17.1
"Work Letter" ........................................................ Exhibit C

## ARTICLE 2

## PREMISES

2.1    DEMISE -- PREMISES.  Landlord hereby demises and leases to Tenant, and Tenant hereby takes and hires from Landlord, a portion of the Building erected on the land (the "Land") more particularly described in Exhibit A hereto, which portion of the Building (the "Premises") is depicted in the floor plan(s) annexed hereto as Exhibit B, for the term hereinafter stated, for the rent hereinafter reserved and upon and subject to the covenants, agreements, terms, conditions, limitations, exceptions and reservations contained in this Lease.

5

Confidential – Subject to Protective Order

2.2    APPURTENANT RIGHTS AND RESERVATIONS.

(a)    Tenant shall have, as appurtenant to the Premises, the non-exclusive right to use in common with others, subject to reasonable rules of general applicability to tenants of the Building from time to time made by Landlord of which Tenant is given notice: (i) the common lobbies, corridors, stairways and elevators of the Building, and (ii) if the Premises includes less than the rentable floor area of any floor, the common toilets, corridors and elevator lobby of such floor.

(b)    Landlord reserves the right from time to time: (i) to install, use, maintain, repair, replace and relocate, for service to the Premises and/or other parts of the Building, shafts, pipes, ducts, conduits, wires, risers and other facilities and appurtenant fixtures, in the Premises or in other parts of the Building, and (ii) to alter or relocate other common facilities, whether located in the Premises or in other parts of the Building; provided that, with respect to clauses (i) and (ii): (A) any replacements, substitutions or alterations are, in the reasonable opinion of Landlord, substantially equivalent to or better than then existing facilities, (B) installations, replacements and relocations shall be located so far as practicable in the central core area of the Building, above ceiling surfaces, below floor surfaces, within perimeter walls of the Premises or otherwise in boxed enclosures, (C) all such work within the Premises shall be performed at such times and in such manner, as to create the least practicable interference with Tenant's use of the Premises (it being understood that the foregoing shall in no event obligate Landlord to do such work on an "overtime" basis), (D) no such work shall reduce the square footage of the floor area of the Premises in excess of one-quarter percent (1/4%) (unless Landlord shall make an appropriate reduction in Annual Fixed Rent to reflect such excess reduction in square footage of the Premises), (E) other than as required by law, no such work shall reduce the usable square footage of the floor area of the Premises by more than one percent (1%), and (F) such installations, replacements and relocations shall not materially adversely interfere with the use of the Premises permitted under this Lease.. Except in the case of emergencies, Landlord agrees to give Tenant reasonable advance notice of any of the foregoing activities which require work in the Premises.

## ARTICLE 3

## LEASE TERM

3.1    COMMENCEMENT DATE.  The term of this Lease and the estate hereby granted (the "Lease Term") shall commence on the Date of this Lease specified in Section 1.2. Such date of commencement is hereinafter called the "Commencement Date".

3.2    EXPIRATION DATE.  The Lease Term shall end on the day immediately preceding the tenth (10th) anniversary of the Rent Commencement Date, which ending date is hereinafter called the "Expiration Date", or shall end on such earlier date upon which the Lease Term may expire or be terminated pursuant to any of the conditions of limitation or other provisions of this Lease or pursuant to law.  Notwithstanding the foregoing, if the Rent Commencement Date is other than the first day of a month, the Expiration Date shall be the last day of the calendar month in which the tenth (10th) anniversary of the Rent Commencement Date occurs.

6

    CLINTON00033983

3.3     COMMENCEMENT DATE AGREEMENT.  As soon as may be convenient after the Commencement Date has been determined, Landlord and Tenant agree to join with each other in the execution of a written agreement, in the form of Exhibit H hereto, in which the Commencement Date, the Rent Commencement Date and the Expiration Date shall be stated, but the failure by either party to so execute or deliver such agreement shall not in any way reduce the respective obligations or rights of Landlord or Tenant under this Lease.

ARTICLE 4

COMPLETION OF THE PREMISES

4.1     PERFORMANCE OF WORK.  Tenant has inspected the Premises, and the Premises are being leased in "AS IS" condition, without representation or warranty by Landlord, except that Landlord represents that, on the Commencement Date, the Premises will be free of asbestos and other Hazardous Substances.  Tenant acknowledges that any work necessary to prepare the Premises for Tenant's occupancy shall be performed solely by Tenant in accordance with the provisions of this Lease, including, without limitation, Exhibit C attached hereto.

4.2     QUALITY AND PERFORMANCE OF WORK.  All construction work required or permitted by this Lease shall be done in a good and workmanlike manner and in compliance with all applicable laws and requirements of public authorities and insurance bodies related to, or arising out of the performance of, such construction work.  Each party may inspect the work of the other at reasonable times, and the Construction Representative of each party shall promptly give notice of any approvals and other actions on the party's behalf required to be given in connection with design and construction.

4.3     LANDLORD'S CONTRIBUTION.  Landlord agrees to pay to Tenant, as a contribution towards Tenant's Cost (as defined in Exhibit C), Landlord's Contribution (as defined in Exhibit C), subject to the terms and conditions of Exhibit C.

ARTICLE 5

ANNUAL FIXED RENT AND ADDITIONAL RENT

5.1     FIXED RENT.  Tenant agrees to pay to Landlord on the Rent Commencement Date (but subject to the provisions of Section 5.2) and thereafter monthly, in advance, on the first day of each and every calendar month during the Lease Term, a sum equal to one twelfth of the Annual Fixed Rent specified in Section 1.2 hereof in lawful money of the United States, without any set-off or deduction whatsoever.  Until notice of some other designation is given, Annual Fixed Rent and all other charges for which provision is herein made shall be paid by remittance to or to the order of "BP 510 MADISON AVE LLC" at the following address:  Boston Properties Limited Partnership, P.O. Box 3557, Boston, MA  02241-3557.  All remittances by Tenant shall be drawn on a member bank of The Clearing House Association, or, at Tenant's election, by wire transfer of immediately available funds to:

Bank Name:                  Bank of America, Dallas, Texas
Bank Routing # (wire):      0260-0959-3

7

| Bank Routing # (ACH): | 111-000-012 |
| Account #: | 3756454460 |
| Account Name: | Boston Properties Limited Partnership |
| Reference: | (World Gold Trust Services LLC, 510 Madison Avenue) |
| Contact Person: | Tonya Adams, Boston Properties (617) 236-3477. |

5.2    ADVANCE PAYMENT OF ONE MONTH'S RENT.  Tenant has, simultaneously with the execution and delivery of this Lease, paid to Landlord an amount equal to one twelfth of the Annual Fixed Rent, to be applied to the first monthly installment of Annual Fixed Rent.  If the Rent Commencement Date is other than the first day of a calendar month, the first monthly installment of Annual Fixed Rent which becomes due on the Rent Commencement Date, prorated to the end of said calendar month, shall be payable on the Rent Commencement Date and the payment made by Tenant upon the execution and delivery of this Lease shall be applied to the second monthly installment of the Annual Fixed Rent.  Landlord shall hold the amount paid by Tenant under this Section 5.2 in trust until the same is applied pursuant to this Section or any other provision of this Lease.

5.3    ADDITIONAL RENT.  All amounts over and above, or in addition to, the Annual Fixed Rent which are payable by Tenant to Landlord under the terms of this Lease or otherwise in connection with the use and occupancy of the Premises including, without limitation, sums payable under work orders issued by the Managing Agent, shall be deemed Additional Rent hereunder and shall be paid by Tenant in lawful money of the United States, without any set-off or deduction whatsoever and otherwise in the same manner as an installment of the Annual Fixed Rent as elsewhere provided in this Lease; and Landlord shall have all the rights and remedies in the event of the non-payment thereof as it would have had in the event of the non-payment of any installment of the Annual Fixed Rent.  Tenant's obligation to pay any Annual Fixed Rent or any Additional Rent which shall have theretofore become due and payable, and Landlord's obligation to pay or refund any amounts owed to Tenant, shall survive the expiration or earlier termination of this Lease.  (The Annual Fixed Rent and Additional Rent are sometimes collectively referred to in this Lease as "rent.")  Rent for any partial months during the Lease Term shall be prorated on a per diem basis.  Except as otherwise expressly set forth in this Lease, to the extent that Tenant shall fail to dispute any invoice for Additional Rent within sixty (60) days after receipt thereof, such invoice shall be conclusive and binding upon Tenant and Tenant shall be deemed to have waived any right to dispute the same.

5.4    LATE PAYMENT.

(a)    If Landlord shall not have received any payment or installment of rent on or before the date (the "due date") on which the same first becomes payable under this Lease, the amount of such payment or installment shall bear interest from the due date through and including the date such payment or installment is received by Landlord, at a rate (the "Lease Interest Rate") equal to the lesser of (i) the rate announced by Citibank, N.A. or its successor from time to time as its prime or base rate, plus two percent (2%), or (ii) the maximum applicable legal rate, if any.  Such interest shall be deemed Additional Rent and shall be paid by Tenant to Landlord within thirty (30) days after Landlord's demand.

8

     CLINTON00033985

(b)    In addition to the interest set forth in Section 5.4(a) above, if any installment of rent or any other sum due from Tenant shall not be received by Landlord on or before its due date, then Tenant shall pay to Landlord a late charge equal to two percent (2%) of the overdue amount; provided, however, that no late charge shall be due with respect to the first late payment during any Lease Year unless such payment is made more than five (5) days after the applicable due date. The late charge shall be deemed Additional Rent and shall be paid by Tenant to Landlord within thirty (30) days after Landlord's demand. The late charge shall be in addition to all of Landlord's other rights and remedies hereunder or at law and shall not be construed as liquidated damages or as limiting Landlord's remedies in any manner.

5.5    RENT CONCESSION. Anything contained in this Article to the contrary notwithstanding, provided no Event of Default exists, Landlord hereby waives payment of Annual Fixed Rent for the period from and including the Commencement Date through the date immediately preceding the Rent Commencement Date.

ARTICLE 6

ESCALATION

6.1    TAX ESCALATION.

6.1.1    DEFINITIONS. For the purposes of this Section 6.1, the following terms shall have the respective meanings set forth below:

(a)    "Taxes" shall mean the aggregate amount of all real estate and taxes and any general or special assessments (exclusive of penalties thereon but inclusive of interest on assessments payable in installments) assessed or imposed upon or with respect to the Building and the Land and including, without limitation, (i) taxes or assessments made upon or with respect to any development rights now or hereafter appurtenant to or used in connection with the construction of the Building, (ii) any fee, tax or charge imposed by any governmental authority for, on or in respect of any vaults, vault space or other space within or outside the boundaries of the Land, (iii) any assessments for public improvement or benefit to the Building, the Land, or the locality in which the Land is situated, and (iv) any tax, assessment or charge imposed on or with respect to any fixtures, equipment or personal property serving or used in connection with the Building or the Land. There shall be excluded from Taxes all income, estate, succession, inheritance, transfer and franchise taxes imposed upon Landlord; provided, however, that if at any time during the Lease Term the method of taxation of real estate shall be changed and as a result any other tax or assessment, however denominated and including, without limitation, any franchise, income, profit, use, occupancy, gross receipts or rental tax, shall be imposed upon Landlord or the owner of the Building and the Land, or the rents or income therefrom, in substitution for or in addition to, in whole or in part, any of the taxes or assessments listed in the preceding sentence, such other tax or assessment shall be included in and deemed part of Taxes, but only to the extent that the same would be payable if the Building, the Land and all appurtenances thereto (including development rights) were the only property of Landlord. The amount of any special assessments for public improvements or benefits to be included in Taxes for any year, in the case where the same may, at the option of the taxpayer, be paid in installments, shall be limited to the amount of the installment due in respect of such year,

9

CLINTON00033986

together with any interest payable in connection therewith (other than interest payable by reason of the delinquent payment of such installment).

    (b) "Tax Year" shall mean each period from July 1 through June 30 (or such other fiscal period as may hereafter be adopted by the City of New York as the fiscal year for any tax, levy or charge included in Taxes), any part or all of which occurs during the Lease Term.

    (c) "Base Tax Year" shall mean the period commencing on July 1, 2013 and ending on June 30, 2014 (the "2014 Tax Year"); provided, however, that if, as of June 30, 2013, less than eighty-five percent (85%) of the rentable area of the Building has been leased, then the Base Tax Year shall mean the period commencing on July 1, 2014 and ending on June 30, 2015 (the "2015 Tax Year").  Upon the request of either party after June 30, 2013, Landlord and Tenant shall confirm in writing the Base Tax Year and the amount of the additional payments due under Section 6.1.2(b) below, but the failure by either party to do so shall not in any way reduce the respective obligations or rights of Landlord or Tenant under this Lease.

    (d) "Base Taxes" shall mean the actual Taxes for the Base Tax Year.

    (e) "Tax Expenses" shall mean all reasonable expenses, including, without limitation, attorney's fees and disbursements and experts' and other witnesses' fees, incurred by Landlord in seeking to reduce the amount of any assessed valuation of the Land and/or Building, in contesting the amount or validity of any Taxes, or in seeking a refund of Taxes for any Tax Year falling within the Lease Term (prorated for any partial Tax Year).

    6.1.2 <u>TENANT'S SHARE OF TAXES</u>.  From and after the Commencement Date, if the Taxes for any full Tax Year falling within the Lease Term shall exceed the Base Taxes, or if, in the case of a Tax Year only a fraction of which is included in the Lease Term, an amount of the Taxes for such Tax Year multiplied by such fraction exceeds the Base Taxes multiplied by such fraction (the amount of such excess in either case being hereafter referred to as the "Tax Excess"), then Tenant shall pay to Landlord, as Additional Rent, Tenant's Share of the Tax Excess.  From and after the Commencement Date, Tenant shall also pay to Landlord, as Additional Rent, Tenant's Share of Tax Expenses.  Tenant's Share of the Tax Excess and Tax Expenses for each Tax Year shall be payable in monthly installments as follows:

    (a) Prior to the commencement of each Tax Year for which payments are due from Tenant hereunder, Landlord shall provide Tenant with a statement of the estimated monthly amount due from Tenant.  Estimated payments by Tenant on account of Taxes and Tax Expenses shall be made on the first day of each and every calendar month during the Lease Term, and otherwise in the same fashion herein provided for the payment of Annual Fixed Rent.  The monthly amount so to be paid to Landlord shall be sufficient to provide Landlord by the time Taxes and Tax Expenses are due a sum equal to Tenant's required payments, as estimated by Landlord from time to time, on account of Taxes and Tax Expenses for the then current Tax Year.  Promptly after receipt by Landlord of bills for such Taxes and Tax Expenses, Landlord shall advise Tenant of the amount thereof and the computation of Tenant's payment on account thereof (it being agreed that Landlord shall use reasonable efforts to so advise Tenant within one

Confidential – Subject to Protective Order

CLINTON00033987

hundred and eighty (180) days after the end of each Tax Year). If estimated payments theretofore made by Tenant for the Tax Year covered by such bills exceed the required payments on account thereof for such Tax Year, Landlord shall credit the amount of overpayment against subsequent obligations of Tenant on account of Taxes and Tax Expenses (or refund such overpayment if the Lease Term has ended and Tenant has no further obligation to Landlord); but if the required payments on account thereof for such Tax Year are greater than estimated payments theretofore made on account thereof for such Tax Year, Tenant shall make payment to Landlord within thirty (30) days after being so advised by Landlord. Tenant's Share of Tax Expenses for each Tax Year shall, at Landlord's option, be payable on a monthly basis as provided above, or at such other time as Landlord shall render a statement therefor.

(b)    If the Taxes for any Tax Year shall equal or be less than the Base Taxes, Tenant shall not be obligated to make any payments to Landlord pursuant to this Section 6.1 in respect of a Tax Excess for such Tax Year, but in no event shall Tenant be entitled to any refund or reduction in the Annual Fixed Rent by reason of such fact.

(c)    It is understood that the provisions of this Section 6.1 are based upon the method of payment of New York City real property taxes in effect at the date of this Lease, to wit, in semi-annual installments in advance on the first days of July and January of each Tax Year. If such method of payment is hereafter changed, Landlord shall have the right to change the method by which Tenant pays Tenant's Share of a Tax Excess to a method of periodic payments which provides Landlord with the full amount of Tenant's Share of such Tax Excess in respect of any installment of Taxes by the date on which such installment becomes due.

(d)    In addition to the payments required under Section 6.1.2(a) above, Tenant shall pay to Landlord on the first day of each and every calendar month the following amounts during the following periods in the same fashion herein provided for the payment of Annual Fixed Rent:

(i)    from January 1, 2012 through December 31, 2012, the sum of Nine Hundred Fifty-Eight and 33/100 Dollars ($958.33) per month;

(ii)    from January 1, 2013 through December 31, 2013, the sum of One Thousand Nine Hundred Sixteen and 67/100 Dollars ($1,916.67) per month; and

(iii)    if the Base Tax Year is the 2014 Tax Year, from January 1, 2014 through the Expiration Date, the sum of Two Thousand Three Hundred Ninety-Five and 84/100 Dollars ($2,395.84) per month; or

(iv)    if the Base Tax Year is the 2015 Tax Year, (A) from January 1, 2014 through December 31, 2014, the sum of Two Thousand Eight Hundred Seventy-Five and 00/100 Dollars

11

CLINTON00033988

($2,875.00) per month and (B) from January 1, 2015 through the Expiration Date, the sum of Three Thousand Three Hundred Fifty-Four and 17/100 Dollars ($3,354.17) per month.

6.1.3   TAX REDUCTION PROCEEDINGS.  Only Landlord shall have the right to institute tax reduction or other proceedings to reduce the assessed valuation of the Land and Building.  Should Landlord be successful in any such reduction proceedings and obtain a refund for any Tax Year or Years in respect of which Tenant shall have made a payment to Landlord, pursuant to this Section 6.1, Landlord shall credit Tenant's Share of such refund (or, in the case of a refund of Taxes for a Tax Year, only a fraction of which is included in the Lease Term, such fraction thereof) against the monthly installment or installments of Annual Fixed Rent next falling due under this Lease, or if the Lease Term has then expired and Tenant has no further obligations to Landlord, such amount shall be refunded by Landlord to Tenant.  In calculating the amount of any such credit or payment, Landlord shall have the right to deduct from such refund all Tax Expenses incurred by Landlord in obtaining the same, to the extent not previously paid by Tenant or other tenants in the Building (so that no double recovery of Tax Expenses shall be permitted).  The provisions of this subsection 6.1.3 shall survive the expiration of the Lease Term.

6.2   OPERATING EXPENSE ESCALATION.

6.2.1   DEFINITIONS.  For the purposes of this Section 6.2, the following terms shall have the respective meanings set forth below:

(a)   "Base Operating Expenses" shall mean the actual Operating Expenses for the Operating Year commencing on January 1, 2013 and ending on December 31, 2013.

(b)   "Operating Expenses" shall mean the aggregate of all costs and expenses (including taxes, if any, thereon) paid or incurred by or on behalf of Landlord (whether directly or through independent contractors) in connection with the operation and maintenance of the Property (as hereinafter defined), including all expenses incurred by Landlord as a result of its compliance with any of its obligations under Sections 7.1 and 7.3 hereof (without duplication), but excluding those items set forth as excluded from Operating Expenses at the end of this subsection 6.2.1(b).  Operating Expenses shall be calculated on the accrual basis of accounting (but subject to the further provisions of this Section 6.2) and shall include, without limitation, the following expenses:

(i)   salaries, wages, medical, surgical and general welfare benefits (including group life insurance), pension and welfare payments or contributions and all other fringe benefits paid to, for or with respect to all persons (whether they be employees of Landlord or its managing agent) for their services in the operation (including, without limitation, security services), maintenance, repair, or cleaning of the Property, and payroll taxes, workers' compensation, uniforms and dry cleaning costs for such persons;

(ii)   payments under service contracts with independent contractors for operating (including, without limitation, providing security services),

12

Confidential – Subject to Protective Order

CLINTON00033989

maintaining, repairing or cleaning of the Property or any portion thereof or any fixtures or equipment therein;

(iii)    all costs or charges for steam, heat, ventilation, air conditioning and water (including sewer rents) furnished to the Property and/or used in the operation of the Property and all costs or charges for electricity furnished to the public and service areas of the Property and/or used in the operation of the service facilities of the Property, including any taxes on any such utilities;

(iv)    ordinary repairs which are appropriate to the continued operation of the Property as a first-class Manhattan office building, provided that to the extent the cost of any such repair and/or replacement is required to be capitalized under GAAP, the same shall be deemed capital improvements and the provisions of clause (x) below shall apply;

(v)    costs of lobby decoration, painting and decoration of non-tenant areas to the extent not excluded by (17) below;

(vi)    cost of snow removal and landscaping in and about the Property;

(vii)    cost of building and cleaning supplies and equipment, cost of replacements for tools and equipment used in the operation, maintenance and repair of the Property and charges for telephone service for the Property;

(viii)    financial expenses incurred in connection with the operation of the Property, such as insurance premiums (including, without limitation, liability insurance, fire and casualty insurance, rent insurance and any other insurance that is then generally carried by owners of major first-class office buildings in Manhattan or may be required by the holder of any mortgage on the Property), reasonable attorneys fees and disbursements (exclusive of any such fees and disbursements incurred in applying for any reduction of Taxes or in connection with the leasing of space in the Property), auditing and other professional fees and expenses, Landlord's reasonable home office accounting charges allocated to the Building, association dues and any other ordinary and customary financial expenses incurred in connection with the operation of the Property;

(ix)    management fees payable to a management company which is unrelated to Landlord or, if to a management company which is owned or controlled by Landlord or Landlord's principals, then for all purposes of this Lease at a rate of two percent (2%) of actual gross rentals of the Property per annum;

(x)    the cost of capital improvements ("Permitted Capital Expenditures") made by Landlord either (1) to reduce Operating Expenses, or (2) pursuant to a requirement of law, ordinance, order, rule or regulation of any public authority having jurisdiction or the requirement of any insurance carrier or insurance rating organization or underwriting board now or hereafter in effect, whether or not such requirement is valid or mandatory, in either case calculated as follows:  the cost of any such capital improvement shall

13

                          CLINTON00033990

be included in Operating Expenses for the Operating Year in which such improvement was made, provided that such cost shall be amortized on a straight-line basis over the useful life thereof determined reasonably by Landlord in accordance with GAAP and practices in effect at the time of the capital improvement, and the annual amortization of such capital improvement, together with interest on the unamortized balance of such cost at the Lease Interest Rate, shall be included in Operating Expenses; provided, however, if Landlord reasonably concludes on the basis of engineering estimates that a particular capital expenditure will effect savings in other Operating Expenses, including, without limitation, energy related costs, and that such projected savings will, on an annual basis ("Projected Annual Savings"), exceed the annual amortization therefor, then and in such event the amount of amortization for such capital expenditure shall be increased to an amount equal to the Projected Annual Savings, and in such circumstance, the increased depreciation (in the amount of the Projected Annual Savings) shall be made for such period of time as it would take to fully amortize the cost of the item in question, together with interest thereon at the Lease Interest Rate in equal monthly payments, each in the amount of one-twelfth (1/12th) of the Projected Annual Savings, with such payment to be applied first to interest and the balance to principal;

(xi)    rental payments made for equipment used in the operation and maintenance of the Property;

(xii)    the cost of governmental licenses and permits, or renewals thereof, necessary for the operation of the Property;

(xiii)    all costs of reporting for the Building or any part thereof to maintain certification under the U.S. EPA's Energy Star® rating system, the U.S. Green Building Council's Leadership in Energy and Environmental Design (LEED) rating system or a similar system or standard (but excluding costs of seeking, applying for and obtaining any initial certification);

(xiv)    all other reasonable and necessary expenses paid in connection with the operation, maintenance, repair and cleaning of the Property which are properly chargeable against income.

Any cost or expenses of the nature described above shall be included in Operating Expenses for any Operating Year no more than once, notwithstanding that such cost or expenses may fall under more than one of the categories listed above.  Subject to the limitation set forth in subdivision (ix) above, Landlord may use related or affiliated entities to provide services or furnish materials for the Property provided that the rates or fees charged by such entities are competitive with those charged by unrelated or unaffiliated entities in the Borough of Manhattan for the same services or materials.

The following costs and expenses shall be excluded from Operating Expenses:

(1)    Taxes and Tax Expenses;

(2)    franchise and income taxes imposed upon Landlord;

14

(3)     debt service under any mortgage on the Property;

(4)     leasing commissions, brokerage fees, reasonable attorneys' and consultants' fees and expenses, leasing expenses and similar costs associated with procuring tenants;

(5)     capital improvements to the Property other than those provided in clause (x) above;

(6)     the cost of electrical energy furnished directly to rentable space at the Property whether or not leased;

(7)     the cost of improvements, alterations and tenant installations and decorations incurred in connection with preparing space for any tenant;

(8)     salaries or fringe benefits of personnel above the grade of senior property manager;

(9)     rent payable under any Underlying Lease;

(10)    the cost of any items to the extent to which such cost is reimbursed to Landlord by tenants of the Property (other than pursuant to this Section 6.2), insurance or condemnation proceeds or third parties;

(11)    depreciation of the building, amortization (except as provided in clause (x) above) and other non-cash charges;

(12)    interest or penalties for late payment by Landlord, if any, except to the extent incurring such expense is a reasonable business expense under the circumstances or caused by a corresponding late payment by Tenant;

(13)    any bad debt loss, rent loss or reserves for bad debts or rent loss;

(14)    costs incurred in connection with Landlord's enforcement of leases with tenants in the Building;

(15)    the cost of repairs or rebuilding necessitated by fire or other casualty to the extent reimbursed by insurance proceeds;

(16)    costs to clean-up, contain, abate, remove or otherwise remedy (but not costs to test and monitor) Hazardous Substances or asbestos-containing materials from the Building unless the Hazardous Substances or asbestos-containing materials (A) were introduced to the Building by a Tenant Party or (B) are required to be cleaned-up, contained, abated, removed or otherwise remedied by legal requirements hereafter enacted or

15

Confidential – Subject to Protective Order

CLINTON00033992

promulgated or the requirement of any insurance carrier or insurance rating organization or underwriting board hereafter enacted or promulgated, whether or not such insurance requirement is mandatory (including the cost of compliance with legal requirements and insurance requirements enacted or promulgated prior to the Date of this Lease if such compliance is required for the first time by reason of any amendment, modification or reinterpretation thereof which is imposed or enacted after the Date of this Lease);

(17)    the cost of acquisition and leasing of sculptures, painting or other objects of fine art in the Building other than the cost of maintaining such art;

(18)    costs incurred, including court costs and attorney's fees, related to a violation of law by Landlord (excluding (A) ordinary repairs otherwise permitted hereunder and (B) capital expenses to comply with changes in requirements of law which are permitted to be included in Operating Expenses under clause (x) above);

(19)    except as otherwise expressly provided herein, amounts paid to Landlord or to an entity which is affiliated with, owned or controlled by Landlord or Landlord's principals (except for the payment of management fees as provided herein) for any services at the Property to the extent such amounts exceed the cost of such services if rendered by other unaffiliated third parties on a competitive basis;

(20)    leasehold improvements, alterations and decorations done for tenants of the Building, and services (such as painting) performed for any tenant (including Tenant) of the Building, whether at the expense of Landlord or such tenant, to the extent that such work or services are of a type or quality in excess of the type or quality of work or services which Landlord is required to furnish to Tenant under this Lease at Landlord's expense;

(21)    all costs and expenses of Landlord's financing and refinancing of the Property;

(22)    costs incurred as a result of Landlord's breach of any lease or a result of Landlord's indemnity obligations;

(23)    costs solely attributable to retail space; and

(24)    Fitness Facility Operating Expenses.

Operating Expenses shall be net of rebates, credits and similar items of which Landlord receives the benefit.

If Landlord is not furnishing any particular work or service (the cost of which if performed by Landlord would constitute an Operating Expense) to a tenant who has undertaken to perform such work or service in lieu of the performance thereof by Landlord, Operating Expenses for any Operating Year during all or any part of which such work or service is not so furnished by Landlord shall be increased by an amount equal to the additional Operating Expenses which reasonably would have been incurred during such period by Landlord if it had at

16

CLINTON00033993

its own expense furnished such work or service to such tenant. Base Operating Expenses shall not include (I) increases due to extraordinary circumstances, including but not limited to, Force Majeure, boycotts, strikes, conservation surcharges, security concerns, embargoes or shortages or (II) Permitted Capital Expenditures.

In determining the amount of Operating Expenses for any Operating Year, if less than ninety-five percent (95%) of the rentable area of the Building shall have been occupied by tenant(s) at any time during such Operating Year, Operating Expenses shall be determined for such Operating Year to be an amount equal to the Operating Expenses which would normally be expected to have been incurred had such occupancy been ninety-five percent (95%) throughout such Operating Year.

(c)     "Operating Year" shall mean the calendar year within which the Commencement Date occurs and each subsequent calendar year, any part or all of which falls within the Lease Term.

(d)     "Property" shall mean the Land, the Building, and any other land contiguous to the Land, and any improvements constructed on such land, whether above or below ground, which Landlord may operate or maintain or may contribute to the cost of the operation or maintenance thereof.

6.2.2   TENANT'S SHARE OF OPERATING EXPENSES. If the Operating Expenses for any full Operating Year falling within the Lease Term shall exceed the Base Operating Expenses or if, in the case of an Operating Year only a fraction of which is included in the Lease Term, the amount of the Operating Expenses for such Operating Year multiplied by such fraction exceeds the Base Operating Expenses multiplied by such fraction (the amount of such excess in either case being hereafter referred to as the "Excess Operating Expenses"), then Tenant shall pay to Landlord, as Additional Rent, Tenant's Share of the Excess Operating Expenses for such Operating Year or portion thereof. Tenant's Share of the Excess Operating Expenses for each Operating Year shall be payable in monthly installments as follows:

(a)     Prior to the commencement of each Operating Year for which payments are due from Tenant hereunder, Landlord shall provide Tenant with a statement of the estimated monthly amount due from Tenant. Estimated payments by Tenant on account of Operating Expenses shall be made on the first day of each and every calendar month during the Lease Term, and otherwise in the same fashion herein provided for the payment of Annual Fixed Rent. The monthly amount so to be paid to Landlord shall be sufficient to provide Landlord by the end of each Operating Year with a sum equal to Tenant's required payments, as estimated by Landlord from time to time, on account of Operating Expenses for such Operating Year. After the end of each Operating Year, Landlord shall submit to Tenant a reasonably detailed statement of Operating Expenses for such Operating Year (it being agreed that Landlord shall use reasonable efforts to submit such statement to Tenant within one hundred and eighty (180) days after the end of each Operating Year). If estimated payments theretofore made for such Year by Tenant exceed Tenant's required payment on account therefore for such Operating Year, according to such statement, Landlord shall credit the amount of overpayment against subsequent obligations of Tenant with respect to Operating Expenses (or refund such

17

CLINTON00033994

overpayment if the Lease Term has ended and Tenant has no further obligation to Landlord); but, if the required payments on account thereof for such Operating Year are greater than the estimated payments (if any) theretofore made on account thereof for such Operating Year, Tenant shall make payment to Landlord within thirty (30) days after being so advised by Landlord.

(b)     If the Operating Expenses for any Operating Year (as adjusted, if applicable, pursuant to the last two (2) paragraphs of subsection 6.2.1(b)) shall equal or be less than the Base Operating Expenses, Tenant shall not be obligated to make any payments to Landlord pursuant to this Section 6.2 in respect of such Operating Year, but in no event shall Tenant be entitled to any refund or reduction in the Annual Fixed Rent by reason of such fact.

(c)     In addition to the payments required under Section 6.2.2(a) above, Tenant shall pay to Landlord on the first day of each and every calendar month the following amounts during the following periods in the same fashion herein provided for the payment of Annual Fixed Rent:

(i)     January 1, 2012 through December 31, 2012, the sum of Four Hundred Seventy-Nine and 17/100 Dollars ($479.17) per month; and

(ii)     January 1, 2013 through the Expiration Date, the sum of Nine Hundred Fifty-Eight and 33/100 Dollars ($958.33) per month.

6.2.3     <u>AUDIT RIGHT</u>.  Subject to the provisions of this Section and provided that no Event of Default exists, Tenant shall have the right to examine the correctness of the Landlord's Operating Expense statement or any item contained therein.  Any request for examination in respect of any Operating Year may be made by notice from Tenant to Landlord no more than one hundred twenty (120) days after the date (the "Operating Expense Statement Date") Landlord provides Tenant a statement of the actual amount of the Operating Expenses in respect of such Operating Year and only if Tenant shall have fully paid such amount.  Such notice shall set forth in reasonable detail the matters questioned.  Any examination must be completed and the results communicated to Landlord no more than one hundred eighty (180) days after the Operating Expense Statement Date.  Tenant hereby acknowledges and agrees that Tenant's sole right to contest the Operating Expense statement shall be as expressly set forth in this Section.  Tenant hereby waives any and all other rights pursuant to applicable law to inspect Landlord's books and records and/or to contest the Operating Expense statement.  If Tenant shall fail to timely exercise Tenant's right to inspect Landlord's books and records as provided in this Section, or if Tenant shall fail to timely communicate to Landlord the results of Tenant's examination as provided in this Section, with respect to any Operating Year Landlord's statement of Operating Expenses shall be conclusive and binding on Tenant.  So much of Landlord's books and records pertaining to the Operating Expenses for the specific matters questioned by Tenant for the Operating Year included in Landlord's statement shall be made available to Tenant within a reasonable time (not to exceed five (5) Operating Days) after

18

Confidential – Subject to Protective Order     CLINTON00033995

Landlord timely receives the notice from Tenant to make such examination pursuant to this Section during normal business hours at the offices in New York, New York or Boston, Massachusetts where Landlord keeps such books and records. Tenant shall have the right to make such examination no more than once in respect of any Operating Year in which Landlord has given Tenant a statement of the Operating Expenses. Such examination may be made only by a qualified employee of Tenant or a qualified independent certified public accounting firm approved by Landlord, and in no event shall such examination be performed by BDO Seidman, LLP or its successors. No examination shall be conducted by an examiner who is to be compensated, in whole or in part, on a contingent fee basis. As a condition to performing any such examination, Tenant and its examiners shall be required to execute and deliver to Landlord an agreement, in form acceptable to Landlord, agreeing to keep confidential any information which it discovers about Landlord or the Building in connection with such examination except to the extent Tenant is legally compelled to do so. No subtenant shall have any right to conduct any such examination and no assignee may conduct any such examination with respect to any period during which the assignee was not in possession of the Premises. All actual out of pocket costs and expenses of any such examination shall be paid by Tenant. If as a result of such examination Landlord and Tenant agree that the amounts paid by Tenant to Landlord on account of the Operating Expenses exceeded the amounts to which Landlord was entitled hereunder, or that Tenant is entitled to a credit with respect to the Operating Expenses, Landlord, at its option, shall refund to Tenant the amount of such excess or apply the amount of such credit, as the case may be, within thirty (30) days after the date of such agreement. Similarly, if Landlord and Tenant agree that the amounts paid by Tenant to Landlord on account of Operating Expenses were less than the amounts to which Landlord was entitled hereunder, then Tenant shall pay to Landlord, as additional rent hereunder, the amount of such deficiency within thirty (30) days after the date of such agreement.

If Landlord and Tenant shall be unable to resolve any dispute concerning Operating Expenses within sixty (60) days following the delivery of the results of Tenant's examination to Landlord, then either Landlord or Tenant shall have the right, within thirty (30) days after the end of such sixty (60) day period, time of the essence, to submit such dispute to arbitration in the City of New York under the Commercial Arbitration Rules of the American Arbitration Association (or its successor) (the "AAA"). The arbitrator(s) shall be an independent lawyer, accountant or financial executive having at least ten (10) years' experience in the leasing, operation or management of first-class Manhattan office buildings. With respect to any such arbitration, (i) the arbitrator(s) shall have no power to vary or modify the provisions of this Lease and jurisdiction is limited accordingly, (ii) the decision and award of the arbitrator(s) shall be final and conclusive on the parties and any such determination so made in accordance herewith may be entered as a judgment in any court of competent jurisdiction and (iii) each party shall bear the expense of its own counsel and witnesses in connection with such arbitration. Except as otherwise set forth herein, Tenant shall pay all fees payable to the AAA for services rendered in connection with the arbitration. Tenant, pending the resolution of any contest pursuant to the terms hereof shall continue to pay all sums as determined to be due in the first instance by Landlord. If it is finally determined that the aggregate amount paid by Tenant to Landlord on account of Tenant's Share of Excess Operating Expenses exceeded the amounts to which Landlord was entitled hereunder, Landlord, at its option, shall refund to Tenant the amount of such excess or apply the amount of such credit against rent, as the case may be, within thirty (30)

19

CLINTON00033996

days after the date of such determination. If it is finally determined that the amounts paid by Tenant to Landlord on account of Tenant's Share of Excess Operating Expenses were less than the amounts to which Landlord was entitled hereunder, Tenant shall pay to Landlord the amount of such shortfall within thirty (30) days of the date Tenant is notified of the error. If Landlord's original determination of Tenant's Share of Excess Operating Expenses is determined to have been overstated by Twenty Thousand Dollars ($20,000) (such amount to be increased annually by a percentage equal to the percentage increase in the CPI) or more, Landlord shall pay all fees payable to the AAA for services rendered in connection with the arbitration.

