UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

CYPRESS HOLDINGS, III, L.P., individually
and derivatively on behalf of SPORT-BLX,
INC.,

                         Plaintiff,

        v.                                                    Civil Action No. 1:22-cv-1243-LGS

GEORGE HALL, JOSEPH DE PERIO,
DANIEL STRAUSS, FRANCIS
RUCHALSKI, CESAR BAEZ,
CHRISTOPHER JOHNSON, SPORT-BLX,
INC., SPORT-BLX SECURITIES, INC.,
CLINTON GROUP INC., and
GLASSBRIDGE ENTERPRISES, INC.,

                         Defendants.

———————————————————————— x

## DEFENDANTS' L.R. 56.1 STATEMENT OF MATERIAL FACTS
## AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

Sport-BLX, Inc. ("Sport-BLX"), Sport-BLX Securities, Inc. ("Sport-BLX Securities"),

Clinton Group, Inc. ("Clinton Group"), George Hall, Cesar Baez, Joe De Perio, and Christopher

Johnson (together the "Sport-BLX Parties"), Defendants in this Action, and Plaintiff Sport-BLX,

Inc. in related case Civil Action No. 1:22-cv-8111, respectfully submit their Rule 56.1 Statement

in support of their motions for summary judgment file concurrently herewith.


1.       On February 28, 2019, Salerno sent to Joe De Perio an email confirming that he

agreed to the terms of the parties' – stating "We are good." He included a note saying, "I saw

that my attorney didn't update agreements with my holding company name… I will do that and

send over signed docs. See you later..." [ellipses in original]. *See* Stecklow Decl. Ex. 1

SPORTBLX00018535.

2.　　██ ██ ██ ████████　████　████ ██ ██████　*See* Stecklow

Decl. Ex. 4 a CYPRESS_00003456.

3.　　Salerno certified to the SEC that Cypress was a pooled investment vehicle. *See*

Stecklow Decl. Ex. 3 Deposition Transcript of Michael Salerno, May 1, 2023 ("Salerno Dep. Tr.

Day 1"), at 22:20-23:10.

4.　　In his deposition, Salerno was asked, "are you or an entity you control a general

partner or managing member of any entity that pools money from multiple investors," the SEC

definition of a pooled investment Fund. In response he testified "Yes." *See* Stecklow Decl. Ex.

3 Salerno Dep. Tr. Day 1, at 32:20-33:16.

5.　　Salerno testified that "[a]s a registered investment advisor my understanding of a

pooled investment fund would be a grouping of multiple investments under one omnibus

account" and that Cypress was an investment vehicle for multiple investors, that "accepted cash

from multiple investors and today holds assets of investments" which he managed of behalf of

multiple other investors. *See* Stecklow Decl. Ex. 3 Salerno Dep. Tr. Day 1, at 23:24-24:4; 34:19-

35:1; 36:8-10; 38:4-7.

6.　　On December 13, 2018, Salerno filed an SEC Form D Notice of Exempt Offering

of Securities stating that Cypress had only three investors. *See* Stecklow Decl. Ex. 79, SEC

Form-D (#14 investors). Within days Cypress ████████ █████ █████ ████ █

█████ ████████ *See* Stecklow Decl. Ex. 4, CYPRESS00003456.

7.　　On January 14, 2019, Sport-BLX sent Salerno "an overall proposal to work

together with you," which stated that it would "re-open the Founder's Round for Mr. Salerno for

$200K" and that "Mr. Salerno will be granted capacity again in a subsequent round. See

Stecklow Decl. Ex. 84, CLINTON00013754-3756; See Stecklow Decl. Ex. 85,

CLINTON00031676. Salerno represented in the SPAs that he: (a) was purchasing for his own

account (Section 3B); and (ii) that he was an accredited investor (Section 3F).Salerno altered the

nominal name of the purchaser in the Stock Purchase Agreements and in the Stockholder

Agreement Side Letter ("Stockholder Agreements") in only one place, and continued to refer to

the purchaser as himself, "Salerno," every other place the purchaser was identified in the

Stockholder Agreement Side Letter. *See* Stecklow Decl. Ex. 5, SPORTBLX00028990, *See*

Stecklow Decl. Ex. 6, SportBLX00000016, *See* Stecklow Decl. Ex. 7 SPORTBLX00028976.

8.      Only Salerno personally, not Cypress, is granted tag along, first refusal, and

Board seat rights in the Agreements, and the Stockholder Agreement specifies conditions that

would trigger a right "in favor of Salerno being elected to the Board." *See* Stecklow Decl. Ex. 6,

SportBLX00000016-018.

9.      On April 11, 2019, Salerno wrote to Joe De Perio and Mr. Hall that he "would

like to exercise *my* right to purchase *my* Pro Rata Share of the New Securities per paragraph 1.a

of the side letter." [emphasis added] *See* Stecklow Decl. Ex. 8, SPORTBLX00018153.

10.      At the September 10 Board meeting Mr. De Perio told Salerno:



. *See* Stecklow Decl. Ex. 9, Cypress_00000018, at 7:34-7:55, 8:59-9:10.

11.      SportBLX Inc.'s FAQs which Salerno examined during due diligence stated that

the Company "                                                                                      " Salerno testified

that he viewed the FAQs and had access to a Company data room with a "substantial volume of

material" and that he printed out and examined at his office the Company's projected revenue sources. *See* Stecklow Decl. Ex. 10,  SPORTBLX0147230; *See* Stecklow Decl. Ex. 11, CYPRESS00001539, at 1549; *See* Stecklow Decl. Ex. 3,  Salerno Dep. Tr. Day 1, at 167:8-20, 188:4-10, 188:21-25.

12.    The due diligence materials provided to and reviewed by Salerno specified that SportBLX, Inc. revenue would be generated exclusively from its activities as a broker dealer. Specifically, it, would generate revenues exclusively from broker/dealer fees charged for trades in these tokens, including: (i) "initial tokenization fees to horse owners an athletes seeking to create trade tokens"; (ii) "fees of the sale of the initial trade tokens" to the public, and (iii) "transaction fees to both buyers and sellers" for each subsequent between and among members of the public. See Stecklow Decl. Ex. 10,  SPORTBLX0147230, at 7232.  The pro forma financials spreadsheet provided to and reviewed by Salerno shows 100% of the Company's revenue is to be generated by the broker dealer operation – specifically from "Issuing Revenue" and "Trading Revenue."  "Other Revenue" is projected at Negative $1,000,000 in 2019 and zero thereafter.  Decl. Ex. 31, SPORTBLX00023177, Tab: InvestorP&L, Rows 10-14, Columns B-J. The pro forma provided in due diligence also has a detailed analysis of the broker dealer operation, showing "Assumptions" including "BD Start Date", "Annual 50 State registration fees", and "BD Purchase Price." See Stecklow Decl. Ex. 31, SPORTBLX00023177, Tab: BrokerBuild, Cell A1-A36.

