Page 1

```
UNITED STATES DISTRICT COURT?
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------X
CYPRESS HOLDINGS, III, L.P., individually
and derivatively on behalf of SPORT-BLX,
INC.,

                        Plaintiff,

     -V-                Civil Action No.:
                        1:22-cv-1243-LGS
GEORGE HALL, JOSEPH DE PERIO, DANIEL
STRAUSS, FRANCIS RUCHALSKI, CESAR BAEZ,
CHRISTOPHER JOHNSON, SPORT-BLX INC.,
SPORT-BLX SECURITIES, INC., CLINTON GROUP
INC., AND GLASSBRIDGE ENTERPRISES INC.,
                        Defendants.
---------------------------------------------X
SPORT-BLX, INC., individually and
derivatively on behalf of its shareholders,

                        Plaintiff,

     -V-                Case No.:
                        1:22-cv-8111-LGS
MICHAEL M. SALERNO, CYPRESS HOLDINGS, III,
L.P.,

                        Defendants.
---------------------------------------------X
              DATE: May 1, 2023
              TIME: 9:43  A.M.


           EXAMINATION BEFORE TRIAL of the
Defendant, Michael Salerno, taken by Mr.
Sack, pursuant to Order, held at the
offices of Hindy Freilich, a Notary Public
of the State of New York.
```



Page 22

```
 1
 2   execution page, and you have a separate set
 3   of certifications of accuracy there, as
 4   well, is that right?
 5        A.    Yes.
 6        Q.    Also on March 31, 2023?
 7        A.    Yes.
 8        Q.    If you could go to the second
 9   page from the back.
10             MR. PEARLSON:  The one we were
11        just on?
12             MR. SACK:  We're still on the
13        same document.  The one before the
14        two pages we just looked at.
15             MR. PEARLSON:  Which page?
16        Second to last page or the third to
17        last page?
18             MR. SACK:  Third to last page.
19        Thank you.
20        Q.    Do you see an answer -- do you
21   see a question and a set of answers there
22   under custody, and it says number 2, pooled
23   investment vehicles and trusts.  Do you --
24   at A 1, "Do you or a related person act as
25   a general partner, managing member or
```



Page 23

```
 1
 2   person serving in a similar capacity for
 3   any pooled investment vehicle for which you
 4   are the advisor to the pooled investment
 5   vehicle or for which you are the advisor to
 6   one or more of the investors in the pooled
 7   investment vehicle."
 8           And do you see the response to
 9   that question is yes?
10       A.   I do see that.
11       Q.   What's a pooled investment
12   vehicle?
13       A.   In this context, I would have
14   to ask our counsel, who completed it.
15       Q.   But you're responsible for the
16   accuracy of the information.  You don't
17   know what a pooled investment vehicle is?
18       A.   In this context, I would have
19   to ask him.
20       Q.   Well, in any context, as a
21   registered investment advisor, what's your
22   understanding of what a pooled investment
23   vehicle is?
24       A.   As a registered investment
25   advisor, my understanding of a pooled
```



Page 24

1
2  investment would be the grouping of
3  multiple investments under one omnibus
4  account.
5       Q.   And would it also be a grouping
6  of multiple investors in one vehicle or one
7  partnership or one investment agreement?
8       A.   In general or in this context?
9       Q.   In any context?  Is that an
10 accurate -- if multiple investors invest in
11 a partnership, would that be a pooled
12 investment vehicle?
13      A.   I'm not sure if it would be in
14 this context.  It might be.  But I don't --
15 in this context, I would have to rely on
16 counsel, which I did.
17      Q.   Well, counsel said yes.  So
18 what did counsel -- counsel had to have
19 some basis -- withdrawn.
20           You said yes, because this was
21 your statement in this form, wasn't it?
22 Didn't you say yes?
23      A.   No.  I signed the form.  I'm
24 responsible for what's in it.  But I relied
25 on counsel.



