Page 567

1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF NEW YORK
2

3     _____

      CYPRESS HOLDINGS, III, L.P.,              Case No.
4     individually and derivatively        22-cv-01243(LGS)
      on behalf of SPORT-BLX, INC.,
5                      Plaintiff,
6          -v-                                  VIDEOTAPED
                                                VIDEOCONFERENCE
7     GEORGE HALL, JOSEPH DE PERIO,         DEPOSITION UPON
      DANIEL STRAUSS, FRANCIS               ORAL EXAMINATION
8     RUCHALSKI, CESAR BAEZ,                       OF
      CHRISTOPHER JOHNSON,                    GEORGE HALL
9     SPORT-BLX, INC., SPORT-BLX            (Vol. III)
      SECURITIES, INC., CLINTON
10    GROUP INC., and GLASSBRIDGE
      ENTERPRISES, INC.,
11                   Defendants.
12    _____
13    SPORT-BLX, INC., individually        Case No:
      and derivatively on behalf of     1:22-cv-8111(LGS)
14    its shareholders,
                       Plaintiff,
15
           -v-
16
      MICHAEL M. SALERNO and
17    CYPRESS HOLDINGS, III, L.P.,
                     Defendants.
18

19    _____

      ***  CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER  ***
20
21          T R A N S C R I P T of testimony taken
      remotely stenographically by and before MARGARET
22    VOLLMUTH-CORSON, a Certified Court Reporter of the
      State of New Jersey, pursuant to Federal Rules
23    Governing Civil Procedures, witness appearing from
      the offices of MORVILLO ABRAMOWITZ GRAND IASON &
24    ANELLO, P.C., 565 Fifth Avenue, New York, New York,
      on Thursday, June 29, 2023, commencing at
25    approximately 10:03 a.m.
      Job No. NJ5987116

Page 590

1    articulated to the board of leaving this demand note

2    outstanding would be lessened if -- if GlassBridge

3    had a -- had a bigger position.

4              The other reason was that by having a

5    bigger position, it would help with what I think I

6    called Phase 2 of the Orix transaction, which would

7    enure benefit to Sport-BLX.

8              And I think, as I said last time, this

9    was effectively a first step towards taking the

10   company public through a reverse merger as opposed

11   to an IPO.  Which going back to the original FAQs, I

12   think it refers to an IPO as potential end goal for

13   this company.  So there were a lot of advantages to

14   Sport-BLX to have GlassBridge own a majority.

15        Q.    Mr. Hall, you referred to a Phase 2

16   with Orix.  What were you referring to when you said

17   that?

18        A.    So Phase 1 was Orix wanted to acquire

19   a minority position in Imation, which was a

20   subsidiary of GlassBridge.  Based on the change of

21   control rules, they could only purchase

22   approximately 20 percent at the time.  There was the

23   ability to purchase more sometime in early to mid

24   2020 as more what we call headroom became available,

25   and they could purchase more without causing a

1         A.      I don't recall this particular chart.

2         Q.      Are you familiar with the entities

3    depicted in this chart, the GlassBridge entities?

4         A.      Basically.  I have some general

5    understanding, --

6         Q.      Okay.  Do you know --

7         A.      -- yes.

8         Q.      Well, do you know what -- what is Adara

9    Enterprises Corp.?

10        A.      In previous questions I referred to

11   Imation, which is a wholly-owned subsidiary of

12   GlassBridge, that 20 -- a little over 20 percent of

13   it was sold to Orix.  Orix changed the name to Adara

14   Enterprises from Imation.

15        Q.      Do you have any knowledge as to what

16   Adara Enterprises and Adara Asset Management do?

17               MR. SACK:  Do or did?  Can you just

18   clarify the time period?

