EXECUTION COPY

**SUBSCRIPTION AGREEMENT**

This Subscription Agreement ("**Agreement**") is made effective as of June 5, 2020 (the "**Effective Date**") by and between Sport-BLX, Inc., a Delaware corporation ("**Supplier**"), and Sport-BLX Securities, Inc., a Delaware corporation ("**Customer**"). Supplier and Customer may be referred throughout the Agreement individually as a "**Party**" or together as the "**Parties.**" In consideration of the promises and mutual covenants herein, the Parties agree as follows:

1. **DEFINITIONS**

1.1 "**Affiliate**" shall mean any company, corporation, or other entity, which controls, is controlled by, or is under common control with a Party and shall be considered an Affiliate only so long as the ownership or control, directly or indirectly, meets the conditions set forth herein.

1.2 "**Authorized User**" means an employee of Customer who is authorized to access the Platform, and who has been provided a unique UserID and password for such access.

1.3 "**Client**" means a customer or client of Customer that trades securities through the Platform.

1.4 "**Customer Data**" means electronic data provided to, entered in, or uploaded through the Platform, by or on behalf of the Customer or its Authorized Users.

1.5 "**Personal Information**" means information provided to Supplier by or at the direction of Customer, or to which access was provided to Supplier in the course of Supplier's performance under this Agreement that: (i) identifies or is actually linked to other data in a manner that can reasonably identify an individual (including, without limitation, names, signatures, addresses, telephone numbers, e-mail addresses and other unique identifiers); or (ii) can be used to authenticate an individual (including, without limitation, employee identification numbers, government-issued identification numbers, passwords or PINs, financial account numbers, credit report information, biometric or health data, answers to security questions and other personal identifiers).

1.6 "**Platform**" means Supplier's current (as of the Effective Date) version of its proprietary sports-based alternative asset trading platform via which Customer may issue sports-related securities that are tradeable by investors, as further described at https://sportblx.com/.

1.7 "**Project Services**" has the meaning given in Section 2.3.

1.8 "**SaaS Services**" means providing access to, use of, and related support and maintenance for, the Platform.

1.9 "**Services**" means SaaS Services and Project Services, collectively.

1.10 "**UserID**" means a unique user identification credential used in combination with a unique password to access the Platform.

2. **LICENSE AND SERVICES**

2.1 Subject to Customer's compliance with the terms and conditions set forth in this Agreement, Supplier hereby grants to Customer a nonexclusive, non-sublicensable, nontransferable, limited right and license (without the right to sublease or sublicense) during the Term, to access and use (a) the Platform in an operating environment hosted by Supplier, for Customer's own internal business purposes; and (b) any associated documentation or materials provided or made available by Supplier during the Term (collectively, "**Documentation**") that are made available by Supplier from time to time. Customer may make a reasonable number of copies of the Documentation

1

19080894.4
233797-10008

Confidential – Subject to Protective Order                                    SPORTBLX00001105

for its internal use in accordance with the terms of this Agreement. Any rights not expressly granted in this Agreement are expressly reserved.

2.2    Supplier may, from time to time in its sole discretion, develop or create updates, upgrades, revisions, modifications, improvements, enhancements, patches, bug fixes, new releases, replacements, or new versions of or to the Platform (each an "**Updates**"). Any routine Updates that Supplier generally releases as part of the current subscription and/or in the ordinary course of Supplier providing SaaS Services hereunder (e.g., minor updates, bug fixes and patches), will be at no additional charge to Customer. In the event Supplier creates or develops any significant or substantial Updates (e.g., new releases, new modules, customizations, or major updates to the design or functionality of the Platform) (each an "**Upgrades**"), or any new products (e.g., a new alternative trading system), such Upgrades or new products may, in Supplier's discretion, be made available to Customer for an additional fee, which will be mutually agreed in writing by the Parties under a new agreement, a SOW, or an amendment to this Agreement.

