Page 278

```
 1            UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF NEW YORK
 2

 3   _____

     CYPRESS HOLDINGS, III, L.P.,            Case No.
 4   individually and derivatively           22-cv-01243(LGS)
     on behalf of SPORT-BLX, INC.,
 5              Plaintiff,
 6      -v-                                  VIDEOTAPED
                                             DEPOSITION UPON
 7   GEORGE HALL, JOSEPH DE PERIO,           ORAL EXAMINATION
     DANIEL STRAUSS, FRANCIS                       OF
 8   RUCHALSKI, CESAR BAEZ,                  GEORGE HALL
     CHRISTOPHER JOHNSON,                      (Vol. II)
 9   SPORT-BLX, INC., SPORT-BLX
     SECURITIES, INC., CLINTON
10   GROUP INC., and GLASSBRIDGE
     ENTERPRISES, INC.,
11              Defendants.
12   _____
13   SPORT-BLX, INC., individually          Case No:
     and derivatively on behalf of         1:22-cv-8111(LGS)
14   its shareholders,
                Plaintiff,
15
         -v-
16
     MICHAEL M. SALERNO and
17   CYPRESS HOLDINGS, III, L.P.,
                Defendants.
18

19   _____

     ***  CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER  ***
20
         T R A N S C R I P T of testimony taken
21   stenographically by and before MARGARET
     VOLLMUTH-CORSON, a Certified Court Reporter of the
22   State of New Jersey, pursuant to Federal Rules
     Governing Civil Procedures, at the offices of CHIESA
23   SHAHINIAN & GIANTOMASI, P.C., 105 Eisenhower
     Parkway, Roseland, New Jersey, on Wednesday,
24   June 21, 2023, commencing at approximately 10:06
     a.m.
25
```

1   at what's been marked as Hall-49 for identification.
2   It's a -- a securities purchase agreement Bates
3   stamped GBE_0009235 through 9300.
4              Do you recall that in October of 2019
5   that GlassBridge entered into a securities purchase
6   agreement with Orix?
7        A.    Yes.
8        Q.    Okay. And do you see that on page 1
9   that it says Seller owns all of the issued and
10  outstanding shares of common star- -- common stock,
11  excuse me, of Imation Enterprises Corp.?
12       A.    Yes.
13       Q.    Can you tell us what Imation
14  Enterprises Corp. is?
15       A.    It was a wholly-owned subsidiary of
16  GlassBridge Enterprises.
17       Q.    And did you hold any ownership interest
18  in Imation at the time of this securities purchase
19  agreement?
20       A.    Not directly.
21       Q.    Okay. Did you hold it indirectly?
22       A.    Well, I own 28 to 30 percent of the
23  parent, so indirectly, yes.
24       Q.    Okay. And did -- and did you hold any
25  position or title at Imation at the time of this

1    trans- -- transfer or securities agreement?
2           A.    No.
3           Q.    Okay.  Then it says at the -- in the
4    second paragraph, "immediately prior to the closing,
5    the company issued to seller a promissory note,
6    dated as of September 30, 2019, in the original
7    principal amount of 9 million and with a maturity
8    date of September 30, 2026, and a promissory note,
9    dated as of September 30, 2019, in the original
10   principal amount of $4 million and with a maturity
11   date of September 30, 2026."  And that's called the
12   Sport-BLX Note, and the first one's a Levy Note, and
13   it says they're collectively referred to as the
14   "Notes."
15                Can you -- can you tell us, in sum and
16   substance, what this transaction involved and what
17   -- what was the involvement of Sport-BLX in it?
18          A.    Sport-BLX had no involvement in this
19   transaction.  GlassBridge owned shares of --
20   actually, Imation owned shares of Sport-BLX, and it
21   also had a claim on some Levies from prior business,
22   and Orix made a loan to the company with those two
23   assets as collateral in two different promissory
24   notes.
25          Q.    Okay.  So -- so GlassBridge sold and

```
 1   shares of Sport-BLX common stock, and Orix made a
 2   loan to Imation and held Sport-BLX -- the Sport-BLX
 3   shares as collateral for the loan.
 4        Q.   And do you know how much Orix paid to
 5   purchase the combination of the stock and the notes
 6   referenced in this agreement?
 7             MR. SACK:  Objection to form.
 8        A.   Well, the notes were 9 million and 4
 9   million respectively.  I don't recall what they paid
10   for the common stock.
11        Q.   Does -- if you look at paragraph 1.2,
12   does that refresh your recollection?
13        A.   Okay.  I think I understand.
14             So I think this -- the way this is
15   structured is as a -- a loan, but they -- the way
16   they worded this here is they took possession of the
17   collateral.  Kind of like what we call a repurchase
18   agreement is the way it seems worded here, but I'd
19   have to look a little closer at some of the other
20   parts of the document to -- to be definitive.  But
21   the total amount -- the total consideration for the
22   two notes and for the common stock of Imation that
23   was purchased by Orix appears to be the $17 million
24   number.
25        Q.   And what role, if any, did the Clinton
```

Page 522

1   Group play in this transaction?
2       A.   We helped negotiate that deal with
3   Orix.
4       Q.   Was that pursuant to any kind of
5   agreement with GlassBridge?  Was that part of the
6   management services agreement?
7       A.   Well, the management services
8   agreement was -- I don't -- I don't recall the
9   specific language -- was basically do whatever you
10  can to help GlassBridge survive.
11      Q.   Do you know if GlassBridge had a
12  specific retention agreement with GlassBridge for
13  this transaction for the services it provided?
14      A.   I don't --
15           MR. SPIRO:  Can you read the question
16  back?  I think you used GlassBridge twice in that
17  sentence.
18           MR. SACK:  Yeah.
19           MR. PEARLSON:  Okay.
20           (Last question is read back by the
21  court reporter.)
22      Q.   No, the -- let me rephrase it because
23  it was -- it was garbled.
24           My question is do you know whether the
25  Clinton Group had a retention agreement with

