**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CYPRESS HOLDINGS, III, L.P., individually and derivatively on behalf of SPORT-BLX, INC., <br><br>                  Plaintiff, <br><br>     v. <br><br> GEORGE HALL, JOSEPH DE PERIO, DANIEL STRAUSS, FRANCIS RUCHALSKI, CESAR BAEZ, CHRISTOPHER JOHNSON, SPORT-BLX, INC., SPORT-BLX SECURITIES, INC., CLINTON GROUP INC., and GLASSBRIDGE ENTERPRISES, INC., <br><br>                  Defendants. | Civil Action No. 1:22-cv-01243-LGS <br><br> **Related case:** <br><br> Civil Action No. 1:22-cv-8111-LGS |

**PLAINTIFF'S RULE 56.1 COUNTERSTATEMENT IN SUPPORT OF ITS OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

      Pursuant to Local Civil Rule 56.1 and Rule III.C.6 of this Court's Individual Rules and Procedures for Civil Cases, Plaintiff ("Cypress"), submits the following Counterstatement in response to Defendants' Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment.

1.     On February 28, 2019, Salerno sent to Joe De Perio an email confirming that he agreed to the terms of the parties' - stating "We are good." He included a note saying, "I saw that my attorney didn't update agreements with my holding company name... I will do that and send over signed docs. See you later..." [ellipses in original]. *See* Stecklow Decl. Ex. 1 SPORTBLX00018535.

   **Response**: Undisputed.

2.     At the time Salerno invested in 2019, Cypress had 16 investors. *See* Stecklow Decl. Ex. 4 a CYPRESS 00003456.

**Response**: Disputed. Cypress, not Salerno, invested in Sport-BLX. At the time of Cypress' investment, it had 14 investors.

3.  Salerno certified to the SEC that Cypress was a pooled investment vehicle. *See* Stecklow Decl. Ex. 3 Deposition Transcript of Michael Salerno, May 1, 2023 ("Salerno Dep. Tr. Day 1"), at 22:20-23:10.

    **Response**: Undisputed.

4.  In his deposition, Salerno was asked, "are you or an entity you control a general partner or managing member of any entity that pools money from multiple investors," the SEC definition of a pooled investment Fund. In response he testified "Yes." *See* Stecklow Decl. Ex. 3 Salemo Dep. Tr. Day 1, at 32:20-33:16.

    **Response**: Undisputed.

5.  Salerno testified that "[a]s a registered investment advisor my understanding of a pooled investment fund would be a grouping of multiple investments under one omnibus account" and that Cypress was an investment vehicle for multiple investors, that "accepted cash from multiple investors and today holds assets of investments" which he managed of behalf of multiple other investors. *See* Stecklow Decl. Ex. 3 Salerno Dep. Tr. Day 1, at 23:24-24:4; 34:1935: 1; 36:8-10; 38:4-7.

    **Response**: Disputed to the extent that Salerno testified that Cypress was an investment vehicle.

6.  On December 13, 2018, Salerno filed an SEC Form D Notice of Exempt Offering of Securities stating that Cypress had only three investors. *See* Stecklow Decl. Ex. 79, SEC Form-D (#14 investors). Within days Cypress added new investors and when Cypress

invested in SportBLX, it had sixteen investors. *See* Stecklow Decl. Ex. 4, CYPRESS00003456.

**Response**: Disputed. At the time of Cypress' investment, it had 14 investors.

7.    On January 14, 2019, Sport-BLX sent Salemo "an overall proposal to work together with you," which stated that it would "re-open the Founder's Round for Mr. Salemo for $200K" and that "Mr. Salerno will be granted capacity again in a subsequent round. See Stecklow Decl. Ex. 84, CLINTON00013754-3756; See Stecklow Decl. Ex. 85, CLINTON00031676. Salerno represented in the SPAs that he: (a) was purchasing for his own account (Section 3B); and (ii) that he was an accredited investor (Section 3F).Salerno altered the nominal name of the purchaser in the Stock Purchase Agreements and in the Stockholder Agreement Side Letter ("Stockholder Agreements") in only one place, and continued to refer to the purchaser as himself, "Salerno," every other place the purchaser was identified in the Stockholder Agreement Side Letter. *See* Stecklow Decl. Ex. 5, SPORTBLX00028990, *See* Stecklow Decl. Ex. 6, SportBLX000000 16, *See* Stecklow Decl. Ex. 7 SPORTBLX00028976.

**Response**: Disputed. Michael Salerno was not a party to the Stockholder Agreements. "Salerno" was a term used to identify Cypress Holdings III, LP in the Side Agreement. Cypress, not Salerno, represented in the SPAs that it: (a) was purchasing for its own account (Section 3B); and (ii) that it was an accredited investor (Section 3F). *See* Stecklow Decl. Ex. 6, SportBLX000000 16, *See* Stecklow Decl. Ex. 7 SPORTBLX00028976. Further, Salerno did not <u>alter</u> the agreement. After giving advance notice of the change to Hall and Deperio, he substituted the name of the

purchaser to Cypress in the two Stock Purchaser Agreements and the Side Letter. *See* Stecklow Decl. Ex. 1 SPORTBLX00018535.

8.     Only Salerno personally, not Cypress, is granted tag along, first refusal, and Board seat rights in the Agreements, and the Stockholder Agreement specifies conditions that would trigger a right "in favor of Salerno being elected to the Board." *See* Stecklow Decl. Ex. 6, SportBLX00000016-018.

**Response**: Disputed. Michael Salerno was not granted any rights in the Agreements. "Salerno" was a term used in the agreements to identify Cypress. Cypress, not Salerno, was granted tag along, first refusal and Board seat rights in the Agreements.

9.     On April 11, 2019, Salerno wrote to Joe De Perio and Mr. Hall that he "would like to exercise *my* right to purchase *my* Pro Rata Share of the New Securities per paragraph 1 .a of the side letter." [emphasis added] *See* Stecklow Decl. Ex. 8, SPORTBLX00018153.

**Response**: Disputed. Only Cypress, not Michael Salerno, had anti-dilution protection rights per the Side Agreement. Any request to exercise those rights were made in his capacity as Manager of Cypress.

10.     At the September 10 Board meeting Mr. De Perio told Salerno: "If we do not know who our are shareholders are, the application is disqualified? Is that clear? Do you understand that?" Mr. Hall told him: "our advisors believe there is no possibility of getting registered with FINRA" if he did not disclose to SportBLX the identity of Cypress' beneficial owners. *See* Stecklow Decl. Ex. 9, Cypress 00000018. at 7:34-7:55, 8:59-9:10.

**Response:**     Undisputed**.**

11.    SportBLX Inc.'s FAQs which Salerno examined during due diligence stated that the
Company "seeks to revolutionize engagement in sports by tokenizing sports assets to
allow for the purchase and trading of tokens by fans and investors all over the world."
Salerno testified that he viewed the FAQs and had access to a Company data room with a
"substantial volume of material" and that he printed out and examined at his office the
Company's projected revenue sources. *See* Stecklow Decl. Ex. 10, SPORTBLXO147230;
*See* Stecklow Decl. Ex. 11, CYPRESS00001539, at 1549; *See* Stecklow Decl. Ex. 3,
Salerno Dep. Tr. Day 1, at 167:8-20, 188:4-10, 188:21-25.

**Response**:    Undisputed except the Salerno did not testify that he printed out the
Company's revenue sources.

12.    The due diligence materials provided to and reviewed by Salerno specified that
SportBLX, Inc. revenue would be generated exclusively from its activities as a broker
dealer.  Specifically, it, would generate revenues exclusively from broker/dealer fees
charged for trades in these tokens, including: (i) "initial tokenization fees to horse owners
an athletes seeking to create trade tokens"; (ii) "fees of the sale of the initial trade tokens"
to the public, and (iii) "transaction fees to both buyers and sellers" for each subsequent
between and among members of the public. See Stecklow Decl. Ex. 10,
SPORTBLX0147230, at 7232. The pro forma financials spreadsheet provided to and
reviewed by Salerno shows 100% of the Company's revenue is to be generated by the
broker dealer operation - specifically from "Issuing Revenue" and "Trading Revenue."
"Other Revenue" is projected at Negative $1,000,000 in 2019 and zero thereafter. Decl.
Ex. 31, SPORTBLX00023177, Tab: InvestorP&L, Rows 10-14, Columns B-J. The pro
forma provided in due diligence also has a detailed analysis of the broker dealer

operation, showing "Assumptions" including "BD Start Date", "Annual 50 State registration fees", and "BD Purchase Price." See Stecklow Deck Ex. 31, SPORTBLX00023177, Tab: BrokerBuild, Cell A1-A36.

**Response**:  Disputed.  The due diligence materials do not state the revenue would be generated <u>exclusively</u> from its activities as a broker dealer.

