# EXHIBIT 63A

CONFIDENTIAL

Page 278

|     |     |     |
| --- | --- | --- |
| 1   | UNITED STATES DISTRICT COURT | |
|     | SOUTHERN DISTRICT OF NEW YORK | |
| 2   |     |     |
| 3   | _____ | |
| 4   | CYPRESS HOLDINGS, III, L.P., individually and derivatively | Case No. 22-cv-01243(LGS) |
|     | on behalf of SPORT-BLX, INC., | |
| 5   | Plaintiff, | |
| 6   | -v- | VIDEOTAPED DEPOSITION UPON |
| 7   | GEORGE HALL, JOSEPH DE PERIO, DANIEL STRAUSS, FRANCIS | ORAL EXAMINATION OF |
| 8   | RUCHALSKI, CESAR BAEZ, CHRISTOPHER JOHNSON, | GEORGE HALL (Vol. II) |
| 9   | SPORT-BLX, INC., SPORT-BLX SECURITIES, INC., CLINTON | |
| 10  | GROUP INC., and GLASSBRIDGE ENTERPRISES, INC., | |
| 11  | Defendants. | |
| 12  | _____ | |
| 13  | SPORT-BLX, INC., individually and derivatively on behalf of | Case No: 1:22-cv-8111(LGS) |
| 14  | its shareholders, | |
|     | Plaintiff, | |
| 15  |     |     |
| 16  | -v- | |
|     | MICHAEL M. SALERNO and | |
| 17  | CYPRESS HOLDINGS, III, L.P., | |
|     | Defendants. | |
| 18  |     |     |
| 19  | _____ | |
| 20  | ***   CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER   *** | |
| 21  | T R A N S C R I P T of testimony taken stenographically by and before MARGARET | |
| 22  | VOLLMUTH-CORSON, a Certified Court Reporter of the State of New Jersey, pursuant to Federal Rules | |
| 23  | Governing Civil Procedures, at the offices of CHIESA SHAHINIAN & GIANTOMASI, P.C., 105 Eisenhower | |
| 24  | Parkway, Roseland, New Jersey, on Wednesday, June 21, 2023, commencing at approximately 10:06 a.m. | |
| 25  |     |     |

1      A.    Well, people signed on for a
2   sports-related venture capital company.  They didn't
3   sign on to be a corporate debt holder of a public
4   company that could be on the verge of bankruptcy at
5   any time.
6      Q.    And in terms of the -- you know, you
7   spoke about the significant advantages to Sport-BLX
8   as a result of you selling your shares.  Was it also
9   were those advantages only realized if you and
10  Mr. De Perio sold your shares together?
11     A.    No, I think the advantages were if
12  GlassBridge got up to a number higher than 50
13  percent.  Whether the shares came from me or Joe
14  didn't matter.
15     Q.    Can you describe for us what you
16  perceived as the advantages to Sport-BLX by you
17  selling your shares to GlassBridge?
18     A.    Well, there are a lot of them, and if
19  you go back to the FAQs, I think we talked about an
20  ultimate potential exit as being an IPO, so you
21  could look at this as a first step towards an IPO.
22  Second of all, GlassBridge, by taking a majority
23  ownership of Sport-BLX, would ultimately be taking
24  responsibility for doing all the financials and
25  consolidating those financials on the public

1   GlassBridge shares -- GlassBridge financial
2   statements.  So that's an advantage for Sport-BLX
3   because it relieved us of accounting responsibility.
4   Public companies are known and viewed to have the --
5   you know, the highest standard of care when it comes
6   to accounting, and so that could be a potential
7   advantage to Sport-BLX, Inc. if there was ever a --
8   another transaction to do having those quality --
9   that quality of financials.  The -- so -- and, you
10  know, there were a number of other -- other
11  advantages, I think, for -- for Sport-BLX, but it
12  was really the first step towards reverse merger
13  slash IPO.
14          Q.    Okay.  When you say "reverse
15  merger/IPO," what would happen in that transaction
16  that you just described?
17          A.    Well, if we did a complete IPO, that
18  -- well, an IPO is taking a private company and
19  making it public.  If GlassBridge bought a hundred
20  percent of the company, then the company would be a
21  wholly-owned subsidiary of GlassBridge, or if they
22  bought 50 percent, they -- it would be a
23  consolidated affiliate and take care of all the
24  accounting and the public company documents, public
25  company reporting.  So by doing this amount, it

1        A.      The price per share with GlassBridge
2   was about 355 or 356.
3        Q.      Okay.  And then is that what was agreed
4   upon as to the equity part of the deal?
5        A.      The equity part of the deal was, I
6   believe, $35.00 a share.
7        Q.      Was what?
8        A.      The equity part of the deal was $35.00
9   a share.  The cash part of the deal.  Is that what
10  you meant by the --
11       Q.      Yes.
12       A.      Yeah, $35.00 a share.
13       Q.      And the rest of the -- so the total
14  share price was 355 --
15       A.      Right.
16       Q.      -- broken down by equity and debt?
17       A.      Correct.
18       Q.      Now, if you could look at what's been
19  marked as Hall-52 for identification.  This is
20  minutes from the -- from GlassBridge's board of
21  directors meeting on December 9, 2019.  It's been
22  Bates stamped GBE_0009062 through 9063.
23              The -- the first thing I want to ask
24  you is it reflects here that Daniel Strauss was the
25  CEO and chief operating officer of GlassBridge at