**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CYPRESS HOLDINGS, III, L.P., individually and derivatively on behalf of SPORT-BLX, INC., <br><br> Plaintiff, <br><br> v. <br><br> GEORGE HALL, JOSEPH DE PERIO, DANIEL STRAUSS, FRANCIS RUCHALSKI, CESAR BAEZ, CHRISTOPHER JOHNSON, SPORT-BLX, INC., SPORT-BLX SECURITIES, INC., CLINTON GROUP INC., and GLASSBRIDGE ENTERPRISES, INC., <br><br> Defendants. | Civil Action No. 1:22-cv-1243-LGS <br><br> <u>Civil Action</u> |

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION FOR SUMMARY JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56**

## <u>TABLE OF CONTENTS</u>

LEGAL ARGUMENT ............................................................................................. 1

I.    CYPRESS FAILS TO CONTROVERT SPORTBLX'S STATEMENT OF MATERIAL FACTS, RENDERING THOSE FACTS ADMITTED FOR PURPOSES OF THIS MOTION. ............................................................. 1

II.   SPORTBLX HAS ESTABLISHED FRAUD AND BREACH OF FIDUCIARY DUTY CLAIMS ............................................................... 4

    A.    Salerno Had A Fiduciary Duty To SportBLX And He Breached It. .......... 4

    B.    SportBLX's Fraud Claim Is Timely And The Other Fraud Elements Are Met. .................................................................. 11

III.  ALL OF CYPRESS' CLAIMS FAIL. ............................................... 13

    A.    Cypress' 10b-5 Claim Is Not Timely. ........................................ 13

    B.    The Anti-Reliance Provisions in the SPAs Bar Cypress' Fraud Claim. ..................................................................... 15

    C.    Cypress' Good Faith And Fair Dealing Claim Fails. ................... 16

    D.    Cypress Cannot Show Damages On Any Claim. ........................ 18

    E.    Cypress's Derivative Claims Fail. ........................................... 20

62527/0004-49252216v2

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Allen v. El Paso Pipeline GP Co.*,
  113 A.3d 167 (Del. Ch. 2014), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015)........................15

*Allied Capital Corp. v. GC–Sun Holdings, L.P.*,
  910 A.2d 1020 (Del. Ch. 2006)....................................................................................................15

*Stone ex rel. AmSouth Bancorporation v. Ritter*,
  911 A.2d 362 (Del.2006) ...............................................................................................................4

*Basho Tech. Holdco B, LLC v. Georgetown Basho Inv'rs, LLC*,
  2018 WL 3326693, (Del Ch July 6, 2018), *aff'd sub nom*, *Davenport v Basho
  Tech. Holdco B, LLC*, 221 A.3d 100 (Del 2019) .........................................................................8

*Brooke v County of Rockland*,
  2021 WL 809320 (S.D.N.Y. Mar. 3, 2021) ...............................................................................2, 3

*Cobalt Operating, LLC v. James Crystal Enterprises, LLC*,
  2007 WL 2142926 (Del. Ch. July 20, 2007), *aff'd*, 945 A.2d 594 (Del. 2008) .......................12

*Diesenhouse v. Soc. Learning & Payments, Inc.*,
  2022 WL 3100562 (S.D.N.Y. Aug. 3, 2022)..................................................................12, 14, 15

*Feldman v Sanders Legal Group*,
  914 F Supp 2d 595 (S.D.N.Y. 2012)..........................................................................................2, 3

*Flight Options Intern., Inc. v Flight Options, LLC*,
  2005 WL 5756537, (Del Ch. July 11, 2005)...............................................................................11

*Glaxo Group Ltd. v DRIT LP*,
  248 A3d 911 (Del 2021) ..........................................................................................................16, 17

*Hernandez v Between the Bread 55th Inc.*,
  496 F Supp 3d 791 (S.D.N.Y. 2020)...........................................................................................11

*Holtz v Rockefeller & Co., Inc.*,
  258 F.3d 62 (2d Cir 2001).........................................................................................................1, 4

*In re KKR Fin. Holdings LLC Shareholder Litig.*,
  101 A.3d 980 (Del Ch 2014), *affd sub nom. Corwin v KKR Fin. Holdings
  LLC*, 125 A3d 304 (Del 2015) .............................................................................................17, 18

*McGowan v Stanley*,
  2024 WL 5038633, (2d Cir. Dec. 9, 2024) ...................................................................................1

*Miller v Brightstar Asia, Ltd.*,
    43 F.4th 112 (2d Cir. 2022) ..................................................................................16

*Oxbow Carbon & Minerals Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*,
    202 A.3d 482 (Del. 2019) ....................................................................................16

*Prairie Capital III, L.P. v. Double E Holding Corp.*,
    132 A.3d 35 (2015) ...............................................................................................15

*T.Y. v New York City Dept. of Educ.*,
    584 F.3d 412 (2d Cir 2009) ....................................................................................2

*Tornetta v Musk*,
    310 A3d 430 (Del Ch 2024) ...............................................................................8, 9

*Vichi v. Koninklijke Philips Elecs., N.V.*,
    85 A.3d 725 (Del. Ch. 2014) ...............................................................................12

*Wagner v BRP Group, Inc.*,
    316 A3d 826 (Del Ch 2024) ................................................................................15

*In re Walt Disney Co. Derivative Litig.*,
    907 A2d 693 (Del Ch 2005), *aff'd*, 906 A2d 27 (Del 2006) ...................................5

## Other Authorities

L.R.56.1 ......................................................................................................................1, 2

Defendants[1] respectfully submit this reply memorandum in further support of Defendants' motion for summary judgment.

