UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

CYPRESS HOLDINGS, III, L.P.,                    Civil Action No. 1:22-cv-1243-LGS

                        Plaintiff,

            v.

GEORGE HALL and SPORT-BLX, INC.,

                        Defendants.

------------------------------------------------------------x

<u>MEMORANDUM OF LAW</u>

TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ........................................................................... 1

II.   RELEVANT FACTUAL BACKGROUND ....................................................... 3

      A. The Board Seat Agreement ....................................................................... 3

      B. The Tag-Along Provisions ........................................................................ 4

      C. Cypress Blocks Sport-BLX's Revenue Earning Prospects ........................... 4

      D. Sport-BLX's Value Declines ..................................................................... 5

      E. The December 12, 2019 Sale of Shares to GlassBridge ............................... 6

      F. The December 23, 2019 Sport-BLX Board Election ..................................... 6

      G. The Court's Pretrial Rulings ..................................................................... 7

      H. Cypress' Damages Evidence ..................................................................... 8

III.  THE COURT SHOULD REMIT DAMAGES OR ORDER A NEW TRIAL ON THE
      IMPLIED COVENANT CLAIM BECAUSE OF IMPROPER AND INSUFFICIENT
      EVIDENCE SUPPORTING THE DAMAGES AWARD ............................... 10

      A. The Damages Award is Based on a Breach of Tag-Along Rights ............... 11

      B. There Was No Evidence From Which The Jury Could Award Damages for Loss of the
      Board Seat .............................................................................................. 13

      C. Remittitur to Nominal Damages or a New Trial on Liability is Required ........... 16

      D. The Court Should Not Permit a Windfall to Cypress ................................ 18

IV.   THE COURT SHOULD ORDER A NEW TRIAL BECAUSE CYPRESS FAILED TO
      PROVE HALL WOULD HAVE AGREED TO SHARE-SALE RESTRICTIONS AND
      SALERNO NEVER NEGOTIATED THEM .................................................. 19

      A. Hall Would Not Have Agreed to Restrict His Ability to Transfer Shares ........... 20

      B. The Parties Considered and Implemented Share-Sale Restrictions and Salerno Failed to
      Negotiate Board Seat Protection .............................................................. 23

      C. The Liability Verdict is Tainted by Salerno's Mischaracterization of the Tag-Along
      Rights .................................................................................................... 26

V.    THE COURT SHOULD ORDER A NEW DAMAGES TRIAL ON THE FIDUCIARY
      DUTY CLAIM...........................................................................................................27

TABLE OF AUTHORITIES

*Ajax Hardware Mfg. Corp. v. Industrial Plants Corp.*
569 F.2d 181 (2d Cir. 1977)................................................................................31

*Akermanis v. Sea-Land Serv., Inc.*
688 F.2d 898 (2d Cir. 1982)................................................................................27

*Allen v. El Paso Pipeline GP Co., L.L.C.*
113 A.3d 167 (Del. Ch. 2014)..............................................................................27

*Allied Capital Corp. v. GC-Sun Hldgs., L.P.*
910 A.2d 1020 (Del. Ch. 2006) ...........................................................................29

*Anderson Grp., LLC v. City of Saratoga Springs*
805 F.3d 34 (2d Cir. 2015)..................................................................................12

*ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*
50 A.3d 434 (Del. Ch. 2012)...............................................................................25

*Baker v. Dorfman*
1999 WL 191531 (S.D.N.Y. Apr. 6, 1999) .........................................................15

*Balooshi v. GVP Global Corp.*
2022 WL 576819 (Del. Sup. Feb. 25, 2022)........................................................27

*Boyce v. Soundview Technology Group*
464 F.3d 376 (2d Cir. 2006)..........................................................................20, 23

*Broome v. Biondi*
17 F. Supp. 2d 211 (S.D.N.Y. 1997).................................................................20

*Caskey v. Village of Wayland*
375 F.2d 1004 (2d Cir. 1967)..............................................................................31

*Corporate Prop. Assocs. 14 Inc. v. CHR Holding Corp.*
2008 WL 963048 (Del. Ch. Apr. 10, 2008).........................................................28

*DeFalco v. Bernas*
244 F.3d 286 (2d Cir. 2001)................................................................................15

*Dunlap v. State Farm Fire & Cas. Co.*
878 A.2d 434 (Del. 2005) ...................................................................................30

*eCommerce Indus. v. MWA Intelligence, Inc.*
2013 WL 5621678 (Del. Ch. Sept. 30, 2013).......................................................27

*Exodus Partners, LLC v. Cooke*
04-cv-10239 (GEL), 2007 WL 120053 (S.D.N.Y. Jan. 17, 2007)............................19, 20, 22, 23

*Fox v. CDX Holdings, Inc*.
CV-8031, 2015 WL 4571398 (Del. Ch. July 28, 2015).......................................................... 16

*Gasoline Products Co. v. Champlin Refining Co*.
283 U.S. 494 (1931) ............................................................................................................. 31

*Givaudan SA v. Conagen, Inc*.
128 F.4th 485 (2d Cir. 2025)................................................................................................. 16

*Glaxo Group Limited v. DRIT LP*
248 A.3d 911 (Del. 2021)…………………………………………………………………………26, 27

*ING Global v. United Parcel Serv. Oasis Supply Corp*.
757 F.3d 92 (2d Cir. 2014).............................................................................................. 11, 23

*Johnson & Johnson Fortis Advisors LLC*
2026 WL 89452 (Del. Jan. 12, 2026)..................................................................................... 28

*Kirsch v. Fleet Street, Ltd*.
148 F.3d 149 (2d Cir. 1998)................................................................................................... 11

*Kronenberg v. Katz*
872 A.2d 568 (Del. Ch. 2004)................................................................................................ 18

*Levitant v. City of New York Human Resources Admin*.
914 F. Supp. 2d 281 (E.D.N.Y. 2012).................................................................................... 15

*Liberty Prop. Ltd. P'ship v. 25 Mass. Ave. Prop*.
2009 WL 224904 (Del. Ch. Jan. 22, 2009)............................................................................ 27

*MacQuesten General Contracting, Inc. v. HCE, Inc*.
296 F. Supp. 2d 437, 447 (S.D.N.Y. 2003) ........................................................................... 15

*Manley v. AmBase Corp*.
337 F.3d 237, 245 (2d Cir. 2003) .......................................................................................... 23

*McLaren v. Smash Franchise P'rs, LLC*
319 A.3d 909 (Del. 2024)...................................................................................................... 16

*Olaechea v. City of New York*
2022 U.S. Dist. LEXIS 142037 (S.D.N.Y. Aug. 9, 2022)....................................................... 12

iv

*OptimisCorp v. Waite*
2015 WL 5147038 (Del. Ch. Aug. 26, 2015) ......................................................... 30

*Oscar Gruss & Son Inc. v. Hollander*
337 F.3d 186 (2d Cir. 2003) ................................................................................... 20

*Peterson v. County of Nassau*
995 F. Supp. 305 (E.D.N.Y. 1998) ......................................................................... 31

*Ryan v. Tad's Enters, Inc.*
709 A.2d 682 (Del. Ch. 1996) ................................................................................ 18

*Saber v. New York State Department of Financial Services*
15-cv-5944 (LGS), 2018 WL 3491695 (S.D.N.Y. July 20, 2018) ........................... 11

