**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| CYPRESS HOLDINGS, III, L.P., individually and derivatively on behalf of SPORT-BLX, INC., | Civil Action No. 1:22-cv-1243-LGS |
| Plaintiff, | **Related case:** |
| v. | Civil Action No. 1:22-cv-8111-LGS |
| GEORGE HALL, JOSEPH DE PERIO, DANIEL STRAUSS, FRANCIS RUCHALSKI, CESAR BAEZ, CHRISTOPHER JOHNSON, SPORT-BLX, INC., SPORT-BLX SECURITIES, INC., CLINTON GROUP INC., and GLASSBRIDGE ENTERPRISES, INC., | |
| Defendants. | |

# PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO TO DEFENDANTS' POST-TRIAL MOTION

ALEXANDER M. DUDELSON, ESQ.
26 Court Street – Suite 2306
Brooklyn, New York 11242
(718) 855-5100
(718) 624-9552 FAX

*Attorneys for Plaintiff*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES………………………………………………………………………..ii

I.   PRELIMINARY STATEMENT…………………………………………………………….1

II.  RELEVANT FACTUAL BACKGROUND……………………………..…………..2

    A.  The Initial Investment and the Side Agreement……………………………………2
    B.  The Deterioration of the Relationship……………………………………………….3
    C.  The Scheme to Evade the Side Agreement………………………………………….5
    D.  The Execution of the GlassBridge Transaction……………………………………..6
    E.  The Aftermath and Diminution of Value…………………………………………..8
    F.  The Court's Pretrial Rulings………………………………………………………….9

III. THE JURY'S DAMAGES AWARD ON THE IMPLIED
      COVENANT CLAIM IS PROPER AND SUPPORTED
      BY THE RECORD
      ARGUMENT……………………………………………………………………...........12

    A.  The Court Previously Established the Validity of Cypress's Damages Theory……..13
    B.  Defendants' Own Math Refutes the "Tag-Along" Theory…………………………..13
    C.  The Verdict Follows the Court's "Value at Breach" Framework……………………14

IV.   DEFENDANTS' PROCEDURAL DEFAULT
      AT TRIAL PRECLUDES THEIR CHALLENGE
      TO THE SUFFICIENCY OF DAMAGES EVIDENCE…………………………….15

    A.  The Second Circuit Rejects the "Unknown Quantity" Defense……………………..16
    B.  Absolute Certainty is Not Required for Jury Action………………….……………16
    C.  Delaware's "Wrongdoer Rule" Complements the
    Second Circuit's Deference to Jury Approximations………………………………..17

V.    THE JURY'S AWARD IS A RESTORATIVE REMEDY,
      NOT A "WINDFALL"………………………………………………………………18

    A.  The Goal of Contract Damages is to Make the
       Non-Breaching Party Whole………………………………………….………………18
    B.  The GlassBridge Price is a Measure of Loss,
       Not Just Defendant's Profit…………………………………………………………...19

VI.   THE LIABILITY VERDICT IS SECURELY
      ANCHORED IN THE EVIDENCE…………………………………………………20
    A.  The Liability Verdict Is Supported By Overwhelming
       Evidence Of Defendants' Bad Faith…………………………………………..21
    B.  The Implied Covenant Strictly Prohibits Defendants

From Orchestrating A Sham Transaction To Evade
Their Express Obligations…………………………………………………22

C.  Defendants' Reliance on Glaxo is Fundamentally Misplaced………………….23

D.  The Jury Properly Found Bad Faith…………………………………………..24

E.  There Was No "Infection" Because There Was
No Error in the Damages Award………………………………………….25

VII.    THE JURY'S DAMAGE AWARD ON THE FIDUCIARY DUTY
COUNTERCLAIM IS RATIONALLY GROUNDED IN THE RECORD AND
MUST NOT BE DISTURBED…………………………………………….25

A.  The Jury Was Entitled to Reject Defendants' Extravagant Damage Theories………26

B.  The Record Supports a Significant Discount Based on Alternative Causes…………26

C.  The Verdict Was Nuanced, Not "Infected"…………………………………..27

CONCLUSION…………………………………………………………………….28

## TABLE OF AUTHORITES

## Cases

*Case Citations:*

*Ajax Hardware Mfg. Corp. v. Industrial Plants Corp.*
*569 F.2d 181 (2d Cir. 1977)………………………………………………………………….....25*

*Analytical Survs., Inc. v. Tonga Partners, L.P.,*
*684 F.3d 36, 52 (2d Cir. 2012)………………………………………………………………....12*

*Araujo v. New York City Department of Education,*
*20-cv-7032 (LGS), 2024 WL 2925190 at 2 (S.D.N.Y. June 10, 2024)……………..…………..12*
*………*
*Boyce v. Soundview Technology Group, Inc.,*
*464 F. 3d 376 (2d Cir. 2006)…………………………………………………………………...18, 19*

*Cruz v. Local Union No. 3 of Intern. Broth. Of Elec. Workers,*
*34 F.3d 1148, 1155 (2d Cir. 1994)…………………………………………………………...15, 16*

*Duncan V. Theratx, Inc.,*
*775 A.2d 1019 (Del. 2001)…………………………………………………………………….....17*

*Dunlap v. State Farm Fire & Cas. Co.,*
*878 A.2d 434, 442 (Del. 2005)………………………………………………………………….23*

*Edinburgh Holdings, Inc. v. Educ. Affiliates, Inc.,*
*2018 WL 2727542 (2018)……………………………………………………………………….23*

*Glaxo Group Limited v. DRIT LP,*
*248 A.D.3d 911 (Del. 2021) Zarcone v. Perry, 572 F.2d 52, 56 (2d Cir. 1978))……………...23,24*

*Hutchinson v. Grace,*
*No. 19 Civ. 270, 2022 WL 1154347, at \*3 (S.D.N.Y. Apr. 19, 2022)……………………….…20*

*ING Global v. United Parcel Serv. Oasis Supply Corp.,*
*757 F.3d 92, 96 (2d Cir. 2014)……………………………………………………...…………..12*

*In re Foreign Exch. Benchmark Rates Antitrust Litig.,*
*No. 13 Civ. 7789 (LGS), 2023 WL 2043719, at \*1 (S.D.N.Y. Feb. 16, 2023)…………..……...20*

*Kirsch v. Fleet St., Ltd.,*
*148 F.3d 149, 165 (2d Cir. 1998)…………………………………………………...…………..12*