      6.2.4    GENERAL APPLICABILITY. The imposition on Landlord by any portion of this Lease of an obligation to perform any work, repairs or other acts with respect to the Property shall not be construed as preventing Landlord from including the cost of such work, repairs or other acts in Operating Expenses, to the extent the same is otherwise properly includible therein pursuant to this Section 6.2.

ARTICLE 7

REPAIRS AND SERVICES

      7.1    LANDLORD'S OBLIGATION TO REPAIR. Except as otherwise provided in this Lease, Landlord shall, throughout the Lease Term, keep and maintain in good order, condition and repair:

          (a)    the roof, the exterior and load bearing walls (including exterior windows), the foundation, the structural floor slabs and other structural elements of the Building; and

          (b)    the common facilities of the Building, including HVAC, plumbing and other Building systems and equipment servicing the Premises (other than any supplementary or accessory HVAC, and telecommunication/computer systems and/or any item of such equipment exclusively serving the Premises) up to the point of connection to the Premises.

Landlord shall not be responsible to make any improvements or repairs to the Building or the Premises other than as expressly provided in this Section 7.1, unless expressly otherwise provided in this Lease. Tenant shall promptly give Landlord notice of any damage to the Premises or the Building (whether or not caused by Tenant) or of any defects in any portion thereof or in any fixtures or equipment therein promptly after Tenant first learns thereof. In making any repairs, alterations, additions or improvements in the Premises, Landlord shall, use reasonable efforts to minimize interference with Tenant's use and occupancy of the Premises, and after completion of same, restore the Premises and any of Tenant's Property affected; provided, however, that Landlord shall have no obligation to employ contractors or labor at so-called overtime or other premium pay rates or to incur any other overtime costs or expenses whatsoever unless the condition is one that poses an imminent risk to the safety of persons or damage to property or materially interferes with Tenant's use of or access to the Premises, provided, however, that Landlord shall not be required to perform such work on an "overtime" basis to the extent that such work would not have been needed but for a violation by Tenant of its obligations under this Lease.

Confidential – Subject to Protective Order

CLINTON00033997

7.2     TENANT'S REPAIRS AND MAINTENANCE.

(a)     Tenant covenants and agrees that, from and after the date that possession of the Premises is delivered to Tenant and until the end of the Lease Term, Tenant, at its expense, will keep neat and clean and maintain in good order, condition and repair the Premises, Alterations and all fixtures or facilities contained in the Premises which do not constitute part of the common areas or the Building systems, including, without limitation, any distribution conduits for the HVAC system serving the Premises, any supplemental air conditioning units, any private lavatory and any public lavatories located on floors leased entirely to Tenant, shower, toilet, washbasin and kitchen facilities, and all plumbing serving or connected to such systems or facilities, and will make all required repairs thereto and/or replacements of portions thereof, excepting only for those repairs or replacements for which Landlord is responsible under the terms of Section 7.1 or Article 12 of this Lease.  Tenant shall not permit or commit any waste, and, notwithstanding anything to the contrary set forth in Section 7.1, but subject to the provisions of Section 11.12 hereof, Tenant shall be responsible for the cost of all repairs and replacements to the Premises, the Building and the facilities of the Building, whether ordinary or extraordinary, structural or, non-structural, when necessitated by Tenant's, or its subtenant's or assignee's, moving property in or out of the Building or installation or removal of furniture, fixtures or other property or by the performance by Tenant, or its subtenant or assignee, of any alterations or other work in the Premises, or when necessitated by the acts, omission, misuse, neglect or improper conduct of Tenant, its assignee or subtenant, or its or their agents, employees, contractors or invitees or the use or occupancy or manner of use or occupancy of the Premises other than in accordance with the terms of this Lease.  All of said repairs and any restorations or replacements required in connection therewith shall be of a quality and class at least equal to the original work or installations and shall be done in a good and workmanlike manner to the reasonable satisfaction of Landlord.

(b)     If repairs or replacements are required to be made by Tenant pursuant to the terms hereof, Landlord may demand that Tenant make the same forthwith, and (except in cases of emergency, where no notice or demand shall be required) if Tenant refuses or neglects to commence such repairs or replacements within thirty (30) days after such demand or to complete the same with reasonable diligence thereafter, Landlord may (but shall not be required to do so) make or cause such repairs or replacements to be made and shall not be responsible to Tenant for any loss or damage that may accrue to Tenant's stock or business by reason thereof except to the extent caused by Landlord's negligence or willful misconduct.  If Landlord makes or causes such repairs or replacements to be made, Tenant agrees that Tenant will, within thirty (30) days after Landlord's demand, pay to Landlord as Additional Rent the cost thereof, together with interest thereon at the Lease Interest Rate.

7.3     SERVICES.  Subject to the provisions of Sections 14.3 and 20.12, Landlord agrees to provide the services set forth in Exhibit D annexed hereto to the Building and the Premises during Operating Hours (as defined in Exhibit D).  In the event that Tenant purchases any utility service directly from the provider, Tenant shall promptly provide to Landlord copies of the utility bills for Tenant's usage of such services in a format reasonably acceptable to Landlord.  Notwithstanding anything in this Lease to the contrary, if Landlord or any affiliate of Landlord has elected to qualify as a real estate investment trust ("REIT"), any service required or permitted to be performed by Landlord pursuant to this Lease, the charge or cost of which may

21

be treated as impermissible tenant service income under the laws governing a REIT, may be performed by a taxable REIT subsidiary that is affiliated with either Landlord or Landlord's property manager, an independent contractor of Landlord or Landlord's property manager (the "Service Provider"). If Tenant is subject to a charge under this Lease for any such service and Tenant has accepted such service, then, at Landlord's direction, Tenant will pay such charge either to Landlord for further payment to the Service Provider or directly to the Service Provider, and, in either case, (i) Landlord will credit such payment against Additional Rent due from Tenant under this Lease for such service, and (ii) such payment to the Service Provider will not relieve Landlord from any obligation under the Lease concerning the provisions of such service.

7.4    LANDLORD'S FAILURE TO REPAIR OR PROVIDE SERVICES.  Anything in this Lease to the contrary notwithstanding, provided no Event of Default exists, if solely by reason of Landlord's negligence or willful misconduct, Landlord shall be unable to supply services or to make repairs which Landlord is obligated under the terms of this Lease to supply or to make for more than twenty (20) consecutive days after notice from Tenant to Landlord, and as a result of such failure the Premises are rendered untenantable or inaccessible and Tenant cannot and does not use the entire Premises for the conduct of its business, then in such event, as Tenant's sole and exclusive remedy, Tenant's obligation to pay Annual Fixed Rent and Additional Rent on account of Taxes and Operating Expenses shall be abated from and after the twenty-first (21st) day after such notice to Landlord until such condition is cured by Landlord or Tenant recommences use of the Premises.

ARTICLE 8

ALTERATIONS

8.1    TENANT'S RIGHTS.  Tenant may from time to time during the Lease Term, at its expense, make such alterations, additions, installations, substitutions, improvements (collectively, with Tenant's Work, referred to as "Alterations") in and to the Premises as Tenant may consider necessary or desirable for the conduct of its business in the Premises, subject to the following conditions:

(a)    the outside appearance or the strength of the Building or any of its structural parts shall not be affected;

(b)    no part of the Building outside of the Premises shall be physically affected;

(c)    no other tenant or occupant of the Building, and no common area of the Building, shall be affected;

(d)    the proper and economical functioning of the Building systems or facilities of the Building or any portion thereof shall not be affected;

(e)    before proceeding with any Alterations, Tenant shall obtain Landlord's written consent (which consent shall not be unreasonably withheld conditional or delayed

22

                CLINTON00033999

provided the conditions of this Article 8 are satisfied) and submit to Landlord for approval plans and specifications for the work to be performed.  Notwithstanding the foregoing, Tenant shall have no obligation to obtain such consent or submit such plans and specifications in connection with the mere painting, carpeting or other cosmetic and non-structural changes of the Premises or the performance of other similar decorative work the cost of which, as reasonably estimated by Tenant, will not exceed $250,000.00, either individually or in the aggregate with other Alterations performed within the twelve (12) month period immediately preceding (except that the foregoing $250,000.00 threshold shall not apply to Tenant's Work), provided that (i) Tenant gives Landlord at least five (5) Operating Days prior notice describing such Alteration in reasonable detail and (ii) a building, alteration or other governmental permit is not required or otherwise filed in connection therewith.  Landlord may as a condition of its consent require Tenant (i) to perform all such work at such reasonable times and in such reasonable manner as to create the least practicable interference with the use of the Building by the other tenants and occupants thereof, including, but without limitation, on an "overtime" basis, (ii) to make revisions in and to its plans and specifications, and/or (iii) to agree to remove, at or prior to the Expiration Date, any item of work shown on such plans of an unusual nature, such as, but not limited to, internal stairways, pantries, lavatories, vaults, special flooring for computer areas and the like ("Specialty Alterations"), and to restore the affected portion of the Premises;

(f)    before proceeding with any Alterations, any required consent from any Mortgagee and/or Overlandlord shall have been obtained; and

(g)    in performing the work involved in such Alterations, Tenant shall perform, observe and comply with all of the conditions and covenants set forth in the provisions of this Article and the Tenant Design & Alteration Criteria promulgated by Landlord from time to time for the Building.  The current Tenant Design & Alteration Criteria for the Building are attached hereto as Exhibit F.

Landlord's review and approval of Tenant's plans and specifications and consent to the performance of the work described therein shall not be deemed an agreement by Landlord that such plans, specifications and work conform with applicable law and insurance requirements, nor shall it be deemed a waiver by Landlord of compliance by Tenant with any provisions of this Lease, nor shall it impose upon Landlord any liability or obligation with respect to such work or the performance thereof.

8.2    CONFORMITY WITH LAW.  Tenant covenants and agrees that any Alterations made by it to or upon the Premises shall be done in a good and workmanlike manner and in conformity and compliance with all applicable laws, ordinances, regulations and requirements of all public authorities having jurisdiction, and with all applicable requirements of insurers and insurance rating or underwriting organizations, that new materials and equipment of at least equal quality and class to the original installations in the Building shall be employed therein, that the structure of the Building shall not be endangered or impaired thereby and that the Premises shall not be diminished in value thereby.

23

8.3    PERFORMANCE OF WORK, GOVERNMENTAL APPROVALS, INSURANCE.

(a)    All Alterations and installation of furnishings by Tenant (i) shall be coordinated with any work being performed by Landlord and in such manner as to maintain harmonious labor relations and not to damage the Building or interfere with or delay Building construction or operation or increase the cost thereof, (ii) shall not interfere with the use or occupancy of any other tenant or occupant of the Building, other than to a *de minimis* extent, (iii) to the extent connected to or involving any portion of the HVAC, plumbing, electrical, life safety, proprietary or other systems of the Building, the connection to or work involving the Building systems shall be performed by a contractor designated by Landlord in its sole and absolute discretion provided that the charges of such contractor shall be reasonable in relation to the charges of contractors providing similar services in other first class office buildings in midtown Manhattan and such contractor is reasonably available, and (iv) with respect to all Alterations and installations which are not the subject of the foregoing clause (iii), shall be performed by contractors and major trade subcontractors first reasonably approved by Landlord, such approval not to be unreasonably withheld, conditioned or delayed. If Landlord shall fail to respond to Tenant's written request for approval of a contractor or subcontractor within ten (10) days, then Tenant shall have the right to give Landlord a second notice requesting such approval and, provided such second request for approval shall prominently specify that Landlord's failure to consent to or disapprove the same within five (5) Operating Days after Landlord's receipt thereof constitutes Landlord's approval, then in the event Landlord fails to approve or disapprove within such 5-Operating Day period, Landlord shall be deemed to have approved such contractor or subcontractor.

(b)    Tenant shall (i) procure all necessary governmental permits, licenses and certificates, (ii) make all required filings of plans with governmental authorities before making any Alterations, (iii) obtain all required governmental approvals upon the completion thereof, and (iv) deliver copies of the items set forth in subsections (i) through (iii) above to Landlord for inspection by Landlord, and, if applicable, for Landlord's approval. Upon completion of any Alterations and to the extent applicable to the Alteration in question, Tenant shall deliver to Landlord (i) an architect's certificate from Tenant's architect certifying that the Alterations have been completed substantially in accordance with the approved plans and specifications and (ii) three (3) complete "as built" sets of Tenant's plans and specifications prepared on an AutoCAD Computer Assisted Drafting and Design System (or such other system or medium reasonably approved by Landlord and generally used in the industry) using naming conventions issued by the American Institute of Architects in June, 1990 (or such other naming conventions as Landlord may reasonably accept) and magnetic computer media of such record drawings and specifications, translated into in a format compatible with AutoCAD Release 2000 or later or another format reasonably acceptable to Landlord. Tenant shall use an expediter designated by Landlord in connection with making such filings and obtaining such permits, licenses, certificates and approvals provided that the fees charged by such expeditor shall be reasonable in relation to the charges for similar services provided by similar expeditors providing similar services to first class office buildings in midtown Manhattan. At any and all times during the period of construction of any Alterations, Landlord shall be entitled to have a representative or representatives on the site to inspect such Alterations, and such representative or representatives shall have free and unrestricted access to any and every part of the Premises. Tenant shall keep

24

full and accurate records of the cost of any Alterations in and to the Premises for a period of five (5) years following any such expenditure (or, at Tenant's option, deliver copies of such records to Landlord),and shall, if requested by Landlord, make the same available to Landlord for use in connection with any proceeding to review the assessed valuation of the Building or any proceedings to acquire the Land and Building for public or quasi-public use.

(c)     Tenant agrees to save harmless and indemnify Landlord and all other Landlord Parties from and against any and all injury, loss, claims, damage and expense (including reasonable attorneys' fees and disbursements) to any person or property occasioned by or arising out of the performance of any Alterations pursuant to the provisions of Section 11.1 hereof, except to the extent caused by the negligence or willful misconduct of the Landlord Parties. In addition, Tenant shall carry or cause each contractor to carry the insurance required pursuant to Section 11.13 hereof.

(d)     In connection with the making of any Alterations, Tenant shall (i) make all arrangements for, and shall pay all expenses incurred in connection with, use of the freight elevator(s) serving the Premises and (ii) pay to Landlord the actual out-of-pocket third-party charges incurred by Landlord for reviewing Tenant's plans and specifications and making any inspections that Landlord reasonably deems necessary during the performance of such Alterations and for other services performed or costs reasonably incurred by Landlord in connection with such Alterations. Notwithstanding anything to the contrary contained herein or in Exhibit D attached hereto, Landlord shall waive all charges for Tenant's use of the freight elevator(s) during non-Operating Hours for the first fifteen (15) hours of aggregate usage by Tenant in connection with Tenant's Work and move-in to the Premises.

8.4     LIENS.  Tenant shall promptly pay and discharge all costs and expenses of any work done in or on the Premises by Tenant or its subtenants, and its and their agents, employees or contractors, and shall not do or fail to do any act which shall or may render the Building or any part thereof, or the Premises or any part thereof subject to any mechanic's lien or other lien or security agreement or charge or chattel mortgage or conditional bill of sale or title retention agreement (hereinafter collectively called "Lien"), and if any Lien be filed against the Building, the Premises, any Alterations, or any portion of any of the foregoing, Tenant shall, at Tenant's own cost and expense, cause the same to be removed of record by bonding or otherwise within twenty (20) days after the filing of any such Lien; and, in default thereof, Landlord may, in addition to any other rights and remedies it may have by reason of Tenant's default, cause any such Lien to be removed of record by payment or bond or otherwise, as Landlord may elect, and Tenant shall reimburse Landlord as Additional Rent for all costs and expenses incidental to the removal of any such Lien incurred by Landlord, together with interest thereon at the Lease Interest Rate.

8.5     VIOLATIONS; DISRUPTION.  Tenant, at its expense, and with diligence and dispatch, shall cause to be discharged or cancelled all notices of violation arising from any Alterations which are issued by the Department of Buildings of The City of New York or any other public or quasi-public authority having jurisdiction. Nothing contained in this Section 8.5 shall prevent Tenant from contesting, in good faith and at its own expense, any such notices of violation, provided that Tenant shall comply with the provisions of Section 9.3 hereof. In addition, Tenant shall not exercise any of its rights under this Article 8 or any other provision of

25

CLINTON00034002

this Lease, or use or occupy the Premises, in such manner as would create any work stoppage, picketing, labor disruption or dispute or a violation of any of Landlord's union contracts affecting the Land or Building, or which would unreasonably interfere with the business of Landlord or of any tenant or occupant of Building. In the event of the Tenant's failure to comply with the preceding sentence, Tenant shall, immediately upon notice from Landlord, cease all manner of exercise of such rights which give rise to such failure to comply. If Tenant shall fail to cease such manner of exercise of its rights as aforesaid, Landlord, in addition to any other rights available to it under this Lease and pursuant to law, shall have the right to seek an injunction.

   8.6   <u>TENANT'S PROPERTY</u>. Except as otherwise provided in this Section 8.6, all work, construction, repairs, Alterations, other improvements or installations made to or upon the Premises (including, but not limited to, the construction performed by Landlord or Tenant under Article 4 and Exhibit C), whether or not at the expense of Tenant, shall become part of the Premises and shall become the property of Landlord and remain upon and be surrendered with the Premises as a part thereof upon the Expiration Date or earlier termination of the Lease Term:

      (a)   All personal property not permanently affixed to the Building, including moveable partitions, business and trade fixtures, machinery and equipment, communications and office equipment, whether or not attached to or built into the Premises, which are installed in the Premises by or for the account of Tenant, at Tenant's expense (and without any contribution to the cost thereof from Landlord) and can be removed without damage to the Building, and all furniture, furnishings, goods, supplies, wares and merchandise and other moveable articles of personal property owned by Tenant and located in the Premises (all of which are herein referred to as "Tenant's Property") shall remain the property of Tenant and may be removed by Tenant or any person claiming under Tenant at any time or times during the Lease Term and (with the exception of special cabinet work or property which is built into the Premises and custom-fitted furniture or cabinetry) shall be removed by Tenant at the expiration or earlier termination of the Lease Term. Tenant shall repair any damage to the Premises occasioned by the removal by Tenant or any person claiming under Tenant of any Tenant's Property from the Premises.

      (b)   At the Expiration Date or earlier termination of the Lease Term, unless otherwise specified in writing by Landlord, Tenant shall remove from the Premises any Specialty Alterations made to the Premises for which such removal was made a condition of such consent under Section 8.1 or Exhibit C. Upon such removal Tenant shall restore the Premises to their condition prior to installation of such Specialty Alterations and repair any damage occasioned by such removal and restoration.

      (c)   Any items of Tenant's Property (except money, securities and like valuables) which remain on the Premises after the Expiration Date or earlier termination of the Lease Term may, at the option of Landlord, be deemed to have been abandoned and in such case may either be retained by Landlord as its property or may be disposed of without accountability, at Tenant's expense, in such manner as Landlord may see fit.

   8.7   <u>SURVIVAL</u>. The provisions of this Article 8 shall survive the expiration or sooner termination of this Lease.

26

Confidential – Subject to Protective Order     CLINTON00034003

ARTICLE 9

LAWS, ORDINANCES, REQUIREMENTS OF PUBLIC AUTHORITIES

9.1    CERTIFICATE OF OCCUPANCY.  Landlord covenants and agrees that, commencing on the date that a certificate of completion is obtained by Tenant from the New York City Department of Buildings for the Premises and thereafter throughout the Lease Term, Landlord shall obtain and maintain a certificate of occupancy for the Building that will permit the Premises to be used and occupied for general office purposes and, if such certificate of occupancy is temporary, Landlord shall renew the same as necessary so that at all times during the Lease Term such certificate will permit the Premises to be used and occupied for general office purposes.

9.2    TENANT'S OBLIGATIONS.  Tenant shall, at its expense, comply with all laws and requirements of public authorities and all requirements of insurance bodies now or hereafter in effect which shall, with respect to the Premises or the occupancy, use or manner of use of the Premises or to any abatement of nuisance, impose any violation, order or duty upon Landlord or Tenant, including without limitation, any violation, order or duty arising from (i) Tenant's use of the Premises, (ii) the manner of conduct of Tenant's business in the Premises or the operation by Tenant of its installations, equipment or other property thereon, (iii) any cause or condition created by or at the instance of Tenant, (iv) the making or performance of any Alterations, installations or other work by Tenant in or on the Premises, including, without limitation, any Tenant's Work, or (v) the breach by Tenant of any of its obligations under this Lease; and Tenant shall make all repairs or Alterations required thereby, whether structural (in which event all such repairs or Alterations shall be performed by Landlord and the reasonable cost thereof shall be paid by Tenant) or nonstructural, ordinary or extraordinary.  In addition to the foregoing, Tenant agrees to participate in all fire and other safety compliance procedures instituted by Landlord and/or public authorities for the Building.

9.3    TENANT'S RIGHT TO CONTEST.  If Tenant receives notice of any violation of any law or requirement of public authority or requirement of insurance bodies applicable to the Premises, it shall give prompt notice thereof to Landlord.  Tenant may, at its expense, contest the validity or applicability of any such law or requirement of public authority or requirement of insurance bodies by appropriate proceedings prosecuted diligently and in good faith, and may defer compliance therewith, provided that (i) Landlord is not thereby subjected to criminal prosecution or criminal or civil penalty of any nature, (ii) no unsafe or hazardous condition remains unremedied, (iii) the Premises, or any part thereof, shall not be subject to being condemned or vacated by reason of such non-compliance or such contest, (iv) no insurance policy carried in respect of the Property by Landlord is cancelled and no premium for any such policy is increased by reason of such non-compliance or such contest, (v) such non-compliance or contest shall not constitute or result in any violation of any Underlying Lease or any mortgage on the Building or on an Underlying Lease thereof of which Tenant has notice, and Tenant complies with all requirements of all such Underlying Leases or mortgages including those, if any, relating to the furnishing of security, and (vi) if Landlord so requires, Tenant furnishes to Landlord the bond of a surety company, in form and substance satisfactory to Landlord, in an amount at least equal to one hundred twenty-five percent (125%) of the cost of such compliance (as estimated by Landlord), or such other security reasonably satisfactory in all respects to

27

                                    CLINTON00034004

Landlord. Tenant hereby agrees to indemnify and save Landlord harmless from and against any loss, liability, damage and expense arising out of any such deferral of compliance or contest, including, without limitation, reasonable attorneys' fees and disbursements and other expenses reasonably incurred by Landlord, and Tenant shall keep Landlord advised as to all settlements of such contest. Landlord agrees to execute any document reasonably required by Tenant in order to permit Tenant effectively to carry on any such contest, provided Landlord is not thereby subjected to any cost or expense or exposed to any liability or obligation on account thereof.

9.4    WINDOW CLEANING. Tenant will not clean, nor require, permit, suffer or allow any window in the Premises to be cleaned, from the outside in violation of Section 202 of the New York Labor Law or of the rules of the New York City Board of Standards and Appeals or of any other board or body having or asserting jurisdiction.

9.5    LANDLORD'S OBLIGATIONS. Landlord shall comply with all applicable laws and requirements of public authorities with respect to the common areas, facilities and systems of the Building for which Tenant is not responsible for compliance, but may defer compliance so long as Landlord shall be contesting the validity or applicability thereof in good faith provided such contest does not unreasonably interfere with Tenant's use of and access to the Premises.


ARTICLE 10

USE

10.1    OFFICE USE. Tenant shall use and occupy the Premises only for executive and general offices in connection with Tenant's business and for no other purpose. Subject to the other provisions of this Lease (including all exhibits) and such reasonable regulations and procedures as may from time to time be in effect, Tenant shall have access to the Premises twenty-four (24) hours per day, seven (7) days per week.

10.2    ADDITIONAL PERMITTED USES. Tenant may, in addition to using the Premises for the purposes permitted by Section 10.1 but subject to Tenant's compliance in respect thereof with the provisions of Section 9.2, also use portions of the Premises for the installation, maintenance and operation in the Premises of (i) electronic data processing equipment, word processing equipment and business machines, (ii) duplicating equipment and (iii) other reasonable and customary purposes ancillary to ordinary office use, including a standard office pantry, in each case used for purposes incidental to the business of Tenant with electrical loads and floor loads not to exceed the respective load capacities set forth in Exhibit F.

10.3    RESTRICTIONS. Tenant shall not suffer or permit the Premises or any part thereof to be used in any manner, or anything to be done therein, or suffer or permit anything to be brought into or kept in the Premises, which would in any way (i) violate any law or requirement of public authorities or requirement of insurance bodies, (ii) cause structural injury to the Building or any part thereof, (iii) interfere with the normal operation of the HVAC, plumbing, electrical or other mechanical or electrical systems of the Building or the elevators installed therein, (iv) constitute a public or private nuisance, (v) alter the appearance of the exterior of the Building, (vi) affect in any adverse way any portion of the interior of the Building

28

    CLINTON00034005

other than the Premises, (vii) interfere with the use or occupancy of any other tenant or occupant of the Building, other than to a *de minimis* extent, (viii) create any offensive odors or noise or (ix) result in the leakage of fluid or the growth of mold or the creation of any other condition which causes, or in Landlord's reasonable opinion would be likely to cause, an internal air quality problem in the Premises or the Building.  Tenant shall not solicit other occupants of the Building to use wireless internet service that emanates from the Premises.  Tenant shall use reasonable efforts to prevent the signals of Tenant's wireless internet service (if any) from emanating beyond the Premises or otherwise interfering in any material respect with any Building systems.  Tenant shall not, nor permit any Tenant Party to, photograph, broadcast, record or otherwise make, use or transmit images of the Premises or the Building for any reason including, without limitation, for use in movies, television, the internet, newspapers, magazines or other publications or media; provided that the foregoing shall not prohibit the making or use of images of the Premises or the Building by Tenant and its permitted assignees and subtenants solely in connection with advertising approved by Landlord for marketing the Premises or a portion thereof for assignment or subletting (subject to the provisions of Article 13 hereof), and provided further that Landlord's consent shall not be required for the incidental making or use of images of the Premises for other reasonable business purposes of Tenant.

10.4    PROHIBITED USES.  Without limiting the restriction on use set forth in Section 10.1, Tenant shall not under any circumstance use or permit the use of the Premises or any part thereof for any of the following which are expressly prohibited:

(a)    sale at retail of any products or materials whatsoever;

(b)    the conduct of a public auction of any kind;

(c)    the conduct of a commercial bank, trust company, savings bank, safe deposit or savings and loan association or any branches of any of the foregoing or a loan company business (except for the conduct of a credit union or benefit plan for Tenant's employees);

(d)    the issuance and sale of traveler's checks, foreign drafts, letters of credit, foreign exchange or domestic money orders or the receipt of money for transmission;

(e)    an employment agency;

(f)    offices or agencies of a foreign government or political subdivisions thereof;

(g)    offices of any governmental bureau or agency of the United States or any state or political subdivision thereof;

(h)    offices of any charitable, religious, union or other not-for-profit or any tax exempt entity within the meaning of Section 168(j)(4)(A) of the Internal  Revenue Code of 1986, as amended, or any successor statute, or rule or regulation applicable thereto;

29

CLINTON00034006

(i)    offices of any public utility company, other than corporate, executive or legal staff offices;

(j)    data processing services rendered primarily to others than Tenant, permitted subtenants or other permitted occupants and which are not strictly ancillary to Tenant's or permitted subtenants' or other permitted occupants' business;

(k)    health care professionals providing patient services;

(l)    schools or other training or educational uses (other than those which are strictly ancillary to the Tenant's, permitted subtenants' or other permitted occupants' business, such as training of Tenant's, permitted subtenants' or other permitted occupants' personnel to be employed in the Building);

(m)    a clerical support business rendering clerical support services primarily to others than Tenant, permitted subtenants or other permitted occupants or performing functions other than those which are strictly ancillary to Tenant's, permitted subtenants' or other permitted occupants' business;

(n)    reservation centers for airlines or for travel agencies;

(o)    broadcasting centers for communications firms, such as radio and television stations;

(p)    any pornographic or obscene purposes, any commercial sex establishment, any pornographic, obscene, nude or semi-nude performances, modeling, materials, activities or sexual conduct or any other use that has or could reasonably be expected to have a material adverse effect on Landlord's financial condition, the value of the Building or the income therefrom;

(q)    a showroom;

(r)    gyms and exercise facilities and equipment including, without limitation, cardiovascular and weight/resistance machines, free weights, exercise and physical training rooms; and

(s)    any other use or purpose which, in the reasonable judgment of Landlord, is not in keeping with the character and dignity of the Building or which is prohibited under the Rules and Regulations.

10.5    LICENSES AND PERMITS.  If any governmental license or permit (other than the Building certificate of occupancy which permits general office use) shall be required for the proper and lawful conduct of Tenant's business in the Premises, or any part thereof, including, specifically, but without limitation, any place of assembly permit or any amendment to the Building certificate of occupancy, Tenant, at its expense, shall duly apply for, procure and thereafter maintain such license or permit and submit the same to Landlord for inspection by

30

Landlord. Tenant's application for and procurement of any such license, permit or amendment shall be subject to Landlord's review and approval, which shall not be unreasonably withheld or delayed. Tenant shall at all times comply with each such license and permit and shall not at any time use or occupy, or suffer or permit anyone to use or occupy, the Premises, or do or permit anything to be done in the Premises, in violation of the certificate of occupancy for the Building.

    10.6    <u>HAZARDOUS SUBSTANCES</u>.

        (a)    No Tenant Party shall store, place, generate, manufacture, refine, handle, or locate on, in, under or around the Premises, the Building or Property any "Hazardous Substance" (as defined below), except for storage, handling and use of reasonable quantities and types of cleaning fluids and office supplies in the Premises in the ordinary course and the prudent conduct of Tenant's business in the Premises. Tenant agrees that (a) the storage, handling, use and disposal of such permitted Hazardous Substances must at all times conform to all applicable laws and requirements of public authorities and to applicable fire, safety and insurance requirements; and (b) the types and quantities of permitted Hazardous Substances which are stored in the Premises must be reasonable and appropriate to the nature and size of Tenant's operation in the Premises and reasonable and appropriate for similar first-class office buildings in midtown Manhattan. Tenant shall indemnify, defend and hold harmless Landlord Parties from and against any and all claims, damages, losses, actions, causes of actions, proceedings, liens, fines, penalties, costs, expenses and liabilities arising out of any breach of any provision of this paragraph, which expenses shall also include laboratory testing fees, personal injury claims, clean-up costs and environmental consultants' fees and attorneys' fees. Tenant agrees that Landlord may be irreparably harmed by Tenant's breach of this paragraph and that an injunction and/or specific performance action may appropriately be brought by Landlord; provided that, Landlord's election to bring or not bring any such injunction and/or specific performance action shall in no way limit, waive, impair or hinder Landlord's other remedies against Tenant. As used in this Lease, the term "Hazardous Substance" shall mean and include any chemical, material, element, compound, solution, mixture, substance or other matter of any kind whatsoever which is now or later designated, classified, listed or regulated under any law, statute, ordinance, rule, regulation, order or ruling of any agency of the State of New York, the United States Government or any local governmental authority, including, without limitation, asbestos, petroleum, petroleum hydrocarbons and petroleum based products, urea formaldehyde foam insulation, polychlorinated biphenyls and freon and other chlorofluorocarbons.

        (b)    Landlord represents that, as of the Commencement Date, the Premises shall be free of Hazardous Substances which would violate applicable laws or governmental regulations. Landlord shall be responsible, at its sole cost and expense, to remove or remediate any Hazardous Substances found in the Premises during the Lease Term to the extent due to a breach of the foregoing representation or caused by a Landlord Party.

31

Confidential – Subject to Protective Order        CLINTON00034008

ARTICLE 11

INDEMNITY AND INSURANCE

11.1    TENANT'S INDEMNITY.

(a)    Indemnity.  To the fullest extent permitted by law, Tenant waives any right to contribution against the Landlord Parties (as hereinafter defined) and agrees to indemnify and save harmless the Landlord Parties from and against all claims of whatever nature arising from or claimed to have arisen from (i) any act, omission or negligence of the Tenant Parties (as hereinafter defined) within the Premises or the Property; (ii) any accident, injury or damage whatsoever caused to any person, or to the property of any person, occurring in or about the Premises from the earlier of (A) the date on which any Tenant Party first enters the Premises for any reason or (B) the Commencement Date, and thereafter throughout and until the end of the Lease Term and after the end of the Lease Term for as long after the Lease Term as Tenant or anyone acting by, through or under Tenant is in occupancy of the Premises or any portion thereof; (iii) any accident, injury or damage whatsoever occurring outside the Premises but within the Building, or on common areas or the Property, where such accident, injury or damage results, or is claimed to have resulted, from any act, omission or negligence on the part of any of the Tenant Parties; (iv) any breach of this Lease by Tenant; or (v) the use of the Fitness Facility (as hereinafter defined) by the Tenant Parties.  Tenant shall pay such indemnified amounts as they are incurred by the Landlord Parties.  This indemnification shall not be construed to deny or reduce any other rights or obligations of indemnity that a Landlord Parties may have under this Lease or the common law.  Notwithstanding anything contained herein to the contrary, Tenant shall not be obligated to indemnify a Landlord Party for any claims to the extent that such Landlord Party's damages in fact result from a Landlord Party's negligence or willful misconduct or is covered by Landlord's indemnity in Section 11.14 hereof.

(b)    Breach.  In the event that Tenant breaches any of its indemnity obligations hereunder or under any other contractual or common law indemnity: (i) Tenant shall pay to the Landlord Parties all liabilities, loss, cost, or expense (including attorney's fees) incurred as a result of said breach, and the reasonable value of time expended by the Landlord Parties as a result of said breach; and (ii) the Landlord Parties may deduct and offset from any amounts due to Tenant under this Lease any amounts owed by Tenant pursuant to this Section.

(c)    No limitation.  The indemnification obligations under this Section shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for Tenant or any subtenant or other occupant of the Premises under workers' compensation acts, disability benefit acts, or other employee benefit acts.  Tenant waives any immunity from or limitation on its indemnity or contribution liability to the Landlord Parties based upon such acts.  Tenant shall in no event be liable for any loss of business or any indirect or consequential or punitive damages under this Lease except as expressly provided Section 19.3(b), 19.4 and/or 20.17 hereof.

(d)    Subtenants and other occupants.  Tenant shall require its subtenants and other occupants of the Premises to provide similar indemnities to the Landlord Parties in a form acceptable to Landlord.

32

                    CLINTON00034009

(e)     Survival.  The terms of this Section shall survive any termination or expiration of this Lease.

(f)     Costs.  The foregoing indemnity and hold harmless agreement shall include indemnity for all costs, expenses and liabilities (including, without limitation, attorneys' fees and disbursements) incurred by the Landlord Parties in connection with any such claim or any action or proceeding brought thereon, and the defense thereof.  In addition, in the event that any action or proceeding shall be brought against one or more Landlord Parties by reason of any such claim, Tenant, upon request from the Landlord Party, shall resist and defend such action or proceeding on behalf of the Landlord Party by counsel appointed by Tenant's insurer (if such claim is covered by insurance without reservation) or otherwise by counsel reasonably satisfactory to the Landlord Party.  The Landlord Parties shall not be bound by any compromise or settlement of any such claim, action or proceeding without the prior written consent of such Landlord Parties.