13.    Salerno testified that whether to disclose Cypress' ownership to SportBLX, "at the end of the day was, it was my discretion *as a Cypress III manager*," and "I don't believe that I would have been doing the right thing by disclosing their names as partners of Cypress." *See* Stecklow Decl. Ex. 3, Salerno Dep. Tr. Day 1, at 317:8-11, 318:22-24 [emphasis added].

4

14.     As part of the process of applying for a broker/dealer license from the Financial Industry Regulatory Authority (FINRA), on July 30, 2019 SportBLX Inc. received Interrogatories from FINRA requesting, among other things, that the Company identify all of the beneficial owners of its shareholders. The Interrogatories were forwarded by Ken Norensburg, CEO of Luxor Financial Group, who was the Company's broker/dealer advisor and was helping to guide it though the FINRA application process. *See* Stecklow Decl. Ex. 12, SPORTBLX0139092; *See* Stecklow Decl. Ex. 13, SPORTBLX0139093

15.     On August 5, 2019 the Company by and through Joe De Perio requested that Salerno provide the information needed to answer the FINRA Interrogatories, specifically writing: "Mike - As a matter of normal course with our FINRA review, they have asked us to note who the beneficial owners are of Cypress Holdings, the shareholder of record. Can you please advise so we can complete their interrogatories?" *See* Stecklow Decl. Ex. 14, SPORTBLX00013008 at 3009.

16.     On August 8, 2019, Mr. De Perio followed up: "I also would like to follow-up on the beneficial owners of Cypress. We require this information for ongoing FINRA compliance and to advance our business." *See* Stecklow Decl. Ex. 14, SPORTBLX00013008.

17.     Having received no answer, and with all other required information gathered and ready to present to FINRA, Mr. De Perio wrote to Salerno again on Friday, August 9, "We are prepared to disclose beneficial ownership of all investment entities within our shareholding with the exception of Cypress. We would like your cooperation here to push forward the FINRA compliance to advance our business." *See* Stecklow Decl. Ex. 14, SPORTBLX00013008.

18.     A few minutes later on August 9, 2019, Mr. Hall wrote to Salerno: "████ █ ██
█ █ ██ ██ ████ █ ████ ██ █ ██ ██ ████ ██ █
█

████, █████████████   ██████ ███ ██████████████   *See* Stecklow

Decl. Ex. 16, CYPRESS00001490.

19.    Salerno responded to Mr. De Perio on August 9, writing only, "we can discuss at the board meeting." *See* Stecklow Decl. Ex. 14, SPORTBLX00013008.

20.    Salerno responded to Mr. Hall on Friday, August 9, did not provide that confirmation as requested, and stated "Let's discuss as my concern is my estate plan structure which I am not inclined to make public." *See* Stecklow Decl. Ex. 17, SPORTBLX00050629.

21.    On Monday, August 12, 2019, Mr. Hall again wrote Salerno ████████ ███

████, █████████ ███ █████, █ ████████   ██ ██ ███ █████████

██ ███████ ██ ██ ███ ████ ██████████ ██ ███ ███ ███ █████   *See*

Stecklow Decl. Ex. 18, CYPRESS_00000518.

22.    The Company's Board met on August 14, 2019.  At that meeting, Mr. De Perio reiterated that "broker/dealer registration requires, among other things, BLX Trading to identify and disclose the identity of its beneficial owners to FINRA, which includes its stockholder (e.g., the Company), as well as its indirect beneficial owners (e.g., the Company's stockholders) until the natural person owners of all entities in the chain of ownership have been identified and disclosed to FINRA." *See* Stecklow Decl. Ex. 19, DePerio0000021-0022.

23.    At the August 14, 2019 Board meeting Mr. De Perio also stated that although all other stockholders had provided the required information, "despite multiple requests, Cypress refused to provide such beneficial ownership information in a manner contemplated by such regulations." *See* Stecklow Decl. Ex. 19, DePerio0000021-0022.

24.    Salerno stated again at the August 14, 2019 Board meeting that he "did not intend to provide such beneficial ownership information to the Company." Salerno stated that he would

consult with "his counsel" and respond by the close of business on August 16. *See* Stecklow Decl. Ex. 19, DePerio0000021-0022.

25.     On August 16, Salerno wrote to Mr. Hall that "I am willing to provide FINRA with ownership information that they want however I am not willing to provide it to you or any other sport-blx directors as you do not have a right to this information at this time." *See* Stecklow Decl. Ex. 21, SPORTBLX0140202.  Mr. Hall responded, "I don't think that is a viable option." *See* Stecklow Decl. Ex. 21, SPORTBLX0140202.

26.     The Company's Board met again on September 10, 2019.  At that meeting Mr. De Perio reported on advice he had received from Mr. Norensburg, specifically that Cypress' beneficial ownership was not a topic that could be avoided and that a failure to respond to the FINRA interrogatory seeking beneficial ownership information would be fatal to any BLX Trading broker-dealer application. *See* Stecklow Decl. Ex. 22, SPORTBLX0264404-4405.

27.



*See* Stecklow Decl. Ex. 9, CYPRESS00000018, at 7:05 – 7:40; *See* Stecklow Decl. Ex. 22, SPORTBLX0264404-4405.  Mr. Hall reported that outside counsel had provided the same conclusion as the Company's broker/dealer advisor, that "any other response to the FINRA interrogatory of beneficial ownership would be fatal to any BLX Trading broker-dealer application." *See* Stecklow Decl. Ex. 22,  SPORTBLX0264404-4405.

28.     Despite receiving this advice from both the Company's broker/dealer advisor, and its outside counsel who was a specialist in FINRA enforcement matters, Salerno again did not provide the required information but instead reiterated at the September 10, Board meeting that his counsel could contact FINRA. *See* Stecklow Decl. Ex. 22, SPORTBLX0264404-4405.

29.     Also, at the September 10, 2019 Board meeting, Mr. Hall began a discussion of how the Company could best respond to the fact that Salerno's refusal to provide the required information would prevent the Company from successfully applying to register as a broker-dealer. *Id.* Mr. Hall concluded that in his view the best course open to the Company was to refocus the business plan of the Company and that one possibility would be to enter into a licensing agreement for its platform to a third-party broker/dealer. *See* Stecklow Decl. Ex. _ *See* Stecklow Decl. Ex. 22, SPORTBLX0264404 (4405-4406).