Page 32

```
 1
 2   you're saying the entity is a fund?
 3        Q.    No.  I'm just reading the first
 4   sentence.  "A pooled investment vehicle is
 5   an entity often referred to as a fund that
 6   an advisor creates to pool money from
 7   multiple investors."
 8        A.    No.  I do not have a fund.
 9        Q.    That's not my question.
10              Are you a manager or general
11   partner of a pooled investment vehicle, a
12   fund being an example or a way of referring
13   to it.  It doesn't say a definition of a
14   fund.  It's a definition of a pooled
15   investment vehicle.
16        A.    Again, based on my
17   interpretation of what this document says
18   that you've put in front of me, it's saying
19   it's a fund.  I do not run a fund.
20        Q.    Mr. Salerno, are you the
21   general partner or managing member of an --
22              Mr. Salerno, are you or an
23   entity you control a general partner or
24   managing member of any entity that pools
25   money from multiple investors?
```



Page 33

```
 1
 2              THE WITNESS:  Can you read it
 3      back, please.
 4              (Whereupon, a portion of the
 5      testimony was read back.)
 6      A.      Yes.
 7      Q.      What are those?  Please name
 8  them.
 9      A.      Name what?
10      Q.      Name the -- are you the
11  managing member of any entity or general
12  partner, please name those entities?
13      A.      Oh.  The entities.  Cypress
14  III.
15      Q.      Any others?
16      A.      I don't think so.
17      Q.      And by Cypress III, you mean
18  Cypress Holdings, III, L.P.?
19      A.      Yes.
20      Q.      Do you have a problem if we
21  just refer to it as Cypress III for
22  shorthand during the deposition?
23      A.      I think that works.
24      Q.      Did you -- were you the general
25  partner or managing member of any entities
```



Page 34

```
 1
 2   that pool money from multiple investors
 3   before Cypress III?
 4        A.   I'm concerned with the context
 5   that you're asking me this, because
 6   Cypress III is not a pooled investment.
 7   Cypress III is a limited partnership that I
 8   set up for investments for myself, which I
 9   have let some friends into.  You're
10   characterizing it as a pooled investment,
11   which I don't think is accurate.
12        Q.   Well, the friends are not part
13   of your family and they're investing in the
14   fund alongside you, correct?  They're --
15   correct?
16        A.   Some of them are family.
17        Q.   But it doesn't matter --
18   withdrawn.
19             So what would you call
20   Cypress III?
21        A.   A limited partnership.
22        Q.   That you manage, correct?
23        A.   Correct.
24        Q.   And that you manage it on
25   behalf of yourself and other investors?
```



MAGNA LEGAL SERVICES

```
 1
 2        A.    Correct.
 3        Q.    And you and your wife actually
 4   had a minority interest in this limited
 5   partnership as of February 2019, isn't that
 6   right?
 7        A.    I'm not sure.  We may have had
 8   a majority interest at that time.  I would
 9   have to look.
10        Q.    All right.  We will look at it.
11              As of now, it's a minority
12   interest, correct?
13        A.    As we sit here today, yes.
14        Q.    It's 25 percent or less of the
15   partnership, would you say?
16        A.    No.
17        Q.    How much -- what's the
18   percentage today?
19        A.    I'm not sure.  I think it's
20   somewhere around 40 percent.
21        Q.    So this is a limited
22   partnership that you manage for yourself
23   and for others in which you are a minority
24   owner?  Is that an accurate description?
25        A.    Today, yes.
```



Page 36

```
 1
 2        Q.    And it holds the assets of
 3   multiple investors?
 4        A.    I'm concerned -- assets of
 5   investors or assets of investments?
 6        Q.    Does it hold the assets of
 7   multiple investors?
 8        A.    It accepted cash from multiple
 9   investors and today holds assets of
10   investments.
11        Q.    And it holds the financial
12   interests of multiple investors, correct?
13        A.    What's the definition of
14   financial interest?
15        Q.    Does it hold -- do the LPs have
16   separate interests from your own,
17   Mr. Salerno, in this limited partnership?
18        A.    What LPs?  I'm sorry.
19        Q.    Are there limited partners in
20   Cypress III?
21        A.    Limited partners, yes.
22        Q.    The limited partners of
23   Cypress III have rights to the money in
24   that fund that are separate and apart from
25   whatever rights you have to the money in
```