19               MR. PEARLSON:  Fair enough.

20        Q.      As of -- as of April 2020 were you

21   familiar with what Adara Enterprises and Adara Asset

22   Management did?

23        A.      Adara Asset Management -- I believe

24   Adara Asset Management was technically the manager

25   of the P.J. Washington -- or the entity that funded

Page 701

```
 1   the balance sheet of this SPV.
 2        Q.    Okay.  And -- and one of the things it
 3   acquired in addition to acquiring the debt, it also
 4   acquired shares in Sport-BLX?
 5              MR. SACK:  Objection to form.
 6        A.    I -- that's what this says, and I
 7   haven't thought about this in a while, but that --
 8   that looks correct.
 9        Q.    What -- what was the status of
10   Sport-BLX's business in July of 2020?
11        A.    Sport-BLX, around that time, was
12   continuing to focus on its technology and to --
13   around that time signed a subscription agreement,
14   what we called a subscription agreement with
15   Sport-BLX Securities.
16        Q.    Was Sport-BLX's activity at that time
17   limited to trying to license its source code and
18   platform?
19        A.    Well, it was limited to licensing it
20   to Sport-BLX Securities.  There was really no other
21   market that would have been practical that we knew
22   about to license it to anybody else.
23        Q.    Okay.  Were there any efforts made to
24   license it to anybody else?
25        A.    I did try to use it as collateral with
```

Page 702

1    the software company, but basically didn't think it

2    was really worth -- that the source code was really

3    worth anything significant, but there's lots of

4    things that I don't do when I make a judgment that

5    -- we'll call it a fool's errand.  Nobody would

6    license this technology at the stage it was at for

7    the purpose it was created unless it was somebody

8    affiliated with -- with it that -- or a related

9    party that understood the business, understood what

10   it was -- the technology was built for and how it

11   might be used.

12        Q.    Can you tell us what is GEH Sport, LLC?

13        A.    I think that's the ultimate name of

14   the entity that was referred to previously.

15             MR. PEARLSON:  Okay.  If we could look

16   at Hall-95 for identification.

17             (Exhibit Hall-95, Four-page Assignment

18   Agreement between GEH Capital, LLC and Adara

19   Enterprises Corp. dated 20th day of July, 2020,

20   Bates stamped SPORTBLX0273641 through 273644, is

21   marked for identification.)

22        Q.    This is an Assignment Agreement.  It

23   looks like it's dated about the same time as the

24   restructuring is going on, and it's between GEH

25   Capital, LLC and Adara Enterprises Corp.  Do you

Page 719

1          Q.    Okay.  And if we turn to GBE_0014757,

2    which is Schedule 1, that shows that the price per

3    share was $2.00, correct?

4          A.    Correct.

5          Q.    Do you know how the $2.00 -- the price

6    of $2.00 per share was arrived at in terms of this

7    purchase by FinTech?

8          A.    I think it was all part of the bigger

9    transaction, multiple pieces to -- to have

10   GlassBridge buy back the debt that it owed to Joe

11   and myself and for Joe and I to form an entity to

12   buy the demand note from Sport-BLX and the stock

13   from Sport-BLX.  So it was all an -- all of these

14   prices worked together to get us to an end result.

15         Q.    Okay.  But do you know how the price --

16   specifically price per share of $2.00 was arrived

17   at?

18         A.    Specifically $2.00 as opposed to

19   $3.00?  I don't think there was a specific

20   calculation that would give you a -- an answer in

21   that fine a detail.

22         Q.    Well, as of December of 2021 what was

23   the status of Sport-BLX's business?

24         A.    The -- we were -- well, as of December

25   of 2021 we had just effectively cancelled the

1   capital raise that we were attempting to do when a

2   shareholder made out allegations about siphoning

3   money from the company, so we had to put that on

4   hold until those allegations were reported to the

5   board and investigated and vetted by the board.  But

6   at the same time, Sport-BLX was potentially going to

7   have -- Sport-BLX, Incorporated was potentially

8   going to get a significant value from consummating

9   the transaction with P.J. Washington, which at that

10  time I think would have been a significant amount of

11  value to Sport-BLX, Inc.

12          Q.      How far did the transaction with P.J.

13  Washington progress?  Was there ever any draft

14  agreements?

15          A.      Yeah, we -- yes, we had draft -- we

16  had agreements.  So we had firm agreements with P.J.

17  Washington, and I was in a number of discussions

18  with selling those shares to third party investors.