2.3    From time to time during the Term, the Parties may execute one or more statements of work (each a "**SOW**"), in form and content mutually agreed by the Parties, for the delivery of certain design, development, customization, implementation, professional, or other project services under the Agreement ("**Project Services**"). Each SOW shall describe in detail the services to be performed, fees, obligations, responsibilities and such other agreed upon terms and conditions applicable to that SOW. Upon execution by both of the parties, each SOW so executed shall be incorporated into this Agreement by this reference, and governed by the terms hereof. Unless explicitly set forth in this Agreement or in the applicable SOW, in the event of a conflict between the terms of any SOW and the terms of this Agreement, the terms of this Agreement shall control. Supplier will have no obligation to perform any Project Services that are not mutually agreed upon by the parties in a duly executed SOW.

2.4    Except as expressly permitted herein or in a SOW, Customer shall not: (a) modify, copy, duplicate, reverse engineer, disable or create any derivative work based on the Platform or the Services; (b) license, sublicense, sell, resell, rent, lease, transfer, assign, distribute, time share, offer in a service bureau, commercially exploit or otherwise make the Platform or the Services available to any third-party other than Authorized Users as permitted under this Agreement; (c) send unsolicited commercial messages in violation of any laws or regulations; (d) copy any features, functions, integrations, interfaces or graphics of the Platform or the Services; (e) send or store viruses, worms, time bombs, Trojan horses, and other harmful or malicious code, files, scripts, agents or programs (collectively, "**Malicious Code**"); (f) send or store infringing, obscene, threatening, defamatory, obscene, racially or ethically offensive, libelous, or otherwise unlawful or tortious material, including material that is harmful to children or violates third party privacy rights; (g) interfere with or disrupt the integrity or performance of the Platform or the Services or the data contained therein; or (h) attempt to gain unauthorized access to the Platform or the Services or its related systems or networks. Supplier reserves the right, without liability to the Customer, to prohibit or disable any access or use of the Platform or any part thereof which Supplier reasonably believes may be (or is alleged to be) in violation of the foregoing.

2.5    Customer is solely responsible for its and its Authorized Users' access and use of the Platform, including provision and use of Customer Data, and compliance with this Agreement and the then-current Documentation. Customer shall, and shall ensure its Authorized Users: (a) comply with the terms and conditions set forth in the Agreement, the then-current Documentation, and as terms set forth at https://sportblx.com/terms, (b) comply with any other click-through end-user agreements applicable to access and use of the Platform and Documentation; (c) obtain any and all rights, authorizations, permissions and consents necessary for Supplier to provide the Services and/or for Customer and Authorized Users to access and use the Platform; (d) use commercially reasonable efforts to prevent unauthorized access and use of the Platform and promptly notify Supplier of any such unauthorized access or use; and (e) comply with all local, state, federal and foreign laws (including all laws and regulations related to data privacy, security, broker-dealers, trading of securities, or otherwise applicable to Customer's use of the Platform ("**Customer Laws**")), in accessing and using the Platform, including, without limitation, by not submitting any Customer Data that is illegal, defamatory, or that infringes any third party privacy or proprietary rights. Supplier reserves the right, without liability to the Customer, to prohibit or disable any access or use of the Platform or any part thereof which Supplier reasonably believes may be (or is alleged to be) in violation of the foregoing.

6.2     Customer acknowledges that in the event Supplier processes certain Personal Information or sensitive financial data of or about the Customer and/or its agents, representatives, employees, Authorized Users, or other individuals in connection with the Services, including for the purposes of: (a) managing Customer's account with supplier; (b) allowing Customer to run reports; and/or (c) compiling aggregate statistics of the distribution and use of the services, Customer may request access to and correction of the Personal Information or exercise any other rights it may have in respect of such Personal Information under applicable law.  More details on Supplier's data processing activities are set out in its Privacy Policy available at https://sportblx.com/privacy, and its Cookie Policy at https://sportblx.com/cookies.