1   GlassBridge for -- in order to provide services in
2   connection with this transaction?
3           A.      I think the -- I don't think there was
4   a specific agreement with respect to this
5   transaction.
6           Q.      Okay.  So there was no -- you don't
7   believe there was a specific written agreement in
8   connection with this transaction?
9           A.      I think it was part of the written
10  agreement that was in place, which would include
11  this, as well as other things.
12          Q.      And that's -- is that the management
13  services agreement that you referred to previously?
14          A.      Yes.
15          Q.      Okay.  If we could go back to Hall-11.
16                  (Exhibit Hall-11, 85-page GlassBridge
17  Enterprises, Inc. Form 10-K for fiscal year ending
18  December 31, 2019, is marked for identification.)
19          Q.      Do you know the amount of -- of this --
20  of the -- what the Clinton Group was paid -- strike
21  that.
22                  First of all, can you describe the
23  services the Clinton Group provided in connection
24  with the transaction?
25          A.      With this transaction?

1	Q.	Yes.
2	A.	Negotiation of the documents.
3	Negotiation of the documents, negotiation of the
4	terms, coming to -- helping Orix understand Imation.
5	They were just from start to finish, the whole deal.
6	Q.	If you could turn -- I'm going back to
7	what's the form 10-K for GlassBridge Enterprises
8	that was marked as Hall-11.  If you could turn to --
9		MR. SACK:  For calendar -- for fiscal
10	year ending December 31, 2019?
11		MR. PEARLSON:  Correct.
12	Q.	And if you could turn to page 74 of 85
13	at the bottom of that document.  The top of the page
14	says "Note 15 - Related Party Transactions."
15		MR. SACK:  I'll just caution the
16	witness that if he feels he needs to refer to other
17	portions of the document to do so.
18	A.	Okay.
19	Q.	Okay.  In the middle of the page it
20	says, "On September 13, 2019, the board approved a
21	success fee in connection with the completion of the
22	Orix transaction and the pension settlement to
23	Clinton."  Do you see that?
24	A.	Yes.
25	Q.	Okay.  Is that referring to the

1  transaction, the securities purchase agreement we
2  just looked at?
3       A.   Well, it's one part of it.
4       Q.   Okay.  And what is it referring to when
5  it says "and the pension settlement to Clinton"?
6       A.   The -- no, the pension settlement
7  wasn't to Clinton.  The -- Clinton was paid the fee,
8  so there was a fee for the pension settlement paid
9  to Clinton.
10      Q.   For -- for performing services in
11 connection with the pension settlement?
12      A.   Correct.
13      Q.   Okay.  And then it says, "The board
14 approved a fee equal to 15 percent of the cash
15 consideration," what is that, "for its work on the
16 Orix transaction"?
17      A.   So I -- well, I could see what it
18 said.  What's the question?
19      Q.   Well, first of all, I guess who
20 negotiated that -- or strike that.
21           How was the 15 percent fee determined?
22      A.   It was discussion between myself and
23 Daniel Strauss, and the board of directors
24 ultimately approved.
25      Q.   How would you characterize that fee?

1      Q.   Okay.  And again, do you have any idea
2  as to why the valuation of 50 million was justified
3  at this point in time in October of 2019 as opposed
4  to the $35 million valuation we just saw?
5      A.   So Orix -- I don't know the inner
6  workings of Orix, but basically I think Orix
7  suggested that they were going to make a loan to
8  Imation, and they were going to use different
9  valuations for different pieces of collateral.  One
10 of those pieces of collateral was Sport-BLX,
11 Incorporated shares, and I think between them and
12 their outside consultant they agreed that a loan at
13 the valuation of 50 million was what they were going
14 to do.
15     Q.   Did you -- did you, being Sport-BLX,
16 give any materials to Orix to make that
17 determination?
18     A.   Orix did a lot of due diligence on the
19 company, yes.
20     Q.   Are you saying that the -- Orix made
21 the determination that the price of $346.00 per
22 share was acceptable?
23     A.   Orix made the determination that that
24 was as much money as they could loan to the company
25 based on that collateral.

1    Q.    Did you use counsel in connection with
2    this transaction?
3    A.    No.
4    Q.    Did -- who drafted the documents --
5    well, strike that.
6          First of all, ultimately did you reach
7    a deal with GlassBridge to sell your shares and
8    Mr. De Perio's shares?
9    A.    I reached a deal with GlassBridge to
10   sell my shares.  Mr. De Perio reached a deal with
11   GlassBridge to sell his shares.
12   Q.    And who drafted the documents that were
13   used to memorialize that transaction?
14   A.    I believe it was Loeb & Loeb.
15   Q.    Okay.  And who retained Loeb & Loeb for
16   that purpose?
17   A.    GlassBridge.
18   Q.    Okay.  And do you recall when they
19   first drafted the documents?  When you first saw the
20   drafts of documents?
21   A.    I don't recall.
22         MR. PEARLSON:  Okay.  Why don't we
23   break here, and this is a good breaking point, and
24   we'll have to have another day where we do a few
25   hours by Zoom, and we'll be done.