13.    Salerno testified that whether to disclose Cypress' ownership to SportBLX, "at the end of the day was, it was my discretion *as a Cypress III manager* and "I don't believe that I would have been doing the right thing by disclosing their names as partners of Cypress." *See* Stecklow Decl. Ex. 3, Salerno Dep. Tr. Day 1, at 317:8-11, 318:22-24 [emphasis added].

**Response**:  Undisputed.

14.    As part of the process of applying for a broker/dealer license from the Financial Industry Regulatory Authority (FINRA), on July 30, 2019 SportBLX Inc. received Interrogatories from FINRA requesting, among other things, that the Company identify all of the beneficial owners of its shareholders. The Interrogatories were forwarded by Ken Norensburg, CEO of Luxor Financial Group, who was the Company's broker/dealer advisor and was helping to guide it though the FINRA application process. *See* Stecklow Decl. Ex. 12, SPORTBLXO139092; *See* Stecklow Decl. Ex. 13, SPORTBLXO139093.

**Response**:  Undisputed.

15.    On August 5, 2019 the Company by and through Joe De Perio requested that Salerno provide the information needed to answer the FINRA Interrogatories, specifically writing: "Mike - As a matter of normal course with our FINRA review, they have asked us to note who the beneficial owners are of Cypress Holdings, the shareholder of record.

Can you please advise so we can complete their interrogatories?" *See* Stecklow Decl. Ex. 14, SPORTBLX00013008 at 3009.

**Response**:  Undisputed.

16.     On August 8, 2019, Mr. De Perio followed up: "I also would like to follow-up on the beneficial owners of Cypress. We require this information for ongoing FINRA compliance and to advance our business." *See* Stecklow Decl. Ex. 14, SPORTBLX000 13008.

**Response**:  Undisputed.

17.     Having received no answer, and with all other required information gathered and ready to present to FINRA, Mr. De Perio wrote to Salerno again on Friday, August 9, "We are prepared to disclose beneficial ownership of all investment entities within our shareholding with the exception of Cypress. We would like your cooperation here to push forward the FINRA compliance to advance our business." *See* Stecklow Decl. Ex. 14, SPORTBLX00013008.

**Response**:  Undisputed.

18.     A few minutes later on August 9, 2019, Mr. Hall wrote to Salerno: "Mike, we are trying to get the FINRA application in today. Simple confirmation. Are you the sole owner of Cypress, the entity that invested? Can you confirm or disclose other ownership?" *See* Stecklow Decl. Ex. 16, CYPRESS00001490.

**Response**:  Undisputed.

19.     Salerno responded to Mr. De Perio on August 9, writing only, "we can discuss at the board meeting." *See* Stecklow Decl. Ex. 14, SPORTBLX000 13008.

**Response**:  Undisputed.

20.    Salerno responded to Mr. Hall on Friday, August 9, did not provide that confirmation as requested, and stated "Let's discuss as my concern is my estate plan structure which I am not inclined to make public." *See* Stecklow Deci. Ex. 17, SPORTBLX00050629.

**Response**:  Undisputed.

21.    On Monday, August 12, 2019, Mr. Hall again wrote Salerno "we need to have answers for FINRA on the ownership of cypress or we will have to make some modifications to our application. I trust that you will provide the information by the board meeting." *See* Stecklow Decl. Ex. 18, CYPRESS 00000518.

**Response**:  Undisputed.

22.    The Company's Board met on August 14, 2019. At that meeting, Mr. De Perio reiterated that "broker/dealer registration requires, among other things, BLX Trading to identify and disclose the identity of its beneficial owners to FINRA, which includes its stockholder (e.g., the Company), as well as its indirect beneficial owners (e.g., the Company's stockholders) until the natural person owners of all entities in the chain of ownership have been identified and disclosed to FINRA." *See* Stecklow Decl. Ex. 19, DePerio0000021 -0022.

**Response**:  Undisputed.

23.    At the August 14, 2019 Board meeting Mr. De Perio also stated that although all other stockholders had provided the required information, "despite multiple requests, Cypress refused to provide such beneficial ownership information in a manner contemplated by such regulations." *See* Stecklow Deci. Ex. 19, DePerio0000021 -0022.

**Response:**  Disputed.  The Board Minutes reflect the statement was made by Deperio.

24.  Salerno stated again at the August 14, 2019 Board meeting that he "did not intend to provide such beneficial ownership information to the Company." Salerno stated that he would consult with "his counsel" and respond by the close of business on August 16. *See* Stecklow Decl. Ex. 19, DePerio0000021-0022.

**Response**:  Disputed. The Board Minutes reflect that Salerno made the purported statements that "he did not intend to provide such beneficial ownership information to the Company."  Salerno did, in fact, agree to provide the beneficial ownership directly to FINRA in August 2019 and directly to the company in December 2019.  See Dudelson Decl. Ex. 9.?  Salerno Emails

25.  On August 16, Salerno wrote to Mr. Hall that "I am willing to provide FINRA with ownership information that they want however I am not willing to provide it to you or any other sport-blx directors as you do not have a right to this information at this time." *See* Stecklow Decl. Ex. 21, SPORTBLXO140202. Mr. Hall responded, "I don't think that is a viable option." See Stecklow Decl. Ex. 21, SPORTBLXO140202.

**Response**:  Undisputed.

26.  The Company's Board met again on September 10, 2019. At that meeting Mr. De Perio reported on advice he had received from Mr. Norensburg, specifically that Cypress' beneficial ownership was not a topic that could be avoided and that a failure to respond to the FINRA interrogatory seeking beneficial ownership information would be fatal to any BLX Trading broker-dealer application. *See* Stecklow Decl. Ex. 22, SPORTBLX0264404-4405.

**Response**: Undisputed.

27.    Mr. De Perio reported on advice he had received from the Company's outside counsel, William Mack, who had been Principal Counsel for Enforcement at FINRA. Mr. De Perio reported that he had been advised that it was inappropriate for FINRA to have a conversation or meeting with a shareholder of an applicant, and that such shareholder would have no standing in the matters of an application made by a corporate entity. *See* Stecklow Decl. Ex. 9, CYPRESS00000018, at 7:05 - 7:40; *See* Stecklow Deci. Ex. 22, SPORTBLX0264404- 4405. Mr. Hall reported that outside counsel had provided the same conclusion as the Company's broker/dealer advisor, that "any other response to the FINRA interrogatory of beneficial ownership would be fatal to any BLX Trading broker-dealer application." *See* Stecklow Decl. Ex. 22, SPORTBLX0264404-4405.

**Response**:  Undisputed.

28.    Despite receiving this advice from both the Company's broker/dealer advisor, and its outside counsel who was a specialist in FINRA enforcement matters, Salerno again did not provide the required information but instead reiterated at the September 10, Board meeting that his counsel could contact FINRA. *See* Stecklow Decl. Ex. 22, SPORTBLX0264404-4405.

**Response**:  Disputed.  In December 2019, Salerno agreed to provide required information to the Company.  See Dudelson Decl. Ex. 9

29.    Also, at the September 10, 2019 Board meeting, Mr. Hall began a discussion of how the Company could best respond to the fact that Salerno's refusal to provide the required information would prevent the Company from successfully applying to register as a broker/dealer. *Id.* Mr. Hall concluded that in his view the best course open to the Company was to refocus the business plan of the Company and that one possibility would

be to enter into a licensing agreement for its platform to a third-party broker/dealer. *See* Stecklow Decl. Ex. _ *See* Stecklow Decl. Ex. 22, SPORTBLX0264404 (4405-4406).

**Response**:  Disputed except that the alleged statements are contained in the Board Minutes.

30.    At its November 26, 2019 meeting, the Board again discussed the FINRA application and Salerno's refusal to disclose Cypress' ownership. Mr. De Perio informed Salerno that FINRA "want[s] the applicant to be aware of who their shareholder are." Salerno refused, stating "the applicant had the opportunity to do its due diligence in the past" and that "I just don't need you and the other Board members to know my estate planning and the ownership." *See* Stecklow Decl. Ex. 23, CYPRESS00000002, at 12:08-12:45.

**Response**:  Disputed.  Salerno agreed to give the information directly to FINRA along with the Company's corporate counsel.  *See* Stecklow Decl. Ex. 9, CYPRESS00000002, at 18:50-19:00.

31.    Salerno was adamant. Asked again, "tell us what your concern is," Salerno answered. "SportBLX and related parties don't need to know my estate planning." *See* Stecklow Decl. Ex. 24, at 14:40-14:55.

**Response**:  Disputed.  Salerno agreed to provide the information to the Company in December 2019.    See Dudelson Decl. Ex. 9.

32.    The Company's outside counsel, former Principal Counsel for Enforcement at FINRA, joined the November 26 meeting and participated in the discussion. Outside counsel Mr. Mack was asked for his view on Salerno's suggestion that his counsel and Company counsel call FINRA without disclosing to SportBLX management who the beneficial

owners were. *See* Stecklow Decl. Ex.24, SPORTBLX0265495 at 5497; Stecklow Deci.