## **LEGAL ARGUMENT**

### I.    **CYPRESS FAILS TO CONTROVERT SPORTBLX'S STATEMENT OF MATERIAL FACTS, RENDERING THOSE FACTS ADMITTED FOR PURPOSES OF THIS MOTION.**

SportBLX submitted 137 Statements of Material Fact in support of this motion, each one of which is meticulously supported by citation to admissible record evidence (the "SportBLX SOF") Cypress does not dispute eighty-four of those facts. Although purportedly disputing others, Cypress does not support twenty-three of its purported denials with a citation to admissible record evidence.  Confusingly, Cypress also purports to "dispute" ten facts while, at the same time, admitting the facts stated.  In response to others, Cypress cites evidence that does not support its denial.  Based on well-settled authority, all of these facts must therefore be deemed admitted for purposes of this motion.

Local Rule 56.1 imposes strict procedural requirements on submissions on a motion for summary judgment and oppositions to those motions.  *McGowan v Stanley*, No. 23-7769-cv, 2024 WL 5038633, at *2 [2d Cir Dec. 9, 2024].  Local Rule 56.1(b) requires that Cypress here to admit or deny each statement of material fact proffered by SportBLX, with each denial "followed by citation to evidence that would be admissible." L.R. 56.1(d). When a non-movant fails to support its purported denial of a Statement of Fact with admissible evidence, that fact "will be deemed to be admitted for the purposes of the motion." L.R.56.1(c).  Further, if a non-movant cites to evidence that does not support its denial, those denials should be disregarded.  *See Holtz v*

---

[1] Capitalized terms shall have the meaning ascribed to them in Defendants' moving brief.

*Rockefeller & Co., Inc.*, 258 F3d 62, 74 [2d Cir 2001] ("Where . . . the record does not support the assertions in a Local Rule 56.1 statement, those assertions should be disregarded.")

"The requirement is strict." *T.Y. v New York City Dept. of Educ.*, 584 F3d 412, 418 [2d Cir 2009] ("In the typical case, failure to respond results in a grant of summary judgment once the court assures itself that Rule 56's other requirements have been met"); *Feldman v Sanders Legal Group*, 914 F Supp 2d 595, 597 [SDNY 2012] (movant's statements "supported by admissible evidence in the record have been deemed admitted for purposes of this motion" where non-movant did not cite supporting evidence,); *Brooke v County of Rockland*, 17-CV-03166 (PMH), 2021 WL 809320, *2, n.2 [SDNY Mar. 3, 2021] ("the Court deems [movant's] statements of fact admitted unless controverted by [non-movant] *and* supported by evidence" (Emphasis in original)). Cypress here has failed to cite controverting evidence to support the majority of its purported denials of SportBLX's supporting facts. In other instances, Cypress grossly misrepresents the evidence which it does cite. For example, in Paragraph 81, Cypress cites to a Glassbridge 10-K and asserts that it states "SportBLX sold proprietary code to S-BLX Securities, a related party, for $225,000." In fact, under the bold heading "The Sports Technology Platform," the 10-K states that Glassbridge "completed a series of three transactions for the purpose of disposing of its interest in SportBLX, as described below," of which Cypress quotes and cites only the first. The second, which Cypress omits, states that SportBLX repurchased $1.5 million of its debt for $126,000, for a net benefit of cash and debt cancellation of $1,599,000. As Hall testified, the second bullet point, reflected debt forgiveness and "w[as] part of the same transaction", and that "we basically wrote off $1.3 million or $1.35 million of debt at Sport-BLX, Incorporated. So the total consideration was the cash plus the debt write-off." (Stecklow Exh. 50, Hall Depo. Day 3, at 750:14 – 751:12; 752:13-15.)

2

In Paragraph 103, Cypress asserts "[i]t was represented to Salerno that transactions such as the Orix transaction would lead to success fees for Sport-BLX," cites only to a statement made by Salerno at a Board meeting, not evidence: (i) of a statement made to Salerno; (ii) that the Orix transaction was related to SportBLX's business model or activities; or (iii) of any representation made by Hall or DePerio, as opposed to Salerno, prior to the transaction. Same is true of the evidence relied upon by Cypress in disputing Paragraphs 2, 5, 6, 9, 24, 34, 38, 61, 63, 70, 73-74, 76, 79, 81, 83, 97, 99, 100-103, 108, and 122-123, 125 none of which supports its purported denials of those facts. In accordance with settled authority, the Court should deem those facts admitted. *See, e.g., Feldman*, 914 F Supp 2d at 597.

Second, Cypress purports to dispute facts that it actually admits. For example, SportBLX's Statement No. 23 states, in its entirety, "At the August 14, 2019 Board meeting Mr. De Perio also stated that 'despite multiple requests, Cypress refused to provide such beneficial ownership information in a manner contemplated by such regulations.'" SportBLX cited to and quoted the applicable Meeting Minutes. Cypress' entire response is: "Disputed. The Board Minutes reflect the statement was made by DePerio." Similarly, SportBLX's Statement No. 12 states, "The due diligence materials provided to and reviewed by Salerno specified that SportBLX Inc. revenue would be generated exclusively from its activities as a broker dealer" and cites to the specific Excel spreadsheet Tab and cells in the pro forma financials from the data room, (which Salerno printed and examined [Undisputed Fact ¶ 11]), which show "100% of the Company's revenue is to be generated by the broker dealer operation." (Undisputed Fact ¶ 12.) Cypress' entire response is: "Disputed. The due diligence materials do not state the revenue would be generated exclusively" by broker dealer operations." (Cypress' emphasis) (*Id.*) This Court should not entertain such sophistry. "100%" means "exclusively". Cypress responds to Statements 11-12, 23, 29-31, 44, 46,

48, 54-56, 58, 62, 84, and 137 in the same fashion while purporting to "dispute" it. These Statements should also be deemed admitted. *See, e.g., Brooke*, 2021 WL 809320, *2, n.2.