*Shareholder Representative Services LLC v. Alexion Pharmaceuticals, Inc.*
341 A.3d 513 (Del. Ch. 2025) ................................................................................ 21

*Smash Franchise P'rs, LLC v. Kanda Hldgs., Inc.*
2023 WL 4560984 (Del. Ch. July 14, 2023) .......................................................... 15

*Smith v. NBC Universal*
524 F. Supp. 2d 315 (S.D.N.Y. 2007) ............................................................. 12, 21

*Stampf v. Long Island R.R. Co.*
761 F.3d 192 (2d Cir. 2014) ................................................................................... 11

*Torres v. Metro-North R.R.Co.*
2023 U.S. Dist. LEXIS 119745 (S.D.N.Y. July 12, 2023) ....................................... 20

*Trademark Research Corp. v. Maxwell Online, Inc.*
995 F.2d 326 (2d Cir. 1993) ................................................................................... 11

## I.    PRELIMINARY STATEMENT

The sole Cypress claim that survived for trial was narrow: that Defendants breached the implied covenant of good faith and fair dealing by selling Sport-BLX stock to eliminate Cypress' board seat. But, Cypress had an obvious problem—how does one prove monetary damage from the loss of an unpaid board seat that provided but one vote out of seven? To receive more than nominal damages, Cypress needed to prove that losing the seat caused "consequential injury to its investment"—that is, a quantifiable decline in the value of Sport-BLX and, therefore, in the value of Cypress' Sport-BLX shares, attributable to the removal of its representative, Michael Salerno, from the board of directors. This Court made clear that any claim relating to tag-along rights under the Stock Purchase Agreements was off limits: Cypress could not argue that those rights were triggered or breached when George Hall sold his shares to GlassBridge, nor could it seek damages flowing from them.

Despite the constraints placed by the Court, Cypress advanced a claim at trial that conflated the tag-along rights with Salerno's board seat, arguing that it was harmed by its inability to tag along with Hall's sale to GlassBridge. Counsel asked witnesses time and again about the tag-along rights, whether Salerno was offered the opportunity to participate, why other shareholders were not informed about the sale to GlassBridge, and how much Hall made from the sale of his shares. Salerno testified that that Hall's sale of his shares to GlassBridge "circumvented" his tag-along rights, which he asserted were "part and parcel" of his board seat. In closing, counsel characterized Hall's sale of shares to GlassBridge as "self-dealing" and that Hall had "promise[d] tag-along rights" to Salerno but then "secretly" sold his shares to GlassBridge without "offer[ing] Cypress or other shareholders" the opportunity to participate. (*See* Motion Exhibits ("Mot. Exs.") B and D, Excerpts from Cypress' Summation Slide Deck).

The implication was unmistakable: Salerno should have participated in that sale under his tag-along rights, and he was harmed because he did not have the opportunity to do so. This led to juror confusion and a damages award based on a faulty calculation of Salerno's tag-along rights rather than any diminution in the value of the company due to Salerno's removal from the board. The $644,080 award seemingly corresponds to Salerno's 7,760 shares multiplied by the amount the jury believed Hall to have received from the GlassBridge transaction—$83 per share, as explained below. This figure represents what the jury incorrectly calculated Hall's total payment from GlassBridge to be plus interest payments. The figure does not take into account the initial payment to Hall, but there is no other explanation for it and it does not correspond to any diminution-in-value theory.

Even if the jury had wanted to award damages based on loss of the board seat rather than tag-along rights, Cypress offered no proof of whether, and to what extent, a decline in the company's value (and therefore a decline in Cypress' investment) was attributable to Salerno's removal from the board. There was no testimony about specific steps Salerno would have proposed had he remained on the board to prevent a decline in the company's value, or that the other directors would have agreed with him. To the contrary, Salerno's own testimony established that as one director among seven, he lacked any authority to singlehandedly prevent the company from taking action. Any award based on the assumption that Salerno would have prevented a diminution in the company's value had he remained on the board would be based on pure speculation that is insufficient to establish the loss causation required by law. Moreover, the evidence presented at trial established a number of potential reasons for the company's diminution in value—including Salerno's refusal to disclose the information needed for Sport-BLX's FINRA application. Cypress made no effort to establish that it was Salerno's removal from the board—and not these other

factors—that led to the decline in the company's value, or to at least apportion causation among the various factors.

Contract damages must flow from the breach actually proven. Here, however, the damages bear no relationship to the implied covenant claim for the lost board seat that the jury was asked to decide. Instead, the verdict rests on one of two untenable foundations: impermissible reliance on the tag-along rights theory—which should never have informed the liability determination—or a complete absence of evidentiary support. Either defect independently warrants a new trial.

The jury's separate award of damages to Sport-BLX suffers from the same fundamental infirmity. Because the award amount is likewise unsupported by the evidence, a new trial is warranted on that claim as well.

## II.    RELEVANT FACTUAL BACKGROUND[1]

In late 2018, George Hall and Joseph DePerio founded Sport-BLX, Inc—a company that would allow ordinary investors to buy fractional ownership stakes in sports-related assets. (Tr. 234:10-20.) While raising capital, they met Michael Salerno, who eventually invested $1 million in Sport-BLX through Cypress Holdings III, L.P. (Tr. 240:5-13.) In the weeks leading up to the closing, Salerno and Sport-BLX exchanged multiple drafts of the investment documents and negotiated terms. (Exs. 14-36.) The final deal, signed on February 28, 2019, consisted of two Stock Purchase Agreements ("SPAs") and a Side Letter Agreement ("Side Letter"). (Exs. 34-36.)

### A.    The Board Seat Agreement

Pursuant to the Side Letter, each Founder agreed to vote all shares of Sport-BLX stock that he owned or over which he had voting control in favor of electing Salerno to the board, so long as

---

[1] Because the Court presided over the trial and heard the evidence firsthand, this motion does not undertake a comprehensive recitation of all the evidence presented. Rather, it highlights those portions of the record most relevant to the relief sought.

Cypress owned at least 2.5% of the company. (Ex. 36.) Salerno asked for Hall and DePerio to vote for him if he owned less, but they said no. (Ex. 24 at 5.) The Side Letter did not restrict the ability of Hall or DePerio to sell their shares. (Ex. 36.) Cypress presented no evidence that Hall or DePerio would have agreed to such a restriction, and DePerio testified they would have rejected terms to that effect outright. (Tr. 396:14-25.) Salerno himself admitted he never sought such a restriction. (Tr. 160:6-24.) The Side Letter also did not guarantee Salerno a permanent board seat, nor did it require that Hall and DePerio only sell their shares to parties who would vote for him. (Tr. 396:14-25; 397:1-3.)

B.  The Tag-Along Provisions

The Stock Purchase Agreements included a "tag-along right" which allowed Salerno to sell a portion of his shares alongside Hall and DePerio if they ever sold more than 50% of the outstanding Sport-BLX shares to a third party. (*See* Ex. 35 at ¶ H.) The trigger was specific: only a sale exceeding 50% of Sport-BLX's aggregate shares would activate the right. (*Id.*) A sale of less than half—no matter how large—would not. (*Id.*) Notably, Salerno's attorney proposed the tag-along right, which was presented to Sport-BLX on February 19, 2019 as an SPA term. (Ex. 19.) Salerno had requested a board seat in January 2019—well before his attorney suggested he request tag-along rights—and the two are unrelated. (*Id.*) Separately, at the November 26, 2019 Sport-BLX board meeting, Hall stated that if he sold his personal shares, he would offer tag-along rights to all other shareholders, albeit under specific circumstances. (Tr. 71:3-6, 331:9-13.) Hall's offhand comment about tag-along rights did not create any legally enforceable right or change the terms of the SPAs. (ECF 300 at 4.)