*Nemec v. Shrader,*
*991 A.2d 1120, 1128 (Del. 2010)*…………………………………………………………………...24

*O'Neill v. Krzeminski,*
*839 F.2d 9, 13 (2d Cir. 1988)*…………………………………………………………………….12

*OptimisCorp v. Waite,*
*2015 WL 5147038 (Del. Ch. Aug. 26, 2015)*…………………………………………………….24

*Peterson v. County of Nassau,*
*995 F. Supp. 305 (E.D.N.Y. 998)*……………………………………………………………….25

*Raedle v. Credit Agricole Indosuez,*
*670 F.3d 411, 418 (2d Cir. 2012)*………………………………………………………………...20

*Saber v. New York State Department of Financial Services,*
*15-cv-5944 (LGS), 2018 WL 3491695 at 4 (S.D.N.Y. July 20, 2018*……………………………12

*Siga Techs., Inc. v. PharmAthene, Inc.,*
*132 A.3d 1108, 1131 (Del. 2015)*……………………………………………………………...17, 19

*Sjunde AP-Fonden v. Gen. Elec. Co.,*
*No. 17 Civ. 8457, 2024 WL 1208778, at *1 (S.D.N.Y. Mar. 21, 2024)*……………………………12

*Smith v. NBC Universal,*
*524 F. Supp. 2d 315 (S.D.N.Y. 2007)*…………………………………………………………...19

*Zarcone v. Perry,*
*572 F.2d 52, 56 (2d Cir. 1978)*…………………………………………………………………12

I.        PRELIMINARY STATEMENT

After a full and fair trial on the merits, a jury unanimously found that Defendants George Hall and Joseph DePerio breached the implied covenant of good faith and fair dealing by orchestrating a sham transaction to strip Plaintiff Cypress Holdings III, L.P. ("Cypress") of its bargained-for board seat. Defendants now ask this Court to do what the Federal Rules of Civil Procedure and the Seventh Amendment forbid: substitute the Court's own judgment for that of the jury. Defendants' Motion for Remittitur or a New Trial is built on a foundation of procedural waiver and substantive mischaracterizations of both the trial record and this Court's prior rulings.

As a threshold matter, Defendants' motion is procedurally barred. Defendants argue that Cypress failed to present legally sufficient evidence to support its damages. However, Defendants failed to move for a directed verdict under Rule 50(a) at the close of evidence. By failing to challenge the sufficiency of Cypress's damages proof during the trial, Defendants forfeited their right to seek what is effectively a disguised Rule 50(b) renewed judgment as a matter of law. Rule 59 is not a vehicle for securing a second bite at the apple to raise arguments that were waived at trial.

Substantively, Defendants' request for a new trial on liability and damages rests entirely on the false premise that the jury's $644,080 award was based on a precluded "tag-along" rights theory. It was not. As Defendants' own mathematical calculations in their moving papers concede, the jury did not award the $355-per-share tag-along price. Instead, the jury faithfully followed this Court's in limine ruling and utilized the money Hall actually received from the GlassBridge transaction as a "contemporaneous valuation data point" to measure the consequential injury to Cypress's investment. The jury calculated a net value of approximately $83 per share, arriving at a conservative, evidence-based assessment of Cypress's damages. To

the extent Defendants complain this calculation lacks absolute precision, they are barred from doing so under Delaware's "Wrongdoer Rule," which dictates that a breaching party cannot use the valuation uncertainty created by their own bad-faith conduct as a shield against liability.

Furthermore, the jury's liability finding was not the result of "confusion," but rather a rational response to overwhelming evidence of Defendants' bad faith. The trial record demonstrated that Defendants used a nominally permitted sale of shares to a controlled entity specifically to disenfranchise Cypress. The centerpiece of this bad faith was a spreadsheet prepared by DePerio—which he explicitly admitted on cross-examination was used to calculate the exact number of shares needed to vote Michael Salerno off the board.

Finally, Defendants' demand for a new damages trial on their fiduciary duty counterclaim is equally meritless. The jury's decision to award Sport-BLX $99,750—rather than the speculative $29 million or $5.5 million figures demanded by Defendants—was a proper exercise of the jury's role in determining proximate cause. The jury rightfully concluded that while Salerno delayed providing FINRA information, he was not the proximate cause of the broker-dealer application's total failure. Instead, the jury properly discounted the damages in light of a mountain of alternative causes, including Sport-BLX's fifty other outstanding FINRA deficiencies, lack of financial licenses, and eviction from its office space.

The jury's verdict was rational, grounded in the trial record, and consistent with the law. Because the verdict neither shocks the judicial conscience nor constitutes a manifest injustice, Defendants' Motion should be denied in its entirety.

## II.     RELEVANT FACTUAL BACKGROUND

### A.  The Initial Investment and the Side Agreement

In late 2018, defendant George Hall ("Hall") and Joseph DePerio ("DePerio") founded

Sport-BLX, Inc. ("Sport-BLX"), a company that would allow investors to buy fractional ownership stakes in sports-related assets (Tr. 234:10-20). Michael Salerno ("Salerno"), through his company, Cypress Holdings III, L.P. ("Cypress"), agreed to invest $1 million in Sport-BLX. Salerno negotiated additional terms alongside his investment, such as a seat on the board of directors for a Cypress representative and "tag-along" rights. The investment and these additional terms were memorialized in two stock purchase agreements and a side agreement, all executed simultaneously on February 28, 2019 (Ex. 34-36).

Sport-BLX and the Founders represented that, as long as Cypress continued to hold in the aggregate at least 2.5% of the capital stock of Sport-BLX, the Founders would vote their capital stock (which constituted the vast majority of the outstanding stock at the time) in favor of a Cypress representative being elected to the Board of Directors. Salerno testified that the inclusion of the board seat was "extremely important and material" to the agreement (Tr. 54:25-55:3). The "tag-along" rights dictated that if the Founders ever sold shares of their own stock constituting more than 50% of the outstanding shares, Cypress would be able to sell a portion of its stock at the same price (Ex. 35 at ¶4H). Salerno testified that these two additional terms were "part and parcel" with each other (Tr. 54:12). Because the Founders owned the vast majority of outstanding stock, Cypress was assured of being elected to the Board (Tr. 54:17-24). However, if the Founders ever sold their controlling interest, Cypress would have the opportunity to exit as well (Tr. 55:2-3).