11.2     TENANT'S RISK.  Tenant agrees to use and occupy the Premises, and to use such other portions of the Building and the Property as Tenant is given the right to use by this Lease at Tenant's own risk.  The Landlord Parties shall not be liable to the Tenant Parties for any damage, injury, loss, compensation, or claim (including, but not limited to, claims for the interruption of or loss to a Tenant Party's business) based on, arising out of or resulting from any cause whatsoever (except to the extent covered by Landlord's indemnity in Section 11.14 hereof), including, but not limited to, repairs to any portion of the Premises or the Building or the Property, any fire, robbery, theft, mysterious disappearance, or any other crime or casualty, the actions of any other tenants of the Building or of any other person or persons, or any leakage in any part or portion of the Premises or the Building or the Property, or from water, rain or snow that may leak into, or flow from any part of the Premises or the Building or the Property, or from drains, pipes or plumbing fixtures in the Building or the Property.  Any goods, property or personal effects stored or placed in or about the Premises shall be at the sole risk of the Tenant Party, and neither the Landlord Parties nor their insurers shall in any manner be held responsible therefor.  The Landlord Parties shall not be responsible or liable to a Tenant Party, or to those claiming by, through or under a Tenant Party, for any loss or damage that may be occasioned by or through the acts or omissions of persons occupying adjoining premises or any part of the premises adjacent to or connecting with the Premises or any part of the Building or otherwise.  The provisions of this Section shall be applicable to the fullest extent permitted by law, and until the expiration or earlier termination of the Lease Term, and during such further period as Tenant may use or be in occupancy of any part of the Premises or of the Building.

11.3     TENANT'S COMMERCIAL GENERAL LIABILITY INSURANCE.  Tenant agrees to maintain in full force on or before the earlier of (i) the date on which any Tenant Party first enters the Premises for any reason or (ii) the Commencement Date and thereafter throughout and until the end of the Lease Term of this Lease and after the end of the Lease Term for as long after the Lease Term as Tenant or anyone acting by, through or under Tenant is in occupancy of the Premises or any portion thereof, a policy of commercial general liability insurance, on an occurrence basis, issued on a form at least as broad as Insurance Services Office ("ISO") Commercial General Liability Coverage "occurrence" form CG 00 01 10 01 or another ISO Commercial General Liability "occurrence" form providing equivalent coverage.  Such

33

insurance shall include broad form contractual liability coverage, specifically covering but not limited to the indemnification obligations undertaken by Tenant in this Lease. The minimum limit of liability of such insurance shall be $5,000,000 per occurrence. In addition, in the event Tenant hosts a function in the Premises, Tenant agrees to obtain, and cause any persons or parties providing services for such function to obtain, the appropriate insurance coverages as determined by Landlord (including liquor liability coverage, if applicable) and provide Landlord with evidence of the same.

    11.4    TENANT'S PROPERTY INSURANCE. Tenant shall maintain at all times during the Term of the Lease, and during such earlier time as Tenant may be performing work in or to the Premises or have property, fixtures, furniture, equipment, machinery, goods, supplies, wares or merchandise on the Premises, and continuing thereafter so long as Tenant is in occupancy of any part of the Premises, business interruption insurance and insurance against loss or damage covered by the so-called "all risk" type insurance coverage with respect to Tenant's Property and all Alterations and Tenant's Work in the Premises, and other property of Tenant located at the Premises. The business interruption insurance required by this Section shall be in minimum amounts typically carried by prudent tenants engaged in similar operations, but in no event shall be in an amount less than the Annual Fixed Rent then in effect during any Lease Year, plus any Additional Rent due and payable for the immediately preceding Lease Year. The "all risk" insurance required by this Section shall be in the amount of the full replacement cost of Tenant's Property and all Alterations and Tenant's Work in the Premises, and other property of Tenant located at the Premises. In addition, during such time as Tenant is performing any Alterations or Tenant's Work in or to the Premises, Tenant, at Tenant's expense, shall also maintain, or shall cause its contractor(s) to maintain, builder's risk insurance for the full insurable value of such Alterations or Tenant's Work. Landlord and such additional persons or entities as Landlord may reasonably request shall be named as loss payees, as their interests may appear, on the policy or policies required by this Section. In the event of loss or damage covered by the "all risk" insurance required by this Section, the responsibilities for repairing or restoring the loss or damage shall be determined in accordance with Section 12.2. If Tenant defaults in its obligation to repair or restore loss or damage to Tenant's Work or Alterations, or if this Lease is terminated or expires prior to completion of such repair or restoration, Landlord shall have the right to receive the proceeds of Tenant's "all risk" insurance therefor, and such right shall survive the expiration or earlier termination of this Lease. Landlord shall not be obligated to insure, and shall not assume any liability of risk of loss for, Tenant's Property, Tenant's Work or Alterations, including any such property or work of Tenant's subtenants or occupants. Landlord will also have no obligation to carry insurance against, nor be responsible for, any loss suffered by Tenant, subtenants or other occupants due to interruption of Tenant's or any subtenant's or occupant's business.

    11.5    TENANT'S OTHER INSURANCE. Throughout the Lease Term, Tenant shall obtain and maintain (1) comprehensive automobile liability insurance (covering any automobiles owned or operated by Tenant) issued on a form at least as broad as ISO Business Auto Coverage form CA 00 01 07 97 or other form providing equivalent coverage; (2) worker's compensation insurance or participation in a monopolistic state workers' compensation fund; and (3) employer's liability insurance or (in a monopolistic state) Stop Gap Liability insurance. Such automobile liability insurance shall be in an amount not less than One Million Dollars ($1,000,000) for each accident. Such worker's compensation insurance shall carry minimum

34

CLINTON00034011

limits as defined by the law of the jurisdiction in which the Premises are located (as the same may be amended from time to time). Such employer's liability insurance shall be in an amount not less than One Million Dollars ($1,000,000) for each accident, One Million Dollars ($1,000,000) disease-policy limit, and One Million Dollars ($1,000,000) disease-each employee.

11.6    REQUIREMENTS FOR INSURANCE.  All insurance required to be maintained by Tenant pursuant to this Lease shall be maintained with responsible companies that are admitted to do business, and are in good standing, in the jurisdiction in which the Premises are located and that have a rating of at least "A" and are within a financial size category of not less than "Class X" in the most current Best's Key Rating Guide or such similar rating as may be reasonably selected by Landlord.  All such insurance shall:  (1) be acceptable in form and content to Landlord; (2) be primary and noncontributory; and (3) contain an endorsement prohibiting cancellation, failure to renew, reduction of amount of insurance, or change in coverage without the insurer first giving Landlord thirty (30) days' prior written notice (by certified or registered mail, return receipt requested, or by fax or email) of such proposed action. No such policy shall contain any deductible or self-insured retention greater than $25,000 for liability insurance or $100,000 for property insurance. Such deductibles and self-insured retentions shall be deemed to be "insurance" for purposes of the waiver in Section 11.12 below. Landlord reserves the right from time to time to require Tenant to obtain higher minimum amounts of insurance based on such limits as are customarily carried with respect to similar properties in the area in which the Premises are located.  The minimum amounts of insurance required by this Lease shall not be reduced by the payment of claims or for any other reason.  In the event Tenant shall fail to obtain or maintain any insurance meeting the requirements of this Article, or to deliver such policies or certificates as required by this Article, Landlord may, at its option, on five (5) days notice to Tenant, procure such policies for the account of Tenant, and the cost thereof shall be paid to Landlord within five (5) days after delivery to Tenant of bills therefor.

11.7    ADDITIONAL INSUREDS.  To the fullest extent permitted by law, the commercial general liability and auto insurance carried by Tenant pursuant to this Lease, and any additional liability insurance carried by Tenant pursuant to Section 11.3 of this Lease, shall name Landlord, Landlord's managing agent, each Mortgagee and Overlandlord and such other persons as Landlord may reasonably request from time to time as additional insureds with respect to liability arising out of or related to this Lease or the operations of Tenant (collectively "Additional Insureds").  Such insurance shall provide primary coverage without contribution from any other insurance carried by or for the benefit of Landlord or the Additional Insureds. Such insurance shall also waive any right of subrogation against each Additional Insured.

11.8    CERTIFICATES OF INSURANCE.  On or before the earlier of (i) the date on which any Tenant Party first enters the Premises for any reason or (ii) the Commencement Date, Tenant shall furnish Landlord with certificates evidencing the insurance coverage required by this Lease, and renewal certificates shall be furnished to Landlord at least annually thereafter, and at least thirty (30) days prior to the expiration date of each policy for which a certificate was furnished.  (Acceptable forms of such certificates for liability and property insurance are ACCORD 25 and ACCORD 27, respectively.)  In jurisdictions requiring mandatory participation in a monopolistic state workers' compensation fund, the insurance certificate requirements for the coverage required for workers' compensation will be satisfied by a letter from the appropriate

35

                                         CLINTON00034012

state agency confirming participation in accordance with statutory requirements. Such current participation letters required by this Section shall be provided every six (6) months for the duration of this Lease. Failure by the Tenant to provide the certificates or letters required by this Section shall not be deemed to be a waiver of the requirements in this Section. Upon request by Landlord, a true and complete copy of any insurance policy required by this Lease shall be delivered to Landlord within ten (10) days following Landlord's request.

11.9    SUBTENANTS AND OTHER OCCUPANTS. Tenant shall require its subtenants and other occupants of the Premises to provide written documentation evidencing the obligation of such subtenant or other occupant to indemnify the Landlord Parties to the same extent that Tenant is required to indemnify the Landlord Parties pursuant to Section 11.1 above, and to maintain insurance that meets the requirements of this Article, and otherwise to comply with the requirements of this Article. Tenant shall require all such subtenants and occupants to supply certificates of insurance evidencing that the insurance requirements of this Article have been met and shall forward such certificates to Landlord on or before the earlier of (i) the date on which the subtenant or other occupant or any of their respective direct or indirect partners, officers, shareholders, directors, members, trustees, beneficiaries, servants, employees, principals, contractors, licensees, agents, invitees or representatives first enters the Premises or (ii) the commencement of the sublease. Tenant shall be responsible for identifying and remedying any deficiencies in such certificates or policy provisions.

11.10    NO VIOLATION OF BUILDING POLICIES. Tenant shall not commit or permit any violation of the policies of fire, boiler, sprinkler, water damage or other insurance covering the Property and/or the fixtures, equipment and property therein carried by Landlord, or do or permit anything to be done, or keep or permit anything to be kept, in the Premises, which in case of any of the foregoing (i) would result in termination of any such policies, (ii) would adversely affect Landlord's right of recovery under any of such policies, or (iii) would result in reputable and independent insurance companies refusing to insure the Property or the property of Landlord in amounts reasonably satisfactory to Landlord.

11.11    TENANT TO PAY PREMIUM INCREASES. If, because of anything done, caused or permitted to be done, or omitted by Tenant (or its subtenant or other occupants of the Premises), the rates for liability, fire, boiler, sprinkler, water damage or other insurance on the Property or on the property and equipment of Landlord or any other tenant or subtenant in the Building shall be higher than they otherwise would be (as shown by reasonable supporting documentation provided by Landlord to Tenant), Tenant shall reimburse Landlord and/or the other tenants and subtenants in the Building for the additional insurance premiums thereafter paid by Landlord or by any of the other tenants and subtenants in the Building which shall have been charged because of the aforesaid reasons, such reimbursement to be made from time to time within thirty (30) days after Landlord's demand.

11.12    WAIVER OF SUBROGATION. To the fullest extent permitted by law, the parties hereto waive and release any and all rights of recovery against the other, and agree not to seek to recover from the other or to make any claim against the other, and in the case of Landlord, against all "Tenant Parties" (hereinafter defined), and in the case of Tenant, against all "Landlord Parties" (hereinafter defined), for any loss or damage incurred by the waiving/releasing party to the extent such loss or damage is insured under any insurance policy required by this

36

Confidential – Subject to Protective Order                                        CLINTON00034013

Lease or which would have been so insured had the party carried the insurance it was required to carry hereunder. Tenant shall obtain from its subtenants and other occupants of the Premises a similar waiver and release of claims against any or all of the Tenant Parties and the Landlord Parties. In addition, the parties hereto (and in the case of Tenant, its subtenants and other occupants of the Premises) shall procure an appropriate clause in, or endorsement on, any insurance policy required by this Lease pursuant to which the insurance company waives subrogation. The insurance policies required by this Lease shall contain no provision that would invalidate or restrict the parties' waiver and release of the rights of recovery in this section. The parties hereto covenant that no insurer shall hold any right of subrogation against the parties hereto by virtue of such insurance policy.

The term "Landlord Party" or "Landlord Parties" shall mean Landlord, any affiliate of Landlord, Landlord's managing agents and leasing agents for the Building, Landlord's asset manager for the Building, each Overlandlord, each Mortgagee, and each of their respective direct or indirect partners, officers, shareholders, directors, members, trustees, beneficiaries, servants, employees, principals, contractors, licensees, agents or representatives. For the purposes of this Lease, the term "Tenant Party" or "Tenant Parties" shall mean Tenant, any affiliate of Tenant, any permitted subtenant or any other permitted occupant of the Premises, and each of their respective direct or indirect partners, officers, shareholders, directors, members, trustees, beneficiaries, servants, employees, principals, contractors, licensees, agents, invitees or representatives.

    11.13   <u>TENANT'S WORK AND ALTERATIONS</u>. During such times as Tenant is performing Tenant's Work or Alterations or having work or services performed in or to the Premises, Tenant shall require its contractors, and their subcontractors of all tiers, to obtain and maintain commercial general liability, automobile, workers compensation, employer's liability, builder's risk, and equipment/property insurance in such amounts and on such terms as are specified in the Work Letter attached hereto as Exhibit C. The commercial general liability and auto insurance carried by Tenant's contractors and their subcontractors of all tiers pursuant to this section shall name Landlord and the Additional Insureds as additional insureds with respect to liability arising out of or related to their work or services. Such insurance shall provide primary coverage without contribution from any other insurance carried by or for the benefit of Landlord or the Additional Insureds. Such insurance shall also waive any right of subrogation against each Additional Insured. Tenant shall obtain and submit to Landlord, prior to the earlier of (i) the entry onto the Premises by such contractors or subcontractors or (ii) commencement of the work or services, certificates of insurance evidencing compliance with the requirements of this Section.

    11.14   <u>LANDLORD'S INDEMNITY</u>. Subject to the limitations in Section 14.1 and in Section 11.2 and Section 11.12 of this Article, and to the extent not resulting from any act, omission, fault, negligence or willful misconduct of Tenant or its contractors, licensees, invitees, agents, servants or employees, Landlord agrees to indemnify and save harmless Tenant from and against any claim by a third party arising from any injury to any person occurring in the Premises or in the Building after the Commencement Date until the expiration or earlier termination of the Lease Term, to the extent such injury results from the negligence or willful misconduct of Landlord or Landlord's employees, or from any breach or default by Landlord in the performance or observance of its covenants or obligations under this Lease; provided, however, that Landlord shall in no event be liable for any indirect or consequential damages. Tenant shall provide notice

37

         

of any such third party claim to Landlord as soon as practicable. Landlord shall have the right, but not the duty, to defend the claim. The provisions of this Section shall not be applicable to (i) the holder of any mortgage now or hereafter on the Property or Building (whether or not such holder shall be a mortgagee in possession of or shall have exercised any rights under a conditional, collateral or other assignment of leases and/or rents respecting the Property or Building), or (ii) any person acquiring title as a result of, or subsequent to, a foreclosure of any such mortgage or a deed in lieu of foreclosure, except to the extent of liability insurance maintained by either of the foregoing.

ARTICLE 12

FIRE, CASUALTY OR TAKING

12.1    RIGHT TO TERMINATE LEASE. Tenant shall give immediate (as soon as it is aware of the same) notice to Landlord in case of fire or other casualty in the Premises. If (a) so much of the Building is damaged or rendered untenantable (whether or not the Premises or a portion thereof shall be damaged) by fire or other cause that Landlord shall determine not to restore the same or to demolish the remainder thereof; or (b) if the Premises shall suffer damage or be rendered untenantable or inaccessible by fire or other casualty and Landlord shall reasonably determine (i) that such portion of the Premises cannot be reasonably expected to be restored or rendered tenantable or inaccessible under a normal working schedule within a period of twelve (12) months after the occurrence of such damage or destruction or (ii) that each Overlandlord and Mortgagee will not permit Landlord to apply the net proceeds of Landlord's insurance to the restoration of the Building or the Premises, then and in any such event Landlord shall have the right to terminate this Lease by notice to Tenant given within ninety (90) days of the occurrence of such fire or other casualty. Landlord shall deliver Landlord's estimate of the required restoration time to Tenant within ninety (90) days of the occurrence of such fire or other casualty. If either (y) the Premises shall be totally or substantially damaged or rendered wholly or substantially untenantable (whether or not any other portions of the Building shall be damaged) or (z) the Building shall be substantially damaged, so that Tenant's access to and use and enjoyment of the Premises shall be rendered substantially impossible, whether or not the Premises shall be damaged, and in case of either (y) or (z) Landlord reasonably determines that the same cannot reasonably be expected to be restored or rendered tenantable under a normal working schedule within a period of twelve (12) months after the occurrence of such damage or destruction, then within thirty (30) days after delivery of Landlord's estimate of the required restoration time to Tenant, either Landlord or Tenant may terminate this Lease by notice to the other party. If during the last year of the Lease Term the Building or the Premises shall be damaged by fire or casualty, or the Premises rendered inaccessible by fire or casualty, and if such fire or casualty damage, whether to the Premises (or access thereto) or the Building, cannot reasonably be expected to be repaired or restored within one hundred twenty (120) days from the time that repair or restoration work would commence or prior to the Expiration Date, whichever first occurs, then Landlord or Tenant shall have the right, by giving notice to the other not later than thirty (30) days after the occurrence of such damage, to terminate this Lease. If either Landlord or Tenant shall give notice of termination pursuant to this Section, the Lease Term shall expire by lapse of time upon the date which is thirty (30) days after such notice is given and Tenant shall vacate the Premises and surrender the same to Landlord. Upon the termination of

38

CLINTON00034015

this Lease under the conditions provided for in this Section, Tenant's liability for rent shall cease as of the date of such termination, subject, however, to abatement thereof between the date of such casualty and the date of such termination pursuant to Section 12.3 below. Tenant hereby expressly waives the provisions of Section 227 of the Real Property Law or any like law which may hereafter be enacted and agrees that the foregoing provisions of this Article shall govern and control in lieu thereof, this Article being an express agreement governing any case of damage or destruction of the Premises by fire or other casualty.

12.2    RESTORATION OF THE PREMISES. If the Building or any portion thereof is damaged by fire or other casualty and this Lease is not terminated pursuant to Section 12.1, then (a) Landlord, promptly after such damage and the determination of the net amount of insurance proceeds available, shall use due diligence to repair and restore the Premises (other than Tenant's Work, Alterations and Tenant's Property) and the Building as nearly as possible to their condition prior to such fire or other casualty, and (b) Tenant, promptly after the substantial completion of Landlord's restoration work, shall use reasonable due diligence to repair and restore Tenant's Work, Alterations and Tenant's Property. Notwithstanding the foregoing, Landlord shall not be obligated to expend for such repairs and restoration any amount in excess of the net insurance proceeds made available to Landlord after deduction therefrom of Landlord's expenses in obtaining such proceeds and any amounts applied by any Overlandlord or Mortgagee to obligations other than restoration of the Building. If such proceeds shall be insufficient to effect such restoration and Landlord elects not to effect such restoration, Landlord shall promptly notify Tenant of such fact, and within thirty (30) days thereafter, Tenant may terminate this Lease by notice to Landlord and the Lease shall terminate as of the date of such notice with the same force and effect as if such date were the date originally established as the Expiration Date hereof. In no event shall Landlord be obligated to repair or restore Tenant's Work, Alterations or Tenant's Property.

Where Landlord is obligated or otherwise elects to effect the repair and restoration of the Premises (other than Tenant's Work, Alterations and Tenant's Property), unless such repair and restoration is completed within twelve (12) months from the date of the casualty (such period to be subject, however, to extension where the delay in completion of such work is due to causes beyond Landlord's reasonable control (but in no event beyond eighteen (18) months from the date of the casualty)), Tenant shall have the right to terminate this Lease at any time after the expiration of such 12-month period (as extended) but prior to the time that the repair and restoration is substantially completed, such termination to take effect as of the thirtieth (30th) day after such notice is given, with the same force and effect as if such date were the date originally established as the Expiration Date hereof unless, within such thirty (30) day period such restoration is substantially completed, in which case Tenant's notice of termination shall be of no force and effect and this Lease and the Lease Term shall continue in full force and effect.

12.3    PAYMENT OF RENT FOLLOWING CASUALTY. Until this Lease is terminated pursuant to Section 12.1 or, if this Lease is not so terminated, until (a) the expiration of such time as is reasonably required for Tenant to restore Tenant's Work and Alterations (but in no event more than six (6) months after Landlord's restoration work has been completed pursuant to Section 12.2) or (b) the date Tenant completes restoration of Tenant's Work and Alterations, whichever of (a) or (b) is earlier, the Annual Fixed Rent and Tenant's Share of Taxes and Operating Expenses shall be apportioned or adjusted according to the part of the

39

Confidential – Subject to Protective Order

CLINTON00034016

Premises which is usable by Tenant. No damages, compensation or claims shall be payable by Landlord for inconvenience, loss of business or annoyance arising from any repair or restoration of any portion of the Premises or of the Building. If rent abates in respect of all or any portion of the Premises and Tenant reoccupies the Premises or such portion thereof, or any part thereof, for the conduct of Tenant's business operations during the period in which Landlord's restoration work is taking place and prior to the date that the same is made completely tenantable, the Annual Fixed Rent and Tenant's Share of Taxes and Operating Expenses allocable to the space so reoccupied shall be payable from the date of such reoccupancy. Notwithstanding anything in this Section to the contrary, if Landlord shall be unable to collect all of the insurance proceeds (including rent insurance proceeds) payable by reason of any damage to the Building or the Premises under Landlord's insurance policies by reason of any action or inaction by Tenant or failure by Tenant to comply with any of the provisions of this Lease (including without limitation Sections 9.2 and 11.10 hereof), then without prejudice to any other remedy which may be available against Tenant, the abatement of rent provided for in this Section 12.3 shall not be effective to the extent of the uncollected insurance proceeds, and the amount of any abatement theretofore taken by Tenant shall be immediately payable to Landlord on demand.

12.4    UNINSURED CASUALTY. Notwithstanding anything to the contrary contained in this Lease, if the Building or the Premises shall be substantially damaged by fire or casualty as the result of a risk not covered by the forms of casualty insurance at the time maintained by Landlord and such fire or casualty damage cannot, in the ordinary course, reasonably be expected to be repaired within thirty (30) days from the time that repair work would commence, Landlord may, at its election, terminate the Lease Term by notice to Tenant given within thirty (30) days after such loss. If Landlord shall give such notice, then this Lease shall terminate as of the date of such notice with the same force and effect as if such date were the date originally established as the Expiration Date hereof.

12.5    LANDLORD NOT TO INSURE ALTERATIONS OR TENANT'S PROPERTY. Landlord is not required to carry insurance of any kind on Tenant's Work, Alterations, Tenant's Property or any telephone, computer or communications systems, cabinet work or special decorative effects and shall not be obligated to repair any damage thereto or to replace the same.

12.6    EMINENT DOMAIN -- COMPLETE OR SUBSTANTIAL TAKING. If all or substantially all of the Building or of the Premises shall be taken by condemnation or in any other manner for any public or quasi-public use or purpose (other than for temporary use or occupancy), the Lease Term shall forthwith cease and terminate as of the date of vesting of title by reason of such taking (which date is hereinafter referred to as the "date of the taking"), and the rent shall be apportioned as of such date. If such portion of the Building shall be so taken so that substantial structural alterations or reconstruction of the Building shall be necessary as a result of such taking (whether or not the Premises be affected), which alterations or reconstruction Landlord determines will take at least 180 days to complete, Landlord may, at its option, terminate this Lease and the Lease Term and estate hereby granted as of the date of such vesting of title by notifying Tenant in writing of such termination within sixty (60) days following the date of the taking.

12.7    EMINENT DOMAIN -- PARTIAL TAKING. If any part, but less than all or substantially all, of the Premises shall be so taken and this Lease shall not be terminated pursuant

40

                                            CLINTON00034017

to Section 12.6, then the part so taken shall no longer constitute part of the Premises but this Lease shall otherwise remain unaffected by such taking; provided, however, that Tenant may elect to terminate the Lease Term in the event of:

        (i)    a taking of more than twenty-five percent (25%) of the total rentable area of the Premises, or

        (ii)    a taking that has a material adverse effect on Tenant's access to the Building or the Premises, if Landlord determines that it will be unable to provide or in fact fails to provide adequate alternative access to the Premises within one hundred twenty (120) days thereafter,

by giving notice of such election to Landlord not later than sixty (60) days after Tenant's receipt from Landlord of notice of such taking or the date of such taking, whichever first occurs, or not later than thirty (30) days after such one hundred twentieth day, as the case may be. If notice of termination of this Lease shall be given pursuant to this Section, then upon such date as may be specified by Tenant by notice to Landlord, which date shall be not earlier than thirty (30) and not later than sixty (60) days after the date of Tenant's notice, the Lease Term shall terminate as of the date specified in such notice and the rent shall be apportioned as of such date of termination. Upon a partial taking and this Lease continuing in force as to any part of the Premises,

        (a)    the Annual Fixed Rent and Tenant's Share of Taxes and Operating Expenses shall be equitably reduced for the remainder of the Lease Term, according to the nature and extent of the loss of use of the Premises suffered by Tenant; and

        (b)    Landlord shall, at its expense, restore with reasonable diligence the remaining portions of the Premises as nearly as practicable to the same condition as it was in prior to such condemnation or taking; provided, however, that Landlord shall not be obligated to expend for such restoration and for restoration of the remainder of the Building any amount in excess of the net condemnation proceeds actually received by Landlord. Proceeds of any award applied by the holder of any mortgage to reduction of the indebtedness secured thereby or retained by any Overlandlord as compensation for the taking shall not be deemed to have been received by Landlord.

    12.8   LANDLORD TO RECEIVE ENTIRE AWARD. In the event of any condemnation or taking hereinabove mentioned of all or a part of the Building (whether or not the Premises be affected) Landlord shall be entitled to receive the entire award in the condemnation proceeding, including any award made for the value of the estate vested by this Lease in Tenant, and Tenant hereby expressly assigns to Landlord any and all right, title and interest of Tenant now or hereafter arising in or to any such award or any part thereof, and Tenant shall be entitled to receive no part of such award. The foregoing, however, shall not be deemed to preclude Tenant from recovering a separate award for Tenant's moving expenses and Tenant's Property, but only provided that such award does not reduce and is not payable out of the amount for the Land and the Building.

41

    

ARTICLE 13

ASSIGNMENT, SUBLETTING, MORTGAGING

13.1   LANDLORD'S CONSENT REQUIRED.

(a)     Except as specifically permitted by this Article, Tenant shall not, by operation of law or otherwise, assign, mortgage or encumber this Lease, or sublet or permit the Premises or any part thereof to be used by others.  If and so long as Tenant is a corporation with fewer than five hundred (500) shareholders or a limited liability company or a partnership, an assignment, within the meaning of this Article 13, shall be deemed to include one or more sales or transfers of stock or membership or partnership interests, by operation of law or otherwise, or the issuance of new stock or membership or partnership interests, by which an aggregate of more than fifty percent (50%) of Tenant's stock or membership or partnership interests shall be vested in a party or parties who are not stockholders or members or partners as of the date hereof.  For the purpose of this Section 13.1, ownership of stock or membership or partnership interests shall be determined in accordance with the principles set forth in Section 544 of the Internal Revenue Code of 1986, as amended from time to time, or the corresponding provisions of any subsequent law.  In addition, the merger or consolidation of Tenant into or with any other entity, or the sale of all or substantially all of its assets, shall be deemed to be an assignment within the meaning of this Article 13.  The limitations set forth in this Section 13.1(a) shall be deemed to apply to subtenant(s), assignee(s) and guarantor(s) of this Lease.

(b)     Anything in the foregoing Section 13.1(a) to the contrary notwithstanding, an assignment of this Lease or a subletting of the Premises to an entity which controls or is controlled by Tenant or is under common control with Tenant (an "Affiliate") which does not result in a physical demise of separate space, shall not require Landlord's consent under this Article 13; provided that: (i) a copy of any applicable instrument of assignment or sublease shall have been delivered to Landlord at least ten (10) days prior to the effective date of any such transaction, (ii) the successor to Tenant agrees directly with Landlord, by written instrument in form reasonably satisfactory to Landlord, to be bound by all the obligations of Tenant hereunder, (iii) in no event shall Tenant be released from its obligations under this Lease, (iv) any such transfer or transaction is for a legitimate, regular business purpose of Tenant other than a transfer of Tenant's interest in this Lease, (v) the Affiliate of Tenant shall be in the reasonable opinion of Landlord of good reputation and engaged in a business or activity which is in keeping with the standards of the Building and (vi) the provisions of Section 13.5(b), (c), (h), (i), (k), (l), (m) and (n) and Section 13.7 hereof shall be satisfied.  If any Affiliate to whom Tenant shall have assigned this Lease or sublet all or any portion of the Premises shall thereafter cease to be an Affiliate of Tenant, then the continuation of such entity's tenancy or occupancy shall be subject to Landlord's consent pursuant to this Article 13.

(c)     Anything in the foregoing Section 13.1(a) to the contrary notwithstanding, (i) transactions with an entity into or with which Tenant is merged or consolidated or (ii) transactions with an entity to which all or substantially all of Tenant's assets (including this Lease) or stock are transferred as a going concern shall not require Landlord's consent under this Article 13; provided that: (A) the successor to Tenant has a tangible net worth computed in accordance with GAAP at least equal to the greater of (y) the tangible net worth of Tenant

42

Confidential – Subject to Protective Order

CLINTON00034019

immediately prior to such merger, consolidation or transfer, or (z) the tangible net worth of Tenant herein named on the date of this Lease, (B) the creditworthiness, earnings and earnings forecast of the successor to Tenant shall be comparable to that of Tenant immediately prior to the date of such merger, consolidation or sale of Tenant's stock or assets, as the case may be and (C) proof satisfactory to Landlord of such tangible net worth, creditworthiness and earnings shall have been delivered to Landlord at least ten (10) days prior to the effective date of any such transaction, (D) a copy of any applicable instrument of assignment or sublease shall have been delivered to Landlord at least ten (10) days prior to the effective date of any such transaction, (E) the successor to Tenant agrees directly with Landlord, by written instrument in form satisfactory to Landlord, to be bound by all the obligations of Tenant hereunder, (F) in no event shall Tenant be released from its obligations under this Lease, (G) any such transfer or transaction is for a legitimate, regular business purpose of Tenant other than a transfer of Tenant's interest in this Lease, (H) the successor to Tenant shall be of good reputation and engaged in a business or activity which is in keeping with the standards of the Building and (I) the provisions of Section 13.5(b), (c), (h), (i), (k), (l), (m) and (n) and Section 13.7 hereof shall be satisfied. Notwithstanding the foregoing, a sale of all or substantially all of Tenant's assets that does not include this Lease or Tenant's operations in the Premises, or an assignment of all of Tenant's leases other than this Lease, shall be an assignment for purposes of this Article 13 (it being intended that a transaction that would result in Tenant's only substantial asset or lease being this Lease or Tenant's operation in the Premises would not be permitted hereunder).

(d)     The Tenant originally named in this Lease together with any permitted successors and assigns under Section 13.1(b) and (c) is sometimes referred to herein as "Original Tenant".

13.2    OFFER NOTICE.  If Tenant shall have received and negotiated a bona fide written offer from an independent third party which it desires to accept to sublet all or any part of the Premises or to assign this Lease, Tenant shall submit to Landlord a notice (any such notice being hereinafter called an "Offer Notice") containing the following:

(i)     the name and address of the proposed subtenant or assignee and a brief description of such person's or entity's business, current financial information in respect of such person or entity (including, without limitation, its most recent balance sheet and income statements certified by its chief financial officer or a certified public accountant), the identity of any broker entitled to a commission in respect of such subletting or assignment and the commission, if any, payable to such broker, and any other information reasonably requested by Landlord; and

(ii)     a copy of a signed term sheet setting forth the material economic terms of the proposed assignment or sublease (containing, in the case of an assignment, a provision for assumption by the assignee of all of the terms, covenants, conditions and agreements herein contained on the Tenant's part to be performed for the Lease Term), the effective date of which shall be at least thirty (30) Operating Days but not more than one hundred twenty (120) Operating Days after the date of the giving of such notice, which shall be conditioned on Landlord's consent thereto and which shall comply with the provisions of Section 13.5; and

43

CLINTON00034020

(iii)    the material terms of all other agreements, if any, relating to the proposed assignment or sublease and, if not fully disclosed by the foregoing, a statement of all consideration to be received by Tenant for or in connection with such assignment or sublease (including, without limitation, any payment to be made for Tenant's Property or leasehold improvements) and the terms of payment therefor.

13.3    LANDLORD'S RIGHT TO UNDERLET.  Upon receipt of any Offer Notice in which Tenant proposes to sublet all or any part of the Premises, Landlord shall have the option with respect to each such Offer Notice, exercisable by Landlord in writing within thirty (30) days after receipt of such Offer Notice, to underlet from Tenant the space which Tenant so desires to sublet, for the term for which Tenant desires to sublet it and for a rent equal to the lower of

(i)    the rent for which Tenant proposes to sublet such space, as set forth in the Offer Notice and the instruments which accompany such notice, or

(ii)    the rent which Tenant by the terms of this Lease is required to pay for the rentable area of the space so to be sublet,

such underlease to be upon the covenants, agreements, terms, provisions and conditions contained in this Lease except as hereinafter provided and except for such thereof which are irrelevant or inapplicable and, without limiting the generality of the foregoing, it is hereby expressly agreed that:

(a)    such underlease to Landlord shall give the undertenant the unqualified and unrestricted right, without Tenant's permission, (x) to assign such underlease or any interest therein and/or to underlet from time to time the space covered by such underlease or any parts of such space for any purpose, or purposes that the undertenant, in the undertenant's uncontrolled discretion, shall deem suitable or appropriate, except that Landlord agrees that any such underlease will not be assigned except simultaneously with an assignment of Landlord's interest under this Lease so that at all times the Landlord under this Lease and the undertenant under said underlease shall be the same person, corporation or other entity, and each assignor of such underlease shall thereafter be released of all obligations under such underlease, and (y) to make any and all changes, alterations and improvements in the space covered by such underlease deemed desirable by the undertenant;

(b)    such underlease shall provide that (x) any assignee or subtenant of the undertenant may, at the election of the undertenant, be permitted to make alterations, decorations and installations in such space or any part thereof, and (y) any such alterations, decorations and installations therein made by any assignee or subtenant of the undertenant may be removed, or left, in whole or in part, by such assignee or subtenant, at its option, prior to or upon the expiration or other termination of such underlease provided that such assignee or subtenant, at its expense, shall repair the damage and injury to such space so underlet caused by such removal;

44

    CLINTON00034021

(c)    such underlease shall also provide that the parties to such underlease expressly negate any intention that any estate created under such underlease be merged with any other estate held by either of said parties;

(d)    Tenant shall and will at all times at its expense provide and permit an appropriate and lawful means of ingress and egress from such space so underlet by Tenant to Landlord, such means of ingress or egress to be specified by Tenant in the Offer Notice with respect to such space;

(e)    Landlord, at Tenant's expense, may make such Alterations as may be required or deemed necessary by Landlord physically to separate the underleased space from the balance of the Premises and to comply with all laws and requirements of public authorities relating to such separation;

(f)    the occupant or occupants of all or any part or parts of such space shall, in common with Tenant, have the use of toilet and other common facilities on the floor on which such space is located;

(g)    at the expiration of such underlease, Tenant shall accept the space covered thereby in its then existing condition provided that (x) Landlord shall have performed Landlord's obligations to keep and maintain such space in good order and condition except for ordinary wear and tear (and further provided that in the event of Landlord's failure to perform any of such obligations Tenant shall have no right to terminate this Lease either in whole or as to such part of the space covered by the underlease) and (y) in no event shall Tenant have any end of term restoration obligations with respect to any alterations, decorations and installations made by or on behalf the undertenant or any assignee or subtenant of undertenant; and

(h)    no default by Landlord under such underlease or by anyone claiming through such underlease shall be deemed to constitute a default under this Lease.