30.     At its November 26, 2019 meeting, the Board again discussed the FINRA application and Salerno's refusal to disclose Cypress' ownership. Mr. De Perio informed Salerno that FINRA " ███████████████████████████████ ██████ ' Salerno refused, stating ' ███████████████████████████████ ███ " and that "I ████████████████████████████████████████ ' *See* Stecklow Decl. Ex. 23, CYPRESS00000002, at 12:08-12:45.

31.     ████████ Asked again, ████████████ Salerno answered, ████████████████████████████ *See* Stecklow Decl. Ex. 24, CYPRESS00000002, at 14:40-14:55.

32.     The Company's outside counsel, former Principal Counsel for Enforcement at FINRA, joined the November 26 meeting and participated in the discussion. ████████████ ████████████████████████████████████ ███



*See*

Stecklow Decl. Ex.24,  SPORTBLX0265495 at 5497; Stecklow Decl. Ex. 23,

CYPRESS00000002; at 1:05:40 – 1:05:50.

33. ████████ *See* Stecklow

Decl. Ex. 23, CYPRESS00000002; at 1:05:50-1:06:22; *See* Stecklow Decl. Ex. 24,

SPORTBLX0265495 at 5497.

34. ████████ *See* Stecklow Decl. Ex. 23,

CYPRESS00000002, at 1:06:45 – 1:07:21.    Salerno did not agree to disclose the beneficial

ownership information required of the Company to apply for and obtain for a FINRA license.

35. ████████ the ████ broker ████



" *See* Stecklow Decl. Ex. 23, CYPRESS00000002, at 1:58:00 – 1:58:22.

36.     On December 12, Mr. Hall wrote Salerno, "we think it's a good idea for you to disclose who the beneficial owners are.  We always assumed it was you but we see now that may not be the case.  As far as FINRA,  as you know we withdrew our application and changed our business plan to a technology model as we discussed in many meetings.  Are you suggesting something else?" *See* Stecklow Decl. Ex. 25, SPORTBLX0283016.

37.     Salerno responded the next day that "I think it would be good to pursue being a broker/dealer as well.  I trust that like me, you too see plenty of upside there." *See* Stecklow Decl. Ex. 25, SPORTBLX0283016.  Mr. Hall replied later that afternoon that "If you are suggesting now that you are willing to make the required disclosures, I will gladly put it on the agenda for the next board meeting.  Joe [De Perio] will coordinate the schedule for the next board meeting." *See* Stecklow Decl. Ex. 15,  SPORTBLX0283469. In response to Mr. Hall's offer to hold a Board meeting regarding Salerno's offer to make the required disclosures, on December 16, 2019, Salerno responded "I think that would make sense." *See* Stecklow Decl. Ex. 15, SPORTBLX0283469.

38.     On the same date, December 16, 2019, at Mr. Hall's request, Mr. De Perio tried to schedule a Board meeting.  Inconsistently with his email to Mr. Hall, Salerno answered, "What are the topics for discussion?" and "I did not speak to George [Hall] or ask for a call so no[t] sure what you are referring to." *See* Stecklow Decl. Ex. 26, SPORTBLX00013059.

39.    Salerno began secretly recording the conversations he had with SportBLX within a week of executing the Stock Purchase and Stockholder Agreement. *See* Stecklow Decl. Ex. 3, Salerno Dep. Tr. Day 1, at 273:2-18.

40.    Approximately one month later, in April 2019, Salerno accused Hall of "self-dealing" in connection with rent payments to Clinton Group for the use of office space and equipment. *See* Stecklow Decl. Ex. 8,  SPORTBLX00018153.

41.    On June 10, 2019, an attorney for Salerno and Cypress sent a demand letter to SportBLX stating "I write in connection with certain potential claims of Cypress in connection with its investment," and "absent additional information, Cypress and Salerno have potential claims that may be asserted under law or in equity." *See* Stecklow Decl. Ex. 27, SPORTBLX00015719.

42.    On February 24, 2019, during Salerno's due diligence and in response to his questions, De Perio wrote Salerno, "We are unable to produce 12/31 financials and thus can't re either the financials and undisclosed liabilities, and frankly they won't be instructive given our operations and their inception date. We hope you get comfortable with the materials in the data room. [...] And the liabilities are tied to the Consensys agreement (in the data room), and our legal counsel." *See* Stecklow Decl. Ex. 29,  SPORTBLX0142787.  On February 28, 2019, Salerno replied "We are good with majority of your response as is." *See* Stecklow Decl. Ex. 28, SPORTBLX00046459 at 6460.

43.    On February 1, 2019, SportBLX sent Salerno draft stock purchase agreements and a draft stockholder agreement and provided a link to the Company's data room: "Set forth below also is link to our data room for your diligence records and wiring instruction." *See* Stecklow Decl. Ex. 30, SPORTBLX0142590.

11

44.     The February 2019 pro forma financials in the data room included the exact amount of annual rent to be paid from 2019 onward. *See* Stecklow Decl. Ex. 31, SPORTBLX00023177, at: Tab Detailed P&L; Cell G64.

45.     Salerno testified that he examined the pro forma and discussed it with Sport-BLX before he invested: "I know before the –I signed, I did discuss with them the pro forma." He further testified that he viewed the FAQs and had access to a Company data room with a "substantial volume of material" and that he printed out and examined at his office the Company's projected revenue sources. *See* Stecklow Decl. Ex. 10,  SPORTBLX0147230; *See* Stecklow Decl. Ex. 11, CYPRESS00001539, at 1549; *See* Stecklow Decl. Ex. 3, Salerno Dep. Tr. Day 1, at 135:23-136:8, 167:8-20, 188:2-20.

46.     By June 30, 2019 Sport-BLX had already spent approximately $2 million on technology, marketing, and legal expenses, not including the salaries of the Chief Technology Officer or the Chief Marketing Officer. Specifically, the June 30 Income Statement shows: technology expenses of $1,370,532 for "Platform Development Expenses"; marketing expenses of $21,230 for "Market Data," and $184,711 for "Travel & Entertainment"; and legal expenses of $407,294 or "Professional Expenses." In August 2019, Sport-BLX provided its June 30 financial containing this data to Salerno. *See* Stecklow Decl. Ex. 20, SPORTBLX0100322.

47.     Salerno was voted off the Sport-BLX board of directors on December 23, 2019 by the vast majority of Sport-BLX unaffiliated shareholders, *See* Stecklow Decl. Ex.32, SPORTBLX0284469. On January 7, 2020, the Company sent Salerno's attorney "a copy of the inspector's report from the annual meeting the votes for/against the various board nominees." *See* Stecklow Decl. Ex. 33, SPORTBLX0284465; *See* Stecklow Decl. Ex.34, SPORTBLX0266070.