MAGNA
LEGAL SERVICES

Page 38

```
 1
 2   eight people, correct?
 3        A.    Correct.
 4        Q.    And so is it fair to say that
 5   this Cypress III holds the assets of those
 6   multiple investors?
 7        A.    Yes.
 8        Q.    In the same -- let's take this
 9   -- I'll set this aside, Mr. Salerno.
10   Please go back to this document that is
11   Exhibit 1.  And I'm going to direct you now
12   to, if you wouldn't mind counting eight
13   pages from the back, and I think we'll be
14   able to find --
15        A.    From the back?
16        Q.    From the back.
17        A.    Sure.
18        Q.    Excuse me.  My mistake.  It's
19   seven pages from the back.  Excuse me.  And
20   then we'll make sure we're on the same
21   page.
22              Do you see a box in the middle
23   of the page?  I think -- I'm sorry,
24   Mr. Salerno, if I could take this document,
25   I'll direct you to the page.
```



```
 1
 2        Q.    They told you that the rent --
 3   the payment for the space would go to
 4   Clinton Group.  That wasn't a surprise to
 5   you.
 6        A.    Yes, it was.
 7        Q.    You knew that going in, didn't
 8   you?
 9        A.    No.
10        Q.    You didn't know the business
11   was housed in Clinton Group?
12              MR. PEARLSON:  Objection.
13         Which question are you asking him to
14           answer?
15        Q.    So you didn't know when you
16   invested that the business was going to be
17   paying for use of space at Clinton Group?
18        A.    No.
19        Q.    So the offices you visited
20   where Sport-BLX was was the Clinton Group,
21   correct?
22        A.    They were the Clinton Group's
23   offices.
24        Q.    And the space, the rental
25   expense projected was $500,000 and --
```



Page 91

1
2  correct, that was the annual rental expense
3  projected before you invested.  You knew
4  that, correct?
5       A.    I recall that was on the pro
6  forma.
7       Q.    Did anyone ever tell you the
8  business was going to move from the Clinton
9  Group to somewhere else?
10      A.    No one ever told me it was
11 going to be in the Clinton Group.
12      Q.    Where did you think it was
13 going to be?
14      A.    At some location.
15      Q.    Excuse me.  You thought George
16 Hall and Joe De Perio --
17            MR. PEARLSON:  Can you let him
18       finish his answer, please.
19      Q.    Sure.  At some location, are
20 you finished?
21      A.    Yes.
22      Q.    At what location?
23      A.    To be determined.
24      Q.    So you thought George Hall and
25 Joe De Perio were going to be shuttling



Page 92

```
 1
 2   back and forth from the Clinton Group
 3   office to somewhere else to work on
 4   Sport-BLX?
 5        A.   So are you saying -- I'm not
 6   understanding your question because --
 7        Q.   Go ahead.
 8        A.   Because they were employees of
 9   Clinton Group, so they would be in Clinton
10   Group's office.  They also had a
11   Glassbridge company that, I believe, had a
12   different office.  They also had other
13   entities that had different offices.
14             So there was nothing ever told
15   to me that they were going to be paying
16   George Hall $500,000, because I would have
17   objected to that.
18        Q.   When did you -- well, no one
19   ever told you they were paying George Hall
20   $500,000, did they?
21        A.   The Clinton Group, I'm sorry,
22   which is solely owned and is George Hall's
23   entity.
24        Q.   When did you find out that it
25   was the Clinton Group that was receiving
```



Page 135

```
 1
 2        Q.    You may have, you just don't
 3   know one way or the other?
 4        A.    I don't recall.  I don't recall
 5   a binder.
 6        Q.    At this meeting, did you go
 7   over the projected financials of Sport-BLX?
 8        A.    I don't recall what we went
 9   specifically over in the meeting.
10        Q.    Did you go over projected
11   expenses and revenues for the business?
12        A.    At that meeting, I don't recall
13   what we went over.
14        Q.    Did you ever have a meeting
15   before signing the stock purchase
16   agreements where you went over with Joe De
17   Perio and/or George Hall, the projected
18   financials of the company?
19        A.    If you define a meeting by
20   telephone conversation, as well as in
21   person, I'm confident that the answer is
22   yes.
23        Q.    Let me break it down.  Do you
24   recall a physical meeting, an in-person
25   meeting where you and Joe and/or George
```



Page 136

```
 1
 2   Hall went over the financial projections
 3   for the company before February 28th?
 4        A.   Again, when I was there in
 5   person, I don't recall specifically what we
 6   went over.  But I know before the -- I
 7   signed, I did discuss with them the pro
 8   forma.
 9        Q.   And it was either, you're
10   saying, by phone or in person, you don't
11   remember which now?
12        A.   I don't recall.
13        Q.   How long was this meeting --
14   withdrawn.
15             How long was this discussion
16   that you're referring to, where you were
17   discussing the pro formas?
18        A.   I don't recall.
19        Q.   Was it longer than 30 minutes?
20        A.   I don't recall.
21        Q.   You have no recollection
22   whether it was a brief five or ten-minute
23   call or more like an hour or more
24   discussion?
25        A.   I'm speculating, but it's more
```