19  So we were pretty close to consummating that

20  transaction and actually leading to a reasonable

21  amount of revenue for a reasonable increase in asset

22  value for Sport-BLX.

23          Q.      And that was as of December of 2021?

24          A.      Well, it was the -- we had to -- I

25  think it was in roughly November of 2021 that we had

1  to -- maybe even October that we -- I felt we had to

2  cancel the -- the fund raise that we were doing for

3  Sport-BLX, Incorporated, so it was a little bit

4  before this time.

5       Q.    And what happened with the P.J.

6  Washington agreement?

7       A.    Well, I was negotiating and talking to

8  a number of parties about making the investment and

9  -- and that was December or January, and then once

10  the -- the company was sued, it was -- it was

11  impossible to get the transaction done.

12       Q.    Okay.  And in terms of the -- so in --

13  as we saw, in December of 2019 GlassBridge purchased

14  your shares and Mr. De Perio's shares for $355.00

15  per share, correct?

16            MR. SACK:  Objection to the form.

17       A.    I understand what you're saying.

18  That's not exactly how I look at it, but yes.

19       Q.    Okay.  And then two years later they --

20  they sold their shares for $2.00 per share, correct?

21       A.    That's way out of context.

22       Q.    Well, isn't it a fact that they sold

23  their shares -- that GlassBridge sold its shares to

24  FinTech for $2.00 per share?

25       A.    Well, then I would argue that they

Page 733

```
 1    why don't you put the schedule up again.  Thank you.
 2         A.    Okay.  So what was the question?
 3         Q.    The question was how long after -- you
 4    indicated that, you know, at some point Sport-BLX
 5    Securities stopped paying the fees.  How long was
 6    the agreement in effect and Sport-BLX Securities
 7    paying the fees until it -- it stopped paying the
 8    fees?
 9         A.    I -- I'm not exactly sure how long it
10    was, but I think the amount of fees paid in -- was
11    approximately $600,000.00, but I'm not exactly sure
12    of that number, and I'm not sure over what time
13    period.
14         Q.    Okay.  And you don't know how long the
15    agreement was in -- in effect?
16              MR. SACK:  Objection to form.  May
17    call for a legal conclusion.
18         Q.    Let me ask you this.  At some point,
19    Mr. Hall, did -- did the parties terminate the
20    agreement, the subscription agreement?
21         A.    As I recall, the -- there was what we
22    referred to -- I don't know if it's in the document,
23    but we referred to it as a trigger agreement where
24    Sport-BLX, Incorporated could no longer perform the
25    functions that Sport-BLX Securities had bargained
```

Page 734

1   for.

2           Q.      And so as a result did Sport-BLX

3   Securities terminate the agreement?

4           A.      I don't think it was a termination at

5   any one particular time.  It was a period of time

6   during which there was some discussion and

7   negotiation about how to deal with this.

8           Q.      And who -- who were the participants in

9   those discussions and negotiations?

10          A.      Well, I think the initial discussions

11  were Pete Rawlins and Joe De Perio.

12          Q.      And you indicated that the -- that

13  Sport-BLX was no longer able to provide the service

14  or service the -- the code and the platform

15  appropriately.  Why was that?

16          A.      Well, --

17                  MR. SACK:  Objection to form, but you

18  can answer.

19          A.      There were a number of reasons, but

20  one was the CTO quit, and then at some point the

21  number two in command on technology quit, so the

22  only real ongoing development was people at

23  Sport-BLX Securities because Sport-BLX, Incorporated

24  couldn't fulfill any of its obligations.

25          Q.      Do you recall when it was -- first of

Page 735

1    all, who was the CTO of Sport-BLX?

2         A.    It was Ryan Fisch.

3         Q.    And do you recall when he quit?

4         A.    I -- I think it was in the -- oh, I

5    think it was August or so -- I don't recall exactly.

6    I think it was August of 2020.

7         Q.    And do you recall why he quit?

8         A.    Well, they never quite tell you, but

9    one thing I do know, he spent a lot of -- he had a

10   lot of interest in the alternative trading system

11   concept, or ATS.  I think one of the projects he

12   spoke about a lot and was interested in pursuing was

13   an ATS, so I think over time he realized that that

14   wouldn't likely happen.  You know, that was one of

15   the things that I knew was troubling to him, but I

16   don't really know specifically why he quit.