7.  **FEES AND PAYMENT**

7.1     Customer shall pay to Supplier the fees set forth in Exhibit A ("**Fees**").  Supplier will invoice Customer for the Fees, and Customer will pay all invoiced amounts within thirty (30) days after the date thereof.  If Customer fails to make payment to Supplier when due, Supplier will have the right to either suspend Customer's access to the Platform until payment is made, or terminate the Agreement upon notice to Supplier. All amounts due to Supplier hereunder not paid within thirty (30) days after the date such amounts are due will bear interest at the lesser of two percent (2%) per month or the maximum rate of interest allowable by the governing jurisdiction

7.2     Customer shall be responsible for all costs and expenses incurred by Supplier in connection with the license rights granted hereunder and any Services provided or made available hereunder.  Supplier will invoice Customer for all such costs and expenses on a monthly basis as incurred.

7.3     Customer is liable for all sales and use taxes, value added taxes, excise taxes, or other taxes related to the use or possession of the Platform by Customer under this Agreement, except for taxes based on Supplier's income or property.

7.4     In the event Supplier grants to a third party broker-dealer substantially similar rights to access and use the Platform as granted to Customer under this Agreement, the Parties will meet and discuss in good faith an appropriate reduction (if any) to the Fees so that Customer's Fees are competitive as compared to other similarly situated broker-dealer subscribers to the Platform.  Any such reduction in Fees shall be effective upon mutual written agreement of the Parties.

8.  **TERM AND TERMINATION**

8.1     This Agreement shall be effective for two (2) years beginning on the Effective Date, unless earlier terminated pursuant to the terms herein ("**Initial Term**"), and shall automatically renew for consecutive one (1) year renewal terms unless either party provides notice to the other party of its intention not to renew prior to the end of the Initial Term or the then current renewal term, as applicable (each a "**Renewal Term**").  The Initial Term together with all Renewal Terms shall be referred to as the "**Term**."

8.2     If either Party to this Agreement materially defaults in the performance of any of its obligations hereunder, and if such default continues for more than thirty (30) days after written notice specifying and describing in specific and complete detail the default is given to the defaulting Party,  then the non-defaulting Party may terminate this Agreement by giving the defaulting Party written notice of termination as of a date specified in such notice of termination.

8.3     Either Party may terminate this agreement for convenience upon thirty (30) days prior written notice to the other Party.

8.4     As of the effective date of expiration or termination of the Agreement, Customer shall (a) immediately cease any access or use of the Platform or Documentation, (b) deliver to Supplier all materials concerning the Platform, including but not limited to the Documentation, (c) destroy all electronic files and materials concerning the Platform and Documentation, and (d) certify in writing that all such materials have been delivered or destroyed. All Fees are

Confidential – Subject to Protective Order                                                                                           SPORTBLX00001110

non-refundable, provided that if Customer terminates this Agreement in the event of an uncured breach of Supplier's obligations hereunder, Supplier shall refund to Customer such portion of any pre-paid Subscription Fees (if any) paid hereunder reflecting, on a *pro rata* basis, the unused portion of the subscription purchased hereunder.

8.5    Any and all provisions of the Agreement which by their nature or effect are required or intended to be observed, kept, or performed after the expiration or termination of the Agreement (including Section 2 (Proprietary Rights), Section 5 (Confidentiality), Section 7 (Fees and Payment), Section 9 (Indemnification), Section 10 (Limitation of Liability), and Section 12 (General)) shall survive the expiration or any termination of the Agreement and remain binding upon and for the Parties' benefit.