Ex. 23, CYPRESS00000002; at 1:05:40- 1:05:50.

**Response**:  Undisputed.

33.    Counsel informed the Board that Salerno's proposed solution of a joint call to FINRA by

his counsel and Company counsel was not viable because, (i) FINRA was unlikely to

even take such a call; (ii) FINRA would require that any matter discussed be submitted to

it in a formal submission by the Company, (iii) the only party who can make a formal

submissions as part of a membership application is the applicant; (iv) FINRA would not

permit an application to proceed if the applicant itself is unable to identify and disclosure

its ultimate beneficial owners, and (v) FINRA will never permit a broker/dealer to not

know who its owners are." *See* Stecklow Decl. Ex. 23, CYPRESS00000002; at 1:05:50-

1:06:22; *See* Stecklow Deci. Ex. 24, SPORTBLX0265495 at 5497.

**Response**:  Undisputed.

34.    Salerno then asked Mr. Mack to speak with his counsel to attempt "to see if we can come

up with some way that SportBLX could in fact file the FINRA application and move

forward?" Mr. Mack replied directly to Mr. Salerno, "you have to understand. There is no

moving forward without SportBLX knowing exactly who its owners, and who the owners

of those owners, are. This is dead in the water. FINRA is never going to permit a

broker/dealer to exist if that broker/dealer doesn't know who its owners are." *See*

Stecklow Decl. Ex. 23, CYPRESS00000002, at 1:06:45 - 1:07:21. Salerno did not agree

to disclose the beneficial ownership information required of the Company to apply for

and obtain for a FINRA license.

**Response**:  Disputed.  Salerno did agree to disclose the beneficial ownership information in December 2019.  See Dudelson Decl. Ex. 9

35.    Mr. Hall asked Salerno at the November 26 Board meeting whether he agreed that "in the absence of the broker/dealer, the only way to the only way to go forward is to try to monetize [the Company's] technology," to which Salerno responded "Yeah" and "although this sounds okay, it's nothing close to the investment we made into SportBLX and, you know, creating an exchange and a broker/dealer platform." *See* Stecklow Decl. Ex. 23, CYPRESS00000002, at 1:58:00- 1:58:22.

**Response**:  Undisputed.

36.    On December 12, Mr. Hall wrote Salerno, "we think it's a good idea for you to disclose who the beneficial owners are. We always assumed it was you but we see now that may not be the case. As far as FINRA, as you know we withdrew our application and changed our business plan to a technology model as we discussed in many meetings. Are you suggesting something else?" *See* Stecklow Decl. Ex. 25, SPORTBLX0283016.

**Response**:  Undisputed.

37.    Salerno responded the next day that "I think it would be good to pursue being a broker/dealer as well. I trust that like me, you too see plenty of upside there." *See* Stecklow Decl. Ex. 25, SPORTBLX0283016. Mr. Hall replied later that afternoon that "If you are suggesting now that you are willing to make the required disclosures, I will gladly put it on the agenda for the next board meeting. Joe [De Perio] will coordinate the schedule for the next board meeting." *See* Stecklow Deci. Ex. 15, SPORTBLX0283469. In response to Mr. Hall's offer to hold a Board meeting regarding Salerno's offer to make

the required disclosures, on December 16, 2019, Salerno responded "I think that would

make sense." *See* Stecklow Decl. Ex. 15, SPORTBLX0283469.

**Response**:  Undisputed.

38.    On the same date, December 16, 2019, at Mr. Hall's request, Mr. De Perio tried to

schedule a Board meeting. Inconsistently with his email to Mr. Hall, Salerno answered,

"What are the topics for discussion?" and "I did not speak to George [Hall] or ask for a

call so no[t] sure what you are referring to." *See* Stecklow Decl. Ex. 26,

SPORTBLX00013059.

Response:  Disputed.  He then followed up that he received the calendar invite without

explanation and did not realize the topic of the call.  He then informed them that he was

available for the meeting.   See Dudelson Decl. Ex. 10.

39.    Salerno began secretly recording the conversations he had with SportBLX within a week

of executing the Stock Purchase and Stockholder Agreement. *See* Stecklow Decl. Ex. 3,

Salerno Dep. Tr. Day 1, at 273:2-18.

**Response**:  Undisputed.

40.    Approximately one month later, in April 2019, Salerno accused Hall of "selfdealing" in

connection with rent payments to Clinton Group for the use of office space and

equipment. *See* Stecklow Decl. Ex. 8, SPORTBLX00018153.

**Response**:  Undisputed.

41.    On June 10, 2019, an attorney for Salerno and Cypress sent a demand letter to SportBLX

stating "I write in connection with certain potential claims of Cypress in connection with

its investment," and "absent additional information, Cypress and Salerno have potential

claims that may be asserted under law or in equity." *See* Stecklow Decl. Ex. 27, SPORTBLX00015719.

**Response**:  Undisputed.

42.    On February 24, 2019, during Salerno's due diligence and in response to his questions, De Perio wrote Salerno, "We are unable to produce 12/31 financials and thus can't re either the financials and undisclosed liabilities, and frankly they won't be instructive given our operations and their inception date. We hope you get comfortable with the materials in the data room. [...] And the liabilities are tied to the Consensys agreement (in the data room), and our legal counsel." *See* Stecklow Decl. Ex. 29, SPORTBLXO142787. On February 28, 2019, Salerno replied "We are good with majority of your response as is." *See* Stecklow Deci. Ex. 28, SPORTBLX00046459 at 6460.

**Response**:  Undisputed.

43.    On February 1, 2019, SportBLX sent Salerno draft stock purchase agreements and a draft stockholder agreement and provided a link to the Company's data room: "Set forth below also is link to our data room for your diligence records and wiring instruction." *See* Stecklow Decl. Ex. 30, SPORTBLXO142590.

**Response**:  Undisputed.

44.    The February 2019 pro forma financials in the data room included the exact amount of annual rent to be paid from 2019 onward. *See* Stecklow Decl. Ex. 31, SPORTBLX00023177, at: Tab Detailed P&L; Cell G64.

**Response**:  Undisputed except that financials did not indicate that the $500,000 in rent would be paid to Hall's wholly owned entity.

45. Salerno testified that he examined the pro forma and discussed it with Sport-BLX before he invested: "I know before the -I signed, I did discuss with them the pro forma." He further testified that he viewed the FAQs and had access to a Company data room with a "substantial volume of material" and that he printed out and examined at his office the Company's projected revenue sources. *See* Stecklow Decl. Ex. 10, SPORTBLXO147230; *See* Stecklow Decl. Ex. 11, CYPRESS00001539, at 1549; *See* Stecklow Decl. Ex. 3, Salerno Dep. Tr, Day l, at 135:23-136:8, 167:8-20, 188:2-20.

**Response**: Undisputed.

46. By June 30, 2019 Sport-BLX had already spent approximately $2 million on technology, marketing, and legal expenses, not including the salaries of the Chief Technology Officer or the Chief Marketing Officer. Specifically, the June 30 Income Statement shows: technology expenses of $1,370,532 for "Platform Development Expenses"; marketing expenses of $21,230 for "Market Data," and $184,711 for "Travel & Entertainment"; and legal expenses of $407,294 or "Professional Expenses." In August 2019, Sport-BLX provided its June 30 financial containing this data to Salerno. *See* Stecklow Peel. Ex. 20, SPORTBLXO 100322.

**Response**: Disputed except that the information is listed on June 30 Income Statement.

47. Salerno was voted off the Sport-BLX board of directors on December 23, 2019 by the vast majority of Sport-BLX unaffiliated shareholders, *See* Stecklow Peel. Ex.32, SPORTBLX0284469. On January 7, 2020, the Company sent Salerno's attorney "a copy of the inspector's report from the annual meeting the votes for/against the various board nominees." *See* Stecklow Decl. Ex. 33, SPORTBLX0284465; *See* Stecklow Peel. Ex.34, SPORTBLX0266070.

**Response**: Disputed. The shareholders were not unaffiliated. Glassbridge had substantial relationships with the Founders, Clinton Group and Sport-BLX among others. All transactions with Sport-BLX, Clinton Group, Hall and DePerio were disclosed on Glassbridge's 10-K filings as related party transactions. See Dudelson Decl. Ex. 12, 13, 14.

48.   The Stock Purchase Agreements' integration clauses state, "This Agreement... supersedes and replaces any and all prior written or oral agreements regarding the subject matter of this Agreement including, but not limited to, any representations made during any interviews, relocation discussions or negotiations whether written or oral." *See* Stecklow Decl. Ex. 5, SPORTBLX00028990 and 28995; *See* Stecklow Decl. Ex. 7, SPORTBLX00028976, and 28982.

**Response**: Disputed. The entire clause reads "This Agreement, including all exhibits hereto, represents the entire agreement between the patties with respect to the purchase of the Shares by the Purchaser and supersedes and replaces any and all prior written or oral agreements regarding the subject matter of this Agreement including, but not limited to, any representations made during any interviews, relocation discussions or negotiations whether written or oral.