Third, Cypress responds with a non-sequitur to several of SportBLX's Statements. Statement No. 34 quotes an audio recording containing oral statements made by Salerno and by the Sport BLX's outside counsel for regulatory affairs at the November 26, 2019 Board Meeting. Statement No. 34 goes on to state: "Salerno did not agree to disclose the beneficial ownership information required of the Company to apply for and obtain a FINRA license." Absurdly, Cypress purports to "dispute" the statements Salerno made and that are heard on the audio recording, citing only to two emails he sent a month later. Cypress' entire response to Statement 34 is: "Disputed. Salerno did agree to disclose the beneficial ownership information in December 2019." Responses 24, 28, 31, and 34 cite to the same December 2019 emails to "dispute" emails and audio recordings of statements from August and September 2019. Statements 24, 28, 31 and 34 should therefore also be deemed admitted. *Holtz*, 258 F3d at 74.

## II. SPORTBLX HAS ESTABLISHED ITS FRAUD AND BREACH OF FIDUCIARY DUTY CLAIMS AS A MATTER OF LAW.

### A. The Undisputed Evidence Establishes That Salerno Breached His Fiduciary Duty To SportBLX

#### 1. As A Director, Salerno Owed A Fiduciary Duty To Sport-BLX.

Cypress' claim that despite being a SportBLX Director, Salerno did not owe a duty of loyalty to SportBLX to disclose Cypress' ownership interest (and thus enable SportBLX to pursue the FINRA license) is legally untenable. (Cypress' Br. at 10-11.) Cypress offers no legal support for this argument because none exists. It is blackletter law that directors owe a fiduciary duty of loyalty to the corporations they serve. *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del.2006). It is undisputed that Salerno was a Director of SportBLX. It is similarly

undisputed that Salerno had the ability to disclose Cypress' ownership information. Indeed, Salerno testified that the decision whether to disclose Cypress' ownership to SportBLX, █████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████ (Undisputed Fact 13.)    "There is no safe-harbor for divided loyalties in Delaware." *In re Walt Disney Co. Derivative Litig.*, 907 A2d 693, 751, 754 (Del Ch 2005), aff'd, 906 A2d 27 (Del 2006) ("It makes no difference the reason why the director intentionally fails to pursue the best interests of the corporation.")    It makes no difference whether it was ████

████████████████████████, or some other undisclosed reason – by refusing to provide this critical information upon which the viability of SportBLX turned, Salerno breached his duty of loyalty to SportBLX as a matter of law. Cypress' feigned argument that because Cypress was the nominal shareholder Salerno as a SportBLX Director had no duty of loyalty is simply a legal non-sequitur without support in the law or record evidence.

Cypress then argues that Salerno did not breach his fiduciary duties because he "did not put any personal interests above the interests of Sport-BLX" when refusing to disclose the ownership of Cypress. (Cypress' Br. at 11.)  Cypress' argument is conclusively disproven by the undisputed facts and must be rejected.  First, Cypress cites to no evidence whatsoever in support of this flawed, conclusory statement. Second, Cypress does not dispute that Salerno wrote █

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████ (Doc 216 ["Non-Movant's Responses"],

¶¶ 20, 30, 31.)    That ████████████████████████████████████ is thus

undisputed. Salerno's argument that he did not breach his fiduciary duty of loyalty thus must be rejected.

Cypress next argues that "It was the Founders' decision to convert SportBLX solely to a technology company," and that it "was not prevented from pursuing the broker-dealer license" in December 2019. (Cypress' Br. at 11.) Cypress goes on to falsely assert that after Salerno refused to disclose the ownership of Cypress from August 5, 2019, when SportBLX first requested the information, through November 26, 2019, (Undisputed and Uncontroverted Facts ¶¶ 14-35), he "agreed to disclose its beneficial ownership directly to Sport-BLX in December 2019." (Cypress Br. at 11.) That assertion is conclusively disproven in three distinct ways by uncontroverted facts evidenced by audio recordings Salerno himself surreptitiously made.

First, Salerno in fact did not offer to disclose Cypress' ownership "directly to SportBLX" in December 2019, but was instead remained adamant that he would not.  Cypress relies on December 23 and December 27 emails in which Salerno wrote that he would "█████████████████ ███████████████████████████████████████████████████████ █████████ (Dudelson Exhs. 9 & 10.)  Salerno's first prior communication was in an August 16, 2019 email in which he stated █████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████ (Sport-BLX 56.1 Response ¶ 142.)  At the November 26, 2019 meeting, Mr. De Perio informed Salerno (and not for the first time) that FINRA ████████████████████████████████ (Undisputed Facts ¶¶ 26-27; Uncontroverted Fact ¶ 30.)

Then, at the November 26, 2019 Board Meeting, Salerno reiterated that ██████████ ████████████████████████████████████████████████████████

████████████████████████████████████ (Uncontroverted Fact ¶ 34.)  Salerno also stated

at that Board Meeting that ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████ (Uncontroverted Fact ¶ 30.)  Thus, the uncontroverted facts conclusively establish

that in December 2019, Salerno's offer to provide ownership information was not an offer to

████████████████████████████████████████ as Cypress falsely asserts here.  Indeed, had

Salerno intended to allow SportBLX access to the ownership information, he could have simply

sent it with the December emails he relies upon in support of his false narrative.   It is undisputed

that he did not.