C.  Cypress Blocks Sport-BLX's Revenue Earning Prospects.

Sport-BLX's business model depended on earning commissions from issuing and trading securities. (Tr. 235:19-25; 236:1.) To operate lawfully under this model, Sport-BLX needed to be

4

registered as a broker-dealer through FINRA. (Tr. 236:22-25.) After Sport-BLX submitted its application, FINRA posed additional questions as part of its review. (Tr. 244:15-18, 245:1-3.) Sport-BLX was asked by FINRA to identify and confirm that it had conducted diligence on all of its beneficial owners. (Exs. 39, 40.) In response, Hall and DePerio contacted Salerno to verify that he was Cypress' sole owner—as he had represented at the time of his investment. (Ex. 41-44.) Salerno refused to respond to their inquiries, citing concerns about disclosing his estate plan and revealing information about his children's trusts. (Tr. 250:5-16; Ex. 87.)

Hall and DePerio warned Salerno explicitly: without disclosure, Sport-BLX would have to withdraw its application. (Tr. 253:11-19.) Company counsel, William Mack, echoed this warning, and told Salerno the application was "dead in the water" if Sport-BLX did not know all of its owners—which included knowing all of Cypress' owners. (Ex. 89.) Salerno was informed that without broker-dealer registration, Sport-BLX could not earn commission-based revenue. (Ex. 88.) Salerno refused anyway, and Sport-BLX was forced to withdraw its FINRA application. (*See id.*) Sport-BLX's founders later discovered that Cypress was not owned by Salerno alone, but by numerous other individuals—including a convicted felon. (Tr. 119:9-21.) The jury found Salerno and Cypress liable for breach of fiduciary duty for this conduct.

### D. Sport-BLX's Value Declines.

Salerno's refusal forced Sport-BLX to withdraw its broker-dealer application on October 18, 2019, causing significant financial harm to the company. (Tr. 255:11-20.) While still in pursuit of its original business plan—which relied on getting the broker-dealer license—the company's valuation had nearly tripled—from approximately $9.5 million in January 2019 to $35 million by July 2019. (Ex. C; Tr. 507:1-5.) But after the application was withdrawn, the value of the company plummeted. Sport-BLX presented testimony from expert Gene Phillips to quantify the company's financial damages. Phillips determined that Sport-BLX's pre-application withdrawal value was

approximately $35.5 million, based on its last capital raise. (Tr. 492:3-7; 493:18-25; 494:1-5.) By December 2019, the company was worth no more than $6.8 million—a figure derived from Sport-BLX's willingness to sell shares at $50 per share but inability to find buyers at that price. (Tr. 498:1-25; 499:1-19.) Phillips concluded that Sport-BLX sustained approximately $29 million in damages. (Tr. 505:1-2.)

### E.    The December 12, 2019 Sale of Shares to GlassBridge

On December 12, 2019, Hall and DePerio collectively sold 55,000 of their Sport-BLX shares to GlassBridge Enterprises, Inc. ("GlassBridge"). (Exs. E, F.) Hall sold 37,924 shares and DePerio sold 17,076 shares at a stated price of $355 per share. (*Id*.) GlassBridge paid roughly 10% in cash and 90% in unsecured promissory notes. (Tr. 185:6-23.) The evidence established that GlassBridge could not pay $355 per share in cash and it never did. (Tr. 186:2-9.) Salerno claimed that Hall and DePerio sold their shares to GlassBridge in order to circumvent their agreement to elect him to the board. But, Hall and DePerio did not breach any written terms of the Side Letter and the sale was motivated by legitimate business reasons, not bad faith. The evidence established that both GlassBridge and Sport-BLX benefited from the deal. (*See, e.g.*, Tr. 215:8-22; 263:10-18; 270:1-19; 412:1-25.)

### F.    The December 23, 2019 Sport-BLX Board Election

On December 23, 2019, Sport-BLX held its annual shareholder meeting to elect the 2020 board of directors. (Tr. 258:8-24.) Hall and DePerio voted their shares in favor of Salerno, consistent with their obligation under the Side Letter to do so. (*Id*.) GlassBridge, however, proposed an alternative director in lieu of Salerno and voted for that individual. (Tr. 259:5-14.) After all, Salerno's refusal to disclose Cypress' owners had torpedoed Sport-BLX's revenue prospects. (Tr. 439:1-10.) GlassBridge was also aware of Salerno's obstructionist behavior on the Sport-BLX board, such as refusing to approve minutes without explanation and voting against

existing directors standing for election—including the GlassBridge representative. (*See, e.g.*, Tr. 274:14-25; 275:1-2; 406:10-16.) Ultimately, Salerno did not receive enough votes to remain on the board. (Tr. 259:12-14.)

G.  The Court's Pretrial Rulings

To prevail on its implied covenant claim, Cypress had to prove: 1) a specific implied contractual obligation; 2) breach of that obligation; and 3) resulting damages. (Tr. 589:13-23.) Cypress alleged the Side Letter contained an implied promise that Hall and DePerio would always vote their 100,000 shares in favor of Salerno, thus guaranteeing him a place on the Sport-BLX board of directors. (Tr. 54:11-24.) Although Salerno's board seat was unpaid, the Court allowed Cypress to prove damages through "consequential injury to its investment"—that is—the value of Cypress' Sport-BLX stock before Salerno was removed from the board, less any remaining value of the stock at the time of trial. (ECF 300 at 5-6.)

There were no claims at trial related to a breach of tag-along rights. Sport-BLX moved *in limine* to preclude Cypress from arguing that: 1) the SPAs provided it with any guarantees regarding the board seat or entitled it to damages; 2) tag-along rights were triggered by the GlassBridge sale; or 3) Cypress was entitled to damages under SPA provisions or tag-along rights. (*See* Sport-BLX Motion *in Limine* 3, ECF 264.) The Court agreed, ruling that "the SPAs are not a basis for liability on Cypress's claim for the breach of the covenant of good faith and fair dealing implicit in the Side Agreement" and "Cypress may not argue that the Sport-BLX parties are liable because tag-along rights (or any SPA provision) were triggered or breached." (ECF 300 at 5-6.) The Court denied Sport-BLX's motion to exclude Hall's offhand comment at the November 2019 Board Meeting—that he would grant tag-along rights if he sold his personal shares—but limited its evidentiary use. (ECF 300 at 4-5.) Specifically, the Court found that the statement may only be used to establish intent and knowledge, not as the basis for a separate contract claim. (*Id.*) The

Court was clear that Cypress may not argue that Hall's statement created enforceable tag-along rights or independently supported liability. (*Id*.) Indeed, had Cypress tagged along, Salerno would have had even fewer votes in his favor and still lost the board seat. As a result of the Court's ruling, Cypress was precluded from arguing that it was entitled to sell at $355 per share under tag-along rights or that the Sport-BLX is liable because tag-along rights were triggered or violated. (*Id*. at 5.)