B.  The Deterioration of the Relationship

Once on the Board, Salerno raised issues with defendants Hall and Sport-BLX regarding excessive company expenses, conflicts of interest, and potential self-dealing (Tr. 59:1-24; Ex. AA). When Salerno asked for further information and company financial documents, Hall

3

refused, belittled his concerns, and called his behavior "idiotic" (Tr. 63:1-5, 68:13-15). Hall asked Salerno to resign from the Board; when Salerno refused, Hall told him that he would "work around him" (Tr. 67:18-25, 68; Ex. HH, Ex. II). The relationship between Salerno and Hall became hostile.

Around August 2019, Salerno was asked to provide the beneficial owners of Cypress for the company's application to FINRA for a broker-dealer license (Ex. 43). Because of the hostile relationship that had developed between himself and the company, Salerno was initially hesitant to provide the information directly to the company and instead offered to provide the information directly to FINRA (Tr. 76:1-25). Hall and others within Sport-BLX told Salerno that the information had to be provided directly to them, but did not provide him with any documents and forbade him from contacting FINRA directly (Tr. 308:11-19, 273:14-16). Once Hall finally allowed Salerno's counsel to speak to Sport-BLX's counsel regarding the FINRA application, Salerno agreed to provide the requested information directly to the company (Ex. WW, VV; Tr. 104:15-24, 106:1-9).

Other than the information requested from Salerno and Cypress, Sport-BLX had not satisfied at least fifty other outstanding items required by FINRA at the time the application was withdrawn (Ex. UU; Tr. 300-305). The Sport-BLX officers, including Hall and DePerio, did not have the required financial licenses (Tr. 301:18-302:12, 330:22-25). Sport-BLX had not conducted the required due diligence on all of its beneficial owners, including OFAC checks (Tr. 306:24-307:22, 380:5-8). Sport-BLX was using office space from the Clinton Group and did not have a lease, which was required pursuant to the terms of the FINRA letter (Tr. 302:13-305:6). Moreover, the Clinton Group was evicted from its office space in December 2019, which may have complicated its approval (Tr. 304:22-305:4). Both Hall and Sport-BLX attorney William

Mack testified that approval of the broker-dealer license was not a certainty even if obtaining the information from Cypress was not an issue (Tr. 305:22–306:1, 330:17-21, 484:3-6). Despite Defendants' claim that the broker-dealer license was essential to the Sport-BLX business, Hall and Sport-BLX took no action to pursue the license after Cypress agreed to provide its beneficial owners (Tr. 312:23-313:7). Instead, Hall started a new company in the summer of 2020 with the explicit purpose of obtaining the broker-dealer license but, notably, had still not obtained the license by the time of trial (Tr. 313:8-22, 488:7-9).

C.  The Scheme to Evade the Side Agreement

By December 2019, Hall and DePerio devised a plan to circumvent their obligation to provide Cypress with its promised seat on the Board. Salerno was told by the Founders via email, and during a Board Meeting, that they would "work around him[.]" Defendants did so through the Founders' sale of their controlling interests of Sport-BLX stock to another entity Hall controlled, GlassBridge Enterprises, Inc. ("GlassBridge"), at a price of $355 per share.

More specifically, on December 9, 2019, during a meeting of the Sport-BLX Board, Hall represented that Sport-BLX had an urgent need for capital (Tr. 332:14-19), had been marketed to numerous investors, and that they were unable to identify any investor who had interest in Sport-BLX stock (Tr. 332:23-333:6). Hall conceded that a sale of his own shares would not help the company with its capital needs (Tr. 336:16-23). At the same time, Hall was nonetheless in the process of selling his own shares to GlassBridge—an entity that he controlled—in an effort to remove Salerno from the Board (Tr. 337:21-23).

Hall's control of GlassBridge was evidenced in several ways:

- He was the single largest shareholder of GlassBridge (Tr. ).

- The slate of directors that he put forward was elected to the GlassBridge Board

5

(Tr. 338:14-21 ).

- The chairman of the GlassBridge Board was Hall's longtime employee and fellow Sport-BLX Founder, Joseph DePerio (Tr. 338:25-339:13).

- Hall's employees managed GlassBridge as CFO and COO through a management agreement (Tr. 339:14-341:23).

- A services contract allowed his employees to manage the company as CEO and CFO.

- GlassBridge made several investments in Hall's company (Tr. 343:13-344:3).

- GlassBridge made several loans to Hall's company (Tr. 344:4-9).

- GlassBridge paid success fees to Hall for other services (Tr. 10-12).

The other Sport-BLX Board members were all closely affiliated with Hall:

- Joseph DePerio: Hall's employee for over ten years (Tr. 414:6-13), co-founder, board member and President of Sport-BLX, and Chairman of the GlassBridge Board (Tr. 425:23-25).

- Daniel Strauss: Hall's employee for over ten years (Tr. 340:17-19), COO of GlassBridge through a Hall/Clinton Group service agreement (Tr. 339:21-340:16), and a Sport-BLX board member (Tr. 340:20-22).

- Ruchalski: Hall's employee for over twenty years (Tr. 341:24-342:1), a childhood family friend (Tr. 342:2-3), CFO of GlassBridge through a Hall/Clinton service agreement, and CFO and Board member of Sport-BLX (Tr. 341:5–342:25).

D. The Execution of the GlassBridge Transaction

Defendants Hall and DePerio did not disclose their contemplated sale in any Sport-BLX board meeting. While Strauss was the CEO of GlassBridge, he directed DePerio to prepare a

6

spreadsheet to calculate the exact number of personally owned shares that he and Hall needed to sell to GlassBridge to give it the slimmest of a majority, thereby ensuring that Salerno would be voted off the Board at the upcoming shareholder meeting (Tr. 426:1-5; Ex. C). The intent of the spreadsheet was obvious, as it contained columns explicitly labeled "for Salerno" and "against Salerno" (Tr. 425:9-431:7). On cross-examination, DePerio explicitly admitted that he prepared the spreadsheet specifically to calculate the exact number of shares GlassBridge needed to buy to vote Salerno off the board, and that the 55,000 shares calculated in that spreadsheet exactly matched the number of shares he and Hall subsequently sold to GlassBridge. (Tr. 429:1–430:11).

Though each witness and party claimed ignorance of how the transaction was negotiated and came to fruition, it was nonetheless put together extremely quickly to satisfy the requirements of the record date and allow GlassBridge to vote its shares at the shareholder meeting (Tr. 345:14-350:1). In fact, the transaction was consummated in the evening after a GlassBridge board meeting ended at 5:30 p.m. on December 12, 2019, even though the final terms still had to be negotiated, documents prepared, and executed. GlassBridge became an owner of record just in time to be eligible to vote at the shareholder meeting, which it did, successfully voting Salerno off the Sport-BLX Board.