13.4    LANDLORD'S RIGHT TO TERMINATE.  Upon receipt of any Offer Notice in which Tenant proposes to assign this Lease (which shall include, for purposes of this Section 13.4, a proposed subletting of all or substantially all of the Premises for the entire or substantially the entire remaining Lease Term), or in which Tenant proposes to sublet less than substantially all of the Premises for the entire or substantially the entire remaining Lease Term, then and in such event Landlord shall have the right, exercisable by notice to Tenant given within thirty (30) days after Landlord receives Tenant's Offer Notice and in addition to the other rights granted Landlord under this Article 13, (i) in the case of an assignment, to terminate this Lease, in which event this Lease shall terminate on the date fixed in Landlord's notice, which shall not be less than thirty (30) nor more than ninety (90) days after the giving of such notice, with the same force and effect as if the termination date fixed in Landlord's notice were the date originally

45

CLINTON00034022

fixed in this Lease as the Expiration Date, or (ii) in the case of a subletting of less than substantially all of the Premises, to terminate this Lease with respect to the space proposed by Tenant to be sublet, in which event on the date fixed in Landlord's notice, which shall not be less than thirty (30) nor more than ninety (90) days after the giving of such notice, such space shall no longer be part of the Premises or covered by this Lease and the rentable area of the Premises, the Annual Fixed Rent and Tenant's Share of Taxes and Operating Expenses shall be appropriately reduced.  The provisions of this Section shall not be applicable to transactions permitted under Sections 13.1(b) or (c) above.

13.5    ADDITIONAL CONDITIONS.  If Landlord does not exercise any option granted to Landlord by Sections 13.3 and 13.4 with respect to a proposed sublease or assignment which is the subject of an Offer Notice, Landlord agrees that, after Landlord's receipt of an executed copy of the sublease or assignment instrument, Landlord will not unreasonably withhold or delay its consent to such proposed sublease or assignment provided that the terms of the instrument of sublease or assignment conform to the Offer Notice and the following further conditions shall be satisfied:

(a)    the Premises or any part thereof shall not, without Landlord's prior consent, have been listed or otherwise publicly advertised for subletting at a rental rate less than the rental rate being sought by Landlord for space in the Building provided that Landlord shall, within ten (10) days after Tenant so requests, have informed Tenant of the rental rate being sought by Landlord for such space, and all advertisements of the Premises or any portion thereof for subletting shall have been approved by Landlord.  The foregoing, however, shall not be deemed to prohibit Tenant from negotiating or consummating a sublease at a lower rental rate;

(b)    there then exists no Event of Default or default of which Landlord has given Tenant written notice;

(c)    the proposed subtenant or assignee is engaged in a business or activity, and the Premises, or the relevant part thereof, will be used in a manner, which (A) is in keeping with the then standards of the Building, (B) is limited to executive, administrative and general offices and such incidental ancillary uses reasonably approved by Landlord in connection therewith and (C) is not prohibited under Section 10.4;

(d)    provided that there is comparable space available in the Building, the proposed subtenant or assignee shall not then be a tenant, subtenant or occupant of any space in the Building, nor an affiliate of any tenant, subtenant or occupant of any space in the Building;

(e)    the proposed subtenant or assignee shall not then be a person or entity, nor an affiliate of a person or entity, with whom Landlord is then actively negotiating to lease space in the Building;

(f)    the proposed subtenant or assignee is of good reputation with sufficient financial worth considering the responsibility involved, and Landlord has been furnished with reasonable evidence of such financial worth and any sublease shall provide that, upon Landlord's request from time to time, subtenant shall deliver to Landlord a copy of subtenant's most recent financial statements certified by an officer of subtenant;

46

CLINTON00034023

(g)    the character of the business to be conducted or the proposed use of the Premises by the proposed subtenant or assignee shall not (i) be likely to increase Landlord's operating expenses by more than a *de minimis* extent beyond that which Landlord now incurs for use by Tenant; (ii) increase the burden on elevators or other Building systems by more than a *de minimis* extent over the burden prior to such proposed subletting; or (iii) violate any provisions or restrictions contained herein relating to the use or occupancy of the Premises;

(h)    any proposed sublease shall state that it is expressly subject to all of the obligations of Tenant under this Lease and shall contain the further condition and restriction that the sublease shall not be assigned, encumbered or otherwise transferred or the subleased premises further sublet by the sublessee in whole or in part, or any part thereof suffered or permitted by the sublessee to be used or occupied by others, without the prior written consent of Landlord in each instance;

(i)    any proposed sublease shall provide that it is subject and subordinate to this Lease and to the matters to which this Lease is or shall be subordinate, and that in the event of the termination of this Lease, or the re-entry or dispossession of Tenant by Landlord under this Lease, such subtenant shall, at Landlord's option, attorn to Landlord as its sublessor pursuant to the then applicable terms of such sublease for the remaining term thereof, except that such subtenant shall have no right to use any portion of the Premises (or other space in the Building occupied or controlled by Tenant) which is not part of the subleased premises, and Landlord shall not be (i) liable for any previous act or omission of Tenant; (ii) subject to any offset or defense which theretofore accrued to such subtenant (including, without limitation, any rights under 11 U.S.C. §365(h)); (iii) bound by any rent or other sums paid by such subtenant more than one month in advance; (iv) liable for any security deposit not actually received by Landlord; (v) liable for any work or payments on account of improvements to the subleased premises or (vi) bound by any amendment of such sublease not consented to in writing by Landlord;

(j)    no subletting shall be for a term of less than two (2) years (provided, however, that if less than two (2) years remains in the Lease Term, such sublease may be for the balance of the Lease Term);

(k)    in no event shall there be more than two (2) occupants (including Tenant) in the Premises and, if the Premises is demised into separate units, Tenant shall, to the extent specified by Landlord by written notice to Tenant at least six (6) months prior to the Expiration Date (or, in the event of the earlier termination of this Lease, by written notice to Tenant upon such termination), at Tenant's sole cost and expense, to remove such Alterations and restore the affected portion of the Premises to the condition existing prior to the performance of such Alterations;

(l)    Tenant shall reimburse Landlord within thirty (30) days after demand for any reasonable out of pocket costs that may be incurred by Landlord in connection with said sublease or assignment, including, without limitation, the costs of making

47

Confidential – Subject to Protective Order

CLINTON00034024

investigations as to the acceptability of the proposed subtenant or assignee and reasonable legal costs incurred in connection with the granting of any consent;

(m)    no part of the rent payable under the proposed assignment or sublease shall be based in whole or in part on the income or profits derived from the Premises nor shall any proposed assignment or sublease potentially have any adverse effect on the REIT qualification requirements applicable to Landlord and its affiliates;

(n)    any proposed sublease shall comply with the requirements of Section 11.9 hereof; and

(o)    no subletting shall be advertised to be at a rental rate which is less than the then fair market rate for sublet space as reasonably determined by Landlord.

Tenant agrees to furnish Landlord such information in addition to the information set forth in the Offer Notice as Landlord may reasonably request in connection with the proposed sublease or assignment.

13.6    <u>LANDLORD MAY COLLECT RENT FROM SUBTENANT OR ASSIGNEE</u>. If this Lease shall be assigned, or if the Premises or any part thereof be sublet or occupied by any person or persons other than Tenant, Landlord may, after the occurrence and during the continuance of an Event of Default, collect rent from the assignee, subtenant or occupant and apply the net amount collected to the rent herein reserved, but no such assignment, subletting, occupancy or collection of rent shall be deemed a waiver of the covenants in this Article, nor shall it be deemed acceptance by Landlord of the assignee, subtenant or occupant as a tenant, or a release of Tenant from the full performance by Tenant of all the terms, conditions and covenants of this Lease.

13.7    <u>ASSUMPTION OF LEASE</u>.  Each permitted assignee or transferee shall assume and be deemed to have assumed the obligations of Tenant under this Lease to be performed, or arising or accruing, on and after the effective date of such assignment or transfer and shall be and remain liable jointly and severally with Tenant for the payment of Annual Fixed Rent and Additional Rent, and for the due performance of all the terms, covenants, conditions and agreements herein contained on Tenant's part to be performed for the Lease Term.  No assignment shall be binding on Landlord unless such assignee or Tenant shall deliver to Landlord a duplicate original of the instrument of assignment which contains a covenant of assumption by the assignee of all of the obligations aforesaid and shall obtain from Landlord the aforesaid written consent, prior thereto.  No assignment in whole or in part of this Lease shall release Tenant or any assignee of Tenant of its continuing liability under this Lease.

13.8    <u>TENANT'S INDEMNIFICATION</u>.  If Landlord shall fail or refuse to give its consent to any proposed assignment or sublease, or if Landlord shall exercise any of its options set forth in Sections 13.3 and 13.4, Tenant shall indemnify and hold harmless Landlord from and against any and all loss, liability, costs and expenses (including, without limitation, reasonable attorneys' fees) asserted against, imposed upon or incurred by Landlord by reason of any claims made against Landlord by the proposed assignee or sublessee or by any brokers, finders or other

48

Confidential – Subject to Protective Order

CLINTON00034025

persons for commissions or other compensation in connection with the proposed assignment or sublease.

13.9    TIME LIMITATION; AMENDMENTS.  If Landlord grants its consent to an assignment or sublease and such assignment or sublease does not become effective for any reason within ninety (90) days after the granting of such consent, or if the economic terms of such assignment or sublease are modified or any other terms are materially modified or amended prior to its becoming effective, then and in either such event Landlord's consent shall be deemed to have been withdrawn and Tenant shall not have the right to assign this Lease or to sublease all or any portion of the Premises without once again complying with all of the provisions and conditions of Sections 13.1, 13.2, 13.3, 13.4, 13.5 and 13.6.  In no event shall Tenant agree to modify or amend the economic terms of such assignment or sublease or materially modify any other terms of such assignment or sublease to which Landlord has consented without Landlord's prior written consent, which shall be granted or withheld subject to and in accordance with this Article 13.

13.10    ADDITIONAL RENT DUE UPON ASSIGNMENT OR SUBLETTING.  If Landlord shall not exercise any of its options set forth in Sections 13.3 and 13.4 and shall give its consent to any assignment of this Lease or to any sublease, Tenant shall, as consideration therefor, pay to Landlord as Additional Rent the following amounts:

(a)    in the case of any assignment, an amount equal to fifty percent (50%) of all sums and other considerations paid to or for the benefit of Tenant by the assignee for or by reason of such assignment (including, but not limited to, sums paid for the sale of any of Tenant's Property, fixtures or leasehold improvements).  For purposes of the foregoing, sums paid for the sale of any of Tenant's Property shall be reduced by the net unamortized or undepreciated cost thereof determined on the basis of Tenant's federal income tax returns; or

(b)    in the case of a sublease, fifty percent (50%) of the excess, if any, of (i) any rents, additional charges or other consideration payable under the sublease or any agreement relating thereto to or for the benefit of Tenant by the subtenant (including, but not limited to, sums paid for the sale of any of Tenant's Property, fixtures or leasehold improvements) over (ii) the rents accruing during the term of the sublease in respect of and allocable to the subleased space pursuant to the terms of this Lease.  For purposes of the foregoing, sums paid for the sale of any of Tenant's Property shall be reduced by the net unamortized or undepreciated cost thereof determined on the basis of Tenant's federal income tax returns.

Amounts due to Landlord pursuant to this Section 13.10 shall be paid to Landlord as Additional Rent at the time such payments are payable by the assignee or subtenant to Tenant and whether or not such payments are made.  Reasonable attorneys' fees and brokerage or leasing commissions to an independent third-party broker actually incurred by Tenant in connection with the assignment or subletting, which amounts, in the case of a sublease, shall be amortized on a straight line basis over the term of the sublease without interest, may be deducted from the rents, charges and other consideration payable by the assignee or subtenant to Tenant in connection with the assignment or subletting prior to the computation of amounts due to

49

CLINTON00034026

Landlord pursuant to subsection (a) or (b) above. The provisions of this Section shall not be applicable to transactions permitted under Sections 13.1(b) or (c) above.

13.11   LIABILITY NOT DISCHARGED. The joint and several liability of Tenant and any assignee or successor of Tenant under this Lease, or any guarantor of Tenant's obligations under this Lease, shall not be discharged, released or impaired in any respect by any agreement or stipulation made by Landlord modifying any of the obligations contained in this Lease, or by any waiver or failure by Landlord to enforce any of the obligations of this Lease, but in no event shall Tenant's continued liability exceed what its continuing liability would have been had the Lease not been modified except for those modifications, if any, which were consented to by Tenant.

13.12   EFFECT OF LISTING OF NAMES. The listing of any name other than Tenant on the door of the Premises, on any Building directory or otherwise shall not operate to vest any right or interest in this Lease or in the Premises in any other person or entity, nor shall such listing be deemed to be the consent of Landlord to any assignment or transfer of this Lease or to any sublease of the Premises or any portion thereof or to the use or occupancy of the Premises or any portion thereof by others.

ARTICLE 14

NO LIABILITY OR REPRESENTATIONS BY LANDLORD; FORCE MAJEURE

14.1   NO LIABILITY.

(a)   Neither Landlord nor any other Landlord Parties shall be liable for (i) any damage to property of Tenant or of others entrusted to employees of the Building, nor for the loss of or damage to any property of Tenant by theft; (ii) any injury or damage to persons or property resulting from fire, explosion, falling plaster, steam, gas, electricity, water, rain or snow or leaks in or from any part of the Building or the Property or from the pipes, appliances or plumbing or from the roof, street or subsurface or from any other place or by dampness or by any other cause of whatsoever nature, unless caused or due to the negligence of Landlord, its agents, servants or employees or the failure of Landlord to perform its obligations under this Lease within a reasonable time after notice of such failure from Tenant; nor shall Landlord and its agents or employees be liable for any such damage caused by other tenants or persons in the Building or caused by operations in construction of any private, public or quasi-public work; (iii) any latent defect in the Premises, the Building or other improvements on the Property; or (iv) any injury or damages for which Tenant is reimbursed under its insurance policies.

(b)   If at any time any windows of the Premises are temporarily or permanently closed, darkened or bricked up as a result of causes beyond Landlord's control, or are temporarily closed or darkened by Landlord for a commercially reasonable purpose, Landlord shall not be liable for any damage Tenant may sustain thereby and Tenant shall not be entitled to any compensation therefor nor abatement of rent nor shall the same release Tenant from its obligations hereunder nor constitute an eviction. Subject to applicable legal requirements and causes beyond Landlord's control, Landlord shall not permanently close,

50

Confidential – Subject to Protective Order                    CLINTON00034027

darken or brick up any windows of the Premises. Landlord shall use reasonable efforts to minimize the period of any such closing or darkening.

(c)    Landlord shall have no responsibility or liability for the ventilating conditions and/or temperature of the Premises during the hours or days Landlord is not required to furnish heat, ventilation or air-conditioning pursuant to Exhibit D or pursuant to Sections 14.3 or 20.12, Landlord having informed Tenant that the windows of the Premises and the Building may be sealed, and that the Premises may become uninhabitable and the air therein may become unbreathable during such times. Insofar as air temperature and ventilation are concerned, any use or occupancy of the Premises during the hours or days Landlord is not so required to, or pursuant to Section 14.3 or 20.12 does not furnish heat, ventilation or air-conditioning to the Premises shall be at the sole risk, responsibility and hazard of Tenant. Such condition of the Premises shall not constitute nor be deemed to be a breach or a violation of this Lease or of any provision hereof, nor shall it be deemed an eviction, nor shall Tenant claim or be entitled to claim any abatement of rent nor make any claim for any damages or compensation by reason of such condition of the Premises. The foregoing shall not derogate from Landlord's obligation to provide condenser water for the supplemental air-conditioning units pursuant to Exhibit D attached hereto.

(d)    Tenant shall neither assert nor seek to enforce any claim against any of Landlord's assets other than Landlord's interest in the Land and the Building, and Tenant agrees to look solely to such interest for the satisfaction of any liability of Landlord under this Lease, it being specifically agreed that neither Landlord, nor any successor holder of Landlord's interest hereunder, nor any general or limited partner of Landlord or any such successor (if Landlord or such successor is a partnership) nor any shareholder of Landlord or any such successor (if Landlord or such successor is a corporation) shall ever be personally liable for any such claim or liability. Landlord shall in no event be liable for any loss of business or any indirect or consequential damages under this Lease. Tenant shall in no event be liable for any loss of business or any indirect or consequential or punitive damages under this Lease except as expressly provided Section 19.3(b), 19.4 and/or 20.17 hereof.

14.2    NO REPRESENTATIONS BY LANDLORD. Tenant expressly acknowledges and agrees that Landlord has not made and is not making, and Tenant, in executing and delivering this Lease, is not relying upon, any warranties, representations, promises or statements, except for those expressly set forth in this Lease and the Exhibits annexed hereto or in any other written agreement which may be made between the parties hereto concurrently with the execution and delivery of this Lease and which shall expressly refer to this Lease. No rights, easements or licenses are acquired by Tenant by implication or otherwise except as expressly set forth in the provisions of this Lease.

14.3    FORCE MAJEURE. This Lease and the obligation of Tenant to pay rent hereunder and perform and comply with all of the other covenants and agreements hereunder on the part of Tenant to be performed and complied with shall in no way be affected, impaired or excused because of Landlord's delay or failure to perform or comply with any of the covenants or provisions hereunder on the part of Landlord to be performed or complied with, or because Landlord is unable to fulfill any of its obligations under this Lease or is unable to supply or is delayed in supplying any service expressly or impliedly to be supplied or is unable to make or is

51

    CLINTON00034028

delayed in making any repair, additions, alterations or decorations or is unable to supply or is delayed in supplying any equipment or fixtures, if Landlord is prevented or delayed from so doing (i) by reason of strikes or labor troubles, (ii) by reason of governmental preemption in connection with a national emergency, (iii) by reason of any rule, order or regulation of any government agency or any department or subdivision thereof, whether in connection with a drought, energy shortage or other like event or otherwise, (iv) by reason of any fact, condition or circumstance related to war, terrorism or other emergency, (v) by reason of fire, casualty or other acts of God or (vi) by reason of any other cause whatsoever beyond Landlord's reasonable control (collectively, "Force Majeure"). Landlord shall in each instance exercise reasonable diligence to effect performance when and as soon as possible or practicable.

<u>ARTICLE 15</u>

<u>ENTRY, RIGHT TO CHANGE PUBLIC PORTIONS OF THE BUILDING</u>

15.1    <u>LANDLORD'S RIGHT OF ENTRY</u>.  Landlord shall have the right, without being deemed thereby to evict Tenant from the Premises or any part thereof or otherwise to violate any of the terms of this Lease or any of Tenant's rights hereunder,

(a)    to enter and pass through the Premises or any part or parts thereof,

(i)    to examine the Premises and to show them to the fee owners, Overlandlord or Mortgagee (both as hereafter defined) and to prospective purchasers, mortgagees or lessees of the Building as an entirety,

(ii)    for the purpose of performing such maintenance and making such repairs or changes in or to the Premises or in or to the Building or its facilities as may be provided for or permitted by this Lease or as may be mutually agreed upon by the parties or as Landlord may be required to make by laws and requirements of public authorities,

(iii)    at such times as such entry shall be required by circumstances of emergency affecting the Premises or the Building, provided that in such event, if practicable, Landlord or its agents shall be accompanied by a designated representative of Tenant or a member of the police, fire, water or other municipal department concerned or of a recognized protection company or of a public utility which is concerned,

(iv)    to exhibit the Premises or any portion thereof to prospective tenants or occupants (A) during the last eighteen (18) months of the Lease Term, (B) at any time during the Lease Term while there exists an Event of Default of Tenant hereunder or (C) during any period in which Landlord may exercise a right to underlease the space in question or to terminate this Lease, and

(v)    for the purpose of photographing the Premises for use by Landlord and/or Landlord's affiliates in connection with promotional and marketing materials, and

52

Confidential – Subject to Protective Order          CLINTON00034029

(b)      to take all materials into and upon the Premises that may be required for any repairs, changes or maintenance and to store the same therein for a reasonable time as reasonably required in connection with the completion of such repairs, changes or maintenance, provided that such storage does not interfere with Tenant's conduct of business by more than a *de minimis* extent.

Landlord's rights under this Section shall be exercised in such manner as to create the least practicable interference with Tenant's use of the Premises; provided, however, that the foregoing shall not obligate Landlord to perform any work outside of Operating Hours (as defined in Exhibit D). Except in the case of an emergency which makes notice to Tenant impractical, any entry on the Premises by Landlord pursuant to this Section 15.1 shall be made after reasonable notice to Tenant.

15.2     LANDLORD'S RIGHT TO CHANGE ENTRIES, ETC. Landlord shall have the right at any time without thereby creating any actual or constructive eviction or incurring any liability to Tenant therefor, and without abatement in rent, to change the arrangement or location of lobbies, entrances, passageways, doors, doorways, stairways, elevators, corridors and other like portions of the Building outside of the Premises, provided that such change does not interfere with Tenant's access to the Premises.

15.3     EXCAVATION. In the event that an excavation or any construction should be made for building or other purposes upon land adjacent to the Building, or should be authorized to be made, Tenant shall, if necessary, afford to the person or persons causing or authorized to cause such excavation or construction, license to enter upon the Premises for the purpose of doing such work as shall reasonably be necessary to protect or preserve the wall or walls of the Building, or the Building, from injury or damage and to support them by proper foundations, pinning and/or underpinning, or otherwise.

ARTICLE 16

ELECTRICITY

16.1     TENANT TO PURCHASE ELECTRICITY.

(a)      Landlord shall make electricity available to the Premises at the service level set forth in Exhibit D attached hereto, and otherwise subject to and in accordance with the provisions of this Article and Exhibits D and F attached hereto.

(b)      Landlord shall determine Tenant's electrical consumption by meter(s) installed by Landlord at Landlord's expense, and Tenant shall pay to Landlord as Additional Rent, for electricity supplied to the Premises, including electricity supplied to the Building HVAC System serving the Premises, an amount equal to (i) the Average Rate (as hereinafter defined) multiplied by the number of kilowatt-hours of electricity used in such portion of the Premises during the period for which such payment is being made, plus (ii) five percent (5%) of the amount set forth in clause (i) above. Such payments shall be made within twenty (20) days after receipt of a statement setting forth the number of kilowatt-hours used in such portion of the Premises during such period, the Average Rate, and the computation of Tenant's payment. For

53

     CLINTON00034030

purposes hereof, the term "Average Rate" shall mean the average cost to Landlord of supplying one (1) kilowatt-hour of electricity to the Building, and such rate shall be determined by dividing (A) the electric bill for the Building for the period(s) covered by Tenant's payment by (B) the number of kilowatt-hours of electricity supplied to the Building during such period. Landlord shall maintain and repair the meter(s) serving the Premises at Tenant's cost.

(c)     Landlord reserves the right to discontinue furnishing electricity to Tenant in the Premises at any time upon not less than sixty (60) days' notice to Tenant; provided, however, that Landlord shall not discontinue furnishing electricity to the Premises until Tenant shall have made arrangements to obtain electricity from the public utility serving the Building (unless Tenant shall have failed to use reasonable diligence to obtain such electrical service. If Landlord, at Landlord's option, exercises such right of discontinuance as provided herein, this Lease shall continue in full force and effect and shall be unaffected thereby, except that, from and after the effective date of such discontinuance, (i) Tenant shall arrange to obtain electricity directly from the public utility company supplying electricity to the Building, (ii) all meters, equipment and other facilities which may be required for Tenant to obtain electricity directly from such public utility company shall be installed by Landlord, at Landlord's expense, and (iii) any such installation shall be maintained by Tenant, at its expense, and shall be subject to such conditions as Landlord and/or the public utility company may require, and Landlord shall not be liable to Tenant therefor and the same shall not be deemed to be a lessening or diminution of services within the meaning of any law, rule or regulation now or hereafter enacted, promulgated or issued.

(d)     If any taxes or charges are or shall be imposed upon Landlord or its agent in connection with the sale or resale of electricity to Tenant, Tenant covenants and agrees that, where permitted by law, Tenant's pro-rata share of such taxes or charges shall be passed on to Tenant and paid by Tenant to Landlord or its agent within thirty (30) days after Landlord's demand, as Additional Rent, without set-off or deduction. At all times during the Lease Term, Tenant shall comply with all present and future general rules, regulations, terms and conditions applicable to service equipment, wiring and requirements in accordance with the regulations of the public utility company supplying electricity to the Building.

(e)     In the event that there is located in the Premises a data center containing high density computing equipment, as defined in the U.S. EPA's Energy Star® rating system, Landlord may require the installation in accordance with Energy Star of separate metering or sub-metering equipment (Tenant being responsible for the costs of any such meter or sub-meter and the installation and connectivity thereof). Tenant shall either (i) directly pay to the utility all electric consumption on any meter or (ii) pay to Landlord, as Additional Rent, all electric consumption on any check meter plus five percent (5%), in accordance with Section 16.1(b) above, within thirty (30) days after being billed thereof by Landlord; in either case in addition to other electric charges payable by Tenant under the Lease.

16.2     LANDLORD NOT LIABLE.  Landlord shall not in any way be liable or responsible to Tenant for any loss or damage or expense which Tenant may sustain or incur if either the quantity or character of electric service is changed or interrupted or is no longer

54

     CLINTON00034031

available or suitable for Tenant's requirements unless due to the negligence or willful misconduct of Landlord, its agents, employees or contractors.

16.3    TENANT NOT TO OVERLOAD CIRCUITS.  In no event shall Tenant use or install any fixtures, equipment or machines the use of which in conjunction with other fixtures, equipment and machines in the Premises would result in an overload of the electrical circuits servicing the Premises.

16.4    TENANT NOT TO EXCEED CAPACITY; LIGHT BULBS.  Tenant covenants and agrees that at all times its use of electric current shall never exceed the capacity of the then existing feeders to the Building or the risers or wiring installation.  Landlord shall furnish, install and replace, as required, all lighting tubes, lamps, bulbs and ballasts required in the Premises at Tenant's sole cost and expense; provided that Landlord's charges therefor shall be in accordance with Landlord's regular rates in effect from time to time, and not materially in excess of the rates for similar materials and services provided by landlords in other first class office buildings in Manhattan.  All lighting tubes, lamps, bulbs and ballasts so installed shall become Landlord's property upon the expiration or sooner termination of this Lease.

## ARTICLE 17

## SUBORDINATION; ASSIGNMENT OF RENTS

17.1    SUBORDINATION TO MORTGAGES, ETC.

(a)    This Lease is and shall be subject and subordinate to any ground or underlying lease (each, an "Underlying Lease") which may now or hereafter affect the Building and/or the Land and to any amendment, modification, renewal or extension of any such Underlying Lease.  Subject to Sections 17.1(d) and 17.6 below, this Lease also is and shall be subject and subordinate to all mortgages which may now or hereafter affect any Underlying Lease, the Land and/or the Building, to each and every advance made thereunder and to all renewals, modifications, amendments, consolidations, replacements or extensions thereof (each, a "Mortgage").  The landlord or lessor under any Underlying Lease is referred to herein as a "Overlandlord" and the secured party under any such mortgage is referred to herein as a "Mortgagee".  This clause shall be self-operative and no further instrument of subordination shall be required by any Overlandlord or Mortgagee.  Subject to Sections 17.1(d) and 17.6 below, in confirmation of such subordination, Tenant, without cost or charge to Landlord, shall execute promptly any certificate or instrument of subordination that Landlord may reasonably request.

(b)    Subject to Sections 17.1(d) and 17.6 below, Tenant agrees that if any Overlandlord or Mortgagee shall succeed to interest of Landlord under this Lease by foreclosure or otherwise, and the Overlandlord or Mortgagee elects in its sole discretion not to cause this Lease to be terminated in connection therewith, this Lease shall not be terminated or affected thereby but shall continue in full force and effect as a direct lease between Overlandlord or Mortgagee and Tenant upon all of the terms, covenants and conditions set forth in this Lease and, in such event, Tenant shall attorn to Overlandlord or Mortgagee provided, however, that the provisions of such Underlying Lease or such mortgage shall govern with respect to the disposition of any casualty insurance proceeds or condemnation awards and Overlandlord or

55

Mortgagee shall not be (i) bound by any prepayment of rent which Tenant might have paid for more than the current month to any prior landlord (including Landlord), (ii) bound by any amendment or modification of this Lease made without the consent of such Overlandlord or Mortgagee, (iii) liable for any act or omission of any prior landlord (including Landlord) under this Lease, (iv) subject to any offsets or defenses of any prior landlord (including Landlord), (v) liable for performance of any initial work or installations which are required to be made by Landlord under this Lease, or (vi) liable for any security deposit, in whatever form, provided by Tenant, unless such security deposit shall have been received in hand by such Overlandlord or Mortgagee.

(c)     Tenant shall not knowingly do nor suffer nor permit any action which would constitute a default under any Underlying Lease or any mortgage of which Tenant shall have notice which may now or hereafter affect any Underlying Lease, the Land and/or the Building, or cause any Underlying Lease of which Tenant shall have notice to be terminated or forfeited by virtue of any right of termination or forfeiture granted to the Overlandlord by such Underlying Lease.

(d)     Landlord represents that there are currently no Underlying Leases or Mortgages affecting the Building and/or the Land, except for that certain Amended and Restated Mortgage, Assignment of Leases and Rents and Security Agreement dated as of September 24, 2010 between Landlord and Bank of America, N.A. (the "Existing Mortgage"), and recorded on September 24, 2010 in the Office of the Register of The City of New York, New York County, as Document ID 2010092400223006 and City Register File No. 2010000323621, which Landlord represents is, by its terms, subordinate to this Lease.

17.2     RIGHTS OF MORTGAGEES, ETC.  In the event of any act or omission by Landlord which would or may give Tenant the right to terminate this Lease or to claim a partial or total eviction, Tenant will not exercise any such right until

(a)     it has given written notice of any such act or omission to Landlord, and to any Overlandlord or Mortgagee whose names and addresses have previously been furnished to Tenant, and

(b)     a reasonable period of time for remedying such act or omission shall have elapsed following such giving of notice during which the parties to whom such notice has been given, or any of them, have not commenced with reasonable diligence the remedying of such act or omission.

17.3     MODIFICATIONS REQUIRED BY LENDERS.  If, in connection with obtaining temporary or permanent financing for the Land and/or Building, or any Underlying Lease, any lender shall request reasonable modifications of this Lease as a condition to such financing, Tenant will not unreasonably withhold, delay or defer the execution of an agreement of modification of this Lease provided such modifications do not increase the monetary obligations of Tenant hereunder or increase Tenant's non-monetary obligations hereunder except to a *de minimis* extent, or adversely affect the leasehold interest hereby created, or Tenant's rights hereunder.

Confidential – Subject to Protective Order                                    CLINTON00034033

17.4    ASSIGNMENT OF LEASE TO MORTGAGEE, ETC.  With reference to any assignment by Landlord of Landlord's interest in this Lease, or the rents payable hereunder, conditional in nature or otherwise, which assignment is made to an Overlandlord or Mortgagee, Tenant agrees:

(a)    that the execution thereof by Landlord, and the acceptance thereof by such Overlandlord or Mortgagee, shall never be treated as an assumption by such Overlandlord or Mortgagee of any of the obligations of Landlord hereunder, unless such Overlandlord or Mortgagee shall, by notice sent to Tenant, specifically otherwise elect; and

(b)    that, except as aforesaid, such Overlandlord, or Mortgagee shall be treated as having assumed Landlord's obligations hereunder only, in the case of a Mortgagee, upon foreclosure by such Mortgagee and the taking of possession of the Premises, or, in the case of an Underlying Lease, the assumption of Landlord's position hereunder by such Overlandlord, any such assumption in each such case to be limited as set forth in Section 14.1(d).  In no event shall the acquisition of title to the Building and/or the Land by a purchaser which, simultaneously therewith, leases the entire Building and/or the Land back to the seller thereof be treated as an assumption, by operation of law or otherwise, of Landlord's obligations hereunder, but Tenant shall look solely to such seller-lessee, and its successors from time to time in title, for performance of Landlord's obligations hereunder.  For all purposes, such seller-lessee, and its successors in title, shall be the landlord hereunder unless and until Landlord's position shall have been assumed by such purchaser-lessor.

17.5    SUBORDINATION OF MORTGAGE, ETC., TO LEASE.  Notwithstanding anything to the contrary set forth in this Article 17, if any Overlandlord or Mortgagee shall file in the office of the Register of the City of New York, New York County, an instrument in which such Overlandlord or Mortgagee shall subordinate its Underlying Lease or mortgage to this Lease, then and in such event such Underlying Lease or mortgage shall be subordinate to this Lease and the provisions of this Article 17, insofar as they would subordinate this Lease to that particular Underlying Lease or mortgage, shall be of no further force or effect.

17.6    NON-DISTURBANCE AGREEMENT.  Landlord shall, at Tenant's expense, obtain a nondisturbance agreement in favor of Tenant with respect to any (x) Underlying Lease which may hereafter affect the Building and/or the Land and (y) Mortgage which may hereafter affect the Building and/or the Land (other than the Existing Mortgage as long as the same remains subject and subordinate to this Lease), in a commercially reasonable form.  Failure by Landlord to obtain any such nondisturbance agreement shall in no way affect the validity of this Lease, but Tenant's obligation to subordinate its leasehold interest in the Premises is conditioned upon Landlord obtaining such nondisturbance agreement.

ARTICLE 18

CERTAIN ADDITIONAL TENANT COVENANTS

In addition to the covenants contained elsewhere in this Lease, Tenant covenants, during the Lease Term and for such further time as Tenant occupies any part of the Premises:

57

CLINTON00034034

(a)      to pay when due all Annual Fixed Rent and Additional Rent and all charges for utility services rendered to the Premises and service inspections therefor and, as further Additional Rent, all charges for additional and special services rendered pursuant to Exhibit D;

(b)      to keep the Premises equipped with all safety appliances (including without limitation fire extinguishers) required by law or ordinance or any other regulation of any public authority, to procure all licenses and permits so required because of any use made of the Premises or any portion thereof by Tenant, and, if requested by Landlord, to do any work so required because of such use, it being understood that the foregoing provisions shall not be construed to broaden in any way the uses to which Tenant is permitted to make of the Premises under the terms of this Lease;

(c)      not to place a load upon any floor in the Premises exceeding the floor load per square foot of area which such floor was designed to carry and which is allowed by law; and not to move any safe, vault or other heavy equipment in, about or out of the Premises except in such manner and at such time as Landlord shall in each instance expressly authorize. Tenant's business machines and mechanical equipment shall be placed and maintained by Tenant at Tenant's expense in settings sufficient to absorb and prevent vibration or noise that may be transmitted to the Building structure or to any other space in the Building;

(d)      to pay promptly when due all taxes which may be imposed upon personal property (including, without limitation, fixtures and equipment) in the Premises by whomever assessed;

(e)      to pay within thirty (30) days after Landlord's demand as Additional Rent, regardless of whether any Event of Default has occurred or whether any proceeding to enforce the Lease has been commenced, all costs and expenses, reasonable attorneys' fees and disbursements and other fees reasonably incurred by Landlord (collectively, "Legal Fees") in connection with (i) the enforcement by Landlord of any obligation of Tenant under this Lease; (ii) the preservation and enforcement of Landlord's rights and remedies in connection with the Lease; (iii) any unsuccessful attempt by Tenant to enforce any obligation or purported obligation of Landlord under this Lease; (iv) any unsuccessful action or proceeding brought by Tenant against Landlord related to this Lease; and (v) any voluntary or involuntary bankruptcy case, proceeding or action by or on behalf of Tenant, including, without limiting the generality of the foregoing, any and all expenses and reasonable attorneys' fees incurred by Landlord related to (A) the assumption or rejection of this Lease, including attempts by Tenant to extend any deadlines related to such assumptions or rejections; (B) the filing of proof(s) of claim by Landlord, and any defense of such proof(s) of claim; (C) the assignment of this Lease; and (D) the reorganization or liquidation of Tenant. This provision shall survive the termination of this Lease. Notwithstanding the foregoing, no Legal Fees shall be payable under (i) and (ii) above if Tenant is the prevailing party in any litigation brought pursuant to (i) or (ii) above;

(f)      to observe and comply with, and to cause its servants, employees, agents, visitors, licensees and sublessees to comply with, the Rules and Regulations set forth in Exhibit E hereto (as such rules and regulations may, from time to time, be amended in accordance with Section 20.13 hereof);

58

Confidential – Subject to Protective Order                                          CLINTON00034035

(g)    to cause all of the windows in the Premises to be kept closed; to keep entirely unobstructed at all times all of the vents, intakes, outlets and grills; and to comply with and observe all reasonable regulations and requirements prescribed by Landlord for the proper functioning of the heating, ventilating and air-conditioning system; and

(h)    not to, either directly or indirectly (i) conduct business in the Premises in such a manner that would or may create or (ii) use any contractors and/or labor and/or materials if the use thereof, would or may create, any difficulty with other contractors and/or labor and/or materials engaged or used by Tenant or Landlord or others in the construction, maintenance and/or operation of the Building or any part thereof. Without limiting any other provision of this Lease, all contractors, vendors and service providers requiring access to the Premises or the Building shall be subject to Landlord's prior and continuing review and approval with respect to insurance, security and operational matters. This provision shall apply prior to, as well as during, the Lease Term.