48.     The Stock Purchase Agreements' integration clauses state, "This Agreement . . . supersedes and replaces any and all prior written or oral agreements regarding the subject matter of this Agreement including, but not limited to, any representations made during any interviews, relocation discussions or negotiations whether written or oral." *See* Stecklow Decl. Ex. 5, SPORTBLX00028990 and 28995; *See* Stecklow Decl. Ex. 7, SPORTBLX00028976, and 28982.

49.     The Stock Purchase Agreements' anti-reliance clauses state, "The Purchaser is relying solely on his or her own counsel and advisors and not on any statements or representations of the Company or its agents for legal or other advice with respect to this investment or the transactions contemplated by this Agreement." *See* Stecklow Decl. Ex. 5, SPORTBLX00028990 and 28996; *See* Stecklow Decl. Ex. 7,  SPORTBLX00028976 and 28983.

50.     Salerno forwarded his attorney's requested changes to the Agreements directly to SportBLX, including draft SPAs with edits and additional seller representations, including Salerno's statement "I am investing . . . ." *See* Stecklow Decl. Ex. 37, SPORTBLX0148243-244, and the SPA being in the name of Michael M. Salerno, *See* Stecklow Decl. Ex. 5, SPORTBLX00028976.

51.     The FAQs contain qualified forward looking statements, including "The reality is that we do not have enough variables sorted out at this point to get any semblance of accuracy." *See* Stecklow Decl. Ex. 10, SPORTBLX0147230, at 7232.  The slide decks Salerno reviewed in due diligence state: "document and the verbal or written comments of any person presenting it" and stating that the information "is not complete and does not contain certain material information about Sport-BLX, Inc. and Clinton Group, Inc., including important disclosures and risk factors." *See* Stecklow Decl. Ex. 39, CYPRESS_00001194 and 1198, *See* Stecklow Decl. Ex. 41, SPORTBLX0147934, at 7954; *See* Stecklow Decl. Ex. 78, SPORTBLX0147958 at 7975.

13

52.    In late May 2019 Salerno valued the investment at price substantially higher than Cypress had paid. Salerno testified that he was offered a buyout of "maybe 1.6 million, and I told Michael that, no, I think 2 million is a very fair number." He further testified, "My negotiation was, I think, that 2 million dollars is very fair and that's what I would like for my shares." *See* Stecklow Decl. Ex. 35, Deposition Transcript of Michael Salerno, July 20, 2023 ("Salerno Dep. Tr. Day 3"), at 132:11-24; 133:9-13; *See* Stecklow Decl. Ex. 43, SPORTBLX00048150.

53.    The Side Agreement obligates Hall and De Perio "to vote, or cause to be voted, all shares of the Company's capital stock owned by such Founder, or over which such Founder has voting control, in favor of Salerno being elected to the Board" so long as Cypress held at least 2.5% of the outstanding Sport-BLX stock. *See* Stecklow Decl. Ex. 6, SportBLX00000016, at 0018.

54.    At an October 6, 2021 Board meeting, Mr. Hall explained "that the company was looking to raise capital" and had identified a viable way of doing so. *See* Stecklow Decl. Ex. 44, SPORTBLX0264436.

55.    On October 18, 2021, in an email to Mr. Hall, ████ ███ ██ ████
█████ ██ ██████████, ██ █████████ ██ ████████ ██ ████████" *See* Stecklow Decl. Ex. 45, CYPRESS00003112.

56.    On October 18, 2021, Mr. Hall wrote Salerno that "█ ██████████ █



 *See* Stecklow Decl. Ex. 46, CYPRESS_00000029.

███████, *See* Stecklow Decl. Ex. 47, <u>CYPRESS00003379,</u> as Mr. Hall explained at the October 6, 2021 Board meeting. *See* Stecklow Decl. Ex. 44, <u>SPORTBLX0264436</u>. After Salerno rebuffed repeated requests to discuss the impact of his allegations on the capital raise, Mr. Hall wrote Salerno that if he continued to refuse, "the fate of the company is sealed." *See* Stecklow Decl. Ex. 64, <u>SPORTBLX0169975, at 976</u>.

57.    Mr. Hall responded the next day, October 19, 2021, telling Salerno, "I will pass on your allegations to the board and they will take the appropriate action.  Given the allegations it is not appropriate to pursue public offering of shares." *See* Stecklow Decl. Ex. 48, <u>SPORTBLX0172525</u>.

58.    The SportBLX Inc. Board met the next day, October 20, 2021. The Company was forced to abandon the recently contemplated capital raise as a result of Salerno's recent written allegations against Mr. Hall and the Company. At the October 20, 2021 Board meeting Mr. Hall explained that as a result of a "recent email from [Salerno], which made accusation about Mr. Hall and SportBLX Inc. . . . [t]here would be no way to raise capital in the public market." *See* Stecklow Decl. Ex. 36, SPORTBLX0264432. *See* Stecklow Decl. Ex. 50, Deposition Transcript of George Hall, June 29, 2023 ("<u>Hall Dep. Tr. Day 3</u>"), at <u>719:22-720:5; 720:24-721:4</u>.)

59.    Later on October 20, 2021, Mr. Hall again responded to Salerno, informing him that the "Board had a meeting today.  Unanimous agreement that we can't go forward with a public capital raise with allegations of 'siphoning.'  Pass on whatever evidence you think you have to the board.  In the meantime the company is out of cash and only one employee remains temporarily.  If you have interest in the software please express it to the board." *See* Stecklow Decl. Ex. 51, <u>SPORTBLX0172540</u>.

60.     On October 21, 2021 Mr. Hall again wrote Salerno: "Please forward any evidence of 'siphoning' directly to the board." *See* Stecklow Decl. Ex. 52, SPORTBLX0172541.

61.     Salerno did not provide any support for his allegations to the Board or any of its members.

62.     Mr. Hall realized that Salerno had "effectively destroyed most of the possibilities of Sport-BLX's success, it was clear that was the mission, I realized that the best way to get shareholders a value and to create this ecosystem was to have the code in the same place as the entity that was going to continue to do business." *See* Stecklow Decl. Ex. 50, Hall Dep. Tr. Day 3, at 751:20-752:2.