Page 167

1
2  investment decks that were provided to me.
3             (Whereupon, an off-the-record
4         discussion was held.)
5       Q.    I'm going to show you some
6  materials and I'll ask you a few questions
7  about those.
8             We'll call it Salerno
9  Deposition Exhibit 13, Cypress Bates stamp
10 1607 to 1610.
11            Are these the set of frequently
12 asked questions that you saw in early 2019,
13 Mr. Salerno?
14      A.    They appear to be.
15      Q.    And you saw a document like
16 this in the data room, correct?
17      A.    I don't know how I got it, but
18 yes, this was what I refer to as the
19 frequent -- the FAQ, frequently asked
20 questions.
21      Q.    Please take a look at the third
22 page of the document, 1609 and item 10.  It
23 lists three ways, three responses to the
24 question how does Sport-BLX make money.  It
25 says, number 1, "We will charge initial



Page 188

```
 1
 2         A.    However, that FAQ was prior to
 3   the pro forma being provided.
 4         Q.    Well, you said you relied on
 5   the FAQ when you invested, isn't that
 6   right?  That was all before February 28th.
 7   It was part of the mix of information that
 8   you had when you invested, correct?
 9         A.    It was a part of the
10   information, yes.
11         Q.    This pro forma, you reviewed it
12   in the data room?
13         A.    I'm sorry.  Rephrase the
14   question.
15         Q.    Did you review data in the data
16   room that you were given access to?
17         A.    No.
18         Q.    You didn't go into the data
19   room and look at any of the data?
20         A.    Yes.
21         Q.    You did go into the data room,
22   correct?
23         A.    I went into the data room, I
24   downloaded the information and I reviewed
25   it in my office.
```



Page 273

```
 1
 2         Q.    That's another conversation you
 3   secretly recorded?
 4         A.    That I recorded of Joe De Perio
 5   and I talking about the wiring
 6   instructions.
 7         Q.    When did you do that?
 8         A.    Before the wire was sent.
 9         Q.    So you started recording Joe De
10   Perio within a week of your investing in
11   the company, you started recording?
12         A.    I think there is one, yes.
13         Q.    No, no.  Not I think there is
14   one.  Did you secretly -- did you start to
15   secretly record conversations within
16   approximately a week of making your
17   investment in this company?
18         A.    Yes, it's very possible.
19         Q.    Why?
20         A.    Because at that point, I was
21   already concerned about the investment
22   being made.  And if I didn't do it, that
23   they were going to hold me up with a
24   contract dispute.
25         Q.    Within one week you were
```



Page 317

```
 1
 2   concerned, you could have disclosed their
 3   names in connection with the broker dealer
 4   application in August 2019?
 5           MR. PEARLSON:  Objection.
 6           Go ahead, you can answer.  I
 7        just objected.
 8       A.   I don't believe so.  I don't
 9   believe that I would have been doing the
10   right thing by disclosing their names as
11   partners of Cypress.
12       Q.   Okay.
13           MR. SACK:  Hindy, could you
14        please read my question back and
15        let's see if Mr. Salerno can answer
16        it.
17           (Whereupon, a portion of the
18        testimony was read back.)
19       Q.   The question was could you have
20   done that?
21       A.   Your question was -- that's not
22   what your question was.
23       Q.   The question was, as far as
24   your limited partners were concerned, you,
25   as general partner, could have disclosed
```



 1
 2   their names to Sport-BLX?
 3              MR. PEARLSON:  I'm going to
 4        object to that.
 5              Go ahead.
 6        A.   Did I have discretion to
 7   disclose their name?  I would think yes.
 8   If you're -- your question was would they
 9   have allowed it, and I'm paraphrasing.  I
10   don't think I can make that determination.
11        Q.   You didn't ask them, did you?
12        A.   No.
13        Q.   So you don't even know whether
14   -- what they would decide about whether to
15   disclose their names, correct?
16        A.   I did not ask them that.
17        Q.   You made the decision solely on
18   your own?
19        A.   That's correct.  Well, no.  I
20   made the decision with speaking to counsel
21   with regard to whether or not it was really
22   necessary, as well.  But at the end of the
23   day, it was my discretion as a Cypress III
24   manager.
25              MR. SACK:  Let's show the