17        Q.    Okay.  Now, at -- you also indicated

18   that the second in command or the second ranked, you

19   know, technology officer quit too.  When -- do you

20   recall when that was?

21        A.    I think early 2021.

22        Q.    Okay.  At some point did the -- did the

23   discussion turn to Sport-BLX Securities purchasing

24   the source code and platform from Sport-BLX, Inc.?

25        A.    Yes.

1        Q.     Mr. Hall, maybe -- regardless of what

2    the -- you know, what the particular provision of

3    the agreement says, what was your understanding of

4    Sport-BLX Securities, Inc.'s rights with respect to

5    the trading platform and source code that you just

6    described to us?

7        A.     Well, the Sport-BLX Securities was

8    paying for the use of code, and if Sport-BLX,

9    Incorporated were not able to support the code or

10   went bankrupt or any situation that they couldn't

11   fulfill their obligations, there needed to be some

12   protection that Sport-BLX Securities didn't throw

13   that money out the window for nothing.  So

14   ultimately if Sport-BLX, Incorporated defaulted and

15   couldn't fulfill its obligations, Sport-BLX

16   Securities can continue to use the code as -- use

17   and modify the code as it sees fit.

18       Q.     Without paying fees or with paying

19   fees?

20       A.     Without paying fees is my

21   recollection.

22              MR. PEARLSON:  Okay.  Why don't we

23   take a break here because I believe now is the time

24   you need to take your break to do the call.

25              How much time do you think -- let's go

1          Q.     Okay.  Now, Mr. Hall, are you saying

2     that as of December 2021, that Sport-BLX, Inc. had

3     ceased providing the servicing of the -- that was

4     required under the agreement?

5                    MR. SACK:  Objection to the form.

6          A.     Well, prior to that date, yes.

7          Q.     Okay.  And -- and that's what you were

8     referring to.  Is there anything else you're

9     referring to when -- when you say there was a

10    triggering event because Sport-BLX ceased to perform

11    its material obligations under the agreement?

12         A.     Well, no.  Let's go through all of

13    them then.  Can we go back a page?

14                    So "becomes insolvent," I think the

15    supplier was, in fact, insolvent.  It was unable to

16    pay its debts.  It did not -- letter (C), it did not

17    file for bankruptcy.  (D), (E)...

18                    It had not yet terminated or

19    permanently ceased its ongoing operations, so there

20    were three -- three of the letters, I think, were --

21    could be applicable to Sport-BLX, Inc. at the time.

22         Q.     So you considered there to have been

23    triggering events that would have allowed Sport-BLX

24    Securities to copy or take control of the -- of the

25    source code and use it for its own purposes.  Is

Page 744

1    that your testimony?

2         A.    Yes.

3         Q.    Okay.  And then it says -- it says, "as

4    acknowledged in the previous board meeting, they

5    would investigate paying some consideration for its

6    sole ownership."

7         A.    Are we -- are we back to the minutes?

8    Can you -- can you put the minutes back up?

9              Go ahead.

10        Q.    So at some point the board looked into

11   a payment from Sport-BLX Securities, Inc. to

12   Sport-BLX for the -- for the ownership, the sole

13   ownership of the code?

14        A.    I don't -- I don't know if "the board

15   looked into it" is the right characterization, but

16   yes, it was my recommendation to the board that

17   Sport-BLX Securities pay some consideration for the

18   -- for the code.

19        Q.    Okay.  And how did you go about -- how

20   did the board go about determining what the

21   appropriate purchase price was for the code?

22        A.    Well, the -- the company was that

23   time -- or prior to that, at the time of the trigger

24   event, was a GlassBridge subsidiary.  Mr. Fisch had,

25   at one point, for purposes of GlassBridge's

1    evaluation, I think, put a value on the -- on the

2    software at roughly $200,000.00.