9. **INDEMNIFICATION**

9.1    Customer agrees to indemnify, defend and hold harmless Supplier from and against any and all losses (including reasonable legal fees) arising out of or related to: (a) any access or use (including any unauthorized access or misuse) of the Platform or Documentation; (b) any claim by a Client or other third party related to the Platform or Documentation, including any claim related to a failure of the Platform or Documentation to comply with Customer Laws; (c) any unauthorized modification made to the Platform by or on behalf of Customer; (d) failure by Customer to use an updated or unaltered release of such Platform provided by Supplier to avoid an infringement or other third party claim; (e) the Customer's combination of the Platform with hardware or software not authorized or supplied by Supplier; (f) any modification made to the Platform by Supplier in order to adhere to Customer's requirements or specifications; or (g) any breach of the Agreement by Supplier.

9.2    Customer may not settle any claim without Supplier's prior written consent unless such settlement unconditionally releases Supplier from all liability and does not require Supplier to take or refrain from taking any action (except with respect to use or non-use of the Platform or Services).

10. **LIMITATION OF LIABILITY**

10.1    NEITHER SUPPLIER NOR ITS REPRESENTATIVES WILL HAVE ANY LIABILITY HEREUNDER FOR ANY SPECIAL, CONSEQUENTIAL INDIRECT, INCIDENTAL, OR PUNITIVE DAMAGES (INCLUDING LOSS OF USE, DATA, BUSINESS OR PROFITS OR DAMAGE TO REPUTATION) FOR ANY REASON, EVEN IF Supplier OR ITS REPRESENTATIVE(S) HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

10.2    SUPPLIER'S AGGREGATE LIABILITY FOR DAMAGES HEREUNDER, WHETHER ARISING FROM BREACH OF CONTRACT, BREACH OF WARRANTY, NEGLIGENCE, TORT OR OTHERWISE, WILL EXCEED NOT EXCEED THE TOTAL FEES PAID BY CUSTOMER UNDER THIS AGREEMENT DURING THE TWELVE (12) MONTHS PRECEDING THE DATE OF THE FIRST CLAIM FOR SUCH DAMAGES.

11. **SOURCE CODE LICENSE**

11.1    Supplier agrees to maintain a complete and up-to-date copy of all source code and object code of the Platform and Documentation (the "**Source Code Materials**") which Supplier will hold in escrow on behalf of Customer. Upon the occurrence of a Trigger Event, Customer shall have the right to access or obtain from Supplier a copy of the Source Code Materials.  Supplier hereby grants to Customer non-exclusive, non-sublicensable, nontransferable license during the Term to copy, modify, maintain, update, make enhancements to, create derivative works of, and otherwise use the Source Code Materials, and to permit third party suppliers, outsourcers, consultants and other contractors to exercise the foregoing rights on Customer's behalf, solely for Customer's business purposes in furtherance of the exercise of Customer's license rights under Section 2.1 (the "**Source Code License**"); provided however, Customer shall not exercise any such rights under the Source Code License unless and until the Source Code Materials are released to Customer following a Trigger Event.

11.2    "**Trigger Event**" for purposes of this Agreement means the occurrence of any of the following as reasonably determined by Supplier:  Supplier (A) becomes insolvent, (B) is generally unable to pay, or fails to pay, its debts as

Confidential – Subject to Protective Order                                    SPORTBLX00001111

they become due, (C) files, or has filed against it, a petition for voluntary or involuntary bankruptcy or pursuant to any other insolvency law, (D) makes or seeks to make a general assignment for the benefit of its creditors, (E) applies for, or consents to, the appointment of a trustee, receiver or custodian for a substantial part of its property or business, (F) terminates or permanently ceases its on-going business operations, or (G) ceases to perform its material obligations under the Agreement.

**12.  GENERAL**

12.1  This Agreement and any and all Exhibits or attachments hereto, and any other terms referenced or incorporated herein, supersede in full all prior discussions and agreement between Supplier and Customer relating to the subject matter of this Agreement and constitutes the entire Agreement relating to the subject matter of this Agreement. This Agreement may not be modified or supplemented except by a written document executed by an authorized representative of each Party.

12.2  In the event that Customer issues a purchase order or other instrument used to pay Fees to Supplier, any terms and conditions set forth in the purchase order which constitute terms and conditions which are in addition to those set forth in this Agreement or which establish conflicting terms and conditions to those set forth in this Agreement are expressly rejected by Supplier, and are deemed void and of no effect.