49.   The Stock Purchase Agreements' anti-reliance clauses state, "The Purchaser is relying solely on his or her own counsel and advisors and not on any statements or representations of the Company or its agents for legal or other advice with respect to this investment or the transactions contemplated by this Agreement." *See* Stecklow Decl. Ex. 5, SPORTBLX00028990 and 28996; *See* Stecklow Decl. Ex. 7, SPORTBLX00028976 and 28983.

**Response**: Undisputed.

50.  Salerno forwarded his attorney's requested changes to the Agreements directly to SportBLX, including draft SPAs with edits and additional seller representations, including Salerno's statement "I am investing ...." *See* Stecklow Decl. Ex. 37, SPORTBLXO 148243-244, and the SPA being in the name of Michael M. Salerno, *See* Stecklow Decl. Ex. 5, SPORTBLX00028976.

**Response**: Disputed.  The quote "I am investing….." was not a seller representation but a communication from Salerno to his attorney.  Additionally, the referenced SPA is not in the name of Michael M. Salerno.  It is in the name of Cypress.

51.  The FAQs contain qualified forward looking statements, including "The reality is that we do not have enough variables sorted out at this point to get any semblance of accuracy." *See* Stecklow Deck Ex. 10, SPORTBLXO 147230, at 7232. The slide decks Salerno reviewed in due diligence state: "document and the verbal or written comments of any person presenting it" and stating that the information "is not complete and does not contain certain material information about Sport-BLX, Inc. and Clinton Group, Inc., including important disclosures and risk factors." *See* Stecklow Decl. Ex. 39, CYPRESS 00001194 and 1198, *See* Stecklow Decl. Ex. 41, SPORTBLXO 147934, at 7954; *See* Stecklow Decl. Ex. 78, SPORTBLXO 147958 at 7975.

**Response**:  Undisputed.

52.  In late May 2019 Salerno valued the investment at price substantially higher than Cypress had paid. Salerno testified that he was offered a buyout of "maybe 1.6 million, and I told Michael that, no, I think 2 million is a very fair number." He further testified, "My negotiation was, I think, that 2 million dollars is very fair and that's what I would like for

my shares." *See* Stecklow Decl. Ex. 35, Deposition Transcript of Michael Salerno, July 20, 2023 ("Salerno Dep. Tr. Day 3"), at 132:11-24; 133:9-13; *See* Stecklow Decl. Ex. 43, SPORTBLX00048150.

**Response**:  Undisputed.

53. The Side Agreement obligates Hall and De Perio "to vote, or cause to be voted, all shares of the Company's capital stock owned by such Founder, or over which such Founder has voting control, in favor of Salerno being elected to the Board" so long as Cypress held at least 2.5% of the outstanding Sport-BLX stock. *See* Stecklow Decl. Ex. 6, SportB LX00000016, at 0018.

**Response**:  Undisputed.

54. At an October 6, 2021 Board meeting, Mr. Hall explained "that the company was looking to raise capital" and had identified a viable way of doing so. *See* Stecklow Decl. Ex. 44, SPORTBLX0264436.

**Response**:  Undisputed except that the minutes of the Board Meeting reflect that statement but Plaintiff takes no position on the accuracy of the minutes.

55. On October 18, 2021, in an email to Mr. Hall, Salerno made new allegations, specifically that "[u]nfortunately, you have siphened [sic] money out of Blx for your benefit" *See* Stecklow Decl. Ex. 45, CYPRESS00003112.

**Response**:  Undisputed except that the allegations were not new and had been made as early as April 2019 and June 2019.  *See* Stecklow Decl. Ex. 8, SPORTBLX00018153, *See* Stecklow Deci. Ex. 27, SPORTBLX00015719.

56.  On October 18, 2021, Mr. Hall wrote Salerno that "the company is attempting to raise capital at the current time. If you want to pursue any frivolous legal action, as you have

done in the past, you will jeopardize the capital raise, and the company will have to be liquidated. Or instead, you could help the company if you chose to do so. I am free to discuss anytime." *See* Stecklow Decl. Ex. 46, CYPRESS 00000029. He followed up an hour later – via text message - with a link to the Wefunder.com website where the capital raise was being conducted, *See* Stecklow Decl. Ex. 47, CYPRESS00003379, as Mr. Hall explained at the October 6, 2021 Board meeting. *See* Stecklow Decl. Ex. 44, SPORTBLX0264436. After Salerno rebuffed repeated requests to discuss the impact of his allegations on the capital raise, Mr. Hall wrote Salerno that if he continued to refuse, "the fate of the company is sealed." *See* Stecklow Decl. Ex. 64, SPORTBLXO 169975. at 976.

**Response**:  Disputed.  In Salerno's October 18, 2021 email referenced above, he stated "I am open to hearing what you have to say.  LMK if u r available anytime 730 to 845 wed morning before my meetings?"  *See* Stecklow Decl. Ex. 64, SPORTBLX0169975. at 976.

57.   Mr. Hall responded the next day, October 19, 2021, telling Salerno, "I will pass on your allegations to the board and they will take the appropriate action. Given the allegations it is not appropriate to pursue public offering of shares." *See* Stecklow Decl. Ex. 48, SPORTBLX0172525.

**Response**:  Undisputed.

58.   The SportBLX Inc. Board met the next day, October 20, 2021. The Company was forced to abandon the recently contemplated capital raise as a result of Salerno's recent written allegations against Mr. Hall and the Company. At the October 20, 2021 Board meeting Mr. Hall explained that as a result of a "recent email from [Salerno], which made accusation about Mr. Hall and SportBLX Inc.... [t]here would be no way to raise capital

in the public market." *See* Stecklow Decl. Ex. 36, SPORTBLX0264432. *See* Stecklow

Decl. Ex. 50, Deposition Transcript of George Hall, June 29, 2023 ("Hall Pep. Tr. Day

3"), at 719:22-720:5; 720:24-721:4.)

**Response**:  Disputed except that the October, 20, 2021 Board minutes contain the factual

allegation and the deposition transcript reflects the testimony of George Hall.  Moreover,

whether the company was forced to "abandon" the capital raise is a matter of opinion not

fact.

59.    Later on October 20, 2021, Mr. Hall again responded to Salerno, informing him that the

"Board had a meeting today. Unanimous agreement that we can't go forward with a

public capital raise with allegations of 'siphoning.' Pass on whatever evidence you think

you have to the board. In the meantime the company is out of cash and only one

employee remains temporarily. If you have interest in the software please express it to the

board." *See* Stecklow Decl. Ex. 51, SPORTBLX00172540.

**Response**:  Undisputed.

60.    On October 21, 2021 Mr. Hall again wrote Salerno: "Please forward any evidence of

'siphoning' directly to the board." *See* Stecklow Decl. Ex. 52, SPORTBLXO172541.

**Response**:  Undisputed.

61.    Salerno did not provide any support for his allegations to the Board or any of its

members.

**Response**:  Disputed.  From as early as 2019 Salerno had raised concerns of siphoning

during Board meetings, via emails and by communications from counsel.  *See* Stecklow

Decl. Ex. 27, SPORTBLX00015719. *See* Stecklow Decl. Ex. 8, SPORTBLX00018153.

62.     Mr. Hall realized that Salerno had "effectively destroyed most of the possibilities of
        Sport- BLX's success, it was clear that was the mission, I realized that the best way to get
        shareholders a value and to create this ecosystem was to have the code in the same place
        as the entity that was going to continue to do business." *See* Stecklow Deci. Ex. 50, Hall
        Dep. Tr. Day 3, at 751:20-752:2.

        **Response**:  Disputed except that the deposition transcript reflects the testimony of  Halls.

63.     On June 5, 2020, SportBLX Securities, as "Customer" had entered into a Subscription
        Agreement with SportBLX Inc. as "Supplier," under which SportBLX Inc. paid for the
        right "to access and use (a) the Platform in an operating environment hosted by Supplier,
        for Customer's own internal business purposes, and (b) any associated documentation or
        materials .. .." *See* Stecklow Decl. Ex. 53, SPORTBLX00001105, at 1105. The
        Subscription Agreement was negotiated at arms-length by Joe De Perio on behalf of
        SportBLX inc. and Peter Rawlins on behalf of SportBLX Securities. *See* Stecklow Decl.
        Ex. 63 Deposition Transcript of George Hall, June 21, 2023 ("Hall Dep. Tr. Day 2"), at
        504:17-21. 505:7-506:3.

        Response:  Disputed except to the extent that deposition transcript contains the testimony
        of Hall.  The Subscription Agreement was not negotiated at Arm's Length in that the
        party's had numerous inter-relations.  Deperio was a founder of both Sport-BLX and
        Sport-BLX Securities. See Dudelson Decl. Ex. 2 - Deperio Dep, 49:11-13.   Peter
        Rawlins was the vice-president of Sport-BLX.  See Dudelson Decl. Ex. 15.