Further, about a year after the November 2019 Board meeting, Salerno himself confirmed

that ████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████ (SportBLX 56.1 Response ¶¶ 142, 143.)

Second, Mr. Mack, ████████████████████████████████████████ who was the

company's outside counsel for regulatory affairs, informed Salerno and the entire Board at the

November 2019 meeting that his alternate proposal to ████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

(Uncontroverted Fact ¶ 34.)  Salerno's ████████████████████████████████████████

7

██████ in fact did not enable SportBLX to pursue the broker-dealer license at that time. It was, in fact, still prevented from doing so.

Third, Cypress' argument that "[i]t was the Founders' decision to convert SportBLX solely to a technology company," is also conclusively disproven by undisputed facts. ████████████



(Undisputed Fact 35.)  Although Salerno acknowledged that ██████████████████████

████████████████████████████████████████████████

████████████████████████ as required to obtain a license.

### 2.    Cypress Had Transaction-Specific Control And It Assumed Fiduciary Duties As A Sport-BLX Minority Shareholder

Cypress also argues that Cypress had no duty of loyalty because it "could not exercise control over the corporation's affairs" as a minority shareholder and had no fiduciary duty of loyalty. (Cypress' Br. at 10.)  Although irrelevant, as already discussed, this position is also legally flawed, which is why Cypress provides no legal support for its misguided position. "[A] plaintiff can establish fiduciary status by demonstrating that the defendant [minority shareholder] controlled the particular transaction at issue, referred to as 'transaction-specific' control." *Tornetta v Musk*, 310 A3d 430, 500 [Del Ch 2024].   A minority shareholder which "channel[s] the corporation into a particular outcome by blocking or restricting other paths," is a controlling shareholder with regard to that transaction.   *Id*.   Likewise, a minority shareholder which "neutralizes a board's power to direct corporate action . . . assumes fiduciary obligations." *Id*. at 498 (citing *Harris v. Carter*, 582 A.2d 222, 234 (Del. Ch. 1990)). "If a defendant wields control

over a corporation, then the defendant takes on fiduciary duties, even if the defendant is a stockholder who otherwise would not owe duties in that capacity." *Basho Tech. Holdco B, LLC v. Georgetown Basho Inv'rs, LLC* C.A. No. 11802-VCL, 2018 WL 3326693, at *26 (Del Ch July 6, 2018), *aff'd sub nom*, *Davenport v Basho Tech. Holdco B, LLC*, 221 A.3d 100 (Del 2019) (recognizing that minority shareholders who control access to capital are considered controlling shareholders under the law).

In determining whether a minority shareholder has exercised transaction-specific control and thereby assumed fiduciary duties, "the facts and circumstances surrounding the particular transaction will loom large." *Tornetta*, at 310 A3d at 501. Here, assuming – *arguendo* and contrary to both law and Salerno's testimony – that Cypress rather than Salerno refused to disclose Cypress' ownership, it thereby became a transaction-specific controlling shareholder by neutralizing the Board's power to obtain a broker dealer license to operate its business.

### 3. SportBLX Indisputably Suffered Substantial, Demonstrable Damages Based On Cypress' Breaches.

Finally, Cypress argues that SportBLX was not injured and cannot show damages. (Cypress' Br. at 11.) Again, Cypress' argument is disproven by uncontroverted facts.

First, SportBLX can show damages flowing from Salerno's breach of over $1,000,000 in sunk costs it incurred from August, when Salerno first



(Stecklow Decl. Ex. 23, CYPRESS0000002 at 2:17:10 to 2:18:40)

Second, Salerno's breaches prevented Sport-BLX from earning any revenue from broker/dealer operations, which was its exclusive source of projected revenue, as shown in the pro forma financials. (Uncontroverted Fact ¶ 12, citing Stecklow Decl. Ex. 31, SPORTBLX00023177,

9

Tab: InvestorP&L, Rows 10-14, Columns B-J.)

Third, the Company was forced to write-off approximately $170,000 in legal costs incurred in connection with the FINRA application process. (*Id.*, at 2:01:15 to 2:02:00.)

Cypress next argues that after SportBLX changed to a technology company as a result of Salerno blocking the Company from applying for a broker-dealer license, "the value of the company was $355/share as evidence [sic] by the Founders' sale of their shares to Glassbridge." (Cypress' Br. at 9.) This too is conclusively disproven by undisputed evidence.

The undisputed evidence Cypress itself cites contradicts its argument that "the value of the company increased" after Sport-BLX was forced to abandon its original broker/dealer business model. (Cypress' Br. at 10.) Cypress contends that before the Company was forced to pivot to a technology venture, "the value of the company was $355 per share as evidenced by the Founders' sale of their shares to Glassbridge, a purported third party." *Id.*, at 9. Cypress' own evidence contradicts this statement. The undisputed evidence establishes that Hall and DePerio each received $35.50 per share for their shares and unsecured promissory notes that would have value only if SportBLX's prospects were to improve dramatically. Glassbridge purchased 37,924 shares of SportBLX stock from Hall for a promissory note and $35.50 per share in cash. (Undisputed Fact 119: "in exchange for $1,346,302 in cash and a $12,116,718 principal amount promissory note.") Glassbridge likewise purchased 17,076 shares of SportBLX stock from DePerio for a promissory note and $35.50 per share in cash. (Undisputed Fact 118: "in exchange for $606,198 in cash and a $5,455,782 principal amount promissory note.") The evidence relied upon by Cypress further establishes that Hall and DePerio received only $2,354,736 and $1,060,264, respectively, from Glassbridge in full satisfaction of the notes. (Dudelson Exh. 14, at p. 17 of 19.) Hall and DePerio received only $2,354,736 and $1,060,264, respectively, from Glassbridge in full satisfaction of the

notes. (Dudelson Exh. 14, at p. 17 of 19.) Hall and DePerio thus received value of $97.59 per share, not $355 as Cypress falsely (and contrary to its own evidence) asserts, and far lower than the $263 per share prior to November 26, when the Company was forced to abandon the FINRA application.