### H.  Cypress' Damages Evidence

At trial, Salerno speculated that his removal from the Sport-BLX board of directors caused consequential harm to the company's value and, by extension, to the value of his shares held through Cypress. He claimed that his presence on the board was "critical to the value of [Sport-BLX]" because he was an independent director, (Tr. 107:1-13), but offered no evidence as to the specific decisions his independent voice would have been able to influence had he remained as a director, or how to calculate the extent to which those unspecified decisions would have improved Sport-BLX's value.

Salerno claimed that had he remained on the board, he would have opposed the sale of Sport-BLX's technology platform by "[fighting] very hard against [it]," but offered no evidence supporting that the sale of the technology platform harmed the company and, if so, by how much. (*See id*.) Salerno's testimony was also at odds with this Court's prior finding that there was no evidence from which to conclude that the sale of the technology harmed the company. (ECF 252 at 32.) Putting aside the vague nature of Salerno's claim, there was also no evidence presented that Salerno—as a single director holding only a single seat—would have been able to influence the remaining six directors and change the course of the board's decision-making with regard to the sale of the technology platform or anything else.

Properly measured, damages should have focused on the difference between Sport-BLX's value at the time of the alleged breach and its current value, and how Salerno's removal from the board was responsible for that difference. Cypress failed to present evidence to support that theory and, instead, conflated the loss of the board seat with Salerno's tag-along rights. In pursuing this theory, Cypress exceeded the bounds of what this Court deemed admissible. The Court permitted evidence about the SPAs and tag-along threshold only insofar as it related to "the Sport-BLX Parties' intent in structuring the GlassBridge sale." (ECF 300 at 4.) And it permitted reference to the GlassBridge transaction price only "as a contemporaneous valuation data point" because it "bears on consequential damages tied to the board-seat loss rather than on a tag-along breach theory." (*Id.*) Cypress went far beyond these limitations. Rather than confining its evidence to the purpose and intent behind the sale, Cypress made the transaction itself—and particularly what Hall and DePerio received for their shares—a focal point of trial.

Throughout the proceedings, Cypress' counsel elicited extensive testimony about the tag-along rights and whether they should have been triggered to allow Cypress to participate in the sale of shares to GlassBridge. Salerno claimed that tag-along rights were "part and parcel" with the board seat promise, and Cypress' counsel characterized the agreement as "provid[ing] tag-along rights to the seat of the board of directors…." (Tr. 55:4-5.) Salerno reiterated that tag-along rights guaranteed him a permanent board seat because, if Hall and DePerio sold their shares, he would be able to sell Cypress'. (Tr. 159:22-25; 160:1-14.) This improper focus on the GlassBridge transaction continued into summation, where counsel argued that Hall's sale of shares to GlassBridge was "self-dealing" and that Hall had "promise[d] tag-along rights" to Salerno but then "secretly" sold his shares to GlassBridge without "offer[ing] Cypress or other shareholders" the opportunity to participate. (*See* Mot. Ex. D, Excerpt from Cypress' Summation Slide Deck).

### III.  THE COURT SHOULD REMIT DAMAGES OR ORDER A NEW TRIAL ON THE IMPLIED COVENANT CLAIM BECAUSE OF IMPROPER AND INSUFFICIENT EVIDENCE SUPPORTING THE DAMAGES AWARD.

Rule 59(e) of the Federal Rules of Civil Procedure permits a district court "to alter or amend a judgment to correct a clear error of law or prevent manifest injustice." *Saber v. New York State Department of Financial Services*, 15-cv-5944 (LGS), 2018 WL 3491695, at *4 (S.D.N.Y. July 20, 2018) (quoting *ING Global v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 96 (2d Cir. 2014)). One remedy available under Rule 59 is remittitur – "the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 204 (2d Cir. 2014). Remittitur is appropriate "where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken…." *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998) (quoting *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 337 (2d Cir. 1993)).

The verdict here includes numerous identifiable errors. First, the jury appears to have calculated damages based on an alleged breach of "tag-along" rights, not any implied covenant in the Side Letter relating to the board seat. The award therefore rests on an improper theory and contravenes the Court's *in limine* ruling, which explicitly precluded tag-along rights from forming the basis of liability. (*See* ECF 300 at 4 ("Cypress may not argue that the Sport-BLX Parties are liable because tag-along rights (or any SPA provision) were triggered or breached.")). Next, even if the jury was attempting to assign damages based on loss of the board seat, the verdict still must be vacated because it is impermissibly speculative and unsupported by the evidence. *See Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 51-52 (2d Cir. 2015) (ordering remittitur due to "specific error" that the award was "impermissibly speculative"); *Olaechea v. City of New York*, 2022 U.S. Dist. LEXIS 142037, at *9 (S.D.N.Y. Aug. 9, 2022) (remitting award due to its speculative nature). Finally, by measuring Cypress' recovery against money Hall received—rather

than any loss Cypress actually sustained—the award hands Cypress an impermissible windfall. *See Smith v. NBC Universal*, 524 F. Supp. 2d 315, 331 (S.D.N.Y. 2007) (holding that a non-breaching party's damages should not be measured by the breaching party's profits, as doing so would create an "undeserved windfall"). The $644,080 damages award should be vacated in its entirety and a new trial on the implied covenant claim should be ordered.

A. <u>The Damages Award is Based on a Breach of Tag-Along Rights.</u>

Throughout trial, Plaintiff conflated the tag-along rights and implied covenant claim, resulting in the jury's erroneous award. Salerno testified that "the tag-along rights were part and parcel with the board seat," and that Hall "made a promise that he broke" by failing to "give tag-along rights to all the shareholders." (Tr. 54:11-24; 71:3-6.) Salerno, over objection, also asserted that Hall and DePerio "circumvented the tag-along rights that would have allowed" Cypress to sell its shares at $355 per share in the GlassBridge transaction, and that Hall "reap[ed] the benefit of the $355 per share valuation" while Cypress could not.[2] (Tr. 72:6-25; 73:1-4.) Then, during summation, Plaintiff's counsel argued that Salerno had "negotiated…tagalong rights" entitling him to "sell Cypress' stock at the same price" as the founders, and that Hall "promised" tag-along rights but "never offered Cypress or any other shareholders what he had promise[d]." (Tr. 596:11-14; 604:24-25; 605:1-2; 605:8-9.) Counsel further contended that Hall and DePerio engaged in "self-dealing" by selling their shares to GlassBridge, and that it was a "big lie" for Hall to tell the board he believed his shares were worth $50/share when he engaged in a "secret sale" to GlassBridge at a price of $355/share—again focusing on the alleged impropriety of the

---

[2] While Sport-BLX objected to certain testimony related to tag-along rights, it did not object to every mention because the Court permitted Cypress to use them for limited purposes, including to establish intent and knowledge. The discussion of Cypress' improper use of this evidence is offered to support Sport-BLX's argument that the jury was confused and ultimately awarded damages based on an impermissible theory.

GlassBridge transaction, the very claim the Court prohibited. (*See* Mot. Ex. A, Excerpt from Cypress' Summation Slide Deck.) The focus on tag-along rights and the argument that Hall had engaged in self-dealing, lying, or other nefarious conduct when he sold his shares to GlassBridge without allowing Cypress to do the same resulted in a very confusing presentation to the jury, which then appears to have calculated damages based on the theory that Salerno should have participated in the GlassBridge sale pursuant to his tag-along rights.