Just three days later, on December 12, 2019, despite their misrepresentations to Cypress and the Sport-BLX Board, the Founders consummated the sale of their personal shares in Sport-BLX to GlassBridge at a value of $355.00 per share. Specifically, GlassBridge purchased 37,924 shares from Mr. Hall in exchange for a cash value of $1,346,302.00 and a note for $12,116,718.00, and 17,076 shares from Mr. DePerio in exchange for a cash value of $606,198.00 and a note for $5,455,782.00. Defendants claim that the "true" price was only the cash portion of the price paid, which was approximately $35 per share. However, Hall and

DePerio received interest for approximately eighteen months on their Notes and eventually negotiated a settlement payment from GlassBridge in satisfaction of the Notes. Hall received approximately $900,000 in interest and a cash payment of $2,354,000. In total, Hall received $4,600,000 from the GlassBridge sale, or $121.30 per share. (Tr. 348:10-349:5)

Despite Cypress's tag-along rights (and Mr. Hall stating during a prior Sport-BLX Board Meeting that he would offer all shareholders tag-along rights as part of any sale of his personal shares), no shareholder was offered such a right with respect to Mr. Hall's December 12, 2019 sale to GlassBridge. By selling their own shares, rather than those of the company, at a significantly higher price, the Founders chose to reap a windfall for themselves rather than raise much-needed additional capital for Sport-BLX.

E.   The Aftermath and Diminution of Value

After selling their controlling interest in Sport-BLX to GlassBridge through this self-interested transaction, the Founders (and the other defendants) used GlassBridge to deprive Cypress of its seat on the Board. Not surprisingly, shortly after the sale of stock to GlassBridge (which was effectuated on the very last day GlassBridge could be deemed a shareholder of record and eligible to vote at Sport-BLX's Annual Shareholders' Meeting), GlassBridge voted its shares to eliminate Cypress's promised seat on the Board. As a result, Defendants were able to deny Mr. Salerno and Cypress access to information to effectively voice their objections to their self-serving conduct.

Cypress continued to have dire capital needs. In GlassBridge's 2020 and 2021 annual 10-K filings, sworn to by its CEO, Daniel Strauss, Sport-BLX's decline in value was attributed not to its lack of a broker-dealer license but instead to COVID-19, the performance of its business, and its capital position. After Salerno was ousted, Sport-BLX sold its only asset (the technology

platform) to Sport-BLX Securities—another company owned by Hall—for only $225,000, despite the platform costing $2.3 million to develop. This resulted in a return of less than 10 cents on the dollar. (Tr. 102:14-18)  Finally, Hall was able to buy back the shares that he sold to GlassBridge for just $2 per share.

Salerno was the only independent director on the Sport-BLX board with his own personal money at stake (his $1 million investment). Unlike the other directors, his income was not reliant on Hall or his alter-ego companies. Salerno testified that had he not been removed from the board, he would have fought aggressively against the subsequent fire-sale of the technology platform. (Tr. 107:2-14)

F.   The Court's Pretrial Rulings

In its decision on the summary judgment motions, the Court held that Cypress's claim for breach survives because:

"[C]onsidering the evidence in a light most favorable to Cypress, a reasonable jury could find that Hall and DePerio used the transfer of their stock to an affiliate to evade the Side Agreement and eliminate Cypress's board seat -- a "gap" that goes to the heart of the bargained-for exchange. In July 2019, Hall told Salerno, 'we can't put a high-class board together with your idiotic behavior. So we will have to work around you.' About ten days before the December 2019 vote, Hall and DePerio transferred personal shares to an entity they allegedly controlled, which proceeded to vote against Salerno. A contemporaneous spreadsheet prepared by DePerio reflects what Cypress alleges are calculations of the shares needed to vote Salerno off the board. On this record, a jury could find that the Hall, DePerio and Sport-BLX used a nominally permitted sale of shares to 'work around' the Side Agreement and eliminate Cypress's board seat -- conduct that 'frustrates the

9

overarching purpose of the contract by taking advantage of [a] position to control implementation of the agreement's terms.' [...] Sport-BLX may argue that the SPAs' tag-along clauses contemplated control-shifting sales. But a reasonable jury could find that such provisions were meant to address third-party sales, not transfers to related entities -- another factual issue to be resolved." (ECF 252 at 29).

Regarding damages, the Court noted:

"The Sport-BLX parties also contend that damages are speculative because the board seat carried no fixed compensation. That argument does not warrant summary judgment. Cypress identifies loss of the bargained-for board representation and consequential injury to its investment."

Before trial, Defendants moved to exclude evidence of monetary damages, including valuation evidence tied to the GlassBridge transaction and lay valuation testimony, and to limit Cypress to nominal damages. The Court denied the motion, noting that:

"[T]he summary judgment opinion expressly rejected the Sport-BLX Parties' argument that damages are speculative, holding that Cypress may prove 'consequential injury to its investment.' Any difficulty in quantifying that loss 'goes to the measure of damages, not liability.' Cypress may offer the GlassBridge transaction price as a contemporaneous data point that bears on valuation, subject to foundation. Cypress may not argue that it was entitled to sell at $355 per share under tag-along rights or that the Sport-BLX Parties are liable because tag-along rights were triggered or violated; the GlassBridge transaction may be referenced as evidence that bears on valuation and consequential damages tied to the loss of the board seat. The Sport-BLX Parties' arguments that the GlassBridge consideration included promissory notes and that Hall and

10

DePerio did not realize $355 per share in cash go to weight, not admissibility."

The Court also denied the Sport-BLX Parties' objection to lay valuation testimony, ruling:

"[A]ny such testimony must be grounded in personal knowledge and not on a specialized valuation methodology. Cypress may present lay opinion testimony from Michael M. Salerno or another Cypress representative about the value of Cypress's investment, subject to Rule 701. [The Sport-BLX] Parties argue that Salerno cannot testify under the owner-witness rule because he is not an owner or officer of Sport-BLX. That objection does not justify categorical preclusion. Salerno may not offer a technical valuation of Sport-BLX as a business, but he may offer lay opinion testimony about the value of Cypress's investment to the extent that testimony is based on his personal knowledge, including the price Cypress paid and other benchmarks he observed. Any testimony requiring a specialized valuation methodology or expert analysis is not admissible as lay opinion and must satisfy Rule 702."