## ARTICLE 19

### TENANT'S DEFAULT; LANDLORD'S REMEDIES

19.1    TENANT'S DEFAULT.  This Lease and the Lease Term are subject to the limitation that Tenant shall be in default if, at any time during the Lease Term, any one or more of the following events (herein called an "Event of Default") shall occur:

(a)    if Tenant shall fail to pay any installment of the Annual Fixed Rent, or any Additional Rent, or any other charges for which provision is herein made, or any part thereof, when the same shall become due and payable and such failure shall continue for ten (10) days after notice thereof from Landlord to Tenant (provided that if Tenant shall have failed to pay any such installment or other charge or portion thereof when the same becomes due and payable two times during any Lease Year and Landlord shall in each case have given Tenant notice of such failure, then after such second time it shall be an Event of Default in the event Tenant thereafter during such Lease Year fails to pay any such installment or other charge or portion thereof on the date the same becomes due and payable, without notice (or, in the case of other charges which are payable on or subsequent to demand, further notice) from Landlord); or

(b)    if the Premises shall become abandoned; provided that Tenant vacating the Premises shall not be construed as an abandonment as long as Tenant is using commercially reasonable efforts (i) to assign this Lease or sublet the Premises and (ii) to secure and to maintain the Premises as usable office space in accordance the standards of first class office buildings in Manhattan; or

(c)    if an assignment or subletting shall occur or if Tenant's interest in this Lease shall devolve upon or pass to any person or entity, whether by operation of law or otherwise, and whether directly or indirectly, except as expressly permitted by Article 13 hereof, or

(d)    if Tenant fails to maintain any of the insurance required to be maintained by Tenant hereunder or to deliver certificates thereof when required hereunder and

59

CLINTON00034036

Tenant fails to remedy such default within five (5) days after notice by Landlord to Tenant specifying such default; or

(e)     Tenant shall fail to perform or observe some term or condition of this Lease which, because of its character, would immediately jeopardize Landlord's interest in the Property, the health or safety of any person, the operation of the Building or any Building system, or the business operations of any occupant (including, without limitation, Tenant's failure to perform any Alterations during non-Operating Hours when required to do so by the terms of this Lease), and such failure continues for two (2) days after notice from Landlord to Tenant specifying such default; or

(f)     if Tenant shall fail to perform or observe any other term, covenant, or condition of this Lease on the part of Tenant to be performed or observed and such failure shall continue for thirty (30) days after notice thereof from Landlord to Tenant, or, if said default is curable but shall reasonably require longer than thirty (30) days to cure, if Tenant shall fail to commence to cure said default within thirty (30) days after receipt of notice thereof and/or fail continuously to prosecute the curing of the same to completion with due diligence, and in any event within such period of time as will prevent Landlord from being subjected to the risk of criminal liability or termination of any Underlying Lease or foreclosure of any mortgage; or

(g)     if the estate hereby created shall be taken on execution or by other process of law; or

(h)     (i)     if Tenant shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; or

(ii)     if Tenant shall commence or institute any case, proceeding or other action (x) seeking relief on its behalf as debtor, or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, or (y) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property; or

(iii)     if Tenant shall make a general assignment for the benefit of creditors; or

(iv)     if any case, proceeding or other action shall be commenced or instituted against Tenant (x) seeking to have an order for relief entered against it as debtor or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, or (y) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property, which either (1) results in any such entry of an order for relief, adjudication of bankruptcy or

60

CLINTON00034037

insolvency or such an appointment or the issuance or entry of any other order having a similar effect or (2) remains undismissed for a period of sixty (60) days; or

(v)    if any case, proceeding or other action shall be commenced or instituted against Tenant seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its property which results in the entry of an order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof; or

(vi)    if Tenant shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clauses (ii), (iii), (iv) or (v) above; or

(vii)    if a trustee, receiver or other custodian is appointed for any substantial part of the assets of Tenant which appointment is not vacated or effectively stayed within seven (7) Operating Days; or

(i)    if Tenant fails to timely deliver a Replacement Letter in accordance with the terms of Section 20.22(a) hereof or to restore the Letter to the face amount then required under Section 20.22(b) hereof after Landlord has drawn upon the Letter, or if the issuer of the Letter fails or refuses to honor the Letter; or

(j)    if any representation or warranty made by Tenant herein or in any report, certificate, financial statement or other instrument, agreement or document furnished to Landlord shall have been false or misleading in any material respect as of the date the representation or warranty was made.

19.2    <u>TERMINATION</u>.

(a)    (i)    If an Event of Default described in Section 19.1(h) hereof shall occur, or

(ii)    if an Event of Default described in Sections 19.1(a),(b),(c),(d), (e), (f), (g), (i) or (j) shall occur and Landlord, at any time thereafter, at its option gives written notice to Tenant stating that this Lease and the Lease Term shall expire and terminate on the date specified in such notice, which date shall not be less than five (5) days after the giving of such notice, then this Lease and the Lease Term and all rights of Tenant under this Lease shall expire and terminate, as if the date on which the Event of Default described in clause (i) above occurred, or the date specified in the notice given pursuant to clause (ii) above, as the case may be, were the date herein definitely fixed for the expiration of the Lease Term (except that Tenant shall continue liable as hereinafter provided) and Tenant immediately shall quit and surrender the Premises.

(b)    Anything contained herein to the contrary notwithstanding, if such termination shall be stayed by order of any court having jurisdiction over any proceeding described in Section 19.1(h) hereof, or by federal or state statute, then, following the expiration of any such stay, or if Tenant, or Tenant as debtor-in-possession or the trustee appointed in any

61

    CLINTON00034038

such proceeding (being collectively referred to as "Tenant" only for the purposes of paragraphs (b) and (c) of this Section 19.2) shall fail to assume Tenant's obligations under this Lease within the period prescribed therefor by law or within one hundred twenty (120) days after entry of the order for relief or as may be allowed by the court, or, if Tenant shall fail to provide adequate protection of Landlord's right, title and interest in and to the Premises or adequate assurance of the complete and continuous future performance of Tenant's obligations under this Lease, Landlord, to the extent permitted by law or by leave of the court having jurisdiction over such proceeding, shall have the right, at its election, to terminate this Lease on five (5) days notice to Tenant and upon the expiration of said three (3) day period this Lease shall cease and expire as aforesaid and Tenant shall immediately quit and surrender the Premises as aforesaid.  Upon the termination of this Lease provided above, Landlord, without notice, may re-enter and repossess the Premises using such force for that purpose as may be necessary without being liable to indictment, prosecution or damages therefor and may dispossess Tenant by summary proceedings or otherwise.

(c)     For the purposes of the preceding paragraph (b), adequate protection of Landlord's right, title and interest in and to the Premises, and adequate assurance of the complete and continuous future performance of Tenant's obligations under this Lease, shall include, without limitation, the following requirements:

(i)     that Tenant comply with all of its obligations under this Lease;

(ii)     that Tenant pay to Landlord, on the first day of each month occurring subsequent to the entry of such order, or the effective date of such stay, a sum equal to the amount by which the Premises diminished in value during the immediately preceding monthly period, but, in no event, an amount which is less than the aggregate rent payable for such monthly period;

(iii)     that Tenant continue to use the Premises in the manner required by this Lease;

(iv)     that Landlord be permitted to supervise the performance of Tenant's obligations under this Lease;

(v)     that Tenant pay to Landlord within thirty (30) days after entry of such order or the effective date of such stay, as partial adequate protection against future diminution in value of the Premises and adequate assurance of the complete and continuous future performance of Tenant's obligations under this Lease, an additional security deposit in an amount equal to the Annual Fixed Rent then payable hereunder plus an amount equal to all Additional Rent payable to Landlord for the preceding calendar year;

(vi)     that Tenant has and will continue to have unencumbered assets after the payment of all secured obligations and administrative expenses to assure Landlord that sufficient funds will be available to fulfill the obligations of Tenant under this Lease;

Confidential – Subject to Protective Order     CLINTON00034039

(vii)    that if Tenant assumes this Lease and proposes to assign the same (pursuant to Title 11 U.S.C. § 365, or as the same may be amended) to any person who shall have made a bona fide offer to accept an assignment of this Lease on terms acceptable to such court having competent jurisdiction over Tenant's estate, then notice of such proposed assignment, setting forth (x) the name and address of such person, (y) all of the terms and conditions of such offer and (z) the adequate assurance to be provided Landlord to assure such person's future performance under this Lease, including, without limitation, the assurances referred to in Title 11 U.S.C. § 365(b)(3), as it may be amended, shall be given to Landlord by Tenant no later than thirty (30) days after receipt by Tenant of such offer, but in any event no later than ten (10) days prior to the date that Tenant shall make application to such court for authority and approval to enter into each assignment and assumption, and Landlord shall thereupon have the prior right and option, to be exercised by notice to Tenant given at any time prior to the effective date of such proposed assignment, to accept, or to cause Landlord's designee to accept, an assignment of this Lease upon the same terms and conditions and for the same consideration, if any, as the bona fide offer made by such person less any brokerage commissions which may be payable out of the consideration to be paid by such person for the assignment of this Lease; and

(viii)    that if Tenant assumes this Lease and proposes to assign the same, and Landlord does not exercise its option pursuant to paragraph (vii) of this Section 19.2(c), Tenant hereby agrees that:

(A)  such assignee shall have a net worth not less than the net worth of Tenant as of the Commencement Date, or such Tenant's obligations under this Lease shall be unconditionally guaranteed by a person having a net worth equal to Tenant's net worth as of the Commencement Date;

(B)  such assignee shall not use the Premises except for general office purposes and subject to all the restrictions contained in Article 10 hereof;

(C)  such assignee shall assume in writing all of the terms, covenants and conditions of this Lease; and

(D)  in the event that the Annual Fixed Rent paid by such assignee is greater than the Annual Fixed Rent reserved hereunder, Tenant shall pay over to Landlord one-half of such difference; and

(E)  if such assignee makes a lump-sum payment to Tenant or Tenant's trustee for the right to assume this Lease, Tenant or Tenant's trustee shall pay over to Landlord one-half of such payment,

(d)    If, at any time, (i) Tenant shall comprise two (2) or more persons, or (ii) Tenant's obligations under this Lease shall have been guaranteed by any person other than Tenant, or (iii) Tenant's interest in this Lease shall have been assigned, the word "Tenant", as used in clause (h) of Section 19.1, shall be deemed to mean any one or more of the persons

63

CLINTON00034040

primarily or secondarily liable for Tenant's obligations under the Lease. Any monies received by Landlord from or on behalf of Tenant during the pendency of any proceeding of the types referred to in said clause (h) shall be deemed paid as compensation for the use and occupation of the Premises and the acceptance of any such compensation by Landlord shall not be deemed an acceptance of rent or a waiver on the part of Landlord of any rights under this Section.

(e)    The provisions of subdivisions (b) through (d) of this Section 19.2 apply only in respect of the circumstances described in subsection 19.1(h) and as such are not intended to constitute modifications of any of the provisions of Article 13 except in such circumstances.

19.3    RE-ENTRY; CONTINUED LIABILITY; RELETTING.

(a)    If Tenant shall default in the payment of any installment of Annual Fixed Rent or any Additional Rent on any date on which the same becomes due and payable, and if such default shall continue for five (5) days after Landlord shall have given Tenant notice of such default, or if this Lease shall be terminated pursuant to or as provided in Section 19.2, Landlord and Landlord's agents and employees may immediately or at any time thereafter re-enter the Premises, or any part thereof in the name of the whole, either by summary dispossess proceedings or by any suitable action or proceeding at law or otherwise, without being liable to indictment, prosecution or damages therefor, and may repossess the same, and may remove any persons therefrom, to the end that Landlord may have, hold, possess and enjoy the Premises again.

(b)    If this Lease is terminated or if Landlord shall re-enter the Premises as aforesaid, or in the event of the termination of this Lease, or of re-entry, by or under any proceeding or action or any provision of law by reason of an Event of Default hereunder on the part of Tenant, Tenant covenants and agrees forthwith that,

(i)    the Annual Fixed Rent (including, without limitation, an amount equal to the amount of Annual Fixed Rent which would have been payable during the rent concession period set forth in Section 5.5) and Additional Rent shall become due thereupon and be paid by Tenant up to the time of such re-entry, dispossession and/or termination, together with such expenses as Landlord may reasonably incur for legal expenses, reasonable attorneys' fees and disbursements, brokerage, and/or putting the Premises in good order, or for preparing the same for reletting;

(ii)    Landlord may relet the Premises or any part or parts thereof, either in the name of Landlord or otherwise (but shall have no obligation to do so), for a term or terms, which may at Landlord's option be less than or exceed the period which would otherwise have constituted the balance of the Term of this Lease and may grant concessions or free rent;

(iii)    Tenant or the legal representatives of Tenant shall also pay Landlord, as liquidated damages for the failure of Tenant to observe and perform Tenant's covenants herein contained, amounts equal to the Annual Fixed Rent and Additional Rent which would have been payable by Tenant had this Lease not been so terminated, or had Landlord not

64

CLINTON00034041

so reentered the Premises, such payments to be made upon the due dates therefor specified herein following such termination or re-entry and continuing until the Expiration Date; provided, however, that if Landlord shall relet the Premises, Landlord shall credit Tenant, up to the amount due from Tenant, with the net rent received by Landlord for such reletting after deducting from the first installments of such rent received the expenses reasonably incurred or paid by Landlord in terminating this Lease or in re-entering the Premises and in securing possession thereof, as well as the expenses of reletting, including legal expenses, reasonable attorneys' fees and disbursements, brokerage commissions, alteration costs and other expenses incurred for keeping the Premises in good order or for preparing the same for reletting. Any suit brought to collect the amount of the aforesaid damages for any month or months shall not prejudice in any way the rights of Landlord to collect the damages for any subsequent month or months by a similar proceeding. Nothing contained herein shall be deemed to require Landlord to postpone suit until the date when the Lease Term would have expired if it had not been so terminated under or pursuant to Section 19.2, or under any provision of law, or had Landlord not re-entered the Premises.

(c)    The terms "re-enter" and "re-entry," as used herein, are not limited to their technical legal meanings.

19.4    LIQUIDATED DAMAGES.  Landlord may elect, as an alternative to the damages and charges provided for in Section 19.3(b)(iii), and in lieu of all other such damages thereafter accruing, to have Tenant pay the liquidated damages provided for below, which election may be made by notice given to Tenant at any time after the termination of this Lease under or pursuant to Section 19.2, above, and whether or not Landlord shall have collected any damages as hereinabove provided in Section 19.3. Upon such notice, Tenant shall promptly pay to Landlord, as liquidated damages, in addition to any damages collected or due from Tenant from any period prior to such notice, such a sum as at the time of such notice represents the amount of the excess, if any, of (i) the discounted present value, at a discount rate of six percent (6%), of the Annual Fixed Rent, Additional Rent and other charges which would have been payable by Tenant under this Lease for the remainder of the Lease Term if Tenant had fulfilled all of its obligations hereunder, over and above (ii) the discounted present value, at a discount rate of six percent (6%), of the Annual Fixed Rent, Additional Rent and other charges that would be received by Landlord (after deducting all reasonably estimated costs of reletting, including, without limitation, brokerage fees, advertising, required tenant improvements and concessions and attorneys' fees) if the Premises were relet at the time of such notice for the remainder of the Lease Term at the fair rental value thereof at the time of such notice.

For the purposes of this Article, if Landlord elects to require Tenant to pay liquidated damages in accordance with this Section 19.4, (a) the total rent shall be computed by assuming Tenant's Share of Taxes and Operating Expenses under Article 6 to be the same as were payable for the twelve (12) calendar months (or if fewer than twelve calendar months shall have elapsed since the date hereof, for the partial year, but annualized) immediately preceding such termination or re-entry, and (b) if the Premises or any part thereof shall have been relet by Landlord for the unexpired portion of the Lease Term, or any part thereof, before presentation of proof of such damages to any court, commission or tribunal, the amount of rent received upon such reletting shall be prima facie evidence of the fair rental value of the Premises, or part thereof, so relet during the term of such reletting.

65

CLINTON00034042

19.5   RIGHTS IN THE EVENT OF TENANT'S BANKRUPTCY.  Nothing contained in this Lease shall limit or prejudice the right of Landlord to prove for and obtain, in proceedings for the termination of this Lease by reason of bankruptcy or insolvency, an amount equal to the maximum allowed by any statute or rule of law in effect at the time when, and governing the proceedings in which, the damages are to be proved, whether or not the amount be greater, equal to, or less than the amount of the loss or damages referred to above.

19.6   WAIVER OF REDEMPTION, ETC.

(a)    Tenant, for itself and any and all persons claiming through or under Tenant, including its creditors, upon the termination of this Lease or expiration of the Lease Term in accordance with the terms hereof, or in the event of entry of judgment for the recovery of the possession of the Premises in any action or proceeding, or if Landlord shall reenter the Premises by process of law or otherwise, hereby waives any right of redemption provided or permitted by any statute, law or decision now or hereafter in force, and does hereby waive, surrender and give up all rights or privileges which it or they may or might have under and by reason of any present or future law or decision, to redeem the Premises or for a continuation of this Lease for the Term of this Lease after having been dispossessed or ejected therefrom by process of law, or otherwise.

(b)    If Tenant is in arrears in the payment of Annual Fixed Rent or Additional Rent, Tenant waives its right, if any, to designate the item against which any payments made by Tenant are to be credited and Tenant agrees that Landlord may apply any payment made by Tenant to any items as Landlord may see fit, irrespective of and notwithstanding any designation or request by Tenant as to the items against which any such payment shall be credited.

(c)    Landlord, Tenant and all of Tenant's successors, subtenants, and assignees (Tenant and all of Tenant's successors, subtenants, and assignees are collectively for the purposes of this Section 19.6(c) referred to as "Tenant"), each hereby waive trial by jury in any action, proceeding or counterclaim brought by either against the other on any matter whatsoever arising out of or in any way connected with the Lease, the relationship of Landlord and Tenant and Tenant's use or occupancy of the Premises or any other claim (other than claim for personal injuries or property damage).  It is further mutually agreed that if Landlord commences any summary proceedings for non-payment of rent, Tenant will not interpose and does hereby waive the right to interpose any counterclaim of whatever nature or description in such proceeding.

19.7   ADDITIONAL RIGHTS OF LANDLORD AND TENANT.

(a)    In the event of a breach or threatened breach by Landlord or Tenant of any of its obligations under this Lease, the other party shall also have the right to obtain an injunction.  The remedies to which Landlord may resort under this Lease are cumulative and are not intended to be exclusive of any other remedies to which Landlord may be lawfully entitled at any time and Landlord may invoke any remedies allowed at law or in equity as if specific remedies were not provided for herein.

Confidential – Subject to Protective Order

CLINTON00034043

(b)     If this Lease shall terminate under or pursuant to Section 19.2, or if Landlord shall re-enter the Premises under the provisions of this Article, or in the event of the termination of this Lease, or of re-entry by or under any summary dispossess or other proceeding or action or any provision of law by reason of Tenant's default hereunder, Landlord shall be entitled to retain all moneys, if any, paid by Tenant to Landlord, whether as advance rent, security or otherwise, but such moneys shall be credited by Landlord against any Annual Fixed Rent or Additional Rent due from Tenant at the time of such termination or re-entry or, at Landlord's option, against any damages payable by Tenant under this Article or pursuant to law. To the extent that any security held by Landlord exceeds the aggregate of moneys due from Tenant and all damages payable by Tenant, Landlord shall refund such excess to Tenant.

19.8     LANDLORD'S DEFAULT.  Landlord shall in no event be in default in the performance of any of Landlord's obligations hereunder unless and until (i) Landlord shall have failed to perform such obligations within thirty (30) days (or, if an obligation is such that it cannot be performed within thirty (30) days, Landlord shall have failed to commence with reasonable diligence performance of the same within such thirty (30) day period) after notice by Tenant to Landlord properly specifying wherein Landlord has failed to perform any such obligation or thereafter fails to proceed to cure with reasonable diligence, and (ii) Tenant has given notice to all parties as required under Section 17.2 hereof and such parties have not commenced the performance of such obligations within the time provided in Section 17.2 or thereafter fail to proceed to cure with reasonable diligence.

ARTICLE 20

MISCELLANEOUS

20.1     WAIVER.  Failure on the part of Landlord or Tenant to complain of any action or non-action on the part of the other, no matter how long the same may continue, shall never be a waiver by Tenant or Landlord, respectively, of any of the other's rights hereunder.

Further, no waiver at any time of any of the provisions hereof by Landlord or Tenant shall be construed as a waiver of any of the other provisions hereof, and a waiver at any time of any of the provisions hereof shall not be construed as a waiver at any subsequent time of the same provisions.  The consent or approval of Landlord or Tenant to or of any action by the other requiring such consent or approval shall not be construed to waive or render unnecessary Landlord's or Tenant's consent or approval to or of any subsequent similar act by the other.

No payment by Tenant, or acceptance by Landlord, of a lesser amount than shall be due from Tenant to Landlord shall be treated otherwise than as a payment on account.  The acceptance by Landlord of a check for a lesser amount with an endorsement or statement thereon, or upon any letter accompanying such check, that such lesser amount is payment in full, shall be given no effect, and Landlord may accept such check without prejudice to any other rights or remedies which Landlord may have against Tenant.  Further, neither the payment by Tenant, nor the acceptance by Landlord of Annual Fixed Rent, Additional Rent or any other charges under this Lease shall be or be deemed to be a waiver by Landlord or Tenant of any default by the other, whether or not the other knows of such default, except for such defaults as

67

CLINTON00034044

to which such payment relates and then only to the extent of the amount of such payment. If Landlord and Tenant shall now or hereafter enter into any agreement for the renewal of this Lease at the expiration of the Lease Term, the execution of such renewal agreement between Landlord and Tenant prior to the expiration of the Lease Term shall not be considered a vested right in Tenant to such further term so as to prevent Landlord from terminating this Lease and any such extension or renewal thereof if Landlord became entitled so to do during the remainder of the original Lease Term; and if Landlord shall so terminate this Lease, any such renewal or extension previously entered into between Landlord and Tenant or the right of Tenant to any such renewal or extension shall also be terminated thereby. Any right herein contained on the part of Landlord to terminate this Lease shall continue during any extension or renewal hereof and any default or Event of Default which occurs and is not cured prior to the commencement of a renewal term or extension of the Lease Term shall continue as such in and during such renewal term or extension of the Lease Term.

20.2    CONSENTS.  Wherever in this Lease Landlord's consent or approval is required and Landlord has expressly agreed in writing that such consent or approval shall not be unreasonably withheld, if Landlord shall refuse such consent or approval, then, except as otherwise expressly set forth below, Tenant in no event shall be entitled to and shall not make any claim, and Tenant hereby waives any claim, for money damages (nor shall Tenant claim any money damages by way of set-off, counterclaim or defense) based upon any assertion by Tenant that Landlord unreasonably withheld or unreasonably delayed its consent or approval. Tenant's sole remedy in such circumstance shall be an action or proceeding to enforce any such provision by way of specific performance, injunction or declaratory judgment, except in the event it is determined by a final, unappealable order of a court of competent jurisdiction that Landlord failed to act in good faith, in which event Landlord shall be liable for the actual monetary damages reasonably suffered by Tenant. Where Landlord has not so expressly agreed in writing, it is the express intent of the parties that any such consent shall be given or required only in the sole, absolute and unfettered discretion of Landlord, and may be withheld for any reason whatsoever. Any reference in this Lease to a consent or approval not being unreasonably withheld shall be deemed to include a requirement that such consent or approval not be unreasonably delayed or conditioned.

20.3    QUIET ENJOYMENT.  Landlord agrees that, upon Tenant's paying the Annual Fixed Rent, Additional Rent and other charges herein reserved, and performing and observing the covenants, conditions and agreements hereof upon the part of Tenant to be performed and observed, Tenant shall and may peaceably hold and enjoy the Premises during the term of this Lease, without interruption or disturbance from Landlord or persons claiming through or under Landlord, subject, however, to the terms of this Lease and to the terms and conditions of all Underlying Leases and all mortgages which now or hereafter affect the Premises. This covenant shall be construed as running with the Land to and against subsequent owners and successors in interest, and is not, nor shall it operate or be construed as, a personal covenant of Landlord, except to the extent of Landlord's interest in the Land and Building, and this covenant and any and all other covenants of Landlord contained in this Lease shall be binding upon Landlord and upon such subsequent owners and successors in interest of Landlord's interest under this Lease, to the extent of their respective interests in the Land and Building, as and when they shall acquire same and then only for so long as they shall retain such interest.

Confidential – Subject to Protective Order                    CLINTON00034045

20.4    SURRENDER.

(a)    No act or thing done by Landlord during the Lease Term shall be deemed an acceptance of a surrender of the Premises, and no agreement to accept such surrender shall be valid, unless in writing signed by Landlord.  No employee of Landlord or of Landlord's agents shall have any power to accept the keys of the Premises prior to the termination of this Lease; provided, however, that the foregoing shall not apply to the delivery of keys to Landlord or its agents in its (or their) capacity as managing agent or for purpose of emergency access.  In any event, however, the delivery of keys to any employee of Landlord or of Landlord's agents shall not operate as a termination of this Lease or a surrender of the Premises.

(b)    Upon the expiration or earlier termination of the Lease Term, or upon any re-entry by Landlord of the Premises, Tenant shall quit and surrender the Premises to Landlord vacant, broom clean and in good order, condition and repair, except for ordinary wear and tear, damage by fire or other casualty, if any, and other conditions requiring repair, if any, which are not the obligation of Tenant to repair under the terms of this Lease, and Tenant shall remove all of Tenant's Property therefrom and shall restore the Premises to the extent required under any of the other provisions of this Lease.  Tenant shall repair any damage to the Premises occasioned by the removal by Tenant or any person claiming under Tenant of any of Tenant's Property and any Specialty Alterations required to be removed pursuant to this Lease.  At Landlord's option, Tenant shall also remove all wiring and cabling located in the Premises including, without limitation, those located in the ceiling plenums.  Tenant's obligations pursuant to this paragraph shall survive the expiration or sooner termination of the Lease Term.  Tenant expressly waives, for itself and for anyone claiming through or under Tenant, any rights which Tenant may have under the provisions of Section 2201 of the New York Civil Practice Law and Rules and of any successor law of like import then in force in connection with any holdover summary proceedings which Landlord may institute to enforce the foregoing provisions of this paragraph.

20.5    BROKER.

(a)    Tenant warrants and represents that Tenant has not dealt with any broker in connection with the consummation of this Lease other than the brokers, persons or firms designated in Section 1.2 hereof; and in the event any claim is made against Landlord by any other broker or agent alleging dealings with Tenant, Tenant shall defend Landlord against such claim, using counsel approved by Landlord, such approval not to be unreasonably withheld, and save harmless and indemnify Landlord on account of any loss, cost, damage and expense (including, without limitation, reasonable attorneys' fees and disbursements) which may be suffered or incurred by Landlord by reason of such claim.  Landlord agrees that it shall be solely responsible for the payment of brokerage commissions to the brokers, persons or firms designated in Section 1.2 hereof.

(b)    Landlord warrants and represents that Landlord has not dealt with any broker in connection with the consummation of this Lease other than the brokers, persons or firms designated in Section 1.2; and in the event any claim is made against Tenant by the brokers, persons or firms designated in Section 1.2 or any other broker or agent alleging dealings with Landlord, Landlord shall defend Tenant against such claim, using counsel approved by

69

CLINTON00034046

Tenant, such approval not to be unreasonably withheld, and save harmless and indemnify Tenant on account of any loss, cost, damage and expense (including, without limitation, reasonable attorneys' fees and disbursements) which may be suffered or incurred by Tenant by reason of such claim. Landlord agrees that it shall be solely responsible for the payment of brokerage commissions to the brokers, persons or firms designated in Section 1.2.

20.6    INVALIDITY OF PARTICULAR PROVISIONS.  If any term or provision of this Lease, or the application thereof to any person or circumstance, shall to any extent be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

20.7    PROVISIONS BINDING, ETC.  The obligations of this Lease shall run with the Land, and except as herein otherwise provided, the terms hereof shall be binding upon and shall inure to the benefit of the successors and assigns, respectively, of Landlord and Tenant and, if Tenant shall be an individual, upon and to his heirs, executors, administrators, successors and assigns.  The reference contained herein to successors and assigns of Tenant is not intended to constitute a consent to assignment by Tenant, but has reference only to those instances in which Landlord may hereafter give consent to a particular assignment as required by the provisions of Article 13 hereof.  This Lease shall be construed as though the covenants herein between Landlord and Tenant are independent and not dependent and Tenant hereby expressly waives the benefit of any law to the contrary.

20.8    NO RECORDING.  Tenant agrees not to record this Lease (whether directly or indirectly), or a memorandum or short form of this Lease or any other document related thereto.

20.9    NOTICES.  Whenever, by the terms of this Lease, any notice, demand, request, approval, consent or other communication (each of which shall be referred to as a "notice") shall or may be given either to Landlord or to Tenant, such notice shall be in writing and shall be deemed sufficiently given or rendered if (i) hand delivered, or (ii) sent by certified or registered United States mail, postage prepaid, return receipt requested, or (iii) sent by reputable overnight delivery service, such as UPS or FedEx, as follows:

(i)    If intended for Landlord, addressed to Landlord at the Present Mailing Address of Landlord set forth on the first page of this Lease (or to such other address or addresses as may from time to time hereafter be designated by Landlord by like notice), Attention: Robert E. Selsam, with a copy to:

Sym Real Estate Law LLC
442 Marrett Road, Suite 5
Lexington, MA 02421
Attention: John A. Sym, Esq.

(ii)    If intended for Tenant, addressed to Tenant at the Present Mailing Address of Tenant set forth on the first page of this Lease until the date that Tenant

70

CLINTON00034047

occupies the Premises for the conduct of its business, and thereafter at the Premises, Attention: Jason Toussaint, with a copy to:

>Katten Muchin Rosenman LLP
>575 Madison Avenue
>New York, NY 10022
>Attention: Jeffrey L. Shuchat, Esq.

In no event shall the validity of any notice actually given to Landlord or Tenant be affected by any failure to deliver copies of such notices to counsel as hereinabove provided. Any notice to be given by any party may be given by such party's attorney. Notwithstanding anything to the contrary contained herein, rent bills and statements regarding Taxes, Operating Expenses and Fitness Facility Operating Expenses shall be deemed sufficiently given or rendered if sent by regular United States mail.

20.10  WHEN LEASE BECOMES BINDING.  Employees or agents of Landlord have no authority to make or agree to make a lease or any other agreement or undertaking in connection herewith.  The submission of this document for examination and negotiation does not constitute an offer to lease, or a reservation of, or option for, the Premises, and this document shall become effective and binding only upon the execution and delivery hereof by both Landlord and Tenant.  All negotiations, considerations, representations and understandings between Landlord and Tenant are incorporated herein and may be modified or altered only by written agreement between Landlord and Tenant, and no act or omission of any employee or agent of Landlord shall alter, change or modify any of the provisions hereof.

20.11  HEADINGS.  The Article and Section headings throughout this Lease and the Table of Contents hereof are for convenience and reference only, and the words contained therein shall in no way be held to explain, modify, amplify or aid in the interpretation, construction or meaning of the provisions of this Lease.

20.12  SUSPENSION OF SERVICES.  Landlord reserves the right to interrupt, curtail or suspend the services required to be furnished by Landlord under Section 7.3 and Exhibit D when the necessity therefor arises by reason of accident, repairs, emergency, mechanical breakdown or governmental preemption or restriction, or when required by any law, order or regulation of any Federal, State, County or municipal authority, or as the result of the making by Landlord of any additions, improvements or installations in the Building or for any cause beyond the reasonable control of Landlord.  Landlord shall use reasonable diligence to complete all required repairs or other necessary work as quickly as reasonably possible so that Tenant's inconvenience resulting therefrom may be for as short a period of time as circumstances will reasonably permit.  No diminution or abatement of rent or other compensation shall or will be claimed by Tenant as a result of, nor shall this Lease or any of the obligations of Tenant be affected or reduced by reason of, any such interruption, curtailment or suspension.

71

Confidential – Subject to Protective Order    CLINTON00034048

20.13   <u>RULES AND REGULATIONS</u>.

    (a)    Landlord shall have the right, from time to time during the term of this Lease, to make reasonable changes in, and additions to, the rules and regulations set forth in Exhibit E provided that such changes or additions

    (i)    shall be similar to rules and regulations of comparable first-class office buildings,

    (ii)    shall not apply to matters other than matters similar to those covered in the rules and regulations set forth in Exhibit E, and

    (iii)    do not materially interfere with the use of or access to the Premises or Building common areas necessary for the use and enjoyment of the Premises by Tenant.

Said rules and regulations, as changed in accordance with this Section from time to time, are hereinafter called the "Rules and Regulations".

    (b)    The right to dispute the reasonableness of any change in the Rules and Regulations upon Tenant's part shall be deemed waived unless the same is asserted by service of a notice upon Landlord within thirty (30) days after notice is given to Tenant of the adoption of any such change.

    (c)    Nothing in this Lease shall be construed to impose upon Landlord any duty or obligation to enforce the Rules and Regulations or terms, covenants or conditions in any other lease against any other tenant. Landlord shall not be liable to Tenant for violation of the Rules and Regulations or of any other lease by other tenants or occupants of the Building, or their servants, agents, visitors or licensees. Notwithstanding the foregoing, Landlord shall not enforce against Tenant any Rules and Regulations which Landlord shall not then be enforcing generally against a majority of the other tenants of the Building.

20.14   <u>DEVELOPMENT RIGHTS</u>. Tenant hereby expressly and irrevocably waives any and all right(s) it may have in connection with any zoning lot merger or transfer of development rights with respect to the Premises including, without limitation, any rights it may have to be a party to, to contest, or to execute, any Declaration of Restrictions (as such term is defined in Section 12-10 of the Zoning Resolution of the City of New York effective December 15, 1961 and as subsequently amended) with respect to the Premises, which would cause the Premises to be merged with or unmerged from any other zoning lot pursuant to such Zoning Resolution or to any document of a similar nature and purpose, and Tenant agrees that this Lease shall be subject and subordinate to any Declaration of Restrictions or any other document of similar nature and purpose now or hereafter affecting the Property. In confirmation of such subordination and waiver, Tenant shall execute and deliver promptly any certificate or instrument that Landlord reasonably may request and, in connection therewith, if Tenant fails to execute any such certificate or instrument within ten (10) days, Tenant hereby irrevocably constitutes and appoints Landlord as Tenant's attorney-in-fact to execute any such certificate or instrument for and on behalf of Tenant, such power of attorney being coupled with an interest.

72

CLINTON00034049

20.15  ESTOPPEL CERTIFICATES.  Each party agrees, at any time and from time to time, as reasonably requested by the other party, upon not less than ten (10) days' prior notice, to execute and deliver to the other a written certified statement executed and acknowledged by an appropriate individual representing such party (a) stating that this Lease is then in full force and effect and has not been modified (or if modified, setting forth all modifications), (b) setting forth the then Annual Fixed Rent and Additional Rent, (c) setting forth the date to which the Annual Fixed Rent, Additional Rent and other charges, if any, have been paid, (d) stating whether or not, to the best knowledge of the signatory, the other party is in default under this Lease, and if so, setting forth the specific nature of all such defaults, (e) stating the amount of the security deposit, if any, held by Landlord under this Lease, (f) stating whether there are any subleases affecting the Premises, (g) stating the address of the person to which all notices and communication under this Lease shall be sent, (h) stating the Commencement Date, the Rent Commencement Date and the Expiration Date, (i) if applicable, stating whether or not there are any amounts of contribution by Landlord towards the cost of Tenant's work not yet advanced to Tenant, (j) stating what portion of the Premises Tenant is in possession and occupancy of pursuant to this Lease, (k) if applicable, all work required to be completed by Landlord in connection with preparing the Premises for Tenant's initial occupancy has been completed by Landlord, and (l) as to any other matters reasonably requested by the party requesting such certificate.  The parties acknowledge that any statement delivered pursuant to this Section 20.15 may be relied upon by others with whom the party requesting such certificate may be dealing, which may, for Landlord, include, without limitation, any purchaser or owner of the Land or the Building, or of Landlord's interest (directly or indirectly) in the Land or the Building or any Underlying Lease, or by any Mortgagee or Overlandlord, or by any purchaser of the interest of any Mortgagee or Overlandlord (directly or indirectly) in the Land or the Building, or by any prospective or actual sublessee of the Premises or assignee of this Lease, or permitted transferee of or successor to Tenant.  Together with its response to each such request hereunder, Tenant shall provide to Landlord a similar written statement certified to Landlord with respect to each sublease or other occupancy agreement from every subtenant and other occupant of the Premises.