63.     On June 5, 2020, SportBLX Securities, as "Customer" had entered into a Subscription Agreement with SportBLX Inc. as "Supplier," under which SportBLX Inc. paid for the right "to access and use (a) the Platform in an operating environment hosted by Supplier, for Customer's own internal business purposes, and (b) any associated documentation or materials . . . ." *See* Stecklow Decl. Ex. 53, SPORTBLX00001105, at 1105. The Subscription Agreement was negotiated at arms-length by Joe De Perio on behalf of SportBLX inc. and Peter Rawlins on behalf of SportBLX Securities. *See* Stecklow Decl. Ex. 63 Deposition Transcript of George Hall, June 21, 2023 ("Hall Dep. Tr. Day 2"), at 504:17-21, 505:7 – 506:3.

64.     The Subscription Agreement also provided that SportBLX Inc. would deliver "design, development, customization, implementation, professional or other project services . . ." related to the Platform. *See* Stecklow Decl. Ex. 53, SPORTBLX00001105, at 1106.

65.     The Subscription Agreement provided a mechanism by which SportBLX Securities injected money into the Company, enabling maintenance and ongoing development of the Platform. Specifically, Section 7.2 of the Agreement provided that SportBLX Securities

"shall be responsible for all costs and expenses incurred by Supplier in connection with the license rights granted hereunder and any Services provided or made available hereunder." *See* Stecklow Decl. Ex. 53, SPORTBLX00001105, at 1110.

66.    [INTENTIONALLY LEFT BLANK]

67.    The Subscription Agreement also called for payment of $150,000 as a One-Time Upfront Fee, half due upon execution and half to be payable three months following execution. *See* Stecklow Decl. Ex. 53, SPORTBLX00001105, at 1114.

68.    [INTENTIONALLY LEFT BLANK]

69.    The Subscription Agreement also called for total Annual Subscription Fee payments of $1.2 and $1.65 million in the first and second years of the contract, respectively, and an option allowing the Company to raise the Annual Fee by 5% upon contract renewal. The Annual Subscription Fee was to be paid in equal monthly installments. *See* Stecklow Decl. Ex. 69, SPORTBLX00001105, at 1114.

70.    Mr. Hall recollected that the Company received a total of approximately $600,000 in fees before it became unable to perform under the agreement and SportBLX Securities stopped paying fees. *See* Stecklow Decl. Ex. 50, Hall Dep. Tr. Day 3, at 733:3-13.

71.    [INTENTIONALLY LEFT BLANK]

72.    The Subscription Agreement gave SportBLX Securities the right to "obtain from Supplier" all up-to-date "source code and object code of the Platform and Documentation" without further payment if SportBLX Inc. became insolvent, terminated "its ongoing business operations," or "cease[d] to perform its material obligations under the Agreement." *See* Stecklow Decl. Ex. 53, SPORTBLX00001105, at 1111-1112; *See* Stecklow Decl. Ex. 50, Hall Dep. Tr. Day 3, at 739:7-21.

17

73.     Prior to October 2021, SportBLX Inc. "could no longer perform the functions that SportBLX Securities had bargained for" of providing design, development, customization, implementation, professional or other project services related to the Platform, and had thus become unable to and did cease to perform its material obligations under the Agreement. *See* Stecklow Decl. Ex. 50, Hall Dep. Tr. Day 3, at 733:21-734:1; 743:1-6. This inability to perform resulted from the resignation in approximately August 2020 of the Company's Chief Technology Officer and of the number two in Assistant Technology Officer in early 2021, such that "the only real ongoing development was people at SportBLX Securities because SportBLX, Incorporated couldn't fulfill any of its obligations.". *Id*., at 734:12-24; *See* Stecklow Decl. Ex. 54, SPORTBLX0264438. Mr. Hall testified that the CTO resigned in 2020 in part because he was interested in developing an Alternative Trading System, which "he realized . . . wouldn't likely happen." *Id*., at 735:4-14.

74.     By October 2021, SportBLX Inc. had become unable to conduct its ongoing business operations. As Mr. Hall informed the Board, because the Company at that time had no capital and no ability to raise capital due to Salerno's written allegations referenced above in Paragraphs 58 and 59, and only one remaining employee, "there does not appear to be a viable path forward." *See* Stecklow Decl. Ex. 6, at SPORTBLX00000016.

75.     On October 21, 2021, Mr. Hall wrote Salerno, "Please forward any evidence of 'siphoning' directly to the board." *See* Stecklow Decl. Ex. 52, SPORTBLX0172541. On November 12, 2021, Mr. Hall again wrote Salerno and informed him again that "[a]s I said, I forwarded on your comments to all of the board members and I assume you have been in touch with them to share specifics. [...] They have also been made aware that there is no way we can raise capital as planned." *See* Stecklow Decl. Ex. 55, SPORTBLX0172592.

76.    In addition, as Mr. Hall explained to the Board on December 15, 2021, Salerno's refusal to confirm the ownership of Cypress as required by FINRA "prevented SportBLX Inc. from filing for and becoming a broker dealer as per its original business plan." *See* Stecklow Decl. Ex. 56, SPORTBLX0264418.

77.    Despite having already taken possession of the Platform without payment, SportBLX Securities agreed to make further payment to the Company as compensation for the Platform. Specifically, on December 21, 2021, in exchange for SportBLX Securities taking sole ownership of all rights to the Platform, SportBLX Securities paid to the Company $225,000. *See* Stecklow Decl. Ex. 57 Glassbridge Enterprises, Inc. Form 10-K FY 2021, at pp. 45-46; *See* Stecklow Decl. Ex. 50 Hall Dep. Tr. Day 3, at 751:16-20.

78.    [INTENTIONALLY LEFT BLANK]

79.    As further consideration to the Company for the transfer of sole ownership of all rights to the Platform to SportBLX Securities, on December 24, 2021, Mr. Hall caused a third party, FDC, which he and Mr. De Perio controlled, to sell back to the Company $1,500,00 of its debt for $126,000, a benefit of $1,374,000. *See* Stecklow Decl. Ex. 57 Glassbridge Enterprises, Inc. Form 10-K FY 2021, at pp. 45-46.

80.    Mr. Hall informed the Company's Board in advance "that as part of the transaction to benefit SportBLX Inc there would be a cancellation of debt which would reduce the company's debt burden." *See* Stecklow Decl. Ex. 56, SPORTBLX0264418, at 4419.

81.    In total, the Company received consideration of $1,599,999 in exchange for the transfer of sole ownership of all rights to the Platform to SportBLX Securities in December 2021. *See* Stecklow Decl. Ex. 57, Glassbridge Enterprises, Inc. Form 10-K FY 2021, at pp. 45-46.

82.     In mid-2020, SportBLX Inc. attempted to use the Platform source code as collateral but was unsuccessful because it had no value "at the stage it was at for" other than "a related party that understood the business" and what "the technology was built for and how it might be used." *See* Stecklow Decl. Ex. 50, Hall Dep. Tr. Day 3, at 701:23-702:11.