3          Q.    For what purpose had Mr. Fisch

4    undertaken that task to value the software or the --

5    I should say the source code?

6                MR. SACK:  Objection to form.

7          A.    Well, it says it in the minutes, that

8    for the 2019 audit Mr. Ruchalski had spoken to

9    Mr. Fisch, the CTO at the time, about what costs

10   could be capitalized, if any.  So that was the

11   purpose.

12         Q.    Okay.  And what -- what was the -- what

13   2019 audit is he referring to there or are you

14   referring to there?

15         A.    I believe it's the 2019 audit of

16   GlassBridge.

17         Q.    Okay.  And then it says, "Mr. Fisch

18   wrote a memo stating that there were not any

19   takeaways from what ConsenSys built."  Did you ever

20   see that memo?

21         A.    I don't know if I specifically saw the

22   memo.

23         Q.    Do you know what was meant there when

24   it says "that there were not any takeaways from what

25   ConsenSys built"?

Page 750

```
 1              MR. PEARLSON:  This is page 62 you're
 2    on?
 3              It doesn't matter.  It's the same
 4    information.  It's fine.
 5        Q.    So here it's called related party
 6    transaction.  It's actually -- that's on page 62 of
 7    the pdf.  It talks about on December 21 at the
 8    beginning -- at the bottom of the page --
 9              MR. PEARLSON:  What page are you on?
10              MR. TYRRELL:  (Inaudible.)
11              MR. PEARLSON:  I was on page 45.
12              Hold on one sec.  Sorry.
13              Here you go.
14        Q.    You see where it says under "Sports
15    Technology Platform" on December '21 "SportBLX sold
16    proprietary code to S-BLX Securities, a related
17    party, for 225,000."  Do you see that?
18        A.    I didn't see the first part.  You said
19    Sport Tech- -- Sports Technology Platform?
20              MR. PEARLSON:  Scroll up so he could
21    see it.
22        A.    Okay.  There we go.
23              Okay.  I can see it, yeah.
24        Q.    Okay.  Is that consistent with your
25    recollection as to the fact that there was a sale of
```

1    the code and platform to Sport-BLX Securities for

2    $225,000.00?

3            A.      Well, that was part of it.

4            Q.      What else was there?

5            A.      The next section below.

6            Q.      Okay.  This is all part of one

7    transaction here?

8            A.      They were done on different days, but

9    they were part of the same transaction.  GlassBridge

10   recorded it on different days, which is probably

11   just creating documents took another day or so, but

12   it's part of the same transaction.

13                   You -- you might assume that

14   $225,000.00 for code that was created for roughly $2

15   million or some number bigger than the founders'

16   round was a low price.  So from Sport-BLX

17   Securities' standpoint, they didn't really

18   necessarily need to buy it, they could just use it,

19   but there would be advantages to actually owning it

20   in terms of marketing.  And once I realized that

21   effectively Mr. Salerno had destroyed most of the

22   possibilities of Sport-BLX's success, it was clear

23   that was the mission, I realized that the best way

24   to get shareholders a value and to create this

25   ecosystem was to have the code in the same place as

Page 752

1    the entity that was going to continue to do

2    business.

3                From Sport-BLX Securities' standpoint,

4    they didn't really have to pay anything, but I

5    thought it was reasonable that they did.  By the

6    same token, it would be unreasonable for Sport-BLX

7    Securities to write a check for some significant

8    amount of money for code that it had already spent

9    $600,000.00, plus an awful lot of time and energy

10   and employee time that went towards Sport-BLX, Inc.

11   So to jump in and make the transaction fair, in my

12   view, as close to fair as possible for both sides,

13   we basically wrote off $1.3 million or $1.35 million

14   of debt at Sport-BLX, Incorporated.  So the total

15   consideration was the cash plus the debt write-off.

16   And if Sport-BLX Securities did pay a big amount of

17   cash for the code, it would have gone to pay down

18   debt anyway.

19               So by doing it this way, effectively

20   Joe De Perio and myself wrote off debt that was

21   owned by FinTech Debt Corp. to make it seem -- to

22   make it not only fair to Sport-BLX Securities, but

23   reasonable compensation to Sport-BLX, Inc. for the

24   original cost of the code.

25          Q.    Mr. Hall, as of the time of this sale,