12.3  This Agreement shall be governed by, interpreted under and construed in accordance with the internal laws of the State of New York without giving effect to principles of conflicts of laws. Any action, suit or proceeding to enforce any provision of, or based on any matter arising out of or in connection with, this Purchase Agreement or the transactions contemplated hereby shall be brought in any federal court located in the Southern District of the State of New York or any New York state court located in the Borough of Manhattan, and the Parties agrees to the exclusive jurisdiction of such courts (and of the appropriate appellate courts therefrom) and each Party waives (to the full extent permitted by law) any objection it may have to the laying of venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding has been brought in an inconvenient forum.

12.4  Customer may not assign this Agreement, or assign or otherwise transfer this Agreement, or the rights or licenses granted hereunder, without the prior written consent of Supplier, and any such attempted assignment or transfer shall be void. All provisions of this Agreement will be binding upon, inure to the benefit of and be enforceable by and against the respective successors and permitted assigns of Supplier and Customer.

12.5  Customer agrees to comply fully with all relevant export laws and regulations of the United States, including but not limited to the U.S. Export Administration Regulations. Customer will not export or re-export any such items or any direct product thereof or undertake any transaction in violation of any such laws or regulations.

12.6  All notices which either Party hereto is required or may desire to give the other Party hereunder will be given by addressing the communication to the address set forth above, and may be given by certified mail, return receipt requested, or electronic mail (email), except that notice of termination, indemnification, breach, or renewal of this Agreement may not be given via email. Such notices are deemed given on the date of receipt (or refusal) of delivery if mailed, or twenty-four (24) hours after electronic transmission if sent by email. Either Party may change its address or other information from time to time for the purposes of notices by giving notice in accordance with this Section 12.6 specifying such change to the other Party.

12.7  The Parties are independent contractors under this Agreement and nothing in this Agreement will be construed to create a partnership, joint venture, or employer-employee relationship between Supplier and Customer. Neither Party will act in a manner that expresses or implies a relationship other than that of independent contractor, nor bind the other Party.

12.8  No waiver of any breach of any provision of this Agreement constitutes a waiver of any prior, concurrent or subsequent breach of the same or any other provisions hereof and no waiver will be effective, unless made in writing and signed by an authorized representative of the Party waiving such breach. All remedies provided for in this

Confidential – Subject to Protective Order    SPORTBLX00001112

**EXHIBIT A**
**FEES**

In consideration of the rights and licenses granted hereunder to Customer, Customer shall pay to Supplier the following (collectively, the "Fees"):

- <u>One-Time Upfront Fee</u>:  $150,000, payable as follows:

    o   $75,000 payable upon execution of the Agreement;

    o   $75,000 to be invoiced two (2) months following the Effective Date and payable 30 days after the date of invoice;

- <u>Annual Subscription Fees</u>:

    o   $1.2 Million for Contract Year 1, to be invoiced monthly in advance (i.e., $100,000 monthly) and payable 30 days after the date of invoice;

    o   $1.65 Million for Contract Year 2, to be invoiced monthly in advance (i.e., $137,500 monthly) and payable 30 days after the date of invoice;

    o   For each Renewal Term beginning in Contract Year 3, Supplier may increase the Annual Subscription Fee by an amount not to exceed five percent (5%) of the previous Contract Year's Annual Subscription Fee.

- <u>Per Listed Asset Fee</u>:  $75,000 for each new tradable asset listed by Customer within the Platform, to be invoiced regularly (no more frequently than monthly) and payable thirty (30) days after the date of invoice.

- <u>Services</u>:  Unless otherwise agreed in writing by the Parties in the applicable SOW, Supplier will invoice Customer for any Services on a time and materials basis, monthly as incurred.

Confidential – Subject to Protective Order

SPORTBLX00001114