64.     The Subscription Agreement also provided that SportBLX Inc. would deliver "design,
        development, customization, implementation, professional or other project services . . ."
        related to the Platform. *See* Stecklow Decl. Ex. 53, SPORTBLX00001105, at 1106.

**Response**:  Undisputed.

65.   The Subscription Agreement provided a mechanism by which SportBLX Securities injected money into the Company, enabling maintenance and ongoing development of the Platform. Specifically, Section 7.2 of the Agreement provided that SportBLX Securities "shall be responsible for all costs and expenses incurred by Supplier in connection with the license rights granted hereunder and any Services provided or made available hereunder." *See* Stecklow Decl. Ex. 53, SPORTBLX00001105, at 1110.

**Response**:  Undisputed.

66.   [INTENTIONALLY LEFT BLANK]

67.   The Subscription Agreement also called for payment of $150,000 as a One-Time Upfront Fee, half due upon execution and half to be payable three months following execution. *See* Stecklow Decl. Ex. 53, SPORTBLX00001105, at 1114.

**Response**:  Undisputed.

68.   [INTENTIONALLY LEFT BLANK]

69.    The Subscription Agreement also called for total Annual Subscription Fee payments of $1.2 and $ 1.65 million in the first and second years of the contract, respectively, and an option allowing the Company to raise the Annual Fee by 5% upon contract renewal. The Annual Subscription Fee was to be paid in equal monthly installments. *See* Stecklow Deci. Ex. 69, SPORTBLX00001105. at 1114.

**Response**:  Undisputed.

70.   Mr. Hall recollected that the Company received a total of approximately $600,000 in fees before it became unable to perform under the agreement and SportBLX Securities stopped paying fees. *See* Stecklow Deci. Ex. 50, Hall Dep. Tr. Day 3, at 733:3-13.

**Response**: Disputed except that the transcript contains the testimony of Hall.

71.    [INTENTIONALLY LEFT BLANK]

72.    The Subscription Agreement gave SportBLX Securities the right to "obtain from Supplier" all up-to-date "source code and object code of the Platform and Documentation" without further payment if SportBLX Inc. became insolvent, terminated "its ongoing business operations," or "cease[d] to perform its material obligations under the Agreement." *See* Stecklow Decl. Ex. 53, SPORTBLX00001105, at 1111-1112; *See* Stecklow Decl. Ex. 50, Hall Dep. Tr. Day 3, at 739:7-21.

**Response**: Undisputed.

73.    Prior to October 2021, SportBLX Inc. "could no longer perform the functions that SportBLX Securities had bargained for" of providing design, development, customization, implementation, professional or other project services related to the Platform, and had thus become unable to and did cease to perform its material obligations under the Agreement. *See* Stecklow Deci. Ex. 50, Hall Dep. Tr. 3, at 733:21-734:1; 743:1-6. This inability to perform resulted from the resignation in approximately August 2020 of the Company's Chief  Technology Officer and of the number two in Assistant Technology Officer in early 2021, such that "the only real ongoing development was people at SportBLX Securities because SportBLX, Incorporated couldn't fulfill any of its obligations.". *Id.,* at 734:12-24; *See* Stecklow Decl. Ex. 54, SPORTBLX0264438. Mr. Hall testified that the CTO resigned in 2020 in part because he was interested in developing an Alternative Trading System, which "he realized ... wouldn't likely happen." *Id.,* at 735:4-14.

**Response**:  Disputed except that the transcript contains the testimony of Hall.

Additionally, this is a statement of opinion.

74.     By October 2021, SportBLX Inc. had become unable to conduct its ongoing business

operations. As Mr. Hall informed the Board, because the Company at that time had no

capital and no ability to raise capital due to Salerno's written allegations referenced

above in Paragraphs 58 and 59, and only one remaining employee, "there does not appear

to be a viable path forward." Stecklow Decl. Ex. 6, at SPORTBLX00000016.

**Response**:  Disputed.  This is a statement of opinion not fact.

75.     On October 21, 2021, Mr. Hall wrote Salerno, "Please forward any evidence of

'siphoning' directly to the board." Stecklow Deci. Ex. 52, SPORTBLXO 172541. On

November 12, 2021, Mr. Hall again wrote Salerno and informed him again that "[a]s I

said, I forwarded on your comments to all of the board members and I assume you have

been in touch with them to share specifics. [...] They have also been made aware that

there is no way we can raise capital as planned." *See* Stecklow Decl. Ex. 55,

SPORTBLXO 172592.

**Response**:  Undisputed.

76.     In addition, as Mr. Hall explained to the Board on December 15, 2021, Salerno's refusal

to confirm the ownership of Cypress as required by FINRA "prevented SportBLX Inc.

from filing for and becoming a broker dealer as per its original business plan." *See*

Stecklow Decl. Ex. 56, SPORTBLX0264418.

**Response**:  Disputed except that statement is contained in cited Board minutes.

Additionally, Salerno agreed to provide the ownership of Cypress in December 2019.

See Dudelson Decl. Ex. 9, 10.

77.    Despite having already taken possession of the Platform without payment, SportBLX
       Securities agreed to make further payment to the Company as compensation for the
       Platform. Specifically, on December 21, 2021, in exchange for SportBLX Securities
       taking sole ownership of all rights to the Platform, SportBLX Securities paid to the
       Company $225,000. *See* Stecklow Decl. Ex. 57 Glassbridge Enterprises, Inc. Form 10-K
       FY 2021, at pp. 45-46; *See* Stecklow Decl. Ex. 50 Hall Dep. Tr. Day 3, at 751:16-20.

       **Response**:  Undisputed.

78.    [INTENTIONALLY LEFT BLANK]

79.    As further consideration to the Company for the transfer of sole ownership of all rights to
       the Platform to SportBLX Securities, on December 24, 2021, Mr. Hall caused a third
       party, FDC, which he and Mr. De Perio controlled, to sell back to the Company
       $1,500,00 of its debt for $126,000, a benefit of $1,374,000. *See* Stecklow Deck Ex. 57
       Glassbridge Enterprises, Inc. Form 10-FY 2021, at pp. 45-46.

       **Response**:  Disputed.  The consideration paid to for the Platform was $225,000.00  See
       Stecklow Deck Ex. 57 Glassbridge Enterprises, Inc. Form 10-FY 2021, at pp. 45.  No
       support has been provided to show that FDC transaction is consideration for the Platform
       transaction.  FDC and SportBLX Securities are separate entities.

80.    Mr. Hall informed the Company's Board in advance "that as part of the transaction to
       benefit SportBLX Inc there would be a cancellation of debt which would reduce the
       company's debt burden." *See* Stecklow Decl. Ex. 56, SPORTBLX0264418, at 4419.

       **Response**:  Disputed except that the statement is contained in cited Board minutes.

81.    In total, the Company received consideration of $ 1,599,999 in exchange for the transfer
       of sole ownership of all rights to the Platform to SportBLX Securities in December 2021.

*See* Stecklow Decl. Ex. 57, Glassbridge Enterprises, Inc. Form 10-K FY 2021, at pp.

4546.

**Response**: Disputed.  The GlassBridge 10-K FY 2021 states that "SportBLX sold

proprietary code to S-BLX Securities, a related party, for $225,000."  *See* Stecklow Decl.

Ex. 57, Glassbridge Enterprises, Inc. Form 10-K FY 2021, at pp. 45.

82.    In mid-2020, SportBLX Inc. attempted to use the Platform source code as collateral but

was unsuccessful because it had no value "at the stage it was at for" other than "a related

party that understood the business" and what "the technology was built for and how it

might be used." *See* Stecklow Decl. Ex. 50, Hall Dep. Tr. Day 3, at 701:23-702:11.

**Response**:  Disputed except that the statement is contained in the deposition transcript.

Additionally, it is a statement of opinion, not fact.

83.    When the Company received consideration of $1,599,999 for the Platform, it was worth

approximately $200,000. The Chief Technology Officer of GlassBridge had estimated the

value of replacement cost of the software to be around $200,000 as part of GlassBridge's

2019 audit valuing the Company's assets. *See* Stecklow Deci. Ex. 56,

SPORTBLX0264418. at 4419; *See* Stecklow Decl. Ex. 50, Hall Dep. Tr. Day 3, at

744:19-745:16, 750:5-752:24; Stecklow Ex. 80, GBE0007971 (R. Fisch Memo)

**Response**:  Disputed.  Sport-BLX received consideration of $225,000 for the Platform.

The purported value is an opinion, not a fact, and is contested by Plaintiff.

84.    SportBLX Inc.'s retained software engineering and computer science expert Dr.

Eslamimehr analyzed the Platform in detail and compared it to other open-source

centralized and decentralized online trading platforms from 2019 to 2021. *See* Stecklow

Decl. Ex. 58, Expert Report of Mahdi Eslamimehr ("Eslamimehr Report"), at p. 15, 34.]