Second, as Cypress argues, Glassbridge and SportBLX's Founders Hall and DePerio "were not unaffiliated. Glassbridge had substantial relationships with the Founders," (Uncontroverted Fact 47)[2], and there is no evidence that the price was negotiated or represented fair market value. The "Company's relatively short history and the difficulty of projecting its cash flows into the future all counsel for caution" in determining that the sale reflected the value of SportBLX and "the process chosen was so informal as to undermine substantially the ability . . . to show that the price is the equivalent of an arms' length transaction's result." *Flight Options Intern., Inc. v. Flight Options, LLC*, C.A. No. 459-N, 2005 WL 5756537, at *9 (Del Ch July 11, 2005) (rejecting S&P valuation based on discounted cash flow as sufficient evidence of fair market value in transaction between related parties); *see also Hernandez v. Between the Bread 55th Inc.*, 496 F.Supp.3d 791, 805 (S.D.N.Y. 2020) (without evidence that fee "was the product of a negotiation," there "[wa]s no evidence that those fees were negotiated at arms' length or otherwise represented fair value"). The undisputed evidence shows the actual value received by Hall and DePerio was $97.59 per share.

---

[2] Cypress purports to dispute Statement ¶ 47 on the basis that Glassbridge is affiliated with the Founders. Statement ¶ 47 states "Salerno was voted off the Sport-BLX board of directors on December 23, 2019 by the vast majority of Sport-BLX <u>unaffiliated</u> shareholders." Defendants do not dispute that Glassbridge is an affiliated shareholder, and never claimed differently, regardless of wrong assumptions by Plaintiff. The assertion in Statement ¶ 47 still holds true, the vast majority of unaffiliated shareholders voted against Salerno..

**B.    SportBLX's Fraud Claim Is Timely And The Other Fraud Elements Are Met.**

Cypress incorrectly argues that SportBLX's fraud claims, which are first alleged in its Amended Complaint, are untimely.  It argues that SportBLX could have discovered that Salerno lied, that "Cypress was a pooled investment fund with multiple owners" (Cypress Br. at 3) and that Cypress' membership included a convicted felon, when he represented that Cypress was "my holding company" more than two years before August 3, 2022.  (Cypress Br. at 1-3.)  The undisputed evidence reflects otherwise.

First, Cypress asserts that SportBLX could have learned that information through public filings.  That too is false.  The public filing to which Cypress alludes (but does not cite) is an SEC Form D Notice of Exempt Offering of Securities Salerno filed on December 13, 2018, stating that Cypress had only three investors.  Within days Cypress added new investors and when Cypress invested in SportBLX, it had sixteen investors, including the convicted felon, none of whom are reflected in that Form D. (Stecklow Exh. 4; Uncontroverted Fact ¶ 6.)

Second, SportBLX made numerous attempts to obtain Cypress' ownership information from Cypress Manager Salerno, who refused to disclose and adamantly withheld that information until it was forced to disclose it pursuant to this Court's Order on January 27, 2023. (SportBLX 56.1 Response ¶ 140; Docket No. 77.)  SportBLX did not, and could not, discover until Cypress' production in response to the Court's January 27, 2023 Order that Cypress was, in fact, ███████ ███████████████████████████████████████████████████████ ███████████████████████████████ SportBLX's reasonable diligence is shown by its consistent efforts to discover Cypress' ownership beginning in August 2019 as part of its efforts to apply for a FINRA broker/dealer license. *Diesenhouse v. Soc. Learning & Payments, Inc.*, 20-cv-7436 (LJL), 2022 WL 3100562, at *5 (S.D.N.Y. Aug. 3, 2022); (Undisputed Facts ¶¶ 14-18,

21-27; Uncontroverted Facts ¶¶ 28-30; Sport-BLX 56.1 Response ¶¶ 141-142.)  Salerno, ▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ [Undisputed Fact ¶ 13] despite SportBLX's

diligence.  The fraud claims are timely.

As shown in its Opening Brief, each element of SportBLX's fraud claims is established by

uncontroverted record evidence. (See Opening Br. at pp. 1-10) and each argument Cypress makes

now is addressed and refuted in there.  Purchaser's Representations in the SPAs that it is buying

for its own account establish the materiality of Salerno's misrepresentation.  Salerno's statements

concerning Cypress' membership were made with "contemporaneous knowledge . . . of

information which rendered misleading" his actual statements establishes scienter.  *Vichi v.*

*Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 809 (Del. Ch. 2014).  The Form D itself states that

"Intentional misstatements or omissions of fact constitute federal criminal violations" but Salerno

nonetheless filed one with misstatements and omissions.  [Uncontroverted Fact ¶ 6.]  Because

Salerno's "efforts at deception prevented the fraud from being detected during due diligence"

SportBLX has established reasonable reliance.  *Cobalt Operating, LLC v. James Crystal*

*Enterprises, LLC*, No. Civ. A. 714-VCS, 2007 WL 2142926, at *28 (Del. Ch. July 20, 2007), aff'd,

945 A.2d 594 (Del. 2008).

### III.    ALL OF CYPRESS' CLAIMS FAIL AS A MATTER OF LAW.

#### A.    Cypress' 10b-5 Claim Is Untimely.

Cypress filed its Complaint on January 11, 2022.  Cypress argues that its 10-b claim is

timely because it purportedly "learned through Glassbridge's 2020 10-K of a success fee paid by