The damages award of $644,080 appears to derive from Cypress' tag-along theory, rather than any claim related to loss of the board seat. Hall testified that he received approximately $900,000 in interest on the demand note issued as part of the December 12, 2019 sale of his 37,924 Sport-BLX shares to GlassBridge. (Tr. 348:22-24.) Notably, during deliberations, the jury specifically requested and was provided the testimony supporting this figure. (*See* Court Ex. 15A (jury question)). The jury also heard testimony that Hall obtained $2.3 million from GlassBridge in satisfaction of the note. (Tr. 349:3-5.) Finally, the jury heard testimony and argument that Hall repurchased the shares from GlassBridge for approximately $2 per share and was reminded of this during closing argument. (Tr. 353:1-7; Mot. Ex. C, Excerpt from Cypress' Summation Slide Deck.) When applied to Hall's shares, these figures yield a price per share of approximately $83. Salerno's 7,760 Sport-BLX shares at $83 per share yield $644,080—precisely the amount the jury awarded Cypress.

| Amount | Money Received or Paid by Hall |
|---|---|
| $900,000 | Amount Hall received in interest on the promissory note from the GlassBridge sale. |
| $2.3 million | Amount Hall received from GlassBridge in the subsequent debt buyback. |

| Amount | Money Received or Paid by Hall |
|---|---|
| $3.2 million (the $900,000 + $2.3 million above) / the 37,924 shares owned by Hall = $84.38/share. | |
| ($2/share) | Amount Hall paid to purchase his shares back from GlassBridge. |
| = $83/share: Approximate Net Amount Hall received | |
| $83 (Net Amount Hall received) x 7,760 (number of shares owned by Salerno) = $644,080 | |

The verdict cannot stand because the award bears no relationship to the implied covenant claim, but is seemingly based, instead, on a faulty calculation of the separate tag-along theory. *See MacQuesten General Contracting, Inc. v. HCE, Inc.*, 296 F. Supp. 2d 437, 447 (S.D.N.Y. 2003) (finding no evidentiary basis for the jury's verdict and granting a new trial where the jury awarded damages in an amount unrelated to the claim before it); *Levitant v. City of New York Human Resources Admin.*, 914 F. Supp. 2d 281, 308 n. 18 (E.D.N.Y. 2012) (ordering new trial where plaintiff argued for damages related to a separate claim not in the lawsuit and the "complete lack of evidence" regarding damages for the claim before it); *Baker v. Dorfman*, 1999 WL 191531, at *9 (S.D.N.Y. Apr. 6, 1999) (scrutinizing whether damages calculation relied on evidence irrelevant to liability). It must therefore be vacated in its entirety.

B. <u>There Was No Evidence From Which The Jury Could Award Damages for Loss of the Board Seat.</u>

Even if the jury had been trying to award damages based on the implied covenant claim, the evidence presented at trial was insufficient to support a damages award based on loss of the board seat. To establish that Cypress sustained consequential injury to its investment because the value of Sport-BLX declined after Salerno was removed from the board, Cypress was required to

show that the alleged breach (his removal from the board) was the "but-for cause" of the loss in value to its investment. *DeFalco v. Bernas*, 244 F.3d 286, 304 (2d Cir. 2001) (vacating damages award that "simply has no relation to reality" where there was "insufficient credible evidence" of damages flowing directly from the predicate acts); *Smash Franchise P'rs, LLC v. Kanda Hldgs., Inc.*, 2023 WL 4560984, at *22 (Del. Ch. July 14, 2023), aff'd sub nom. *McLaren v. Smash Franchise P'rs, LLC*, 319 A.3d 909 (Del. 2024); *Givaudan SA v. Conagen, Inc.*, 128 F.4th 485, 497 (2d Cir. 2025) (quoting *Fox v. CDX Holdings, Inc.*, No. CV-8031, 2015 WL 4571398, at *35 (Del. Ch. July 28, 2015)) (to establish the damages element of a breach-of-contract claim, a plaintiff must prove "both the existence of damages provable to a reasonable certainty, and that the damages flowed from the defendant's violation of the contract."). Cypress presented only speculation, and no actual evidence, to support this causal link.

Cypress asserted that Salerno would have preserved Sport-BLX's value based on his purported independence and his opposition to Sport-BLX's sale of its technology. (Tr. 107:1-13.) Salerno, however, did not explain how he—as a single director out of seven—would have influenced the decision-making of the board. In fact, his own testimony undermines this wishful thinking: Salerno testified that during the time he was on the board, he alone could not determine Sport-BLX's strategic direction. (Tr. 165:3-20.) He also conceded that whether he even "had a voice" as "one vote out of seven" was "debatable"—an admission underscoring his lack of influence over the board's decision-making. (Tr. 165:21-24.)

As to the sale of the technology platform, there is no support in the record that it harmed Sport-BLX or contributed to any loss. Indeed, this Court granted summary judgment to Sport-BLX and Hall on Cypress' earlier claims related to the sale, finding that Cypress "pointed to no evidence showing that the purchase price was unjust or unfair." (ECF 252 at 32-33.) At trial, Salerno

14

admitted he had no firsthand knowledge of the sale or its rationale; he learned about it only by reviewing GlassBridge's Form 10-K after the fact. (Tr. 101:18-25; 102:1-5.)[3] Even if the technology sale did somehow negatively impact the company, Salerno again did not explain how he—as one board member out of seven—could have prevented it. Nor did Cypress present evidence quantifying the resultant monetary loss. Cypress utterly failed to demonstrate that any harm to Sport-BLX was related to Salerno's removal, offering only a chain of conjecture requiring the jury to stack assumption upon assumption—if Salerno had remained on the board, he would have, in some undescribed way, alone caused Sport-BLX to take some unspecified act that would have impacted Sport-BLX's value in some unspecified amount.

The problems run deeper still. Cypress' chain of hypotheticals also failed to account for other causes of harm to Sport-BLX's value. Salerno's damages theory never explained how the jury, in assessing damages based on his removal from the board (of which there were none), should account for the separate categories of harm to Sport-BLX's value unrelated to his removal from the board, including 1) Sport-BLX's loss of broker-dealer potential; and 2) external factors, such as COVID-19.[4] Sport-BLX's business plan depended on earning revenue from issuing and trading securities, which required registration as a broker-dealer. (*See* Tr. 463-465 (testimony of W. Mack, outlining relevant regulations).) Without that registration, Sport-BLX could not lawfully earn commissions on trades, (Tr. 464:13-14), nor could it license its technology to a third-party broker-dealer and share in commissions (Tr. 466:19-24). Salerno's refusal to disclose Cypress' beneficial owners left Sport-BLX unable to respond to FINRA's request, forcing it to withdraw its

---

[3] And, Salerno was only permitted to offer lay opinion testimony about Cypress' value to the extent it was based on his personal knowledge.

[4] Sport-BLX's damages evidence did not suffer from this same defect, as Gene Phillips provided an opinion on damages Sport-BLX suffered as of December 2019.

application. (Tr. 473:19-25, 474:1-8 (Mack explaining that Sport-BLX's application was "not successful because they were unable to provide FINRA with . . . [t]he ownership of Cypress Holdings.")) Moreover, Cypress itself presented evidence of other reasons for the company's decline in value after 2019, including the COVID-19 pandemic. It elicited testimony from GlassBridge CEO Daniel Strauss that the goodwill attributed to Sport-BLX decreased by approximately $42.3 million between 2019 and 2020 because of factors including "the outbreak of COVID-19 and its impact on sports globally, the performance of the business, and its capital position." (Tr. 211:1-15.)