Finally, regarding Defendants' argument that Cypress failed to disclose its damages theory, the Court found:

"[T]he record likewise fails to support preclusion on that basis. Cypress disclosed a damages methodology based on 'the value of Cypress' Sport-BLX stock (at the $355.00 per share price at which the Founders sold their personal shares in Sport-BLX -- in a purported arms'-length transaction -- to GlassBridge) less any remaining value of the acquired stock at the time of trial.' This disclosure provides sufficient notice under Rule 26(a)(1)(A)(iii). The fact that the computation requires determination of remaining value at trial does not render the damages theory inadequate because that value is a factual question

11

for the jury based on the evidence presented at trial. Preclusion under Rule 37(c)(1) is not warranted on this record because the Sport-BLX Parties have had notice of Cypress's theory and can test it through cross-examination and their own case-in-chief."

III.    THE JURY'S DAMAGES AWARD ON THE IMPLIED COVENANT CLAIM IS PROPER AND SUPPORTED BY THE RECORD ARGUMENT

Rule 59(e) allows a district court to "alter or amend judgment to correct a clear error of law or prevent manifest injustice". *Saber v. New York State Department of Financial Services*, 15-cv-5944 (LGS), 2018 WL 3491695 at 4 (S.D.N.Y. July 20, 2018) (quoting *ING Global v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 96 (2d Cir. 2014)) (emphasis added).  It is well-settled that Rule 59 is "not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple." *Araujo v. New York City Department of Education*, 20-cv-7032 (LGS), 2024 WL 2925190 at 2 (S.D.N.Y. June 10, 2024) (quoting *Analytical Survs., Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012)); accord *Sjunde AP-Fonden v. Gen. Elec. Co.*, No. 17 Civ. 8457, 2024 WL 1208778, at *1 (S.D.N.Y. Mar. 21, 2024). Rather, the standard for granting a Rule 59 motion for reconsideration is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked.

Where there is no particular discernable error, the Second Circuit has generally held that a jury's damage award may not be set aside as excessive unless " 'the award is so high as to shock the judicial conscience and constitute a denial of justice,' " *O'Neill v. Krzeminski*, 839 F.2d 9, 13 (2d Cir. 1988) (quoting *Zarcone v. Perry*, 572 F.2d 52, 56 (2d Cir. 1978)); see also *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998).

12

Defendants' motion for remittitur is little more than a recycled version of arguments this Court has already rejected at the summary judgment and in limine stages. Defendants continue to erroneously insist that Cypress is limited to nominal damages and speculate that the jury utilized a precluded "tag-along" theory. The trial record and this Court's prior rulings prove otherwise.

A.  The Court Previously Established the Validity of Cypress's Damages Theory

In their motion for summary judgment, Defendants argued that Cypress could not prove damages; the Court rejected this, noting Cypress could seek "consequential injury to its investment". Defendants moved again in limine to preclude evidence of damages and were again rebuffed.

While the Court precluded Plaintiff from arguing liability based on tag-along rights, it explicitly held that Cypress could prove "consequential injury to its investment" by offering "the GlassBridge transaction price as a contemporaneous valuation data point". The Court further clarified:

"[T]he GlassBridge transaction may be referenced as evidence that bears on valuation and consequential damages tied to the board-seat loss rather than on a tag-along breach theory."  (ECF 300 at 5)

The Court noted that the use of promissory notes went to the "weight, not admissibility" of the evidence, and that the ultimate question of value remained a "factual question for the jury".

B.  Defendants' Own Math Refutes the "Tag-Along" Theory

Defendants' attempt to label the verdict as a "tag-along" award is mathematically

incoherent.  The damages theory that defendants put forth demonstrates that the jury's

calculation were not based on "tag along" rights but instead were based on consequential

injury to Cypress' investment.  Specifically, the jury's award was based on the value of

SportBLX at the time of the breach less the value at the time of trial.

| Amount | Money Received **or Paid** by Hall |
|---|---|
| $900,000 | Amount Hall  received in interest on the promissory note from the GlassBridge sale. |
| $2.3 million | Amount Hall received from GlassBridge in the subsequent debt buyback. |
| $3.2 million (the $900,000 + $2.3 million above) / the 37,924 shares owned by Hall<br><br>= $84.38/share. | |
| **($2/share)** | **Amount Hall paid to purchase his shares back from GlassBridge.** |
| = $83/share: Approximate Net Amount Hall received | |
| $83 (Net Amount Hall received) x 7,760 (number of shares owned by Salerno) = $644,080 | |

    C.  The Verdict Follows the Court's "Value at Breach" Framework

"Tag along" rights as discussed in detail during the trial and set forth in the Stock

Purchase Agreements, if triggered, would have allowed Cypress to sell its shares at the

same price that the Founders sold their shares.  However, based on Defendants' own

calculations, the jury's award was not based on the price that the Founders sold their

shares.  Instead, this calculation confirms the jury did exactly what the Court permitted.

They used the money Hall actually received as a "contemporaneous data point" for the

value of Sport-BLX at the time of the breach. Consistent with Plaintiff's theory of

damages, the jury then deducted the value of the stock at the time of trial—the $2 per share

price at which Hall repurchased the shares—to determine the final compensatory amount .

14

Defendants have failed to prove a "clear error of law". By their own analysis, the jury rejected the precluded tag-along price and instead performed a rational, evidence-based calculation of the "consequential injury" to Cypress's investment. Because the award is grounded in the trial record and adheres to this Court's prior Orders, it must not be disturbed.

IV.    DEFENDANTS' PROCEDURAL DEFAULT AT TRIAL PRECLUDES THEIR CHALLENGE TO THE SUFFICIENCY OF DAMAGES EVIDENCE

Defendants' remaining arguments for remittitur are not based on an alleged excessive award, but rather on the assertion that the evidence was legally insufficient to support any damages. Their contention is not that the jury's award was too high; instead, they claim that Plaintiff failed to prove entitlement to any compensatory damages at all . Defendants essentially argue that the jury should never have been permitted to decide the issue, as any award exceeding nominal damages was purportedly improper as a matter of law . In effect, this is a disguised Rule 50(b) motion for a renewed judgment as a matter of law. However, because Defendants failed to move for a directed verdict at the close of evidence, they are procedurally precluded from now arguing that the evidence was "legally insufficient" to support the jury's compensatory award. See *Cruz v. Local Union No. 3 of Intern. Broth. Of Elec. Workers*, 34 F.3d 1148, 1155 (2d Cir. 1994).