20.16  SELF-HELP.  If Tenant shall at any time fail to make any payment or perform any act which Tenant is obligated to make or perform under this Lease then Landlord, may, but shall not be obligated so to do, after thirty (30) days' notice to and demand upon Tenant, or without notice to or demand upon Tenant in the case of any emergency, and without waiving or releasing Tenant from any obligations of Tenant in this Lease contained, make such payment or perform such act which Tenant is obligated to make or perform under this Lease in such manner and to such extent as Landlord shall determine provided Tenant has not cured or commenced and is diligently prosecuting such cure, and, in exercising any such rights, pay any reasonably necessary and incidental costs and expenses, employ counsel and incur and pay reasonable attorneys' fees.  All sums so paid by Landlord and all reasonable and necessary costs and expenses of Landlord incidental thereto, together with interest thereon at the Lease Interest Rate, shall be deemed to be Additional Rent and, except as otherwise in this Lease expressly provided, shall be payable to Landlord within thirty (30) days after Landlord's demand, and Tenant covenants to pay any such sum or sums with interest as aforesaid, and Landlord shall have (in addition to any other right or remedy of Landlord) the same rights and remedies in the event of the nonpayment thereof by Tenant as in the case of default by Tenant in the payment of Annual Fixed Rent.

73

20.17  <u>HOLDING OVER</u>.  If Tenant remains in possession of the Premises after the expiration or other termination of the Lease Term, then, at Landlord's option, Tenant shall be deemed to be occupying the Premises as a month-to-month tenant only, at a monthly rental equal to (a) during the first month of any such holding over, one hundred fifty percent (150%) of the greater of (x) the Annual Fixed Rent and any Additional Rent payable hereunder during the last month of the Lease Term and (y) the then current Fair Market Rent for the Premises, and (b) thereafter, two hundred percent (200%) of the greater of (x) the Annual Fixed Rent and any Additional Rent payable hereunder during the last month of the Lease Term and (y) the then current Fair Market Rent for the Premises, and otherwise on the terms and conditions set forth in this Lease, as far as applicable.  If applicable, Landlord shall specify Landlord's determination of the Fair Market Rent in a written notice to Tenant after the commencement of any such holdover by Tenant.  If Tenant disagrees with Landlord's determination of Fair Market Rent, then Tenant shall have the right, within ten (10) days after receipt of Landlord's determination, to initiate arbitration proceedings to determine such Fair Market Rent.  Such arbitration shall be in accordance with the provisions of Sections 21.3(b) through (c) hereof which shall be applicable, *mutatis mutandis*, except that Fair Market Rent shall be determined as if there were a minimum term of five (5) years.  Tenant shall also pay all Additional Rent payable under the terms of this Lease, prorated for each month during which Tenant remains in possession.  Such month-to-month tenancy may be terminated by Landlord or Tenant, effective as of the last day of any calendar month by delivery to the other of notice of such termination prior to the first day of such calendar month.  Landlord waives no rights against Tenant by reason of accepting any holding over by Tenant and Tenant shall defend, indemnify and hold Landlord harmless from and against any and all claims, losses and liabilities for damages resulting from failure to surrender possession upon the Expiration Date, including, without limitation, any claims made by any succeeding tenant and any lost profits, and such obligations shall survive the expiration or sooner termination of this Lease. The provisions of this Section 20.17 shall not in any way be deemed to (i) permit Tenant to remain in possession of the Premises after the Expiration Date or sooner termination of this Lease, or (ii) imply any right of Tenant to use or occupy the Premises upon expiration or termination of this Lease and the Lease Term, and no acceptance by Landlord of payments from Tenant after the Expiration Date or sooner termination of the Lease Term shall be deemed to be other than on account of the amount to be paid by Tenant in accordance with the provisions of this Section 20.17.  Tenant's obligations under this Section 20.17 shall survive the expiration or earlier termination of this Lease.

20.18  <u>RENT CONTROL</u>.  If any of the Annual Fixed Rent or Additional Rent payable under the terms and provisions of this Lease shall be or become uncollectible, reduced or required to be refunded because of the laws and requirements of any public authorities, Tenant shall enter into such agreement(s) and take such other steps (without additional expense to Tenant) as Landlord may request and as may be legally permissible to permit Landlord to collect the maximum rents which from time to time during the continuance of such legal rent restriction may be legally permissible (and not in excess of the amounts reserved therefor under this Lease).  Upon the termination of such legal rent restriction, (a) the rent shall become and thereafter be payable in accordance with the amounts reserved herein for the periods following such termination and (b) Tenant shall pay to Landlord, to the maximum extent legally permissible, an amount equal to (i) the rent which would have been paid pursuant to this Lease but for such legal rent restriction, less (ii) the rent actually paid by Tenant during the period such legal rent restriction was in effect.

74

CLINTON00034051

20.19   COUNTERPARTS.  This Lease may be executed in several counterparts, each of which shall be deemed an original, and such counterparts together shall constitute but one and the same instrument.

20.20   ENTIRE AGREEMENT.  This Lease (including the Exhibits attached hereto) constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and thereof and supersedes all prior dealings between them with respect to such subject matter, and there are no verbal or collateral understandings, agreements, representations or warranties not expressly set forth in this Lease.  No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant, unless reduced to writing and signed by the party or parties to be charged therewith.

20.21   NO PARTNERSHIP.  The relationship of the parties hereto is that of landlord and tenant and no partnership, joint venture or participation is hereby created.

20.22   SECURITY DEPOSIT.

(a)     Upon execution by Tenant of this Lease, Tenant shall furnish to Landlord, at Tenant's sole cost and expense, a clean, irrevocable and unconditional letter of credit (the "Letter of Credit") drawn in favor of Landlord substantially in the form attached hereto as Exhibit G.  The Letter of Credit shall have a face amount equal to the amount of the Security Deposit and shall be assignable, upon request, to any Overlandlord, Mortgagee or successor to Landlord at no additional charge to Landlord.  Any Letter of Credit which replaces the initial Letter of Credit delivered hereunder is referred to as a "Replacement Letter".  Any Replacement Letter shall be in a face amount at least equal to the Security Deposit then required hereunder.  The initial Letter of Credit and any Replacement Letter are herein sometimes referred to simply as a "Letter".  Each Letter shall be issued by and drawn on a commercial bank reasonably acceptable to Landlord in its sole and absolute discretion and at a minimum having a long-term issuer credit rating from Standard & Poor's Professional Rating Service of A or a comparable rating from Moody's Professional Rating Service.  If the issuer's credit rating is reduced below A, or if the financial condition of such issuer changes in any other materially adverse way, then Landlord shall have the right to require that Tenant obtain from a different issuer a Replacement Letter that complies in all respects with the requirements of this Section within ten (10) days following Landlord's written demand.  If the issuer of any Letter held by Landlord is placed into receivership or conservatorship by the Federal Deposit Insurance Corporation or any successor or similar entity then, effective as of the date such receivership or conservatorship occurs, said Letter shall be deemed not to meet the requirements of this Section, and Tenant shall obtain from a different issuer a Replacement Letter that complies in all respects with the requirements of this Section within ten (10) days following the date such receivership or conservatorship occurs.  In any event, Tenant shall, not later than sixty (60) days prior to the expiration of the term of the initial Letter of Credit or any Replacement Letter, deliver to Landlord a Replacement Letter such that a Letter shall be in effect at all times after the date of this Lease until sixty (60) days beyond the end of the Lease Term, and any extensions or renewals thereof, and thereafter so long as Tenant is in occupancy of any part of the Premises.  If Tenant fails to deliver to Landlord a Replacement Letter within the time limits set forth in this Section, Landlord may, without limiting Landlord's other rights or remedies on account of such failure, draw down the full amount of the existing Letter without notice or demand and retain and apply the proceeds thereof

Confidential – Subject to Protective Order                              CLINTON00034052

as substitute security subject to the provisions of this Section. Tenant shall be responsible for the payment of any and all costs incurred with the review of any Replacement Letter (including without limitation Landlord's reasonable attorneys' fees). Any and all fees or costs charged by the issuer in connection with the issuance, maintenance or transfer of the Letter shall be paid by Tenant. If a Letter is lost, mutilated, stolen, or destroyed, Tenant shall cooperate with Landlord to have the Letter replaced. The Security Deposit (whether a Letter, cash or other collateral) will not operate as a limitation on any recovery to which Landlord may be entitled.

(b)     Landlord shall hold the Letter as security for the performance by Tenant of all obligations on the part of Tenant hereunder. If Tenant defaults in respect of any of Tenant's obligations hereunder, including but not limited to payment of Annual Fixed Rent or Additional Rent, or if Tenant remains in occupancy of any part of the Premises beyond the expiration of the Lease Term, Landlord shall have the right from time to time, without notice and without prejudice to any other remedy Landlord may have on account thereof, and upon presentation of a certificate of demand, to draw upon any Letter and apply any funds so drawn to Landlord's damages arising from, or to cure, any default by Tenant, whether such damages accrue before or after summary proceedings or other reentry by Landlord. If Landlord shall so apply any funds, Tenant shall, within ten (10) days following Landlord's written demand, restore the Letter to the face amount required hereunder. Landlord shall have the right to hold and draw upon the Letter pursuant hereto until sixty (60) days after (i) the expiration of the Lease Term (or the applicable extension or renewal period, if any) or (ii) the date Tenant has vacated the Premises, whichever is later. If there then exists no default by Tenant in any of the terms or conditions hereof, Landlord shall return the Letter, or, if applicable, the remaining proceeds thereof, to Tenant. If Landlord conveys Landlord's interest under this Lease, any Letter or, if applicable, the proceeds thereof, shall be turned over and assigned by Landlord to Landlord's grantee (or, at Landlord's election, Tenant shall furnish Landlord's successor with a new Replacement Letter showing such successor as payee, provided that the original Letter then outstanding shall be simultaneously returned to Tenant). From and after any such transfer, assignment or return, Tenant agrees to look solely to such grantee for proper application of the funds in accordance with the terms of this Section and the return thereof in accordance herewith. No Overlandlord or Mortgagee shall be responsible to Tenant for the return or application of any such Letter, or, if applicable, the proceeds thereof, whether or not it succeeds to the position of Landlord hereunder, unless such Letter shall have been received in hand by, and assigned to, such Overlandlord or Mortgagee.

20.23   <u>FINANCIAL STATEMENTS</u>.

(a)     Tenant represents and warrants to Landlord that (i) the financial statements of Tenant heretofore delivered to Landlord are true and correct and fairly reflect the financial condition and results of operation of Tenant and (ii) as of the date of this Lease, there has been no material adverse change in the condition, financial or otherwise, of Tenant from the date of such financial statements which could affect Tenant's ability to perform its obligations hereunder.

(b)     During the Lease Term, within ninety (90) days following the end of Tenant's fiscal year, Tenant shall deliver to Landlord a copy of Tenant's financial statements for Tenant's fiscal year just ended, certified by an independent certified public accountant or any

76

officer of Tenant as presenting fairly, in all material respects, the financial condition of Tenant and the results of its operations in accordance with GAAP.

(c)     Any financial statements delivered by Tenant to Landlord, whether before or after the date of this Lease, may be delivered to and relied upon by any Overlandlord or Mortgagee or by other parties with whom Landlord may be dealing.

20.24   GOVERNING LAW, ETC.  This Lease shall be governed by the laws of the State of New York applicable to agreements made and to be wholly performed within the State, as the same may from time to time exist.  Landlord and Tenant agree that any claim or action relating to this Lease shall be brought and maintained exclusively in a state or federal court located in the Borough of Manhattan, State of New York, United States of America, and Tenant hereby submits to the jurisdiction of all such state and federal courts and waives any right to assert that such courts constitute an inconvenient forum.  Tenant represents that it is not entitled to immunity from judicial proceedings and agrees that, in the event Landlord brings any suit, action or proceeding in New York or any other jurisdiction to enforce any obligation or liability of Tenant arising, directly or indirectly, out of or relating to this Lease, no immunity from such suit, action or proceedings will be claimed by or on behalf of Tenant.

20.25   CONFIDENTIALITY OF LEASE.  Tenant agrees that this Lease and the terms contained herein will be treated as strictly confidential and except as required by law Tenant shall not disclose the same to any third party except for Tenant's assignees, subtenants, partners, lenders, accountants and attorneys who have been advised of the confidentiality provisions contained herein and agree to be bound by the same. In the event Tenant is required by law to provide this Lease or disclose any of its terms, Tenant shall give Landlord prompt notice of such requirement prior to making disclosure so that Landlord may seek an appropriate protective order. If failing the entry of a protective order Tenant is compelled to make disclosure, Tenant shall only disclose portions of the Lease which Tenant is required to disclose and will exercise reasonable efforts to obtain assurance that confidential treatment will be accorded to the information so disclosed.

20.26   PATRIOT ACT AND EXECUTIVE ORDER 13224.  As an inducement to Landlord to enter into this Lease, Tenant hereby represents and warrants that:  (i) Tenant is not, nor is it owned or controlled directly or indirectly by, any person, group, entity or nation named on any list issued by the Office of Foreign Assets Control of the United States Department of the Treasury ("OFAC") pursuant to Executive Order 13224 or any similar list or any law, order, rule or regulation or any Executive Order of the President of the United States as a terrorist, "Specially Designated National and Blocked Person" or other banned or blocked person (any such person, group, entity or nation being hereinafter referred to as a "Prohibited Person"); (ii) Tenant is not (nor is it owned or controlled, directly or indirectly, by any person, group, entity or nation which is) acting directly or indirectly for or on behalf of any Prohibited Person; and (iii) from and after the effective date of the above-referenced Executive Order, Tenant (and any person, group, or entity which Tenant controls, directly or indirectly) has not conducted nor will conduct business nor has engaged nor will engage in any transaction or dealing with any Prohibited Person in violation of the U.S. Patriot Act or any OFAC rule or regulation, including, without limitation, any assignment of this Lease or any subletting of all or any portion of the Premises or the making or receiving of any contribution of funds, goods or services to or for the

77

CLINTON00034054

benefit of a Prohibited Person in violation of the U.S. Patriot Act or any OFAC rule or regulation. In connection with the foregoing, it is expressly understood and agreed that (x) any breach by Tenant of the foregoing representations and warranties shall be deemed a default by Tenant under Section 19.1(e) of this Lease and shall be covered by the indemnity provisions of Section 11.1 of this Lease, and (y) the representations and warranties contained in this subsection shall be continuing in nature and shall survive the expiration or earlier termination of this Lease.

20.27    FITNESS FACILITY.

(a)    If and for so long as Landlord, in its sole and absolute discretion, elects to operate a fitness facility (the "Fitness Facility") in the Building on a private basis, i.e., which is available exclusively to tenants and occupants of the Building, executive personnel of Landlord and its affiliates, and their respective guests (or a more limited subset of the foregoing such as only senior management, as determined by Landlord from time to time in its sole and absolute discretion), then Tenant shall be entitled to five (5) individual memberships for the Fitness Facility. Tenant shall pay to Landlord as Additional Rent Tenant's Share of the Fitness Facility Operating Expenses (as hereinafter defined).

(b)    Tenant shall pay Tenant's Share of the Fitness Facility Operating Expenses commencing on the date the Fitness Facility is made available to Tenant substantially equipped and operational. Estimated payments by Tenant on account of Fitness Facility Operating Expenses shall be made on the first day of each and every calendar month during the Lease Term for which the Fitness Facility is available for use by Tenant, and otherwise in the same fashion herein provided for the payment of Annual Fixed Rent. The monthly amount so to be paid to Landlord shall be sufficient to provide Landlord by the end of each Operating Year with a sum equal to Tenant's required payments, as estimated by Landlord from time to time, on account of Fitness Facility Operating Expenses for such Operating Year. After the end of each Operating Year, Landlord shall submit to Tenant a reasonably detailed statement of Fitness Facility Operating Expenses for such Operating Year. If estimated payments theretofore made for such Year by Tenant exceed Tenant's required payment on account therefor for such Operating Year, according to such statement, Landlord shall credit the amount of overpayment against subsequent obligations of Tenant with respect to Fitness Facility Operating Expenses (or refund such overpayment if the Lease Term has ended and Tenant has no further obligation to Landlord); but, if the required payments on account thereof for such Operating Year are greater than the estimated payments (if any) theretofore made on account thereof for such Operating Year, Tenant shall make payment to Landlord within thirty (30) days after being so advised by Landlord. Tenant shall have the right to audit Fitness Facility Operating Expenses on and subject to the same terms and conditions as set forth in Section 6.2.3 of this Lease with respect to Operating Expenses, which Section 6.2.3 shall apply to Tenant's right to audit Fitness Facility Operating Expenses *mutatis mutandis*.

(c)    "Fitness Facility Operating Expenses" shall mean the aggregate of all costs and expenses (including taxes, if any, thereon) paid or incurred by or on behalf of Landlord (whether directly or through an operator or through independent contractors) in connection with the operation and maintenance of the Fitness Facility. Fitness Facility Operating Expenses shall be calculated on the accrual basis of accounting (but subject to the further provisions of this Section 20.27) and shall include, without limitation, the following expenses:

78

CLINTON00034055

(i)      salaries, wages, medical, surgical and general welfare benefits (including group life insurance), pension and welfare payments or contributions and all other fringe benefits paid to, for or with respect to all persons for their services in the operation (including, without limitation, security services), maintenance, repair, or cleaning of the Fitness Facility, and payroll taxes, workers' compensation, uniforms and dry cleaning costs for such persons;

(ii)      payments to any operator and payments under service contracts with independent contractors for operating, maintaining, repairing or cleaning of the Fitness Facility or any portion thereof or any fixtures or equipment therein (including, without limitation, providing security services and pest control/extermination services);

(iii)      all costs or charges for electricity, steam, heat, ventilation, air conditioning and water (including sewer rents) and other utilities furnished to the Fitness Facility and/or used in the operation of the Fitness Facility, including any taxes on any such utilities;

(iv)      repairs and replacements which are appropriate to the continued operation of the Fitness Facility as a first-class state-of-the-art fitness facility in midtown Manhattan, provided that to the extent the cost of any such repair and/or replacement is required to be capitalized under GAAP, such cost shall be amortized on a straight-line basis over the useful life thereof utilized under GAAP, and the annual amortization of such repair and/or replacement, together with interest on the unamortized balance of such cost at the Lease Interest Rate, shall be included in Fitness Facility Operating Expenses;

(v)      cost of building and cleaning supplies and equipment, cost of replacements for tools and equipment used in the operation, maintenance and repair of the Fitness Facility and charges for telephone, telecommunication, television and internet service for the Fitness Facility;

(vi)      financial expenses incurred in connection with the operation of the Fitness Facility, such as insurance premiums (including, without limitation, liability insurance, fire and casualty insurance, and any other insurance that is then generally carried by owners or operators of first-class state-of-the-art fitness facility in midtown Manhattan, auditing and other professional fees and expenses, and any other ordinary and customary financial expenses incurred in connection with the operation of the Fitness Facility;

(vii)      a management fee of five percent (5%) of Fitness Facility Operating Expenses;

(viii)      rental payments made for equipment used in the operation and maintenance of the Fitness Facility;

(ix)      the cost of governmental licenses and permits, or renewals thereof, necessary for the operation of the Fitness Facility;

79

Confidential – Subject to Protective Order

CLINTON00034056

         (x)     a reasonable reserve for the acquisition and replacement of furniture, fixtures, floor coverings and equipment for the Fitness Facility; and

         (xi)    all other reasonable and necessary expenses paid in connection with the operation, maintenance, repair and cleaning of the Fitness Facility.

Any cost or expenses of the nature described above shall be included in Fitness Facility Operating Expenses for any Operating Year no more than once, notwithstanding that such cost or expenses may fall under more than one of the categories listed above, and in no event shall Fitness Facility Operating Expenses be duplicative of Operating Expenses under Article 6 hereof. Subject to the limitation set forth in subdivision (vii) above, Landlord may use related or affiliated entities to provide services or furnish materials for the Fitness Facility provided that the rates or fees charged by such entities are competitive with those charged by unrelated or unaffiliated entities in the Borough of Manhattan for the same services or materials. Fitness Facility Operating Expenses for each Operating Year shall be reduced by the aggregate Joining Fees and Annual Membership Fees received by Landlord for such Operating Year.

        (d)    Subject to availability on first-come, first-served basis, Tenant shall have the right to purchase up to three (3) additional individual memberships (each, an "Additional Membership") for the Fitness Facility at the following price per Additional Membership: a one-time joining fee of Fifteen Thousand and 00/100 Dollars ($15,000.00) (the "Joining Fee"), plus an annual membership fee of Three Thousand and 00/100 Dollars ($3,000.00) (the "Annual Membership Fee"). The Joining Fee shall be payable upon purchasing the Additional Membership(s) and the Annual Membership Fee(s) shall be payable as Additional Rent in equal monthly installments (prorated for any partial months) on the first day of each month during the Lease Term in the same manner as Annual Fixed Rent commencing upon the purchase of the Additional Membership(s). Both the Joining Fee and the Annual Membership Fee shall be increased annually by a percentage equal to the percentage increase in the CPI. If Tenant purchases any Additional Memberships, Tenant shall have a right, at anytime, to terminate all or any of such Additional Memberships, and from and after the date that Tenant notifies Landlord in writing of such termination, Tenant shall owe Landlord no further Annual Membership Fees with respect to such terminated Additional Memberships (but the Joining Fees with respect to such Additional Memberships shall be non-refundable). To the extent that Tenant terminates any Additional Memberships, Tenant shall have no further right to purchase such Additional Memberships hereunder.

        (e)    If and for so long as Landlord elects to operate the Fitness Facility on a private basis pursuant to this Section 20.27, Landlord shall operate and maintain the Fitness Facility as a first-class fitness facility, with a high level of cleanliness, an adequate number of personal trainers and staff, and state-of-of-the-art equipment, facilities and amenities maintained in good repair and upgraded on a regular basis. Landlord shall have the right to close the Fitness Facility, temporarily or permanently, or to cease operating the Fitness Facility on a private basis, i.e., limiting membership in the Fitness Facility exclusively to tenants and occupants of the Building, personnel of Landlord and its affiliates, and their respective guests (or a more limited subset of the foregoing), at any time in Landlord's sole and absolute discretion and, as Tenant's

80

        CLINTON00034057

sole and exclusive remedy on account thereof: (i) Tenant's payments on account of Fitness Facility Operating Expenses and Annual Membership Fees shall abate during the period of such closure or cessation of private operation (i.e., exclusive to tenants, etc.) and (ii) the unamortized amount of any Joining Fees paid by Tenant shall be refunded (assuming straight-line amortization of the Joining Fee over a period of three years following payment thereof). Notwithstanding anything to the contrary set forth herein, unless otherwise specified in writing by Landlord, membership in any Fitness Facility operated by Landlord hereunder shall be open only to individuals who are senior management of tenants of the Building who work in the Building on a regular basis and senior management of Landlord and its affiliates. Tenant may make Tenant's individual memberships available to its subtenants on a pro-rata basis. Members shall have access to the Fitness Facility during such hours and on such days as Landlord or the operator shall elect, in its sole and absolute discretion, to operate the Fitness Facility, subject to rules and regulations promulgated by Landlord or the operator, provided that, as long as Landlord elects to operate the Fitness Facility on a private basis pursuant to this Section 20.27, Landlord covenants to operate the Fitness Facility at least from 7:00 AM to 7:00 PM on Operating Days. Landlord or the operator may specifically condition the use of the Fitness Facility by any person upon such person's compliance with the rules and regulations for the Fitness Facility and execution of a written waiver and release holding the Landlord Parties harmless from any and all liability, damage, expense, cause of action, suit, claim, judgment and cost of defense arising from injury to such person or such person's guests occurring in the Fitness Facility or resulting from the use thereof. No Landlord Party shall have any liability to any Tenant Party or any individual member or his/her guests for any damage, injury, loss, expense, compensation or claim whatsoever arising out of the use of the Fitness Facility. The operation of the Fitness Facility shall be covered by any commercial general liability insurance maintained by Landlord with respect to the Building or, if Landlord elects, by a separate commercial general liability insurance policy, with customary exclusions and exceptions and subject to such deductibles as Landlord may determine.

## ARTICLE 21

## OPTION TO EXTEND

21.1    TENANT'S OPTION.  Provided that at the time of such exercise and upon the commencement of the Extended Term (i) there then exists no Event of Default or condition which, with the giving of notice or passage of time or both, would constitute an Event of Default, (ii) this Lease is then in full force and effect, and (iii) Original Tenant is in actual occupancy of the entire Premises, Tenant shall have the irrevocable right and option (the "Extension Option") to extend the Lease Term for one extended term of five (5) years (the "Extended Term").  The Extended Term shall commence on the day immediately succeeding the Expiration Date of the initial Lease Term. Tenant shall exercise the Extension Option by giving notice to Landlord of its desire to do so not later than fifteen (15) months prior to the Expiration Date of the initial Lease Term.  Provided the conditions set forth in the foregoing clauses (i), (ii) and (iii) shall have been satisfied, the giving of such notice by Tenant shall automatically extend the Lease Term for the Extended Term, and no instrument of renewal need be executed.  In the event that Tenant fails to give such notice to Landlord, this Lease shall automatically terminate at the end of the initial Lease Term, and Tenant shall have no further option to extend the Lease Term, it being agreed

81

CLINTON00034058

that time is of the essence with respect to the giving of such notice. Notwithstanding the foregoing, Landlord may waive any or all of the conditions set forth in the foregoing clauses (i) and (iii), at its election, by written notice to Tenant at any time. The Extended Term shall be on all the terms and conditions of this Lease, except that during the Extended Term, Tenant shall have no further option to extend the Lease Term, and the rent for the Extended Term shall be determined as provided below. The Extension Option shall be personal to Original Tenant and shall be void if the interest of the tenant under the Lease is otherwise assigned or transferred.

21.2    EXTENDED TERM RENT. The Annual Fixed Rent for the Extended Term shall be the Fair Market Rent for the Premises as of the commencement of the Extended Term. During the Extended Term, Tenant shall in all events pay Tenant's Share of Taxes and Operating Expenses as Additional Rent in accordance with Article 6 of this Lease provided that Base Taxes and Base Operating Expenses shall be updated in connection with the determination of the Fair Market Rent.

21.3    EXTENDED TERM RENT DETERMINATION.

(a)    If, pursuant to the provisions of Section 21.1 hereof, Tenant has exercised validly the Extension Option, then, for purposes of establishing the Annual Fixed Rent payable by Tenant during the Extended Term under the provisions of Section 21.2 above, the term "Fair Market Rent" shall mean the then current fair market rental value per annum for the Premises as of the commencement of the Extended Term. A determination of the Fair Market Rent payable for the Premises during the Extended Term shall be made in the manner described in Sections 21.3(b), (c) and (d) below.

(b)    If Tenant shall have exercised the Extension Option, then no later than six (6) months prior to the Expiration Date of the initial Lease Term, Landlord, in a notice given to Tenant, shall specify its initial determination of the Fair Market Rent for the Premises during the Extended Term. Within twenty (20) Operating Days after receipt of Landlord's notice, Tenant shall notify Landlord of Tenant's initial determination of the Fair Market Rent for the Premises. If Tenant shall fail to notify Landlord of Tenant's initial determination of the Fair Market Rent for the Premises within such twenty (20) Operating Day period, then Landlord's initial determination of the Fair Market Rent shall be the Fair Market Rent for the Premises. If, within sixty (60) days after receipt of Tenant's notice setting forth Tenant's determination of the Fair Market Rent for the Premises, Landlord and Tenant fail to reach agreement on the determination of the Fair Market Rent to be paid by Tenant for the Premises during the Extended Term, then either Landlord or Tenant (the "Initiating Party") shall initiate the proceedings for such determination by notice to the other, and by designating in such notice the name and address of a commercial real estate broker, consultant or appraiser unaffiliated with the designating party and willing to act in such determination and having at least ten (10) years' experience in the leasing of first-class office space in Manhattan (hereinafter called a "Qualified Appraiser"). Within ten (10) days after receipt by the other party (the "Responding Party") of such notice, the Responding Party, by notice given to the Initiating Party, shall designate the name and address of another Qualified Appraiser willing so to act in such determination. If the Responding Party shall fail, neglect or refuse within said 10-day period to designate another Qualified Appraiser willing so to act, the Qualified Appraiser designated by the Initiating Party shall alone conduct the determination of the Fair Market Rent for the Premises during the Extended Term. If two (2)

82

CLINTON00034059

Qualified Appraisers have been designated as aforesaid, such Qualified Appraisers shall appoint an additional Qualified Appraiser (the "Third Qualified Appraiser") who is willing so to act in such determination, and notice of such designation shall be given both to the Initiating Party and to the Responding Party. If the two (2) Qualified Appraisers do not, within a period of ten (10) days after the appointment of the latter of them, agree upon and designate a Third Qualified Appraiser willing so to act, either Qualified Appraiser previously designated may request the New York Office of the AAA to designate a Third Qualified Appraiser willing so to act and a Third Qualified Appraiser so appointed shall, for all purposes, have the same standing and powers as though the Third Qualified Appraiser had been timely appointed by the Qualified Appraisers first appointed. In case of the inability or refusal to serve of any person designated as a Qualified Appraiser, or in case any Qualified Appraiser for any reason ceases to be such, a Qualified Appraiser to fill such vacancy shall be appointed by the Initiating Party, Responding Party, the Qualified Appraisers first appointed or the New York Office of the AAA, as the case may be, whichever made the original appointment, or, if the party which made the original appointment fails to fill such vacancy, upon application of any Qualified Appraiser who continues to act or by the Initiating Party, the Responding Party or the New York Office of the AAA, and any Qualified Appraiser so appointed to fill such vacancy shall have the same standing and powers as though appointed originally. The resulting board of Qualified Appraisers, forthwith upon their appointment, shall (i) hear the parties to this Lease and their respective witnesses, and each of the parties shall upon the conclusion of their presentation be required to submit a complete statement (the "Fair Market Rent Proposal") setting forth in detail all of the relevant economic terms of the parties' proposed determination of the Fair Market Rent (it being understood that Landlord's and Tenant's respective proposed determinations may differ from Landlord's and Tenant's initial determinations of the Fair Market Rent given to the other party in accordance with the first two (2) sentences of this clause (b) and, in such event, the Qualified Appraisers shall not take into account any determinations of such Fair Market Rent previously given by Landlord or Tenant, as the case may be, to the other party), (ii) examine the records relating to the Building and such other documents and records as may, in their judgment, be necessary and (iii) select in the manner hereinafter provided, the Fair Market Rent for the Premises to become applicable during the Extended Term. In determining the Fair Market Rent for the Premises during the Extended Term, the parties, and any Qualified Appraisers shall take into account (A) the presentation of the parties regarding the current fair market rental value of the Premises, (B) Tenant's payments under this Lease with respect to Taxes and Operating Expenses as provided in Article 6 of this Lease provided that Base Taxes and Base Operating Expenses shall be updated in connection with the determination of the Fair Market Rent, and (C) all other factors relevant to the determination of the fair market rental value of the Premises.

(c)    If, pursuant to the preceding provisions, there is only one (1) Qualified Appraiser, the determination of Fair Market Rent for the Premises shall be determined by such sole Qualified Appraiser selecting, in its entirety, without modification, the Fair Market Rent Proposal submitted by either Landlord or Tenant as the Fair Market Rent, whichever such Qualified Appraiser believes most accurately reflects the then current fair market rental value per annum for the Premises. Where, however, there exists a board of three (3) Qualified Appraisers, as is contemplated hereby, then the Fair Market Rent for the Premises shall be determined by majority vote of the board of Qualified Appraisers selecting, in its entirety, without modification, the Fair Market Rent Proposal submitted by either Landlord or Tenant as the Fair Market Rent,

83

CLINTON00034060

whichever such Qualified Appraisers believe most accurately reflects the then current fair market rental value per annum for the Premises.

(d)    Each of Landlord and Tenant shall pay the costs and fees of the Qualified Appraiser chosen by it, and Landlord and Tenant shall equally share the costs and fees of the Third Qualified Appraiser. Each of Landlord and Tenant shall pay the legal fees and expenses of their respective counsel.

21.4    RETROACTIVE ADJUSTMENTS; AMENDMENT.

(a)    If, pursuant to the preceding provisions of this Article 21, Fair Market Rent has not been determined as of the date the same is to become effective, Tenant shall pay on account of Annual Fixed Rent the rent specified by Landlord as the Fair Market Rent until such determination is made. If, based upon the final determination of such Fair Market Rent as provided herein, such payments made by Tenant on account of Annual Fixed Rent for the Extended Term were (i) less than the Fair Market Rent as finally determined in accordance with the provisions hereof, Tenant shall pay to Landlord the amount of such deficiency, with interest thereon at the Lease Interest Rate from the respective due dates therefor until paid, within thirty (30) days after final determination of the Fair Market Rent, or (ii) greater than the Fair Market Rent as finally determined in accordance with the provisions hereof, Landlord shall credit the amount of such excess against the next installments of rent due under this Lease, with interest thereon at the Lease Interest Rate from the respective dates of overpayment until credited. Payment by Tenant hereunder of Annual Fixed Rent in the amount specified by Landlord as the Fair Market Rent shall in no way be an admission by Tenant that such amount is the Fair Market Rent for the Premises.

(b)    If Tenant shall validly exercise the Extension Option, it shall promptly after such election and the determination of the Fair Market Rent enter into an amendment to the Lease incorporating the terms of such leasing, but failure to do so shall have no effect on Tenant's agreement to extend the Lease Term for the Extended Term.

Signatures on next page.

84

Confidential – Subject to Protective Order

CLINTON00034061

EXECUTED in one or more counterparts by persons or officers hereunto duly authorized on the Date set forth in Section 1.2 above.

LANDLORD:

BP 510 MADISON AVE LLC

By: _____
Name: Robert E. Selsam
Title: Vice President

TENANT:

WORLD GOLD TRUST SERVICES LLC

By: _____
Name: ARAM SHISHMANIAN
Title: CHIEF EXECUTIVE OFFICER

85

Confidential – Subject to Protective Order                    CLINTON00034062

EXHIBIT A

LAND

ALL THAT CERTAIN plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

Beginning at the corner formed by the intersection of the southerly side of East 53rd Street with the westerly side of Madison Avenue; and

Running thence southerly along the westerly side of Madison Avenue, 100 feet;

Thence westerly and parallel with the southerly side of East 53rd Street 45 feet;

Thence southerly and parallel with the westerly side of Madison Avenue, 5 inches to the center line of the block between 52nd and 53rd Streets;

Thence westerly along said center line and parallel with the southerly side of East 53rd Street, 112 feet 6 inches;

Thence northerly parallel with the westerly side of Madison Avenue, 100 feet 5 inches to the southerly side of East 53rd Street;

Thence easterly along the southerly side of East 53rd Street, 157 feet 6 inches to the corner at the point or place of beginning.

Together with the benefits of the easements in favor of the above land that are granted, set forth, defined and limited in that certain Zoning Lot Development and Easement Agreement by and between The Laboratory Institute of Merchandizing, Inc. and 53rd Street and Madison Tower Development LLC dated as of November 15, 2006 and recorded on November 24, 2006, in the office of the City Register of New York County, as CRFN 2006000650636, as amended by that certain Amendment to Zoning Lot Development and Easement Agreement between The Laboratory Institute of Merchandizing, Inc. and 53rd Street and Madison Tower Development LLC dated as of February 11, 2008 and recorded February 21, 2008 as CRFN 2008000071316 in the Office of the New York City Register, New York County.