83.     When the Company received consideration of $1,599,999 for the Platform, it was worth approximately $200,000. The Chief Technology Officer of GlassBridge had estimated the value of replacement cost of the software to be around $200,000 as part of GlassBridge's 2019 audit valuing the Company's assets. *See* Stecklow Decl. Ex. 56, SPORTBLX0264418, at 4419; *See* Stecklow Decl. Ex. 50, Hall Dep. Tr. Day 3, at 744:19-745:16, 750:5-752:24; Stecklow Ex. 80, GBE0007971 (R. Fisch Memo)

84.     SportBLX Inc.'s retained software engineering and computer science expert Dr. Eslamimehr analyzed the Platform in detail and compared it to other open-source centralized and decentralized online trading platforms from 2019 to 2021. *See* Stecklow Decl. Ex. 58, Expert Report of Mahdi Eslamimehr ("Eslamimehr Report"), at p. 15, ¶ 34.] Dr. Eslamimehr noted that by 2021 there had been a "surge in high-quality, freely available platforms" and that the SportBLX Platform was of merely average quality compared to these freely available platforms. *Id.*, at ¶ 33.

85.     [INTENTIONALLY LEFT BLANK]

86.     Plaintiff's expert witness Dr. Eslamimehr opined that a sale price of $225,000 for the SportBLX Platform in December 2021 was a fair price given the software code quality and the wide availability of high quality platforms that were available for free. *See* Stecklow Decl. Ex. 58, at p. 15-16, ¶¶ 33-35.

87.     Cypress has not submitted an expert valuation of the Platform.

88.     On February 27, 2017 Glassbridge Enterprises (f/k/a Imation Corp.) entered into a services agreement with Clinton Group, Inc. ("Clinton") under which Clinton provided management services to Glassbridge. *See* Stecklow Decl. Ex.59, SportBLX0260336.

89.     Beginning in September 2018, Clinton entered into discussions with the U.S. Pension Benefit Guaranty Corp. ("PBGC"). Specifically, due to certain funding deficiencies of the Imation Cash Balance Pension Plan, the PBGC had perfected a lien on all assets of GlassBridge and of all other members of GlassBridge's Control Group as defined by the PBGC implementing legislation at 29 US § 1301(a)(14). *See* Stecklow Decl. Ex. 60, GBE0000978.

90.     The PBGC lien covered all liabilities under Title IV of ERISA in connection with the Plan's termination, including unfunded benefit liabilities, due and unpaid Plan contributions, premiums, and interest on each of the foregoing (the "Pension Liabilities"), for which GlassBridge and all members of its Control Group were jointly and severally liable to the PBGC. *See* Stecklow Decl. Ex. 61, GBE001146, at 1148.

91.     Clinton Group continued negotiations with the PBGC before SportBLX, Inc. was formed, providing documents to the PBGC in September 2018 and meeting with the PBGC in November 2018. *See* Stecklow Decl. Ex. 62, CLINTON00033969.

92.     On Nov 22, 2018 to GEH visited Cynthia Wong of Corporate Finance and Restructuring at the PBGC's Washington, D.C. Office to discuss settlement with Glassbridge. *See* Stecklow Decl. Ex. 62, CLINTON00033969.

93.     When the Settlement Agreement with PBGC was negotiated and executed, Imation was a wholly owned subsidiary of GlassBridge. *See* Stecklow Decl. Ex. 63, Hall Dep. Tr. Day 2, at 518:13-16; *See* Stecklow Decl. Ex. 50, Hall Dep. Tr. Day 3, at 590:15-20, 686:10-14.

94.     On April 16, 2019 Glassbridge received notice that its "application for termination of the plan had been approved by the PBGC with the termination of the plan to occur on April 30, 2019." *See* Stecklow Decl. Ex. 60, GBE0000978, at 0979.

95.     Pursuant to the terms of the Settlement Agreement, GlassBridge agreed to pay $3,000,000 in cash to PBGC in return for a release from the lien of GlassBridge and all other members of the Control Group. *See* Stecklow Decl. Ex. 61, GBE001146, at 1148.

96.     Following successful consummation of the PBGC negotiations which had begun in September 2018, the Glassbridge Board approved a one-time success fee to Clinton Group "in consideration of Clinton's efforts regarding same." Stecklow Decl. Ex. 60, GBE0000978 at 0979; *See* Stecklow Decl. Ex. 63,  Hall Dep. Tr. Day 2, at 524:19-525.

97.     Clinton Group was paid a fee equal to ten percent of the difference between the $3,000,000 Settlement Payment and the gross Pension Liabilities. *See* Stecklow Decl. Ex. 63 Hall Dep. Tr. Day 2, at 524:19-23, 525:4-12; 562:3-8.

98.     Negotiation of Settlement Agreements with PBGC on behalf of third parties had no relation to SportBLX, Inc.'s business plan or operations. See Stecklow Decl. Ex. 40, CYPRESS_00001431, at 1441; *See* Stecklow Decl. Ex. 41,  SportBLX00147934-7957; *See* Stecklow Decl. Ex. 42,  SPORTBLX0147209.

99.     On October 1, 2019, GlassBridge sold to Orix: (i) 20% of the outstanding stock of Imation, which prior to the sale was wholly owned by GlassBridge; (ii) a promissory note in the amount of $9,000,000 issued by Imation to GlassBridge as consideration for assignment of certain pre-existing claims owed by Glassbridge against a third party, and (iii) a promissory note in the amount of $4,000,000 issued by Imation to Glassbridge as consideration for the assignment of 11,154 shares of SportBLX, Inc. stock. The 11,154 shares were the collateral

backing Imation's original promissory note in favor of Glassbridge. *See* Stecklow Decl. Ex. 61, GBE001146, at 1148; *See* Stecklow Decl. Ex. 63, Hall Dep. Tr. Day 2, at 521:8-24; 539:5-14. "Sport-BLX had no involvement in this transaction. . . . Imation owned shares of Sport-BLX, and . . . Orix made a loan to the company with [that] asset[] as collateral." *Id*., at 519:15-24.

100.    Clinton Group helped negotiate the transaction with Orix under a pre-existing management services agreement with GlassBridge. *See* Stecklow Decl. Ex. 63, Hall Dep. Tr. Day 2, at 521:25 – 522:10, 523:6-14. Specifically, Clinton Group led the negotiation of the entire deal with Orix from start to finish including the terms of the transaction and their memorialization in transaction documents and helped Orix understand Imation. *Id*., at 523:22 – 524:5.