Dr. Eslamimehr noted that by 2021 there had been a "surge in high-quality, freely available platforms" and that the SportBLX Platform was of merely average quality compared to these freely available platforms. *Id.,* at ' 33.

**Response**:  Disputed except that the report contained Eslamimehr's opinion.

85.    [INTENTIONALLY LEFT BLANK]

86.    Plaintiff s expert witness Dr. Eslamimehr opined that a sale price of $225,000 for the SportBLX Platform in December 2021 was a fair price given the software code quality and the wide availability of high quality platforms that were available for free. *See* Stecklow Decl. Ex. 58, at p. 15-16. 33-35.

**Response**:  Undisputed.

87.    Cypress has not submitted an expert valuation of the Platform.

**Response**:  Undisputed.

88.    On February 27, 2017 Glassbridge Enterprises (f/k/a Imation Corp.) entered into a services agreement with Clinton Group, Inc. ("Clinton") under which Clinton provided management services to Glassbridge. *See* Stecklow Decl. Ex.59, SportBLX0260336.

**Response**:  Undisputed.

89.    Beginning in September 2018, Clinton entered into discussions with the U.S. Pension Benefit Guaranty Corp. ("PBGC"). Specifically, due to certain funding deficiencies of the Imation Cash Balance Pension Plan, the PBGC had perfected a lien on all assets of GlassBridge and of all other members of GlassBridge's Control Group as defined by the PBGC implementing legislation at 29 US § 1301(a)(14). *See* Stecklow Deci. Ex. 60, GBE0000978.

**Response**:  Undisputed.

90.    The PBGC lien covered all liabilities under Title IV of ERISA in connection with the

Plan's termination, including unfunded benefit liabilities, due and unpaid Plan

contributions, premiums, and interest on each of the foregoing (the "Pension Liabilities"),

for which GlassBridge and all members of its Control Group were jointly and severally

liable to the PBGC. *See* Stecklow Decl. Ex. 61, GBE001146, at 1148.

**Response**:  Undisputed.

91.    Clinton Group continued negotiations with the PBGC before SportBLX, Inc. was formed,

providing documents to the PBGC in September 2018 and meeting with the PBGC in

November 2018. *See* Stecklow Decl. Ex. 62, CLINTON00033969.

**Response**:  Undisputed.

92.    On Nov 22, 2018 to GEH visited Cynthia Wong of Corporate Finance and Restructuring

at the PBGC's Washington, D.C. Office to discuss settlement with Glassbridge. *See*

Stecklow Decl. Ex. 62, CLINTON00033969.

**Response**:  Undisputed.

93.     When the Settlement Agreement with PBGC was negotiated and executed, Imation was

a wholly owned subsidiary of GlassBridge. *See* Stecklow Decl. Ex. 63, Hall Dep. Tr. Day

2, at 518: 13-16; *See* Stecklow Decl. Ex. 50, Hall Dep. Tr. Day 3, at 590: 15-20,

686:1014.

**Response**:  Undisputed.

94.    On April 16, 2019 Glassbridge received notice that its "application for termination of the

plan had been approved by the PBGC with the termination of the plan to occur on April

30, 2019." *See* Stecklow Decl. Ex. 60, GBE0000978, at 0979.

**Response**:  Undisputed.

95.    Pursuant to the terms of the Settlement Agreement, GlassBridge agreed to pay
$3,000,000 in cash to PBGC in return for a release from the lien of GlassBridge and all
other members of the Control Group. *See* Stecklow Decl. Ex. 61, GBE001146, at 1148.
**Response**:  Undisputed.

96.    Following successful consummation of the PBGC negotiations which had begun in
September 2018, the Glassbridge Board approved a one-time success fee to Clinton
Group "in consideration of Clinton's efforts regarding same." Stecklow Decl. Ex. 60,
GBE0000978 at 0979; *See* Stecklow Decl. Ex. 63, Hall Dep. fr. Day 2, at 524: 19-525.
**Response**:  Undisputed.

97.    Clinton Group was paid a fee equal to ten percent of the difference between the
$3,000,000 Settlement Payment and the gross Pension Liabilities. *See* Stecklow Decl. Ex.
63 Hall Dep. Tr. Day 2, at 524:19-23,525:4-12; 562:3-8.
**Response**:  Disputed.  Clinton Group was paid a fee of $250,000 for the PBGC
negotiations.   See Stecklow Decl. Ex. 60, GBE0000978 at 0979.  The cited deposition
testimony does not support Plaintiff's fact statement.

98.    Negotiation of Settlement Agreements with PBGC on behalf of third parties had no
relation to SportBLX, Inc.'s business plan or operations. See Stecklow Decl. Ex. 40,
CYPRESS 00001431, at 1441; *See* Stecklow Decl. Ex. 41, SportBLX 00147934-7957;
*See* Stecklow Decl. Ex. 42, SPORTBLXO147209.
**Response**:  Undisputed.

99.    On October 1, 2019, GlassBridge sold to Orix: (i) 20% of the outstanding stock of
Imation, which prior to the sale was wholly owned by GlassBridge; (ii) a promissory note
in the amount of $9,000,000 issued by Imation to GlassBridge as consideration for

assignment of certain pre-existing claims owed by Glassbridge against a third party, and (iii) a promissory note in the amount of $4,000,000 issued by Imation to Glassbridge as consideration for the assignment of 11,154 shares of SportBLX, Inc. stock. The 11,154 shares were the collateral backing Imation's original promissory note in favor of Glassbridge. *See* Stecklow Decl. Ex. 61, GBE001146, at 1148; *See* Stecklow Decl. Ex. 63, Hall Dep. Tr. Day 2, at 521:8-24; 539:5-14. "Sport-BLX had no involvement in this transaction.... Imation owned shares of Sport-BLX, and .. . Orix made a loan to the company with [that] asset[] as collateral." *Id.,* at 519:15-24.

**Response**: Disputed except that the transcript reflects the testimony of Hall. Additionally, as part of the Orix transaction, "In July 2020, an Adara wholly owned subsidiary assumed the obligations under the notes, and the subsidiary was sold to GEH Sport LLC, wholly owned by Mr. Hall, for $1.00, after the subsidiary had distributed to Adara all of the subsidiary's assets, except for its general partnership interest in The Sports & Entertainment Fund, L.P. and the related commodities pool operator registration and $1,790,000 in cash."  Dudelson Decl. Ex 13 at p. 82

100. Clinton Group helped negotiate the transaction with Orix under a pre-existing management services agreement with GlassBridge. *See* Stecklow Decl. Ex. 63, Hall Dep. Tr. Day 2, at 521:25 - 522:10, 523:6-14. Specifically, Clinton Group led the negotiation of the entire deal with Orix from start to finish including the terms of the transaction and their memorialization in transaction documents and helped Orix understand Imation. *Id.,* at 523:22 - 524:5.

**Response**: Disputed except that the transcript reflects the testimony of Hall.

101.    SportBLX had no involvement in the October 1,2019 transaction between GlassBridge

and Orix. *See* Stecklow Decl. Ex. 63, Hall Dep. Tr. Day 2, at 519:18-19.

**Response**:  Disputed except that the transcript reflects the testimony of Hall.

102.    The transaction had nothing to do with SportBLX and the capital was not used to create a

fund which would generate revenues. Salerno asked several questions regarding the Orix

transaction at the November 26, 2019 meeting of SportBLX, Inc.'s Board. Salerno stated

that he had invested in the hope that a fund "would be set up and that revenues would be

created from that fund for SportBLX. And when I look at everything that is taking place

today, with Glassbridge, I assume that that's a part of the fund. The $17,000,000 that was

just raised." Salerno was asked why he thought that and responded, nonsensically,

"That's one of my questions for you to please answer." *See* Stecklow Deci. Ex. 23,

CYPRESS00000002 at 1:29:08. In the same meeting, Salerno asked, "Are those dollars

being used to purchase athlete contracts?" and was told "No." *Id.,* at 1:35:24 Salerno

stated "Well, if there is no fund, and you are not creating a fund elsewhere that SportBLX

should have involvement with, then there won't be any issue." *Id.,* at 1:36:10.

**Response**:  Disputed.  According to 2020 FY Glassbridge 10K, the Orix transaction

consisted of the following: "On October 1, 2019, the Company sold to Orix, for

$17,562,700, 20.1% of the outstanding stock of Adara, until then a Company wholly

owned subsidiary, together with two promissory notes of Adara Enterprises, Inc. to the

Company in total principal amount of $13,000,000. In July 2020, an Adara wholly owned

subsidiary assumed the obligations under the notes, and the subsidiary was sold to GEH

Sport LLC, wholly owned by Mr. Hall, for $1.00, after the subsidiary had distributed to

Adara all of the subsidiary's assets, except for its general partnership interest in The

Sports & Entertainment Fund, L.P. and the related commodities pool operator registration and $1,790,000 in cash.  See Dudelson Decl. Ex. 13 at 82.