Orix, a third party, to Clinton Group, which is owned by Hall, for consulting work.  (Cypress' Br.

at 12.)  Cypress cites only to the 2020 10-K in response, which of course has no probative value

concerning when Salerno, or Cypress, learned about the fee. Salerno did not testify that he or

Cypress learned of the Orix fee from the 2020 10-K, nor could he have without perjuring himself, as the record conclusively establishes otherwise. ████████████

████████████████████

████████████████████

████████████████████ (Stecklow Decl. Ex. 23, CYPRESS00000002, at 1:29:15 to 1:29:33; 1:31:20 to 1:31:39; 1:35:15 to 1:35:40; 2:07:06 to 2:08:06). The October 7, 2019 Glassbridge 8-K which Salerno ████████████████ specifies, under the bold header "**Transaction Fee to Clinton Group**," that Clinton Group received "a success fee . . . equal to 15% of the Cash Consideration for its work on the Orix Transaction." (Stecklow Exh. 61-A.) Contrary to its manufactured, and wholly unsupported assertion that Salerno only learned of the fee months later, the undisputed evidence establishes that Cypress knew of that fee on November 26, 2019, at the very latest.

Cypress next asserts that it learned of the December 2019 sale of the Founders' shares to Glassbridge on or about April 3, 2020, again citing only to the 2019 10-K Annual Report in support. (Cypress' Br. at 12.) The undisputed evidence directly contradicts this assertion – on January 7, 2020, the Company sent Salerno's attorney a copy of the inspector's report from the annual meeting at which he was not re-elected to the Board, which shows that Glassbridge owned 40.7% of SportBLX and that the Founders' ownership share had declined to 30.8%. (Uncontroverted Fact ¶ 47.) Moreover, Salerno consistently reviewed Glassbridge's 8-Ks, as evidenced by his statements at the ████████████████ (Stecklow Exh. 90.) The 8-K public filing that was required to be made no later than 7 days after the December 2019 sale gave notice to a reasonably diligent shareholder or other interested person of the Founders' sale of shares. *Diesenhouse*, 2022 WL 3100562, at *5 (S.D.N.Y. Aug. 3, 2022). Finally, there is no

14

evidence whatsoever that the Founders contemplated selling their shares to Glassbridge, nor the re-purchase of those shares from Glassbridge, prior to Salerno's investment. Cypress cannot rely on the spreadsheet, nor on the repurchase of shares from Glassbridge, to save its untimely claim and the claim should therefore be dismissed.

  **B.**  <u>The Anti-Reliance Provisions in the SPAs Bar Cypress'</u>
      <u>Fraud Claim.</u>

  Cypress next argues that the SPAs' anti-reliance clause "specifically states that it applies only to 'legal or other advice'" and that it "contains no language specific to the transaction." (Non-movant Br. at 14.) Cypress ignores crucial language in the SPAs. The anti-reliance clause specifically states: "Purchaser acknowledges that he or she has had the opportunity to review this Agreement, including all attachments hereto, and <u>the transactions contemplated by this Agreement</u> with his legal advisors, tax advisors, and other advisors. The Purchaser is relying solely on his or her own counsel and advisors and not on any statements or representation of the Company or its agents for legal or other advice with respect to this investment or the transactions contemplated by this Agreement." Stecklow Exhs. 5 & 7, at 7 (emphasis added). The Integration clause specifies that the SPAs "supersede[] and replace[] any and all prior written and oral communications regarding the subject matter of this Agreement, including but not limited to any representations made during interviews . . . or negotiations whether written or oral." *Id*., at 6. These clauses contain language specific to the transaction, *i.e.*, Cypress acknowledgment that it reviewed the Agreement and "the transactions contemplated by this Agreement."

  Second, Cypress argues that under Delaware law an anti-reliance clause must identify the specific information on which a party has relied, but the case it cites does not impose a standard of such high specificity. Delaware law "enforces clauses that identify" such information, *Prairie Capital III, L.P. v. Double E Holding Corp.*, 132 A.3d 35, 50 (2015), but it "does not require magic

words." *Id.*, at 51. The inquiry is whether, taken together, the Agreements' Integration, and Anti-reliance clauses demonstrate that Cypress "contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract." *Id.*

Taken together, these clauses, as was the case in *Prairie Capital*, "represent[] affirmatively that the Buyer only relied on the representations and warranties in the SPA." *Id.* Where as here "a party represents that it only relied on particular information, then that statement establishes the universe of information on which that party relied." *Id.*

### C.    Cypress' Good Faith And Fair Dealing Claim Fails As A Matter of Law.

The threshold inquiry on an implied covenant claim is "whether there is a gap that needs to be filled." *Allen v. El Paso Pipeline GP Co.*, 113 A.3d 167, 182–83 (Del. Ch. 2014), aff'd, 2015 WL 803053 (Del. Feb. 26, 2015). "The court must determine whether a gap exists because "[t]he implied covenant will not infer language that contradicts a clear exercise of an express contractual right." *Wagner v BRP Group, Inc.*, 316 A3d 826, 870 (Del Ch 2024) ("[B]ecause the implied covenant is, by definition, implied . . . it cannot be invoked where the contract itself expressly covers the subject at issue.") A gap exists under Delaware law only "when the contract is truly silent" as to a particular issue. *Allied Capital Corp. v. GC–Sun Holdings, L.P.*, 910 A.2d 1020, 1033 (Del. Ch. 2006). Conversely, a gap does not exist, and the implied covenant of good faith and fair dealing does not apply, "when the contract addresses the conduct at issue." *Nemec*, 991 A.2d at 1125 (internal quote omitted).