But Cypress did not present any additional testimony or evidence explaining the extent to which the withdrawal of the FINRA application, COVID, or any other factor, contributed to Sport-BLX's decline in value, or how much of that decline was attributable to these alternative causes as opposed to Salerno's removal from the board. Thus, even setting aside the complete absence of causation evidence, Cypress failed to prove damages "with a reasonable degree of precision." *Kronenberg v. Katz*, 872 A.2d 568, 606 & n. 77 (Del. Ch. 2004) (internal citations omitted); *Ryan v. Tad's Enters, Inc.*, 709 A.2d 682, 689 (Del. Ch. 1996) (recognizing that "the law does not…promote speculative damages at the [defendant's] expense").

C. Remittitur to Nominal Damages or a New Trial on Cypress' Claim is Required.

The jury's $644,080 award must be remitted in its entirety because the figures on which Cypress relied lack any evidentiary foundation. *Exodus Partners, LLC v. Cooke,* 04-cv-10239 (GEL), 2007 WL 120053, at *13 (S.D.N.Y. Jan. 17, 2007), is instructive. There, the Cooke defendants claimed damages from three sources: $90,000 in contract damages flowing from improper withdrawals supported by records, $106,666.67 for a separate contractual breach, and a $500,000 tax liability. *Id*. The jury awarded $330,000 in damages to Cooke. Judge Lynch upheld

16

$90,000 of the award because specific evidence showed that the Exodus Partners plaintiffs had improperly withdrawn that precise amount, but the remaining $240,000 posed a problem because the only possible source was the claimed $500,000 tax liability. *Id*. at 14. Yet, the jury awarded neither zero nor $500,000—the only two amounts the evidence supported. Because the jury's award lacked evidentiary support, Judge Lynch concluded that it had "engage[d] in pure guesswork as to what defendants' damages truly were." *Id*. In so finding, Judge Lynch emphasized that because nothing in the record provided a "stable foundation" for any amount between zero and $500,000, the award must be remitted to zero. *Id*. at *15. Among the defects cited was that defendants had "provide[d] no expert testimony or other evidence to provide a rational method of calculating a limited reduction" from the $500,000 figure, leaving the jury to "arbitrarily pick[] a number between zero and $500,000." *Id*. Because the basis for the award was unknown, Judge Lynch concluded that "the only plausible explanation for the reduction would be that they settled on a reduced amount by means of an illegitimate compromise verdict." *Id*. Judge Lynch ultimately ordered that the defendants could either accept remittitur or plaintiffs were entitled to a new trial on the claim. *Id*. at *17 (holding that any retrial would include the issue of Exodus's liability because the basis for the award was unknown).

The evidentiary gap here is even more pronounced. Plaintiff presented no evidence of the actual financial loss to Cypress and offered no reliable means of calculating damages. It only offered Salerno's conjecture that the company's value collapsed from $50 million to nothing after Salerno was removed from the board—testimony rife with the infirmities described above. Moreover, had the jury credited Salerno's testimony that the company went from being worth $50 million (equaling $355 per share) to zero, damages would have been $2,754,800—the value of his 7,760 shares at $355 per share minus their present day value of zero. The jury plainly rejected that

17

calculation when it awarded $644,080. Cypress introduced no expert testimony or other evidence to "provide a rational method of calculating a limited reduction in the claimed damages." *Exodus Partners, LLC*, 2007 WL 120053, at *15. If the damages award was not based on the impermissible tag-along theory, then the result could only have been exactly what the law prohibits: the jury would have been left to "arbitrarily pick[] a number between zero and [$2,754,800]." *See id*.

That defect warranted remittitur to zero or a new trial on the claim in *Exodus Partners, LLC*, and it warrants the same relief here. *See also Torres v. Metro-North R.R.*, 2023 U.S. Dist. LEXIS 119745, at *42-43 (S.D.N.Y. July 12, 2023) (granting remittitur where the jury's award of $250,000 in economic damages was not supported by the record, as any lost wages in excess of $78,100 was unduly speculative); *Broome v. Biondi*, 17 F. Supp. 2d 211 (S.D.N.Y. 1997) (granting motion for remittitur of compensatory damages where plaintiff failed to prove that she incurred actual damages in the amount awarded).

### D.  The Court Should Not Permit a Windfall to Cypress

Contract damages are intended to restore the plaintiff to the position it would have occupied but for the breach. *See Boyce v. Soundview Technology Group*, 464 F.3d 376, 391 (2d Cir. 2006) (the amount of damages must put the non-breaching party in as good a position as if the breach had not occurred). They are not meant to confer a windfall or elevate the non-breaching party beyond where it would have stood absent the breach. *See Shareholder Representative Services LLC v. Alexion Pharmaceuticals, Inc.*, 341 A.3d 513, 550 (Del. Ch. 2025) (recognizing policy against awarding windfalls). Nor are they meant to be measured against the defendant's profits, as opposed to plaintiff's losses. *See Smith*, 524 F. Supp. 2d at 331 (holding that a plaintiff's alleged damages have "no relationship whatsoever to defendants' profits," and "awarding the non-breaching party damages calculated by reference to the breaching party's profits could place the

non-breaching party in a better position that it would have been in had the breach not occurred," which "would constitute an undeserved windfall").

As explained above, the verdict is not supported by the evidence. If anything, it relates only to the tag-along rights theory that the Court precluded. The Court should not permit Cypress to retain the award where the jury appears to have determined Cypress' damages based on their calculation of the money Hall earned through the GlassBridge sale, rather than any losses Cypress actually suffered as a result of the board seat claim. The Court should order remittitur to nominal damages or order a new trial on Cypress' claim.

## IV.   THE COURT SHOULD ORDER A NEW TRIAL BECAUSE CYPRESS FAILED TO PROVE HALL WOULD HAVE AGREED TO SHARE-SALE RESTRICTIONS AND SALERNO NEVER NEGOTIATED THEM.

Rule 59(a) permits the court to grant a new trial on all or some issues in a case. *See* Fed. R. Civ. P. 59(a). A district court must order a new trial when it concludes 1) "the jury has reached a seriously erroneous result," or 2) "the verdict is a miscarriage of justice," i.e., it views "the jury's verdict as against the weight of the evidence." *Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003). A "new trial under Rule 59(a) may be granted even if there is substantial evidence supporting the jury's verdict," *id.* at 244, and the Court "may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner." *ING Global*, 757 F.3d at 99. The Court may also set aside a verdict under Rule 59(a) if it reflects juror confusion. *Manley*, 337 F.3d at 246.

The Court should order a new trial on Cypress' claim because the jury's verdict is against the weight of the evidence and reflects juror confusion.

The Court instructed the jury that the implied covenant "applies only if it is evident from the contract that the parties would have forbidden the conduct, had they considered it…." (Tr. 589:17-20.) The rationale is straightforward: the implied covenant enforces the reasonable

19

expectations of the parties at the time of contracting. It does not permit a dissatisfied party to impose terms he failed to negotiate. To invoke the implied covenant here, Salerno was required to demonstrate that it was "evident" that had Hall considered the possibility of selling his Sport-BLX shares, he would have agreed to restrict his ability to do so in order to protect Salerno's board seat. Salerno offered no such evidence, and the evidence presented actually leads to the opposite conclusion. The jury's verdict is, therefore, unsupported.