Defendants argue that the damages award of $644,080 lacks an evidentiary foundation and should be remitted to nominal damages. However, Defendants' motion is effectively an attempt to bypass their own failure to move for a directed verdict under Rule 50(a) at the close of evidence. Having failed to challenge the legal sufficiency of Plaintiff's damages proof during trial, Defendants are now precluded from seeking what is essentially

15

a renewed judgment as a matter of law.

A.  The Second Circuit Rejects the "Unknown Quantity" Defense

Defendants may suggest, as the defendant did in *Cruz v. Local Union No. 3*, that they could not have formed an opinion on whether the verdict was supported by the evidence until the jury actually rendered a specific dollar amount. The Second Circuit has explicitly rejected this logic:

"Although [the defendant] claims that it could not have raised the issue of damages previously because they were an unknown quantity, it could have challenged the sufficiency of the evidence for a damage award." See *Cruz* at 1155.

Defendants were fully aware of the "proof submitted on the issue of damages", specifically Michael Salerno's lay testimony and the $355 per share GlassBridge valuation data point as well as their own contention of the purported "real" price of $35 per share. Yet, they chose not to challenge the sufficiency of that evidence before the case went to the jury.  Consequently, this Court should not grant Defendants' motion unless it is required to prevent "manifest injustice", a standard that cannot be met where the jury made permissible inferences based on a valuation explicitly permitted by this Court .

B.  Absolute Certainty is Not Required for Jury Action

Defendants' attack on the award as "speculative" ignores the governing standard for jury verdicts in this Circuit.  As the Court held in *Cruz*: "Absolute certainty is not required for jury action and, given the record evidence, we believe that the district court should not have usurped the role of the jury." *Cruz* at 1156-57. **Under Delaware law**, once the fact of damage is proven, which the jury confirmed by finding a breach of the implied covenant, the jury is granted wide latitude to compute a "fair approximation" of

16

the loss. See *Cura Fin. Servs. N.V. v. Elec. Payment Exch., Inc.*, 2001 WL 1334188, at \*20 (Del. Ch. Oct. 22, 2001) (when a contract is breached, expectation damages can be established as long as the plaintiff can prove the fact of damages with reasonable certainty. The amount of damages can be an estimate.)  See also *Siga*.

The jury's award of $644,080 falls squarely within the range of permissibility established by the trial record, which included valuations ranging from $35 per share to $355 per share.

C. Delaware's "Wrongdoer Rule" Complements the Second Circuit's Deference to Jury Approximations

Defendants' attack on the jury's $644,080 award demands a level of mathematical perfection that neither the Second Circuit nor Delaware substantive law requires. The Second Circuit's holding in Cruz, that damages need only be a "fair approximation" falling within a "range of permissibility", operates in perfect harmony with Delaware's long-standing "Wrongdoer Rule" for breach of contract damages.

Under Delaware law, there is a fundamental distinction between proving the fact of damages and calculating the amount. Once a plaintiff proves that a breach occurred and caused some injury, the burden of precise calculation relaxes. Delaware courts consistently hold that where a defendant's own bad-faith conduct or breach creates difficulty in proving the exact amount of damages, the risk of that uncertainty is thrown squarely upon the wrongdoer. See, e.g., *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1131 (Del. 2015) ("Responsible estimates that lack mathematical certainty are permissible so long as the court has a basis to make a responsible estimate of damages.").  See also See *Duncan V. Theratx, Inc.*, 775 A.2d 1019, 1022, n.41 (Del. 2001) (the injured party need not

17

establish the amount of damages with precise certainty where the wrong has been proven and injury established.)

Defendants complain that the jury's approximate $83-per-share calculation is imprecise. However, it was Defendants' own bad-faith conduct, orchestrating a secretive transfer of shares to GlassBridge and systematically stripping Salerno of his board seat, that obscured the precise, ongoing valuation of Cypress's investment . Defendants cannot intentionally dismantle Cypress's window into the company's governance and then use the resulting valuation ambiguity as a shield against liability.

Because Defendants created the very evidentiary complexity they now complain about, they are legally barred from demanding absolute precision. Read together, Cruz and the Delaware Wrongdoer Rule insulate the jury's math from judicial second-guessing. The jury utilized the GlassBridge financial data permitted by the Court to formulate a "fair approximation" of the loss. Because this approximation is rationally tethered to the trial record, the Court must defer to the jury's judgment.

V.    THE JURY'S AWARD IS A RESTORATIVE REMEDY, NOT A "WINDFALL"

Defendants' attempt to label the $644,080 award as an "undeserved windfall" misconstrues the fundamental purpose of contract damages and ignores the specific evidence of Michael Salerno's $1 million investment . Under the standards articulated by the Second Circuit and the Delaware Supreme Court, the verdict is a proper restorative measure designed to put Cypress in the position it would have occupied but for Defendants' bad faith.

A.  The Goal of Contract Damages is to Make the Non-Breaching Party Whole

Defendants cite *Boyce v. Soundview Technology Group, Inc.,* 464 F. 3d 376 (2d

Cir. 2006) to argue that damages should not elevate a plaintiff beyond where they would have stood absent a breach . However, *Boyce* actually supports Plaintiff's position: the core purpose of a damage award is to place the non-breaching party in "as good a position as if the breach had not occurred".  *Boyce* at 391.

Michael Salerno invested $1 million into Sport-BLX with the expectation of a contractually protected board seat that would allow him to provide oversight and safeguard that capital . When Defendants breached the implied covenant to strip him of that protection, they destroyed the "expectation interest" of his investment. An award that restores a portion of that value is not a windfall; it is the "expectation damages" mandated by the Delaware Supreme Court in *Siga Technologies, Inc. v. PharmAthene, Inc.* to compensate for a bad-faith breach of an agreement.

B.  The GlassBridge Price is a Measure of Loss, Not Just Defendant's Profit

Defendants rely on *Smith v. NBC Universal*, 524 F. Supp. 2d 315 (S.D.N.Y. 2007) to argue that damages should not be measured by a defendant's profits . This reliance is misplaced. While Smith cautions against using profits as a standalone measure, it recognizes that damages must be tethered to the plaintiff's actual loss.

In this case, the jury did not award Cypress "Hall's profits" in a vacuum. Rather, following this Court's explicit instructions, the jury used the GlassBridge transaction, a sale of the exact same class of stock occurring simultaneously with the breach, as a "contemporaneous valuation data point" to determine what Cypress's shares were worth before Defendants' interference .