A-1

CLINTON00034063

EXHIBIT B

PREMISES

The portion of the Building demised to Tenant pursuant to the Lease (the "Premises") shall mean all the area on the ninth (9th) floor of the Building as shown on the floor plan annexed to this Exhibit B and forming a part hereof within the outside walls of the Building, excluding the area occupied by Building stairs, fire towers, elevator shafts, flues, vents, stacks, pipe shafts and vertical ducts, with their enclosing walls (but including the area occupied by the shafts and machinery for any private elevators, pneumatic tubes, conveyors, mail chutes and the like installed by Tenant, and the interior walls and partitions enclosing such shafts and machinery).

B-1

Confidential – Subject to Protective Order

CLINTON00034064

**Floor 9**

**510 Madison Avenue**
Madison at 53 Street

Madison Avenue

**Suite 9A**

East 53 Street

**Scale:** NTS
**Date:** April 5, 2011

Note: All dimensions and conditions are approximate and for information only

**Boston Properties**



Confidential – Subject to Protective Order

CLINTON00034065

EXHIBIT C

WORK LETTER

1.    <u>Performance of Work</u>. Tenant shall, at the sole cost and expense of Tenant and subject to the limitations and provisions of this Work Letter and the Lease including, without limitation, Article 4 and Article 8 thereof, perform all work necessary to prepare the Premises for Tenant's occupancy.  In the event of any inconsistency between the provisions of Article 4 or Article 8 of the Lease and this Work Letter with respect to the performance of Tenant's Work, the provisions of this Work Letter shall control.

2.    <u>Preparation of Tenant's Plans and Specifications</u>.  Tenant shall submit to Landlord, for Landlord's approval, complete plans, working drawings, specifications and information (collectively, "Plans and Specifications") necessary to perform Tenant's Work (as hereinafter defined).

3.    <u>Plan Requirements; Approval by Landlord.</u>

(a)    The Plans and Specifications shall be fully detailed and fully coordinated, shall show complete dimensions, shall have designated thereon all points of location and other matters, required to perform or let contracts for the performance of Tenant's Work and shall consist of the final plans and specifications (including air conditioning, ventilating, electrical, plumbing and engineering design drawings and specifications) prepared by Tenant's licensed interior architect or designer and engineer to describe the manner in which Tenant intends to finish the Premises, including any changes thereto from time to time made by Tenant to obtain the approvals or permits referred to in paragraph 5 hereof.  Each submission shall consist of six (6) complete sets of the relevant plans and specifications.  In addition, submissions shall identify changes from the prior submissions.  The Plans and Specifications shall comply with and conform to Landlord's plans for the Building and with all applicable laws, codes and regulations relating to construction of the Building and/or the Premises.

(b)    Prior to the commencement of Tenant's Work, the Plans and Specifications shall have been approved in writing by Landlord, but such approval shall be as to layout only, shall not be deemed to be an approval of the legality or the cost of Tenant's Work or the Plans and Specifications and shall not be deemed a waiver of any Landlord's rights under this Work Letter with respect to any delays which may result from the materials, services or work required by the Plans and Specifications.  The Plans and Specifications shall not be materially changed or modified by Tenant after such approval by Landlord without the further approval in writing by Landlord.  Landlord will not unreasonably withhold, condition or delay its approval of the Plans and Specifications or any change or modification thereof.

4.    <u>Work Letter Definitions</u>.  As used in this Exhibit C ("Work Letter"), all capitalized terms have the same meanings as defined in the Lease. In addition, the following terms have the following respective meanings:

C-1

          CLINTON00034066

(a)     "Building Standard" shall mean such materials of at least as good quality as Landlord has elected at the time of execution of this Lease to use as a part of its standard construction substantially throughout the Building;

(b)     "notice" shall, as used in this Work Letter only, and notwithstanding the general provisions of Section 20.9 of the Lease, mean any letter, memorandum or other written communication which is either mailed to Landlord or Tenant, as the case may be (by registered or certified mail, return, receipt requested), or is actually delivered to Landlord's Construction Representative or to Tenant's Construction Representative at the Present Mailing Address of Landlord or Tenant or at the Premises. Any such notice shall be deemed to have been, given when received by mail or when delivered to Landlord's Construction Representative or to Tenant's Construction Representative, as the case may be;

(c)     "Tenant's Architect" shall mean the person or entity lawfully licensed to practice architecture, which has prepared and stamped the Plans and Specifications;

(d)     "Tenant's Cost" shall mean the total of the actual out-of-pocket cost of work done or caused to be done by Tenant, its architects and engineers and by its contractors, suppliers and work forces for materials and labor in connection with the performance of Tenant's Work;

(e)     "Tenant's Work" shall mean all materials and work necessary to finish the Premises for Tenant's initial occupancy, including built-in furniture.

5.     Governmental Approvals: Filing.  Prior to the commencement of Tenant's Work, Tenant shall, with reasonable speed and diligence, file with Landlord the Plans and Specifications for Tenant's Work, and shall take whatever action shall be necessary (including modifications approved by Landlord of the Plans and Specifications for Tenant's Work) to obtain and maintain all governmental permits and authorizations, if any, which may be required in connection with commencing Tenant's Work, and shall deliver copies of all of the same to Landlord for inspection by Landlord, and, if applicable, for Landlord's approval. Tenant shall pay all filing fees and other costs in connection therewith. Tenant shall deliver copies of all such permits and authorizations to Landlord upon receipt, along with an Architect's Certificate from Tenant's Architect (or such other architect as may be reasonably approved by Landlord) certifying that such Plans and Specifications are in full compliance with all applicable laws, codes and regulations. Landlord shall cooperate with Tenant in connection with the aforesaid. Tenant will promptly furnish to Landlord copies of all drawings.  Tenant shall use an expeditor designated by Landlord in connection with making all filings and obtaining all permits, licenses, certificates and approvals from governmental authorities.

6.     Performance of the Work: Tenant's Cost.

(a)     Tenant shall promptly commence and diligently prosecute the performance of Tenant's Work to completion in accordance with Tenant's approved Plans and Specifications therefor and Tenant shall abide by Landlord's construction procedures for the Building. Tenant's Work shall be completed at Tenant's sole cost and expense.

C-2

Confidential – Subject to Protective Order                    CLINTON00034067

(b)    Except with respect to Tenant's Work which involves or in any way affects connection to the HVAC, plumbing, electrical, life safety, proprietary or other systems of the Building, Tenant shall perform all of Tenant's Work through its own employees or contractors.

(c)    Upon completion of Tenant's Work, Tenant shall deliver to Landlord (i) an architect's certificate from Tenant's Architect certifying that Tenant's Work has been completed in accordance with the approved Plans and Specifications, (ii) three (3) complete "as built" sets of Tenant's Plans and Specifications prepared on an AutoCAD Computer Assisted Drafting and Design System (or such other system or medium reasonably approved by Landlord and generally used in the industry) using naming conventions issued by the American Institute of Architects in June, 1990 (or such other naming conventions as Landlord may reasonably accept) and magnetic computer media of such record drawings and specifications, translated into in a format compatible with AutoCAD Release 2000 or later or another format reasonably acceptable to Landlord and (iii) final lien waivers from all contractors and subcontractors covering their respective work and materials in connection with Tenant's Work.

7.    Landlord's Contribution.  Landlord agrees to pay to Tenant (or at Tenant's election, to Tenant's contractor), as a contribution towards Tenant's Cost up to Seven Hundred Forty-Seven Thousand Five Hundred and 00/100 Dollars ($747,500.00).  In no event shall any portion of Landlord's Contribution be used to pay for Tenant's Property or moving expenses. Prior to the commencement of Tenant's Work, Tenant shall provide to Landlord a reasonable estimate of Tenant's Cost.  In the event that Landlord's Contribution is not exhausted by Tenant within two (2) years from the Commencement Date, Tenant shall not be entitled to any cash payment or to any credit or set-off with respect to rent, subsequent Tenant's Costs, or any other monetary obligation of Tenant to Landlord.

8.    Payment.  Subject to the provisions hereof, all payments to be made by Landlord to Tenant in accordance with the provisions of this Exhibit C shall be disbursed to Tenant within twenty (20) days after receipt by Landlord of requisitions from Tenant setting forth in detail the amount of Tenant's Costs covered in such requisitions.  All requisitions for payment presented to Landlord as provided hereunder shall (a) be marked "Approved for Payment", and be countersigned by Tenant and Tenant's Construction Representative and approved by Landlord's Construction Representative; (b) include a complete description of Tenant's Work theretofore completed, and submission of complete and executed AIA forms G-702 and G-703; (c) with the exception of the first requisition, be accompanied by partial waivers of lien from all contractors, subcontractors, material suppliers and others covering all work and materials which were the subject of previous progress payments by Landlord and Tenant, and (d) include such other information and documentation as Landlord or any of its lenders may reasonably request in connection with the completion of Tenant's Work.  If Tenant's Cost, as reasonably estimated, is equal to or less than Landlord's Contribution, then, subject to retainage as hereinafter described, the amount of each disbursement of Landlord's Contribution shall be equal to the approved amount of Tenant's Costs covered by the requisition.  If Tenant's Cost, as reasonably estimated, exceeds Landlord's Contribution, then, subject to retainage as hereinafter described, the amount of each disbursement of Landlord's Contribution shall be determined by multiplying (x) the approved amount of Tenant's Costs covered by the requisition by (y) a fraction, the numerator of which shall

C-3

Confidential – Subject to Protective Order                    CLINTON00034068

be Landlord's Contribution, and the denominator of which shall be Tenant's Cost. In addition to and without limiting the foregoing, Landlord shall have the right to withhold a commercially reasonable retainage from each disbursement of Landlord's Contribution payable hereunder (but in no event more than ten percent (10%) until such time as fifty percent (50%) of the work shall have been completed and thereafter no more than five percent (5%)), which retainage shall be paid to Tenant within thirty (30) days after completion of Tenant's Work and delivery to Landlord of the items specified in paragraph 6(c) of this Work Letter. In no event shall Landlord be required to make disbursements of Landlord's Contribution (i) more frequently than once per month, (ii) prior to Landlord's approval of the Plans and Specifications or (iii) while there exists an Event of Default or condition which, with the giving of notice or passage of time or both, would constitute an Event of Default.

9.      Tenant's Contractors. With respect to Tenant's Work, Tenant shall not engage any contractor or subcontractor for any major trade required in the performance of Tenant's Work unless the same shall have been approved by Landlord, which approval shall not be unreasonably withheld or delayed.

10.     Insurance. Prior to the commencement of Tenant's Work, Tenant shall deliver to Landlord a true copy of all insurance policies or certificates of insurance issued in conformity with Article 11 of the Lease bearing notations evidencing the payment of premiums or accompanied by other evidence of such payments satisfactory to Landlord, for the following insurance, which shall name the respective contractor or subcontractor as insured and (except with respect to the workers compensation and disability insurance described in clause (c) below and the builder's risk insurance described in clause (d) below) Tenant, Landlord and the Additional Insureds as additional insureds with respect to liability arising out of Tenant's Work, including but not limited to liability to employees of contractor or subcontractors of all tiers, or their personal representatives, heirs and beneficiaries. Such policies shall also (i) provide that the coverage provided thereunder shall be primary and any liability insurance of each additional insured party shall be secondary and non-contributory and (ii) waive any right of subrogation against each additional insured party:

(a)     a policy of commercial general liability insurance, on an occurrence basis, issued on a form at least as broad as ISO Commercial General Liability Coverage "occurrence" form CG 00 01 10 01 or another ISO Commercial General Liability "occurrence" form providing equivalent coverage. Such insurance shall include broad form contractual liability coverage, specifically covering but not limited to the indemnification obligations undertaken by Tenant in this Lease. The minimum limit of liability of such insurance shall be $5,000,000 per occurrence;

(b)     comprehensive form automobile liability and property damage insurance for all owned, non-owned and hired vehicles insuring against liability for bodily injury and death and for property damage in an amount not less than $1,000,000 combined single limit, such insurance to contain the so-called "occurrence clause";

(c)     workers' compensation and statutory disability providing statutory New York State benefits for all persons employed in connection with Tenant's Work at or in connection with the Premises; and statutory employer's liability;

C-4

Confidential – Subject to Protective Order                    CLINTON00034069

(d)    "all risk" builder's risk insurance with respect to Tenant's Work, written on a completed value, non-reporting replacement cost basis. Such insurance shall be in the amount of the full replacement value of Tenant's Work, it being agreed that no omission on the part of a party to request any such determination shall relieve Tenant of its obligation to have such replacement value determined as aforesaid. Such insurance shall contain an acknowledgment by the insurance company that its rights of subrogation have been waived; and

(e)    equipment / property insurance.

C-5

Confidential – Subject to Protective Order

CLINTON00034070

EXHIBIT D

LANDLORD'S SERVICES

I.    DEFINITIONS

As used herein or in the body of the Lease, (i) the term "Operating Days" shall mean such Mondays, Tuesdays, Wednesdays, Thursdays and Fridays as do not fall on the days celebrated as New Year's Day, Martin Luther King Day, Presidents' Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Thanksgiving Day, the Day after Thanksgiving or Christmas Day, or on such other days as may now or hereafter be celebrated as holidays under the contract from time to time in effect between Locals 32B and 32J of the Building Service Employees Union AFL-CIO (or any successor thereto) and the Real Estate Advisory Board of New York, Inc. (or any successor thereto) or on which comparable first-class office buildings in midtown Manhattan are now or hereafter closed; and (ii) the term "Operating Hours" shall mean (A) with respect to HVAC service, the hours between 8:00 A.M. and 6:00 P.M. on Operating Days, (B) with respect to freight elevator service, the hours between 8:00 A.M. and 4:45 P.M. on Operating Days and (C) for all other purposes, the hours between 8:00 A.M. and 6:00 P.M. on Operating Days.

II.    CLEANING

A.    Cleaning of office areas (including a standard office pantry in the Premises subject to paragraphs B and C below), lavatories, main lobby, elevators, building exterior, and windows shall be performed or caused to be performed by Landlord at Landlord's expense on Operating Days in accordance with the cleaning specifications contained in the contract from time to time in effect between Landlord and the cleaning contractor from time to time engaged by Landlord for the Building. A copy of such specifications as in effect on the date of the prefixed Lease is annexed hereto as Schedule 1.

B.    If Tenant requires services in excess of those contained in the cleaning contract described above, Tenant shall request same through the cleaning contractor engaged by Landlord and shall be responsible for paying the cost thereof.

C.    Without limiting the provisions of paragraph B above, Tenant shall reimburse Landlord within thirty (30) days after demand for the actual costs charged by the cleaning contractor (a) for extra cleaning work in the Premises required by reason of (i) misuse or neglect on the part of Tenant, its agents, employees, contractors, invitees or subtenants, (ii) use of portions of the Premises for the preparation, serving or consumption of food or beverages in excess of normal office usage, data processing or reproducing operations in excess of normal office usage, private lavatories or toilets or other special purposes requiring greater or more difficult cleaning work than office areas, (iii) unusual quantities of interior glass surfaces or (iv) materials or finishes not included in Landlord's general cleaning

D-1

                    CLINTON00034071

specifications for the Building or (b) for removal from the Premises and the Building of so much of any of Tenant's refuse or rubbish as shall exceed that ordinarily accumulated daily in ordinary office occupancy (it being understood that, without limitation, garbage or other waste from any cafeteria, lunchroom or other food preparation and/or consumption facilities in the Premises are in excess of ordinary office occupancy). Landlord, its cleaning contractor and their employees shall have access to the Premises after Operating Hours and the free use of light, power and water in the Premises as reasonably required for the purpose of cleaning the Premises.

III.    HEATING, VENTILATING, AIR CONDITIONING

A.    Landlord shall, subject to energy conservation requirements of governmental authorities, provide heat, ventilation and air-conditioning ("HVAC") to the Premises and hot water (or equivalent heat) for the Tenant's heating system during Operating Hours on Operating Days consistent with the specifications set forth in the Tenant Design & Alteration Criteria attached to the Lease as Exhibit F through local DX systems installed by Landlord on each floor of the Building and including cooling towers, pumps and associated equipment (collectively, sometimes referred to herein as the "Building HVAC System"). Tenant acknowledges that Tenant is solely responsible for the design of the HVAC system within the Premises and the adequacy of such system to distribute HVAC therein, and no approval by Landlord of any proposed or final plans for such work shall constitute a representation or warranty by Landlord that such system will function to achieve its intended purpose. Tenant at all times shall cooperate fully with Landlord and shall abide by the reasonable regulations and requirements which Landlord may prescribe for the proper functioning and protection of the Building HVAC System.

B.    If Tenant shall require heating, ventilation or air-conditioning service at other than during Operating Hours on Operating Days ("Overtime Service") Landlord shall furnish such Overtime Service upon reasonable advance notice from Tenant, and Tenant shall pay on demand Landlord's standard hourly charge therefor, which is $75.00 per hour per floor (subject to increase annually by a percentage equal to the percentage increase in CPI).

C.    Tenant acknowledges that the use of the Premises, or any part thereof, in a manner exceeding the design categories (including occupancy and connected electrical load) specified below, or the rearrangement of partitioning which interferes with the normal operation of the Building HVAC system in or servicing the Premises, may require changes in said Building HVAC system (including, without limitation, the installation of supplementary HVAC systems in the Premises). Such changes, if required as aforesaid and approved by Landlord, shall be made by Tenant at its expense as Alterations pursuant to Article 8 of the Lease.

D-2

     CLINTON00034072

IV.    <u>WATER</u>

Landlord shall furnish at its expense cold water at temperatures supplied by the City of New York water mains for drinking, lavatory and cleaning purposes only and shall furnish hot water to the core lavatories on the floor(s) on which the Premises are located. If Tenant uses water for any other purposes, Landlord may install a meter or meters to measure the water supplied to any kitchen (including dishwashing) and restaurant or other areas in the Premises, in which case Tenant shall, upon Landlord's request, reimburse Landlord for the cost of such meter or meters, the installation thereof, the maintenance of such equipment, and the cost of the water (including heating thereof) consumed in such areas and the sewer use charges resulting therefrom.

V.    <u>ELEVATORS</u>

Landlord, at its expense, shall provide public elevator service, passenger and freight, during Operating Hours on Operating Days and shall have at least one passenger elevator subject to call at all times. If Tenant shall require freight elevator service or more than one passenger elevator other than during Operating Hours and/or other than on Operating Days, Landlord shall furnish said service upon reasonable advance notice from Tenant, and, Tenant shall pay to Landlord on demand Landlord's standard charges therefor.

VI.    <u>ELECTRICITY</u>

Electrical service shall be sufficient to provide eight (8) watts per usable square foot connected load exclusive of the Building HVAC System.

D-3

SCHEDULE 1 TO EXHIBIT D

GENERAL CLEANING SPECIFICATIONS

I.    Nightly Cleaning

      A.    Main Entrance Lobby

      B.    Elevator Cabs

      C.    Public Areas -- Multi-Tenant Floors

      D.    General Offices

      E.    Lavatories

II.    Weekly Services

III.    Monthly Services

IV.    Pest Control

V.    Window Cleaning

SD-1

CLINTON00034074

GENERAL CLEANING SPECIFICATIONS

I.    NIGHTLY SERVICES

    A.    Main Entrance Lobby

        1)    Dust sweep flooring with specially treated cloths to insure dust-free floors.

        2)    Wash ceramic tile, marble, and terrazzo flooring in building entrance and foyers.

        3)    Damp mop and spot clean resilient tile floors.

        4)    Wax, buff, apply sealer on floor finish as required.

        5)    Wipe down all metal surfaces in the lobby interior, using appropriate metal cleaner.

        6)    Dust lobby decorative motif and clean glass.

        7)    Clean entrance and lobby glass doors and lobby desk.

        8)    Wipe clean all elevator kiosks.

        9)    Maintain all rubber mats and vacuum wool or nylon runners clean and in good condition.

    B.    Elevator Cabs:

        1)    Clean saddles, door, and frames of elevators at lobby.

        2)    Remove all gum, foreign matter and unauthorized writing from elevators.

        3)    Clean metal and sides of elevator cabs.

        4)    Wash and refinish resilient floor in elevator, and if carpeted, vacuum and spot clean.

    C.    Public Areas:  (If multi-tenant floors)

        1)    Maintain public area walls in clean condition.  Public areas shall also include elevator lobbies on multiple tenant floors.

SD-2

Confidential – Subject to Protective Order                    CLINTON00034075

2)    Vacuum clean all carpets in public areas. If flooring, sweep floors with treated mop to maintain in clean condition throughout the public areas.

3)    Inspect and maintain cleanliness of fire hoses, extinguishers, and other similar equipment.

4)    Remove finger marks from all doors and elevator cabs.

D.    Tenant Office Areas:

1)    Sweep all uncarpeted flooring, using chemically treated dust mop to prevent dust dispersion.

2)    Carpet sweep carpeted areas and rugs four (4) nights each week and vacuum once each week, moving light furniture other than desks, file cabinets, etc.

3)    Hand dust and wipe clean with a treated cloth, mitt, or duster, all furniture, file cabinets, desk lamps, window sills and convector enclosed tops.

4)    Move and dust under all desk equipment and phones, replacing and dusting said equipment with approved anti-bacterial cloth.

5)    Scour and wash clean all water coolers and fountains.

6)    Clean all glass furniture tops.

7)    Empty and clean all waste basket and disposal receptacles, and remove waste to designated areas of building.

E.    Lavatories:

1)    Scour, wash, and disinfect all basins, bowls and urinals with approved germicidal detergent solution, using spray tank method.

2)    Wash and disinfect both sides of all toilet seats with approved germicidal detergent solution.

3)    Wash and polish with a non-acid polish all mirrors, powder shelves, brightwork, and enamel surfaces, etc., including flushometers, piping, and toilet seat hinges.

4)    Hand dust and wash all partitions, dispensers, and receptacles.

SD-3

Confidential – Subject to Protective Order                    CLINTON00034076

5) Sweep and wash all lavatory flooring with an approved disinfectant.

6) Empty and clean all paper towels, sanitary disposal receptacles, transporting waste to the designated location.

7) Fill all toilet tissue holders, paper towel dispensers, sanitary napkin, and soap dispensers.

II. WEEKLY SERVICES

A. Main Entrances:

1) Dust all lobby walls.

2) Hand dust all louvers and ventilating louvers.

3) Remove all finger marks from all painted surfaces near light switches, entrance doors, and the like.

B. Elevator Cabs:

1) Clean saddles and frames on floors above lobby.

2) Clean lights in cabs.

3) Dust elevator doors above lobby.

C. Tenant Office Areas:

1) Dust standard window treatments.

2) Dust surfaces not reached in nightly cleaning.

III. MONTHLY OR QUARTERLY CLEANING

A. Main Entrance:

1) High dust all electrical and air-conditioning ceiling fixtures.

B. Elevators:

1) Shampoo carpets using extraction vacuum method.

SD-4

Confidential – Subject to Protective Order

CLINTON00034077

C.    Public Areas:

    1)    Wash and wax all floors in public corridors. Public corridors shall also include elevator lobbies on multiple-tenant floor.

D.    Tenant Office Area:

    1)    Remove all smudges, fingermarks, and other marks from painted surfaces on doors, and areas around electrical light wall switches and door jambs.

    2)    Hand dust all pictures, frames, charts, graphs, and similar wall hangings not reached in nightly or weekly cleaning.

    3)    Dust overhead pipes, air-conditioning louvers and ducts, etc.

E.    Lavatories:

    1)    Machine scrub flooring.

    2)    Hand dust, clean, and wash all tile walls.

    3)    High dust lights, walls, grilles, etc.

    4)    Dust all lighting fixtures.

IV.    PEST CONTROL

    1)    Pest Control treatment in all public areas, lavatories on multi-tenant floors, and service sink rooms will be done once a month. All service will be rendered by operators licensed by Board of Health of the City of New York.

V.    WINDOW CLEANING

    1)    Cleaning of windows on the outside and inside will be done semi-annually for the second (2nd) through the fifth (5th) floors and quarterly for all other floors.

General Note

The cleaning specification described above shall be rendered as scheduled but only on Monday through Friday excluding union and legal holidays. Areas not covered as part of normal cleaning services are:

SD-5

Confidential – Subject to Protective Order    CLINTON00034078

1.  retail stores

2.  restaurants

3.  special concession areas

4.  vault areas

5.  private dining rooms, cafeterias, kitchens, bathrooms or shower rooms or athletic facilities.

6.  Tenant technology areas including, without limitation, MDF, IDF, computer/server, UPS, battery back-up and special equipment rooms.

SD-6

Confidential – Subject to Protective Order

CLINTON00034079

EXHIBIT E

RULES AND REGULATIONS

1.    The sidewalks, entrances, passages, courts, elevators, vestibules, corridors and halls shall not be obstructed or encumbered by Tenant or used for any purpose other than ingress and egress to and from the Premises and for delivery of merchandise and equipment in prompt and efficient manner, using elevators and passageways designated for such delivery by Landlord. The Building's fire stairways are for emergency use only; the use thereof for other purposes being expressly prohibited.

2.    No awnings, air-conditioning units, fans or other projections shall be attached to or project through the outside walls or windows of the Building. No curtains, blinds, shades or screens, other than those which conform to the Tenant Design & Alteration Criteria as promulgated by Landlord from time to time, shall be attached to or hung in, or used in connection with, any window or door of the Premises, without the prior written consent of Landlord. Such awnings, projections, curtains, blinds, shades, screens or other fixtures must be of a quality, type, design and color, and attached in the manner approved by Landlord. All electrical fixtures hung in offices or spaces along the perimeter of the Premises must conform to the Tenant Design & Alteration Criteria as promulgated by Landlord from time to time.

3.    No sign, advertisement, notice or other lettering shall be exhibited, inscribed, painted or affixed by Tenant on any part of the outside of the Premises or Building or on the inside of the Premises if the same can be seen from the outside of the Premises without the prior written consent of Landlord except that the name of Tenant and of Tenant's subtenants or assignee may appear on the entrance door of the Premises subject to Landlord's reasonable approval of the size, style, color and manner in which such name is displayed. In the event of the violation of the foregoing by Tenant, if Tenant has refused to remove same after reasonable notice from Landlord, Landlord may remove same without any liability, and may charge the expense incurred by such removal to Tenant.

4.    The exterior windows and doors that reflect or admit light and air into the Premises or the halls, passageways or other public places in the Building shall not be covered or obstructed by Tenant, nor shall any articles be placed on the windowsills. All windows in the Premises shall be kept closed and all blinds therein, if any, above the ground floor shall be lowered when and as reasonably required because of the position of the sun, during the operation of the Building HVAC system to cool or ventilate the Premises.

5.    No showcases or other articles shall be put in front of or affixed to any part of the exterior of the Building, nor placed in the halls, corridors or vestibules, nor shall any article obstruct any air-conditioning supply or exhaust without the prior written consent of Landlord.

6.    The water and wash closets and other plumbing fixtures shall not be used for any purposes other than those for which they were constructed, and no sweepings, rubbish, rags,

E-1

Confidential – Subject to Protective Order

acids or other substances shall be deposited therein. All damages resulting from any misuse of such fixtures shall be borne by Tenant.

7.      Except as approved by Landlord or otherwise permitted by the Lease, Tenant shall not mark, paint, drill into, or in any way deface any part of the Premises or the Building. No boring, nor any cutting or stringing of telephone, computer, electric or other wires or instruments, shall be permitted, except with the prior written consent of Landlord, which consent shall not be unreasonably withheld or delayed, and as Landlord may direct. Tenant shall not lay floor tile, or other similar floor covering, so that the same shall come in direct contact with the floor of the Premises, and, if such floor covering is desired to be used an interlining of builder's deadening felt shall be first affixed to the floor, by a paste or other material, soluble in water, the use of cement or other similar adhesive material being expressly prohibited.

8.      No space in the Building shall be used for manufacturing, for the storage of merchandise, or for the sale of merchandise, goods or property of any kind at auction or otherwise.

9.      Tenant shall not make, or permit to be made, any unseemly or disturbing noises or disturb or interfere with occupants of the Building or neighboring buildings or premises or those having business with them whether by the use of any musical instrument, radio, television set, tape player, phonograph, whistling, singing, or in any other way.

10.     Tenant, or any of Tenant's servants, employees, agents, sublessees, visitors or licensees, shall not at any time bring or keep upon the Premises any inflammable, combustible or explosive fluid, chemical or substance except such as are incidental to usual office occupancy and are properly safeguarded.

11.     No additional locks or bolts of any kind shall be placed upon any of the doors or windows by Tenant, nor shall any changes be made in existing locks or the mechanism thereof, unless Tenant promptly provides Landlord with the key or combination thereto (except with respect to security areas). Tenant must, upon the termination of its tenancy, return to Landlord all keys of stores, offices and toilet rooms, and in the event of the loss of any keys furnished at Landlord's expense, Tenant shall pay to Landlord the cost thereof.

12.     No bicycles, vehicles or animals of any kind except for seeing eye dogs shall be brought into or kept by Tenant in or about the Premises or the Building.

13.     All removals, or the carrying in or out of any safes, freight, furniture or bulky matter of any description, must take place in the manner and during the hours which Landlord or its agent reasonably may determine from time to time. Unless Landlord grants prior approval, Tenant shall not be permitted to perform any of the foregoing during Operating Hours on Operating Days (as defined in Exhibit D to the Lease). Landlord reserves the right to inspect all safes, freight or other bulky articles to be brought into the Building and to exclude from the Building all safes, freight or other bulky articles which violate any of these Rules and Regulations or the Lease of which these Rules and Regulations are a part. Landlord shall have the right to prescribe the weight and position of safes and other objects of excessive weight, and

E-2

no safe or other object whose weight exceeds the lawful load for the area upon which it would stand shall be brought into or kept upon the Premises. If, in the judgment of Landlord, it is necessary to distribute the concentrated weight of any heavy object, the work involved in such distribution shall be done at the expense of Tenant and in such manner as Landlord shall determine.

14.    Tenant shall not occupy or permit any portion of the Premises demised to it to be occupied as an office for a public stenographer or typist, or for the possession, storage, manufacture or sale of liquor, narcotics or drugs, or as a barber or manicure shop, or as an employment bureau. Tenant shall not engage or pay any employees on the Premises, except those actually working for Tenant at the Premises, nor advertise for labor giving an address at the Premises.

15.    Tenant shall not purchase spring water, ice, towels or other like service, or accept barbering or bootblacking services in the Premises, from any company or persons not approved by Landlord, which approval shall not be withheld or delayed unreasonably, or at hours or under regulations other than as reasonably fixed by Landlord.

16.    Landlord shall have the right to prohibit any advertising by Tenant which, in Landlord's reasonable opinion, tends to impair the reputation of the Building or its desirability as a building for offices, and upon written notice from Landlord, Tenant shall refrain from or discontinue such advertising.

17.    Landlord reserves the right to exclude from the Building other than during Operating Hours on Operating Days all persons who do not present a pass to the Building signed or approved by Landlord. Tenant shall be responsible for all persons for whom a pass shall be issued at the request of Tenant and shall be liable to Landlord for all acts of such persons.

18.    Tenant shall, at its expense, provide artificial light for the employees of Landlord while doing janitor service or other cleaning, and in making repairs or alterations in the Premises.

19.    The requirements of Tenant will be attended to only upon written application at the office of the Building. Building employees shall not perform any work or do anything outside of the regular duties, unless under special instructions from the office of Landlord.

20.    Canvassing, soliciting and peddling in the Building is prohibited and Tenant shall co-operate to prevent the same.

21.    There shall not be used in any space, or in the public halls of the Building, either by Tenant or by jobbers or others, in the delivery or receipt of merchandise, any hand trucks, except those equipped with rubber tires and side guards.

22.    Tenant shall not do any cooking, conduct any restaurant, luncheonette or cafeteria for the sale or service of food or beverages to its employees or to others, or cause or permit any odors of cooking of other processes or any unusual or objectionable odors to emanate from the

Confidential – Subject to Protective Order                                                    CLINTON00034082

Premises (but Tenant shall be permitted a standard office pantry pursuant to Article 10 of the Lease without cooking). Tenant shall not install or permit the installation or use of any food, beverage, cigarette, cigar or stamp dispensing machine other than for the exclusive use of Tenant's employees and invitees, or permit the delivery of any food or beverage to the Premises.

23.     Tenant shall keep the entrance door to the Premises closed at all times.

24.     Any person whose presence in the Building at any time shall, in the judgment of the Landlord, be prejudicial to the safety, character, reputation and interests of the Building or of its tenants may be denied access to the Building or may be ejected therefrom. In case of invasion, riot, public excitement or other commotion, the Landlord may prevent all access to the Building during the continuance of the same, by closing the doors or otherwise, for the safety of the tenants and protection of property in the Building. The Landlord may require any person leaving the Building with any package or other object to exhibit a pass from the tenant from whose premises the package or object is being removed, but the establishment and enforcement of such requirement shall not impose any responsibility on the Landlord for the protection of any tenant against the removal of property from the premises of the tenant.

25.     Smoking is prohibited at all times throughout the Building including, without limitation, on the sixth (6th) floor terrace.

26.     Landlord may from time to time adopt additional systems and procedures to improve the security or safety of the Building, any persons occupying, using or entering the same, or any equipment, finishings or contents thereof, and Tenant shall comply with Landlord's reasonable requirements relative thereto.

27.     Tenant shall neither contract for, nor employ, any labor in connection with the maintenance or cleaning of, or providing of any other services to, the Premises (other than Tenant's Property) without the prior consent of Landlord which consent shall not be unreasonably withheld.  It shall be reasonable for Landlord to withhold any such consent on the ground that use of such service provider would disrupt labor harmony, security or operations in the Building.

28.     Tenant shall not permit the consumption of alcoholic beverages in any public, common or reception areas of the Building or the Premises except in commercial establishments properly licensed to serve such beverages.

29.     Tenant is required to fund any Emergency Action Plan (EAP) updates if required by a tenant project.

E-4

    CLINTON00034083

EXHIBIT F

TENANT DESIGN & ALTERATION CRITERIA

(see attached)

Confidential – Subject to Protective Order

CLINTON00034084

IIb Boston Properties

510 Madison Avenue
Alteration Rules & Regulations & Design Guidelines

I.  **OPTIONAL TENANT LEED CERTIFICATION AND RATING**

This building's core and shell has been designed to obtain LEED certification as a "green" building. This design and alteration criteria has been developed to comply with the requirements for this certification. Tenant's participation in this program is entirely optional. If a tenant wishes to participate, "green" tenant interior design and construction guidelines which are being published will be provided upon request.

These guidelines will explain the "green" features of the building. They will also present methods that the tenants may elect to follow in order to, among other things, reduce energy use, increase indoor air quality, and in general, make the buildings "green" rating more sustainable. Under LEED, the content of these guidelines shall:

Provide a description of the sustainable design and construction features incorporated in the Core & Shell project and delineates the project intent with respect to sustainability goals and objectives including those for tenant spaces.

Provide information that enables a tenant to coordinate its space design and construction with the core and shell building systems. Specific building LEED-CS credits are to be addressed when applicable and include:

- Water Use Reduction
- Optimizing Energy Performance, Lighting Power
- Optimizing Energy Performance, Lighting Controls
- Optimizing Energy Performance, HVAC
- Energy use and metering
- Measurement and Verification
- Ventilation and Outdoor Air Delivery
- Construction IAQ Management
- Indoor Chemical and Pollutant Source Control
- Controllability of Systems
- Thermal comfort
- Daylighting and views
- Commissioning
- The elimination or control of environmental tobacco smoke.
- Provide recommendations and suggestions , including examples, of sustainable  strategies, products, materials, and services,
- Provide information on the LEED Green Building Rating System for Commercial Interiors (LEED-CI) and how the core and shell building contributes to achieving these credits.

The tenant's decision, whether to participate in this rating system or not, does not affect the building's LEED certification rating.

II.  **GENERAL**

A.  The terms "Boston Properties Limited Partnership, "BPLP", "Landlord' and "Building Management" are interchangeable.

B.  The term "Contractor" refers to the General Contractor or Construction Company responsible for overseeing the project.

C.  Tenant must furnish Building Management with Certificates of Insurance prior to the start of construction. The Building Manager reserves the right to require actual policies.