101.    SportBLX had no involvement in the October 1, 2019 transaction between GlassBridge and Orix. *See* Stecklow Decl. Ex. 63, Hall Dep. Tr. Day 2, at 519:18-19.

102.    The transaction had nothing to do with SportBLX and the capital was not used to create a fund which would generate revenues. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ *See* Stecklow Decl. Ex. 23, CYPRESS00000002 at 1:29:08.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ *Id*., at 1:35:24 Salerno stated ▮▮▮▮▮▮▮▮▮

███ ▌█ ███ ████ ████ █████ ████ ██ █

███ *Id.*, at 1:36:10.

103.     At no time did SportBLX, Inc.'s business plans or operations include any

activities such as negotiating Settlement Agreements with US Government agencies or

negotiating transactions such as the October 1, 2019 sale by GlassBridge to Orix. *See* Stecklow

Decl. Ex. 40, <u>CYPRESS_00001431, at 1441</u>, *See* Stecklow Decl. Ex. 41, <u>SportBLX00147934-

7957</u>, *See* Stecklow Decl. Ex. 42, <u>SPORTBLX0147209</u>; *See* Stecklow Decl. Ex. 10,

<u>SPORTBLX0147230</u>.

104.     Prior to investing in SportBLX Salerno visited its offices, which were housed in

Clinton Group's offices at 510 Madison Avenue in New York City. *See* Stecklow Decl. Ex. 3,

<u>Salerno Dep. Tr. Day 1</u>, at <u>90:19-23</u>.

105.     Salerno executed three Agreements with SportBLX, Inc. on February 28, 2019:

two Stock Purchase Agreements and one Letter Agreement titled RE: Stockholder Agreement.

The Letter Agreements -which Salerno executed - shows SportBLX, Inc's address to be: "510

Madison Avenue, 9th Floor, New York, NY 10022." *See* Stecklow Decl. Ex. 6,

<u>SportBLX00000016.</u>

106.     Salerno testified that he assumed that SportBLX, Inc. would operate at "some

location" because he "believed" some related entities, including GlassBridge, "had a different

office." *See* Stecklow Decl. Ex. 3, <u>Salerno Dep. Tr. Day 1</u>, at 91:12 – 92:13. Under oath,

Salerno refused to testify that anyone ever told him SportBLX, Inc. was going to move from the

Clinton Group to somewhere else. *Id.*, at 91:7-11.

107.     The annual rent expense of $500,000 to be paid by SportBLX, Inc was disclosed

in the pro forma financials which Salerno reviewed as part of his due diligence before he

invested in SportBLX, Inc. *See* Stecklow Decl. Ex. 31, SPORTBLX00023177, at: Tab Detailed P&L; Cell G65. Salerno testified that "I recall that was on the proforma." *See* Stecklow Decl. Ex. 3, Salerno Dep. Tr. Day 1, at 90:24 – 91:6.

108.    The pro forma financials were an Excel model created by an outside consulting company, ConsenSys, with substantial input from various sources. *See* Stecklow Decl. Ex. 65, Deposition Transcript of George Hall, June 14, 2023 ("Hall Dep. Tr. Day 1"), at 135:9-17.  In March 2019, when SportBLX, Inc. started paying rent, its space housed between ten and thirteen full-time employees and a number of unpaid consultants, in addition to the ConsenSys staff who were working with the Company. *Id*., at 136:6-12.  The annual rental amount was determined based on an analysis of the business, head count, projected growth of the company, and the necessity of having space suitable for marketing purposes and giving presentations. *Id*., at 136:21-137:3, 137:20-138:1; *See* Stecklow Decl. Ex. 66, SPORTBLX00021294.

109.    Clinton Group occupied the space at 510 Madison Avenue pursuant to a Sublease executed with World Gold Trust Services, LLC ("World Gold") on August 31, 2015.  The Sublease identifies World Gold as the Overtenant and Clinton Group as the Subtenant. *See* Stecklow Decl. Ex. 67, CLINTON00034105. World Gold in turned had leased the space as Tenant from BP 510 Madison Ave LLC on April 22, 2011, the Landlord. *See* Stecklow Decl. Ex. 83, CLINTON00033973. The Sublease identifies that April 22, 2011 lease as the "Overlease." *See* Stecklow Decl. Ex. 67, CLINTON00034105, 34121.

110.    The Sublease specifies that "this is a sublease of the Demised Property and is subject and subordinate in all respects, to all of the terms, covenants and conditions of the Overlease as it relates to the Demised Premises." *See* Stecklow Decl. Ex. 67, CLINTON00034105, at 4121.  It further specifies that all provisions in the Overlease relating to

the premises "are hereby incorporated by reference in this Sublease" and "constitute the terms of this Sublease" and are made applicable to World Gold and Clinton Group "as if they were the Landlord and the Tenant, respectively, under the Overlease" [*Id.*]

111.    Overlease provision 13.1(b) specifies that no consent by the Landlord is required for the Tenant to sublet the space at 510 Madison Avenue to an Affiliate provided that the sublet does not result in a physical demise of separate space. *See* Stecklow Decl. Ex. 83, CLINTON00033973, at 34019.

112.    Cypress is a Delaware limited partnership. See Dkt. No. 80 at ¶ 10.

113.    On January 4, 2019, GlassBridge was issued 10,526 shares of Sport-Blx, Inc. ("Sport-BLX") stock, and made a commitment to invest $1,000,000 in Sport-BLX. *See De Perio* Affidavit, Dkt. No. 031 at ¶ 17.

114.    GlassBridge's commitment to invest $1,000,000 in Sport-BLX was funded in installments over the course of 2019. *See id.*

115.    On September 16, 2019 GlassBridge purchase 679 shares of Sport-BLX common stock, for $178,854. *See id.* ¶¶ 18-19.

116.    On October 1, 2019 GlassBridge made a $1,750,000 demand loan to Sport-BLX. *See id.* ¶ 24; Stecklow Decl. Ex. 70, (Sport-BLX Demand Loan).

117.    On October 18, 2019 Adara Enterprises Corp (subsidiary of GlassBridge Enterprises) purchased 2,314 shares of Sport-BLX stock for $609,524.72. *See De Perio* Affidavit, Dkt. No. 031 at ¶ 20.

*118.*    On December 12, 2019, GlassBridge purchased 17,076 shares of Sport-BLX stock from Mr. De Perio in exchange for $606,198 in cash and a $5,455,782 principal amount promissory note. *See De Perio* Affidavit, Dkt. No. 031 at ¶ 21.

119.    On December 12, 2019, GlassBridge purchased 37,924 shares of Sport-BLX stock

from Mr. Hall in exchange for $1,346,302 in cash and a $12,116,718 principal amount promissory

note. *See id.* ¶ 22.