103.    At no time did SportBLX, Inc.'s business plans or operations include any activities such as negotiating Settlement Agreements with US Government agencies or negotiating transactions such as the October 1, 2019 sale by GlassBridge to Orix. *See* Stecklow Deck Ex. 40, CYPRESS 00001431, at 1441, *See* Stecklow Deck Ex. 41, SportBLXOO 1 479347957, *See* Stecklow Decl. Ex. 42, SPORTBLXO147209; *See* Stecklow Decl. Ex. 10, SPORTBLX0147230.

Response:  Disputed.  It was represented to Salerno that transactions such as the Orix transaction would lead to success fees for Sport-BLX.  See Dudelson Decl. Ex. 16 at p. 3

104.    Prior to investing in SportBLX Salerno visited its offices, which were housed in Clinton Group's offices at 510 Madison Avenue in New York City. *See* Stecklow Deck Ex. 3, Salerno Dep. Tr. Day 1, at 90:19-23.

Response:  Undisputed.

105.    Salerno executed three Agreements with SportBLX, Inc. on February 28, 2019: two Stock Purchase Agreements and one Letter Agreement titled RE: Stockholder Agreement. The Letter Agreements -which Salerno executed - shows SportBLX, Inc's address to be: "510 Madison Avenue, 9th Floor, New York, NY 10022." *See* Stecklow Deck Ex. 6, SportBLX00000016.

Response:  Undisputed.

106.    Salerno testified that he assumed that SportBLX, Inc. would operate at "some location" because he "believed" some related entities, including GlassBridge, "had a different office." See Stecklow Deck Ex. 3, Salerno Dep. Tr. Day 1, at91:12-92:13. Under oath,

Salerno refused to testify that anyone ever told him SportBLX, Inc. was going to move from the Clinton Group to somewhere else. *Id.,* at 91:7-11.

**Response**: Undisputed.

107.    The annual rent expense of $500,000 to be paid by SportBLX, Inc was disclosed in the pro forma financials which Salerno reviewed as part of his due diligence before he invested in SportBLX, Inc. *See* Stecklow Decl. Ex. 31, SPORTBLX00023 177, at: Tab Detailed P&L; Cell G65. Salerno testified that "I recall that was on the proforma." *See* Stecklow Decl. Ex. 3, Salemo Dep. Tr. Day 1, at 90:24 -91:6.

**Response**: Undisputed.

108.    The pro forma financials were an Excel model created by an outside consulting company, ConsenSys, with substantial input from various sources. *See* Stecklow Deci. Ex. 65, Deposition Transcript of George Hall, June 14, 2023 ("Hall Dep. Tr. Day 1"), at 135:9-17. In March 2019, when SportBLX, Inc. started paying rent, its space housed between ten and thirteen full-time employees and a number of unpaid consultants, in addition to the ConsenSys staff who were working with the Company. *Id.,* at 136:6-12. The annual rental amount was determined based on an analysis of the business, head count, projected growth of the company, and the necessity of having space suitable for marketing purposes and giving presentations. *Id.,* at 136:21-137:3, 137:20-138:1: See Stecklow Decl. Ex. 66, SPORTBLX00021294.

**Response**: Disputed except that the transcript reflects the testimony of Hall.

109.    Clinton Group occupied the space at 510 Madison Avenue pursuant to a Sublease executed with World Gold Trust Services, LLC ("World Gold") on August 31, 2015. The Sublease identifies World Gold as the Overtenant and Clinton Group as the Subtenant.

*See* Stecklow Decl. Ex. 67, CLINTON00034105. World Gold in turned had leased the space as Tenant from BP 510 Madison Ave LLC on April 22, 2011, the Landlord. *See* Stecklow Deci. Ex. 83, CL1NTON00033973. The Sublease identifies that April 22, 2011 lease as the "Overlease." *See* Stecklow Decl. Ex. 67, CL1NTON00034105, 34121.

**Response**:  Undisputed.

110.  The Sublease specifies that "this is a sublease of the Demised Property and is subject and subordinate in all respects, to all of the terms, covenants and conditions of the Overlease as it relates to the Demised Premises." *See* Stecklow Deci. Ex. 67, CL1NTON00034105, at 4121. It further specifies that all provisions in the Overlease relating to the premises "are hereby incorporated by reference in this Sublease" and "constitute the terms of this Sublease" and are made applicable to World Gold and Clinton Group "as if they were the Landlord and the Tenant, respectively, under the Overlease" [Id.]

**Response**:  Undisputed.

111.  Overlease provision 13.1(b) specifies that no consent by the Landlord is required for the Tenant to sublet the space at 510 Madison Avenue to an Affiliate provided that the sublet does not result in a physical demise of separate space. *See* Stecklow Decl. Ex. 83, CLINTON00033973, at 34019.

**Response**:  Undisputed.

112.  Cypress is a Delaware limited partnership. See Dkt. No. 80 at " 10.

**Response**:  Undisputed.

113.  On January 4, 2019, GlassBridge was issued 10,526 shares of Sport-BIx, Inc. ("Sport-BLX") stock, and made a commitment to invest $1,000,000 in Sport-BLX. *See De Perio* Affidavit, Dkt. No. 031 at 117.

**Response**:  Undisputed.

114.    GlassBridge's commitment to invest $1,000,000 in Sport-BLX was funded in installments over the course of 2019. *See id.*

**Response**:  Undisputed.

115.    On September 16, 2019 GlassBridge purchase 679 shares of Sport-BLX common stock, for $178,854. *See id.* 18-19.

**Response**:  Undisputed.

116.    On October 1, 2019 GlassBridge made a $1,750,000 demand loan to Sport-BLX. *See id.* ' 24; Stecklow Decl. Ex. 70, (Sport-BLX Demand Loan).

**Response**:  Undisputed.

117.    On October 18, 2019 Adara Enterprises Corp (subsidiary of GlassBridge Enterprises) purchased 2,314 shares of Sport-BLX stock for $609,524.72. *See De Perio* Affidavit, Dkt. No. 031 at 120.

**Response**:  Undisputed.

118.    On December 12, 2019, GlassBridge purchased 17,076 shares of Sport-BLX stock from Mr. De Perio in exchange for $606,198 in cash and a $5,455,782 principal amount promissory note. *See De Perio* Affidavit, Dkt. No. 031 at • 21.

**Response**:  Undisputed.

119.    On December 12, 2019, GlassBridge purchased 37,924 shares of Sport-BLX stock from Mr. Hall in exchange for $ 1,346,302 in cash and a $ 12,116,718 principal amount promissory note. *id.* • 22.

**Response**:  Undisputed.

120.    [INTENTIONALLY LEFT BLANK]

121.    As a result of GlassBridge's purchases of Sport-BLX stock detailed in the preceding

seven paragraphs, GlassBridge and its subsidiaries owned 50.7% of Sport-BLX stock

outstanding as of December 13, 2019. *See* Stecklow Decl. Ex. 34, SPORTBLX0266070;

Sh. Register.

**Response**:  Undisputed.

122.    The December 9, 2019 Minutes of the Regular Meeting of the Board of Directors of

GlassBridge state that: Management suggested to the Board that acquiring additional

ownership in SportBLX from Mrs. De Perio and Hall could be beneficial to the

Company. It would give the Company voting control of SportBLX. The board asked

questions, discussed and deliberated. Upon a motion duly made and seconded, the Board

authorized Management to negotiate a transaction with Mrs. De Perio and Hall and report

back to the Board. Stecklow Deci. Ex. 71, GBE 0009062; 12/9/19 GLAE Minutes.

**Response**:  Disputed except that the information is contained in the cited minutes.

123.    The December 12, 2019 Minutes of the Regular Meeting of the Board of Directors of

GlassBridge state that: After a detailed discussion on the valuation mechanism,

opportunities and business risk among members of the Board and Mr. Hall, where the

Board asked questions regarding the valuation and business prospects of Sport-BLX, Mr.

Hall and Mr. De Period left the meeting. The remaining members of the Board discussed

the valuation and made inquiries with management regarding the business opportunities

and business plan of Sport-BLX. The remaining members of the Board discussed and

deliberated the Transactions as a whole and the specific terms of the Transactions. After

deliberations regarding the value to the Corporation of having a direct holding in the

Sport-BLX, and the terms of the Transaction, the non-interested members of the Board

resolved, authorized and instructed the officers of the Corporation to enter into the Transaction pursuant to the terms set out above and to continue to negotiate the terms of the De Perio Note and the Hall Note to optimize the interest rate to be in the range of 3-7%...Stecklow Deck Ex. 72, GBE 0015714; 12/12/19 GLAE Minutes.

**Response**:  Disputed except that the information is contained in the cited minutes.

124.    On December 18, 2019, GlassBridge issued a Proxy Statement "in connection with the solicitation of proxies from the stock holders of Sport-BLX, Inc. ... for the 2019 Annual Meeting of Stockholders ... [t]o elect GlassBridge's slate of seven director nominees, Cesar A. Baez, Joseph A. De Perio, George E. Hall, Francis A. Ruchalski, Christopher Johnson, Harlan Simon, and Daniel A. Strauss ... as directors..." See Stecklow Ex. 73, GBE 0015693.