There is no gap here. The Side Letter expressly states: "Reference is hereby made in this letter agreement" to the SPAs (Stecklow Decl. Exh. 6 at 1), and the Side Letter does not contain an Integration Clause limiting its terms. The express language of the SPAs specifically contemplates a potential sale of control by the Founders: "In the event that the Founders elect to

16

sell shares of the Company's common stock that represent more than fifty percent (50%) of the aggregate number of shares then outstanding to a third party purchaser," Salerno would have certain Tag Along rights. (Stecklow Decl. Exhs. 5 & 7, at 5.) As the Delaware Supreme Court has "reinforced on many occasions, [the covenant] is a limited and extraordinary legal remedy and not an equitable remedy for rebalancing economic interests that could have been anticipated. It cannot be invoked when the contract addresses the conduct at issue." *Glaxo Group Ltd. v DRIT LP*, 248 A3d 911, 920 (Del 2021])[internal quotes omitted].

"Even where the contract is silent, an interpreting court . . . should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it." *Oxbow Carbon & Minerals Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 507 (Del. 2019). As a result, "not all gaps should be filled." *Id*., quoting *Allen* at 183. "Implied good faith cannot be used to circumvent the parties' bargain, or to create a free-floating duty unattached to the underlying legal document." *Miller v Brightstar Asia, Ltd.*, 43 F4th 112, 124 [2d Cir 2022] quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005).

The implied covenant of good faith and fair dealing cannot be invoked here. The provision at issue is explicit in its terms. It obligates Hall and De Perio "to vote, or cause to be voted, all shares of the Company's capital stock owned by such Founder, or over which such Founder has voting control, in favor of Salerno being elected to the Board." (Undisputed Fact ¶ 53.) The provision does not obligate the Founders to maintain ownership of the shares, nor could it be based on the SPA Tag Along provision. A sale to a "third party" was in fact anticipated; a sale to a related party could easily have been anticipated. *Glaxo*, 248 A3d at 920. ("The time to demand restrictions on an express contractual right was during negotiations—not years later through the implied covenant.")

17

Cypress argues that Hall and DePerio's "transfer of shares to a separate entity that they own and control exploits a gap." (Cypress Br. at 18-19.) But Cypress admits that Hall owns 30% of Glassbridge, *i.e.*, that he is not even a majority stockholder of that entity, much less its "owner." Cypress goes onto assert, in a conclusory manner, that "Glassbridge, despite being a publicly traded company, was controlled by the Founders." (Cypress Br at 19.) For this, Cypress claims that Glassbridge is a related party, that Glassbridge Officers Strauss and Ruchalski were Directors of SportBLX and employees of Clinton Group, and that Hall owned 30.1% of Glassbridge's stock. *Id*. Cypress speculates that Clinton Group "paid the salaries" of Strauss and Ruchalski in their capacity as Glassbridge Officers, *Id.*, although its own evidence establishes otherwise. (Dudelson Exh. 13, at 12 of 19.) Cypress ignores that Glassbridge's four-person Board included, in addition to DePerio and Robert Searing, the prominent attorney and businessman Alex Spiro, and attorney and former U.S Representative Robert Torricelli. *Id*. It also ignores that DePerio recused himself from the Glassbridge Board's vote on whether to purchase the Founders' shares. (Stecklow Exh. 71, at 2.) Cypress' speculation and conclusory assertion that Glassbridge's Board was controlled by Hall and DePerio is completely baseless and unsupported by any competent record evidence.

"Delaware law presumes the independence of corporate directors." *In re KKR Fin. Holdings LLC Shareholder Litig.*, 101 A3d 980, 995 [Del Ch 2014], affd sub nom. *Corwin v KKR Fin. Holdings LLC*, 125 A3d 304 [Del 2015]. To prove a Director's lack of independence, a plaintiff must show the "director is beholden to a controlling person or so under their influence that their discretion would be sterilized." *Id*. (internal quotations omitted). Even assuming that DePerio lacked independence (which is denied), Cypress has produced no evidence to even suggest a lack of independence by Messrs. Spiro or Mr. Torricelli, that they were somehow

"beholden" to Hall, or that their discretion would somehow be "sterilized" by Hall's influence. Cypress' argument therefore fails as a matter of law, requiring dismissal.

**D.  Cypress Cannot Establish Damages On Any Of Its Fabricated Claims.**

Cypress makes several baseless assertions concerning damages (Cypress Br. at 16), none of which are supported by competent, record evidence. First, Cypress claims a "constant lack of capital which eventually forced the company to become insolvent." In support of that statement, Cypress relies upon an August 2019 Board meeting discussion (Stecklow Exh, 19, at 56.1 ¶ 146) concerning "potential structures to make a fundraising attractive to more potential shareholders" which has no bearing whatsoever on the issue of solvency. Cypress also cites Hall's November 26, 2019 statement that "efforts to raise capital for a fund were unsuccessful" (Pltfs.' Counter 56.1 ¶ 145), which is similarly irrelevant to SportBLX's solvency. Any capital raised by a fund is invested by, and must be managed by, that fund on behalf of its investors, who continue to own that capital, and is not operating capital for a business.

Cypress then cites to allegedly "excessive" rent payments that were indisputably disclosed to Salerno before he invested (Undisputed Fact ¶ 44). Moreover, contrary to Cypress' assertion, the amount of rent does not become "excessive" simply because the party to whom it was paid was a related party. Cypress did not consider the rental amount to be "excessive" when the dollar amount was disclosed to Salerno prior to investing, nor does the amount of rent have anything to do with SportBLX's solvency. Accordingly, Cypress should not be permitted to use the amount of rent (which amounted to only $185,091 in total by June 30, 2020 (56.1 ¶ 20)) as an *ex post facto* basis to litigate this case to a fare thee well.