First, the evidence clearly established that Hall never would have restricted his ability to sell his own shares merely to protect Salerno's board seat. To the contrary, both Hall and DePerio made clear that circumstances existed under which they would not vote for Salerno. Second, the operative agreements demonstrate that the parties expressly considered and implemented certain share-sale restrictions, but rejected others. Having failed to secure specific protections for his board seat when he had the opportunity to request them, Salerno cannot now invoke the implied covenant to gain more favorable terms he did not negotiate and would not have received. Third, Salerno's misrepresentations regarding the tag-along rights—specifically, his claim that those rights were part and parcel of his board seat—and the focus on the tag-along rights throughout the trial caused juror confusion. The damages award reveals that the liability verdict was not grounded in admissible evidence relating solely to the implied covenant claim but was instead influenced by improper argument suggesting "self-dealing," a "big lie," and other alleged nefarious conduct relating to the tag-along theory that the Court had prohibited. For these reasons, the Court should order a new trial on the implied covenant claim.

A. Hall Would Not Have Agreed to Restrict His Ability to Transfer Shares.

The implied covenant enforces the parties' bargain by implying those terms they would have agreed to had they addressed them. *ASB Allegiance Real Estate Fund v. Scion Breckenridge*

*Managing Member, LLC*, 50 A.3d 434, 440-42 (Del. Ch. 2012), *aff'd in part, rev'd in part on other grounds*, 68 A.3d 665 (Del. May 9, 2013). Salerno, however, did not prove that Hall would have agreed to restrict his ability to sell Sport-BLX stock to protect Salerno's board seat. DePerio—the primary negotiator of the agreements with Salerno—testified that Salerno never sought any restriction on the Founders' ability to sell their shares. (Tr. 396:14-25; 397:1-3.) Nor did Salerno ask them to sell their shares only to buyers who would vote for him in shareholder elections. *Id.* Had Salerno made such a request, DePerio confirmed, the Founders would have declined. (*Id.*) DePerio explained that the Founders could not give Salerno a permanent board seat because they "could only control [the] shares that [they] vote." (*Id.*) Hall echoed these points, emphasizing that the agreements contained no restrictions preventing him from selling his shares to someone who might vote against Salerno—and that Salerno never requested such protections. (Tr. 262:12-18.)

The evidence further established that Salerno sought additional protections for his board seat, but Hall and DePerio refused. During negotiations, Salerno asked that the Founders vote their shares in his favor indefinitely. (Tr. 383:2-14.) They refused—agreeing only to vote their shares in favor of Salerno's board seat so long as he owned at least 2.5% of the company's stock. *Id.* Regarding the request for permanent board-seat protection, DePerio testified that "it wasn't something [he and Hall] were comfortable signing." (Tr. 383:9-14.) Indeed, before the final agreements were signed, DePerio emailed Salerno that they "[could not] accept the proposal on maintaining the board seat with dilution below 2.5%." (Ex. 24 at 5.) DePerio added that, "if [Salerno] [got] diluted but [was] still contributing to the company, [they] would gladly keep [him] on the board." (*Id.*) These communications make clear that Salerno was never promised a permanent board seat and the Founders would never have agreed to restrict their ability to sell shares to provide board-seat protection.

Salerno's testimony does not counsel otherwise. Salerno confirmed that nothing in the agreement prohibited Hall and DePerio from selling their shares, but claimed "the intent [of the agreement] was [Hall] would always vote his 100,000 shares." (Tr. 159:7-8.) No evidence at trial supported that Hall ever held this intent. And Salerno never asked for that term to be explicitly included in the Side Letter. (Tr. 159:18-21.) Salerno further testified that, while he never asked Hall to agree not to sell his shares to someone who would vote against him, that is "not something that you negotiate" because "it's implied they're not going to do the wrong thing." (Tr. 159:18-21; 160:18-24.) This assertion fundamentally misunderstands the implied covenant. Despite its name, "the covenant does not establish a free-floating requirement that a party act in some morally commendable sense." *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 182-83 (Del. Ch. 2014), aff'd, 2015 WL 803053 (Del. Feb. 26, 2015). Nor does "good faith…envision loyalty to the contractual counterparty." *ASB Allegiance Real Estate Fund*, 50 A.3d at 440. Rather, the covenant is "controlled by the parties' original intent—not a one-sided notion of fairness urged at the time of the alleged wrong." *Balooshi v. GVP Global Corp.*, 2022 WL 576819, at *10 (Del. Sup. Feb. 25, 2022). And the obligation must be *clearly implied*. *Liberty Prop. Ltd. P'ship v. 25 Mass. Ave. Prop.*, 2009 WL 224904, at *5 (Del. Ch. Jan. 22, 2009). Here, it was not. No evidence supports Salerno's assertion that the Side Letter implied the Founders would always vote 100,000 shares in his favor. Salerno's after-the-fact complaints about fairness cannot save his claim, and the jury's verdict cannot stand. *eCommerce Indus. v. MWA Intelligence, Inc.*, 2013 WL 5621678, at *33 (Del. Ch. Sept. 30, 2013) ("A party does not act in bad faith by relying on contract provisions for which that party bargained where doing so simply limits advantages to another party.").

B. <u>The Parties Considered and Implemented Share-Sale Restrictions and Salerno Failed to Negotiate Board Seat Protection.</u>

The testimony establishes that the parties considered share sales during their negotiations and expressly set forth terms to govern them. Salerno's failure to secure a term he later desired does not provide a basis for invoking the implied covenant. Delaware courts have declined to imply contractual terms where, as here, "the parties were sophisticated" and "bargained over related issues" but ultimately "did not secure the term they [now seek] to have implied." *Corporate Prop. Assocs. 14 Inc. v. CHR Holding Corp.*, 2008 WL 963048, at *5 (Del. Ch. Apr. 10, 2008); *Johnson & Johnson Fortis Advisors LLC*, 2026 WL 89452, at *14 (Del. Jan. 12, 2026) (reversing Chancery's determination of liability on an implied covenant claim where the type of risk that materialized was both foreseeable and addressed in parties' agreement). This principle supports the conclusion that the jury's verdict is against the weight of the evidence.

The negotiated terms imposed certain restrictions on the parties' ability to sell shares, some of which Salerno himself proposed. In the Stock Purchase Agreements, share transfers were restricted in certain circumstances based on a Lock-Up Period, Rights of First Refusal ("ROFR"), and Tag-Along Rights. Pursuant to the terms governing the Lock-Up Period, Salerno could not sell, transfer, or dispose of his shares for a specific period following the first registration statement of the Company to be filed under the Securities Act of 1933. (Ex. 34 at 4.) Under Sport-BLX's ROFR, Salerno could not sell shares without providing written notice to the company, which then had the option to purchase the shares for itself rather than permit Salerno to sell to a third party. (Ex. 34 at 4-5.)