The Market Value Standard: Under *Boyce*, damages are not speculative if there is a "stable foundation" for the estimate.  Boyce at 391.

19

The Calculation: The jury used a net value of approximately $83 per share (derived from the total consideration Hall actually realized) to value Salerno's 7,760 shares .

The Result: This figure is significantly lower than the $355 per share valuation that could have reasonably been awarded, demonstrating that the jury did not grant a "windfall," but rather a conservative, evidence-based assessment of the investment's value at the time of the breach .

VI.     THE LIABILITY VERDICT IS SECURELY ANCHORED IN THE EVIDENCE

Under Rule 59(a), a court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Such reasons include a verdict that is against the weight of the evidence or a verdict so tainted by misconduct that it warrants a new trial. See *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 Civ. 7789 (LGS), 2023 WL 2043719, at *1 (S.D.N.Y. Feb. 16, 2023). However, this Court has emphasized that a motion for a new trial should not be granted unless the court is "convinced that the jury reached a seriously erroneous result or that the verdict is a miscarriage of justice." Id. (quoting Ali v. Kipp, 891 F.3d 59, 64 (2d Cir. 2018)).

While a trial court evaluating a Rule 59 motion "may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner," it must exercise this authority with "caution and great restraint." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012). A judge "should rarely disturb a jury's evaluation of a witness's credibility" and may not "freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury." Id. (internal quotation marks omitted); accord *Hutchinson v.*

*Grace*, No. 19 Civ. 270, 2022 WL 1154347, at *3 (S.D.N.Y. Apr. 19, 2022).

A.  The Liability Verdict Is Supported By Overwhelming Evidence Of Defendants' Bad Faith

Defendants' request for a new trial on liability is yet another attempt to relitigate arguments squarely rejected by this Court at summary judgment. The jury was properly instructed, both at the outset and the close of the trial, on the elements of the implied covenant of good faith and fair dealing [Tr. 19:18–20:25; 588:23–590:2]. Defendants presented their theory of the case to the jury during opening statements and summation, and the jury unanimously rejected it.

The verdict is anchored by an abundance of evidence demonstrating that Defendants transferred shares to GlassBridge for the express purpose of evading the Side Letter agreement and removing Salerno from the Sport-BLX board. Hall's effective control over GlassBridge was undeniable: he was its single largest shareholder, he single-handedly replaced its Board of Directors, and he installed his long-time associates (DePerio, Strauss, and Ruchalski) as officers and directors. Furthermore, the entities were deeply financially entangled, with GlassBridge paying Hall fees, investing heavily in his company, and extending millions of dollars in loans to Sport-BLX.

The centerpiece of Defendants' bad faith was an Excel spreadsheet that served as a literal blueprint for Salerno's ouster. Prepared by DePerio (a party to the sale) at the direction of Strauss (the CEO of GlassBridge), the spreadsheet categorized Sport-BLX shareholders into columns explicitly labeled "for Salerno" and "against Salerno." Most damningly, it calculated the exact number of shares that needed to be transferred to GlassBridge to manufacture the slimmest possible majority to defeat Salerno. The actual number of shares Hall and DePerio subsequently sold to GlassBridge matched this

21

calculation perfectly.

Because this spreadsheet speaks for itself, the jury was fully entitled to conclude that DePerio's incredible testimony, specifically, his claim that he did not know the document's purpose, was fabricated. Likewise, the jury reasonably determined that the "alternative" business justifications for the sale offered by Hall and Strauss were pretextual. Under Rule 59, this Court must defer to the jury's evaluation of witness credibility and cannot substitute its own judgment to save Defendants from a document of their own making.

Finally, Defendants mischaracterize Plaintiff's legal theory to suggest the verdict was improper. At no point did Plaintiff argue that the implied covenant prohibited Hall from ever transferring his shares. Rather, Plaintiff argued that any transfer must be done in good faith. By way of analogy, if Hall had transferred his shares to a family member the day before the shareholder meeting on the condition that they vote against Salerno, it would clearly constitute a breach of the covenant. The jury correctly recognized that using GlassBridge to accomplish the exact same goal was a bad-faith destruction of the contract's fruits.

   B.  <u>The Implied Covenant Strictly Prohibits Defendants From Orchestrating A Sham Transaction To Evade Their Express Obligations</u>

Defendants argue that because the operative agreements did not expressly prohibit them from selling their shares, they had an absolute, unrestricted right to transfer those shares under any circumstances, even if the sole purpose of the transfer was to destroy Plaintiff's bargained-for rights. This argument misapprehends Delaware law and ignores the jury's explicit factual findings regarding Defendants' bad faith.

Under Delaware law, the implied covenant of good faith and fair dealing requires a

22

party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." See *Edinburgh Holdings, Inc. v. Educ. Affiliates, Inc.,* 2018 WL 2727542 (2018) (quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005)). While Defendants are correct that the implied covenant cannot be used to rewrite contracts or grant unnegotiated substantive rights, it is properly invoked when a party technically complies with the letter of an agreement while intentionally violating its spirit.

Defendants lean heavily on the fact that the Stock Purchase Agreements contained specific restrictions (Lock-Up, ROFR, Tag-Along) and argue that Salerno's failure to negotiate a blanket prohibition on Founders' sales acts as a waiver of his right to complain now. This is a strawman argument. Plaintiff has never argued that Hall and DePerio were permanently barred from selling their shares in a legitimate, arms-length transaction.

Rather, Plaintiff argued, and the jury agreed, that Defendants could not effectuate a sham transfer of shares to a controlled entity (GlassBridge) for the precise mathematical purpose of stripping Salerno of the board seat guaranteed to him by the Side Letter. The failure to negotiate a blanket restriction on all share sales does not equate to a license for Defendants to engage in bad-faith subversion.

C. Defendants' Reliance on *Glaxo* is Fundamentally Misplaced

Defendants cite *Glaxo Group Limited v. DRIT LP*, 248 A.D.3d 911 (Del. 2021) for the proposition that the implied covenant cannot impose a "good faith" limitation on an unrestricted contractual right. *Glaxo* is completely distinguishable.

In *Glaxo*, the defendant exercised a right to disclaim a patent, a known, foreseeable action within the patent context that terminated royalty payments.   The covenant is "not an equitable remedy for rebalancing economic interests that could have been anticipated." *Glaxo Grp. Ltd.*, 248 A.3d at 919 (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010).