D.  Two (2) full size sets of prints, three (3) half size set of prints and must be submitted to BPLP for approval prior to proceeding with any installations and/or alterations. All drawings must be prepared by a. licensed Architect or Engineer. All engineering drawings must be complete (ready for submission to the Building

Confidential – Subject to Protective Order                                CLINTON00034085

Department) when sent to BPLP for review. Drawing revision schedule shall indicate "Issued for Landlord Review". Revisions to drawings and/or specifications must be resubmitted for approval and/or comments. Revisions must be clearly indicated on drawings and dated in a revision box with a brief, precise description of the revisions made. At the completion of the project, the tenant shall deliver to the landlord an electronic copy of the as-built drawings for all trades, as well as copies of testing and balancing reports.

E.    Design drawings must be prepared utilizing current version of AutoCAD format, employing A.I.A. layering guidelines.

F.    Symbol legends for all systems and devices must be shown on drawings.

G.    All plans must be drawn at either 1/8" or 1/4" per foot scale; details are to be of sufficient scale to show complete information required for fabrication and installation.

H.    Design and installation of all electrical, plumbing, HVAC, fire and life safety (Class "E") systems and equipment must be in compliance with BPLP standards for the building, the Administrative Code of The City of New York, Rules of the City of New York and all other governing codes and standards.

I.    Tenant shall retain the services of the buildings expediting and code consultant Jerome S. Gillman Consulting Architect for Building Department expediting services. All Building Department forms (i.e. Plan Work Approval [PW-1], Statement of Responsibility [TR-1] (including signoff of Special and Progress inspectors on the TR-1 before start of work, and Plumbing and Sprinkler Schedule) must be completely filled in with the exception of Owner's Authorization as to applicant and plan responsibility and submitted to BPLP with final plans. The Tenant is responsible for executing all Cost Affidavits [PW-3] for work performed by Tenant contractor(s).

J.    Tenant shall furnish BPLP with the Certificate of Inspection from the Bureau of Electrical Control upon completion of any electrical work necessitated by the alteration.

K.    Compliance with all requirements of the Americans with Disabilities Act (ADA) within the Premises is the Tenant's responsibility.

L.    Provide updated fire protection plan drawings (11" x 17" format) to Building Manager, indicating location of all life safety/fire protection devices and exit signs/emergency lights.

M.    All abandoned or unused cabling, raceways, sheet metal ducts, pipes, etc. shall be removed back to the point of origin.

N.    All required building systems shutdowns - electrical, HVAC, plumbing, fire protection and life safety (Class 'E') - must be coordinated with, and approved by Building Management at least three (3) days in advance of desired shutdown.

O.    Equipment Use Permits must be provided to Building Management prior to operating any equipment requiring such permits.

P.    Fire exits and stairs shall be kept clear and accessible at all times. Fire Exit doors shall remain closed at all times. Stairwells are for emergency purposes only and are not to be used by tenant contractors for inter-floor travel.

Q.    Operable fire extinguishers must be on the job site at all times.

R.    Applicable permits, a Fire Watch (by persons carrying Form 820 - Certificate of Qualification and Fitness) and protective blankets are required for any burning, welding or use of open flames.

S.    The Building Management Office must be contacted-prior to the removal of hardware, light fixtures and other

Confidential – Subject to Protective Order                                                              CLINTON00034086

IIⅅ Boston Properties

building standard reusable fixtures or equipment.

T.     All work performed that may inconvenience or disturb other tenants must be scheduled before 8:00am or after 6:00pm, Monday through Friday, or on weekends. Building Management reserves the right to stop such work during normal working hours.

U.     Any part of the Building, including all building equipment rooms, damaged during alterations shall be repaired to the Building Manager's satisfaction. The General Contractor and Tenant are to make arrangements with the Building Manager to inspect the site before construction to determine the existing conditions and to notify the Building Manager, in writing, of any exceptions.

V.     Materials or refuse of any kind are not to be stored in any building hallway, electrical closet, telecommunication room, restroom or any mechanical equipment room. Any materials stored in any of these areas are subject to removal and disposal at Contractor's expense, without prior notice to Contractor.

III.     CONTRACTOR'S RESPONSIBILITIES

A.     The Contractor is responsible for its own trash removal on a regular basis. Construction personnel must keep the work areas clean and free of trash at all times. Refuse and debris removed from the work areas must be deposited in a container and removed via the service elevators to the loading dock. Neither full nor empty containers nor debris are to be stored/staged on the loading dock, or in any base building area. Any debris found in base building areas will be disposed of at Contractor's expense

B.     Workmen will be assigned one restroom area. The Contractor is responsible for the proper protection of the assigned restroom area, as directed by Building Management. The Contractor will be responsible for any and all damages to the assigned restroom area. The Contractor is also responsible for the proper cleaning of the assigned area (which includes the maintenance of paper products).

C.     Loud or abusive language or the playing of music that can be heard outside the work area will NOT be tolerated. The use of non-prescription drugs or alcohol is strictly prohibited on the Building site. It is the responsibility of the Contractor to enforce these regulations on a day-to-day basis and to immediately respond to specific complaints from other tenants or Building Management.

D.     Work shall be in compliance with all local, state and federal laws and regulations. Notwithstanding anything contained herein, applicable governing codes or regulations which are more restrictive than the Landlord's standards shall be the codes and regulations followed.  Smoking is prohibited throughout the entire building including the sixth floor setback, loading dock and roof.

E.     The Contractor is responsible for ensuring that base building areas are thoroughly cleaned upon completion of construction. This includes Electric Closets, Telecommunication Rooms, Janitor's Closets and Restrooms.

F.     The Contractor is required to have a full time Superintendent or Project Manager present on site whenever work is being performed.

IV.     CONSTRUCTION MATERIAL DELIVERIES

A.     All deliveries related to construction activity are to be scheduled through the Building Management Office a minimum of 72 hours in advance, i.e., three (3) business days prior to the planned delivery date.

B.     Construction materials shall be delivered to the job in proper containers and shall be stored in the Tenant work area. Materials must not be stored in public areas (i.e., freight lobbies, loading dock areas, public corridors.) All deliveries are to be made through the freight elevator located in the basement. All construction personnel, material and equipment must access the building through the loading dock to the building freight car. *All construction personnel must also access the building through the freight elevator. Construction Personnel shall not use the passenger elevators.*

Confidential – Subject to Protective Order                                           CLINTON00034087

Boston Properties

510 Madison Avenue
Alteration Rules & Regulations & Design Guidelines

C.  Procedures for moving construction material and furniture at 510 Madison Avenue service entrance.

- Tenant and/or Construction Company must notify the Building Manager at least 72 hours in advance of required date for moving materials.
- Large and oversized deliveries must be scheduled before 8:00 a.m., after 6:00p.m. or on weekends. Service elevator scheduling is done on a "first come, first served basis". *Building Management reserves the right to stop any deliveries being made during the day which impede the normal operation of the service elevators.*
- Any oversized deliveries which require access to the freight elevator top or hatch will require the services of an elevator mechanic, whose time will be billed to the Tenant at the prevailing rate.
- A security guard is required to be on duty whenever the service entrance door is open for an extended period of time, outside business hours. A service elevator operator is required whenever the freight elevator is needed. Arrangements for security guards and for service elevator operators are to be requested through the Building Management Office.
- Building Management will bill the Tenant at the prevailing rates and work rules for elevator operator, operating engineer, security guard and any other services provided during construction. Contact Building Management for a copy of the prevailing rates.
- Building material shall not be stored or transported through the building in a manner that overloads floor slabs and the freight elevator.

V.  **SAFETY**

A.  The Contractor is responsible for ensuring that the workplace is maintained in a safe and orderly manner for all persons working within the area.

B.  Danger and warning signs shall be prominently displayed, and every precaution exercised to offer the fullest protection to pedestrian traffic in and around the premises, building tenants and their guests, and Building Management and maintenance personnel.

C.  Particular attention should be paid to fire safety precautions during construction, particularly when welding is required. Storage of flammable and combustible material must be done with the prior written approval of Building Management.

D.  The Contractor shall conform to construction and building fire regulations as directed by Building Management, in addition to regulations and practices as required by local governing authorities.

VI.  **PROTECTION**

A.  Protect walls, floors, stair doors in public areas and elevator cabs subject to construction traffic.

B.  Disconnect electric power before demolition work commences. Install temporary lighting.

C.  Protect perimeter fin tube and unit enclosures against dirt and dust. The fin tube and enclosures must be cleaned and restored, if necessary, when construction work is finished.  Cutting of enclosures is not permitted

D.  Install shoe wiping mats at all openings between public and construction areas and maintain them as needed.

E.  Remove construction debris and excess material from the Building before 8:00am or after 6.00pm. Containers are not allowed to remain on the sidewalks after 8:00am or they will be removed by Building staff and charged back to the Contractor.

F.  If dollies, hand trucks and Contractor's lock boxes do not have rubber wheels and bumpers; proper protection

Confidential – Subject to Protective Order                                          CLINTON00034088

Boston Properties

510 Madison Avenue
Alteration Rules & Regulations & Design Guidelines

must be used to protect building areas.

G.  Contractor shall endeavor to minimize the noise caused by excessive movement of gang boxes, dollies and mini containers.

VII.  **STRUCTURAL**

A.  Provide layout drawings indicating the weight, location and dimensions of any heavy equipment (vaults, rolling files, batteries, transformers, storage racks, A/C units, pumps, etc.) supported on floors or hung from the building structure. All such equipment installations are subject to approval of, and must be installed in accordance with the recommendation of the Landlord's Structural Engineer.

B.  Where hangers cannot be supported from building structure, install two double expansion shields connected by a 2" x 2" angle from which the hanger rod shall be suspended. For ductwork and pipe sizes 2" and under, use a single double-expansion shield subject to the approval of the Structural Engineer. The carrying capacity and size of each shield shall be calculated on the basis of the spacing indicated above but the minimum size shall be 3/8". Hanger rods shall be of adequate size to support the loads, which they carry. Shields may be used in stone concrete only. No power or power actuated inserts will be permitted. The intention is to provide supports which, in each case, shall be amply strong and rigid for the load, but which shall not weaken or unduly stress the building construction.

C.  Requirements for Floor Penetrations to Accommodate Communication, Electrical Conduits and Piping:

- Penetrations through slabs shall not be installed over girders, beams, column pedestals, or columns.
- Penetrations shall be kept to an absolute minimum in size, ¼" larger than the diameter of the conduit. (Firestopping can follow by foaming methods).
- Where possible, tenants shall exercise prudence to consolidate wiring to minimize the number of floor penetrations.
- All small holes shall be hand-drilled.
- Where core-bored penetrations are required, they shall be kept to a minimum and shall likewise be as small in diameter as is necessary to accommodate the conduit and/or pipe.

D.  Core boring holes if used, shall not damage or cut any floor reinforcing bars and likewise not be positioned over building structure.

- Whenever core boring is to occur, all reinforcing shall be located by magnetic means.
- Holes shall likewise only be 1/4." larger than the protruding conduit.
- Procedures for core borings in reinforced concrete column strips and pedestals, if absolutely required, shall be specified by the Tenant's architectural or structural engineer. Such specifications shall include any required reinforcing, all of which shall be approved by the Owner's structural engineer.

E.  If duct, large diameter penetrations, and/or multiple, closely-spaced penetrations must be installed, structural reinforcing must be provided by the tenant.

F.  All tenants construction documents and construction shall reflect and meet these requirements.

G.  FLOOR LOADING

The building is designed to support the following tenant loading:

Confidential – Subject to Protective Order                                    CLINTON00034089

**Boston Properties**

510 Madison Avenue
Alteration Rules & Regulations & Design Guidelines

| Floor | Live Load |
|---|---|
| Ground | 100 psf |
| 2-5 | 50 psf |
| 6 | 100 psf |
| 7-30 | 50 psf |

VIII.   **HEATING, VENTILATION AND AIR CONDITIONING SYSTEMS**

A.   **HVAC DESIGN CRITERIA**

1.   Temperature and Humidity Design Conditions,

| | |
|---|---|
| **Summer:** | Outdoor 89°F dry bulb, 73°F wet bulb |
| Indoor | 78°F dry bulb, |
| **Winter:** | Outdoor 15°F dry bulb |
| Indoor | 70°F dry bulb (no humidity control) |

2.   Cooling Load Conditions

| | |
|---|---|
| People: | One person per 100 usable sq.ft. |
| Outside Air Quality: | 0.25 cfm per usable sq.ft. (floors 2-5) |
| | 0.22 cfm per useable sq. ft. (floors 7-30) |

B.   **TENANT REQUIREMENTS**

1.   Location of Tenant furnished and installed water-cooled condensing equipment must be approved by BPLP.

2.   Tenant systems must comply with the 1990 Clean Air Act (release, testing, repair, installation, training, serving, etc.) and subsequent amendments covering refrigerants.

3.   Systems containing refrigerants shall be installed in accordance with the requirements of the latest version of ANSI/ASHRAE-15. Refrigerants containing CFC's are not permitted.

4.   All Tenant air conditioning systems utilizing building air shall be single duct variable air volume (VAV) type. VAV boxes shall be electric type.

5.   Duct systems shall be constructed in accordance with the following SMACNA HVAC duct construction standards:

6.   Ductwork downstream of VAV boxes 1-inch pressure class per Table 1-4, Class C sealed.

7.   Ductwork upstream of VAV boxes 2-inch pressure class per Table 1-5, Class B sealed.

8.   The suction and discharge of all exhaust systems shall be 2-inch pressure class per Table 1-5, Class A sealed.

9.   The Base Building perimeter fin tube heating system is provided with local control valves. The Tenant, as part of the Tenant's construction, shall interface the local control valves with Tenant's with Landlord's BMS system, in a manner prescribed by Landlord. (Contact Building Management office for detailed specification requirements).

Confidential – Subject to Protective Order                                     CLINTON00034090

Boston Properties

510 Madison Avenue
Alteration Rules & Regulations & Design Guidelines

10. Piping systems circulating condenser water shall utilize ASTM B-88, Type K or L hard-drawn copper pipe with wrought copper or case bronze fittings; solder shall be lead-free. Piping system pressure ratings shall meet or exceed a working pressure floors C1 – 3; 300 psig; floors 4-12: 250 psig; floors 14-25: 200 psig; floors 26-29: 150 psig

11. Systems shall be designed to maintain a minimum velocity of 3 feet per second and assure that there is flow to all portions of the system, including standby units, for a minimum of four (4) hours each day. Condenser water range will be a maximum temperature of 88°F during the summer and a minimum temperature of 45°F during the winter. Tenant shall A three-way water-regulating valve shall be provided for each water-cooled supplemental A/C unit and a capped full size shut off valve after the Tenant connection.

12. Dielectric fittings shall be installed at all connections between dissimilar metals.

13. Tenant to design supplemental condenser water system for Tenant system losses only.

14. All new piping connecting to base building systems must be chemically cleaned and passivated prior to utilization of the base building system. Provide a letter indicating the approximate linear feet of each size of copper piper installed.

15. Piping systems must be pressure tested utilizing treated water. Pressure test shall be performed at one and one half times (150%) the working pressure for a period of four (4) hours.

16. Cleaning and passivation of condenser water piping shall be performed in the presence of the Owner's representative, utilizing chemicals recommended by the building's chemical treatment company.

17. All piping systems must be provided with identification labels installed every 20 feet on each pipe and at least once within each room.

18. All valves shall be 1/4 turn-type, i.e., ball valves, butterfly valves, and lubricated-plug chocks. Ball valves shall be full port design. Access doors must be provided. All valves shall be tagged and a valve list provided to Building Management

19. Exhaust hoods for kitchens must be the water-wash grease-extraction type, utilizing hot water and cold water.

20. Fire dampers shall be combination fire/smoke dynamic-type, electrically actuated.

21. All supply air ductwork serving Tenant space and/or located within the Tenant space shall be insulated.

22. The Tenant shall be responsible for any acoustical treatment and for the treatment of acoustical problems that may result from equipment located within and serving the Tenant space.

23. Furniture, equipment, etc., located near the enclosure of the building perimeter radiation unit system shall in no way interfere with the operation of and/or access (for service) to the existing piping, valuing, and radiation units.

24. All supplemental air conditioning units are to be balanced for design flow conditions and reports indicating same are to be submitted to the Building Management. Circuit setters are to be installed to limit water flow to required design value.

25. Discharge condensate into sink areas or waste lines only.

Confidential – Subject to Protective Order     CLINTON00034091

IIɔ Boston Properties

510 Madison Avenue
Alteration Rules & Regulations & Design Guidelines

26.  Install proper isolation pads or vibration eliminators on supplementary air conditioning units.

27.  Locate all strainers for supplemental A/C units so that they are easily accessible and have proper shutoffs. if system is critical, dual strainers are to be installed.

28.  Provide insulation for all condenser water and drain piping.

29.  Tenant is responsible for repairing and/or replacing existing insulation on condenser water riser, which may be damaged during construction.

30.  All ductwork and piping shall be properly secured to the building structure in a manner acceptable to the Owner's structural engineer.

31.  Penetrations and openings through slabs must be approved by the Owner's structural engineer and comply with Structural requirements of this Tenant Design and Alteration Criteria.

32.  All ceiling plenum spaces are to be designed to allow adequate clearance for return air to the main return air duct.  This includes maintaining return air paths from adjacent tenant spaces. Mechanical engineer shall verify return size and adequacy of air path.

IX.  **ELECTRICAL**

A.  Contact the Building Manager and Chief Engineer before commencing work.

B.  Electric service is supplied from Con Edison at 265/460 volts, 3 phases, and 4 wires. Step-down transformers provide service at 120/208 volts, 3 phases, and 4 wires. Available power for Tenant's exclusive use for lighting and small power is as agreed to in the Lease.  Floors 2-5 are served with a 75 kva transformer and floors 7-30 are served with a 45 kva transformer.

C.  Emergency egress lighting and exit lighting shall utilize battery backup.

D.  All conductors shall be copper.

E.  All cable shall utilize one of the following insulation types, as appropriate: THHN, THWN, XHHW.

F.  Transformers shall be copper-wound, K-13 rated.

G.  GFI type receptacles shall be utilized in Toilet Rooms, Janitor's closets and similar wet areas.

H.  All electrical feeders and all electrical branch circuits in Electrical Closets, Mechanical Equipment Rooms, Telecommunication Rooms, common areas (lobbies, corridors, etc.) shall utilize one of the following raceways: EMT, galvanized rigid steel, IMC or aluminum.

I.  Branch circuits within the Tenant's demised space may utilize any one of the above raceway types or armored cable.

J.  Conduit systems shall be properly supported, neatly arranged and installed parallel to walls. All conduits and raceways in common areas must be concealed.

K.  "Sealtite" shall be used for final connections to mechanical equipment where the environment will be subject to moisture or within fan plenums.

L.  Poke-through floor outlets are permitted in limited quantities. In general, not more than one (1) two-inch penetration is permitted per structural concrete "cell" (including existing penetrations) without specific approval by the Structural Engineer.

Confidential – Subject to Protective Order

CLINTON00034092

Boston Properties

M.   All electrical power shall be metered by the Landlord after the 265/460 V switch on the buss duct in accordance with BPLP standards.

N.   All panelboards, switchboards, meters, transformers and disconnected switches shall be permanently labeled. Panel covers and trims must be reinstalled.

O.   All feeders shall be labeled at each pull box, splice box and function box.

P.   Panelboard loads shall be balanced to within 10% (5%) of each phase.

Q.   Design drawings shall utilize full panelboard schedules, listing the type of load, pole position, circuit breaker type and size and shall indicate both estimated and connected demand loads on each feeder/riser.

R.   Clean Electric Closets of all debris and material at the completion of work. Seal any penetrations in slabs or walls with approved fire-rated materials.

S.   Remove wiring abandoned in ceiling including telephone wiring (back to source). Vacuum all ducts and cap open floor outlets. (Where Applicable)

T.   Penetrations and openings through slabs must be approved by the Owner's structural engineer and comply with Structural requirements of this Tenant Design and Alteration Criteria.

X.   **TELECOMMUNICATION SYSTEMS**

A.   New telecommunications equipment, if required, shall be installed within the Tenant's demised space and not within the base building core area.

B.   New riser cabling shall be installed in the telecommunications riser closets or riser conduits at the explicit direction of BPLP. Submit a request for use of risers to BPLP prior to preparation of design drawings indicating proposed route, number and type of cables, total cross-sectional area, weight per linear foot, total weight at each point of support, and proposed method/location of support. Floor-to-floor cabling shall not be run in base building closets, but shall be routed in separate risers.

C.   All telecommunications cabling shall be approved for use in plenum spaces.

D.   Telecommunication cabling in common areas, Mechanical Equipment Rooms, etc. shall be installed in an enclosed raceway and shall be identified.

E.   Ceiling tiles and light fixtures in public space must be re-installed and damaged tiles must be replaced immediately upon completion of work.

F.   Penetrations and openings through slabs must be approved by the Owner's structural engineer and comply with Section 3 of Structural requirements of this Tenant design and Alteration Criteria.

XI.   **PLUMBING SYSTEMS**

A.   All piping systems must be provided with identification labels installed every 20 feet on each pipe and at least once within each room.

B.   All valves shall be 1-1/4 turn type, i.e., ball valves, butterfly valves, lubricated-plug chocks. Ball valves shall be full port design. Full access shall be provided.

C.   New plumbing to be copper pipe of a size and wall thickness meeting or exceeding legal code requirements and shall originate on the same floor from the nearest wet column with proper access for maintenance. Shutoff valves are to be installed and made accessible.

Confidential – Subject to Protective Order                                    CLINTON00034093

IIIᗺ Boston Properties

510 Madison Avenue
Alteration Rules & Regulations & Design Guidelines

D.   Insulate water supply pipes to prevent sweating or heat loss.

E.   Waste lines shall be properly pitched to prevent "trapped" water. Install waste line connections with long turn or 45° "Y" fittings.

F.   Retain existing clean out connections and provide clean-out connections at new fittings.

G.   All ductwork and piping shall be properly secured to the building structure in a manner acceptable to the Owner's structural engineer.

H.   Penetrations and openings through slabs must be approved by the Owner's structural engineer and comply with Section 3 of Structural requirements of this Tenant Design and Alteration Criteria.

I.   All piping shall be run as tight as possible to the metal deck and routed to minimize interference with other tenant's construction.

XII.   **LIFE SAFETY SYSTEMS**

A.   Tie-ins to the base building fire and life safety (Class "E") system and any programming associated thereto must be supervised by the base building Class "E" Maintenance Contractor.

B.   Any work requiring the building Life Safety System to be taken off line, must be coordinated, in advance, with the Building Management Office.

C.   Building Management must be notified prior to the use of any burning or welding device or demolition work so that the Life Safety System can be taken "off-line". Notification must also be given when work is complete.

D.   Smoke detectors and other life safety devices must be protected when performing work that may cause these devices to become contaminated with dust.. Protection must be removed upon completion of the work.

E.   Tenant will be fully responsible for any and all false alarms resulting from their work.

F.   Prior to occupying tenant space, the newly installed fire alarm devices must be tested. Test to be conducted during non-business hours (Saturday), in the presence of Boston Properties Management, at Tenant's sole cost and expense.

XIII.   **FIRE PROTECTION**

A.   All spaces shall be sprinklered. Sprinkler system shall be designed in accordance with Factory Mutual Standards.

B.   Fire Protection Design Criteria:

   •   Sprinkler control valve assemblies will be provided at fire sprinkler riser.
   •   All areas within Tenant's space, including elevator lobbies, toilets, janitor's closets, telephone closets and communications closets must be provided with sprinklers.
   •   Sprinkler systems for office areas shall be designed to Light Hazard.

C.   Sprinkler systems must remain active throughout construction. Contractor shall not interrupt or shutdown the existing sprinkler systems without Building Management's permission. All shutdowns of the existing system shall be coordinated with Building Management and the local fire department. The sprinkler system shall be refilled and activated at the end each of the day.

D.   A fire watch guard with a Certificate of Fitness shall be maintained during all shutdowns.

Confidential – Subject to Protective Order                                         CLINTON00034094

**Boston Properties**

510 Madison Avenue
Alteration Rules & Regulations & Design Guidelines

E.    Sprinkler heads shall be Underwriters' Laboratories listed approved for ordinary degree rating.

XIV.   <u>BUILDING STANDARDS FINISHES</u>

The Tenant's installation shall include the following elements as applicable.

A.    **WINDOW TREATMENT**

Solar Shades manually operated in extruded aluminum housing. Fabric Phifer Sheerweave #2000, 5% openness, color: P 02, white.

B.    **PERIMETER COLUMNS**

Gypsum wall board cover on all four sides. Three columns facing the windows to be painted with Benjamin Moore Super White, eggshell finish

C.    **DEMISING WALLS**

Gypsum wallboard with rating as required by the New York City Code. All doors, finishes and assemblies must conform to relevant codes.
Acoustical performance wall to be at least STC 50.

D.    **TENANT ELEVATOR LOBBY**

The Tenant lobby elevator lobby is required and the design standard is as follows:

1.    Flooring

Calacatta Vagli Soprano marble, sequence matched, 30" x 24" slabs, ¾" thick, set in a mortar bed approximately 1-1/4" thick over an anti-fracture membrane.

2.    Entrance Doors

Main Entry Doors:  Double, full height, clear tempered self closing smoke barrier glass doors with 2'-0" sidelights, stainless steel patch fittings, floor closers, and custom 42" x 1-1/4" heavy straight satin stainless steel wire pulls manufactured by D-Line.  Additional glass in lieu of drywall partitions will be permitted and as approved by Landlord.
Secondary Entrance Doors: Full height flush fire rated hollow metal doors in single rabbet 1-1/2" profile hollow metal frames with Schlage L-series mortise lever locksets, #12 design, satin stainless steel finish, mortised ball bearing stainless steel hinges.

3.    Wall Treatment

Fabric wrapped panels to match Landlord's Standard.

4.    Ceiling

Gypsum drywall ceiling to match Landlord's standard prebuilt design.

E.    **TENANT SIGNAGE**

- If glass door, silver letters on glass
- If metal door, black letters on aluminum
- Signage to be submitted to Landlord for review and approval.

Confidential – Subject to Protective Order

CLINTON00034095

**Boston Properties**

510 Madison Avenue
Alteration Rules & Regulations & Design Guidelines

F.    **BUILDING STANDARD HARDWARE**

Building Standard hardware is Schlage L-Series lockset.  Mortise locksets are are L9080T store room function.  The handle style is 07. The permanent core is Schlage 23-030. The finish is 630 satin stainless steel.

G.    **PERIMETER CONDITIONS**

Tenant shall comply with the specifications set forth on the following detail drawings attached hereto: SKI-1 through SKI-8

Confidential – Subject to Protective Order                                    CLINTON00034096



**NOTE:** NO PENETRATION OF ANY ELEMENT OF CURTAIN WALL OR RADIATOR COVER ALLOWED

1/2" REVEAL

WINDOW BLINDS SOLAR SHADE FABRIC PHIFER SHEERWEAVE #2000, 5% OPENESS, COLOR: P02 WHITE

WHITE BLACKOUT SHADE IF REQUIRED

PAINTED METAL PANEL PPG DURANAR UC43350 BONE WHITE SEMI-GLOSS

PTD. GWB COLUMN ENCLOSURE BENJAMIN MOORE "SUPER WHITE" FLAT FINISH PER SK1-11 & SK1-12

1" INSULATION GLASS

CLEAR ANODIZED ALUMINUM MULLION

CLEAR ANODIZED ALUMINUM RADIATOR COVER

CEILING TILES ARMSTRONG 2'X2' "ULTIMA" W/ SILHOUETTE 9/16" BOLT SLOT - 1/4" REVEAL GRID W/ SHADOWLINE EDGE TRIM

NO OBSTRUCTION TO AIR FLOW PERMITTED

FLOOR PER BUILDING STANDARD FINISHES

1
SK1-3

11'-3"

1'-2"

13'-6"

10'-0"

2'-2½"

11"

1  SECTION AT NORTH/SOUTH 2ND-5TH FLOOR
   SCALE: 3/8" = 1'-0"





BUILDING STANDARDS
2ND-5TH FLOOR SK1-1
07.13.2010

Confidential – Subject to Protective Order

CLINTON00034097



CEILING TILES ARMSTRONG 2'X2' "ULTIMA" W/ SILHOUETTE 9/16" BOLT SLOT - 1/4" REVEAL GRID W/ SHADOWLINE EDGE TRIM

**NOTE:** NO PENETRATION OF ANY ELEMENT OF CURTAIN WALL OR RADIATOR COVER ALLOWED

2'-6"

10'-0"

PTD. GWB COLUMN ENCLOSURE BENJAMIN MOORE "SUPER WHITE" FLAT FINISH

CLEAR ANODIZED ALUMINUM MULLION

CLEAR ANODIZED ALUMINUM RADIATOR COVER

NO OBSTRUCTION TO AIR FLOW PERMITTED



1  TYP. ELEVATION 2ND-5TH FLOOR
   SCALE: 3/8" = 1'-0"



PTD. GWB COLUMN ENCLOSURE BENJAMIN MOORE "SUPER WHITE"; ENCLOSURE SIZE PER SK1-9

1
SK1-4

FOR INSTALLATION OF DEMISING WALL AT INTERMIDIATE MODULE INSTALL METAL COVER PLATE

RADIATOR COVER TO REMAIN CLEAR ANODIZED ALUMINUM

11"



2  TYP. PLAN 2ND-5TH FLOOR
   SCALE: 3/8" = 1'-0"



510 MADISON AVENUE

MOED & ARMAS / SHANNON

BUILDING STANDARDS
2ND-5TH FLOOR SK1-2
07.13.2010

Confidential – Subject to Protective Order

CLINTON00034098



**NOTE:** NO PENETRATION OF ANY ELEMENT OF CURTAIN WALL OR RADIATOR COVER ALLOWED

BLOCKING

CLEAR ANODIZED ALUMINUM EXTRUSION

WINDOW BLINDS SOLAR SHADE FABRIC PHIFER SHEERWEAVE #2000, 5% OPENESS, COLOR: P02 WHITE BY TENANT

WHITE BLACKOUT SHADE IF REQUIRED

PAINTED METAL PANEL PPG DURANAR UC43350 BONE WHITE SEMI-GLOSS BY TENANT

CEILING TILES ARMSTRONG 2'X2' "ULTIMA" W/ SILHOUETTE 9/16" BOLT SLOT - 1/4" REVEAL GRID W/ SHADOWLINE EDGE TRIM BY TENANT

FACE OF COLUMN ENCLOSURE PER SK1-11 & SK1-12

$1'-2\frac{1}{2}"$     $\frac{1}{2}"$

1  TYP. SECTION AT PERIMETER
   SCALE: 3" = 1'-0"





Confidential – Subject to Protective Order



ALUMINUM CHANNEL
PAINTED PPG
DURANAR UC43350
BONE WHITE
SEMI-GLOSS

ACOUSTIC
INSULATION

PAINTED METAL
PANEL PPG
DURANAR UC43350
BONE WHITE
SEMI-GLOSS

WHITE SEALANT

CONTINUOUS SNAP
ON COVER TAPED
TO CURTAINWALL
MULLION



TYP. PLAN AT TENANT DEMISING WALL
SCALE 3" = 1'-0"

**NOTE:** NO PENETRATION OF ANY ELEMENT OF
CURTAIN WALL OR RADIATOR COVER ALLOWED

510 MADISON AVENUE



2ND-5TH FLOOR SK1-4
BUILDING STANDARDS
07.13.2010

Confidential – Subject to Protective Order

CLINTON00034100

**NOTE:** NO PENETRATION OF ANY ELEMENT OF
CURTAIN WALL OR RADIATOR COVER ALLOWED



1/2" REVEAL

WINDOW BLINDS
SOLAR SHADE FABRIC
PHIFER SHEERWEAVE #2000,
5% OPENESS, COLOR: P02
WHITE

WHITE BLACKOUT SHADE IF
REQUIRED

PAINTED METAL PANEL PPG
DURANAR UC43350 BONE
WHITE SEMI-GLOSS

PTD. GWB COLUMN
ENCLOSURE BENJAMIN
MOORE "SUPER WHITE" FLAT
FINISH PER SK1-9 & SK1-10

1" INSULATION GLASS

CLEAR ANODIZED ALUMINUM
MULLION

CLEAR ANODIZED ALUMINUM
RADIATOR COVER

CEILING TILES ARMSTRONG
2'X2' "ULTIMA" W/
SILHOUETTE 9/16" BOLT
SLOT - 1/4" REVEAL GRID W/
SHADOWLINE EDGE TRIM

NO OBSTRUCTION TO AIR
FLOW PERMITTED

FLOOR PER BUILDING
STANDARD FINISHES

PTD. GWB COLUMN
ENCLOSURE PER
SK1-9 & SK1-10

CLEAR ANODIZED
INFILL PIECE TO
MATCH EXISTING
RADIATOR
ENCLOSURE

ALIGN



1   SECTION AT NORTH/SOUTH 7TH-28TH FLOOR
SK1-7   SCALE: 3/8" = 1'-0"



2   SECTION AT RADIATOR ENCLOSURE INFILL
SCALE: 1 1/2" = 1'-0"

510 MADISON AVENUE

BUILDING STANDARDS
7TH-28TH FLOOR SK1-5
07.13.2010

Confidential – Subject to Protective Order

CLINTON00034101



**NOTE:** NO PENETRATION OF ANY ELEMENT OF CURTAIN WALL OR RADIATOR COVER ALLOWED

CEILING TILES ARMSTRONG 2'X2' "ULTIMA" W/ SILHOUETTE 9/16" BOLT SLOT - 1/4" REVEAL GRID W/ SHADOWLINE EDGE TRIM

PTD. GWB COLUMN ENCLOSURE BENJAMIN MOORE "SUPER WHITE" FLAT FINISH

CLEAR ANODIZED ALUMINUM MULLION

CLEAR ANODIZED ALUMINUM RADIATOR COVER

NO OBSTRUCTION TO AIR FLOW PERMITTED

10'-0"



1  TYP. ELEVATION 7TH-28TH FLOOR
   SCALE: 3/8" = 1'-0"



PTD. GWB COLUMN ENCLOSURE BENJAMIN MOORE "SUPER WHITE"; ENCLOSURE SIZE PER SK1-9 & SK1-10

CLEAR ANODIZED ALUMINUM INFILL PER 2/SK1-5

RADIATOR COVER TO REMAIN CLEAR ANODIZED ALUMINUM

1
SK1-8

FOR INSTALLATION OF DEMISING WALL AT INTERMIDIATE MODULE INSTALL METAL COVER PLATE



2  TYP. PLAN 7TH-28TH FLOOR
   SCALE: 3/8" = 1'-0"





BUILDING STANDARDS
7TH-28TH FLOOR SK1-6
07.13.2010

Confidential – Subject to Protective Order

**NOTE:** NO PENETRATION OF ANY ELEMENT OF CURTAIN WALL OR RADIATOR COVER ALLOWED



BLOCKING

CLEAR ANODIZED ALUMINUM EXTRUSION

WINDOW BLINDS SOLAR SHADE FABRIC PHIFER SHEERWEAVE #2000, 5% OPENESS, COLOR: P02 WHITE BY TENANT

WHITE BLACKOUT SHADE IF REQUIRED

PAINTED METAL PANEL PPG DURANAR UC43350 BONE WHITE SEMI-GLOSS BY TENANT

CEILING TILES ARMSTRONG 2'X2' "ULTIMA" W/ SILHOUETTE 9/16" BOLT SLOT - 1/4" REVEAL GRID W/ SHADOWLINE EDGE TRIM BY TENANT

7"

1"
2



1    TYP. SECTION AT PERIMETER
      SCALE: 3" = 1'-0"



BUILDING STANDARDS
7TH-29TH FLOOR SK1-7
07.10.2010

Confidential – Subject to Protective Order

CLINTON00034103



CLEAR ANODIZED ALUMINUM
INFILL COVER

ALUMINUM CHANNEL PAINTED
PPG DURANAR UC43350 BONE
WHITE SEMI-GLOSS

PAINTED METAL PANEL
PPG DURANAR UC43350
BONE WHITE SEMI-GLOSS

WHITE SEALANT

CONTINUOUS SNAP ON
COVER TAPED TO
CURTAINWALL MULLION

TYP. PLAN AT TENANT DEMISING WALL
SCALE: 3" = 1'-0"

**NOTE:** NO PENETRATION OF ANY ELEMENT OF
CURTAIN WALL OR RADIATOR COVER ALLOWED

510 MADISON AVENUE

MOED de ARMAS / SHANNON

BUILDING STANDARDS
7TH-29TH FLOOR SK1-8
07.13.2010

Confidential – Subject to Protective Order

CLINTON00034104