120.    [INTENTIONALLY LEFT BLANK]

121.    As a result of GlassBridge's purchases of Sport-BLX stock detailed in the

preceding seven paragraphs, GlassBridge and its subsidiaries owned 50.7% of Sport-BLX stock

outstanding as of December 13, 2019. *See* Stecklow Decl. Ex. 34, SPORTBLX0266070; Sh.

Register.

122.    The December 9, 2019 Minutes of the Regular Meeting of the Board of Directors

of GlassBridge state that:

> Management suggested to the Board that acquiring additional ownership in SportBLX from Mrs. De Perio and Hall could be beneficial to the Company. It would give the Company voting control of SportBLX. The board asked questions, discussed and deliberated. Upon a motion duly made and seconded, the Board authorized Management to negotiate a transaction with Mrs. De Perio and Hall and report back to the Board.

Stecklow Decl. Ex. 71, GBE_0009062; 12/9/19 GLAE Minutes.

123.    The December 12, 2019 Minutes of the Regular Meeting of the Board of Directors

of GlassBridge state that:

> After a detailed discussion on the valuation mechanism, opportunities and business risk among members of the Board and Mr. Hall, where the Board asked questions regarding the valuation and business prospects of Sport-BLX, Mr. Hall and Mr. De Period left the meeting.
> The remaining members of the Board discussed the valuation and made inquiries with management regarding the business opportunities and business plan of Sport-BLX. The remaining members of the Board discussed and deliberated the Transactions as a whole and the specific terms of the Transactions. After deliberations regarding the value to the Corporation of having a direct holding in the Sport-BLX, and the terms of the Transaction, the non-interested members of the Board resolved, authorized and instructed the officers of the Corporation to enter into the Transaction pursuant to the terms set out above and to continue to negotiate the terms of the De Perio Note and the Hall Note to optimize the interest rate to be in the range of 3-7%...

Stecklow Decl. Ex. 72, GBE_0015714; 12/12/19 GLAE Minutes.

124.    On December 18, 2019, GlassBridge issued a Proxy Statement "in connection with the solicitation of proxies from the stock holders of Sport-BLX, Inc. … for the 2019 Annual Meeting of Stockholders … [t]o elect GlassBridge's slate of seven director nominees, Cesar A. Baez, Joseph A. De Perio, George E. Hall, Francis A. Ruchalski, Christopher Johnson, Harlan Simon, and Daniel A. Strauss … as directors…" See Stecklow Ex. 73, GBE_0015693.

125.    Section 2.A. of the February 28, 2019 Letter Agreement (the "Side Agreement") between Cypress Holdings, III, L.P. ("Cypress"), Sport-BLX, George Hall and Joseph De Perio is the only section of the Side Agreement that Cypress alleges was breached in its Second Amended Complaint (the "SAC"). *See* Dkt. No. 80, ¶¶ 53, 103, 153.

126.    GlassBridge's December 20, 2019 Proxy Card voted "For All Nominees" in response to Proposal 1, i.e., "The election of Cesar A. Baez, Joseph A. De Perio, George E. Hall, Francis A. Ruchalski, Christopher Johnson, Harlan Simon, and Daniel A. Straus to serve as directors on the Board." See Stecklow Ex. 74, GBE_0015701 (GLAE Proxy Vote).

127.    Imation Enterprises, Corp's December 20, 2019 Proxy Card voted "For All Nominees" in response to Proposal 1, i.e., "The election of Cesar A. Baez, Joseph A. De Perio, George E. Hall, Francis A. Ruchalski, Christopher Johnson, Harlan Simon, and Daniel A. Straus to serve as directors on the Board." See Stecklow Ex. 75, (GBE0015689; Imation Proxy Vote).

128.    Pursuant to Section 2.A. of the Side Agreement, Hall and De Perio agreed "to vote, or cause to be voted, all shares of the Company's capital stock owned by [them], or over which [they had] voting control, in favor of Salerno being elected to the Board," for as long as Cypress held at least 2.5% of the outstanding Sport-BLX stock. *See* Declaration of Wylie Stecklow, Esq., dated November 22, 2024 (the "Stecklow Decl.") Ex. 6, (Side Agreement) at SPORTBLX0000018.

129.    Cypress alleges in the SAC that GlassBridge "knew of the [Side Agreement]." Dkt. No. 80, ¶ 153.

130.    There is nothing in the record that demonstrates GlassBridge's actual knowledge of the existence of Side Agreement.

131.    There is nothing in the record that demonstrates GlassBridge's actual knowledge of the Side Agreement's terms.

132.    At the December 23, 2019 Annual Meeting of Stockholders of Sport-BLX (the "Stockholder Meeting"), Hall and De Perio voted all shares of Sport-BLX stock that they owned in favor of Salerno being elected to the Board.  See Stecklow Decl. Ex. 34, SPORTBLX0266070; Sh. Register; Ex. 77, SPORTBLX0284468; Vote Results.

133.    Cypress does not dispute that Hall and De Perio voted all shares of Sport-BLX stock that they owned in favor of Salerno being elected to the Board at the Stockholder Meeting.

134.    1,122 shares of Sport-BLX stock outstanding as of the Stockholder Meeting were voted against Salerno's board seat at the Stockholder Meeting.  See Stecklow Decl. Ex. 34, SPORTBLX0266070; Sh. Register; Ex. 77, SPORTBLX0284468; Vote Results.

135.    82,059 shares of Sport-BLX stock outstanding as of the Stockholder Meeting were not voted in favor of, or against, Salerno's board seat at the Stockholder Meeting.  See Stecklow Decl. Ex. 34, SPORTBLX0266070; Sh. Register; Ex. 77, SPORTBLX0284468; Vote Results.

136.    The shares of Sport-BLX stock were not voted in favor of, or against, Salerno's board seat at the Stockholder Meeting represented a majority of the shares outstanding as of the Stockholder Meeting. See Stecklow Decl. Ex. 34 SPORTBLX0266070; Sh. Register; Ex. 77 SPORTBLX0284468; Vote Results.

137.    The tag-along rights provision in the SPAs authorizes the founders "to sell shares of the company's common stock that represent more than fifty (50%) percent of the aggregate number of shares then outstanding to a third-party purchaser." *See* Stecklow Decl. Ex. 5 SPORTLBX00028976, at 8980.


Dated: New York, New York
      December 3, 2024


WYLIE STECKLOW PLLC


Wylie Stecklow, Esq.
Jon Avins, Esq.
Carnegie Hall Tower
152 W. 57th Street, 8th Floor
New York, NY 10019
(212) 566 8000
ECF@WylieLAW.com