**Response**:  Undisputed.

125.    Section 2.A. of the February 28, 2019 Letter Agreement (the "Side Agreement") between Cypress Holdings, III, L.P. ("Cypress"), Sport-BLX, George Hall and Joseph De Perio is the only section of the Side Agreement that Cypress alleges was breached in its Second Amended Complaint (the "SAC"). See Dkt. No. 80, "I 53, 103, 153.

**Response**:   Disputed.  The Breach of the Covenant of Good Faith and Fair Dealing attaches to the entire Agreement.

126.    GlassBridge's December 20, 2019 Proxy Card voted "For All Nominees" in response to Proposal I, i.e., "The election of Cesar A. Baez, Joseph A. De Perio, George E. Hall, Francis A. Ruchalski, Christopher Johnson, Harlan Simon, and Daniel A. Straus to serve as directors on the Board." See Stecklow Ex. 74, GBE 0015701 (GLAE Proxy Vote).

**Response**:  Undisputed.

127.    Imation Enterprises, Corp's December 20, 2019 Proxy Card voted "For All Nominees" in response to Proposal I, i.e., "The election of Cesar A. Baez, Joseph A. De Perio, George E. Hall, Francis A. Ruchalski, Christopher Johnson, Harlan Simon, and Daniel A. Straus to serve as directors on the Board." See Stecklow Ex. 75, (GBE0015689; Imation Proxy Vote).

**Response**: Undisputed.

128.    Pursuant to Section 2.A. of the Side Agreement, Hall and De Perio agreed "to vote, or cause to be voted, all shares of the Company's capital stock owned by [them], or over which [they had] voting control, in favor of Salerno being elected to the Board," for as long as Cypress held at least 2.5% of the outstanding Sport-BLX stock. *See* Declaration of Wylie Stecklow, Esq., dated November 22, 2024 (the "Stecklow Decl.") Ex. 6, (Side Agreement) at SPORTBLX0000018.

**Response**:  Undisputed.

129.    Cypress alleges in the SAC that GlassBridge "knew of the [Side Agreement]." Pkt. No. 80.153.

**Response**:  Undisputed.

130.    There is nothing in the record that demonstrates GlassBridge's actual knowledge of the existence of Side Agreement.

**Response**:  Disputed.   Knowledge of the directors and officers are imputed to the Company.  DePerio was the Chairman of the Board and a party to the side agreement. Additionally, Strauss, the CEO, and Ruchalski, the CFO, were on the Sport-BLX Board in which the side agreement was discussed during board meetings.  See Dudelson Decl. Ex. 12 at p. 9.

131.    There is nothing in the record that demonstrates GlassBridge's actual knowledge of the Side Agreement's terms.

**Response**:  Disputed.   Knowledge of the directors and officers are imputed to the Company.  DePerio was the Chairman of the Board and a party to the side agreement. Additionally, Strauss, the CEO, and Ruchalski, the CFO, were on the Sport-BLX Board in which the side agreement was discussed during board meetings.  See Dudelson Decl. Ex. 12 at p. 9.

132.    At the December 23, 2019 Annual Meeting of Stockholders of Sport-BLX (the "Stockholder Meeting"), Hall and De Perio voted all shares of Sport-BLX stock that they owned in favor of Salerno being elected to the Board. *See* Stecklow Peel. Ex. 34, SPORTBLX0266070; Sh. Register; Ex. 77, SPORTBLX0284468; Vote Results.

**Response**:  Undisputed.

133.    Cypress does not dispute that Hall and De Perio voted all shares of Sport-BLX stock that they owned in favor of Salerno being elected to the Board at the Stockholder Meeting.

**Response**:  Undisputed.  However, it is Plaintiff's position that they transferred their personal shares to an affiliate that they control for the purpose of undermining their duty under the Side Agreement.

134.    1,122 shares of Sport-BLX stock outstanding as of the Stockholder Meeting were voted against Salerno's board seat at the Stockholder Meeting. *See* Stecklow Peel. Ex. 34, SPORTBLX0266070: Sh. Register; Ex. 77, SPORTBLX0284468; Vote Results.

**Response**:  Undisputed.

135.    82,059 shares of Sport-BLX stock outstanding as of the Stockholder Meeting were not voted in favor of, or against, Salerno's board seat at the Stockholder Meeting. *See*

Stecklow Peel. Ex. 34, SPORTBLX0266070; Sh. Register; Ex. 77, SPORTBLX0284468; Vote Results.

**Response**:  Undisputed.

136.    The shares of Sport-BLX stock were not voted in favor of, or against, Salerno's board seat at the Stockholder Meeting represented a majority of the shares outstanding as of the Stockholder Meeting. *See* Stecklow Decl. Ex. 34 SPORTBLX0266070: Sh. Register; Ex. 77 SPORTBLX0284468; Vote Results.

**Response**:  Undisputed.

137.    The tag-along rights provision in the SPAs authorizes the founders "to sell shares of the company's common stock that represent more than fifty (50%) percent of the aggregate number of shares then outstanding to a third-party purchaser." Stecklow Decl. Ex. 5 SPORTLBX00028976, at 8980.

**Response**:  Disputed in that the intent of the Agreement was that the provision would be triggered when there was a change of control from the Founders to a third-party.

### PLAINTIFF'S ADDITIONAL RULE 56.1 STATEMENT

138.    Sport-BLX filed its original complaint against Cypress in New York State Supreme Court on August 3, 2022 alleging claims of Breach of Fiduciary Duty.  1:22-cv-08111-LGS - ECF 3.

139.    Sport-BLX filed its Amended Complaint on March 1, 2023 asserting Misrepresentation and Fraud claims as well as their underlying factual allegations for the first time.  See ECF 40, ¶ 3, 29-30, 88-103.  Specifically, Sport-BLX alleged   "But, on February 28, 2019—the very day the deal was to be finalized—Salerno abruptly changed course when— *less than one hour* before executing the Investment Agreements—he claimed that the Agreements needed to be "update[d] with "my holding company['s] name." He then

unilaterally changed the Investment Agreements to reflect for the first time that *Cypress* was the purchaser and sent executed copies of the revised Agreements to Sport-BLX. By means of these acts, omissions and statements, Salerno and Cypress intentionally misled Sport-BLX about what Cypress was and who owned it." 1:22-cv-08111-LGS - ECF 40, ¶ 29

140.    Also for the first time, Sport-BLX alleged "Salerno continued his dishonest conduct the same day by separately revising the Side Letter to define Cypress as "Salerno"; until then, that defined term referred only to Salerno individually. This revision to the Side Letter made by Salerno himself once more informed Sport-BLX that Cypress and Salerno were alter egos, and that Salerno was Cypress's sole owner. At no time did Salerno convey, directly or indirectly, that Cypress was, in fact, a pooled investment vehicle owned by a diverse array of 18 separate limited partners, including multiple trusts and corporate entities and a convicted felon." 1:22-cv-08111-LGS - ECF 40, ¶ 30

141.    From June though October 2019, Sport-BLX was issuing new shares to purchasers at $263.40 per share as part of their third round of financing.  See Dudelson Declaration Ex. 10.

142.    In December 2019, Salerno notified Hall that he was willing to disclose the beneficial owners of Cypress directly to the Sport-BLX.  See Dudelson Declaration Ex. 9.

143.    In December 2019, Salerno notified Deperio that he was willing to disclose the beneficial owners of Cypress directly to the Sport-BLX.  See Dudelson Declaration Ex. 10

144.    Deperio prepared a spreadsheet to calculate the number of shares needed tobe sold to Glassbridge to get Salerno voted off of the Sport-BLX Board.  See Dudelson Declaration Ex. 4.

145.    Hall conceded that a sports related fund was part of Sport-BLX business plan.  In response to "Mr. Salerno stating that Mr. Hall represented there would be a fund that

would generate revenues for the Company," Hall "explains that the effort to raise capital for a fund was unsuccessful."  See Dudelson Dec. Ex. 16 at GBE_0014669.

146.    In its meeting on August 14, 2019, the Sport-BLX Board discussed the need to lower its valuation or convertible preferred stock to raise capital.  Stecklow Decl. Ex. 19

147.    In a Special Meeting of the Sport-BLX Board held on December 9, 2019,  Hall led a discussion on the need to raise capital for the Company.  See Dudelson Decl. 5.

148.    In an email to Salerno on July 20, 2019, Hall informed Salerno that they would "work around you".  See Dudelson Decl. Ex. 3.


Executed this 6th day of January 2025, in Brooklyn, New York.

　/s/ Alexander M. Dudelson　　　　　　　　　
ALEXANDER M. DUDELSON, ESQ.
26 Court Street – Suite 2306
Brooklyn, New York 11242
(718) 855-5100
(718) 624-9552 FAX