Cypress then cites "the $3,983,000 success fee to Clinton Group," which is actually two separate success fees: $1,348,385 for work on the PBGC, and $2,635,000 for work on the Orix

19

transaction.  (New Exh. 12-A)[3]  Cypress claims the PBGC settlement fee as "damages" despite admitting that "Negotiation of Settlement Agreements with PBGC on behalf of third parties had no relation to SportBLX, Inc.'s business plan or operations."  (Undisputed Fact ¶ 98.)  Similarly, Cypress claims the $2.635 million Orix fee as "damages" despite admitting that "[a]t no time did SportBLX, Inc.'s business plans or operations include . . . transactions such as the October 1, 2019 sale by Glassbridge to Orix." (Uncontroverted Fact 56.1 ¶ 103.)  Cypress purports to "dispute" that statement, but the Court can see that, in its 56.1 Counterstatement at ¶ 103, Cypress cites to Board meeting minutes which have no bearing whatsoever on that purported "dispute."

Cypress next argues that SportBLX "could have issued new shares for Glassbridge to purchase."  This argument is particularly egregious, speculative, lacks evidentiary support, and simply defies logic.  As the evidence indisputably shows, every member of the SportBLX Board, including the head of the Related Party transaction committee Cesar Baez and the other Independent Directors, wanted to do exactly that, and urged Salerno that it was the best course to follow, but Salerno refused to concur and blocked the way. (Sport-BLX 56.1 Response ¶ 147.) The remainder of Cypress' assertions regarding damages are similarly baseless and unsupported by citation to any evidence whatsoever.  Because Cypress cannot establish damages as a matter of law, all of its claims must be dismissed.

### D.    Cypress's Derivative Claims Fail.

Cypress argues that its derivative claims should survive, but each of its factual assertions is conclusively disproven by undisputed evidence.  (Cypress Br. at 21-23.)  First, Cypress

---

[3] Cypress cited no evidence for the $3,983,000 aggregate amount of the two success fees and omitted from its Exhibit 12, Glassbridge's 2020 10-K, the page on which the information is contained. SportBLX has submitted the relevant evidence in this Opposition to remedy that presumably unintentional oversight.

complains of "excessive rent," (*Id.*, at 21) but, as already discussed, the undisputed evidence establishes that Salerno was aware of the rent prior to investing.  Cypress then complains that SportBLX's sublease was "illegal" (*Id.*) but admits that Clinton Group's sublease expressly states that "no consent by the Landlord is required for the Tenant [Clinton Group] to sublet the space at 510 Madison Avenue to an Affiliate provided that the sublet does not result in a physical demise of separate space." (Undisputed Fact ¶ 111).

Cypress asserts that SportBLX sold its technology platform for $225,000 in cash (Cypress Br. at 22), but as shown above, Cypress intentionally omits that as part of the transaction, SportBLX repurchased $1.5 million of its debt for $126,000, so that the software sale yielded the company a net benefit of $1,599,000. (See 56.1 ¶ 81.)

Finally, Cypress asserts that an "Orix Transaction" in July 2020 involved the improper sale of a "partnership interest in The Sports & Entertainment Fund" to an entity owned by Hall for $1.00.  (Cypress Br. at 23.)  Cypress is both confused and intentionally misleading.  Confused, because "the Orix Transaction" on which Cypress' claims are supposedly based is a different transaction, which occurred in 2019, not 2020, and which, as Cypress alleges in its Amended Complaint, involved "a Sport-BLX investment by Orix in Glassbridge.  (Docket 78 at ¶¶ 62 and 63.)  Intentionally misleading because, as Cypress' own Exhibit 14 shows, The Sports & Entertainment Fund was a subsidiary of the entity sold to GEH Sport LLC, and prior to the sale that entity assumed $13,000,000 in debt and divested itself of "all of [its] assets, except for its general partnership interest in the The Sports & Entertainment Fund, L.P., a related commodities pool operator registration, and $1,790,000 in cash."  (Dudelson Exh. 13 at p. 17 of 19; Dudelson Exh. 14 at p. 17 of 19.)  Thus, for $1.00, GEH Sport LLC purchased the partnership interest and a balance sheet $11,210,000 in the red.  As with its other arguments addressed above, Cypress'

arguments on its derivative claims are frivolous and misleading, and its factual assertions knowingly false.

## CONCLUSION

As shown above, there is no evidence to support any of Cypress' claims. Those claims, as well as its defenses against Defendants' claims, are based on factually false and unsupported assertions, many of which are conclusively disproven by Cypress' own evidence. Cypress does not support its purported "disputes" of facts with controverting evidence and thus it has not met its burden in opposition to Defendants' motion or its burden on its own motion seeking dismissal of SportBLX claims.   The Court should not be distracted by Cypress' distraction and obfuscation and instead focus on the undisputed facts, all of which support a complete dismissal of all of Cypress' manufactured claims.   For this reason, and the reasons set forth above and in Defendants' Opening Brief, Defendants respectfully request that the Court enter an Order granting their motion, and denying Cypress' motion, in their entireties.

Date:   January 24, 2025
        New York, New York

                              Respectfully submitted,

                              WYLIE STECKLOW PLLC

                              By: /s/ Wylie Stecklow_____
                              Wylie Stecklow, Esq.
                              Jon Avins, Esq.
                              Carnegie Hall Tower
                              152 W. 57th Street, 8th Floor
                              New York, NY 10019
                              (212) 566-8000
                              ECF@WylieLAW.com