The only restriction to the Founders' ability to sell their shares that Salerno sought was the tag-along rights. The tag-along rights provided that "in the event that the Founders elect to sell shares of the Company's common stock that represent more than fifty percent (50%) of the

aggregate number of shares outstanding to a third party purchaser, the Founders shall give notice (a "Tag-Along Notice") to [Salerno]" at least fifteen days before the sale. (Ex. 34 at 5-6.) Salerno's attorney suggested this provision be included and dictated its parameters. (*See* Ex. 19.) Salerno could have requested that the tag-along rights be triggered at a lower threshold or requested restrictions on the Founders' ability to transfer their shares that mirrored his ROFR restrictions, but he did not. Salerno clearly understood based on the agreements he signed that Hall and DePerio were free to sell their shares to anyone at any time. And the evidence shows that Hall and DePerio would not have agreed to restrict their ability to sell their shares. (Tr. 396:14-19.) Salerno could have negotiated for additional restrictions on their ability to sell, but failed to. *See Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006) (courts should not use the implied covenant to grant substantive rights a party did not extract during negotiation).

At trial, Salerno attempted to circumvent this problem by characterizing the tag-along rights as part of the board seat promise. (Tr. 54:12.) He contended that the contracts created a framework under which share sales would never result in the loss of his board seat because, if the Founders sold their shares, he would have the opportunity to sell his as well. (Tr. 54:17-25; 55:1-3.) This characterization is contradicted by the record. Salerno was well aware that his tag-along rights were not triggered if the Founders sold less than 50% of the outstanding stock—he was the one who proposed those terms. (Exs. 19, 24.) Moreover, he acknowledged that the tag-along rights were *not* triggered by the GlassBridge sale, because he claimed Hall and DePerio intentionally sold less than the 50% threshold to avoid triggering his tag-along rights. (Tr. 72:20-24.) Salerno knew that Hall and DePerio could sell shares, without triggering his tag-along rights, and that he therefore was not guaranteed a permanent seat on the board.

In *Glaxo Group Limited v. DRIT LP*, the Delaware Supreme Court reversed the trial court's denial for judgment as a matter of law on DRIT's implied covenant claim for the same reasons 248 A.3d 911 (Del. 2021). There, Glaxo ("GSK") and Biogen were engaged in a patent dispute, resulting in a patent license and Settlement Agreement. *Id*. Under the Agreement, GSK retained its patent and Biogen received payments and ongoing royalties from GSK's sales. *Id*. The Agreement obligated GSK to make these payments until the expiration of the last "valid claim" of certain patents. *Id*. The Agreement defined a "Valid Claim" as an unexpired patent claim that had not, among other things, been "disclaimed" by GSK. *Id*.

Biogen later assigned the Agreement to DRIT LP. GSK then voluntarily disclaimed the patent, terminating royalty payments to DRIT. *Id*. at 915. DRIT filed a claim for breach of the implied covenant and GSK was ultimately found liable. *Id*. GSK appealed and argued that 1) DRIT failed to prove that GSK would have agreed to limit its right to disclaim its patent; and 2) in making available the implied covenant, the court erroneously implied a limitation on GSK's ability to disclaim its patent. *Id*. at 917-18. The Delaware Supreme Court agreed, holding that an event where GSK might voluntarily end its patent rights was not outside the parties' contemplation, and that the "time to demand restrictions on an express contractual right [was] during negotiations—not years later through the implied covenant." *Id*. at 920. The court further held that the trial court erred when it imposed a good-faith requirement on GSK's ability to disclaim, reasoning that the implied covenant should not be used to imply terms that modify or negate an unrestricted contractual right authorized by an agreement. *Id*. at 920-21.

So, too, here. Not only is there no support in the record that Hall would have agreed to limit his ability to sell his shares, but by making available the implied covenant, Hall's right to sell shares under the contracts has been improperly limited to circumstances where he can sell—but

only in good faith. As the court in *OptimisCorp v. Waite*, explained: "[T]he implied covenant is not a license for the court 'to create a free-floating duty…unattached to the underlying legal document.'" 2015 WL 5147038, at *76 (Del. Ch. Aug. 26, 2015).

C. The Liability Verdict is Tainted by Salerno's Mischaracterization of the Tag-Along Rights

"Partial new trials should not be resorted to 'unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be held without injustice.'" *Caskey v. Village of Wayland*, 375 F.2d 1004, 1009 (2d Cir. 1967) (quoting *Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494, 500 (1931). Where the damages verdict reflects a fundamental misunderstanding by the jurors on what claims were before it, a new trial on liability is warranted as well. *See Ajax Hardware Mfg. Corp. v. Industrial Plants Corp.*, 569 F.2d 181, 184 (2d Cir. 1977) (sustaining award for new trial where the damages lacked support in the record and the Court was not satisfied that the jury properly determined the issue of liability).

As outlined above, the damages award suggests that it was based on the precluded tag-along theory. Given Cypress' conflation of tag-along rights and the board seat, including Salerno's testimony that the tag-along rights guaranteed him a board seat in perpetuity, it is evident that the same error that infected the damages verdict infected the liability finding as well. Under these circumstances, the Court cannot be satisfied that the jury's liability finding was based on the board seat promise alone. Accordingly, a new trial should be ordered on both damages and liability. *Peterson v. County of Nassau*, 995 F. Supp. 305, 320 (E.D.N.Y. 1998) (Where the "improper jury action affected both the liability and damages issues…a new trial as to both issues must be ordered.")

V.     THE COURT SHOULD ORDER A NEW DAMAGES TRIAL ON THE FIDUCIARY DUTY CLAIM.

The jury awarded Sport-BLX only $99,750 in damages on its breach of fiduciary duty counterclaim against Cypress and Salerno, but the record does not support this insufficient award. Thus, the principles articulated in *Exodus Partners*, discussed above, also warrant a new trial on damages awarded to Sport-BLX. Sport-BLX presented Gene Phillips' conclusion that it sustained approximately $29 million in damages from losing its broker-dealer potential. (Tr. 491:18-23.) Even if the jury did not credit Phillips' expert analysis, it was presented with an alternative basis for damages: the $5.5 million in expenditures made in furtherance of Sport-BLX's plan to become a broker-dealer. (Ex. 108; Tr. 284:13-19.) Trial testimony confirmed that Sport-BLX was unable to generate any return on those expenses, resulting in a $5.5 million loss. (Tr. 282:20-25; 283:1-25.)

But the jury did not award $29 million or $5.5 million. Instead, it awarded $99,750—a figure that finds no support in the evidence, and may have been influenced by Cypress' argument that Hall had profited by his "self-dealing" when he cheated Cypress out of its tag-along rights.[5] Where, as here, nothing in the record provides a "stable foundation" for an award substantially lower than that amount, a new trial is warranted. *Exodus Partners, LLC*, 2007 WL 120053, at *14 (quoting *Boyce*, 464 F.3d at 392). Accordingly, the Court should order a new damages trial on the breach of fiduciary duty claim.

---

[5] There is no evidence that the improper tag-along theory infected the jury's liability determination on the breach of fiduciary duty claim. Thus, the jury's award of damages and its finding of liability are "sufficiently separate to allow a partial new trial." *Akermanis v. Sea-Land Serv., Inc.*, 688 F.2d 898, 906 (2d Cir. 1982).

Dated: March 6, 2026

Respectfully submitted,

/s/ *Michael S. Schachter*

WILLKIE FARR & GALLAGHER LLP
Michael S. Schachter (MS0326)
Shaimaa M. Hussein (SH9276)
Meredith E. Mayer-Dempsey (5213202)
787 Seventh Avenue
New York, NY 10019-6099
(212) 728-8000
mschachter@willkie.com
shussein@willkie.com
mmayer-dempsey@willkie.com

*Counsel for Defendants*