The Delaware Supreme Court found this was a legitimate exercise of a contractual right. Here, Defendants did not simply execute a normal business transaction. The trial record, most notably the spreadsheet prepared by DePerio, demonstrated a calculated, bad-faith scheme to transfer just enough shares to manufacture a voting majority against Salerno.  Delaware courts consistently hold that a party breaches the implied covenant when it exploits a contractual gap to engage in deceptive or bad-faith maneuvers that the parties clearly would have prohibited had they anticipated them. Had the parties considered whether Hall could transfer his shares to his own controlled entity simply to evade the voting requirement of the Side Letter, they unequivocally would have forbidden it.

D.  <u>The Jury Properly Found Bad Faith</u>

Defendants' quotation of *OptimisCorp v. Waite*, 2015 WL 5147038 (Del. Ch. Aug. 26, 2015) that the covenant is not a "free-floating duty" actually supports Plaintiff. The duty here was directly attached to the underlying legal document: the Side Letter. The Side Letter contained an express promise by the Founders to vote their shares for Salerno. By transferring those shares to an entity they controlled to bypass that exact promise, defendants destroyed the core benefit of the Side Letter.

The jury heard defendants' arguments that they were merely exercising their

unrestricted right to sell shares. The jury rejected that narrative, finding instead that the

transfer was an act of bad faith designed to disenfranchise Cypress. Defendants cannot

now use a motion for a new trial to ask this Court to retroactively bless their bad-faith

conduct as a matter of law.

E. There Was No "Infection" Because There Was No Error in the Damages Award

Defendants' argument rests entirely on a house of cards: the false assumption that

the jury based its damages award on a precluded "tag-along" theory. As demonstrated

supra, the jury did not award tag-along damages. They utilized the financial data from the

GlassBridge transaction to formulate a "contemporaneous valuation data point" exactly as

this Court explicitly permitted.

Because the jury faithfully followed the Court's instructions and grounded their

mathematical calculation in the permitted evidentiary record, there is no "error" to infect

the liability finding. Defendants' reliance on *Ajax Hardware Mfg. Corp.* and *Peterson* is

therefore deeply misplaced. *Ajax Hardware Mfg. Corp. v. Industrial Plants Corp*. 569 F.2d

181 (2d Cir. 1977); *Peterson v. County of Nassau*, 995 F. Supp. 305 (E.D.N.Y. 998).Those

cases involve verdicts completely untethered from the record, legally incomprehensible

outcomes, or obvious "compromise" verdicts. Here, the jury found a clear breach based on

overwhelming documentary evidence and calculated damages based on the actual money

Hall received in the very transaction that effectuated the breach. There is no confusion,

only a verdict defendants dislike.

VII.    THE JURY'S DAMAGE AWARD ON THE FIDUCIARY DUTY
        COUNTERCLAIM IS RATIONALLY GROUNDED IN THE RECORD
        AND MUST NOT BE DISTURBED

Defendants argue that the jury's award of $99,750 on Sport-BLX's breach of

25

fiduciary duty counterclaim is "insufficient" because it does not match their expert's $29 million projection or their alternative $5.5 million out-of-pocket calculation. Therefore, they claim, the award lacks a "stable foundation" and requires a new trial. This argument fundamentally misunderstands the jury's role in assessing proximate cause and weighing the credibility of expert testimony.

A.  The Jury Was Entitled to Reject Defendants' Extravagant Damage Theories

It is a bedrock principle of federal jurisprudence that a jury is not bound to accept the damage calculations of any party or expert. The jury was entirely within its rights to reject Gene Phillips's $29 million "lost potential" valuation as wildly speculative. The trial record established that Sport-BLX might never have obtained a broker-dealer license, and even when Hall started a new company in 2020 specifically to obtain one, he had still failed to do so by the time of trial [Tr. 313:8-22]. The jury reasonably refused to award $29 million in lost profits for a highly speculative, unrealized business venture.

Similarly, the jury was under no obligation to award the full $5.5 million in "expenditures." The jury is tasked with determining not just the amount of the loss, but whether Cypress/Salerno proximately caused that entire loss.

B.  The Record Supports a Significant Discount Based on Alternative Causes

The $99,750 award is not arbitrary; it represents a rational determination by the jury that while Salerno may have breached a duty by delaying the provision of FINRA information, he was not the proximate cause of the company's total failure to obtain the license or its alleged $5.5 million in wasted expenses.

The trial record was replete with evidence demonstrating that Sport-BLX's FINRA application was doomed by the defendants' own sheer incompetence:

26

Sport-BLX had over fifty (50) other outstanding FINRA deficiencies completely unrelated to Cypress [Ex. UU; Tr. 300-305].

Key officers, including Hall and DePerio, lacked the required financial licenses [Tr. 301:18-302:12].

The company failed to conduct basic OFAC due diligence [Tr. 306:24-307:22].

The company did not have the required office lease and was evicted from its shared space in December 2019 [Tr. 302:13-305:6].

Faced with this "mountain" of alternative causes, the jury logically concluded that Salerno's delay did not cause the $5.5 million collapse of the broker-dealer initiative. Instead, the jury reasonably approximated the actual, limited harm caused by the delay— such as specific administrative costs, wasted legal fees during that window, or fractional delays—and arrived at $99,750. In the Second Circuit, a jury's damage award will be upheld if it falls within the "range of permissibility" established by the evidence. The jury is permitted to discount a plaintiff's damages demand based on comparative fault and intervening causes.

C.  The Verdict Was Nuanced, Not "Infected"

Defendants baselessly speculate that the $99,750 award was "influenced by Cypress' argument that Hall had profited by his self-dealing." To the contrary, the fact that the jury found liability against Cypress on this counterclaim, but severely discounted the damages, proves that the jury was careful, attentive, and able to parse the distinct claims.

The jury punished Cypress for the technical breach of delaying the FINRA information, but refused to grant Defendants an unearned multi-million-dollar windfall for a business failure that was primarily of their own making. Because the award reflects a

27

rational apportionment of proximate cause grounded firmly in the trial testimony, there is

no "manifest injustice," and the motion for a new damages trial must be denied.

## CONCLUSION

For the reasons set forth herein, defendants' motion should be denied in its entirety.


Dated:  New York, New York
        April 3, 2026

 /s/ Alexander M. Dudelson
ALEXANDER M. DUDELSON, ESQ. (AD4809)
Attorney for Plaintiff
26 Court Street – Suite 2306
Brooklyn, New York 11242
(718) 855-5100

28